**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, | : : : No. 1:22-cv-07464-RMB-EAP : : : : : : |
| Plaintiffs, | : : |
| v. | : : |
| WILLIAM REYNOLDS in his official capacity as the Prosecutor of Atlantic County, New Jersey; GRACE C. MACAULAY in her official capacity as the Prosecutor of Camden County, New Jersey; ANNEMARIE TAGGART in her official capacity as the Prosecutor of Sussex County, New Jersey; MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, | : : : : : : : : : : : : : |
| Defendants. | : : |

**PLAINTIFFS' BRIEF IN SUPPORT OF A TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

David D. Jensen, Esq.
DAVID JENSEN PLLC
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
david@djensenpllc.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. *ii*

INTRODUCTION ............................................................................ 1

PERTINENT FACTS, STATUTES & REGULATIONS ........................... 2

A. Until Yesterday, a Person with a New Jersey Permit to Carry Could Lawfully Carry a Handgun Throughout Most of the State ................. 2

B. The State has Eliminated "Justifiable Need"—But has Enacted Sweeping Preclusions on the Ability to Carry Handguns in Public .................... 4

C. The Injury to the Plaintiffs ......................................................... 9

ARGUMENT ................................................................................ 15

I) The Plaintiffs are Likely to Succeed on the Merits ..................... 16

   a. The Second Amendment's plain text protects Plaintiffs' proposed course of conduct ............................................................. 17

   b. The challenged provisions are not consistent with the historical tradition of firearms regulation in the United States .............. 18

      i. The relevant time period for historical analysis is the Founding ........ 19

      ii. The State's "sensitive place" bans on Libraries & Museums, Bars and Restaurants and Entertainment Facilities .......................... 20

      iii. The "sensitive place" presumption against carry on private property .................................................................... 26

      iv. The State's ban on carrying in vehicles ............................. 30

II) An Injunction is Needed to Prevent Irreparable Injury ................ 32

III) An Injunction Will Not Harm Other Interested Persons .............. 33

IV) The Protection of Constitutional Rights is in the Public Interest ...... 35

CONCLUSION ............................................................................ 36

# TABLE OF AUTHORITIES

## Cases

*American Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003),
  *aff'd*, 542 U.S. 656 (2004) ..................................................................35

*Antonyuk v. Hochul*, No. 1:22-CV-0986, 2022 WL 16744700
  (N.D.N.Y. Nov. 7, 2022) .................................................22, 26, 31

*Brown v. Ent. Merch. Ass'n*, 564 U.S. 786 (2011)..................................29

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ....................................31

*Christian v. Nigrelli*, No. 22-CV-692, 2022 WL 17100631
  (W.D.N.Y. Nov. 22, 2022) .................................................26, 27

*Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.*,
  501 F.2d 917 (3d Cir. 1974) .............................................................15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............17, 19, 27

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................................................32

*Enterprises, Inc. v. City of Asbury Park*, 197 F. Supp. 2d 141 (D.N.J. 2002) ........35

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)...................32, 34

*Forchion v. Intensive Supervised Parole*, 240 F. Supp. 2d 302 (D.N.J. 2003).......35

*Gamble v. United States*, 587 U.S. ___, 139 S. Ct. 1960 (2019)...........................20

*GJJM Enterprises, LLC v. City of A. City,* 293 F. Supp. 3d 509 (D.N.J. 2017)......32

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016) ....................32

*Hardaway v. Nigrelli*, No. 22-CV-771, 2022 WL 16646220
  (W.D.N.Y. Nov. 3, 2022) .................................................................24

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. ___, 142 S. Ct. 2407, 2421 (2022).....28

*Klenosky v. N.Y. City Police Dep't*, 75 App. Div. 2d 793,
  428 N.Y.S.2d 256 (2d Dep't 1980) ......................................................4

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961)...........................................16

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ...............................................20

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)......................................19, 34

*Minnesota Voters All. v. Mansky*, 585 U.S. ___, 138 S. Ct. 1876 (2018)..............29

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).................................................17

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___,
   142 S. Ct. 2111 (2022).................................................................*passim*

*Norwood v. Harrison*, 413 U.S. 455 (1973) .........................................................28

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017)....................................15

*Stilp v. Contino*, 613 F.3d 405 (3d Cir. 2010).........................................................32

*Virginia v. Moore*, 553 U.S. 164 (2008)................................................................20

## Statutes

1 LAWS OF THE STATE OF NEW JERSEY (Bloomfield ed., 1811)..............................24

1 LAWS OF THE STATE OF NEW YORK (2nd ed., Albany: Websters and
   Skinner 1807)....................................................................................24

18 U.S.C. § 930 ....................................................................................... 3

2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams, eds., 1797) ....24

2022 N.J. Laws c. 131.................................................................*passim*

2022 N.Y. Laws c. 371 ...............................................................................35

5 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF
   VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE at 19 (William
   Waller Hening ed., 1809)..................................................................25

N.J.S.A. § 2C:39-5.................................................................................2, 3

N.J.S.A. § 2C:39-6.............................................................................2, 3, 8

N.J.S.A. § 2C:43-6................................................................................ 8

N.J.S.A. § 2C:44-1............................................................................3, 8

N.J.S.A. § 2C:58-4........................................................................1, 3, 4, 5

N.Y. Penal L. § 265.01-D ............................................................................35

N.Y. Penal L. § 265.01-E.............................................................................35

PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, 378 (WM. Stanley
   Ray ed., 1904)....................................................................................24

## Other Authorities

*"At the Instance of Benjamin Franklin": A Brief History of the Library Company
   of Philadelphia* 5 (2015) ...................................................................21

19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES, COLONIAL AND REVOLUTIONARY, 1768–1773 ...................................................25

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws (Robert Watkins ed., 1800)...................................................................................24

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA (Augustine Davis ed., 1796) ...........................................................................24

Christine Sismondo, *America Walks Into a Bar: A Spirited History of Taverns, Saloons, Speakeasies and Grog Shops* (2011)....................................................23

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205 (2018) ...................................................................................................24

Dept. of Interior, Compendium of Seventh Census: 1850 (1854).........................22

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868 (working draft)* (Oct. 1, 2022) ...................19

N.J. Attorney General Law Enforcement Directive No. 2022-07 (Jun. 24, 2022)..................................................................................................... 5

