UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, | Hon. Renée Marie Bumb, U.S.D.J.<br>Hon. Elizabeth A. Pascal, U.S.M.J.<br><br>Docket No. 22-CV-7464 |
|    Plaintiffs, | ***CIVIL ACTION***<br>**(ELECTRONICALLY FILED)** |
| v. | Motion Return Date: January 5, 2023 |
| WILLIAM REYNOLDS in his official capacity as the Prosecutor of Atlantic County, New Jersey; GRACE C. MACAULAY in her official capacity as the Prosecutor of Camden County, New Jersey; ANNEMARIE TAGGART in her official capacity as the Prosecutor of Sussex County, New Jersey; MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, | |
|    Defendants. | |

---

## STATE DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

---

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL
OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, New Jersey 08625
*Attorney for Defendants
Platkin and Callahan*

Angela Cai (NJ Bar 121692014)
  *Deputy Solicitor General*
Jean Reilly
  *Assistant Attorney General*
David Chen
Amy Chung
Viviana Hanley
Chandini Jha
Samuel L. Rubinstein
  *Deputy Attorneys General*
 Of Counsel And On The Brief

# **TABLE OF CONTENTS**

TABLE OF CONTENTS...............................................................................i

TABLE OF AUTHORITIES .....................................................................ii

PRELIMINARY STATEMENT .................................................................1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY ............2

    A.    The *Bruen* Decision And New Jersey's Public-Carry Laws.....................2

    B.    New Jersey Updates Its Firearms Laws After *Bruen*.................................4

    C.    The Instant Challenge And TRO Request..................................7

LEGAL STANDARD.................................................................................7

ARGUMENT ............................................................................................9

  I.  JURISDICTIONAL DEFECTS PREVENT FINDING A LIKELIHOOD OF SUCCESS ON THE MERITS AND IRREPARABLE HARM. ..........................9

  II.    PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING IRREPARABLE HARM.....................................................................17

  III.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS, AS FURTHER BRIEFING WILL CONFIRM. .........................................20

  IV.    AN INJUNCTION WILL RESULT IN EVEN GREATER HARM TO THE STATE AND THE PUBLIC. ....................................................35

CONCLUSION ......................................................................................38

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018) ...................................................................................35

*Adams v. Freedom Forge Corp.*,
  204 F.3d 475 (3d Cir. 2000) ...........................................................................17

*Am. Postal Workers Union v. U.S. Postal Service*,
  766 F.2d 715 (2d Cir. 1985) ...........................................................................19

*Amalgamated Transit Union Local 85 v. Port. Auth.*
  *of Allegheny Cnty*,
  39 F.4th 95 (3d Cir. 2022) ....................................................................8, 17, 35

*Anderson v. Davila*,
  125 F.3d 148 (3d Cir. 1997) ...........................................................................18

*Angelo v. District of Columbia*,
  22-cv-1878, __ F. Supp. 3d __, 2022 WL 17974434
  (D.D.C. Dec. 28, 2022) ................................................................................2, 14

*Angelo v. District of Columbia*,
  No. 1:22-cv-1878, Minute Order (D.D.C. July 15, 2022) ................................35

*Antonyuk v. Hochul*,
  No. 22-2908, D.E. 75 (2d Cir. Dec. 7, 2022) ....................................................2

*Bonidy v. U.S. Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) ...............................................................24, 25

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
  142 S. Ct. 1002 (2022) ...................................................................................36

*Carr v. State*,
  34 Ark. 448 (1879) .........................................................................................34

*Cedar Point Nursery v. Hassid*,
  141 S. Ct. 2063 (2021) ...................................................................................22

*Christian v. Nigrelli*,
    1:22-cv-695, D.E. 26, (W.D.N.Y. Oct. 3, 2022) ................................................35

*Christian v. Nigrelli*,
    No. 22-2987, D.E. 41 (2d Cir. Dec. 12, 2022) .....................................................2

*City of Philadelphia v. Att'y Gen. of United States*,
    916 F.3d 276 (3d Cir. 2019) ...............................................................................38

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)............................................................................................13

*Conchatta, Inc. v. Evanko*,
    83 F. App'x 437 (3d Cir. 2003) .........................................................................19

*Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't
of Health & Human Servs.*,
    No. 13-1144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013)......................................8

*Constr. Ass'n of W. Pa. v. Kreps*,
    573 F.2d 811 (3d Cir. 1978) ...............................................................................19

*Corbett v. Hochul*,
    1:22-cv-5867, PI Hrg. Tr. (S.D.N.Y. Nov. 29, 2022)....................................2, 28

*D.T. v. Sumner Cnty. Sch.*,
    942 F.3d 324 (6th Cir. 2019) ...........................................................................7, 18

*Delta Const. Co. v. EPA*,
    783 F.3d 1291 (D.C. Cir. 2015).........................................................................16

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ......................................................................................21, 23

*Doe v. Nat'l Bd. of Med. Examiners*,
    199 F.3d 146 (3d Cir. 1999) .................................................................................9

*Donahue v. N.J. Tpk. Auth.*,
    No. A-0648-20, 2022 WL 1039690
    (N.J. Super. Ct. App. Div. Apr. 7, 2022)...........................................................24

*Ellison v. Am. Bd. of Orthopaedic Surgery*,
    11 F.4th 200 (3d Cir. 2021) .........................................................................10, 11

*Elrod v. Burns*,
   427 U.S. 347 (1976)..................................................................................18, 19

*English v. State*,
   35 Tex. 473 (1872)..........................................................................................29

*Eslava v. State*,
   49 Ala. 355 (1873) ..........................................................................................34

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ..........................................................................27

*Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*,
   141 F.3d 71 (3d Cir. 1998) ..............................................................................10

*Fischer v. Governor of N.J.*,
   842 F. App'x 741 (3d Cir. 2021) ................................................................13, 15

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015)...........................................................................9

*GeorgiaCarry.Org, Inc. v. Georgia*,
   687 F.3d 1244 (11th Cir. 2012) .......................................................................23

*Greater Phila. Chamber of Commerce v. City of Phila.*,
   949 F.3d 116 (3d Cir. 2020) ..............................................................................7

*Greco v. Grewal*,
   No. 3:19-cv-19145, Op., D.E. 57 (D.N.J. Feb. 21, 2020) ...............................19

*Hardaway v. Nigrelli*,
   No. 22-2933, D.E. 53 (2d Cir. Dec. 7, 2022) ....................................................2

*Hohe v. Casey*,
   868 F.2d 69 (3d Cir. 1989) ..............................................................................18

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
   909 F.3d 446 (D.C. Cir. 2018).........................................................................16

*Kendrick v. Bruck*,
   586 F. Supp. 3d 300 (D.N.J. 2022)..................................................................16

*L.A. Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*,
   506 F. Supp. 3d 1018 (C.D. Cal. 2020) ............................................................37

*LaSpina v. SEIU Pa. State Council*,
   985 F.3d 278 (3d Cir. 2021) ...............................................................16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)...............................................................*passim*

*Mallet & Co. v. Lacayo*,
   16 F.4th 364 (3d Cir. 2021) ...............................................................8

*Marxe v. Jackson*,
   833 F.2d 1121 (3d Cir. 1987) ...............................................................17

*Maryland v. King*,
   133 S. Ct. 1 (2012) (Roberts, C.J., in chambers)...............................................................36

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010)...............................................................27

*McKay v. Federspiel*,
   823 F.3d 862 (6th Cir. 2016) ...............................................................4

*McTernan v. City of York*,
   577 F.3d 521 (3d Cir. 2009) ...............................................................18

*Mielo v. Steak 'n Shake Ops., Inc.*,
   897 F.3d 467, 480 (3d Cir. 2018) ...............................................................14, 15

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)...............................................................7

