FOR PUBLICATION                                            [Docket No. 8]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| RONALD KOONS, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>WILLIAM REYNOLDS, *et al.*,<br><br>                    Defendants. | Civil No. 22-7464 (RMB/EAP)<br><br>**OPINION** |

**APPEARANCES**
David D. Jensen
David Jensen PLLC
33 Henry Street
Beacon, NY 12508

>        *On behalf of Plaintiffs*

Angela Cai, Deputy Solicitor General
Jean Reilly, Assistant Attorney General
David Chen, Deputy Attorney General
Amy Chung, Deputy Attorney General
Viviana Hanley, Deputy Attorney General
Chandini Jha, Deputy Attorney General
Samuel L. Rubinstein, Deputy Attorney General
Office of the New Jersey Attorney General
25 Market Street
Trenton, New Jersey 08625

>        *On behalf of New Jersey State Defendants and Defendant Annemarie Taggart (in her*
>        *official capacity as the Prosecutor of Sussex County, New Jersey)*

James F. Ferguson
Atlantic County Department of Law
1333 Atlantic Avenue
Atlantic City, NJ 08401

*On behalf of Defendant William Reynolds (in his official capacity as the Prosecutor of Atlantic County, New Jersey)*

Howard L. Goldberg
Office of Camden County Counsel
520 Market Street – Courthouse– 14th Floor
Camden, NJ 08102

*On behalf of Defendant Grace Macaulay (in her official capacity as the Prosecutor of Camden County, New Jersey)*

**BUMB, United States District Judge**

This matter comes before the Court upon the Motion for a Temporary Restraining Order and Preliminary Injunction by individual plaintiffs Ronald Koons, Nicholas Gaudio, and Jeffrey Muller, as well as the following four organizations that each such individual is a member of: Second Amendment Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey Second Amendment Society (together, "Plaintiffs") against the New Jersey Attorney General, Matthew J. Platkin, Superintendent of the New Jersey State Police, Patrick Callahan (both "New Jersey State Defendants" or "State Defendants"), and County Prosecutors William Reynolds (Atlantic County Prosecutor), Grace C. Macaulay (Camden County Prosecutor), and Annemarie Taggart (Sussex County Prosecutor) (together, "Defendants"). For the reasons set forth below, the motion for a temporary restraining order will be GRANTED, and the Court will RESERVE its decision on the motion for a preliminary injunction.

## I.       BACKGROUND

This case concerns a constitutional challenge on Second and Fourteenth Amendment grounds to newly enacted New Jersey legislation that restricts the possession of a firearm in any location classified by the state legislature as a "sensitive place" and certain other restrictions on carrying functional firearms in vehicles.  Plaintiffs, who have permits from the State of New Jersey to conceal carry handguns, contend that just until a few short weeks ago, persons in this state with a permit were generally free to carry a handgun "as they went about their business," with limited exceptions for specific locations including schools, colleges, universities, other educational institutions, state parks, casinos, and any "federal facility" as such term is defined by applicable federal law. [Docket No. 9 (hereafter, "Pls.' Br."), at 3 (citations omitted).]

The New Jersey legislation at issue here was enacted in response to the United States Supreme Court decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, holding "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. __, 142 S. Ct. 2111, 2122 (2022).  The *Bruen* Court struck down a New York statute that required an applicant for a permit to carry a handgun to demonstrate "proper cause," and, in doing so, acknowledged the unconstitutionality of analogous statutes in other states that required a "showing of some additional special need," such as New Jersey's law that required an applicant to show "justifiable need" for a permit to carry. *Id.* at 2124 n.2.

### A.      Plaintiffs' Complaint and Request for Emergent Injunctive Relief

Plaintiffs allege that "[a]t first, the State of New Jersey complied with the Court's directive" in *Bruen*, by abandoning its "justifiable need" requirement.  [Pls.' Br. at 1.]  But on December 22, 2022, Governor Phil Murphy signed into law Chapter 131 of the 2022 Laws of New Jersey that imposed a new set of requirements, many of which became effective immediately, including declaring certain locations as "sensitive places" where firearms are prohibited, even by carriers with permits, as well as a ban on carrying functional firearms in vehicles.  Plaintiffs decry the challenged legislation as declaring war on the Second Amendment because it essentially renders the entire State of New Jersey a "sensitive place" where firearms are prohibited.  [Pls.' Br. at 1 (New Jersey "has declared most of the State to be off limits to carry through the artifice of 'sensitive places'").]

Of note is the fact that Plaintiffs' current challenge does not attack the entire piece of legislation.  As Defendants point out and Plaintiffs do not challenge here, other relevant provisions of Chapter 131 strengthened the criteria used to determine whether an applicant is qualified to purchase or carry firearms.  2022 N.J. Laws c. 131 § 2.  The chapter also enhanced requirements for character references and instituted a firearms safety course requirement.  *Id.* §§ 2, 3.  Further safety-related changes to carry requirements are set to take effect in seven months:  Section 4 requires that anyone carrying a handgun in public obtain liability insurance, and Sections 5 and 6 set out requirements for the safe carry of handguns.  *Id.*

In their Complaint, Plaintiffs assert a cause of action against each Defendant for Deprivation of Civil Rights pursuant to 42 U.S.C. § 1983, alleging that each Defendant has the authority to enforce the State's criminal laws, including Chapter 131 subparts 12, 15, 17, and 24 of Section 7(a), as well as Section 7(b)(1)'s prohibition on carrying functional firearms in vehicles, notwithstanding that these provisions are unconstitutional and violate the Second Amendment (as applied to the states through the Fourteenth Amendment).  [Docket No. 1 ¶¶ 67—69.]  Defendants do not oppose their authority to enforce these laws.  In fact, at oral argument, the State confirmed that Defendants would not agree to forgo prosecuting Plaintiffs for violations of these provisions.  [Transcript of Oral Argument held on January 5, 2023 ("Tr."), at 27 (The Court: "Is the State willing to agree not to prosecute each of these plaintiffs?" Ms. Cai: "No.").]

On December 24, 2022, Plaintiffs filed a Motion for Order to Show Cause, Motion for Temporary Restraining Order, and Motion for Preliminary Injunction. [Docket No. 8.] On December 26, 2022, the Court entered an Order requiring Defendants to appear and Show Cause why the relief sought should not be granted, as well as setting a briefing schedule for this motion.  [Docket No. 13.]  On January 5, 2023, the Court held oral argument.

### B.    The Challenged Legislation and Potential Penalties of Conviction

Section 7(a) of the newly enacted legislation lists 25 categories of locations where it is a third-degree offense "to knowingly carry a firearm."  2022 N.J. Laws c. 131.  The punishment for a crime of the third degree is imprisonment for up to five

years.  *See* N.J.S.A. §§ 2C:43-6(a)(3), 2C:44-1(f)(1)(d).  In the current suit, Plaintiffs

seek to enjoin the law's enforcement of the following enumerated "sensitive places"

set forth in Section 7(a):

    (1)    Subpart 12 (prohibiting firearms in "a publicly owned or leased library or museum");

    (2)    Subpart 15 (prohibiting firearms in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises");

    (3)    Subpart 17 (prohibiting firearms in "a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held"); and

    (4)    Subpart 24 (prohibiting firearms in "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6").

2022 N.J. Laws c. 131.

In addition, Section 7(b) of the legislation imposes an additional "sensitive

place" restriction that bans functional firearms in vehicles, more specifically, it makes

it a fourth-degree offense to transport or carry a firearm "while in a vehicle in New

Jersey, unless the firearm is unloaded and contained in a closed and securely

fastened case, gunbox, or locked unloaded in the trunk of the vehicle."  *Id.*  The

maximum sentence for this crime is 18 months' imprisonment.  *See* N.J.S.A. §§

2C:43-6(a)(4), 2C:44-1(f)(1)(e).  Plaintiffs highlight the unconstitutional effect of Section 7(b):  that permitted firearm carriers such as themselves now must transport a firearm in a vehicle the same way as someone who does not have a concealed carry permit from the State.  [Pls.' Br. at 8 (citing N.J.S.A. 2C:39-6(g)).]

In their submissions, Plaintiffs acknowledge that the "sensitive places" and vehicle carry restrictions both carve out exemptions for certain persons (law enforcement, members of the Armed Forces, airport security officers, arson investigators, nuclear site guards, etc.).  [*Id.* at 89 (citing N.J.S.A. 2C:39-6).]  They do not challenge those carve-outs.  However, Plaintiffs contend that the only exemption the law gives for an ordinary, law-abiding, private citizen is authorization to "store a handgun or ammunition within a locked lock box and out of plain view within the vehicle in the parking area."  2022 N.J. Laws c. 131 § 7(c)(2).  A holder of a valid and lawfully issued permit to carry can "transport a concealed handgun in the immediate area surrounding [his] vehicle within a prohibited parking lot for the limited purpose of storing or retrieving the handgun within a locked lock box in the vehicle's trunk or other place inside the vehicle that is out of plain view," and can "transport a concealed handgun between a vehicle parked within a prohibited parking lot area and a place other than a prohibited place . . . provided that the person immediately leaves the parking lot area and does not enter into or on the grounds of the prohibited place with the handgun."  [*Id.* at § 7(c)(3)-(4).]

Again, although Plaintiffs do not concede the constitutionality of any of the chapter's other "sensitive place" designations, [Pls.' Br. at 10.], they only challenge

7

the foregoing subparts because they "all satisfy three essential criteria." [*Id.*] Specifically, that these new regulations are: "(1) plainly unconstitutional; (2) do not depend on other legislative acts, such as the enactment of a local ordinance or a state regulation; and (3) substantially interfere with a law-abiding citizen's ability to carry a handgun for the purpose of protection." [*Id.* at 11.] Because they are being irreparably harmed each day that the unconstitutional legislation remains in effect, Plaintiffs ask this Court to immediately, temporarily, preliminarily, and ultimately, permanently restrain Defendants' enforcement of these challenged provisions.[1]

### C.   The Individual Plaintiffs

In support of their request, the three individual Plaintiffs have submitted sworn declarations. [Docket Nos. 10 (Decl. of Ronald Koons), 11 (Decl. of Nicholas Gaudio), 12 (Decl. of Jeffrey Muller).] Plaintiff Koons, a retired U.S. Air Force member, former official of the Federal Aviation Association, and a pastor at a church in Egg Harbor Township, New Jersey, swears in his Declaration that he regularly carried a handgun while driving in a car or doing business at a number of private businesses. [Docket No. 10 ¶¶ 3, 4, 5, 9.] He carried a handgun while in

---

[1] In another case filed on the same day as the present action, *Siegel, et al. v. Platkin, et al.*, Civ. No. 22-07463 (KMW/AMD), certain plaintiffs have challenged the constitutionality of many other provisions of Chapter 131 governing firearm restrictions in New Jersey. The Court agrees with Plaintiffs that the present case raises a distinct and separate issue regarding only whether certain enumerated locations constitute constitutionally permissible "sensitive places" where handguns may be prohibited even by permitted carriers and not other constitutional attacks on the new law. [*See* Docket No. 16, at 1.]

