**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

RONALD KOONS; NICHOLAS GAUDIO;      )      CIVIL ACTION NUMBER:
JEFFREY M. MULLER; SECOND           )
AMENDMENT FOUNDATION; FIREARMS      )      1:22-cv-07464-RMB-EAP
POLICY COALITION, INC.; COALITION   )
OF NEW JERSEY FIREARM OWNERS; and   )
NEW JERSEY SECOND AMENDMENT         )
SOCIETY,                            )
                    *Plaintiffs*,   )
vs.                                 )
                                    )
WILLIAM REYNOLDS, in his official   )      MOTION HEARING FOR A
capacity as the Prosecutor of       )
Atlantic County, New Jersey;        )      TEMPORARY RESTRAINING
GRACE C. MACAULAY, in her official) 
capacity as the Prosecutor of       )      ORDER
Camden County, New Jersey;          )
ANNEMARIE TAGGART, in her official) 
capacity as the Prosecutor of       )
Sussex County, New Jersey; MATTHEW) 
J. PLATKIN, in his official         )
capacity as Attorney General of     )
the State of New Jersey; and        )
PATRICK CALLAHAN, in his official   )
capacity as Superintendent of the   )
New Jersey State Police,            )
                    *Defendants*.   )

Mitchell H. Cohen Building & U.S. Courthouse
4th and Cooper Streets, Camden, New Jersey 08101
Thursday, January 5, 2023
Commencing at 11:00 a.m.


**B E F O R E:**          THE HONORABLE RENÉE MARIE BUMB,
                         UNITED STATES DISTRICT JUDGE


        John J. Kurz, Federal Official Court Reporter
               John_Kurz@njd.uscourts.gov
                    (856)576-7094

 Proceedings recorded by mechanical stenography; transcript
         produced by computer-aided transcription.

1    **A P P E A R A N C E S:**

2    DAVID JENSEN PLLC
     BY:  DAVID D. JENSEN, ESQUIRE
3    33 Henry Street
     Beacon, New York 12508
4    For the Plaintiffs

5    ATLANTIC COUNTY DEPARTMENT OF LAW
     BY:  MURIANDA L. RUFFIN, ASSISTANT COUNTY COUNSEL
6    1333 Atlantic Avenue, 8th Floor
     Atlantic City, New Jersey 08401
7    For the Defendant William Reynolds, Atlantic County Prosecutor

8    OFFICE OF CAMDEN COUNTY COUNSEL
     BY:  HOWARD LANE GOLDBERG, FIRST ASSISTANT COUNTY COUNSEL
9    520 Market Street, 14th Floor, Courthouse
     Camden, New Jersey 08102
10   For the Defendant Grace C. Macaulay, Camden County Prosecutor

11   OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
     BY:  ANGELA CAI, DEPUTY SOLICITOR GENERAL
12        JEAN REILLY, ASSISTANT ATTORNEY GENERAL
     R.J. Hughes Justice Complex
13   25 Market Street, P.O. Box 080
     Trenton, New Jersey 08625
14   For the Defendants Attorney General Platkin and Superintendent
     of NJ State Police Callahan, and Sussex County Prosecutor

15

16   **A L S O   P R E S E N T:**

17   Arthur Roney, The Courtroom Deputy

18   Jordan Pino, Judicial Law Clerk

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*

```
 1              (PROCEEDINGS, held in open court before The Honorable

 2   Renée Marie Bumb, United States District Judge, at 11:00 a.m.

 3   as follows:)

 4              THE COURTROOM DEPUTY:  All rise.

 5              THE COURT:  Good morning.

 6         Okay.  You can have a seat.  Thank you.

 7         All right.  Let me get to know counsel.  You're

 8   welcome to remove your mask when you're speaking and while

 9   you're seated at counsel table.

10         All right.  Let me get to know the parties.  So we're

11   here in the case Koons versus Reynolds, et al.  The docket

12   number is 22-7464.  Let me start with appearances.  I'll start

13   with the plaintiff.

14              MR. JENSEN:  Good morning, Your Honor.  David Jensen

15   for the plaintiffs.

16              THE COURT:  Good morning.  And welcome.

17              MS. CAI:  Good morning, Your Honor.  Angela Cai for

18   the Attorney General, the Superintendent of State Police, and

19   the acting Sussex County prosecutor.

20              THE COURT:  Okay.  So you're entering an appearance

21   for Sussex County, okay.  All right.  Welcome.

22              MS. REILLY:  Assistant Attorney General Jean Reilly

23   for the same defendants as Ms. Cai.

24              THE COURT:  Okay.  Welcome.

25              MR. GOLDBERG:  Good morning, Your Honor.  First
```

```
 1   Assistant County Counsel, Howard Goldberg, on behalf of

 2   Prosecutor Grace Macaulay for Camden County.

 3           THE COURT:  Okay.  Welcome.

 4           MS. RUFFIN:  Good morning, Your Honor.  Attorney

 5   Murianda Ruffin, just substituting in today for Attorney James

 6   Ferguson.  We are county counsel for Atlantic County, for the

 7   Atlantic County prosecutor.

 8           THE COURT:  Okay.  All right.  Welcome.  Good to see

 9   you all.

10           All right.  I set this down for a hearing.  This is

11   before me on the plaintiffs' application for temporary

12   restraints.  Mr. Jensen, I'll hear from you.

13           I thought the way that I would lay out the oral

14   argument, counsel, is to lay it out by various topics.  I

15   wanted to first address the issue of standing.  I then want to

16   turn to the issue of irreparable injury.  I then want to turn

17   to the likelihood of success on the merits and then public

18   interest.

19           So it seems to me, it would make more sense if I

20   could first have you, Mr. Jensen, address the issue and then

21   turn to the defendants to respond, and I'll have various

22   questions, okay?

23           MR. JENSEN:  Sure.  That sounds great.

24           THE COURT:  Is that okay?

25           MR. JENSEN:  Yes.
```

```
 1              THE COURT:  Okay.  So let me start with the issue of

 2    standing.

 3              I have before me, Mr. Jensen -- well, do you want to

 4    make a preliminary statement?  I didn't want to interrupt your

 5    presentation if you wanted to make a preliminary statement.

 6              MR. JENSEN:  Sure.  I might as well.

 7              THE COURT:  Okay.

 8              MR. JENSEN:  Use the lecturn, I assume.

 9              THE COURT:  Yes, please.

10              And I'm just a little hard of hearing, Mr. Jensen, so

11    if you can just keep your voice up, please.

12              MR. JENSEN:  You bet.

13              THE COURT:  Okay.  Thank you.

14              MR. JENSEN:  Good morning, Your Honor.  I'm here

15    today on behalf of the plaintiffs, which is three individuals

16    and four organizations, but I'm really here on behalf of

17    hundreds of thousands of lawful gun owners in New Jersey.

18              Most of the people living in the United States have

19    been able to exercise their right to bear arms well before the

20    Supreme Court decided *Bruen*.  For many years, people in states

21    like Connecticut and Delaware and Pennsylvania have been able

22    to obtain permits to carry handguns; and once they've done so,

23    they've been able to carry handguns with them as they went

24    about their daily business, so driving their vehicles, stopping

25    for gas, going to restaurants, shopping at the grocery store.
```

1    There have always been some limited areas where

2  people have not been able to take guns.  Until two weeks ago,

3  the only place the statutes of New Jersey placed off limits

4  were schools.

5    Obviously acting in the role of proprietor, the State

6  had placed correctional institutions, police departments,

7  courthouses, places like that off limits as a general

8  proposition.  But you'll notice a common theme running through

9  these places, which is that these are places that often

10 restrict access.  They often require people to pass through

11 security screenings, and they often have their own armed

12 security present.

13    There are also places --

14    THE COURT:  And the plaintiffs aren't challenging

15 those provisions in the newly enacted legislation.  They're not

16 challenging schools, they're not challenging day care centers,

17 et cetera, correct?

18    MR. JENSEN:  That is correct.  And certainly some of

19 these areas, based on what the Supreme Court has already said

20 in both *Heller* as well as in *Bruen*, would appear to pass

21 muster.

22    We specifically singled out particular areas where

23 our assessment was that if there is indeed a right to bear arms

24 in public for the purpose of self-defense, it does not appear

25 that these can be defended.  And further, it really doesn't

1  require any further examination of the record or development of

2  the record.

3          Since the Court asked to proceed under the issue of

4  standing, I'll do that, but that was basically the introductory

5  statement I had prepared to open things up.

6          THE COURT:  Mr. Jensen, and thank you.  And in your

7  comments to me about standing, the question I have for you and

8  I have for your adversaries is, do I parse out the provisions

9  when I look at the issue of standing?

10          So, for example, subchapter 17 refers to

11  entertainment facilities as designated as "sensitive place."

12  Do I then parse out a racetrack from a stadium from a theater,

13  or do I just look at the provision broadly?  In your comments

14  to me, if you can address that.

15          MR. JENSEN:  Well, I think that may be a question

16  that doesn't necessarily have a pat answer that applies across

17  the board, because certainly some of these areas, you know,

18  arenas, stadiums, theaters, there's not really a real clear

19  basis for drawing a distinction between those categories.  It

20  would probably be accurate to call them all "entertainment

21  facilities."

22          I think perhaps the issue you might be going to here

23  is that we've sort of got two parallel tracks of injury here,

24  right.  We've got a list of 25 places where the State has said,

25  all right, if you bring a gun into here, even though you're

1    licensed, et cetera, you're committing a felony, and that

2    results in -- you can characterize that as 25 distinct

3    deprivations.  For that matter, you could probably break that

4    list out longer and make it 50 or 100 or 150 places.

5              THE COURT:  Under the plaintiffs' analysis, what's

6    left?

7              MR. JENSEN:  Well, under the plaintiffs' analysis,

8    since we've only challenged those four sensitive places, as

9    well as the vehicle carrier restrictions, everything else is

10   left.

11             However, and this goes to sort of the second part of

12   this, which is what this is doing in the overall scheme of

13   things, this death-by-a-thousand-cuts scheme.

14             Once you have enough of these limitations down,

15   you've effectively created a situation where there's really no

16   place left to carry or, to the extent there is a place left to

17   carry, you're talking about having to very carefully map out

18   what you're going to be doing for the next 20 minutes.  Are you

19   going to veer off a public sidewalk, for example?

20             So if you take these four sensitive places and the

21   vehicle carrier restriction that we've challenged, and I think

22   we made this clear on the brief, we're not trying to signal

23   that other areas are permissible.  We're really going for the

24   low-hanging fruit here.  But just eliminating those categories

25   would open up a fair amount of conduct that isn't opened right

1    now in terms of people actually going about their daily lives

2    and carrying arms.

3            THE COURT:  And that's the key, "with respect to

4    their daily lives."

5            MR. JENSEN:  With respect to their daily lives,

6    because that's the issue we're actually protecting here.  And

7    this actually really does tie directly in to standing.  Because

8    in putting together this claim that we haven't articulated a

9    claim of concrete injury or imminent injury, what this whole

10   framing of the issue is presupposing is that we're not talking

11   about the right that the Supreme Court has recognized, right.

12   The right to wear, bear, and carry arms upon the person in case

13   of confrontation with another person.  We're talking about this

14   much more constricted idea that as long as someone has some

15   theoretical ability to carry a gun somewhere within the state

16   of New Jersey, then the right to bear arms has been protected.

17   And once you drop that constricted view where someone needs to

18   say, okay, well, on this date I would go to this particular

19   location and I would carry a gun and then I would come back

20   home and you make it more about whether or not people have the

21   actual right of armed self-defense, this claim that we haven't

22   articulated a concrete enough injury goes out the window.

23           You know, one thing I would refer the Court to in

24   this regard is the Seventh Circuit's decision in *Moore versus*

25   *Madigan*.  And in that decision, one thing that Judge Posner did

```
 1   in distinguishing the Second Circuit's prior decision upholding

 2   the proper-cause law there was to refute the attempt to connect

 3   the Second Amendment in terms of its scope to the right to

 4   privacy and this notion that, you know, there's a quote that's

 5   been quoted a few times.

 6          Judge Posner disagreed with the suggestion that the

 7   Second Amendment should have much greater scope inside the home

 8   than outside simply because other provisions of the

 9   Constitution have been held to make that distinction.

10          The interest in having sex inside one's home is much

11   greater than the interest in having sex on the sidewalk in

12   front of one's home, but the interest in self-protection is as

13   great outside as inside the home.  And what is, I would say, an

14   unavoidable takeaway of Heller and McDonald and Bruen is that

15   the core interest that is being protected by the Second

16   Amendment is that of armed self-defense.

17          So then if we dive down into some of the cases that

18   the State is citing in support of this standing argument, you

19   know, for example -- and this we did address in the brief so

20   I'll be concise with it -- Ellison versus American Board of

21   Orthopaedic Physicians.

22          Well, in the big picture, what we've got -- and I

23   think that if you look at standing decisions over time, you'll

24   see the steam come out -- what exactly a plaintiff needs to

25   have to allege a concrete and imminent injury depends, to a
```

1    certain extent, on the specific facts at issue.  But the big

2    picture idea is the plaintiff needs to have done something to

3    distinguish themselves from just any member of the population.

4    And ideally what they need to have done is they need to have

5    done everything possible to get right up to the point where

6    they would be engaging in this conduct but for the restriction

7    at issue.

8             So in *Ellison*, the whole problem was the parties got

9    sidetracked on this question of whether or not he needed to

10   have an actual position with a hospital or needed to apply for

11   admitting privileges and then be told, well, because you

12   haven't taken this test --

13            THE COURT:  Right, which he had not yet done, and so

14   on that grounds I think the --

15            MR. JENSEN:  Well, no.  The Court actually said, for

16   purposes of discussion, we're going to accept that it would

17   have been futile to apply for admission privileges because they

18   required this board certification that he couldn't get without,

19   in effect, already having admitting privileges, right?  Kind of

20   a circular thing.

21            What the Court said is he's not admitted to practice

22   medicine in New Jersey.  So no matter what, even if we accept

23   this as futile, there's still a significant amount more that he

24   needs to do in order to be at a point where he would be in a

25   position to say, okay, so now the only thing that is holding me

 1  back is this restriction that I've challenged in this lawsuit.

 2         I would need to pull up my iPad to give you the

 3  cases, but if you go on to the next one or two pages of the

 4  State's brief, they go on to cite additional cases where, most

 5  significantly, one theme you have is that there's the

 6  possibility of an exception, all right.

 7         So let's say that instead of enacting the sensitive

 8  place law that it enacted, the New Jersey Legislature said,

 9  okay, so we're going to have all these sensitive places, but if

10  you really need to be in one of these places, you could make an

11  application to the State Police or the Attorney General and

12  maybe we'd let you in.

13         Now, I'm not saying that that sort of a framework

14  would be constitutional; but I am saying that in terms of

15  standing and ripeness, if that's the way the law was set up, I

16  think you'd have a standing and ripeness problem if someone

17  hadn't pursued that option and then been told no.

