## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RONALD KOONS; NICHOLAS GAUDIO; EFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY,** | **Civil Action No: 1:22-cv-7464 RMB/EAP (CONSOLIDATED)** <br><br> **Hon. Renee Marie Bumb, U.S.D.J.** <br> **Hon. Elizabeth A. Pascal, U.S.M.J.** |

        **Plaintiffs,**

**v.**

**WILLIAM REYNOLDS in his official capacity as the Prosecutor of Atlantic County, New Jersey; GRACE C. MACAULAY in her official capacity as the Prosecutor of Camden County, New Jersey; ANNEMARIE TAGGART in her official capacity as the Prosecutor of Sussex County, New Jersey; MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police,**

        **Defendants.**

**and**

**NICHOLAS P. SCUTARI, President of the New Jersey Senate, and CRAIG J. COUGLIN, Speaker of the New Jersey General Assembly,**

**Intervenors-Defendants.**

---

### BRIEF OF INTERVENORS-DEFENDANTS NEW JERSEY SENATE PRESIDENTNICHOLAS P. SCUTARI AND NEW JERSEY ASSEMBLY SPEAKER CRAIG J. COUGHLIN IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

_____

Leon J. Sokol, Esq.
CULLEN AND DYKMAN, LLP
433 Hackensack Avenue
Hackensack, NJ 07601
(201) 488-1300

Edward J. Kologi, Esq.
KOLOGI • SIMITZ
500 N. Wood Avenue
Linden, NJ 07036
(908) 486-8877

Attorneys for Intervenors-Defendants Senate President Nicholas P. Scutari and Assembly Speaker Craig J. Coughlin

LEON J. SOKOL, ESQ.
EDWARD J. KOLOGI, ESQ.
Of Counsel and On the Brief

STEVEN SIEGEL, ESQ.
MICHAEL SIMITZ, ESQ.
On the Brief

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................. v

PRELIMINARY STATEMENT ......................................................... 1

LEGAL ARGUMENT......................................................................... 5

  POINT I ....................................................................................... 5

THE *BRUEN* COURT MADE CLEAR THAT A DISTRICT COURT CAN AND SHOULD GO BEYOND MERE LITERALISM OF RECOGNIZED HISTORICAL ANALOGUES OF SENSITIVE PLACES AND INSTEAD "USE ANALOGIES TO … HISTORICAL REGULATIONS OF 'SENSITIVE PLACES' TO DETERMINE [WHETHER] MODERN REGULATIONS PROHIBITING THE CARRY OF FIREARMS IN NEW AND ANALOGOUS SENSITIVE PLACES ARE CONSTITUTIONALLY PERMISSIBLE." APPLYING THE *BRUEN* STANDARD, CHAPTER 131's IDENTIFICATION OF "SENSITIVE PLACES" IS PROPERLY UPHELD.

  A.  Analysis of the *Bruen* Court's "analogic approach" to the challenge of applying the dictates of the Second Amendment to legislatively designated "sensitive places" .................................. 6

  1. The *Bruen* Court's instruction to District Courts that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." ............................... 6

  2. The flexibility of the *Bruen* Court's analogic approach is shown by the Court's refusal to limit "arms" "only [to] those arms in existence in the 18th century." The *Bruen* Court expressly acknowledged that the same flexible analogic approach applies to delineation of "sensitive places" under the Second Amendment – in that such sensitive places should not be limited to those places that were in existence in the 18th century ...................................... 7

  3.  The *Bruen* Court's recognized "metrics" of analogic reasoning are "how and why the regulations burden a law-

i

abiding citizen's right to armed self-defense." These broad metrics imply a flexible approach to determining whether and to what extent a particular location is properly deemed a sensitive place under the Second Amendment ..................................... 9

4. Analysis of the key paragraph in the *Bruen* opinion delineating the scope and application of the sensitive places doctrine using analogical reasoning ........................................... 9

5. The *Bruen* opinion's other passages reinforce the conclusion that: (1) sensitive place doctrine is a developing area of the law; (2) district courts are instructed to be flexible in their application of the doctrine; and (3) "modern-day regulation [need not be] a dead ringer for historical precursors," *Bruen*, 142 S. Ct. at 2133 ................................ 13

B. The New Jersey Legislature's application of the *Bruen* Court's analogic approach to its statutory designation of sensitive places in Chapter 131 .................................................... 16

1. Chapter 131's designations of locations where core constitutional rights are regularly exercised are properly deemed a sensitive place under the Second Amendment because: (1) under *Bruen*, legislative assemblies, courthouses and polling places are historically recognized sensitive places; and (2) the distinguishing feature of legislative assemblies, courthouses and polling places is that these are locations wherein core constitutional rights are regularly exercised ................................................................. 17

2. Chapter 131's designations of locations where vulnerable or incapacitated people gather are properly deemed a sensitive place under the Second Amendment because: (1) under *Bruen*, a school is an historically recognized sensitive place; and (2) the distinguishing feature of a school or similar institution is that it is a location in which vulnerable or incapacitated people gather ............................................................. 21

3. Chapter 131's designations of densely populated indoor and outdoor locations are properly deemed a sensitive place

under the Second Amendment by reason of the *Bruen* Court's express recognition of this defining characteristic ................ 24

**POINT II** ........................................................................................................... 30

**CHAPTER 131's INSURANCE REQUIREMENT FOR GUN-CARRY PERMITS IS A VALID EXERCISE OF STATE POWER AND DOES NOT INFRINGE ON ANY RIGHT SECURED BY THE SECOND AMENDMENT**

A. Chapter 131's insurance requirement does not infringe on any cognizable right secured by the Second Amendment .............................. 30

B. Chapter 131's insurance requirements for gun-carry permits are constitutionally permissible by reference to the well-established standards that govern fee and insurance requirements in connection with government-issued permits to engage in First Amendment expressive activity on public streets and parks ..................................................................................... 32

C. Chapter 131's insurance requirement is consistent with historical firearms regulation ................................................................ 33

**POINT III** .......................................................................................................... 36

**THIS COURT SHOULD DENY PRELIMINARY INJUNCTIVE RELIEF TO PLAINTIFFS IN LIGHT OF THE SUBSTANTIAL EVIDENCE IN THE RECORD ESTABLISHING THE PUBLIC INTEREST AND THE POSSIBILITTY OF HARM TO OTHER INTERESTED PERSONS IF SUCH RELIEF WERE GRANTED BY THIS COURT.  THAT EVIDENCE INCLUDES PEER-REVIEWED SCHOLARLY RESEARCH INDICATING A LINK BETWEEN THE RELAXATION OF PERMIT REQUIREMENTS FOR CARRYING CONCEALED WEAPONS AND AN INCREASE IN OFFICER INVOLVED SHOOTINGS WITH CIVILIAN VICTIMS.**

**CONCLUSION** ................................................................................................. 40

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Hochul,* 2022 WL 18228317 (2d Cir. 2022)......................................41

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) ...................................................36

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853

   (1982) ....................................................................................................................20

*Brown v. State of La.*, 383 U.S. 131, 141 (1966)....................................................20

*Cox v. New Hampshire*, 312 U.S. 569, 577 (1941).................................................33

*District of Columbia v. Heller*, 554 U.S. 570 (2008)..............................................11

*Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) ....................33

*Gerritsen v. City of Los Angeles*, 994 F.2d 570, 578–79 (9th Cir.1993) ...............34

*Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)..................................22

*Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) .................................................21

*Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 1994)....................37

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013)................................................36

*Martin v. Struthers*, 319 U.S. 141, 143 (1943) .....................................................20

*McCulloch v. Maryland,* 4 Wheat. 316, 415 (1819) ................................................8

*McDonald v. Chicago*, 561 U.S. 742 (2010) ..........................................................15

*New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S.Ct. 2111 (2022) *passim*

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir 2017) .............................37

*The Nationalist Movement v. City of York*, 481 F.3d 178, 184 (3d Cir. 2007).....33

*United States v. Grace*, 461 U.S. 171, 177 (1983) ............................................... 21

**Statutes**

N.J. L. 2021, c. 131 .......................................................................................*passim*

R.I. Laws 9 §2 (1851 ...................................................................................... 35

*N.Y. Penal Law Ann*. § 400.00 ........................................................................ 33

Ordinances and Joint Resolutions of the City Of San Francisco §13 (1854) ....... 35

**Other Authorities**

Mitchell L Doucette, Alexander D McCourt, Cassandra K Crifasi, Daniel W
  Webster, *Impact of Changes to Concealed Carry Weapons Laws on Fatal and
  Nonfatal Violent Crime*, 1980-2019, Am. J. Epidemiology, Sep. 14, 2022 ...... 40

Mitchell L. Doucette, Julie A. Ward, Alex D. McCourt, Daniel Webster &
  Cassandra K. Crifasi, *Officer-Involved Shootings and Concealed Carry
  Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–
  2020*, Journal of Urban Health, volume 99, at 373–384 (2022) ........................ 39

Eric M. Rubenm & Saul Cornell, *Firearm Regulation and Public Carry: Placing
  Southern Antebellum Case Law in Context*, 125 Y.L.J.F. 121, 131 (2014) .......... 35

## PRELIMINARY STATEMENT

On January 30, 2023, this Court granted the motion to intervene of Senate President Nicholas P. Scutari and New Jersey General Assembly Speaker Craig J. Coughlin (hereafter collectively "the Presiding Officers"). By their motion to intervene, the Presiding Officers sought to present the perspective of the New Jersey Legislature in connection with its enactment of L. 2022, c. 131 (hereafter "Chapter 131").

The Legislature enacted Chapter 131 in response to the Supreme Court's decision in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S.Ct. 2111 (2022) , that established a Second Amendment right to carry firearms in public places. The Legislature's enactment of Chapter 131 had two purposes. *First*, Chapter 131 was intended to amend the State's firearms carry law so as to fully comply with the requirements of *Bruen. Second,* Chapter 131 was intended to provide critical additional safeguards with respect to the handling and carrying of firearms in New Jersey in recognition of the fact that many more citizens would likely become firearms carry permit holders under the new legal regime.  Chapter 131's additional safeguards include: (1) revisions to the application process; (2) a training requirement for permit holders; (3) a requirement that permit holders obtain liability insurance coverage to insure against loss resulting from firearms; and (4) the designation of "sensitive places" in which the carry of firearms is prohibited.

In filing this brief in opposition to Plaintiffs' motion for a preliminary injunction, the Presiding Officers present three discreet legal arguments to the Court that are intended to supplement the principal arguments that are presented by the Executive Branch Defendants.[1] The three legal arguments presented herein may be briefly summarized.

In Point I, we address Plaintiffs' challenge to Chapter 131's designation of various "sensitive places" in which the carry of firearms is prohibited. The focus of the legal analysis in Point I is a review of the *Bruen* Court's "analogic approach" to the designation of sensitive areas.

The *Bruen* Court adopted its analogic approach in order to meet the challenge of applying the dictates of the Second Amendment to a complex modern industrial society that would be unrecognizable to the Founders who wrote and ratified the Second Amendment in 1791. Recognizing this challenge, the *Bruen* Court held that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." Id. at 2133. Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Ibid*.

In enacting Chapter 131, the Legislature properly applied *Bruen*'s flexible analogic approach in its designation of sensitive places. The Legislature adhered

---

[1] The Presiding Officers adopt, and incorporate by reference, the other and further legal arguments that are put forth by the Executive Branch Defendants in opposition to Plaintiffs' motion for a preliminary injunction.

to the Court's instruction to go beyond mere literalism of recognized historical analogues of sensitive places and to identify the "how[s] and why[s]" that underlie the historical analogue itself.  *Id.* at 2132-33.   In short, the Legislature properly applied *Bruen*'s flexible analogic approach in its designation of sensitive places because:

> ● Chapter 131's designations of locations where core constitutional rights are regularly exercised are properly deemed a sensitive place under the Second Amendment because: (1) under *Bruen*, legislative assemblies, courthouses and polling places are historically recognized sensitive places; and (2) the distinguishing feature of legislative assemblies, courthouses and polling places is that these are locations wherein core constitutional rights are regularly exercised.

> ● Chapter 131's designations of locations where vulnerable or incapacitated people gather are properly deemed a sensitive place under the Second Amendment because: (1) under *Bruen*, a school is an historically recognized sensitive place; and (2) the distinguishing feature of a school or similar institution is that it is a location in which vulnerable or incapacitated people gather.

> ● Chapter 131's designations of densely populated indoor and outdoor locations are properly deemed a sensitive place under the Second Amendment by reason of the *Bruen* Court's express recognition of this defining characteristic.

For these reasons (among others), Chapter 131's sensitive-place designations are consistent with the dictates of the Second Amendment and thereby should be upheld.  *See* Point I, *infra*.

In Point II, we address Plaintiffs' challenge to the constitutionality of Chapter 131's provision that generally requires gun-carry permit holders to

procure liability insurance in connection with liability resulting from a gun incident. *See* L. 2002, c. 231, §4. Plaintiffs contend that that the insurance requirement is an unconstitutional condition to the exercise of their Second Amendment right. However, Plaintiffs' contention lacks merit for two reasons. *First*, Chapter 131's insurance requirement does not infringe on any cognizable right secured by the Second Amendment. *Second*, even if Chapter 131's insurance requirement were determined to be an infringement of a right secured by the Second Amendment, the insurance requirement *nevertheless* is valid because – consistent with the *Bruen* standard – a requirement that a gun permit holder procure insurance is wholly consistent with historical firearms regulation.

In Point III, we assert that this court should deny preliminary injunctive relief to Plaintiffs in light of the substantial evidence in the record establishing the public interest and the possibility of harm to other interested persons if such relief were granted by this court. That evidence includes peer-reviewed scholarly research indicating a link between the relaxation of requirements for carrying concealed weapons and an increase in officer involved shootings with civilian victims.

For these reasons (as well as for the other and further reasons set forth in the brief of the State Executive Branch Defendants), Plaintiffs' motion for a preliminary injunctive should be denied in its entirety.

