UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, AND ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., | No. 22-CV-7463 (RMB) (AMD) |

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police,

    Defendants.

| | |
|---|---|
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, | No. 22-CV-7463 (RMB) (AMD) |

*Plaintiffs,*

v.

WILLIAM REYNOLDS in his official capacity as the Prosecutor of Atlantic

County, New Jersey; GRACE C.
MACAULAY in her official capacity as the
Prosecutor of Camden County, New Jersey;
ANNEMARIE TAGGART in her official
capacity as the Prosecutor of Sussex
County, New Jersey; MATTHEW J.
PLATKIN, in his official capacity as
Attorney General of the State of New
Jersey; and PATRICK CALLAHAN, in his
official capacity as Superintendent of the
New Jersey State Police,

*Defendants.*

## DECLARATION OF HENDRIK HARTOG

I, Hendrik Hartog, do hereby certify as follows:

### **Background**

1. I am the Class of 1921 Bicentennial Professor in the History of American Law and Liberty, Emeritus at Princeton University. I taught at Princeton University from 1992 to 2019, when I retired.  Prior to that, I taught at the University of Wisconsin Law School and the Indiana University School of Law.

2. I obtained my Ph.D. in History of American Civilization from Brandeis University in 1982.  I obtained my J.D. from New York University School of Law in 1973. I received my A.B. from Carleton College in 1970.

3. I am the author of five published books, including two books on New Jersey legal history.  I am also the coeditor of several other books, and the author of many articles in law journals and history journals.

4. Much of my scholarly life has been immersed in the question of how to read eighteenth and nineteenth century statutes, particularly local and regulatory statutes.  I have written a great deal about the social history of American rights, including writings on property law.  My scholarship has also focused on how constitutional doctrine has shaped legislative practices, as well as the question of how legislative practices and understandings have shaped constitutional doctrine.

5. My first book, *Public Property and Private Power: the Corporation of the City of New York in American Law*, 1730-1870 (1983) was about eighteenth century American statutes.

6. Early in my career as a scholar, I researched and published an article about eighteenth century regulatory practices, including efforts to limit hunting out of season. *See* H. Hartog, "The Public Law of a County Court: Judicial Government in Eighteenth Century Massachusetts," American Journal of Legal History, 20 (1976), 282-329.

7. I was a student of and for many years a close collaborator of (and occasional editor of) the late John Phillip Reid, who was, for the past fifty years, the leading scholar of rights discourses in Revolutionary Era America (see his five volume *Constitutional History of the American Revolution.*)

8. I have supervised graduate students whose dissertations and published articles focused on the history of eighteenth and nineteenth century statutory interpretation, and on officer's rights and duties, among other subjects.

9. Exhibit A contains a copy of my resume.

## Scope of Analysis

10. It is my understanding that the above-captioned cases present constitutional questions about New Jersey's 2022 law prohibiting carrying of firearms on private property without the express consent of the property owner. See subpart 24, Section 7, Public Law 2022 Chapter 131.

11. I have been asked to evaluate firearm trespass legislation of early New Jersey, including legislation contemporaneous with the enactment of the Second and Fourteenth Amendments.

12. I focus on the 18th century enactments:

    a. A 1722 Statute: "An Act to prevent killing of deer out of season, and against carrying of guns and hunting by persons not qualified." (Exhibit B).

    b. A 1769 Statute: "An Act for the more effectual preservation of deer in this Colony." (Exhibit C).

    c. A 1771 Statute: "An Act for the preservation of deer and other game, and to prevent trespassing with guns." (Exhibit D).

13. I have also reviewed 19th century legislative documents showing the continuation of the relevant provision in the 18th century statutes listed above. They include:

    a. An 1846 Statute: "An Act for the preservation of deer and other game, and to prevent trespassing with guns." (Exhibit E).

14. I have also reviewed a number of other historical documents, including relevant historical treatises.

15. My findings are informed by my review of the historical documents and my knowledge and expertise as a historian of early American legislation.

## Review of 18th Century New Jersey Gun Trespass Statutes

### *Statutory Goals*

16. In 1722, 1769, and again in 1771, the New Jersey colonial legislature enacted statutes that created a presumption, what in modern language is usually referred to as a default rule, that property owners refused permission to others, including other property owners, to carry guns on to their properties.

17. These 18th century statutes all framed as restrictions on the rights of to bring a gun on privately owned lands.  To read the colonial statutes, one has to think of them as marked by the enormous weight that the right to property held for colonial and early national white Americans.

