UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, AND ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC.,<br><br>     Plaintiffs,<br><br>v.<br><br>MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police,<br><br>     Defendants. | No. 22-CV-7463 (RMB) (AMD) |

| | |
|---|---|
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, *Plaintiffs,*<br>v.<br>WILLIAM REYNOLDS in his official capacity as the Prosecutor of Atlantic County, New Jersey; GRACE C. MACAULAY in her official capacity as the Prosecutor of Camden County, New Jersey; | No. 22-CV-7464 (RMB) (AMD) |

ANNEMARIE TAGGART in her official
capacity as the Prosecutor of Sussex
County, New Jersey; MATTHEW J.
PLATKIN, in his official capacity as
Attorney General of the State of New
Jersey; and PATRICK CALLAHAN, in his
official capacity as Superintendent of the
New Jersey State Police,
*Defendants.*

## DECLARATION OF DR. BRENNAN GARDNER RIVAS

1.     I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.     I am an Historian and Independent Scholar. My chosen professional name is Brennan Gardner Rivas. From 2021 until earlier this year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University. Before that, I was a graduate student in history who conducted research and administrative tasks on behalf of my professors, taught undergraduate survey courses, and worked at my university library. My educational background includes a Ph.D. in History from TCU, where my Thesis was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

3.     I have been retained by the State of New Jersey to render expert opinions in this case. I make this declaration on the basis of my training,

professional expertise, and research. For my work in this case, I am being compensated at a rate of $200/hour for preparatory work and $325/hour for court work.

4.      My CV, detailing my education, experience, and publications, is attached to this declaration as Exhibit A. I have written a number of articles related to the regulation of guns, especially as to the history of nineteenth-century weapon policies and the socio-political context that made them possible.

5.      For this engagement, I was asked to provide expert testimony about historical gun regulations that pertained to travelers, and nineteenth century gun regulations in Texas.

**Application of Public Carry Laws to Travelers & Transportation**

6.      Americans of the late eighteenth and nineteenth centuries had laws that broadly prohibited the carrying of firearms and other deadly weapons in public, including while travelling. Early versions of these regulations, particularly those enacted in the eighteenth century by colonial and early American legislatures, tended to draw heavily from legal language with deep roots in the English common law tradition, reaching at least as far back as the Statute of Northampton from 1328.[1] The Statute of Northampton generally prohibited the carrying of arms in "Fairs, Markets, nor in the Presence of the Justices or Ministers

---

[1] Patrick J. Charles, "The Faces of the Second Amendment Outside the Home: History versus Ahistorical Standards of Review," *Cleveland State Law Review* 60, no. 1 (2012), 7-40; Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *UC Davis Law Review* 55, no. 5 (June 2022), 2560-2566.

nor in no Part elsewhere."[2] The public spaces specifically named and protected under the Statute were the very public areas that people frequented in their daily lives—the town markets and gatherings, and the town itself under the direction of local officials, formed the very heart of community life.

7.     This tradition was absorbed into American law, where numerous colonies and states enacted similar measures that forbade someone to "go or ride" armed in public spaces. An early example provided that individuals shall neither "go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country,[3] upon pain of being arrested and committed to prison."[4]

---

[2] 2 Edw. 3, c. 3 (1328) (Eng.) (Ex. B); see also 25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (Ex. C) (if "any Man of this Realm ride armed covertly or secretly with Men of Arms against any other . . . shall be judged Treason.").

[3] In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2144-50 (2022), the Supreme Court suggested that the phrases "to the terror of the country" and "to the terror of the people" cabined these early statutes to prohibiting firearm carry only in a threatening manner. But the latest research, published after *Bruen*, shows that, according to common law, the act of carrying deadly weapons in public spaces was inherently terrifying and therefore a breach of the peace. See Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555-2556 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Patrick J. Charles, "The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2022, forthcoming), draft p.12 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.' ") [draft available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4222490].

