UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, AND ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, <br><br> Defendants. | No. 22-CV-7463 (RMB) (AMD) |
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, *Plaintiffs*, <br><br> v. <br><br> WILLIAM REYNOLDS in his official capacity as the Prosecutor of Atlantic County, New Jersey; GRACE C. MACAULAY in her official capacity as the Prosecutor of Camden County, New Jersey; | No. 22-CV-7464 (RMB) (AMD) |

ANNEMARIE TAGGART in her official
capacity as the Prosecutor of Sussex
County, New Jersey; MATTHEW J.
PLATKIN, in his official capacity as
Attorney General of the State of New
Jersey; and PATRICK CALLAHAN, in his
official capacity as Superintendent of the
New Jersey State Police,
*Defendants.*

## DECLARATION OF PATRICK J. CHARLES

Pursuant to 28 U.S.C. § 1746, I, Patrick J. Charles, declare and state as follows:

1.     I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration and testify based on my personal knowledge and information.

2.     I have been retained by the Office of the Attorney General for New Jersey as a historical and constitutional expert on Second Amendment matters. I also have expertise in legal history and its multiple uses in adjudicating constitutional questions.

3.     I have read the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111 (2022), and New Jersey has asked me to expound on the historical evidence that the Court relied upon to uphold restrictions on the carrying of dangerous weapons in schools and government buildings.

4.     Virtually all the information contained in this declaration is from research conducted prior to having been retained by the Office of the Attorney General for New Jersey on January 28, 2023. Beginning on that date, I have been compensated for my work on this declaration at a rate of $100 per hour.

## Background and Qualifications

5.     I am a historian, legal scholar, and author of dozens of articles and books on the Constitution, legal history, and standards of review. I received my L.L.M. in Legal Theory and History with distinction from Queen Mary University of London in 2014, J.D. from Cleveland-Marshall College of Law in 2009, and B.A. in History and International Affairs with honors from George Washington University in 2005. My writings on the history of the law have been cited by the Supreme Court of the United States, federal Circuit Courts of Appeal, federal District Courts, and State supreme courts. A true and correct copy of my curriculum vitae is attached as **Exhibit 1** to this declaration.

6.     For the past 12 years I have served as a historian for the United States Air Force (USAF) in several capacities, including deploying several times with Special Operations Forces (SOF) for contingency operations in Afghanistan and the Middle East. I currently serve as the Research Division Supervisor for the Air Force Historical Research Agency (AFHRA) located at Maxwell Air Force Base,

Alabama, where I oversee all historical information requests and archival research for the USAF.

7.     This declaration was compiled and completed outside my official duties for the USAF. Moreover, the contents and opinions expressed in this declaration are solely my own, and not those of the USAF, AFHRA, Department of Defense, or the federal government.

## *Bruen*, the "Sensitive Places" Doctrine, and the History of Carrying Firearms Into "Sensitive Places"

### I.     *Bruen* and the "Sensitive Places" Doctrine

8.     *Bruen* established a general test when examining the constitutionality of modern firearm regulations. First, the challenger must show that "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If the challenger succeeds in this pursuit, the "government must then justify its regulation by demonstrating that it is consistent with the Nation's tradition of firearm regulation." *Id*. at 2130. At this second step, the government is required to provide historical laws analogous—not identical—to the modern regulation. *Id*. at 2133. The *Bruen* Court went on to note that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

9.      One regulatory area that the *Bruen* Court expounded upon was that of

"sensitive places," *i.e.*, locations "where arms carrying could be prohibited

consistent with the Second Amendment." *Id.* (citations omitted). And in

expounding upon this rule, the Court singled out prohibitions on carrying in

"schools and government buildings" as two constitutionally permissive examples.

*Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). The Court

upheld arms carrying prohibitions at these two locations despite "the historical

record yield[ing] relatively few" examples. *Id.* In other words, the Court found it

"settled" that "these locations were [indeed] 'sensitive places'" because it was not

made "aware of [any] disputes regarding the lawfulness of such prohibitions." *Id.*

10.     In support of its conclusion, the *Bruen* Court cited two sources. Both

provided relatively few historical laws that *expressly* prohibited the carrying of

firearms in school and government buildings by the mid-nineteenth century. *See*

David. B. Kopel & Joseph S. Greenlee, *The "Sensitive Places" Doctrine: Location

Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 229-36, 244-47

(2018); Brief of Amicus Curiae the Independent Institute in Support of Petitioners,

*New York State Rifle & Pistol Association, Inc. v. Bruen*, No. 18-280, at 11-17.

This historical research is consistent with my own, and is expounded upon in Part

II.

