



DATE DOWNLOADED: Tue Feb  7 22:19:52 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Benjamin Vaughan Abbott. Judge and Jury: A Popular Explanation of Leading Topics in
the Law of the Land (1880).

ALWD 7th ed.
Abbott, Benjamin Vaughan. Judge & Jury: A Popular Explanation of Leading Topics in
the L of the L& (1880).

APA 7th ed.
Abbott, B. (1880). Judge and Jury: Popular Explanation of Leading Topics in the Law
of the Land. New York, Harper & Bros.

Chicago 17th ed.
Abbott Benjamin Vaughan. Judge and Jury: A Popular Explanation of Leading Topics in
the Law of the Land. New York, Harper & Bros.

McGill Guide 9th ed.
Benjamin Vaughan Abbott, Judge & Jury: A Popular Explanation of Leading Topics in the
L of the L& (New York: Harper & Bros., 1880)

AGLC 4th ed.
Benjamin Vaughan Abbott, Judge and Jury: A Popular Explanation of Leading Topics in
the Law of the Land (Harper & Bros., 1880

MLA 9th ed.
Abbott, Benjamin Vaughan. Judge and Jury: A Popular Explanation of Leading Topics in
the Law of the Land. New York, Harper & Bros. HeinOnline.

OSCOLA 4th ed.
Abbott, Benjamin Vaughan. Judge and Jury: A Popular Explanation of Leading Topics in
the Law of the Land. New York, Harper & Bros.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

## Chapter XXXIII.

### FIREARMS AND FIREWORKS.

So many calamities and fatal accidents arise from careless use of gunpowder that the legal responsibility for those who use or misuse firearms or fireworks has been steadily growing more strict.

#### THE RIGHT TO BEAR ARMS.

There is an important distinction between firearms and fireworks. Some general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war. The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, practises in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right. No doubt, a person whose residence or duties involve peculiar peril may keep a pistol for prudent self-defence. But these are very different habits from keeping pistols for playthings; carrying them carelessly in the pocket; toying with them at picnics, on board steamers, and in saloons; exhibiting them to curious girls; lending them to boys; firing at random with them upon city sidewalks. These are practices upon which every good citizen will frown, and which the law of the land is every year more explicitly discouraging. For grown men to use pistols as playthings should be everywhere rebuked. They should be firmly refused to children. Carrying them for defence, in the more settled parts of the land, savors of cowardice rather than of prudence; a well-behaved man has less to fear

from violence than from the blunders of himself and friends in managing the pistol he might carry as a protection. And the grounds on which the right to keep and practise with weapons of war is protected lend no support whatever to an indiscriminate use of fireworks for amusement. These are restricted, and may be even prohibited altogether by the authorities. If allowed, they are merely tolerated; and the users are held to a strict responsibility.

As to guns and pistols, then, the citizen who practises with them is in the exercise of a constitutional right; and to mulct him for any unfortunate consequences, proof is needed that he was careless. He must exercise due care to avoid doing mischief. *Sic utere tuo ut alienum non lœdas*—use your gun so as not to hurt another man—is a time-honored maxim. In July, 1866, the pleasure yacht *Rambler*, as she came to anchor at her rendezvous in the Hudson portion of the harbor, fired the customary salute of one gun to the other vessels of the yacht squadron. The wadding struck a passenger upon a Hoboken ferryboat passing near, knocking him down and breaking his arm, rendering it useless for life. He sued the owner of the *Rambler*. The latter escaped judgment upon the ground that he was not in any manner in fault. He was not on board, did not authorize the firing, and had given general orders that the yacht's gun should not be fired without directions from him. It was the master of the yacht who directed the salute. The court said that under these circumstances the owner was not liable. He had done all in his power. It was no necessary part of the business of navigating the yacht, for which the master was hired, to fire complimentary salutes; if he did so, he acted on his own responsibility, and he, if anybody, was the proper person to pay damages.*—The Colonel of a New York regiment was less fortunate in a suit brought against him. This case occurred in

---

* Haack *v.* Fearing, 5 *Robt.* 528.