Omri Ben-Shahar & John A.E. Pottow, *On the Stickiness of Default Rules*, 33 FLA. ST. L. REV. 651 (2006).............................................................................28

P. Holland and M. Patterson, *Eighteenth Century Theatre* in THE OXFORD ILLUSTRATED HISTORY OF THEATRE (2001)........................................................22

Resolution of October 20, 1774, *1 Journal of Continental Congress 1774–1789* (1904) .........................................................................................23

*The Autobiography of Benjamin Franklin* (Bigelow, ed., 1868)...........................22

THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA (Grimke, ed. 1790)...........23

VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND: NOVEMBER SESSION 1791 (Frederick Green ed., 1795).................24

Walter Perez, *Disturbing rise in carjackings in some suburban communities*, WPVI (Jan. 24, 2022), ....................................................................................30

**Regulations**

N.J.A.C. § 7:2-2.17 ..................................................................................... 3

N.J.A.C. § 13:54-2.4 ...............................................................................3, 5

N.J.A.C. § 13:69D-1.13 ............................................................................... 3

## **Constitutional Provisions**

U.S. Const. amend. II ........................................................................16

## **INTRODUCTION**

This summer, the United States Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___, 142 S. Ct. 2111 (2022), where it "h[e]ld . . . that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home" and overturned a New York law that conditioned licenses to carry handguns on a finding of "proper cause," *see id.* at 2112. The Court recognized that its decision would invalidate analogous provisions in several States, including the "justifiable need" standard in New Jersey. *See id.* at *2124 & n.2 (citing N.J.S.A. § 2C:58-4. At first, the State of New Jersey complied with the Court's directive—by issuing permits to carry handguns, but without requiring individuals to show "justifiable need." However, in Chapter 131 of the 2022 Laws of New Jersey, enacted yesterday, the New Jersey legislature has now declared open war on both the Second Amendment and the Supreme Court's ruling. While superficially removing the requirement of "justifiable need," the legislature has declared most of the State to be off limits to carry through the artifice of "sensitive places," as well as by means of a broad ban on carrying functional guns in vehicles.

Moreover, the legislature has imposed these "sensitive place" and vehicle-carry restrictions effective immediately. Neither the Plaintiffs nor anyone else had the ability to challenge these restrictions—plainly unconstitutional—before they

came into effect less than 48 hours before the start of Christmas weekend. As such, the Plaintiffs here seek a temporary restraining order and preliminary injunction against enforcement of the "sensitive place" and vehicle-carry restrictions challenged here.

## PERTINENT FACTS, STATUTES & REGULATIONS

### A.   Until Yesterday, a Person with a New Jersey Permit to Carry Could Lawfully Carry a Handgun Throughout Most of the State

For many years, it has been a serious crime to "possess[]" a handgun unless a person either: (1) holds a New Jersey permit to carry a handgun; or (2) is a person (such as a police officer) who is exempt from the requirement to do so. *See* N.J.S.A. §§ 2C:39-5(b)(1), 2C:39-6(a)-(c), (*l*). A person who does not have a permit and is not exempt can only possess a handgun within narrow parameters— notably, while at their own home or place of business or on their own land, or while target showing or hunting, or while at a firearms exhibition. *See id.* § 2C:39-6(e)-(f). The person can transport a handgun between these locations only if it is "unloaded and contained in a closed and fastened case, gunbox, securely tied package, or locked in the trunk of the automobile in which it is being transported, and . . . the course of travel . . . include[s] only deviations as are reasonably necessary under the circumstances." *See id.* § 2C:39-6(g). A person who runs afoul of these restrictions commits a crime of the second degree, for which the

presumptive sentence is imprisonment for seven years. *See id.* §§ 2C:39-5(b)(1), 2C:44-1(f)(1)(c).

However, until yesterday, New Jersey law allowed a person with a permit to carry to carry a handgun on their person throughout most of the State. By statute, the person could not possess a gun "in or upon any part of the buildings or grounds of any school, college, university or other educational institution, without the written authorization of the governing officer of the institution," and there were regulations that restricted guns from state parks and casino rooms. *See id.* § 2C:39-5(e)(1); N.J.A.C. §§ 7:2-2.17(b), 13:69D-1.13(a). In addition, federal laws prohibited the person from having a gun in certain locations, including (most notably) any "federal facility," which is "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." *See* 18 U.S.C. § 930(a), (e)(1), (g)(1). But beyond this, a person with a permit was generally free to carry a handgun as they went about their business.

In order to obtain a permit to carry, a person needed (and needs) to meet various requirements related to their age, background, training and qualification. *See* N.J.S.A. § 2C:58-4(c). Notably, the person needed meet the same Police Training Commission training requirements that apply to exempt persons such as police officers. *See* N.J.A.C. § 13:54-2.4(b)(1); *see also* N.J.S.A. § 2C:39-6(j).

Until yesterday, the statute also required an applicant to show "justifiable need," which it defined as "urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun." N.J.S.A. § 2C:58-4(c).

### B. The State has Eliminated "Justifiable Need"—But has Enacted Sweeping Preclusions on the Ability to Carry Handguns in Public

On June 23, 2022, the Supreme Court decided *Bruen*, where it explicitly "h[e]ld . . . that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home," *Bruen*, 142 S. Ct. at 2122. The issue in that case was a New York law that required people to show "proper cause" in order to obtain unrestricted licenses to carry handguns. *See id.* at 2122-23. "Proper cause" was "a special need for self-protection distinguishable from that of the general community." *Id.* at 2123 (quoting *Klenosky v. N.Y. City Police Dep't*, 75 App. Div. 2d 793, 428 N.Y.S.2d 256, 257 (2d Dep't 1980)). "If an applicant cannot make that showing, he can receive only a 'restricted' license for public carry, which allows him to carry a firearm for a limited purpose, such as hunting, target shooting, or employment." *Id.* (citations omitted). As discussed at further length *infra*, the Court found this "proper cause" requirement unconstitutional. *See id.* at 2138.