*N.J. Bankers Ass'n v. Att'y Gen. N.J.*,
   49 F.4th 849 (3d Cir. 2022) ...............................................................13

*Nat'l Treasury Emp. Union v. United States*,
   927 F.2d 1253 (D.C. Cir. 1991)...............................................................19

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022)...............................................................*passim*

*Nken v. Holder*,
556 U.S. 418 (2009)................................................................................35

*Nordyke v. King*,
563 F.3d 439 (9th Cir. 2009),
*vacated*, 611 F.3d 1015 (9th Cir. 2010)...............................................30

*Pub. Serv. Co. of N.H. v. Town of W. Newbury*,
835 F.2d 380 (1st Cir. 1987)..................................................................19

*Range v. Att'y Gen. U.S.*,
53 F.4th 262 (3d Cir. 2022) ..............................................................9, 26

*Reilly v. Ceridian Corp.*,
664 F.3d 38 (3d Cir. 2011) ....................................................................11

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017) ....................................................8, 20, 28

*Robinson v. Ardoin*,
37 F.4th 208 (5th Cir. 2022) ..................................................................36

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) .............................................................19

*Smith v. State*,
50 Tenn. 511 (1872)...............................................................................34

*Steffel v. Thompson*,
415 U.S. 452 (1974)...............................................................................13

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)...............................................................................13

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)...........................................................................10

*Turner v. Epps*,
842 F. Supp. 2d 1023 (S.D. Miss. 2012) ..............................................37

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019)...............................................................24

*United States v. Marcavage*,
609 F.3d 264 (3d Cir. 2010) .................................................20

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008)..............................................................20

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
900 F.3d 250 (6th Cir. 2018) ..................................................9

*Whitmore v. Arkansas*,
495 U.S. 149 (1990).............................................................10

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)...................................................................7

**Statutes**

P.L. 2022, Ch. 131 .........................................................*passim*

1786 Va. Laws 25 ......................................................29, 32

1821 Tenn. Acts ch. 13, § 1, p. 15 .................................33

1859 Conn. Acts 62, ch. 82, § 5 .....................................30

1865 La. Extra Acts 14, No. 10 § 1 ................................31

63 Proceedings and Acts of the General Assembly 338, (June 15-July
3, 1773) ............................................................................29

1839 Ala. Acts no. 77, § 1 ..............................................33

Ala. Code § 13A-11-61.2.................................................5

Alaska Stat. Ann. § 11.61.220 .........................................6

Ark. Rev. Stat. § 13, p. 280 (1838).................................33

D.C. Code Ann. § 7-2509.07 .......................................5, 6

Ga. Code Ann. § 16-11-127(b)(4)....................................6

Gen. Digest of the Ords. & Res. of the Corp. of New Orleans 371
(1831) (art. 1).................................................................29

1876 Iowa Acts 142, ch. 148, § 1 ........................................................................32

1929 Iowa Acts 90, § 30 ......................................................................................33

La. Rev. Stat. § 40:1397.3(O) ...............................................................................6

1919 Me. Laws 193 ...............................................................................................33

Mo. Rev. Stat. 1879, at 224 (§ 1274) ...................................................................30

1771 N.J. Laws 346, §1 ........................................................................................31

N.J.S.A. 2C:58-4(c) ................................................................................................2

Nev. Rev. Stat. Ann. § 202.3673 ...........................................................................5

Ohio Rev. Code Ann. § 2923.126(B)(6) ................................................................6

S.C. Code Ann. § 23-31-225 ..................................................................................6

1869-70 Tenn. Pub. Acts 23 .............................................................................29, 32

Tex. Act of April 12, 1871 Art. 320 .....................................................................30

1870 Tex. Gen. Laws 63 ............................................................................29, 30, 31, 32

Tex. Parks & Wildlife Code Ann. § 62.012 ...........................................................6

Tex. Penal Code §§ 46.03 ......................................................................................5

## PRELIMINARY STATEMENT

Plaintiffs make the extraordinary demand that this Court should invalidate on a TRO posture portions of a state law that protects the safety of New Jersey residents and is consistent with the text and longstanding history of the Second Amendment. That law, P.L. 2022 Chapter 131, was enacted in response to *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), to protect New Jerseyans from gun violence. Plaintiffs cannot meet the high bar for emergency relief.

Plaintiffs' TRO application suffers from multiple defects that require denial. First, Plaintiffs' rushed application for emergency relief fails to establish that they imminently will suffer Article III injury caused by Chapter 131 and redressable by a TRO. Second, because they lack standing and because they fail to adduce a record to meet their burden, Plaintiffs cannot show irreparable harm. Third, on the merits, Plaintiffs fare no better. *Bruen* confirmed that the Second Amendment allows states to enact a host of gun regulations that expressly includes protecting sensitive places and requiring background checks. Chapter 131 does exactly that. Many of the provisions Plaintiffs challenge fall outside the scope of the Second Amendment entirely, and all are supported by a longstanding historical tradition of regulation. Fourth and finally, the equities overwhelmingly favor denying a TRO; injunctive relief would immediately authorize individuals to bring guns to places where they do not belong: crowded stadiums, places where alcohol is served, libraries, rush hour

1

traffic, somebody else's home when that person does not consent—even while more fulsome briefing in this case is underway.

The State will offer ample evidence that Chapter 131 is constitutional. A hasty injunction would short-circuit the democratic process while the litigation process is underway. Tellingly, the Second Circuit has stayed injunctions in cases challenging a similar firearm statute in New York, confirming that the laws should remain in place while courts review the merits.[1] And other courts addressing similar challenges have refused to issue preliminary relief.[2] This Court should follow that lead.

## COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY

A. The *Bruen* Decision And New Jersey's Public-Carry Laws.

New Jersey has long required permitting and background checks for those wishing to purchase and publicly carry a handgun. Carry permit applicants were required to demonstrate that they had a "justifiable need" to publicly carry a handgun beyond a generic interest in self-defense. N.J.S.A. 2C:58-4(c).

In *Bruen*, the U.S. Supreme Court struck down a New York law analogous to New Jersey's "justifiable need" requirement. Holding that such a requirement

---

[1] *See* Order, D.E. 41, *Christian v. Nigrelli*, No. 22-2987 (2d Cir. Dec. 12, 2022); Order, D.E. 75, *Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Dec. 7, 2022); Order, D.E. 53, *Hardaway v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022) (collected in Ex. 2).

[2] *See Angelo v. District of Columbia*, 22-cv-1878, __ F. Supp. 3d __, 2022 WL 17974434 (D.D.C. Dec. 28, 2022); Order, D.E. 74, *Corbett v. Hochul*, 1:22-cv-5867 (S.D.N.Y. Nov. 29, 2022); Tr. of Hr'g. (Ex. 3).

infringes the right of "ordinary, law-abiding citizens" to carry handguns in public for self-defense, 142 S. Ct. at 2122, the *Bruen* Court rejected the use of means-end scrutiny that prior courts had adopted in Second Amendment cases. Instead, *Bruen* instructed courts first to ask whether "the Second Amendment's plain text covers an individual's conduct," and, only if it does, then to ask whether the challenged regulation of that conduct is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The Court explained that, there need not be "a historical twin" for the challenged law. *Id.* at 2133.

Consistent with that test, the *Bruen* Court recognized that the right to publicly carry a firearm "has traditionally"—and constitutionally—"been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id*. at 2138. The Court specifically identified that historical tradition as including (1) licensing requirements and (2) prohibitions on carrying firearms in "sensitive places." *Id.* at 2133, 2138 n.9. The Court specified that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of provisions "designed to ensure only that those bearing arms … are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quotation omitted). And the Court "assume[d] it settled" that prohibiting firearms in certain locations (*e.g.*, "schools and government

buildings," "legislative assemblies, polling places, and courthouses") and analogous "new" sensitive locations is constitutional. *Id.* at 2133.