Atlantic City, New Jersey to protect himself and other individuals from church for self-defense.  [*Id.* ⁋ 9.]  Now that the law is in effect, he avers, he has stopped carrying a gun "during the normal course of [his] life" because the "'sensitive places' are so extensive, and the penalties are so great for violating them, it [is] too much of a risk to take."  [*Id.* ⁋ 12.]  As to the private property legislation, Plaintiff Koons avers that the majority of places where he transacts business "have never expressed an opinion about whether they want firearms on premises.  Since [he] lack[s] express consent, [he] would not be able to carry there."  [*Id.* ⁋ 13.]

Plaintiff Gaudio, a systems engineer for Lockheed Martin with a United States Department of Defense Top Secret security clearance, avers in his Declaration that he began carrying a handgun on a regular basis after he received his permit to carry a firearm.  [Docket No. 11 ⁋⁋ 3, 4.]  However, as a result of the new legislation, "[he] will have no option but to leave [his] handgun at home when [he] is traveling in public by automobile, effectively negating all of the protections and freedoms that [his] family and [he] have enjoyed since [obtaining the permit to carry] and rendering [his] New Jersey Permit to Carry useless."  [*Id.* ⁋ 16.]  Moreover, as to the prohibition on driving with a functional firearm, Plaintiff Gaudio avers that the new legislation effectively prevents him from defending himself while driving or as a passenger.  [*Id.* ⁋ 15.]  He is also afraid of the risk of being charged with brandishing a weapon as the "act of uncasing, loading, and holstering a handgun in public could easily be perceived as brandishing a handgun by passersby and bystanders, which creates the potential for law enforcement officers to misinterpret [his] only legal

option to arm [himself] in public for a threatening act.  This could potentially result in a situation where [he] could get arrested or injured due to a misunderstood innocent and legal action."  [*Id.*]

Plaintiff Muller, a victim of a vicious kidnapping, had obtained a carry permit pursuant to the previous "justifiable need" standard.  [Docket No. 12 ¶¶ 36.]  After receiving his permit, he remained "very concerned about [his] personal safety, and [he] began to carry [his] handgun on a nearly constant basis."  [*Id.* ¶ 8.]  As a result of the new legislation, he avers, he has "no choice but to stop carrying a handgun away from [his] own home and property."  [*Id.* ¶ 18.]  According to Muller the irony of the State's reaction to the Supreme Court's decision in *Bruen* protecting the right to bear arms is this legislation, pursuant to which "I have largely lost the ability to bear arms that I have had since 2011."  [*Id.*]  Like Plaintiff Gaudio, Plaintiff Muller is unable to protect himself while in a car and is concerned that loading and unloading a gun when getting into and out of a car as the legislation requires would cause "someone who saw [him] loading or unloading [his] gun [to] call the police."  [*Id.* ¶ 13.]

### D.    Defendants' Response to the Request for Immediate Relief

In response,[2] Defendants first argue that there is no need for urgency, and, at a minimum, this Court should afford Defendants more time to set forth the legal justifications for the newly enacted legislation.  [State's Br. at 7 ("The State files this

---

[2] The State Defendants filed a Brief in Opposition [Docket No. 21 ("State's Br.")], which Defendant Reynolds, Defendant Macaulay, and Defendant Taggart have since joined in. [Docket Nos. 19, 22, 32.]

response to the TRO application only, and requests an opportunity to fully brief the PI motion.")]  Next, Defendants assert that Plaintiffs have failed to establish an Article III injury redressable by the issuance of a temporary restraining order.  [*Id.* at 9.]  Because each Plaintiff has failed to establish a sufficiently imminent injury, Defendants argue, standing is lacking and the Court's jurisdiction is defective.  [*Id.*]  Finally, as to the merits of Plaintiffs' motion, Defendants argue that many of the provisions challenged by Plaintiffs fall outside the scope of the Second Amendment, and even if they are covered by the text of the Second Amendment the provisions are supported by a historical tradition of firearm regulation consistent with the dictate of *Bruen*.  [*Id.* at 20.]

## II.     GOVERNING LEGAL STANDARDS

### A.     Procedural Legal Standard

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders and preliminary injunctions.  In the Third Circuit, the four requirements Plaintiffs must satisfy to obtain the emergent injunctive relief sought are familiar ones:

> (1) a reasonable probability of eventual success in the litigation, and (2) that [they] will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (citing *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917,

11

919–20 (3d Cir. 1974) (citations omitted)).  The Third Circuit has also made clear that "[p]reliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'"  *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994)).

Relatedly, temporary restraining orders have the same requirements and are "stay-put orders . . . designed to maintain the status quo during the course of proceedings. They 'function[ ], in essence as an automatic preliminary injunction.'" *J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 272 (3d Cir. 2002) (quoting *Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir.1996)).  However, relevant for purposes of appeal, "a party cannot be a prevailing party if the interim relief received is not merit-based."  *Id.* at 273 (citations omitted).

### B.    Substantive Legal Standard

The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *Bruen*, the Supreme Court rejected the two-step approach adopted by many of the Courts of Appeals to assess Second Amendment claims, abandoning the second step of the analysis at which courts "appl[ied] means-end scrutiny in the Second Amendment context."  142 S. Ct. at 2127.  Relying on its precedential decisions in *Heller* and *McDonald*, the Supreme Court explained that it had not once, but twice "declined to engage in means-end

12

scrutiny because 'the very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.'" *Id.* at 2129 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008) (emphasis in original)); *see also McDonald v. Chicago*, 561 U.S. 742, 790-91(2010) (explaining that the Second Amendment does not permit "judges to assess the costs and benefits of firearms restrictions" under a means-end scrutiny analysis).

By making "the constitutional standard endorsed in *Heller* more explicit," the *Bruen* Court clarified that:

> the standard for applying the Second Amendment is as follows:  When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The Government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition.

*Bruen*, 142 S. Ct. at 2129–30.  Drawing an analogy to the First Amendment, the *Bruen* Court reasoned that when the Government restricts constitutionally protected conduct like speech, "the Government bears the burden of proving the constitutionality of its actions." *Id.* at 2130 (citations omitted). Thus, the State must be able to meet its burden of proof in the Second Amendment context and "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

The *Bruen* Court was clear in its instruction to this Court when undertaking a constitutional analysis of a state's gun control legislation.  This Court must rely on history to inform the meaning of constitutional text rather than make empirical

judgments about the costs and benefits of firearms restrictions.  As the Court explained, "[i]f the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of 'intermediate scrutiny' often defer to the determinations of legislatures." *Bruen*, 142. S. Ct. at 2131.  And,

> while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here.  The Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law- abiding responsible citizens to use arms' for self-defense . . . It Is this balance—struck by the traditions of the American people—that demands our unqualified deference.

*Id.*

The *Bruen* Court then applied the test set forth in *Heller* to the challenged legislation, further instructing District Courts considering Second Amendment challenges "to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."  *Id.* at 2131.  The *Bruen* Court gave important examples indicating how District Courts might detect unconstitutional legislative overreach in Second Amendment terms:

> [i]n some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds,

that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* By contrast, in "other cases implicating unprecedented societal concerns or dramatic technological changes," historical analogies will not be as easy to draw and "may require a more nuanced approach." *Id.* at 2132. Nevertheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* (citing *United States v. Jones*, 565 U.S. 400, 404–05 (2012)).

Thus, in keeping with *Heller*, District Courts must look to historical context because "it has always been understood that the Second Amendment . . . codified a *pre-existing* right." *Id.* at 2127 (quoting *Heller*, 554 U.S. at 592) (emphasis in original). The *Bruen* Court also emphasized the important balance that District Courts must strike when considering statutes that plainly implicate the Second Amendment:

> analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2133.

The *Bruen* Court further instructed "that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* And as stated in those precedential cases, "individual

self-defense is the central component of the Second Amendment right." *Id.* (internal

quotations and citations omitted).  And central to the consideration of a reviewing

District Court is "whether modern and historical regulations impose a comparable

burden on the right of armed self-defense and whether that burden is comparably

justified." *Id.* (citations omitted).

Of critical importance to the current controversy, the *Bruen* Court expressly

considered and commented upon the permissibility of the type of "sensitive place"

legislation at issue here:

> Consider, for example, *Heller's* discussion of "longstanding" laws
> forbidding the carrying of firearms in sensitive places such as schools
> and government buildings. Although the historical record yields
> relatively few 18th- and 19th-century "sensitive places" where weapons
> were altogether prohibited—*e.g.*, legislative assemblies, polling places,
> and courthouses—we are also aware of no disputes regarding the
> lawfulness of such prohibitions. We therefore can assume it settled that
> these locations were "sensitive places" where arms carrying could be
> prohibited consistent with the Second Amendment. And courts can use
> analogies to those historical regulations of "sensitive places" to
> determine that modern regulations prohibiting the carry of firearms in
> new and analogous sensitive places are constitutionally permissible.

> Although we have no occasion to comprehensively define "sensitive
> places" in this case, we do think respondents err in their attempt to
> characterize New York's proper-cause requirement as a "sensitive-
> place" law. In their view, "sensitive places" where the government may
> lawfully disarm law-abiding citizens include all "places where people
> typically congregate and where law-enforcement and other public-safety
> professionals are presumptively available." It is true that people
> sometimes congregate in "sensitive places," and it is likewise true that
> law enforcement professionals are usually presumptively available in
> those locations. But expanding the category of "sensitive places" simply
> to all places of public congregation that are not isolated from law
> enforcement defines the category of "sensitive places" far too broadly.
> Respondents' argument would in effect exempt cities from the Second
> Amendment and would eviscerate the general right to publicly carry

16

arms for self-defense that we discuss in detail below. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

[*Id.* at 2133–34 (internal quotations and citations omitted).]

With the guiding instructions and principles given in *Bruen*, this Court examines the challenged state law provisions. But before doing so, the Court repeats the following observation. The State's Brief spends considerable time setting forth what the Legislature's concerns were: "The Legislature found that the elimination of the 'justifiable need' requirement resulted in 'the likelihood that a much greater number of individuals will now qualify to carry handguns in public,' necessitating identifying 'sensitive places where, due to heightened public safety concerns, carrying a dangerous, potentially lethal device or weapon, including a handgun, is not permissible.'" [State's Br. at 5 (citing 2022 N.J. Laws c. 131 § 1(e)).] The Legislature also recognized the unique dangers of having loaded firearms in vehicles. [*Id.* at 7.]