18         Now, that's not what we're dealing with here.  All of

19  the individual plaintiffs we have in this case have permits to

20  carry.  Up until December 22nd, they were carrying.  And the

21  only reason they're not carrying right now is because of this

22  law.  There is absolutely nothing else that they could do to

23  get closer to crossing that line, the line of the statutes

24  we've challenged, aside from going out and breaking the law.

25         THE COURT:  What evidence do you point to that they

1  will be prosecuted and charged with violating the law if they

2  do go out?

3          MR. JENSEN:  Well, in terms of evidence, we don't

4  have any evidence right now aside from the fact that the law

5  has been passed.  It's categorized as a serious crime and the

6  defendants are not coming in and disavowing it.  Because,

7  again, under *Steffel versus Thompson* and progeny, what we know

8  is that we can't be required to engage in serious criminal

9  conduct merely to raise a constitutional claim and to say this

10  law is infringing my rights.  But if what we have right now

11  isn't enough, then, effectively*, Steffel v. Thompson* is out the

12  window because you have no means of challenging this except

13  saying, okay, I'm now going to carry my gun into the gas

14  station, please come arrest me and charge me with a felony.

15          To state the obvious, people should not have to

16  undergo that kind of a risk in order to simply vindicate their

17  rights.

18          Well, let me put it this way:  I think that basically

19  stakes out the essential parameters of standing.

20          THE COURT:  Okay.

21          MR. JENSEN:  I'd be happy to entertain any questions

22  or otherwise.  I'm sure the Court wants to hear from Ms. Cai.

23          THE COURT:  Yes.  Thank you.

24          Ms. Cai.

25          MR. JENSEN:  Thank you.

1          MS. CAI:  Your Honor, would it make sense for me to

2    give a brief opening as well, very briefly, just to set the

3    scene?

4          THE COURT:  Yes, if you'd like.

5          MS. CAI:  I do think it actually ties into the

6    standing issue, so hopefully it's not too disparate.

7          So in this facial challenge against Chapter 131,

8    plaintiffs are making the extraordinary request of asking this

9    Court to short-circuit the typical procedural process for legal

10   challenges.  And that legal process typically, as it happens,

11   exists for a reason.  It's because the development of a record

12   through discovery and fact-finding, both on jurisdictional

13   issues and on merits issues, adequate timing for briefing of

14   dispositive legal arguments, and the Court's careful evaluation

15   of the law as applied to the facts are all very crucial.

16         THE COURT:  And do you agree with me, Ms. Cai, that

17   if I were to allow that process -- to endorse your argument,

18   your position, that that would, in effect, mean that the

19   plaintiffs would not be permitted to or would be deprived of

20   carrying their firearms for perhaps years while this works

21   through the process?

22         MS. CAI:  So two points at that, Your Honor.  So

23   first, we're here on a TRO.  So I think the time of whatever

24   this Court's decision impact is is from now until whenever the

25   PI is decided.

```
 1            THE COURT:  No.  But you've asked -- my understanding
 2   of your argument is, is that nothing should be done until this
 3   entire matter works its way through what you call the
 4   democratic process.  That democratic process could take years;
 5   could it not?
 6            MS. CAI:  It depends, Your Honor.  It depends on the
 7   discovery schedule and all that's said and whether or not it's
 8   dispositive motions very early on or not.
 9            THE COURT:  Okay.
10            MS. CAI:  I will say, though, it's the plaintiffs'
11   burden at the TRO stage and the PI stage to demonstrate, more
12   than just on allegation, that they are entitled to emergency
13   relief specifically for the period for which they're seeking
14   relief.
15            THE COURT:  Okay.
16            MS. CAI:  And so for right now, we're just looking at
17   the period between the TRO and the PI.
18            THE COURT:  Okay.  So I interrupted you in your
19   opening statement, so go ahead.
20            MS. CAI:  No; that's quite all right.  And I think in
21   this case, plaintiffs bring a challenge to a state law but also
22   on Second Amendment grounds, which, by its very nature,
23   especially after the *Bruen* decision, requires a special kind of
24   development and careful examination of historical evidence to
25   satisfy the Supreme Court's text and history-based approach.
```

1      When we get to the merits, I think it will become

2  clear to the Court that, one, the State has carried its burden.

3  But, two, as the reply from the plaintiffs that came in a

4  couple days ago shows, some of their misconceptions of what

5  those historical pieces of evidence actually say and don't say

6  requires a much more careful reading and takes a lot longer

7  than a rushed rush to judgment that the plaintiffs are putting

8  before this Court would suggest.  And I do want to get through

9  that.  But I did want to start with the Court's inquiry on

10 standing.

11     And I think a couple things are undisputed.  It's

12 undisputed, I think, that plaintiffs bear the burden and that

13 burden on a PI posture or TRO posture is more than just relying

14 on the allegations in the Complaint.  And so we are not asking

15 this Court at this time to dismiss their Complaint for lack of

16 standing.  What we are arguing is plaintiffs come to this Court

17 seeking extraordinary relief.  They have a very high bar to

18 proffer evidence on all of the elements.  And on each element

19 of standing they have not done so.  That's not to say it is

20 impossible for them to do so.  They could possibly cure some of

21 the deficiencies that I want to go through.  Perhaps they

22 can't.  I don't know.  And so that's the process that I think

23 would be required, even on a PI posture.  And that may take

24 time, too.  And if they are unable to do that on the PI

25 posture, then we go on to whether or not even their allegations

1   are deficient and all that.

2          So we put forward three separate and I think they're

3   pretty independent standing problems.  And I want to go through

4   each of them a little bit separately.  Some of them will be

5   intertwined.  And I think Your Honor was maybe hoping for a

6   provision-by-provision breakdown of which arguments apply to

7   which, and I'll try to signpost that to the best that I can.

8   Some of them are generally applicable across all of their

9   claims, and some of them are more applicable to specific claims

10  than others.

11         THE COURT:  Well, the one that comes to -- the one

12  that I think is distinguishable -- and I meant to ask

13  Mr. Jensen about this, and I'll get back to it -- is the

14  libraries and museums.  I didn't see in the declarations

15  where -- I think for one of the plaintiffs he had visited a

16  museum armed, I think.  But I don't know of any intent to visit

17  a public museum or library in the near future.

18         However, the other provision seemed to me to be so

19  broadly defined; that doesn't plaintiff make a legitimate

20  argument that because they are so broadly defined, that they

21  pretty much can't go anywhere in the state of New Jersey

22  without their weapon?

23         MS. CAI:  I don't think they've met that burden, Your

24  Honor, in what they've offered to the Court.  And I'm sort of

25  harping back to the burden, but I think it's important at this

1    stage, we can't just presume things to be true.  The plaintiff

2    has to proffer some evidence.  They don't have to prove their

3    evidence, although the State is entitled to cross-examine them

4    on whether or not that's appropriate.

5              I do think there are some provisions for which the

6    deficiency is far more lacking than others.  And I can go

7    through them bit by bit.

8              THE COURT:  Okay.

9              MS. CAI:  So it seems like, you know, it was the

10   first deficiency I was going to start with, which is the --

11   what I call the lack-of-imminent-injury problem.  And so I want

12   to clarify something.  Mr. Jensen was talking about his clients

13   as people who have carry permits and perhaps separate from the

14   general public.  That solves a particularized injury problem.

15   So Article III injury has to be both concrete -- or it's three

16   things: concrete, particularized to the individual, and

17   imminent.

18             Our issue in this part of the argument is on the

19   imminence problem, not the particularized problem.

20             I do understand that his clients are able to carry

21   firearms concealed in ways that people who don't have conceal

22   permits don't.  And so it's not about whether or not they have

23   taken the step of obtaining a concealed carry permit.  That's

24   not the problem.  The problem is the imminence of the injury.

25             So, for example, plaintiffs challenge the

1    restrictions on firearms carry at public libraries and museums,

2    entertainment facilities, places that serve alcohol, vehicle

3    restrictions, including public transit and private vehicles.

4    But nowhere in their declarations do they put forward anything

5    saying anything about their future imminent intent to visit

6    these places.  No plaintiff has said anything about future

7    intent to visit a library or museum.  They also haven't said

8    anything about intentions to in the future visit a movie

9    theater or an entertainment facility.  They could easily do

10   that if they were to say, for example, I --

11           THE COURT:  But isn't it enough for the plaintiff to

12   have to say that this is my daily routine, I typically get up,

13   I go to a restaurant, I go to a hardware store, I go to all of

14   these various different places, this is my ordinary routine,

15   and I should be permitted, because I have a license to conceal

16   carry, to take my firearm with me, but because the statute is

17   so broadly defined, I'm leaving my firearm at home.

18           It seems to me what the State is saying is that each

19   plaintiff should be able to say, okay, tomorrow when I get up,

20   I'm going to go to Lowe's because I'm going to go home and

21   paint my house, and then after that I might go join a friend

22   for lunch at Applebee's, and then after that I may have to then

23   run because I need something else at Home Depot.

24           It seems to me the State is asking the plaintiffs to

25   do that.  What do you say?

```
 1              MS. CAI:  So the State is not asking for a
 2   day-by-day, hour-by-hour or future intention.  What the
 3   plaintiff is missing -- plaintiffs are missing in their
 4   allegations is any statement about future intent.  And
 5   especially on the TRO posture.  We're talking about an
 6   injunction for a matter of days or weeks.  We don't know how
 7   frequently any particular plaintiff intends to visit a
 8   restaurant that serves alcohol, for example, or how frequently
 9   they would be going to a movie theater.
10              THE COURT:  But isn't once enough?
11              MS. CAI:  No, Your Honor.
12              THE COURT:  Why do you say "frequently"?
13              MS. CAI:  Because if there is no concrete plan to
14   visit, for example, a movie theater in the next month or two,
15   they don't have adequate standing to ask this Court to enjoin
16   that provision because they will not be harmed in any Article
17   III way.
18              THE COURT:  Well, and then that gets to my first
19   question that I asked Mr. Jensen is, do I parse out the various
20   provisions in the statute?
21              Do I say, okay, I've looked at the declarations of
22   the plaintiffs and nowhere do they talk about, well, I want to
23   go see the next movie.  Therefore, movie theaters, they haven't
24   shown standing as to movie theaters.  But they do say that they
25   regularly meet their friends at a restaurant that serves
```

```
 1   alcohol, so there they've showed standing.  Is that the

 2   analysis that I engage in?

 3          MS. CAI:  I think you do, right.  Because I think

 4   each plaintiff has to show -- has to demonstrate standing as to

 5   each of the claims they're bringing.

 6          THE COURT:  Well, how do -- so we're kind of jumping

 7   around, but then how do you define entertainment facilities?

 8          MS. CAI:  So --

 9          THE COURT:  Doesn't that depend upon what people view

10   to be entertainment?  Does that include a concert in a church?

11          MS. CAI:  Your Honor, I think if there are as applied

12   questions that pertain to a particular plaintiff, like they're

13   not sure, we could talk about that.

14          I don't think there is any question, though, that

15   plaintiffs are challenging the entertainment facility provision

16   as it applies, and the statute makes this clear, does apply to

17   theaters, stadiums, museums, racetracks, arenas, and other

18   places where performances, concerts, exhibits, games or

19   contests are held.  And so that's a pretty defined set of

20   places.

21          THE COURT:  No.  Ms. Cai, but what you're asking --

22   it seems to me what you're saying is that this Court, in order

23   to find that the plaintiffs have standing, would have to parse

24   through the plaintiffs' declarations to see if, and if they

25   did, what they had concrete plans to do.  That's how I'm
```

1    understanding your argument to me.

2           MS. CAI:  Yes.  And that argument comes straight from

3    the Supreme Court's decision in *Lujan*.  So plaintiff's claimed

4    injury in that case was obviously different from what it is

5    here.  It's the inability to view endangered species that they

6    claim would be further imperiled by the regulation they're

7    challenging.

8           THE COURT:  Okay.  So then under your argument, do

9    you agree then that if each plaintiff has averred that wherever

10   they go, they go by car, that satisfies standing as to the

11   subchapter dealing with transportation?

12          MS. CAI:  I think that would be true, Your Honor.  I

13   think the affidavits are even lacking on that part.  Now, it

14   may be very easily fixable, but it is still the plaintiffs'

15   burden at this stage to do that.

16          I will note that as to Section 7(b)(1), which applies

17   to both public and private vehicles, no plaintiff has alleged,

18   even in the past, that they've ridden public transit and

19   certainly no future intention to do so.

20          I also want to point out that the Supreme Court has

21   been very clear that allegation of past injury or past, you

22   know, past visits to certain locations standing alone without

23   averments of future imminent intent is not enough to satisfy

24   the imminent injury requirement.

25          And so, again, these are not necessarily things that

1   would be necessarily difficult for a plaintiff to demonstrate.

2   There are some plaintiffs who seem to aver that they are

3   unlikely to ever visit a museum, a movie theater, or public

4   transit.  So, for example, the Muller affidavit at paragraph 11

5   suggests that this person is very unlikely to visit those

6   places according to what he's already testified to.  Other

7   plaintiffs may have an easier time.  We're just submitting to

8   the Court that on this posture, the plaintiffs have not met

9   their burden in the rushed affidavits that they submitted to

10  this Court.

11          We are not saying that the Court should dismiss the

12  Complaint because it could never satisfy that burden.  So

13  that's on just one of the three standing problems I wanted to

14  talk about.

15          The second standing problem, which I didn't really

16  hear Mr. Jensen talk about, is demonstrating that Chapter 131

17  is actually the cause of any injury that they allege.  So this,

18  I mean, the Supreme Court has recognized that traceability and

19  redressability are very related in the causation context.  And

20  so a good example I think to illustrate this is entertainment

21  facilities, for example.

22          So plaintiffs say I want to be able to go to concerts

23  and performances and all that, and Chapter 131 should be

24  enjoined because it says that I can't carry my firearm at those

25  venues.

1          The problem is many, if not most, large entertainment

2     facilities and some movie theaters already, by their own

3     policies, prohibit firearms.

4          So plaintiffs' challenged Chapter 131 on a facial

5     posture asking this Court to invalidate the statute.  But the

6     statute is not the but-for cause of their claimed injury, even

7     if they can get over the imminence requirement that we were

8     just talking about.  And so that's the problem for all of

9     the -- well, most of the places that they're challenging.  So

10    libraries, entertainment venues, at least some of the private

11    enterprises they're going to that have made it clear on their

12    own websites or on their doors that firearms are not allowed.