## LEGAL ARGUMENT

## POINT I

**THE *BRUEN* COURT MADE CLEAR THAT A DISTRICT COURT CAN AND SHOULD GO BEYOND MERE LITERALISM OF RECOGNIZED HISTORICAL ANALOGUES OF SENSITIVE PLACES AND INSTEAD "USE ANALOGIES TO … HISTORICAL REGULATIONS OF 'SENSITIVE PLACES' TO DETERMINE [WHETHER] MODERN REGULATIONS PROHIBITING THE CARRY OF FIREARMS IN NEW AND ANALOGOUS SENSITIVE PLACES ARE CONSTITUTIONALLY PERMISSIBLE."  APPLYING THE *BRUEN* STANDARD, CHAPTER 131's IDENTIFICATION OF "SENSITIVE PLACES" ARE PROPERLY UPHELD**

Plaintiffs have argued to this Court that the historical record and the sources cited by the Supreme Court in *Bruen* support an exceedingly narrow definition of a "sensitive place" that, in essence, is limited to the locations already identified by the Court in its opinion as sensitive places, *i.e.*, government administration buildings, legislative assemblies, courthouses, polling places and schools.  However, as fully discussed below, a plain reading of the *Bruen* opinion discloses that Plaintiffs' cramped construction of the *Bruen* "sensitive place" doctrine does not withstand scrutiny.

Instead, the *Bruen* Court recognized a flexible "analogic approach" to the challenge of applying the dictates of the Second Amendment to contemporary society. In essence, *Bruen* held that: (1) schools and government buildings are examples of sensitive places, but not an exhaustive list of what sensitive places are; (2) banning weapons in sensitive places has a longstanding historical

pedigree, which does not violate or run afoul of the Second Amendment; and (3) when necessary, a district court may use analogical reasoning to identify other sensitive places. *Bruen*, 142 S.Ct. at 2132-35. The Court also determined that "central considerations when engaging in an analogical inquiry" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. The Court stressed "that analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin" or "dead ringer." *Id.* at 2133. Finally, the Court identified two metrics to guide the analogic inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Ibid.*

In Point IA, *supra*, we review at length the *Bruen* Court's "analogic approach" to the challenge of applying the dictates of the Second Amendment to a complex modern industrial society. In Point IB, *supra*, we apply Bruen's flexible analogic approach to Chapter 131.

**A. Analysis of the *Bruen* Court's "analogic approach" to the challenge of applying the dictates of the Second Amendment to legislatively designated "sensitive places"**

**1. The *Bruen* Court's instruction to District Courts that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."**

The Court in *Bruen* was required to acknowledge a self-evident truth: "The regulatory challenges posed by firearms today are not always the same as those

that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S.Ct. at 2132. The Court thus recognized the shortcomings of a strictly historical approach to constitutional interpretation in light of the United States' profound social, economic and technological changes that have taken place over the past 230 years.

To be sure, "the Founders created a Constitution—and a Second Amendment -- intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *Id* at 2132 (quoting *McCulloch v. Maryland,* 4 Wheat. 316, 415 (1819)). But for the Constitution to endure, it "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Ibid.*

Acknowledging these substantial challenges to interpretation and application of the Second Amendment, the *Bruen* Court set about developing a paradigm by which district courts may adjudicate a Second Amendment claim regarding the nature and extent of a right to carry in a society that would be unrecognizable to the Founders who wrote and ratified the Second Amendment in 1791.

**2.  The flexibility of the *Bruen* Court's analogic approach is shown by the Court's refusal to limit "arms" "only [to] those arms in existence in the 18th century."   The *Bruen* Court expressly acknowledged that the same flexible analogic approach applies to delineation of "sensitive places" under the Second Amendment – in that such sensitive places should not be limited to those places that were in existence in the 18th century.**

The Court began its discussion of the formation of an analogic approach to modern-day gun-carry regulations by invoking its prior cases that addressed the distinct question of what constitutes "arms" within the meaning of the Second Amendment.   The Court noted:

> We have already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century." 554 U.S. at 582, 128 S.Ct. 2783. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, **to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.**" *Ibid.*

> [*Bruen,* 142 S.Ct. at 2132 (emphasis added)]

In the context of the delineation of "sensitive places" under the Second Amendment, the mirror image of this flexible approach with respect to "arms" is that sensitive places should not be limited to those in existence in the 18th century. Put simply, if the meaning and application of "arms" is not fixed, neither should the meaning and application of "sensitive places" be fixed to only those precise places that were in existence in 1791. Instead, what is required is a flexible analogic approach to both. *See id.* ("Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding.")

**3.  The *Bruen* Court's recognized "metrics" of analogic reasoning are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." These broad metrics imply a flexible approach to determining whether and to what extent a particular location is properly deemed a sensitive place under the Second Amendment**

The Court thus recognized a flexible analogic approach to the challenge of applying the dictates of the Second Amendment to contemporary society. The Court then turned to address what constitutes a proper "metric" that would "enable[e] the analogizer to assess which similarities are important and which are not."   The Court identified two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen,* 142 S.Ct. at 2133.

Applying these metrics, the Court determined that "central considerations when engaging in an analogical inquiry" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Ibid.*

**4. Analysis of the key paragraph in the *Bruen* opinion delineating the scope and application of the sensitive places doctrine using analogical reasoning**

A key paragraph in the *Bruen* opinion delineates the scope and application of the sensitive places doctrine.  The pertinent language within this paragraph reads as follows:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited -- *e.g.*, legislative assemblies, polling places, and courthouses -- we are

also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine those modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

[*Bruen*, 142 S. Ct. at 2133-34].

It is instructive to carefully analyze this "sensitive places" paragraph, sentence-by-sentence. The first sentence reads:

Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."

[*Bruen*, 142 S. Ct. at 2133-34].

In this sentence, the Supreme Court gives initial insight into how to define a sensitive place. The *Bruen* Court does not explicitly define the phrase, opting instead to provide examples. The Supreme Court identified sensitive places as places "such as" "schools" and "government buildings." Notably, these examples are unqualified—the *Bruen* Court did not narrow the applicability of these examples in any way. *Id.*; *see also District of Columbia v. Heller*, 554 U.S. 570, 627, n. 26 (2008) ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive"). Nowhere in this passage nor at any other point in the opinion does the *Bruen* Court hold, *e.g.*, that only "elementary schools" or "middle schools" are sensitive places. The same is

true for government buildings. Nowhere in *Bruen* (nor in *Heller*, for that matter) is the definition of "sensitive places" narrowed to government buildings devoted to, *e.g.,* the exercise of political functions. Put another way, schools and government buildings are presented as broadly as possible, allowing the reader to consider all possible subtypes that fall within those two examples. *See Bruen*, 142 S. Ct. at 2133-34. If the *Bruen* Court had intended the first sentence to restrict the applicability of the "sensitive places" doctrine to, *e.g.,* a small subset of government buildings, the Supreme Court could have explicitly made that limitation. In the absence of a clear limitation, a fair reading of *Bruen* does not support a narrow interpretation of the first sentence.

The second sentence of the *Bruen* "sensitive places" passage reads:

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.,* legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions.

[*Bruen*, 142 S. Ct. at 2133-34].