18. One regulatory goal was making sure that deer were not slaughtered out of season, at a time when deer were for many a crucial source of protein.  But that was not the only regulatory goal of the statutes.

    a. The desire to restrict the season in which deer would be shot was qualified by the overarching desire to protect the interests of freeholding property owners. The desire to prevent hunting out of season was always countered by the over-arching value given to property in land.

    b. It is worth noting that the right of the landowner to hunt as he or she pleased on her or his property was validated in a separate paragraph in each of these statutes.  The statutes ensured that the property owner

could shoot deer found on his property whenever he wished, but that others could not.

19. Another explicitly named goal in the titles of the 1722 and 1771 Acts was preventing trespass with guns.

20. The specific goal that is apparent in provisions in each of the 1722, 1769, and 1771 Acts was to validate the power of landowners to regulate who should be permitted to enter onto their properties, and in particular to control who could bring guns onto those properties.

    a. Section 4 of the 1722 statute made it unlawful to "carry any gun, or hunt on the improved or inclosed lands in any plantation, other than his own" without written permission from the owner. *See* Ex. B.

    b. Section 1 of the 1769 statute made it unlawful to "carry any gun, or hunt or watch for deer, or set in any dog or dogs to drive deer or any other game, on any lands not his own" without written permission from the owner. *See* Ex. C.

    c. Section 1 of the 1771 statute made it unlawful to "carry any Gun on any Lands not his own" without written permission from the owner. It does not mention hunting. Other parts of the 1771 statute, such as section 2, deal with hunting game. But the first section concerned only carrying guns. *See* Ex. D.

21. A person would violate the above provisions by carrying a gun on another's property without written permission from the owner, regardless of whether the carrying of guns was in order to hunt game.

22. The aim of these provisions was to protect the powerful right of the property owners to prevent armed individuals from coming on to their property without license. Each of the above-listed statutes reveals a goal to protect the rights of the property holders, who were also the selectmen with voting rights at the time.

23. It was common for 18th and early 19th century statutes to have multiple goals. That sense of multiple purposes contained within a single statute was the norm in statutory drafting, particularly of what was then known as general or public legislation (as opposed to special legislation that granted particular privileges or franchises to particular individuals or communities).

*Default Property Rules*

24. These 18th and 19th century historical statutes and the 2022 subpart 24 provision all contain specifications of the traditional "bundle of rights" that pertain to the fee simple absolute that constitutes property ownership.

25. The 2022 statute shifts the default or the presumption from one that presumes that a licensee or visitor to someone's property <u>has</u> the right to carry a gun, unless the owner explicitly forbids it, to one that presumes as a default measure that the owner <u>does not</u> license gun owners to bring their weapons on to private property, unless the property owner has specifically licensed it.

26. In the above-listed provision in each of the 1722, 1769, and 1771 Acts, the presumption or default rule articulated was, in effect, an ordinary expression of property law. Structurally, such provisions are no different than property law rules are today—including the subpart 24 private property default rule enacted in 2022.

27. Any property regime is full of rules, many of which are explicit, some of which are not, that define the relations of owners to a world of others. Those default rules are typically articulated as a right /no-right relationship.

28. In this instance, a presumptive right to carry weapons on to property, which may or may not have preexisted the passage of the 1722 Act, became a no-right presumption, unless the property owner licensed that hunter or gun possessor.

29. Under the relevant provision in each of the 1722, 1769, and 1771 Acts, only explicit license by the property owner exempted the otherwise trespassing gun owner from the restriction on his freedom.

30. The gun owner who carried his weapon on to private property presumptively trespassed, unless he had prior license from the property owner to do so. When he trespassed, he was subject to a misdemeanor fine before a justice of the peace.

31. The statutory texts as enacted and reenacted from the mid-18th century through the 19th century were clear: that there was no right to bear arms on someone else's private property—even if that owner was silent as to consent. Instead, there was an absolute right to exclude firearms which extended to all real property.

*Scope Of Default Property Rule*

32. What lands counted as private lands to which one had implicit or direct notice that one could not bring guns onto them without explicit permission? Land on which one might theoretically hunt was obviously included. But the property rules expressed in the first provision in each of the 1769 and 1771 Acts provide that the same no-right presumption extended to all varieties of real property, including the typical "businesses" of the times.

33. The 1771 law applied to all privately held lands without limitation. Its text was straightforward and unqualified on this question: "any lands . . . for which the owner pays taxes [] or is in his lawful possession." And the statute went out of its way to mark that jurisdiction may fall to justices of the peace in towns and cities, not just rural justices. The 1769 statute similarly applied to "any lands … for which the owners pay Taxes [] or is in his lawful Possession."