[4] 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays (Ex. D). A non-exhaustive list of additional examples includes: 1835 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace.") (Ex. E); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) (Ex. F) ("…nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure,");

Under this scheme, no one was permitted to carry arms into public areas without having a justifiable reason. Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety.[5]

8.     In the nineteenth century, the language of American public carry regulations began to shift away from the inherited language of common law, and toward more explicit statutory prohibitions. These public carry laws generally prohibited the concealment of certain specified weapons in public spaces, and are therefore known as concealed-carry laws. The approach of prohibiting the carrying of concealed weapons spread rapidly, including in slaveholding states and those removed from the Atlantic coast.[6]

---

see also 1821 Me. Laws 285, ch. 76, § 1 (Ex. G) (simplified to a requirement that officials "cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State").

[5] The peace bond was one of many processes inspired by America's common law heritage. See Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 73-74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39, no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

[6] Examples include: 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 (Ex. H) ("That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine…"); Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State,

5

9.      The language of concealed carry laws might at first suggest that open carry of firearms was accepted and commonplace, but that was not the case. Individuals generally did not view concealed carry laws as giving permission to openly carry in populated places during a person's ordinary activities.[7] For example, in 1843, an appellate court in North Carolina stated, "No man amongst us carries [a firearm] about with him, as one of his every day accoutrements—as a part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment."[8] And a Louisiana case from 1856 held that a partially visible weapon was a violation of the concealed carry law because it was "the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."[9]

10.     As the nineteenth century wore on, concealed-carry laws became more likely to mandate a criminal penalty (often a fine) rather than engage the surety mechanism, and they also tended to provide a number of exceptions. These exceptions ranged from people fearing an imminent and deadly attack to peace officers and travelers. The statutes themselves varied from one state to another, and many left the definition of terms like "travel," "peace officer," and "journey" quite

---

A.D. 1837 (Ex. I) ("Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twenty-five dollars…").

[7] Mark Anthony Frassetto, "The Myth of Open Carry," *U.C. Davis Law Review* 55 (June 2022).

[8] *State v. Huntley*, 25 N.C. 418 (1843).

[9] *State v. Smith*, 11 La. Ann. 633 (1856).

ambiguous. In Texas, even exempted travelers were required to place their weapons in their baggage, which did not include saddlebags.[10]

11.    Although carry prohibitions made an exception for "travel," it was far from a blanket exception for people to go armed at all times outside their homes. To the contrary, the travel exception only confirms that nineteenth century carry prohibitions applied to individuals while going about in their communities.

12.    The travel exception was narrowly defined by state courts. The kind of "travel" which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern transportation. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life—courts, magistrates, constables, and the security of being among one's neighbors. To be a traveler was to venture outside one's community sphere and become vulnerable to dangers such as robbers and predatory animals.

13.    A case from 1879 held that: "The court decided the case on the ground that defendant, whilst stopping over at Marianna, could not be said to be on a journey, and should, to avoid a breach of the law, have deposited his pistols with his baggage, and not carried them on his person. This is correct, if the appellant was really wearing them, or either of them, as a weapon. The exception in the statute is to enable travelers to protect themselves on the highways, or in transit

---

[10] Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930," PhD diss. (Texas Christian University, 2019), 108-110. John Thomas Shepherd, "Who Is the Arkansas Traveler: Analyzing Arkansas's Journey Exception to the Offense of Carrying a Weapon," Arkansas Law Review 66, no. 2 (2013): 463-484.

through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others. Travelers do not need weapons, whilst stopping in towns, any more than citizens do. They should lay them aside, unless the delay be slight, and the journey soon resumed."[11] An Alabama appellate court affirmed the decision of a lower court judge who, even though he acquiesced that the defendant had a right to carry a concealed weapon while traveling on a dangerous stretch of road, instructed the jury that "if they further believed, from all the evidence in the case, that the defendant was in the daily habit of coming to the city, engaging in his business in the city from morning until evening, mingling with the inhabitants of the city in business and social intercourse, and carried a pistol concealed about his person during this time, not being justified or excused otherwise than for the reason of his having to travel" along the dangerous stretch of roadway, "then he would be guilty, as charged in the indictment."[12] A Tennessee decision rejected the idea that a "journey" meeting the standards of a travel exception "should embrace a mere ramble in one's own neighborhood across the lines of contiguous counties."[13] The court's final word was that "The evil intended to be corrected is the carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating—a habit which will ultimately convert a good man into an assassin, and a brave man into a coward."[14] These are only a small sample of the

---

[11] *Carr v. State*, 34 Ark. 448 (1879).