II.     **The History of "Sensitive Places" Through the Nineteenth Century**

11.     For nearly five centuries in England, from the late thirteenth century through the late eighteenth century, what constituted a "sensitive place" in which arms bearing could be prohibited was rather broad. It encompassed densely populated areas, as well as areas where people regularly congregated or conducted commerce. The text "fairs" and "markets" language contained within the 1328 Statute of Northampton makes this abundantly clear. 2 Edw. 3, c. 3 (1328) (Eng.) (**Exhibit 2**). So too do several other English legal sources. For instance, in 1351, Edward III issued a proclamation declaring it was unlawful to "go armed" with dangerous weapons "within the City of London, or within the Suburbs, or any other places between the said city and the Palace of Westminster…except the officers of the King…" *Royal Proclamation as to the Wearing of Arms in the City, and at Westminster; and as to Playing at Games in the Palace at Westminster,* MEMORIALS OF LONDON AND LIFE 268-69 (H.T. Riley ed., 1868) (**Exhibit 3**). Similarly, in John Carpenter's 1419 treatise *Liber Albus*, it stipulates that "no one, of whatever condition he be, go armed in the said *city [of London] or in the suburbs*, or carry arms, by day or by night, except the va[]lets of the great lords of the land, carrying the swords of their masters in their presence, and the serjeants-at-arms of his lordship the King, of my lady the Queen, the Prince, and the other children of his lordship the King, and the officers of the City, and such persons as shall come in their company in aid of them, at their command, for saving and

maintaining the said peace; under the penalty aforesaid, and the loss of their arms and armour." JOHN CARPENTER, LIBER ALBUS: THE WHITE BOOK OF THE CITY OF LONDON at 335 (Henry Thomas Riley ed., 1861) (**Exhibit 4**).

12.    As it pertains particularly to express prohibitions on carrying dangerous weapons into schools and government buildings, English law is relatively silent. This is because English prohibitions on going armed in "sensitive places" were worded quite broadly, and therefore there was no need for the law to carve out individual locations. Churches or places of worship is the one notable exception. *See* 4 Hen 4, c. 29 (1403) (**Exhibit 5**) ("no Man be armed nor bear defensible armor to Merchant Towns Churches nor Congregations in the same, nor in the Highways, in affray of the Peace or the King's Liege people").

13.    The historical record shows that armed carriage restrictions and the English common law against 'going armed' made their way to the United States. *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 31-32 (2012). Additionally, historians can state with certainty that state and local governments were well within their authority to prohibit armed assemblies circa the late eighteenth century, no matter whether said assemblies were deemed the militia or not. *See* Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9

GEO. J.L. & PUB. POL'Y 323, 326-27, 374-90 (2011); AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES, AND THE EVIL CONSEQUENCES THEREOF, SEPTEMBER SESSION, CHAPTER VIII (Mass. 1786) (**Exhibit 6**); AN ACT FOR THE MORE SPEEDY AND EFFECTUAL SUPPRESSION OF TUMULTS AND INSURRECTIONS IN THE COMMONWEALTH, JANUARY SESSION, CHAPTER IX (Mass. 1787) (**Exhibit 7**); AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES (N.J. 1797) (**Exhibit 8**); AN ACT TO PREVENT HUNTING WITH FIRE-ARMS IN THE CITY OF NEW-YORK, AND THE LIBERTIES THEREOF (NY 1763) (**Exhibit 9**); AN ACT AGAINST RIOTS AND RIOTERS (Pa. 1705) (**Exhibit 10**); *see also* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES 126 (2d ed., 1829) (**Exhibit 11**) (noting that the Second Amendment "ought not…in any government…be abused to the disturbance of the public peace," which included the assembling "of persons with arms, for an unlawful purpose"). This is because it had long been understood that any armed assemblage required the consent of government officials.[1]

---

[1] This understanding of the law goes all the way back to the 1328 Statute of Northampton. *See* 2 Edw. 3, c. 3 (1328) (Eng.) (**Exhibit 2**); *see also* 3 CALENDAR OF CLOSE ROLLS, RICHARD II, 1385-1389, at 399-400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914) (**Exhibit 12**); 1 CALENDAR OF CLOSE ROLLS, RICHARD II, 1377-1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914) (**Exhibit 13**).

14.     By the mid-to-late nineteenth century, express location specific armed

carriage prohibitions began to be codified.[2]  One example is that of Columbia,

Missouri, which in 1890 passed an ordinance prohibiting the carrying of dangerous

weapons "into any church, or place where people have assembled for religious

worship; or into any school room, or place where people are assembled for

educational, literary or social purposes; or into any court room, during the sitting of

court, or to any election precinct on any election day; or into any other public

assemblage of persons met for any lawful purpose…" *Chapter XVII: Carrying*

*Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc.*, May 22, 1890,

*reprinted in* GENERAL ORDINANCES OF THE TOWN OF COLUMBIA, IN BOONE

COUNTY, MISSOURI 34, 35 (Lewis M. Switzler ed., 1890) (**Exhibit 16**).[3] The

Columbia ordinance mirrored Missouri state law.[4]

---

[2] There are, of course, a few exceptions, such as two mid-seventeenth century Maryland laws
that prohibited dangerous weapons within legislative assemblies. 1647 Md. Laws 216 (**Exhibit
14**); 1650 Md. Laws 273 (**Exhibit 15**).