July, 1855.  The regiment was in camp near Kingston, and, in the early morning, practised target-firing, using, of course, ball-cartridges; and some few of the guns were not discharged.  The Colonel ordered these taken to the rear and unloaded, which was supposed to have been done.  One rifle, however, was over-looked.  In the afternoon, the men were paraded for some ex-ercises involving firing with blank-cartridges.  When the Colonel gave the word " fire !" the regiment was fronting a crowd of spectators, who supposed themselves in perfect safety, as only blank-cartridges were to be used.  But the ball from the gun remaining loaded killed a child in its mother's arms, also break-ing the mother's arm.  The jury found a verdict of $1500 against the Colonel, and it was sustained.  The Colonel argued that he ordered the firing in the performance of a public duty as a military officer training his men, and was not liable.  But the court said that such use of firearms requires a very high degree of care to avoid injury; and unless he could show that he had given all proper orders, and taken precautions to have them faithfully obeyed, and that the injury was done in violation of his judi-cious orders, he was chargeable.*  The case would have been differently decided, doubtless, if the woman had been in any re-spect careless.—In Indiana, a man lent his gun to four boys, who, when they had done with it, loaded it up heavily and re-turned it to the owner.  This was done as a trick, and to have him hurt by the recoil when he discharged the gun next time. He did fire it, and was hurt, and then sued the boys.  But they proved that he had suspected the trick, and tested the loading be-fore he fired, and knew it was overloaded with six inches of charge. The judges said he had no business to fire the gun, and must bear the consequences himself, as they were partly his own fault.† One has a general right to practise with firearms; but the least

---

* Castle *v.* Duryee, 1 *Abb. App. Dec.* 327 ;  32 *Barb.* 480.
† Smith *v.* Thomas, 23 *Ind.* 69.

carelessness exposes him to pay for all injury done.   And, no doubt, whoever amuses himself with firearms on the Fourth of July or any other day, in crowded streets and public places, is liable for any injury that is caused, except where the injured person is in fault.

### DISPLAY FIREWORKS.

The rule relative to all mere display fireworks is probably stricter than that which applies to firearms, properly so called. To secure the training of the people in the use of weapons, the Constitution declares that individuals may keep them ; hence, to obtain damages for an injury from a gun or pistol, one must show some impropriety in time, place, or manner of using it.   There is no such right as to rockets, squibs, and crackers ; and as they are necessarily dangerous things, one who uses them for amusement should be held—except, perhaps, where he keeps fully within his own land—liable, irrespective of any carelessness.   He takes the risk.

Thus, with respect to rockets, there was a case in Boston at a time when a Grant Club organized a torch-light procession.   The plan was that, as the procession passed along the street, the residents who sympathized with the club in politics should greet it with various fireworks.   Mr. Fisk and his son George were in the vestibule of their house letting off Roman candles ; and Mr. Wait, directly opposite, was firing rockets, and one of these rockets, instead of taking course upward, flew across the street and put out George's eye.   Mr. Wait's lawyer argued that he could not be charged, because he and Fisk were both members of the Grant Club, and had united in getting up the celebration, and so it was a joint affair, and Fisk was in fault as well as Wait. But the court said that had nothing to do with Wait's carelessness in aiming rockets across the street, when the plain rule for rockets is *sic itur ad astra.*   And the jury awarded $2000.

---

* Fisk *v.* Wait, 104 *Mass.* 71.

It seems strange there have not been lawsuits by persons injured by the fall of rocket-sticks, but we do not remember that any such case has been before the courts.

As to fire-crackers, it was upon the Fourth of July, 1857, that a man was driving his horse and wagon through a Poughkeepsie street, when a patriot, aged fourteen, threw a lighted cracker under the horse.  Its explosion frightened the horse, which dropped dead.  Lawsuit; in which the lawyers argued that the wagon-driver knew that Poughkeepsie boys were accustomed to fire these crackers on the Fourth, and he had no business to be driving through their streets; also, that the horse had heart-disease, and died of that, not of the cracker at all; also, that he was so old he would have died very soon anyway.  But the owner recovered his damages.  And the court said that the whole business of exploding crackers in the streets on the Fourth or any other day is unlawful.*  Mere custom cannot justify it.  The crackers are tolerated, but not authorized; and whoever fires them to the injury of travellers acts at his peril, and is liable for all the damage he causes.