The following day, the New Jersey Attorney General issued a directive advising that the *Bruen* decision "prevents us from continuing to require a demonstration of justifiable need in order to carry a firearm." *See* N.J. Attorney General Law Enforcement Directive No. 2022-07 p. 2 (Jun. 24, 2022), *available at* https://www.nj.gov/oag/dcj/agguide/directives/ag-Directive-2022-07_Directive-Clarifying-Requirements-For-Carrying-Of-Firearms-In-Public.pdf (last visited Dec. 23, 2022). The directive instructed officials throughout New Jersey to "continue to ensure that the applicant satisfies all of the criteria . . . , except that the applicant need not submit a written certification of justifiable need to carry a handgun." *Id.* at p. 3 (citing N.J.S.A. § 2C:58-4(d); N.J.A.C. § 13:54-2.4). Two of the three individual Plaintiffs in this case obtained permits to carry following the issuance of this directive. *See* Dec. of R. Koons ¶¶ 6-8; Dec. of N. Gaudio ¶¶ 5-6.

The Assembly passed the legislation at issue here on November 21, 2022, and the Senate passed the bill on December 19, 2022. Three days later, on December 22, 2022, Governor Phil Murphy approved the legislation. The stated legislative justification was that under "*Bruen*, laws requiring showings of particularized need are no longer legally viable to determine whether a person may carry a handgun in public." 2022 N.J. Laws c. 131, § 1(b). While the "justifiable need" standard had "minimized the serious dangers of misuse and accidental use inherent in the carrying of handguns in a public place," and new "sensitive place"

restrictions were now necessary because "a much greater number of individuals will now qualify to carry handguns in public." *Id.* § 1(e).

Chapter 131 specifies 25 categories of places where it is a crime of the second degree "to knowingly carry a firearm." *See id.* § 7(a). The areas are:

(1) a place owned, leased, or under the control of State, county or municipal government used for the purpose of government administration, including but not limited to police stations;

(2) a courthouse, courtroom, or any other premises used to conduct judicial or court administrative proceedings or functions;

(3) a State, county, or municipal correctional or juvenile justice facility, jail and any other place maintained by or for a governmental entity for the detention of criminal suspects or offenders;

(4) a State-contracted half-way house;

(5) a location being used as a polling place during the conduct of an election and places used for the storage or tabulation of ballots;

(6) within 100 feet of a place where a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event;

(7) a school, college, university or other educational institution, and on any school bus;

(8) a child care facility, including a day care center;

(9) a nursery school, pre-school, zoo, or summer camp;

(10) a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations of public safety;

(11) youth sports events, as defined in N.J.S.5:17-1, during and immediately preceding and following the conduct of the event, except that this provision shall not apply to participants of a youth sports event which is a firearm shooting competition to which paragraph (3) of subsection b. of section 14 of P.L.1979, c.179 (C.2C:58-6.1) applies;

(12) a publicly owned or leased library or museum;

(13) a shelter for the homeless, emergency shelter for the homeless, basic center shelter program, shelter for homeless or runaway youth, children's shelter, child care shelter, shelter for victims of domestic violence,

or any shelter licensed by or under the control of the Juvenile Justice Commission or the Department of Children and Families;

(14) a community residence for persons with developmental disabilities, head injuries, or terminal illnesses, or any other residential setting licensed by the Department of Human Services or Department of Health;

(15) a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises;

(16) a Class 5 Cannabis retailer or medical cannabis dispensary, including any consumption areas licensed or permitted by the Cannabis Regulatory Commission established pursuant to section 31 of P.L.2019, c.153 (C.24:6I-24);

(17) a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held;

(18) a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located within the casino property;

(19) a plant or operation that produces, converts, distributes or stores energy or converts one form of energy to another;

(20) an airport or public transportation hub;

(21) a health care facility, including but not limited to a general hospital, special hospital, psychiatric hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, residential health care facility, medical office, or ambulatory care facility;

(22) a facility licensed or regulated by the Department of Human Services, Department of Children and Families, or Department of Health, other than a health care facility, that provides addiction or mental health treatment or support services;

(23) a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose;

(24) private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign

indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6; and

(25) any other place in which the carrying of a firearm is prohibited by statute or rule or regulation promulgated by a federal or State agency.

2022 N.J. Laws c. 131, § 7(a). The punishment for a crime of the third degree is imprisonment for up to five years, and the presumptive sentence is four years' imprisonment. *See* N.J.S.A. §§ 2C:43-6(a)(3), 2C:44-1(f)(1)(d).

In addition, Chapter 131 also prohibits individuals with permits to carry from carrying functional handguns in their vehicles. Under section 7(b) of the act, it is a crime of the fourth degree "to carry or transport a firearm . . . while in a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." 2022 N.J. Laws c. 131, § 7(b)(1). The maximum sentence for this crime is 18 months' imprisonment, and the presumptive sentence is imprisonment for nine months. *See* N.J.S.A. §§ 2C:43-6(a)(4), 2C:44-1(f)(1)(e). The essential result of this is that a person who has obtained a "permit to carry" must now transport a handgun in a vehicle under the same circumstances as someone who does not have one at all—unloaded and contained in a case or the trunk. *See id.* § 2C:39-6(g).

Both sets of prohibitions—those on carrying guns in "sensitive places," and those on carrying guns in vehicles—do not apply to persons (such as law enforcement officers) who have statutory exemptions from the requirement of

-8-

obtaining a permit. *See* 2022 N.J. Laws, c. 131, § 7(a)-(b). In addition, the legislature also authorized armored car employees to "carry[] a firearm, openly, in the regular course of employment," notwithstanding these prohibitions. *See id.* § 7(f). Finally, the legislature exempted those "lawfully authorized to provide security at a [sensitive] place . . . , provided that the authorization is set forth in writing, and only to the extent permitted by the entity responsible for security at the place in question." *See id.* § 7(e)(1).

None of these exemptions benefit an ordinary private citizen who has obtained a permit to carry. Rather, the only exemption the legislature gave to a licensed private citizen is authorization to store a handgun "within a locked box and out of plain view within [a] vehicle" while in the parking lot of a "sensitive place." *See* 2022 N.J. Laws c. 131, § 7(c)(2). The person can "transport a concealed handgun in the immediate area surrounding their vehicle . . . only for the limited purpose of storing or retrieving the handgun," and they can also "immediately leave[]" the parking lot with the handgun, provided they do not "enter into or on the grounds of the prohibited place with" it. *See id.* § 7(c)(3)-(4).