### B. New Jersey Updates Its Firearms Laws After *Bruen*.

After *Bruen* effectively invalidated the justifiable need requirement for public carry, the New Jersey Legislature passed P.L. 2022 Chapter 131, A4769/S3124 (Ex. 1), on December 19, 2022. The Governor signed the bill into law on December 22, 2022. In passing the bill, the Legislature noted that *Bruen* "makes clear … that the Legislature can enact laws to protect our communities" by respecting "the Supreme Court's … ruling while continuing to promote and enhance public safety." Ch. 131 § 1(b). The law "mitigate[s] the impact of having more people carrying guns in public places," and " better ensure[s] that those who exercise the right to carry are responsible, law-abiding, and appropriately trained individuals." *Id.* § 1(c). Chapter 131 amends and augments the State's firearm regulations in the following respects.

#### 1. *Enhanced Permitting And Carry Requirements*

Mindful of *Bruen*'s guideposts for permissible firearm regulation, Chapter 131 repeals the "justifiable need" requirement and strengthens the criteria used to determine whether an applicant is qualified to purchase or carry firearms. *Id.* § 2. It enhances requirements for character references and institutes a firearms safety course requirement. *Id.* §§ 2, 3. Additional changes to carry requirements will take effect in seven months: Section 4 requires that anyone carrying a handgun in public

4

obtain liability insurance, and Sections 5 and 6 set out requirements for the safe carry of handguns. *Id.* §§ 4, 5, 6, 12.

   *2.   Sensitive Places Restrictions*

Section 7 of Chapter 131 "designates places in which the carrying of a firearm or destructive device is prohibited." *Id.* § 1(e). The Legislature found that the elimination of the "justifiable need" requirement resulted in "the likelihood that a much greater number of individuals will now qualify to carry handguns in public," necessitating identifying "sensitive places where, due to heightened public safety concerns, carrying a dangerous, potentially lethal device or weapon, including a handgun, is not permissible." *Id.*[3] These locations fall into the following categories:

First, several locations are "vital to the functioning of democracy and our system of government." *Id.* § 1(g)(1). Thus, firearms are prohibited in government buildings, including public libraries and museums. *Id.* § 7(a)(12). Second, several locations are places where vulnerable or incapacitated populations gather. *Id.* §§ 1(g)(2)-(4). That includes locations where children are concentrated, like schools

---

[3] Sensitive places restrictions are common. *See, e.g.*, Ala. Code § 13A-11-61.2 (school or professional athletic events); D.C. Code Ann. § 7-2509.07 (schools, hospitals, public transportation vehicles, places that sell alcohol, stadiums); Tex. Penal Code §§ 46.03; 46.035 (schools, racetracks, some businesses with liquor licenses, hospitals, airports, amusement parks); Nev. Rev. Stat. Ann. § 202.3673 (airports, schools, and childcare facilities).

and libraries. *Id.* § 7(a)(7), (12). It includes healthcare facilities and places where alcohol is sold for consumption on the premises. *Id.* § 7(a)(21), (15). Third, several locations are places where large crowds gather and "where volatile conditions may pose a threat to public safety." *Id.* § 1(g)(5). That includes entertainment facilities and casinos. *Id.* § 7(a)(17), (18). Some places fall into multiple categories.[4]

### 3.  *Default Rule For Communicating Property Preferences*

The Legislature found that "[t]he historical record . . . supports restriction of firearm possession on private property when the owner has not given their consent." *Id.* § 1(h). It observed that "[m]any states require a property owner's permission before another may enter private dwellings and private lands with a firearm or other weapons." *Id.* § 1(h).[5] And it found that "[r]equiring consent from the property owner before carrying weapons onto private property is . . . in line with both the reasonable expectations and property rights." *Id.* § 1(h). Thus, Section 7(a)(24) prohibits bringing firearms onto another's "private property . . . unless the owner has provided express consent or posted a sign indicating" consent. *Id.* § 7(a)(24).

---

[4] Chapter 131 also provides a number of exemptions, including brief and incidental entries and traveling along public rights-of-way. *Id.* §§ 7(a), (c), (e), (f), (g).

[5] Other states have similar rules regarding certain private property. *See, e.g.*, Alaska Stat. Ann. § 11.61.220; D.C. Code § 7-2509.07; Ga. Code Ann. § 16-11-127(b)(4); La. Rev. Stat. § 40:1397.3(O); Ohio Rev. Code Ann. § 2923.126(B)(6); S.C. Code Ann. § 23-31-225; Tex. Parks & Wildlife Code Ann. § 62.012.

*4.  Vehicle Restrictions*

The Legislature also recognized the unique dangers of having loaded firearms in vehicles. Effective immediately, Section 7(b)(1) requires individuals carrying a gun in a vehicle to keep the gun "unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." *Id.* And when storing a gun in a vehicle, individuals must keep it unloaded in a securely fastened storage area not visible from outside the vehicle. *Id*. § 7(b)(2).

## C.  The Instant Challenge And TRO Request.

Plaintiffs filed the instant suit on the same day Chapter 131 was signed into law. Specifically, Plaintiffs challenge the sensitive places restrictions in Sections 7(a)(12) (libraries and museums), 7(a)(15) (places that serve alcohol), and 7(a)(17) (entertainment facilities), the private property default rule in Section 7(a)(24), and the vehicle carry restriction in Section 7(b)(1) under the Second and Fourteenth Amendments. On December 24, 2022, Plaintiffs filed a TRO and a preliminary injunction. The State files this response to the TRO application only, and requests an opportunity to fully brief the PI motion.

## LEGAL STANDARD

Injunctive relief "is a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), which is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only in limited circumstances," *Greater Phila. Chamber of Commerce v.*

7

*City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (quotation omitted); *see also, e.g.*, *Mallet & Co. v. Lacayo*, 16 F.4th 364, 389 (3d Cir. 2021) ("The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat." (quotation omitted)). Injunctions "are rarely granted" in the Third Circuit because "the bar is set particularly high." *Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't of Health & Human Servs.*, No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013).

A court entertaining preliminary relief "must consider (1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party; and (4) whether the relief is in the public interest." *Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty,* 39 F.4th 95, 102-03 (3d Cir. 2022) (quotation omitted). "The first two factors are prerequisites that the moving party must establish." *Id.* at 103. But even if those two factors are met, courts must still determine "in [their] sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

**ARGUMENT**

## I.  JURISDICTIONAL DEFECTS PREVENT FINDING A LIKELIHOOD OF SUCCESS ON THE MERITS AND IRREPARABLE HARM.

As "[t]he party invoking federal jurisdiction," Plaintiffs have the burden of establishing standing to litigate *each* claim. *Range v. Att'y Gen. U.S.*, 53 F.4th 262, 269 n.7 (3d Cir. 2022). Because jurisdiction is not a "mere pleading requirement but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because Plaintiffs seek an emergency injunction, courts evaluate standing under the "heightened standard for evaluating a motion for summary judgment." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *Doe v. Nat'l Bd. of Med. Examiners*, 199 F.3d 146, 152 (3d Cir. 1999) ("Because [Article III] requirements are not pleading requirements, but are necessary elements of a plaintiff's case, mere allegations will not support standing at the preliminary injunction stage.").

Thus, Plaintiffs must affirmatively demonstrate that they have suffered "an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief" for each of their claims. *TransUnion LLC v. Ramirez*,

141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560–61). They have not carried this burden.