However, it is this type of deference seeking that the Supreme Court has cautioned federal courts to avoid. It is not the role of this Court to either pass judgment (*i.e.*, "make difficult empirical judgments") on the costs and benefits of firearms restrictions or to defer to the intent of the Legislature (which parenthetically, the Supreme Court found understandable). *Bruen*, 142 S. Ct. at 2131. This Court's role is straightforward. The Court must answer two questions: one, does the Second Amendment's plain text cover the challenged provision? And two, does historical

17

evidence support the restriction?

## III.    ANALYSIS

Before the Court turns to the merits of Plaintiffs' Motion, it addresses two of
Defendants' preliminary arguments.  As noted, Defendants press this Court to refrain
from acting urgently and to afford them more time to set forth the legal justifications
for the legislation.  [State's Br. at 7.]  As State Defendants argue, a "hasty injunction
would short-circuit the democratic process while the litigation process is underway."[3]
[State's Br. at 2.]  This Court concurs, in that no injunction should ever be hastily
issued, but Defendants must do more than promise they will justify the constitutional
basis for its legislation later.  Surely, Defendants had—or should have had—the
historical materials and analyses the State relied upon when it began its legislative
response to *Bruen*.  After all, the Supreme Court was clear that in order for any gun
control legislation to pass constitutional muster under the Second Amendment, such
legislation must be consistent with historical tradition.  The State has had six months

---

[3] In support, Defendants point to the Second Circuit's stays of District Court orders
enjoining the enforcement of similar New York legislation.  [State's Br. at 2 n.1
(citing Order, Docket No. 41, *Christian v. Nigrelli*, No. 22-2987 (2d Cir. Dec. 12,
2022); Order, Docket No. 75, *Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Dec. 7, 2022);
Order, Docket No. 53, *Hardaway v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022)).]
But Defendants leave out part of the story:  on December 21, 2022, plaintiffs in
*Antonyuk* petitioned the United States Supreme Court to vacate the Second Circuit's
stay order.  Brief of Applicants, *Antonyuk v. Nigrelli*, No. 22A557 (U.S. Dec. 21,
2022).  Thus, it is by no means clear that New York's newly adopted gun control
legislation will remain in effect while the case proceeds.  Here, Defendants are in
essence asking this Court to allow New Jersey's legislation to continue with no
reasonable end in sight, as this litigation could take years to resolve.  Instead, until
such time, this Court will uphold the status quo.

since *Bruen* to identify well-established and representative historical analogues.[4]  *See*

*Bruen*, 142 S. Ct. at 2133 ("analogical reasoning requires only that the government

identify a well-established and representative historical *analogue*, not a historical *twin*.

So even if a modern-day regulation is not a dead ringer for historical precursors, it

still may be analogous enough to pass constitutional muster.")  In fact, Chapter 131

expressly states that the "sensitive-place prohibitions on dangerous weapons set forth

in this act are rooted in history and tradition . . . analogous to historical laws that can

be found from the Founding era to Reconstruction, which are also found in modern

laws in many states."  2022 N.J. Laws c. 131 § 1(g).[5]

That Defendants dedicate a significant portion of their argument discussing

the benefits of the firearms regulations and not evidence of historical analogues is

quite telling.  And although Defendants represent that the "State will offer ample

evidence that Chapter 131 is constitutional," [State's Br. at 2], they do not

adequately explain why—if such evidence was critical to the passage of the

legislation that would pass constitutional muster post-*Bruen* and available to the

Legislature as set forth in Section 1(g) of the statute—they have not introduced such

---

[4] The New Jersey Assembly passed the legislation on November 21, 2022, and the New Jersey Senate passed the bill on December 19, 2022.  Both bills were introduced in mid-October. https://njleg.state.nj.us/bill-search/2022/

[5] Thus, the State will not be given significant time moving forward to produce sufficient justification for the new firearm restrictions.  At oral argument the State seemed to clarify that there were not necessarily more historical analogues that this Court might need to consider, but that the historical context and analysis require a deeper inquiry.

19

evidence here.  Certainly, Defendants anticipated challenges to the legislation and should have been better prepared to defend the legislation's constitutionality. Plaintiffs implore this Court to consider the only reasonable conclusion from Defendants' posturing:  their dragging of feet is evidence that no such historical tradition and evidence exists.  Perhaps.  At this juncture, there is no bona fide basis for this Court to withhold its ruling because the State says it needs more time to come forward with historical evidence that the Legislature represented it had at the time of the law's passage.  The Court will therefore proceed to consider the evidence and argument the parties have presented.[6]

Defendants also remonstrate against the restraints, urging that the "risk of dangerous and fatal situations looms large if the sensitive places provisions are enjoined.  For example, a crowded entertainment venue (such as sporting events) could become deadly if fan rivalries are aggravated by a volatile mix of alcohol and firearms. [State's Br. at 36–37.]  After all, "[a] shooting death or injury cannot be undone." [*Id.* at 37.]  It is a prod that seeks to embroil this Court in assessing the benefits of the challenged gun control regulations, something this Court is expressly

---

[6] As noted, Defendants may ultimately come forward with historical materials or analyses that demonstrate comparable traditions of regulation.  That remains to be seen, but this Court is under a duty to rule on the matter before it at this time.  And if Defendants have historical evidence they wish this Court to consider during the pendency of the restraints, they are free to seek to dissolve the restraints.  As the Court in *Antonyuk* pointed out when presented with a similar argument, temporary restraining orders do not actually require an opportunity for opposition or papers. 2022 WL 5239895, at * 5.  There, the court also found that the State defendants had had a reasonable opportunity in their opposition papers and oral argument to come forward with all historical statutes they believed to be analogues.

prohibited from doing under Supreme Court jurisprudence. *See Bruen*, 142 S. Ct. at 2129 (explaining that "[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all") (citations and quotations omitted).

The Court turns to the parties' arguments.

## A.   Standing

To have standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561(1992)).  Defendants first challenge any issuance of restraints on jurisdictional grounds, contending that each Plaintiff has failed to demonstrate concrete plans to imminently visit each of the challenged "sensitive places," that Plaintiffs fail to establish any credible threat of enforcement, and that Plaintiffs have not demonstrated traceability or redressability as to their claims.  This Court disagrees and finds that the Plaintiffs have sufficiently shown that they have suffered an imminent injury:  not being able to carry their handguns in public locations for the purpose of self-defense, a right guaranteed by the Second Amendment.  If Plaintiffs resumed such conduct, they would suffer imminent injury in the form of criminal penalties, which Defendants, who have not disavowed an intent to enforce the new law, have full authority to bring against them.

At oral argument, the State conceded that Plaintiffs have shown a

particularized injury,[7] given that they each have valid permits to carry handguns and were generally permitted to do so in the challenged "sensitive places" prior to the enactment of the relevant provisions of Chapter 131.  [Tr. at 18.]  Instead, the State argued that Plaintiffs fail to show imminent harm to obtain the temporary restraints they seek because individual Plaintiffs' Declarations did not set forth a future intent to visit each of the enumerated "sensitive places."  [*Id.* at 18–19.]

The Court makes two initial observations.  First, is the *Bruen* Court's holding that individuals have a Second Amendment "right to carry a handgun for self-defense outside the home."  *Bruen*, 142 S. Ct. at 2122.  Second, is the fact that the narrow category of sensitive places challenged (*public* libraries and museums, bars/restaurants/where alcohol is served, entertainment facilities, in vehicles, and on private property such as businesses) clearly concern locations that are generally open to, and frequented by, ordinary members of the public.  Indeed, Plaintiffs affirmed at oral argument that they intended this suit as a narrow attack on these specific locations because if such restrictions were enjoined, there would again be a

_____

[7] Curiously enough, in their supporting briefs, both sides rely upon the Third Circuit's decision in *Ellison v. Am. Bd. of Orthopaedic Surgery*, in which the Circuit held that a surgeon did not have standing to sue a medical board for preventing him from obtaining privileges to practice in New Jersey when the surgeon "had not attempted to apply for medical staff privileges or taken any concrete steps to practice in New Jersey." 11 F.4th 200, 203 (3d Cir. 2021). The Circuit explained that "[i]njury in fact is often determinative of standing," the purpose of which is to determine whether a plaintiff has "a direct stake in the outcome." *Id.* at 205. Here, the Court agrees with Plaintiffs that *Ellison* is distinguishable as Plaintiffs' conduct in obtaining permits from the State to conceal carry wherever permitted equates to concrete steps taken to carry a handgun in the locations now prescribed as "sensitive places."  Thus, Plaintiffs have shown a particularized injury.

significant number of locations where they could go about conducting their daily lives. [Tr. at 89 ("eliminating those categories would open up a fair amount of conduct that isn't opened right now in terms of people actually going about their daily lives and carrying arms").]

"[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). The Court is satisfied that Plaintiffs have met this showing. Here, as summarized above, Plaintiffs have submitted sworn statements that the challenged regulations are so broad that they severely impact their ability to even leave their own home and property with their firearms, notwithstanding the fact that they were previously permitted by the State to freely do so, without fear of severe criminal penalty. This has substantially impacted their ability to carry a handgun at all within the State. It is the Court's view that such threatened injury is sufficient to show standing at this stage with respect to the challenged provisions. [*See e.g.*, Docket No. 12 (Muller Decl.) ¶¶ 16, 19.] The Court notes, however, that the Supreme Court has cautioned that "the proof required to establish standing increases as the suit proceeds."[8] [*Id.*]

Defendants contend that the Plaintiffs fail to substantiate or even allege

---

[8] The Court reserves on the question as to whether it should parse each "sensitive place' mentioned in the relevant provisions of the statute with respect to each individual Plaintiff at the preliminary injunction ("PI") stage. However, if discovery reveals additional standing issues, the Court expects the State to raise such issues at the PI stage.

concrete plans to imminently visit the places for which they challenge Chapter 131's provisions.  For example, with respect to the restriction on carrying firearms in public libraries or museums, Defendants admit that "[t]he closest that any Plaintiff comes is Plaintiff Muller's statement that he has carried his handgun while visiting the library in the past." [State's Br. at 11 (internal citations and quotations omitted).] And although Mr. Muller did state that he does not remember visiting a museum since having his permit to carry, the State does not look at what he does positively affirm under oath:  that he would resume carrying a handgun in public more frequently if he did not face criminal penalties, including "attend[ing] a public event or go[ing] to a venue like a museum or theater."  [Muller Decl. ¶¶ 11, 19.]  The other Plaintiffs similarly affirm that they, too, would generally resume carrying a handgun with them in public, including at the grocery store, in bars and restaurants, and during their ordinary suburban activities, among other locations.  [Koons Decl. ¶ 14; Gaudio Decl. ¶ 18.]