13    So the YMCA, for example, Costco, perhaps the local coffee

14    shop.  There's no evidence that these places would allow

15    plaintiffs to carry with a firearm.  And, in fact, some of them

16    already have existing policies prohibiting weapons.  So that's

17    one of the problems that plaintiff has never provided this

18    Court a satisfying answer to.

19         It could also be overcome with more specific evidence

20    at the PI stage.  So, for example, one of the plaintiffs says I

21    want to be able to carry at my local coffee shop or my local

22    YMCA.  If they have an affidavit from the coffee shop owner or

23    whoever runs the YMCA that but for Chapter 131 you would be

24    allowed to carry here, then, yes, they have demonstrated

25    causation on that point.

```
 1            THE COURT:  So the State is suggesting that the
 2    plaintiffs must lay out how they intend to spend the rest of
 3    their lives for the next several months --
 4            MS. CAI:  No, Your Honor.
 5            THE COURT:  -- to establish standing?
 6            MS. CAI:  No, Your Honor.  I think they just need to
 7    give at least one example for each category, each provision
 8    that they're challenging, that they're actually intending to go
 9    to.
10            THE COURT:  So the State's position -- I want to make
11    sure I understand your position.  The State's position is that
12    the plaintiff must, if they're going to challenge each subpart
13    or each provision, must at least satisfy standing as to one of
14    the categories; is that the position?
15            MS. CAI:  Yeah.
16            THE COURT:  Okay.
17            MS. CAI:  Because they need to have some injury to
18    challenge the provision at issue, to make the claim at issue.
19            And I will fully acknowledge that the
20    but-for-causation problem in this part of the standing
21    challenge almost certainly does not apply to the plaintiff's
22    own vehicle, right?  They don't need to show that because but
23    for the statute, they've demonstrated that they would be
24    carrying loaded guns in their automobiles.
25            THE COURT:  Okay.  So you concede standing as to
```

1   subchapter 7, the transportation, (d).

2          MS. CAI:  Not standing in general, Your Honor, but on

3   this, the causation part of standing.

4          THE COURT:  Well, how do you quarrel with the fact

5   that each plaintiff rides his -- each declaration discusses how

6   when they go places they get in the car.  How do you quarrel

7   with that standing?

8          MS. CAI:  There's a different -- this is the third --

9   the third problem with standing is the credible likelihood of

10  enforcement.

11         THE COURT:  Okay.

12         MS. CAI:  So that's what I wanted to get to.

13         THE COURT:  Okay.

14         MS. CAI:  And so I think that the issue there is the

15  Supreme Court has been clear and this Court, as affirmed by the

16  Third Circuit in cases like *Fischer*, have made clear that the

17  mere existence of a law is not sufficient to demonstrate

18  credible likelihood of enforcement.

19         It's not the case that the plaintiff has to be

20  prosecuted, but the plaintiff has to do more.  And in *SBA List*,

21  the Supreme Court case, the Court gave three ways of getting

22  there.  One is past history of enforcement.  Two is any kind of

23  specific threat of enforcement against a plaintiff or similarly

24  situated person.

25         The third is some other operation of the statute that

     1    makes it especially easy for enforcement.  So, for example, a

     2    citizens suit provision is the example that the Supreme Court

     3    gave.  Plaintiffs have not even tried to meet this burden.

     4    They have not tried to demonstrate any of this.

     5              THE COURT:  Well, let me ask you this:  Is the State

     6    willing to agree not to prosecute each of these plaintiffs?

     7              MS. CAI:  No.  And that's not what the requirement

     8    is, right.  So --

     9              THE COURT:  So then help me understand when the

    10    threat of prosecution becomes credible.

    11              MS. CAI:  So if, for example, plaintiffs adduced any

    12    evidence about how the State had previously enforced sensitive

    13    places restrictions and places like government buildings,

    14    schools, et cetera, they haven't done any of that.  And I think

    15    if you think about the claim by claim, there are some claims

    16    for which the credible threat of enforcement issue becomes very

    17    crystallized, and so the private property restriction is one of

    18    them.

    19              So plaintiffs say, well, everything is likely to be

    20    enforced because the statute has been passed and law

    21    enforcement says we enforce all of our statutes, right.  But

    22    the problem is, think about the commonsense scenario that that

    23    provision would provide.  If a plaintiff carries a concealed

    24    firearm on to private property and the owner hasn't indicated

    25    one way or the other whether or not they consent --

```
 1              THE COURT:  He's in violation of the law.

 2              MS. CAI:  But it's not clear how that would be

 3   enforced, and it's not clear that the threat of enforcement

 4   would be that credible, and here's why --

 5              THE COURT:  Well, I just asked you if the State was

 6   willing not to enforce the laws and you would not concede that.

 7   So the law, the default is, is that unless the owner has

 8   consented, and in the scenario that you're positing, in that

 9   case the owner hasn't consented, then under the law, the gun

10   owner violates the law, right?

11              MS. CAI:  That's --

12              THE COURT:  Should he wait for the police to come

13   arrest him before there's a credible threat of prosecution?

14              MS. CAI:  No, Your Honor.  No, Your Honor.  But the

15   issue is how it's enforced.

16              So one scenario is the owner, upon seeing the

17   plaintiff with the concealed weapon -- I'm not sure how that

18   would even happen.  A lot of times perhaps the owner wouldn't

19   even know -- is actually okay with having it on their property

20   all along.  They just haven't expressed their consent either

21   way.  This is what the plaintiffs are worried about, right,

22   people who are fine or don't really care about you bringing

23   your firearm but haven't expressed consent.  I think it's very

24   unlikely that that private owner would be calling the police to

25   enforce the provision against the plaintiff.
```

```
 1          THE COURT:  What evidence do you have to support

 2   that?

 3          MS. CAI:  The burden is not on the State to support

 4   that.  But I think it's common sense to say if I am a person

 5   who is perfectly fine with others bringing firearms onto my

 6   property, I just haven't told that person, if a person happens

 7   to do that in violation of the technical law on my own

 8   property, but I'm not willing, as most people probably are, to

 9   pick up the phone or do anything about it, that's going to be,

10   admittedly, difficult for the State to enforce, especially

11   because it's on private property.

12          And so that's an example of why I think the burden,

13   you know, plaintiffs have to satisfy their burden.  And maybe

14   it's a little bit easier with respect to carrying at a large

15   stadium where it would be more likely that law enforcement will

16   see you do it or whatever.  But with respect to private

17   property I think it's harder to know.  And if the --

18          THE COURT:  But under your analysis, what is the

19   plaintiff to do?  It's the plaintiff's burden, I agree with you

20   on that.  Is the plaintiff supposed to present evidence that he

21   went up to ten different property owners and even though there

22   was no sign that said you can have a gun here, that they were

23   all okay with it?  I mean, I'm not sure I'm following your

24   argument.

25          MS. CAI:  No.  I think it would have to be something
```

```
 1   more specific.  And I don't want to lay out a roadmap for how

 2   plaintiffs would cure their own standing deficiencies, but

 3   perhaps any examples of other enforcement in this area that

 4   could shed light on how likely the enforcement is.

 5           THE COURT:  But the law was just enacted.  So how can

 6   you criticize plaintiffs for not coming forward with such

 7   evidence?  I guess that is what is troubling to me; that in the

 8   cases of standing that you are discussing, there, there is a

 9   historical pattern.

10           So, for example, in some of the cases, the plaintiff

11   lacks standing because though there's been a statute on the

12   books for 20 years, it's never been prosecuted, right?

13           So do you quarrel with the plaintiffs' position that

14   they have every right to believe that they will be prosecuted

15   if they are found to be in violation of the provision?

16           MS. CAI:  Of course not, Your Honor.  I mean, the

17   State would never say we're not going to enforce, you know, a

18   duly enacted criminal law unless there was some other specific

19   circumstance at stake.

20           THE COURT:  Okay.

21           MS. CAI:  I'm just saying that as the Supreme Court

22   and other cases, including the Sixth Circuit and the Third

23   Circuit, have said, the plaintiffs' burden is to say more than

24   the law exists and there's no disavowal of enforcement.  And

25   how they choose to do that, whether it's through history of
```

1  enforcement of similar statutes or through an example of a

2  similarly situated person who has been enforced against, that's

3  up to them.  And if they would like to do that, we can evaluate

4  the evidence and see if it reaches the threshold.

5          And I think, you know, in cases like *Kendrick*, which

6  is a DNJ decision that cited to D.C. Circuit case law on this

7  issue, as well as the recent *Angelo* decision of the D.C.

8  Circuit, there is a real issue on this point.  And this applies

9  to all of their claims because the burden on the plaintiff for

10 challenging a newly enacted law is to demonstrate that specific

11 provisions that they fear enforcement of will actually be

12 likely to be applied to them and enforced against them.

13         THE COURT:  And just to be clear, that wasn't a D.C.

14 Circuit decision.

15         MS. CAI:  Sorry.  District of D.C., citing D.C.

16 Circuit law, yes.

17         THE COURT:  And that seemed to rely upon D.C. Circuit

18 law that really, I think, is distinguishable from this Court's

19 precedence.

20         MS. CAI:  There are different ways of looking at it,

21 Your Honor.  And I think the D.C. Circuit in those cases have

22 gone even further to say you actually need to be prosecuted,

23 which is not our position here.  But I think, you know, the

24 Supreme Court in *SBA List*, the Sixth Circuit in the *McKay* case

25 and other cases and other courts have recognized the three-part

 1   factor.  You know, it doesn't have to be all three but one of

 2   the three additional proffers that the plaintiff has to give.

 3         And I think especially at the PI posture where, you

 4   know, a quasi-summary judgment standard is the standard, the

 5   plaintiff has to do more than just say the law exists.  And so

 6   unless the Court has any other questions on standing...

 7               THE COURT:  Thank you.

 8         All right.  Mr. Jensen, you want to respond.

 9               MR. JENSEN:  Yes, Your Honor.

10               THE COURT:  Yes.

11               MR. JENSEN:  I'll try to be brief.

12         So, first and foremost, we're not talking -- as the

13   Court has already recognized, we're talking about a law that

14   was just enacted.  There's not going to be a history of

15   enforcement and a requirement that you must show a history of

16   enforcement to show imminence, particularly in the context of

17   newly enacted legislation, is going to create a situation where

18   the legislation is simply not reviewable, which is not the end

19   goal of the standing statutes.  It's to ensure that we have

20   particularized controversies that are susceptible to

21   determination by the courts.

22         And moreover, this is not a mere technical violation.

23   We're not talking about something like driving five miles per

24   hour over the speed limit where maybe they'll pull you over,

25   maybe they won't; and if they do, you're going to get handed a

```
 1    piece of paper that says write a check for 50 or $100.  We're

 2    talking about serious criminal statutes where the result is

 3    going to be someone is going to be arrested, they are going to

 4    be held in jail unless and until they make bail, and they are

 5    going to face a serious threat of a term of imprisonment.

 6           A couple of the cases that we're referencing, you

 7    know, in particular, Kendrick, I was local counsel on that

 8    case, the issue there was the plaintiffs were challenging

 9    parameters related to the permitting process.  They hadn't

10    applied for permits.  Now, whether or not that was rightly

11    decided based on the particular claims they were putting

12    forward is debatable.  But long story short, that's not what

13    we're dealing with here.

14           We're not dealing with -- and I still haven't heard

15    any specific thing that any of the plaintiffs could do to get

16    themselves closer to the line than they already are.  They've

17    already passed all of the processes they would need to pass to

18    be able to engage in that conduct.

19           THE COURT:  What about your adversary's position that

20    the plaintiffs have to sort of lay out their concrete plans, I

21    guess, as they see their life unfolding for the next several

22    days or weeks?

23           MR. JENSEN:  I normally try to avoid answering

24    questions with questions, but take this as a rhetorical

25    question.  When's the next time you're going to a movie
```

1    theater?

2          People's lives do not necessarily lay out into a

3    scheduling book that run six months or a year or however long

4    into the future.

5          What the plaintiffs are saying here is that when they

6    were able to -- and if they were now able to, they would

7    continue to do this -- when they were able to, they carried

8    guns with them throughout their daily lives.  Sometimes that

9    might involve going to museums.  Sometimes that might involve

10   going to restaurants or gas stations or where have you.

11         Requiring a higher level of specificity or

12   concreteness than that is basically turning the right of armed

13   self-defense on its head.

14         THE COURT:  Although I didn't see anything in the

15   declarations -- and you'll correct me if I'm wrong -- that the

16   plaintiffs intended to visit libraries and museums, and maybe I

17   missed it.

18         MR. JENSEN:  I don't think anyone said I have a

19   definite plan right now to go to the Sussex County Library or

20   what have you next week.

21         THE COURT:  Because not everybody is a library-goer

22   and not everybody is a museum-goer.  So to that, the State

23   might have a point.

24         MR. JENSEN:  Well, but the real issue here is what's

25   the injury?  And the injury is deprivation of the right to

1    armed self-defense.  And the issue is, does that right attach

2    to you as an individual that then subject you to specific

3    justified limitations, or does the right in the first place

4    only come up in particular locations.

5            They're trying to put forward a view where this is a

6    right that only comes up in particular locations.  As long as

7    you have some ability to carry a gun in some manner within the

8    geographic confines of New Jersey, the right to bear arms is

9    being protected.  But that's not what the right of armed

10   self-defense entails.  It entails the ability to actually be

11   able to protect one's self when the need for defense arises.

12   And this in and of itself ties back into this "sensitive

13   places" issue.  Because one of the defining characteristics of

14   sensitive places, like this courthouse, is you're not too

15   likely to need a firearm to defend yourself.  If someone

16   attacks me right now, we've got, I don't know, at least one CSO

17   in the room.  I think a bunch more would probably come in

18   pretty quick, all right.

19           That is distinguishable from going to a museum or

20   library, and the basis for distinction doesn't relate to how

21   frequently someone goes there.  It relates to whether, if they

22   are going to go there, that need is going to arise.

23           One other thing that I think should be addressed just

24   briefly, *Fischer versus Governor of New Jersey*, which I believe

25   actually went up to the Third Circuit out of this Court, so you

```
 1   may actually be more familiar with the facts than I am, but
 2   stated generally the plaintiffs in Fischer are challenging a
 3   New Jersey law that governs withdrawal from a public sector
 4   union, specifically a teacher's union.  The New Jersey statute
 5   says you've got to request withdrawal from the union within ten
 6   days of your anniversary date.  And the plaintiffs are saying,
 7   under the Supreme Court decision, that's unconstitutional.
 8           The problem is, the way that this had actually worked
 9   out for all the plaintiffs is that their union rules let them
10   withdraw earlier, and they had withdrawn earlier.  So then you
11   do get into a question of, well, just because the statute is on
12   the books doesn't mean it's being applied to you.  How do you
13   have standing?  That is apples and oranges from what we are
14   dealing with here.
15           THE COURT:  Okay.
16           MR. JENSEN:  And beyond that, the only other thing I
17   can say is that I think that the Court has accurately
18   identified the issue with, in particular, the Naviguard
19   decision out of the D.C. Circuit where the reality is we've got
20   a circuit split.
21           I don't think that line of authority will ultimately
22   prevail because I think particularly when you get up to the
23   Supreme Court level, this notion that people should have
24   standing without having to risk getting sent to prison is going
25   to be persuasive with the Court.  But long story short, I think
```

1    there are one or two outcomes you get out of the D.C. Circuit

2    that you would not get out of the Third Circuit.

3           So unless the Court has anything further...

4           THE COURT:  No.  Let's turn to -- I want to get to

5    irreparable injury, and we'll do that at the end.  But I want

6    to turn to the "sensitive place" designations, and I want to do

7    them by -- I want to focus -- I want to skip past the subpart

8    12.  I want to turn to subpart 15 just briefly, and 17, and

9    then I want to talk to you about the private property.