*Bruen*'s second sentence serves the limited purpose of demonstrating that there are few historical examples of sensitive places legislation that altogether prohibited carrying weapons in sensitive places. Contrary to Plaintiffs' contention, this sentence – fairly read -- does not stand for the proposition that the scope of the sensitive-places doctrine is limited to the specific set of examples that the Supreme Court identified. Such an interpretation does not make sense

because the first sentence presented examples of sensitive places using expansive language ("such as"), allowing for examples that include, or are "similar to," those provided. If the second sentence were intended to narrow the list of sensitive places, the first and second sentences would contradict each other. Thus, the most plausible reading of this second sentence results in the *Bruen* Court holding that: (1) the sensitive places doctrine can apply expansively; (2) the historical record does not yield many examples of legislators passing laws under this doctrine; and (3) the lawfulness of regulations pertaining to sensitive places has never been disputed.

In the third sentence, the *Bruen* Court refers back to the historical pedigree of the sensitive places doctrine:

> We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment.

> [*Bruen,* at 2133-34].

Fairly read, this sentence merely serves to reinforce the notion that the sensitive places doctrine -- and the examples the Supreme Court provided -- are consistent with the Second Amendment.

The fourth and final sentence of the passage provides guidance on how analogies may be used to demonstrate that a location qualifies as a sensitive place:

> And courts can use analogies to those historical regulations of "sensitive places" to determine those modern regulations

> prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

[*Bruen*, at 2133-34].

Here, the *Bruen* Court holds that analogical reasoning may be used to determine if a particular location qualifies as a sensitive place. This provides the district court the formula for analyzing, if necessary, what constitutes a "sensitive place" in the present day, reinforcing that the examples listed in the first and second sentences can be used to identify other sensitive places which are "similar."

In sum, the above-referenced paragraph of *Bruen* – fairly read -- holds that: (1) schools and government buildings are examples of sensitive places, but not an exhaustive list of what sensitive places are; (2) banning weapons in sensitive places has a longstanding historical pedigree, which does not violate or run afoul of the Second Amendment; and (3) when necessary, a District Court may use analogical reasoning to identify other sensitive places.

**5. The *Bruen* opinion's other passages reinforce the conclusion that: (1) sensitive place doctrine is a developing area of the law; (2) district courts are instructed to be flexible in their application of the doctrine; and (3) "modern-day regulation [need not be] a dead ringer for historical precursors," *Bruen*, 142 S. Ct. at 2133**

In other key passages, the *Bruen* Court further addresses sensitive places doctrine and the permissible use of historical analogues. The Court also offers a specific example of sensitive-place analysis that sweeps too broadly as compared

to the historical analogues upon which the analysis is based.  As we shall see, the scope and breadth of that specific example is quite telling.

The *Bruen* Court first underscored that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin."  *Bruen*, 142 S. Ct. at 2133.  Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  *Id.* at 2133.

Fairly read, this passage invites District Courts to go beyond mere literalism of recognized historical analogues of sensitive places and to instead identify the "how[s] and why[s]" that underlie the historical analogue itself.  *Id.* at 2132-33.  The Court was emphatic: "history guide[s] our consideration of modern regulations" and "we do think that *Heller* and *McDonald [v. Chicago,* 561 U.S. 742 (2010)] point toward at least two metrics: *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense."  *Ibid.* (emphasis added).

Later in the opinion, the *Bruen* Court cautioned that the scope and application of historical analogues (to modern circumstances) are not unlimited. The Court offered this example:

> Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all

14

"places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." Brief for Respondents 34. **It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations.** But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

[*Bruen*, 142 S. Ct. at 2133-34 (emphasis added)]

Critically, the *Bruen* Court recognized that high population density and a high level of general police protection can and do serve as a talisman of many constitutionally permissible sensitive places. *Id.* at 2133-34. However, these defining characteristics cannot be stretched so far so as to exempt a broad geographic area (Manhattan is 22 square miles) from the reach of the Second Amendment. "Entire cities" cannot be exempted from the Second Amendment. *Id.* at 2134. In other words, the *Bruen* Court set an "outer limit" on the permissible level of generality underlying an historical analogy to sensitive places.

By necessary implication, although constitutionally permissible sensitive places cannot extend to entire cities or to large expanses of urban areas generally,

the designation of sensitive areas *can and should* extend to other locations that are characterized by high population density and a high level of general police protection -- as long as those areas are reasonably compact. *Id.* at 2133-34.

**B. The New Jersey Legislature's application of the *Bruen* Court's analogic approach to its statutory designation of sensitive places in Chapter 131**

Having reviewed the *Bruen* analogic standards, we turn to address the New Jersey Legislature's application of these standards to its designation of sensitive places in Chapter 131

In enacting Chapter 131, the Legislature designated certain locations as "sensitive places" in which the carrying of firearms is prohibited.  These sensitive place locations include, but are not limited to, government buildings, courthouses, polling places, schools, childcare facilities, nursery schools, parks, beaches, recreation facilities, youth sports events, libraries, museums, homeless shelters, eating and drinking establishments where alcohol is served, entertainment facilities, casinos, airports and health care facilities.  *See* L. 2022, c. 131, §7a.

In connection with its statutory designation of sensitive places, the Legislature made the following express findings and declarations that are premised on – and apply -- the *Bruen* Court's analogical approach:

> The sensitive-place prohibitions on dangerous weapons set forth in
> this act are rooted in history and tradition. They are analogous to
> historical laws that can be found from the Founding era to
> Reconstruction, which are also found in modern laws in many

states. History and tradition support at least the following location based restrictions on carrying firearms:

(1) Places that are the site of core constitutional activity, such as but not limited to the exercise of First Amendment rights, or that are otherwise vital to the functioning of democracy and our system of government. That includes prohibitions of firearms in facilities within the criminal justice system;

(2) Schools, universities, other educational institutions, where people assemble for educational purposes and for the purposes of teaching, learning, research, and the pursuit of knowledge;

(3) Parks and other recreation spaces, including locations where children congregate;

(4) Locations that protect vulnerable classes of people, such as the young and the frail;

(5) Places where intoxicating substances are sold, places where large groups of individuals congregate, and places where volatile conditions may pose a threat to public safety; and

(6) Various forms of transportation and public infrastructure, whose safety, security, and stability are critical to supporting social function.

[L. 2022, c. 131, §1]

As discussed below, these legislative findings and declarations are fully consistent with *Bruen*'s analogic approach to the delineation of constitutionally permissible sensitive places in contemporary society that encompass relevant characteristics and features that are analogous to historically recognized sensitive places.

**1. Chapter 131's designations of locations where core constitutional rights are regularly exercised are properly deemed a sensitive place under the**

**Second Amendment because: (1) under *Bruen*, legislative assemblies, courthouses and polling places are historically recognized sensitive places; and (2) the distinguishing feature of legislative assemblies, courthouses and polling places is that these are locations wherein core constitutional rights are regularly exercised.**

In Chapter 131, the Legislature designated as sensitive places (among other locations): (1) places owed by government or controlled by government "for the purpose of government administration"; (2) courthouses; (3) polling places; (4) "publicly owned or leased librar[ies] or museum[s]"; (5) a "place where a public gathering, demonstration or event is held for which a government permit is required"; and (6) "a public location used for making motion picture or television images." Chapter 131, §§7(a)(1), (2) (5), (6), (12), (23). What all of these places have in common are that they are ""[p]laces that are the site of core constitutional activity, such as but not limited to the exercise of First Amendment rights." Chapter 131, §1.