34. Private business property in 18th century New Jersey would have encompassed taverns, leathersmiths and blacksmiths, pharmacies, seed stores, and merchants who bought and sold livestock. Thus, under the 1771 law, if one entered a blacksmith's shop, one needed the permission of the blacksmith or his agents if one meant to enter the space armed. Such a duty was not as such a restriction on the right to bear arms. It was, rather, an expression of how one lived as an armed white subject of the Crown and then, soon, as an armed free citizen of an American state.

35. The 1722 statute limited the right of the property owner (or, one might say, limited the constraint on the gun owner) to the property owner's "improved or inclosed lands in any Plantation."

36. The language of "improved or inclosed" in the 1722 Act was not a limitation of the provision to fenced-in land. Rather, it would have marked two ways an owner would have given notice of his possession of the property at issue. Fencing-in was one way to give such notice of possession, but there were others, such as recording in county deed books and paying of taxes.

37. There may have been at a time, early in the colonization and settlement of New Jersey, when white colonial settlers did not yet routinely record property records in county deed books and tax records may have been sparse. By the middle of the 18th century, however, the development of a recording system and tax collections would have clarified and given notice

both of who was a legal possessor and of the boundaries of possession.  *See* C. Priest, CREDIT NATION, 40, 44-45, 179 (2019) (noting the "New Jersey Assembly's efforts to create locally run institutions for publicly searchable title recording" in the first half of the 18th century).

38. In any event, in both the 1769 and 1771 statutes, no limitation as to "improved or inclosed" or "plantation" appeared.  Instead, the presumption of no-carry of firearms applied for land where anyone paid taxes or was in lawful possession of the land.

### *Historical Context*

39. All the evidence suggests that the relevant provision in each of these three 18th century statutes was not controversial.  I am not aware of any Second-Amendment challenge to these statutes.  Certainly, none in the several generations they remained in effect, in terms of the default rule each statute articulated requiring express consent before carrying guns on another's property. In the 18th century, general legislation usually occurred when there was a need to ratify existing practices.  Legislation occasionally intended to mark a change from past practices.

40. Nothing about these three 18th century statutes suggests that they marked a change from a prior rule that the presumption was that the property owner had to affirmatively mark that guns were not permitted.  Rather, the provisions in the statutes, particularly in 1769 and 1771, speak to the diversity of peoples that increasingly populated New Jersey, a diversity that required, in the minds of the legislators, specific and diverse penalties.

41. Regardless of whether these 18th century statutes ratified existing practice, established a new default rule, or clarified an ambiguity, they provided clear notice of the existence of the presumption that one could not carry guns on to private property.

42. This understanding continued through and well past the American Revolution and into the 19th century. Historical sources confirm the that the 1771 presumption that one may not carry guns onto the property of another without explicit license existed for most of the 19th century.

43. In James Ewing's treatise on "The Office and Duty of a Justice of the Peace," the section on "Hunting and Guning[sic]" begins "No person may carry a gun on any lands not his own, and for which the owner pays taxes,

unless he hath license or permission in writing from the owner, or owners or legal possessor." (Trenton, James Oram, 1805, 303).

44. The Legislature enacted a law in 1846, referenced above and in Ex. E, which contained substantially the same language in its Section 1 as did the 1771 Act, see Ex. D.  The above conclusions about the scope and operation of the 1771 statute's first provision thus apply equally to the 1846 statute's first provision.

45. Lucius Elmer's 1868 Digest of the Laws of New Jersey 362 (4th ed., Newark, 1868) contained the relevant provisions of the 1846 Act.  (Ex. F).

46. By 1895, the Legislature enacted a new law codifying a different presumption.  Under that new enactment on trespass, one was still presumptively forbidden to carry a gun onto private property for purposes of hunting, but only when the private property owner, occupant, lessee, or licensee has given "public notice." (Public Law 1895, ch. § 148 (approved Mar. 14, 1985).  (Exhibit G.)

47. In short, well after the passage of the 14th Amendment in 1868, the presumption that it was illegal to take a gun on to private property without prior affirmative permission by the property owner remained the rule of law.

## Conclusion

48. In sum, in 18th and throughout much of 19th century New Jersey, bringing arms onto the lands of another was presumptively illegal, unless the owner of those lands had affirmatively consented to the presence of those arms on his or her lands. This practice, which presumed the no-right of gun possessors to enter on to private property, was unqualified and unchallenged at the time of the passage of the 2nd Amendment, and it was still in force at the time of the passage of the 14th  Amendment.

I certify that pursuant to 28 U.S.C. § 1746 and under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing is true and correct.

_____

Hendrik Hartog
January 30, 2023