[12] *Eslava v. State*, 49 Ala. 355 (1873).

[13] *Smith v. State*, 50 Tenn. 511 (1872).

[14] *Smith v. State*, 50 Tenn. 511 (1872).

travel-related cases that formed the corpus of traveler-exception jurisprudence associated with nineteenth century concealed weapon laws.[15]

14.    Thus public carry laws in force during the late eighteenth and nineteenth centuries, whether they employed language from English common law or took the shape of concealed-carry laws, applied to public spaces in American communities large and small. The exceptions which some concealed weapon laws carved out for travelers remained closely guarded by appellate courts and did not apply to everyday travel.

## Firearm Prohibitions In Texas during the Reconstruction Era

15.    In 1870, the State of Texas enacted a law prohibiting individuals from carrying firearms in a broad range of sensitive places.[16] The statute provided:

> That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ballroom, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to

---

[15] See also *Darby v. State*, 23 Tex. Ct. App. 407 (1880), "He was not a traveler. He resided in Williamson county, and was merely going from his residence to the county site of said county, a distance of about eighteen miles, intending to return the next day. These facts certainly did not constitute him a traveler, within the common meaning of that word, and within the spirit of the statute." See also Shepherd, "Who Is the Arkansas Traveler," 466-482.

[16] 1870 Tex. Gen. Laws 63, ch. 46, § 1 (Ex. J).

locations Subject to Indian depredations ; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

16.     The historical context surrounding the 1870 Texas law is crucial to understanding its purpose. Several social and cultural forces converged during Reconstruction to make that period especially tumultuous in Texas and the South more broadly. One critical part of lawmakers' responses to these new societal concerns was to prohibit arms in certain public spaces, especially those that featured large gatherings of people. Although not all states enacted legislation similar to the 1870 law, those other states were not confronted with the unique social concerns in Texas that resulted in passage of the 1870 law.

17.     In Texas, the defeat of the Confederate cause led to political instability, racial violence, and a profound distrust of government institutions. Confederate sympathies there still ran high because Texans had not been conquered or occupied by U.S. Army forces during the war.

18.     Meanwhile, revolvers were flooding American consumer markets. After Samuel Colt's patent on his revolver design expired in 1857, other manufacturers began producing similar models for the United States military during the Civil War. After the war, demobilization ended those contracts, and gunmakers turned to American consumers to buy their pistols. The net result was more and cheaper pistols throughout the country[17], including in areas plagued by violence and social dislocation, such as postbellum Texas.

---

[17] Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as $1.40. For example, *see* digitized Sears and Roebuck catalog (1898), pp. 365-367. Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (*see* p. 367). Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as

19.     Another factor involved in Texas's experience with gun regulation involved demographic changes. Since the 1820s, Texas had consistently drawn immigrants from other parts of the United States, but that growth accelerated rapidly after statehood and the conclusion of the U.S.-Mexican War. In just the three years between 1847 and 1850, the population grew from an estimated 142,000 to 212,295 (a growth of nearly fifty percent). By the time of the 1860 census, the population reached 604, 215.[18] Even during the Civil War, tens of thousands of people moved to Texas, and the pace of migration accelerated rapidly between 1870 and 1900 as the state's population of roughly 800,000 grew to more than 3,000,000.[19] Many (and possibly most) of these newly engrafted Texans intended to farm or ranch, meaning that they would live outside of the towns and market centers; but rail construction enabled industrial development and the formation of towns, which led to a period of urbanization in postbellum Texas.[20] The market towns of Texas—rail stops and county seats—created more opportunities for altercations that could result in violence and crime.

20.     Following the Civil War, Texans from all walks of life, from fire-eating secessionists to reluctant Confederates and dedicated unionists, all recognized that there was a gun problem in their state. The governor elected in 1866, who represented a coalition of Confederate sympathizers called Conservatives, specifically asked the legislature to do something about the

---

$1.40 (*see* p. 365). For the 1898 Sears & Roebuck catalog online, *see* https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

[18] On population figures in Texas between 1847 and 1860, see Randolph B. Campbell, *Gone to Texas: A History of the Lone Star State* (New York: Oxford University Press, 2003), 205.