[3] *See* 1877 Mo. Laws 158, 166 (**Exhibit 17**) (1877 Missouri state law empowering city and town
councils, such as Columbia, with the authority to "prohibit and punish the carrying of firearms
and other deadly weapons, concealed or otherwise"). Like Columbia, Webb City, Missouri and
Huntsville, Missouri enacted similar laws. *See Ordinance No. 577: An Ordinance Defining What
Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing
Penalties Therefor*, May 15, 1905, *reprinted in* REVISED ORDINANCES OF THE CITY OF WEBB
CITY, MISSOURI, 1905, at 99-100 (1905) (**Exhibit 18**); *An Ordinance in Relation to Carrying
Deadly Weapons*, July 17, 1894, THE REVISED ORDINANCES OF THE CITY OF HUNTSVILLE,
MISSOURI OF 1894, at 58-59 (1894) (**Exhibit 19**).

[4] The ordinance mirrored an 1874 Missouri state law titled "An Act to Prevent the Carrying of
Weapons in Public Assemblies of the People." *See* 1874 Mo. Laws 43 (**Exhibit 20**) (prohibiting
persons from "go[ing] into any church or place where people have assembled for religious
worship" with "any kind of fire-arms" or "deadly weapon"); 1875 Mo. Laws 50 (**Exhibit 21**)
(same). In 1883, the Missouri state law was amended to increase the fine. *See* 1883 Mo. Laws 76

15.    Stockton, Kansas provides another example. In 1887, Stockton prohibited the carrying of dangerous weapons "into any church or place where the people have assembled for public worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons …or shall go upon the public streets or public places of the city…" *Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons*, July 1, 1887, *reprinted in* STOCKTON REVIEW AND ROOKS COUNTY RECORD (KS), July 1, 1887, at 1 (**Exhibit 24**).

16.    In addition to localities like Columbia, Missouri and Stockton, Kansas several states enacted laws that expressly defined so-called "sensitive places" where armed carriage could be prohibited. For instance, an 1869 Tennessee law prohibited the carrying of dangerous weapons into "any election…fair, race course, or other public assembly of the people." PUBLIC STATUTES OF THE STATE OF TENNESSEE SINCE THE YEAR 1858, at 108 (James H. Shankland ed., 1871) (**Exhibit 25**). Not long thereafter, Texas prohibited the carrying of dangerous weapons "into any church or religious assembly, any school-room or other place where persons

---

(**Exhibit 22**); *State v. Reando* (Mo. 1878) (**Exhibit 23**) (Missouri Supreme Court decision upholding 1874 law as constitutional, describing the law as "nothing more than a police regulation, made in the interest of peace and good order, perfectly within the power of the legislature to make.").

assembled for educational, literary, or scientific purposes, or into a ball room,

social party, or other social gathering, composed of ladies and gentlemen, or to any

election precinct on the day or days of any election, where any portion of the

people of this state are collected to vote at any election, or to any other place where

people may be assembled to muster or to perform any other public duty, or any

other public assembly…" 1870 Tex. Gen. Laws 63 (**Exhibit 26**). That same year,

Georgia provided that "no person in said State of Georgia be permitted or allowed

to carry about his or her person any . . . pistol or revolver, or any kind of deadly

weapon, to any Court of justice, or any election ground, or precinct, or any place of

public worship, or any other public gathering in this State…" 1870 Ga. Laws 421

(**Exhibit 27**). In 1889, Arizona law provided that "[i]f any person shall go into any

church or religious assembly, any school room, or `other place where persons are

assembled for amusement or for educational or scientific purposes, or into any

circus, show or public exhibition of any kind, or into a ball room, social party or

social gathering, or to any election precinct on the day or days of any election,

where any portion of the people of this Territory are collected to vote at any

election, or to any other place where people may be assembled to minister or to

perform any other public duty, or to any other public assembly, and shall have or

carry about his person a pistol or other firearm . . . he shall be punished by a fine

not less than fifty nor more than five hundred dollars, and shall forfeit to the

County the weapon or weapons so found on his person." 1889 Ariz. Sess. Laws 16

(**Exhibit 28**). Then there was the state of Oklahoma, which in 1890 prohibited the

carrying of dangerous weapons "into any church or religious assembly, any school

room or other place where persons are assembled for public worship, for

amusement, or for educational or scientific purposes, or into any circus, show or

public exhibition of any kind, or into any ball room, or to any social party or social

gathering, or to any election, or to any place where intoxicating liquors are sold, or

to any political convention, or to any other public assembly..." 1890 Okla. Stat.