### CARRYING CONCEALED WEAPONS.

One token of progress towards a restricted use of firearms is seen in the laws which now prevail in most of the States against carrying concealed weapons.  It was formerly claimed that because a man has a right to own a pistol he might carry it in any manner he pleased.  But the legislatures interposed by saying, "Carry a pistol if you please, but you shall carry it openly.  Hang it in a belt, or hold it in your hand, or keep it in sight so that people can see you go armed, and keep out of your way accordingly.  You shall not hide it in a pocket or carpet-bag."  And the courts have sustained laws like these, for they do not interfere with the substantial right of self-defence.  Another ex-

---

* Conklin *v.* Thompson, 29 *Barb.* 218.

ample of this progress is in decisions that the constitutional right is limited to correspond with its purpose—the cultivating an ability of armed defence—and does not extend to toy and petty weapons. The meaning is that the citizen has the right to keep and bear such weapons as are used in civilized warfare. The little pistols that are sold and carried so much for the mere amusement of the lad of the period probably have no constitutional protection.

### "I DID NOT THINK IT WAS LOADED."

Another aspect of this matter is seen in various decisions in recent years subjecting persons to severe responsibility for annoying others with unloaded pistols. It was considered in former times that if the pistol was not loaded, no offence was committed in aiming it at a bystander, for by no possibility could it do harm. And the every-day excuse for what is called an accidental shooting is, "I did not think it was loaded." But now many courts hold this no excuse. It is lawless and criminal behavior to brandish a gun or pistol at another person, whether the weapon is loaded or not. For the act must be considered from his point of view. If one sees a pistol aimed at himself, the annoyance, insult, or sense of alarm, or provocation may be just as great, although it is not loaded, if he does not assuredly know it is not. What if it be not loaded? What great difference does that make, after all? The one who holds the butt may know that the barrel is innocuous; but what can the one who fronts the muzzle know as to the fact? Why, then, should it be thought a trivial matter to point even unloaded firearms at one's friends and neighbors? It ought to be universally understood and realized that threatening a person with even an unloaded weapon, or making believe to shoot with a pistol which has no charge, is a rude, unmannerly, disgraceful act. It is often as likely to give alarm as if the weapon were really loaded; and the feelings of the person threatened are the true

test of the mischief done, not the belief or supposition of the actor.

The story narrated by the complainant in a North Carolina case was this. He was approaching church one Sunday morning, and saw a group of people at the door. One of these—coincidentally named Church, by-the-way—called to him to go back. He refused to go back. Church then stood up and said, "I have a pistol," and placed his hand on a pistol that was belted around him. Then the complainant began to walk back. Church followed him, saying he would shoot him; and as he walked, he drew the pistol, but did not cock it or aim it. The court held that Church was punishable. Drawing his pistol and threatening to shoot was an offer of violence, and constituted an assault, and the fact that the pistol was not cocked made no difference.*

In an Iowa case, a man accompanied by a dog was crossing a neighbor's field where sheep were pastured, when the dog attacked and bit some of the sheep. This angered the sheep-owner (upon whom the report humorously bestows the name Shepard); and he came forward with his gun, and attempted to shoot the dog. The owner of the dog expostulated, saying, "Don't shoot my dog. I will pay for any damage he has done." But Shepard shot the dog. Then there was a prolonged controversy. At last Shepard pointed the gun at the owner of the dog, and threatened to shoot him. For this he was brought to trial. He argued that there was no offence, for the gun, which was an old-fashioned single-barrelled one, had just been fired at the dog, and had not been reloaded. It could not possibly have been discharged. But the court adjudged it an assault; for, they said, the offence of aiming a gun at another is to be determined by the apprehension of the person at whom it is aimed, not by the intent of the offender.†

About six years ago, a quarrelsome fellow named White,

---

* State v. Church, 63 N. C. 15.          † State v. Shepard, 10 Iowa, 126.