## C.    The Injury to the Plaintiffs

Plaintiffs challenge four of the enumerated "sensitive places," as well as the prohibition on carrying functional handguns while in vehicles. *See* Complaint (Doc. No. 1) ¶¶ 39-41. The four challenged sensitive places are: (1) subpart 12,

which prohibits guns from "a publicly owned or leased library or museum" (hereinafter "Libraries & Museums"); (2) subpart 15, which prohibits guns from "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises" (hereinafter "Bars & Restaurants"); (3) subpart 17, which prohibits guns from "a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held" (hereinafter "Entertainment Facilities"); and (4) subpart 24, which prohibits guns from "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4" (hereinafter "Private Property").

In confining the present challenge to these four categories, as well as the prohibition on carrying guns while in vehicles, Plaintiffs do not intend to signal that other purported "sensitive place" designations are constitutional. To the contrary, a number of the other designations are almost certainly impermissible. Rather, Plaintiffs' view is that the four challenged "sensitive places," and the prohibition on carry while in a vehicle, all satisfy three essential criteria.

Specifically, these restrictions: (1) are plainly unconstitutional; (2) do not depend on other legislative acts, such as the enactment of a local ordinance or a state regulation; and (3) substantially interfere with a law abiding citizen's ability to carry a handgun for the purpose of protection. As such, these restrictions demand the issuance of both a temporary restraining order and a preliminary injunction, and they are particularly appropriate for inclusion in the case at bar.

Each of the individual Plaintiffs in this case—Ronald Koons, Nicholas Gaudio and Jeffrey Muller—testify that these restrictions largely prevent them from carrying handguns for the purpose of protecting themselves. *See* Dec. of R. Koons ¶ 12; Dec. of N. Gaudio ¶ 15; Dec. of J. Muller ¶ 18. All three individuals testify that, prior to Chapter 131's enactment, they would have been likely to leave their gun at home if they intended to go to a location that prohibited firearms. *See* Dec. of R. Koons ¶ 10; Dec. of N. Gaudio ¶¶ 9-10; Dec. of J. Muller ¶ 14. Particularly notable is the testimony of Plaintiff Jeff Muller, who is one of the (very few) New Jersey citizens who obtained a permit to carry prior to *Bruen*, in 2011. *See* Dec. of J. Muller ¶ 6. His view, after carrying a gun in New Jersey for more than a decade, is that while "[i]t is possible to securely store a handgun in a vehicle, . . . it is also a hassle, making it easier to leave the gun home most of the time" if he is traveling to a prohibited location. *See id.* at ¶ 14. He testifies that "[i]ronically, the result of the Supreme Court's decision protecting the right to bear

-11-

arms is that I have largely lost the ability to bear arms that I have had since 2011." *Id.* at ¶ 18.

While a person with a permit still has the theoretical legal ability to carry a handgun when they are outside of both "sensitive places" and vehicles, these restrictions render the right largely illusory. To carry a handgun under these circumstances, a person must navigate a veritable minefield of "sensitive places," each of which requires one to unload their gun and store it somewhere else, on pain of a conviction for a serious felony. As Plaintiff Ronald Koons testifies, "[t]he 'sensitive places' are so extensive, and the penalties are so great for violating them, that it seems like too much of a risk to take. Indeed, I did not carry a gun before I had a permit to carry because the penalties for doing so were too great." Dec. of R. Koons ¶ 12. Mr. Koons, who is a pastor at a church in Egg Harbor Township, testifies that before he obtained his permit to carry, he would only carry his gun while at the church, and he would transport it between his home and the church unloaded and enclosed in a case. *See id.* at ¶ 5. Now that Chapter 131 is in effect, Mr. Koons has "stopped carrying a gun during the normal course of [his] life." *Id.* at ¶ 12. Rather, he "intend[s] to go back to [his] old practice of transporting an unloaded and cased gun between [his] home and the church, and then carrying the gun only while [he is] there." *Id.* Put simply, Chapter 131 has largely negated the practical value of Mr. Koon's purported "permit to carry a handgun."

-12-

Each of the Plaintiffs testifies that, as a practical matter, the only public place they can now carry a handgun is while walking on a street or sidewalk. *See* Dec. of R. Koons ¶ 12; Dec. of N. Gaudio ¶ 13; Dec. of J. Muller ¶ 16. While it remains possible to carry in a couple other locations—notably, private property where the owner has consented, and public parks not declared to be "gun free zones"—"the remainder of places are so extensive that [Plaintiffs] cannot afford to take the risk of being caught in a prohibited sensitive place." Dec. of R. Koons ¶ 12; *see also* Dec. of N. Gaudio ¶ 13; Dec. of J. Muller ¶¶ 15-16. There is "little margin of buffer between" being "in harm's way," where a gun might be needed, "or in a legally punishable situation," where one is subject to arrest and prosecution for the "sensitive place" restrictions. *See* Dec. of R. Koons ¶ 13.

Moreover, the prohibition on carrying a functional gun in a vehicle also renders the right to "bear" arms largely illusory. First, the requirement to carry guns both unloaded and encased means that a person would likely not be able to use their gun to protect themselves, were someone to attack them while they were in their vehicle, as they would not have enough time to retrieve the gun from its case and load it. *See* Dec. of N. Gaudio ¶ 14; Dec. of J. Muller ¶ 13. (This is presumably a substantial part of the reason that the legislature exempted police officers and other law enforcement officials from this restriction. *See* 2022 N.J. Laws c. 131, § 7(b)(1).) Second, and beyond that, the practice is unsafe. There is a

-13-

significant risk that, if a person saw one of the Plaintiffs loading or unloading a gun in a vehicle, the person might call the police or otherwise react adversely. *See* Dec. of N. Gaudio ¶¶ 10, 14; Dec. of J. Muller ¶ 13. "This could potentially result in a situation where I could get arrested or injured due to a misunderstood innocent and legal action." Dec. of N. Gaudio ¶ 14. Moreover, the need to repeatedly load and unload a gun makes carry in this manner impractical. *See* Dec. of N. Gaudio ¶ 16; Dec. of J. Muller ¶ 17.

However, all Plaintiffs also testify that they would resume carrying a handgun much more frequently if they did not face the restrictions challenged here. *See* Dec. of R. Koons ¶ 14; Dec. of N. Gaudio ¶ 17; Dec. of J. Muller ¶ 19. This means that, even though these new prohibitions are expansive and chilling, and even though Plaintiffs do not challenge many of them in the case at bar, redressability is present. That is, this Court's order enjoining Defendants from enforcing the challenged restrictions would not only make it possible to carry a gun in the specifically challenged areas, it would also make it much more practical for the Plaintiffs to resume exercising their right to arms in the normal course of their daily lives—which is at this point largely impractical.