*First*, Plaintiffs fail to substantiate—or even allege—concrete plans imminently to visit the places for which they challenge Chapter 131's provisions, and otherwise fail to state a sufficiently concrete injury in fact. For "a statement of intent to take future action" to support injury in fact, that statement "must reflect a concrete intent to do so imminently." *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 207 (3d Cir. 2021). "'[S]ome day intentions'—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564; *see also Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1998) ("[I]nchoate plans for future [actions] are insufficient to demonstrate injury for purposes of Article III"); *Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990) ("A threatened injury must be 'certainly impending' to constitute injury in fact." (citation omitted)). In *Lujan*, for example, the Supreme Court deemed insufficient the plaintiff's averments that she "intend[ed] to go back to Sri Lanka," given that she had no concrete plans to do so. 504 U.S. at 564. Plaintiffs here fare no better, as they fail to establish a sufficiently imminent injury to have standing to litigate these types of claims.

For example, for their challenge to Section 7(a)(12), none of the Plaintiffs declare a concrete intention imminently to visit a public library or museum. *See* D.E. 10 (Koons Decl.) ¶¶ 12-13; D.E. 11 (Gaudio Decl.) ¶ 9; D.E. 12 (Muller Decl.) ¶ 11. The closest that any Plaintiff comes is Plaintiff Muller's statement that he "[has] carried [his] handgun while visiting the library" in the past. D.E. 12 ¶ 10.  But that is not enough. *See Lujan*, 504 U.S. at 564 ("That the women 'had visited' the areas of the projects before the projects commenced proves nothing.").

Plaintiffs' declarations similarly fall short of establishing concrete, imminent injury as to the firearms prohibition in Section 7(a)(15) regarding places that serve alcohol. Plaintiff Koons states that he attends breakfast meetings at restaurants with bars "quite often," but he does not specify what that means. D.E. 10 ¶ 13. Plaintiffs Gaudio and Muller merely state that they previously carried a handgun at restaurants that serve alcohol. D.E. 11 ¶ 9; D.E. 12 ¶¶ 8-9. These declarations lack the specificity required to establish an imminent Article III injury: they fail to explain when Plaintiffs will next visit these restaurants or even to identify a particular restaurant they will visit. *See Ellison*, 11 F.4th at 207; *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) ("[F]uture harm at some indefinite time cannot be an 'actual or imminent injury'" (quoting *Lujan*, 504 U.S. at 564 n.2)).

The same standing deficiencies defeat Plaintiffs' challenge to the prohibition in Section 7(a)(17) on handgun carriage in entertainment facilities. Plaintiff Koons

does not allege any intention to visit such facilities. *See* D.E. 10 ¶¶ 12-13. Plaintiff

Gaudio merely states that he had previously carried a handgun "at a movie theater,"

but does not identify the theater or state that he has any plans to return to it. D.E. 11

¶ 9. Similarly, Plaintiff Muller only states that he has "carried [his] handgun at music

events conducted in public arenas and in theaters" in the past. D.E. 12 ¶ 10. Because

a past visit does not establish an intention imminently to revisit, *see Lujan*, 504 U.S.

at 564, these descriptions of past activity do not establish Article III injury.

Finally, as to Plaintiffs' challenge to Section 7(b)(1), they fail to meet their

burden to demonstrate concrete injury. While Plaintiff Gaudio claims the provision

"effectively prohibits [him] from carrying a functional handgun" while in a vehicle,

his only support for this claim is speculation that "[i]f [he] were to need [his]

handgun to protect [him]self, [he] would need to remove it from its container and

then load it, which [he] *likely* would not have time to do." D.E. 11 ¶ 15 (emphasis

added). Similarly, he speculates that doing so could "be perceived as brandishing by

passerby." *Id.* But to satisfy Article III, injury must not be "'conjectural' or

'hypothetical.'" *Lujan*, 504 U.S. at 560 (citation omitted); *Clapper v. Amnesty Int'l*

*USA*, 568 U.S. 398, 410 (2013) ("[R]espondents' theory of standing, which relies on

a highly attenuated chain of possibilities, does not satisfy the requirement that

threatened injury must be certainly impending"). Plaintiff Muller similarly only

claims unlocking and loading the gun is "not practical." D.E. 12 ¶ 17. Plaintiff Koons

says nothing about why he would suffer injury due to Section 7(b)(1). No Plaintiff has demonstrated that Section 7(b)(1)'s requirement that they keep the firearm unloaded in a container while in a vehicle poses a concrete and imminent injury to their Second Amendment right to self-defense. *Lujan*, 504 U.S. at 560.

***Second***, Plaintiffs fail to establish any credible threat of enforcement of Chapter 131 against them. Pre-enforcement challenges like this are justiciable only if "enforcement [is] sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) ("*SBA List*"); *see N.J. Bankers Ass'n v. Att'y Gen. N.J.*, 49 F.4th 849, 855 (3d Cir. 2022). Although a plaintiff need not "first expose himself to actual arrest or prosecution" to have standing "to challenge a statute," *Steffel v. Thompson*, 415 U.S. 452, 459 (1974), he otherwise must establish "an intention to engage in a course of conduct … proscribed by a statute," and identify "a credible threat of prosecution thereunder," *SBA List*, 573 U.S. at 159 (quotation omitted).  A plaintiff can establish a credible threat of enforcement by presenting evidence of, for example, a statute's "history of past enforcement" or the mechanisms for its enforcement. *See SBA List*, 573 U.S. at 164. None of that exists here.

Plaintiffs assume that the existence of the law is sufficient for standing. But "[t]he mere presence of a statute on the law books, standing alone, is insufficient to show a 'credible threat' that the statute will be enforced against a particular plaintiff." *Fischer v. Governor of N.J.*, 842 F. App'x 741, 749 (3d Cir. 2021); *see*

13

*also McKay v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016) (holding allegation of "subjective chill," without additional factors showing credible threat of imminent enforcement—like a history of past enforcement or enforcement warnings—is insufficient to establish standing); *Angelo*, 2022 WL 17974434, at *6 ("[A] plaintiff bringing a preenforcement challenge must do more than show that the government enforces its laws as written."); *Kendrick v. Bruck*, 586 F. Supp. 3d 300, 309 (D.N.J. 2022) (noting a "state's general interest in enforcing its gun laws was insufficient to confer standing on plaintiffs" (citing *Seegars v. Gonzales*, 396 F.3d 1248, 1255 (D.C. Cir. 2005)). Because Plaintiffs bear the burden of showing that Chapter 131 imminently will be enforced against them, but present nothing to meet that burden, a TRO should be denied.

**Third**, Plaintiffs have not demonstrated traceability or redressability as to several of their claims. They adduce no evidence that the proprietors of entertainment venues, restaurants, and other private establishments would have allowed Plaintiffs to bring firearms into those locations were it not for Section 7(a)(24). Consequently, they have not shown that enjoining enforcement of this provision would result in their ability to carry handguns lawfully on these properties.

Plaintiffs bear the burden of establishing that any injury is "fairly traceable" to the enactment of the legislation, *Mielo v. Steak 'n Shake Ops., Inc.*, 897 F.3d 467, 480 (3d Cir. 2018) (citation omitted), which requires something "akin to but for

causation in tort," *LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 284 (3d Cir. 2021) (citation omitted). An injury is not fairly traceable to newly enacted legislation "if the alleged injury is merely the result of the independent action of some third party not before the court." *Mielo*, 897 F.3d at 481 (quotation omitted). Plaintiffs also bear the burden of establishing that any injury is "likely to be redressed by a favorable judicial decision." *Id.* (citation omitted). "[T]he redressability element . . . is not satisfied if a favorable result would eliminate one of multiple causes of an injury without actually decreasing the injury at all." *Fischer*, 842 F. App'x at 750-51 (citation omitted).