The Court finds that all Plaintiffs clearly have standing to challenge the sweeping restrictions on carrying handguns on private property or in vehicles.  Of the three remaining "sensitive place" restrictions, the Court is satisfied based on the Plaintiffs' pleadings, arguments, and Declarations that at least one Plaintiff has frequented a location covered by each of the challenged provisions.  Further, these "sensitive places" all appear to be limited to places that are generally open to the public and where ordinary persons like Plaintiffs would be expected to frequent upon occasion.  The Court need not get bogged down in knowing how frequently each

24

Plaintiff checks books out of his local library or who is more of a movie-goer. Instead, Plaintiffs have shown an immediate threat if they were to resume carrying their handguns with them in public as they did prior to the law's enactment, notwithstanding that they have a Second Amendment right to do so in public for self-defense.[9]

Indeed, the challenged provisions became effective immediately, and there exists no way for Plaintiffs to obtain an exception under the law to avoid a criminal prosecution. This is only further evidence of imminent harm. The State's demand that Plaintiffs demonstrate a concrete future intent to visit every single one of the statutorily prescribed "sensitive places" is too demanding, especially since some provisions contain catch-alls. *See* 2022 N.J. Laws c. 131, Section 7(a) subpart 17 (banning firearms in all entertainment facilities "including but not limited to" those listed). Having reviewed the Plaintiffs' Declarations, including allegations that at least one Plaintiff has visited a location covered by each of the challenged provisions of the legislation and that Plaintiffs would resume carrying handguns with them publicly wherever permissible, the Court is satisfied that Plaintiffs, as the holders of concealed carry permits, have demonstrated standing to pursue the current relief against an imminent, particularized, and concrete injury.

The Court also outright rejects Defendants' argument that Plaintiffs have

---

[9] The Court concurs with counsel for Plaintiffs that "[p]eople's lives do not necessarily lay out into a scheduling book that run six months or a year or however long into the future." [Tr. at 34.]

failed to establish any credible threat of enforcement of the laws against them. Absent a concession by Defendants that they do not intend to enforce the newly enacted legislation, Plaintiffs have averred credible threats of prosecution.  Indeed, as Plaintiffs point out, every indication is that the State of New Jersey intends to prosecute any violation of these laws to the fullest extent.[10] [Docket No. 28 ("Pls.' Reply") at 5 (explaining that the law does not require petitioner to expose himself to actual arrest or prosecution to challenge a statute as unconstitutional because "what's more significant" is the fact that Defendants do "not disavow the possibility of prosecution") (citing *Artway v. Attorney General*, 81 F.2d 1235, 1248 (3d Cir. 1998)).]  As noted above, at oral argument, the Court explored the threat of prosecution and queried whether Defendants would agree not to prosecute a violation under these provisions of the new legislation, but the Defendants would not agree that they would not prosecute Plaintiffs for violations of the newly enacted legislation.  [Tr. at 27.]

Finally, Defendants argue that Plaintiffs have failed to demonstrate traceability or redressability as to their claims.  Specifically, they argue, Plaintiffs have "adduce[d] no evidence that the proprietors of entertainment venues,

---

[10] At least one court has adopted the opposite view and refused to enjoin a similar law post-*Bruen*, but in that case the court was applying D.C. Circuit precedent that required the plaintiffs to establish prior threats of prosecution or a special likelihood of enforcement to demonstrate an imminent injury.  *See Angelo v. District of Columbia*, 2022 WL 17974434, at *6 (D.D.C. Dec. 28, 2022) (explaining that "to establish Article III standing, a plaintiff bringing a preenforcement challenge must do more than show that the government enforces its laws as written").  This Court does not take the same view in its standing analysis.

restaurants, and other private establishments would not have allowed Plaintiffs to bring firearms into those locations were it not for Section 7(a)(24)." [State's Br. at 14.]  It is an illogical argument this Court explores in greater detail below:  in order for Plaintiffs to demonstrate redressability they must first give up their right to bear arms, and then go on to the private property to inquire as to the proprietor's intent. If the proprietor does not expressly authorize the presence of firearms, then the Plaintiffs now have the answer they needed, but by that time they have violated the law and exposed themselves to prosecution.  This convoluted scenario demonstrates how the challenged legislation is directly traceable to the Plaintiffs' complained of injury.[11]

For the reasons set forth above, the Court finds that at this stage of the proceeding the individual Plaintiffs have made a sufficient showing of standing.  The Court therefore turns to the requirements under Federal Rule of Civil Procedure 65.

**B.  Likelihood of Success on the Merits – The State's Historical Justification for the Challenged "Sensitive Places"**

As an initial matter, this Court echoes the observations made in *Antonyuk v. Hochul*, Civ. No. 22-0986 (Suddaby, J.), 2022 WL 5239895, at *14 (N.D.N.Y. Oct. 6, 2022) (considering a Second Amendment challenge to a similar law in New York that prohibited firearms in sensitive locations).  First, although the Supreme Court in *Bruen* did not go so far as to restrict the definition of "sensitive places" to only

---

[11] As noted earlier, the parties do not contest that the named Defendants are not the proper Defendants.  As averred by Plaintiffs, each Defendant is tasked with the duty to enforce the provisions of Chapter 131.

government-sanctioned or affiliated places, it did indicate a skepticism as to expanding the definition of "sensitive places" based on the historical record.  *See Bruen*, 142 S. Ct. at 2133 (indicating that "although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouse—we are also aware of no disputes regarding the lawfulness of such prohibitions") (citations omitted)[12]; *see also Antonyuk*, 2022 WL 5239895, at *14.  Thus, "sensitive place" is a term within the Second Amendment context that should not be defined expansively.

The Court's second observation is that the plain text of the Second Amendment clearly covers the conduct at issue: "carrying a handgun in public for self-defense."  *Id.* (citing *Bruen*, 142 S. Ct. at 2150 (explaining that a historical analysis of public discourse during the Reconstruction "demonstrate[s] how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens").  Defendants dispute this proposition but seem to do so only with respect to the private property provision of Section 7(a)(24).  To the extent Defendants challenge other provisions, they inject language into the legislation that does not exist. [*See e.g.*, State's Br. at 24 (suggesting

---

[12] As Plaintiffs point out, what is notable about these few "sensitive places" where weapons were prohibited is the long tradition of the government providing security. [Pls.' Br. at 23–24.]  Defendants do not quarrel with this proposition.

that the government is the proprietor of the library or museum or vehicle referenced in Section 7(a) of the statute, which is not the case).

Again, Defendants must be able to rebut the presumption that the challenged conduct is constitutionally protected by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  To reiterate, Defendants "may not simply posit that the regulation promotes an important interest.  Rather, the [Defendants] must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*[13] (emphasis added).  Carefully following this roadmap set forth in *Bruen*, the Court now considers each of the challenged "sensitive places" set forth in Plaintiffs' pending motion for emergent injunctive relief.[14]

### 1.    Subpart 12 – Public Libraries or Museums

Section 7(a), subpart 12 of the legislation prohibits licensed firearm owners

---

[13] Plaintiffs argue that because the scope of the Second Amendment was set in 1791, that is the key time period for historical tradition analysis as opposed to the prevailing understanding of an individual right when the 14th Amendment was ratified in 1868.  [Pls.' Br. at 19.]  Because New Jersey's lack of support for its newly enacted legislation fails in either time period, whether it be 1791 when the Bill of Rights was enacted or 1868 when the 14th Amendment was, for reasons set forth herein, at this stage the Court need not decide this issue that had been left unresolved in *Bruen*.  *See Bruen,* 142 S. Ct. at 2163 ("Here, the lack of support for New York's law in either period makes it unnecessary to choose between them.") (Barrett, J., concurring).

[14] By stating that Defendants have not met their burden as to presenting historical evidence, the Court does not mean to shift the burden that Plaintiffs have in obtaining injunctive relief.  Rather, it is a factor this Court considers as to whether Plaintiffs have met their burden as to the likelihood of success on the merits prong.

from carrying handguns in "a publicly owned or leased library or museum." 2022 N.J. Laws c. 131. In their brief, Defendants have conflated this section of the legislation with "locations for government and constitutionally-protected activity" suggesting a connection with public libraries and museums as "places where the rights to speech and intellectual freedom are at their apex." [State's Br. at 29.] This is a stretch to say the least.

First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public). As a result, Defendants must be able to rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation.

Next, Defendants contend that where the government is a proprietor of a library or museum, it has a right to exclude firearms. However, the provision does not limit libraries and museums to government-owned ones, and Defendants do not cite to any historical statutes that expressly or analogously prohibited firearms in museums and libraries, despite the fact that at least with respect to libraries, they have been in existence since the days of Benjamin Franklin. [*See* Pls.' Br. at 21 ("Benjamin Franklin founded America's first lending library in Philadelphia in 1731") (citing "*At the Instance of Benjamin Franklin": A Brief History of the Library Company of Philadelphia* (2015)).] Plaintiffs further point to evidence that by 1850, the United States Census reported 1,217 public libraries in the country. [*Id.* at 22 (citing

Dept. of Interior, Compendium of Seventh Census: 1850 at 159, Table CLXVII
(1854)).]

Moreover, the two historical analogues provided by the State to justify its
firearm prohibition in publicly owned museums and libraries are inapposite.  First,
Defendants rely upon a 1773 Maryland law that prohibited bringing any weapon into
the Maryland House of Assembly.  63 Proceedings and Acts of the General
Assembly 338 § 5 (June 15–July 3, 1773). [Docket No. 20, Ex. 4.]  But the provision
here does not deal with legislative houses of assembly, places where the Supreme
Court specifically acknowledged there is no dispute.  *See Bruen*, 142 S. Ct. at 2134
(listing legislative assemblies as an example of a "sensitive place" where firearms
have been historically and constitutionally restricted).

The other is an 1870 Texas law prohibiting guns in "places where persons are
assembled for educational, literary or scientific purposes."  1870 Tex. Gen. Laws 63.
[Docket No. 20, Ex. 5.]  Plaintiffs are correct that the *Bruen* Court found two cases
from around this time adopting "reasonable grounds" restrictions on firearms in
Texas that were "outliers," and in any event, the Court should not stake its
"interpretation of the Second Amendment upon a single law, in effect in a single
[State]." *Bruen*, 142 S. Ct. at 2120, 2153.  Thus, there does not appear to be historical
support for this restriction, at least at this juncture.

Accordingly, Plaintiffs have met their burden of showing that they are likely to
succeed on their constitutional challenge as to this provision.