10          You know what, let me just hear you as to "sensitive

11   place" designation all along, and we'll keep the

12   transportation, the vehicle one, for a separate conversation.

13          Okay.  Go ahead.

14          MR. JENSEN:  Okay.  So what we know under -- to start

15   this conversation off, we need to talk about what the framework

16   of review is, right?  So under *Bruen*, which is really primarily

17   where we're going to be looking to to find out how do we

18   evaluate these restrictions, the starting premise is, if

19   something falls within the scope of the Second Amendment,

20   meaning we are talking about the act of keeping or bearing

21   arms, it is presumptively unconstitutional unless the

22   government bears the burden of identifying a historical

23   analogue that amounts to what could be called and what, in

24   fact, the Court did call an enduring tradition, an enduring

25   American tradition.

1          Now, one issue that has already come up quite a bit

2     on the briefing is precisely what period we're looking at.  And

3     when you look at *Bruen* around -- I want to say this is roughly

4     page 2133, 2134 --

5          THE COURT:  Well, I think that we can skip that

6     conversation now.  And I don't really want to delve into it.

7     Because, as in *Bruen*, it didn't matter to the Supreme Court's

8     decision whether or not you looked at the 1791 period or you

9     looked at the 1868 period, right, under the *Bruen* decision?

10         MR. JENSEN:  Yes, that's correct.

11         THE COURT:  Your argument is the same here.

12         MR. JENSEN:  I think that is the same.  But to the

13    extent it does make a difference, what does need to be noted is

14    that in *Bruen*, the Court directly said we have narrowly looked

15    to 1791 to determine the scope of the Bill of Rights.  There is

16    an ongoing academic debate, that term, direct quote.  They cite

17    Amar and Khan -- Akhil Amar and K. Lash, and I'm drawing a

18    blank on Lash's first name -- for these articles talking about

19    a somewhat novel theory that when the Fourteenth Amendment was

20    adopted, it basically reenacted the entire Bill of Rights.  So

21    maybe for the entire ten original protections, we ought to be

22    looking at 1868 instead of 1791.

23         THE COURT:  And let's not get bogged down in that

24    conversation.

25         MR. JENSEN:  Okay.

```
 1            THE COURT:  Yes.

 2            MR. JENSEN:  I think we made the point, so let's not

 3    get bogged down in it.

 4            THE COURT:  Understood.

 5            MR. JENSEN:  So let's look at -- so with regard to

 6    15, first of all, let's start at the manner in which the

 7    statute has articulated it.  And this is bars and restaurants

 8    that serve alcohol and, paraphrasing, other places where

 9    alcohol is available or is sold for consumption on premises,

10    okay.

11            And the way that the State is characterizing this,

12    which it's a direct quote, locations where vulnerable or

13    incapacitated people gather, which I don't really know that

14    that's an entirely accurate way to describe restaurants.

15            What we have under Bruen to start out with is the

16    State of New York argued that any place where people gather and

17    where law enforcement is presumptively available ought to fall

18    under the guise of a sensitive place.  The Supreme Court

19    emphatically rejected that.  So whatever we have as a starting

20    premise, we pretty much know that if what the justification is

21    is that, well, hey, people gather here and if you call the

22    police, they'll presumably show up --

23            THE COURT:  Well, I think there are two principles,

24    if not more, that Bruen was clear on.  One is that the

25    sensitive place designation should not be so expansive, and
```

1    cautioned courts against expanding the definition of sensitive

2    place.  You agree with that?

3         MR. JENSEN:  Yes.

4         THE COURT:  The other principle is exactly the one

5    that you articulated.  Because otherwise, according to the

6    Supreme Court, the city of Manhattan becomes designated a

7    sensitive place.

8         MR. JENSEN:  Correct.

9         THE COURT:  Okay.  And so in that vein, your argument

10   is?

11        MR. JENSEN:  Well, okay, so let's call that context.

12   The simple fact that people gather in an area is not going to

13   be enough to make it a sensitive place.  And frankly, that sort

14   of has to be the case because ultimately people gather there.

15   Look, people gather in public places.  That's kind of the

16   definition of a public place, right.

17        So with regard to restaurants and bars that serve

18   alcohol, the State's identified three laws.  And I will follow

19   the Court's admonition not to get bogged down in the details,

20   but it should be noted, not one of these is from anything close

21   to 1791, all right.

22        So, first of all, we've got an 1870 Texas law, and

23   what that law actually prohibited was going into any church or

24   religious assembly, any schoolroom or other place where people

25   are assembled for educational, literary, or scientific purposes

1  or into a ballroom, social party, or other social gathering

2  composed of ladies and gentlemen, or to any election precinct

3  on the day or days of any election, or to any other place where

4  people may be assembled to muster or to perform any other

5  public duty or any other public assembly.

6           By its terms, this does not cover restaurants.  It

7  does not, for that matter, cover bars.  And any attempt to

8  convert this into something that might cover restaurants and

9  bars requires us to sort of read a lot in there that basically

10  goes, well, so we're talking about places where people assemble

11  or they gather.  But that would just be going back to do you

12  have a right to bear arms in public in the first place.  And

13  there are probably two notes that should be thrown out there

14  with regard to this Texas law.  One is that the law was amended

15  a year later to strike out the reference to literary purposes.

16           The second is that in the grand scheme of things,

17  Texas was one of at least two states that had rejected a view

18  of the right to bear arms.  Now, this is the right to bear arms

19  as stated under the Texas Constitution that as a general

20  proposition applied to handguns in the first place.  So

21  restrictions that are being upheld in Texas at this time period

22  are not really particularly pertinent because this is this

23  whole line of authority that the Supreme Court rejected in

24  *Heller* in the first place.

25           THE COURT:  So, Mr. Jensen, and you've made all of

 1   those arguments in your brief, so to move things along, I don't

 2   want you to have to reiterate what's in your brief.  I

 3   understand the positions you've taken with respect to the

 4   statutes that the defendants have cited, and I have some

 5   questions for them about that.

 6          And we're only going to focus now on 15 and 17.

 7   Anything else in your brief that you want to add?

 8          MR. JENSEN:  Well, okay.  So let me just on 15, I

 9   will hit these two points very quickly.

10          THE COURT:  Yes.

11          MR. JENSEN:  The other two laws that are being cited,

12   1859 Connecticut, this doesn't have anything to do with

13   restricting carrying guns.  It says you can't sell alcohol or

14   have a gambling facility within either a half a mile or a mile

15   of a military encampment.  I don't know.  General Order No. 1

16   generally says you can't drink while you're on duty, right.

17   The military's ability to prohibit alcohol use or restrict

18   alcohol use by members of the service is kind of not what we're

19   talking about here.

20          And then finally, this 1867 Kansas law says you can't

21   be intoxicated.  All right.  Section 5 of this new legislation

22   already says you can't be intoxicated while carrying a gun.

23   We're not challenging that.  I don't think anyone in their

24   right mind is going to assert a constitutional right to walk

25   around drunk and armed.

|    |                                                                                  |
|----|----------------------------------------------------------------------------------|
| 1  | With regard to 17, entertainment facilities, well, |
| 2  | we're starting out with the Statute of Northampton.  The big |
| 3  | issue there is -- and believe me, plenty of ink has been |
| 4  | spilled on the issue of the Statute of Northampton over the |
| 5  | past 12 years.  The Supreme Court has resolved this. |
| 6  | THE COURT:  Right.  And in your brief you refer to |
| 7  | the Statute of Northampton, but actually the statute that the |
| 8  | State cites was actually addressed by the Supreme Court. |
| 9  | MR. JENSEN:  Well, yes.  It was a state analogue to |
| 10 | the Statute of Northampton. |
| 11 | THE COURT:  Yes.  Okay. |
| 12 | MR. JENSEN:  And significantly, if you start doing |
| 13 | research in Virginia case law, you really won't find anything |
| 14 | that construes this.  So all we really have to go from is the |
| 15 | established common law meaning of the statute at the time of |
| 16 | the framing or any other time that might be material. |
| 17 | And notably, while we're not going to find authority |
| 18 | in Virginia that addresses this, there is some authority from |
| 19 | other states.  I believe *State v. Huntley* from North Carolina |
| 20 | addressed this issue, the Statute of Northampton and a phrase, |
| 21 | "liability" for a phrase, by explaining that the general act of |
| 22 | possessing or carrying a gun did not come within the statute in |
| 23 | the first place. |
| 24 | We've got that same 1870 Texas law that we're just |
| 25 | talking about, which, again, the only way you're going to get |

1   this into an entertainment venue is simply by saying, well, the

2   premise here is that any place where people assemble, guns can

3   be banned.  But that premise has already pretty much been

4   rejected.

5          And more to the point, you know, one of the things

6   that, I think, even if I'm right and this Civil War era stuff

7   isn't really directly pertinent, one thing we do really get

8   from *Bruen* is that in looking at analogous laws, they found

9   five laws from the 1860s generally from territories and

10  oftentimes they weren't enforced for very long, but on their

11  face, they broadly precluded the carry of guns.  A lot of times

12  it was just within the confines of an organized town or city.

13         But the fact that you could locate one or two or in

14  that case five laws that stood for the proposition or that

15  embraced this restriction wasn't enough to show an enduring

16  American tradition.  And if you stop and think about this, you

17  know, take one step back from the situation and look at this

18  from the framework of, well, what should the law be, if you're

19  defining constitutional rights based on what we could call the

20  low water mark or the lowest common denominator, meaning if you

21  look through the history of the country, where is an example

22  where we can find this right either hasn't been observed or has

23  been winnowed down to nothing, well, we wouldn't have any

24  rights.  People would cite *Korematsu* and they would say it's

25  fine for the government to make race- or ethnicity-based

1   distinctions.

2           And that is part of why -- a significant part of why

3   the mere fact that someone can point to a law that is arguably

4   analogous here isn't enough.  We need to be able to show that

5   there was actually an enduring tradition that supported this

6   regulation.

7           THE COURT:  Okay.  Let me hear from your adversary,

8   please.

9           MR. JENSEN:  You bet.

10          THE COURT:  Okay.

11          So, Ms. Cai, I really want to move on to the

12  privately owned property.  But do you have anything else to add

13  to your submissions with respect to 15 and 17, the

14  entertainment provision and the alcohol provision?  Do you have

15  anything else to add?

16          MS. CAI:  I do, Your Honor.

17          THE COURT:  Okay.

18          MS. CAI:  I think --

19          THE COURT:  And in your comments, though, because one

20  of the questions I do want you to address is, I understand the

21  State to be saying that the conduct at issue here is not

22  covered by the Second Amendment, and so that is a question I

23  most certainly want you to address.  Okay.

24          MS. CAI:  With respect to places that -- so Section

25  15 and Section 17, generally speaking, we don't make a text of

1    the Second Amendment argument unless the entertainment facility

2    is operated by the government as a market participant, as

3    actually many of the largest venues in New Jersey are.  So PNC

4    Bank Art Center, for example, is a government-run facility.  So

5    that's the only distinction I'm making on the first step *Bruen*

6    inquiry about the text.  That argument I'll save for the other

7    provisions where that's much more applicable.

8               THE COURT:  Okay.

9               MS. CAI:  So on the historical analogue, so starting

10   with I guess we're talking about entertainment facilities, I

11   think what's notable is the State provided five or six

12   historical analogues specifically prohibiting firearms at not

13   just places where people assemble, but crowded places for

14   social or entertainment or ballrooms, the kind of things, the

15   specific kind of things that Section 17 prohibits.  And so if

16   you want to find a almost historical twin, there are a number

17   of them that we've identified.  And plaintiffs have --

18               THE COURT:  But didn't *Bruen* caution against that?

19               MS. CAI:  Yeah, absolutely.  We don't have to do that

20   for everyone.  I'm just saying even if -- the plaintiffs are

21   asking in a lot of cases for, well, this is not close enough.

22   They haven't given anything about why the examples we gave on

23   entertainment facilities are not close enough.  And so that may

24   be a question for some of the other provisions.  But I think as

25   to entertainment facilities, we have identified very, very

1   direct historical analogues that they haven't challenged.

2           I think one thing that sort of illustrates my earlier

3   point about sort of hasty TRO proceedings is what the

4   plaintiffs were trying to argue in their reply brief on the

5   Tennessee statute that is in our Exhibit 8, the 1869 Tennessee

6   statute.  So they say this statute allowed open carry, so you

7   shouldn't consider it.  That's plain wrong from the text.  And

8   I have a copy of the statute if the Court wants to look at it,

9   and I can walk through it.

10          But the statute literally says:  "It shall not be

11  lawful for any person attending any fair, racecourse, or other

12  public assembly of the people to carry on his person, concealed

13  or otherwise, any pistol or any other deadly or dangerous

14  weapon."

15              THE COURT:  What exhibit is that?

16              MS. CAI:  This is Exhibit 8.  And I'm happy to --

17              THE COURT:  I have a copy of it.

18              MS. CAI:  And I think --

19              THE COURT:  May I?  I want to get to this.  The State

20  has throughout its papers told this Court not to make a hasty

21  decision.  And of course, this Court would never make a hasty

22  decision.  But the State has done so saying we promise we'll

23  give you the historical evidence to support this legislation.

24          But when this legislation was passed, the legislature

25  said we have plenty of historical evidence to support this

1   legislation.  So it's there.  What more time do you need?  It's

2   been there.

3          MS. CAI:  It's certainly there, Your Honor.  And

4   that's why we provided the Court with, you know, I think 20

5   historical exhibits demonstrating --

6          THE COURT:  Is that all you have?

7          MS. CAI:  It's not though, Your Honor, because --

8          THE COURT:  But if you had more -- is this all that

9   the legislature had?

10          MS. CAI:  I -- I can't know exactly what the

11   legislators were looking at.  I can't get into their minds or

12   their research, but --

13          THE COURT:  Well, I'm looking at the plain language

14   of the statute.  I'm looking at the plain language of the

15   legislation that says that these laws are rooted in historical

16   evidence and supported.  I don't have the language right in

17   front of me, but the legislation itself says that historical

18   tradition supports this legislation.

19          So it seems to me that the legislature has had this

20   evidence at the time of passage.  And for the State to come

21   forward to me today and say we need more time to show you the

22   legislation, the legislature said they had it.

23          MS. CAI:  So the argument is not that the State needs

24   more time to come up with historical analogues.