Chapter 131's designations of locations where core constitutional rights, including First Amendment rights, are regularly exercised are properly deemed a sensitive place under the Second Amendment. This is so because: (1) under *Bruen,* legislative assemblies, courthouses and polling places are historically recognized sensitive places; and (2) the distinguishing feature of legislative assemblies, courthouses and polling places is that these are locations wherein core constitutional rights are regularly exercised. *Bruen*, 142 S.Ct. at 2133. *See also Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt

18

on longstanding prohibitions on ... laws forbidding the carrying of firearms in sensitive places such as ... government buildings ....").

### (a)  Plaintiffs' challenge to the Legislature's designation of libraries and museums as "sensitive places."

Here, Plaintiffs challenge the Legislature's designation of libraries and museums as "sensitive places."  But there can be no question that these are places that are devoted to activities that involve the regular exercise of First Amendment rights.  *See Brown v. State of La.*, 383 U.S. 131, 141 (1966) (reversing conviction of a breach of the peace statute involving conduct in a public library, because petitioners were engaging in activity in the library that was protected "under the First and Fourteenth Amendments guaranteeing freedom of speech and of assembly, and freedom to petition the Government for a redress of grievances."). Moreover, libraries, museums and similar institutions are repositories of knowledge and ideas, and, as such, they have long been held to implicate the First Amendment right to receive information. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866–67, (1982) (applying the First Amendment right to receive information to a school library); *see id* at 867 (holding that the right to receive ideas follows ineluctably from the sender's First Amendment right to send them"); *Martin v. Struthers*, 319 U.S. 141, 143 (1943) ("The right of freedom of speech and press ... embraces the right to distribute literature, and necessarily protects the right to receive it"); *Kleindienst v. Mandel*,

408 U.S. 753, 763 (1972) (stating that the First Amendment right to receive information "is **nowhere more vital**" than in academic and research institutions) (emphasis added).

Applying the *Bruen* Court's metric of "how and why the regulations burden a law-abiding citizen's right to armed self-defense," the conclusion to be drawn *in a setting such as a library* is that a law-abiding citizen's right to armed self-defense should give way to countervailing considerations when (as here) the location is devoted to activities that involve the regular exercise of First Amendment rights, including (as the *Bruen* Court held) government buildings, courthouses and polling places. That is the "how" and the "why" of the analogic inquiry mandated by *Bruen*.

**(b)   Plaintiffs' challenge to the Legislature's designation of government-permitted expressive activity as a "sensitive place."**

The Siegel Plaintiffs also challenge "place[s] where a public gathering, demonstration or event is held for which a government permit is required." However, a public gathering of this type – expressive activity occurring in a public forum that is subject to a government permit -- has long been held to implicate core First Amendment concerns. *See United States v. Grace*, 461 U.S. 171, 177 (1983) (holding that expressive activity in "public places ... such as streets, sidewalks, and parks, are considered, without more, to be "public forums." and "the government's ability to permissibly restrict expressive conduct [in these

locations] is very limited" under the First Amendment); *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, *time out of mind*, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions") (emphasis added).

Here again, applying the *Bruen* Court's metric of "how and why the regulations burden a law-abiding citizen's right to armed self-defense" to expressive activity in streets and parks **subject to government permits**, the proper conclusion to be drawn is that a law-abiding citizen's right to armed self-defense *in this setting* should give way to countervailing considerations arising from activities long associated with the exercise of core First Amendment rights. "Time out of mind" streets and parks have been used for First Amendment activities subject to government permits, *Hague*, 307 U.S. at 515; just as "time out of mind" courts, legislative assemblies and polling places have been used for the exercise of core constitutional functions, including First Amendment activities. Under the *Bruen* analogical approach, the former location is properly deemed a "sensitive place" by reference to the latter, and broadly analogous, "sensitive place" location.

**2.  Chapter 131's designations of locations where vulnerable or incapacitated people gather are properly deemed a sensitive place under the Second Amendment because: (1) under *Bruen*, a school is an historically recognized sensitive place; and (2) the distinguishing feature of a school or similar institution is that it is a location in which vulnerable or incapacitated people**

**gather.**

In Chapter 131, the New Jersey Legislature designated as sensitive places (among other locations): (1) a juvenile justice facility; (2) a school, college, university or other educational facility and on any school bus; (3) a child care facility, including a day care facility; a nursery school, pre-school, zoo or summer camp; (4) youth sports events; (5) a shelter for the homeless; (6) a community residence for persons with developmental disabilities and similar community facilities; (7) a health care facility; and (8) a facility that provides addiction or mental health treatment or support services.   Chapter 131, §§7(a)(3), (7), (8), (9), (11), (1#, (14), (21), (22).

What these places have in common are that they are: (1) "[s]chools, universities [or] other educational institutions where people assemble for educational purposes and for the purposes of teaching, learning, research, and the pursuit of knowledge; and (2) locations that protect vulnerable classes of people, such as the young and the frail."   Chapter 131, §1.   A school is a place where defenseless young children congregate.   Schools serve diverse populations, including children with disabilities.

In that sense, all of the above-referenced locations enumerated in Chapter 131 – serving vulnerable classes of people, including the young and the frail -- are analogous to schools.   Significantly, the Court in *Bruen* held, as a matter of law, that a school is a sensitive place within the meaning of the Second Amendment.

*Bruen*, 142 S.Ct. at 2133 ("We therefore can assume it settled that these locations [including schools] were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment").   *See also Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on ... laws forbidding the carrying of firearms in sensitive places such as ... schools.").

The *Bruen* Court instructed that – with respect to "schools" -- courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen*, 142 S.Ct. at 2133.  *Here, the New Jersey Legislature did just as the Bruen Court instructed.* The Legislature determined that – like schools – locations such as day care centers, youth sports events, health care facilities and homeless shelters – are "locations that protect vulnerable classes of people, such as the young and the frail." Chapter 131, §1.   Under the *Bruen* analogical approach, day care centers, youth sports events, health care facilities and homeless shelters (among other locations) are properly deemed "sensitive places" by reference to a school – which unquestionably is a broadly analogous "sensitive place" location.

Against this backdrop, the Siegel Plaintiffs challenge the Legislature's designation of playgrounds and youth sports events as constitutionally permissible sensitive places. However, both playgrounds and youth sports events are designed

23

to serve the needs of children – just as schools are designed to serve the needs of children.   Under the *Bruen* analogical approach, the former locations are properly deemed a "sensitive place" by reference to schools – an analogous location that the *Bruen* Court held was a sensitive place within the meaning of the Second Amendment.  *See Bruen*, 142 S.Ct. at 2133.

Indeed, this Court – in its opinion addressing the Siegel Plaintiffs' TRO application -- so held.  *See* 1/30/23 Opinion (Dckt. 51), at 24, 29.  The Court determined that "schools and playgrounds intersect, that is playgrounds fall within the sphere of schools." *Id.* at 24.   Similarly, the Court determined that "schools and youth sports events intersect, that is youth sports events fall within the sphere of schools." *Id*. at 29.   Based on the foregoing, the Court concluded that "under *Bruen*, the Court can 'assume it settled" that playgrounds and youth sports events are sensitive places.  *Ibid.*

The Presiding Officers respectfully submit that this same analogic approach authorized by *Bruen* applies in other settings as well.  *See* Points IB(1), *supra*, and IB(3), *infra*.