[19] On population figures in Texas between 1870 and 1900, see Campbell, *Gone to Texas*, 304.

[20] Texas went from having only 9 urban centers of 2,500 residents or more in 1870 to having 42 in 1900. See Campbell, *Gone to Texas*, 307.

problem. He said he did not believe "that it was intended by the Constitution to convey the idea that men and boys, vagabonds and vagrants, were to be licensed to have arms about their persons on all occasions."[21] He proposed a tax on all "pistols and weapons carried about the person," though disagreements about rates, terms, and other details prevented the proposal from being enacted.[22]

21.     During the late 1860s, the Conservatives fell from power in favor of a fledgling Republican party composed of Freedpeople and Unionists. They, too, agreed that there was a gun problem in Texas, and they determined to do something about it. Republican leaders at the convention agreed with the Conservatives about the need for gun regulation, but their experiences of persecution at the hands of secessionists, Confederates, Conservatives and others (all of whom ultimately coalesced into a resurgent Democratic party) made it a priority for them. Republicans in 1868 did much the same thing that we do now: they gathered as much information as possible about crime in order to understand the problem they faced and inform the route they might take to address it. They created a special Committee on Lawlessness and Violence that requested all counties to send information about crimes committed since 1865. Not all counties participated, but the committee's reports told a "frightful story of blood."[23] The committee ultimately uncovered 939 homicides between 1865 and the summer of 1868, a disproportionate number of which involved Freedpeople killed at the hands of whites.[24] Convention delegates also received the annual report from military

---

[21] *House Journal* (1866), 199-200.

[22] Ibid.

[23] *Journal of the Reconstruction Convention* (1868-1869), 194.

[24] *Journal of the Reconstruction Convention* (1868-1869), 193-203, 194. White and black Texans were murdered in about equal numbers, which is itself a dramatic overrepresentation of the state's African American population, which constituted about 30% of the state overall. To make

authorities, which told of the rise of the Ku Klux Klan, conspiracies to intimidate Black voters, and declared that "the civil law east of the Trinity river is almost a dead letter."[25] The information gathered by Republicans in 1868 and 1869 became the evidentiary foundation for a law-and-order platform that their candidates promoted in upcoming campaigns.[26]

22.     As a result of these factors, the legislative session that met in 1870 enacted a law for the state that prohibited all firearms and weapons in certain public spaces. A member of the state senate introduced the bill that ultimately became the 1870 sensitive spaces law, which made it a misdemeanor for anyone to "have about his person" deadly weapons at public gatherings. The prohibited weapons were "A bowie knife, dirk or butcher knife, or firearms, whether known as a six-shooter, gun, or pistol of any kind." It is important to note that this bill included the terms "firearms" and "gun," which would have applied to rifles and shotguns as well as pistols. Even more exhaustive than the list of prohibited weapons was that of the social settings in which public carry would be illegal: "any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place

---

matters worse, the overwhelming majority of freedman deaths were committed by whites (373 of 429), yet only ten white deaths came at the hands of freedmen.

[25] See Report and Declaration of Special Committee on the condition of the State concerning elections, in *Journal of the Reconstruction Convention* (1868-1869), 107-115.

[26] *Journal of the Reconstruction Convention* (1868-1869), 194.

where people may be assembled to muster or perform any other public duty, or any other public assembly… ."[27]

23.     The primary exemption created by the 1870 sensitive spaces law was a proviso for "any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law."[28] This would have effectively limited the carrying of weapons to peace officers and active-duty soldiers or militiamen engaged in their duties. Armed soldiers or other officials frequently guarded polling stations in Texas during Reconstruction due to the high incidence of voter fraud. The drafters in 1870 likely also envisioned sheriffs, deputies, marshals, and constables who were loyal to the United States as well as the new State Police force and active-duty members of the militia.[29]

24.     Subsequent iterations of the 1870 law incorporated the same exception, though they deviated slightly from the original language and structure. A later reenactment of the same law embedded the exception within one of the several clauses that made up the list of weapon-free spaces. It prohibited the carrying of weapons in various public spaces "or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,)… ."[30] The context surrounding the exception clearly indicates that the drafters intended it to cover the carrying of arms to militia musters or by duly authorized persons performing a public duty; in other words,

---

[27] 1870 Tex. Gen Laws 63, Ch. 46, § 1 (Ex. J).