495 (**Exhibit 29**).

17.   Looking at these local and state "sensitive places" laws from a macro

level—it is safe to conclude that come the mid-to-late nineteenth century state and

local governments maintained the authority to prohibit the carrying of dangerous

weapons in a variety of "sensitive places" where people were known to

congregate.[5] Such "sensitive places" categories included 1) churches and places of

---

[5] It worth noting that several localities viewed the "sensitive places" doctrine as extending across their respective territorial limits. *See, e.g.,* A DIGEST OF THE LAWS AND ORDINANCES FOR THE GOVERNMENT OF THE CITY OF HARRISBURG, PENNSYLVANIA IN FORCE JANUARY 1, A.D. 1906, at 557-58 (1906) (**Exhibit 30**) (1873 ordinance prohibiting the open or concealed carrying of "any pistol, dirk-knife, slung-shot or deadly weapon, within the city limits...except police officers..."); THE REVISED ORDINANCES OF PROVO CITY, UTAH 96 (1893) (**Exhibit 31**) ("Every person who shall wear, or carry upon his person any pistol, or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon within the city limits of this city is guilty of an offence, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both fine and imprisonment."); THE REVISED ORDINANCES OF PAYSON CITY, UTAH 84 (1893) (**Exhibit 32**) ("Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon

worship; 2) places where large public assemblies generally took place, *i.e.*, parks,

town squares, and the like; 3) polling places and other buildings where political

activity generally took place; 4) schools and institutions of higher learning; 5)

places where events of amusement took place, *i.e.*, places where people congregate

for large planned events; and 6) bars, clubs, social venues, or anywhere in which

alcohol or psychoactive or mood altering drugs were purchased or consumed.

---

within the limits of this city is guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both fine and imprisonment."); THE REVISED ORDINANCES OF TOOELE CITY, UTAH 87 (1893) (**Exhibit 33**) ("Every person who shall wear, or carry upon his person any pistol, or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon, is guilty of an offence, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both such fine and imprisonment."); *An Ordinance to Prohibit Intoxication, Breach of Peace, Carrying Deadly Weapons, the Use of Obscene Language, the Discharge of Fire-Arms, and to Close Places of Amusement on Sunday in the City of Wallace, Kansas*, Jan. 31, 1889, *reprinted in* WALLACE COUNTY REGISTER (KS), Feb. 9, 1889, at 2 (**Exhibit 34**) ("Any person who shall be found carrying on his person a pistol, bowie knife, dirk or other deadly weapon shall upon conviction be fined in any sum not exceeding $25 or by imprisonment in the city jail not exceeding 30 days; Provided however that this section shall not apply to any peace officer of the state, counties or cities of this state and provided further that if it shall appear to the court trying the offense that the accused was engaged in any legitimate business or calling that would necessitate the carrying of any such weapons, such persons shall be acquitted."); *Ordinance No. 97: Ordinance Related to Carrying Deadly Weapons*, May 17, 1882, *reprinted in* BURLINGTON DEMOCRAT (KS), May 26, 1882, at 2 (**Exhibit 35**) ("That is shall be unlawful for any person hereafter to carry on his or her person a pistol, bowie-knife, dirk or other deadly weapon, concealed or otherwise, within the corporate limits of said City of Burlington, *Provided*: This Section shall not apply to any person carrying a deadly weapon while in the performance of his or her legitimate business, wherein the law commands such person to carry a deadly weapon."); *Miscellaneous Ordinance*, Jun. 24, 1871, *reprinted in* ABILENE WEEKLY CHRONICLE (KS), Jun. 29, 1871, at 3 (**Exhibit 36**) ("That any person who shall carry within the corporate limits of the city of Abilene or commons, a pistol, revolver, gun, musket, dirk, bowie knife, or other dangerous weapon upon his person, either openly or concealed, except to bring the same and forthwith [to] deposit it or them at their house, store room, or residence, shall be fined seventy-five dollars.").

18.    Additionally, what historically buttresses that each of these categories were generally understood to be "sensitive places" is the fact that there is no historical evidence that informs otherwise. As far as I am aware, not one nineteenth century court of law found any of these "sensitive places" categories to be unconstitutional. The same is true for nineteenth century legal commentary—not one calls these sensitive places categories into constitutional question. This is rather important because *Bruen* denotes that when it comes to the "sensitive places" doctrine a *lack* of historical evidence disputing their lawfulness *presumes* their constitutionality. 142 S. Ct. at 2133.

19.    I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on 12 February 2023

PATRICK J. CHARLES