driving in his wagon along the highway, came to a spot where several men were mending the road. One of these, Sullivan, asked White to drive in the middle of the road. White answered rudely, and Sullivan inquired, pointedly, what he meant. Then White took up a gun which he had in the wagon, and aimed it at Sullivan, and then at another of the workmen, Harrington, and said, "I have got something here that will pick the eyes of you." White was tried for this. It was proved that Harrington believed for the moment that White would shoot, and was alarmed. The judge told the jury that if White, within shooting distance, menacingly pointed a gun at Harrington, which Harrington had reasonable cause to believe was loaded, and if he were in fact alarmed, and with good reason, there was a criminal assault, whether the gun were in fact loaded or not.*

Once upon a time, in Texas, Flournoy was drinking in Grace's bar-room. He became drunk, excited, and abusive. Grace tried to quiet him. He drew a pistol, which a bystander pulled away from him. "Why," said he, "it isn't loaded!" And it had no cap upon it. Flournoy was tried for an assault with a deadly weapon. His lawyer argued that an unloaded pistol, without a cap, is not a deadly weapon. But the judge left that question to the jury, who found Flournoy guilty, and he was fined $150. The Supreme Court approved this, and said, "If juries would generally impose more exemplary punishment for offences of this character, reckless men would feel the necessity of more self-restraint, and offences committed by violence would be less frequent." †

There have been other decisions of the courts to the same general effect. They show that courts regard aiming guns and pistols at people as a rude and lawless act, even if they are not loaded. If done with intent to alarm, it may be a criminal of-

---

* Commonwealth *v.* White, 110 *Mass.* 407.

† Flournoy *v.* State, 16 *Tex.* 31.

fence, and proving that the weapon was not loaded makes no difference. If done in jest, it cannot fail to excite the contempt and reprehension of every right-minded person at the spirit and temper which can find pleasure in such jests.

### SHOOTING IN SELF-DEFENCE.

Few principles of law are more uncertain and variable in their application to a particular case than the doctrine of self-defence. That there is a right to kill an assailant in defence of one's own life is perfectly well established; and some generalities in regard to it are declared, in about the same terms, year after year in successive law-books. It is agreed that there must be a well-founded apprehension that one's own life is in imminent danger; but the danger need not be real; if it be apparent, so as to convince a cool, reasonable man, this is enough. Thus, if one should be attacked by an enemy who had threatened his life, or by one appearing like a robber on the highway, who should level a pistol at his head with every demonstration of intending to shoot, he might very well believe his life in immediate peril, and be excused for shooting in advance, if he could, notwithstanding the assailant's pistol was not loaded, so that there was not, actually, any danger. The apparent peril would give an excuse. It must be a peril inferred from acts of violence; threats alone, however boisterous or often repeated, do not present a case for killing in self-defence. And the person claiming this defence must be substantially free from blame in the commencement of the affray; one cannot commence a fight and then, when it proceeds to extremity, kill the other and rely on a plea of self-defence, unless the jury, in view of special circumstances, should be more liberal in applying the rule than the law-books are in prescribing it. It used to be said that a person attacked must retreat if possible, and as far as he could—must " back to the wall," as the old phrase was—before he might exercise the right of self-defence; but this rule has been hacked by so many ex-

ceptions and qualifications that there is not much of it left. Modern trials have proceeded more upon the theory that a peaceable, innocent man, rightfully in the place where he stands, may keep his ground and defend himself against unlawful violence without first retreating. There is, however, an important and clear limitation, that one who has retreated and reached a place of safety cannot arm himself and then return and renew the quarrel, and plead self-defence for afterwards shooting the other. The judiciary naturally incline strongly against persons taking the law into their own hands and settling their quarrels by violence. In the judicial view there is a legal remedy for every wrong, and all persons are expected to avail themselves of it if possible. Only when circumstances absolutely prevent a resort to the law is violence excused. The strong tendency of opinion is that if a man escapes out of a fight, he should apply for legal protection, should have his enemy bound over to keep the peace, and not return better armed and renew the conflict. Juries sometimes view such cases differently from judges. And as the system is to submit the question to the judgment of twelve common-sense men, with general instructions from the judge as to all legal doctrines involved, there is ample opportunity for both the theory of the law and the general conscience of mankind to co-operate in the decision.