## **ARGUMENT**

Equitable relief is necessary to prevent irreparable injury, and the Plaintiffs readily meet the standards for preliminary equitable relief. As the Court is aware, preliminary equitable relief requires a "threshold" showing that: (1) there is "'a reasonable probability of eventual success in the litigation'"; and (2) "'it will be irreparably injured . . . if relief is not granted.'" *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (*quoting Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)) (alteration in source). After this, a court balances these two factors along with, "when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* (*quoting Del. River Port Auth.*, 501 F.2d at 920).

The Plaintiffs plainly meet the two "threshold" considerations—"a reasonable probability of eventual success in the litigation," and the existence of irreparable injury "if relief is not granted." This is because bans on bearing arms in public are presumptively unconstitutional, and the "sensitive places" challenged here are not analogous to the exception that the Supreme Court has provided. Beyond that, there can be little doubt that the denial of a constitutional right to engage in conduct is irreparable *per se*. The other two factors—the possibility of harm to others, as well as the public interest, which (again) are only considered

"when they are relevant"—also weigh strongly in favor of equitable relief. Put simply, irreparable injury exists now, and it will continue to exist unless and until the Court grants relief.

## I) The Plaintiffs are Likely to Succeed on the Merits

The Plaintiffs are likely to succeed on the merits because the challenged restrictions substantially prevent them (and all others) from exercising their right to bear arms, and are plainly not analogous to the "sensitive place" restrictions that the Supreme Court has signaled are permissible.

The starting point is the text of the Second Amendment, which provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30. Once this prima facie textual showing has been made, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n. 10 (1961)).

### a. The Second Amendment's plain text protects Plaintiffs' proposed course of conduct

The textual inquiry is straightforward. The Supreme Court has already defined all of the key terms in *Heller* and *Bruen*. "The people" presumptively means "all Americans," "Arms" presumptively includes "all instruments that constitute bearable arms," and, most relevant here, to bear simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008). Unlike other Amendments, *see* U.S. CONST. amend. IV, "[n]othing in the Second Amendment's text draws a home/public distinction," *Bruen*, 142 S. Ct. at 2134—or for that matter, any locational distinction at all. Accordingly, the "definition of 'bear' naturally encompasses public carry" and "[t]o confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Id.* at 2134–35. Indeed, in *Bruen* the Court observed that "[m]any Americans hazard greater danger outside the home than in it." *Id.* at 2135 (citing *Moore v. Madigan*, 702 F.3d 933, 937 (7th Cir. 2012) ("[A] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower.")).

Plaintiffs are Americans who seek to carry bearable arms. As in *Bruen*, these undisputed facts end the textual inquiry. 142 S. Ct. at 2134 (noting this inquiry presented "little difficulty" and the government did "not dispute this"). Thus, as in

-17-

*Bruen*, the inquiry becomes historical, for which the State bears both the burden of persuasion and production.

### b. The challenged provisions are not consistent with the historical tradition of firearms regulation in the United States

States can exercise regulatory authority over the right to carry firearms in certain narrow circumstances. When doing so, the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Not just any evidence of historical firearm regulation will suffice; rather the evidence of historical regulation must demonstrate "relevantly similar" regulations to the modern regulation and that such historical regulations were "part of an *enduring* American tradition." *Id.* at 2132, 2155 (emphasis added). *Bruen* additionally makes clear that it is the government that bears the burden of both identifying this relevant historical evidence and then demonstrating that its evidence constitutes a historical tradition justifying its firearm regulations. *See id.* at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."); *id.* at 2135 (explaining "the burden falls on respondents"); *id.* at 2138 (holding that "respondents have failed to meet *their burden* to identify an American tradition" (emphasis added)); *id.* at 2151 (explaining that it is the government's "burden" to "sift the historical materials for evidence to sustain [its] statute"). Thus, it is Defendants who bear the burden of

production and persuasion.

>    **i.  The relevant time period for historical analysis is the Founding**

Because the scope of the Second Amendment was set in 1791, the Founding era is the key time period for determining any limits on the scope of the Second Amendment's protection. *See generally* Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868 (working draft)*, (Oct. 1, 2022), *available at* https://bit.ly/3CMSKjw. This conclusion follows ineluctably from two lines of Supreme Court precedent. The first mandates that the scope of the Second Amendment with respect to the Federal Government is based on the public understanding in 1791. *See, e.g., Heller*, 554 U.S. at 634–35. The second establishes that incorporated Bill of Rights provisions mean the same thing when applied to the States and the Federal Government. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 765–66 (2010). *Bruen* itself was another entry in a long line of these precedents because it too—notwithstanding dicta about an "ongoing scholarly debate"—treated evidence surrounding the Founding as generally dispositive of the contours of the incorporated Second Amendment. *See* 142 S. Ct. at 2137–38 (noting Reconstruction era evidence has only been used as "confirmation" of what "had already been established" by Founding era evidence); *see also Gamble v. United States*, 587 U.S. ___, 139 S. Ct.

1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance."). At most, the Supreme Court has looked to the Reconstruction Era to "confirm[] … what the Court thought had already been established" at the Founding. *Bruen*, 142 S. Ct. at 2137. This "post-ratification" history cannot be used to "overcome or alter" the original meaning of the text as understood at the Founding. *Id.* (internal quotation marks omitted). "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. And what's more, it is the Founding that is paramount.

### ii.  The State's "sensitive place" bans on Libraries & Museums, Bars and Restaurants and Entertainment Facilities

As relevant here, Chapter 131 bans the carrying of firearms by ordinary, law-abiding citizens in libraries, museums, bars or restaurants where alcohol is served, and entertainment facilities, such as theaters. The designation of these locations as firearm-free zones for ordinary, law-abiding citizens is not "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at

2126. Accordingly, Defendants cannot meet their burden to justify these regulations.

In attempting to "affirmatively prove" that its restrictions on public carry are consistent with the Nation's historical tradition, a government may refer to historical analogues, such as restrictions on carrying in "sensitive places" at the Founding. *See Bruen*, 142 S. Ct. at 2134. The Supreme Court has identified three such places: "legislative assemblies, polling places, and courthouses." *Id.* But "sensitive places" cannot be construed "too broadly," *i.e.*, beyond what the historical tradition at the Founding demonstrates, and these certainly do not authorize restrictions that "would in effect exempt cities" or entire States "from the Second Amendment." *Id.* Sensitive places may not be used to "eviscerate the general right to publicly carry arms for self-defense." *Id.* After all, governments may bar the carrying of firearms in only "exceptional circumstances." *Id.* at 2145. The exception cannot become the rule.