Plaintiffs fail to demonstrate traceability or redressability in claiming that Chapter 131 unconstitutionally deters them from carrying a handgun into a number of private establishments. For example, Plaintiffs neither allege nor demonstrate that it is Chapter 131—rather than the prerogative of the owner or proprietor of the venue—that prohibits firearms on that private property.[6] *See, e.g.*, D.E. 11 ¶ 18 (no evidence that local coffee shop or physician would consent to Plaintiff carrying a firearm on premises); D.E. 12 ¶¶ 10, 19 (same lack of evidence regarding theaters, museums, physicians, dentists, and stores); D.E. 10 ¶ 13 (same lack of evidence

---

[6] Many establishments independently prohibit firearms. *See, e.g.*, MetLife Stadium Guest Policies, https://tinyurl.com/8mdkjvdh; Adventure Aquarium Code of Conduct, https://tinyurl.com/2p9xjebv; Camden County Library Customer Behavior Policy, https://tinyurl.com/ytvnfk62.

regarding medical facilities and restaurants). The same problem exists for Plaintiffs'
challenge against Section 7(a)(24). The only statement concerning whether the
owners of these private properties consented (implicitly or explicitly) to the carriage
of handguns on their properties is Plaintiff Koons's statement that "the vast majority
of places where [he] normally transact[s] business have never expressed an opinion
about whether they want firearms on premises." D.E. 10 ¶ 13. But nothing about
Section 7(a)(24) prevents these private establishments—if they indeed consent to
firearms on premises—from indicating their consent and allowing Plaintiffs to carry.
If the proprietor chooses not to so communicate, it is her choice to exercise her
property right to exclude firearms—and not Section 7(a)(24)—that is the but-for
cause of Plaintiffs' inability to bring firearms there.

Thus, Plaintiffs fail to demonstrate standing to challenge these provisions,
because they cannot establish that any injury is fairly traceable to Chapter 131 or
redressable by an injunction thereof. *See Kaspersky Lab, Inc. v. U.S. Dep't of
Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018) (no traceability where separate,
unchallenged law "prohibit[ed] all the same conduct" challenged by plaintiff); *Delta
Const. Co. v. EPA*, 783 F.3d 1291, 1296 (D.C. Cir. 2015) (same).

For each of these reasons—the lack of imminent action, the speculative nature
of any enforcement, and the presence of independent obstacles to carrying firearms
in the proposed locations—Plaintiffs lack Article III standing on many of their

16

claims.[7] Because lack of standing prevents Plaintiffs from establishing irreparable harm and likelihood of success, the TRO should be denied.

## II.  PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING IRREPARABLE HARM.

Even if Plaintiffs have standing, they nonetheless fail on the required factor of irreparable harm. *Amalgamated Transit*, 29 F. 4th at 103; *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) ("[E]ven the strongest showing on the other three factors cannot eliminate the irreparable harm requirement," the absence of which is "dispositive" (quotation omitted)). Courts cannot grant relief "unless the moving party shows that it specifically and personally risks irreparable harm." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000); *see Marxe v. Jackson*, 833 F.2d 1121, 1127 (3d Cir. 1987) ("Courts have long required that a party seeking preliminary relief produce affirmative evidence indicating that he or she will be irreparably harmed should that relief be denied."). Plaintiffs have not met that burden as to any of the provisions that they challenge.

***First***, as discussed extensively above with regard to standing, Plaintiffs have not established any Article III harm that they have or imminently will suffer because of Section 7. As a result, they cannot demonstrate that they would be irreparably

---

[7] Plaintiffs proffer no evidence regarding organizational standing at this stage distinct from that regarding the standing of individuals who are both named plaintiffs and members of the organizational plaintiffs.

harmed absent an injunction. *See McTernan v. City of York*, 577 F.3d 521, 528 (3d Cir. 2009) (there can be "no irreparable harm" when there is "no harm of any type"). And even if Plaintiffs could meet the Article III threshold, they nevertheless have not demonstrated an "'immediate,' 'irreparable' injury that warrants the 'extraordinary remedy' of a preliminary injunction." *D.T.*, 942 F.3d at 327 (citation omitted). In fact, they have not attempted to do so. *See* D.E. 9, Br. 32-33.

**Second**, Plaintiffs cannot rely on allegations of constitutional injury alone to make a required showing of irreparable harm. Br. 32. As the Third Circuit has unequivocally stated: "Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) (citation omitted)). Plaintiffs cannot rely on the plurality opinion in *Elrod v. Burns*, 427 U.S. 347 (1976), which stated only that losing "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. Significantly, the Third Circuit has made it clear that "[n]othing" in *Elrod* "suggests that the Court meant to do away with the traditional prerequisites for injunctive relief simply because First Amendment freedoms were implicated." *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997); *Conchatta, Inc. v. Evanko*, 83 F. App'x 437, 442 (3d Cir.

2003) (same).[8] That is because to do so would mean collapsing the irreparable harm element of the PI burden into the likelihood of success element, contrary to established precedent confirming each is a separate requirement.

More fundamentally, neither the Supreme Court nor the Third Circuit has ever expanded *Elrod* to cover *all* alleged violations of constitutional rights. Indeed, courts have refused to extend even a presumption of irreparable harm to non-First Amendment challenges. *See, e.g.*, *Constr. Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 820 n.33 (3d Cir. 1978) (declining to extend *Elrod* to equal protection claims); *Greco v. Grewal*, No. 3:19-cv-19145, Op. at 15-16, D.E. 57 (D.N.J. Feb. 21, 2020) (declining to extend the *Elrod* to the Fourth Amendment); *see also Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (rejecting contention "that a violation of constitutional rights always constitutes irreparable harm"); *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) ("[A]lleged denial of procedural due process, without more, does not automatically trigger . . . a finding" of irreparable harm). Thus, Plaintiffs cannot show irreparable harm just by alleging Second Amendment injury.

---

[8] Indeed, then-Judge Clarence Thomas clarified in *Nat'l Treasury Emp. Union v. United States*, 927 F.2d 1253 (D.C. Cir. 1991), that even in the First Amendment context, the mere claim of a constitutional violation is insufficient to establish irreparable harm, notwithstanding *Elrod*. *Id.* at 1255-56; *see also Am. Postal Workers Union v. U.S. Postal Serv.*, 766 F.2d 715, 722 (2d Cir. 1985) (same).

## III.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS, AS FURTHER BRIEFING WILL CONFIRM.

Plaintiffs also have not demonstrated "a reasonable probability of eventual success in the litigation." *City of Harrisburg*, 858 F.3d at 176 (quotation marks and citation omitted). In asking the Court to declare the statutory provisions invalid and to enjoin their enforcement writ large, *see* Compl. at 22, this "facial attack," which "tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case," must clear a high bar. *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). Plaintiffs must prove that the law is "unconstitutional in all of its applications" or lacks a "plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008); *see id.* at 451 (noting facial challenges are disfavored because they "threaten to short circuit the democratic process"). Plaintiffs are not likely to clear this high bar.

The Second Amendment analysis is a complex one, and it is unlikely that mere allegations in a Complaint will evince a likelihood of success on the merits. Under *Bruen*, this Court must assess whether "the Second Amendment's plain text covers an individual's conduct" and, if so, whether a state's restriction of that conduct accords with "the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. The latter historical inquiry often requires examination of judicial, legislative, executive, and academic materials, *id.* at 2138-56, and also requires "nuanced judgments about ... how to interpret" such evidence, *id.* at 2130.

20

The State will be able to further address why Plaintiffs cannot succeed on the merits when given adequate time to brief the PI motion. But even at this stage, several obvious problems make Plaintiffs' claims unlikely to succeed. The court should thus deny Plaintiffs' motion for a TRO.