31

### 2.    Subpart 15 – Bars, Restaurants, and Where Alcohol is Served

Subpart 15 bans handguns in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises." 2022 N.J. Laws c. 131 § 7(a).   First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public).  As a result, Defendants must be able to rebut the constitutional presumption against this regulation by demonstrating it is consistent with this Nation's historical tradition of firearm regulation.

In short, Defendants have presented no historical support to permit New Jersey to restrict concealed carry in bars and restaurants where alcohol is served. The most they do is cite to an 1867 Kansas statute that prohibited the possession of firearms by intoxicated persons.  1867 Kan. Sess. Laws 25 [Docket No. 20, Ex. 12.] It is a prohibition that gets no quarrel from Plaintiffs, for one, and has no relevance here as the restriction at issue clearly does not address possession of firearms by intoxicated persons.  *See also* Mo. Rev. Stat. 1879 §1274 (declaring it unlawful to possess a firearm when intoxicated) [Docket No. 20, Ex. 10.][15]

The other analogue Defendants erroneously rely upon is an 1859 Connecticut law.  [*Id.*, Ex. 11.]  The law is an amendment to "[a]n Act for forming and

---

[15] At oral argument the State suggested that it should be permitted to explore why such legislation was enacted, presumably because guns and alcohol do not mix.  It seems unlikely that historical analysis will support the conclusion that law-abiding citizens with conceal carry permits should be restricted from any place that serves alcohol.  Nonetheless, Defendants will be afforded an opportunity to delve into the history of such statutes to support their argument.

conducting the Military Force.'"  [*Id.*]  Thus, on its face it is a law that addresses the conduct of the military, such that the owner of any "booth, shed, tent" or other structure temporarily erected "within one mile of any military parade-ground, muster-field or encampment, [and] used and occupied for the sale of spirituous or intoxicating liquor, or for the purpose of gambling" would be notified by law enforcement to "vacate and close the same immediately."  [*Id.* § 5.]  This statute applies to the military and is not historical evidence probative of the restriction of one's right to carry a firearm anywhere where alcohol is served.

Accordingly, at this stage, Plaintiffs have met their burden of showing that they are likely to succeed on their constitutional challenge as to this provision

### 3.    Subpart 17 – Entertainment Facilities

As an initial impression, subpart 17 of the legislation is exceptionally broad, which makes it is a criminal offense to carry handguns in "a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum,[16] arena, racetrack or other place where performances, concerts, exhibits, games or contests are held." 2022 N.J. Laws c. 131 § 7(a).

First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public).  As a result, Defendants must be able to rebut the presumption of protection against this regulation by

---

[16] Museum also appears in Section 7(a), subpart 12, discussed above.

demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation.

The historical laws Defendants rely upon generally restrict firearms in places "where crowds gather." [State's Br. at 29.]  However, the Court finds that the historical analogues Defendants rely on do not support the specific restricted locations as set forth in the legislation.  Defendants' reliance on a 1786 Virginia law is faulty as it cites only half of the statute.  The statute prohibited a person from "rid[ing] by night []or by day in fairs or markets, in terror of the county."  1786 Va. Laws 25 (emphasis added). [Docket No. 20, Ex. 6.]  Thus, it is the conduct of terrorizing the county, not the possession of a firearm in fairs or markets, that the statute prohibited.  This historical analogue is inapposite.  Indeed, the *Bruen* Court considered this same statute, explaining that it falls within a category of laws for which a common theme is to "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people."  *Bruen*, 142 S. Ct. at 2145.  Thus, this historical law concerns "something more than merely carrying a firearm in public." *Id.*  Instead, the historic Virginia statute criminalizes the underlying conduct at issue.

As for the 1870 Texas statute relied upon by Defendants that prohibited firearms in a "ball-room, social party, or social gathering," the statute, in addition to likely being an outlier (*see Bruen*, 142 S. Ct. at 2153), expressly exclude[d] from application "persons authorized or permitted by law to carry arms at the places." Art. 320, Tex. Act of April 12, 1871. [Docket No. 20, Ex. 9.]  The challenged law

here has no similar exclusion that would presumably apply to the Plaintiffs here, and thus, the statute is distinguishable.

A similar flaw exists with respect to the Missouri statute cited by Defendants. Mo. Rev. Stat. 1879, at 224 (§ 1274). [*Id.*, Ex. 10.]  Although the 1879 Missouri law prohibited concealed weapons in "any other public assemblage of persons met for any lawful purpose," the statute was explicit that the statute did not apply to "persons moving or traveling peaceably through [the] state," and that "it shall [be] a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property." *Id.* § 1275.  The *Bruen* Court recognized that several like jurisdictions codified narrow exceptions to, but generally permitted open carry, including Tennessee.  *Bruen*, 142 S. Ct. at 2147 (explaining that the Tennessee Supreme Court in 1871 interpreted its laws to "permit the public carry of larger, military-style pistols because any categorical prohibition on their carry" would violate the right to bear arms) (citations omitted).  Thus, the Court has doubts that the Tennessee statute cited by Defendants actually restricted firearms in the way that Defendants contend.  In any event, this statute prohibiting deadly weapons in any "fair, race course, or other public assembly of the people" is not sufficient to establish a tradition of banning firearms in the broad number of locations set forth in Section 7(a), subpart 17 of the statute.  *See* 1870 Tenn. Pub. Acts 23. [Docket No. 21, Ex. 8.]

35

This leaves only Defendants' citation to a New Orleans law prohibiting weapons in public ballrooms.  [State's Br. at 29 (citing Gen. Digest of the Ords. & Res. of the Corp. of New Orleans 371 (1831)).]  Indeed, there appears to be many differences between the public ballrooms of 1831 and modern-day concert venues and amusement parks.  Still, "one example does not a tradition make" and the Court must not stake its interpretation of the second amendment based upon "a single State or a single city."  *Antonyuk*, 2022 WL 5239895, at *18; *Bruen*, 142 S. Ct. at 2154.  As in *Antonyuk*, the Court finds that in the present suit, the Defendants have failed to identify a historical analogue that supports a restriction as broad as the challenged provision.  2022 WL 5239895, at *19 (stating that there was an "obvious distinction" between New York's challenged statute prohibiting firearms in "amusement parks, performance venues, concerts, exhibits, conference centers banquet halls, and gaming facilities" and historical statutes restricting firearms in ball rooms or social parties").

Accordingly, at this juncture Plaintiffs have met their burden of showing that they will likely succeed in establishing that this provision is unconstitutional.

### 4.   Subpart 24 – Private Property (Unless Indicated Otherwise by Owner)

Subpart 24 of the statute deals with private property, which is defined as:

[P]rivate property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to

36

keep or carry a firearm established under subsection e. of N.J.S.2C:39-6.

2022 N.J. Laws c. 131 § 7(a).  As is apparent from the language, Subpart 24 is very broadly defined.  As a result, Plaintiffs argue, this provision essentially bans the carrying of firearms by permit holders in almost all of New Jersey.

First, the plain text of the Second Amendment covers the conduct in question. But unlike the other provisions that Plaintiffs challenge, this provision bans the carrying of firearms <u>unless and until</u> the owner has affirmatively and expressly consented to the carrying of a firearm on the premises.

Plaintiffs contend that this provision establishes an "anti-carry" presumption and therefore establishes an unconstitutional "default ban" on the carry of firearms for self-defense.  [Pls.' Br. at 26.]  In other words, Defendants are flipping the constitutional presumption that a permitted gun owner can carry for self-defense in public by declaring that all *private* property, which is the vast majority of property in the State, is now off limits unless a property owner affirmatively consents or posts a "guns allowed" sign.  Defendants disagree, arguing that while there has always been a presumption that one has a right to carry on public property, no such presumption exists with respect to private property because a property owner has always had the right to be "king of his own castle."  *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F. 3d 1244, 1264 (11th Cir. 2012).

Defendants' argument is somewhat of an "apples and oranges" argument. Just because a property owner has always had the right to exclude firearms from his

property—a proposition Plaintiffs do not dispute—does not mean that the right of the people to keep and bear arms was presumed only on public property. Defendants seem to turn a private property owner's lack of consent and/or right to exclude into a general proposition that the Second Amendment does not presume the right to bear arms on private property. Nothing in the text of the Second Amendment draws that distinction. Nor can this Court find such distinction made by the Court in *Heller* or *Bruen*, as Defendants argue.

Indeed, the historical evidence suggests otherwise and Defendants' insistence that no such presumption exists because a private property owner has the right to exclude firearms from his property misses the point.[17]  [State's Br. 22–23.]  Here, the State itself, not a private property owner, is excluding firearm owners from most of New Jersey by default. In fact, the State's argument that Section 7(a)(24) "protects property owners' right to exclude firearms from their property by *removing their obligation* to affirmatively tell every repairperson or customer that firearms are prohibited," [*Id.* at 23–24 (emphasis added)], seems to acknowledge what has been

---

[17] In principal part, the State relies upon *GeorgiaCarry.Org, Inc. v. Georgia* for this proposition. The State is correct insofar as the right to exclude another from one's property is an inviolable property right that is in no way abridged by the Second Amendment, which "codified a preexisting right." 687 F.3d at 1263–64. But the State's suggestion that a rebuttable presumption has historical lineage and consensus is a misreading of *GeorgiaCarry.Org*. Nothing articulated herein stands for the proposition that a gunowner has "a right to carry a firearm in a place . . . *against the owner's wishes*." *Id.* at 1264 (emphasis added).

customary:  that a rebuttable presumption to carry exists.[18] Why else would the State be "removing" the private owner's obligation to advise that no guns are allowed on her property?  In the end, this Court finds Plaintiffs' argument persuasive.  And by reversing the presumption to carry for self-defense, the State is, in essence, criminalizing the conduct that the *Bruen* Court articulated as a core civil right.  "The Nation's historical traditions have not countenanced such an incursion into the right to keep and bear arms across all varieties of private property spread across the land." *Christian v. Nigrelli*, 2022 WL 17100631, at *9 (W.D.N.Y. Nov. 22, 2022).