25          THE COURT:  Okay.

```
 1              MS. CAI:  The argument is historical evidence is

 2      oftentimes tricky.  What do particular phrases mean at the

 3      moment in history that they existed?

 4              THE COURT:  Okay.

 5              MS. CAI:  Is there other context supporting that

 6      particular understanding of what these statutes meant?  I mean,

 7      this is the work of historians.  And the State -- I'm sure the

 8      legislature had many of these in mind.  I can't purport to know

 9      exactly which ones they did or didn't.  And there's also a

10      whole doctrine where exactly what the legislature had in mind

11      is not necessarily what justifies the law.

12              But in any event, I think the key is as demonstrated

13      by plaintiffs' attempt to challenge the State's historical

14      analogues with misreadings of what the statutes actually say,

15      and there are other scenarios where perhaps the readings are

16      ambiguous or debatable, those are the kinds of conversations

17      and factual development that needs to happen in the normal

18      course of litigation.

19              And so I think it's -- and the other thing that I

20      think needs to happen --

21              THE COURT:  Although this Court's perfectly capable

22      of reading the statute and construing it as well.  Do you agree

23      with that?

24              MS. CAI:  Of course.  Of course.  But I think there's

25      something about historical statutes that's a little bit
```

```
 1   different because the way in which people used certain phrases,

 2   for example, or what led to the establishment of certain

 3   statutes and how they were adopted by other municipalities or

 4   other states, you know, does figure into the analysis.

 5           I will note that at no time in this submission does

 6   the State rely on purely territorial laws or any territorial

 7   laws.  We are only relying on state statutes or local

 8   provisions that existed in U.S. states at the time.

 9           And so on entertainment facilities, I mean, I think

10   there's plenty of historical tradition to support this.  The

11   other thing I would note is that I think plaintiffs' discussion

12   of what Bruen said about sensitive places and what an enduring

13   historical tradition analysis requires is a little bit off

14   base.

15           So what Bruen said explicitly is that you can't say

16   all of New York is a sensitive place.  I mean, we totally agree

17   with that.  But it's silent on how expansive one should look at

18   sensitive places because it didn't conduct the historical

19   inquiry into how expansively did the historical tradition look

20   at sensitive places.  And that's exactly what we are doing now.

21           Moreover, I think what's really important is we can

22   look to what Bruen said about places that they thought were

23   settled sensitive places.  And Bruen said that although the

24   historical record "yield relatively few 18th and 19th century

25   sensitive places where weapons were altogether prohibited, we
```

 1  are also aware of no disputes regarding the lawfulness of such

 2  prohibitions."

 3       So the Court was able to draw conclusions about

 4  sensitive places, government buildings and schools, for

 5  example, based on relatively few historical analogues because

 6  those analogues were not challenged in court.  And I think

 7  that's the thing that plaintiffs are missing.  They have not

 8  demonstrated that the analogues that we put forth -- sometimes

 9  numerous -- have ever been challenged at the time or any time

10  close to when they were enacted.

11       And instead, the State has put forward evidence, at

12  least examples -- and we can do more of this on sort of a more

13  voluminous briefing timeline and briefing pages -- that

14  actually some of these laws were upheld immediately after they

15  were enacted.  And so the Texas statute that plaintiffs were

16  talking about is a good example of this.

17       And so just to focus on that for a little bit, this

18  is the 1870 Texas statute that's in Exhibit 5.  You know, the

19  Court in *Bruen* talked about the Texas court's *English versus*

20  *State* decision was incorrect to assume that the Second

21  Amendment right only applied to the militia context.  Totally

22  agreed.  We're not challenging that.  A separate part of that

23  *English v. State* decision in 1872 talks about sensitive places.

24  And the *Bruen* court doesn't abrogate this at all.  It doesn't

25  talk about this at all.

1          But the Texas Supreme Court made clear that the

2    legislature can regulate firearms carry in sensitive locations.

3    And, in fact, has said it appears to us, little short of

4    ridiculous, that anyone should claim the right to carry upon

5    his person any of these mischievous devices, for instance,

6    going into a church, a lecture room, a ballroom or any other

7    place where ladies and gentlemen are congregated together.

8          And so I think nothing about what the plaintiffs are

9    arguing is supported by what *Bruen* was saying, which is what

10    you look to is what statutes were enacted and how courts and

11    the people understood the lawfulness of those enactments at the

12    time.  And so I think that that's what the historical analysis

13    and further briefing will show.  But we have put forth examples

14    on a number of these or actually, on all of them.

15          One final point on places that serve alcohol, and

16    this applies to all the arguments that plaintiffs are making,

17    plaintiffs, the gist of their reply and what Mr. Jensen is

18    coming up here to say is that, well, you need to give like the

19    same statute in history in order for it to be justified.  But

20    *Bruen* said that's not correct.  And the Third Circuit in the

21    *Range* decision said that is absolutely not the right mode of

22    analysis.

23          Instead, what *Bruen* and *Range* tells courts to do is

24    to look at why and how the statute limits firearms.  In the

25    alcohol context, it's because alcohol and firearms don't mix.

```
 1    Now, plaintiffs say well, it's enough to say if you are

 2    actively drunk, you can't carry.  If that's the line that they

 3    are drawing, I think that requires then the State to be limited

 4    in every single way to how history -- how an 18th century

 5    statute or 19th century statute decided to limit that

 6    particular form of intoxication.  So if in history, drunk meant

 7    having a certain level of drunkenness and anything below that

 8    is fine, I think plaintiffs would have to come up here by their

 9    own logic and say, well, if you're not so drunk, then you can

10    carry.  And I think --

11              THE COURT:  No.  But I think --

12              MS. CAI:  I'm sorry, Your Honor.

13              THE COURT:  In fairness, the State cites to the

14    Kansas statute to support as evidence of a historical analogue

15    to support subpart 15.  But that Kansas statute clearly says as

16    the plaintiff says.  It says, intoxicated people can't possess

17    firearms.  And I think for the State to say otherwise, the

18    statute is plain on its face.  And to ask this Court to delve

19    down below and to do a deep dive into, well, why was that

20    statute enacted, et cetera, et cetera, that seems -- no one's

21    quarreling here that intoxicated people shouldn't be possessing

22    firearms.

23              MS. CAI:  I agree that's exactly what the Kansas

24    statute says.  But I do think what the *Range* decision

25    suggests -- says that courts have to do is to delve down into
```

 1    the reason for that restriction and how widely applicable that

 2    is.

 3              THE COURT:  Okay.  I think there we have a

 4    disagreement.  I think *Bruen* says explicitly that a district

 5    court is not to delve into the utility or the wisdom of a

 6    regulation.

 7              MS. CAI:  Your Honor, I want to make one point very

 8    clear.  We are not asking this Court to evaluate the utility of

 9    the current regulation.  What *Bruen* says, though, is that

10    courts have to evaluate the how and why of why historical

11    statutes were enacted.

12              And so, for example, in *Range*, the plaintiff there

13    argued, well, the historical statutes never say that someone

14    who is convicted of fraud -- in this case welfare fraud --

15    could be disarmed.  In fact, he pointed to statutes where the

16    prosecutions for embezzlement led to basically taking away all

17    the possessions of an individual except for firearms.  And the

18    Third Circuit says we looked to why it is that categories of

19    statutes were enacted.  And the category of statutes we look to

20    is that people who have been dishonest and breaking the law

21    were disarmed generally.  So we don't look to the

22    provision-by-provision historical twin but rather to why

23    historical analogues were enacted, and we carried that forward

24    to today.

25              THE COURT:  And so your argument with respect to --

1    let's stick with the Kansas statute, is what?

2          MS. CAI:  The reason that the Kansas statute and

3    similar statutes were enacted is that the legislatures at that

4    time correctly recognized that people who are intoxicated or

5    could be intoxicated or go to places to be intoxicated should

6    not have firearms on them.  And so we can't, you know, we're

7    not doing an analysis of whether the current statute, Section

8    15, is narrowly tailored to only apply to people who have

9    already started drinking at the restaurant versus later.

10   That's not what *Bruen* tells the Court to do.  It's whether or

11   not --

12         THE COURT:  So I guess your argument is, is that it

13   is presumed that anyone who goes into an establishment that

14   sells alcohol is going to drink?

15         MS. CAI:  No, Your Honor.  And that's --

16         THE COURT:  But that's how you'd get there.

17         MS. CAI:  No.  I don't think that's the logic we're

18   trying to draw.  The logic we're trying to draw is historically

19   legislatures have had no problem prohibiting the mixture of

20   alcohol and firearms, period.

21         Now, the current regime, it's hard to know exactly

22   who started drinking or not at any particular restaurant.  And

23   so you may disagree with the policy decision of the current

24   legislature to not make it a certain BAC level or whatever.

25   But the point is, the same animating why laws were enacted is

```
 1  the same for the Kansas law and today, which is that alcohol

 2  and firearms do not mix.  And I think that's why we're looking

 3  at this level of generality, because I think the question, as

 4  the Texas decision I just quoted to this Court describes, is

 5  the legislature's wisdom about what combinations of alcohol --

 6  I'm sorry, of locations and firearms do not mix well is based

 7  on, you know, we have historical analogues of legislatures

 8  making that determination with respect to alcohol, similarly

 9  with respect to social gatherings and large crowds, and so

10  that's why we carried those forward to today.

11          THE COURT:  Okay.  All right.  Can we turn to,

12  Ms. Cai, I have my questions for you, can we now turn to

13  subpart 17, which is the provision -- not 17.  I'm sorry.

14  Number 24, the private property provision.

15          MS. CAI:  Yes, Your Honor.  Did you want me to answer

16  or did you want Mr. Jensen to go?

17          THE COURT:  I do.  I think to move things along, I do

18  have some questions.  The question I have for you, it seems to

19  me in subpart 24, and this is what I want you to address, is

20  isn't the State turning the presumption of the right to carry

21  on its head?

22          MS. CAI:  No, Your Honor.  I think plaintiffs already

23  agree that one does not have a right to carry on other's

24  private property without their consent.  And the *GeorgiaCarry*

25  case from the Eleventh Circuit makes very clear that all of
```

1   Second Amendment history supports that proposition.

2           THE COURT:  Well, let's back up for a second.

3           You agree that a person has a right to carry a

4   firearm on private property unless the person says no?  Do you

5   agree with that principle?

6           MS. CAI:  I don't necessarily, Your Honor.  I think

7   the problem is, well, how do we know whether or not the

8   property owner consents?  And that's the whole inquiry for

9   Section 23.

10          THE COURT:  Okay.  Because that's why -- there is a

11  presumption under the Second Amendment that you have a right to

12  bear arms, okay.  That presumption carries on to private

13  property.  You agree with that?

14          MS. CAI:  I think it certainly applies to your own

15  private property and private property where the owner has

16  consented.

17          THE COURT:  Why does the owner -- so is the State's

18  argument that there is no presumption to the Second Amendment

19  right to carry?  There is no such presumption; is that the

20  State's argument?

21          MS. CAI:  There is such a presumption in public, and

22  that's the exact language that *Bruen* and *Heller* uses, but on

23  someone else's private property, from *Blackstone* forward, and

24  this is all in the *GeorgiaCarry* decision, which plaintiffs

25  don't refute.

```
 1              THE COURT REPORTER:  I'm sorry.

 2              (Reporter clarified the record.)

 3              MS. CAI:  In the GeorgiaCarry decision from the

 4    Eleventh Circuit.

 5              The right to property has always included the right

 6    to exclude.  And all that Section 24 regulates is how property

 7    owners communicate their right to exclude.

 8              THE COURT:  But why does the State feel the need to

 9    tell property owners how to communicate?  I mean, putting aside

10    whether or not there are First Amendment concerns.  Why does

11    the State feel the need to communicate to private property

12    owners what they must communicate?  Because it's well known

13    that private properties have every right to post no gun signs,

14    right?

15              MS. CAI:  Yes, of course.

16              THE COURT:  And that's the state of the existence

17    today; that if a private property owner doesn't want guns on

18    his or her property, he posts "no guns" signs, correct?

19              MS. CAI:  But you don't only have to do that, Your

20    Honor.  So I think that's what the legislature is getting to.

21    You don't have to post a sign.  You can communicate that in

22    other ways.  And --

23              THE COURT:  Okay.  So why does the State have to

24    compel, quote-unquote, a private property owner to post a sign

25    that says you have my express consent?  Why?
```

```
 1            MS. CAI:  So just as a technical, I don't think that
 2    there's any compulsion happening here, because the private
 3    property owner -- so in the opposite of Chapter 131, if it
 4    didn't exist, if Section 24 didn't exist and that the opposite
 5    regime were in place, a private property owner who didn't want
 6    firearms on their property would then be compelled to speak in
 7    a certain way, to tell people, everyone who comes in, the
 8    plumber, the dishwasher repair person, any customer, all that,
 9    I don't want you to have firearms here.  That's the alternate
10    regime, or there's confusion about what silence means.
11            And so what Section 24 does is it tells property
12    owners:  If you want your property rights to be exercised in
13    this way, this is what you do, which is, you don't need to say
14    anything, or if you want them to be exercised in this other
15    way, to allow firearms, this is what you do, which is that you
16    say something.
17            THE COURT:  But private property owners -- it's yes
18    or no.  Private property owners today know if they don't want
19    guns, they post a "no gun" sign, right?
20            MS. CAI:  I actually don't know if that's true, Your
21    Honor.  So Exhibit 21 is an empirical study of what private --
22    of what people believe to be the default rules of what happens
23    or doesn't happen if you don't say anything about firearms
24    carried on your premises.  And if you look at the provisions --
25    or the results that we cite from New Jersey, individuals,
```

1  respondents from New Jersey, a statistically significant sample

2  actually believed that if they don't say anything, you are not

3  allowing the repair person or the customer to come on to their

4  property.  And so that's -- I'm not saying that the legislature

5  is necessarily relying on that specific piece of evidence, but

6  we are saying that the reason that the legislature wanted to

7  clarify property owners' communication is to make it clear to

8  property owners how they can exercise their rights in a way

9  that actually fits with their expectations.

10             THE COURT:  But who was confused before?  What

11  doesn't make any sense to me, it seems to me that this statute,

12  it seems to me, is compelling private property owners to

13  express a view as to their view on this legislation.  Because

14  it says you have to, unless there's a sign that says we consent

15  to guns on our property, then the default is no guns are

16  permitted, right?  That's what the statute says.  It

17  immediately -- if there is no "we consent" sign, it immediately

18  defaults to no guns.

19             MS. CAI:  It does not have to be sign, Your Honor.

20  It could be on your website.  It can be --

21             THE COURT:  Okay.  Let's stick with the sign so it's

22  just easier to understand, okay.

23             So unless the private property owner says we consent,

24  it defaults to "no guns" under this statute, right?