**3. Chapter 131's designations of densely populated indoor and outdoor locations are properly deemed a sensitive place under the Second Amendment by reason of the *Bruen* Court's express recognition of this defining characteristic.**

In Chapter 131, the Legislature designated as sensitive places (among other locations): (1) a bar or restaurant where alcohol is served; (2) a privately or

publicly owned entertainment facility, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held; and (3) casino and related facilities. Chapter 131, §§7(a) (15), (17), (18). What these places have in common are that they are "places where large groups of individuals congregate, and places where volatile conditions may pose a threat to public safety." Chapter 131, §1.

Turning to *Bruen*: As more fully discussed in Point IA(5), the *Bruen* Court -- in rejecting the entire island of Manhattan as a constitutionally permissible sensitive place -- set an "outer limit" on the permissible level of generality underlying an historical analogy to sensitive places. *Bruen*, 142 S.Ct. 2133-34. Entire cities are not to be deemed a "sensitive place" within the meaning of the Second Amendment.

However, the *Bruen* Court recognized that high population density and a high level of general police protection can and do serve as a talisman of many constitutionally permissible sensitive places. *Id.* at 2133-34. More particularly, *Bruen* held that, although constitutionally permissible sensitive places cannot extend to entire cities, the designation of sensitive areas *can and should* extend to other locations that are characterized by high population density and a high level of general police protection -- as long as those areas are reasonably compact. *Id.* at 2133-34.

This interpretation of *Bruen* is buttressed by reference to *Bruen*'s "'central considerations when engaging in an analogical inquiry." *Bruen*, 142 S.Ct. at 2133. These central considerations – what the Court also refers to as "metrics" – are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Ibid*.

As applied to places with high population density – such as stadiums, arenas and indoor entertainment venues -- the "how and why the regulations burden a law-abiding citizen's right to armed self-defense" is quite clear to anyone who has ever been to a crowded stadium or indoor concert venue. Although the right of self-defense is a key concern of the Second Amendment, the exercise of private self-defense is ineffective or counterproductive in places of high population density. This is so because stray bullets can easily injure or kill bystanders. Furthermore, if many people are armed in places of high population density and if a private armed conflict ensues, the situation can spiral out of control.

It is precisely for this reason that stadiums, arenas and indoor entertainment venues typically are subject to high levels of police protection.[2] Police are trained to address emergencies and conflicts (including armed conflicts) that take place in

---

[2] For example, the New Jersey State Police provide policing functions at New Jersey's major stadiums and arenas, including the Met Life Stadium, the Prudential Center, the Red Bull Arena and the PNC Banking Center.

crowds. However, the duty of the police to maintain order and to minimize the loss of life is made more difficult if a greater number of people are armed in places of high population density. Moreover, a private armed conflict in a crowded situation is dangerous not only to bystanders but also to the police.

For these reasons, the "how and why the regulations burden a law-abiding citizen's right to armed self-defense" is simply this: armed self-defense in a densely populated venue is not safe – not to the civilian with the permitted firearm, not to bystanders and not to the police. If a substantial portion of attendees at a stadium are legally armed (which is possible, even likely, if the venue is *not* designated a sensitive place), the net result would be a tinderbox that could erupt at any time based on a minor dispute or a misunderstanding.[3] This is especially so in a venue in which alcoholic beverages are served.

---

[3] Consider, for example, this hypothetical of an armed confrontation at Met Life Stadium -- a facility that has a capacity of 82,500 patrons. Assume that five percent of the fans attending a football game are armed with handguns. That would amount to 4,000 individuals with handguns in a densely populated arena, Consider, as well, that Met Life Stadium is licensed to serve alcoholic beverages. In the context of a football game that often elicits heightened emotions, the presence of 4,000 individuals with handguns produces a very volatile and difficult-to-police environment

Under this hypothetical, if a dispute were to occur that resulted in two or more individuals drawing their guns, it would be well-nigh impossible in many situations to determine which individual was the aggressor and which individual was engaging in self-defense. Furthermore, if additional individuals in the stadium were to draw their guns in response to the initial incident, there is a high probability that the situation would spiral out of control and quite possibly result in mass injury or death. At the very least, the situation could prove to be

Stated succinctly, the "how and why the regulations burden a law-abiding citizen's right to armed self-defense" is that the regulation *is no burden at all to the law-abiding citizen.* In a densely populated stadiums, arena or indoor entertainment venues, the law abiding citizen is safer relying on a highly trained police presence for protection in designated gun-free venue rather than relying on his or her firearm in a venue that may be awash in firearms held by other attendees. [4]

---

extremely difficult for the police to control once guns are drawn by various individuals.

Applying *Bruen*'s "how and why the regulations burden a law-abiding citizen's right to armed self-defense" standard to this hypothetical, the common-sense conclusion to be drawn is simply this: armed self-defense in a densely populated venue is not safe – not to the civilian with the permitted firearm, not to bystanders and not to the police. Hence, there is no "burden" whatsoever to a law-abiding citizen if a stadium, arena or other entertainment venue is a designated a sensitive place in which the carrying of firearms is prohibited.

[4] There are myriad additional practical considerations that will arise in connection with allowing handgun carry permit holders to carry firearms into crowded indoor and outdoor sports and entertainment venues. For example, allowing permit holders to carry firearms into these venues likely will significantly disrupt the security screenings – in light of the practical difficulties in separating those attendees who are carrying lawfully from those who are carrying unlawfully. Indeed, an unlawful carrier may be in a better position to enter the facility if they are able to persuade the security screeners they are carrying lawfully. This is especially so when overburdened security screeners lack the time and resources to thoroughly check credentials or determine if a firearms identification card is genuine or counterfeit. From a practical perspective, it is difficult to conceive how large-scale security screenings can be conducted in an

As previously noted, this common-sense observation finds substantial support in *Bruen* itself.  Although the Court in *Bruen* recognized that an "entire city" that contains a dense concentration of people and a substantial police presence is not properly deemed a constitutionally permissible sensitive place, the Court implicitly recognized that factors of dense population and police presence are relevant factors to sensitive place analysis – albeit not on the scale of an entire city. *Bruen*, 142 S.Ct. at 213-34.  By necessary implication, *Bruen* recognized that a more compact location that is crowded and contains a police presence – such as a stadium or an indoor entertainment venue – is properly deemed a sensitive place under the Second Amendment.

For all of the foregoing reasons, Chapter 131's designations of densely populated indoor and outdoor locations are properly deemed a sensitive place under the Second Amendment.

---

orderly and efficient manner in circumstances in which a significant percentage of the attendees are carrying firearms.

The conclusion to be drawn from these and other practical considerations is that both the firearm permit holder and all other attendees at a crowded venue would be far safer if there were an outright prohibition on carrying firearms into the venue.  Of course, that is precisely what is achieved by way of the Legislature's designation of this type of venue as a sensitive place.  See Chapter 131, §§7(a) (15), (17), (18).

## POINT II

**CHAPTER 131's INSURANCE REQUIREMENT FOR GUN-CARRY PERMITS IS A VALID EXERCISE OF STATE POWER AND DOES NOT INFRINGE ON ANY RIGHT SECURED BY THE SECOND AMENDMENT**

The Siegel Plaintiffs challenge the constitutionality of Chapter 131's provision that generally requires gun carry permittees to procure liability insurance in connection with liability resulting from a gun incident.[5]   *See* L. 2002, c. 231, §4. Plaintiffs contend that that the insurance requirement is an unconstitutional condition to the exercise of their Second Amendment right.[6]

However, as described below, Plaintiffs' contention is devoid of merit for several reasons.