[28] Ibid.

[29] On the Texas State Police, an organization that existed during Republican rule in Texas, see John G. Johnson, "State Police," *Handbook of Texas Online*, https://www.tshaonline.org/handbook/entries/state-police, published by the Texas State Historical Association.

[30] 1871 Tex. Gen. Laws 25, ch. 34 § 1 (Ex. K).

the exception applied to peace officers as well as soldiers and militiamen in actual service. When state lawmakers issued a revised penal code in 1879, the exception was relocated to a subsequent article which read: "The preceding article shall not apply to peace officers or other persons authorized or permitted by law to carry arms at the places therein designated."[31] Even though the format and phrasing of the exception changed, its substance did not—the exception was for peace officers and active-duty militia. The exception would not have reached ordinary, civilian gunowners, as there was no general gun permitting scheme in Texas at the time.

25.     Realizing that the sensitive places statute was not enough to sufficiently curb the violence in their communities, the Texas legislature in 1871 enacted a more comprehensive deadly weapons prohibition that incorporated the sensitive places law passed one year earlier.[32] Section 1 of the 1871 law prohibited both concealed and open carry of deadly weapons in public altogether while Section 3 expanded the prohibition on carrying deadly weapons in sensitive places. Lawmakers added as sensitive places assemblies for "amusement," like "any circus, show, or public exhibition of any kind," as well as those assemblies "for educational or scientific purposes."[33] In 1879, the statute and its several sections were reformatted in the penal code as a chapter concerning the unlawful carrying of arms.[34] The sensitive places law and its exception became Articles 320 and 321.

26.     In 1872, a series of convictions for unlawfully carrying arms made their way to the state supreme court. The Defendant William Daniels had been

---

[31] Penal Code of the State of Texas, (1879), Title X, Offenses Against the Public Peace, Chapter 4, Unlawfully Carrying Arms, § 321 (Ex. L).

[32] 1871 Tex. Gen. Laws 25, ch. 34 § 1 (Ex. K).

[33] Ibid.

[34] Penal Code of the State of Texas, § 318-323 (Ex. L).

convicted under Section 3 of the 1871 deadly weapon law, which was the updated sensitive places provision. He had gone to a church service with the handle of a butcher knife visible in his waistband. Two other appellants, William English and G. W. Carter, had been convicted under Section 1, which prohibited carrying deadly weapons (open or concealed) upon one's person or in one's saddlebags. The three cases were consolidated into one case, called *English v. State*[35], which addressed certain questions about Texans' constitutional and fundamental rights to carry weapons. A distinguished attorney who later joined the state supreme court argued that the 1871 deadly weapon law violated the Second Amendment to the US Constitution, that it violated the Article I, Sec. 13 of the Texas Constitution of 1869[36], and that it deprived Texans of their customary right to self-defense.[37] The court profoundly disagreed with these claims.

27.     The Chief Justice stated emphatically that "No kind of travesty, however subtle or ingenious could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit."[38] The court went on to say that: "[W]e do not intend to be understood as admitting for one moment, that the abuses prohibited are in any way protected either under the state or federal constitution. We confess it appears to us little short of

---

[35] *English v. State*, 35 Tex. 473 (1872).

[36] "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe."

[37] The opinion did not mention it, but Section 2 of the law provided that anyone convicted of publicly carrying a prohibited weapon could plead self-defense at trial; that exception did not technically apply to the sensitive places provision outlined in Section 3.

[38] *English*, 35 Tex. 473.

ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[39]

28.     The decision in *English* ultimately rested upon state police power to affirm the constitutionality of the deadly weapon law. The court held that whatever conduct offends against public morals or public decency comes within the range of legislative authority.[40] The goal of a weapon-free public sphere, then, justified the enactments required to achieve it. Furthermore, the justices did not believe that the Texas law deviated from the national norm. "It is not our purpose to make an argument in justification of the law. The history of our whole country but too well justifies the enactment of such laws. This law is not peculiar to our own state, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas. It is safe to say that almost, if not every one of the states of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration."[41] A subsequent court, this one staffed with Democrats rather than Republicans, reaffirmed the constitutionality of the deadly weapon law in a case decided in 1875.[42]

29.     In the late 1870s and throughout the 1880s, Texas appellate judges consistently applied the sensitive places law without questioning its

---

[39] *Id* at 478-79.

[40] *Id*. at 473.

[41] *Id.* at 479.

[42] *State v. Duke*, 42 Tex. 455 (1875).

constitutionality. In 1878 they decided that a Justice of the Peace court qualified as a "public assembly" when it was in session hearing a cause.[43] The same year, the court determined that a man deputized to carry out a specific arrest did not qualify as a peace officer exempt from the weapon ban at polling places.[44] In 1889, a teacher feared that local residents would interfere with an entertainment event taking place at his school, so he took a pistol with him (and ended up brandishing it). Texas appellate judges forcefully condemned the idea that teachers were authorized to carry weapons in schoolhouses, saying that "such an effect could not be other than pernicious, and should not be tolerated."[45]

30.      The majority opinion in *NYSRPA v. Bruen* treated the 1871 Texas statute as an outlier, but its discussion was limited to the first section of that law banning open and concealed carry of arms in public altogether. [46] Section 3 of the 1871 law prohibiting carry in sensitive places was not unique. *English* recognized as much when it concluded, "This law is not peculiar to our own state, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas."[47] That conclusion was not wrong as many states around that time enacted similarly broad sensitive places prohibitions. For

---

[43] *Summerlin v. State*, 1878 3 Tex. Ct. App. 444 (1878).

[44] *Snell v. State*, 4 Tex. App. 171 (1878)

[45] *Alexander v. State*, 11 S.W. 628 (Tex. App. 1889). The passage is worth quoting in full: "We can not believe that it was the purpose and intent of the Legislature to permit school teachers to carry prohibited weapons upon their persons in their school rooms among their pupils, or on the occasion of public assemblies in such school rooms. The law does not in terms accord them such a privilege, and, without a clearly expressed exception in such case, this court will not sanction a defense, the effect of which would be to authorize every school teacher in the State to carry prohibited weapons upon his person in our school rooms. Such an effect could not be other than pernicious, and should not be tolerated."

[46] 142 S. Ct. at 2153.

[47] *English*, 35 Tex. at 479.

example, in 1869, Tennessee lawmakers prohibited the carrying of deadly weapons "concealed or otherwise" at elections or "any fair, race course, or other public assembly of the people."[48] Similarly in 1870, Georgia lawmakers prohibited the carrying of deadly weapons "to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds."[49] Laws in effect in Missouri in 1879 and Oklahoma Territory in 1890 were nearly identical to the sensitive places law from Texas.[50] Vermont and Mississippi both prohibited weapons inside schools, with the Mississippi legislature prohibiting students at colleges from possessing deadly weapons on campuses or within two miles of them (effectively disarming college

---

[48] Ch. 22, 1869 Tenn. Pub. Acts 23[22] (36th Assembly, 1st Sess.), "An Act to Amend the Criminal Laws of the State," §2 (Ex. M). The section read in full: "That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon." The following section (§3) stated: "That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court."

[49] Act No. 285, 1870 Ga. Laws 421 (Ex. N). The list of prohibited weapons included "any dirk bowie-knife, pistol or revolver, or any kind of deadly weapon." There was also no implicit or explicit exception for open carry. Violators convicted received a fine ($20-50), imprisonment (10-20 days), or both.