The peculiar feature of going into the house to get a gun after an altercation has commenced has actually occurred in several cases, at the South and West particularly. In Tennessee there was a quarrelsome bully named Garret, a drinking man, and known to be of very passionate, dangerous temper when intoxicated, who had an old grudge against Williams, and who had made various threats against that individual in the hearing of third persons, who had informed him of them. One day when Williams was at work for a distiller in the neighborhood, testing or bottling a quantity of brandy, Garret came to the place and began drinking some of the brandy, and picking a quarrel with

Williams.  Williams said to his employer, the distiller, " I must
leave here, or I shall have a difficulty with Garret."  The distil-
ler advised him to go.  Accordingly he went to the distiller's
house, about a quarter of a mile away, where he had left his gun
when he began work.  Half an hour afterwards the employer
and other workmen went to the house, and Garret went with
them, brandishing a pistol.  This, however, he put up when he
actually reached the house.  While he sat on his horse in front
of the house, talking with the distiller, Williams came to the
door and said, " Garret, you have come for a fuss, and, if you
don't mind, you will get it."  Garret said, " Let it come."  Then
Williams stepped back into the house, got his gun, came to the
door again, and shot Garret dead.  Although there was a good
deal of proof that Garret had been for several months previous
threatening to kill Williams, and had repeated these threats among
the party on the trip to the house at this very time, yet the
judges decided that the case could not be called self-defence,
because, at the time of the shooting, Williams was not in any
immediate danger.  He had withdrawn safely from the quar-
rel in the distillery, and Garret had not done any act at the
house to renew the danger.  He came out from the front door
and discharged his gun, when, to all appearance, he might have
stayed inside in safety.*

In Nevada, Schooley and Smith were drawn into a violent
quarrel, arising from Smith charging Schooley with having sto-
len whiskey from him, which Schooley denied and resented.
Smith went into his house and got his gun, cocked it, and ad-
vanced upon Schooley, who ran a few rods, as if to escape ; but
when he came upon a big stick that lay in his way, he picked it
up for a club, and returned upon Smith.  The latter then low-
ered his gun, and exclaimed that he " was only fooling."  Not-
withstanding this, Schooley continued to rush towards him with

---

* Williams *v.* State, 3 *Heisk.* 376.

the club. When he came within nine feet of Smith, Smith raised his gun again and fired, and Schooley was killed. The judge decided that this could not be allowed as a case of self-defence. Smith was himself too much in fault, in commencing the violence and precipitating the conflict, to set up that plea.*

In Alabama, two men quarrelled over a game of cards. One claimed to be winner and the other would not pay. The claimant went away, obtained his gun, and returned with it. As he came back to the spot of the quarrel, the other approached him in a threatening manner, as if, perhaps, he would draw a pistol. The claimant retreated, with his gun presented, saying, "Stand back!" The other cried, "Shoot! I can shoot as quick as you." Upon this the claimant fired his gun, which killed the other player, while the latter drew and discharged a pistol, which, however, did no harm. The judges said that this could not be called self-defence, because the accused, after the first quarrel, went away and returned with his gun to shoot the other player if he refused to do what the accused requested.†

Which person was in fault in commencing the quarrel may sometimes have an important influence in deciding the question of self-defence. An example is in the nearly forgotten shooting of young Austin by Selfridge in State Street, Boston, in 1806. In that instance, a son endeavored to avenge political abuse of his father. The case is noted in the law-books, but their references to it do not disclose the circumstances out of which the shooting arose; these are to be learned from pamphlets of the time, now rare. The city authorities had decided upon a public semi-political dinner for the Fourth of July. The committee, of which Benjamin Austin, the father, was chairman, employed a caterer named Eager to supply the dinner; he did so; the authorities and invited guests ate it, and Chairman Austin then

---

* State *v.* Smith, 10 *Nev.* 106.
† Lewis *v.* State, 51 *Ala.* 1.