Looking to the Founding era, libraries, establishments serving alcohol, and entertainment facilities such as theaters all existed. Benjamin Franklin founded America's first lending library in Philadelphia in 1731. *"At the Instance of Benjamin Franklin": A Brief History of the Library Company of Philadelphia* 5 (2015), available at https://bit.ly/3vdBGQk. In the beginning, it was open on Saturday afternoons where members and nonmembers could borrow books. *Id.* at

13–14. By 1787, "it had become the public library of the University and City." *Id.*
at 25. Franklin's library would not be alone in the early Republic. By 1850, the
Census reported 1,217 public libraries in the United States. *See* Dept. of Interior,
Compendium of Seventh Census: 1850 at 159, Table CLXVII (1854), available at
https://bit.ly/3jp7GhR. In addition, "taverns, inns, public houses, 'tippling houses,'
'victualing houses,' or 'ordinaries'" existed during the Founding. *Antonyuk v.
Hochul*, No. 1:22-CV-0986, 2022 WL 16744700, *74 (N.D.N.Y. Nov. 7, 2022). In
fact, as a result of founding his library, Franklin engaged in "constant study"
avoiding the "amusement" that he would otherwise find "in taverns, games, or
frolics of any kind." *The Autobiography of Benjamin Franklin* 209 (Bigelow, ed.,
1868). Theaters too were a staple of life in the Founding era. The first theater
opened up in Williamsburg in 1716, followed soon by Philadelphia (1724),
Charleston (1736), and New York (in the 1730s); theater companies toured the
colonies "up and down the East coast" "establishing and converting theatres" in the
towns they visited. P. Holland and M. Patterson, *Eighteenth Century Theatre* 295
in THE OXFORD ILLUSTRATED HISTORY OF THEATRE (2001).

Despite the existence of these institutions where people gathered during the
Founding, the State will be unable to identify a historical tradition of banning
possession of firearms in these locations or otherwise creating them as firearm-free
zones during the Founding. And it is not as though the Founding generation would

-22-

have been unaware of regulating such institutions or activities. The First

Continental Congress even sought to boycott "all horse-racing, and all kinds of

gaming, cock-fighting, exhibitions of shews, plays, and other expensive diversions

and entertainments." *See* Resolution of October 20, 1774, § 8, *1 Journal of*

*Continental Congress 1774–1789* at 78 (1904). And "[i]n all states" during the

Founding era, "tavern legislation was involved and constantly changing." Christine

Sismondo, *America Walks Into a Bar: A Spirited History of Taverns, Saloons,*

*Speakeasies and Grog Shops* 15 (2011). Nevertheless, Defendants will search in

vain for a ban on possession of firearms in these places—the absence of which is

dispositive. "[W]hen a challenged regulation addresses a general societal problem

that has persisted since the 18th century, the lack of a distinctly similar historical

regulation addressing that problem is relevant evidence that the challenged

regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

Moreover, libraries, establishments serving alcohol, museums, and

entertainment facilities are materially different from the sensitive places already

identified by the Supreme Court. *Bruen* directed courts to consider "analogies to

those historical regulations to determine" whether "modern regulations prohibiting

the carry of firearms in new and analogous sensitive places are constitutionally

permissible." *Id*. at 2133. What is relevant about those places is the long tradition

of the government providing comprehensive security, *see e.g.* THE PUBLIC LAWS

OF THE STATE OF SOUTH CAROLINA 271 (Grimke, ed. 1790) ("The said sheriffs

shall by themselves, or their lawful deputies respectively, attend all the courts

hereby appointed, or directed to be held, within their respective districts."),[1] and

the fact each place historically "concentrate[s] adversarial conflict" as part of

democratic governance or reflects locations where government officials are "at

acute personal risk of being targets of assassination," David B. Kopel & Joseph

G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to

Bear Arms*, 13 CHARLESTON L. REV. 205, 290 (2018); *see also Hardaway v.

Nigrelli*, No. 22-CV-771, 2022 WL 16646220, *14 (W.D.N.Y. Nov. 3, 2022). As a

general matter, none of those features will be found at libraries, establishments

---

[1] Other examples of Founding Era regulations in these places: VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND: NOVEMBER SESSION 1791, at *2 (Frederick Green ed., 1795) (appointing sergeant at arms and door-keeper for state legislature); PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, 378 (WM. Stanley Ray ed., 1904) ("sergeant-at-arms" and "door-keeper" for legislature); 1 LAWS OF THE STATE OF NEW YORK 176 (2nd ed., Albany: Websters and Skinner 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons... . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42 (Augustine Davis ed., 1796) (court's "serjeant at arms); A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611 (Robert Watkins ed., 1800) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); 1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811) (polling places); 2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams, eds., 1797) (polling places).

serving alcohol, museums, or entertainment facilities. In the words of *Bruen*, recognized sensitive places restrictions are not "relevantly similar" to New Jersey's modern bans on possession by ordinary, law-abiding Americans in these places.

Moreover, other regulations at the Founding Era demonstrate a principle that when assemblies of people could be vulnerable to violence, the government imposed an obligation to carry. For instance, Founding Era governments imposed an obligation to carry in churches during times of worship. *See, e.g.*, 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES, COLONIAL AND REVOLUTIONARY, 1768–1773, at 137-140 (1770 Georgia statute mandating that all those "liable to bear arms in the militia" and "resorting, on any Sunday or other times, to any church, or other place of divine worship . . . shall carry with him a gun . . . and shall take the said gun or pistols with him to the pew or seat . . . ."); 5 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE at 19 (William Waller Hening ed., 1810) (1738 Virginia statute providing that "it shall and may be lawful, for the chief officer of the militia, in every county, to order all persons listed therein, to go armed to their respective parish churches"). The Founding Era's response to vulnerable assemblies was to arm the law-abiding, not disarm them.