*First*, Chapter 131 involves regulations on background checks and sensitive locations, which are precisely the sort of regulation that the Supreme Court already described as "presumptively lawful regulatory measures." *District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008). The new statute's provisions "prohibiting the carry of firearms in *new* and analogous sensitive places," *Bruen*, 142 S. Ct. at 2133, and employing "objective licensing requirements," *id.* at 2162 (Kavanaugh, J., concurring), fall into what *Bruen* has likewise described as legitimate restrictions under the Second Amendment. *Id.*; *see also id.* at 2133.

The *Bruen* Court considered "it settled that [certain] locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 142 S. Ct. at 2133. These include "schools and government buildings," "legislative assemblies, polling places, and courthouses," as well as "*new* and analogous sensitive places." *Id*. Accordingly, Plaintiffs are unlikely to succeed in their TRO challenges to Section 7's sensitive-place restrictions.

*Second*, as to several challenged provisions, Plaintiffs cannot meet their threshold burden under *Bruen*: demonstrating that the relevant conduct is

encompassed by the Second Amendment's plain text. 142 S. Ct. at 2126. This initial but dispositive inquiry is "focused on the 'normal and ordinary' meaning of the Second Amendment's language." *Id.* at 2127 (quoting *Heller*, 554 U.S. at 576-77). If the text does not cover the conduct, "the analysis can stop there; the regulated activity is categorically unprotected." *Id.* at 2126 (quotation marks omitted). Importantly, it is Plaintiffs who bear the burden at this stage of the inquiry. *Id.*

Take, for example, Plaintiffs' challenge to the private property default rule in Section 7(a)(24) of Chapter 131. Plaintiffs simply assume that the provision is a restriction on the right to bear arms, but fail to show how a rule on property owners' communication falls within the scope of the plain text of the Second Amendment.

Nothing about Section 7(a)(24) alters substantive rights of property owners to exclude firearms from their property. Plaintiffs concede that "[p]roperty owners generally have a right to determine whether someone may or may not carry firearms on their property." Br. 29. And the property owner's substantive "right to exclude … is a fundamental element of the property right that cannot be balanced away." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2077 (2021) (internal citation omitted). As the Eleventh Circuit explained in a case challenging an analogous Georgia law that prohibited firearms in places of worship if the authority for that place did not consent, the Second Amendment in no way "abrogated the well established property law, tort law, and criminal law that embodies a private property

owner's exclusive right to be king of his own castle." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012) (collecting historical citations). Instead, "the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place . . . against the owner's wishes." *Id*. Nothing in *Bruen* suggests otherwise because the decision only concerned the right to carry firearms "in *public*," not on private land. 142 S. Ct. at 2135 (emphasis added). And certainly nothing in *Heller* suggested that the Second Amendment took away states' ability to regulate *property rights*. 554 U.S. at 635.

Similarly, nothing about Section 7(a)(24) changes the scope of the right to carry on private property. The substantive right has always been the same: one cannot bear arms on someone else's home, business, or land if that person is unwilling. Section 7(a)(24) merely establishes what a visitor must presume about a property owner's preference regarding firearms on her property where the property owner has not affirmatively communicated her preference.[9] Like the Georgia law that was upheld by the Eleventh Circuit, Section 7(a)(24) protects property owners' right to exclude firearms from their property by removing their obligation to

---

[9] Default rule-setting is commonplace. For example, employers set default rules for how employees receive paychecks. The default is often by mail, but employees can opt for direct-deposit instead by saying so and entering their account information. States set default intestacy procedures that individuals can alter through wills. Nothing about the setting of the default changes the substantive rights of the parties involved, who can simply choose to alter the default.

affirmatively tell every repairperson or customer that firearms are prohibited.[10] Changing default rules on how property owners communicate their preferences for conduct by visitors on their properties does not fall within the plain text of the Second Amendment.

A similar deficiency plagues Plaintiffs' challenge to provisions of the statute that bar carrying firearms in places where the government is proprietor of the property, such as Sections 7(a)(12) (public libraries and museums) and government-operated vehicles in Section 7(b)(1).[11] As numerous courts have found, when the government owns or operates the property, the government has a right to exclude persons who do not conform with conditions that define their license to enter that property. *See United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) (upholding ban on guns in parking lot near U.S. Capitol because "the government—like private property owners—has the power to regulate conduct on its property"); *Bonidy v.*

---

[10] Empirical evidence shows that this reflects the preferences of the vast majority of New Jerseyans who prefer not to have firearms on their property without express consent. *See* Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L. Medicine & Ethics 183, Table A4 (2020) (Ex. 21) (79% of New Jersey respondents preferring default rule requiring repairperson to obtain consent before carrying firearms onto private property); *id.* (67%, customers to carry at businesses).

[11] The same problem also applies to entertainment venues owned by the government, including PNC Bank Arts Center, which is owned by the New Jersey Turnpike Authority. *See Donahue v. N.J. Tpk. Auth.*, No. A-0648-20, 2022 WL 1039690, at *1 (N.J. Super. Ct. App. Div. Apr. 7, 2022).

*U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("[T]he fact that the government is acting in a proprietary capacity, analogous to that of a person managing a private business, is often relevant to constitutional analysis.").

When regulating conduct in government-owned or operated facilities, the government acts "as a proprietor rather than as a sovereign." *Id.* at 1126. And by prohibiting firearms in those facilities, it "affects private citizens only insofar as they are doing business" with the government as a provider of services. *Id.* at 1127. Thus, for the same reasons that private property rules do not implicate the text of the Second Amendment, neither do these provisions regulating firearms-carry in locations where the government is acting as a proprietor.

***Third***, for any challenged provisions that do implicate the plain text of the Second Amendment, Plaintiffs are also unlikely to succeed on the merits because Chapter 131's provisions are amply supported by historical tradition. As *Bruen* noted, if the challenged activity falls within the scope of the Second Amendment's plain text, a state can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation" by identifying a "well-established and representative historical analogue." 142 S. Ct. at 2126, 2130.

The Court expressly confirmed that the analogue need not be "a historical twin." *Id.* at 2133. In other words, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass

constitutional muster." *Id.* As the Third Circuit explained, courts assess whether the cited historical laws are "relevantly similar," not whether there is "an analogy specific to the crime charged." *Range*, 53 F.4th at 285. The central consideration is whether the modern regulation "impose[s] a comparable burden on the right of armed self-defense and whether that burden is comparably justified" as to the burden imposed by the historic regulation—that is, whether "how and why" the regulation is imposed is analogous. *Bruen*, 142 S. Ct. at 2133. To that end, because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," *id.* at 2132, if a modern regulation addresses an "unprecedented societal concern" spurred by "dramatic technological changes" unimaginable to the Founders or the Reconstruction generation, an analysis of historic analogues will not be "relatively simple to draw," calling instead for "a more nuanced approach." *Id.* at 2132.

While Plaintiffs insist that only evidence from 1791 can support modern regulations, Br. 19, they are wrong. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35) (emphasis added). States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second," and the Fourteenth Amendment was ratified in 1868. *Bruen*, 142 S. Ct. at 2137-38. After all, States were not constrained by the Constitution until their

ratification of the Fourteenth Amendment in 1868. Indeed, *Bruen* itself explicitly referred to 19th-century evidence in discussing sensitive places. *Id.* at 2133. There would be no reason to do so if 1791 were the dispositive year. Nor would there be reason for the Court to recount the "long journey through the Anglo-American history of public carry" to public-carry restrictions decades "after the ratification of the Second Amendment in 1791." *Id.* at 2145, 2156.[12]

While *Bruen* left open to what extent Founding era evidence is relevant in challenges against state regulations, the State's position is that evidence from 1868 and the post-ratification period is most relevant because it reflects the understanding of the right that states had in mind when ratifying the Fourteenth Amendment.[13] But because the challenged provisions are supported by historical analogues even prior to 1868, the Court need not resolve this issue to deny a TRO.

---

[12] *Cf. McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (extensively discussing history of U.S. gun laws in latter half of 19th century); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("[T]he Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.").