Defendants offer two state statutes for the proposition that Section 7(a)(24) is consistent with this country's history and tradition.  The first is a 1771 New Jersey law that prohibited "carry [of] any gun on any lands not his own . . . unless he hath license or permission in writing from the owner or owners, or legal possessor."  1771 N.J. Laws 346, § 1.  The second is an 1865 Louisiana law that prohibited "carry[ing] fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor."  1865 La. Extra Acts 14, No. 10 § 1.  The Court finds neither

---

[18] The State also points to an article that "the vast majority of New Jerseyans . . . prefer not to have firearms on their property without express consent."  [Docket No. 21, at 24 n.10 (citing Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns:  Public Support for 'No Carry' Defaults on Private Land*, 48 J.L. MEDICINE & ETHICS 183, Table A4 (2020)).]  As the Supreme Court cautioned the lower courts, it is not this Court's role to make these types of empirical judgments.  *Bruen*, 142 S. Ct. at 2131.  A majority of New Jerseyans may, indeed, prefer there not to be an individual right under the Second Amendment to self-defense in public.  But that "preference" would be foreclosed by *Bruen*.  As a legal matter, contemporary preferences that conflict with this nation's history and tradition have no bearing on the question whether a law coheres with the Second Amendment.

to be convincing evidence, however.  The New Jersey law, titled "An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns," should not be read out of context. [Docket No. 20, Ex. 13.]  It is not gun control legislation, but rather a law to address the problem of poaching and trespass.  *See, e.g.*, *Chew v. Thompson*, 9 N.J.L. 249, 249 (1827) (applying law).  The Louisiana law appears historically inconsistent and unconstitutional, and in any event, it is but one example. The Court should not stake its "interpretation of the Second Amendment upon a single law, in effect in a single [State]."  *Bruen*, 142 S. Ct. at 2153. Additionally, the lack of other examples in the historical record is suggestive of the point that firearm owners have been permitted to carry their weapons on private property without prior consent.  *See id.* at 2131.

In fact, the State's own historical evidence supports a finding that there is a presumption under the Second Amendment that an individual can enter private property with a firearm unless the property owner says otherwise.  For instance, in the hunting context, *criminal* liability for a trespass on the land of another for the purpose of hunting wild animals has typically required the landowner to post a notice or personally forbid others from trespassing.  *See, e.g.*, *State v. Wouters*, 71 N.J. Super. 479, 485, 117 A.2d 299, 302 (App. Div. 1962) (citing N.J.S.A.23:71, which provides for a fine for entering the land of another to hunt in disregard of conspicuous notice or personal knowledge forbidding trespass); *Hopewell Twp. v. Gruchowski*, 29 N.J. Super. 605, 608, 103 A.2d 177, 179 (Cty. Ct. 1954) ("Since 1895 the [New Jersey] Legislature has passed several laws concerning trespassing and for

the first time introduced criminal sanctions.  The first was L.1895, p. 307, an act to prevent trespassing with guns.  This law and all subsequent trespass laws have one element in common: to constitute a violation of them, the land must have been conspicuously posted with notices forbidding trespassing or the defendant must have been personally forbidden to trespass.  The posting of the land or the giving of personal notice is a major substantive element of the offense.").  In other words, in New Jersey the burden is on the landowner to demarcate his property and to advise others not to trespass.  Only then can the trespasser be found criminally liable for trespassing for the purpose of hunting.

Similarly, under New Jersey's ordinary criminal trespass statute, the trespasser commits an offense only if, "knowing that he is not licensed or privileged to do so," he enters or surreptitiously remains."  N.J.S.A. 2C: 18-3 (emphasis added).  "The offense is a crime of the fourth degree if it is committed in a dwelling."  *Id.*  Likewise, under the defiant trespasser subsection, "[a] person commits a petty disorderly persons offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by: (1) [a]ctual communication to the actor; or (2) [p]osting in a manner prescribed by law or reasonably likely to come to the attention of intruders; or (3) [f]encing or other enclosure manifestly designed to exclude intruders." N.J.S.A. 2C: 18-3b.(1)–(3) (emphasis added).  Just as in the hunting context, the burden under the criminal trespass statute is not on the unsuspecting actor, but on the landowner to indicate to others not to trespass.

41

The foregoing notwithstanding, Defendants point to others states that have required a property owner's consent to make their presumption point.  Specifically, the State cites the New Jersey Legislature's finding that "[m]any states require a property owner's permission before another may enter private dwellings *and private lands* with a firearm or other weapons."  [State's Br. at 6 (citing Ch. 131 § 1(h)) (emphasis added).]   The State lists several purportedly analogous restrictions.  [*Id.* at 6 n.5 (citing Ak. Stat. Ann. § 11.61.220; D.C. Code § 7-2509.07; Ga. Code Ann. § 16-11-127(b)(4); La. Rev. Stat. § 40:1379.3(O); Ohio Rev. Code Ann. § 2923.126(B)(6); S.C. Code Ann. § 22-31-225; Tex. Parks & Wildlife Code Ann. § 62.012).]  The problem with the Defendants' (as well as the Legislature's) reliance on these statutes, however, is that they are modern day statutes and the Defendants offer no historical precursors or analogy.  As the *Bruen* Court made clear, and this Court observed above, contemporary statutes that conflict with our nation's history and tradition have no place in a Second Amendment analysis.  *See supra* at 39 n. 18.  Nonetheless, putting the lack of any historical analysis aside, with the exception of Texas' law and the District of Columbia's law,[19] every other statute stands for a much narrower proposition, that a firearm owner must obtain prior consent to enter *into* or *within* a private *residence* or *dwelling*, and the Ohio and Georgia laws prohibit the carrying of firearms into places of worship.  From these few modern-day statutes

---

[19] The D.C. law prohibits carrying a firearm *onto* private *residential* property, unless authorized in advance of entry, which the Court notes may sweep too broadly.  D.C. Code § 7-2509.07(b)(1).  The Texas law the State cites is another hunting provision and is thus factually distinguishable.

Defendants cannot leap to an unsupported general conclusion that there was no historical presumption that one had a right to carry firearms onto private property. Not to mention that this all begs the question:  was not the longstanding presumption to carry under the Second Amendment the driving force that ultimately led to the enactment of these statutes?  It seems so.  Defendants' attempt to argue otherwise is unpersuasive.  For the above reasons, the Court agrees with Plaintiffs,[20] at least at this stage, that this provision unconstitutionally turns the presumption of the right to keep and bear arms under the Second Amendment on its head.

Defendants next attempt to defend the legislation by contending that the legislation simply "regulates . . . how property owners communicate their right to exclude."  [Tr. at 58.]  Defendants also argue that nothing in Supreme Court jurisprudence suggests that the Second Amendment took away a state's ability to regulate property rights.  [Def. Br. at 23; *see also* Tr. at 68 ("Nothing about the substantive right to bear arms has changed at all because the property owner always has the right to exclude, and the government is just letting the property owners know

---

[20] Plaintiffs cite to various analogous cases in other constitutional challenges to demonstrate why subpart 24, in particular, is unconstitutional.  For example, a state cannot pass legislation that praying before a meal is unlawful unless a restauranteur expressly consents.  *See Kennedy v. Bremerton School District*, 597 U. S. ___, 142 S. Ct. 2407, 2421 (2022) (explaining that the Free Exercise Clause protects individuals' ability to actively practice their religious beliefs).  Nor could the State ban an individual from wearing a political T-shirt in an office park unless the leasing agent expressly consents.  Plaintiffs also cite to *Minnesota Voters All. v. Mansky*, 585 U.S. ___, 138 S. Ct. 1876, 1885 (2018) (explaining that "Minnesota's ban on wearing any 'political badge, political button, or other political insignia' plainly restricts a form of expression within the protection of the First Amendment.").

of ways to make that clear.  This is no different.").]  All that is true, but it is a

disingenuous argument by the State:  it ignores the other half of the legislation that

criminalizes innocent conduct as it relates to the possession of a firearm, that is,

one's Second Amendment right to carry and self-defend.  Under the legislation, a

gun owner faces prosecution even when he does not know that the property owner

does not consent to his possession of a firearm and by the time he finds out, he has

already committed a criminal violation.  At oral argument, the State conceded this

troubling point:

> THE COURT:  [D]oes the UPS man, woman, violate the law when he
> gets up to the front door and the owner says you should not have come
> on my property if you're armed?
>
> MS. CAI:  Yes.  Yes.

[Tr. at 63.]

> THE COURT:  But to make it liable for trespassing under New Jersey, it has
> to be known to the potential trespasser ahead of time before he or she can be
> charged with trespassing.  This law has no such provision.  This law says you
> can walk down the winding driveway, get to the front door and the [armed]
> repairmen is told [by the owner you do not have consent and] have just now
> violated the law, I'm calling the police.
>
> MS. CAI:   And that's exactly what the law provides…
>
> THE COURT:  But I think you're ignoring one salient fact, is that
> you're now making it criminal for a person who has a license to conceal
> carry to not know in advance what that right is.
>
> MS. CAI:  So that's right, Your Honor.

[*Id.* at 66–67.]

Also, at oral argument the State attempted to minimize the plain language of

the legislation by suggesting that the only real injury to the gun owner is "having to ask for permission." [*Id.* at 67.]  Again, Defendants miss the mark.  Putting aside how a gun owner goes about asking the question whether the private owner consents,[21] as Defendants conceded at oral argument, the provision plainly provides that by the time the gun owner has asked the question and is told that the owner does not consent, he has already subjected himself to criminal prosecution.[22]

Defendants downplay the Court's concern by pointing to the language that excepts incidental conduct under N.J.S.A. 2C:2-11.  This is of little comfort to a holder of a permit to carry, however.  Contrary to their argument, even a *de minimis* infraction is a criminal violation.[23]  As the Court discussed at oral argument, the

---

[21]  At oral argument, the State gave some examples of how a permit holder might go about determining whether he has consent to carry his firearm on the property:  "It could be on your website.  It could be calls.  It does not have to be a sign . . . or on their doors."  [Tr. at 24, 63.]

[22] At oral argument the State took the position that "it's very unlikely that that private owner would be calling the police to enforce the provision against the plaintiff." [Tr. at 28.]  This is speculative at best, and certainly a risk Plaintiffs have indicated they are not willing to take.

[23] N.J.S.A. 2C:2-11 provides with respect to a *de minimis* infraction that:

> The assignment judge may dismiss a prosecution if, having regard to the nature of the conduct charged to constitute an offense and the nature of the attendant circumstances, it finds that the defendant's conduct:
>
> > a. Was within a customary license or tolerance, neither expressly negated by the person whose interest was infringed nor inconsistent with the purpose of the law defining the offense;

Defendants' position, in essence, requires a gun owner in certain cases to "read his neighbor's mind."  Other than suggesting that the permit holder check the establishment's website or make a call to a property owner, Defendants offered little guidance as to how a holder of a permit to carry a firearm would know whether he had consent before his possession of a firearm made him criminally liable.

A fundamental basic principle has long undergirded criminal law in this country, "namely, the importance of showing what Blackstone called 'a vicious will.'"  *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019) (citing 4 W. Blackstone, Commentaries on the Law of England 21 (1769)).  "The understanding that an injury is criminal only if inflicted knowingly 'is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.'"  *Id.* (citations omitted).  It is this "knowingly" requirement that helps to "separate those who understand the wrongful nature of their act from those who do not."  *U.S. v. X-*

---

b. Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or

c. Presents such other extenuations that it cannot reasonably be regarded as envisaged by the Legislature in forbidding the offense. The assignment judge shall not dismiss a prosecution under this section without giving the prosecutor notice and an opportunity to be heard. The prosecutor shall have a right to appeal any such dismissal.