25             MS. CAI:  That's correct.

```
 1              THE COURT:  Okay.  That's the way it's always been;
 2   that a person can go onto property unless there's a no gun
 3   posted.  So it just seems to me that this is a superfluous
 4   impediment that the State is imposing on private property
 5   owners.  And that tends to be -- and whenever there's a
 6   superfluous impediment, it seems to me that that infringes.
 7              MS. CAI:  If I can --
 8              THE COURT:  Help me understand what I'm missing.
 9              MS. CAI:  If I can give the Court a very practical
10   example.
11              THE COURT:  Yeah.
12              MS. CAI:  So if I'm a homeowner before Chapter 131
13   went into effect.
14              THE COURT:  Yeah.
15              MS. CAI:  And maybe I have little kids.  Maybe I have
16   a lot going on in the house, there's contractors coming in and
17   out, I may not be thinking about whether or not the people
18   coming in and out of my house, the plumber, the roofer, are
19   carrying firearms.  On the other hand, I may have a very, very
20   strong preference and desire for people coming into my house
21   not to have firearms because --
22              THE COURT:  Then post "no guns allowed."
23              MS. CAI:  So the problem with that is the onus,
24   right, that would require the State to tell those property
25   owners you have to speak in this way.  And all Section 24 does
```

```
 1    is reverse that to say you don't have to speak.  These other

 2    property owners have to speak.

 3              THE COURT:  Do you agree it's less onerous to post a

 4    no gun sign than to make a private property owner express a

 5    view?  Because this is how I see it, and you can respond to it.

 6              It seems to me, let's take a business owner, for

 7    example.  As the law stood before the enactment of this law, if

 8    there was no sign posted, no guns, there was ambiguity as to

 9    whether or not that property was protected.  Agreed with that?

10              MS. CAI:  Yes.  And that's a problem, right.  Yeah.

11              THE COURT:  Okay.  But that may be -- that may be

12    what the business owner desires, let's say.  This ambiguity

13    works as a deterrent, for example.

14              Now, under the new legislation it seems to me that

15    the State is removing that ambiguity and that state is now

16    forcing a private property owner to broadcast -- against its

17    will -- that its property is unprotected.  And so because by

18    default if there's no signage, there's no expressed consent,

19    the law says no guns.  And it just seems to me that the

20    ambiguity that perhaps worked to a business owner's advantage

21    no longer does under this law.  And we're getting a little bit

22    far afield of the Second Amendment issue that may delve into

23    First Amendment concerns and policy concerns that this Court

24    doesn't delve into, but it does seem to pose an additional

25    obstacle to the person entering the property.
```

```
 1          The other question I have is, at what point does the
 2   gun owner know whether or not he has expressed consent?  Does
 3   he walk down the winding driveway, get to the front door and
 4   until he's gotten to the front door, violate the law because he
 5   only learns when he gets to the front door that he didn't have
 6   consent?
 7          At what point does the gun owner know that he
 8   shouldn't have a gun on my property?
 9          MS. CAI:  So to answer that question first, Section
10   24 makes clear that if you don't have expressed consent in some
11   way, and it does not have to be a sign broadcasting "my
12   property is unprotected," it only broadcasts that I'm not
13   allowing other people into the property with firearms.  It
14   doesn't say the property is unprotected.  But you don't have to
15   post a sign.  It could be direct communications with all the
16   delivery people who come.  It could be on your website.  It
17   could be calls.  It does not have to be a sign, and so it's not
18   compelling someone to speak.
19          THE COURT:  No; I understand that.  The statute
20   doesn't say that.  But is the law violated -- does the UPS man,
21   woman, violate the law when he gets up to the front door and
22   the owner says you should not have come on my property if
23   you're armed?
24          MS. CAI:  Yes.  Yes.
25          But to Your Honor's question about, you know, who is
```

1   the government regulating, in the opposite scenario, the

2   government would be saying if you don't want guns on your

3   property, you need to broadcast that to everyone via a sign or

4   something else.

5          THE COURT:  Why can't the State just run an ad

6   tomorrow saying if you don't want guns on your property, post a

7   no gun sign?

8          MS. CAI:  It could.  It certainly could.

9          THE COURT:  That seems much less onerous.

10         MS. CAI:  I think this gets to whether or not this is

11  actually a Second Amendment question at all.  So imagine that's

12  what the State did.  Broadcast to property owners:  Know your

13  rights.  You can always exclude anyone from your property who

14  you didn't want firearms [sic].  We encourage you to do it this

15  way, all that.

16         THE COURT:  Yeah.

17         MS. CAI:  Nothing about the substantive right to bear

18  arms has changed at all because the property owner always has

19  the right to exclude, and the government is just letting the

20  property owners know of ways to make that clear.  This is no

21  different.

22         THE COURT:  Is not the State posing additional

23  obstacles that are unnecessary?

24         MS. CAI:  I don't think that the State is posing

25  obstacles, and I don't think that they're unnecessary.  And

1   those are two different things.

2           The obstacle to any particular person's ability to

3   carry on someone else's private property is that private

4   property owner's wishes.  So that's what's preventing any

5   particular person from carrying on their property.

6           THE COURT:  Right.  But you've just told me that the

7   armed UPS man or woman violates the law if he gets up to

8   deliver the package and the person, the homeowner answers the

9   door and says, "You're armed.  You were not allowed on my

10  property."  You've just told me that.

11          So what is a person to do going forward with this

12  legislation, never enter private property?  Because the law

13  doesn't even require signage.  It just says verbal.  So what is

14  someone who has a license to conceal carry to do, never enter

15  for risk of violating the law?  And in the UPS example, leave

16  the packages on the street?  I mean, have you thought this

17  through?

18          MS. CAI:  I think that the law makes it very clear

19  that you cannot enter someone else's property, their castle,

20  without their permission with a firearm.  And I think that

21  happens for a number of reasons.  And we can talk about the

22  policy reasons, none of which is about the Second Amendment

23  analysis at all.

24          THE COURT:  Well, it is because you haven't really

25  addressed the presumption; that there is a presumption of the

1   right to carry.

2          MS. CAI:  So -- but I think the problem is there is

3   no presumption of the right to carry on private property if the

4   property owner does not want you there.  And so that has always

5   been true.  And I don't even, you know, to be honest, I don't

6   know under prior trespass law what, you know, what exactly the

7   line was with respect to whether or not you can carry on

8   someone else's property without their expressed consent,

9   especially if that property owner may be liable for damages

10  from injuries with your firearm.

11         THE COURT:  But to make it liable for trespassing

12  under New Jersey, it has to be known to the potential

13  trespasser ahead of time before he or she can be charged with

14  trespassing.  This law has no such provision.  This law says

15  you can walk down the winding driveway, get to the front door

16  and the repairman is told you have just now violated the law,

17  I'm calling the police.

18         MS. CAI:  And that's exactly what the law provides,

19  and that's only because there has always been, and there's no

20  question, that private property owners have a right to exclude

21  firearms from their property.  And so what this law does is

22  regulate what private property owners communicate and not the

23  right to bear arms of the individual.

24         THE COURT:  They've always had that right.  But I

25  think you're ignoring one salient fact, is that you're now

 1   making it criminal for a person who has a license to conceal

 2   carry to not know in advance what that right is.

 3            MS. CAI:  So that's right, Your Honor.  There's two

 4   components to that.  One is, if we're doing a Second Amendment

 5   analysis, we look to the historical analogues, if you assume

 6   that the Second Amendment does cover this conduct.  And on

 7   that, Exhibit 13 and 14 are exact replicas of the same statute.

 8   And, in fact, Exhibit 13 is actually more prohibitive because

 9   the consent had to be in writing.  And that's a 1771 New Jersey

10   statute that specifically said you need to obtain expressed

11   permission if you enter someone else's property with a firearm.

12            And so if we're going down the historical analysis

13   route, and plaintiffs actually have no answer to this

14   whatsoever, I think that indicates if we're doing a Second

15   Amendment analysis on Section A24, plaintiffs cannot succeed on

16   the merits.

17            But with respect to what exactly is the injury to the

18   plaintiff and whether or not -- and I know you want to talk

19   about irreparable harm a little bit later, but once we're on

20   this point, I'm reluctant just to go off of it.  I think it

21   seems to me that what the plaintiffs are arguing is the

22   irreparable harm to me is having to ask for permission.  And if

23   we assume that's a title -- or Article III injury, assuming

24   that even is one, I think that's not --

25            THE COURT:  I really don't think -- Ms. Cai, I don't

1     think that's a fair attack on the record.

2            Again, having to ask isn't the injury.  It's the risk

3     that the plaintiffs are being put upon in the scenario that I

4     have posited for you, which is that under this law, it is not

5     known at what time in the scenario the plaintiff learns that he

6     doesn't have the consent.  But by then, it's a little too late.

7     He has already violated the law.  And that's the problem as I

8     see it with this statute, because it puts a gun owner at risk

9     of prosecution.  And it's a risk that these plaintiffs are not

10    willing to take, and so they leave their guns at home.  And

11    prior to the enactment of this statute, it didn't have that

12    risk.  There was no risk of criminal prosecution.  The State

13    has now put the risk of criminal prosecution on the gun owner's

14    inability to read his neighbor's mind.  And as I see it, that's

15    the problem with the statute.

16            I asked you about the UPS carrier, the armed UPS

17    carrier.  You tell me he has violated the law if he gets up to

18    the front door and the owner says you shouldn't have come on my

19    property, you violated the law.

20            Is that how this law is going to operate; that

21    someone who has gone to the extra measures of getting a

22    concealed carry permit should phone his neighbor, phone his

23    local hardware store, or phone his doctor's office to determine

24    whether or not he can even come with a gun?  Is that how this

25    law is supposed to work?

```
 1              MS. CAI:  So, yes, Your Honor.  I think the risk is
 2    to a person who's carrying a gun on someone else's property
 3    without having tried to -- without having asked for permission.
 4              Now, whether or not the UPS owner example, the very
 5    brief and incidental dropping off the package on the driveway
 6    would actually be prosecuted, that's another problem with risk
 7    of enforcement.  The statute actually provides an exception for
 8    brief and incidental de minimis infractions.  And so I don't
 9    know exactly what that would look like.  And it probably
10    depends on whether or not, you know, the homeowner is
11    sufficiently upset and whether or not the prosecutor thinks
12    that that's de minimis or not.
13              THE COURT:  Where is that brief and incidental
14    exception?
15              MS. CAI:  It is in Section 7(b).  I don't have
16    exactly which sub-subprovision.  I believe it is --
17              THE COURT:  I don't see it.
18              MS. CAI:  I can provide that exact cite to Your
19    Honor.  I'm positive that there is a de minimis exception for
20    all of the sensitive places.
21              THE COURT:  I didn't see it.  I would like to --
22              MS. CAI:  Oh, I'm sorry, it's 7(c).  I'm sorry, Your
23    Honor.  It wasn't 7(b).
24              THE COURT:  And what does it say?  Can you read it to
25    me?  Can you read that language to me?
```

1          MS. CAI:  Yes.  I'm looking for the specific part,

2   Your Honor, that my colleagues have just referred me to.

3          Oh, I'm sorry.  Okay.  Oh, yes, Your Honor, so 7(a),

4   the very first sentence:  Except as otherwise provided in the

5   section and in the case of a brief incidental entry onto

6   property which shall be deemed a de minimis infraction, within

7   the contemplation of N.J.S. 2C:2-11, it shall be a crime.

8          THE COURT:  So it's still a crime.  As I read this,

9   it's still a crime under the de minimis.

10          MS. CAI:  No, Your Honor.  That's not how I read it.

11   Except as otherwise provided and except as in the case of a

12   brief incidental entry onto property --

13          THE COURT:  Which shall be deemed a de minimis

14   infraction within the contemplation of 2C:2-11.  That's a

15   criminal statute.

16          MS. CAI:  It's a criminal statute, but it doesn't

17   criminalize your conduct.  So it's not -- if you look at

18   2C:2-11.

19          THE COURT:  What does that say?

20          MS. CAI:  I don't have that right in front of me,

21   Your Honor.  But it makes it --

22          THE COURT:  Do you know?

23          MR. JENSEN:  I don't know what that says, no.

24          THE COURT:  Well, that says to me that even if it's a

25   de minimis infraction, it's still a prosecution.  Because that

```
 1    was my next question, which is if I'm walking, if I have a
 2    concealed carry and I'm walking with my child and her ball, and
 3    her ball, she kicks it inadvertently onto my neighbor's
 4    property who I know doesn't want any firearms, does she leave
 5    the ball there?
 6              MS. CAI:  Well, Your Honor, I think that's not even a
 7    question about Section 7(a) -- A724.  If your neighbor has
 8    already made it known to you that they don't want your firearms
 9    there --
10              THE COURT:  Yeah.  I leave the ball there.
11              MS. CAI:  Even before Chapter 131 went into place,
12    that neighbor could call the police and try to institute a
13    trespass action against you in any event, if they've made
14    crystal clear to you do not bring firearms onto my property.
15    So that's not really a question about Chapter 131.
16              THE COURT:  Well, I mean, we could go down the parade
17    of horribles.  I'm walking with my child and she gets very sick
18    and she's now on his yard.  I choose helping her or getting
19    prosecuted, I guess.
20              MS. CAI:  I mean, in all of New Jersey law, there's
21    always an exception for duress and other exigent circumstances.
22    And so I think we don't have to go down those examples because
23    I think what the plaintiffs are challenging is a facial
24    challenge, the entire statute.  We've discussed why it's
25    perhaps not even irreparable to require someone to ask a
```

1   question why it's not within the text of the Second Amendment

2   to regulate property owner communication.  And perhaps at the

3   end of the road what's perhaps most important is that even

4   under a Second Amendment historical analysis, the historical

5   analogues are directly on point.

6           THE COURT:  Okay.

7           MS. CAI:  Does the Court want me to go further on

8   other provisions or --

9           THE COURT:  Let me have, Mr. Jensen, can you respond

10  to the private property and then I want to turn to

11  transportation.

12          MR. JENSEN:  Yes, Your Honor.  And I'll try to be

13  brief.

14          First and foremost, the historical analogues are not

15  on point.  These are both laws that, on their face, are

16  directed for the purpose of preventing poaching.  And as a side

17  note, and perhaps I shouldn't say "side note" because it's

18  quite material, when you get into that vehicle issue, I know we

19  haven't gotten there yet, but many of the restrictions, modern

20  day restrictions that are being cited in the context of

21  restrictions on carrying firearms in motor vehicles are also

22  restrictions that are directed towards this aim of keeping

23  people from road hunting or keeping people from poaching.

24          So this 1771 New Jersey law, which is captioned an

25  Act for the Preservation of Deer and Other Game and To Prevent

1    Trespassing with Guns, virtually every operative provision of

2    this law is directed at poaching.

3          Yes.  If you take this language out of Section 1 and

4    read it in isolation, it would appear to say, well, you just

5    can't walk onto somebody's plantation or premises with a gun.

6    If you look at everything else in the statute, it's clear that

7    what's being talked about here is taking game.

8          And notably, if you do a little legal research on how

9    this New Jersey law was construed, that's pretty much the

10   result you walk away with.

11         *Crew v. Thompson*, 9 N.J.L. 249, 1827, they quote from

12   a claim for damages asserted against someone who apparently

13   trespassed on someone else's land and shot a deer or in some

14   manner killed a deer.  And that claim is being articulated

15   under Section 1, the language that we're talking about.  But it

16   is extraordinarily clear that the whole gravamen of this is you

17   trespassed on my land and shot my game so I'm coming after you

18   for damages.

19         Much later, *State versus One 1990 Honda Accord*, 154

20   N.J. 373, a 1998 decision from the Supreme Court of New Jersey,

21   this law is being characterized as a forfeiture statute for

22   fish and game violations.  That's nearly verbatim.