**A.    Chapter 131's insurance requirement does not infringe on any cognizable right secured by the Second Amendment**

Unlike the laws struck down in the Supreme Court's decisions in *Heller, McDonald,* and *Bruen*, Chapter 131's insurance requirement does not prohibit or prevent anyone from keeping or bearing arms for self-defense in the home or in public.  *See Bruen*, 142 S. Ct. at 2156 (striking down "proper cause" standard for

---

[5] The Siegel Plaintiffs did not challenge the insurance provision in connection with their application for temporary restraints. These Plaintiffs have elected to challenge this provision as part of the preliminary injunction proceeding.

[6] On this record Plaintiffs have failed to even address as to whether they presently are insured for liability resulting from the use of their firearms.  In light of this deficiency in the record, Plaintiffs plainly lack standing to challenge the constitutionality of Chapter 131's insurance requirement. Nevertheless, for present purposes we address Plaintiffs' claim on the merits.

gun-carry applicant); *Heller,* 554 U.S. at 628, 630 (striking down law that "totally bans handgun possession in the home" and "makes it impossible" to use guns for self-defense"); *McDonald*, 561 U.S. at 750 (striking down law "banning handgun possession").  Indeed, the insurance requirement does not regulate the purchase, sale, storage, or use of firearms in any way, whether inside the home or in public; it merely requires they obtain liability insurance to cover the risk of accidental harm that always accompanies firearms possession in public.

By contrast, the New York law at issue in *Bruen* criminalized possessing a firearm publicly without a license, obtainable only if a gunowner could prove "proper cause," which required him to "demonstrate a special need for self-protection distinguishable from that of the general community." *Bruen*, 142 S. Ct. at 2123 (citing *N.Y. Penal Law Ann*. § 400.00(2)(f)).  *Bruen* struck down this law explicitly for "features" entirely absent from the insurance requirement:  a vague "special-need requirement" and the "unchanneled discretion" afforded state licensing officials upon issuance.  *Id.*, at 2161 (Kavanaugh, J., and Roberts, C.J., concurring); *see also id.*, at 2157 (Alito, J., concurring) ("[T]oday's decision therefore holds that a State may not enforce a law … that effectively prevents its law-abiding residents from carrying a gun for [self defense]. That is all we decide.").

Plaintiffs' claim against Chapter 131's insurance requirement fails for this reason alone.  Stated succinctly, because Chapter131's insurance requirement

does not preclude law-abiding residents from carrying a firearm for self-defense, it does not infringe on any cognizable right secured by the Second Amendment.

**B.    Chapter 131's insurance requirements for gun-carry permits are constitutionally permissible by reference to the well-established standards that govern fee and insurance requirements in connection with government-issued permits to engage in First Amendment expressive activity on public streets and parks**

An insurance or fee requirement imposed in connection with the exercise of *First Amendment* rights – such as a requirement incident to the issuance of a street permit for expressive activity – is common throughout the United States.  In the First Amendment context, insurance and permit fee requirements are upheld, provided that the amount of required insurance coverage and fees are uniform and are not imposed based on the content of the expressive activity.  *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (holding that fee regime for permitting expressive activity in a public forum will be upheld provided that it does "not delegate overly broad licensing discretion to a government official"); *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (holding that "[t]here is nothing contrary to the Constitution in the charge of a fee limited" to "meet the expense incident to the administration of the Act and to the maintenance of public order in the matter licensed"); *The Nationalist Movement v. City of York*, 481 F.3d 178, 184 (3d Cir. 2007) ("It is beyond peradventure that a city can establish a permit scheme whose goal is to assure financial accountability for damage caused by an event"); *Gerritsen v. City of Los Angeles*, 994 F.2d 570,

578–79 (9th Cir.1993) (upholding insurance bond requirement for use of a public park because "[t]he bond requirement is content-neutral in that it is applied to every applicant regardless of the nature of the expression or content of the message they wish to convey").

Given that standard and uniform permit fees and insurance requirements have long been upheld in the First Amendment context, such requirements also should be upheld in the Second Amendment context of gun-carry regulations.[7]

## C.   Chapter 131's insurance requirement is consistent with historical firearms regulation

In the alternative, even if Chapter 131's insurance requirement were determined to be an infringement of a right secured by the Second Amendment, the insurance requirement *nevertheless* is valid because – consistent with the *Bruen* standard – a requirement that a gun permittee procure insurance is wholly consistent with historical firearms regulation.

---

[7] In their Complaint, the Siegel Plaintiffs point to *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), as purportedly standing for the proposition that the "require[ement of] insurance as a condition to the exercise of a constitutional right is unconstitutional."   Siegel Complaint, ¶281. However, the Siegel Plaintiffs' reliance on *Claiborne Hardware* is misplaced. In that case, the Supreme Court held that an organization exercising its First Amendment rights may not be held liable for the conduct of a third party "without a finding that [it] authorized—either actually or apparently—or ratified unlawful conduct." *Claiborne Hardware*, 458 U.S. at 931. The *Claiborne* holding is entirely inapposite to Chapter's 131's insurance requirement.  The Chapter 131 insurance requirement pertains exclusively to coverage for the permit holder's own liability -- as distinct from coverage for the liability of any third party.

In *Bruen*, the Court carefully considered the "surety statutes" that nine jurisdictions enacted in the roughly 20 years leading up to and shortly after the ratification of the Fourteenth Amendment and rejected any notion that such financial requirements were "a severe constraint" on Second Amendment conduct. *Bruen*, 142 S.Ct. at 2148-50. These surety statutes required individuals to post, or have a third-party post, a bond before they could carry a firearm. *See* Eric M. Rubenm & Saul Cornell, *Firearm Regulation and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Y.L.J.F. 121, 131 (2014). The *Bruen* Court observed that "the surety laws did not prohibit public carry in locations frequented by the general community," *Bruen*, 142 S.Ct. at 2148, and that "the burden these surety states may have had on the right to public carry was likely too insignificant to shed light on" the regulation at issue, *id*. at 2149. At the same time, the Court recognized that the minimal economic burden that these statutes imposed promoted public interests, including the "prevention" of gun harms and "provid[ing] financial incentives for responsible arms carrying." *Id.* at 2150.

Beyond the surety bonds considered in *Bruen*, American history is full of government imposed economic burdens associated with gun ownership and use. *See, e.g.,* 1851 R.I. Laws 9 §2 (1851 ("[T]wo hundred dollars per annum on any person who shall own or keep a pistol [or] rifle gallery"); Ordinances and Joint Resolutions of the City Of San Francisco §13 (1854) (San Francisco ordinance

requiring "ten dollars per quarter" from "[e]very person, house or firm engaged in keeping a pistol or shooting gallery"; 1856-57 N.C. Sess. Laws 34 Pub. Laws, An Act Entitled "Revenue" ch 34, §23, pt. 4 (On every pistol… one dollar and twenty five cents").   Similar economic burdens have endured to the present day, and modern courts have not hesitated to uphold gun-related fees and costs as constitutional. *See, e.g., Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) (upholding fees on firearms transfers); *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) (upholding residential handgun licensing fee).   Such fees have long been accepted as consistent with the Second Amendment.