[50] *Revised Statutes of the State of Missouri* (1879), ch.24, §1274 (Ex. O); 1890 Okla. Stat. 495-96 (Ex. P).

students within the limits of college towns).[51] Other laws prohibited the carrying of weapons at or near polling places, churches, and parks.[52]

## Additional Research Into Municipal Ordinances

31.    In addition to state legislatures, other jurisdictions had authority to regulate the carry of firearms and other weapons in public spaces.[53] For instance, the statewide 1870 sensitive places law from Texas was quite similar to a municipal ordinance from that same year in the city of San Antonio, one of the leading metropolitan and commercial centers in Texas. That ordinance prohibited the carrying of "a bowie-knife, dirk, or butcher-knife or any fire arms or arms,

---

[51] *Annotated Code of the General Statute Laws of the State of Mississippi* (1892), "Crimes and Misdemeanors," §1030 (Ex. Q). "A student at any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both." *Laws of Vermont*, Special Session (1891), No. 85, §2 (Ex. R). "A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars."

[52] 1870 La. Acts 159–60, "An Act to Regulate the Conduct and to Maintain the Freedom of Party Election," § 73 (Ex. S) (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); George Washington Paschal, *A Digest of the Laws of Texas*, 3rd ed. (1873) II: 1317-1318 (Ex. T) (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); John Prentiss Poe, *The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888* (Vol. 2, 1888), 1457 (Ex. U) (no carry by any person in Kent County on days of an election); 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, ch. 189 §1 (Ex. V) (no carry by any person in Calvert County within 300 yards of polls on election day); 1877 Va. Acts 305, Offenses Against The Peace, § 21 (Ex. W) (no weapons in church during services, or anywhere beyond one's on premises on Sundays); Oscar F. Greene, *Revised Ordinances of the City of Boulder* (1899), 157 (no one save city police officers shall carry weapons into public parks) (Ex. X).

[53] See, *supra* at n.52., especially examples from City of Boulder and Counties of Kent and Calvert, Maryland.

whether known as six-shooter, gun or pistol of any kind," or any "brass-knuckles, slung shot, club, loaded or sword cane, or any other weapon of offence or defence" into a series of public spaces within the city. The list included: "any church, or religious assembly, any school-room, or other place where persons are assembled, for educational, literary or scientific purposes, or into any ball room, social or wedding party, or other assembly or gathering, for amusement or instruction, composed of males and females, or to any election precinct in the city, on the day or days of an election, or into any Court room or court of Justice, or to any other place where people or individuals may be assembled, to perform any public duty, or shall go into any other public assembly, or shall enter any bar-room, drinking saloon or any other place where people resort for business or amusement or shall join or accompany any public procession… ."[54]

32.     It is likely that yet more municipal governments (in Texas and throughout the country) enacted sensitive places ordinances. These local laws are much more challenging to identify in the historical record, though, because compilations of historical ordinances have often not been preserved or digitized. The best access to municipal ordinances is often local newspapers, many of which have not been digitized, are no longer extant, or are incomplete. A thorough search of newspaper databases may yield more examples of municipal sensitive places laws, and yet more may be contained in the pages of old newspapers housed in archival collections or on microfilm. Identifying additional examples of these regulations would be a time-consuming process.

**Conclusion**

---

[54] "An Ordinance," *San Antonio Express* (San Antonio, Texas), December 23, 1870 (Ex. Y).

33.     Many American jurisdictions had public carry laws that generally prohibited people from carrying deadly weapons within the confines of towns and cities. Even though a sizeable number of these laws specifically prohibited *concealed* carry, the open carrying of pistols, bowie knives and other such weapons was not commonplace. The exemptions for these public carry laws sometimes included "travelers" or persons on a "journey" within their purview, but the case law from the time clearly shows that antebellum appellate courts associated "travelers" on "journeys" with people who were venturing beyond the protection of the law and beyond the limits of their community. Routine travel in areas where a person had recourse to legal protection did not fall within this definition.

34.     American jurisdictions also enacted special ordinances and statutes designed to protect public gathering places beyond simply courthouses and polling places. Some protected schools and college campuses, others applied to entire commercial districts and city centers during electoral proceedings, and yet more provided for the disarming of *all* public gatherings. Taking regulatory action to protect people assembled for entertainment, recreation, education, and civic purposes from potential violence is not unusual or ahistorical.

I certify that pursuant to 28 U.S.C. § 1746 and under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing is true and correct.


*Brennan Gardner Rivas*
Brennan Gardner Rivas
February 11, 2023