disputed the bill.  A suit was brought on behalf of Eager, and payment enforced.   In this suit Selfridge was Eager's attorney, and some gossip arose to the effect that Eager did not, in the first instance, apply to Selfridge, but that the latter solicited the suit.   Benjamin Austin circulated this story pertinaciously and offensively.   As rules of professional ethics then very stringently forbade such soliciting, and the two men were prominent in the opposing parties, the charge made Selfridge very indignant.   Through a friend, he furnished Austin with proofs, which the latter accepted, that the charge was unfounded ; yet Austin would not make a satisfactory acknowledgment.   Thereupon Selfridge published in the newspapers a card charging Benjamin Austin with having circulated an infamous falsehood and refusing satisfaction for it, and declaring him a coward, a liar, and a scoundrel.   Austin retaliated with a counter-card.   The quarrel at this stage was taken up by Charles Austin, a son of Benjamin, upon his father's behalf.   He intercepted Selfridge while walking in State Street, and made an attack upon him with a heavy cane ; upon which Selfridge drew a pistol and shot him fatally. On trial of Selfridge for murder, the judge told the jury that Selfridge was wholly unjustifiable in publishing the card he did about the elder Austin.   To call a man " coward, liar, and scoundrel " in the public papers is not justifiable, as courts view such matters, by any circumstances whatever.   But the abuse, bad as it was, could not possibly justify young Austin in making the street attack with the cane.   No words, however aggravating, no libel, however scandalous, can authorize a son of the person abused to resort to violence in retaliation or revenge.   A son may aid his father, if beaten, and if the assailant is killed the son will be excused ; but neither son nor parent can justify resorting to violence to avenge an injury consisting in words, however opprobrious, or writings, however defamatory.   Austin's attack being thus legally unjustifiable, Selfridge was acquitted on the ground of self-defence.

346          LIFE IN CITY AND COUNTRY.

Much depends, however, in these cases upon what the jury think of the characters of the two men and of the circumstances of the case. It is only where they have found the accused guilty that the question has come before the bench of judges for decision. There has been, doubtless, a multitude of cases in which the jury have acquitted the accused, and no formal law decision made. It has never been customary to spend any time in arguing about the law of these cases after a jury has rendered an acquittal.

A very remarkable and difficult case involving these principles occurred in 1879 in New Jersey. The details will be generally remembered. The leading facts were: A, being in B's employ as coachman, misbehaved so as to give cause for dismissal. B told him to give up the keys and leave. A met the notice in what was from one point of view turbulent defiance, from another a rightful refusal to leave until his wages should be paid. B, probably meaning no more than to enforce his rights as he understood them, went to the house for a pistol as a means of protection; returned; and, without desiring or threatening to kill A, resumed insisting that A should surrender the keys and depart. But he became satisfied, and with apparent good grounds, from A's acts and demeanor, that the latter intended shooting. To anticipate this and disable A from doing it, he gave what was not intended to be, though it was, a fatal shot with the pistol he had brought from the house. Of course this chain of circumstances presented as one element the returning armed to the conflict. Another element was also involved—the right to eject an unlawful intruder. There is a general understanding that a householder may shoot a burglar. But how far does such a right extend? Can it be asserted towards any one who wrongfully insists upon remaining after he has been rightfully ordered to leave? A customer visits a store, buys goods, and disputes the change offered. A tenant or boarder denies that his month is up. A passenger proffers an insufficient ticket to the conductor.

Either one ought, we will say, to yield in the dispute, leave peaceably at the demand of the rightful owner, and sue at law for the money due him or the damages sustained. But suppose he will not; may he be shot like a burglar, or must the owner, in his turn, keep the peace and seek redress in the courts? Certainly a servant, who has rightfully entered the premises, and is remaining in the assertion of a right, stands on a different footing, even if his claims are not tenable, from a midnight criminal. Probably the limit of the rule would be that a householder has the right gently to expel an intruder, and to use such force as is necessary in doing this.

But in the case described A resisted to the extent of threatening, or preparing to shoot B. The jury probably reduced their view of the facts to something like this: that B supposed, sincerely, that it was right and necessary for him to resume the possession of the barn, which he had temporarily intrusted to A, and that he might meet dangerous resistance in endeavoring to do so; that he armed himself to repel any such danger; and that he fired when he believed that resistance which imperilled his own life was seriously threatened. Accordingly they found a verdict of acquittal on the ground of self-defence.