### iii. The "sensitive place" presumption against carry on private property

Chapter 131 generally bans law-abiding citizens from carrying firearms on all private property in the state except when the owner has previously "provided express consent or has posted a sign indicating that it is permissible to carry on the premises." This provision establishes an "anti-carry" presumption throughout the State and is unconstitutional in that it establishes a default ban on the carry of firearms for self-defense in areas that members of the public normally access.

As *Bruen* instructed, the Court must look to history. But as two courts that have already evaluated New York's similar anti-carry presumption have held, New Jersey's presumption cannot be justified by history. *See Christian v. Nigrelli*, No. 22-CV-692, 2022 WL 17100631, *10 (W.D.N.Y. Nov. 22, 2022); *Antonyuk*, 2022 WL 16744700, at *81. As the Court in *Christian* explained,

> the vast majority of land in New York is held privately, and it encompasses homes, farms, businesses, factories, vacant land, hotels, parking lots and garages, grocery stores, pharmacies, medical offices, hospitals, cemeteries, malls, sports and entertainment venues, and so on. These are places that people, exercising their rights, frequent every day when they move around outside their homes. The exclusion here makes all of these places presumptively off limits, backed up by the threat of prison. The Nation's historical traditions have not countenanced such an incursion into the right to keep and bear arms across all varieties of private property spread across the land.

*Christian*, 2022 WL 17100631 at *9.

Moreover, New Jersey's end-run around the Constitution cannot be countenanced as simply a choice between "one of two default rules" for private property owners. *Id*. The Second Amendment "is the very product of an interest balancing by the people" and it "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Because of "this balance—struck by the traditions of the American people," *id*.,—"certain policy choices" have been definitively taken "off the table," *Heller*, 554 U.S. at 636. Among these policy choices is establishing a presumption against carrying on private property because the Second Amendment itself establishes a presumption that Plaintiffs and other licensed, law-abiding citizens have a "right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135; *Christian*, 2022 WL 17100631 at *9 (explaining that "the scope of the *right codified in the Second Amendment* demonstrates that this society—*this nation*—has historically had" a default rule that "generally permitted" "carrying on private property . . . absent the owner's prohibition"). New Jersey cannot flip a presumption codified in the Constitution itself. But that is exactly what the State has attempted to do by dictating that all private property is now presumptively off-limits without express consent or conspicuous signage.

Furthermore, it is no argument that individual property owners maintain

some agency with respect to a default rule like New Jersey's. By its very nature, the establishment of a "default rule" of interaction with strangers, *i.e.*, members of the public coming to a property open to the public, is particularly "sticky." *See generally* Omri Ben-Shahar & John A.E. Pottow, *On the Stickiness of Default Rules*, 33 FLA. ST. L. REV. 651 (2006), available at https://bit.ly/3pWXM6Y (last visited Sept. 26, 2022). By "sticky," legal scholars mean that individuals have a well-known tendency to stick by the default rule even when they would otherwise take a different position. *Id.* at 651–54. The State established this default rule to create a widespread ban on carrying "outside the home," in contravention of *Bruen*, because many property owners sill simply stick with the default, rather than changing the status quo that the State has struck. 142 S. Ct. at 2122.

The Second Amendment cannot be so easily manipulated. *Cf. Norwood v. Harrison*, 413 U.S. 455, 465 (1973) ("[I]t is also axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish."). Consider other unconstitutional presumptions that a State would be barred from establishing. The State could not establish a default rule that praying before a meal is unlawful unless a restauranteur expressly consents. *Cf. Kennedy v. Bremerton Sch. Dist.*, 597 U.S. ___, 142 S. Ct. 2407, 2421 (2022) ("The [Free Exercise] Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important

work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." (internal quotation marks omitted)). The State could not establish a default rule that an individual cannot wear a political t-shirt in an office park unless a leasing agent expressly consents. *Cf. Minnesota Voters All. v. Mansky*, 585 U.S. ___, 138 S. Ct. 1876, 1885 (2018) ("Minnesota's ban on wearing any 'political badge, political button, or other political insignia' plainly restricts a form of expression within the protection of the First Amendment."). As in those situations, the Bill of Rights poses no obstacle to a property owner independently banning praying or banning political t-shirts (even if other laws might), just as a property owner may be able to independently decide to bar invitees from carrying firearms. But, as in all those situations, the State may not presume to make the property owner's decision for them and place a thumb on the scale against the exercise of constitutional rights.

The key distinction here is that between the rights of a property owner and the rights of the government. Property owners generally have a right to determine whether someone may or may not carry firearms on their property. But honoring this right of property owners does not justify the government in establishing a default rule that all private property is off-limits for persons carrying firearms. That impermissibly puts a thumb on the scale against the exercise of a constitutional

-29-

right. *Cf. Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (reasoning that

although it "perhaps follows" from parents' authority over minor children "that the

state has the power to *enforce* parental prohibitions," "it does not follow that the

state has the power to prevent children from saying or hearing anything *without*

*their parents' prior consent*").

Far from honoring the Second Amendment as the Supreme Court instructed

in *Bruen*, the State's new default rule broadly sweeps away the Second

Amendment rights of New Jersey citizens and effectively shuts off most public

areas from carrying for self-defense.

### iv.  The State's ban on carrying in vehicles

Chapter 131's ban on carrying firearms in vehicles—at least by ordinary,

law-abiding citizens—cannot be conceived as a "sensitive place" restriction of the

kind established at the Founding and recognized by the Supreme Court to be one of

the "exceptional circumstances" where States can prohibit carry. *See Bruen*, 142 S.

Ct. at 2156. Instead, the ban on carrying firearms while in a vehicle disables the

Plaintiffs, and all other similarly situated individuals, from carrying every time

they seek to drive anywhere in the state. *Cf. id.* at 2133 (explaining governments

cannot "expand[] the category of 'sensitive places'" and, in so doing, "eviscerate

the general right to publicly carry arms for self-defense"). This a particularly

pernicious prohibition as it renders law-abiding citizens defenseless in their

-30-

vehicles despite a "disturbing rise" in carjackings in New Jersey. *See, e.g.,* Walter Perez, *Disturbing rise in carjackings in some suburban communities*, WPVI (Jan. 24, 2022), available at https://6abc.cm/3Vew3vK ("Carjackings are becoming more and more common at shopping centers and convenience store parking lots across the Delaware Valley.").