[13] *Cf. Bruen* 142 S. Ct. at 2138 (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* at xiv, 223, 243 (1998) and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917), both of whom argue that the Fourteenth Amendment invested the Bill of Rights with the meanings as understood in the 1868 era).

Moreover, while *Bruen* held that the government bears the burden of adducing relevantly similar historical analogues for firearms restrictions that fall within the protection of the Second Amendment's text, Plaintiffs seeking emergency relief always bear the burden to establish a likelihood of success on the merits. *See City of Harrisburg*, 858 F.3d at 176; *Corbett* (Ex. 3) Tr. 9:13-23 (denying preliminary injunction of firearms statute and noting Plaintiffs fail to meet their burden on likelihood of success if they cannot present "countervailing evidence" rebutting the government's evidence of historical analogues).

Below, the State highlights illustrative examples of historical analogues that support the constitutionality of challenged provisions of Chapter 131.

1. *Locations For Government And Constitutionally-Protected Activity.*[14]

As noted above, *Bruen* already confirmed the constitutionality of designating government buildings as sensitive places where firearms are not permitted. That the *Bruen* Court had little trouble so concluding is unsurprising because government buildings are locations where important democratic rights are at stake, such as the right to vote, the right to petition one's government, and the right to due process in the judicial system. Plaintiffs do not challenge most of Chapter 131's provisions regarding government buildings, but, puzzlingly, they challenge the public library and museum provision. But the same concerns regarding firearms-carry in places

---

[14] Plaintiffs challenge Section 7(a)(12) (libraries and museums).

where the right to petition one's government—like courthouses—also animate restrictions on firearms-carry in places where the rights to speech and intellectual freedom are at their apex—public libraries and museums.

The relevant history confirms that firearms were regularly prohibited at places of government and other constitutionally-protected activity. For example:

- A 1773 Maryland law prohibited bringing any weapon into the House of Assembly. 63 Proceedings and Acts of the General Assembly 338, § 5 (June 15-July 3, 1773) (Ex. 4).
- An 1870 Texas law prohibited carrying guns into any "place where persons are assembled for educational, literary or scientific purposes ... or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly." 1870 Tex. Gen. Laws 63 (Ex. 5). [15]

2. *Locations Where Crowds Gather.* [16]

Historical restrictions on firearms-carry also applied to locations where large crowds gathered, where risk of violent upheaval and chaotic activity with firearms was heightened. This included examples like:

- A 1786 Virginia law prohibited "rid[ing] armed by night nor by day in fairs or markets." 1786 Va. Laws 25, Ex. 6.
- An 1816 New Orleans law prohibited "any person to enter into a public ball-room with any cane, stick, sword or any other weapon." Gen. Digest of the Ords. & Res. of the Corp. of New Orleans 371 (1831) (art. 1) (Ex. 7).
- An 1869 Tennessee statute prohibited deadly weapons in any "fair [or] race course." 1869 70 Tenn. Pub. Acts 23 (Ex. 8).

---

[15] The Texas Supreme Court immediately confirmed the validity of such a law in *English v. State*, 35 Tex. 473, 478–79 (1872).

[16] Plaintiffs challenge Section 7(a)(17) (entertainment facilities).

29

- The same 1870 Texas statute described above prohibited firearms in any "ball room, social party or other social gathering composed of ladies and gentlemen." 1870 Tex. Gen. Laws 63, Ex. 5. In 1871, Texas further prohibited firearms in any "place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind." Art. 320, Tex. Act of April 12, 1871 (Ex. 9).

- An 1879 Missouri law prohibited carrying concealed weapons in "any other public assemblage of persons met for any lawful purpose." Mo. Rev. Stat. 1879, at 224 (§ 1274) (Ex. 10).

   *3. Locations Where Vulnerable Or Incapacitated People Gather.*[17]

   *Bruen* made equally clear that schools are paradigmatic sensitive locations where firearms can be banned. Such restrictions are paradigmatic precisely because schools are places where "great numbers of defenseless people (e.g., children)" gather. *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010). Other locations designated as sensitive also protect vulnerable or otherwise incapacitated individuals. Historical analogues for restricting firearms in locales where vulnerable or incapacitated people gather are plentiful. They include:

- An 1859 Connecticut law providing that: "If any booth shed, tent, or other temporary erection, within one mile of any military parade-ground, muster-field or encampment, shall be used and occupied for the sale of spirituous or intoxicating liquor, or for the purpose of gambling," then "the owner or occupant" of such a structure must "vacate and close the same immediately." 1859 Conn. Acts 62, ch. 82, § 5 (Ex. 11).

- An 1867 Kansas law prohibited carrying of firearms by intoxicated persons. 1867 Kans. Sess. Laws 25 (Ex. 12).

---

[17] Plaintiffs challenge Sections 7(a)(12) (libraries and museums), where children often gather, and (a)(15) (facilities serving alcohol).

- The same 1870 Texas statute described above prohibited firearms in "any school room or other place where persons are assembled for educational, literary or scientific purposes." 1870 Tex. Gen. Laws 63 (Ex. 5).

   *4. Private Property Without Express Permission (Section 7(a)(24)).*

Given the sanctity of property rights throughout our Nation's history, it is unsurprising that there is a robust historical record of laws prohibiting firearms on another's private property without that property owner's express consent. Examples can be found in our own State's history and others':

- A 1771 New Jersey law prohibited "carry [of] any gun on any lands not his own . . . unless he hath license or permission in writing from the owner or owners, or legal possessor." 1771 N.J. Laws 346, §1 (Ex. 13).

- An 1865 Louisiana law prohibited "carry[ing] fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor." 1865 La. Extra Acts 14, No. 10 § 1 (Ex. 14).

   *5. Vehicle Restrictions (Section 7(b)(1)).*

Nor are Plaintiffs likely to succeed on the merits of their challenge to Chapter 131's vehicle carry restriction, which merely specifies *how* firearms are to be carried. Section 7(b)(1) requires individuals carrying a handgun "in a vehicle" to store their gun "unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." But it does not wholly prohibit licensed individuals from carrying firearms in a vehicle.

As applied to public transit vehicles, the provision does not fall within the scope of the Second Amendment's protections because the vehicles are government property or are under government contract, *see supra* at 32-33 (explaining

government as proprietor can decide to prohibit firearms like private owner). In any event, it is consistent with historical regulations of firearms. The concerns that animate permitting firearms-carry on a crowded bus are not relevantly different from those supporting prohibitions on firearms-carry at:

- "[F]airs" or "markets," 1786 Va. Laws 25 (Ex. 6),
- A "race course," 1869-70 Tenn. Pub. Acts 23 (Ex. 8), and
- A "social gathering," 1870 Tex. Gen. Laws 63 (Ex 5).

In each of these places, large numbers of people are congregated in confined spaces, rendering them vulnerable to firearm violence and making self-defense using a gun impracticable given the risk of harming bystanders. In fact, these concerns are amplified on public transit where strangers crowd and jostle in spaces with limited egress, increasing the risk of accidental discharge of a gun. As a result, some states prohibited firearms in and around mass transport.[18] *See, e.g.*, 1876 Iowa Acts 142, ch. 148, § 1 (Ex. 15) (prohibiting "present[ing] or discharge[ing] any gun, pistol, or other fire arm at any railroad train, car, or locomotive engine"). Section 7(b)(1) does not go as far—it only requires storage in a particular way.

As to private vehicles, Section 7(b)(1)'s language on how one must carry also passes constitutional muster. Although private automobiles were not in use at the

---

[18] Because it is not evident that publicly operated mass transportation existed at the Founding or Reconstruction, these provisions serve as the most analogously similar historical statutes for Section 7(b)(1).