N.J.S.A. 2C:2-11.

*Citement Video, Inc.*, 513 U.S. 64, 72–73 n.3 (1994).  The cases in which the Supreme Court has emphasized the importance of scienter to separate wrongful from innocent acts are legion.  *See Rehaif*, 139 S. Ct. at 2196–97 (collecting cases).  But here, by Defendant's own admission, the wrongful conduct includes scenarios in which the permit holder does not know, or even know how to know, if he has the owner's consent to carry until it is too late.  This, by definition, is the criminalization of an innocent act, to wit, the lawful possession of a firearm.  Stated differently, by removing any requirement of a permit holder's *mens rea*, the legislation punishes an individual for the exercise of his Second Amendment rights.

In sum, no matter how the State tries to dress up Section 7(a)(24),[24] the legislation presents considerable constitutional problems.  No party disputes here that private property owners in New Jersey—and across the country for that matter—have long had the right to exclude firearms from their properties.  As discussed above, New Jersey's attempt to craft how private property owners communicate the word "no" works, in effect, to deter a law-abiding citizen who has a permit to conceal carry from exercising his constitutional right under pain of criminal prosecution.[25]  That is not how the Second Amendment works.

---

[24] "And so what this law does is regulate what private property owners communicate and not the right to bear arms of the individual."  [Tr. at 66.]

[25] The Court agrees with the observation the *Antonyuk* court made with respect to the comparable New York law; through this provision, the State of New Jersey is in effect making a decision for private property owners that they are perfectly able to make for themselves and have done so long before the passage of this legislation, "as well as arguably compelling speech on a sensitive issue."  2022 WL 5239895, at *21.

Accordingly, for all of the above reasons, at this stage Plaintiffs have met their burden of showing that they will likely succeed in proving that this provision is unconstitutional.

### 5.      Section 7(b) – Functional Firearms in Vehicles

Pursuant to Section 7(b) of the statute, a vehicle is essentially a prohibited sensitive place "unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." 2022 N.J. Laws c. 131.

First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public).  As a result, Defendants must be able to rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation.

Defendants contend that where the government is a proprietor of a vehicle, it has a right to exclude firearms.  But the provision is not limited to government-

---

By enacting legislation that says—before a gun owner can enter private property, the property owner must tell the gun owner what the gun owner already knows (that he has the right to bear arms)—the State is imposing a superfluous impediment that infringes upon one's right to bear arms under the Second Amendment.

owned or public transit vehicles.[26]  [State's Br. at 31.] The Court is also not
persuaded by Defendants' argument that the requirement to carry firearms in
vehicles only when unloaded, locked, and in the trunk does not wholly restrict the
right to carry, given that "individual self-defense is the central component of the
Second Amendment right." *Bruen*, 142 S. Ct. at 2133.

 According to Defendants, motor vehicles pose different problems than
Founding-era modes of transport.  The speed and distance which modern motor
vehicles can travel make them facilitators of escape in gun crimes, and their speed
has created the need for police to enforce speed limits, exposing officers to danger
whenever they approach a vehicle at a traffic stop." [State's Br. at 33.]  But again,
Defendants are asking this Court to engage in a balancing of interests and usefulness
inquiry that the Supreme Court has expressly indicated this Court cannot do.  And
while the Supreme Court recognized that some modern day regulations may have
been unimaginable at the time of our Nation's Founding, that still does not excuse
the duty of this Court to engage in a historical inquiry that involves reasoning by

---

[26] Defendants discuss the safety concerns that animate from permitting the carrying
of concealed weapons on a crowded bus.  [*See* State's Br. at 32.]  Again, as the
Supreme Court cautioned, it is not the role of this Court to pass empirical judgment
on the wisdom of a regulation that restricts conceal carry of a firearm on a crowded
bus.  It is worth noting, however, that the Iowa statute that Defendants cite for the
proposition that Iowa prohibited firearms in and around mass transit is incorrect.
The statute forbid the presenting or discharging of a firearm at a railroad car or train.
It did not sweep as broadly as the current legislation.  *See* 1876 Iowa Acts 142, ch.
148 § 1. [Docket No. 20, Ex. 15 ("If any person shall throw any stone, or other
substance of any nature whatever, or shall present or discharge any gun, pistol, or
other fire arm at any railroad train, car, or locomotive engine he shall be deemed
guilty of a misdemeanor.").]

analogy.  *Bruen,* 142 S. Ct. at 2132 ("Much like we use history to determine which

modern 'arms' are protected by the Second Amendment, so too does history guide

our consideration of modern regulations that were unimaginable at the founding.

When confronting such present-day firearm regulations, this historical inquiry that

courts must conduct will often involve reasoning by analogy—a commonplace task

for any lawyer or judge.").  A "proper analogue for a distinctly modern regulation

requires a determination of whether the two regulations are 'relevantly similar.'"

*Id.*[27]  Defendants concede that the fact that restrictions in motor vehicles "logically

could not have existed prior to the popularization of automobiles is hardly a

problem." [State's Br. at 33.]

      Moreover, the laws and the courts interpreting such laws that Defendants cite

to as historical evidence of prohibition of concealed weapons in transportation do

not stand for that proposition.  Defendants' citations to Reconstruction analogues for

the proposition that states restricted carrying a concealed firearm in very narrow

---

[27] Defendants cite to 20th century statutes to support their proposition that States began to restrict carrying firearms in motor vehicles contemporaneous with the popularization of automobiles, but their reliance is misplaced.  The Iowa statute expressly permits the carrying of a pistol or revolver in a motor vehicle.  1929 Iowa Acts 90, § 30 ("No person shall carry a gun or any firearms, *except a pistol or revolver,* in or on a motor vehicle unless the same be unloaded in both barrels and magazine, and taken down or contained in a case.")  [Docket No. 20, Ex. 16 (emphasis added).]  Similarly, the Maine legislation is limited to a shotgun or rifle, not all firearms.  1919 Me. Laws 193 (Ex. 17) ("No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests.")  [Docket No. 20, Ex. 17.]  Such laws are not analogues for the New Jersey statute at issue, which contains no such exceptions to the general right to carry as guaranteed by the Second and Fourteenth Amendments.

journey exceptions fail.  First, the Arkansas legislation expressly permitted the conceal carry "upon a journey."  Ark. Rev. Stat. Art. I § 13, pg. 280 (1838) ("Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty.") [Docket No. 20, Ex. 18.]  Moreover, the Alabama statute, 1839 Ala. Acts no. 77, says nothing about the restriction on the transportation of firearms, but rather was enacted solely "to suppress the evil practice of carrying weapons secretly," an issue not relevant here.  [*Id.*, Ex. 19.]  Thus, not only does the statute say nothing about the restriction on carrying firearms in a vehicle, but it does suggest that if there is a carrying it should not be concealed.  Nor does the other statute cited in the State's Brief from Tennessee provide historical evidence in support of the current restriction.  *See* 1821 Tenn. Acts. ch 13, §1., p.15 [Docket No. 20, Ex.20.]  That statute expressly provides that the restriction does not apply to "any person that may be on a journey to any place out of his county or state." *Id.*

In *Antonyuk,* the reviewing court considered a statute that banned firearms on public transportation in New York, which certainly is distinct from the legislation at issue here pertaining to private vehicle travel.  However, even in consideration of public transportation, the reviewing court found that the historical analogues before it actually proved that firearms were generally permitted and temporarily enjoined such provision.  2022 WL 5239895, at *17 (explaining that "historical analogues exist containing specific exceptions permitting the carrying firearms while traveling (presumably because of danger often inherent during travel)") (citations omitted).

Here, the Court finds that the State has not been able to demonstrate that the current restriction prohibiting functional firearms while traveling in a vehicle in New Jersey is consistent with the Nation's tradition of firearm regulation.[28]

Accordingly, at this juncture Plaintiffs have met their burden of showing that they will likely succeed in establishing that this provision is unconstitutional.

### 6. The Legislation Sweeps So Broadly that Plaintiffs Cannot Decipher What Constitutes a "Sensitive Place"

Finally, the Court has yet another constitutional concern in addition to the above challenges that the individual Plaintiffs raise. The below scenario posed by the Court at oral argument demonstrates the cumulative effect of the legislation: to make it so unwieldy and burdensome for a permit holder to exercise his constitutional right to carry a firearm:

> THE COURT: And so the State envisions it [Chapter 131] that if someone with a concealed carry permit wakes up and plans his day, that . . . he puts the firearm in the trunk. He goes to his cousin who doesn't want firearms. He leaves it in the trunk. He then goes to the local market that permits firearms. He goes and he gets it out of the trunk, puts it together in public view, citizens see. Citizens are going to get alarmed. Perhaps he's brandishing the weapon, one might argue. And then goes to the local market, then he comes back out, he then brandishes the weapon, one could argue, puts it into the trunk and goes to another establishment where he's not quite sure, so he puts it in the trunk and then goes up, gets the expressed consent, yes, that's fine, goes back to his trunk, puts the firearm, assembles the firearm and then goes about and reenters the property. That's how the State envisions the day in the life of a gun owner?

---

[28] Of note, the State conceded at oral argument that the provision restricting functional firearms in vehicles did infringe in some sense the "immediate ability to have that firearm loaded and on you." [Tr. at 83.] The Court appreciates the State's candor, and finds that such conduct is clearly protected by the Second Amendment, which at its core protects the right to self-defense. *Bruen*, 142 S. Ct. at 2122.

MS. CAI:  That could be, Your Honor.

[Tr. at 81–82.]

As Plaintiffs lament, the challenged provisions force a person permitted to carry a firearm in New Jersey to "navigate a 'veritable minefield.'"  [Pls'. Br. at 12.] Their view is a legitimate one.  The Court knows of no constitutional right that requires this much guesswork by individuals wanting to exercise such right.  With such sweeping legislation that includes catch-alls,[29] Plaintiffs cannot decipher what constitutes a "sensitive place," and so they have abandoned their constitutional right to bear arms out of fear of criminal penalty.  Relatedly, Plaintiffs argue that these provisions sweep so broadly that the legislation "effectively shuts off most public areas from carrying for self-defense."  [Pls.' Br. at 30.]  In the final analysis, at some point on the line, when a constitutional right becomes so burdensome or unwieldy to exercise, it is, in effect, no longer a constitutional right.  Plaintiffs have made a convincing case that this legislation has reached that point.