23         This is also true of this 1865 Louisiana act which,

24   on its face, applies to entering onto plantations.  And not

25   insignificantly, if you look at the next following act in this

```
 1   exhibit, which is an act that's becoming effective on the same

 2   date, this is simply a blanket prohibition on entering a

 3   plantation without permission, gun or not.

 4            To stretch this into the premise that there is some

 5   sort of grounded historical tradition of, by default,

 6   preventing guns from going onto private property requires a

 7   great deal of mental gymnastics.

 8            Now, one thing that happens when we start talking

 9   about legal rules and historical precedence is we kind of lose

10   track of what's actually going on here.  So what the State

11   would like to call reversing the presumption and I would call

12   making the conduct illegal --

13            THE COURT:  Can you talk to me about the presumption,

14   because I think that there's a disagreement between the parties

15   about the presumption that the Second Amendment holds.  The

16   State makes a distinction between public and private property;

17   and you say?

18            MR. JENSEN:  I say under *Bruen*, if we are talking

19   about the act of keeping or bearing arms as it's presumptively

20   protected, and the authorities that have been cited do not

21   overcome that presumption --

22            THE COURT:  Whether it's public or private property?

23            MR. JENSEN:  Whether it's public or private property.

24   And to be fair, the majority of the East Coast is private

25   property.
```

1          And as the Court has already alluded to, this is

2    creating a situation where how is someone even realistically

3    supposed to know this?  You're walking down the street, there's

4    a field that has grass.  Is it private?  Is it public?  Are you

5    supposed to, what, go down to the property clerk's office and

6    do a records search to try to figure this out?

7          None of the laws, meaning the modern laws that are

8    being cited in the State's brief to say oh, this is an

9    established practice, actually stand for this proposition.  The

10   furthest they go is we have a couple of states that have said

11   you can't enter into someone's residence, someone else's

12   residence with a firearm without their permission.  Is that

13   constitutional or not?  I don't know.  It's really not the

14   issue presented here.

15         In terms of an actual modern analogue, and I'm

16   offering this for purposes of illustrating the burden we're

17   talking about, obviously under *Bruen*, the analytic framework is

18   looking back to 1791 or perhaps 1868.  The only place I can see

19   an actual analogue to this is Illinois.  So Illinois was the

20   last state to completely prohibit private citizens from

21   carrying guns.  And in the case I alluded to, *Moore versus*

22   *Madigan,* that changed.  But the statutes at issue in Illinois,

23   unlawful use of weapons and aggravated unlawful use of weapons,

24   while they generally prohibit people from carrying guns, one of

25   the exceptions is if you're on private property with the

permission of the owner or occupant of that property, okay.

So when we were arguing *Moore*, at no point in the litigation did anyone, the Attorney General's Office, the State Police, our side, anyone, say, oh, this is a sensitive place restriction.  This is a law that allows carry subject to a requirement that you obtain the owner's permission.  Everyone said, including all the reviewing courts, this is a ban.

Move this outside the context of guns.  I can't think of any example where the default presumption is something is illegal on private property unless the owner has expressly consented.  And I particularly can't think of any example that touches on constitutionally protected conduct, all right.

THE COURT:  Well, that's what the State is arguing.  The State is arguing that there is no -- that your argument carries no weight because there is no such presumption that you have a right to carry a firearm onto private property.

MR. JENSEN:  Well, I think saying that there is no presumption you have a right to carry a firearm in the first place is getting everything exactly wrong.  There is a presumption that you have a right to carry a firearm.  And the issue is whether or not we have established a sufficiently engrained historical tradition to overcome that.

Just -- this is going to sound like a ridiculous example, but that's kind of because it's ridiculous -- a private property owner, like my house, I can choose to exclude

 1   all sorts of people.  I could choose to exclude people who are

 2   gay.  I could choose to exclude people who are members of races

 3   I don't like.

 4          Just to be clear, I'm certainly not doing this.

 5   That's not my view.  But I would be free to do this.

 6          Now, if the legislature enacts a law that says the

 7   default rule is that gay people are not allowed in other

 8   people's private residences unless they have affirmatively

 9   consented in advance, would we even be standing here having

10   this argument?  Would this not, on its face, be a law that

11   serves the purposes of suppressing the conduct?

12          Your Honor, unless you have anything further, I'll

13   sit down just because I know we've been here for a long time.

14          THE COURT:  Okay.  Yeah.  Thank you.  I want to move

15   to the issue of the transportation.

16          Ms. Cai, let me hear you on the issue of

17   transportation.

18          MS. CAI:  Yes, Your Honor.

19          THE COURT:  On the -- it is 7(b).

20          MS. CAI:  Yes.  I'll start by saying, as applied to

21   public transit, plaintiffs have a standing problem because

22   they've never alleged any intent to ride public transit.  On

23   that front as well, there's also whether or not it falls within

24   the text of the Second Amendment at all, because the government

25   when it operates a public transit vehicle is acting as a

1   proprietor of property as well as a market participant.  So

2   under cases like *Class*, the D.C. Circuit decision, and *Bonidy*,

3   the Tenth Circuit decision, it just doesn't fall even within

4   the text.

5              THE COURT:  Okay.

6              MS. CAI:  On private vehicles, I think what the

7   plaintiffs are suggesting is that there needs to be some kind

8   of historical analogue prohibiting firearms carry for something

9   that didn't exist at the time of the founding or at

10  reconstruction, which is automobiles.  And I think the problem

11  there is of course, *Bruen* already says if it's a new social

12  problem that could not have been imagined by our founders or

13  people in history, then you don't -- you look to even less of a

14  direct analogue.  You kind of look to the intent and what's

15  going on there.  And so I think here it makes a lot of sense to

16  look at what states started doing as soon as automobiles came

17  into practice, which is in the 1910s and '20s.  And we've given

18  examples of direct, you know, even in 1919 and 1920 states --

19  and this is Exhibit 16 and 17 -- requiring firearms to be

20  unloaded in automobiles.

21             Now, plaintiffs quip, well, it was long guns and

22  rifles and not handguns, et cetera.  The problem with that kind

23  of analysis is it doesn't get into at all why it was that the

24  State was restricting the manner of carry in the way that they

25  were.  So I don't see any rationale that the plaintiffs have

```
 1   advanced for why the State could prohibit one versus the other.

 2   The fact that the State chose to prohibit one versus the other

 3   doesn't say it could not have also prohibited handguns loaded

 4   in the firearm, so I think that's the problem there.

 5              If we want to look beyond automobiles because perhaps

 6   one thinks there are other ways of traveling that were similar

 7   to automobiles, we can look to the historical analogues that we

 8   cited prohibiting carrying firearms on day journeys basically,

 9   journeys within the State.  And plaintiffs' response is, well,

10   it defined journeys narrowly.  True.  But because Chapter 131

11   and Section 7(b)(1) only applies to New Jersey, it also applies

12   in a similar way.  It does not prohibit someone from carrying a

13   loaded handgun once they've traveled out of the state, which

14   is, you know, I think the bright historical analogue for the

15   longer journey that was where firearms carry was allowed under

16   the historical analogue.  So I think that -- if you wanted to

17   line it up that way, I think that also supports our case.

18              And so I think this is the end-all, be-all of just,

19   you know, how to think about why historical regulations were in

20   place and whether they're relevantly similar.  And I think on

21   both of those analogues, the statutes were relevantly similar.

22              THE COURT:  Do you agree that self-defense is at the

23   core of the Second Amendment?

24              MS. CAI:  Of course.

25              THE COURT:  So how does someone who has an approved
```

1  concealed carry defend himself if it's in the trunk, if the

2  firearm is in the trunk?

3       MS. CAI:  So, first, Your Honor, the statute does not

4  require that the firearm be in the trunk.  It just requires

5  that it be unloaded and fastened in some case.  It could be on

6  the -- in the glove box, it could be on the passenger side

7  seat.  It could be, you know, in any number of locations where

8  they --

9       THE COURT:  Okay.  Fair enough.

10      How does he protect himself with a disassembled or

11 unloaded firearm?

12      MS. CAI:  Of course the person would have to then, if

13 it faces a self-defense situation, take it out and load it.

14      But that's the exact prohibitions that states have

15 put forth in history, and those were not challenged as

16 unconstitutional, or at least the plaintiffs have not given us

17 any evidence.

18      And that's because the government, you know, the

19 right to self-defense, as *Bruen* and *McDonald* and *Heller* have

20 noted, is not unlimited in every manner and to every person and

21 to every place.  And so --

22      THE COURT:  Do you agree with the plaintiffs that

23 this provision treats every permit holder the same?

24      MS. CAI:  I -- yes.

25      THE COURT:  Okay.

1          MS. CAI:  I wasn't sure if there was a -- every

2    permit holder has the same, yes, has the same -- has to follow

3    the same rules.

4          But I think if we look to the rationales that the

5    courts interpreting the historical statutes have justified

6    them, plaintiffs have no responses.  So we explain on page 34

7    of the brief that the journeys regulation was to prevent people

8    from, quote, going about the streets armed in a manner which,

9    if in a sudden fit of passion, might endanger the lives of

10   others.  This is the road rage analogue from the 1800s, I

11   suppose.  And that's precisely one of the reasons why Section

12   (b)(1) was enacted.  The legislature wanted people to be able

13   to transport their firearms between places where they're

14   allowed to carry them, right.  So it didn't prohibit having

15   firearms in your vehicle.  It just prohibited people from

16   having such easy access to the firearm that if they were in a

17   sudden fit of passion or if there was a car accident or

18   something like that, that it would create danger to others.

19   And so that's the prohibition that exists now and has always

20   animated the restrictions historically.

21          THE COURT:  And so the State envisions it that if

22   someone with a concealed carry permit wakes up and plans his

23   day, that he puts the -- let's just use the trunk -- he puts

24   the firearm in the trunk.  He goes to his cousin who doesn't

25   want firearms.  He leaves it in the trunk.  He then goes to the

 1   local market that permits firearms.  He goes and he gets it out

 2   of the trunk, puts it together in public view, citizens see.

 3   Citizens are going to get alarmed.  Perhaps he's brandishing

 4   the weapon, one might argue.  And then he goes to the local

 5   market, then he comes back out, he then brandishes the weapon,

 6   one could argue, puts it into the trunk and goes to another

 7   establishment where he's not quite sure, so he puts it in the

 8   trunk and then goes up, gets the expressed consent, yes, that's

 9   fine, goes back to his trunk, puts the firearm, assembles the

10   firearm and then goes about and reenters the property.  That's

11   how the State envisions the day in the life of a gun owner?

12            MS. CAI:  That could be, Your Honor.  I will note

13   that, once again, it doesn't have to be in the trunk.  Now, if

14   he wanted to keep it in the trunk while he wasn't there, I

15   think that's a very good idea, and I think perhaps that's

16   actually required by 7(b)(2) which plaintiffs don't challenge.

17   But he could very well take the bag or the case or whatever it

18   is stored in, bring it into the car if he's not comfortable

19   loading it outside in view of others.  If he's concerned about

20   that risk which I'm not quite sure, you know, if that risk,

21   that concern is super legitimate, but he can just -- he could

22   load it in the car and put it in his holster.

23            THE COURT:  Does that scenario I just laid out for

24   you sound like self-defense?

25            MS. CAI:  I presume that the plaintiff is doing that

1    because he wants to have the firearm loaded when he walks into

2    the store that allows him to have it.  And so, yes, he's arming

3    himself.

4            THE COURT:  And while he's traveling.  But he's told

5    he cannot, right?

6            MS. CAI:  Well, while he's traveling, when he's

7    driving the car, he has the firearm, he can have the firearm

8    within reach, and it's just about whether or not he can have it

9    loaded and unsecured somewhere in the car while he's doing

10   that.  And so I think there's perhaps some infringement on the

11   immediate ability to have that firearm loaded and on you.  That

12   restriction -- and I do admit that is a restriction -- has been

13   historically upheld.

14           THE COURT:  And I appreciate your candor.

15           MS. CAI:  Yeah.

16           THE COURT:  Yes.

17           MS. CAI:  Yeah.  And my point is just that that

18   particular restriction has historical analogues and the

19   analogues have been upheld.

20           I will also note, and this relates back to something

21   that Mr. Jensen said about the New Jersey statute and the

22   Louisiana statute on going into someone else's property without

23   their consent, but it also applies to their argument on their

24   reply brief page 11 on the main statute that prohibits loaded

25   firearms in vehicles.

```
 1          Plaintiffs say, you know, that restriction is
 2   confined to hunting.  This is where the rush really does not
 3   work, because that law in our -- I believe it's Exhibit 27 --
 4   or sorry, 17, the law actually amended the title from
 5   "prohibiting hunting from automobiles," to the more general
 6   "possessing of loaded shotgun or rifle in motor vehicles in
 7   highways, field, or forests," and so it's not just about
 8   hunting.
 9          And the same with the New Jersey law and the
10   Louisiana law, there are separate provisions on poaching and
11   trespassing on other game lands.  But the specific provisions
12   were just about private property.  And, in fact, what
13   Mr. Jensen just did was read the word "premises" or
14   "plantation" out of the title of the Louisiana statute.
15          And so if you look at Exhibit 12 -- I'm sorry,
16   Exhibit 14, you'll see that it's prohibiting carrying of
17   firearms on premises or plantation of any citizen without the
18   consent of the owner.  And so it does not only apply to
19   plantations.  It's any premises held by a private owner.  So I
20   think being careful about what the statutes actually say is
21   really important.
22          And I understand the rush to get something before the
23   Court is maybe what led to these mistakes, but I think that's
24   also why the historical record has to be fully developed so
25   that we can actually have a full record to go on.
```

```
1              THE COURT:  And, again, because this is a theme

2    throughout the State's papers, what is it that the State is

3    missing other than a more thorough analysis, if you will?

4    Because if the historical analogues existed at the time of the

5    legislation's passage, why aren't they before me now?

6              MS. CAI:  Sure, Your Honor.

7              I think that the legislature saw sufficient numbers

8    of analogues to do what it wanted to do, which is pass the law

9    in the way that it did.

10             THE COURT:  And so where are they?

11             MS. CAI:  So we have submitted a number of them to

12   this Court.

13             THE COURT:  Yes.

14             MS. CAI:  There may be others out there.

15             THE COURT:  Oh, okay.

16             MS. CAI:  I don't know, right.  And so if there are

17   others out there that support -- that further support the

18   longstanding history or if there's additional case law out

19   there that supports the idea that these laws were not

20   challenged or weren't deemed constitutional, we would want to

21   provide them to this Court.

22             THE COURT:  Okay.  I wanted to make sure I understood

23   what you were saying.

24             You are not telling me that there are, in fact,

25   additional historical analogues; that there may be others out
```

 1   there.

 2              MS. CAI:  That's correct, Your Honor.

 3              THE COURT:  Okay.

 4              MS. CAI:  And to the extent that plaintiffs are

 5   saying well, this law actually meant X or Y, that's different

 6   from what the State is positing.  I think we would then have a

 7   development of why it is that they're wrong or we're wrong and

 8   all that.

 9              And Mr. Jensen just cited a number of cases that he

10   did not put in his brief and so we would want to respond to

11   that as well with further briefing.

12              THE COURT:  All right.  While you're standing, talk

13   to me about irreparable injury.

14              MS. CAI:  Sure, Your Honor.

15              A very general point and then a more specific point

16   on irreparable injury.