   In short, Chapter 131's insurance requirement does not infringe on any cognizable right secured by the Second Amendment In the alternative, even if Chapter 131's insurance requirement were determined to be an infringement of a right secured by the Second Amendment, the insurance requirement *nevertheless* is valid because – consistent with the *Bruen* standard – a requirement that a gun permittee procure insurance is wholly consistent with historical firearms regulation.

## POINT III

**THIS COURT SHOULD DENY PRELIMINARY INJUNCTIVE RELIEF TO PLAINTIFFS IN LIGHT OF THE SUBSTANTIAL EVIDENCE IN THE RECORD ESTABLISHING THE PUBLIC INTEREST AND THE POSSIBILITTY OF HARM TO OTHER INTERESTED PERSONS IF SUCH RELIEF WERE GRANTED BY THIS COURT.  THAT EVIDENCE INCLUDES PEER-REVIEWED SCHOLARLY RESEARCH INDICATING A LINK BETWEEN THE RELAXATION OF PERMIT REQUIREMENTS FOR CARRYING CONCEALED WEAPONS AND AN INCREASE IN OFFICER INVOLVED SHOOTINGS WITH CIVILIAN VICTIMS.**

Preliminary injunctive relief "is an extraordinary remedy and should be granted only in limited circumstances."   *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 1994).  Such relief may be granted by the court only if the plaintiff satisfies *all* of the following four factors:

> (1) a reasonable probability of eventual success in the litigation, and (2) that [they] will be irreparably harmed.. if the relief is not granted… [In addition], the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

[*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir 2017)]

Here, as discussed below, if Plaintiffs' motion for a preliminary injunction were granted, the evidence in the record strongly suggests "the possibility of harm to other interested persons" and a result that would be inimical to "the public interest." *Ibid.* That being so (and for this reason alone), the grant of preliminary injunctive relief is not warranted on this record.

\*\*\*

By its recent opinion granting the Presiding Officers' motion to intervene, this Court observed:

> Additionally, pursuant to Rule 65, relevant factors for the Court to consider at the preliminary injunction phase include the public interest and possibility of harm to other interested persons. As the Court considered in its earlier Opinion in *Koons,* the State, thus far, has failed to present any "empirical evidence to suggest that concealed carry permit holders are responsible for gun crimes or an increase in gun crimes in New Jersey, which they cite as justification for the law." [Docket No. 34.] Such evidence is certainly relevant to these factors. [Opinion dated 1/30/23 granting the Presiding Officers' motion to intervene [Dckt. No. 47], at 2]

In this brief point, we address the Court's observation regarding the lack of "empirical evidence" from New Jersey that would show "the possibility of harm to other interested persons" and a result that would be inimical to "the public interest." *Ibid.*

At the outset, we respectfully point out that Defendants were not in a position to provide New Jersey-specific statistics "to suggest that concealed carry permit holders are responsible for gun crimes or an increase in gun crimes in New Jersey" (as suggested by the Court) – given that Chapter 131 was only enacted less than three months ago and there has not been sufficient time in New Jersey to measure the impact of the elimination of the "justifiable need" standard and its effect on the incidence of gun crimes or gun-related incidents in New Jersey. However, in the absence of such New Jersey-specific statistics, we rely on studies

that use firearms incident data aggregated from other states that previously had relaxed restrictions regarding the carrying of firearms in public.

We begin our analysis by referring to the text of Chapter 131 itself.  In Section 1 of the statute, the Legislature sets forth the following finding addressing the need for safeguards in the new gun-carry regulatory regime based on the experience of other states that had relaxed their own gun-carry regulations:

> Statistics show that expanding handgun carrying creates safety risks, helping to fuel the epidemic of gun violence. For example, a study by researchers at the Johns Hopkins Bloomberg School of Public Health found that the estimated average rate of officer-involved shootings increased by 12.9 percent in ten states that relaxed restrictions between 2014 and 2020 on civilians carrying concealed firearms in public. Accordingly, evidence demonstrates that more guns on the streets can translate into more acts of gun violence. To mitigate the impact of having more people carrying guns in public places, steps must be taken to better ensure that those who exercise the right to carry are responsible, law abiding, and appropriately trained individuals who would not pose undue safety risks if armed in public places.  [L. 2022, c. 131, §1]

The Legislature was referring to this article published in a scholarly peer-reviewed journal: Mitchell L. Doucette, Julie A. Ward, Alex D. McCourt, Daniel Webster & Cassandra K. Crifasi, *Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020*, Journal of Urban Health, volume 99, at 373–384 (2022), *available at* https://link.springer.com/article/10.1007/s11524-022-00627-5.   As previously noted, the Johns Hopkins study found that the estimated average rate of officer-involved shootings increased by 12.9 percent in ten U.S. states that relaxed

restrictions between 2014 and 2020 on civilians carrying concealed firearms in public.

Another study found that states that adopted Shall-Issue concealed-carry law were "associated with a 9.5% increase in rates of assaults with firearms during the first 10-years post-law adoption and associated with an 8.8% increase in rates of homicides by other means." *See* Mitchell L Doucette, Alexander D McCourt, Cassandra K Crifasi, Daniel W Webster, *Impact of Changes to Concealed Carry Weapons Laws on Fatal and Nonfatal Violent Crime*, 1980-2019, Am. J. Epidemiology, Sep. 14, 2022, *available at https://pubmed.ncbi.nlm.nih.gov/36104849/*

As these studies indicate and as the Legislature expressly found, "[the] evidence demonstrates that more guns on the streets can translate into more acts of gun violence." L. 2022, c. 131, §1. The conclusion to be drawn is that New Jersey's transition from a may-carry state to a shall-carry state will result in more guns on the street. Whether more guns on the street results in more acts of gun violence will depend on many factors, including but not limited to whether Chapter 131 is allowed to take full effect -- and thereby limit gun carrying in sensitive places: (1) that are especially prone to acts of gun violence, such as locations where alcoholic beverages are sold; and (2) that contain high population density (such as stadiums and arenas) in which there is the greatest risk of multiple injuries or deaths from acts of gun violence.

It is respectfully submitted that – on this record -- the substantial risks to third parties and the harm to the public interest are such that preliminary injunctive relief should not issue. *See Antonyuk v. Hochul,* 2022 WL 18228317 (2d Cir. 2022) (concluding that "a stay pending appeal is warranted" of a district court's order enjoining various sensitive-place designations in New York's new post-*Bruen* gun-carry statute).

### CONCLUSION

For the reasons set forth above (as well as the reasons set forth in the brief of the State Executive Defendants), Plaintiffs' motion for a preliminary injunction should be denied in its entirety.

Respectfully submitted,

Cullen and Dykman LLP

By:*/s/ Leon J. Sokol*
    Leon J. Sokol

Kologi ◆ Simitz,
Counsellors at Law

By:*/s/ Edward J. Kologi*
    Edward J. Kologi

Attorneys for Intervenors-Defendants
Senate President Nicholas P. Scutari and
Assembly Speaker Craig J. Coughlin

Dated: February 13, 2023