Although automobiles did not exist at the Founding, travelers and those journeying obviously did (including in "vehicles" such as stagecoaches and ferries). But, here too, the State will be unable to point to a historical tradition of banning the possession of firearms while traveling or while within the vehicles of the day. Again, when the Founding generation could have regulated the same issue but did not do so or only regulated it "through materially different means" that is dispositive evidence that the State's modern regulation is unconstitutional. *Bruen*, 142 S. Ct. at 2131. As another court has already recognized, the law of earlier generations was *more* protective of the self-defense rights of those traveling or on the move, not less so. *Antonyuk*, 2022 WL 16744700 at *66 & n.109. And it is no argument that New Jersey still allows carrying a firearm while walking; the protections of the Second Amendment do not change merely because of technological advancements in how Americans move around their communities. *See Bruen*, 142 S. Ct. at 2132 ("Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to

circumstances beyond those the Founders specifically anticipated."); *cf. Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (per curiam). Simply put, the Second Amendment applies in cars too.

## II) An Injunction is Needed to Prevent Irreparable Injury

Like the First Amendment, the Second Amendment secures the right to engage in affirmative conduct—to (for example) speak, exercise a religion, or keep and bear arms. *Cf. United States v. Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2009) ("[W]e look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice."); *Bruen*, 142 S. Ct. at 2130 (stating that the "Second Amendment standard accords with how we protect other constitutional rights," including the First Amendment). As such, a deprivation of Second Amendment rights is an injury that, by its very nature, is irreparable. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). The enumeration of constitutional rights gives people the right to enjoy them in fact, not through the fiction of a compensatory money damages judgment. *See Ezell*, 651 F.3d at 699 ("Infringements of this [Second Amendment] right cannot be compensated by damages."). Thus, the only real issue is whether there is probable success on the merits of the constitutional claim, for if there is, any injury

will be irreparable. *See Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *GJJM Enterprises, LLC v. Atlantic City,* 293 F. Supp. 3d 509, 520–21 (D.N.J. 2017); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 149 (D.D.C. 2016). And as demonstrated *supra*, Plaintiffs' probability of success on the merits is overwhelmingly in their favor, as a categorical ban on acquiring arms is flatly unconstitutional. Thus, the injury that Plaintiffs' suffer and will continue to suffer in the absence of an injunction is irreparable.

### III)  An Injunction Will Not Harm Other Interested Persons

This Court's injunction will only apply to individuals who have already qualified for and obtained permits to carry from pertinent New Jersey authorities.[2] And as previously explained, those authorities had a legal obligation to "investigate" applications and refuse licensure to unsafe or disqualified individuals. Thus, anyone who is able to carry a handgun following this Court's order will have gone through, and passed, a substantial vetting process that is focused on whether their possession of firearms would be contrary to the public interest.[3] Allowing these people to carry handguns notwithstanding the State's

---

[2] Prior to Chapter 131, Superior Court Judges were responsible for issuing permits to carry, following an investigation by police authorities, but now police authorities are the ones responsible for both investigating applications and issuing permits. *See* 2022 N.J. Laws c. 131, § 3(c)-(d).

[3] We do not mean to suggest that a State *without* a licensing or permitting system for the regulating the carry of guns would be free to substantially close down the

attempt to largely foreclose the activity will not significantly undercut the State's overarching goal in requiring people to meet background, training and qualification requirements in the first place. Obviously, the State cannot cite the existence of the right to bear arms as a "harm" because the decision has already been made—over 200 years ago—to protect this activity. *See McDonald*, 561 U.S. at 783 (rejecting argument that the  Amendment was less-deserving of protection because of public safety concerns; "[t]he right to keep and bear arms ... is not the only constitutional right that has controversial public safety implications"); *accord Bruen*, 142 S. Ct. at 2126 n.3.

Notably, in *Ezell* the City of Chicago argued that the balance of equities was against injunctive relief (in the form of an order requiring the city to allow gun ranges) because there were no regulations in place that would govern the operation of ranges in the city. See *Ezell*, 651 F.3d at 710. The court rejected this argument, explaining that "[*p*]*roperly regulated* firing ranges . . . should not pose significant threats to public health and safety." *Id.* (emphasis added). Indeed, any claimed need for additional laws and regulations would not be a basis for denying an

---

places where guns can lawfully carry guns. Rather, we wish to highlight that, on the facts presented here, the people who would benefit are people who have already passed background, training and qualification requirements.

injunction, as legislative bodies retain their ability to adopt such regulations. *See id.* at 711.

That is particularly the case here, where the State's sweeping restrictions are basically unprecedent. Indeed, the only precedent appears to be New York's recently enacted ban on carrying guns in "sensitive places" and "restricted places," which was likewise passed in the wake of the Supreme Court's decision in *Bruen*. *See* N.Y. Penal L. §§ 265.01-D, 265.01-E; *see also* 2022 N.Y. Laws c. 371, §§ 4-5. And notably, not even New York attempted to prevent licensed people from carrying guns while driving or riding in cars. *See* N.Y. Penal L. § 265.01-E.

### IV) The Protection of Constitutional Rights is in the Public Interest

This consideration is readily met because "it is in the public interest for constitutional rights to be protected." *Forchion v. Intensive Supervised Parole*, 240 F. Supp. 2d 302, 310 (D.N.J. 2003) "[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *American Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004). "The public interest generally favors such constitutional protection even in the face of otherwise important public interests." *LCN Enterprises, Inc. v. City of Asbury Park*, 197 F. Supp. 2d 141, 154 (D.N.J. 2002). If the "sensitive place" and vehicle carry prohibitions are unconstitutional— as they are—then it is in the public interest to proscribe their enforcement.

## <u>CONCLUSION</u>

Plaintiffs have clearly demonstrated they are likely to prevail on the merits and have suffered an irreparable injury, for the actions of the Defendants have struck at the very core of their Second Amendment rights. The remaining factors necessary for preliminary relief give no quarter to the Defendants' actions either.

For the foregoing reasons, Plaintiffs respectfully ask that this Court grant their motion.


Dated:        December 23, 2022

s/ David D. Jensen
David D. Jensen
DAVID JENSEN PLLC
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
Fax: 914.591.1318
david@djensenpllc.com

-36-