Founding or during the Reconstruction period, States began to restrict carrying firearms in motor vehicles contemporaneous with the popularization of automobiles.[19] The mere fact that such restrictions in motor vehicles logically could not have existed prior to the popularization of automobiles is hardly a problem. Motor vehicles pose different problems than Founding-era modes of transport. The speed at and distance which modern motor vehicles can travel make them facilitators of escape in gun crimes. And their speed has created the need for police to enforce speed limits, exposing officers to danger whenever they approach a vehicle at a traffic stop. Thus "[t]he regulatory challenges posed by firearms [in vehicles] today are not … the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132.

Indeed, the laws that did exist during the Founding and Reconstruction eras addressed relevantly similar problems by prohibiting concealed carry altogether. In the early to mid-19th century, States enacted laws broadly prohibiting concealed carry of pistols and other weapons "unless upon a journey." Ark. Rev. Stat. § 13, p. 280 (1838) (Ex. 18); *see also, e.g.*, 1839 Ala. Acts no. 77, § 1 (Ex. 19); 1821 Tenn.

---

[19] *See* 1929 Iowa Acts 90, § 30 (Ex. 16) (prohibiting carrying firearms "in or on a motor vehicle unless the same be unloaded in both barrels and magazine, and taken down or contained in a case"); 1919 Me. Laws 193 (Ex. 17) (prohibiting possession of rifle or shotgun "loaded … in or on any motor vehicle").

Acts ch. 13, § 1, p. 15 (Ex. 20).[20] But courts interpreting these statutes construed the journey exception narrowly, holding that the statutes still prohibited carry while individuals were engaged in day-to-day travel within their community as opposed to prolonged journeys. For example, in *Carr v. State*, 34 Ark. 448 (1879), the Arkansas Supreme Court held that the state's concealed carry ban applied to people "mixing with the people in ordinary intercourse, about the streets" and thus someone in transit through town should "have deposited his pistols with his baggage, and not carried them on his person." *Id*. at 449; *see also Eslava v. State*, 49 Ala. 355, 537 (1873) (holding concealed carry ban applied to someone "going to and from his residence and to his place of business" as well as to "[t]ravel … within the ordinary line of the person's duties, habits, or pleasure"); *see also Smith v. State*, 50 Tenn. 511, 513 (1872) (concealed carry prohibition applied to a "ramble in one's own neighborhood across the lines of contiguous counties"). Thus, like Section 7(b)(1), these statutes restricted the carry of firearms in transit and aimed to prevent individuals from being "about the streets armed in a manner which, upon a sudden fit of passion, might endanger the lives of others." *Carr*, 34 Ark. at 449.

---

[20] *Bruen* concluded that these statutes were not analogous to the modern New York law prohibiting public carry altogether because these historical statutes prohibited only concealed carry and allowed open carry. 142 S. Ct. at 2146. Here, Section 7(b)(1) does not ban handgun carry in a vehicle altogether; it only regulates the manner in which a handgun in a vehicle must be carried. It is therefore analogous to the 19th-century statutes as both restrict manner of carry.

*     *     *     *     *

To be clear, the above list is not the sum of the State's evidence, which will be supplemented at the PI posture and to the extent necessary in the litigation process.[21] But at this early juncture, the State has amply shown that Plaintiffs cannot demonstrate a likelihood of success on the merits because the historical record is replete with relevantly similar sensitive locations regulations.

## IV.   AN INJUNCTION WILL RESULT IN EVEN GREATER HARM TO THE STATE AND THE PUBLIC.

Even if Plaintiffs meet their burden on the likelihood of success on the merits and irreparable harm, emergency relief is still not warranted. That is because the court must "then determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Almagamated Transit*, 39 F.4th at 102-03. When "the Government is the opposing party," the final two factors—"assessing the harm to the opposing party and weighing the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs have not shown that these merged factors favor relief.

The State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018);

---

[21] Courts reviewing less expansive firearms challenges post-*Bruen* have ordered at least a month for a PI response. *See, e.g.*, Order, D.E. 26, *Christian v. Nigrelli*, 1:22-cv-695 (W.D.N.Y. Oct. 3, 2022) (one month); Minute Order, *Angelo v. District of Columbia*, No. 1:22-cv-1878 (D.D.C. July 15, 2022) (two months).

*see also Robinson v. Ardoin*, 37 F.4th 208, 227 (5th Cir. 2022) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." (quotation omitted)). The State, as sovereign, "has a legitimate interest in the continued enforceability of its own statutes." *Cameron v. EMW Women's Surgical Ctr.*, 142 S. Ct. 1002, 1011 (2022) (quotation omitted). But specific harm to the state is especially pronounced where, as here, there is "an ongoing and concrete harm to [the State's] law enforcement and public safety interests." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers).

Here, the harm at issue is more than affront to state sovereignty; an emergency injunction would prevent the State from protecting the public from threats to "health, safety, and welfare posed by gun violence." Ch. 131 § 1(b). "[E]xpanding handgun carrying creates safety risks," including "serious dangers of misuse and accidental use" and "can translate into more acts of gun violence." *Id.* §§ 1(c), (e). There are especially "heightened public safety concerns" for "sensitive places." *Id.* § 1(e).

The risk of dangerous and often fatal situations looms large if the sensitive places provisions are enjoined. For example, a crowded entertainment venue (such as sporting events) could become deadly if fan rivalries are aggravated by a volatile mix of alcohol and firearms. The same rings true for establishments that serve alcohol, should disagreements amongst intoxicated people turn deadly. Studies have shown that road rage incidents are likely to be more frequent and violent when

36

firearms are easily accessible to motorists.[22] And needless to say, firearms in locations where children gather to read and learn pose grave risks of accidental shootings or worse for some of the State's most vulnerable population.[23] The risks to public safety greatly outweigh by any individual harms alleged by Plaintiffs.

A shooting death or injury cannot be undone. Chapter 131 protects the public from "the single most irreparable harm of all"—"death itself." *Turner v. Epps*, 842 F. Supp. 2d 1023, 1028 (S.D. Miss. 2012); *L.A. Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*, 506 F. Supp. 3d 1018, 1036 (C.D. Cal. 2020) ("There can be no dispute that serious injury or death constitutes irreparable harm."). And while the State's interest in protecting the public is obvious, it should be permitted to submit additional evidence at the PI stage.

---

[22] *See* Road Rage, Harvard Injury Control Research Center, https://tinyurl.com/mydabab7; Harry Hoenig, *Road Rage Shootings Soar as New Laws Put More Guns in Cars*, https://tinyurl.com/4mbprc5m (Nov. 28, 2022); Sarah Burds-Sharps, Everytown for Gun Safety, *Reports of Road Rage Shootings are on the Rise*, https://tinyurl.com/52t82waa (Apr. 4, 2022).

[23] *See, e.g.*, Dustin Jones, *Firearms overtook auto accidents as the leading cause of death in children*, https://tinyurl.com/mwu6y9cs (Apr. 22, 2022); Jaclyn Diaz, *High Gun Sales And More Time At Home Have Led To More Accidental Shootings By Kids*, https://tinyurl.com/3k5472sv (Aug. 31, 2021); Michael A. Fletcher, *"A quiet phenomenon": The rise of gun violence at school sports*, https://tinyurl.com/3a6dcv3c (Sept. 30, 2022).

## <u>CONCLUSION</u>

This Court should deny a TRO.[24]


                    Respectfully submitted,

                    MATTHEW J. PLATKIN
                    ATTORNEY GENERAL OF NEW JERSEY
By:    */s/Angela Cai*
                    Angela Cai
                    Deputy Solicitor General


Dated:  December 30, 2022

---

[24]  If the Court disagrees, any TRO should limit its relief to the Plaintiffs in this suit. *See City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 292 (3d Cir. 2019) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." (citation omitted)).