While the State presses that it has legitimate societal reasons for its legislation, it bears repeating that this is an arena into which this Court cannot venture.  *Bruen*, 142 S. Ct. at 2129 ("the Second Amendment does not permit . . . 'judges to assess the cost and benefits of firearms restrictions'") (citation omitted).  It is not the role of this

---

[29] Subpart 17 bans handguns in ""a privately or publicly owned and operated entertainment facility within this State, *including but not limited to* a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held."" 2022 N.J. Laws c. 131 § 7(a) (emphasis added).

Court to either defer to the Legislature or to pass judgment on the wisdom of the firearms restrictions.

Accordingly, for this reason as well, Plaintiffs have met their burden in showing that they are likely to succeed on the merits of their constitutional challenges to the foregoing provisions.

### C. The Challenged Provisions Are Irreparable Constitutional Violations

The Court next addresses whether Plaintiffs are likely to experience irreparable injury if the Temporary Restraining Order is not issued. Finding the constitutional deprivations alleged to be irreparable by their very nature, the Court concludes that Plaintiffs have met their burden.

In addition to likelihood of success on the merits, the movant must establish that it is more likely than not that it will suffer irreparable harm absent the relief requested. *Reilly*, 858 F.3d at 179. A deprivation of a constitutional right can demonstrate irreparable injury justifying injunctive relief, and "most courts hold that no further showing of irreparable injury is necessary." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) (collecting cases). In the First Amendment context, a deprivation "unquestionably constitutes irreparable injury," even if the deprivation is for "minimal periods of time." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). This Court finds that the same is true in the Second Amendment context. Because the Second Amendment protects the right to bear arms for self-defense in public, state restrictions that are so extensive and

burdensome as to render that right illusory must constitute irreparable injury. *See Rhode v. Becerra*, 445 F. Supp. 3d 902, 953 (S.D. Cal. 2020) (finding that burdensome restriction on purchase of ammunition constituted irreparable injury), *vacated and remanded on other grounds sub nom. Rhode v. Bonta*, 2022 WL 17099119 (9th Cir. Nov. 17, 2022); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016) (concluding that District of Columbia's "good reason" requirement to obtain license to carry concealed firearm constituted irreparable injury). As the *Bruen* Court observed, "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780).

Additionally, the fundamental interests that the Second Amendment protects—like those of the First Amendment—are not easily remediable by monetary damages or other non-injunctive relief. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (holding that infringement of Second Amendment right cannot be compensated by monetary damages because it protects "intangible and unquantifiable interests" similar to those protected by the First Amendment). In weighing requests for injunctive relief post-*Bruen*, other courts have adopted the same conclusion and found similar Second Amendment deprivations to constitute irreparable injury. *See, e.g.*, *Spencer v. Nigrelli*, 2022 WL 17985966, at *13 (W.D.N.Y. Dec. 29, 2022) (finding pastor's inability to exercise right to carry firearm at place of worship to constitute irreparable harm) (citing *A.H. by & through Hester v. French*, 985

F.3d 165, 184 (2d Cir. 2021) ("The denial of a constitutional violation ordinarily

warrants a finding of irreparable harm, even when the violation persists for 'minimal

periods' of time.")); *Hardaway v. Nigrelli*, 2022 WL 16646220, at *17 (W.D.N.Y.

Nov. 3, 2022) (same); *Antonyuk v. Bruen*, 2022 WL 3999791, at *36 (N.D.N.Y. Aug.

31, 2022) (finding irreparable harm in challenge to New York's Concealed Carry

Improvement Act based on plaintiff's "diminished safety in all the locations that he

currently carries his concealed handgun that he will not be able to carry it").

Here, Plaintiffs persuasively explain that the constitutional deprivation alleged

constitutes an irreparable injury.[30]  [Pls.' Br. at 12.]  Plaintiffs have demonstrated that

they have been immediately harmed by the enactment of the challenged provisions of

Chapter 131.  Before the law was passed, Plaintiffs were generally free to exercise

their Second Amendment right to bear arms in public for self-defense by carrying a

licensed firearm on their person, for instance, at a "library or museum," "bar or

restaurant where alcohol is served," or "entertainment facility"; on "private

property"; or in their vehicles or on public transportation.  Now, Plaintiffs all testify

that they have ceased carrying their firearms *because of* the new restrictions.  [*See*

Koons Decl. ¶¶ 12, 13; Gaudio Decl. ¶ 15; Muller Decl. ¶ 18.]

---

[30] Citing *Grace v. District of Columbia* and *Rhode*, Plaintiffs suggest that the loss of
psychic comfort that underlies being prohibited from carrying a licensed firearm for
self-defense in public is a component of the irreparable injury that they experience.
[Pls.' Reply at 13.]  The Court does not express a view on this point, in particular.
The deprivation constitutes an irreparable injury simply because it so restricts
Plaintiffs' ability to exercise their right to self-defense in public as to render it a
nullity, whatever their underlying sentiment for carrying a firearm for self-defense.

The Court finds that the challenged provisions have chilled Plaintiffs' reasonable exercise of their Second Amendment right.  For example, because Mr. Koons regularly meets for breakfast at restaurants that occasionally have liquor licenses, he now leaves his firearm at home.  [*See* Koons Decl. ¶ 13.]  Likewise, Mr. Gaudio, who testified to carrying a handgun when "conducting [his] everyday suburban activities"—such as, visiting Shop Rite and a movie theater as well as "attending a community event . . . at a YMCA camp"—now leaves his firearm at home because of the new restrictions. [Gaudio Decl. ¶¶ 9, 10, 16.]  Similarly, Mr. Muller stated that he carried his handgun "most of the time"—at stores, friends' homes, restaurants, parks, and other locations—but now feels as though he has "no choice but to stop carrying a handgun" outside of his own home and property. [Muller Decl. ¶¶ 9–11, 18.]  Together, the new restrictions are so extensive and burdensome that they render Plaintiffs' right to armed self-defense in public a nullity.

Furthermore, the Court rejects Defendants' view that Plaintiffs "cannot show irreparable harm just by alleging Second Amendment injury."  [State's Br. at 19.] Defendants argue that, under Third Circuit precedent and other circuit court decisions, the Court may not rely upon a constitutional deprivation alone to satisfy the irreparable harm prong for injunctive relief.  [*Id.* at 18–19.]  The Court disagrees. At oral argument and in their papers, Plaintiffs convincingly explain that these cases do not involve an ongoing injury that can be remedied by injunctive relief only.  [Tr. at 9091; Pls.' Reply at 14.]  Plaintiffs' right to carry a firearm in public for self-defense can be restored only by enjoining implementation of the challenged

57

provisions.

Finally, as discussed above, *see supra* Section III.A, the Court finds that Plaintiffs' credible fear of prosecution for violating one of the challenged restrictions constitutes irreparable injury.  [*See* Koons Decl. ¶ 12; Gaudio Decl. ℙ 15; Muller Decl. ¶ 13.]  Unlike the *Angelo v. District of Columbia* court, which found under D.C. Circuit precedent that gun permit holders could not establish standing to challenge newly enacted legislation prohibiting them from carrying their handguns on public transportation because they could not point to prior threats of enforcement or a special likelihood of enforcement, 2022 WL 17974434, at *6 (D.D.C. Dec. 28, 2022), this Court comes to a contrary conclusion and reasons that Plaintiffs need not actually be subject to "arrest, prosecution, or other enforcement action" to challenge a criminal statute.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  It is enough that Plaintiffs' prior conduct has been rendered criminal by the challenged provisions of Chapter 131.

Thus, in light of *Bruen*, the effect of the challenged provisions is an immediate constitutional deprivation of Plaintiffs' Second Amendment right to carry a handgun for self-defense in public.  Plaintiffs can no longer exercise this right by carrying their firearms at locations they were accustomed to visiting in their day-to-day lives and in ways law-abiding gun owners routinely do.  Additionally, if they were to do so, Plaintiffs would face an "imminent" threat of prosecution, which the State acknowledged at oral argument.  [Tr. at 27.]  Accordingly, Plaintiffs have satisfied the irreparable injury prong justifying injunctive relief.

### D.    Other Interested Parties and the Public Interest

Finally, the Court agrees with Plaintiffs that since injunctive relief will only impact individuals who have already gone through the State's vetting process to obtain a permit to carry a handgun, other interested parties will not be harmed by the relief requested.  [Pls.' Br. at 33.]  And after all, "neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *Am. C.L. Union v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003), *aff'd and remanded*, 542 U.S. 656 (2004). Lastly, at oral argument, this Court specifically pressed the State whether it had empirical evidence to suggest that concealed carry permit holders are responsible for gun crimes or an increase in gun crimes in New Jersey, which they cite as justification for the law.  However, the State had no such evidence.  [Tr. at 96.]  Already having found that the Plaintiffs are likely to suffer irreparable injury and succeed on the merits of their Second Amendment claim, the Court now finds that the balance of equities and public interest also tip in Plaintiffs' favor.  Thus, all four requirements for injunctive relief have been satisfied.

Further, Plaintiffs are excused from giving security because the Court is satisfied that there is no risk that a Defendant will sustain "costs and damages" if "found to have been wrongfully enjoined or restrained" pursuant to Fed. R. Civ. P. 65(c).  The Court also finds that based on the showing made by Plaintiffs, good cause exists to extend the duration of this Temporary Restraining Order beyond fourteen (14) days pursuant to Fed. R. Civ. P. 65(b)(2).  Thus, this Temporary Restraining Order will be in effect pending a hearing on Plaintiff's motion for a preliminary

injunction (which shall occur as expeditiously as possible once a briefing schedule for such motion has been set).

## IV.   CONCLUSION

Plaintiffs have demonstrated a probability of success on the merits of their Second Amendment challenge to the relevant provisions of Chapter 131 Section 7(a), which criminalizes carrying handguns in certain "sensitive places," subparts 12 (public libraries or museums), 15 (bars, restaurants, and where alcohol is served), 17 (entertainment facilities), and 24 (private property), as well as section 7(b)'s ban on functional firearms in vehicles.  The State may regulate conduct squarely protected by the Second Amendment only if supported by a historical tradition of firearm regulation.  Here, Plaintiffs have shown that Defendants will not be able to demonstrate a history of firearm regulation to support any of the challenged provisions.  The deprivation of Plaintiffs' Second Amendment rights, as the holders of valid permits from the State to conceal carry handguns, constitutes irreparable injury, and neither the State nor the public has an interest in enforcing unconstitutional laws.  Accordingly, good cause exists, and the Court will grant the motion for temporary restraints.  An accompanying order of today's date shall issue.

January 9, 2023                          s/Renée Marie Bumb
Date                                     Renée Marie Bumb
                                         United States District Judge