17              THE COURT:  Yes.

18              MS. CAI:  So the general point is that the black

19   letter law is that irreparable harm is a separate and

20   independent gateway requirement for emergency relief that's

21   separate from the merits.  And you can look to any number of

22   Third Circuit cases, but I think the Supreme Court's decision

23   in *Benisek versus Lamone*, which we cite in our brief, makes

24   this crystal clear.

25              It says a preliminary injunction does not follow as a

1    matter of course from a plaintiff's showing of a likelihood of

2    success on the merits.  And as the movant also must show,

3    quote, that he is likely to suffer irreparable harm in the

4    absence of preliminary relief and, of course, if the rest of

5    the factors tip in his favor.

6            And so Third Circuit cases like *Anderson* and *Hohe* and

7    other courts of appeals cases, we cite the Eleventh Circuit en

8    banc case in *Siegel*, those all confirm that even with

9    constitutional cases where plaintiffs have been held to have

10   shown a likelihood of success on their constitutional claims,

11   some of them are First Amendment claims, they still have to do

12   more than that and show irreparable harm.

13           And I think one of the ways in which this is best

14   illustrated, and I think I already talked about this a little

15   bit, is with respect to the private property problem.  So

16   plaintiffs say, well, we need to then get permission to go on

17   to other people's property with our firearms.  And that may be

18   Article III injury.  But I don't see how that's irreparable for

19   the period of time that they're asking for the injunction.

20   Simply asking for permission to clarify whether or not the

21   private property owner does or doesn't want firearms on their

22   property is not irreparable harm.  And so I think that's the

23   more specific example that I can provide to this Court.

24           THE COURT:  But that's not the only injury that the

25   plaintiffs are complaining about, in fairness.  They are

1   complaining about the right to self-defense, to defend

2   themselves, and that these provisions, in essence, because they

3   are forced to keep their firearms at home, deprive them of

4   their constitutional right to self-defense.

5          The cases are clear that a First Amendment violation

6   is by definition irreparable injury.  Is there a reason why the

7   First Amendment should be prioritized over the Second

8   Amendment?

9          MS. CAI:  I think the law of the Third Circuit is not

10  even that all First Amendment injuries are necessarily

11  irreparable.  The *Hohe* case and the *Conchatta* case make that

12  clear.  Instead --

13         THE COURT:  That's true.  I'm sorry, Ms. Cai.  That's

14  true.  But I think you have to look at it in context.

15         So in a First Amendment case, for example, if there

16  were a law or a decree that you are precluded from on May 1st

17  protesting on the courthouse steps, that might not be an

18  immediate irreparable injury, but you don't have such exception

19  here.  The law has taken effect immediately.

20         MS. CAI:  Your Honor, I think what the case law says,

21  and if you look at the case that it all comes back to, the

22  *Elrod* case, is there's irreparable harm in that case because

23  the First Amendment political speech context in particular is

24  central to irreparable timeliness component, because people

25  want to make a political speech at a particular moment in time,

```
 1   otherwise the speech has a different meaning where it has less

 2   value or it has less impact.

 3          THE COURT:  Of course.  And these plaintiffs want to

 4   get in the car and defend themselves tomorrow, this afternoon,

 5   30 minutes from now.  What's the difference?

 6          MS. CAI:  I think the difference is that plaintiffs

 7   haven't even attempted to say what it is that is irreparable

 8   about their desire to carry firearms.  If that were true, Your

 9   Honor, if the plaintiffs were right, all they had to do was

10   succeed on the merits of their Second Amendment claim, then we

11   would be reading the irreparable harm element out of

12   preliminary injunction and TROs entirely.

13          THE COURT:  Well, that's why I asked the question

14   though, Ms. Cai, which is, the case law seems to me to be very

15   clear that a First Amendment violation is by definition

16   irreparable.  It seems to me the State is insisting that a

17   First Amendment right is more important than a Second Amendment

18   right.  That's what it seems to me the State is saying.

19          MS. CAI:  In a number of doctrines, the Supreme Court

20   has basically made special exceptions for the First Amendment,

21   not just relative to the Second Amendment, but across all other

22   constitutional rights.  And I don't -- you know, I don't

23   purport to have the full sort of doctrinal explanation of why

24   that has to be true.

25          But what I do know is that the black letter law is
```

```
 1   that irreparable harm has to be a separate, standalone

 2   requirement from likelihood of success on the merits.

 3            It is possible that plaintiffs could show irreparable

 4   harm.  They just haven't tried to do so.  All they do is rely

 5   on we're going to succeed on the merits, and that's just not

 6   enough according to case law.

 7            THE COURT:  All they do is what?

 8            MS. CAI:  Is to say we will succeed on the merits,

 9   and that's just not enough.

10            Thank you, Your Honor.

11            THE COURT:  You want to respond.

12            MR. JENSEN:  Sure, Your Honor.

13            You know, preliminarily, another rhetorical question:

14   Is the denial of the right to vote an irreparable injury if a

15   plaintiff doesn't come in with proof that their vote would have

16   altered the outcome of the election?  Because that's pretty

17   much what I'm hearing here for why the interest in armed

18   self-defense isn't an irreparable injury.

19            To be frank, I don't -- knock on wood -- I don't see

20   irreparable injury as a particularly close issue here.  We

21   cited a raft of decisions that have found that the denial of

22   Second Amendment rights is an irreparable injury.

23            What I would really say is just take one step back

24   and look at what we're actually doing here.  You know,

25   obviously this requirement of irreparable injury stems back to
```

1    the division of courts between courts of law and courts of

2    equity and the general presumption that if a plaintiff has a

3    claim, that claim should be answered in money damages.

4            It's also extremely well established that the denial

5    of constitutional rights, as a general premise, is an

6    irreparable injury.  Yes, there are some specific applications

7    where it's not going to be an irreparable injury.  For example,

8    if you have a Takings Clause claim, the whole premise of this

9    is you're supposed to be paid for your property.  The injury

10   and the remedy for it is a claim for money damages, even though

11   you have a constitutional entitlement.

12           If it's a situation like *Hohe* where, look, the law

13   hasn't even come into effect yet, there's still plenty of time

14   for the court to act, yeah, if the law comes into effect, it

15   may impose an irreparable injury.  But as we stand here right

16   now, it's not clear someone's facing imminent irreparable

17   injury.

18           If someone needs to exercise their right of armed

19   self-defense and they don't have a functional arm on their

20   person, that is the irreparable injury; or, otherwise stated,

21   having to go out, go forth in the world without having that

22   level of comfort or assurance is what the irreparable injury

23   is, much in the same way that the inability to freely express

24   one's thoughts would be an irreparable injury regardless of

25   whether or not someone had anything that was actually

1    particularly insightful or relevant to say.

2          With regard to these vehicle cases, I understand, and

3    I think the Court does, too, that we're looking for historical

4    analogues and relevant similarity, but just one big picture

5    point.  I have lived all over this country.  I have owned guns

6    and hunted everywhere I lived.  I do not know of any state that

7    does not prohibit private citizens from having loaded rifles

8    and shotguns in vehicles.  However, the only state that is

9    prohibiting at least licensed individuals from having

10   operative, functional handguns on their persons in their

11   vehicles is New Jersey.  New York also passed a whole host of

12   these laws in response to *Bruen*, although even in New York they

13   didn't go that far.  So not only are we lacking historical

14   analogues here, frankly, we're lacking modern analogues.

15         This 1919 main law by its terms applies only to

16   rifles and shotguns.  The 1929 Iowa law, it says all firearms,

17   but then it exempts handguns.  That's a fairly common

18   legislative approach that I've seen in current times in the

19   statute books, which is either the statute only applies to

20   rifles and shotguns or it applies to all firearms, but it

21   exempts people who are licensed to carry with regard to a

22   handgun.

23         And why can the State allow people to carry handguns

24   but not rifles or shotguns at least in vehicles?  I think it's

25   the same reason why can the state of New Jersey say you must

```
 1   carry your handgun in a concealed manner.  Or alternatively,
 2   they could potentially also say you must carry your handgun in
 3   an open manner.  The real question is, is the right of armed
 4   self-defense being protected here?  And of course, in the big
 5   picture, it's not real clear that in a personal defense
 6   situation a rifle or shotgun in a vehicle is going to be of a
 7   lot of use.
 8            The way this is going to come up is you're going to
 9   be stopped at a stop sign and two guys are going to come
10   running up and rip you out of the car before you realize what
11   happened.  And that gun that's in the box, on the seat beside
12   you, or in the trunk, you're never going to have a chance to
13   grab it.  And even if you were driving around Camden with a
14   12-gauge in the front seat, which might draw a little attention
15   to yourself, it's also pretty unlikely you're going to be able
16   to get that weapon out of the car.  In terms of the actual
17   historical --
18            THE COURT:  But to the argument that the plaintiff
19   makes is that it renders meaningless the right to self-defense.
20            MR. JENSEN:  It effectively does, I mean, because
21   look, all right, let's just state the obvious, the apparent
22   purpose of this is the State's concern about road rage
23   incidents.  And I am sure we are all united in our desire to
24   not be shot while driving down the New Jersey Turnpike, all
25   right.  Now, the problem is if someone decides I'm going to go
```

```
 1    shoot some other motorist, they're not reacting to a defensive
 2    situation.  They've got time to get the gun out of the box and
 3    load it and go murder this other person.  It's the person who
 4    is reacting to a defensive situation that's going to be bearing
 5    the brunt of this burden.
 6            When we look at these historical laws, we've talked
 7    about Northampton.  The 1869 Tennessee statute says you can't
 8    have guns at racecourses.  I think we're talking about
 9    horseraces.  Like not really much of an analogy.
10            1870 Texas law we've talked about a few times may not
11    be a totally pertinent example.  But other social gathering,
12    that's a pretty far stretch to a vehicle.
13            1876 Iowa act, it's illegal to shoot at trains.  I
14    don't really see what this has to do with being able to carry a
15    firearm in a vehicle.
16            We've got these laws that are either prohibitions on
17    concealed carry or restrictions on carry but which have
18    exceptions for people on journeys.  Well, this seems to reflect
19    the idea that going back a long way, even if you're going to
20    restrict people's ability to have arms, they're going to have a
21    particular need for it while they're on a journey.  Journeys
22    typically involve vehicles.  It seems to really be saying
23    exactly the opposite of the way it's being portrayed right now.
24            Well, there you have it.  Do you have any more
25    questions for me, or shall I keep talking?
```

```
 1          THE COURT:  Can you distinguish the cases of
 2   irreparable injury that the defendants have cited to?
 3          MR. JENSEN:  Well, just what I said.  First and
 4   foremost, whether or not irreparable injury is imminent.  If
 5   the law isn't coming into force for some period of time, it may
 6   not be imminent.  If the underlying injury is one that would be
 7   remedied by money damages in the first place, that's not by
 8   definition irreparable injury.
 9          Also, a good example would be Los Angeles versus
10   Lyons, right, that's where someone was basically choked half to
11   death by a member of the LAPD and they were trying to get an
12   injunction saying, hey, LAPD, stop using these strangleholds.
13   It's an unreasonable use of force.  It violates my Fourth
14   Amendment rights.
15          Well, presumably, the actual act of being subjected
16   to a stranglehold is an irreparable injury.  The issue there is
17   because the whole premise of this is you're raising the issue
18   of misconduct, something that shouldn't be happening in the
19   first place.  You've got an issue of immanence, right?
20   Basically it's the same thing as we have with Parratt-Hudson
21   doctrine with regard to the idea that -- well, let me just
22   leave it at that.  I'm going to get too far afield if I go down
23   that one.
24          But the idea that whether or not the injury that's
25   being threatened is actually one that is likely to occur,
```

1    because Parratt-Hudson has to do with unauthorized

2    deprivations, like Parratt was the prison -- or maybe it was

3    Hudson.  The prison guard steals the inmate's things, and the

4    government is like but the prison guards aren't supposed to

5    steal these things.  Maybe, maybe not the active theft is an

6    irreparable injury.  But because the whole premise of this is

7    we're talking about unauthorized actions, things that shouldn't

8    be happening, it's not imminent.

9            In the context of, the Constitution secures a right

10   to engage in personal conduct, right, whether that's the right

11   to go to a school that isn't segregated, whether that's the

12   right to speak freely, whether that's the right to vote in an

13   election.  There is no basis for saying that the ability to

14   engage in the core conduct of the Second Amendment, the keeping

15   and bearing of arms, is not irreparable injury.

16           THE COURT:  Thank you, Mr. Jensen.

17           MR. JENSEN:  Thank you.

18           THE COURT:  I know we've been long.  I just have a

19   quick question for you, Ms. Cai, and then one observation that

20   I want to make and then I'll let you folks -- we'll adjourn.

21   And this goes to the public interest factor.

22           Does the State have any evidence that concealed carry

23   holders are responsible for an increase in gun crimes?

24           MS. CAI:  Not specifically, Your Honor, no.

25           THE COURT:  Okay.  The next is an observation that

```
 1   says -- that deals with the -- I had a look at 2C.  You might

 2   recall that we were looking at the de minimis infractions

 3   earlier and you had promised to get that to me.  You don't need

 4   to.  I have it here.  2C:2-11, it is a de minimis infraction

 5   under the code.  And the legislation treats it -- the new

 6   legislation treats it as such.  It is considered a prosecution.

 7   It gives the authority of the assignment judge to dismiss the

 8   prosecution if having regard to the nature of the conduct

 9   charged to constitute an offense and the nature of the

10   attendant circumstances the Court finds that the defendant's

11   conduct... and then there are three elements that the Court

12   must find under 2C:2-3.  And so that was the question that I

13   had.  It nonetheless is considered an infraction under the

14   code, but it gives the judge the authority not to press the

15   charges.

16           So the point is, there's no need for you to follow up

17   on that, okay?

18           MS. CAI:  Thank you, Your Honor.  My team did bring

19   it up, but thanks.

20           THE COURT:  Yes.  Okay.  Unless there's nothing else,

21   I thank you all.

22           Mr. Goldberg, I don't want to leave you folks out,

23   Ms. Ruffin.

24           MR. GOLDBERG:  Nothing to add, Your Honor.  Thank

25   you.
```

1          MS. RUFFIN:  Nothing to add, Your Honor.

2          THE COURT:  And you've joined in all the arguments

3  here today?

4          MR. GOLDBERG:  Yes.

5          MS. RUFFIN:  Yes.

6          THE COURT:  Good to see you all.

7          It is my intent and my hope to get a decision to you

8  just as expeditiously as I can, okay?

9          Thank you, all.

10          MR. JENSEN:  Thank you, Your Honor.

11          MS. CAI:  Thank you, Your Honor.

12          THE COURTROOM DEPUTY:  All rise.

13          (Proceedings concluded at 1:20 p.m.)

14       - - - - - - - - - - - - - - - - - - - - - -

**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

15       - - - - - - - - - - - - - - - - - - - - - -

16      I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter.

18

19

20  /S/John J. Kurz, RDR-RMR-CRR-CRC       January 6, 2023

21  Court Reporter/Transcriber

22

23

24

25