# REPORT AND
# RECOMMENDATIONS
## OF THE

# GOVERNOR'S
# ADVISORY
# COMMISSION
# ON GAMBLING

*Trenton, New Jersey*

*June 30, 1988*

**New Jersey State Library**

NJ
10
G191
1988a

NJ 10 G191 1988a

NJ Governor's Advisory Comm.
on Gambling.

Rep. & recommend. of the
Gov. Adv. Comm. on Gambling

| MAY 20 1990 | | | |
| AUG 14 1996 | | | |
| MAY 10 1993 | | | |
| JUL 07 1993 | | | |

Case 1:22-cv-07464-RMB-AMD   Document 89-39   Filed 02/13/23   Page 3 of 282 PageID: 2290

# REPORT AND RECOMMENDATIONS

## OF THE

## GOVERNOR'S ADVISORY COMMISSION ON GAMBLING

New Jersey State Library

Trenton, New Jersey

June 30, 1988

## GOVERNOR'S ADVISORY COMMISSION ON GAMBLING

June 30, 1988

The Honorable Thomas H. Kean
Office of the Governor
CN-001
Trenton, New Jersey 08625

Dear Governor Kean:

On behalf of the Commissioners, I am very pleased to enclose a copy of the final report of the Governor's Advisory Commission on Gambling. As you will see, this report is the product of the efforts of all of the Commissioners. Over the past 15 months, the Commission has labored long and hard. We have listened to the testimony of many experts, heard from scores of citizens and government officials, debated important issues among ourselves, and have spoken with executives from all aspects of legalized gambling.

To the extent possible, given our time and financial constraints, we have tried to present a balanced view inclusive of the diverse interests and backgrounds of our Commissioners and witnesses.

Please do not consider this report to be a final, completed study. Gambling in New Jersey, we have found, is alive and vital. The mixture of gambling issues, economic and social interests, as well as public policy concerns is a rapidly changing and complex montage. This report is merely the effort of a few public servants and citizens to capture some of the many viewpoints concerning gambling in the State of New Jersey.

I would like to extend my thanks to all of those who participated in this effort. In particular, the members of the Commission and their designees, and Drs. Bruce Ransom and Michael Frank, of the South Jersey Center for Public Affairs at Stockton State College, who served as Corporate "Secretary" to the Commission.

A special thank you to you for allowing me to serve as Chairman of this Commission.

Cordially yours,

Steven Batzer, Chairman
Governor's Advisory Commission
on Gambling

SB/nl

Pomona, New Jersey 08240-9988 (609) 652-4657

ii

# PREFACE

The South Jersey Center for Public Affairs (SJCPA) at Stockton State College is a non-partisan unit of the college whose purpose is to provide data, analyses, and programs on issues of statewide and regional importance to citizens, public officials, and business leaders in New Jersey. SJCPA began its operations in 1986 to assist in improving the policymaking process in New Jersey.

SJCPA's mission is to provide regional data and policy analyses to public- and private-sector leaders so that decisions are formed by dialogue and critical thinking rather than by heated partisan rivalries and special-interest pressures. To accomplish its objectives, SJCPA sponsors a variety of programs and services aimed at improving the policymaking process.

The report is based on over 14 months of deliberation and testimony before the Commission. Additional copies or information concerning the efforts of the Governor's Advisory Commission on Gambling may be obtained directly from the South Jersey Center for Public Affairs.

The South Jersey Center for Public Affairs
Stockton State College
Pomona, New Jersey 08240
(609) 652-4657

Bruce Ransom, Ph.D.                                                                 Michael L. Frank, Ph.D.
Executive Director                                                                  Research Director

# TABLE OF CONTENTS

                                                                                          **Page**

LETTER TO THE GOVERNOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PREFACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      ESTABLISHMENT AND PURPOSE OF THE COMMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      MEMBERSHIP OF THE COMMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      WORK OF THE COMMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FINDINGS AND RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      GAMBLING AS PUBLIC POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        Overview and General Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        Institutionalizing Review of Gambling as
          Public Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          Consolidation & Centralization of all
            Gaming Related Law Enforcement Functions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          American Indian Tribal Gaming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        Gambling Promotion: A Uniform Code and Curbs
          on Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        Competition: Racing as a Casualty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        Dependence on Gaming Revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      SOCIAL IMPACT: THE PROBLEM OF COMPULSIVE, INDUCED
        AND JUVENILE GAMBLING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      ECONOMIC IMPACT OF GAMBLING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      CRIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        Organized Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        Casino Crime: Casinos as Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        Street Crime and Legalized Gaming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        Impact of Legal Gaming on Illegal Gambling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF CONTENTS (Continued)

Page

Appendix A:  List of Members of the Advisory Commission
on Gambling ......................................................... 21

Appendix B:  Commission's Workplan ..................................................... 22

Appendix C:  Chronology of Commission Meetings ............................................ 23

Appendix D:  Voting Record of Commissioners on Recommendations .............................. 26

Appendix E:  Consultants' Reports
Ken Harrison, Ph.D. ...................................................... 34
Richard Lehne, Ph.D. ..................................................... 72
Henry R. Lesieur, Ph.D. ................................................... 104

Appendix F:  Anthony J. Parrillo's Reports
Gambling and Crime and Criminal Activity in New Jersey ...................... 166
Proposal to Consolidate Legalized Gaming Enforcement ....................... 182

Appendix G:  Subcommittees' Recommendations
Economic Impact ........................................................ 193
Compulsive Gambling .................................................... 195
Public Policy ........................................................... 198

Appendix H:  Arnold Wexler's Submissions
Recommendations ....................................................... 205
William Eadington's Paper ................................................ 206

Appendix I:  Dr. Charles I. Zadikow's Recommendations ..................................... 214

Appendix J:  Walter N. Read's Comments .................................................. 217

Appendix K:  Bishop Herluf M. Jensen's Submissions
Recommendations ....................................................... 221
Comments ............................................................. 223

Appendix L:  Thomas D. Carver's Comments ............................................... 225

Appendix M:  Senator Richard J. Codey's Comments ......................................... 229

# I. INTRODUCTION

As an historical matter, gambling has been considered so sensitive, and of such concern to the people of this State, that it is governed by the New Jersey Constitution itself. No form of gambling may take place in this State unless it is specifically authorized by that document, having first been approved by a majority of our voters in a special election.

Pursuant to the constitutional provisions, the voters of New Jersey have, at various times over the last 50 years, authorized a number of different gambling activities in which people may legally participate. Today, pari-mutuel wagering on horse races, bingo and raffles, a state lottery, casino gambling, and amusement games are the forms of gambling available in the Garden State. In addition to providing opportunities for recreation and entertainment, gambling directly impacts upon the lives of New Jerseyans in other, very important ways.

## A. ESTABLISHMENT AND PURPOSE OF THE COMMISSION

Interest and concern regarding both the positive and negative aspects of gambling in New Jersey resulted in the State Legislature and Governor agreeing to establish a 19-member Governor's Advisory Commission on Gambling ("Commission"). The purpose of the Commission was to study the social and economic impact of legalized gambling in New Jersey, and to advise the Governor and Legislature with regard to the means by which state public policy might address collectively all components of gambling.

The bill creating the Commission, A-1453, was sponsored by Assembly Speaker Chuck Hardwick. Acting Governor Chuck Hardwick signed the bill into law on October 6, 1986. The Commission's specific legislative mandates were:

a.  to study the social impact of gambling upon the lives of the residents of New Jersey;

b.  to examine the role of legalized gaming as a revenue raising operation; and

c.  to determine the best way to conduct legalized gaming in this State.

Established under Chapter 115 of the Laws of 1986, the Commission is the first body created by the State to examine all forms of gambling with a view towards codifying the interrelated elements of gambling policy. The Commission's primary mission was to report its findings on the social and financial impact of the major forms of gambling operations and make recommendations to the Governor and Legislature on broad legislative and administrative issues that will apply to each of the different forms of gambling.

At the ceremonial signing of the enabling legislation, Acting Governor Hardwick instructed the Commission to:

. . . find a way to maximize the positive effects that gambling can bring to New Jersey, while identifying and minimizing its negative impact. The course that this Commission charts for our State will determine the place and influence of gambling in New Jersey well into the 21st Century. The State needs to study how gambling is best regulated so that New Jersey will always manage gambling, and not be managed by it. The Commission also must examine the State's responsibility to people who are hurt by gambling. New Jersey cannot simply enjoy revenues from the gambling we allow and encourage without also counting the cost of it.

The legislative mandate and the charge of Acting Governor Hardwick instructed the Commission to look comprehensively, for the first time ever, at the major aspects of gambling in a coordinated manner, rather than in a segmented fashion, as has occurred over the years.

## B. MEMBERSHIP OF THE COMMISSION

The Commission is composed of 19 members who represent a broad cross-section of interests including members of the public, representatives of the various gaming industries and public officials whose responsibilities impact on legalized gaming in New Jersey. According to the enabling legislation, the Commission's membership consists of: three public members appointed by the Governor; three public members

1

appointed by the Speaker of the General Assembly; and three public members appointed by the President of the Senate. Other members include the Attorney General, Commissioner of Health, State Treasurer, Commissioner of Education, Counsel to the Governor, Chairman of the Casino Control Commission, Chairman of the New Jersey Racing Commission, Chairman of the State Lottery Commission, Director of the Council on Compulsive Gambling of New Jersey, and Chairman of the Atlantic City Casino Association (renamed the Casino Association of New Jersey).

## C. WORK OF THE COMMISSION

The public work of the Commission commenced on April 24, 1987. Given its broad mandate, the many complex issues thereby engendered, the dynamics of the varied aspects of the gambling industry, and the financial resources available, the Commissioners quickly determined to concentrate their efforts on meaningful, yet manageable, areas of inquiry. Aided by its research arm, the South Jersey Center for Public Affairs at Stockton State College, whose executive director, Dr. Bruce Ransom, served as the Commission's staff director and secretary with Dr. Michael Frank as research director, the Commission selected four seemingly discrete yet clearly critical and ultimately interwoven topics to pursue: 1) Gambling as Public Policy; 2) Compulsive Gambling; 3) Economic Impact; and 4) Crime and Criminal Activities.

Having chosen the general matters to be investigated, the Commission then concluded to focus on specific aspects of these categories in order to further refine, and efficiently manage, the fact-gathering process. With respect to Gambling as Public Policy, the Commission identified a number of topics to be addressed in order to develop a comprehensive understanding of the present status of gambling in this State. The Commission determined to develop a detailed record regarding the history of the development of each of New Jersey's major forms of gambling, including an examination of the economic and political context shaping the consideration of each form of gambling with specific emphasis on the original intent of the particular enabling legislation. A review of the initial legislative process teaches about the social, economic and political forces that meshed to bring about the legalization of that form

of gambling activity, but a review so limited does not provide a full enough perspective for a thorough analysis of present-day gambling. Consequently, the Commission's research agenda included a consideration of the regulatory policies, and changes in and of those policies, regarding these major varieties of gambling and as expressed in and by relevant administrative agency practice. Further, in recognition of the State's fiscal interest in the proceeds of gambling activity, the Commission sought to discuss the merits of continuing to fund State programs through tax revenues generated by legalized gaming. Finally, no appraisal of the public policy implications of gambling would be complete without both a description of the current and emerging policy issues affecting gambling and a consideration of the legislative options that may be necessary to deal with and resolve these concerns. These subjects formed the final component of this first major category of Commission concentration.

Gambling, while a form of entertainment, necessarily relies for its success on the participation of the individual gambler. Unfortunately, the many available forms of legalized gaming have seemingly led to a proliferation of gambling by minors and a substantial and dramatic increase in the number of people affected by a compulsive gambling disorder. A study of these deleterious ramifications of legalized gaming was a high priority of the Commission. Thus, the Compulsive Gambling segment of the Commission's agenda included a survey of the incidence, geographical distribution and demographic characteristics of pathological gambling among New Jersey residents. This survey included testimony regarding the nature of the disorder, and a description of the profound social, economic and psychological problems resulting from compulsive gambling. The Commission also reviewed the treatment facilities available in New Jersey. Finally, the Commission explored the costs to the State arising from compulsive gambling as well as solutions thereto with particular emphasis on the State's role in the treatment and eradication of compulsive gambling.

The third major category of the Commission's exploration involved the Economic Impact of the gaming industry. The Commission concluded that a proper study of New Jersey's gaming industry necessitated a searching analysis of the economic costs and benefits, both direct and indirect, of each form of

gambling. Moreover, any consideration of the overall impact of gambling in New Jersey required a systematic study to determine the demographic and economic profile of gamblers in New Jersey. Thus, the Commission attempted to gather relevant data on this topic as well. Finally, the Commission studied the effects of gambling on employment trends, the retail trade, and real estate development.

The final major area that the Commission decided was a most crucial aspect of a broad review of the condition of legalized gaming was the relationship, if any, between gambling and Crime and Criminal Activity. Therefore, the Commission undertook to study the relationship between gambling activities and criminal behavior. Such a study required an overview of the role of each component of the law enforcement community in the prevention, investigation and prosecution of gaming-related crime. In this connection, several law enforcement experts testified before, and at the request of, the Commission. Of course, such a study also required the Commission to develop pertinent information regarding crime attributable to the availability of gaming, criminal involvement in gambling activities and the incidence of, and relationship between, street crime, crime on the casino floors and white collar crime.

Segmenting the Commission's mandate into four major areas of inquiry permitted the Commission and the staff to maximize the opportunity to provide the Governor and Legislature with guidance regarding the gaming industry. After the initial organizational meeting in April 1987, the Commission commenced a series of meetings, generally monthly, which concludes with the issuance of this report on June 30, 1988. During the course of its work, the Commission conducted several public hearings, and considered the testimony of over 40 witnesses, including gaming operators, state regulators, members of the law enforcement community, concerned

citizens, mental health professionals, and recovering compulsive gamblers. Furthermore, the Commission employed several consultants in the fields of compulsive gambling (Dr. Henry Lesieur), public policy (Dr. Richard Lehne) and economics (Dr. Kenneth Harrison) who have rendered valuable reports and studies which are appended to this Report and Recommendations. These studies, occasioned by the lack of relevant, current research in certain focus areas, filled an important information gap. Because of temporal and budgetary restrictions, however, they constitute only a small portion of the research this Commission would have preferred to have undertaken.

Additionally, the Commissioners were afforded important insights into the unique perspectives of various diverse and interested constituencies through their submission to the Commission of position papers. *In toto* the evidence adduced during the hearing process, the testimony of the many witnesses, the data and opinions garnered from the consultants' reports and position papers, and the field work of the staff comprise the record upon which this Report is premised.

The final phase of the Commission's work consisted of the rendering of findings and recommendations based on the record as a whole. To advance this process, the Commission formed several subcommittees coinciding with the four major area of inquiry and focus. These subcommittees in turn deliberated and presented their conclusions to the full Commission for further discussion, consideration and final vote. In order for a specific proposal to be adopted as a formal recommendation of the Commission, it had to receive the support of a simple majority — 10 of 19 members. As noted throughout this Report, only some of the many issues considered by the Commission lent themselves to consensus resolution and therefore appear herein as formal recommendations.

# II. FINDINGS AND RECOMMENDATIONS

## A. GAMBLING AS PUBLIC POLICY

### 1. Overview and General Conclusions

New Jersey began legalized gambling in 1939 with the introduction of horse racing. Today, almost 50 years later, New Jersey offers more different forms of legal gambling than any other state in the nation. Because of the growth of this industry and the lack of any mechanism to formulate overall and long-term gambling policy, the Commission was created and generally charged with the responsibility for analyzing the impact of the variety of gambling opportunities on the people of this State. It was thus recognized, perhaps for the first time, just how far gambling has been allowed to infuse itself into the social and economic fabric of our State, and the corresponding need to assess the effects and desirability of this phenomenon.

In carrying out its overall mission, this Commission has met with limited success. With reference to its specific statutory mandate, this Commission studied both the benefits and burdens of legalized gambling and considered how best these various activities should be conducted. Despite our best efforts, however, we have been able to reach only certain conclusions.

As to *benefits*, it is generally acknowledged that when legalized gambling is proposed, it is linked to some worthwhile public purpose. For example, an 8% tax on casino revenues is designated for programs for the elderly and disabled, and another 1.25% reinvestment requirement is earmarked for redevelopment projects in Atlantic City and across the State. The 8% tax has raised more than $1 billion to date, while the reinvestment requirement is expected to gross more than $1.5 billion over 25 years. The New Jersey Lottery, which supports state education programs and institutions, added over $472 million to general revenue in fiscal year 1987. Together, casinos and the lottery account for the lion's share of gambling revenues which now support 7% of the State budget, with horse racing making a small contribution. Thus, judged solely by their role as revenue-raising operations,[1] and when compared to original projections, both casino gaming and the lottery have been enormously successful, while horse racing, which can be traced to the same historical origin, has had to look elsewhere for its continued justification and rationale.

Although the benefits derived by the State from the generally painless taxation of legalized gambling activities are obvious, the *burdens* occasioned by such activities may be more easily hidden, harder to measure or quantify, and slower to reach the level of public awareness needed for their proper identification and resolution. We refer, in particular, but not exclusively, to the social costs associated with street crime and its resultant strain on municipal law enforcement resources as well as compulsive, induced and juvenile gambling. While this Commission was unable to determine the exact scope and extent of compulsive gambling in New Jersey, we recognize this problem to be on a disturbing rise, and the solutions to this problem simply have not kept pace with the acceleration and promotion of legalized gaming in this State. Similarly with street crime, the Commission has not established any independent causal connection with legal gaming, although we cannot ignore the historical attraction of the parasitical elements (namely loansharks, prostitutes, disorderly persons) especially to casinos and the increase in Index Crime in Atlantic City since the advent of casino gaming in 1978. Our inability to measure precisely the social impacts of legal wagering, however, does not detract from the seriousness of the concerns we have identified as real social burdens and of the need for remediation.

Just as important as the benefit/burden analysis is the determination of how New Jersey's various forms of legalized gambling are to be *conducted*. The answer practically suggests itself—namely, in a manner which maximizes the positive effects and simultaneously minimizes the negative impacts so that, on balance, the public benefits clearly and compellingly outweigh the societal costs of these experiences. It appears that this can best be achieved by governmental insistence upon gambling operations being conducted in strict conformity with the public purposes and goals which underlie their respective constitutional and statutory authorization.

First and foremost, each form of gambling must never be considered an end unto itself, but rather

4

should be viewed as part of an overall legislated plan designed to achieve expressly worthwhile public purposes, and should be ultimately judged by the fulfillment of those statutory promises. Second, each component of legal gaming in this State should remain limited and restricted so as to avoid unchecked growth, limitless competition, and undue inducement, and should minimize the social and governmental costs associated therewith. New Jersey, for instance, has wisely minimized the potential problems inherent in a "wide-open" legalization of casinos by choosing to develop a more restricted industry than has Nevada. By confining casino gaming geographically to Atlantic City and to "approved hotels" which must meet minimum room and public space requirements, New Jersey has effectively limited gaming to resort hotel-casino complexes operated by large corporations. Third, legalized gaming must operate only in highly controlled, strictly regulated environments. Given the importance of public confidence in the integrity of legalized gaming and its oversight processes, the gaming industry has a vested interest in strong regulation. So significant is this factor that New Jersey should never risk weakening its regulatory systems to enhance the State's fiscal condition or offset possible economic consequences occasioned by downturns or the threat of competition from within or outside our borders. Simply put, the integrity of the regulatory process should never be compromised by the value of the privilege.

### 2. Institutionalizing Review of Gambling Public Policy

Subsumed within the above-stated general findings are a host of issues and public policy questions not so easily or readily answerable. While this Commission has formulated a number of definitive recommendations in important areas, other no less significant matters, although seriously discussed and considered, simply did not lend themselves to consensus resolution. Some issues, such as the casino industry's political participation, were emotionally charged and provoked widely polarized viewpoints, ranging from total elimination to relaxation to enhancement of existing statutory controls, with no evident majority for any view. Other questions, for instance the regionalization of Atlantic City's planning, zoning and budgeting functions, touched such fundamental constitutional themes and entrenched

values, the answers to which have eluded policymakers at local, county and state levels over a much longer period of time than the relatively short lifespan of this Commission.

Still other issues like the wisdom of further expansions of gambling, dedicated gaming taxes, and capping the percentage of gaming revenues supporting the State budget required complex quantitative judgments, calling for precision in defining just how dependent New Jersey should be on its gaming industries. While some may draw inferences from the Commission's lack of exactitude in this area, we do find that gaming must never be allowed to become critical to New Jersey's economy or comprise a major source of state financing. Precisely where that breaking point may be, whether it forever precludes 24-hour casino gaming or requires a ceiling on lottery jackpots, is obviously harder to measure since gambling is not the predominant characteristic of New Jersey, with its thriving, diversified economy, as it is in Nevada.

The lack of consensus on many of these issues actually underscores one of our key recommendations. There is currently no systemic or institutional procedure to examine issues left undecided by this Commission, much less those inevitably to evolve long after we will have disbanded. As a measure of government's responsibility in legalizing gaming activity, given the growth and diversity of this industry in New Jersey, there should be a review of public policy concerning gambling as an *ongoing process* and a recognition that such an *institutionalized* process must be a key element in the formulation of any overall gambling policy which is coherent, rational and designed for the long term.

While the precise form this process will take needs to be further defined, its functions are clear: to examine the cumulative impact of the State's gambling decisions on the people and economy of New Jersey; to consider the interrelationships among the various forms of gambling and weigh their competing interests; and to assess problems and controversies both common and peculiar to their respective constituencies. This institutional review process is intended to be advisory in nature as well as serve as a clearinghouse of research and data upon which informed judgments about gambling can be made.

New Jersey State Library

Consolidation, in a nutshell, may be greatly beneficial in achieving uniform investigatory procedures and regulatory approaches; sharing of acquired expertise and data bases; and efficiency in centralizing and streamlining all the cross-cutting elements of gaming related law enforcement. Importantly, as well, consolidation can be accomplished without disruption or difficulty. As previously noted, all gaming regulatory agencies, excepting the Lottery Commission and the Casino Control Commission, are presently housed in the Department of Law and Public Safety under the Attorney General's jurisdiction. Even the Lottery Commission relies upon Department of Law and Public Safety personnel to handle background investigations necessary to maintain the integrity of the Lottery's extensive network of agents and vendors. The proposal now under consideration would simply further consolidate and centralize into one gaming regulatory agency what has already been brought together under the larger umbrella of the department.

**RECOMMENDATION 2:** GIVEN THE SHARED GOAL OF STRICT REGULATION AND THE CROSS-CUTTING ELEMENTS OF ENFORCMENT IN ALL FORMS OF LEGALIZED GAMING, THE COMMISSION RECOMMENDS THAT SERIOUS CONSIDERATION BE GIVEN TO THE CONSOLIDATION OF ALL GAMING RELATED LAW ENFORCEMENT FUNCTIONS WITHIN A SINGLE AGENCY IN THE DEPARTMENT OF LAW AND PUBLIC SAFETY, UNDER THE DIRECTION OF THE ATTORNEY GENERAL.

### c. American Indian Tribal Gaming

Federally recognized Indian tribes have been determined by federal courts to be quasi-sovereign entities. This means such tribes are quasi-independent states within the United States, largely exempt from state and local laws and not subject to the jurisdiction of state or federal courts. Subject only to federal legislation, which provides no pervasive regulatory scheme, Indian tribes may establish gaming free of state regulation and control.

Many tribes in other states have organized high stakes gambling akin to casino gaming on their tribal lands. Such enterprises are defended as promoting tribal economic development, self-sufficiency, and strong tribal government.

Notwithstanding the benefits of tribal gaming to individual Indian tribes, such unregulated gambling is vulnerable to enormous abuse. Unregulated gambling is subject to infiltration by organized crime and other unscrupulous promoters and operators. Without a regulatory framework, neither management nor individual employees are subject to licensing requirements including ongoing background checks for good character, integrity, financial stability, or lack of a criminal record and unsavory associations. And the lack of controls associated with unregulated gaming cannot possibly insure that the games are being run and played honestly.

Of course, should the individual tribes opt to regulate tribal gaming, their relatively limited numbers and lack of law enforcement expertise would impede such control. Moreover, regulation of gaming by the owners of the same establishments gives rise to an obvious conflict of interest.

Because of the absence of regulation of tribal gaming, public trust and confidence in legalized, highly regulated state gaming may very well be damaged. In those jurisdictions which must cope with both forms (Indian gaming is not subject to state taxes despite their substantial profits), competition with tribal gaming diminishes state revenues from legalized gaming.

This may not be too remote a concern for New Jersey. It has been reported that the Ramapo Mountain People, an isolated community of American Indian descendants just outside Mahwah in Bergen County, have requested to be considered for federal tribal status by the Interior Department's Bureau of Indian Affairs. Official recognition would allow the Ramapos to operate a bingo game without federal or state regulations.

The Commission supports federal efforts to regulate gambling on American Indian Tribal lands, areas where state laws and regulations do not apply, and renders the following observation:

THE COMMISSION IS CONCERNED AND ALARMED ABOUT THE CONTINUED

INCREASE IN AVAILABILITY OF GAM-
BLING UPON AMERICAN INDIAN TRIBAL
LANDS. WE WISH TO GO ON RECORD AS
STRONGLY SUPPORTING THE FEDERAL
EFFORTS IN THE CONGRESS OF THE
UNITED STATES DESIGNED TO CON-
TROL GAMBLING ON INDIAN RESERVA-
TIONS.

### 4. Gambling Promotion: A Uniform Code and Curbs on Advertising

In at least one sense the public policy of New Jersey
toward legalized gaming is curiously ambivalent.
While these activities remain the subject of strict
state regulation and control, they are, as commonly
accepted forms of leisure and entertainment, none-
theless actively advertised and promoted. To compli-
cate the matter, the State Lottery, in contrast to other
types of legal gambling, is a *public* activity that relies
on private agents to sell most of its tickets and on
private contractors to develop its games and manage
its on-line computer network.[5] The Lottery Commis-
sion, a State agency, supervises its own marketing
program. Its advertising budget for 1987 was $4 mil-
lion, ranked one of the lowest nationwide.

Amid this mix of public/private responsibility and
interest, there is surprisingly no uniform state policy
on gambling advertising. Although most gaming
promotions are regulated, the degree of state over-
sight varies greatly among New Jersey's diverse forms
of legal gambling. At the one end are casinos,
restricted from publishing information about odds,
number of games and size of the casino — limita-
tions much less intrusive than original regulations
prohibiting casinos from any "gaming dominated"
advertising. Although greatly relaxed in 1982, rem-
nants of that policy remain in present day proscrip-
tions against barking and other "undue" on-site
enticements. At the other end, lottery advertise-
ments must simply be consistent with the "dignity of
the state." Oddly enough, what New Jersey bans
casinos from publishing about the odds of their
games, other states require of their lotteries so as to
inform about the chances of winning and the average
return. Somewhere in the middle are bingo and raf-
fles which cannot advertise to the "general" public.

No serious suggestion has been made to this Com-
mission to bar all gaming-related advertising, pre-

sumably because of the realization that a total ban
may cripple these legalized revenue-makers. Opin-
ion was offered, on the other hand however, that
gaming should not be "induced" or demand "stim-
ulated", although no definition was offered of the
key measures or standards. While the Commission
believes it clear that the standard encompasses at
least false, fraudulent, deceptive misleading or
exploitative advertising, which no doubt should be
banned, we perceive more difficulty in assessing the
outer boundaries of anything more. Advertising by
its very nature, after all, is promotional.

Because of this inherent difficulty is drawing lines,
the Commission believes the better approach is to
require that all advertisements of gaming activities
be *balanced*. More specifically, any advertising which
promotes gambling should also contain informa-
tional and public service content, preferably educat-
ing patrons of the problem of compulsive gambling.
Of course, even with such messages, advertising
which is false, misleading or excessive must be strictly
prohibited. We further find that any promotional
advertising which serves no informational or public
service purpose constitutes *per se* undue enticement
or undue inducement and should also be banned.

These findings, in our view, apply across the board
to all New Jersey's forms of legal gaming. Of course,
there is presently in this State no uniform code of
advertising governing gaming or gaming-related
promotional activities and the lack thereof has led to
inconsistent regulation in this field. The Commis-
sion believes it in the best interests of the people of
this State that a uniform code of gaming advertising
be adopted containing at least the guidelines we ear-
lier referenced. Consistency of approach, we find,
will also benefit the various gaming industries in
New Jersey as a whole by removing whatever compet-
itive edges may now exist due to the unevenness of
the rules and their application.

This no doubt will be an important first step in
developing responsible and responsive policy in the
gambling promotion and advertising area. We sug-
gest this effort should be continued, either through
the permanent advisory arm we earlier recom-
mended or through an Office on Compulsive Gam-
bling which we discuss later in this Report. Either
mechanism would be charged with an ongoing
review function and responsibility for advising

9

whether further curbs (*i.e.* caps on advertising expenditures, restrictions on type of advertising) may be warranted.

**RECOMMENDATION 3:** WE THEREFORE RECOMMEND THAT ALL GAMBLING ADVERTISING AND RELATED ACTIVITIES CONFORM TO STANDARDS OF GOOD TASTE AND THAT ADVERTISEMENTS WHICH ARE DIRECTLY RELATED TO GAMBLING ACTIVITIES INCLUDE APPROPRIATE PUBLIC SERVICE CONTENT INCLUDING A REFERENCE TO INFORMATION ABOUT COMPULSIVE GAMBLING.

### 5. Competition: Horse Racing As a Casualty

There is intense competition for the gambling dollar both within and outside New Jersey's borders. Racetracks have supplemented their racing cards with simulcasting to vie with off-track betting in New York and neighboring tracks in Pennsylvania and Delaware, not to speak of the closer threats from the New Jersey lottery and casinos. The State lottery itself constantly invents new games to maintain patron interest in the face of bigger jackpots offered in adjoining states. Our casinos worry about maintaining their competitive edge in the event of legalization elsewhere, and must keep pace with casinos in Nevada, which themselves must counter the threat of the California lottery.

All this competition has taken its toll. In 1939, horse racing became the State's first sanctioned form of legalized gaming and enjoyed a virtual monopoly until 1953 when bingo and raffles were allowed. With the lottery in 1969, casinos in 1978, and out-of-state competition everpresent, gambling money has been steadily siphoned away to the point where horse racing has suffered serious economic consequences.

Perhaps the best evidence of this fact is that in the years since legalization, pari-mutuel betting on horse races has been transformed from a tool for raising revenue for the general funds into a means of benefitting the horse race industry. These benefits are now justified on the grounds of job creation, the preservation of farm land, and the contribution of the Meadowlands to the State's national image.

These are not insignificant considerations. Indeed, testimony before this Commission indicates that horse racing still has a substantial impact upon the State's economy. More than 17,000 persons are employed today in jobs directly related to the racing industry and the total handle for 1987 was approximately $1.3 billion, the third largest of any State in the nation. Aside from the jobs, there is the number of breeding, boarding and training farms for the horses. That, in turn, means farms have flourished and real benefits accrue for veterinarians, blacksmiths, equipment suppliers. All of this translates into important contributions to the State's economy, in ways other than revenue-raising.

In light of both the direct and indirect benefits to New Jersey, the Commission finds it to be in the best interests of the State to have a healthy and viable horse racing industry. We also find that this industry has been negatively affected by increasing competition for the leisure, entertainment dollar from forces within and outside our State. To the extent this can be attributed to a state policy encouraging so many different forms of gaming within our borders, the Commission renders a series of recommendations designed solely to offset that impact.

We strongly caution however that our recommendations are not intended nor designed to gain for the horse racing industry an advantage or competitive edge over any existing form of legal gaming in New Jersey. Our recommendation on Sunday racing, for instance, is made simply because we find no logical argument which advocates Sunday closure. Other recommendations, in our view, are rendered to allow horse racing to compete on a *level* field with race tracks in other states and with other gambling interests in New Jersey.

We believe the more significant finding implicit in these recommendations is that one form of legalized gaming cannot exist at the expense of others in this State. Competition for the gambling dollar is a fact but, for obvious reasons, the State cannot tolerate unlimited competition or allow marketing approaches, promotional devices or new proposals to seriously cut into each other's gaming constituencies.

Presently there is no state mechanism to set policy on competition among all forms of legal gambling in

New Jersey. We believe this can be one of the most important functions of the permanent advisory arm we have recommended earlier in this Report. The creation of such policy and the review and enforcement of its application will ensure healthy, honest and limited competition.

**RECOMMENDATION 4:** WE RECOMMEND THAT AN ORGANIZATION BE CREATED WHOSE MISSION IS TO ENHANCE THE ECONOMIC VIABILITY OF THE RACING INDUSTRY AND TO PROVIDE STATEWIDE PROMOTION AND MARKETING OF ALL ASPECTS OF HORSERACING IN NEW JERSEY.

WE FURTHER RECOMMEND THE ESTABLISHMENT OF A NEW JERSEY HORSE INDUSTRY GROWTH AND DEVELOPMENT FUND, TO BE ADMINISTERED BY THE NEW JERSEY RACING COMMISSION, WHICH WILL PROVIDE FUNDING FOR NEEDED EDUCATIONAL AND DEVELOPMENTAL ASSISTANCE PROGRAMS FOR RACETRACK EMPLOYEES AND RACETRACK OPERATORS.

FURTHERMORE, WE RECOMMEND THAT THE LEGISLATURE UNDERTAKE THE NECESSARY STEPS TO ALLOW SUNDAY RACING TO OCCUR AT THE RACETRACKS OF NEW JERSEY WITHOUT ANY INCREASE IN THE SIX DAY RACE WEEK.

## 6. Dependence on Gaming Revenues

A key theme of pro-gaming forces whenever legalization is sought for a particular kind of activity has been that gambling can be a substantial source of revenue to promote, address and advance significant and important social goals and policies. Of course, the opponents of gambling have traditionally argued that gaming is a regressive and administratively inefficient method of generating revenues for public purposes. Despite such opposition, successful legalization efforts have resulted in constitutional or statutory enactments which allocate or direct, in some specific manner, that revenues inure to the benefit of the public weal.

As the result of the legalization of the several forms of gambling, New Jersey now depends on tax revenues from gambling to support public programs and services for the elderly and handicapped, education and institutions, and community development. The New Jersey Lottery, which is required by statute to contribute 30 cents of every dollar to the state budget, added over $472 million to general revenue in fiscal year 1987. Casino gaming in 1987, through the 8% casino revenue tax, contributed almost $200 million to provide services to the elderly and handicapped. Further, contributions to the Casino Reinvestment Development Authority are used to rebuild the City of Atlantic City and will, ultimately, provide needed financing for redevelopment projects in distressed cities all across the State. The racing industry provides funding for the entire Meadowlands Complex, as well as a contribution to the general fund of approximately $8 million dollars. Bingo and raffles provide needed direct revenue to charitable organizations and churches throughout the Garden State. During the last calendar year, 1987, bingo and raffles provided about $50 million for covered organizations. Additionally, revenues from amusement gaming fees approximated $278,000 in the 1987 fiscal year. In short, approximately 7% of the State's budget is derived from legal gambling and it is the fourth largest revenue producer for the budget (the state sales, income and corporate taxes are the three highest-ranking revenue sources).

Clearly, then, while the State and the gaming industry have a symbiotic relationship, there is a danger of the State becoming too dependent upon gambling revenues. Indeed, the results of an Eagleton Institute poll show that 50% of the people surveyed have concluded that such a danger in fact, may arise. The potential jeopardy facing the State arises from two different, but equally important, concerns.

First, although dedication of gambling revenues may serve to create or increase expenditures to achieve socially desirable goals, there is no assurance, and there can be no assurance, that the level of revenues presently obtained from gaming will remain constant, much less increase. Lottery revenues fell 45% between 1972 and 1975. In the early 1980s, the increase in the number of casinos led to a decrease in the casino industry's average revenue per casino. Therefore, direct linkage between specific programs and a funding mechanism predicated on a gaming

source may jeopardize the extent of the benefits otherwise sought to be achieved if gambling revenues do not keep pace with public policy goals. More importantly, given the historical ebb and flow in gambling revenues, government must not permit itself the luxury of assuming that the gaming industry, in one form or another, can provide, in the absence of some other funding source, all of the money necessary to implement social programs.

Second, undue reliance on the gaming industry to subsidize governmental initiatives may transform the government/gaming industry relationship from that of regulator/regulatee and generate an unwarranted partnership between government and private gaming interests. In that event, regulatory authorities will have effectively altered their traditional oversight role and exchanged it instead for that of an industry proponent and ally. The net effect of such a circumstance will undoubtedly be a significant reduction in the rigorous scrutiny to which the gaming industry is now subject. Indeed, the casino industry's response in the early 1980s to its decline in revenues was to wage a campaign against state regulation, charging that such regulation inflated the costs of operation, thereby reducing revenues, and interfered with the efficient operation of their casinos. The more entrenched is gambling in the budget process, then the more successful the industry may be in causing the relaxation of regulatory policies and procedures with which they do not agree.

This latter fear is not susceptible to any particular mode of resolution. Rather, it demands a continued awareness of, and sensitivity to, the opportunity the gaming industry has to influence the regulatory process. However, with regard to the other articulated concern, the State ought to be prepared to grapple with the ramifications for the budget process of a shortfall in anticipated gambling revenues otherwise earmarked for the effectuation of public policy objectives.

Since gaming revenues designated for budgetary purposes are neither fixed nor certain, the State must be poised to deal with the negative impact on public programs caused by a diminution in State-directed gaming revenues. Any significant shortfall in anticipated revenues may endanger the viability of important components of the safety net New Jersey provides to its needier citizens. This is particularly

applicable regarding funds derived from casino and lottery activity as their public uses are legislatively mandated.

In this regard, the Commission gave serious consideration to recommending the creation of a dedicated "rainy day" fund for gambling-supported programs but ultimately concluded such a proposal risked placing undue importance on these programs compared to others funded through the general fund, protecting them at the expense of all others and depriving the Governor and Legislature of needed flexibility in the budget process. Similarly there was some sentiment expressed for a general budgetary "rainy day" fund but the prevailing view held that such a recommendation related directly to overall fiscal policy and was thus beyond the scope of the Commission.

The Commission looked elsewhere instead for precedent in handling this or similar type of problem. We found a useful model. In January 1985, the Casino Revenue Fund Study Commission, chaired by Senator Catherine Costa and consisting of four members each of the State Senate and General Assembly and eight senior citizens, was formed to review the State's anticipated revenues from casino gaming, study the utilization of those revenues and analyze how casino funds could best be allocated to address the many needs of the State's disabled and senior citizens. The Commission's efforts were completed with its delivery of a final report to the Legislature in 1985.

Drawing on that experience, the Commission offers the following proposal to address any potential problem that may be caused by the interplay between a State budget which, in large measure, is dependent upon lottery and casino revenues and the inability of government to guarantee to itself the availability of those revenues:

**RECOMMENDATION 5: WE SPECIFICALLY RECOMMEND THAT THE STATE SENATE CONSIDER RECONSTITUTING ITS CASINO REVENUE STUDY COMMISSION AND THAT A SIMILAR BODY BE ESTABLISHED TO REVIEW LOTTERY REVENUES SO THAT THE STATE WOULD BE PREPARED FOR ANY DOWNTURN IN GAMBLING REVENUES AND PRIORITIZE THE USE OF SUCH FUNDS.**

12

## B. SOCIAL IMPACT: THE PROBLEM OF COMPULSIVE, INDUCED AND JUVENILE GAMBLING

With all the legal wagering transacted in New Jersey, the benefits in terms of jobs, tax revenues and capital investment are by now obvious. The burdens, however, have yet to stimulate the heightened awareness needed for their proper cure.

One of these burdens is compulsive or pathological gambling — classified by the American Psychiatric Association as a form of mental illness, a disorder of impulse control. Estimates of the number of compulsive gamblers vary. While this Commission has been unable to quantify the exact extent of the problem, the Council on Compulsive Gambling estimates there are about 400,000 gambling addicts in New Jersey, including juveniles, lottery players and options purchasers on Wall Street. Despite the lack of numerical certainty, however, one thing appears clear to us. The more opportunities that exist for expending the leisure gaming dollar, the more evidence to substantiate an increased estimate.

Although there have been some honest and good faith efforts — some promising starts — in the past, the solutions to compulsive gambling have simply not kept pace with the acceleration and promotion of legalized gaming in this State. This Commission finds that the continued disparity between the amounts of money being earned from gambling and the amount of money being earmarked to address this serious social issue will only exacerbate the problem. This realization is further compelled by the apparent attraction of these gambling activities to increasing numbers of teenage and underage players.

States that have legalized, and likewise promote, gambling have a serious obligation to direct some of the funds realized from gambling into public education/prevention, training treatment and research programs. The wisdom of providing funds for the "victims of public policy" is obvious. There is evidence which indicates that the availability of legalized gambling increases the risk of becoming a compulsive gambler. The Commission on the Review of the National Policy Toward Gambling (1973-1976) recognized a direct relationship between the rate of addiction and increased availability. It seems apparent then that by sanctioning legalized gam-

bling as a revenue-raising device, the State has contributed significantly to what is now known to be a major societal problem. While the State and those who pursue profit through its various forms of legalized gambling are not *solely* responsible for the disease, they must accept a certain measure of responsibility for its cure.

Aside from the moral question, however, it just makes good common sense to immediately embark on a comprehensive solution. It seems self-evident to this Commission that the costs of intervention and treatment are quite modest when compared to the ultimate costs of non-treatment. Compulsive gambling, it has been documented, leads to misappropriation of funds, embezzlement and other illicit activities, negatively impacts on the family and business and poses problems for the entire gaming industry.

This Commission therefore finds that there is a present need for the State of New Jersey to establish a coordinated and comprehensive program to address compulsive gambling. Any such program should have as its primary goal the education of the public relative to the problems associated with compulsive gambling, including the underage component, as well as prevention, treatment and research programs related thereto.

More particularly, there should be an agency established within the Department of Health with dedicated responsibility for overseeing the statewide program against compulsive gambling. The centralization of planning, research, and accountability for such programs is critical to the effectiveness of the overall effort. At a minimum, this program would address the need for State and privately sponsored treatment facilities, community education, public information, and a coordinated plan for health, mental health, and social welfare agencies in this area. Moreover, this office would be charged with assessing the social impact of compulsive gambling and the extent of the underage gambling problem in New Jersey.

While this Commission was unable to agree upon a precise funding formula to support this effort, it appears a reasonable proposition that if a compulsive gambling disorder is not detected and treated at a point in time when personal funds and private third

party funding sources are still available, both the State, which looked to gaming as a solution, and the gaming industries, which are privileged to engage in this profit making activity, must accept shared responsibility for helping compulsive gamblers. Such a public/private arrangement to meet expenses associated with treatment, research and education programs designed to lessen the negative personal and societal impact of compulsive gambling would result in an equitable arrangement wherein the costs of such efforts would be borne primarily by those who sanction and choose to pursue pleasure and/or profit through gambling. Fair share allocation would lighten the burden on any one source and would assure that much-needed programs will be able to continue without fear of funding shortages.

**RECOMMENDATION 6:** WE RECOM-MEND THE ESTABLISHMENT OF AN OFFICE OF COMPULSIVE GAMBLING WITHIN THE DEPARTMENT OF HEALTH. THIS OFFICE SHOULD ENGAGE IN EFFORTS TO UNDERTAKE COMPREHEN-SIVE RESEARCH INTO THE CAUSES AND TREATMENTS OF COMPULSIVE GAM-BLING, INSTITUTE PUBLIC AWARENESS PROGRAMS AS TO THE RISK OF GAM-BLING, TAKE SPECIAL EFFORTS TO INFORM THE YOUTH OF THE STATE OF NEW JERSEY ABOUT THE INHERENT DANGERS INVOLVED IN GAMBLING, DEVELOP PROGRAMS TO ASSURE APPROPRIATE INSURANCE COVERAGE, PROVIDE EFFECTIVE AND LONG-LASTING TREATMENT PROGRAMS, REC-OMMEND TO THE GOVERNOR APPRO-PRIATE ADVERTISING POLICY FOR GAMING, AND EXPLORE ALL ISSUES WHICH MAY IMPACT UPON GAMBLING RELATED PROBLEMS OF THE RESIDENTS OF THE STATE OF NEW JERSEY.

**RECOMMENDATION 7:** THE COMMIS-SION RECOMMENDS THAT THE APPRO-PRIATE GOVERNMENTAL AGENCIES, IN CONJUNCTION WITH OFFICIALS FROM RACETRACKS, CASINOS, AND LOTTERY, INCREASE EFFORTS TO CONTROL GAM-BLING BY UNDERAGE PERSONS THROUGHOUT THE STATE. WE DO NOT,

AT THIS TIME, RECOMMEND ANY STATU-TORY CHANGE IN THE MINIMUM AGE REQUIREMENTS FOR GAMING IN THE STATE.

WE RECOM-MEND, HOWEVER, THAT THE OFFICE OF COMPULSIVE GAMBLING WITHIN THE DEPARTMENT OF HEALTH BE DIRECTED TO CLOSELY STUDY THIS ISSUE AND PROPOSE APPROPRIATE POLICY RECOM-MENDATION, EDUCATION, AND ENFORCEMENT PROCEDURES. WE ALSO RECOMMEND A STUDY BE CONDUCTED TO DETERMINE THE EXTENT OF THE UNDERAGE GAMBLING PROBLEM.

WE ENCOUR-AGE THE RACING COMMISSION, THE LOTTERY COMMISSION, AND THE CASINO CONTROL COMMISSION TO CONSIDER THE USE OF STRONGER AND MORE EFFECTIVE SANCTIONS DESIGNED TO LIMIT THE INVOLVEMENT OF YOUTH IN GAMBLING RELATED ACTIVITIES AND TO DEVELOP CREATIVE SOLUTIONS WITHIN THEIR RESPECTIVE INDUSTRIES.

WE ENCOUR-AGE STRICTER ENFORCEMENT BY THE CASINO SECURITY PERSONNEL AND CASINO FLOOR OPERATORS.

WE FURTHER RECOMMEND SOME PROGRAM OF PUB-LIC EDUCATION THROUGH THE SCHOOLS, THE CASINOS, AND APPRO-PRIATE STATE AGENCY TO ALERT THE COMMUNITY TO THE INHERENT DAN-GERS OF GAMBLING.

## C. ECONOMIC IMPACT OF GAMBLING

The evidence is overwhelming, and the Commis-sion finds, that legalized gambling has had a signifi-cant positive impact on the economy of New Jersey. This impact has manifested itself in several impor-tant areas.

14

First, in 1987, the last year for which complete figures are available, direct gambling revenues accruing to state government totalled $656 million. Over the last five years direct gambling revenues have comprised about 7% of the state budget. If the combined revenue from gambling is compared with all other revenue sources, it ranks fourth behind the sales, gross personal income, and corporate income taxes.

The Commission's review of the history of gambling in New Jersey has demonstrated that official policy as to the appropriate level of budgetary reliance on gambling revenues and the actual level of budgetary contributions by individual forms of gambling and gambling as a whole have fluctuated over time. Pari-mutuel betting on horse racing was presented to the state's voters as a revenue source which might preclude the need for new taxes. In the mid-1950s, the State did, in fact, receive nearly 10 percent of general fund revenues from racing. By 1986, racing supplied far less than 1% of state revenues, and New Jersey ranked 17th among states that collect racing revenues. The Lottery also was promoted to the voters as a revenue-raiser. The principal sponsor of the successful proposal put it succinctly, "The primary reason [for the measure] is to provide the State of New Jersey with much-needed funds in a relatively painless way." Like racing revenues, Lottery revenues have shown some tendancy to fluctuation, declining in years 1972 through 1975, accelerating in the early 1980s, and rising more slowly in the last two years. When compared to other Lottery states, New Jersey's reliance on Lottery revenues has fallen slightly. In FY 1984, New Jersey ranked third in terms of percentage of state revenues generated by the Lottery (4.97%). In FY 1985, New Jersey's rank had declined to fifth and overall share supplied by the Lottery had slipped to 4.85%. When all three forms of gambling are considered, the 7% share of budget revenues provided less in direct dollars than the 10% generated by racing alone in the mid-50s. These figures do not, however, consider the magnitude of the spin-off benefits related to gambling, either during the 1950s or today.

Second, gambling has undeniably had a positive effect on employment within this State. The Commission notes at the outset that estimates of gambling-related employment are heavily dependent upon assumptions, among them assumptions as to the number of full- and part-time casino jobs, the State's unwillingness to fund social programs in the absence of the gambling dollar dedication, and the number of retail jobs spun off through the sale of Lottery tickets. Depending upon assumptions made, employment may be as high as 91,000 persons employed directly or indirectly in gambling-related industries, regulation or gambling-supported programs. If correct, this number would represent about 3% of employment statewide. While it can be assumed that if gambling opportunities did not exist in New Jersey, consumers' dollars would be spent for other commodities, thus creating alternative types of employment, the Commission also finds that a significant number of new and irreplaceable jobs have been created by the gambling industries, particularly the casinos, which attract a large number of out-of-state consumers.

Third, gambling has enhanced overall income in New Jersey. In 1986, for instance, the total direct and indirect income generated by the gambling industries may have been as high as $4.6 billion, or about 3% of total state personal income. Of the $4.6 billion, casinos generated 74%, while the lottery and horse racing generated 18% and 8% respectively. These estimates, however, are based upon certain assumptions. For example, to the degree that casino-related profits and New Jersey-vendor profits are exported from the state, the casino-related estimates will be over-stated. Similarly, the total income figures are sensitive to the magnitude of the multipliers used to estimate indirect income. Small changes in the multipliers may result in large changes in the numbers, and there is no guarantee that the multipliers remain stable over time.

Fourth, the gambling industries have had a positive impact on the State's overall economic development. Many companies have been started or expanded to take advantage of business opportunities created by gambling. The casinos buy goods and services from nearly 3,700 firms throughout the State. Companies from every county transact business with the casino industry. For example, 289 firms in Bergen transact about $16 million, and 75 companies in Mercer conduct about $11 million in business. The employment created by gambling also inevitably has a ripple effect throughout the state economy, as individuals earning money become consumers of other goods and services.

15

Although these positive factors are significant, the economic impact of gambling in New Jersey is not without its negative aspects. Gambling obviously competes with other leisure activities for entertainment-related dollars and, to some extent, has necessarily drawn jobs and money away from such activities. Gambling has also brought about a number of social and economic costs, as addressed elsewhere in this Report, and may be effecting a broad redistribution of wealth with respect to income, employment, tax burden, revenues, and programatic benefits, in a manner which is not the most efficient or equitable. Moreover, regarding the casinos in particular, it is clear that retail business and retail employment in Atlantic City have continued to decline despite the presence of gambling, and that rampant land speculation has rendered the redevelopment of vast parts of Atlantic City difficult if not impossible. On that score, the population of Atlantic City declined from 43,648 persons in 1977 to 37,140 in 1986. Finally, the costs of casino development may be most visible in its surrounding geographical area. These costs may include increased air and water pollution, increases in transportation congestion and infrastructure deterioration, but would require substantial additional research to document. From 1976 to 1985, for instance, the accident rate rose 38% on the Atlantic County portion of Route 30, one of the three major arteries into Atlantic City; but whether that increase in accidents is related to casino traffic has not been documented.

On the other hand, Atlantic County has been a winner. For instance, the casino industry does over $500 million in business annually with over 1,600 firms located in Atlantic County and employs nearly 20,000 residents.

Notwithstanding the foregoing, the Commission has found that calculation of the economic impact of gambling on New Jersey is hampered by the absence of certain analytic tools and reporting requirements. Efforts to assess nondirect gambling employment, for instance, rely upon the employment multiplier utilized and the number of full and part-time jobs created within the industry. There is, however, only limited reporting of full versus part-time employment, and the employment multipliers for the State were developed at a time when the service and information sectors had less importance than they do now.

**RECOMMENDATION 8:** THUS, WE RECOMMEND BOTH THE UPDATING OF THE EMPLOYMENT AND INCOME MULTIPLIERS AND THE DEVELOPMENT OF ECONOMIC MODELS OF REVENUE PREDICTION FOR THE THREE FORMS OF GAMBLING.

WITH REGARD TO REPORTING, WE RECOMMEND INCREASED REPORTING OF FULL AND PART-TIME EMPLOYMENT, AND ANNUAL TRACKING OF ECONOMIC TRENDS IN ATLANTIC CITY AND COUNTY.

The Commission also finds that although the casino gaming industry has had a major, positive economic impact on the State in terms of direct and indirect taxes, employment, and other forms of development, these positive effects are still amenable to significant improvement. In this connection, we quote from the Casino Control Act of 1977:

The Legislature hereby finds, and declares to the public policy of this State, the following:

(1) The tourist, resort and convention industry of this State constitutes a critical component of its economic structure and, if properly developed, controlled and fostered, is capable of providing a substantial contribution to the general welfare, health and prosperity of the State and its inhabitants.

(2) By reason of its location, natural resources and worldwide prominence and reputation, the city of Atlantic City and its resort, tourist and convention industry represent a critically important and valuable asset in the continued viability and economic strength of the tourist, convention and resort industry of the State of New Jersey.

(3) The rehabilitation and redevelopment of existing tourist and convention facilities in Atlantic City, and the fostering and encouragement of new construction and the replacement of lost convention, tourist, entertainment and cultural centers in Atlantic City will offer a unique opportunity for the inhabitants of the entire State to make maximum use of the natural resources available in Atlantic City for the expansion and encouragement of New Jersey's

hospitality industry, and to that end, the restoration of Atlantic City as the Playground of the World and the major hospitality center of the Eastern United States is found to be a program of critical concern and importance to the inhabitants of the State of New Jersey. [*N.J.S.A.* 5:12-1(b)].

We agree that Atlantic City can contribute strongly to the potential economic strength of the tourist, convention, and resort industry of the State of New Jersey. We further agree that the rehabilitation and redevelopment of the tourist and convention facilities in Atlantic City will promote the resort community's restoration as a major hospitality center of the Eastern United States.

**RECOMMENDATION 9:** WE FIND THAT IN ORDER FOR THIS GROWTH TO CONTINUE AND EXPAND, AND FOR ATLANTIC CITY TO BECOME THE CONVENTION AND TOURIST CENTER ENVISIONED BY THE CASINO CONTROL ACT, THIS COMMISSION RECOMMENDS THAT THE ADMINISTRATION AND LEGISLATURE TAKE IMMEDIATE ACTION TO ENSURE THAT A FIRST CLASS CONVENTION FACILITY IS DEVELOPED IN ATLANTIC CITY, AS SOON AS POSSIBLE, AND THAT THE DEVELOPMENT OF A FIRST CLASS AIRPORT FACILITY BE EXPEDITED. THE POTENTIAL OF COMPETITION FROM OTHER JURISDICTIONS OUTSIDE OF NEW JERSEY, AS WELL AS THE EXPANDING COMPETITION WITHIN THE CITY, MAKE THE IMMEDIATE EXPANSION OF CONVENTION AND TRANSPORTATION FACILITIES IMPERATIVE.

## D. CRIME

### 1. Introduction

Among the chief concerns uniformly voiced by public officials and private citizens considering legalized gaming in their jurisdictions is crime, especially the organized and street varieties. This is so because whatever economic benefits flow from legalized gaming, the societal costs almost invariably include the "crime" phenomenon. Our focus on this issue is but part of this Commission's broader study identi-

fying and measuring all costs and benefits to shed light on the real contribution of legalized gambling to the welfare of the State and to serve as a guideline for public policies. In assessing its impact on crime, the Commission has concentrated on one particular form — casino gaming — because its unique characteristics make it readily susceptible to and a vulnerable target for criminal elements.

### 2. Organized Crime

Casino gambling is unique and has had a checkered history in other jurisdictions, particularly Nevada where organized crime figures dominated the industry's early development.[6] So strong is the historical basis for this belief that a widespread public perception linking casino gambling with organized crime has persisted at least as late as 1982[7] despite the movement toward a professional, regulated industry in Nevada largely devoid of such influences, the introduction of large publicly-held companies under the supervision of the Securities and Exchange Commission and finally, the start-up in 1977 of New Jersey's comprehensive casino regulatory machinery.

The Commission finds that as a result of New Jersey's strict regulatory scheme and law enforcement diligence, organized crime has not in fact infiltrated the operation, management or ownership of the casino industry in this State, the games in Atlantic City are conducted fairly and honestly and all casino revenues are being accurately recorded. This strong regulatory apparatus as well as government's rock-hard commitment to use it are largely responsible, we find, for an improvement over a five-year period in the public's perception that it is less likely casino gambling in Atlantic City would fall under the control or influence of organized crime.[8] Because this improved perception reflects more accurately the reality of the situation, and because public confidence in the integrity of casino operations and of the regulatory process is so vital to their continued existence, the Commission strongly urges that this perception be reinforced and strengthened. The Commission also recognizes, however, that as a general proposition, organized crime gravitates to the points of least resistence and thus remains today on the fringes of casino gambling, eagerly attempting backdoor access into the casino/hotels through the service industries and labor unions where the threat of

17

organized crime infiltration is most acute. While the large majority of ancillary businesses (some 11,000 as of 1987 including about 3,800 New Jersey-based firms) servicing the casino industry are legitimately run, organized crime has managed to make some inroads through the use of fronts and other means of hidden ownership in certain segments of the support services sector, particularly as concerns the lucrative junket business.

The Commission further finds that the Casino Control Act, particularly as most recently amended to upgrade junket licensure and expand regulatory jurisdiction over construction companies and labor unions, provides law enforcement the necessary tools to ward off organized crime influence even at the peripheral layers of casino gambling. The confluence of strict eligibility criteria, full disclosure laws and tough licensing burdens which has been so effective in ridding the casino industry of the taint of organized crime can meet with an equal degree of success if applied with the same vigilance and effort at the ancillary level.

**RECOMMENDATION 10:** THEREFORE, WE RECOMMEND THAT STRICT REGULA-TORY AND LAW ENFORCEMENT SCHEMES SHOULD BE APPLIED WITH EQUAL FORCE AND DILIGENCE TO THE ANCILLARY BUSINESSES AND LABOR UNIONS WHICH SERVICE THE ATLANTIC CITY CASINO INDUSTRY TO THE END OF ENSURING THAT ORGANIZED CRIME BENEFIT NEITHER DIRECTLY NOR INDI-RECTLY FROM CASINO GAMING.

### 3. Casino Crime: Casinos As Victims

A related area of concern is casino-specific crime — offenses such as theft, fraud, cheating at the table games or slots — which victimize the industry and the State which relies on taxes from gambling reve-nues. No one knows for sure how much these cheat-ing gambits cost the casino industry but just those scams that are detected and prosecuted suggest the losses could run into the tens of millions of dollars.

While several of these scams involve organized criminal conspiracies, many are not as elaborately planned and executed, yet their cumulative effect can be just as devastating. Particularly in the area of

casino credit and currency transaction reporting which are both vulnerable to organized criminal schemes, the Commission finds that in the past loose and informal casino practices and policies have facili-tated and contributed to the industry's own victim-ization. Recent statutory and regulatory reforms tightening credit controls as well as heightened fed-eral and state oversight of currency transaction reporting promise to minimize the risks otherwise posed by this cash-intensive business.

**RECOMMENDATION 11:** GIVEN THE PARTICULAR VULNERABILITY OF, AND SPECIAL LAW ENFORCEMENT CON-CERNS WITH, CASINO CREDIT AND CURRENCY REPORTING, THE COMMIS-SION ENDORSES THESE REFORMS.

**RECOMMENDATION 12:** THE COMMIS-SION RECOGNIZES THE INCREASING SOPHISTICATION AND COMPLEXITY OF OTHER TYPES OF CASINO-SPECIFIC CRIMES. GIVEN THE MUTUALITY OF INTERESTS INVOLVED, THE COMMIS-SION FURTHER SUPPORTS A CLOSELY COORDINATED EFFORT BETWEEN INDUSTRY REPRESENTATIVES AND STATE REGULATORS IN THIS REGARD.

### 4. Street Crime and Legalized Gaming

No discussion of the general issue can be complete without reference to street crime — the single most common factor cited in arguments against legaliza-tion of casino gambling. Although much has been written and spoken about the surging crime rates of transient resort cities like Reno, Las Vegas and Atlan-tic City and how casinos act like a magnet to attract the criminal parasites who prey on the millions of tourists who visit these cities each year, the Commis-sion is unaware of any generally-accepted study con-clusively establishing the link between casino gam-bling and crime.

To be sure, experience in both Nevada and New Jersey suggests that street crimes increase with the introduction of casino gambling. Indeed, Index Crime in Atlantic City sharply rose after the advent of casino gaming. While this upsurge in post '78 Atlantic City street crime is a highly significant con-sideration for this Commission, we believe it also

important to assess the *crime rate* and the *risk* of crime to citizens in Atlantic City. In other words, any accurate analysis of the street crime issue must take into account changes in: the population at risk, criminal opportunities, law enforcement resources and priorities, and crime rates elsewhere in the State. Stated somewhat differently, the real question is whether casinos have an *independent effect* on serious crime in Atlantic City or whether the rise in Index Crime is due to other factors incidental to casino gaming, namely increases in transient population, opportunities, police manpower or criminal incidents throughout the State.

Given the inconclusiveness of the studies and information in the record before us, the Commission is unable to render a definitive answer.

> **RECOMMENDATION 13:** BECAUSE OF THE IMPORTANCE OF THIS ISSUE (CASINO/CRIME LINK) TO THE GOOD AND WELFARE OF THE PEOPLE OF THE STATE, THE COMMISSION STRONGLY RECOMMENDS THAT AN ANALYSIS AND EVALUATION OF THIS PROBLEM BECOME PART OF THE FUNCTION AND RESPONSIBILITY OF THE PERMANENT ADVISORY STRUCTURE RECOMMENDED ELSEWHERE IN THIS REPORT.

### 5. Impact of Legal Gaming on Illegal Gambling

This Commission has heard from law enforcement experts in New Jersey who contend that legalized gaming has not only failed to curb illegal gambling but in fact has been conducive to its growth. While it may be surprising that the availability of so many forms of legal gaming in New Jersey has not cut into the appeal of the illegal gambling business, this Commission strongly suspects that whatever recent successes have been realized, illegal gambling, especially the numbers rackets and sports betting, remains a major problem. The reasons appear to be several. First, illegal gambling is a mainstay of organized crime groups. Numbers and sports book traffic, considered by many as basically an innocuous activity, is so deeply rooted in certain areas that it has become culturally acceptable and part of the local economy in some neighborhoods. And finally,

from a competitive perspective, illegal gambling offers better odds, easier credit and confidentiality.

As with street crime, the impact of legal gaming in all of its forms on illegal gambling may be an appropriate subject for further in-depth study as part of the State's continuing review of gaming policy issues. In the absence of conclusive proof to the contrary, however, the Commission supports the following findings.

> THE COMMISSION HAS HEARD EVIDENCE THAT THE IMPACT OF LEGALIZED GAMING HAS REDUCED NEITHER THE MAGNITUDE NOR THE FREQUENCY OF ILLEGAL GAMBLING IN NEW JERSEY. THE COMMISSION FINDS THAT NUMBERS RACKETS AND ILLEGAL SPORTS BETTING REMAIN A MAJOR PROBLEM FOR THE RESIDENTS OF NEW JERSEY AND THAT THE LEGALIZATION OF GAMBLING DOES NOT APPEAR TO BE AN EFFECTIVE DETERRENT TO ILLEGAL GAMBLING.

### END NOTES

1. Of course, public purposes other than raising state funds underlie some of the various forms of legal gaming. Bingo and raffles were legalized to provide revenue for charitable and religious organizations and casino gaming was adopted in part as a stimulus for capital investment and job creation in a depressed region of the State. Racing-generated revenues are used in part for the Meadowlands debt service.

2. Although formally established in the Department of the Treasury, the Division of the State Lottery is represented by the Attorney General in legal proceedings and staffs its investigative function with the Division of the State Police, which is under the authority of the Attorney General. Also in, but not of, the Department of the Treasury is the Casino Control Commission, the quasi-judicial arm of the State's casino control apparatus.

3.  The Amusement Games Law requires an appli-
    cant to obtain both a local or municipal license
    and a state license. Under the Bingo Licensing
    Law and Raffles Licensing Law, the municipality
    is the licensing authority. However, the state reg-
    ulatory agency (Legalized Games of Chance
    Control Commission) may screen out ineligible
    applicants in its mandated registration process
    prior to any municipal licensing review.

4.  The consolidation proposal has reference solely
    to the enforcement functions of gaming regula-
    tion, namely, background and compliance
    investigations, audits, inspections and other
    types of reviews to ensure eligibility and contin-
    uing suitability for licensure, and conformity of
    gaming operations with applicable rules and
    regulations. The proposal does not address the
    quasi-judicial and administrative functions of
    gaming regulation which presumably will
    remain where appropriate, within the autono-
    mous, independent agencies where they cur-
    rently reside. In such cases, the regulatory
    framework will follow the casino control model
    which, as previously noted, is bifurcated rather
    than unitary with decision making and adminis-
    trative functions vested in the Casino Control
    Commission and investigative, compliance and
    enforcement activities conducted by the Divi-
    sion of Gaming Enforcement.

5.  The Meadowlands Racetrack presents another
    pattern of public-private cooperation. The Meadow-
    lands is a public agency with public employees that
    provides a setting for private horsemen to compete
    for funds raised through state-approved pari-mutuel
    betting.

6.  *U.S. Commission on the Review of the National
    Policy Toward Gambling Study Panel*, State of New
    York (1979) at 10-11; *Second Interim Report of New
    Jersey Governor's Staff Policy Group on Casino
    Gambling* (Feb. 17, 1977).

7.  "Atlantic City Watch — A 'Family Resort',"
    *New Jersey Reporter*, Volume 12, No. 13, Sep-
    tember 1982 at 8.

8.  Dr. Glenn Reeling, *Memorandum to Gover-
    nor's Advisory Commission on Gambling*,
    March 31, 1988.

**APPENDIXES**

**A. LIST OF MEMBERS OF THE ADVISORY
COMMISSION ON GAMBLING**

# MEMBERS OF THE GOVERNOR'S ADVISORY COMMISSION ON GAMBLING

1. Steven J. Batzer, Chairman
   Margate

2. Thomas O'Brien, Esq., Vice Chairman
   Roseland

3. John Chaplick, Esq.
   Toms River

4. The Honorable Chuck Hardwick, Speaker of
   the General Assembly
   Westfield

5. The Honorable Richard J. Codey, State Senator
   West Orange

6. Ronald Dancer
   New Egypt

7. Bishop Herluf M. Jensen, New Jersey Synod,
   Evangelical Lutheran Church in America
   Trenton

8. Elizabeth S. Rozier, Esq.
   Lakewood

9. Molly Coye, M.D., Commissioner of Health,
   Trenton

   Designee: Riley Regan, Director, Division of
         Alcoholism

10. Feather O'Connor, State Treasurer
    Trenton

    Designee: Laura Sanders, Assistant State
          Treaurer

11. Dr. Saul Cooperman, Commissioner of
    Education
    Trenton

    Designee: Dr. Thomas Rubino, Student
          Discipline-Behavioral Project
          Coordinator

12. Michael Cole, Esq., Counsel to the Governor
    Trenton

    Designee: Arthur Herrmann through April
          1988; Peter Markens thereafter,
          Assistant Counsel to the Governor.

13. Stuart Goldsmith, Chairman, New Jersey
    Racing Commission
    Rochelle Park

    Designee: Bruce Garland, Executive Director,
          New Jersey Racing Commission

14. Arnold Wexler, Executive Director, Council on
    Compulsive Gambling of New Jersey, Inc.
    Trenton

15. Peter J. O'Hagan, Jr., Chairman, New Jersey
    Lottery Commission
    Lawrenceville

16. The Honorable W. Cary Edwards, Attorney
    General
    Trenton

    Designee: Anthony J. Parrillo, Director,
          Division of Gaming Enforcement

17. The Honorable Walter N. Read, Chairman,
    Casino Control Commission
    Trenton

18. Dr. Charles Zadikow
    Summit

19. Richard Gillman through 1987; David P.
    Hanlon, Chairman, Casino Association of New
    Jersey, thereafter.
    Atlantic City

    Designee: Thomas D. Carver, President,
          Casino Association of New Jersey.

21

## B.  COMMISSION'S WORKPLAN

# COMMISSION'S WORKPLAN

## WORKPLAN

The Commission's workplan emerged from its efforts to develop a research strategy for investigating, within its legislative mandate, the four agreed upon areas for study. The steps in the plan include:

Step 1: Interviews of Commission Members

Staff interviewed all commissioners and/or their designees during the period of April 24 to May 20, 1987. The concerns and questions raised by each commissioner was presented to the full Commission at its May 1987 monthly meeting.

Step 2: Commissioners Propose an Agenda

At the May 1987 meeting, the commissioners defined and specified areas for research.

Step 3: Options for Research Presented

At the May 1987 meeting, staff presented two options on the scope and level of research methodology and analysis for the commissioners to consider. The options were: (a) use existing information which could be provided by the forms of gambling, state agencies, trade associations, and existing literature and (b) conduct original research and gather information tailored according to the Commission's specifications. Option A, combined with a limited use of consultants (in the areas of compulsive gambling, public policy, and economic impact) and testimony from experts (in the areas of compulsive gambling, gambling and criminal activity, casino reinvestment, and horse racing and sports betting) was agreed upon. The commissioners also decided to hold public hearings in several locations.

Step 4: Work Session

Commissioners conducted a work session in June 1987 to examine and assess reports and data that are already available.

Step 5: Expert Testimony Received

Commissioners received expert testimony on compulsive gambling, casino reinvestment in Atlantic City, criminal activity and gambling, economic impact of casino gambling, and horse racing and the New Jersey Sports and Exposition Authority.

Each of the major forms of gambling also provided an overview of their structure and operations. Representatives from the Lottery Commission, Legalized Games of Chance Control Commission, Racing Commission, Atlantic City Casino Association, and the Casino Control Commission provided overviews for the Commission. These presentations were made between August 1987 and March 1988.

At the request of the Commission, the Casino Association of New Jersey, presented the commissioners with a study entitled, "The Casino Industry's Economic Impact on Atlantic City." The report was prepared by Touche Ross International.

Step 6: Consultants Retained

Consultants were hired to prepare reports on gambling as public policy, compulsive gambling, and the economic impact of gambling.

Step 7: Public Hearings Held

Public hearings were held in Atlantic City, Freehold, and Trenton in late March and April 1988 to obtain comments and testimony from the general public and other persons.

Step 8: Commissioners Voted on Policy Recommendations

Step 9: Final Report Released

Commission issued its Final Report, including research findings and policy recommendations to the Governor and Legislature.

**C.  CHRONOLOGY OF COMMISSION MEETINGS**

# CHRONOLOGY OF COMMISSION MEETINGS

Generally, the Governor's Advisory Commission on Gambling met monthly, beginning in April 1987 and ending in June 1988. The meeting schedule and the names of persons appearing before the Commission are listed below:

1. April 24, 1987 — Organizational Meeting (Lawrenceville) — Presentation on Taxes, the State Budget, and Revenues Derived from Gambling

    a. Laura Sanders, Assistant State Treasurer

    b. Richard B. Sandiford, III, Director of the New Jersey Office of Management and Budget

2. May 22, 1987 — Outlining Commissioners Concerns, Questions and Workplan (Lawrenceville)

3. June 30, 1987 — Work Session to Determine State of Existing Data on Gambling in New Jersey. (Lawrenceville)

4. July 9, 1987—Overview of Gambling in New Jersey. (Lawrenceville)

    a. Barbara A. Marrow, Executive Director of the State Lottery

    b. William J. Reed, Executive Officer, Legalized Games of Chance Control Commission

5. August 14, 1987 — Pathological Gambling in New Jersey. (Lawrenceville)

    a. Dr. Robert Custer, Director of Gambling Treatment Programs at Taylor Manor Hospital in Ellicott City, Maryland

    b. Dr. Michael Leffand, Director of Gambling Treatment Outpatient Program at JFK Medical Center in Edison

    c. Dr. Rena Nora, Chief of Psychiatry and the Inpatient Program for Compulsive

Gamblers at Lyons Veterans Administration Hospital

    d. Testimony from recovering compulsive gamblers and family members.

6. September 18, 1987 — Casino Reinvestment in Atlantic City (Lawrenceville)

    a. Michael Cohan, Director of the Casino Reinvestment Development Authority

    b. Presentations by Potential Consultants

    — Dr. Richard Lehne, Rutgers University
    — Dr. Thomas Hamer, Glassboro State College
    — Dr. Henry Lesieur, St. John's University
    — Mr. Bernard Sless, Stockton State College
    — Mr. Robert Culleton, Rutgers University

7. October 16, 1987 — Gambling and Criminal Activity (Lawrenceville)

    a. Colonel Clinton Pagano, Superintendent of the Division of New Jersey State Police

    b. Michael J. Bozza, Assistant Director for Organized Crime in the New Jersey Division of Criminal Justice

    c. Justin Dintino, Chief of the State Commission of Investigation's Intelligence Division

    d. John McGinley, Special Agent in Charge for the Federal Bureau of Investigation in New Jersey

    e. Fredrick E. Gushin, Assistant Director in the New Jersey Division of Gaming Enforcement

8. November 13, 1987 — The Casino Industry's Economic Impact on New Jersey (Trenton)

a. Thomas Carver, President of the Casino Association of New Jersey

b. William Weidner, President of the Pratt Hotel Corporation

c. Thomas Veal, Partner in the firm of Touche Ross International

d. Two Consultants' Proposals Accepted

— Dr. Henry Lesieur, an update of Rickey Green's 1979 report entitled, "A Preliminary Study of Compulsive Gambling in New Jersey"

— Dr. Richard Lehne, a paper entitled, "A Contemporary History of Gambling in New Jersey"

9. December 11, 1987 — Continuation of Overview of Gambling in New Jersey (Trenton)

a. Commissioner Walter Read, Chairman of the Casino Control Commission

b. Bruce Garland, Director of the New Jersey Racing Commission

10. February 19, 1988 — Work Session on the Major Topics in the Final Report's Outline (Trenton)

— Commission Chairman reports that staff have retained the services of Dr. Kenneth Harrison of Stockton State College to prepare a paper entitled, "The Economic Impact of Gambling in New Jersey"

11. March 25, 1988 — Horse Racing, Sports Betting, and Gambling (Trenton)

a. Robert Mulcahy, III, President and Chief Executive Officer of the New Jersey Sports and Exposition Authority

b. Jack Killion, Former President of the New Jersey Breeders Association

12. March 31, 1988 — Public Hearing (Atlantic City)

— Presenters

a. Michael Redpath, Executive Director of the New Jersey Amusement Association

b. Ellie Asroff, A Concerned Citizen

c. Chuck Reynolds, Publisher of *The Press*

d. Joel Jacobson, Former Commissioner of the Casino Control Commission and Director of the Council on Compulsive Gambling of New Jersey

e. James Murphy, President of the Atlantic City Race Course

f. Dr. Frank Twiggs, Director of Outpatient Services and Co-director of the Compulsive Gambler Crisis intervention Service at the Atlantic Mental Health Center in Atlantic City

g. Leonard Cohen, A Concerned Citizen

h. Dr. Glenn Reeling, Professor of Psychology and Education at Jersey City State College

i. Dr. Henry Lesieur, Associate Professor of Sociology at St. John's University and Consultant to the Commission

13. April 15, 1988 — Public Hearing (Freehold)

— presenters

a. Dr. Cliff Zukin, Associate Professor of Political Science and Director of the Center for Public Interest Polling at the Eagleton Institute of Politics, Rutgers University

b. Joseph V. McLoone, President and CEO of the Freehold Raceway

c. Edward A. "Ted" Snell, Vice President and General Manager of the Freehold Raceway

d. Edward Looney, President of the Board of Directors of the Council on Compulsive Gambling of New Jersey

24

e.   Ronald Gaudia, Acting Executive Director of the Westchester Jewish Community Service in New York

f.   Wilbur Edwards. A concerned Citizen

g.   "Stewart," a recovering compulsive gambler

h.   Codey Barrett, A Concerned Citizen

i.   "Terry S.," A Member of Gam-Anon

j.   "Sharon B.," A Recovering Compulsive Gambler

k.   "Michael," A Recovering Compulsive Gambler

l.   "John S.," A Recovering Compulsive Gambler

m.   "Stan," A Recovering Compulsive Gambler

n.   "Jim G.," A Recovering Compulsive Gambler

14.   April 22, 1988 — Public Hearing (Trenton)

— Presenters

a.   The Honorable Hazel F. Gluck, Commissioner of the New Jersey Department of Transportation and Former Executive Director of the New Jersey State Lottery

b.   Albert Merck, Former Commissioner of the Casino Control Commission

c.   Kenneth LeFevre, Deputy Commissioner for New Jersey Department of Commerce, Energy, and Economic Development

d.   The Honorable Irwin Kimmelman, Former Attorney General

e.   Robert Quigley, President of Garden State Park

f.   The Reverend Dudly E. Sarfaty, Associate General Secretary of the New Jersey Council of Churches

g.   Commissioner Walter Read, at the request of State Senator Catherine A. Costa, former chair of the Casino Revenue Fund Study Commission of the 1984-1985 Legislative Session, read her statement into the record in her absence.

15.   May 20, 1988 — Work Session in which Commissioners met Initially as a Committee of the Whole and then Divided Themselves into Special Subcommittees—Gambling as Public Policy, Pathological Gambling, Economic Impact, Crime and Criminal Activity—for the Purpose of writing Recommendations for the full Commission's consideration. (Trenton)

16.   June 2, 1988 — Determined Recommendations to be Voted on by the Full Commission (Lawrenceville)

17.   June 10, 1988 — Full Commission Voted on Recommendations (Trenton)

18.   June 21, 1988 — Commissioners Reviewed the Executive Summary of its Final Report (Trenton)

19.   June 30, 1988 — Commissioned Released Its Final Report

## D. VOTING RECORD OF COMMISSIONERS ON RECOMMENDATIONS

New Jersey State Library

# VOTING RECORD OF COMMISSIONERS ON RECOMMENDATIONS

**RECOMMENDATION #1**: THE COMMISSION RECOMMENDS THAT A PERMANENT ADVISORY GROUP INCLUDING MEMBERS OF THE PUBLIC CONTINUE TO EXAMINE AND ANALYZE ISSUES CON-CERNED WITH THE CONDUCT AND INTERRELATIONSHIPS OF GAMING IN THE STATE OF NEW JERSEY.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J.Batzer | Richard Codey | Chuck Hardwick* | |
| Cary Edwards | | Arnold Wexler | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Herluf Jensen | | | |
| Saul Cooperman | | | |

**RECOMMENDATION #2**: GIVEN THE SHARED GOAL OF STRICT REGULATION AND THE CROSS-CUTTING ELEMENTS OF ENFORCEMENT IN ALL FORMS OF LEGALIZED GAMING, THE COMMISSION RECOMMENDS THAT SERIOUS CONSIDERATION BE GIVEN TO THE CONSOLIDATION OF ALL GAM-ING RELATED LAW ENFORCEMENT FUNCTIONS WITHIN A SINGLE AGENCY IN THE DEPARTMENT OF LAW AND PUBLIC SAFETY, UNDER THE JURISDICTON OF THE ATTORNEY GENERAL.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J.Batzer | Herluf Jensen | Chuck Hardwick | |
| Cary Edwards | | | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Richard Codey | | | |

*Speaker Chuck Hardwick attended the session, but declined to vote on any resolutions.

**RECOMMENDATION:** THE COMMISSION IS CONCERNED AND ALARMED ABOUT THE CONTINUED INCREASE IN AVAILABILITY OF GAMBLING UPON AMERICAN INDIAN TRIBAL LANDS. WE WISH TO GO ON RECORD AS STRONGLY SUPPORTING THE FEDERAL EFFORTS IN THE CONGRESS OF THE UNITED STATES DESIGNED TO CONTROL GAMBLING ON INDIAN RESERVATIONS.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J. Batzer | | Chuck Hardwick | |
| Cary Edwards | | | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Herluf Jensen | | | |
| Richard Codey | | | |

**RECOMMENDATION #3:** WE THEREFORE RECOMMEND THAT ALL GAMBLING ADVERTISING AND RELATED ACTIVITIES CONFORM TO STANDARDS OF GOOD TASTE AND THAT ADVERTISEMENTS WHICH ARE DIRECTLY RELATED TO GAMBLING ACTIVITIES INCLUDE APPROPRIATE PUBLIC SERVICE CONTENT INCLUDING A REFERENCE TO INFORMATION ABOUT COMPULSIVE GAMBLING.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J. Batzer | | Chuck Hardwick | |
| Cary Edwards | | | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Herluf Jensen | | | |
| Richard Codey | | | |

**RECOMMENDATION #4:** WE RECOMMEND THAT AN ORGANIZATION BE CREATED WHOSE MISSION IS TO ENHANCE THE ECONOMIC VIABILITY OF THE RACING INDUSTRY AND TO PROVIDE STATE-WIDE PROMOTION AND MARKETING OF ALL ASPECTS OF HORSE RACING IN NEW JERSEY.

WE FURTHER RECOMMEND THE ESTABLISHMENT OF A NEW JERSEY HORSE INDUSTRY GROWTH AND DEVELOPMENT FUND, TO BE ADMINISTERED BY THE NEW JERSEY RACING COMMISSION, WHICH WILL PROVIDE FUNDING FOR NEEDED EDUCATIONAL AND DEVELOPMENTAL ASSISTANCE PROGRAMS FOR RACETRACK EMPLOYEES AND RACETRACK OPERATORS.

FURTHERMORE, WE RECOMMEND THAT THE LEGISLATURE UNDERTAKE THE NECESSARY STEPS TO ALLOW SUNDAY RACING TO OCCUR AT THE RACETRACKS OF NEW JERSEY WITHOUT ANY INCREASE IN THE SIX DAY RACE WEEK.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J.Batzer | Saul Cooperman | Chuck Hardwick | |
| Walter Read | Herluf Jensen | Cary Edwards | |
| John Chaplick | | Michael Cole | |
| Ronald Dancer | | Feather O'Connor | |
| Bruce Garland | | Arnold Wexler | |
| David Hanlon | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Richard Codey | | | |

**RECOMMENDATION #5:** WE SPECIFICALLY RECOMMEND THAT THE STATE SENATE CONSIDER RECONSTITUTING ITS CASINO REVENUE STUDY COMMISSION AND THAT A SIMILAR BODY BE ESTABLISHED TO REVIEW LOTTERY REVENUES SO THAT THE STATE WOULD BE PREPARED FOR ANY DOWNTURN IN GAMBLING REVENUES AND PRIORITIZE THE USE OF SUCH FUNDS.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J.Batzer | | Chuck Hardwick | |
| Cary Edwards | | Herluf Jensen | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Richard Codey | | | |

28

**RECOMMENDATION #6:** WE RECOMMEND THE ESTABLISHMENT OF AN OFFICE OF COMPULSIVE GAMBLING WITHIN THE DEPARTMENT OF HEALTH. THIS OFFICE SHOULD ENGAGE IN EFFORTS TO UNDERTAKE COMPREHENSIVE RESEARCH INTO THE CAUSES AND TREATMENTS OF COMPULSIVE GAMBLING, INSTITUTE PUBLIC AWARENESS PROGRAMS AS TO THE RISK OF GAMBLING, TAKE SPECIAL EFFORTS TO INFORM THE YOUTH OF THE STATE OF NEW JERSEY ABOUT THE INHERENT DANGERS INVOLVED IN GAMBLING, DEVELOP PROGRAMS TO ASSURE APPROPRIATE INSURANCE COVERAGE, PROVIDE EFFECTIVE AND LONG-LASTING TREATMENT PROGRAMS, RECOMMEND TO THE GOVERNOR APPROPRIATE ADVERTISING POLICY FOR GAMING, AND EXPLORE ALL ISSUES WHICH MAY IMPACT UPON GAMBLING RELATED PROBLEMS OF THE RESIDENTS OF THE STATE OF NEW JERSEY.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J. Batzer | | Chuck Hardwick | |
| Cary Edwards | | | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Herluf Jensen | | | |
| Richard Codey | | | |

**RECOMMENDATION #7:** THE COMMISSION RECOMMENDS THAT THE APPROPRIATE GOVERNMEN-TAL AGENCIES, IN CONJUNCTION WITH OFFICIALS FROM RACETRACKS, CASINOS, AND LOTTERY, INCREASE EFFORTS TO CONTROL GAMBLING BY UNDERAGE PERSONS THROUGHOUT THE STATE. WE DO NOT, AT THIS TIME, RECOMMEND ANY STATUTORY CHANGE IN THE MINIMUM AGE REQUIREMENTS FOR GAMING IN THE STATE.

WE RECOMMEND, HOWEVER, THAT THE OFFICE OF COMPULSIVE GAMBLING WITHIN THE DEPART-MENT OF HEALTH BE DIRECTED TO CLOSELY STUDY THIS ISSUE AND PROPOSE APPROPRIATE POLICY RECOMMENDATION, EDUCATION, AND ENFORCEMENT PROCEDURES. WE ALSO RECOM-MEND A STUDY BE CONDUCTED TO DETERMINE THE EXTENT OF THE UNDERAGE GAMBLING PROBLEM.

WE ENCOURAGE THE RACING COMMISSION, THE LOTTERY COMMISSION, AND THE CASINO CON-TROL COMMISSION TO CONSIDER THE USE OF STRONGER AND MORE EFFECTIVE SANCTIONS DESIGNED TO LIMIT THE INVOLVEMENT OF YOUTH IN GAMBLING RELATED ACTIVITIES AND TO DEVELOP CREATIVE SOLUTIONS WITHIN THEIR RESPECTIVE INDUSTRIES.

WE ENCOURAGE STRICTER ENFORCEMENT BY THE CASINO SECURITY PERSONNEL AND CASINO FLOOR OPERATORS.

WE FURTHER RECOMMEND SOME PROGRAM OF PUBLIC EDUCATION THROUGH THE SCHOOLS, THE CASINOS, AND APPROPRIATE STATE AGENCY TO ALERT THE COMMUNITY TO THE INHERENT DANGERS OF GAMBLING.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|-----|-----|------------|------------------------|
| Steven J. Batzer | | Chuck Hardwick | |
| Cary Edwards | | | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Herluf Jensen | | | |
| Richard Codey | | | |

**RECOMMENDATION #8:** THUS, WE RECOMMEND BOTH THE UPDATING OF THE EMPLOYMENT AND INCOME MULTIPLIERS AND THE DEVELOPMENT OF ECONOMIC MODELS OF REVENUE PRE-DICTION FOR THE THREE FORMS OF GAMBLING.

WITH REGARD TO REPORTING, WE RECOMMEND INCREASED REPORTING OF FULL AND PART-TIME EMPLOYMENT, AND ANNUAL TRACKING OF ECONOMIC TRENDS IN ATLANTIC CITY AND COUNTY.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|-----|-----|------------|------------------------|
| Steven J. Batzer | | Chuck Hardwick | |
| Cary Edwards | | | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Herluf Jensen | | | |
| Richard Codey | | | |

**RECOMMENDATION #9:** WE FIND THAT IN ORDER FOR THIS GROWTH TO CONTINUE AND EXPAND, AND FOR ATLANTIC CITY TO BECOME THE CONVENTION AND TOURIST CENTER ENVISIONED BY THE CASINO CONTROL ACT, THIS COMMISSION RECOMMENDS THAT THE ADMINISTRATION AND LEGISLATURE TAKE IMMEDIATE ACTION TO ENSURE THAT A FIRST CLASS CONVENTION FACILITY IS DEVELOPED IN ATLANTIC CITY, AS SOON AS POSSIBLE, AND THAT THE DEVELOPMENT OF A FIRST CLASS AIRPORT FACILITY BE EXPEDITED. THE POTENTIAL OF COMPETITION FROM OTHER JURIS-DICTIONS OUTSIDE OF NEW JERSEY, AS WELL AS THE EXPANDING COMPETITION WITHIN THE CITY, MAKE THE IMMEDIATE EXPANSION OF CONVENTION AND TRANSPORTATION FACILITIES IMPERA-TIVE.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven Batzer | Elizabeth Rozier | Chuck Hardwick | Saul Cooperman |
| John Chaplick | | Walter Read | |
| Ronald Dancer | | Feather O'Connor | |
| Bruce Garland | | Michael Cole | |
| David Hanlon | | Cary Edwards | |
| Peter O'Hagan | | Herluf Jensen | |
| Molly Coye | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Richard Codey | | | |

**RECOMMENDATION #10:** THEREFORE, WE RECOMMEND THAT STRICT REGULATORY AND LAW ENFORCEMENT SCHEMES SHOULD BE APPLIED WITH EQUAL FORCE AND DILIGENCE TO THE ANCIL-LARY BUSINESSES AND LABOR UNIONS WHICH SERVICE THE ATLANTIC CITY CASINO INDUSTRY TO THE END OF ENSURING THAT ORGANIZED CRIME BENEFIT NEITHER DIRECTLY NOR INDI-RECTLY FROM CASINO GAMING.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J.Batzer | | Chuck Hardwick | |
| Cary Edwards | | | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Herluf Jensen | | | |
| Richard Codey | | | |

31

**RECOMMENDATION #11:** GIVEN THE PARTICULAR VULNERABILITY OF, AND SPECIAL LAW ENFORCEMENT CONCERNS WITH, CASINO CREDIT AND CURRENCY REPORTING, THE COMMIS-SION ENDORSES THESE REFORMS.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J.Batzer | | Chuck Hardwick | |
| Cary Edwards | | | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Herluf Jensen | | | |
| Richard Codey | | | |

**RECOMMENDATION #12:** THE COMMISSION RECOGNIZED THE INCREASING SOPHISTICATION AND COMPLEXITY OF OTHER TYPES OF CASINO-SPECIFIC CRIMES. GIVEN THE MUTUALITY OF INTERESTS INVOLVED, THE COMMISSION FURTHER SUPPORTS A CLOSELY COORDINATED EFFORT BETWEEN INDUSTRY REPRESENTATIVES AND STATE REGULATORS IN THIS REGARD.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J.Batzer | | Chuck Hardwick | |
| Cary Edwards | | | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Herluf Jensen | | | |
| Richard Codey | | | |

32

**RECOMMENDATION #13:** BECAUSE OF THE IMPORTANCE OF THIS ISSUE (CASINO/CRIME LINK) TO THE GOOD AND WELFARE OF THE PEOPLE OF THE STATE, THE COMMISSION STRONGLY RECOMMENDS THAT AN ANALYSIS AND EVALUATION OF THIS PROBLEM BECOME PART OF THE FUNCTION AND RESPONSIBILITY OF THE PERMANENT ADVISORY STRUCTURE RECOMMENDED ELSEWHERE IN THIS REPORT.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J. Batzer | | Chuck Hardwick | |
| Cary Edwards | | | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Herluf Jensen | | | |
| Richard Codey | | | |

**RECOMMENDATION:** THE COMMISSION HAS HEARD EVIDENCE THAT THE IMPACT OF LEGALIZED GAMING HAS REDUCED NEITHER THE MAGNITUDE NOR THE FREQUENCY OF ILLEGAL GAMBLING IN NEW JERSEY. THE COMMISSION FINDS THAT NUMBERS RACKETS AND ILLEGAL SPORTS BETTING REMAIN A MAJOR PROBLEM FOR THE RESIDENTS OF NEW JERSEY AND THAT THE LEGALIZATION OF GAMBLING DOES NOT APPEAR TO BE AN EFFECTIVE DETERRENT TO ILLEGAL GAMBLING.

| YES | NO | ABSTENTION | NOT PRESENT/NOT VOTING |
|---|---|---|---|
| Steven J. Batzer | | Chuck Hardwick | |
| Cary Edwards | | | |
| Walter Read | | | |
| John Chaplick | | | |
| Feather O'Connor | | | |
| Ronald Dancer | | | |
| Bruce Garland | | | |
| Michael Cole | | | |
| David Hanlon | | | |
| Saul Cooperman | | | |
| Peter O'Hagan | | | |
| Molly Coye | | | |
| Elizabeth Rozier | | | |
| Charles Zadikow | | | |
| Thomas O'Brien | | | |
| Arnold Wexler | | | |
| Herluf Jensen | | | |
| Richard Codey | | | |

33

# E. CONSULTANTS' REPORTS

# The Economic Impact of Gambling in New Jersey.

Final Report
prepared for the
Governor's Commission
on Gambling

Ken Harrison Ph.D.
Associate Professor
  of Economics
Stockton State College
Pomona, New Jersey
  6/30/88

# Executive Summary

- For 1986, there were approximately 91,000 jobs in New Jersey that were dependent upon the gambling industry. 58,000 of these jobs are directly related to gambling while 33,000 were created indirectly. Total casino related employment was 68% of the total while horse racing and the lottery contributed 18% and 14%, respectively.

- Employment in the gambling industry constitutes about 2.5% of the total statewide employment for 1986. For Atlantic County gambling related employment was 33% of total employment.

- Direct regulatory employment was 1362 for 1986 which was 1.5% of total gambling related employment. The dollar cost of this employment and associated regulatory costs was $66.4 million in 1986, scheduled to rise 15% in 1987.

- Total direct and indirect income generated by the gambling industry was about $4.6 billion dollars for 1986. Casinos generated 74% of this income while the lottery and horse racing generated 18% and 8% respectively. This amount constituted 3% of total State Personal Income. Fifty percent of this income was "imported" from other states and accrued mostly to the casino sector.

- Atlantic County received 57% of net income benefits from casinos. The casino wage component generated 14% of Atlantic County's personal income for 1984.

- In 1986 direct gambling revenues accruing to State Government totalled $613 million, expected to rise to $742 million in Fiscal year 1989. As a percentage of total own-state revenues, gambling revenues have stabilized at about 7%. Casinos generated, not including reinvestment obligations, 30% of the total while the lottery and horse racing contributed 68% and 2% respectively.

- For 1985, Atlantic County, including Atlantic City, received 33% of total budgetary expenses from the casinos via the local property tax.

- The four major areas of the State Budget that receive lottery funds (Corrections, Higher Education, Departments of Education and Human Services) have not increased their total share of the budget from FY 1978 (64.9%) through 1988. (63.5%) Inside this aggregate, Human Services gained the most (8.4%) while the Department of Education lost the most (11.5%).

- From 1978-1986 lottery sales have increased about 2% for every 1% increase in New Jersey Personal Income per capita.

- For both the lottery and casino revenue fund benefits, there appears to be no substantial geographic redistribution.

- Atlantic County's gross income grew 20% faster than the State of New Jersey Income between 1978 and 1985.

- The percentage share of Budgetary allocations for Atlantic City and County have increased from 1976-1985 for Law Enforcement and have decreased for Health/Welfare and Public Words/Debt Service.

- A series of ten recommendations are listed in the conclusion section. They include:

  - Part time and full time employment study
  - Sales Tax Collection Data by County
  - Rainy Day Fund for Gambling Revenues
  - Analysis of Regulatory Employment and Costs
  - A Social Report for Atlantic County
  - Econometric multiplier and revenue models

# List of Tables

| Table No. | | Page |
|---|---|---|
| 1. | N.J. and U.S. employment 1977-87 | 37 |
| 2. | N.J. and U.S. unemployment 1978-88 | 38 |
| 3. | Volume of N.J. Unemployment 1977-87 | 38 |
| 4. | Unemployment Rates in Atlantic County and N.J. 1976-87 | 39 |
| 5. | Growth in Labor Force Atlantic County vs. New Jersey 1980-86 | 40 |
| 6. | Total Gambling Related Employment Effects, Fiscal Year 1986 | 42 |
| 7. | Top Ten Private N.J. Employers Nov. 1987 | 42 |
| 8. | Casino Expenditures and Surplus 1986 | 44 |
| 9. | Summary of Income Effects 1986 | 46 |
| 10. | Distribution of Lottery Expenditures FY 1986 | 47 |
| 11. | Distribution of Lottery Income, FY 1986 | 47 |
| 12. | Summary of Direct Gambling Revenues Fiscal Years 1978-1989 | 48 |
| 13. | Percentage Change in Gambling Revenues Fiscal Years 1981-89 | 50 |
| 14. | Income Elasticity of Gambling Revenues, 1978-1986. | 51 |
| 15. | Family Income Distribution N.J. vs. U.S. 1979 and 1984 | 53 |
| 16. | Percentage Changes in Property Values around Racetracks | 55 |
| 17. | Per-capita Income — County and Twp. around Racetracks | 55 |
| 18. | Atlantic City and Atlantic County Budget, 1976 and 1985, Selected Items | 58 |

# List of Appendixes

| Number | Title | Page |
|---|---|---|
| 1. | Governors Advisory Commission Outline of Final Report | 62 |
| 2. | Lottery Program FY 1986 Contributions to State Programs | 63 |
| 3. | Regulatory Employment and Budget Allocation FY 1986 | 65 |
| 4. | Casino Employment-County of Origin — 6/30/87 | 66 |
| 5. | Casino Revenue Fund Disbursements FY 1986 | 67 |
| 6. | Percentage Budget Allocations Depts. Receiving Lottery Funds Fiscal Years 1978/79 and 1987/88 | 68 |
| 7. | Homestead Rebate Data for Horse Racing Counties 1978 and 1986. | 69 |

### Introduction:

This study will examine the economic impact, of the three major forms of legalized gambling in New Jersey, the casino industry, horse racing and the State Lottery. No attempt will be made to analyze other forms of legal gambling, such as Bingo, or illegal gambling such as sports betting.

It is somewhat remarkable that the aggregate economic effects of the gambling have not, to date, been analyzed. Major recent studies and forecasts of the New Jersey economy, from both the private and public sectors[1] have not paid specific attention to the gambling industry. *A priori*, this industry must exert a major impact upon income, employment, the tax revenue and expenditure structure, as well as geographical and redistributional economic effects. This study will thresh out and aggregate these and other economic effects and discuss several public policy implications of these economic trends. In addition, related aspects of the relationship between economic development and gambling will be addressed as requested in the "Outline of Final Report" from the Governors Commission on Gambling. (see appendix 1)

### Methodology:

Regional economic multiplier analysis will be used to estimate the aggregate economic impact of gambling, especially with respect to employment and income. While there are alternative models, (eg. input/output, econometric)[2] multiplier analysis is the model most often used and has the longest history of application. This model is especially useful in a new industry such as gambling.

Briefly put, regional multiplier analysis begins with an assessment of direct economic benefits, such as increases in payroll, and then makes assumptions and estimates concerning the indirect economic benefits such as secondary employment and income created. Both direct and indirect benefits may be large, if they accrue in-state, or small if they are "exported" to other states. Hence, location of employees, vendors and customers is crucial in regional multiplier analysis.

In addition, the relationship between gambling tax revenues and the New Jersey State Tax structure will be analyzed. What is the mix of revenues from each section of the industry and what are the trends that have emerged? The methodology in this section will contain some estimates of the revenue elasticity of gambling tax revenues. Revenue elasticity measures the quantitative relationship between changes in an income measure (such as New Jersey personal income) and changes in tax revenue, in this case gambling tax revenue. Revenue elasticity estimates, because they measure revenue stability, may provide a useful framework in which to plan for changes in State programs that rely upon gambling tax revenues.

The time frame used in this report will be one year, 1986, the most recent year that contains a complete data set. Where more recent data is available it will be presented. Cumulative economic effects may be outlined in some areas but the major question addressed is: What are the aggregate annual economic benefits of the gambling industry?

The assessment of direct and indirect economic benefits raises additional areas of concern relating to tertiary benefits and costs. For example, the growth of a new industry may reduce State expenditures on income maintenance or provide the tax revenues for State programs that lead to a healthier and more productive work force. On the other hand, additional social and economic costs may be incurred by the development of a new industry such as increased pollution, crime costs, infrastructure decay as well as increased mental and physical health costs. Economists call these tertiary benefits and costs, "externalities". These benefits and costs cannot be easily measured, and this study will not calculate aggregate dollar estimates but will provide an outline of these benefits and costs along with evidence as to the direction of change.

1. See, *New Jersey Success* "Economic Forecast, 1988", Dec., 1987, *New Jersey Economics Indicators*, Jan. 1988 "Annual Statement of the Economic Policy Council", State and Local Expenditure and Revenue Policy Commission, "New Jersey's Economy, Jan. 1987"

2. See R. Richardson, *Regional Economics*, especially Chapter 4.

### Employment Impact of the Gambling Industry:

This section will examine the employment impact of casinos, the state lottery and the horse racing industry. Calculations will include direct employment and spinoff or indirect employment as well as the geographic distribution of employment. In order to quantify the relationship between direct and indirect employment, an employment multiplier concept will be used that is derived from an Input-Output Model of the New Jersey Department of Commerce[3]. The multipliers developed in this model are fairly conservative compared to models developed for a study of Nevada's economy[4], as well as the United State's Department of Commerce's multiplier estimates for New Jersey.[5]

Before analyzing the specific employment effects of the gaming industry, it is important to examine the overall employment picture. New Jersey's total employment, contrasted with United States data,

1977-1987, is presented in Table One.

In the last eleven years, New Jersey's share of total U.S. employment has remained about the same, although the growth rate for New Jersey employment (25%) is slightly higher than the figure (23%) for the United States as a whole. It is important to note that employment figures do not differentiate between full-time and part-time employment.

The opposite side of the coin, unemployment is presented below. Table Two presents New Jersey's unemployment rate contrasted with the United States during the last decade.[6] For most of the 1980's New Jersey's rate of unemployment was below the United States. The last column of the table, the ratio of New Jersey to U.S. unemployment, emphasizes a continuing robustness of the overall State economy.

Table three shows the actual volume of unemployment in New Jersey from 1977 to 1987.

| Table One: | | | |
| --- | --- | --- | --- |
| N.J.* and U.S. Employment (000) | | | |
| Year | New Jersey | U.S. | NJ/US |
| 1977 | 3065 | 92017 | 3.33% |
| 78 | 3209 | 96048 | 3.34 |
| 79 | 3323 | 98824 | 3.36 |
| 80 | 3334 | 99303 | 3.36 |
| 81 | 3330 | 100397 | 3.32 |
| 82 | 3306 | 99526 | 3.32 |
| 83 | 3385 | 100834 | 3.36 |
| 84 | 3589 | 105005 | 3.42 |
| 85 | 3617 | 107150 | 3.38 |
| 86 | 3696 | 109597 | 3.37 |
| 87** | 3843 | 113500 | 3.38 |

Sources: *New Jersey Economic Indicators* Jan, 1988 p. S-36 and the *Statistical Abstract of the United States*, various years.
*Resident Employment
**November

3. New Jersey Department of Commerce, Office of Economic Policy and Planning, Dr. Jong Krun, Aug. 1986.

4. Apt, *et al; The Business of Risk* p. 82.

5. United States Department of Commerce, Bureau of Economic Analysis, "Regional Multipliers", May, 1986, p. 100

6. New Jersey Department of Labor, Division of Planning and Research, *Statistical Abstract of the United States. New Jersey Economic Indicators.* p. 5-36, Jan., 1988.

| Table Two — Unemployment | | | |
|---|---|---|---|
| Year | New Jersey | United States | NJ/US |
| 1978 | 7.2% | 6.1% | 118.0% |
| 79 | 6.9 | 5.8 | 119.0 |
| 80 | 7.2 | 7.1 | 101.4 |
| 81 | 7.3 | 7.6 | 96.1 |
| 82 | 9.0 | 9.7 | 92.8 |
| 83 | 7.8 | 9.6 | 81.3 |
| 84 | 6.2 | 7.5 | 82.7 |
| 85 | 5.7 | 7.2 | 79.2 |
| 86 | 5.0 | 7.0 | 71.4 |
| 87 | 4.1 | 6.2 | 66.1 |
| Feb. 88 | 3.2 | 5.6 | 57.1 |

Sources:  NY Times, 3/5/88 p. 7
          *New Jersey Economic Indicators*, N.J. Dept. of Labor, various issues.

These figures indicate progress that the New Jersey public and private and economies have made in the reduction of the actual percentage and number of unemployed persons. Two questions emerge. First, to what extent is the gambling industry responsible for this trend and second, how are these gains distributed state-wide?

Table Four looks at the unemployment rate of the home of the casinos, Atlantic County.

| Table Three | |
|---|---|
| N.J. Volume of Unemployment 1977-87. | |
| Year | Volume |
| 1977 | 317,000 |
| 78 | 248,000 |
| 79 | 247,000 |
| 80 | 260,000 |
| 81 | 263,000 |
| 82 | 326,000 |
| 83 | 288,000 |
| 84 | 236,000 |
| 85 | 217,000 |
| 86 | 196,000 |
| 87* | 142,000 |

Source: *N.J. Economic Indicators*, Jan. 1988,
        p. S-36.
        *November 87.

At first glance; it may appear that the growth of the gambling industry did little to relieve, in a relative sense, unemployment. A closer examination, however reveals that the growth of the labor force, as measured by the total number of employed and unemployed and usually reflected in the labor force participation rate, has risen faster in Atlantic County than for New Jersey as a whole. Table Five shows that growth for the 1980's.[7]

## Table Four

### Unemployment Rates in Atlantic County vs. New Jersey. (1976-1987)

| Year | Atlantic County | New Jersey | AC/NJ% |
|------|-----------------|------------|--------|
| 1976 | 12.2 | 10.4 | 117.3% |
| 77 | 12.2 | 9.4 | 129.8 |
| 78 | 9.7 | 7.2 | 134.7 |
| 79 | 9.3 | 6.9 | 134.8 |
| 80 | 8.9 | 7.2 | 123.6 |
| 81 | 9.2 | 7.3 | 126.0 |
| 82 | 11.3 | 9.0 | 125.6 |
| 83 | 10.3 | 7.8 | 132.1 |
| 84 | 8.5 | 6.2 | 137.1 |
| 85 | 7.4 | 5.7 | 129.8 |
| 86 | 6.7 | 5.0 | 134.0 |
| 87 | 5.2 | 4.1 | 151.2 |

Source: New Jersey Dept. of Labor, Division of Planning and Research. Changes in methodology during this time make county data not strictly comparable.

Therefore, while the unemployment rate for Atlantic County is still above the state unemployment rate, the cumulative rate of growth of the labor force has risen more than three times the growth rate for the state as a whole. In other words, part of the higher unemployment rate is explained by an expanding labor force. In addition, some employment in Atlantic County is still seasonal, which will raise the yearly average unemployment rates.[8] It seems logical that a large part, if not most of the increase in the labor force is explained by the growth of casinos.

7. Exhibit 11, Touche Ross Study, Oct., 1987.

8. See Hamer, T., "The Casino Industry in Atlantic City" Federal Reserve Bank of Philadelphia, *Business Review*, Jan. Feb., 1982., pp. 3-16.

## Table Five

### Growth in Labor Force (000) NJ vs. Atlantic County

| Year | New Jersey | % | Atlantic County | % |
|------|-----------|------|----------------|------|
| 1980 | 3,594 | NA | 95.0 | NA |
| 81 | 3,593 | Neg. | 101.1 | 6.4% |
| 82 | 3,632 | 1.1% | 103.1 | 2.0 |
| 83 | 3,673 | 1.1 | 105.8 | 2.6 |
| 84 | 3,825 | 4.1 | 113.5 | 7.3 |
| 85 | 3,835 | .3 | 121.2 | 6.8 |
| 86 | 3,892 | 1.0 | 125.7 | 3.7 |
| | cumulative total | 7.6% | cumulative total | 28.8% |

Source: *N.J. Economic Indicators*, Jan. 1988 and Touche Ross Study, Oct., 1987.

### Employment — Casinos

According to a recent Touche-Ross study, the number of Casino Hotel payrolled employees has risen from an annual average of 3,100 in 1978 to 38,300 in 1986,[9] a percentage increase more than 1100%. In addition, a large majority of these employees live in Atlantic City (21.0%) and Atlantic County (47.2%)[10] Appendix Four shows the geographical breakdown of these employees as of June 30, 1987.

The 38,300 employees in 1986 are counted as the direct employment effect. Because these employees buy local goods and services with their income, they generate secondary or spinoff local employment. Using the multiplier developed by the New Jersey Department of Commerce[11], it is assumed that an additional 21,892 secondary jobs are created by direct casino employment for a total of 60,192 jobs. It is important to note that no data is available to indicate how many of these 38,300 jobs are full time and how many are part time.

Another form of direct employment is the amount of regulatory positions generated by the casino industry. According to budget data, the Casino Control commission was authorized for 507 positions in FY86.[12] In addition, the Division of Gaming Enforcement was authorized for 544 positions.[13] In sum, therefore, direct regulatory employment was 1051 positions for FY 1986. Indirect regulatory employment, using the employment multiplier, is estimated to be 599 for a total of 1650 jobs. It is important to recognize that actual employment may differ from budgeted employment.

### Employment: The Lottery

There are both direct and indirect employment effects of the New Jersey State Lottery. According to the Fiscal Year (FY) 1987/88 New Jersey *State Budget*, there were 254 budgeted positions for the financial administration of the State Lottery Fund.[14] In addition, in FY 1986, about $53 million was paid to approximately 4500 agents who sold lottery tickets.[15] This averages to about $11,800 per agent.

9. Touche Ross *Casino Industry's Economic Impact on New Jersey*, Oct. 20, 1987, exhibits 3 and 10. (unpublished document)

10. *Ibid.*

11. The employment multiplier is estimated to be 1.5716 which means that for every 1000 direct jobs, approximately 570 additional or secondary jobs are created.

12. *New Jersey State Budget FY 1987-88* p. H-6.

13. *Ibid.* p. H-5.

14. *N.J. State Budget*, FY 1987/88, p. J-13.

15. *N.J. Lottery Annual Report, 1986*, p. 5.

40

It is difficult to argue, however, that 4500 jobs are created by this expenditure. To reach that conclusion, it must be assumed that the small businesses (small "Mom and Pop" grocery stores, liquor stores etc.) are operating at full capacity, an extremely unlikely situation. It is also true though, that while the most important economic effect of this expenditure is helping to keep a relatively large number of small businesses profitable, some new employment must also be created. For the purposes of this study, it is assumed that 15% of this expenditure would create new employment. Fifteen percent was chosen to roughly correspond to a probable percentage of peak time lottery sales in small businesses. Using this assumed percentage and the aggregate figure from above, the number of full-time, in-state jobs created from this expenditure is about 1000. Clearly, this estimate must be interpreted with great caution and the actual number must await further study.[16]

Other employment must be created by the net expenditures of the lottery. This figure totalled $419.4 million and was allocated to 49 separate programs in FY 1986.[17]

Where possible, the lottery contributions to each program were taken as a percentage of the total state appropriation and this percentage was applied to the number of budgeted positions to arrive at an aggregate employment figure. Using this methodology, and imputing "full time equivalent jobs" when budgetary data was not available or appropriate, an aggregate figure of 6,810 jobs was calculated for FY 1986.

Thus far, a total of 7,810 jobs has been calculated as a direct effect of the lottery. To compute the total amount of employment, the previously described employment multiplier must be used. When these calculations are performed, it is estimated that 4,464

indirect jobs are lottery-dependent for an aggregate total of 12,274.

Budgetary data for FY 1986 indicates a total of 254 authorized positions for lottery administration:[18] Using multiplier analysis, it is estimated that an additional 145 jobs are created from this regulatory employment. Thus, 399 total jobs were created bringing the grand total for lottery dependent employment to 12,673.

## Employment — Horse Racing Industry:

Licensing data gathered from the Annual Report of the New Jersey Racing Commission indicates that, for 1986, approximately 10,350 persons were directly employed in the horse racing industry in New Jersey.[19] The two largest categories of employment were stable and pari-mutuel employees.[20] It was not possible, using the data available, to ascertain what percentage of this employment was full-time and part-time. For the purposes of this report, the figure of 10,350 will be used and all employment will be assumed to be full-time. Using the methodology developed previously, the indirect employment effect is calculated to be 5916 for a total of 16,265 jobs.

Budgetary data indicate that direct regulatory employment was 57 authorized positions for FY 1986.[21] Total regulatory employment, including indirect jobs generated, was estimated to be 90 for FY 1986. The grand total for horse racing given, these assumptions, is 16,356.

## Summary for Employment

Table Six summarizes direct and indirect in-state employment generated by the gambling industry in FY 1986.

---

16. The $17 million spent in computer leasing fees and on suppliers and distributors of lottery tickets will be discussed below.

17. *Ibid.* p. 15. (See Appendix Two for the specific breakdown of expenditures.)

18. *New Jersey State Budget FY 1987-88*, p. J-13

19. New Jersey Racing Commission, *Annual Report 1986*, p. 16.

20. *Ibid.*

21. *New Jersey State Budget, FY 1987-88* p. D-289.

**Table Six**

**Total Gambling Related Employment Effects FY 1986**

|  | Direct And Regulatory Employment | Indirect Employment |
|---|---|---|
| Casinos | 39,351 | 22,493 |
| Lottery | 8,064 | 4,609 |
| Horse Racing | 10,407 | 5,967 |
| Totals | 57,822 | 33,069 |
| Grand total | 90,891 | |

It is important to note the caveats and assumptions listed above, as well as the sensitivity of the final results to the multipliers used.

Of course, the total amount of employment generated must be compared to other industries and segments of the economy. Table Seven lists the top ten private employers in New Jersey in 1987.[22]

**Table Seven**

**Top Ten Private N.J. Employers Nov. 1987**

| Rank | Company | Number of Employees |
|---|---|---|
| 1 | AT & T | 50,300 |
| 2 | ShopRite Supermarkets | 34,000 |
| 3 | N.J. Bell | 19,822 |
| 4 | Supermarkets General Corp. | 18,412 |
| 5 | Prudential Ins. | 17,412 |
| 6 | General Electric/RCA | 17,073 |
| 7 | Sears, Roebuck & Co. | 16,518 |
| 8 | Public Service Electric and Gas | 13,582 |
| 9 | R. H. Macy | 13,400 |
| 10 | Johnson & Johnson | 13,000 |

Source: *Business Journal of New Jersey*, Nov., 1987.

---

22. *Business Journal of New Jersey.*, Nov., 1987.

Therefore, the gambling "Industry" with approximately 58,000 employees directly employs a greater number of individuals than the states largest private employer, AT & T with 50,300 employees.

It may be argued that it is more realistic to compare the gambling "industry" to other industries in the state. Viewed this way, the direct gambling related employment approximates the printing and publishing industry (66,400) and the non electrical machinery production industry (55,500).[23]

In the public sector, the State of New Jersey had budgeted positions in excess of 83,000 for FY 1986.[24] Total public sector employment, which includes county and municipal government, was 535,600 for 1986.[25] Thus, gambling related employment, net of regulatory employment was only ten percent of public sector employment.

As a percent of aggregate employment in New Jersey the gambling industry constituted almost 2.5 percent of the total. Put another way, however, the absence of the gambling industry would add over 2% to New Jersey's unemployment rate for 1986. For certain areas, such as Atlantic County, the effect would be much larger. For example, according to the most recent Touche Ross report, direct casino related employment constituted 32% of Atlantic County employment for 1986.[26] If Atlantic City racetrack employment is added, the percentage rises to 33%. Clearly, Atlantic County's employment and overall economy are directly dependent upon the gambling industry.

As a concluding note to this section, it is important to reemphasize that to the extent that part-time gambling employment increases as a percentage of full-time, aggregate employment effects will be less than stated above. In addition, the employment multiplier used will be sensitive to the part-time to full-time ratio. Finally, it must be recognized that there is a fundamental difference between new jobs created by a new industry, such as casino gambling and employment that is gambling dependent such as lottery employment. The estimates in this report are gambling dependent jobs. In other words, if the lottery did not exist, the dollars of consumers would be spent for other commodities, thus creating an alternate type of employment. Not so with casino employment generated by expenditures from out-of-state consumers.

## Gambling Industry's Effect Upon New Jersey Income and Output

In addition to effects upon employment, gambling payrolls and vendor contracts inject income into the local and state economies. Furthermore, these initial increases in income lead, through an income multiplier, to indirect or induced income.

Two problems emerge from any discussion of aggregate income effects. First, what is the appropriate measure of the net income effect, and second, how much of this net income remains in-state in order to generate indirect income? Using examples from the lottery, it would be inappropriate to use the measure "Gross Sales" to calculate the income effects of the State Lottery because the payout of lottery winnings constitutes a redistribution of dollars from losers and winners. Hence, it makes sense to use some measure of gross sales minus payout. Also, some estimates must be made concerning in-state vs. out-of-state customers or vendors. For example, if 50 percent (vs. 10 percent) of lottery sales came from out-of-state, the net income effect would be altered.

23. *New Jersey Economic Indicators*, May, 1988, p. 5-30.

24. Computed from the *New Jersey State Budget, FY 1987/88* pp. D1-D367. (Some of these positions were funded by the Federal Government.)

25. *New Jersey Economic Indicators*, May, 1988, p. 5-30.

26. Touche Ross International, "The Casino Industry's Economic Impact on the Atlantic City Region", March 25, 1988, exhibits 10 and 15.

43

**Income Effects: Casinos**

The most appropriate measure of the direct income effect of Casino gaming upon New Jersey is the "Gross Revenue" figure, which totals "Casino Win" and subtracts an adjustment for "uncollectibles".[27] For 1986, total casino win was $2,281.2 million.[28] The gross revenue for 1986 was 2265 million.[29] Table Eight lists the identifiable dispersement of the gross revenue figure for 1986.

## Table Eight

### Casino Expenditures and Surplus 1986 (000)

|  |  | % of total |
|---|---|---|
| 1. Wages and salaries | $658.6 | 29.1% |
| 2. N.J. Vendors | 695.7 | 30.7 |
| 3. Non-N.J. Vendors | 399.5 | 17.6 |
| 4. N.J. Taxes | 389.0 | 17.2 |
| 5. Non-N.J. Taxes | 40.8 | 1.8 |
| 6. Profits | 55.0 | 2.4 |
| 7. Benefits, Debt Service, Depreciation, other. | 26.4 | 1.2 |
| Total | $2265.0 | 100.0% |

Source: Touche Ross "The Casino Industry's Economic Impact on the Atlantic City Region", March 25, 1988, exhibits 19 and 20.

It is important to note that these figures must be considered rough estimates whose magnitude is subject to changes due to accounting, corporate tax and other cash-flow considerations.

The New Jersey expenditure of the gross revenue figure is calculated at $1825 million dollars. (Items 1,2,4,6,7 from Table Eight) To the extent profits are reinvested outside New Jersey and New Jersey Vendor income is "exported" this figure will be overestimated.

Using multiplier analysis,[30] this income impact generates indirect income of $1581 million for an

27. New Jersey Casino Control Commission *Annual Report*, 1986, p. 18 and also see "A Report on Casino Gaming in Atlantic City", Casino Control Commission, April, 1987 for more specific definitions, esp. p. 15.

28. Arthur Young, "A Graphic Compilation of Casino Performance Data, Sept. 30, 1987, p. 1-1.

29. Casino Control Commission, Annual Report, 1986, p. 18.

30. See "Casino Industry's Economic Impact on New Jersey, Oct. 20, 1987", Exhibit 6. The multiplier used in this case was a weighted averge of the wage and output multiplier. (1.866)

aggregate amount of $3,406 million dollars. Intuitively, it is difficult to make the argument that this figure represents a total net addition to New Jersey's income. For example, if 100% of gross revenue was generated by New Jersey casino patrons and redistributed in New Jersey the net effect would be different than if the percentage was 50%. In the case of casinos, fortunately, the geographical breakdown of patrons is known. For 1984, according to the Touche Ross 1987 study, out-of state casino visitors constituted 68% of the total visitors.[31] Using this percentage as an approximation of the "imported" win, the net addition to direct and indirect income totals $2315 million dollars.[32]

In conclusion, given the assumptions and caveats outlined above, the casino industry generates over $3.4 billion dollars of income on an annual basis for New Jersey. South Jersey receives the lion's share of this net addition to income, and, using the percentages for Casino employees, vendors and tax payments to Atlantic County, the casino income impact is conservatively estimated to be almost $1300 million dollars yearly, giving Atlantic County 57% of the net income benefits from casinos.[33] In 1984, the last year income data was available, the casino wage component alone generated 14% of Atlantic County's personal income.[34]

### Income Impact — Lottery

In the case of the New Jersey State Lottery, the net income impact is relatively small because the lottery primarily redistributes monies, with little out-of-state business. Total funds to the lottery in 1986 consisted of gross sales, interest income, miscellaneous income and forfeited prizes and totalled $1,003.3 million.[35] Because $496.4 million (49.5%) was paid out as prizes, $506.9 can be counted as income generated by the lottery.[36] The Lottery's Annual Report indicates that most of these dollars not allocated to State Education and Institutions are spent in New Jersey.[37]

Using multiplier analysis, the indirect effect is calculated to be $322.7 million for a total of $829.6 million. To the extend that any income is spent out of state the total figure would be reduced. Since most of the dollars are allocated to State Education and Institutions and their employees, the out-of-state leakage is probably fairly small.

### Income Impact — Horse Racing

According to the Annual Report of the New Jersey Racing Commission, total wagering at the harness and thoroughbred tracks was $1.1 billion dollars.[38] Because $882.9 million dollars was returned to patrons, the net direct income effect of horse racing, in 1986, was $217.1 million dollars.

Using the multiplier model, the indirect income effect was $138 million for a total of $355 million dollars. It is interesting to note that horse racing returns about 80% of patrons wagering while the lottery returns about 50%.[39]

---

31. *Ibid*, Exhibit 17.

32. $1825 x .69 = 1241 x 1,866 = $2315

33. Items 1, 2 and 4 from Table 8 times Atlantic County's share multiplied by the "imported" percentages (68%) and the income multiplier.

34. Casino Control Commission Annual report 1986, p. 19. There is approximately 17 million spent out of state, p. 5.

35. *New Jersey Lottery Annual Report, 1986*, p. 12.

36. *Ibid*.

37. *Ibid*. p. 5

38. *Annual Report of the New Jersey Racing Commission 1986, p. 1*

39. This report does not address the overall economic impact of New Jersey's equine industry. The New Jersey Department of Agriculture estimates that equine-related assets and expenditures totalled $4.1 billion and $631 million respectively for 1986.

## Summary — Income Effects

The gambling industry in New Jersey generated, in 1986, a grand total of about $4.6 billion dollars of income. Table nine shows this breakdown. It is important to recognize that this figure represents only about three percent of New Jersey's total personal income ($139 billion) for 1986.[40] It is equally important to understand that these figures represent "gambling dependent" income. As previously noted, new or imported income accrues mostly in the casino industry and totalled $2.3 billion for 1986. A final note of caution. The total income figures are sensitive to the magnitude of the multipliers used. Small changes in the multipliers may result in relatively large changes in total numbers. In addition, there is no guarantee that multipliers are stable over time. For example, as an economy changes from a manufacturing to service base, income and employment multipliers will change and must be reviewed on a periodic basis.

| Table Nine — Summary of Income Effects 1986 | | | | |
|---|---|---|---|---|
| | (all figs. in mil.$) | | | |
| | Direct Income | Indirect Income | Total | % |
| Casinos | $1825 | $1581 | $3406 | 74.2% |
| Lottery | 507 | 323 | 830 | 18.1 |
| Horse racing | 217 | 138 | 355 | 7.7 |
| | | | $4591 | 100% |

## Gambling Impact upon State Revenues

This section of the report will investigate the magnitude of gambling revenues and taxes that accrue to the State. A major question of importance to policymakers is also addressed i.e., "Is the New Jersey State Revenue Structure becoming dependent upon the gambling industry?"

## State Lottery:

The State Lottery, by statute, is required to allocate a minimum of 30% of total revenues for the purposes of aid-to-education and institutions.[41] In practice, the lottery has exceeded this percentage. In (FY) 1986, for example, the percentage was 42.3%.[42]

Table 10 shows the breakdown of FY 1986 contributions to the State and Table 11 shows the distribution of total lottery income.[43]

40. *Regional Labor Market Review*, N.J. Dept of Labor, Jan. 1988 p. 75.

41. See the State Lottery Law (*N.J.S.A.* 5:9-1, *et. seq.*) for a description of the enabling legislation.

42. New Jersey Lottery Annual Report, 1986, p. 13.

43. *Ibid.*, pp. 2-3., 12.

### Table 10

#### 1986 FY (1985), Distribution of Lottery Fund Expenditures[44]

|  | Amount (mil.) | | Percentage | |
|---|---|---|---|---|
| Institutions[45] | $ 167.0 | (172.4) | 39.8% | (44.1) |
| Higher Education | 96.7 | (95.4) | 23.1 | (24.4) |
| Elementary and Secondary Ed. | 155.6 | (122.8) | 37.1 | (31.4) |
| Total | 419.3 | (390.6) | 100% | (100%) |

**Casino Revenue:**

By statute,[46] casinos pay an 8% tax on gross revenues which accumulates in the Casino Revenue Fund to be directed in support of programs for the handi-capped and elderly. In FY 1986, approximately $186 million was available for this purpose.[47] This figure grew to $190 million in FY 1987 and is forecast at $205 million in FY 1988, and $225 million in FY 1989.[48]

### Table 11

#### Distribution of Lottery Income FY 1986.

|  | Amount (mil.) | Percentage |
|---|---|---|
| Prizes to Lottery Players | $ 496.4 | 49.4% |
| Operation and Promotional Expenses | 18.5 | 1.8% |
| Agent Commissions, Contractor Fees | 70.2 | 7.0 |
| Support of State Ed. and Institutions | 419.3 | 41.8 |
|  | $1004.4* | 100.0% |

\* Total includes other income such as interest income and forfeited prizes (A total of $13.2 mil.)
Source:  New Jersey Lottery, Annual Report, 1986, p. 12.

---

44. Figures in parenthesis show FY 1985 *Lottery Annual Report Fy 1985*, p. 17.

45. See Appendix Two for a list of institutions and the level of support.

46. *New Jersey State Lottery Annual Report, 1986*, p. 13.

47. *New Jersey State Budget, A Taxpayer's Guide*, Fiscal Year 1987-88. p. 14.

48. *Ibid.*

Other direct taxes that Casinos pay, such as the State Corporate Income Tax and the Investment Alternative Tax, as well as revenue generated from indirect taxes (such as the luxury tax) will be discussed below.

### Horse Racing:

The State tax contribution from the horse racing industry, by statute, is generated from percentages of the win pool. In FY 1986, this tax generated $7.6 million while in FY 1987 it declined to $6.0 million and is projected at $6.0 million in FY 1988.[49] Other monies from the win pool are earmarked for horse breeding and sire stakes purses and awards. In FY 1986, 6.3 million was available for these purposes.[50]

### Summary of Direct Revenues:

Table 12 reflects the direct contribution of gambling to the state revenue structure from FY 1978-1988. 1978 was chosen as the base year because it was the year that the first casino came on-line.

## Table 12

### Summary of Direct Gambling Revenues[51]

| Fiscal Year | Casino | Lott. | Racing | Dir. Tot. Gam. Rev. | State Tot. Revenue | Gam. Rev. as & of Tot. Rev. |
|---|---|---|---|---|---|---|
| 1978 | $    2 | $    96 | $  22 | $  120 | $  3919 | 3.06% |
| 79 | 18 | 122 | 19 | 159 | 4308 | 3.69 |
| 80 | 58 | 146 | 16 | 220 | 4654 | 4.73 |
| 81 | 72 | 176 | 16 | 264 | 5032 | 5.25 |
| 82 | 103 | 220 | 14 | 337 | 5530 | 6.09 |
| 83 | 131 | 295 | 12 | 438 | 6208 | 7.06 |
| 84 | 153 | 360 | 10 | 523 | 7238 | 7.23 |
| 85 | 167 | 391 | 7 | 565 | 8031 | 7.03 |
| 86 | 186 | 419 | 8 | 613 | 8633 | 7.10 |
| 87 | 190 | 460 | 6 | 656 | 9221 | 7.12 |
| 88* | 205 | 470 | 6 | 681 | 9881 | 6.89 |
| 89* | 225 | 510 | 7 | 742 | 11236 | 6.60 |
| Total | $1510 | $3665 | $142 | $5318 | $83891 | 6.34  ave |

Note: All figures in millions of dollars
   * — projected

49. *New Jersey State Budget, A Taxpayers Guide*, Fiscal Year 1987-88, p. 14.

50. *New Jersey State Budget, Fiscal Year 1987-88*, p. D 19.

51. *N.J. State Budget,* FY 1977-78, 1987-88.

### Analysis:

In the last five years, direct gambling revenues, as defined above, appear to have stabilized at about 7% of New Jersey generated revenues. It may be too early to tell if projected figures for FY 88 and 89 constitute a trend.[52] The aggregate figure of $613 million in FY 1986 was roughly equivalent to a 1.33% increase in the State Sales Tax.[53] (i.e., from 6% to 7.33%) Put another way for comparison purposes, the direct gambling revenue was approximately 70% higher than ($613 million *vs.* $358 million) the tax revenue raised from the sale of alcohol and cigarettes in New Jersey in FY 1986.[54]

If the combined revenue from gambling in 1986 is compared to all other revenue sources, it would rank fourth in FY 1986, behind the sales, gross personal income and corporate income tax. According to budget figures and projections, this ranking is not likely to change in the near future.

Another method of addressing the question of potential revenue dependency is to compare New Jersey's generation of gambling revenues to the experience of other states. This is particularly difficult with respect to casino revenues because only one other state, Nevada, has casino gaming revenues. It would be spurious to compare Nevada relatively small, narrowly based state economy to New Jersey's

larger broad-based economy. There is little question that Nevada's state economy and revenue structure is dependent upon gambling. Nevada, without a state lottery, received 52.3% of its general fund revenue in FY 1982 from direct levies on gaming and casino entertainment taxes.[55]

It would be reasonable, however, to make interstate comparisons with respect to pari-mutuel taxation and lottery revenue. In FY 1984, for example, in the measurement of "Net Revenues from Lotteries as a Percentage of State General Revenue from Own Sources", New Jersey ranked third (4.97%).[56] By 1986, the percentage had decreased to 4.85% and the rank declined to fifth.[57] Figures projected for FY 89 further reduce this percentage to 4.54%.[58]

For pari-mutuel tax revenue, of the 31 states that collect any revenues from horse racing, New Jersey ranked 17th in 1986.[59] New Jersey collected 1.1% of all United States pari-mutuel tax revenues for 1986.[60]

In sum, New Jersey does not seem to be over-reliant upon these two sources of revenue, at least with respect to an interstate and trend comparison.

In addition to the level and percentages of gambling revenue, the shares and stability of these revenue sources must be examined. If, for example, of

---

52. If other, less direct state taxes such as the luxury tax and the corporation tax paid by casinos is included, the percentage figure would rise to 7.45% for 1986 (Touche Ross Study, Mar. 25, 1988, exhibit 5).

53. Calculated from the New Jersey State Budget, FY 87-88 p. C.4.

54. *Ibid.*

55. Abt, *et al.*, p. 82.

56. Mikesell and Zorn, "State Lotteries as Fiscal Savior or Fiscal Fraud: A Look at the Evidence," *Public Administration Review* July/Aug. 1986, p. 313.

57. *Statistical Abstract of the United States* (1987) p. 266. and 1986 *Government Finances* p. 55.

58. *New Jersey State Budget FY 88/89* p. 13.

59. *1986 Governmental Finances*, U.S. Dept. of Commerce, p. 11.

60. *Ibid.*

the three revenue sources, the most unstable one (in terms of its share of the total) is increasing, this may add to the overall instability of the tax structure especially if it is a large source and programs are dependent upon those revenues.

One measure of stability is the percentage changes of the three revenue sources. Table 13 presents a picture of the percentage changes in the 1980's, including the projections for FY 1989.

## Table 13

### Percentage Changes in Gambling Revenues

| Fiscal Year | Casino Revenue | Racing | Lottery | Total Gambling Revenue |
|---|---|---|---|---|
| 81 | 24% | 0% | 21% | 20% |
| 82 | 43 | −12 | 25 | 28 |
| 83 | 27 | −14 | 34 | 30 |
| 84 | 17 | −17 | 22 | 19 |
| 85 | 9 | −30 | 9 | 8 |
| 86 | 11 | + 14 | 7 | 9 |
| 87 | 2 | −25 | 10 | 7 |
| 88* | 8 | 0 | 2 | 4 |
| 89* | 10 | + 17 | 9 | 9 |

* — projected
Figures calculated from Table 12.

Total gambling revenues have moved from double to single digit rates of increase. Over the fiscal years 1985-89, total gambling revenue growth has averaged slightly over seven percent. Assuming that this growth rate can be maintained over the next five years, gambling revenues would exceed $955 million. Of course, simple trend analysis must be interpreted with great caution.

Two additional points are worth noting. First, total state revenues, at least over the fiscal years 1985-1989 have been growing slightly faster than 9% a year, on

average. This suggests a decreasing reliance upon gambling revenues. Second, gambling revenues, as well as total state tax revenue, had relatively large percentage increases (28% and 10% respectively) during the recession years of 1981-1982 when New Jersey's unemployment rate rose from 7.3 to 9.0%. This suggests a stability of both the general tax structure and gambling revenues.

Another way of looking at the stability of gambling revenues is to examine their revenue elasticities. As stated previously, revenue elasticity measures

the responsiveness of the revenue source to changes in variables such as income per capita.[61] Table 14 presents New Jersey per capita income 1978-1986

and percentage changes in total gambling revenue (from Table 13).

## Table 14

### Income Elasticity of Gambling Revenues

| Year | (A)<br>NJ per<br>capita earned<br>income | (B)<br>% change | (C)<br>% Gam. Rev.<br>Change | (D)<br>Elasticity<br>Coefficient |
|------|------|------|------|------|
| | | | | D = C/B |
| 1978 | $ 8797 | — | — | — |
| 79 | 9758 | 11% | 33% | 3.0 |
| 80 | 10975 | 13 | 38 | 2.9 |
| 81 | 12269 | 12 | 20 | 1.7 |
| 82 | 13169 | 7 | 28 | 4.0 |
| 83 | 14781 | 12 | 30 | 2.5 |
| 84 | 16063 | 9 | 19 | 2.1 |
| 85 | 17211 | 7 | 8 | 1.1 |
| 86 | 18452 | 7 | 9 | 1.3 |

Sources: Statistical Abstract of the United States and N.J. Economic Indicators, various years.

What Table 14 signifies is that the elasticity coefficient is close to one which would indicate a stability in percentage change of gambling revenues to percentage changes in income. Put another way, in the absence of increased gambling competition from other states, gambling revenues to the state will grow at roughly the same percentage as state income. This economic relationship, however, is based on a relatively narrow time frame, and cannot adjust for changes in legislation or institutional differences such as new lottery programs. Thus, the elasticity relationship should be interpreted with great caution and be continually reassessed. Adjustments to the data, such as using United States per capita income,

or regional income (due to a large percentage of casino revenue imported from out-of-state) do not significantly alter the calculations.

In summary, gambling tax revenues constitute roughly six to seven percent of state tax revenues and represent an increasingly stable source of income. Calculations of indirect gambling taxes (State Corporation, Sales Liquor Taxes paid by Casinos) raise this percentage by only .5%. Future increases in this percentage, if desired, will probably have to come from expanding market shares or increasing the tax rate, not from rising incomes.

61. More specifically, in this case, the elasticity coefficient measures the percentage change in gambling revenues due to the percentage change in income. The implicit assumption is that gambling is purchased as a "normal" good, i.e. as income increases so do purchases.

51

On the local level such as Atlantic City and County, however, gambling tax revenue represents a much larger share of government revenues. For example, in 1985 casinos alone paid property taxes to Atlantic City and Atlantic County that totalled 33% of all budgetary expenditures.[62]

### Redistributional Impact of the Gambling Industry

One way to view the economic impact of the gambling industry is to examine possible redistributional effects with respect to income, employment, tax burden and revenues, and programatic benefits. Redistributional effects may take place over time, among different income levels of the state population, or between Northern *vs.* Southern sections of the state.

The generation of this type of information is especially important to state policymakers in assessing both the equity (fairness) and fiscal incidence of programs and policies. For example, most economic literature indicates that when a state lottery is viewed as a "voluntary" tax, the net dollars are raised from lower income groups thus denoting a regressive tax.[63] However, it is equally important to calculate the distribution of benefits to have a clearer picture of fiscal incidence. In theory, if a program benefits older, lower income groups, the primary redistribution would be intergenerational (from young to old) rather than by income. (from lower to middle income) This is not saying however, that a more "progressive" fiscal incidence may be obtained by financing programs though alternative tax sources such as the State Personal Income Tax.

One indicator of possible income redistributional effects from the gambling industry would be changes in the distribution of family income. Table 15 shows

this distribution for New Jersey and the United States for two years 1979 and 1984 in constant (adjusted for inflation) dollars.[64]

What the data in the table suggest is that "real" median income in New Jersey has increased by almost four percent while real income in the United States actually declined during 1979-1984. With respect to income class, the percentage of those families receiving more than $25,000 per year increased from 62.6% to 65.9%.

It is difficult to infer using the data above, what quantitative effect the gambling industry has had upon income distribution. Differences in Federal and State tax laws, non-gambling economic growth and other economic forces may have changed the income distribution. It is interesting to note that the percentage of families that received less than $25,000 in both 1979 and 1984 is much lower than for the United States as a whole.

Because it is not possible to collect current income distribution data by county, alternative measures of possible redistribution must be used. Income tax data was collected for the years 1978 and 1985 (the latest year available) from the New Jersey Division of Taxation.[65]

It might be expected that because Atlantic County is home to casinos and most of casino employees live in Atlantic County that either the share of gross income or the percentage rate of increase (*vs.* state averages) would be substantially altered between 1978 and 1985. Gross income, not taxable income is used as a measure due to changes in the New Jersey personal income tax law between 1978 and 1985.[66] Gross income for the state increased by 103% ($46.9

62. Touche-Ross, "The Casino Industry's Economic Impact on the Atlantic City Region, March 25, 1988, exhibits, 25, 28, 40 and 55.

63. Mikesell and Zorn, "State Lotteries as Fiscal Savior or Fiscal Fraud: A look at the evidence", *Public Administration Review*, July / Aug., 1986, p. 316.

64. "New Jersey's Economy, January, 1987", State and Local Expenditure and Revenue Policy Commission, p. 51.

65. *Statistics of Income 1985 Income Tax Returns*, Department of the Treasury, Division of Taxation, Office of Tax Analysis, p. 88. (Also 1978 *Statistics of Income*, p. 69)

66. State of New Jersey. *Annual Report of the Division of Taxation, Department of Treasury, 1986, p. 55.*

## Table 15

### Family Income Distribution in 1979 and 1984
### New Jersey and United States
### (income in 1984 dollars)

|  | New Jersey | | United States | |
|---|---|---|---|---|
|  | 1984 | 1979 | 1984 | 1979 |
| Percentage Distribution | | | | |
| Under $5,000 | 3.7% | 2.5% | 5.0% | 4.5% |
| $5,000 to $9,999 | 7.3 | 7.2 | 9.4 | 7.8 |
| $10,000 to $14,999 | 6.7 | 8.8 | 10.8 | 10.0 |
| $15,000 to $24,999 | 16.4 | 18.9 | 21.5 | 21.4 |
| $25,000 to $34,999 | 18.5 | 17.9 | 19.0 | 20.6 |
| $35,000 to $49,999 | 23.6 | 22.9 | 18.4 | 20.3 |
| $50,000 and over | 23.9 | 21.7 | 15.8 | 15.4 |
| Median Income in Dollars/1 | $33,377 | 32,210 | 26,433 | 28,029 |

Source:  State and Local Expenditure and Revenue Policy Commission, "New Jersey's Economy, Jan. 1987", p. 19.

to 95.4 billion for this time period. For Atlantic County, the percentage increase was 121%[67] ($960 million to $2.2 billion). In 1978, Atlantic County's share of total state gross income was 2.1% and only rose to 2.2% for 1985.[68] This second statistic is less significant than the first because from 1978-85 the rest of the state was growing quite rapidly. As more current data becomes available, it would be interesting to see if Atlantic County's gross income continues to grow 20% faster than the states.

Yet another way to analyze possible economic redistribution is to examine the economic benefits of gambling with respect to the Northern and Southern

parts of the State. Historically, the Southern section has had lower income levels.[69] In 1985, the average gross income of the eight Southern counties weighted by number of tax returns was $22,763 while the thirteen Northern counties averaged $29,715.[70] The eight Southern counties have about 26% of the state's population (1984 figures) and, in addition, contain about 29% of the resident population sixty-five and older[71] (1986 estimates).

If some of the benefits of the gambling industry are noted, the following breakdown can be seen in the South-North paradigm. For the Casino Revenue Fund, the eight Southern counties have received a

67. *Statistics of Income* 1978, 1985.

68. *Ibid.*

69. For the purposes of this paper, the Southern part is defined as Atlantic, Burlington, Camden, Cape May, Cumberland, Glouster, Ocean, and Salem Counties.

70. *Statistics of Income.*, 1985, p. 89, and *N.J. Economic Indications*, Sept. 30, 1985, p. 8.

71. *New Jersey Economic Indicators, Nov. 1987*, p. 16.

cumulative total of $246.6 million dollars from 1979-1986.[72] Therefore, with about 26% of the total population and approximately 29% of the state 65+ population, 30.7% of the total benefits ($803.2 million) were received by the Southern eight counties.[73] Therefore, it is hard to argue that there has been any substantial redistribution, at least for these benefits.

Analysis based on the redistribution of in-state casino patrons shows that a slightly disproportionate percentage originates in the "South", (37% vs. 26% of the state population).[74] This percentage would be undoubtedly higher if all casino workers were permitted to wager in "non-home" casinos. This information and its continued analysis, might be useful in targeting service locations for compulsive gamblers.

The North-South paradigm may also be applied to the lottery. The geographical breakdown of a substantial percentage of lottery funds (63.2%) that are allocated to thirty-three institutions in the Department of Human Services and Correction are easily indentifiable. Of the total dollars allocated to these institutions, ($246.5 million) $48.8 million is received by the institutions in the eight Southern counties for a 19.8% of the total. Therefore, there is a slight redistribution Northward in that 26% of the population receives 19.8% of these monies allocated.[75] A more definitive conclusion awaits the analysis of the other 36.8% of lottery funds that are allocated to the Departments of Education and Higher Education.[76] Policy issues include but are not limited to questions such as to whether lottery benefits should be returned to areas of the state based on population and whether some redistribution to less affluent areas should be formula-mandated? Finally, it must be noted that the dedication of lottery monies have not necessarily increased the percentage budget allocation of Departments receiving the funds. (See Appendix Six)

## The Gambling Industry and Economic Development

The investigation of the relationship between an industry and the concept of economic development is fraught with difficulties. First, there is no agreed-upon definition of economic development. The usual approach of simply summing up net business formations, state-wide or disaggregated, yields precious little information regarding size of business, in-state to out-of-state input ratio or the percentage of profits exported to other states. In addition, there is no "index of economic development" through which different regions of the state could be quantitatively compared to each other.

The methodological approach that this study will use will be to investigate proxies for economic development such as changes in the value of property and retail sales. While this method also has some difficulties, (e.g. changing mix of ratable properties) it may allow for some time series (long term) and cross sectional (short term) quantifiable comparisons.

## Economic Development — Horse Racing

One of the measurements of economic development for horse racing is to take the changing patterns of ratables in the immediate area around a racetrack and compare this trend to county and state data. Of course, it is important not to confuse correlation with causation. For example, the business decision to locate the Hamilton Mall next to the Atlantic City racetrack may have had more to do with the rates of growth of county income and population or casinos than the specific location of the racetrack. Nevertheless, it may be useful to compare the various changes in the tax base around racetracks to note any patterns.

Table 16 shows data for the five racetracks in New Jersey and annual average changes in property values 1977-1986.

72. Touche-Ross Study, Oct., 1987, exhibit 37.

73. *Ibid*, exhibits p. 37-45.

74. Touche-Ross Study, Oct. 20, 1987, exhibit 17. The data are from 1984.

75. *New Jersey State Lottery, Annual Report, 1986*, p. 15.

76. The three largest programs funded in 1986 were a) School Building Aid, ($79.4 mil.) b) Aid to County Colleges for operational costs ($71.6 mil.) and c) Minimum Teachers Starting Salary ($30 mil.).

In three of five of the townships, property values grew faster than the country average although it is important to note that per capita income and base wealth disparities between townships and counties also explain growth rates. Table 17 shows per-capital incomes for the counties and townships for 1980, the latest available year for township data. It would be interesting to see when data becomes available, the rates of change of township *vs.* county income data.

### Table 16[77]

#### Changes in Property Values 1977-86

| Name | County | 1977-86 % change property value | Twp. or Borough | 1977-86 % change property value |
|------|--------|-------------------------------|-----------------|-------------------------------|
| 1. Atlantic City Raceway | Atlantic | 55.8% | Hamilton | 32.2% |
| 2. Freehold Raceway | Monmouth | 20.2 | Freehold Twp. & Freehold Boro | 26.1 |
| 3. Garden State Park | Camden | 21.6 | Cherry Hill | 23.0 |
| 4. Meadowlands | Bergen | 26.7 | East Rutherford | 20.0 |
| 5. Monmouth Park | Monmouth | 20.2 | Oceanport | 27.5 |

### Table 17[78]

#### Per capita income 1980

| County | Per Cap. Income | Twp. or Bor. | Per Cap. Income |
|--------|-----------------|--------------|-----------------|
| Atlantic | $ 7194 | Hamilton | $ 6770 |
| Bergen | 10191 | East Rutherford | 7535 |
| Camden | 7287 | Cherry Hill | 10439 |
| Monmouth | 8539 | Freehold Borough | 6957 |
| Monmouth | 8539 | Freehold Twp. | 8841 |
| State of N.J. | $10935 | | |

---

77. State of New Jersey, Annual Report of the Division of Taxation, Dept. of Treasury, Fiscal Years 1977 and 1986. The percentage changes were calculated from net valuation which included adjustments for equalized value ratios.

78. *New Jersey Municipal Data Book, 1986.*

From the data, it appears that the strongest case could be made for the two racetracks in Monmouth County leading to a trend of economic development. For Garden State Racetrack, the case is weaker due to Cherry Hill's per capita income being far in excess of Camden County income. The case of Atlantic County is explained, for the most part, by the growth of casino property values. In the final case, Bergen County income far exceeds East Rutherford, and, coupled with the recent real estate boom and New York City relocators, makes concrete conclusions hard to draw. Other proxy measures of economic development, such as housing statistics from homestead rebate data, show equally inconclusive results. (see Appendix Seven)

The horse racing industry has built an infrastructure (five race tracks) valued at over $600 million dollars in 1986[79]. Whether this physical plant is used or can be used as an anchor for further economic development depends upon the availability of land and the continued profitability of the racing industry. At this point in time, it is still an open question.

Finally, in 1986, a small percentage of horse race wagering (.1%) and 50% of the "out" tickets (uncashed winning tickets) generated $3.5 million dollars to be used to fund the breeders program. Whether these dollars spent are cost effective also awaits the long term profitability of horse racing in the United States as well as in New Jersey.[80]

### Economic Development: Casinos

The two sources of funding for economic development from the casino industry are the luxury tax and the monies allocated to the Casino Reinvestment Development Authority. In addition, the growth in the number of hotel rooms helps to increase the number of conventions in Atlantic City.

In 1986, the luxury tax in Atlantic City generated $14.7 million dollars, 73.4% of which is attributable to casinos.[81] Prior to 1984, the Atlantic County Improvement Authority (ACIA) constructed and/or refurbished a number of housing projects, spending $34 million dollars, both in Atlantic City and the County. Subsequent to 1984, the lion's share of the ACIA's money is mandated to the subsidization of the debt service and operating deficit of the Atlantic City Convention Center as well as its recent $23 million dollar renovation.[82]

By statute, casinos are required to pay 2.5% of their gross revenues as a tax or invest 1.25% of their gross revenues in New Jersey Casino Reinvestment Development Authority (CRDA) bonds.[83] By 12/31/87 CRDA had approved plans for investment of $143.1 million for construction or approval to construct 1,064 housing units in five projects.[84] The 25 year projection for CRDA obligations from Casinos totals about $1.4 billion dollars, with South and North Jersey receiving funds as well as Atlantic City.[85]

While it is too early to assess the long term development effects of CRDA, it is also true that the 1000-plus units of housing probably would not have been constructed by the private sector. The investment obligation revenue totalled $27.1 million for 1986 alone.[86]

79. *New Jersey Sports and Exposition Authority, Annual Report, 1986*, International Thoroughbred Breeders. Inc., Annual Report, 1987 and Atlantic city Race Course. Annual Report, 1986. There is some overcounting in this figure because the Meadowlands Racing Facility is not listed as separate item in the Meadowlands Complex Financial Statements.

80. *1986 Annual Report of the New Jersey Racing Commission.*

81. Touche-Ross, "The Casino Industry's Economic Impact on the Atlantic City Region" exhibit 5. The Atlantic County Improvement Authority receives the 3% tax on liquor and 9% on rooms and amusements.

82. *Atlantic County Improvement Authority 1986 Report*: p. 41.

83. *Casino Reinvestment Development Authority 1986.*

84. Touche Ross, March 25, 1988, exhibit 34.

85. *CRDA Annual Report 1986*, p. 9.

86. *Ibid*. p. 17.

The casino hotel investment (property, plant and equipment) in Atlantic City rose to about $3 billion dollars in 1986.[87] This investment and resulting hotel rooms, has lead to over 2500 "in house" (Hotel Conventions) conventions with visitors in excess of 300,000 for 1986.[88] It is interesting to note that, for the Convention Center, both the number of conventions and visitors has remained fairly constant from 1983-1987[89], implying that the casinos have not necessarily helped the growth of the Atlantic City Convention Center.

The growth in retail sales is another indicator of economic development. For Atlantic County, retail sales grew from $584 million dollars in 1976 to $1671 million in 1986.[90] While sales grew almost 300 percent, the per capita calculations show an increase from $3140 in 1976 to $8104 in 1986. Atlantic City's share of County retail sales was about 36% in 1977 and fell to 26% in 1986.[91] So, in a relative sense, while retail sales have increased for the county and the city, the city's share has declined and has grown at only one-third the rate of County sales growth. This trend is also shown by data for the number of retail units and the average amount of retail units and the average amount of retail employment. According to the New Jersey Department of Labor, the number of retail units in Atlantic City hs declined 639 in 1975 to 452 in 1985 while the number of employees has decreased from 6,052 to 5,657 for the same time period.[92] So, it should be clear from this data, that there is some doubt about the spillover effects of economic development to Atlantic City. For the state as a whole, sales subject to the State Sales Tax grew about 250% from 1976-1986.[93]

As stated previously, economic development may also be measured in part by changes in property values. Conclusions concerning this variables effect upon economic development may be muted, however, by changes in the structure of rents, the overall supply of housing, inflation, and other economic variables. In addition, equalized property values, not assessed values, should be used in any analysis. For example, the 1986 property revaluation in Atlantic City raised the aggregate assessed value from $2.2 billion in 1985 to $5.6 billion in 1986.[94]

For 1977, Atlantic City had a net (equalized) evaluation of $364 million dollars resulting in an effective tax rate of 6.75%.[95] This represented about 15% of Atlantic County equalized value. For 1986, Atlantic City had an equalized value of $5.5 billion resulting in an effective rate of taxation of 2.02%.[96] This represented about 45% of Atlantic County's equalized value in 1986[97]. If the casinos are removed from the Atlantic City base to note the changes in property values, Atlantic City's percentage of the County total equalized value rises from the 15% figure stated above, to 28% of the County total.[98] Therefore, given the caveats outlined above, and assuming that economic development is measured, in part, by rising property values, it can be argued that casinos have contributed to Atlantic City development. A more complete analysis would examine the change in the housing stock, growth in average rents and employment opportunities.

87. Touche-Ross, March 25, 1988, exhibit 9.

88. *Ibid*, exhibit 3

89. *Ibid*.

90. *Ibid*, exhibit 21

91. *Ibid*, caclulated from exhibits 21 and 22.

92. *Ibid*, exhibit 22.

93. *Annual Reports of the Division of Taxation*, 1977 and 1986, pp. 95 and 84 respectively.

94. Touche-Ross report, exhibit 24.

95. *Annual Report, Division of Taxation 1977* pp. 245 and 291. The effective tax rate is equal to the actual taxes paid divided by the tax base or, in this case, equalized value.

96. *Ibid*, p. 297.

97. *Annual Report, Division of Taxation 1986* pp. 371 and 174.

98. Touche-Ross, March 25, 1988, figure calculated from exhibit 24.

In sum, it is difficult to state a definitive conclusion regarding the gambling industry and economic development. This ambiguity is further compounded when the social costs of this development, especially for Atlantic City and Atlantic County, are examined.

### Social and Economic Costs of the Gambling Industry

Any economic benefits of the gaming industry must be examined within the context of social and economic costs. These costs are most visible and acute in the geographical areas of Atlantic County and City. These costs include, but are not limited to a) increased air and water pollution and other forms of environmental degradation b) increases in the crime rate c) increases in transportation congestion and d) infrastructure deterioration.

Of course, there are both long term and short term manifestations of these costs and, in the final analysis, some estimates must be made concerning the direction of these costs. One way to attempt to measure these costs, at least to the public sector, is to examine the City and County budgets before casinos and for 1986. This is an inherently difficult exercise because needs and expenditures are not necessarily correlated and because sometimes programs expand to fill the resources available. Finally, some of the costs may simply not be measurable such as changes in the quality of life or the rate of interest used to discount increased health costs (caused by pollution) that may occur in the 21st century. Nevertheless, considering the importance of the gambling industry to South Jersey, some attempt must be made to begin to discuss these costs in a systematic manner.

The following table was constructed from calculations obtained from the most recent Touche Ross report, which collected data from the New Jersey Department of Community Affairs. Budget categories "Judicial" and "Public Safety" represent some measure of the cost of law enforcement. The categories "Public Works" and "Debt Service" can be construed to measure local committment to infrastructure construction and repair[99] while "Health and Welfare" shows changes in the local budgetary allocation to direct social service.

Percentage share of the budget was the measure used in this table rather than simply the percentge increase in each item. County and City budgetary data are aggregated, compared in 1976 vs. 1985 and then contrasted with state trends.

### Table 18

#### Percentage Share of Atlantic County and Atlantic City Budget — Selected Items

| | At. City & County | At. City & County | All Co. & MUNIS New Jersey | |
|---|---|---|---|---|
| Budget Item | 1976 | 1985 | 1976 | 1985 |
| Judicial and Public Safety | 18.4% | 25.7% | 12.6% | 9.6% |
| Health and Welfare | 12.9% | 8.8% | 7.0% | 7.4% |
| Public Works and Debt Service | 14.7% | 11.9% | 11.7% | 13.4% |

Source: Touche Ross Report, March 25, 1988 exhibits 38-60

---

99. These monies are separate from the resources allocated to infrastructures from State and Local Public Authorities.

**Analysis:** For the Judicial and Public Safety items, Atlantic City/County had higher levels than the state averages for both years. In addition, the direction of change is the opposite with City/County increasing and taking 25.7% of the total budget while state-wide, the figure is 9.6% and falling.

A different pattern emerges for the Health and Welfare budgetary allocation. The City/County total has declined from 12.9 to 8.8% of the combined budgets while the state-wide average has increased slightly from 7 to 7.4%. For the Public Works and Debt Service categories, the direction of change is also different between Atlantic City/County and the Statewide budget share with the former decreasing and the latter increasing.

It is true that some of the differences in these trends may be partially explained by the overall growth of the respective budgets. The combined budgets of Atlantic City and County grew, adjusted to reflect population changes, 227 percent from 1976-1985 while the figure for all 21 counties and 567 municipalities was 173%. It is also true that these budget items are imperfect measures of social costs. Nevertheless, the direction of change of these items seems important. The health and welfare trend reflects a positive influence of increased budgetary revenues. The other two items, however are problematic, especially the decline in the share of the budget devoted to public works. It is important that these costs of economic development continue to be monitored on an on-going basis.

Finally, it is also imperative to generate and centralize data based upon other social costs such as air and water pollution, traffic, congestion and homelessness. For example, from 1976-1985, the accident rate rose 38 percent on the Atlantic County portion of Route 30, one of the three major arteries into Atlantic City.[100] Another indication of social cost is homeless families in Atlantic County which num-bered 105 in June 1988. Eighty-six percent of these families are Black and Hispanic and sixty percent had lived in Atlantic City.[101] A total of 343 persons were homeless including 227 children.[102] Much more research is needed to further document these and related costs to compare trends over time and patterns of change in other urban areas.

## Conclusions and Recommendations:

### Employment:

The total amount of employment that is dependent upon the gambling industry is significant but, except for Atlantic County, will probably not increase past five percent of total New Jersey employment in the foreseeable future. What may be increasingly significant, however, is the number of part-time employees and their percentage relationship to full-timers. This is important for a number of reasons. First, the aggregate effects of the gambling industry on the local and state economies may be overstated. For example, the most recent Touche Ross study of the economic impact of the casino industry contained no estimate of part-time imployment. Second, to the extent that part-time employment is increasing, especially in the casino industry, the demand for State and Local Government Services and benefits (such as health services or day care) may increase. As the gambling industry reaches maturity, or inter-state gambling competition increases, this issue may become increasingly important.

### Recommendation 1

*The various segments of the gambling industry should increase reporting part-time and full-time employment.* Because there are a number of reporting requirements already in place, the marginal cost of obtaining this information is small and could be contained in annual reports or budgetary data.

100. New Jersey Department of Transportation, 1976, 1985 *Summary of Motor Vehicles Accidents.*

101. Figures supplied by the Atlantic County Department of Social Services.

102. *Ibid.* It is important to note that these figures do not include the so-called homeless "street people" or the 150-200 people per month serviced by the Stranded Travelers program of the Red Cross (estimates provided by the Red Cross, Atlantic City).

## Recommendation 2

*The employment multiplier model needs to be updated to include structural changes in the New Jersey Economy.* As the service and information sectors of the State and Local Economies increase, the magnitude of the employment multiplier will change. The multiplier developed by the Office of Economic Policy and Planning drives many of the figures in this and other reports and is in need of revision.

## Recommendation 3

*There should be continued outside analysis and accountability for increased regulatory employment and its budget allocation.* (Appendix Three contains the summary data for regulatory employment and its costs for FY 1986 and 1987). As the gambling industry reaches maturity, regulation costs should stabilize and therefore must be continually monitored. It is important, however, to recognize that there are economic and social benefits to regulation and some systematic analysis is necessary to account for these benefits.

## Income:

As stated previously, the gambling industry contributes approximately five billion dollars to the State economy but only accounts for 3% of State Personal Income. As the State economy continues to grow, and as the Gambling industry reaches maturity, this percentage will undoubtedly decline.

## Recommendation 4

*The income multiplier model needs to be updated to include structural changes in the New Jersey Economy.* For many of the same reasons outlined in Recommendation 2, this model needs to be revised. As new gambling legislation is offered there must be objective analysis of the economic effects of this industry. For example, the current campaign of the casino industry to make known its economic benefits must be scrutinized with great care.

## Recommendation 5

*Information concerning State tax collections, by county, should be made available by the Division of*

*Taxation.* While some of this information is currently available, (State Personal Income Taxation by Counties) Sales tax data, the largest source of State Tax revenue, is not. There are a number of benefits to this recommendation. First, this data would be a cross-check for income multiplier data, i.e. working backwards from the sales tax to compute income. Second, economic development could be measured by observing changes in collections. Third, potential legislative reform initiatives could use this information as a basis of comparison. For example, reform of the sales tax could take the form of changing rates, changing the base, or allowing a county option, as in the case of New York State. Because the State already collects sales tax information by vendor, the marginal cost of requiring vendors to disaggregate by county and the cost of reassembling this data seems reasonably small.

## State Tax Revenue Structure

This report has shown that the State Tax Structure collects approximately seven percent of total own-state revenue from the gambling industry. In addition, this percentage has been fairly stable for the past few years and is expected to remain so. If, however, state economic growth levels off or the social costs generated by a maturing gambling industry rise, there may be increased pressure for more state program and/or higher gambling taxes.

## Recommendation 6

*A State Gambling Rainy Day Fund should be established at a fixed percentage of actual gambling tax revenues to be used to maintain existing or fund emerging state programs.* It is interesting to note that according to a recent issue of *City and State*, New Jersey is only one of fifteen states without a "budget stabilization fund".

## Recommendation 7

*The State programs that receive dollars from gambling tax revenue should be evaluated annually on a cost-benefit basis.* Needs change, new problems arise and old ones are sometimes solved. In addition, a continued source of funding may lead to the substitution of funds rather than improvements of programs. For example, the economic literature concerning lottery-funded programs shows that, in

many cases, the percentage of the State Budget allocated to certain programs remained the same prior to and after lottery funds were applied. Appendix six shows that this is the case in New Jersey. Clearly, a continued process of evaluation, short of zero-based budgeting, is called for.

### Recommendation 8

*Economic Models of Revenue Prediction should be developed for the three sources of gambling revenue for the State.* While economic prediction is still a relatively young science, a literature about gambling econometric models is emerging. These models are useful to policymakers by attempting to predict aggregate amounts of revenue, as well as what might happen to revenues when controllable variables (e.g. tax rates) changed.

### Redistributional Considerations:

There is some need to account for the three major forms of redistribution of gambling revenues and expenditures; income redistribution, geographical redistribution and intergenerational redistribution. While it probably is not possible for the State to be distributionally neutral, equity concerns should be addressed. In particular, the raising of governmental gambling revenue and expenditures should not redistribute monies from the less affluent to more affluent, either in terms of population or geographical areas.

No specific recommendations are offered for this section but, at minimum, marketing studies of all three sections of the industry should be monitored on an ongoing basis to affirm that State revenue needs are not abrogating equity considerations.

### Economic Development

There can be little doubt that the gambling industry has had many positive effects upon economic development. The increase in wholesale and retail vendor trade, housing, employment and income. In addition, there has been a large increase in the value of the physical facilities associated with the gambling industry. This most certainly has led to spinoff increases in the tourism and convention industries.

On the other hand, there are social costs associated with economic development. Increased water and air pollution, congestion, crime and decaying infrastructure are just a few of these costs that must be accounted for in an overall cost benefit analysis. These costs, as are the benefits, especially visible in Atlantic County.

### Recommendation 9

*There should be a centralized clearing house of information whose function it is to monitor, on a continuous basis from all segments of the gambling industry, indicators and patterns of economic development.* This information could be gleaned from a number of state agencies, County departments and industry sources, concerning the continuing impact of gambling on economic development.

### Recommendation 10

*There should be an annual report concerning the economic and social costs and benefits of gambling for Atlantic County.* In the late 1960's the Federal Government issued a monograph entitled "Toward a Social Report". This report addressed both the distributional and quality of life issues connected with economic growth. Because of Atlantic County's unique relationship with the gambling industry this report, hopefully prepared by those outside an industry and political infrastructure, would address those same concerns as "Toward a Social Report." This report could be used by policymakers to develop changes is existing gambling legislation as well as for a discussion of new programs.

### A Final Note:

The purpose of this report was to synthesize existing information and provide a framework for policymakers to discuss future policy options. It rises a number of questions and concerns that, at this point in time, have not been fully answered. As the gambling industry reaches maturity, these questions and concerns will become increasingly important to policymakers and the public at large. It is my belief that much work needs to be done and I hope that this effort represents a small but positive step in the process.

# APPENDIX ONE

# GOVERNOR'S ADVISORY COMMISSION ON GAMBLING
## TENTATIVE OUTLINE OF FINAL REPORT

1.   ECONOMIC IMPACT

   a.   Who Gambles in New Jersey and Proportion of Gamblers/Gambling Dollars Coming from Outside State

   b.   Employment/Unemployment Trends (Direct and Related)

   c.   Vendor and Contracting Trends by County

   d.   Changes in Retail Trade, especially in Atlantic County

   e.   Real Estate Development Patterns in Atlantic County Area and Near Racetracks

   f.   Pattern of Business Births in Atlantic County Area and Near Racetracks

   g.   Direct Public Revenues From Gambling

   h.   Public Uses of Gambling Revenues

   i.   Regulatory Costs

   j.   Assessment of State's Dependence on Gambling Dollars

   k.   Future Policy Options

# APPENDIX TWO

| State of New Jersey Programs<br>Supported by State Lottery Resources<br>for the Fiscal Year Ended June 30, 1986 | Fiscal 1986<br>Contributions |
|---|---|

### Department of Education

| | |
|---|---|
| Project COED | $1,740,116 |
| Marie H. Katzenbach School for the Deaf | 3,046,610 |
| Statewide Testing Program | 691,216 |
| Non-Public School Aid | 17,197,280 |
| School Building Aid Debt Service | 23,521,000 |
| School Building Aid | 79,371,682 |
| Master Teacher Program | 20,000 |
| Minimum Teacher Starting Salary | 30,000,000 |

### Department of Higher Education

| | |
|---|---|
| Aid to County Colleges for Operational Costs | 71,563,000 |
| Veterinary Medicine Education | 1,237,500 |
| Aid to Independent Colleges and Universities | 14,195,000 |
| Schools of Professional Nursing | 1,351,257 |
| Dental School Aid | 3,996,900 |
| Optometric Education | 300,000 |
| Compulsive Gambling Research | 75,000 |
| High Technology Initiatives | 3,983,202 |

### Department of Human Services

| | |
|---|---|
| Greystone Park Psychiatric Hospital | 10,906,292 |
| Trenton Psychiatric Hospital | 7,822,080 |
| The Forensic Psychiatric Hospital | 2,237,200 |
| Marlboro Psychiatric Hospital | 10,037,340 |
| Ancora Psychiatric Hospital | 9,928,000 |
| Arthur Brisbane Child Treatment Center | 944,300 |
| Glen Gardner Center for Geriatrics | 1,978,060 |
| Green Brook Regional Center | 588,860 |
| Vineland Developmental Center | 8,328,630 |
| North Jersey Developmental Center | 4,403,647 |
| Woodbine Developmental Center | 4,864,494 |
| New Lisbon Developmental Center | 4,638,338 |
| Woodbridge Developmental Center | 5,038,696 |
| Hunterdon Developmental Center | 5,208,631 |
| Edward R. Johnstone Training & Research Center | 2,043,940 |
| North Princeton Developmental Center | 5,555,764 |
| NJ Mem. Home for Disabled Soldiers at Menlo Park | 2,434,544 |
| NJ Mem. Hom for Disabled Soldiers at Vineland | 2,186,590 |
| NJ Mem. Home for Disabled Soldiers at Paramus | 270,224 |

### Department of Corrections

| | |
|---|---|
| State Prison, Trenton | 12,406,958 |
| State Prison, Rahway | 8,591,600 |
| State Prison, Leesburg | 7,889,056 |

New Jersey State Library

Southern State Correctional Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,109,937
Mid-State Correctional Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,847,311
Camden Correctional Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,158,682
Correctional Institution for Women, Clinton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,496,500
Adult Diagnostic & Treatment Center, Avenel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,254,977
Youth Reception & Correction Center, Yardville . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,875,141
Youth Correctional Institution, Bordentown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,835,701
Youth Correctional Institution, Annandale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,471,897
Training School for Boys, Skillman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,248,250
Training School for Boys, Jamesburg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,255,899
Juvenile Medium Security Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,205,970

**Total Spent on 1986 Programs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$419,353,272**

Source: *N.J. Lottery Annual Report*, 1986 p. 15.

# APPENDIX THREE

### Regulatory Employment and Budget Allocation

|  | FY 1986<br>Regulatory Employment | Expenditures<br>FY 86 | (mil. of $)<br>FY 87 |
|---|---|---|---|
| Casinos | 1051 | $45.2 | $51.1 |
| Lottery | 254 | $18.9 | $23.0 |
| Horse racing | 57 | $ 2.3 | $ 2.5 |
|  | 1362 | $66.4 | $76.6 |

Source: *New Jersey State Budget, FY 1986-7*

# APPENDIX FOUR

Casino Employment-County of Origin — 6/30/87



Source: Touche Ross International, Atlantic City Press.

# APPENDIX FIVE

### Casino Revenue Fund Disbursements (FY 1986)

| Program | | Amount | Percentage |
|---|---|---|---|
| Lifeline Credit | | $66.6 (mil.) | 52.0% |
| Pharmaceutical Assistance | | $33.7 | 26.3% |
| Tax Exemption Reimbursement | | $17.8 | 14.0% |
| Boarding Home Regulation | | $ 5.4 | 4.2% |
| Transportation Assistance | | $ 3.2 | 2.5% |
| General Medical Services | | $ 1.3 | 1.0% |
| | Total | $128.0 mil. | 100% |

Source: *Casino Control Commission Annual Report 1986*, p. 12.

# APPENDIX SIX

**Percentage Budget Allocations-Depts. Receiving Lottery Funds**

| Dept. | FY 1978/79 | FY 1987/88 |
|-------|-----------|-----------|
| Corrections | 2.3% | 3.7% |
| Higher Education | 7.9% | 8.2% |
| Dept. of Education | 43.0% | 31.5% |
| Human Services | 11.7% | 20.1% |
| Totals | 64.9% | 63.5% |

Source: *N.J. State Budget*, 1978/79 and 1987/88

# APPENDIX SEVEN

### Homestead Rebate Data For Horse Racing Counties

#### (Number of Rebates in Thousands)

| County | 1978 | 1986 | Percentage Change |
|--------|------|------|-------------------|
| Atlantic | 26.2 | 31.1 | 18.7% |
| Bergen | 141.1 | 161.8 | 14.7% |
| Camden | 70.3 | 86.2 | 22.6% |
| Monmouth | 74.0 | 92.4 | 25.0% |
| State | 1047.9 | 1267.6 | 21.0% |

Source:  Dept. of Treasury, Division of Taxation, ''Owner Occupied Housing Statistics'', ''Homestead Rebates and Income Tax Data Match'', 1978 & 1986.

''For the category, ''owner-occupied housing'', Monmouth and Camden Counties exceeded the Statewide averages while Atlantic and Bergen were less. A final conclusion must await data from Townships around racetracks, in addition to rental rebate data''.

# Bibliography

## Books

1. Abtx, V., Smith, J.F., and Christiansen, E.M., *The Business of Risk*, University Press of Kansas, Lawrence, Kansas, 1985.

2. Bendavid, A., *Regional Economic Analysis*, Praeger Publishers, New York, 1974,

3. Friedman, J., and Alonso, W., (eds.), *Regional Policy: Readings in Theory and Applications*, MIT Press, Cambridge, Mass., 1975.

4. Maxwell, J., and Aronson, J.R., *Financing State and Local Government*, the Brookings Institution, Washington D.C. (1977)

5. Richardson, H.W., *Regional Economics*, University of Illinois Press, Chicago, 1979.

6. Skolnick, J.H., *House of Cards: The Legalization and Control of Casino Gambling*, Little Brown and Co., Boston, 1978.

7. Smith, W.F., *Urban Development: The Process and the Problems*, University of California Press, Berkeley, California, 1975.

8. Sternlieb, G., and Hughes, J.W. *The Atlantic City Gamble*, Harvard University Press, Cambridge, Mass. 1983

9. Winston, S. and Harris, H., *Nation of Gamblers*, Prentice-Hall, Inc., Englewood Cliffs, N.J. 1984.

## Articles

1. Brammer, D.B. "State Lotteries: Promise But No Panacea", *Public Administration Survey*, Sp./Summer, 1987 Vol. 34, No. 5 3/4. Public Policy Research Center, University of Mississippi.

2. Kaplan, R.H., "Lottery Winners: The Myth and Reality", *Journal of Gambling Behavior*, Vol. 3 (3) Fall, 1987. pp. 168-178.

3. Mikesell, J.C., and Zorn, K.C., "State Lotteries as Fiscal Savior or Fiscal Fraud: A Look at the Evidence", *Public Administration Review*, July/Aug. 1986. pp. 311-320.

## Government Documents

1. Congressional Research Service, Library of Congress, "Lotteries: Bibliograph — in Brief, 1974-1986", Mar., 1986.

2. Federal Reserve Bank of Philadelphia, *Business Review*, Jan./Feb. 1982. "The Casino Industry in Atlantic City: What has it Done for the Local Economy?", Thomas Hammer.

3. New Jersey Casino Control Commission, *Annual Reports*, 1985, 1986.

4. New Jersey Casino Reinvestment Development Authority, 1986 Annual Report.

5. N.J. Department of Labor, Division of Planning and Research, *New Jersey Economic Indicators*, January, 1988, Sept., 1985, Trenton, N.J.

6. N.J. Department of Labor, Division of Planning and Research, "Employment and the Economy: Atlantic City Labor Area", Various years.

7. N.J. Division of Taxation, *Annual Report of the Division of Taxation* in the Department of Treasury, Trenton, N.J. 1983-1987 editions.

8. New Jersey Division of Taxation, "New Jersey State Tax News", various issues.

9. New Jersey Lottery Commission, *Annual Reports*, 1985, 1986.

10. New Jersey Racing Commission, *Forty Seventh Annual Report*, 1986.

11. New Jersey Sports and Exposition Authority, *Annual Report, 1986*.

12. New Jersey State and Local Expenditure and Revenue Policy Commission, "New Jersey's Economy, 1987"

13. United States Department of Commerce, Bureau of Economic Analysis, *Regional Multipliers*, May, 1986

**Monographs**

1. Arthur Young International, "Compilation of Casino Financial Accounting Disclosures, 1986", Philadelphia, P.A.

2. Arthur Young International, "A Graphic Compilation of Casino Performance Data, Atlantic City, Sept. 30, 1987", Philadelphia, P.A.

3. Atlantic City Race Course, *Annual Report, 1986*

4. R.H. Bruskin Associates, Market Research, *N.J. Lottery Tracking Study*, WAVE III, Mar. 1985 and WAVE IV, Aug. 1985, New Brunswick, N.J.

5. Clotfleter, C.T. and Cook, P.J., Working Paper Series, No. 2246, "Implicit Taxation in Lottery Finance", National Bureau of Economic Research, Inc., Cambridge, Mass., May, 1987.

6. Eadington, W.R., "The Economics of Gambling Behavior: A Qualitative Study of Nevada's Gambling Industry", Bureau of Business and Economic Research, University of Nevada, Reno, Nev., 1973.

7. Eadington, W.R., (ed.) The Gambling Studies, *Proceedings of the Sixth National Conference on Gambling and Risk Taking*, Vol. 2, "Casino Gambling: Business and Economic Issues", Bureau of Business and Economic Research, College of Business Administration, University of Nevada, Reno, 1985.

8. International Thoroughbred Breeders, Inc., *Annual Report, 1987.*

9. Kaplan, R.H., "Gambling Among Lottery Winners: Before and After the Big Score", Presened at the Seventh International conference on Gambling and Risk Taking, Bally's Hotel and Casino, Reno, Nevada, Aug. 23, 1987.

10. Peat, Marwick, Mitchell & Co., Policy Economics Group, "The Economic Import of the U.S. Horse Industry", Jan. 1987, Washington, D.C.

11. Touche Ross & Co., "Casino Industry's Economic Import on New Jersey", Oct. 20, 1987, Newark, N.J.

12. Touche Ross & Co., "Casino Industry's Economic Impact on the Atlantic City Region" March 25 1988.

**Miscellaneous**

1. Crain's Newspaper of Public Business and Finance *City and State*, 4/11/88, Vol. 5, No. 8, Chicago, Ill.

2. Horner, E., (ed.), *The New Jersey Economic Almanac*, 1984, New Jersey Associates, Montclair, N.J.

3. Horner, E., (ed.), *The New Jersey Municipal Data Book* 1986 edition, New Jersey Associates, Montclair, N.J.

4. *New Jersey Success*. Dec., 1987, Vol. 8, No. 4, Success Publishing Co., Inc., Hillside, N.J.

# A CONTEMPORARY REVIEW OF LEGALIZED GAMBLING

Richard Lehne
Department of Political Science
Rutgers University
201/463-0940

May 15, 1988

*(IMPORTANT NOTE: The views and analyses contained in this paper are those of the author. They do not represent the opinions of any other group or institution).*

**Mailing address: 2 Wakefield Lane, Piscataway, New Jersey 08854**

# INTRODUCTION

Gambling has been a controversial topic in New Jersey policy circles for decades. Major steps in the state's gambling policy have usually been accompanied by dispute and discord. Gambling was such a contentious issue at the 1947 constitutional convention that it threatened to undo the work of the delegates and lead to the rejection of the new charter at the polls. In 1939, New Jersey's adoption of a constitutional amendment permitting horse race betting climaxed years of legislative strife and partisan division, and the 1953 amendment legalizing bingo and raffles was enacted in the face of open disregard of the state's anti-gambling laws. The state's voters approved an amendment authorizing a state lottery in 1969, at a time when lotteries in New Hampshire and New York were producing disappointing results, and in 1976, on the second try, New Jersey sanctioned the establishment of casinos, even though many voters thought that the casinos would be dominated by organized crime. Opinions on gambling topics are deeply held in New Jersey, and policy decisions have usually been difficult to reach.

Gambling has not only been a controversial topic in New Jersey policy circles, but a persistent one as well. The first amendment to the 1947 constitution concerned gambling, and seventeen of the fifty-five public questions placed before the voters in subsequent years, that were not related to bond issues, also involved gambling. Dozens of reports, scores of public hearings, hundreds of legislative committee meetings, and thousands of legislative proposals have contributed to the state's gambling policy.

While the fundamental allure of gambling has not changed during these years, the governmental context of gambling in New Jersey has been profoundly transformed. In 1939, the constitutional prohibition of all forms of gambling was still in effect. By 1988, an array of state agencies used an elaborate framework of statute, regulation, and judicial decision to supervise a multi-billion dollar industry that employs tens of thousands of workers and contributes hundreds of millions of dollars to state coffers.

As a consequence of governmental decisions, legalized gambling is today a major activity in New Jersey that affects the lives and fortunes of all the state's residents. Table 2 depicts the magnitude of legalized gambling in New Jersey by reporting an estimate of the gambling losses state residents incur through state-approved gaming. In 1987, state residents lost approximately $761 million in casinos, $560 million through the state lottery, $229 million on horse race betting, and $62 million with bingo games and raffles. The losses reported here reflect the difference between the amount New Jersey residents bet and the amount they receive back in prizes. In 1987, the total gambling losses by state residents at state-sanctioned games are estimated at $1.6 billion, or approximately $210 per person. As comparison, this amount equals 57 percent of the amount the state received in 1987 through the sales tax.[1] (These estimates assume that betting by non-New Jersey residents at New Jersey bingo, horse race, and lottery events are essentially equal to out-of-state betting by New Jersey residents.)

This paper examines the course the state's gambling policy has followed from the 1947 constitutional convention to the present day. After noting the constitutional status of gambling, the first section of the paper reviews sequentially the history of bingo and raffles, horse racing, the lottery, and casino gambling in the state. It explores the process of approval of the different forms of gambling, the goals that gambling was to achieve when it was legalized, and the issues that were prominent at the time of legalization. The discussion here considers the major administrative decisions that affected the various forms of gambling, changes that occurred in each gambling area through legislative amendment, and public issues that emerged subsequent to legalization.

Section Two of the paper examines the public finance of New Jersey gambling by reviewing the revenues and expenditures of the state's gambling institutions, the contributions gambling makes to public purposes, and the share of the state budget provided by legalized gambling. The paper's third section analyzes the information presented in sections One and Two. It highlights similarities and contrasts that appear in the development of New

---

1. Sales tax receipts in F1987 were $2,822 million. See State of New Jersey, Budget Fiscal Year 1988-1989, p. c-4. The 1987 [sic]

TABLE 1
PUBLIC QUESTIONS ON GAMBLING UNDER 1947 CONSTITUTION

| Question | Year | Outcome | Votes In Favor | Votes Against |
|---|---|---|---|---|
| **BINGO AND RAFFLES** | | | | |
| Permit Bingo and Raffles | 1953 | Adopted | 947,676 | 374,818 |
| Allow Senior Citizen Groups to Conduct Bingo | 1972 | Adopted | 1,968,434 | 341,816 |
| Allow Senior Citizen Groups to Conduct Raffles | 1984 | Adopted | 2,074,417 | 342,344 |
| **RACING** | | | | |
| Permit Betting on Horse Races at Night | 1966 | Adopted | 945,495 | 577,002 |
| Permit Betting on Horse Races on Sunday | 1980 | Rejected | 996,006 | 1,285,074 |
| Permit Betting on Horse Races that are Simulcast | 1985 | Adopted | 1,040,117 | 533,926 |
| **LOTTERY** | | | | |
| Authorize a State Lottery | 1969 | Adopted | 1,593,239 | 362,947 |
| **CASINOS** | | | | |
| Permit Gambling Casinos | 1974 | Rejected | 790,777 | 1,202,638 |
| Permit Atlantic City Casinos | 1976 | Adopted | 1,535,249 | 1,180,799 |
| Increase Flexibility in Use of Casino Revenues | 1981 | Adopted | 1,105,957 | 524,496 |
| Allow Use of Casino Revenues for Homestead Rebates | 1985 | Rejected | 573,555 | 943,740 |
| **OTHER FORMS OF GAMBLING** | | | | |
| Permit Amusement Games | 1959 | Adopted | 917,291 | 630,800 |
| Permit Amusement Games at Agricultural Fairs | 1961 | Adopted | 768,372 | 445,816 |
| Permit Larger Fees and Prizes-Amusement Games | 1976 | Rejected | 907,007 | 1,359,860 |
| Permit Jai Alai Gambling | 1978 | Rejected | 671,793 | 966,254 |
| Allow Legislature to Change Rules for Amusement Games | 1980 | Rejected | 977,766 | 1,191,128 |
| Permit Larger Fees and Prizes-Amusement Games | 1981 | Adopted | 927,680 | 688,679 |

Source: *Legislative Manual: State of New Jersey - 1987,* pp. 903-11

73

## TABLE 2

### ESTIMATED GAMBLING LOSSES BY NEW JERSEY RESIDENTS IN LEGAL GAMES
#### Fiscal Year 1987

| Forms of Gambling | Estimated Loss | Proportion of Loss |
|---|---|---|
| Bingo and Raffles | $    62 million | 4% |
| Casinos | 761 million | 47% |
| Horse racing | 229 million | 14% |
| Lottery | 560 million | 30% |
| Total Loss | $1,612 million | 100% |
| Loss per capita | $210 | |

Sources: Legalized Games of Chance Control Commission, *Financial Report, Fiscal Year 1986-1987;* Atlantic City Casino Association, *Fact Sheet;* New Jersey Racing Commission, *Annual Report 1986* and *1987;* and New Jersey Lottery, *Annual Report 1987.*

Notes: **Bingo and Raffles:** Gross receipts for bingo and raffles in 1987 were $141 million; net proceeds to charities were $56 million; and non-prize expenses are estimated to be 6 million. Resident losses are sum of administrative costs and proceeds to charities. **Casinos:** Gross revenue was $2,379 million. Thirty-two percent of patronage is attributed to New Jersey residents, on basis of Touche Ross & Co., *Casino Industry's Economic Impact on New Jersey,* Exhibit 17, October 20, 1987. **Horse Racing:** The amount reported is the mean of the Total Amount Distributed by the Commission for calendar 1986 and 1987. **Lottery:** Gross revenue for lottery was $1,117 million, and prize awards equalled $557 million. Resident losses are calculated by subtracting prize awards from gross revenue.

Jersey's four forms of legalized gambling by examining such factors as the patterns of support and opposition, the approach adopted in the different pieces of enabling legislation, the mix of public and private responsibilities, and responses to declines in revenues. The final section of the paper draws upon the material presented in earlier sections to suggest perspectives that may be constructed in addressing future policy issues.

Despite the controversies surrounding the state's gambling policies, or perhaps, in part, because of them, New Jersey has adopted innovative policies in each of the four areas of legalized gambling. The state has sought to use gambling to achieve a variety of public purposes without losing sight of the need to maintain restraints to limit the social and governmental costs that usually accompany legalized gambling. The creation of the Governor's Advisory Commission of Gambling continues the state's tradition of innovative approaches to managing gambling policy.

# SECTION ONE

# FORMS OF LEGALIZED GAMBLING IN NEW JERSEY

**Constitutional Background.** The present forms of gambling in New Jersey—bingo and raffles, horse racing betting, the lottery, and casino gambling—are rooted in the state's constitutional history. The 1947 constitution provided New Jersey both a framework for a modernized and strengthened state government and a formula for addressing gambling controversies that was acceptable to the state's voters and political leadership.

Lotteries and horse racing were common forms of entertainment in colonial New Jersey, but the constitution of 1776 was silent on the question of gambling. Gambling policy was not elevated to constitutional status until the constitution of 1844, when the framers of that reform era document included a provision that explicitly prohibited both state-sanctioned lotteries and the sale within state borders of lottery tickets from other states.

The 1844 constitution was amended only four times during the century it was in force, and two of those amendments dealt directly with gambling. The prohibition on lotteries was first extended in 1897 to include betting on horse races and all other forms of gambling, and, then, in 1939, the state reversed itself and amended the constitution to allow pari-mutuel betting at horse races.[1]

The legalization of horse race betting in 1939 influenced the tenor of debate that occurred over gambling at the 1947 convention. While staunch opponents of gambling wanted to insert a simple prohibition of gambling in the new charter, racing had become too deeply entrenched for such an option to win wide support. In 1947, for example, pari-mutuel betting contributed $8 million to the state treasury.[2] The convention committee responsible for the gambling question was headed by pro-gambling delegates. After a full airing of gambling issues, the committee defined four possible courses of action.[3]

(a) Eliminate any reference to gambling in the new constitution;

(b) Retain present provision, allowing pari-mutuel betting at race tracks but prohibiting all other forms of gambling;

(c) Liberalize the present clause to permit, in addition to pari-mutuel betting, bingo and games of chance operated by charitable, religious, fraternal or veterans organizations;

(d) Liberalize the present gambling clause to permit specified games of chance, subject to local referendum, without reference to charitable or religious organization.

Forces that sought to prohibit gambling had little support within the convention, and attention focused on maintaining the status quo or providing some degree of liberalization.[4] Fearful that any provision it could draft might jeopardize the fate of the constitution at the polls, the committee was unable to overcome its own differences and simply presented the issue to the full convention. After much debate, Senator Arthur Lewis proposed a compromise amendment on the convention floor that was adopted overwhelmingly and included almost verbatim in the 1947 Constitution. That original passage reads:

> No gambling of any kind shall be authorized by the Legislature unless the specific kind, restrictions and control thereof have been heretofore submitted to, and authorized by a majority of the votes cast by the people at a special election or shall hereafter be submitted to, and authorized by a majority of the votes cast theron by, the legally qualified voters of the State voting at a general election.[5]

This provision would maintain the status quo for gambling until the voters themselves authorized a change, and it separated the fate of the new constitution from the question of gambling. The clause was regarded as a masterful compromise by the delegates who met in New Brunswick, but, at the same time, it set the stage for numerous battles in the years to come over the features of the state's gambling policy.

## BINGO AND RAFFLES

### ORIGINS

The legalization of bingo was one of the issues that was extensively debated at the 1947 constitutional

convention. Even though it did not legalize bingo, the convention urged the legislature to consider placing the question of legalization before the voters.[6] Proposals to legalize bingo were introduced into every legislature from 1948 until 1953 when a constitutional amendment legalizing bingo and raffles was approved by the voters.[7]

Playing bingo was widespread in New Jersey before it had legal sanction. In fact, one national magazine described New Jersey as the state with "the most-wide-open bingo" in the nation.[8] In 1948, the issue presented to the legislature was "charitable gambling." Representatives of charitable, veterans, fraternal, and church groups appeared before the legislature to argue that they should be permitted to raise funds for their organizations through bingo games and raffles. Respected groups acknowledged that they had depended for years on revenues from illegal gaming for their charitable work and for their very existence. While opposed to "commercial" bingo, the religious and charitable groups proposed a municipal or state licensing process that would authorize them to raise money for their activities through bingo games and raffles. Voicing the one major dissent from the pro-bingo theme, representatives of Protestant churches testified vigorously against this and other gambling proposals.

Governor Driscoll opposed the bingo measure in 1948, and it received only scattered support in the assembly, mostly from legislators representing Hudson County.[9] In the 1949 gubernatorial election, Governor Driscoll's opponent differed with the Governor and emphasized his support for a referendum to legalize bingo.[10] Driscoll's failure to back the referendum and his subsequent re-election kept the bingo issue from center-stage until 1952.

In 1952, future gubernatorial candidate Malcolm Forbes introduced his "Bingo Legalization Law," which would have led to an amendment that permitted municipalities to issue licenses to charitable groups to operate bingo games under state supervision. The bill's prospects were aided by provisions to prevent "commercial" bingo and by antagonisms produced by county prosecutors who moved at this time to close down existing bingo games and gambling wheels.[11] Forbes succeeded in securing passage of the bill through the legislature, but it was vetoed by Governor Discoll on the grounds that it did not

adequately safeguard against commercialization. In his veto message, Driscoll also expressed opposition to increased gambling in any form:[12]

> We must ask ourselves . . . whether this is the time to expand and promote gambling activities in this State. In my judgment, it would be a great mistake for the State to put its stamp of approval on any increase in gambling activities.

News accounts the next year reported that the bingo issue had again thrown Trenton into turmoil.[13] The controversy in 1953 become acute when police chiefs, under pressure from a state supreme court decision, were instructed to enforce every aspect of the state's anti-gambling laws. Opposition to the bingo crackdown from charitable groups became a "swelling storm," and some cities instructed their police departments to disregard orders from Trenton and allow bingo gambling to continue. Support for a referendum legalizing bingo was announced by would-be Republican and Democratic candidates for governor. Legislative maneuvering was dominated by bingo, and other problems were set aside as legislators sought to frame a bingo policy. After an animated public hearing, the legislature adopted a concurrent resolution that placed the bingo question on the November ballot. The five votes against the resolution in the assembly and all the dissenting votes in the senate were cast by Republicans.[14] Governor Driscoll was quoted as saying that he had never seen a bingo bill that he could sign, but the concurrent resolution placing bingo on the ballot did not require his approval.

In 1953, veterans organizations were again prominent backers of the bingo proposals before the legislature and during the fall campaign, and they were supported by Catholic groups and by both the Democratic and Republican candidates for governor. Protestant clergy led the campaign to reject the measure, but their efforts failed as Robert Meyner was elected governor, and the bingo amendment was endorsed by seventy percent of the voters.[15]

## STATUTE

Shortly after election day, Governor-elect Meyner appointed an ad hoc committee to examine charitable gambling in New Jersey in light of the approval of

the amendment and to draft legislation creating an administrative system to regulate bingo and raffles.[16]

The committee based its work on two premises. First, bingo is "tolerable only when conducted on a small or moderate scale. It is harmful when conducted as a commercial enterprise or as an end in itself, or when it grows to such size that it is a significant factor in the economic or social life of the community." Second, the committee saw its primary task to be the design of a regulatory system which would safeguard bingo from domination by racketeers and protect it as a revenue source for deserving charities.[17] The action of the committee can be examined under three headings: division of authority between localities and the state; restrictions on gaming operations; and public revenues.

**State-local Authority.** The state government had no experience regulating bingo and raffles before the 1953 amendment, and some argued that the state should play only a minimal role in the future. A representative of the Hudson County Democratic Organization and the mayor of Jersey City proposed to the ad hoc committee that licenses should be granted to appropriate groups and that they then be allowed to operate as they saw fit. In a home-rule state, others wanted the communities rather than the state to be the locus of regulation and control.[18]

The outcome of this debate was a statutory scheme that assigned primary responsibility for control to the municipalities but reserved to the state ruling-making and oversight authority.[19] A five-member Legalized Games of Chance Control Commission was created to develop rules and regulations and to "supervise the administration" of the bingo and raffles law. Municipalities were to receive application requests from the charitable groups, investigate the applicants, issue licenses to qualifying organizations, supervise the conduct of the games, and receive financial reports. The state commission would hear appeals from decisions of the local governments and investigate the administration of the laws by the municipalities, but the commission did not itself have authority to impose penalties other than suspending or revoking an organization's license.[20]

**Restrictions on Operations.** Restrictions were imposed on bingo and raffles activities both to pre-

vent racketeering and to guarantee the "moderate" character of the games. The licensing process, the investigation of license applicants, and the requirement that a complete financial report report be filed within fifteen days of each bingo or raffle event were intended to prevent corruption.

Other provisions emphasized the charitable purposes bingo and raffles were to serve in New Jersey. The games were to be operated by current members of the sponsoring organizations, and none was to be paid. The value of the raffle prizes was limited, the top prize on any bingo game was set at $250, and the total value of bingo prizes offered in all the games played on any one occasion was limited to $1000. There was to be no advertising directed toward the general public, no gaming on Sundays, and no participation by persons under 18. These limitations not only kept the games at a moderate level; they also reduced the attractiveness of legalized bingo and raffles as targets for racketeers.

**Revenues.** The planning committee recommended and the statute agreed that the state should receive no revenues from bingo and raffles. Aside from administrative costs for the municipalities, all the proceeds from bingo and raffles were to go to the charities. The committee warned that ". . . if the State derives revenue, and so becomes a partner in bingo and raffles, there will be added pressure to encourage their multiplication and growth, or to relax the restrictions and controls."[21]

## DEPARTURES FROM INITIAL DESIGN

**Local Government Role.** The greatest departure from the original statutory plan is the absence of a vigorous municipal role in the supervision of bingo and raffle activities. Municipal clerks issue licenses and receive financial reports, but they have been less willing to investigate applicants and supervise the conduct of games. To compensate for this, the Legalized Games of Chance Commission requires charitable organizations to obtain from it a registration number before applying for a license from a municipality. The commission also monitors gaming activities on its own and has acquired statutory authority to impose sanctions beyond suspending or revoking licenses. The Commission describes the control system as essentially "self-regulating."[22]

**Proposals for Liberalization.** Complaints that the bingo and raffle rules were too rigid and required liberalization greeted the Commission at its first meeting. Particular targets were the statutory requirement that bingo prizes be limited to $1000 per evening, the prohibition on advertising, and the requirement that the games be run by volunteer members of the sponsoring organization. Even though complaints have been directed against these requirements for more than three decades, they remain essentially intact.[23]

The complaints were originally dismissed as protests from "commercial" bingo interests who would be closed down under state regulation. The continuation of the criticisms revealed an important division of opinion among the charitable groups conducting bingo and raffles games. Throughout this period, operators of larger games wanted higher prizes and more advertising to draw patrons from "high stakes" games in New York and Pennsylvania and to compete with other gambling attractions in New Jersey. Operators of smaller games, however, opposed relaxation of the rules because they feared they would not be able to compete. They had smaller halls and fewer patrons. Larger prizes or any other increases in their costs could probably not be recouped by increase in their revenues, but, unless they offered top prizes, they would probably lose existing patrons and existing revenues. The representatives of smaller games have usually opposed enhancement of the games, and, until recently, the Legalized Games of Chance Commission has usually sided with the smaller groups and opposed larger prizes, advertising, and similar promotions.[24]

**Fears of Siphoning Off Funds.** Prior to the adoption of the Bingo Law, professional gamblers operated games for charities and drained off the proceeds. To prevent this from recurring, the statute required that sponsoring groups own rather than rent bingo and raffle equipment. This provision was later relaxed when it was found to be impractical, but the Commission won statutory authority to regulate the rental of meeting halls in which some organizations hold their games to preclude the siphoning off of funds.[25]

**Arbitrary and Excessive Regulations.** Complaints of arbitrary and excessive regulation by the Legalized Games of Chance Control Commission began in the

first year of the commission's existence and climaxed in a series of sensational legislative hearings in 1958 and 1959. The following indictments were made of the commission:

- \*\*The paperwork required by the commission was excessive.[26]

- \*\*The approach of the commission reflected a suspicion that the charities were "deliberately attempting to violate the law" and made the volunteers feel like "second-class citizens."[27]

- \*\*The commission imposed severe penalities for minor infractions and made "life as miserable as possible for the charitable groups."[28]

- \*\*The commission abused its authority by demanding financial records it had no right to obtain and seeking to regulate activities of the organizations that were unrelated to gaming.[29]

The commission defended its actions by contending that "limited gambling for charitable purposes had never been successful before" and that the "entire nation has been watching the experiment."[30]

> We feel that any relaxation would result in widespread violations of the law and would be an open invitation to commercial interests and worse with a resulting revulsion on the part of the general public leading eventually to the repeal of the entire laws. Such repeal would deprive charitable organizations . . . (of) millions of dollars per year.

A special legislative committee held six days of public hearings and numerous closed-door sessions and then released a report graphically entitled *Control Through Fear* that substantiated most of the accusations made against the commission. Even though the governor subsequently backed the commission and praised its "tough" decision-making, the Legalized Games of Chance Commission moderated some of the regulations which the veterans and religious organizations found most objectionable.[31]

**Administrative Costs.** Beginning in 1961, the commission began reconsidering the policy of relying exclusively on state general fund revenues to finance the activities of the commission. During the next

decades, the commission began gathering licensing fees and other charges from the groups and firms involved in bingo and raffle activities, and the state now depends entirely on these revenues to finance the administrative costs of the commission. The municipalities also receive revenues from fees and charges to offset their administrative costs.[32]

**Senior Citizens.** By constitutional amendments in 1972 and 1984, senior citizen groups were allowed to operate bingo games and raffles and use the proceeds on their own activities.

## HORSE RACING

### ORIGINS

The history of horse racing and horse race betting in New Jersey is an extensive one.[33] An early step in the contemporary story of horse racing occurred in 1933, when the legislature established a State Racing Commission to charter corporations and to authorize them to sponsor race meetings.[34] A companion measure that would have legalized horse race wagering died in the senate. Standing alone, the racing commission bill was described in the press as a "subterfuge to receive gambling."[35]

In 1934, the state declared an emergency in the finances of municipalities and authorized by statute greyhound racing and pari-mutuel betting.[36] The municipalities where tracks were located were to receive 1 1/2% of the total money handled, and an equal amount was to go to the state. Four greyhound tracks were in operation by summer 1934, and the meets produced hundreds of thousands of dollars in revenues for both the municipalities and the state. The Racing Commission argued that this experience demonstrated the value of horse racing as a revenue source for the state and urged the adoption of the necessary amendments. In September 1934, however, the courts declared the greyhound enterprise to be contrary to the state constitution and shut it down.[37]

The full legalization of horse racing and pari-mutuel betting occurred in 1939, and was entangled in a dispute within and between political parties.[38] In these years, Mayor Frank Hague of Jersey City was at the height of his power in the Democratic Party and in the state. A reform faction in the Republican

party argued that the leadership of the Republican party worked too closely with Mayor Hague and other Democratic leaders. The reformers were strong enough to win the Republican gubernatorial nomination in the 1937 primaries, but they lost the general election to the Democratic candidate.

In 1937 and 1938 a coalition of Democrats and traditional Republicans backed the racing amendment in the face of opposition from the reform Republicans, and the measure was finally placed on the ballot in a special election in June 1939.[39] Mayor Hague and the Hudson County Organization supported the measure, and they were joined by traditional Republicans and groups from resort areas. The opposition was led by the reform Republicans, Protestant church groups, and women's organizations, and endorsements opposing the amendment were received from business and agricultural associations.[40] After an aggressive contest, pari-mutuel betting at race tracks was approved by a vote of nearly three to two.

### STATUTE

The partisan conflict that dominated the adoption of the constitutional amendment and the special election campaign continued during the preparation of the enabling legislation.[41] When the Republican Speaker of the Assembly declared the chamber adjourned at one late night session, a coalition of Democrats and pro-gaming Republicans seized control of the Assembly, elected a temporary speaker, and advanced their legislation to regulate the racing industry.[42] After much turmoil, the measure was finally passed over the opposition of the Republican reformers and signed into law in March 1940.

The 1940 legislation created a four-member New Jersey Racing Commission that was given authority to license tracks, owners, jockeys, attendants, and other employees.[43] There were to be no more than four tracks in the state. Each could operate for up to fifty weekdays a year between April and November, at times between noon and 6:00 p.m. The tracks would apply to the commission for dates, and there were to be no conflicts among racing dates at different tracks. There was to be at least one race per track every six days which would be limited to horses foaled in New Jersey. The commission would designate a steward, accountant, and veterinarian who

79

would be present at races and be paid by the tracks. Up to 10 percent of the pari-mutuel pool could be withheld, with 4 percent going to the state and up to 6 percent going to the permit holder.

## DEPARTURES FROM INITIAL DESIGN

**Strengthen Procedures to Enhance Integrity.** Governmental procedures designed to maintain the integrity of sensitive activities such as horse racing have become more rigorous in the years since the legislation creating the New Jersey Racing Commission was enacted in 1940. At least as far back as 1946, a gubernatorial commission prepared a "Special Report on Horse Racing and the Pari-Mutuel System" and concluded that procedures to maintain integrity needed to be tightened.[44]

In 1946, the governor's commission argued that licensing standards and investigation procedures should be strengthened for the associations staging the meets and for the employees who worked at the tracks so that the state could "know who our licensees are."[45] In order to prevent doping of horses, the commission wanted the state to establish a laboratory at the site of the track staffed by state employees.[46] The governor's commission recommended that the personnel designated by the Racing Commission to safeguard the state's interests in the operations of the track be paid by the state rather than by the race track so that they were not subjected to "divided loyalties."[47] Finally, the governor's commission concluded the state did not receive adequate financial records to determine that the state interests as a partner of the license holders in the operations of the track were being well represented. It recommended that a uniform method of financial accounting and record keeping be required of the various associations.[48]

The attorney general convened a task force on racing in 1977 and the State Commission of Investigation undertook an inquiry between 1983 and 1986 that repeated many of the same recommendations. In 1986, the SCI praised the Racing Commission for the progress made in some of these areas, but it also noted that financial restraints and changes in the character of the industry precluded action on other important recommendations.[49]

Despite the progress that had been made, the SCI

concluded its 1986 statement by linking the issue of integrity to the decline of horse racing in New Jersey. "Does the betting public believe," the SCI asked, "that racing can't be trusted? Has the excitement of witnessing a horse race been deflated by a suspicion that the odds are stacked against making a worthwhile wager on any race's outcome?"[50] Integrity issues remain an important issue for the racing industry.

**Expansion of Racing.** Under the state's initial legislation, racing was limited to fifty days a year at each track. With three tracks in operation until 1958, no more than one hundred and fifty racing days occurred.[51] When a fourth track opened in 1959, the number of racing days increased to two hundred, and in 1962, the number of racing days was temporarily increased to raise funds for disaster relief along the New Jersey shore.[52] Once the initial limit of fifty days per track per year was broken, the total number of racing days increased continuously. In 1987, racing was authorized on eight hundred and thiry-seven days at the various tracks in the state.[53]

During these years the racing industry argued that it was facing unfair competition from neighboring states and difficult economic conditions. One state report from 1960 concluded that "continuity of operations" would enhance the quality of racing in New Jersey and attract patronage while, at the same time, reducing the burden to the owners of their fixed costs.[54] Similar arguments were presented to support the adoption of the constitutional amendment in 1966 that permitted night racing. The Racing Commission noted then that night racing "vastly increased the revenue potential of racing in the State" and gave the industry the "opportunity to compete more actively with neighboring states, both for revenue and for the best quality harness sport."[55] Later, the same arguments were again made to support simulcasting and Sunday racing.

**Revenues to State.** Parimutuel betting on horseracing was initially presented to the state's voters as a revenue source which might preclude the need for new state taxes. The state received 4 percent of the amount wagered in the early years and a larger share in later years as state revenue needs increased. In the mid-1950s, the state did, in fact, receive almost 10 percent of its general fund revenues from horse race betting.

Beginning in the late 1950s and becoming explicit in the 1960s and 1970s, the justification for permitting horse racing in New Jersey changed. Rather than a state revenue source, pari-mutuel revenues were now presented as a means of subsidizing New Jersey's horse industry. In a 1978 public hearing, the industry argued that it should receive subsidies because it created jobs, preserved open space, and constituted a "tourist attraction" in the state. Like a public utility, a spokesman argued that it should be guaranteed a profit.[56]

In past decades, the share of the amount bet not returned to the bettors has grown to approximately 20 percent. In the last ten years as well, the state's share of the amount withheld has fallen to one half of one percent. The balance is now divided among the tracks, breeding programs, and horsemen.

**Sports and Exposition Authority.** The creation of the Sports and Exposition Authority transformed New Jersey's commitment to horse racing and pari-mutuel betting. The Sports and Exposition Authority Law passed the assembly and senate by large margins in spring 1971, and the measure was enthusiastically signed by Governor Cahill in May 1971.[57]

The statute's declaration of policy stated that the "Legislature hereby finds and declares that the general welfare, health and prosperity of the people of the State will be promoted by the holding of . . . horse racing and other spectator sporting events . . . ."[58] The authority was empowered to provide horse race facilities, football stadiums, and other sports facilities.

The funds that the authority was to borrow to finance its projects were not to be an obligation of the state. The debts were to be a simple obligation of the authority itself. The statute expresses this without qualification:

Bonds and notes of the authority issued under the provisions of the act shall not be in any way a debt or liability of the State . . . and shall not create or constitute any indebtedness, liability or obligation of the State . . . . [59]

The principal source of revenue for the authority was to be a share of the proceeds from pari-mutuel betting at the race track.

The Meadowlands Racetrack opened in 1976, and the Sports and Exposition Authority boasts that it has now become "the nation's leading harness track."[60] The track is the most important single element in horse racing in New Jersey. In 1986, the Meadowlands Racetrack had an attendance of 3.5 million visitors, equalling 55 percent of total attendance of all New Jersey tracks in that year. In the same year, almost 60 percent of the Total on Track Handle of all the state's racetracks, the amount bet on live races, was also wagered at the Meadowlands.[61]

In the last decade, the Meadowlands has also contributed a critical element to the emergence of New Jersey's new national image. At the same time, the Sports and Exposition Authority remains dependent on pari-mutuel betting for most of its operating income. In 1987, the authority derived 80 percent of its excess of operating revenues over operating expenses from the Meadowlands Racetrack.[62] As a consequence, one element of New Jersey's improved national image now depends on the state's willingness to defend and enhance pari-mutuel wagering on horse racing.

## STATE LOTTERY

### ORIGINS

Efforts to create a state lottery began immediately after the adoption of the 1947 Constitution. These efforts were originally driven by proposals to pay a bonus to military veterans, but the lottery initiative was soon overshadowed by the campaign to legalize bingo.

The year after the state approved the 1947 constitution, the assembly minority leader from Hudson County introduced a bill that set the pattern for lottery proposals for the next two decades.[63] This bill envisioned a lottery patterned after the Irish Sweepstakes. It would be based on a horse race, and it would be held no more than twice a year. Under this proposal, the proceeds would be used to pay a bonus to veterans who had served in World War II, a popular cause in these years. The Commission on State Tax Policy was directed to study the financing of a state bonus for veterans, but its report dismissed a lottery as a serious technique for raising state revenue.[64] Two discharge petitions were intended to bring the lottery proposal from the judiciary committee to the floor,

but they both failed, and the bill died in committee at the end of the session.[65]

Similiar bills authorizing a lottery called the "Garden State Sweeps" were introduced in the 1949 session.[66] This lottery was to be operated by a new Department of the State Lottery, and the tickets were to be sold by motor vehicle agents and other state personnel. These bills, too, were unable to win broad support. The lottery campaign suffered a critical setback on election day 1949, when a bond issue to finance a veterans' bonus program was narrowly rejected by the voters, and when Governor Driscoll, with his anti-gambling sympathies, was reelected governor.[67] No lottery measure was proposed again in the legislature until 1954.

The passage of the constitutional amendment permitting bingo and raffles in 1953 cleared the way for a revival of interest in lottery proposals. A new constitutional amendment authorizing a lottery was proposed by another Hudson County legislator in 1954, and pro-lottery measures were introduced every year until the lottery was placed on the ballot in 1969.[68]

Revenues from a lottery were originally proposed to fund veterans' bonuses, but, over the years, a variety of other purposes were considered: aid to education; support for state institutions; highway construction; local government; hospital costs; and the state's general fund expenditures.[69]

The most vigorous supporters of a lottery in the early years were veterans groups, but in later years officials from Hudson and Camdem Counties, labor unions, and even the New Jersey Jaycees appeared as pro-lottery advocates. Protestant clergy were consistent critics of lottery proposals.

Lotteries were promoted by their supporters as a revenue technique. The principal sponsor of the final lottery proposal explained the rationale: "The primary reason (for the measure) is to provide the State of New Jersey with much needed funds in a relatively painless way."[70] Many legislators, however, were suspicious of the revenue claims.

In 1963, the Commission on State Tax Policy again opposed the creation of a state lottery. Although supportive of legalizing other forms of gambling, the commission concluded tht a lottery would be an insubstantial and unreliable source of revenue.[71] Futher skepticism about a lottery's revenue potential emerged in 1964, when the New Hampshire lottery became operational, and its revenue yields were less than anticipated. The 1965 gubernatorial campaign began with both the Republican and Democratic candidates cool to the idea of a lottery for New Jersey.

During this period, the form of lottery that the advocates were championing began to change. Newspaper accounts reported that, "A subtle change in attitude toward a state lottery is taking place in Gov. Hughes (sic) administration."[73] While still emphasizing their support for a New Hamphire-style lottery, lottery proponents acknowledged that New Jersey's lottery might take a different form. They indicted that the details should be left to a future legislature.

The failure of New Hampshire and later the New York lottery to produce the expected revenue, "should not be ascribed to the lottery concept," they explained, "but to the manner in which it has been implemented." The sponsor of the 1969 lottery resolution would not discuss the mechanics of a lottery before the legislative committee, but he argued, obliquely, that "if run as efficiently as the illegal operations now run it, the revenues derived (from the state lottery) would far exceed the most optimistic estimates."[74]

A resolution calling for a lottery amendment passed the Assembly in 1968, but it was bottled up in the Senate Judiciary Committee.[75] A lottery proposal was finally placed on the November ballot in 1969, by margins of 55 to 12 in the Assembly and 26 to 12 in the Senate.[76] The measure was backed by all Democrats who voted in both chambers and by a significant number of the Republicans. All the votes against the lottery measure in the Assembly and the Senate were cast by Republicans. Some commentators believed that the lottery question would attract additional Democratic voters to the polls in the general election and, thus, improve the prospects of the Democratic candidate for governor in November 1969.[77] But it didn't happen that way. In the general election, the Republican candidate was elected governor, and the lottery referendum was supported by more than 80% of the voters.

## STATUTE

Two weeks after the adoption of the amendment, the legislature created the State Lottery Planning Commission composed of legislators, public members and the state treasurer.[78] The planning commission proposed that the lottery should be managed by a Commission and a director and that raising state revenue should be the lottery's primary goal. It stressed the need to allow the commission flexibility in running the lottery:

> . . . this Commission recommends most strongly that the permanent commission and director . . . be allowed the maximum possible flexibility commensurate with preserving the full trust and confidence of the citizens of this State. In particular, it is important to avoid unnecessary rigidities in the legislation which will inhibit the lottery commission's ability to modify the lottery so as to increase public interest and participation . . . . The danger which must be avoided is the establishment of unnecessarily stringent conditions on the operation of the lottery.[79]

The planning commission proposed that lottery drawings be held more than once a month, as was then the practice in New York, but that "daily drawings should be approached with caution."[80] It recommended convenient sales outlets, low ticket prices, annuity payments to reduce the cost to the state of large prizes, computerization, extensive contracting with private vendors, and substantial expenditures for advertising and promotion.[81]

The planning commission also considered a second lottery goal, competing with illegal gambling organizations. While the planning commission was sitting, the U.S. Attorney for New Jersey released a report that expressed this goal quite succinctly:

> The citizens of New Jersey, by directing that a State Lottery be established, have thus afforded the State a golden opportunity to go into direct competition with the lotteries run by organized crime, thereby substantially reducing profits from these illegal enterprises.
>
> To accomplish this desired result (and the equally important one of raising substantial

revenue for the State) the State must present a lottery which is as accessible and attractive as the prevalent illegal 'numbers' operation. There should be frequent pay-offs to winners, perhaps daily. The pay-offs should be at ratios exceeding the 600 to 1 figures which is tops for numbers games . . . .

> The price of participation is an important consideration. Illegal numbers operators will often take bets in amounts as small as five cents. If the State Lottery is to attract the person who customarily plays the 'numbers', it must permit participation at a low price . . . .[82]

The planning commission feared that the state might be compelled to give up too much revenue in prizes if it sought to compete with illegal gambling organizations, but it urged the lottery to explore this issue and the legalization of other forms of gambling as it gained experience in the future.

The legislation developed by the Lottery Planning Commission established the commission and executive structure for the lottery and then left most operating decisions to the judgment of the new agency. These proposals were accepted by the legislature, and the lottery statute passed the Assembly and the Senate without opposition in February 1970.[83] By offering more frequent drawings, more numerous sales outlets, and cheaper tickets, New Jersey hoped to surpass the limited success of the New Hampshire and New York lotteries.

## DEPARTURES FROM INITIAL DESIGN

**Marketing.** The State Lottery has become a far more sophisticated and aggressive marketing organization than was envisioned when the lottery was discussed by voters or even when the Lottery Planning Commission drafted its reported.

After enjoying growing sales during the period of the public's initial enthusiasm for a state lottery, the novelty of the lottery faded, and ticket sales fell sharply. From $138 million in 1972, sales fell to $77 million in 1975. To reverse the decline, the State Lottery inaugurated a daily lottery to complement its weekly game. In announcing the decision, the press release presented these justifications:

83

To gain new revenues to ease the burden on the state's taxpayers and to weaken the impact of the illegal numbers racket, Governor William T. Cahill announced today that New Jersey will become the first state to inaugurate a daily lottery . . . Governor Cahill said the advent of a daily lottery will give the New Jersey Lottery the kind of resurgence it needs to reverse the downward trend of weekly lottery sales . . . .[84]

Despite the Governor's hopes, the daily lottery did little to revive sales. It was not until the advent of a game that allowed the customer to select his or her own number that lottery sales began to grow. After years of doubt, the lottery recognized that in order to sustain sales, it must keep its games "fresh and appealing." A successful lottery could not simply collect the public's money. To sustain public interest, a lottery must make continual "product changes to rejuvenate the various games by introducing variety, enhancements and new elements . . . ."[85]

**Interest in Other Forms of Gambling.** The State Lottery Commission has followed the recommendation of the Lottery Planning Commission by sustaining interest in legalizing other forms of gambling. In 1974, the newly-designated lottery director announced plans to transform the lottery commission into a superagency responsible for the operation and supervision of casinos and other forms of gambling.[86] In later years, the lottery has followed off-track-betting and sports betting issues.[87]

**Other Legislative Amendments.** Given the growth of the state lottery, there have been remarkably few significant amendments to the original lottery statute. In 1983, the state treasurer became an ex officio member of the lottery commission, and a sixth public member was added.[88] In the same year, the use of video slot machines was prohibited in games operated by the state lottery.[89] The other amendments concerned technical issues.[90] The State Lottery has raised far more revenue for the state than had been originally projected without any important changes in its legal structure.

## GAMBLING CASINOS

### ORIGINS

The constitutional amendment that legalized

casino gambling had its contemporary origins in a resolution proposed in 1969 by a Sussex County legislator. Sussex was emerging as a recreation center, and a company active there already operated casinos in Great Britain.[91] The 1969 resolution died in committee, but two similar measures were introduced the next year. Four public hearings were held on the new resolutions, and the issues discussed there foreshadowed the debated that would occur in New Jersey for the next six years.[92]

Two issues raised during the casino hearings were distinctive. The first was the question of the ownership and operation of casinos. Some casino supporters advocated the establishment of casinos that would be owned and operated by state government, while others favored private ownership and private management. Champions of public ownership argued that the social impact of casinos could be managed more easily and the revenues to the state would be greater if casinos were owned by a government agency. Advocates of private ownership maintained that the state lacked the capital funds, administrative flexibility, and financial incentive needed to make New Jersey casinos a success. Only private ownership would allow the state to realize the goals of legalization.

The second issue debated at the legislative hearings was the location of the casinos. Casinos were viewed by most witnessed as an economic benefit to the area where they were to be located. Gambling had been an illicit attraction of Atlantic City and other shore resort areas in the past, and most discussion of casino gambling focused on Atlantic City. While it was widely agreed that Atlantic City needed whatever economic stimulation it could get, representatives of Sussex County and of hard-pressed urban areas contended that the economies of their regions also needed the stimulus that would come from the injection of new revenues.[93]

The 1970 hearings heard from witnesses who would appear on numerous occasions in the years ahead. In support of casinos, representatives of Atlantic City, business groups, the tourism industry, the government of Atlantic City, and organized labor contended that casino gambling would generate public revenues, create jobs, and rejuvenate the state's convention trade. In making the case against casinos, state fiscal officers, law enforcement

officials, religious leaders, and civic figures argued that the claims made on behalf of casinos were exaggerated and that proponents overlooked the criminal, fiscal, and social problems that gambling would create.

The most important opponent of casino gambling in these years was Governor William Cahill who regarded casinos as a boon to organized crime. During the early 1970s, Cahill opposed casino proposals, and the measures failed to win enough votes to be released from the Republican legislative caucus.[94]

When Brendan Byrne was elected governor in November 1973, the governor's office was assumed by someone who had been a longtime advocate of casino gambling. As a former prosecutor from Essex County, Byrne believed that gambling was an inescapable fact of life. In the late 1960s, Byrne had introduced pro-casino resolutions at various meetings. As a candidate during the gubernatorial campaign, Byrne had expressed his support for the legalization of casinos in Atlantic City.[95] While governor-elect, Byrne promised to propose a constitutional amendment to make casinos a reality.[96]

Potential casino operators objected to the requirement of state operation of the casinos, but their desire to run their own casinos was quieted by a reminder that the governor had vowed to veto any legislation that permitted casinos to be owned by private interests. Representatives from areas outside Atlantic City succeeded in amending the resolution to permit casinos in all parts of the state, but Governor Byrne insisted that for five years he would only sign enabling legislation authorizing casinos in Atlantic City.[98]

The resolution placing the amendment on the November 1974 ballot passed the assembly and senate by two-to-one margins, but the public was unconvinced of its value.[99] The referendum was defeated soundly at the polls, with three voters opposing casino gambling for every two who endorsed it. Only Atlantic and Hudson counties returned majorities in favor of casino gambling. Shortly after the referendum was defeated, planning for a new casino campaign was begun.

The centerpiece of the 1976 proposal was the limitation of casinos to Atlantic City and the use of casino gambling as a tool for the redevelopment of the city's economy. Casino advocates argued that the legalization of casinos would be a major ingredient in the revitalization of the city, and they claimed that casino development would create between twenty and thirty thousand new jobs.[100] Since the new plan relied on private investment to initiate the city's revival, Governor Byrne abandoned his call for public ownership of casinos.

The 1976 resolution received the same pattern of support in the legislature that had been given to the 1974 amendment, but the voters were more supportive than they had been two years earlier. When the measure came before the electorate in November 1976, 1.5 million citizens voted to approve the casino initiative while only 1.2 million voters registered their opposition. The amendment recorded its greatest victories in Atlantic City and Atlantic County, but it carried sixteen of the state's twenty-one counties. Some argued that the measure passed on the second try because casino advocates presented their case more effectively in 1976 than in 1974.[101] Other explanations noted the higher turnout of marginal voters in the presidential election year of 1976 and the reduced fear of crime that characterized public opinion during the second campaign season.[102]

## STATUTE

The day after the 1976 election, the Byrne administration began to formulate plans to regulate casino development in the state.[103] A staff group assembled to prepare the enabling legislation focused on five topics: governance, licensing, operations, taxation, and urban development.[104] The legislature and the governor would eventually incorporate the major elements of the staff group design into the Casino Control Act.

**Governance.** The casino legislation established two separate state agencies to regulate the casino industry. By assigning rule-making, licensing, and adjudicatory responsibilities to one agency and investigative, law enforcement, and prosecutorial tasks to another agency, the state sought to reduce the chances of abuse and mismanagement of regulatory authority.

**Licensing.** The Casino Control Act mandated a far-reaching system of licensing to maintain public

85

confidence in the honesty of the state's casinos. Corporations seeking to operate casinos, their officers and principal owners, key management personnel in the casinos, dealers and gaming supervisors, ordinary employees, service industries, and labor unions were all subjected to state licensing procedures.

**Restrictions on Operations.** The staff group proposed to impose restrictions on casino operations for three distinct purposes. First, casinos in Atlantic City were to be one attraction in a resort area that would appeal to visitors on the basis of its beaches, its climate, its ocean breezes, convention facilities, celebrity entertainment, and sports programs. Atlantic City was to become a family resort with casinos that possessed European dignity rather than Las Vegas extravagance. Second, the staff group proposed to impose rules which would protect gamblers from unfair games and from their own impaired judgment. To prevent the unwary from gambling excessively, casino shills were prohibited, alcohol was restricted, rules and odds were to be posted, advertising limited, and similar regulations imposed. While the rigor of these restrictions was diluted during the legislative process, the fundamental objectives were retained. Third, additional restrictions would be imposed on the operations of the industry to prevent misconduct and criminality.

**Revenues.** Casinos were not introduced in New Jersey as a means of raising public revenue, and the staff group dismissed state revenues as the "least significant" factor in state planning for casino regulation. After last minute appeal from the Treasury for increased state revenue, the legislature imposed a tax of 8 percent on casino gross receipts and required the casino industry to pay all the costs of the state's system of regulation. As the constitutional amendment required, proceeds from the gross receipts tax were to be used to finance programs for senior and disabled citizens.

**Urban Development.** The staff group report argued that "the most significant consideration for planning" casino development was the role of casinos in promoting the redevelopment of the convention, entertainment, and resort industries in Atlantic City. The Casino Control Act agreed that the most effective way to stimulate the revival of Atlantic City's convention and tourist businesses was through the construction of large casino-hotel complexes that could serve as ". . . a permanent mooring against the tides of competition and urban decay . . . "[105] Specifications for the construction of casino-hotels were defined in the statute.

## DEPARTURES FROM INITIAL DESIGN

**Casino Operations.** The scale of the New Jersey casino industry has exceeded the projections on which state planning was based. The costs of casino complexes, the number of viable casino properties, total capital investment, the number of visitors, the magnitude of casino employment, and total gambling revenues are all far beyond initial expectations.[106]

Atlantic City casinos were to be located halfway between London and Las Vegas in style as well as geography. Many of the restrictions that were initially proposed for industry operations have been relaxed over the years in such areas as entertainment, junkets, staffing levels, and licensing. Some of these changes have resulted from increasing governmental understanding of casino operations and of the state's own objectives, and some changes reflect compromises with the positions of the industry.

The costs and pervasiveness of the state regulatory structure is also more extensive than had been anticipated. The intrusions of state regulators in casino operations have made industry charges of "overregulation" a frequent theme in the public life of the state, but the detailed provisions of the Casino Control Act underline the intention of the state to play a dominant role in the conduct of New Jersey casinos.

**Atlantic City Development.** The Casino Control Act earmarked no state funds for urban development. The statute assumed that investments in large casino-hotel complexes in Atlantic City would stimulate the redevelopment of the balance of the city through the private marketplace. The casinos were to be the engine that would generate economic activity in the resort town, attract private capital, and produce the local tax revenues needed to meet the community's housing, public service and infrastructure needs.

The redevelopment of Atlantic City has not occurred. The "story" from Atlantic City remains the contrast between the gleaming casino complex

and the improverished ghetto, between consumption and deprivation, between the high-roller and the homeless street person. Economic activity in Atlantic City has outpaced the projections of the industry's most optimistic champion, but the town has also experienced the disruption of development. The casinos have brought the opportunities of employment and development to many in the community, but they have added to the woes of other residents who lacked the skills or resources to benefit from the economic transformation that has occurred.

In response to the plight of the city and to popular rhetoric, the Casino Reinvestment Act was passed by the legislature in 1984 and approved by the gover-

nor. The legislation sought to accelerate the redevelopment process by requiring casino companies to become a continuing source of capital funds for public projects. [107]

Casino investment and employment have not yet constituted an adequate stimulus for effective urban revitalization. The state continues to play a restrained role in the development process in the city and allow primary responsibility for the creation of a constructive social climate to remain with the city government. Whether the private marketplace can function to rebuild the city in such circumstances has not yet been demonstrated.

# SECTION TWO

# FISCAL PERSPECTIVES

Gaming policy in New Jersey has combined respect for the rights of individual citizens to make their own decisions, a vague distrust of gambling, and a desire to use gambling to achieve worthy public goals. A good statement of the peculiar mixture of concerns that has guided New Jersey policy comes from a report prepared for Governor Meyner on pari-mutuel revenues:

It is probably a fair statement to say that existing policy is to permit pari-mutuel wagering within tolerable limits, on condition that it provides a reasonable revenue for the support of the State. The 1939 amendment and the enabling legislation certainly spell out the idea that the public did not want pari-mutuel operations to be conducted without restrictions or control; they also imply that so long as it did not reach excessive levels, the activity, although controversial, should be permitted from a realistic point of view. It recognizes the wide freedom of choice according to varying preferences, which is typical of our society.[1]

Each of the four types of gambling discussed in this paper were legalized to achieve a specific public purpose. The constitutional amendments authorizing wagering on horse racing and the lottery were presented as means of raising state funds and preventing the need for a tax increase. Bingo was legalized to provide revenue for charitable organizations, and casino gambling was adopted as a stimulus for capital investment and job creation in a depressed region of the state. It is appropriate to review the financial contributions that the different forms of gambling have made toward accomplishing their original objectives.

**Contribution to State Revenues.** Table 3 reports the revenues that the state government received from the different forms of gambling between 1950 and 1985. Until the early 1970s, the only type of gambling that generated revenues for the state was racing. In the early 1970s, the state began receiving income from the lottery, and in the late 1970s it

began receiving casino revenues. In 1985 racing contributed $7 million to state general revenues, the lottery added $391 million, and casinos revenues equalled $167 million.

The state's total revenues from gaming grew during this period, from $12 million in 1950 to $565 million in 1985. Despite this absolute growth, the proportion of state revenues coming from gaming has not consistently grown during this period. Gaming revenues constituted 6.85% in 1955 and then began a pattern of decline that allowed it to contribute only 2.6% in 1970. Since 1970, the share of state revenues coming from gaming has grown once again, and in 1985 gaming accounted for 7.1% of state general revenues.

The state received the greatest share of its budget from gambling revenues in the mid 1950s. Although the amount produced by racing in these years appears today modest, it constituted a substantial share of the resources then available to the state government. Gambling today accounts for a smaller share of state general revenues than in the early 1950s, but the absolute size of the state budget today is substantially greater.

**Estimated Gambling Revenues.** Table 4 reports the revenues produced by the four gambling activities that have been legalized by the state. The revenues displayed here are the differences between what people wager in the different games and what they receive back in prizes. What the gambling institutions gain in revenues, of course, is equal to the amount gamblers lose. In 1987, the revenues gathered from bingo and raffles are estimated at $62 million, casino revenues equalled $2,379 million, horse racing produced $229 million, and state lottery revenues were $572 million. Total revenue from the four forms of gambling was $3,242 million.

This table reports the revenues from the various forms of gambling regardless of the residence of the gambler. While Table 2 above reported only the amounts lost by residents of New Jersey, Table 4

## TABLE 3

### TRENDS IN NEW JERSEY GAMING REVENUE, 1950-1985
#### ($ millions)

| Fiscal Year | State General Revenues | Racing | Lottery | Casinos | Total Gaming | Percent of Total General Revenues |
|---|---|---|---|---|---|---|
| 1950 | $ 174 | $12 | | | $ 12 | 6.8% |
| 1955 | 256 | 23 | | | 23 | 8.8 |
| 1960 | 396 | 25 | | | 25 | 6.3 |
| 1965 | 590 | 29 | | | 29 | 4.9 |
| 1970 | 1366 | 35 | | | 35 | 2.6 |
| 1975 | 2393 | 36 | $ 36 | | 72 | 3.0 |
| 1980 | 4654 | 16 | 146 | $ 58 | 220 | 4.7 |
| 1985 | 7981 | 7 | 391 | 167 | 565 | 7.1 |

Source: State of New Jersey, *Budget,* for years 1952, 1957, 1962, and 1967; and State and Local Government Expenditure and Revenue Policy Commission, "New Jersey Gaming Revenues: Issues and Options."

## TABLE 4

### ESTIMATED GAMBLING REVENUES PRODUCED BY GAMBLING ACTIVITIES, 1987
#### ($ millions)

| Form of Gaming | Estimated Revenue |
|---|---|
| Bingo-Raffles | $ 62 |
| Casinos | 2379 |
| Horse Racing | 229 |
| Lottery* | 572 |
| Total Revenue | $3242 |

Source: See Table 2.

Note: * This amount includes "Other Income."

includes all revenues received through gaming regardless of the residence of the gambler. Approximately one-half of the revenue received through gaming in New Jersey comes from New Jersey residents, $1,612 million, and approximately one half, $1,630 million, comes to New Jersey from non-New Jersey residents.

The revenues gained from non-New Jersey residents come entirely through casino gambling. This contribution of $1.6 billion to New Jersey's economy is probably the greatest benefit that comes to New Jersey from legalized gambling.

**Estimated Distributions of Gambling Revenues.** Table 5 describes the manner in which gambling revenues are distributed. This review rests on the premise that it is appropriate to examine how gambling revenues are used since these revenues are raised under the authority of state decisions to legalize the various forms of gaming.

Table 5 examines the distributions of gambling revenues under three headings: Statutory Purposes, Administrative Agencies, and Gaming Operations. By statute, gambling revenues are used to provide income for charitable, fraternal and religious groups, for programs for senior and disabled citizens, for investments in Atlantic City and other areas; to contribute to the state fund; to guarantee the Meadowlands debt service; and to help support the state educational and other institutions. The total amount expended for these purposes in 1987 was $799 million, or approximately 25 percent of the total revenues produced through gaming.

Approximately $73 million, or 2 percent of gambling revenues, is used to finance the state's administrative agencies, principally the Casino Control Commission, the Division of Gaming Enforcement, and the State Lottery Commission. Approximately $2,374 million of gambling proceeds is used to pay the costs of operating the various forms of gambling. This amount equals approximately 73 percent of gambling revenues. (The administrative and operating costs of the Meadowlands are classified as operating costs rather than state administrative costs.)

An estimated $56 million of the $62 million in revenues raised through bingos and raffles, or approximately 90 percent, flows to the charities. Approximately $472 million of the $572 million received by the lottery, or 83%, is used for the statutory purposes of education and institutions. Of the $229 million in racing-generated revenues, 19 percent, or $43 million is used for the Meadowlands debt service or given to the general fund. Casino revenues equalled $2,379 million in 1987, and 10 percent of this amount was used to finance statutory investments obligations and programs for senior and disabled citizens.

It should be noted that the statute legalizing casino gambling stipulated that the major benefits of casinos to the state were to come in capital investment and job creation. Thus, it is appropriate that a somewhat smaller proportion of casino-generated gambling revenues should appear as explicit expenditures for state-approved projects than is provided by other forms of gambling, such as the lottery.

90

## TABLE 5.

### ESTIMATED DISTRIBUTIONS FINANCED BY GAMBLING INCOME, 1987
### ($ millions)

| Purposes | Source | Amount | Percent of Total Distributions |
|---|---|---|---|
| *Statutory Purposes* | | | |
| Charitable Groups | Bingo-Raffles | $ 56 | |
| Senior-Disabled | Casinos | 198 | |
| Investment Obligation | Casinos | 30 | |
| General Fund | Racing | 6 | |
| Meadowlands Debt Service* | Racing | 37 | |
| Education-Institutions | Lottery | 472 | |
| Subtotal | | $ 799 | 25% |
| *Administrative Agencies* | | | |
| Legalized Games of Chance | Bingo-Raffles | $ 1 | |
| Law and Public Safety | Casinos | 28 | |
| Treasury | Casinos | 20 | |
| N.J. Racing Commission** | Racing | 3 | |
| State Lottery Commission | Lottery | 21 | |
| Subtotal | | $ 73 | 2% |
| *Gaming Operations* | | | |
| Bingo-Raffles | Bingo-Raffles | $ 6 | |
| Casinos | Casinos | 2,103 | |
| Tracks-Owners | Racing | 186 | |
| Agents-Contractors | Lottery | 79 | |
| Subtotal | | $2,374 | 73% |
| TOTAL DISTRIBUTIONS | | $3,243 | 100% |

Sources: Legalized Games of Chance Control Commission, *Financial Report, Fiscal Year 1986-1987;* Atlantic City Casino Association, *Fact Sheet;* New Jersey Racing Commission, *Annual Report 1986* and *1987;* New Jersey Lottery, *Annual Report 1987;* New Jersey Sports and Exposition Authority, ''Proposed 1988 Operating Budget''; and State of New Jersey, *Budget Fiscal Year 1988-1989.*

Notes: *This number is for FY 1988; it covers all Meadowlands facilities. **The administrative costs of the Racing Commission are supported from the General Fund. Number included here for comparison. It is not included in Total Distributions.

91

# SECTION THREE

# PATTERNS IN THE DEVELOPMENT OF LEGALIZED GAMING

Sections One and Two of this paper have examined the four forms of gambling that have been legalized in New Jersey. This section seeks to identify patterns in the development of gambling that might be helpful in addressing gambling issues in the future.

**Positions on Gambling.** The arguments offered by supporters and opponents of gambling have changed very little since the 1930s. Regardless of the gambling issue being discussed, the same justifications and the same criticisms have been offered in public debate. The arguments presented at the first legislative hearing on gambling after the constitutional convention illustrate the positions that became familiar in the legislative hearings in succeeding decades. (This hearing was held in August 1948, and concerned the legalization of bingo and raffles.)[1]

**Advocates of gambling made three major points:**

Gambling is a proper social pastime enjoyed by many citizens. No moral distinctions can or should be made among the various forms of gambling. The self-destructive abuse of gambling by some citizens is not adequate grounds for outlawing gambling.

Gambling can be a meaningful source of revenues for important public purposes.

The substitution of legalized for illegal gambling would allow citizens to gamble without violating the law and would reduce illicit revenues that now flow to organized crime.

**Opponents of gambling responded as follows:**

Gambling creates anti-social attitudes that undermine the work ethic and diminish a sense of community responsibility.

Gambling diverts money from family needs and attention from families concerns.

The legalization of gambling creates compulsive gamblers.[2]

The revenue claims made by gambling advocates are temporary or even illusory because they do not consider the economic activities that are harmed when dollars are withdrawn to support gambling.

Gambling is a regressive and administratively inefficient means of raising public revenues.

The legalization of gambling does not reduce illegal gambling but creates, instead, new clients for illegal gambling.

The positions of groups and institutions on gambling have also remained surprisingly stable during these decades. The legalization of horse racing in the 1930s was an issue of dispute between pro-gambling groups led by Mayor Hague of Jersey City and the Hudson County Organization and opponents of gambling represented by reform elements within the Republican party and by Protestant church groups. This same fundamental division reappeared in subsequent years on most gambling issues voted on by the 1947 convention and by the legislature. Public and elite opinions today certainly accept gambling more fully than in past decades, but the heritage of conflict from the 1930s remains evident.

The basic exception to this rule is presented by groups that expected to benefit financially from the forms of gambling considered at specific times.

**Enabling Legislation.** The legislation enacted to regulate gambling after the adoption of the various constitutional amendments reflects strikingly different administrative orientations. The Lottery Planning Commission emphasized how little the state then knew about lotteries and stressed the need to allow the administrative agency maximum discretion to face unforeseen problems. The provisions of the Casino Control Act reflected an opposite viewpoint. State officials believed that casino regulators would be in a constant struggle with an aggressive industry seeking to subvert state rules. The only way to secure the state's purposes in casino gambling, it was thought, was to incorporate countless specific requirements into the statute.

The bingo legislation embodied yet a third orientation. The legislators who approved this measure identified a few critical aspects of bingo operations and incorporated specific decisions about these items in the statute. The statute limited nightly prizes to $1,000, stipulated that people who operated the games should be unpaid, volunteer members of the sponsoring organizations, and prohibited advertising of the games to the general public. Having made these judgments in the statute, most other bingo issues were left to the discretion of the regulatory agency. (The racing statute comes from am earlier era and adds little to this comparison.)

How have the forms of gambling evolved under the different statutes? With great administrative discretion, the lottery has experienced a substantial transformation without the benefit of statutory amendment. The lottery has evolved from an infrequent drawing involving millions of dollars to an almost perpetual numbers game involving hundreds of millions of dollars.

The detailed statute has strengthened the hand and perhaps the resolve of casino regulators as they faced the contests with the industry that legislators had anticipated. Casino gambling has grown in scale from its early days and some regulations have been relaxed, but the form of casino operations has remained stable.

Bingo operations have probably remained truest to the assumptions that guided voters and state officials when the game was legalized. The games are modest, and the key elements of the state's initial regulatory judgments remain in force.

Part of the success of the bingo legislation is due to its identification of a few critical elements of regulation. The endurance of the system of bingo regulation is also a product of the emergence of a group of bingo operators who sought to preserve the status quo. They feared that the development of "high-stakes" bingo would diminish their revenue and drive them from business. Interest groups in favor of restraining the growth of gambling have not played a meaningful role in the other gambling areas.

**Policy Goals.** Legalized gambling has existed in New Jersey for almost half a century. Horse race betting enjoyed monopoly status for a dozen years

before the amendment legalizing bingo and raffles was adopted. Almost two decades later, the voters approved the creation of a state lottery, and then, after another five years, casinos were permitted to begin operations in Atlantic City. Have the initial purposes of legalization survived the passing decades, or have they been replaced by more contemporary goals?

In the years since legalization, pari-mutuel betting on horseraces has been transformed from a tool for raising revenue for the general fund into a means of funding substantial subsidies for the horse race industry. These subsidies are now justified on the grounds of job creation, the preservation of farm land, and the contribution of the Meadowlands to the state's national image.

In another change from the original statutory decisions, casino corporations have recently been required to contribute to the financing of public facilities in Atlantic City and in other regions. Other than these items, legalized gambling in New Jersey has remained surprisingly faithful to its initial statutory purposes.

**Mix of Public-Private Responsibility.** Legalized gambling encompasses a complicated mixture of public and private activities. Casino, bingo, and horse race regulators in the early years all sought to defend state purposes and impose state regulations on private operators. Each encountered criticism from the institutions whose autonomy was being limited, and each has also become a defender of the institutions it was created to regulate.

The lottery, in contrast, is a public activity that relies on private agents to sell most of its tickets and private contractors to develop its games and manage its on-line computer network. The lottery supervises its own marketing program.

The emergence of the Meadowlands Racetrack as the centerpiece of the racing industry presents another pattern of public-private cooperation. The Meadowlands is a public agency with public employees that provides a setting for private horsemen to compete for funds raised through state-approved pari-mutuel betting. The actual supervision of the races has been a private function that is assuming an increasingly public character. The State Commission

93

of Investigation has noted that the purchase of Monmouth Park by the Sports and Exposition Authority means that two of the five tracks in the state are now public entities and that the regulatory task facing the Racing Commission might be reduced.

**Dedication of Revenues.** Lottery funds are legally dedicated to support education programs and state institutions, the proceeds of the casino revenue tax are to fund programs for senior and disabled citizens, the casino investment obligation must support publicly-approved projects in Atlantic City and elsewhere, and casino license and administrative fees are earmarked to support the state regulatory system. In addition, charities are the beneficiaries of bingo and raffles revenues, and racing revenues support the Meadowlands debt service payments. While one half of one percent of the pari-mutuel handle goes into the state general fund, the balance of the proceeds from pari-mutuel betting is directed to the tracks and horsemen.

The significance of dedicated revenues is determined by the amount of the dedicated funds and magnitude of the normal expenditures for designated purpose. Other things being equal, dedication of funds to a narrow purpose will have more significance than dedication to a broad purpose. The dedication of lottery proceeds to education and institutions is said to help lottery marketing, but state expenditures on these purposes are so enormous that the dedication probably has little fiscal significance.

The dedication of casino revenues to regulation, public facility investment, and senior and disabled citizen programs may have increased expenditures for these purposes beyond what they otherwise would be. There would probably be more restraint on the revenues going to tracks and owners if the fund came through the normal state appropriations process rather than through pari-mutuel proceeds.

A less formal type of "dedication" appears in the use of gambling funds to sustain gaming operations and state administrative agencies. While not a legal "dedication," gaming institutions are in position to secure gaming revenues for their own support. It can be argued, for example, that the problems of the Meadowlands Racetrack are not problems of declining revenues but of increasing costs.[3] In recent years, racetrack costs have increased more rapidly than revenues.

When gaming revenues are increasing comfortably, no one notices the increases in administrative costs. By the time that gaming revenues stabilize or decline, administrative costs may have grown so vigorously that they consume most available revenues. Some fear that the availability of revenues has permitted unnecessary growth in the casino, lottery, and racing agencies.

**Responses to Declining Revenues.** Not all claims of inadequate revenues should be taken at face value. Some institutions paint their financial position in darker colors than are warranted as part of a campaign to win added revenues or further regulatory concessions from the state.

Despite this caveat, each of the state's forms of gambling has experienced revenue problems. The 45 percent fall in lottery revenues between 1972 and 1975 transformed the lottery into a sophisticated marketing organization seeking new customers and broader public support. Faced with inadequate revenues, the lottery devised new games for different income groups, hired market research firms, created an incentive system for sales agents, modified the prize structure of the games, began the public release of the names of lottery winners, implemented new marketing programs, moved the drawings to a later hour, and began advertising on television.[4]

At least as early as 1960, the racing industry began to fear that competition from neighboring states would lead to declines in track revenue. A number of suggestions were developed to neutralize the potential decline. These proposals provided confirmed gamblers more opportunities to gamble without necessarily enlarging the customer base for pari-mutuel betting. These techniques included lengthening the racing season, adding a ninth race, allowing pre-race wagering, permitting night operations, increasing the amount withdrawn from the handle, constructing additional racing facilities, or allowing additional betting opportunities on combinations of races.[5]

The Legalized Games of Chance Commission saw bingo proceeds reach $114 million in 1982, and then fall 15 percent in subsequent years. Attendance at bingo games has also declined from 13.2 million in 1977, to 9.3 million in 1987, a decline of 30 percent. Faced with legal and political barriers to altering bingo rules, the commission began to relax the rules governing the operations of raffles. Between 1983 and

94

1987, raffles proceeds grew from $27 million to $42 million, an increase of 56 percent in what is regarded as a stagnant market.[6]

In the early 1980s, the increase in the number of casinos led to declines in the average revenue per casino. The response of the casino industry to the decline was to launch a campaign against the state regulations that the industry argued inflated their operating costs, reduced revenues, and interferred with the efficient operation of their casinos.[7]

95

# SECTION FOUR

# RECOMMENDATIONS AND CONCLUSIONS

1. *The state should prepare an annual report on gambling.*

**Justification.** There is currently no institutional procedure to examine the *cumulative impact* of the state's gambling decisions on the people or the economy of the state. Decisions, that appear inconsequential when examined alone, may be found to have considerable significance when seen in the context of a series of earlier actions. There is now, for example, no way to ask what limits, if any, should exist on the magnitude of publicly-sanctioned gambling.

There is now no way to consider the *interrelations* among the various forms of gambling. Many, but certainly not all, of the same people patronize the state's different gambling institutions. Emerging technology will blur the differences among the existing forms of gambling in the years ahead.

There is now no forum to discuss *common problems* and no mechanism to address issues that concern different forms of gambling. Similar problems may be approached in inconsistent ways. Topics such as age requirements and advertising provide examples. *Equitable treatment* of people and institutions in similar situations can now be difficult to achieve.

Finally, current limitations on the *availability of data* hamper analysis of important policy issues. For statutory or other reasons, some agencies report information on a fiscal year basis, and others use a calendar year. Some agencies distinguish operating expenditures and administraive costs, and other do not. In some instances, the ultimate recipients of funds gambled by state residents are identified, and, in some circumstances, they are not. Without adequate information, it is not possible to anticipate problems.

**Contents of an Annual Report.** Topics included in an annual report should be both fiscal and non-fiscal.

Possible fiscal items include: gambling and income data for gambling institutions; non-gambling income data for gambling agencies; gambling losses by New Jersey and non-New Jersey residents; administrative and operating costs; payments to statutory beneficiaries; proportion of gambling income going to statutory beneficiaries; proportion of state revenues from gambling; and projections of future revenues and expenditures.

Possible non-fiscal items include: impact on the state's economy; levels of participation in the various types of games; employment implications; extent of compulsive and excessive gambling; plans for dealing with declining revenues; impact of technological changes; and special problems areas.

**Preparation of Report.** In determining where an annual report should be prepared, two considerations are important. First, there is a need to build in state government a body of continuing expertise on gambling issues to help the state address the problems that will arise in the future; and, second, the agency that prepares the report should have concern for a range of gambling issues and have a central location in state government. These factors suggest that an annual report could be prepared by an agency such as the Treasury or by a well-staffed legislative or executive commission.

2. *A checklist of questions should be devised to examine proposals for the inauguration of new forms of gambling or expansion of current games.*

Possible questions for changes of existing forms of gambling:

What is the motivation for the change?

Are there other ways of achieving the purpose of the change?

What is the likely impact of the change on the patron?

Will the change increase knowledge and awareness of the gambler, or will it place the gambler in an uninformed position?

From which current expenditures, income groups, or activities will the money come that is to be raised by the change?

96

What is the likely impact of the change on existing gambling and other institutions?

What financial benefits do the groups requesting increases in revenues now receive from the state?

Why should the problem not be addressed by a state appropriation?

Additional questions for new forms of gambling:

What is the best mix of public and private responsibilities within the new form of gambling?

What remedial actions are possible if the innovation does not succeed?

In what ways is the new activity consistent with the assumptions of the state's bidding laws and personnel system?

Should funds be dedicated to a specific purpose?

3. *New Jersey agencies should consider forming an on-going research council on gambling topics. The state should emphasize continuity in its effort to examine issues that have implications for more than one gambling area.*

**Explanation.** Certain state gambling agencies now have statutory responsibility to review developments in some gambling issues. Many of the best minds in the state have addressed specific problems in these efforts and devised innovative solutions to the situations they encountered.

Because of the episodic nature of these projects, however, their cumulative value has been limited. Study groups frequently disband by the time they have mastered the complexity of a policy area, and administrative agencies understandably focus their attention on immediate regulatory or operating problems. Gambling issues are now of sufficient importance to the state that they merit continuing systematic investigation. Unlike most policy areas, there is essentially no national research community focusing on most gambling issues to provide continuity for New Jersey's investigative efforts.

4. *Standards of effectiveness for the state's gaming agencies other than the revenues produced through gambling should be developed.*

The state agencies face pressure to sustain or increase revenues in their area of gambling. When gambling revenues fall, regulatory budgets receive intensified scrutiny, and administrative personnel changes are contemplated.[1] From a state constitutional or statutory perspective, however, more gambling is not necessarily better. State agencies may be doing an appropriate job regardless of whether gambling revenues are rising or falling, and administrative standards should be devised to indicate that. Perhaps, the legislature should establish revenue targets for each agency and direct any excess revenues into a "rainy-day" fund.

5. *The three statutes involving bingo, raffles, and the Legalized Games of Chance Control Commission should be reviewed.*

These statutes have not faced comprehensive review in thirty-five years, and the conditions on which they are based have changed.

97

# ENDNOTES

### SECTION ONE

[1]Julian B. Boyd, ed. *Fundamental Laws and Constitutions of New Jersey, 1664-1964* (Princeton, 1964), p. 174, D. Van Nostrand Co. New Jersey Historical Series.

[2]New Jersey Racing Commission, *Annual Report 1947.*

[3]Richard N. Baisden, *Charter for New Jersey: The Constitutional Convention of 1947,* (Trenton, N.J.: Division of the State Library, Archives and History, N.J. Dept of Education, 1952) p. 34. See also, Report of the Committee on the Legislature, New Brunswick, 1947, pp. 8-9.

[4]See also Richard J. Connors, *The Movement for Constitutional Revision in New Jersey 1941-1947,* Columbia University Masters thesis, 1950, pp. 111-13 and 143; Robert G Cutler, *Charter Reviewed: The New Jersey Constitution 1947-1957,* Princeton University, Ph.D. dissertation, 1957, pp. 46-49.

[5]State of New Jersey Constitutional Convention of 1947, Convention Proceedings, Vol. II., pp. 1065-66 contains the exact wording of various proposals.

[6]Richard N. Baisden, *Charter for New Jersey: The Constitutional Convention of 1947,* (Trenton: Division of State Library, 1952), p. 38.

[7]In 1948, the proposals were A374 by Kafes, A501 by Vogel, and A518 by Reiffin. In 1949, S54 by Vogel. In 1950, S44 by Vogel and A426 by Mackey. In 1951, S8 by Vogel and A133 by Wegner. IN 1952, S20 by Vogel and S26 by Forbes. In 1953, S85 by Vogel; A376 by Forbes: SCR8 by Stout, Dumont, and Forbes; SCR9 by Stout, SCR10, Stout and Dumont; A367 by Csciano; and A651 by Beadleston and Bowkley.

[8]See Public Hearing before Senate Judiciary Committee, on Senate Bill 26, the Bingo Bill, March 13, 1952; and Bill Davidson, "Is Bingo Getting Too Big?", *Colliers,* December 10, 1954, pp. 34-38.

[9]On May 12, 1948, for example, only fourteen members of the Assembly voted to remove a bingo bill from the Judiciary Committee, and eight of the fourteen represented Hudson County.

[10]"Wene Plugs Bingo Issue," *Newark Evening News,* October 27, 1949.

[11]"Bingo Faces Shutdown, Statewide Compaign Against Games and Wheels of Chance Gets Underway Tommorrow," *Newark Evening News,* June 3, 1951.

[12]Driscoll's veto message of Forbes' bill, S26, is found in the Journal of the Senate, May 27, 1952.

[13]"Bingo Crackdown Set," *Newark Evening News,* April 10, 1953; "Orders Out on Gambling," *Newark Evening News,* April 11, 1953; "Bingo Called Legal: Jersey City and Bayonne Counsels Advice Police Not to Halt Games" and "Once Prosaic Raffles Now Crime," *Newark Evening News,* April 21, 1953, "Bingo Vote Seems Sure; Troast Endorsement of Referendum Comes as Surprise" and "Bingo Storm Swells," *Newark Evening News,* April 28, 1953; "Meyner for Bingo Action Jointly by Both Parties," *Trenton Evening Times,* May 18, 1953; "Legislative Maneuver Dominated by Bingo," *Trenton Evening News,* May 19, 1953; "Leans to Bingo Law," *Newark Evening News,* June 16, 1953; and "Bingo Vote November 3," Newark Evening News, June 26, 1953.

See also, Public Hearing before Senate Judiciary Committee, To consider proposed amendments to the Constitution dealing with the holding of Bingo, Raffles, and games of chance to be conducted by charitable, religious, veteran, fraternal organizations, volunteer fire companies, and first aid squads, June 15, 1953.

[14]See *Journal of the Senate,* for June 22, 1953; and *Assembly Minutes,* for June 25, 1953.

[15]"Jersey Legion Gets Bingo Aid Pledges; Troast and Meyner Say They Favor Legalizing the Games and Promise Safeguards," *New York Times,* September 12, 1953; "Wants 'No' Bingo Vote," *Newark Evening News,* October 29, 1953; "Legion Backing Vote for Bingo, Widows' Tax Cut," *Newark Evening News,* October 29, 1953; "Clergy in Jersey Preach on Bingo; Roman Catholics Call for 'Yes' Vote, While Protestants Urge Proposal's Defeat," *New York Times,* November 2, 1953; and "Pastors in Pro, Con Pleas," *Newark Evening News,* November 2, 1953.

[16]"Bingo Study Unit Named," *Newark Evening News,* December 9, 1953. The committee was chaired by former-judge John O. Bigelow.

[17]Committee Appointed by Governor-Elect Robert B. Meyner to Study Problems Involved in Enacting Legislation Relative to Bingo and Other Games of Chance, *Report and Draft Statutes,* January 15, 1954, p. 1.

[18]See "Public Hearing before N.J. Committee Appointed by Governor-Elect Robert B. Meyner to Study Problems Involved in Enacting Legislation Relative to Bingo and Other games of Chance . . .," December 19, 1953, p. 56; the Committee, *Report and Draft Statutes;* and "Bingo Plan Provisions," *Newark Evening News,* January 22, 1954; and "Bingo Bills Hearings Set; Legislative Unit Hopes to use Best Features of 5 Measures," *Newark Evening News,* January 26, 1954.

[19]The statutes here were Chapters 5, 6, and 7 of the Laws of 1954, entitled respectively, "Raffles Licensing Law," and An Act to create a Legalized Games of Chance Control Commission.

[20]There was substantial discussion during the development of the enabling legislation about the requirement that the municipality approve the conduct of raffles or bingo within its boundaries, including issues such as the procedure for approval, the timing, and the mechanism for revocation of approval.

[21]Committee Appointed by Governor-Elect Robert B. Meyner to Study . . . Bingo and Other Games of Chance, *Report and Draft Statutes,* p. 2. The bingo bill itself was drafted by Joseph Weintraub.

[22]See, "Bingo Law is Defined: Organizations Warned They Must Register with N.J.," *Newark Evening News,* April 8, 1954; Legalized Games of Chance Control Commission, *Annual Report 1957,* p. 13; "Bingo Board 'Over-zealous'—Meyner," *Trenton Times,* September 24, 1958; and c. 57, P.L. 1957.

[23]"Backs Bingo Law Change," *Newark Evening News,* August 24, 1954; "Bingo Special Session is Urged by Berry," *Newark Evening News,* August 31,

1954; "Meyner in Parley on Bingo," *Newark Evening News,* September 15, 1954; "Differ Over Cash Prizes for Bingo: Two Catholic Groups Give Views at Hearing on Raising Maximum," *Newark Evening News,* October 3, 1954; "2 Bingo-raffles Groups to Discuss Law Changes," *Newark Evening News,* January 21, 1955; "Would Ease Game Rules," *Newark Evening News,* January 28, 1955; "Bingo Changes Clouded," *Newark Evening News,* January 28, 1955; "Ads for Raffles Blocked," *Newark Evening News,* January 29, 1972; "Jersey Asked to OK Rise in Bingo Prizes," *Jersey Journal,* November 17, 1972; "Esposito Drops Higher Prize Bingo Bill," *Jersey Journal,* December 2, 1972; "Bingo Groups Fight Bill to Boost Prizes," *Newark Star Ledger,* August 26, 1973; "Hearings Decision Bingo, Raffles," *Newark Star Ledger,* November 8, 1975; and "Sunday's Bingo Ban Under Repeal Test," *Asbury Park Press,* May 7, 1978.

See also letter to Commission from Elizabeth Lodge #289 B.P.O. E., July 9, 1954; Legalized Games of Chance, *Annual Report 1957,* p. 5; L. 1955, c. 160; and Bingo and Raffles Study Commission, Report, November 1, 1977.

[24]See, for example, the discussion of bus charters in Legalized Games of Chance, *Annual Report 1957,* p. 8.

[25]See c. 162 of L. 1955, and c. 57 of L. 1957.

[26]Legalized Games of Chance Commission, *Annual Report 1955.*

[27]Public Hearing before Senate Special Committee Created Under Senate Resolution No. 6, June 5, 1958, p. 45; and Public hearing before Senate Special Committee, May 8, 1959, p. 2.

[28]Senate Special Committee to Investigate the Administration of the Bingo Licensing Law, *Control Through Fear,* pp. 158-59.

[29]Public hearing before Senate Special Committee Created Under Senate Resolution No. 6, June 5, 1958, pp. 47-48 and 16, 17.

[30]Legalized Games of Chance Commission, *Annual Report 1957,* pp. 1-2.

31"Gaming Report Rapped," *Newark News,* November 30, 1960; "Tough Bingo Rule Lauded," *Newark News,* April 28, 1961; and "Governor Vetos Bingo Czar," *Philadelphia Inquirer,* July 18, 1962.

32Legalized Games of Chance Commission, *Annual Report-1961; 1964; 1965;* and *1971;* and L. 1969, c.206.

33See *First Report to the Attorney General of the Racing Task Force,* October 6, 1977, pp. 1-3.

34A3 passed the assembly on March 13, 1933, by a 32 to 19 vote, and the senate on June 20, 1933, by an 11 to 1 margin, and was signed on June 27, 1933, as c. 333. Laws of 1933.

35See "Racing Measure Passes Senate," *Newark Evening News,* June 21, 1933; "Legislature Ends After Long Grind," *Newark Evening News,* June 22, 1933; and "Horse Racing Bill Is Law, Other Measures Approved," *Newark Evening News,* June 28, 1933.

36Chapter 56, P.L. 1934, declared the financial emergency, and C,179, P.L. 1934, authorized the State Racing Commission to regulate greyhound racing.

37This account is based on the New Jeresy State Racing Commission, First Annual Report, 1934. See for bill, *New York Times,* March 8, 1933, p. 11:6; March 20, 1933, p. 10:5; March 28, 1933, p. 24:5; and May 9, p. 10:1. See for court rulings, *New York Times,* September 9, 1933, p. 35:7; and September 12, 1933, p. 10:5.

38This account follows closely Baisden, *Charter for New Jersey,* pp. 28-30.

39Under the procedure then in force, a proposed constitutional amendment had to pass two successive sessions of the legislature before it was placed on the ballot.

40See, "On Betting," *Newark Evening News,* June 19, 1939, and "Racing Majority Is 156,660," *Newark Evening News,* June 21, 1939. See also, *New York Times,* January 19, 1939, p. 11:2; February 25, 1939, p. 32:1; June 21, 1939, p. 1:4; and June 22, 1939, p. 7:1.

41This section is based on "Horse Racing Delay Causes House Revolt," February 13, 1940; "McClave Plans Racing Test," February 14, 1940; "To Caucus on Racing Bill," February 19, 1940; "Racing in 1940 Now Assured," February 20, 1940; "No Rush For Race Licenses," February 22, 1940; "Race Bill Near Vote in Senate: Action is Urged to Speed Track Revenues," March 11, 1940; "Race Bill Goes to Governor: Adopted 12-7 After Hour's Debate in Senate," March 12, 1940; and "Racing Commission Named by Moore," March 18, 1940, all in *Newark Evening News.*

42See State Service Bureau, *Legislative Index,* February 19, 1940, p. 71; February 24, 1940, pp. 97 and 101; and March 16, 1940, p. 165.

43C. 17, P.L. 1940.

44New Jersey Commission on State Administrative Reorganization, *Special Report on Horse Racing and the Pari-Mutuel System,* submitted to Governor Walter E. Edge, February 1946.

45*ibid.,* p. 3.

46*ibid.,* p. 6.

47*ibid.,* p. 7.

48*ibid.,* p. 8.

49Attorney General's Task Force on Racing, *First Report,* October 6, 1977; and New Jersey Commission of Investigation, letter to Racing Commission, October 7, 1986.

50Commission of Investigation, letter to Racing Commission, October 7, 1986, p. 11.

51Data on the number of racing days comes from New Jersey Racing Commission, *Annual Report,* various years.

52For an account of the proposal, see Public hearing before Senate Judiciary Committee, *Assembly Bill no. 588 Increasing racing days,* March 23, 1962, and Chapter 17, P.L. 1962. For a review of the controversy that followed, see Public Hearings before Special Senate Committee to Examine Reports, Audits,

and Returns in Connection with Special Horse Race Meetings held in 1962, May 24, 1963; July 12, 1963; and July 25, 1963; and the Special Senate Committee, *Report on Special 1962 Running Race Meeting,* December 1963.

[53]New Jersey Racing Commission, *Annual Report 1987,* Attachment I.

[54]Vincent P. Biunno, *A Study of Pari-Mutuel Tax Revenue in New Jersey,* p. 46.

[55]New Jersey Racing Commission, Annual Report 1966, p. 1.

[56]See Public Hearing before Assembly State Government, Federal and Interstate Relations and Veterans Affairs Committee, *P.L. 1978, c.31, Which provided certain financial benefits to private racetracks and horsemen during 1978,* October 25, 1978.

[57]Chapter 137, Laws of 1971, was introduced by DeKorte as A2319 on April 1, 1975. It passed the Assembly on April 26, 1971, by a vote of 53 to 6, and the Senate on May 3, 1971, by a margin of 28 to 2. See Governor's Press Release dated March 24, 1971, announcing impending legislation, together with Fact Sheet, and April 19, 1971, concerning amendments. The bill was signed on May 10, 1971.

[58]See C. 5: 10-2, N.J.S.A.

[59]See C. 5: 10-10.e, N.J.S.A.

[60]New Jersey Sports and Exposition Authority, *Annual Report 1987,* p. 5.

[61]New Jersey Racing Commission, *Annual Report 1986.*

[62]New Jersey Sports and Exposition Authority, *Annual Report 1987,* "Statement of Revenues and Expenses."

[63]A482 was introduced by Assemblyman T. James Tumulty on May 3, 1948.

[64]The Commission on State Tax Policy, *Fourth Report: Financing a State Bonus for Veterans of World War II,* August 27, 1948. The study was directed by ACR12, introduced by Mehorter on May 10, 1948.

[65]The first effort lost on May 5, 1948, by a vote of 15 to 41 and the second was rejected on September 1, 1948, by a 15 to 33 margin. *Assembly Minutes.*

[66]A79 was introduced by Tumulty on January 17, 1949, and S63 was introduced by Hull on January 24, 1949.

[67]The $105,000,000 bond issue to fund a bonus program for World War II veterans was defeated by a margin of 587,933 to 596,484. *Legislative Manual: State of New Jersey-1987,* p. 903.

[68]ACR12 was introduced by Assemblyman Musto.

[69]See public hearings before Assembly Committee on public Safety, Defense and Veterans on ACR#7, February 24, 1959; before same committee on September 15, 1959; before Assembly Judiciary Committee on ACR#2 and ACR#4 on April 30, 1964; before Senate Judiciary Committee on SCR#7 on June 1, 1966; before Assembly Judiciary Committee on ACR#22 on May 7, 1968; and before Assembly Committee on Taxation on ACR3#2 on march 5, 1969. See also, for example, "Lottery Urged to Assist Local Governments," *Philadelphia Inquirer,* November 11, 1964; and "Urge Hospital Lottery," *Newark Sunday News,* November 1, 1964.

[70]Statement of Assemblymen John F. Brown, at *Public Hearing before Assembly Committee on Taxation, on ACR#32,* March 5, 1969, p. 1.

[71]Commission on State Tax Policy, *Tenth Report: Increased State Aid to Public Schools and Distribution of the Cost of Expanding Public Services,* January 10, 1963, p. 143.

[72]"Dumont, Hughes Cool to Lottery," *Camden Courier Post,* June 16, 1965.

[73]"Jersey is Weighing State Lottery Again to Build Up Funds," *New York Times,* July 7, 1965; "To Explore Operation Carefully," *Jersey Journal,* July 10, 1965; and "A Lottery for Jersey?", *Star-Ledger,* September, 30, 1965.

[74]These statements come sequentially from Musto, *Public Hearing* of April 30, 1964; Musto, *Public Hearing* of May 7, 1968, p. 29; and Brown, *Public Hearing* of March 5, 1969, p. 4. See also,

"Chances Dim For Lottery Referendum", *Trenton Times,* June 14, 1966.

[75]ACR22 of 1968 passed the assembly on May 20, 1968, by 52 to 15 margin; it was referred to the Senate Judiciary Committee where it remained. *Assembly Minutes,* May 20, 1968.

[76]*Assembly Minutes,* April 2, 1969; and *Journal of the Senate,* May 1, 1969.

[77]"Lottery Referendum may Die in Senate," *Newark Evening News,* April 3, 1969; "Senate Approval Seen For State," *Newark Evening News,* May 1, 1969; and "Ballot to Resolve State Lottery Issue," *Newark Evening News,* May 2, 1969.

[78]The Commission was established by JR#11, adopted November 20, 1969.

[79]State Lottery Planning Commission, *Report,* February 9, 1970, pp. 5 and 8.

[80]*ibid.,* p. 22.

[81]*ibid.,* pp. 7, 12, 21, and 28.

[82]Frederick B. Lacey, *Recommendations to the 1970 Session of the New Jersey Legislature Concerning . . . Organized Crime,* January 20, 1970, pp. 30-31.

[83]A616 sponsored by Assemblymen Coleman of Monmouth and Kean of Essex was introduced on February 9, 1970. It passed the assembly on February 16, by a vote of 64 to 0, and the senate on the same day by 36 to 0. It was signed as chapter 13, L. 1970, and became effective on February 16, 1970.

[84]As quoted in State Lottery Commission, "Minutes of Meeting," October 3, 1972.

[85]New Jersey Lottery, *Annual Report 1986,* p. 1; and State Lottery Commission, "Minutes of Meeting," January 9, 1986.

[86]"Lottery agency umbrella to cover all state gaming," *Newark Star Ledger,* January 1, 1974.

[87]State Lottery Commission, "Minutes of Meeting," September 14, 1976; February 23, 1982; and April 1, 1982.

[88]L.1983, c. 60.

[89]L.1983, c. 80.

[90]L. 1973, c. 173, made altering lottery tickets a misdemeanor. L.1977, c. 169, permitted sale direct payments of prizes by agents. L. 1981, c. 182, c. 182, exempted certain rules [sic]

[91]ACR51 of 1969, introduced by Littell. See also, "AC Wants To Buck Up Boardwalk With Gambling," *Trenton Evening Times,* March 7, 1969; "Hugh Hefner Talks about Atlantic City," *New Jersey Monthly,* March 1979, p. 70.

[92]SCR39 and SCR74 sponsored by McDermott. Public Hearing before Senate and Assembly Judiciary Committees on SCR39, March 19, 1970; and Public Hearings before Senate Judiciary Committee on SCR74, December 8, 1970; February 10, 1971; and April 7, 1971.

[93]A2004, 1971, sponsored by Caputo.

[94]"No Casinos Cahill Insists," *Atlantic City Press,* January 12, 1972; "Cahill, GOP Clash on Gaming," *Jersey Journal,* February 8, 1972; "Governor Pledges Fight on Casino Bid," *Newark Evening News,*

February 11, 1971; "Cahill: No Vegas here, but winter racing OK," *Newark Star Ledger,* March 10, 1970; and "GOP Caucus Says 'No' To Casinos," *Trenton Evening Times,* April 20, 1971. *New York Times,* April 20, 1971, p. 73; and *Wall Street Journal,* January 21, 1971, p. 1.

[95]Senate and Assembly Judiciary Committees, *Public Hearing on SCR39,* March 19, 1970, pp. 25-29.

[96]"Byrne Seeks Right N.J. 'Slot'," *Trenton Evening Times,* December 14, 1973; *New York Times,* December 7, 1973, p. 86.

[97]Senate Judiciary and Assembly State Government Committees, *Public Hearing on S2011, S2012, S2013, and A2015, A2016, A2017,* on April 11, 1973; *Assembly Judiciary Committee,* Public Hearing on ACR 128, April 26, 1974; and *New York Times,* May 9, 1974, p. 90.

98"Byrne Backs Referendum On State Casino Gambling," *New York Times,* April 4, 1974; Assembly Judiciary Committee, *Public Hearing on ACR128,* April 26, 1974; and Peter Loos and Robert Purcell, *A Study of Casino Gambling in the State of New Jersey,* p. 7.

99*Assembly Minutes,* April 29, 1974, pp. 367-68; and Senate, *Journal,* May 16, 1974, p. 320.

100Economic Research Associations, "Impact of Casino Gambling," section 3.

101Geoffery Douglas, "The Selling of Casino Gambling," *New Jersey Monthly,* 1 (1977) pp. 22-26

102Richard Lehne, *Casino Policy,* (New Brunswick: Rutgers University Press, 1986) pp. 35-42.

103Office of the Governor, press release, November 30, 1976.

104Walter R. Bliss, "Casino Gambling: Progress to Date," November 15, 1976; and Governor's Staff Policy Group on Casino Gambling, *Second Interim Report,* February 17, 1977.

105*ibid.,* p. 6.

106(New Jersey Treasury), "Major Features of Revised Tax Provisions," undated.

107See Casino Reinvestment Development Authority, *Annual Report 1986.*

## SECTION TWO

1Vincent P. Biunno, *A Study of Pari-mutuel Tax Revenues in New Jersey,* June 26, 1960, pp. 53-54.

## SECTION THREE

1Public Hearing on Assembly Bill #518 before the Committee Appointed to Hear the Same, August 10, 1948.

2*ibid.,* testimony of Robert E. Carl, "Nobody feels he or she is going to be a professional gambler or go into crime when they start gambling, but after they start, it gets some people and once they have started they can't stop." p. 136. See also the testimony of Vincent E. Hull.

3New Jersey General Assembly Majority, "The New Jersey Sports and Exposition Authority: A Financial Review," n.d.

4See State Lottery Commission, *Minutes,* May 2, 1972; October 3, 1972; February 6, 1973; March 20, 1973; April 3, 1973; April 17, 1973; December 4, 1973; March 5, 1974; September 14, 1976; and April 18, 1978.

5Vincent P. Biunno, *A Study of Pari-Mutuel Tax Revenues,* p. 27.

6Legalized Games of Chance Control Commission, *Financial Report,* 1983 through 1987.

7See Casino Control Commission, "Special Meeting On [sic]

## SECTION FOUR

1See, for example, State Lottery Commission, *Minutes,* September 10, 1974

Report on Pathological Gambling in New Jersey
Written for the New Jersey
Governor's Advisory Commission on Gambling

by

Henry R. Lesieur, Ph.D.
Department of Sociology & Anthropology
St. John's University
Jamaica, New York

April, 1988

# Executive Summary
## Report on Pathological Gambling in New Jersey
### by
### Henry R. Lesieur, Ph.D.

1. A review of research and treatment efforts was conducted in order to update a report on pathological gambling written by Rickey Greene for the Division of Alcoholism in 1979. Over one hundred articles and books were reviewed for this report and persons from more than thirty organizations were contacted. Since that report there have been major changes. The principal findings of the report follow.

2. The volume of legalized gambling has increased by over 950 percent in the U.S. between 1974 and 1987. There was $17.3 billion wagered legally in 1974 and $166.5 in legal wagering in 1986.

3. In 1980, the American Psychiatric Association formally recognized pathological gambling as a disorder of impulse control. In 1987, it was acknowledged by the APA that pathological gambling is an addictive disorder similar to alcoholism and other psychoactive substance dependence.

4. Available evidence suggests an increase in the number of pathological gamblers has taken place between 1974 and 1987. In 1974, fewer than one percent of the U.S. adult population were recognized as compulsive gamblers; in 1984-85 state surveys were estimating the rate at between 1.4 and 3.4 percent of the adult population. An estimated 192,000 people are "probable pathological gamblers" and another 233,700 are "potential pathological gamblers" in New Jersey. Most of these individuals are addicted to legalized forms of gambling.

5. Surveys done in New York and the Delaware Valley have found that males, people under age 35, Blacks and Hispanics, Catholics, and lower income individuals are overrepresented among probable pathological gamblers in the population. When we compare these figures with people calling the 800-GAMBLER hotline and in

treatment we find that females, those under age 35, Blacks and Hispanics and lower income individuals are underrepresented in these populations. Clearly, there is a need for outreach to these groups of people.

6. Attitude studies of New Jersey residents point to an increasing acceptance of the dangers of compulsive gambling. An overwhelming majority of those studied believe it is a treatable illness; they also believe that no advertising of gambling should be done without warnings of its possible dangers. Additionally, over 70 percent believe that this should be addressed in the school systems of the state.

7. The report reviews the theories of pathological gambling including psychoanalytic, behavioral, personality, general addiction, physiological and sociological approaches.

8. Pathological gambling creates serious problems in the family. Financial and serious interactional problems including psychological and physical abuse, affect all members of the family. Additionally, the spouse and children are more likely to be substance abusers and have eating disorders than the general population. Other problems include physical and emotional problems which are three to eight times higher than in the general population. For example, chronic or severe headaches are eight times greater and suicide attempts are four times more frequent than among the general population. Present treatment resources are inadequate to cope with these problems.

9. Job disruptions produced by pathological gambling include exploitation of work time to gamble and handicap sporting and racing events, poor concentration on work, irritability, moodiness, and absenteeism. Borrowing from work becomes more serious as the compulsive gambling progresses. It eventually includes

employee theft and embezzlement. In spite of this, very few employee assistance programs are actively screening troubled employees for a gambling problem. Systematic education of these people is sorely needed.

10. Financial difficulties are also serious for pathological gamblers in New Jersey. The average gambling related debt of patients at the JFK treatment center for pathological gamblers is $53,350. Using a twenty year gambling history and estimates of the number of probable pathological gamblers in the state, I would estimate that over $514 million is accumulated in debt by compulsive gamblers in New Jersey *per year*. These debts are a reflection of easy credit and check cashing policies of the gaming industry.

11. Ultimately, pathological gambling results in crime. Approximately two-thirds of non-incarcerated and 97 percent of incarcerated pathological gamblers admit engaging in illegal behavior to finance gambling or pay gambling related debts. White collar crimes predominate among treatment samples while street crimes and drug sales are more frequent among imprisoned compulsive gamblers. The total cost of this crime is unknown at present. An estimated 30 percent of prisoners are probable pathological gamblers. Most of them are also addicted to alcohol and other drugs. We need to find out what percent of their drug related crimes are actually produced by their gambling in combination with drug use. Treatment programs which address multiple addictions are vitally needed in prisons and diversion programs, and halfway houses are needed for individuals on probation and parole.

12. Recent evidence has revealed that pathological gambling overlaps with other psychiatric disorders and substance abuse. Despite this, treatment facilities are not actively screening their patients for problems with gambling.

13. Studies of high school and college students reveal that, in contrast with the adult figure of 3.4 percent prevalence rate for probable pathological gamblers, over five percent of high school and 6-8 percent of college students show signs of pathological gambling. Longitudinal studies are needed to determine whether these problems are a product of maturational difficulties or pose potentially serious problems for New Jersey's future. In either event, they reinforce the need for state mandated education about pathological gambling in the schools particularly since five percent state that their father or mother has a gambling problem.

14. Treatment of pathological gamblers is far more extensive in 1988 than it was in 1979 when Rickey Greene wrote his report. Gamblers Anonymous and Gam-Anon have increased as well has cooperation of various facilities for inpatient and outpatient treatment for compulsive gambling. This effort is still in its infancy and needs to be given additional support by the state. Much of the progress in this area has been produced by the Council on Compulsive Gambling of New Jersey.

15. The gaming industry response to pathological gambling in New Jersey has been minimal. The Lottery Commission was contributing $75,000 per year to research or 0.0068% of gross annual sales but now contributes nothing. The racing industry gave $45,000 or 0.0038% of total handle to a hotline (800-USA- REACH) and to the Council on Compulsive Gambling of New Jersey. The casino industry put up a few signs and gave $4,600 to the Council or 0.000031% of the drop. All told, their contribution is projected to be $50,600 combined in 1988. This is about *one ten-thousandth* of the debt that compulsive gamblers accumulate each year. On the other hand, the gaming industry is doing more in New Jersey than the industry of any other state.

16. According to the gaming industry, it contributed over $670 million to the state in dedicated funds or into the general treasury in 1987. Almost single-handedly, the compulsive gamblers of this state create this much in debts each year. They, therefore, pay an inordinate share of gambling related taxes, far greater than their 3.4 percent of the New Jersey population. I would recommend that *at least* 3.4 percent of the money from gambling revenues go to the education, treatment, and research into compulsive gambling. This would represent over $22.6 million, not the extremely small amount of

$500,000 the legislature is currently considering.

17. More specific recommendations are attached in the enclosed document. These include specific treatment and counseling needs, education and training, outreach to the compulsive gambler, extensive research needs, needs for tighter gaming law enforcement on underage gambling, recommendations concerning credit and a call for a National Commission on Compulsive Gambling because of the extensive interstate commerce involved in gambling.

106

# Table of Contents

|  | Page |
|---|---|
| Introduction | 110 |
| Pathological Gambling — Definition | 111 |
| Methodology | 112 |
| Surveys of Pathological Gamblers | 114 |
|   Rates of Pathological Gambling | 114 |
|   Demographic Characteristics of Pathological Gamblers from General Population Surveys | 114 |
|   Demographic Characteristics of Pathological Gamblers from the 800-GAMBLER hotline | 116 |
|   Demographic Characteristics of Pathological Gamblers in Treatment at the JFK Medical Center | 116 |
|   Demographic Characteristics of Pathological Gamblers from Studies of Gamblers Anonymous | 116 |
|   Data Comparisons | 116 |
|   Gambling Preferences of Pathological Gamblers | 118 |
| Attitudes of New Jersey Residents | 119 |
| Theories of Pathological Gambling | 121 |
|   Psychoanalytic Theory | 121 |
|   Personality Research | 121 |
|   Cognitive Social Learning (Behavioral) Theories | 122 |
|   Psychologically Based Addiction Theories | 122 |
|   Physiological Theories | 122 |
|   Sociological Research | 123 |
| Family Issues and Compulsive Gamblers | 124 |
|   Treatment Issues in Counseling Spouses | 126 |
|   Children of Compulsive Gamblers | 126 |
| Gambling and the Workplace | 128 |
| Finances and Credit | 129 |
| Pathological Gambling and Crime | 131 |
|   Pathological Gamblers Turned Criminal — The Research Evidence | 132 |
|   Patterns of Crime in Four Different Studies | 133 |
|   Pathological Gamblers and Violence | 135 |
| Psychiatric Disorders Among Pathological Gamblers | 136 |
|   Multiple Addictions | 137 |
| Gambling Among High School Students | 139 |
|   Gambling by the Students | 139 |
|   Parents and Gambling | 140 |
|   Gambling, Jobs and School | 140 |
|   Gambling and Borrowing | 140 |
|   Getting Money to Gamble — Legitimately and Otherwise | 141 |
|   Students and Atlantic City | 142 |
|   "The Big Problem Here is Drugs" | 142 |
| Gambling Among College Students | 144 |
| The Female Pathological Gambler | 145 |
| Treatment of Pathological Gamblers | 147 |
|   The New Jersey Experience | 147 |
| Social Service Agencies and the Pathological Gambler | 151 |
|   Atlantic City Agencies | 151 |
| Social Responsibility and the Gaming Industry | 152 |
| The State of New Jersey's Response | 154 |
| Recommendations | 155 |
|   Treatment and Counseling Needed | 155 |

# Table of Contents (Continued)

Education and Training ................................................................. 155

Outreach to the Compulsive Gambler ...................................................... 156

Research Needed ...................................................................... 157

Gaming Law Enforcement ............................................................... 158

Credit ............................................................................. 158

Need for Multi-State Efforts ............................................................. 158

References .......................................................................... 160

# List of Tables

Page

1. Demographic Characteristics of Probable Pathological Gamblers: Characteristics Overrepresented in New York and Delaware Valley ................................................................ 115

2. Comparison of Demographic Characteristics of Gamblers Anonymous, Treatment Programs, 800-GAMBLER Hotline, and Delaware Valley Survey ........................................... 117

3. Gambling Preferences of Gamblers Anonymous, JFK Medical Center Patients and 800-GAMBLER Hotline Cases ...................................................................... 120

4. A Five-Year Comparison of 1980 Responses and 1985 Responses to Ten Attitudinal Questions Regarding Compulsive Gambling in New Jersey ................................................ 120

5. Summary of Data from Lorenz's Study of Wives of Compulsive Gamblers .......................... 125

6. Lorenz and Yaffee Data Compared with Date on Hospitalized Females ............................. 125

7. Estimates of Number of Pathological Gamblers in Prison, on Parole and on Probation in New Jersey, 1987 ................................................................................ 133

8. Illegal Activities and Civil Fraud Engaged in by Pathological Gamblers in Order to Gamble or Pay Gambling Debts. Five Samples .................................................... 134

9. Mental Health Information System Data on Pathological Gamblers ................................. 137

10. Data on Pathological Gamblers from the Alcoholism Management Information System .............. 138

11. Type of Gambling Done by New Jersey High School Students ...................................... 139

12. Parents and Gambling Among New Jersey High School Students .................................. 140

13. Gambling, Jobs, and School Problems Among New Jersey High School Students .................... 141

14. Gambling and Borrowing by New Jersey High School Students .................................... 141

15. Sources of Money — Legal and Otherwise by New Jersey High School Students ..................... 141

16. Casino Control Commission Data on Minors ...................................................... 142

17. Gambling by Stockton State College Students .................................................... 144

18. Contributions of the Gaming Industry to the Problem of Pathological Gambling (1987) ............. 153

19. Money Received from Gambling into the New Jersey State Treasury ................................ 154

20. Money for Pathological Gambler Programs which Came from the State of New Jersey, 1987 ........... 154

# Report on Pathological Gambling in New Jersey

## Introduction

In 1979, Rickey Green, from the Alcohol, Narcotic and Drug Abuse Unit of the New Jersey Department of Health issued a report called: "A Preliminary Study on Compulsive Gambling in New Jersey." Since that time the American Psychiatric Association has formally recognized pathological gambling as a disorder of impulse control and has modified these criteria in their Diagnostic and Statistical Manual: DSM-III-R.

In addition to the formal recognition of pathological gambling by the American Psychiatric Association, other major events have intervened between the Greene report and the present time. In 1979, Atlantic City was in its formative stage towards the development as a major resort/gaming community and there was no simulcasting at the race tracks.

In 1974, 61 percent of the U.S. adult population gambled. At that time, there was $17.346 billion wagered legally (Commission, 1976). According to Gaming and Wagering Business magazine estimates, there was $166.47 billion in legal wagering in 1986 (Christiansen, 1987). This is almost a 950 percent increase. Gambling is now legal in some form in 47 of the 50 states. Current estimates are that approximately 80 percent of the U.S. population gambles. One could hypothesize that there should be an increase in the number of individuals who are becoming pathological gamblers. Preliminary data seem to support this impression. A national survey in 1974 reported that 0.77 percent of the U.S. population were "probable compulsive gamblers" (Kallick, et al., 1979). Polls done in Ohio, the Delaware Valley (parts of New Jersey and Pennsylvania) and

New York State in 1984 and 1985 pointed to between 1.4 and 3.4 percent prevalence rates of "probable pathological gamblers" (Culleton and Lang, 1984; Culleton, 1985; Volberg and Steadman, 1986).

Other changes have also taken place since the Greene report. In 1979 only Maryland had provided state funding for the treatment of pathological gambling. Since then Connecticut, Delaware, Iowa, Maryland, Massachusetts, Minnesota, New York, and New Jersey have had some state funding. In addition, there were only three programs for the treatment of compulsive gambling in the U.S. outside of Gamblers Anonymous (Maryland had funded the Hopkins Center but this was not yet operational). All these were in the Veteran's Administration. Since that time as a result of state funding, the entry of private hospitals into treatment, and the efforts of the National Council on Compulsive Gambling and its ten state affiliates (including the Council on Compulsive Gambling of New Jersey), both outpatient and inpatient facilities have opened up in many areas of the country. New Jersey is in the forefront of this movement.

The 1980s have produced a burgeoning of interest in research into compulsive gambling as well. Scores of professional articles have appeared in some of the most highly respected journals in the U.S. and overseas. With the foundation of the *Journal of Gambling Behavior* the amount of published research has increased even more. Not a month goes by today without something appearing in professional journals and the mass media about compulsive gambling.

# Pathological Gambling — Definition

Pathological (or compulsive) gambling has been defined by the American Psychiatric Association as a disorder of impulse control since 1980 (American Psychiatric Association, 1980). The essential features of this disorder are as follows: "a chronic and progressive failure to resist impulses to gamble, and gambling behavior that compromises, disrupts, or damages personal, family, or vocational pursuits" (American Psychiatric Association, 1987, p.324).

In 1979, Rickey Greene, from the Alcohol, Narcotic and Drug Abuse Unit of the New Jersey Department of Health issued a report called: "A Preliminary Study on Compulsive Gambling in New Jersey" (Greene, 1979). Since that time the American Psychiatric Association has formally recognized pathological gambling as a disorder of impulse control and has modified these criteria in their Diagnostic and Statistical Manual: DSM-III-R (American Psychiatric Association, 1987, pp.324-325). These criteria are:

Maladaptive gambling behavior as indicated by at least 4 of the following:

(1) Frequent preoccupation with gambling or obtaining money to gamble.

(2) Often gambles larger amounts of money or over a longer period than intended.

(3) Need to increase the size or frequency of bets to achieve the desired excitement.

(4) Restlessness or irritability if unable to gamble.

(5) Repeatedly loses money gambling and returns another day to win back losses ("chasing")

(6) Repeated efforts to cut down or stop gambling

(7) Often gambles when expected to fulfill social, educational or occupational obligations.

(8) Has given up some important social, occupational or recreational activity in order to gamble.

(9) Continues to gamble despite inability to pay mounting debts or other significant social, occupational, or legal problems that the individual knows to be exacerbated by gambling.

These criteria were specifically modeled after those for psychoactive substance dependence in the DSM-III revision. All the criteria, with the exception of criterion five ("chasing losses"), have their counterpart in the diagnosis of alcohol, heroin, cocaine and other forms of drug dependence. Note that the third criterion is "tolerance" related and the fourth is based on the notion of "withdrawal." This change has great implications for the study and treatment of pathological gambling. We should expect more comparisons to be made among pathological gamblers and other addicts.

While pathological gambling does not involve the use of a substance, research conducted by numerous scholars has noted its similarity to addictive behaviors (Moran, 1970; Miller, 1980; Levinson, et al., 1983). Pathological gamblers, like alcoholics and drug addicts, come to have a frequent preoccupation with seeking out gambling; they gamble longer than intended and with more money than intended. There is also the equivalent of "tolerance" as when the gamblers say that once they have bet with thousands, two dollar bets lose their significance. Research done by Wray and Dickerson (1981) and by Custer (1982) has noted "withdrawal symptoms" in some pathological gamblers undergoing abstinence.

Pathological gamblers undergo phases which are different from drug dependent individuals. One such phase is the "losing phase" (Custer, 1982) characterized by what gamblers call "chasing" (trying to get money back that was lost gambling) to the extent that this becomes an obsession (Lesieur, 1984, Chapter 1). Like substance abusers, pathological gamblers frequently try to cut down and quit their addiction. While gambling does not produce intoxication or physical impairment and consequently does not have an impact on social, educational or occupational obligations in that way, the obsession with gambling has been noted to impair performance in these spheres. Finally, criterion nine notes that gambling has an economic impact which can be devastating.

In sum, there has been a movement toward the recognition that pathological gambling is similar to other addictions. While this is true, the differences have been refined and efforts to further refine them are under way.

111

# Methodology

This report is an update of the "Preliminary Study on Compulsive Gambling in New Jersey" written by Rickey Greene (1979). It asks the question, what new information has come to light on compulsive gambling since Greene wrote the 1979 report? Three major areas have been investigated: research, education, and treatment.

Several major things have come to pass since 1979 which are of major importance to knowledge about pathological gambling:

1980 — American Psychiatric Association recognized pathological gambling as a disorder of impulse control

1983 — Council on Compulsive Gambling of New Jersey established

1983 — 800-GAMBLER hotline established

1985 — *Journal of Gambling Behavior* initiated by the National Council on Compulsive Gambling and published by Human Sciences Press.

1987 — American Psychiatric Association revised the diagnostic criteria for pathological gambling making it similar to psychoactive substance dependence

1979-1987 — the following states have funded education, research and/or treatment for pathological gambling: New Jersey, New York, Maryland, Connecticut, Massachusetts, Minnesota, Iowa, and Delaware.

## Library Searches

The following indices were searched for articles on pathological gambling: Psychological Abstracts, Sociological Abstracts, Social Sciences Citation Index, Science Citation Index, Index Medicus, Dissertation Abstracts, Criminal Justice Abstracts. A computer search was requested from the National Clearinghouse on Alcohol and Drug Abuse Information.

## Unpublished sources

Papers from proceedings of the following conferences were requested:

1984 — 6th International Conference on Gambling and Risk Taking, Atlantic City, New Jersey

1985 — First National Conference on Gambling Behavior of the National Council on Compulsive Gambling, New York, New York

1986 — Second National Conference on Gambling Behavior of the National Council on Compulsive Gambling, Philadelphia, Pennsylvania

1987 — 7th International Conference on Gambling and Risk Taking, Reno, Nevada

In addition, the author is the editor of the *Journal of Gambling Behavior*. Articles which have been submitted to that journal but have not yet been published have also been reviewed for this work.

## Agency and Treatment Center Contacts.

The following organizations, agencies and treatment centers were contacted in connection with this research:

Council on Compulsive Gambling of New Jersey
Gamblers Anonymous and Gam-Anon
New Jersey Department of Corrections
New Jersey Probation Department
New Jersey Division of Parole
New Jersey Division of Alcoholism
New Jersey Division of Mental Health and Hospitals
New Jersey State Lottery Commission
New Jersey Racing Commission
New Jersey Sports and Exposition Authority
New Jersey Casino Control Commission
Atlantic City Casino Association
Salvation Army Social Service Unit, Atlantic City
Atlantic City Rescue Mission

Gaming Business Magazine

Gallup Organization

National Center for Health Statistics

J.F.K. Medical Center — Edison, New Jersey

Bergen County Network Adolescent Rehabilitation

Bergen Pines County Hospital

Straight & Narrow Alcoholism Services

RAFT — East Orange, New Jersey

New Hope — Marlboro, New Jersey

Hampton Hospital — Rancocas, New Jersey

Veteran's Administration Medical Center — Lyons, New Jersey

Maryville — Williamstown, New Jersey

New Beginnings — Lakehurst, New Jersey

Carrier Foundation — Belle Mead, New Jersey

Seabrook House — Seabrook, New Jersey

Fair Oaks E.A.P. 800-USA REACH — Summit, New Jersey

The Harbor — Hoboken, New Jersey

Atlantic Mental Health — Atlantic City, New Jersey

113

# Surveys of Pathological Gamblers

Four different methods are available to determine the demographic characteristics of pathological gamblers: surveys of Gamblers Anonymous members, surveys of persons in treatment, examinations of callers to hotlines, and epidemiological surveys of the general population. Each sample tells us different things. From the general population we can find out who really are affected; from the hotlines we can find out who is informed about and concerned about their own or someone else's problem; from the treatment and Gamblers Anonymous groups we can find out which populations are currently being served by available treatment resources.

## Rates of Pathological Gambling.

In 1974, the Commission on the Review of National Policy Towards Gambling conducted a survey of the adult population in the U.S. and the results of that survey were reported by Greene. Since that time surveys have been done in Connecticut, Minnesota, New York, Ohio and the Delaware Valley (New Jersey and Pennsylvania). The Connecticut and Minnesota studies relied on only a few questions. In Connecticut, using three questions in 1977 researchers estimated that 1.8% of the adult population were probably compulsive gamblers (Abrahamson & Wright, 1977). Another group of researchers in Connecticut in 1986 used four questions and determined that 0.34% of the adult population were probably compulsive gamblers (Laventhol & Horwath, 1986). Unfortunately, a positive answer to the question, "Have you ever thought you gambled too much?" was used as a screen in the second study. This question undoubtedly lowered the number of potential pathological gamblers significantly. In Minnesota, a 1984 survey revealed that 2% of 1,000 St. Paul metropolitan area respondents and 1% of 2,000 respondents contacted throughout the state felt they had a problem with gambling and another 5% reported that they have family members who have serious problems with gambling (Mental Health Division, 1985). Unfortunately, both items were based on only one question. Neither the Connecticut nor the Minnesota studies were based on validated, reliable instruments.

More systematic research has been conducted in Ohio, the Delaware Valley and New York. Using what he calls the Clinical Signs Model, which is partially validated, Culleton conducted research in Ohio and the Delaware Valley (Culleton & Lang, 1984; Culleton, 1985). In Ohio he found that 2.5% of the adult population were "probable pathological gamblers" and another 3.4% were "potential pathological gamblers" (Culleton, 1985). In the Delaware Valley he found that 3.4% were "probable pathological gamblers" and another 4.1% were "potential pathological gamblers" (Culleton & Lang, 1984). In New York, Volberg and Steadman, using a validated and reliable screening instrument called the South Oaks Gambling Screen (Lesieur and Blume, 1987), found that 1.4% of the sample were "probable pathological gamblers" and another 2.8% were classified as "problem gamblers" (Volberg & Steadman, 1986). Since the Culleton and Volberg studies used different measurement instruments they are difficult to compare. For example, while it appears that the Delaware Valley has a higher rate of pathological gambling than in New York, only a survey which uses the same epidemiological procedures can be compared. Rachel Volberg has recently received a grant from the National Institutes of Mental Health to survey the New Jersey population. She will be using the same procedures that were used in New York. After that research is completed we will have a better idea of the two state comparison.

## Demographic Characteristics of Pathological Gamblers from General Population Surveys.

While a direct comparison of rates is not possible at this time because the studies used different methods, an examination of the demographic characteristics of the pathological gamblers in the New York and Delaware Valley study reveals that there are similarities. These similarities (noted in Table 1) have implications for social policy.

In both New York and the Delaware Valley males are overrepresented in the population of pathological gamblers. They represent two-thirds of the pathological gamblers found in each survey. Younger adults are also overrepresented in the surveys. While the New York and Delaware Valley surveys did not use the same categories it is clear that those under 35 are overrepresented. This contrasts with the earlier findings reported by Gambling Commission which found that older individuals were overrepresented (Kallick, *et al.*, 1979, p.434-435). Further research is needed to determine whether the national data from the Gambling Commission will be upheld or not.

114

Table 1. Demographic Characteristics of Probable Pathological Gamblers:
Characteristics Overrepresented in New York and the Delaware Valley.

| | New York | | Delaware Valley | |
|---|---|---|---|---|
| | % in general population | %probable pathological gamblers | % in general population | %probable pathological gamblers |
| Sex | | | | |
| Males | 44% | 64% | 52% | 65% |
| Age | | | | |
| under age 30 | 22 | 43 | | |
| under age 35 | | | 39 | 46 |
| Race | | | | |
| Blacks | 13 | 29 | 16 | 28 |
| Hispanics | 8 | 14 | 3 | 6.5 |
| Income | | | | |
| $25,000 or less | 45 | 57 | | |
| $20,000 or less | | | 34 | 59 |
| Education | | | | |
| not graduated high school | 18 | 43 | 12 | 13 |
| high school graduates | * | * | 38 | 56 |
| Employment | | | | |
| unemployed | 7 | 25 | n/a | n/a |
| seeking work | n/a | n/a | 4 | 11 |
| Regional differences | | | | |
| New York City | 42 | 57 | | |
| New Jersey | | | * | * |

* = not overrepresented in this study

n/a = information not available

Source: New York (Volberg & Steadman, 1986)
Delaware Valley (Culleton, 1985)

Blacks and Hispanics are overrepresented in both New York and the Delaware Valley. Hispanics (but not Blacks) were overrepresented in the national study as well (Kallick, *et al.*, 1979, p.435-436). The national study had found that Italians and "race-other" (Asians and native Americans) were also overrepresented but the data were not sufficient to examine that hypothesis in the two Northeastern areas surveyed. One hint that Italians may be overrepresented in the Delaware Valley comes from the overrepresentation of Catholics in that survey as well as the 1974 Commission study (Kallick, *et al.*, 1979, p.435-436). Jews were overrepresented in neither the Delaware Valley nor the national study. Income, education and employment status show commonalities between the New York and Delaware Valley studies.

In each case, the lower status groupings are overrepresented among probable pathological gamblers. This is in contrast to the national survey which reported that individuals in the middle income ranges, college educated, and retired people were overrepresented and not lower income, less educated and unemployed (Kallick, *et al.*, 1979, p. 435-436). Jews were overrepresented in neither the Delaware Valley nor the national study.

Income, education and employment status show commonalities between the New York and Delaware Valley studies. In each case, the lower status groupings are overrepresented among probable pathological gamblers. This is in contrast to the national survey which reported that individuals in the middle

income ranges, college educated, and retired people were overrepresented and not lower income, less educated and unemployed (Kallick, *et al.*, 1979, p. 434-436).

The last variable for which demographic information is available is marital status. The Delaware Valley study found that single, separated and divorced individuals were overrepresented among pathological gamblers. The national survey found that "probable compulsive gamblers" were more likely to have been married three or more times than the general population and were less likely to be single (Kallick, *et al.*, 1979, p.434-436).

### Demographic Characteristics of Pathological Gamblers from the 800-GAMBLER Hotline.

The Council on Compulsive Gambling of New Jersey maintains statistics on compulsive gamblers connected with 800-GAMBLER hotline calls. Data were made available for 1985, 1986 and 1987. Combining these data reveals characteristics which are different from those derived through the population surveys. Fourteen percent of the callers are female, 86 percent male; 91 percent white, 6 percent Black, 2 percent Hispanic, and 1 percent American Indian or Asian; 7 percent were under age 21, 29 percent 21-29 years old, 33 percent 30-40 years old, 21 percent 41-54 years old, and 10 percent 54 and over. The median age is 34.8 years old. The marital status of the 800-GAMBLER cases is also different from the general population survey. Thirty-four percent of the compulsive gamblers are single, never married, 54 percent are married, 2 percent widowed, 8 percent divorced, and 2 percent separated. These data are presented in Table 2 below.

### Demographic Characteristics of Pathological Gamblers in Treatment at the JFK Medical Center.

Since JFK is the only state funded treatment center, the demographic characteristics of the patients were examined in order to compare them with other sources of demographic information on pathological gamblers in New Jersey. Data were made available through Donald Weinbaum at the Division of Alcoholism. They cover 155 individuals who were treated at the JFK Medical Center from 1984 through part of 1987. As with the 800-GAMBLER data, females are highly underrepresented. This is true also for people

under age 30, Blacks and Hispanics, those with lower incomes, and single individuals. These data are presented in Table 2. Data were also provided for the USA-REACH hotline. However, the demographics of the gamblers were not separated from those of non-gambler callers (spouses, etc.).

### Demographic Characteristics of Pathological Gamblers from Studies of Gamblers Anonymous.

Research conducted by the Custers (Custer & Custer, 1978) revealed that the following characteristics are overrepresented in Gamblers Anonymous: males, mean age 39.7 (range 17-65), married, those with some college or college graduates, Catholic and Jewish in religion, or Italian, Irish and German ethnic background, and employed at the time of the survey. Two studies were done of Gamblers Anonymous members recently (Nora, 1985; Wexler, 1986). Wexler surveyed 196 members of G.A.. Their average age was 39.8 years old. Education: 16.7% had 9-11 years of education; 83.5% finished high school; 25% have finished college. Married individuals were overrepresented as well. Nora queried 190 individuals (93% were from New Jersey): 98% were male, their median age 44.1 years old (only 8% aged 30 or under). As with the Custer and Wexler studies, married people, Catholic and Jewish religion were overrepresented as were Italians, Irish and German ethnic background. Eleven percent had 9-11 years education, 35% completed high school; 29% had some college; 22% completed college and 5% did not answer or had an elementary grade education. Twelve percent were unemployed at the time of the survey. These data are presented in Table 2.

### Data Comparisons.

Given the figures from the population surveys, females should represent one-third of people in treatment, the hotline calls, and Gamblers Anonymous. However, as can be seen in Table 2, this is not the case. As we move from the 800-GAMBLER hotline to the JFK treatment sample to Gamblers Anonymous, females are increasingly underrepresented. Part of the reason for this is the stigma that is attached to being a female compulsive gambler. The Damon Runyan figure of the "gambler" is a male image. The female who gambles heavily does not fit this glamorous image. One consequence of this is that female gamblers are more likely to be closet

Table 2. Comparison of Demographic Characteristics of Gamblers Anonymous Treatment Programs, 800-GAMBLER hotline, and Delaware Valley survey.

| | Gamblers Anonymous | JFK Medical Center | 800-GAMBLER hotline | Delaware Valley probable p.g. | potential p.g. |
|---|---|---|---|---|---|
| Sex | | | | | |
| Males | 98 | 93 | 86.4% | 65% | 61% |
| Age | | | | | |
| under age 30 | 8 | 17 | 36 | 43   (NY) | |
| under age 35 | n/a | 47 | 50 | 46 | 49 |
| Race | | | | | |
| Blacks | * | 5 | 6 | 28 | 19 |
| Hispanics | * | 3 | 2 | 6.5 | 2 |
| Income | | | | | |
| $20,000 or less | n/a | 26 | n/a | 59 | 35 |
| Education | | | | | |
| not graduated high school | 11-17% | 12 | n/a | 13 | 10 |
| h.s. grad (no college) | 35 | 50 | n/a | 56 | 17 |
| Employment | | | | | |
| unemployed | 12 | 26 | n/a | n/a | n/a |
| seeking work | n/a | n/a | n/a | 11 | 0 |
| Marital Status | | | | | |
| single (never married) | 7 | 20 | 34 | 41 | 26 |
| married | 83.5 | 59 | 54 | n/a | n/a |
| Religion | | | | | |
| Catholic | 61 | n/a | n/a | 61 | 51 |
| Jewish | 24 | n/a | n/a | 0 | 2 |

n/a = information not available

Source: Gamblers Anonymous (Nora, 1985; Wexler, 1986) JFK Medical Center (Division of Alcoholism, 1987) 800-GAMBLER (Council on Compulsive Gambling of New Jersey, 1988) Delaware Valley (Culleton & Lang, 1985)

gamblers than their male counterparts. They also have fewer social supports than the male compulsive gambler. The females who enter G.A. are less likely to be married than males (42% vs. 83%). Their referral sources are therefore different from that of males who enter. They are more likely to be self-referred (62% were self-referred in one study) than males who are frequently brought in by their spouse (Lesieur, 1987; Livingston, 1974).

A reverse pattern is found with age. As we move from the Delaware Valley study to the 800-GAMBLER, then JFK and finally the Gamblers Anonymous studies, the samples get increasingly older. The underrepresentation of those under 30 and single persons gives us several clues as to the nature of G.A. and referral. The young are quite probably underrepresented because of the image of the compulsive gambler in society. This is a person who has "lost it all." The young are less likely to have experienced bankruptcy, divorce threats by their spouse, or other threatening signs of problematic gambling. As for single people, they have one less person who might care for them and pressure them into G.A.

Blacks should represent over one-fourth of the Gamblers Anonymous, JFK and hotline samples; however, as with females, they are underrepresented. There has been no research on this issue. At this point we can only speculate on why this is the case. Blacks, Hispanics and whites live in segregated communities in the U.S.. Gamblers Anonymous members are a reflection of the prejudices, fears, and disjunctures in American society. It is possible that Blacks and Hispanics who come into G.A. feel uncomfortable about being in the organization. On the other hand, it is possible that Blacks and Hispanics utilize different media sources than are presently giving attention to the hotline. I would recommend that Blacks and Hispanics be targeted. A study of media used by these groups should be conducted with that goal in mind.

Lower income individuals are underrepresented in the JFK sample when compared with the Delaware Valley study. Anyone who attends G.A. meetings will also note that they are underrepresented there. It is possible that as one moves down the socioeconomic ladder, individuals are less likely to internalize their troubles and hence, less likely to see that they are in need of help. On the other hand, Gamblers Anonymous seems to have more of a skewed population than the JFK program.

Religion is the last variable for which we have comparative data. All studies of Gamblers Anonymous show that Jews are overrepresented yet this does not surface in general population surveys. Several explanations for this arise if the surveys are accurate. Quite possibly Jews are joiners or else they experience the stigma more than members of other groups and get help for their problems at a more rapid rate. Whatever the reason, it is an enigma which deserves to be solved.

### Gambling Preferences of Pathological Gamblers.

Part of the current debate in New Jersey is over which form of gambling is the most "responsible" for creating the problem of pathological gambling. There are only a few sources of data for addressing this question. None of the general population surveys discussed in the previous section asked that question. Gamblers Anonymous, treatment and 800-GAMBLER hotline data are presented in Table 3. Surveys based on Gamblers Anonymous have a biased sample as do the treatment samples. Perhaps the best estimate we have at present comes from the 800-GAMBLER hotline data. According to those data, 58 percent of compulsive gamblers preferred casinos, 30 percent preferred horse racing, 26 percent sports and 17 percent preferred lotteries. These figures add up to more than 100 percent because compulsive gamblers frequently have more than one preferred form of gambling. While the hotline data are the best we have, the only accurate way of assessing the relative "contribution" of each to the problem would be to find out how much time and money have been spent at each activity by the compulsive gamblers involved. No study has done this to date.

## Attitudes of New Jersey Residents

According to a survey conducted by Glenn Reeling, the attitude of New Jersey residents altered significantly between 1980 and 1985 (Reeling, 1986). Comparing the 1980 and 1985 surveys (see Table 4), Reeling found that more people now believe: (1) gambling is not a victimless activity; (2) New Jersey should not advertise the "joys" of gambling without also advertising its possible dangers; (3) compulsive gamblers can be "cured;" (4) Gamblers Anonymous is an effective organization; (5) and that compulsive gamblers eventually resort to a life of crime to finance their gambling.

It is my belief that part of these changes are a product of the work of the Council on Compulsive Gambling of New Jersey and advertising of the 800-GAMBLER hotline. While neither promotes that compulsive gamblers can be "cured" but rather focuses on treatment, the other points are actively promoted by the Council.

While more than half the persons surveyed know someone who is a compulsive gambler, 50% believe that it is less common than it actually is (1 of 50 is the correct response). Another significant finding of both time periods is that more than 70% believe education about the dangers of gambling should be part of the school curriculum and teachers should be trained to recognize the symptoms associated with a child whose welfare is being hurt by having a compulsive gambler in the family.

119

Table 3. Gambling Preferences of Gamblers Anonymous, JFK Medical Center
Patients and 800-GAMBLER Hotline Cases

|  | Female Gamblers Anonymous | Gamblers Anonymous | JFK Medical Center | 800-GAMBLER hotline |
|---|---|---|---|---|
| Casino | 58% | 40% | 46% | 58% |
| Horse Betting | 32 | 60 | 52 | 30 |
| Legal Lottery | 34 | n/a | 13 | 17 |
| Illegal Lottery | 12 | n/a | 8 | 1 |
| Sports | 12 | 53 | 41 | 26 |
| Craps/cards (non-casino) | 64 | 46 | 24 | 5 |
| Bingo | 22 | 8 | 1 | 1 |
| Other | 10 | 8 | 4 | 2 |

Note: Percentages add up to more than 100% because of multiple responses.

n/a = information not available

Source: Gamblers Anonymous (females: Lesieur, 1986; G.A.: Nora, 1985) JFK Medical Center
(Division of Alcoholism, 1987)
800-GAMBLER (Council on Compulsive Gambling of New Jersey, 1987; 1988)

Table 4. A Five-Year Comparison of 1980 Responses and 1985 Responses to Ten
Attitudinal Questions Regarding Compulsive Gambling in New Jersey.

| Question | Percentage "Yes" Responses | |
|---|---|---|
| | 1980 | 1985 |
| 2. Do you feel gambling is a victimless activity? | 37% | 23%* |
| 22. Do you feel the State of New Jersey should be allowed to advertise/promote the "joys" of gambling without also advertising any of its possible dangers? | 29 | 21* |
| 23. Do you know anyone who gambles excessively, or that you would call a compulsive gambler? | 58 | 53 |
| 24. Do you view compulsive gambling as being a mental illness? | 69 | 70 |
| 25. As some compulsive alcoholics can be cured (go on the wagon), do you believe it is possible also to cure a compulsive gambler? | 74 | 82* |
| 26. Do you feel Gamblers Anonymous is an effective organization? | 48 | 52* |
| 27. Do you feel that most compulsive gamblers must eventually resort to a life of crime to obtain money for their gambling habit? | 39 | 43* |
| 36. Do you feel there should be a unit taught in the high schools which speaks to the issue of gambling and its inherent dangers? | 72 | 76 |
| 37. Do you think school teachers should be trained to recognize the symptoms associated with child whose welfare is being hurt by having a compulsive gambler in the family? | 71 | 71 |
| 40. What proportion of the total U.S. population do you feel are compulsive gamblers? | | |
| 1 of 10 ................................................. | 20 | 22 |
| 1 of 50 ................................................. | 30 | 29 |
| 1 of 500 ................................................ | 35 | 32 |
| 1 of 10,000 ............................................. | 15 | 17 |

* Difference is statistically significant.

Source: (Reeling, 1986, pp.24-27)

# Theories of Pathological Gambling

In his report Greene focused on two primary types of theories of causation: psychoanalytic and behavioral. Several competitors to these orientations also exist: sociological, physiological, addiction oriented psychological theories and more specific psychological and psychiatric theorizing.

There is now a recognition that an eclectic approach needs to be taken to the issue of pathological gambling. Quite probably, sociological, psychological and biological processes are involved in an interactive and complex fashion in its etiology.

### Psychoanalytic Theory.

Psychoanalysts were the first to examine pathological gambling and develop theories about its causation. Most of these are reviewed or reprinted in Halliday and Fuller (1974). The most widely cited psychoanalyst in the past is Bergler, who contended that gamblers are masochists who try to lose in an effort to expiate some unconscious source of guilt (1969). Most therapists seem to discount this view today. Custer (1982), Livingston (1974) and Moran (1970b) found early winning years which contradict this idea. Masochists could not stand to win for that long.

More recent psychoanalytic theorizing has focused on defense mechanisms (Rosenthal, 1986) and variations of psychoanalytic theorizing like transactional analysis (Ingram, 1985).

### Personality Research.

Personality trait theorists are the inheritors of the view that some underlying personality is at the route of the pathological gambler's problems. Studies using the Edwards Personal Reference Schedule found pathological gamblers to have higher scores than normal on achievement, exhibition, dominance, heterosexuality, deference, and endurance (Moravec and Munley, 1983). However, Taber, *et al.*, using the California Personality Inventory which also measures achievement motivation failed to find that pathological gamblers scored above average (1986). Further studies report low ego strength and possibly high incidence of narcissistic personality disorder among pathological gamblers (Livingston, 1974; Taber, *et al.*, 1986).

All studies using the Minnesota Multiphasic Personality Inventory (MMPI) have found pathological gamblers to have elevated or "spiked," scores on the psychopathic deviation (Pd) scale, while many showed clear signs of depression when tested (Graham and Lowenfeld, 1986; Moravec & Munley, 1981). Alcoholics and other substance abusers also score high on these two measures, giving credence to the idea that there are commonalities across addictions.

Presence of high amounts of depression in pathological gamblers has been reported several ways. Virtually every study which could find depression has done so. However, there are still unanswered questions about the source of the depression. We confront a "chicken and egg" problem. Does depression cause pathological gambling or does pathological gambling cause depression? Evidence seems to be pointing in both directions at once. Gambling related problems create tremendous stress which increases as the pathological gambler becomes more involved in gambling and uses options for financing it (Lesieur, 1979). Whitman-Raymond (1988) found evidence of loss in each of eight pathological gamblers he examined in detail. Coincident with this, Taber, McCormick and Ramirez (1986) found major traumatic events in histories of 23% of pathological gamblers seeking treatment. These authors focused on "the concept of learned dysthymia, a chronic state of negative affect related to cumulative life trauma and seemingly instrumental in potentiating addictive euphoria" (p.71).

McCormick and Taber (1987), outline five major personality constructs which have promise for future research. These are: an obsessive-compulsive factor (ranging from few preoccupations other than gambling to multiple compulsions), a mood factor (ranging from depression to hypomania), presence of traumatic and major life stressors (from recent acute to remote chronic), a socialization factor (from completely socialized to antisocial personality disordered) and substance abuse or multiple addiction factor (from no other addictions to having multiple addictions). Each of these factors has implications for research and treatment.

121

### Cognitive Social Learning (Behavioral) Theories.

Dickerson notes that there are multiple stimuli which can be perceived to be rewarding in gambling settings (1984). Events such as the pre-race and race sequence at the race track and OTB, the spinning wheel, the croupier's calls, placing bets, and other activities at roulette and other gambling related activities can be reinforcing because they produce excitement, arousal and tension. Through observations of last second wagers at off-course betting shops Dickerson supported this hypothesis (1979). High frequency bettors are more likely to place their bets in the last two minutes before the "off" than low frequency bettors are. This has the effect of increasing the excitement and tension experienced by the players. Higher wagers by these players produce greater excitement. This interacts with the possibility of bigger wins to have a high reinforcing potential (Dickerson, 1984). Dickerson explains continued wagering in spite of loss because loss produces deprivation which can be relieved by further gambling.

Other proponents of a social learning (behavioral) theories of problematic gambling include Blaszczynski (1985), Brown (discussed below), Walker and Trimboli (1985) and those who emphasize behavior modification techniques in treatment. Perhaps the major distinction between learning theorists and others is the belief that since the pathology is learned, it can be unlearned.

### Psychologically Based Addiction Theories.

Much of the most recent theorizing has come from the recognition that pathological gamblers have much in common with other addicted populations.

Some of the general addiction theory is being developed from experiences with pathological gamblers. Durand Jacobs has hypothesized a general dissociative state which is common across addictions. In addition, he has tested these ideas and found some support for them (Jacobs, 1987; Kuley and Jacobs, 1988).

In another general addictions approach, Brown develops a modification of arousal and reversal theory which accounts for addiction and relapse (1987). These states of arousal and reversal occur in telic (goal oriented) and paratelic (playful) states. The general idea behind this view is that pathological gamblers

switch from highly aroused to highly anxious states during the course of play and vice versa. Anderson and Brown hypothesize:

> The pathological gambler who, having begun with high arousal in an unpleasant telic state, may continue to gamble in the face of the most distressing anxiety. This may be because he has learned to associate the high arousal in the telic state of losing with the anticipation of the subsequent powerful reward in pleasurable excitement when eventually that high arousal will be interpreted after a win and a reversal to the paratelic state (1987, p.189).

This theory combines what is already known about the pathological gambler. He or she is concerned with both monetary gain and loss (the telic) as well as excitement (the paratelic). Consideration of both physiological (paratelic) and cognitive (telic) processes are essential to understanding pathological gambling.

### Physiological Theories.

Three different attacks have been launched to date which attempt to examine the idea that physiological gambling has a biological substrate. Goldstein and colleagues have examined EEG waves; Blaszczynski and colleagues have examined plasma endorphin levels and Roy and colleagues have studied the incidence of other brain chemical imbalances in pathological gamblers undergoing treatment.

Blaszczynski, Winter and McConaghy hypothesized that pathological gambling is a defense against depression and anxiety or is a reaction to imbalanced physiological arousal levels (1986). They studied thirty male pathological gamblers and compared them with thirty non-gambling males. No baseline differences were found between the samples taken as a whole but differences were found when horserace gamblers were compared with poker machine players and controls. These gamblers had lower baseline B-endorphin levels. These results give credence to the idea that possibly, as Blaszczynski and colleagues hypothesize, poker machine players may be trying to ward off stress while horse race gamblers may be warding off depression related to their low B-endorphin levels. Lest we give too much weight to these data, however, field experiments using small

wagers have failed to show alteration in B-endorphin levels after gambling. It is possible that some form of tolerance has developed and higher wagers would have been needed to raise B-endorphin levels in the horse race gamblers studied.

In a series of studies funded by the New Jersey Lottery Commission, Goldstein and colleagues (with surprisingly small samples given the amount of funding they received), studied eight male G.A. members and eight controls (Goldstein, *et al.*, 1985; Carlton & Goldstein, 1987). They found that pathological gamblers showed lower levels of hemispheric differentiation than controls. The patterns were similar to those found in children with attention deficit disorder (A.D.D.). Further support for this came from results of a questionnaire designed to show signs of A.D.D.. The fourteen pathological gamblers had significantly higher scores than the sixteen controls (Carlton & Goldstein, 1987; Carlton, *et al.*, 1987).

Research has also been conducted by researchers at the National Institutes of Mental Health. Alec Roy and colleagues were not able to forward copies of their results to this author so it cannot be reported on here.

### Sociological Research.

Sociological explanations of pathological gambling tend to recognize that rather than being a state, pathological gambling is the end on a continuum which includes social gamblers at one end and suicide attempters at the other. This approach is the logical consequence of doing research in gambling settings and through intensive interviews with gamblers of all types rather than a sole focus on those in treatment.

Oldman (who conducted research in a casino) states that compulsive gambling is produced by a "defective relationship between a strategy of play on the one hand and a way of managing one's finances on the other" (1978). Similarly, Hayano (who engaged in participant observation of card rooms) sees the pathological gambler as just one variety of loser. In his view, gamblers lose for one of three reasons: inexperience and imperceptive or bad play; erroneous ideas about cards, dice and so forth; and inept money management (1982). My research with male compulsive gamblers led me to a similar conclusion. In *The Chase* I focused on inept money management, what gamblers call "chasing" (1984). Through the chase, compulsive gamblers become involved in a self-enclosed system that reinforces and creates further pressures to continue gambling despite heavy losses.

Rosecrance, in an article which critiques the idea that a "big win" is the major impetus for pathological gambling, focuses on the "bad beat" as the catalyst for the development of problem gambling (1986). According to Rosecrance, a bad beat is "a significant monetary loss resulting from a seemingly inexplicable turn of events" (p.463). This produces a disorienting state called being "on tilt." Most gamblers revive from this state as a product of having peer support and can continue gambling normally again.

Browne, in a participant observational study of card rooms, also comments on "going on tilt" (1987). It is his contention that this phenomenon is central to the career of the problematic gambler. Like Rosecrance, he sees that many individuals return to sensible gambling after having been on tilt. However, there are some individuals who, for whatever reason, are not able to handle the "emotion work" which is required to stay off tilt.

The sociological work points to the potential of crossing the bridge between going on tilt and chasing. It is possible that going on tilt is but the first stage in the compulsive gambler's career. While on tilt, the gambler may then chase his or her losses to such an extent that it has devastating consequences.

# Family Issues and Compulsive Gambling

Compulsive gambling creates serious problems for family members. In his earlier survey, Greene discussed some of these problems. Surprisingly, with some exceptions, not much further research has been done on the impact on the family.

Lorenz, in addition to the research reported by Greene (see Lorenz and Shuttlesworth, 1983), conducted a survey of 103 wives of compulsive gamblers attending G.A.-Gam-Anon Conclaves (1981). In Table 5 I have summarized the data from her study into three areas: financial problems as experienced by the spouse, interactional problems and psychological/physical abuse, and personal reactions by the spouse. Like her earlier findings, Lorenz's data show serious internal problems within the family. We cannot determine whether these are higher than in normal populations because Lorenz does not have controls built into her study and does not compare the results with normed groups. If we compare her results with national norms which are available (see Straus, Gelles and Steinmetz, 1980) we find that the gamblers themselves are *less* violent than the general population while the spouses are much *more* violent than the general population. Pathological gamblers may provoke a *reactive* form of violence by their spouse. One other piece of data for which there are norms is the suicide attempt rate. The eleven percent reported in this study and the 12 percent reported earlier is three times higher than the rate of reported suicide attempts (Mintz, 1970).

In more recent research, Lorenz and Yaffee have examined the psychosomatic, emotional and marital difficulties of pathological gamblers and their spouses (1986; 1988). Five hundred questionnaires were filled out at G.A.-Gam-Anon Conclaves. Of these, 215 were completed by spouses. They found very high incidence of the following illnesses when compared with studies of female hospital patients: chronic or severe headache, problems with bowels (excessive constipation or diarrhea), asthma, depression and suicide attempts. These data are outlined in Table 6.

Some recent advances have been made in understanding of the relationships among family members. Both Sheila Wexler (1981) and Robert Custer (Custer and Milt, 1985) recognize that the spouse of the pathological gambler goes through definite stages: these are denial, stress, and exhaustion.

In the *denial phase*, gambling has a moderate impact on the family. The gambler is frequently not at home and there may be some suspicion and concern. In balance, "things aren't all that bad." After a while, the pluses are outweighed by the minuses. The gambler is questioned, gives in and doesn't go out as often. This lasts for a short period after which the gambler reverts back to the old pattern. The spouse confronts the gambler with what others have told her (Custer refers primarily to wives of male compulsive gamblers). He responds with anger and storms out of the house. She revises her expectations about the marriage and adjusts in order to accommodate. She might even gamble with him for a while but unexpected bills come up and he lies to cover up.

Elsewhere I have called this a "discovery cycle" (Lesieur, 1984). This sequence occurs over and over again: discovery, request for forgiveness, forgiveness, slow down or abstinence and then relapse and concealment until rediscovery, and the cycle starts again. All along, the marriage continues because the spouse engages in self-deception believing that things aren't all that serious and she makes further adjustments.

Wexler's, as well as Custer's next phase is the *stress phase*. The initiator of this phase is a major crisis. No longer can the spouse deny that gambling is causing serious problems in the family. The wife's subjective reaction is to accept the husband's explanations, forgive him, and believe he will quit gambling as he says. In addition, she feels guilty and blames herself for the problem. "If I only hadn't nagged him." At around this time, in a defensive move, the gambler goes on the offensive when she accuses him. Verbal assaults are made; he accuses her and she may accept it.

With mounting debts, drained savings and checking account, forged signatures on loans, and bad checks the wife is at wit's end. She calls relatives for help and they accommodate if they can. They come over to the house and make appeals to him. She tries to get others to help her make him quit. He usually doesn't cooperate. She tries to control his gambling by calling his gambling buddies and creditors. She refuses to cook for him and hides valuables. Her relations with others are now severely strained. She feels embarrassed, edgy and isolated. Periodically she cries out her troubles to her friends.

**Table 5. Summary of Data from Lorenz's Study of Wives of Compulsive Gamblers.**

|  | Percent |
|---|---|
| Financial Problems Experienced by the Spouse | |
| Spouse borrowed or signed loans to pay for basic needs | 67 |
| Spouse was harassed by bill collectors | 62 |
| Spouse was threatened by bill collectors | 50 |
| Interactional problems and psychological/physical abuse: | |
| Gambler ridiculed, insulted, embarrassed or belittled the | |
| wife in front of their children and others | 87 |
| Gambler blamed spouse for his gambling | 43 |
| Gambler was physically abusive towards spouse | 11 |
| Spouse got so angry or frustrated with gambler that she | |
| wanted to kill, hurt, or incapacitate him | 82 |
| Spouse physically struck him or threw something at him | 61 |
| Gambler was physically abusive towards children | 6 |
| Spouse acted out against her children verbally | 88 |
| Spouse acted out against her children physically & verbally | 37 |
| Spouse's personal reactions | |
| Spouse threatened to leave the gambler | 89 |
| Spouse left the gambler | 29 |
| Spouse resorted to over or undereating | 75 |
| Spouse overcleaned and/or neglected housework | 76 |
| Spouse slept excessively and/or suffered insomnia | 78 |
| Spouse became a heavy drinker and/or smoker | 50 |
| Spouse attempted suicide | 11 |

**Table 6. Lorenz and Yaffee Data Compared with Data on Hospitalized Females.**

|  | Hospitalized Females | Lorenz & Yaffee |
|---|---|---|
| Illness or Problem | Percent | Percent |
| chronic or severe headache | 5% | 41% |
| bowels problems | 5 | 37 |
| asthma | 3 | 14 |
| depression | 8-20 | 47 |
| suicidal | 1-3% | 14% |
| Problems where no comparative data are available | | |
| feeling faint, dizzy, having cold clammy hands, excessive perspiring | | 27% |
| hypertension, shortness of breath, rapid breathing or other breathing problem | | 23 |
| backaches | | 18% |

Source: Lorenz and Yaffee, 1988.

The last phase of the wife's career is the *exhaustion phase*. At this point her endurance breaks down. Her husband weeps for forgiveness but this is false. He returns to gambling in spite of all promises to quit. Her insomnia gets worse, she may take more tranquilizers or drink more, she has severe headaches and other signs of psychosomatic illness which Lorenz and Yaffee reported on. She thinks she is losing her mind. He badgers her so much she believes it and starts questioning reality. Without help, she is heading for divorce, drug and/or alcohol addiction, a nervous breakdown or suicide. Treatment is another way out.

### Treatment Issues in Counseling Spouses.

Boyd and Bolen reported on spouses in group psychotherapy (1970). They found marriages which were characterized by hostile silence as well as separations and divorce threats. In therapy, there are multiple arguments over petty matters. This reverts to a "blame game" which is designed to prevent fears of abandonment from surfacing, to circumvent desired but terrifying intimacy, and to deny dependency, helplessness and being "one down." Another defense the spouses use in therapy is projection (thinking she knows what he is thinking and projecting personal feelings onto him). As therapy proceeds, the wives experienced depression as the husbands got well. They came to recognize that they were playing the martyr role and scapegoating the husband.

More recently Susan Darvas conducted a study of wives in treatment (1981). She describes two types of wives who come in for treatment: the "Martyr" and "Chicken Little." The martyr protects the gambler and provides him with periodic bailouts. After repeated efforts in this vein she gives up the possibility of "rescuing" him. She enters treatment wondering what she has done wrong. Chicken little, on the other hand, has recently experienced a tremendous disaster and feels "the sky is falling!" She is totally disillusioned about the gambler. The treatment progress is different for each variation on the two themes. Heineman compared treatment of wives of pathological gamblers with wives of alcoholics (1987). She found four major areas of difference: many wives received threatening phone calls from creditors, they had to repay loans they had cosigned or their husband has forged, they had to commence handling the family budget, and loneliness was an issue in treatment

because the husband became a workaholic in an effort to pay off bills. Within treatment, these wives face additional problems. They are financially strapped for funds and may not be able to afford treatment. Secondly, in many areas of the country there is a shortage of Gam-Anon. Finally, there is a scarcity of trained counselors.

### Children of Compulsive Gamblers.

While there is a body of literature on pathological gambling itself, there is relatively little known about the children of compulsive gamblers. What little is known tends to point to serious levels of pathology in the children as well as their parents.

The children of compulsive gamblers are caught in a process which reflects extremes in behavior by their parents. At times the gambler dotes on them, then ignores them. This seesaw relationship has been portrayed in the few accounts of the dynamics of the family of the pathological gambler (Custer & Milt, 1985; Wanda G., 1971). The children respond by feeling angry, hurt, lonely, guilty, abandoned, and rejected. They experience troubled teen years and run away from home, use drugs, become depressed and experience psychosomatic illnesses. Lorenz and Yaffee, in their study of the spouses of pathological gamblers, asked about the psychosomatic illnesses of the children (1988). They did not find any statistically significant differences between the rates of the children and that of the general juvenile population.

Some studies have obtained comparative data which support serious psychosocial maladjustment in the children of pathological gamblers. Jacobs, in a study of California high school students found compulsive gambling in the parents of these students associated with abuse of stimulant drugs, and overeating (1987). They were also more likely to report having an unhappy childhood, having a legal action pending, being depressed and suicidal, and showing other signs of psychosocial maladjustment than children without troubled parents (Jacobs, 1987). In a different study, Lesieur and Klein (1987) found that high school students who reported that their parents had a gambling problem were more likely to have a gambling problem themselves than children who did not report having a parent with a gambling problem.

Lorenz, in a study of spouses of compulsive gamblers, asked these spouses some questions about their

126

relationship with their children. She found that eight percent of the gamblers and 37 percent of the spouses were physically abusive to the children (1981). Since those figures were not compared with national norms, there is no way at present of knowing whether children of compulsive gamblers are more or less likely to be abused than the rest of the population.

Both the Lorenz and Jacobs studies are in need of replication with samples of teenage children of compulsive gamblers.

While we have data on children of compulsive gamblers, there are no data at all on the impact of compulsive gambling on these children when they grow to be adults. Research is sorely needed in this area.

127

# THE WORKPLACE

With the exception of my own research, little systematic study has been done on the pathological gambler in the workplace. In my research, I have described differences between supervised, less supervised and self-employed compulsive gamblers (Lesieur, 1984). The lower the level of supervision on the job, the more likely that the compulsive gambler will exploit the time and finances which the positions grant.

Lateness and absences from work are produced by extended card games and casino ventures; lunch hours are lengthened to accommodate hours at the off-track betting (O.T.B.) parlors; the gambler's mind may not be at work because of heavy losses, indebtedness and intense efforts to get even; irritability, moodiness, and poor concentration on work are added consequences. Many gamble on company time including card playing, betting on numbers, and acting as a runner, writer, or bookmaker for a gambling operation at work. Fellow employees are borrowed from; advances are taken on paychecks; paychecks are garnisheed; and, as a last resort, the employer may steal from work or engage in illegal activities on company time. The exact cost of these activities to employers is not known but appears to be rather extensive. Further research into this is needed.

As part of research conducted for the New York State Office of Mental Health, I surveyed New York members of the Association of Labor-Management Administrators and Consultants on Alcoholism (ALMACA) about their experiences with compulsive gamblers. Out of 86 Employee Assistance Programs (EAPs) and service providers replying to the survey, 64 percent had identified compulsive gamblers. These gamblers represented only 1.4 percent of the total client population (288 out of 20,660 employees seen by these organizations). These figures are low considering the nature of the troubled employee population. There was a serious need for case finding in EAPs. This rate is much lower than one would expect for a troubled population especially now that we know that 10-20% of alcohol and other drug abusers have gambling related problems (Lesieur, Blume & Zoppa, 1986; Lesieur and Heineman, 1988).

Those organizations which had someone attend training conferences on compulsive gambling were more likely to identify compulsive gamblers, indicating that training was raising the level of recognition by these agencies. A majority of the pathological gamblers seen by the New York State ALMACA members were addicted to chemicals as well as gambling.

Several suggestions were made in the New York State report to increase case finding by EAPs. First, the South Oaks Gambling Screen (the SOGS) (see Lesieur & Blume, 1987) should be used on a trial basis in major EAPs. Secondly, some linkage between credit and financial arms of employer and employee organizations and the EAPs of those organizations should be created. Pathological gamblers will use these sources of credit when they are available. Some sort of notification by the credit union and the pension plan to the EAP should be created. In addition, EAPs should receive notifications of wage garnishments. Such a relation could possibly produce individuals who were borrowing heavily as a result of their gambling.

Another possible linkage source could be between the security departments of these same organizations and the EAPs. Some work-related illegal activities are signs of compulsive gambling (see Lesieur, 1987b). Such a connection would involve having the security department notify the EAP when an employee was in trouble.

Employers should be encouraged to experiment with these possible procedures for case finding and outreach to compulsive gamblers.

128

# FINANCES AND CREDIT

The mean gambling-related debt (excluding auto loans, mortgages, and other "legitimate" debt) of individuals in treatment at the JFK treatment center had an average debt of $53,350 (Division of Alcoholism, 1988). Individuals who entered the St. Vincent's treatment clinic in Staten Island had an average debt of $54,662 (Blackman, Simone and Thoms, 1986); that of another was $92,000 (Politzer, *et.al.*, 1985: 138). Female Gamblers Anonymous members have a lower level of debt averaging $14,979 (Lesieur, 1986a).

Using the average debt of the JFK patient, we can estimate the overall indebtedness of compulsive gamblers in New Jersey. Different researchers have found that the average number of years of active gambling by individuals in treatment is approximately twenty years. In other words, the debt averages out to $2,676.50 per year. This does *not* include loans taken out and repaid. If we included paid loans and refinancing the figure would be much higher than this amount. According to the best available estimates, 3.37% of the adult population of New Jersey are probable pathological gamblers (Culleton and Lang, 1984). Since, according to the most recent figures available (1985), there were an estimated 5,700,000 people 18 or over in the state (U.S. Bureau of the Census, 1987), this represents 192,090 people. These people are accumulating an annual addition to their debt of $514,128,885.00! It should be recognized that this is only the debt that they accumulate and does not include the debt they pay off.

Based on a review of the available literature, the following policies by gambling establishments appear to exacerbate the debt of pathological gamblers:

1. Ability to cash a check at the gambling facility.

2. Holding a check for months or allowing gamblers to "buy back" their checks at a later date rather than cashing them right away.

3. Cash machines at the gambling location or within easy walking distance from the casinos.

4. Credit in any form associated with gambling.

5. One time credit checks on the gamblers rather than a periodic review of credit required.

6. Failure to totally review credit when a payment for a marker has "bounced" or is overdue.

7. Loan sharks operating in or near the gambling facility.

8. Drinking in association with gambling. This produces irrational play which increased debt.

Credit is an important factor in New Jersey gambling. According to New Jersey Commission of Investigation on the Abuse and Misuse of Credit Controls at Atlantic City (Lane, *et al.*, 1983), there was $1.453 billion worth of credit issued in 1982. That commission recommended the *repeal of credit*. Knowing that this would be highly unlikely the members recommended alternative measures. Primarily, they recommended a requirement that casinos deposit all counter checks in a bank for payment within fourteen days of the date of the transaction. Connected with this they recommended that the most recent marker be redeemed before old markers. This would, along with the 14-day deadline for counter checks, reduce or eliminate the rolling of markers. In order to reduce the practice of "walking with chips" (leaving a casino with chips and cashing them before paying off debts), they recommended that chip cashers be required to pay markers with the chips being cashed in. This would be done before a player with credit could leave the tables. To fail to do so increases overall debt.

The Commission's wording says much:

The long check-holding time period has also promoted the practice of credit players' rolling over old markers to create the illusion of reliability in order to obtain new 90-day casino loans. Most tragic of the abuses attributable to the check-retention time lapse has been — as evidenced by hearing testimony — its seduction of addicts and other types of problem gamblers who are lulled by easy money and distant pay-up deadlines to literally self destruct at the gaming tables. (p.6)

I would recommend that the State of New Jersey Commission of Investigation recommendations be reaffirmed by the New Jersey Governor's Commission on Gambling. In addition, I would recommend the following:

1. All bank card machines be removed from gambling facilities. The removal of all bank card machines (except at already established branch banks with full banking services) within five blocks (or several hundred yards) of any gambling facility.

2. No check cashing be allowed in any gambling facility.

3. Elimination of free drinks at all gambling facilities.

4. A study to determine how much money is withdrawn from bank card machines in the Atlantic City area, particularly money withdrawn from out-of-town patrons and banks.

# PATHOLOGICAL GAMBLING AND CRIME

Three primary areas link pathological gambling to crime in contemporary society. This occurs when: gambling is a crime, crooked gambling is criminal, and pathological gamblers turn criminal. In the following section, I will demonstrate that these three areas overlap extensively. The data also show that the dividing line between "professional gambler" and "pathological gambler" and between "thieves who gamble" and "gamblers who steal" is not all that clear.

In 1981, there were 41,000 persons arrested in connection with illegal gambling; by 1986 this figure had dropped to 25,839. While much of the research into this looks primarily at organized crime and how much it controls illegal gambling, some studies examine the link between addictive gambling and employment in the illegal gambling industry. Reuter and Rubenstein, in their study of bookmakers and numbers operators in New York City, found that many sports bookmakers are "bettors themselves and regard bookmaking less as a business than as a way to bet with other people's money on more favorable terms" (1982: 57-58). Also, bettors who go into debt often try to meet their obligations by becoming runners for their bookies and later possibly bookmakers themselves (1982: 56). It is not surprising then to learn that bookmakers have trouble with runners and writers who cheat (1982: 66-68). Moreover, Reuter and Rubenstein discovered that profit margins were low and business failures and near failures were high in these operations. I would contend that many of the problems which appear in illegal gambling systems are produced by pathological gambling. In a study of pathological gamblers turned bookmakers, I found that bookmaking is linked to pathological gambling in a way quite similar to the relation between narcotics sales and drug addiction. Just as selling drugs and "ripping and running" is common in the drug world (Agar, 1973), becoming a bookmaker and "screwing the bookie" are a part of life for pathological gamblers (Lesieur, 1984: Chapter V).

Similar patterns appeared in a participant observation study of female line sellers — women who make money illegally in bingo related lotteries called "lines" (Lesieur & Sheley, 1987). One woman, Claire, was constantly in trouble in the bingo hall because she bet with money she took in from her customers. When their lines came in (they won) she was unable to pay. She also owed other line bookies money and was constantly in hot water as a result. While Claire had this problem, we cannot say she was "compelled" to become a line bookie. To her, this was a logical way of making money (in spite of reality which appears to be contradictory) and being in action at the same time.

Cheating at gambling is the second form of overlap between gambling and crime. In any case, while these cheats are technically engaged in illegal behavior and frequently engage in other illegal behavior, they are rarely arrested or imprisoned for cheating. Research I conducted uncovered tremendous overlaps between each of these cheating enterprises and pathological gambling (Lesieur, 1984: Chapter VII).

Like cheats (whom we might call "short con" artists), the world of the confidence man converges with that of the pathological gambler. Unlike most gambling hustlers, however, the confidence man is a professional thief with both feet clearly in the world of illegal life. In his study of the American confidence man, David Maurer recognized that most con men were gamblers who would make a lot of money illegally but would spend the bulk of it gambling (1974:150-155). Indeed, they showed signs of addiction. Maurer says that most con men recognize that they are addicted but feel unable to stop.

> This indulgence of the gambling instincts becomes more than relaxation; their gratification is the only motive which many con men have for grifting (stealing). They win and lose, win and lose, always losing more than they win, until they come away broke and full of reasons why their *systems* didn't work that time (1974: 155).

It appears that many con men would classify as pathological gamblers. In addition to con men, other categories of thieves, hustlers, and streetwise persons have recognized that they were addicted to gambling. There is evidence which points to an interconnection between mounting gambling losses and heightened criminal activity in some mobsters like Joey, the author of *Killer* (1974), and Vincent Theresa. Both Joey and Vinnie Theresa acknowledged that they were themselves "degenerate

131

gamblers'' who moved into a world of crime to pay off bookies and loan sharks and to go to the track. Joey eventually became a hit man for the mob and Theresa became a professional thief, race fixer and money-mover for the mob (Theresa, 1973). Interviews I have had with Gamblers Anonymous members who were once affiliated with organized crime reveal similar stories. In fact, their gambling gave them trouble with the mob because they "embezzled" from their bosses. For one woman I interviewed, this "embezzlement" was the only thing she felt guilty about in her long illegal career.

## PATHOLOGICAL GAMBLERS TURNED CRIMINAL — THE RESEARCH EVIDENCE

Research by clinicians who have treated pathological gamblers typically glosses over crime and either tends to lump all crimes together or fails to differentiate or recognize the wide variety of crime categories implicated in the process. Most notable in this regard are researches by Custer and Custer (1978), and Politzer et al. (1985). Both uncovered arrests, prosecutions and convictions of pathological gamblers for forgery, fraud, embezzlement and income tax evasion. The image one gets from these two studies is of a middle class offender gone wrong.

Studies by Livingston (1974) and myself (1985) uncovered a wide variety of illegal behaviors among compulsive gamblers we interviewed. Livingston found compulsive gamblers involved in check forgery, embezzlement and employee theft, larceny, armed robbery, bookmaking, hustling, running con games and fencing stolen goods. I uncovered these patterns as well and also found gamblers engaged in systematic loan fraud, tax evasion, burglary, pimping, selling drugs and hustling at pool, golf, bowling, cards and dice. From this research, I found that compulsive gamblers are engaged in a spiral of options and involvement wherein legal avenues for funding are utilized until they are closed off. As involvement in gambling intensifies, options for funding become closed. Dependent on personal value systems, legitimate and illegitimate opportunity, perceptions of risk, the existence of threats (for example, loan sharks) and chance, the gamblers became involved in more and more serious illegal activity (1985). For some, the amount of money runs into the millions of dollars.

There are actually very few studies which investigate the pathological gambling and crime connection. Using the term "inveterate gambler," Julian Roebuck found that 157 out of 409 prisoners (38 percent) "spent most of his leisure time at cards, dice, race tracks, lottery games, etc. A considerable amount of this gambler's earnings had to be spent in this activity" (1967: 279). In the Washington, D.C. prison, 56 percent of armed robbers, 14 percent of drug addicts, 100 percent of numbers men, 70 percent of assaultive drinkers, 63 percent of "jack of all trades" offenders (these dabble in everything), 55 percent of burglary-larceny offenders (did both types of crime) and 53 percent of burglars were classified as inveterate gamblers (1967: 115-220). Roebuck's data suggest strong support for a gambling and crime connection. Unfortunately, Roebuck did not examine the files in more detail to find out if the prisoners came into prison as a consequence of their gambling or whether any of the illegal activity the prisoners may have done was attributable to gambling.

A study using different questions than Roebuck and hence with different results was reported by Sewell in a probe of 1,058 inmates at Pentonville Prison in London (Royal College of Psychiatrists, 1977). Sewell found five percent of prisoners gambled heavily (n$56), using "more than their family approved" as the definition. Another five percent (n$54) were classified as compulsive gamblers. An added two percent (n$18) mentioned having a gambling problem in their past. The results were later confirmed by Borrill and Moran (Royal College of Psychiatrists, 1977). As in Roebuck's study, there is no examination of the possibility that gambling somehow created a problem which eventually lead to illegal behavior.

In a study of pathological gambling among prisoners at Yardville and Clinton prisons in New Jersey, prisoners were given a questionnaire which asked them about the extent of their gambling and the nature of problems which might be associated with it (Lesieur & Klein, 1985). Unfortunately, the survey was not randomly conducted but the data are suggestive. Thirty percent of the prisoners who responded to the questionnaire (68 out of 230 at Yardville and 36 out of 118 at Clinton) showed clear signs of pathological gambling. Even if every prisoner who was a pathological gambler in the prison ended up in the

132

survey, *at a minimum* ten percent of the prisoners are pathological gamblers. This is *5 times* higher than the figures for the general population. If the 30% figure is accurate, prisoners are *10-15 times* more likely to be pathological gamblers than the general population of New Jersey. Basically then, the figures used by Greene in the earlier report need to be revised substantially upward. Table 7 indicates the number of prisoners, parolees and probationers who are pathological gamblers using minimum 10 percent and possible 30 percent figures.

Another striking finding from this study was the extent to which prisoners have multiple addictions. Fifty-five percent of the female and 50% of the male pathological gamblers stated they were drug addicts. In addition, 58% of the female and 44% of the male pathological gamblers stated they were alcoholics. Conversely, 40% of the female and 39% of the male drug addicts and 39% of the male and 63% of the female alcoholics showed signs of pathological gambling. Clearly, pathological gambling needs to be recognized and treated among the prison population. In particular, the extremely high rates of multiple addiction need to be addressed.

## PATTERNS OF CRIME IN FOUR DIFFERENT STUDIES

For the past few years, I have been trying to assess how frequent different forms of illegal behavior are among pathological gamblers. This has been done in concert with my contention that "arrest for forgery, fraud, embezzlement and income tax evasion" is too narrow and middle class a focus to use. These offenses exclude larceny, burglary, and other "commonplace crimes" as options which pathological

gamblers use in connection with their problems. It also ignored the presence of gambling system connected crimes such as bookmaking and various forms of hustling and cons which are engaged in by gamblers.

Studies of prisoners (Lesieur and Klein, 1985), alcohol and drug abusing inpatients (Lesieur, Blume and Zoppa, 1985), female members of Gamblers Anonymous (Lesieur, 1987) and a study of Veteran's Administration inpatients and Gamblers Anonymous members (Nora, 1984) provide useful comparative information. In all four studies, the subjects were asked if they had engaged in a range of financially motivated crimes in order to gamble or to pay gambling debts. The specific offenses and the results of the four studies are listed in Table 8.

Pathological gamblers in hospitals, Gamblers Anonymous and prison admitted involvement in a wide range of illegal behaviors in order to finance gambling or to pay gambling debts but there was variation in the types of crimes committed. In addition, the inpatients and male as well as female Gamblers Anonymous members committed civil fraud but the prisoners were less likely to do so. This difference appears to be based on socio-economic differences among the samples as prisoners are more likely to have been unemployed than the inpatients or Gamblers Anonymous members. Other socioeconomic differences appear throughout Table 8. The prisoners were less likely to be involved in embezzlement, tax evasion and tax fraud which are white collar crimes. An exception to this pattern is the greater likelihood of forgery among female prisoners with no significant difference among male prisoners, the hospital and the VA/GA group.

Table 7. Estimates of Number of Pathological Gamblers in Prison, on Parole and on Probation in New Jersey, 1987.

|  | Total | 10 percent estimate | 30 percent estimate |
|---|---|---|---|
| Prisoners | 10,112 | 1,011 | 3,034 |
| Parolees | 16,447 | 1,645 | 4,934 |
| Probationers | 53,000 | 5,300 | 15,900 |

Table 8: Illegal Activities and Civil Fraud Engaged in by Pathological Gamblers in Order to Gamble or Pay Gambling Debts.

Five Samples, 1984-1986.

| TYPE OF ACTIVITY | Hospital Inpatients* n = 40 | VA & GA n = 190 | Male Prisoners n = 68 | Female Prisoners n = 36 | Female GA n = 50 |
|---|---|---|---|---|---|
| Loan Fraud (civil) | 38% | 41% | 13% | 8% | 44% |
| White-Collar Crime | | | | | |
| Check forgery | 30 | 33 | 28 | 56 | 40 |
| Forgery | 18 | 18 | 19 | 36 | 18 |
| Embezzlement and Employee Theft | 28 | 38 | 13 | 22 | 24 |
| Tax Evasion | 10 | 28 | 6 | -12 | |
| Tax Fraud | 13 | 18 | 1 | 3 | 4 |
| Commonplace Crime | | | | | |
| Larceny | 13 | 21 | 22 | 19 | 14 |
| Burglary | 13 | 15 | 47 | 31 | 2 |
| Armed Robbery | — | 4 | 21 | 17 | 2 |
| Pimping | — | 2 | 19 | 11 | 0 |
| Prostitution | 5 | — | 3 | 39 | 10 |
| Selling Drugs | 28 | 9 | 54 | 53 | 0 |
| Fencing Stolen Goods | 23 | 14 | 37 | 42 | 4 |
| Gambling System Connected | | | | | |
| Bookmaking or Working in an Illegal Game | 18 | 23 | 13 | 25 | 26 |
| Hustling at Pool, Golf, Bowling or Other Sport | 23 | 19 | 51 | 50 | 10 |
| Hustling at Cards or Dice | 30 | 21 | 50 | 36 | 6 |
| Run a "con game"; Swindle Suckers | 18 | 9 | 50 | 31 | 12 |
| Engaged in Any of the Illegal Activities Above | 65% | n/a | 97% | 97% | 68% |

n/a = information not available

Sources: Hospital sample — research conducted for study of gambling among alcohol & drug inpatients (Lesieur, Blume & Zoppa, 1986).
Veteran's Administration and Gamblers Anonymous sample (Nora, 1984).
Prison samples of males and females (Lesieur & Klein, 1985).
Female G.A. members (Lesieur, 1987).

Commonplace crimes, which are predominantly working and lower class offenses were more prevalent among the prisoners. With the exception of larceny, all the commonplace crimes were significantly more frequent among prisoners. This includes burglary, robbery, pimping, selling drugs and fencing stolen goods. In addition, the female prisoners admitted to prostitution at a greater rate than the male prisoners and primarily male hospital (38 males out of 40) and VA/GA (185 males out of 190) samples. While this is the case, only 10% of the female G.A. members admitted to any prostitution to finance gambling.

The female G.A. members were less likely to engage in street crimes than people in the other samples. In actuality, they were more likely to fit the stereotype of the white-collar crime offender with the exception that they were also involved in working in illegal gambling operations.

134

At this point we should note that selling drugs was more popular among the prisoners and hospital inpatients than the GA/VA group. A further investigation of this phenomenon revealed that these drug selling prisoners and inpatients were either drugs addicts or drug abusers.

The third cluster of offenses listed in Table 8 is connected with gambling systems. The patterns here are similar to those for commonplace crimes. While bookmaking, writing numbers or working in an illegal gambling setting did not show a consistent pattern, the three forms of hustling were more prevalent among prisoners than the hospital, female GA or VA/GA samples.

## PATHOLOGICAL GAMBLERS AND VIOLENCE

One question which can be raised given the high level of property crime among pathological gamblers is to what extent do they engage in violent behavior? Violence and rage have been associated with gambling in various historical and cross-cultural documents (Lesieur, 1987). Contemporary studies of pathological gambling tend to downplay the violence associated with it. The evidence seems to suggest that pathological gamblers are no more (and possibly less) violent than the general population. There are three areas of violence which have been examined: violence in the home (discussed in the section on the family), suicide attempts (discussed along with depression in the section on psychiatric disorders among pathological gamblers), and violent crime in general.

In the only study to date which examines the hypothesis of nonviolence among pathological gamblers, Brown surveyed 107 Gamblers Anonymous members in England and Scotland and found that 35 of them (33%) had criminal convictions (1987). He examined all of these convictions to find out whether pathological gamblers had patterns of crime which were more similar to alcoholics (with a mix of violence and property offenses) or drug addicts (primarily property offenders). Theft and fraud offenses accounted for 94.3% of all criminal convictions which these members sustained (1987, p.108). An additional 3.65% of convictions were for armed robbery. Fewer than 1% of convictions were for nonproperty violence offenses. Brown concluded that pathological gamblers are primarily nonviolent and their crime patterns are closer to those of heroin addicts than to alcoholics.

135

# PSYCHIATRIC DISORDERS AMONG PATHOLIGICAL GAMBLERS

Recent evidence has revealed that pathological gambling overlaps with other psychiatric disorders. McCormick and colleagues examined rates of major affective disorders and schizophrenia among fifty inpatients at the Brecksville V.A. medical center (1984). Seventy-six percent of the subjects were diagnosed as having major depressive disorder and 38% as having hypomanic disorder [13 patients (26%) met the criteria for both major depression and hypomanic disorder]. Eight percent had manic disorder [3 patients (6%) also met the criteria for major depressive disorder] and one patient (2%) had schizoaffective disorder, depressed type. Only four patients (8%) did not meet the criteria for another disorder.

In a study of twenty-five male Gamblers Anonymous members, Linden and colleagues used different methods but arrived at similar results (1986). Eighteen of their subjects (72%) had experienced at least one major depressive episode. Thirteen (52%) had recurrent major affective episodes. There was a high rate (20%) of panic disorders also. In addition, 12 (52%) met the criteria for alcohol abuse or dependency.

Further evidence that depression is a major problem for pathological gamblers appears in each study which reports on suicide attempts. Moran found one in five of his sample of fifty pathological gamblers had attempted suicide (1970), and Livingston found eight attempted out of fifty-three questioned (1974). Custer and Custer in a survey of Veteran's Administration patients and Gamblers Anonymous members found 24 percent of the 100 VA patients and 18 percent of the 150 GA members attempted suicide (1978). McCormick *et al.* studied fifty hospitalized pathological gamblers and found that 12 percent made a lethal attempt at suicide, another 12 percent made preparations for a serious attempt, 6 percent mentally rehearsed a specific plan or made a suicidal gesture, 18 percent thought of a specific method of suicide, 22 percent frequently thought of suicide but chose no method and 10 percent had occasional thoughts of wishing they were dead (1984: 217). Only 20 percent had no apparent suicidal tendency. To date, no study has been done which examines the extent to which pathological gamblers call suicide hotlines.

In his report, Rickey Greene mentioned that Nevada had high suicide and cirrhosis death rates and a similar thing may happen to New Jersey should it legalize casinos. Data we have at present does not support this contention but they are preliminary. Nevada still has the highest rate of suicide (23.5 per 100,000) and comes in after the District of Columbia in cirrhosis death rates (17.5 per 100,000). New Jersey has the lowest suicide rate in the country (7.6 per 100,000) but ranks fifth in cirrhosis death rates (15.3 per 100,000). New Jersey also had the lowest suicide rate in 1970 and 1980 and ranked fifth in cirrhosis death rates in those years as well. Other factors (most notably a high percent of Catholic residents) account for the low suicide rate. Contrary to expectations, it does not appear that the onset of casino gambling has had an impact on these rates.

The high rates of other psychiatric disorders in both hospitalized and nonhospitalized male pathological gamblers indicates that there is a possibility that some of these individuals have been treated for these disorders prior to the recognition that they had a problem with gambling. Some evidence for this comes from studies of Gamblers Anonymous members. Custer and Custer (1978) surveyed 150 members and revealed that 40% had seen mental health professionals prior to attending. In a study of 186 males and 4 female members, Nora found that 24 percent had seen mental health professionals prior to GA (1985). As part of intensive study of fifty female pathological gamblers I did for the New York State Office of Mental Health, I found that 35 (70%) had been treated by mental health professionals (Lesieur, 1987). Twenty-nine (58%) had been treated by these professionals before or at the time they entered GA. Twelve of the women (24%) mentioned that they had discussed their gambling with their therapist prior to entry into GA. The other 17 (34%) went to therapists prior to GA *without* mentioning gambling at all. Of the fifty women, only 4 (8%) were referred to GA by a therapist.

Several conclusions can be drawn from the above data. First of all, many pathological gamblers are receiving treatment for other disorders. While this is true, they are not surfacing as pathological gamblers in diagnosis by health care providers. There is a need for screening of general psychiatric populations, particularly those with major affective disorders, for pathological gambling. Secondly, in spite of treatment, they are not being referred to Gamblers Anonymous. There is a need to educate mental health

professionals about pathological gambling and Gamblers Anonymous.

While there appears to be clear overlap between pathological gambling and psychiatric disorders, this is not reaching the mental health community. The Mental Health Information System (from the New Jersey Division of Mental Health) identified very few cases of pathological gambling in mental health agencies which report to the Division. As we can see in Table 9, identification is still negligible. We can assume that mental health professionals are either not looking for it or are not reporting these cases to the reporting system. It is possible for some at least that the latter is true as psychiatrists may fear that insurance companies would decide to question billing with that diagnosis.

## MULTIPLE ADDICTIONS

Custer & Custer, in an early study (1978) found that 8% of Gamblers Anonymous members were alcoholic and another 2% were addicted to other drugs. However, using a different screening procedure, 52% of Linden and colleagues' study population of Gamblers Anonymous members evidenced problems with alcohol and/or substance abuse (1986). In my study of fifty female Gamblers Anonymous members, I found that 50% had abused alcohol and/or drugs at some point in their life (Lesieur, 1987). Similar findings emerged for Veteran's Administration hospital samples. Custer and Custer's 1978 study found that only 4% of hospitalized compulsive gamblers were alcoholic and 6% were addicted to other drugs (1978). Later, Ramirez, McCormick, Russo and Taber examined fifty-one consecutive admissions into the same VA Medical Center using systematic screening procedures. All patients were male veterans. Thirty-nine percent met the criteria for alcohol and/or substance abuse in the year prior to admission while 47% met these criteria at some point in their life (1983).

Other addictions also intrude into the lives of pathological gamblers. Adkins, Rugle and Taber (1985) reported on 100 consecutive admissions to the VA Medical Center in Cleveland. They found that 14% could be judged to have heterosexual addictive patterns following the criteria set forth by Carnes (1983). In the study of female pathological gamblers, I pointed out that 24% classified themselves as compulsive overspenders, 20% called themselves compulsive overeaters, and 12% were possibly sexually addicted (1987).

Recent research and theorizing has begun to concentrate on communalities and overlaps among addictive disorders (Jacobs, 1986; Levinson, et al., 1983; Orford, 1985; Peele, 1985). Some researchers have found common personality traits (Blaszczynski, et al., 1985) and criminal behavior patterns (Brown, 1987) which pathological gamblers and heroin addicts share. Jacobs found what he has called common dissociative states among compulsive gamblers, compulsive overeaters and alcoholics (Jacobs, in press). Others have conducted personality research on pathological gamblers and noted the similarities of their findings to those done with alcoholics and other substance abusers (Graham & Lowenfeld, 1986; Taber, et al., 1986).

Some research has been done on substance abusing populations to find out the extent to which those people have problems with pathological gambling. In a study of 70 alcoholics, Haberman found that 17 percent admitted to "gambling difficulties" (1969:164). According to treatment professionals at Danbury Federal Correctional Facility, 18 out of the 100 prisoners in their alcohol unit were directed to Gamblers Anonymous because of collateral gambling problems (personal communication with treatment team, 1984). A study of 458 alcoholism and drug dependency inpatients found 40 (9 percent) were diagnosed as pathological gamblers and an additional 47 (10 percent) showed signs of problem-

| Table 9: Mental Health Information System Data on Pathological Gamblers | | | | |
|---|---|---|---|---|
| | 1984 | 1985 | 1986 | 1987 |
| Total admissions | 87661 | 91029 | 76611 | 81653 |
| Cases Identified (DSM 312.31) | 15 | 27 | 10 | 29 |
| Percent of Total | 0.02% | 0.03% | 0.01% | 0.04% |

atic gambling (Lesieur, Blume and Zoppa, 1986). They also found that 5 percent of patients abusing only alcohol, 12 percent of those with alcohol and another drug in combination, and 18 percent of those with other drug abuse problems without an alcohol component showed clear signs of pathological gambling.

To aid in the screening process, the South Oaks Gambling Screen was developed to help identify patients with a problem with gambling (Lesieur & Blume, 1987). This screen is a valid, reliable instrument which has been found to be a useful adjunct in the assessment of alcohol and substance abusing patients. Using the South Oaks Gambling Screen (the SOGS) 100 multiple substance abusing residents of two interconnected therapeutic communities were screened for gambling related problems by Lesieur and Heineman (in press). Out of 86 male and 14 female residents tested, 14 were diagnosed as pathological gamblers and an additional 14 showed signs of problematic gambling. This screening device is currently being used to assess alcohol and substance abusing patients at five pilot sites in New Jersey. To date, rates of pathological gambling ranging from 8 to 25% have been uncovered.

Further research is needed on the overlapping social worlds of the substance abusing gambler and the gambling substance abuser. Current evidence suggests that multiple addiction may place pathological gamblers in greater risk of incarceration (Lesieur, 1987). In addition, substance dependent patients who are also pathological gamblers have higher rates of stress related diseases and serious psychiatric problems including suicide attempts (Ciarrocchi, 1987).

Substance abusing patients diagnosed as pathological gamblers are being treated for that simultaneously with their treatment for substance abuse. Facilities which treat alcohol and substance dependent patients are easily transferring their treatment paradigm to the treatment of poly-addicted gamblers (Blume, 1986; Moravec, 1978). Evaluations of these programs show some success (Russo, *et al.*, 1984) and others are currently underway.

Since there is already a link between substance abuse and pathological gambling, conferences on multiple addictions should be used for the purpose of attracting those already treating addictions. This should be in addition to training sessions devoted to pathological gambling alone.

I would recommend a formal system of cooperation be institutionalized between the Division of Alcoholism, the Division of Substance Abuse Services, and the Division of Mental Health and Hospitals in New Jersey.

While there appears to be clear overlap between pathological gambling, alcohol and substance abuse, this is just beginning to reach the treatment community. The Alcoholism Management Information System identifies very few cases of pathological gambling. As we can see in Table 10, while the number increased from 1983 to 1984, it has appeared to stabilize. The identification is considerably less than one would expect from studies done to date. We can assume that alcoholism professionals are either not looking for it or are not reporting these cases to the reporting system.

| Table 10. Data on Pathological Gamblers from the Alcoholism Management Information System. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 9 mos. |
| Total admissions | | | | | | | | 45,745 |
| Cases Identified | 60 | 84 | 96 | 87 | 179 | 230 | 164 | 192 |
| Percent of total | 0.2 | 0.3 | 0.4 | 0.3 | 0.6 | 0.6 | 0.4 | 0.5 |
| Referrals to G.A. | | | | | 181 | 193 | 141 | 160 |
| Percent of Total | | | | | 0.5 | 0.6 | 0.3 | 0.5 |

# GAMBLING AMONG HIGH SCHOOL STUDENTS

Eleventh and twelfth grade students from four predominantly middle class high schools in New Jersey were surveyed (Lesieur and Klein, 1987). There were 892 students studied.

## GAMBLING BY THE STUDENTS

Ninety-one percent of the students surveyed have gambled at least once in their lifetimes. Eighty-six percent stated they had gambled in the last year and 31.8 percent stated they gambled on something at least once a week within the past year. The most popular form of gambling among New Jersey high school students is card playing for money. Cards are followed by casino gambling in student interest.

Fully 46 percent claim to have gambled in casinos with 3.4 percent doing so weekly. Sports betting is a third. Lotteries and numbers betting were a close fourth in popularity. Almost 45 percent play the numbers or bet on lotteries and almost 13 percent do this weekly. Bowling, shooting pool, playing golf or some other game of skill came in fifth while wagers on horses, dogs or other animals came in sixth with twenty-nine percent betting on them in the year the survey was conducted. Five percent did this weekly. Bingo games were frequented by 18 percent of the students. One and a half percent go weekly. Dice games came in last in popularity. More complete data are presented in Table 11.

| Table 11: Type of Gambling Done by New Jersey High School Students | | |
|---|---|---|
| Type of Gambling | Percent in the last year | Percent gambling every week |
| card playing for money | 49% | 6% |
| casino gambling | 46 | 3 |
| sports betting | 46 | 17 |
| lotteries or numbers | 45 | 13 |
| bowling, shooting pool, or other games of skill for money | 42 | 11 |
| horses, dogs or other animals | 29 | 5 |
| bingo | 18 | 2 |
| dice games | 18 | 3 |
| Gambled in the last year (total) | 86% | 32% |
| Source: survey of 892 students in four schools in New Jersey | | |

139

## PARENTS AND GAMBLING

Just as most of the students gamble, most parents do not object to the gambling their children do. This approval is evidenced in the claim by 53 percent of the students that they have gambled with their parents. Twenty-four percent of the parents object to the gambling among this sample of students. In spite of this, 22 percent of the students whose parents object gamble weekly. Several clues to parental disapproval of gambling are provided by survey answers. These are summarized in Table 12. Most striking for our purposes are arguments with parents over gambling, the use of lunch money to gamble with, and stealing money from someone they live with in order to gamble.

## GAMBLING, JOBS AND SCHOOL

While most of these students develop no problems at school or on the job connected with their gambling, 5 percent mentioned cutting classes to gamble and 4 percent evidenced job related problems as a result of their gambling. Almost two and a half percent declared they "borrowed" money from work without their boss knowing. One percent each said they changed a job so they could gamble more, lost time from work due to gambling, and lost a job due to gambling related problems. Overall, gambling interfered with schooling and/or jobs for over 6 percent of the high school students surveyed. These data are summarized in Table 13.

## GAMBLING AND BORROWING

Fully forty-six percent of the students surveyed mention some form of borrowing in connection with gambling. Twenty-five percent borrow from their parents, 20 percent from friends, 16 percent from siblings, 5 percent from other relatives, one percent claim to have borrowed from loan sharks, 2.4 percent "borrowed" from work without their boss knowing and only three of the 892 students admitted to loans from banks or loan companies. More than 5 percent have borrowed from three or more different types of sources of money for gambling. Measured in another way, 6 percent said they had "gone to someone to relieve a desperate financial situation produced by gambling." When combined, 9 percent of the students have either gone to someone to relieve a desperate financial situation produced by gambling and/or have borrowed from three or more different sources.

A further exacerbation of the financial situation is evidenced in the answer to the question: "Have you ever failed to pay someone money you owed as a result of your gambling?" Six percent said they had.

---

**Table 12: Parents and Gambling Among New Jersey High School Students.**

Have gambled with parents ................................................................. 54%
Parents object to their gambling ............................................................ 24%

Signs of family disruption:

Gamble weekly and parents object ........................................................... 5%
Arguments with parents over gambling ...................................................... 4%
Sneak bets over phone or sneak out to gamble .............................................. 5%
Hide signs of gambling ..................................................................... 6%
Use lunch money for gambling ............................................................... 14%
Steal from someone they live with and use it for gambling .................................. 2%
"Gambling harms relations with my family" .................................................. 4%
At least one of the above .................................................................. 34%
"My father or mother gambles too much." .................................................... 5.4%

Source: survey of 892 students in four schools in New Jersey

---

---

### Table 13: Gambling, Jobs and School Problems Among New Jersey High School Students

Gamble with people at work  . . . . . . . . . . 28%

Gambling related problems at work & school:

Changed a job so could gamble more  . .  1%

Lost time from work due to gambling  . .  1%

Lost a job due to gambling . . . . . . . . . . .  1%

"Borrowed" money from work without boss knowing and used the money to gamble . . . . . . . . . . . . . . . . . . . . . . . . .  2%

Total job related problems  . . . . . . . . . . . .  4%

"Gambling caused me to cut classes"  . . .  5% (note how this question was worded)

Total job and/or school interference  . . . . .  6%

Source: survey of 892 students in four schools in New Jersey

---

### Table 14: Gambling and Borrowing by New Jersey High School Students

Who borrowed from:

Parents  . . . . . . . . . . . . . . . . . . . . . . . . . . . 25%
Friends  . . . . . . . . . . . . . . . . . . . . . . . . . . . 20%
Brothers or sisters  . . . . . . . . . . . . . . . . . . 16%
Other relatives  . . . . . . . . . . . . . . . . . . . . .  5%
From work (embezzled)  . . . . . . . . . . . . .  2%
Loan sharks  . . . . . . . . . . . . . . . . . . . . . . .  1%
Banks or loan companies . . . . . . . (3 students)
BAILOUT  . . . . . . . . . . . . . . . . . . . . . . . . . . 6%
Default on debts due to gambling  . . . . . . 6%

Amount of money owed at present:

Owe no money at all due to gambling . . 90%
Owe $10 or less . . . . . . . . . . . . . . . . . . . . . 5%
Owe more than $10  . . . . . . . . . . . . . . . . . 5%
Owe $100 or more . . . . . . . . . . . . . . . . . 1.5%

Source: survey of 892 students in four schools in New Jersey

---

In spite of this, the vast majority of students (90 percent) claimed to owe no money at all due to gambling. Five percent claim to owe more than ten dollars and one and one-half percent say they owe one hundred dollars or more. These data are summarized in Table 14.

### GETTING MONEY TO GAMBLE — LEGITIMATELY AND OTHERWISE

While traditional routes of funding are used for gambling, illegal avenues are utilized as well. Five percent of the students claimed to use money from drugs sales to gamble with; two percent stated they steal money from someone they live with; almost three percent shoplift for the gambling money; four percent steal in other ways one; and a half percent work for bookmakers, numbers writers, sell football pool tickets or are otherwise involved in the illegal gambling industry; three and a half percent put down that they "do other illegal things." In all, 10% claim to have used some illegal means to finance gambling. These data are summarized in Table 15.

---

### Table 15: Sources of Money — Legal and Otherwise by New Jersey High School Students

Use allowance money  . . . . . . . . . . . . . . . 33%
Use lunch money  . . . . . . . . . . . . . . . . . . . 14%
Use money from a job  . . . . . . . . . . . . . . . 29%
Use gambling winnings  . . . . . . . . . . . . . . 15%

Illegal sources:

sell drugs . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%
steal from someone they live with  . . . . . . 2%
shoplift  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3%
steal in other ways . . . . . . . . . . . . . . . . . . . 4%
work for bookmakers, numbers writers
    sell football tickets  . . . . . . . . . . . . . . . . 1%
"do other illegal things"  . . . . . . . . . . . . . 3%
Do something illegal to get
    gambling money  . . . . . . . . . . . . . . . . . 10%

Source: survey of 892 students in four schools in New Jersey

---

141

Whether they stole, sold drugs, or did other crimes to pay for gambling or whether gambling was just one way of spending illegally obtained money was not determined in this survey. There is sufficient evidence from scholarly research into pathological gambling to provide the link between it and criminal activity (Lesieur, 1984).

Our data indicate that numerous students in New Jersey are potential pathological gamblers. At the very least, they exhibit signs of pathological gambling. Using an earlier version of the South Oaks Gambling Screen, Robert Klein and I found that at least five percent of the students are probable pathological gamblers. Whether this is a sign of youthful trouble which will decline as they take on responsibilities of work and home is uncertain. More research is needed on this issue.

## STUDENTS AND ATLANTIC CITY

With the rise of Atlantic City, a new fascination with gambling has possibly arisen among New Jersey students. More high school students have gambled in the state in the past year than recorded for the adult population in the United States in 1974. At that time, 60 percent of the people had gambled. Taking middle class Catholics as a base (which is probably more comparable for our purposes), this rises to 74-80 percent participation (Commission, 1976:59). The New Jersey high school students surveyed show more than 86 percent involvement.

The students' fascination with the glitter and glamour of the casinos is revealed in their overall impressions of Atlantic City. Almost 47 percent of the students questioned said they have a positive or very positive impression of Atlantic City. Only 6 percent hold a negative or very negative impression of the city. It is not a wonder that 13 percent said they used a fake I.D. to get into a casino. Twenty-six percent said that they had asked for or accepted a free drink in one of the casinos. Figures on the attractiveness of casinos to minors are available from the Casino Control Commission and are presented in Table 16.

| Table 16. Casino Control Commission Data on Minors. | | |
|---|---|---|
| | 1986 | 1987 (only 11 months) |
| Prevented from entering the casinos | 172,413 | 184,947 |
| Escorted from the casino | 34,292 | 31,602 |

## "THE BIG PROBLEM HERE IS DRUGS"

One of the more disturbing elements of this research was the refusal on the part of numerous students to recognize that there are any gambling related problems in their school. At the end of the questionnaire, an open ended statement was made requesting written comments on the study. Some students wrote in that "X high school doesn't have a gambling problem, you should do a drug survey." This is the public perception and it is accepted by the students. Unlike drug or alcohol use, gambling is still perceived to be adventurous and anyone who raises the spectrum of abusive or pathological gambling is perceived to be a spoilsport or a weirdo. This is partially because pathological gambling is not visible to the eye as are drug addiction and alcoholism. If a student is inattentive because of drugs or alcohol, this is easily detected. If the same student is inattentive because he or she is worried about paying a debt, making a pick for a basketball game or is too tired because of a casino visit the night before, this is attributed to something else — perhaps "sowing wild oats." In addition, raising the image of pathological gambling poses a threat to teachers, parents and others who gamble, some of whom are pathological gamblers themselves. This is evidenced in the belief by 5.4 percent of the students that one or both of their parents "gamble too much." It is possible that these parents are pathological gamblers.

An educational program is definitely needed for the students of New Jersey high schools. An amazing 5 percent of the students voice a desire to stop gambling but feel they cannot. Should they desire to stop

142

with the help of others, they may have problems. For example, only 70 percent had heard of Gamblers Anonymous and 12 percent had heard of New Jersey's toll free number 800-GAMBLER. While the probable pathological gambling students are more likely to have heard of the phone number (28 percent have), should the others believe that they want to stop gambling but feel that they are unable to stop, they are not adequately informed of the possibilities for relieving their problems.

143

# GAMBLING AMONG COLLEGE STUDENTS

Other than an unpublished study by the author (partially reported on in Lesieur, 1988) and another by Michael Frank, there are no studies of gambling by college students. College students are used in studies of risk taking, locus of control and other areas of psychology which involve gambling but not directly relevant to the study of pathological gambling.

As part of the field trials of the South Oaks Gambling Screen (the SOGS), a study of pathological gambling among 384 college students was conducted by the author. In that study over 5 percent of the college students scored in the "at risk" (probable pathological gamblers) range for the SOGS. This represented 9 percent of the male and 2 percent of the female students. In addition 9 percent said that their father had a gambling problem and 1 percent said their mother had a gambling problem. The survey was done in the New York City environment where race tracks, off-track betting, the numbers, lottery, bingo and Las Vegas Nights are legal.

For the past three years, Michael Frank has conducted a study of Stockton State College students. Stockton State is just outside of Atlantic City and a large number of students work in the casino industry. Data for 1985 and 1986 were available at the time of this study (Frank & Cashmere, 1987). In 1985, 304 students were surveyed; in 1986 there were 148 students tested. The figures for gambling for each year are presented in Table 17. Almost *two-thirds* of the students who gambled were *under age*. They, like their high school counterparts, reveal the inadequate age controls in the casinos. In spite of the hundreds of thousands who are denied entry and ejected (even if there are obviously many repeat actors) under age people are still gambling. These students have their favorite games and are likely to gamble with less than $50 but 7-8% gambled with $100 or more on each occasion.

Most distressingly, 8 percent showed clear signs of pathological gambling. Although the samples are not strictly comparable, this rate is higher than among New York students and higher than for the high school students. Quite possibly, the State of New Jersey is putting its future "at risk." Immediate steps need to be taken to follow these students longitudinally.

Another step which should be taken includes the incorporation of pathological gambling education and treatment within student assistance programs and university counseling centers. Additionally, since so many students work in the casino industry, future studies should find out if employees of the industry are particularly at risk.

| Table 17. Gambling by Stockton State College Students. | | |
|---|---|---|
| **Recency of wagering** | 1985 | 1986 |
| Gambled within last 12 months | 73% | 78% |
| Gambled within last 6 months | 51 | 56 |
| Gambled within last month | 26 | 19 |
| Favorite Casino Game (Gamblers only) | | |
| Slots | 51% | 64% |
| Blackjack | 34 | 22 |
| Roulette | 9 | 11 |
| Dollar amount wagered (Gamblers only) | | |
| Less than $50 | 71% | 77% |
| $50-100 | 22 | 15 |
| More than $100 | 7 | 8 |
| Probable pathological gamblers | | 8% |
| Source: Frank & Cashmere, 1987 | | |

144

# THE FEMALE PATHOLOGICAL GAMBLER

Knowledge about the female pathological gambler is just beginning to surface. In 1986 I conducted a study of fifty women for New York State's Office of Mental Health (Lesieur, 1987). The subjects of that study came from Gamblers Anonymous. A summary of the major findings and recommendations (with New Jersey used instead of New York) follows:

1. Like in New York, the female pathological gambler is underrepresented in hotline calls, treatment, and in Gamblers Anonymous in New Jersey. Serious outreach efforts are needed to serve this underserved population.

2. An advertising campaign directed at female gamblers and their spouses is needed in New Jersey. The campaign should use female as well as male voices and should concentrate on radio announcements as the preferred form of advertisement. The females interviewed felt that this would be the most effective way of informing women about the existence of available services.

3. Seventy percent of these women have seen mental health professionals; 58 percent prior to or at the time of GA entry. Only four of the women were referred to GA by therapists. The implications of the study for outreach are evident. There is a serious need to educate mental health professionals about the nature of pathological gambling. Many of these professionals have contact with compulsive gamblers yet are not sensitized to the problem. In particular, they need to think of this as a possibility when they are counseling female as well as male clients. Meetings of state organizations of psychologists, psychiatrists, social workers, alcoholism and addictions counselors and others need to be addressed in a systematic fashion. I would recommend that this would be done by the Council on Compulsive Gambling of New Jersey as the only viable organization which could do this.

4. Given the high number of poly-addicted females (50% were alcohol and/or other drug abusers) special effort should be made to educate members of organizations like Alcoholics Anonymous Narcotics Anonymous, Cocaine Anonymous and Overeaters Anonymous. In addition, special efforts should be made to encourage existing alcohol and substance abuse treatment facilities to screen their clients for a gambling problem. This could be done in connection with the education of mental health professionals. Consonant with this, I would suggest that a high priority be given to establishing a cooperative conference series among the Division of Alcoholism, the Division of Substance Abuse Services and the Division of Mental Health and Hospitals. This should be in addition to training sessions devoted to pathological gambling alone.

5. A systematic campaign needs to be waged which will place educational materials in the following locations across the state: Legalized gambling agents: bingo halls, lottery ticket agents, casinos, and race tracks. In addition, because a large percent of female gamblers worked in these industries, employees of these organizations should be targeted for educational efforts.

   Civil court — an educational pamphlet is needed which addresses the possibility that financial problems may be a consequence of compulsive gambling.

   Utilities — given that many of the female gamblers went to the utilities in person to pay their bills (on the day the gas, electric, etc. would have been shut off), it would be useful to have signs and educational pamphlets placed at these locations. Alternatively, these pamphlets could be sent to individuals who are late in paying their bills.

   Banks, finance companies, and credit unions — pamphlets should be available which concentration on credit and checking account problems, how they can result from excessive gambling, and where individuals can go for help.

   Buses, limousines, and other free transportation to Atlantic City — given that women favor casino games for their addictive gambling, advertisements and pamphlets should be placed in locations where individuals going to Atlantic City would be most likely to see them.

6. Lawyers and others connected with the civil and

145

criminal courts need to be educated to be aware that some of the clients they have are coming to them as a consequence of a gambling problem.

7. Cooperation with other states is needed. Many out of state residents are coming into New Jersey to gamble in Atlantic City. Education of the residents of these states about compulsive gambling is needed. This could take the form of encouraging a greater amount of advertising and free pamphlets at toll booths and rest areas of the Garden State Parkway, New Jersey Turnpike, and the Atlantic City Expressway. With this in mind, personnel from the National Council on Compulsive Gambling and the New York State Office of Mental Health, (which oversee programs for New York State), the Pennsylvania Council on Compulsive Gambling, the Delaware Council on Gambling Problems, the Maryland Council on Compulsive Gambling, and the Connecticut Council on Compulsive Gambling should network with individuals at the Council on Compulsive Gambling of New Jersey and the New Jersey Division of Alcoholism (who are in charge of their compulsive gambling programs) to see what can be done about this issue. New Jersey is a beneficiary of taxes from out of state residents yet is partially responsible for problems of a regional nature and should be in the forefront for the creation of regional and federal efforts to cope with the problem.

146

# TREATMENT OF PATHOLOGICAL GAMBLERS

Most treatment plans for pathological gamblers utilize a combination of group and individual therapy, lectures, films, and self-help groups. The personnel usually include psychiatrists, psychologists, certified alcoholism counselors with added training for counseling pathological gamblers and peer counselors who run workshops. Family counseling as well as coordination with employee assistance programs often round out the holistic approach to therapy these programs provide.

Evaluations of the treatment of pathological gambling are relatively new. Most existing evaluations have been of individualistic style therapies and have been done on limited samples. Seven published studies include only one case (Goorney, 1968; Fitchett and Sanford, 1976; Rankin, 1982; Bannister, 1977; Cotler, 1971; Dickerson and Weeks, 1979; Victor and Krug, 1967) and two include three cases (Barker and Miller, 1968; Moskowitz, 1980). Aside from Victor and Krug's use of "paradoxical intentions," and Moscowitz's use of lithium carbonate, these studies used various forms of behavior modification procedure including aversive conditioning and desensitization.

Other evaluations of individualistic therapy have used small to moderate samples. Greenberg and Marks (1982) used desensitization on seven patients. Three of the seven had reduced their gambling at a six-month follow-up. Seager (1970) who utilized aversive conditioning reported that five of the fourteen patients were free of gambling for one to three years following treatment while another appeared to have his gambling under control. Greenberg and Rankin (1982) reported on 26 men treated with various behavioral techniques with five having their gambling under control, seven lapsing intermittently and the other fourteen still gambling when seen between nine months and 4 and 1/2 years after treatment. McConaghy *et al.* (1983) compared ten treated using an aversive technique with ten treated using imagined desensitization. The imagined desensitization fared better with two abstaining and five having their gambling under control (defined as gambling less than $10 per week and without financial hardship). In contrast, aversion produced two controlled gamblers and no abstainers. Using psychoanalysis, Edmund Bergler saw 200 referrals (1958). Eighty were "serious patients" and 60 remained in treatment. According to Bergler 45 were cured and 15 experienced symptom removal.

Only two studies have been done which have evaluated group oriented treatment programs. Russo *et al.* (1984) conducted a follow up of 124 patients who went through a Veteran's Administration medical center program that uses group and individual psychotherapy along with Gamblers Anonymous as an adjunct. Sixty of the 124 replied to a mailed questionnaire. Thirty-three (55 percent of the respondents) reported being completely abstinent for at least one year since discharge. Another 13 (22 percent) reported some gambling but were abstinent for at least the month prior to the survey completion. Overall, 54 (92 percent) reported less gambling than before. For those who gambled, financial status, depression and interpersonal relationships were worse than those who did not gamble. Attendance in Gamblers Anonymous was highly correlated with success as was professional follow-up treatment. Thirty out of the 31 who attended Gamblers Anonymous in the 30 days prior to the survey reported no gambling.

Brown (1985), in a study of 232 people who attended Gamblers Anonymous in Scotland, reported an 8 percent total abstinence rate on a one-year follow-up. This dropped only slightly (to 7 percent) after a two-year follow-up. Twelve percent who ever attended were still attending two years later. Attenders were more likely to be married than non-attenders.

Three studies are currently underway. These are evaluations of treatment at Taylor Manor Hospital in Ellicott City, Maryland, South Oaks Hospital in Amityville, New York and the state funded treatment programs in New York State.

## THE NEW JERSEY EXPERIENCE

Perhaps the major treatment resource which the State of New Jersey has are Gamblers Anonymous and Gam-Anon. There are 44 different Gamblers Anonymous meetings held in the state. Seven of these meetings are held in prisons and thirty-seven outside. In addition there are thirty-five meetings of Gam-Anon. There are also meetings in Pennsylvania and New York which New Jersey compulsive gamblers attend on a regular basis. Two areas of the state have few meetings: the northwestern and southern counties.

There are currently two hotlines 800-GAMBLER and 800-USA-REACH which act as referral agents for treatment. In addition, there are currently ten treatment facilities involved in the treatment of pathological gamblers. They range in their experience from extensive to just beginning. They are:

J.F.K. Medical Center, Edison, New Jersey
RAFT
New Hope Foundation, Marlboro
Hampton Hospital
Veteran's Administration Medical Center, Lyons, New Jersey
Maryville
New Beginnings, Lakehurst
The Harbor
Carrier Foundation
Seabrook House
Bergen County Network Adolescent Rehabilitation

Two other facilities have Gamblers Anonymous meetings at their facility: Straight and Narrow Alcoholism Services and Bergen Pines County Hospital. A crisis intervention center has just opened in Atlantic City at Atlantic Mental Health.

The JFK Medical Center is an outpatient facility which receives funding from the State of New Jersey through the Division of Alcoholism. The Division monitors the program and maintains statistics on their population.

At JFK patients receive individual and marital outpatient treatment. According to Dr. Michael Leffand they do not hold group therapy sessions as they believe this would duplicate what is happening in G.A. They cooperate with Gamblers Anonymous and Gam-Anon and one meeting a week of each is held at the facility. In addition to trained therapists they have a peer counselor who helps in liaison with Gamblers Anonymous and does crisis intervention with clients where needed. The JFK center has a limited capacity for handling 30 patients at any one time. In 1987 there were 933 individual and marital sessions held. This represented a 50% increase over 1986.

Dr. Leffand commented that there is a serious need for state funded treatment services to compulsive gamblers in the northern and southern sections of the state. Two other needs include the need for publicity for treatment in addition to Gamblers Anonymous. Additional funding would be used for that purpose and for hiring a second peer counselor. A female peer counselor is needed.

The Veteran's Administration Medical Center in Lyons has just initiated an inpatient treatment program for compulsive gamblers. This facility follows an alcoholism and "Brecksville" model (for a description of that model see Russo, *et al.*, 1984). Like the JFK program they have a G.A. and Gam-Anon meeting held on the premises. Unlike that program, most of the compulsive gamblers being treated are also addicted to alcohol or other drugs. According to Dr. Rena Nora, out of 70 inpatient alcohol and substance abusers in treatment at any one time, 18-20% are also compulsive gamblers. Additionally, they have one or two "pure gamblers" (not dually addicted) in treatment at any one time.

New Hope in Marlboro (Monmouth County) has also just initiated an inpatient treatment program for pathological gamblers. In cooperation with the Council on Compulsive Gambling of New Jersey and the Division of Alcoholism they provided a field test for the South Oaks Gambling Screen (the SOGS) in New Jersey. According to Sheila Wexler, director of the adult unit, 25% of their alcohol and substance abusing clients have a gambling problem. In response to this figure, New Hope developed an inpatient treatment program for the treatment of compulsive gamblers. At present they have G.A. speakers come in twice a cycle (28 day period); there are two G.A. volunteers who run a weekly G.A. group and patients go to outside G.A. meetings once a week. In addition, there are specialized gambling groups run by therapists; patients see a specialized gambling counselor at least once a week; family counseling is specific to gambling; and there is specialized financial counseling where a G.A. volunteer conducts a "pressure group" with a staff member also in attendance. To round off this program, gambling is integrated into all lectures and the film "You Bet Your Life" is shown to all alcohol and other drug abuse patients. The program is new but shows promise of being a model for alcohol and drug treatment facilities to follow in the state.

Seabrook House in Seabrook (Cumberland County) has also field tested the SOGS. From June,

1987 to January, 1988 they tested 158 individuals. Seventy-four percent had no problem, 22% were abusive gamblers (scored from 1 to 4 on the SOGS — see Lesieur and Blume, 1987) and 4% were clearly pathological gamblers. Given these preliminary results they have started to include treatment for pathological gambling in their alcoholism treatment program. Patients are given Gamblers Anonymous literature as well as literature from Hazelden Educational Materials on compulsive gambling. The risk of transferring addictions is addressed to those who score in the problem range. There is a lecture on compulsive gambling while they are in the facility and it becomes an issue in aftercare. Seabrook's major problem is the lack of a local Gamblers Anonymous chapter. The closest meetings are 25 miles away (Woodbury and Cherry Hill) and 45 miles away (Atlantic City). According to Jim Hoffman, a counselor who treats many of the compulsive gamblers, they are planning to initiate a G.A. meeting at the facility in a month or two.

The Maryville treatment center in Williamstown (Gloucester County) has also field tested the SOGS, this time with a greater percentage of patients with a gambling problem. Out of 116 clients tested, 22% received a score of 5 or more (i.e. in the pathological gambling range). I was unable to determine the extent of gambling specific counseling given to the patients at the facility. Jerry Washcoe, the treatment coordinator, said that one problem they confront is the lack of G.A. meetings in the area. They are 20 miles from Philadelphia and 55 miles from the Atlantic City meetings. He said they were thinking of possibly starting a G.A. meeting at the treatment center.

At the RAFT treatment center in East Orange also field tested the SOGS. From their testing, according to Deborah Malory who is supervising this, they are averaging about 8 to 10% of their clients with critical scores in the pathological range. At present they provide no gambling specific treatment yet have a lecture on transferring addictions and multiple addictions.

Hampton Hospital in Rancocas (Burlington County) is a 43 bed facility where a C.A.C. (certified alcoholism counselor) screens incoming patients by asking the G.A. 20 questions. At present they have five patients in the adult alcoholism treatment and two in the psychiatric unit who are compulsive gamblers. According to Joanne Ciurlino, a counselor and head of the adolescent unit, there is a gambling lecture given to the patients, gambling is an issue which is addressed in treatment and there is a Gamblers Anonymous step meeting held at the facility. It has 13 regular members who come in from the outside. The compulsive gamblers attend this meeting and go to an outside meeting in their last week at the facility in order to make contacts with possible sponsors. One thing which Ms. Ciurlino mentioned in her conversation to me is the need for halfway houses for compulsive gamblers. Many need this type of transition in lieu of or following their stay at an inpatient treatment center.

New Beginnings at Lakehurst, New Jersey is currently screening their patients using the DIS (diagnostic interview schedule) but no other screening. According to Charlie Ward, a director, "10 percent average would be high" as a count of the percentage of their clients who are compulsive gamblers. New Beginnings provides no gambling specific treatment but has a peer counselor who is in G.A.

Carrier Foundation in Belle Mead (Somerset County) has just started screening their patients and have contracted with Robert Klein to provide counseling to the compulsive gamblers they uncover. According to Brad Evans at Carrier they have an open G.A. meeting at the facility which is available to inpatients with other problems. They are working on getting a Gam-Anon meeting initiated.

Bergen County Network Adolescent Rehabilitation in Rockleigh (Bergen County) has a general form of screening at intake but patients are screened more intensively once they get into conferences with their counselor. As this is a long term stay facility, Gamblers Anonymous members come once every few months. According to Vivian Potolsky, C.A.C., they hope to have a G.A. meeting at the facility in the near future.

The Harbor in Hoboken (Hudson County) screens patients for a problem with compulsive gambling at intake. According to John Clancy approximately 20 percent of their alcoholism patients either are compulsive gamblers or have a potential problem with gambling. While they have no ongoing program for compulsive gambling their staff has been trained to

149

deal with problems unique to this population. One lecture a cycle (each 28 days) is devoted to compulsive gambling. Those patients who are compulsive gamblers attend outside Gamblers Anonymous meetings once or twice a week. The Harbor has offered and continues to offer a free bed to needy compulsive gamblers. According to Tom Graham, who used to be the project manager for the compulsive gambling programs at the Division of Alcoholism and is now at The Harbor, they will probably be extending more attention to pathological gambling in the future. One problem they face is that The Harbor is not a psychiatric hospital and therefore cannot receive insurance coverage for pathological gambling.

The most recent addition to outreach and treatment is Atlantic Mental Health in Atlantic City. They have just received a $20,000 grant from the Council on Compulsive Gambling of New Jersey to conduct crisis intervention and referral in Atlantic City. They have a center one block from the Boardwalk at 13 North Hartford Avenue. According to Mary Hunt at AMH they will provide a full range of casework services primarily geared to connecting individuals to available social services. They will work in close collaboration with the 800-GAMBLER hotline to help deal with calls which come from the Atlantic City area. As the program is just getting off the ground and caseworkers are being trained, now is an ideal time for input into evaluation efforts at this facility.

In sum, the situation in New Jersey has improved substantially compared with 1978. While this is so, there are still areas of the state where there is no readily available treatment for pathological gambling. This is particularly true in northwestern and southern portions of the state.

150

# SOCIAL SERVICE AGENCIES AND THE PATHOLOGICAL GAMBLER

To date only one study has been done which questioned representatives from social service agencies in order to determine if pathological gambling is a problem among their clients (Grodsky & Kogan, 1985). In their survey of forty agencies in New York City, Grodsky and Kogan found that compulsive gambling is a hidden problem which is not systematically uncovered by agency personnel. Clients rarely mention it as a problem with the exception of wives of male compulsive gamblers who occasionally discuss it. Grodsky and Kogan suggested that agency personnel keep statistics on gambling and gambling related problems. While their study was done in 1974 for the U.S. Gambling Commission, no follow-up has been conducted.

In spite of the association of pathological gambling with unemployment and financial difficulties we still do not know whether and to what extent it is placing a burden on welfare and unemployment services in the state of New Jersey. A study of the clients of these agencies needs to be conducted.

## ATLANTIC CITY AGENCIES

In his report, Rickey Greene mentioned Traveler's Assistance at the Salvation Army in Atlantic City. A phone call to Barbara Siracusa at the Salvation Army revealed that in a six month period in 1984 their traveler's assistance program had helped 981 people (an average of 163 per month). At that time, those who missed their bus at a casino were told "go to the Salvation Army and you'll get a bus ticket." This put a tremendous strain on their services. After going to the United Way with this problem, it appears that the casinos took on the responsibility of helping stranded travelers. The number of stranded travelers which the Salvation Army is now helping has been reduced to approximately 65 per month. These people are divided between people who get mugged, those whose car breaks down, those who are separated from friends and those who lost their money in

casinos. The latter category accounts for around 20 percent of their programming.

Ironically, the improvement in services by the casinos can be a minor "bailout" to the compulsive gambler. Previously, the Salvation Army called the closest relative of the traveler. While they were not equipped to counsel them over the phone, this process alerted these relatives to the problem.

I would like to recommend that casinos be mandated to utilize a "voucher" system for their stranded travelers. Those individuals who are stranded would be required to go to a crisis intervention center for counseling in order to receive a voucher for the bus ticket. A similar voucher system could be used for those who exceed or otherwise abuse credit limits.

Another Atlantic City agency which services casino related clients is the Atlantic City Rescue Mission. According to Bill Southrey, the chaplain of the mission, the number of indigent men has increased since he came to the mission seven years ago. At that time approximately 40 people were seen per day; presently that figure has risen to 130 per day. In one month between 400 and 450 different individuals come to them for help. There are a total of 2,400-2,600 separate individuals per year. About 30 percent of these are attracted to the city by prospects of jobs but start from a low economic base; another 15 percent come for the gambling but lose their money and are stranded. In all, 60-70 percent have addictive problems. They were interested in using different screening instruments as the figures chaplain Southrey gave me were based on impressions.

> RECOMMENDATION: all social service agencies in the state and in the Atlantic City area in particular should be instructed in screening of pathological gamblers.

# SOCIAL RESPONSIBILITY AND THE GAMING INDUSTRY

An attempt was made to measure the extent to which the gaming industry has confronted its social responsibility with respect to the pathological gambler. With this in mind, an effort was made to find out how much money different segments of the industry was giving to efforts which state a claim to aiding the interests of the pathological gambler. Individuals (usually public relations personnel) from the Racing Commission, the Sports and Exposition Authority, the Casino Control Commission, the Atlantic City Casino Association and the Lottery Commission were interviewed in order to determine the extent to which they help the pathological gambler.

The contribution of the industry to the problem is minor by any standards. Even the largest contributor, the Lottery Commission gave $75,000 per year for research into the biological causes of pathological gambling. This represents 0.0068% of gross sales (using 1987 figures), 0.1% of operational and promotional expenses (including amounts which went to the businesses which sell the lottery tickets but excluding prize money and money returned to the state for education and institutions), or 0.68% of forfeited prizes (using 1986 figures which were sent to me). The net result of this effort (which lasted for three years for a cost of $225,000) has been four professional publications to date and extensive public relations benefits. Each of the publications I have seen (Goldstein, *et al.*, 1985; Carlton, *et al.*, 1987; Carlton & Goldstein, 1987; Carlton & Goldstein, 1988) involved very small samples (8 to 14 compulsive gamblers in each with 8 to 16 controls) but I was told by Peter Carlton that approximately fifty compulsive gamblers have been involved at some stage of the research. There is another publication being prepared based on a comparison of 15 alcoholics, 15 pathological gamblers and 15 controls. Carlton states that it has been hard to attract subjects to the research as Rutgers does not have a treatment base. They proposed developing such a base but the Lottery Commission turned them down. In the latter part of 1987 and in 1988, the Lottery Commission will have contributed nothing to addressing the problem.

The Racing Commission contributed nothing but the New Jersey Sports and Exposition Authority which runs the Meadowlands has set up posters there

with a toll-free hotline number to call. The hotline number is 800-USA-REACH. This is manned by masters degree health care professionals at Fair Oaks Hospital from 9 a.m. to midnight during the week and noon to 9 p.m. on weekends. Counselors provide assessment and counseling and make referrals to treatment facilities or Gamblers Anonymous. In addition two free in-person assessments are made with gamblers or family members. Because of lack of an aggressive outreach effort, however, the number of people reached to date has been small (there were 188 calls in an eight month period; 105 of these appear to have been directly gambling related). It appears that many of the calls they have received have come as a result of TV and other mass media publicity about the program. There are only two signs at each level of the Meadowlands. In addition, the signs point to "compulsive gambling" and not the more generic "gambling problem." It is a fact of life that people are more willing to admit that they have family, occupational, or financial troubles because of gambling than admit they are compulsive gamblers. A more general approach would probably produce more calls.

While the Sports and Exposition Authority should be commended for this direct effort at outreach, the $35,000 (plus $10,000 various portions of the racing industry gave to the New Jersey Council on Compulsive Gambling or $45,000 in all) represents 0.0038% of total track handle for the state, 0.019% of total operating expenses (takeout minus money returned to the state of New Jersey), and 1.73% of out tickets (uncashed tickets). This is increased to 3.45% if we consider that 50% of out-ticket moneys are returned to the state and go into general revenue.

The Sports and Exposition Authority approach illustrates the dilemma of the gaming industry. They are caught between being accused of doing nothing for the problem and encouraging lawsuits and a loss of clientele should they acknowledge that racing may be a contributing factor to compulsive gambling. While I was not able to find out about lawsuits, one thing is certain. There has been an *increase* in business since the signs went up at the Meadowlands. This is primarily a result of simulcasting. The potential danger of the signs (at least in terms of loss of clientele) has not materialized.

A call to the Casino Control Commission revealed that they had not done anything for the compulsive gambler. The Atlantic City Casino Association was also not doing anything for the compulsive gambler. Upon query, David Gardner at the Casino Association told me that three casinos had put up signs and one had put notices in its brochure. If we are generous and place a $1,000 value on these signs and notices, and add to it the $4,600 various casinos gave to the Council on Compulsive Gambling of New Jersey, the total ($5,600) represents 0.000031% of the drop in 1987 and 0.0002% of total operating expenses ("win" minus funds earmarked for the state). For the casinos to "match" the small amount allocated by the lottery commission in 1987 would require at least $1,228,484 if we use gross handle and $2,297,578 if we used "win" minus money returned to the state. The data for the three major industries are included in Table 18.

While readers of this report might quibble with how the percentages were calculated, it would not be exaggerating to say that for any of the three, the amount of money presently allocated to the problem of pathological gambling by the industry is miniscule when compared with the problem which exists. Whether this should be addressed through further state funding or some other mechanism is a matter for the legislature to decide.

On the other hand, as far as I could determine, the gaming industry in New Jersey has contributed more than the industry in any other state including the Ohio State Lottery which funded an epidemiological survey of pathological gambling among the general population in Ohio.

---

**Table 18. Contributions of the Gaming Industry to the Problem of Pathological Gambling (1987).**

As Percent of Total Handle

| | |
|---|---|
| Lottery | $75,000/$1,100,000,000 = 0.0068% (0.0% in 1988) |
| Racing | 45,000/$1,194,760,375 = 0.0038% |
| Casinos | $5,6000/$18,065,940,000 = 0.000031% |

As Percent of Operating Expenses After Money Returned to Public and Money Given to the State are Taken into Account

| | |
|---|---|
| Lottery | $75,000/$74,800,000 = 0.1% (0.0% in 1988) |
| Racing | $45,000/$231,524,963 = 0.019% |
| Casinos | $5,600/$2,297,578,000 = 0.0002% |

As Percent of Uncashed Lottery and Race Track Tickets (minus money returned to the state)

| | |
|---|---|
| Lottery | $75,000/$10,992,054 = 0.68% (0.0% in 1988) |
| Racing | $45,000/$1,303,389 = 3.45% |

# THE STATE OF NEW JERSEY'S RESPONSE

Table 19 shows the money received from gambling to the state treasury, whether from dedicated funds or into the general fund.

In the same year, the state saw right to "earmark" money from the casinos to senior citizens and from the lottery to education and state institutions. No money was earmarked for the compulsive gambler. The money for pathological gamblers came out of general revenues. This is depicted in Table 20.

---

### Table 19: Money Received from Gambling into the New Jersey State Treasury.

| Industry | Amount Received |
|---|---|
| Casinos: | $198,101,004 |
| Lottery: | 465,300,000 (information from Lottery Commission brochure) |
| Racing: | 5,960,719 |
| out tickets | 1,303,389 |
| Total | $670,665,112 |

---

The $437,000 total represents 0.065% of the $670,665,112 that went to the state from the gaming industry. 7.1% of the state's total budget comes from gambling yet only 0.0046% goes to help the compulsive gambler. Even if the Commission recommends that an Office on Compulsive Gambling receives

$500,000 this will represent only 0.075% of the money from gambling that went to the state (0.0053% of the total state budget).

---

### Table 20. Money for Pathological Gambler Programs which Came from the State of New Jersey, 1987.

$275,000 to the CCGNJ from the health budget

  92,000 to the CCGNJ from appropriations

  70,000 to JFK Medical Center for treatment

$437,000 total

---

In the section on finances and debt, it was noted that on an annual basis, compulsive gamblers in New Jersey accumulate over $514 million in debt. If we think of these losses as a gambling tax, almost single-handedly the compulsive gambler is paying the gambling taxes for the state. Indeed, these compulsive gamblers pay an inordinate share of gambling related taxes, far greater than the 3.4 percent of the population which they represent. I would recommend that *at least* 3.4% of the money from gambling revenues go to the education, treatment and research into compulsive gambling. If only 3.37% of that money went to education, treatment and research into pathological gambling, this would represent $22,601,414.27. In other words, the present budget would have to be increased by 52 times in order to represent a just budget.

# RECOMMENDATIONS

While many of the recommendation in the Greene report have come to pass, much treatment, education, research, and outreach are still needed. We still do not know the total cost of pathological gambling to the State of New Jersey due to lack of data. Greene recommended that fund for this effort be gotten from Title XX, the general revenues or the gambling industry. These matters are still in flux. There is a need for continued funding of the existing programs. Since 3.4% of New Jersey residents are compulsive gamblers according to the best estimates (it should be emphasized that this estimate does not include spouses, children and others impacted by the compulsive gambler), it would not be unreasonable to recommend that 3.4% of gambling revenues be targeted for treatment, education, outreach and research into compulsive gambling. This would represent over $22.6 million, not the extremely small amount of $500,000 the legislature is currently considering.

## TREATMENT AND COUNSELING NEEDED

Since the Greene report, two inpatient programs for compulsive gamblers have been established (New Hope and the Lyons VA Medical Center), a crisis intervention center has been established in Atlantic City (Atlantic Mental Health), and a study in cooperation with the Department of Corrections was done which established the need for treatment of prisoners. I would recommend the following:

1. Specific populations need to be addressed. In particular, it appears that many pathological gamblers can be treated by focusing on the inmate population of the state. Given that many of these individuals are Black and Hispanic, the racial bias of present treatment efforts would be somewhat offset through this process. The Department of Corrections should be encouraged to open up Gamblers Anonymous meetings in all the correctional facilities in the state (there are seven such meetings presently).

2. There is a need for screening of probation and parole caseloads for pathological gambling. In connection with probation, a pre-trial intervention program is needed.

3. There is a need for trial screening of general psychiatric populations, particularly those with major affective disorders, for pathological gambling.

4. Programs which address multiple addictions need to be targeted for screening and incorporation of treatment for compulsive gamblers within their existing structure. This is being attempted by several facilities due largely to the efforts of the Council on Compulsive Gambling of New Jersey and the Division of Alcoholism. This should be encouraged through further funding of these efforts.

5. Treatment and outreach needs to be done with special populations. Women in particular need to be targeted for outreach in order to increase their representation in treatment.

6. Alcoholism and substance abuse treatment facilities which service large numbers of Black and Hispanic patients should be targeted for education and pilot projects in treating pathological gamblers.

7. Although a crisis intervention center has been established in Atlantic City, crisis intervention centers (such as at Atlantic Mental Health or through the 800-USAREACH hotline) are needed in connection with each race track as well.

8. Several halfway houses for pathological gamblers are needed in the state. In particular, a halfway house is needed in the Atlantic City area. In addition, halfway houses are needed where pathological gamblers can go after a period of inpatient treatment.

9. Employee Assistance Programs at casinos and racetracks need to be alerted to the problem of pathological gambling among their employees.

## EDUCATION AND TRAINING

Rickey Greene's major recommendation was for the establishment of a Council on Compulsive Gambling of New Jersey. This has happened. Much of the education and outreach he recommended is being done by this valuable organization. The following activities should be targeted by the Council.

1. There is a need to educate mental health professionals about pathological gambling and Gamblers Anonymous. This should be done through a committee which would specifically

155

target all organizations of mental health professionals in the state for training sessions at their annual meetings.

2. Certified alcoholism and substance abuse counselors should be targeted for training to become certified compulsive gambling counselors.

3. Criminal justice personnel, particularly probation, parole and correctional officials should be targeted for specific education.

4. There is a need to educate teachers and students about gambling problems and the problems of children of compulsive gamblers. Education about pathological gambling needs to become a part of the curriculum in every school in the state. In particular, a certain percent (starting with at least one percent) of the money which the Lottery Commission provides to education should be targeted for education about pathological gambling. At least as much money should be spent on education of the dangers of gambling as is spent on attracting people to gamble.

5. Employee Assistance Programs should be targeted for special training institutes.

6. Student assistance counselors in high schools and colleges need to be educated about pathological gambling among the students and their parents.

## OUTREACH TO THE COMPULSIVE GAMBLER

The Council on Compulsive Gambling of New Jersey has been quite successful in reaching the media. These efforts should be commended. More focused outreach is needed in the following areas:

1. Females need to be targeted more extensively. In particular, ads and media presentations should have female voices and representation.

2. Blacks and Hispanics need to be targeted more extensively. Ads and media presentations should have Blacks and Hispanics in them. In addition, promotion of treatment should be done in Spanish. This should be done wherever there are Spanish speaking counselors who have been trained to treat compulsive gamblers.

3. Information on pathological gambling needs to be provided to:

   a. all existing suicide hotlines in the state.

   b. all alcohol and substance abuse treatment professionals and facilities.

   c. all mental health treatment professionals in the state.

   d. all educators in the state

4. Visible information on the 800-GAMBLER hotline needs to be posted at all gambling outlets including:

   lottery ticket agents
   casinos
   games of chance events
   racetracks
   bingo halls
   buses going to and from Atlantic City
      and race tracks.

5. The following locations which interact with troubled gamblers frequently should be targeted for information and pamphlets:

   civil courts
   criminal courts
   utilities (where c.g.s pay their bills
      at the last minute)
   banks, finance companies and credit unions

6. Information on the 800-GAMBLER hotline needs to be printed on all of the following:

   race track tickets
   racetrack programs
   lottery tickets
   *all* gambling machines (including lottery, slots, poker, blackjack, etc.)
   *all* brochures advertising or describing any gambling game
   *all* newspapers, magazines or other media presentations (on the same page or at the same time where odds on sporting events, winning lottery numbers, or race track information are posted.
   signs announcing gambling related events including bus trips to Atlantic City

156

7. No advertising for gambling should be allowed without some warning about the dangers of pathological gambling.

## RESEARCH NEEDED:

While the amount of research into pathological gambling has increased (Greene used 33 different citations compared with 118 in this report), the number of articles and books is still fairly low in this field when compared with alcoholism. Most studies still rely on comparatively small sample sizes, are with Gamblers Anonymous or treatment samples, and are in need of replication. There are still no longitudinal studies. I would recommend that the Commission recommend the funding of the following research:

1. A general population survey to find out the impact of each form of gambling on the rate of pathological gambling in New Jersey. This can be done in two stages:

   a. contract with Robert Culleton and Rachel Volberg to re-examine the surveys they have already conducted in order to find out what forms of gambling the pathological gamblers they found were addicted to.

   b. contract with Rachel Volberg to expand her National Institutes of Mental Health funded project to answer this and other questions listed below. Given the rate of pathological gambling in the Delaware Valley (3.5%), a large survey would be required to find out this information.

2. Find out what percent of pathological gamblers started gambling heavily on legalized forms of gambling in order to assess the contribution of legalized gambling on the rate of pathological gambling in New Jersey.

3. Find out which regions of New Jersey have higher rates of pathological gamblers in order to be able to direct the delivery of services to the most needed areas.

4. We need to find out the extent to which pathological gamblers utilize social service agencies like welfare, soup kitchens, missions, unemployment offices, and crisis centers. Once this is done, specific agencies could be targeted for educational and other purposes.

5. Research is needed on the rate of pathological gambling among probationers and parolees. Since it appears that the rate of pathological gamblers among the prison population is close to ten times the rate in the general population, it is logical to suspect that the same is true for probationers and parolees.

6. Research is needed on the extent to which pathological gamblers contribute to the state's crime rate.

7. Given the overlap between pathological gambling and alcohol and drug abuse, it is imperative that we find out the extent to which pathological gamblers account for crime which people assume is drug and alcohol connected.

8. Further research is needed into the nature of multiple addictions. What is the impact of alcoholism on the pathological gambler? What is the impact of cocaine or other drug abuse on the pathological gambler?

9. We need to find out whether and to what extent pathological gamblers utilize suicide and other crisis hotlines.

10. We need to find out to what extent psychiatric patients have problems with pathological gambling. A pilot project should be funded which would determine whether and to what extent pathological gambling is going unnoticed in existing treatment of psychiatric disorders.

11. Further research is needed into the interconnection between pathological gambling and physical illnesses, particularly stress related illnesses. To what extent do pathological gamblers have a higher health care cost and death rate than the general population?

12. Research should be funded to assess the impact of pathological gambling on the work setting. Additional research is needed to find out how to increase referrals by Employee Assistance Programs to centers for the treatment of pathological gamblers. In particular, given the high rate of

157

pathological gambling among casino workers (five percent of all 800-GAMBLER hotline calls), these workers should be targeted for the first studies.

13. A study of high school students in lower income areas of the state to find out if they are at greater risk of problematic gambling than students in middle income areas.

14. Research is needed to find out the extent to which pathological gambling by parents and siblings affects elementary school, junior and senior high school, and college students.

15. Research to find out the extent of knowledge about pathological gambling held by guidance and other educational counselors.

16. Research to evaluate different forms of treatment for pathological gambling. All treatment efforts should have an evaluation component built in.

17. A research team consisting of scientists from multiple disciplines should be created which would have as its mandate the following tasks:

    a. coordination of research into pathological gambling in the state.

    b. address the research agenda set out in this report as well as formulate a research agenda for the future.

    c. generate and evaluate research proposals for possible funding by private and governmental sources.

## GAMING LAW ENFORCEMENT

1. The exceedingly high figures of the number of teenagers refused entry into the casinos (almost 200,000 in 1987) and ejected from the casinos (over 30,000) as well as the high school study of the number of high school students who are gambling leads to the conclusion that actual enforcement needs to be increased.

2. Given the high number of high school students who gambled on the lottery (45 percent with 13 percent playing weekly), officials need to study

the feasibility of field tests of enforcement by lottery ticket agents. Action should be taken against those agents found to be selling lottery tickets to minors.

## CREDIT

The recommendations of the State of New Jersey Commission on Investigation on the abuse and misuse of credit controls at Atlantic City casinos should be reaffirmed by the Governor's Commission. In addition, the commission should recommend the following:

1. All bank card machines be removed from gambling facilities. The removal of all bank card machines (except at already established branch banks with full banking services) within five blocks (or several hundred yards) of any gambling facility.

2. No check cashing be allowed in any gambling facility.

3. Elimination of free drinks at all gambling facilities.

4. A study to determine how much money is withdrawn from bank card machines in the Atlantic City area, particularly money withdrawn from out-of-town patrons and banks.

## NEED FOR MULTI-STATE EFFORTS

1. Given that 13,201,000 people came into Atlantic City by bus last year, this must translate into a massive interstate operation, and given the recent push for a multi-state lottery, and given that some forms of gambling are currently regulated by the federal government already (e.g. the securities industry). . .

2. I would propose that a multi-state commission be established to monitor and study the impact of gambling on interstate commerce.

3. It is possible that New Jersey is creating problems for neighboring states. It reaps the tax benefits of casino gambling in particular and can export many of the problems. Anyone who attends Gamblers Anonymous in southern New York,

158

eastern Pennsylvania, Delaware and Maryland in particular quickly finds out that many of the members developed gambling problems in Atlantic City.

4. It is probable that there are reciprocal problems as well. Many New Jersey residents have been attracted to New York's OTB and race tracks.

5. Given the great extent of interstate commerce involved, the Governor's Commission should recommend that New Jersey's Senators and Congressional Representatives sponsor a bill which would call for a National Commission on Compulsive Gambling. This would to be created to follow up on the 1974 Commission on the Review of the National Policy Towards Gambling. Since that time, the gross (legal) handle has risen over 950% from $17.4 billion to $166.47 billion.

159

# References

Abrahamson, M. & Wright, J.N. (1977) *Gambling in Connecticut*. Storrs, CT: Connecticut State Commission on Special Revenues.

Adkins, B.J., Rugle, L.J. & Taber, J.I. (1985). *A note on sexual addiction among compulsive gamblers*. Paper presented at the First National Conference on Gambling Behavior of the National Council on Compulsive Gambling, New York (November).

Agar, M. (1973). *Ripping and running: Formal ethnograph of urban heroin addicts*. New York: Academic Press.

American Psychiatric Association (1980) *Diagnostic and statistical manual, third edition*. Washington, D.C.: Author.

American Psychiatric Association (1987) *Diagnostic and statistical manual, third edition, revised*. Washington, D.C.: Author.

Anderson, G. & Brown, R.I.F. (1987). Some applications of reversal theory to the explanations of gambling and gambling addictions. *Journal of Gambling Behavior, 3*, 179-189.

Bannister, G. (1977). Cognitive and behavior therapy in a case of compulsive gambling. *Cognitive Therapy and Research*, 1, 223-227.

Barker, J.C. & Miller, M. (1968). Aversion therapy for compulsive gambling. *Journal of Nervous and Mental Disease*, 146, 285-302.

Bergler, E. (1958). *The psychology of gambling*. New York: International Universities Press.

Bergler, E. (1969). The gambler: A misunderstood neurotic. In E. Bergler (Ed.) *Selected papers of Edmund Bergler*. New York: Grune & Stratton.

Blackman, S., Simone, R. & Thoms, D. (1986) Letter to the editor: Treatment of gamblers. *Hospital and Community Psychiatry, 37*, 404.

Blaszczynski, A.P. (1985). Pathological gambling: An illness or myth. In J.McMillen (Ed.) *Gambling in the 80s*. Proceedings of the inaugural conference of the National Association for Gambling Studies (NAGS), Brisbane.

Blaszczynski, A.P., Buhrich, N. & McConaghy, N. (1985). Pathological gamblers, heroin addicts and controls compared on the E.P.Q. 'addiction scale.' *British Journal of Addiction, 80*, 315-319.

Blaszczynski, A.P., Winter, S.W. & McConaghy, N. (1986). Plasma endorphin levels in pathological gambling. *Journal of Gambling Behavior, 2*, 3-14.

Blume, S.B. (1986). Treatment for the addictions: Alcoholism, drug dependence and compulsive gambling in a psychiatric setting. *Journal of Substance Abuse Treatment, 3*, 131-133.

Brown, R.I.F. (1987). Models of gambling and gambling addiction as perceptual filters. *Journal of Gambling Behavior, 3*, 224-236.

Brown, R.I.F. (1987). Pathological gambling and associated patterns of crime: Comparisons with alcohol and other drug addictions. *Journal of Gambling Behavior, 3*, 98-114.

Brown, R.I.F. (1985). The effectiveness of Gamblers Anonymous. In Eadington (ed.) *The gambling studies: Proceedings of the sixth national conference on gambling and risk taking*. Reno, Nevada: Bureau of Business and Economic Research, University of Nevada, Reno.

Browne, B. (1987). *Going on tilt: Frequent poker players and control*. Paper presented at the Seventh International Conference on Gambling and Risk Taking, Reno, Nevada (August).

Carlton, P.L. & Goldstein, L. (1987). Physiological determinants of pathological gambling. In T. Galski (Ed.) *Handbook on pathological gambling*. (Pp. 111-122). Springfield, IL: Charles C. Thomas Pub.

Carlton, P.L. & Goldstein, L. (1988). Physiological factors as determinants of pathological gambling. *Journal of Gambling Behavior, 3*, 274-285.

Carlton, P.L., Manowitz, P., McBride, H., Nora, R., Swartzburg, M. & Goldstein, L. (1987). Attention deficit disorder and pathological gambling. *Journal of Clinical Psychiatry, 48*, 487-488.

Carnes, P. (1983). *The sexual addiction*. Minneapolis: Comp Care.

Ciarrocchi, J. (1987) Severity of impairment in dually addicted gamblers. *Journal of Gambling Behavior, 3*, 16-26.

Commission on the Review of the National Policy Toward Gambling (1976). *Gambling in america*. Washington, D.C.: U.S. Government Printing Office.

Cotler, S.B. (1971). The use of different behavioral techniques in treating a case of compulsive gambling. *Behavior Therapy*, 2, 579-584.

Council on Compulsive Gambling of New Jersey (1988). *1987 — Monthly activity report*. Trenton, NJ: Author.

Council on Compulsive Gambling of New Jersey (1987). *1986 — Monthly activity report*. Trenton, NJ: Author.

Council on Compulsive Gambling of New Jersey (1986). *1985 — Monthly activity report*. Trenton, NJ: Author.

Culleton, R.P. (1985). *A survey of pathological gamblers in the State of Ohio*. Philadelphia: Transition Planning Associates.

Culleton R.P. & Lang, M.H. (1985) *Supplementary report on the prevalence rate of pathological gambling in the Delaware Valley in 1984*. Camden, NJ: Rutgers/Camden Forum for Policy Research and Public Service.

Culleton R.P. & Lang, M.H. (1984) *The prevalence rate of pathological gambling in the Delaware Valley in 1984*. Camden, NJ: Rutgers/Camden Forum for Policy Research and Public Service.

Custer, R.L. (1982). An overview of compulsive gambling. In P.A. Carone, S.F. Yoles, S.N. Kiefer and L. Krinsky (Eds.) *Addictive disorders update: alcoholism, drug abuse, Gambling*. New York: Human Sciences Press.

Custer, R.L. & Custer, L.F. (1978) *Characteristics of the recovering compulsive gambler: A survey of 150 members of Gamblers Anonymous*. Paper presented at the Fourth Annual Conference on Gambling, Reno, Nevada (December).

Custer, R.L. with Milt, H. (1985) *When luck runs out*. New York: Facts on File Publications.

Dickerson, M.G. (1979). FI schedules and persistence at gambling in the UK betting office. *Journal of Applied Behavioral Analysis, 12*, 315-323.

Dickerson, M.G. (1984). *Compulsive gamblers*. London: Longman. Dickerson, M. & Weeks, D. (1979). Controlled gambling as a therapeutic technique for compulsive gamblers. *Journal of Behavior Therapy and Experimental Psychiatry*. 10, 139-141.

Fitchett, S.M. & Sandford, D.A. (1976). Treatment for habitual gambling. In Krumboltz & Thoresen (eds.) *Counseling Methods*. New York: Holt, Rinehart & Winston.

Frank, M.L. & Cashmere, C. (1987). *Youth: Casino gambling and college students*. Paper presented at the Fifth Annual State-wide Conference on Compulsive Gambling of the Council on Compulsive Gambling of New Jersey, Asbury Park, New Jersey, (September).

Goldstein, L., Manowitz, P, Nora, R., Swartzburg, M. & Carlton, P.L. (1985). Differential EEG activation and pathological gambling. *Biological Psychiatry, 20*, 1232-1234.

Goorney, A.B. (1968). Treatment of a compulsive horse race gambler by aversion therapy. *British Journal of Psychiatry*, 114, 329-333.

Graham, J.R. & Lowenfeld, B.H. (1986). Personality dimensions of the pathological gambler. *Journal of Gambling Behavior, 2*, 58-66.

Greenberg, D. & Rankin, H. (1982). Compulsive gamblers in treatment. *British Journal of Psychiatry*, 140, 364-366.

Greenberg, D. & Marks, I. (1982). Behavioral psychotherapy of uncommon referrals. *British Journal of Psychiatry*, 141, 148-153.

Greene, R. (1979). *A preliminary study on compulsive gambling in New Jersey*. New Jersey Department of Health, Alcohol, Narcotic and Drug Abuse Unit, Trenton.

Grodsky, P.B. & Kogan, L.S. (1985). Does the client have a gambling problem? *Journal of Gambling Behavior, 1*, 51-58.

Haberman, P.W. (1969) Drinking and other self-indulgences: Complements or counter-attractions? *The International Journal of the Addictions, 4*, 157-167.

Halliday, J. & Fuller, P. (Eds.) (1974). *The psychology of gambling*. New York: Harper & Row.

Hayano, D. (1982). *Poker faces: The life and work of professional card players*. Berkeley: University of California Press.

Ingram, R. (1985). Transactional script theory applied to the pathological gambler. *Journal of Gambling Behavior, 1*, 89-96.

Ingram-Smith, N. (1967). Alcoholic rehabilitation centre of the West London Mission. *British Journal of the Addictions, 62*, 295-305.

Jacobs, D.F. (1988). Behavioral aspects of gambling: Evidence for a common dissociative-like reaction among addicts. *Journal of Gambling Behavior, 4*, (in press).

Jacobs, D.F. (1987). *Effects on children of parental excesses in gambling*. Paper presented at the 7th International Conference on Gambling and Risk Taking, Reno, Nevada, August.

Jacobs, D.F. (1986). *Early identification and prevention of health-threatening behaviors in adolescents*. Paper presented at the 21st International Congress of Applied Psychology, Jerusalem, Israel.

Jacobs, D.F. (1986). A general theory of addictions: A new theoretical model. *Journal of Gambling Behavior, 2*, 15-31.

Kallick, M., Suits,D., Dielman, T. & Hybels, J. (1979). *A survey of gambling attitudes and behavior*. Ann Arbor, MI: Institute for Social Research.

Kuley, N.B. & Jacobs, D.F. (1988). The relationship between dissociative-like experiences and sensation seeking among social and problem gamblers. *Journal of Gambling Behavior, 4*, (in press).

Ladouceur, R. & Mireault, C. (in press). Gambling behaviors among high school students in the Quebec area. *Journal of Gambling Behavior, 4*.
Lane, A.S., Patterson, H.S., Del Tufo, R.J. & Greenberg, W.S. (1983) *Report of the New Jersey Commission of Investigation on the abuse and misuse of credit controls at Atlantic City casinos*. Trenton: Commission of Investigation.

Laventhol & Horwath (1986). *The effect of legalized gambling on the citizens of Connecticut*. Author: mimeo.

Lesieur, H.R. (1979) The compulsive gambler's spiral of options and involvement. *Psychiatry: Journal for the Study of Interpersonal Processes, 42*, 79-87.

Lesieur, H.R. (1984) *The chase: Career of the compulsive gambler*. Cambridge, MA: Schenkman Books.

Lesieur, H.R. (1987). *The female pathological gambler*. Paper presented at the 7th International Conference on Gambling and Risk Taking, Reno, Nevada (August).

Lesieur, H.R. (1987). Gambling, pathological gambling and crime. In T. Galski (ed.) *Handbook on pathological gambling*. (Pp. 89-110). Springfield, IL: Charles C. Thomas Pub.

Lesieur, H.R. (1987a) Deviance in sport: The case of pathological gambling. *Arena Review, 11*, 5-11.

Lesieur, H.R. (1988). Altering the DSM-III criteria for pathological gambling. *Journal of Gambling Behavior, 4*, (in press).

162

Lesieur, H.R. & Blume, S. (1987) The South Oaks Gambling Screen (The SOGS): A new instrument for the identification of pathological gamblers. *American Journal of Psychiatry 144*, 1184-1188.

Lesieur, H.R., Blume, S.B. & Zoppa, R.M. (1985). Alcoholism, drug abuse, and gambling. *Alcoholism: Clinical and Experimental Research, 10*, 33-38.

Lesieur, H.R. & Klein, R. (1987). Pathological gambling among high school students. *Addictive Behaviors, 12*, 129-135.

Lesieur, H.R. & Klein, R. (1985) *Prisoners, gambling and crime*. Paper presented at the Annual Meetings of the Academy of Criminal Justice Sciences, Las Vegas, Nevada (April).

Lesieur, H.R. & Heineman, M. (1988). Pathological gambling among youthful multiple substance abusers in a therapeutic community. *British Journal of Addiction*, (in press).

Lesieur, H.R. & Sheley, J.F. (1987). Illegal appended enterprises: Selling the lines. *Social Problems, 34*, 249-260.

Levinson, P.K., Gernstein D.R. & Maloff D.R. (eds.) (1983) *Commonalities in substance abuse and habitual behaviors*. Lexington, MA: Lexington Books.

Linden, R.D., Pope, H.G. & Jonas, J.M. (1986). Pathological gambling and major affective disorder: Preliminary findings. *Journal of Clinical Psychiatry, 47*, 201-203.

Livingston, J. (1974). *Compulsive gamblers: Observations on action and abstinence*. New York: Harper Torchbooks.

Lorenz, V. (1981). *Differences found Among Catholic, Protestant and Jewish families of pathological gamblers*. Paper presented at the Fifth National Conference on Gambling and Risk Taking, Lake Tahoe, Nevada, (October).

Lorenz, V. & Shuttlesworth, D.E. (1983). The impact of pathological gambling on the spouse of the gambler. *Journal of Community Psychology, 11*, 67-76.

Lorenz, V.C. & Yaffee, R.A. (1986) Pathological gambling: Psychosomatic, emotional, and marital difficulties as reported by the gambler. *Journal of Gambling Behavior, 2*, 40-49.

Lorenz, V.C. & Yaffee, R.A. (1988) Pathological gambling: Psychosomatic, emotional, and marital difficulties as reported by the spouse. *Journal of Gambling Behavior, 4*, (in press).

McConaghy, N., Armstrong, M.S., Blaszczynski, A. & Allcock, C. (1983). Controlled comparison of aversive therapy and imaginal desensitization in compulsive gambling. *British Journal of Psychiatry*. 142, 366-372.

McCormick, R.A., Russo, A.M., Ramirez, L.F. & Taber, J.I. (1984). Affective disorders among pathological gamblers seeking treatment. *American Journal of Psychiatry, 141*, 215-218.

McCormick, R.A., & Taber, J.I. (1987). The pathological gambler: Salient personality variables. In T. Galski (ed.) *Handbook on pathological gambling*. (Pp. 9-40). Springfield, IL: Charles C. Thomas Pub..

Mental Health Division (1985). *Interim report to the legislature: Treatment of compulsive gamblers*. St. Paul, MN: Minnesota Department of Human Services.

Mikawa, J. & Stotler, C. (1973). Suicide in Nevada. *Rocky Mountain Medical Journal, 70*, 43-49.

Miller, W.R. (Ed.) (1980) *The addictive behaviors*. Oxford: Pergamon Press.

Moran, E. (1969). Taking the final risk. *Mental Health, (London)*, 21-22.

Moran, E. (1970a). Varieties of pathological gambling. *British Journal of Psychiatry, 116*, 593-597.

Moran, E. (1970b). Gambling as a form of dependence. *British Journal of Addictions, 64*, 419-428.

Moravec, J.D. (1978) *A guide to establishing compulsive gambler treatment programs in outpatient clinics, mental hygiene clinics and community mental health clinics*. Paper presented at the

163

Fourth Annual Conference on Gambling, Reno, Nevada (December).

Moravec, J.D. & Munley, P.H. (1983). Psychological test findings on pathological gamblers in treatment. *The International Journal of the Addictions, 18*, 1003-1009.

Moskowitz, J.A. (1980). Lithium and lady luck: Use of lithium carbonate in compulsive gambling. *New York State Journal of Medicine*, 80, 785-788.

Nora, R. (1984) *Profile survey on pathological gamblers*. Paper presented at the Sixth National Conference on Gambling and Risk Taking, Atlantic City, N.J. (December).

Oldman, D. (1978). Compulsive gamblers. *Sociological Review, 26*, 349-371.

Orford, J. (1985). *Excessive appetites: A psychological view of addictions*. Chichester: Wiley & Sons.

Politzer, R.M., Morrow, J.S. & Leavey, S.B. (1985) Report on the cost-benefit/effectiveness of treatment at the Johns Hopkins Center for Pathological Gambling. *Journal of Gambling Behavior, 1*, 119-130.

Ramirez, L.F., McCormick, R.A., Russo, A.M. & Taber, J.I. (1984) Patterns of substance abuse in pathological gamblers undergoing treatment. *Addictive Behaviors, 8*, 425-428.

Rankin, H. (1982). Control rather than abstinence as a goal in the treatment of excessive gambling. *Behavioural Research and Therapy*, 20, 185-187.

Reeling, G. (1986). *A five-year comparison (1980-1985) of attitudes of New Jersey residents regarding gambling especially in Atlantic City*. Jersey City: Jersey City State College.

Reuter, P. & Rubenstein, J. (1982). *Illegal gambling in New York*. Washington, D.C.: U.S. Government Printing Office.

Roebuck, J. (1967). *Criminal typology*. Springfield, IL: Charles C. Thomas.

Rosecrance, J. (1986). Attributions and the origins of problem gambling. *The Sociological Quarterly, 27*, 463-477.

Rosenthal, R. (1986). The pathological gambler's system of self-deception. *Journal of Gambling Behavior, 2*, 108-120.

Royal College of Psychiatrists (1977). *Submission of evidence to the Royal Commission on Gambling*. London: Royal College of Psychiatrists.

Russo, A.M., Taber, J.I., McCormick, R.A. & Ramirez, L.F. (1984). An outcome study of an inpatient treatment program for pathological gamblers. *Hospital and Community Psychiatry, 35*, 823-827.

Schwaneberg, R. (1981). Resort aid tells of casino lure for underage teens. *The Star Ledger*, April 6, p.4.

Seager, C.P. (1970). Treatment of Compulsive Gamblers by Electrical Aversion. *British Journal of Psychiatry*, 117, 545-553.

Strauss, M.A., Gelles, R.J., & Steinmetz, S.K. (1980) *Behind closed doors: Violence in the american family*. Garden City, N.Y.: Anchor Press/Doubleday.

Taber, J.I., McCormick, R.A. & Ramirez, L.F. (1987). The prevalence and impact of major life stressors among pathological gamblers. *The International Journal of the Addictions, 22*, 71-79.

Taber, J.I., Russo, A.M., Adkins, B.J. & McCormick, R.A. (1986). Ego strength and achievement motivation in pathological gamblers. *Journal of Gambling Behavior, 2*, 69-80.

U.S. Bureau of the Census (1987). *Statistical abstracts of the United States*. Washington, D.C.: U.S. Department of Commerce.

Victor, R.G. & Krug, C.M. (1967). Case reports: 'Paradoxical intentions' in the treatment of compulsive gambling. *American Journal of Psychotherapy*, 21, 808-814.

Volberg, R. & Steadman, H. (1986). *Refining prevalence estimates of pathological gambling*. Paper presented at the Second Annual Conference on Gambling Behavior of the National Council on Compulsive Gambling, Philadelphia (November).

Walker, M. & Trimboli, L. (1985). An analysis of heavy gambling as an addiction. In J.McMillen (Ed.) *Gambling in the 80s*. Proceedings of the inaugural conference of the National Association for Gambling Studies (NAGS), Brisbane.

Wanda G. & Foxman J. (1971). *Games compulsive gamblers, wives and families play*. Downey, CA: Gam-Anon, Inc.

Wexler, A. (1980). *Results of a survey of compulsive gamblers*. Unpub. mimeo, Parlin, NJ: Author.

Wexler, S. (1981). *A chart on the effects of compulsive gambling on the wife*. Parlin, NJ: Author.

Whitman-Raymond, R.G. (1988). Pathological gambling as a defense against loss. *Journal of Gambling Behavior, 4*, (in press).

Wray, I. & Dickerson, M. (1981). Cessation of high frequency gambling and 'withdrawal' symptoms. *British Journal of Addiction, 76*, 401-405.

165

# F.  ANTHONY J. PARRILLO'S REPORTS

# GAMBLING AND
# CRIME AND CRIMINAL ACTIVITY
# IN NEW JERSEY

Submitted by
Anthony J. Parrillo

# I. INTRODUCTION

Gaming is a matter reserved to the states within the meaning of the Tenth Amendment to the United States Constitution.[1] *State v. Rosenthal,* 93 *Nev.* 36, 559 *P.2d* 830, 836 (Sup. Ct. l977), appeal dism'd 434 *U.S.* 803 (l978). Within this context, it has been the public policy of New Jersey, historically, to condemn gambling. *Atlantic City Racing Ass'n v. Attorney General,* 98 *N.J.* 535, 540 (1985). By a comprehensive statute enacted February 8, l797 (Paterson, Laws, 224) gaming in all forms was declared to be an indictable offense. This policy was given state constitutional force and effect in l844. *N.J. Const.* (1844), Art. IV, S VII, par. 2. A constitutional amendment in l939 authorized only one form of gaming, on-track pari-mutuel betting on horse races conducted at legalized race tracks; it explicitly prohibited all other forms. *See Caribe Hilton Hotel v. Toland,* 63 *N.J.* 301, 306 (1973).

The Constitution of l947 continued the ban on legislation authorizing gambling but contained specific exceptions to this prohibition. *Id.* These authorizations have been legislatively implemented by the Bingo Licensing Law, *N.J.S.A.* 5:8-24 *et seq.;* the Raffles Licensing Law, *N.J.S.A.* 5:8-50 *et seq,;* the Amusement Games Licensing Law *N.J.S.A.* 5:8-100 *et seq.;* and the Racing Act, *N.J.S.A* 5:5-22 *et seq.* The l947 Constitution also permits the Legislature to authorize any form of gambling that shall be approved by popular referendum. Such a referendum was submitted as to one kind of gambling, State lotteries, and approved at the election of l969. The Constitution was amended accordingly. *N.J. Const.* (1947), Art. IV, S VII, par. 2. The conduct of such lotteries is now controlled by the State Lottery Law, *N.J.S.A.* 5:9-1 *et seq.* And finally, by public referendum held in l976, the electorate of this State, after rejecting a similar ballot proposition in l974, voted to amend the State Constitution to authorize the Legislature to permit, by statute, certain casino gaming activities within the boundaries of Atlantic City. Pursuant to this constitutional mandate, the Casino

Control Act was enacted by the Legislature in l977 (L. l977, c. 110, *N.J.S.A.* 5:12-1 through -152).

It has also been the public policy of New Jersey, historically, to regulate its forms of legalized gaming strictly. *See e.g., In re Martin,* 90 *N.J.* 295, 319 (1982) (Legislature has substantial power to regulate non-essential, dangerous and sensitive industries such as legalized gambling to protect public safety and welfare); *In re Boardwalk Regency Casino License Application,* 180 *N.J. Super.* 324, 341 (App. Dikv. l981), mod., 90 *N.J.* 361, appeal dismissed *sub nom. Perlman v. Atty. Gen. of N.J.,* 459 *U.S.* 1081 (1982) (almost unlimited legislative power to regulate non-essential and inherently dangerous commodities as wholly constitutional expression of concern for public health, safety, morals or general welfare extends to legalized forms of gambling); *In re Tufi,* 182 *N.J. Super.* 631, 644 (App. Div. l981), certif. den., 91 *N.J.* l89 (1982) (necessity of strictly controlling certain industries that present potential, innate danger to public—such as legalized gambling—by subjecting them to close and intensive investigation and regulation has been long recognized). In fact, all such activities come under the direct regulation, supervision, and control of the State.

Because of the sensitivity involved and the need for public control and supervision, legalized gaming in this State in all forms except the lottery[2] is regulated and controlled by New Jersey's chief law enforcement officer, the Attorney General,[3] through his Department of Law and Public Safety, which organizes this responsibility into four different divisions or offices within the agency. While the diversity of each component of legalized gaming may help explain separate control apparatus, there are significant regulatory aspects (*i.e.,* licensing and enforcement), and philosophies of strict supervision common to all. The following analysis surveys the regulatory mechanisms for each of the five forms of legalized gambling.

# II.  LEGALIZED GAMING

## A.  NEW JERSEY RACING COMMISSION

### 1.  Mandate

In 1939 the State electorate approved a Constitutional amendment that legalized pari-mutuel wagering[4] on horse races in order to create a source of post-Depression revenue. This amendment was reincorporated in the 1947 State Constituion as *N.J. Const.* 1947, Art. IV, S VII, par. 2. *Atlantic City Racing Ass'n v Attorney General,* 98 *N.J.* 535, 540-41 (1985).

The New Jersey Racing Commission ("Racing Commission"), was established in 1940 in the Division of Law and Public Safety under the authority of the Attorney General. It was vested with the power and duty to govern all aspects of New Jersey horse racing, including the authority to license track owners, horse owners, jockeys, attendants, and other persons working in the industry. *N.J.S.A.* 5:5-22. Accordingly, "the Racing Commission was granted broad rule-making powers to protect the State's interest in the industry and to carry out its statutory mandate." *N.J.S.A.* 5:5-30. *State v. Dolce,* 178 *N.J. Super.* 275, 285 (App. Div. 1981).

The Commission is empowered to prescribe rules, regulations and conditions under which all horse races must be conducted. N.J.S.A 5:5-30. Accordingly, *N.J.S.A.* 5:5-38 through 51 provides numerous requirements for the filing of applications for permits and licenses, renewal permits, and revocation and refusal of licenses. *Township of Cherry Hill v. New Jersey Racing Commission,* 131 *N.J. Super.* 125 (Law Div. 1974).

### 2.  Staff and Budget

The Commission is composed of seven members (*N.J.S.A.* 5:5-23) who draw no salaries but are allowed reasonable expenses up to $5,000 annually for the chairman and $3,500 annually for the other commissioners (*N.J.S.A.* 5:5-25).[5] The Racing Commission must appoint an executive director of racing to administer all Commission activities. The Commission is empowered to hire a chief inspector,

assistant secretaries, inspectors, clerks, stenographers, and other employees as may be necessary to perform its statutory duties. *Id.*

For FY89 the total amount of projected revenue for the horse racing industry is $4,680,000, including proceeds from simulcasting, pari-mutuel wagering, permit and license fees, fines, and chemical testing. The Racing Commission has requested $3,500,000. Anticipated fees are $180,000, which will not contribute to operating costs. Currently, the Commission utilizes 10 authorized investigator positions at a cost of $356,153 from the General Fund. Additionally, 40 inspector positions are filled at a cost of $1,053,662, which includes uniforms, from the General Fund. These positions are involved with auditing, particularly verification of pari-mutuel audits, accounting, testing of blood and urine, and secretarial duties. As of March 1, 1988, sixteen people, including two administrators, were assigned to the State Police Horse Racing Unit to patrol and cover on a rotated basis the five racing tracks in New Jersey. The Racing Commission pays the salaries and associated costs of the State Police assigned to the Horse Racing Unit.

All costs incurred in connection with any hearing or investigation must be paid by the applicant, who may be required by the Racing Commission to provide a surety bond or other assurance of payment. *N.J.S.A.* 5:5-61; *N.J.A.C.* 13:70-30.1(u).

The Racing Commission must also appoint a State steward and two or more associate State stewards in the case of a running race meeting; a State steward, presiding judge, and two or more associate judges in the case of a harness race meeting; a State veterinarian and associate State veterinarians; and a State supervisor of mutuels, who is a certified public accountant. The Racing Commission determines the compensation of these officials, which is paid weekly by the holder of a permit at whose racetrack the officials serve. *N.J.S.A.* 5:5-37. The Commission may appoint 4 persons with police powers at a salary determined by the Commission and licensees or permittees authorized to hold horse race meetings and paid by such licensees or permittees. *N.J.S.A.* 5:5-77.

### 3. Permits and Licenses

#### a. Permit to Hold Horse Races

In order to conduct or hold a horse race, an applicant track owner must be granted a permit by the Commission. *N.J.S.A.* 5:5-50. A public hearing must be conducted within the county of the proposed horse race. *N.J.S.A.* 5:5-39.1 The Commission Chairman must conduct the hearing, or, alternatively, may designate the counsel assigned to the Racing Commission by the office of the Attorney General to conduct the hearing. *N.J.A.C.* 13:70-30.1.

If the Commission acts favorably on the application after the hearing, the applicant is granted a provisional permit pending approval by the legal voters of the county and municipality in which the proposed race will be held. *N.J.S.A.* 5:5-39.1. If a majority of county and municipal voters approve the horse races, the Commission will consider permissible dates for such horse races. In the event that the voters do not approve of the horse races, the applicant's permit is denied and the application process must begin anew. *Id.*

#### (1) Standard

*N.J.A.C.* 13:70-30.1(f) set forth information required to grant a provisional permit for horse racing. These requirements presently impose a duty to disclose various information on the part of the individual partnership or corporation seeking a permit for horse racing.

Moreover, every applicant member, partner, officer, director, stockholder and person having any direct or indirect interest in the applicant and every real party in interest in the applicant must furnish a detailed affidavit of his experience and background in racing and of his business and financial background, including a financial statement. N.J.A.C. 13:70-30.1 (h) (2).

Additionally every applicant member, partner, officer, director, real party in interest and stockholder must furnish an affidavit to the Racing Commission describing any and all direct or indirect interests that he or she presently has, or previously had, in any other racing organization, association or race track

existing in the present or past anywhere in the world. *N.J.A.C.* 13:70-30.1 (h) (4). *N.J.S.A.* 5:5-33; see *N.J.A.C.* 13:70-4.1 (persons required to have licenses in connection with horse racing) and *N.J.A.C.* 13:71-7.1 (persons required to have licenses in connection with harness racing).

#### (2) Investigation

The Racing Commission is further authorized to:

investigate the applicant or any person named in the application, with respect to such person's criminal record, subversive activities recored and any other reports concerning such persons, in order to determine whether the applicant or a person for whom ownership is directly or beneficially to beheld has not been convicted of a crime of moral turpitude, has not violated any rules and regulations previously or presently prescribed by the New Jersey Racing Commission, and who possesses sufficient moral responsibility so as not to be detrimental to the best interests of racing in New Jersey. (*N.J.A.C.* 13:71-6.28.)

A person whose permit or license has been refused or revoked may request another hearing from the Racing Commission. *N.J.S.A.* 5:5-52 and -53. Racing Commission actions are reviewable in the Appellate Division. *Bishop v. N.J. Sports & Exposition Authority,* 168 *N.J. Super.* 553, 537-38 (App. Div. l979); *N.J.S.A.* 5:5-60.

#### b. License

The Racing Commission prescribes rules, regulations, and conditions under which all licenses pursuant to horse racing may be issued or revoked. In addition to issuing licenses to the entity sponsoring the horse racing, the Commission must also license all pari-mutuel employees and horse owners, riders, agents, trainers, starter, timers, judges, grooms, drivers and others, acting in any capacity in connection with the training of the horses or the actual running of the races. No license fee may be in excess of $50. Any person convicted of a crime involving moral turpitude is precluded from employment in any capacity where any horse race or harness race is permitted. *N.J.A.C.* 13:70-1.12 and 13:71-l.14. Moreover, the Racing Commission may refuse to

issue or renew a license or may suspend or revoke a license issued to any person involved in certain enumerated bad acts involving conviction of a crime, financial irresponsibility, or association with undesirable persons. *N.J.A.C.* 13:71-7.3; 13:70-4.9; see *N.J.A.C.* 13:70-4.12 ("Financial irresponsibility").

### 4. Enforcement

The Attorney General and county prosecutors are obligated statutorily to enforce the provisions of *N.J.S.A.* 5:5-22 *et seq. N.J.S.A.* 5:5-76. *Cf. Atlantic City Racing Ass'n., supra,* 98 *N.J.* at 539 (pursuant to *N.J.S.A.* 52:17A-4, Racing Commission must follow legal advice of Attorney General). The Racing Commission may request that the Governor order State, county, or municipal law enforcement officers to prevent horse racing at a track which lacks a permit. *N.J.S.A.* 5:5-76. An association conducting race meetings under license from the Commission must properly police its grounds. *N.J.A.C.* 13:70-1.17 and 13:71-5.1.

The enforcement of *N.J.S.A.* 5:5-71, enumerating certain unlawful acts, is the responsibility of the State Police Horse Racing Unit. *N.J.A.C.* 13:70-14.15. In addition to enforcing section 71, State Police personnel eject undesirables, prepare and publish the Race Track Licensing Guide, assist the New Jersey Racing Commission in fingerprinting racing employees, undertake responsibility for all violations of the rules of the games, and provide operational security for the race tracks.

The Racing Commission must approve the use of a mutuel board to display racing information.

The Racing Commission or its duly authorized representatives shall have access to all records of any permit holder in order to examine such records to determine the accuracy of the amounts being paid to the State. *N.J.S.A.* 5:5-67. The Commission, after a hearing, may revoke the permit of any permit holder failing to comply with the uniform method of keeping accounts and records prescribed in *N.J.S.A.* 5:5-67-1. *Id.*

The Racing Commission has prescribed procedures for the testing of urine and/or blood of race horses at the direction of the State Veterinarian, the Judges, and/or State Stewards. *N.J.A.C.* 13:71-23.2.

The Racing Commission may impose penalties on any persons and/or associations, whether licensed or not, for violation of the law, rules and regulations, or directives of the Commission. Monetary fines may not exceed \$5,000 for each violation. *N.J.A.C.* 13:70-31.3; see *N.J.A.C.* 13:71-23.7; *N.J.S.A.* 5:5-69 and-70. All monies received by the Racing Commission under *N.J.S.A.* 5:5-22 *et seq.* shall be paid into the State Treasury and with certain narrow exceptions, "shall be part of the free Treasury funds." *N.J.S.A.* 5:5-68.

## B. AMUSEMENT GAMES

### 1. Mandate

At the General Election held in November 1959 the State electorate approved the Amusement Games Licensing Law, then *N.J.S.A.* 5:8-100 through 120 (and subsequently supplemented by *N.J.S.A.* 5:8-121 through 126 with the approval of the electorate). This Law provided for the authorization and regulation of certain amusement games, either of chance and/or skill, which award prizes of merchandise, located at an amusement park, seashore or other resort, or agricultural fair and exhibition (N.J.A.C. 13:3-1.1). The voters of a municipality must also approve the conduct of such amusement games within their border. *N.J.S.A.* 5:8-115 and -116.

The Director of the Division of Alcoholic Beverage Control serves as the Amusement Games Control Commissioner ("Commissioner"). *N.J.S.A.* 5:8-78. The Commissioner is vested with the power and duty to supervise the administration of the Amusement Games Licensing Law and promulgate rules and regulations governing licensure and the operation of amusement games. *N.J.S.A.* 5:8-79.

### 2. Staff and Budget

The office of the Commissioner is a bureau of the Division of Alcoholic Beverage Control within the Department of Law and Public Safety. The Commissioner serves without salary and is paid expenses only. *N.J.S.A.* 5:8-78 and -94. All fees paid to him or her must be remitted to the State Treasurer. *N.J.S.A.* 5:8-78.

The Commissioner may appoint an executive officer as well as expert advisors, investigators, and

clerical and stenographic assistants, who are paid by appropriated sums. *N.J.S.A.* 5:8-94. In FY89 four positions are allocated to serve the Commissioner. The total budget is $150,000 paid from the General Fund including salaries and operating costs. For FY87 and FY88 (calendar year l987), the Commissioner issued 1,211 licenses, conducted 2,400 investigations, and found 260 violations. Generally, a separate license is issued for each specific kind of authorized game as well as for each place at which a licensee is authorized to conduct such a game. *N.J.A.C.* 13:3-1.8. For Fiscal Years l986 and l987, the revenues from fees were $117,760 and $278,386, respectively. For Fiscal Years l988 and l989, the estimated revenues are $250,000 and $270,000 respectively.

### 3. Licensing

The Amusement Games Law requires an applicant to obtain two licenses, a local or municipal license and a state license. *N.J.S.A.* 5:8-102. The applicant must secure a municipal license first; he or she then has 90 days to procure a state license from the Commissioner. In determining whether an applicant should receive an amusement games municipal license, the governing body of the municipality shall conduct an investigation to insure that the applicant or its officers, directors and stockholders are of good moral character and have never been convicted of a crime; that the games will be operated within the rules promulgated by the Commissioner: and that the prizes not exceed permissible retail value and not be exchangeable directly or indirectly for cash. *N.J.S.A.* 5:8-103. If the municipality refuses a license, the party appeals to the Commissioner, whose decision is binding on both parties. *N.J.S.A.* 5:8-84. No reported cases have challenged this provision.

The State license is to be issued by the Commissioner, if he or she finds that "all of the conditions, terms and requirements of this act...have been fully met and complied with." *N.J.S.A.* 5:8-102. It is unclear whether this means that the Commissioner conducts an independent investigation in addition to the one conducted by the municipality to ensure that an applicant is qualified.

The municipality sets its own fee which must be at least $10, with limited exceptions, per license for

each specific kind of game authorized for each place. *N.J.A.C.* 13:3-1.5 (a) (2) and -1.8. The state license fee is $250 for each premises in which the licensee conducts amusement games, plus an additional $10 per machine for each machine over the first fifty machines. *N.J.S.A.* 5:8-102. In the event of the denial or withdrawal of a municipal or state license, the municipality shall retain the full fee up to $10 or 25% or the fee, whichever is greater, for an investigation fee. *N.J.A.C.* 13:3-1.9.

Additionally, every applicant must obtain a certification from the Commissioner for a non-refundable fee of $100 with respect to the permissibility of the games awaiting licensure. *N.J.A.C.* 13:3-1.4; *see N.J.A.C.* 13:3-7.2 ("Application for certification; contents"). The Commissioner then forwards to each municipal governing body authorized to issue amusement games licenses a copy of every certification of permissibility granted. *N.J.A.C.* 13:3-7.6. Pursuant to *N.J.A.C.* 13:3-7.8, the Commissioner is authorized to inspect equipment used in amusement games to determine if such equipment meets certification requirements.

Licensees are restricted from hiring any person who does not meet the standard for licensing by reason of conviction of a crime or otherwise. *N.J.A.C.* 13:3-3.8.

No license shall allow any deceptive, fraudulent, or misleading advertising or practice. *N.J.A.C.* 13:3-3:8

### 4. Enforcement

The governing body of any municipality issuing a license for an amusement game is vested with the power and duty to ascertain that such a game is conducted in compliance with the Amusement Games Licensing Law and the rules and regulations promulgated thereunder. The Commissioner also is empowered to conduct investigations of the administration of the law in a descretionary cross-section of municipalities and shall receive and investigate complaints as to violations of the law in any municipality. *N.J.S.A.* 5:8-81.

The Commissioner, or his agents, have the right of entry into any premises housing an amusemnent game or equipment used to conduct such a game.

*N.J.S.A.* 5:8-106. Both the Commissioner and the governing body of the municipality are empowered to examine relevant books and records of any licensee as well as to examine under oath any person or employee connected with such licensee. *N.J.S.A.* 5:8-108. Such books must be complete and accurate pursuant to *N.J.A.C.* 13:3-4.1. Every licensee shall file an annual report of the conduct of games for the previous license year. *N.J.A.C.* 13:3-4.3(a).

The Commissioner is authorized to suspend and, after a hearing, revoke any municipal license. *N.J.S.A.* 5:8-106 and -82. Alternatively, the Commissioner may impose a penalty of not more than \$250 for the first offense and not more than \$500 for the second and each subsequent offense. Any such penalty must be paid into the State Treasury for the general purposes of the State. *N.J.S.A.* 5:8-82. In addition to hearing appeals from municipalities' licensure decisions, the Commissioner is empowered to hold investigations and hearings and is given subpoena power. *N.J.S.A.* 5:8-87.

Violators of the Amusement Games Licensing Law shall be convicted of a disorderly person offense. *N.J.S.A.* 5:8-111.

## C. LEGALIZED GAMES OF CHANCE

### 1. Mandate

In l953 the State electorate amended the State Constitution to permit the playing at games of chance known as bingo and raffles in municipalities[6] in which a majority of the voters approved such gambling. *Allendale Field and Stream Ass'n. v. Legalized Games,* 41 *N.J.* 209, 211 (1963) (citing *N.J. Const.* 1947, Art. IV, S VII, par. 2). The drafters of the enabling legislation "saw its primary task to be the design of a regulatory system which would safeguard bingo from domination by racketeers and protect it as a revenue source for deserving charities." Draft Paper at 4.

The Legalized Games of Chance Control Commission ("LGCCC") was established in l954 in the Department of Law and Public Safety under the authority of the Attorney General. It was vested with the power and duty to supervise the administration of the Bingo Licensing Law (*N.J.S.A.* 5:8-24 to 5:8-49.11) and the Raffles Licensing Law (*N.J.S.A.*

5:8-50 to 5:8-76) and to adopt pertinent rules and regulations. *N.J.S.A.* 5:8-6. "(W)hile local government is enjoined to be vigilant, the (LGCCC) holds the ultimate responsibility and powers equal to it." *Allendale, supra,* 41 *N.J.* at 216. The LGCCC is responsible for continuously monitoring the operation and administration of the licensing laws by the municipalities and must file reports at least annually with respect to its recommendations of necessary legislative changes. *Kendall Pk. Chap. of Deborah v. New Brunswick,* 159 *N.J. Super.* 249, 252 (App. Div.), certif. den., 78 *N.J.* 396 (1978) (citing *N.J.S.A.* 5:8-12, -13, and -23). Restrictions were imposed on bingo and raffle activities both to prevent racketeering and to guarantee the "moderate" character of the game. The licensing process, investigation of license applicants, and requirements of prompt filing of financial reports were intended to prevent corruption.

### 2. Staff and Budget

The LGCCC is composed of five members (*N.J.S.A.* 5:8-1) who draw no salaries but are reimbursed for their actual expenses within the limits of available appropriations (*N.J.S.A.* 5:8-4). The administrative costs of the LGCCC is paid from licensing fees and other charges from the

groups and firms involved in bingo and raffle activities. In order to offset their administrative costs, the municipalities also receive revenues from fees and charges.

Specifically, licensees must pay \$5.00 for each occasion bingo games are conducted; \$5.00 for each day raffles are conducted; and with, respect to off-premise draw raffles, \$5.00 for each \$1,000.00 of retail value of the prizes to be awarded, and \$10.00 for each \$1,000.00 of the value of the prizes above the original \$1,000.00. *N.J.A.C.* 13:47-4.9; *N.J.S.A.* 5:8-53. Five dollars of the bingo fee goes to the municipality, and the other five dollars goes to the State Treasury. *N.J.S.A.* 5:8-27. Five dollars of each ten dollars collected for prizes in excess of one thousand dollars is payable to the municipality, as is the initial five dollars. The remainder is remitted to the State. *N.J.S.A.* 5:8-53.

The LGCCC is authorized to hire and appoint an executive officer, competent and expert advisors, clerical and stenographic assistants, and investigators

as it deems necessary at terms of compensation within the limits of sums appropriated for such purposes. *N.J.S.A.* 5:8-21. For FY89, the total budget is $288,957, allocated from the General Fund. Currently, 13 positions are allocated. Anticipated revenues are $400,000/year, which are earmarked for the General Fund.

### 3. Licensing

Once a municipality has adopted the Bingo Licensing Law and/or Raffles Licensing Law, the governing body of the municipality may issue licenses to eligible bona fide veterans organizations; church or religious congregations and organizations; charitable, educational, and fraternal organizations; civic and service clubs; senior citizen associations and clubs, volunteer fire companies; and volunteer first aid or rescue squads.

In determining whether to issue a bingo or raffles license, the governing body of the municipality shall conduct an investigation to determine that the bona fide members of the applicant designated to conduct the games of chance are of good moral character and have never been convicted of a crime, that the games to be held will be conducted within the rules governing such games, and that no compensation will be paid to the person or persons conducting the games. *N.J.S.A.* 5:8-27 (Bingo); *N.J.S.A.* 5:8-53 (Raffles). The entire net proceeds of the games of chance must be devoted to statutorily authorized purposes. *N.J.A.C.* 13:47-6.3.

The LGCCC's investigations are to determine whether the laws are being violated by a licensee (*N.J.S.A.* 5:8-14), or, to determine whether the local municipalities are properly administering the Bingo and Raffles Laws (*N.J.S.A.* 5:8-8). If a municipality denies a license to an applicant, the applicant may appeal to the LGCCC, whose decision is binding on all parties. *N.J.S.A.* 5:8-11.

Although the municipality is the licensing authority, a potential applicant must also register with the LGCCC and secure an identification number before filing an application for a license with the municipality. *N.J.A.C.* 13:47-2.1; *Allendale, supra,* 41 *N.J.* at 212-13. The LGCCC has the power to screen out ineligible applicants at the registration stage. *Id.* 216.

The municipal license is effective for one year. *N.J.A.C.* 13:47-4.7. Senior citizens associations or clubs that conduct games of chance for nominal prizes for bona fide active members may be issued a special license by the municipality without fee effective for two years. *N.J.A.C.* 5:8-25.1.

Licensees are restricted to a maximum of 6 days in any calendar month for the conduct of bingo and raffles. *N.J.A.C.* 13:47-6.11. The maximum value of prizes, admission prices, bingo equipment specifications, and advertising restraints are also prescribed.

If an organization wishes to rent or use premises that it does not own, the owner, lessor, or supplier ("rentor") must apply for a license from the LGCCC on a prescribed form. *N.J.A.C.* 47:13-14.2. In order to obtain a rentor's license, the applicant must demonstrate to the LGCCC that the rent is fair and reasonable and that the rentors are statutorily approved. *N.J.S.A.* 5:8-49.3. Rentors must be of good moral character with no criminal record. *N.J.A.C.* 47:13-14.2(e)(2). The LGCCC may hold a hearing to determine eligibility. *N.J.A.C.* 47:13-14.2(g). The rules promulgated by the LGCCC prescribe rental contract terms. *N.J.A.C.* 47:13-14.3. The fee for a rentor's license is $100.00 plus an additional $5.00 for each occasion on which bingo games are held. This money is paid to the State. *N.J.A.C.* 13:47-14.2(h).

Persons desiring to furnish raffles equipment for rent also must first be approved by the LGCCC (*N.J.A.C.* 47:13-13.1), and conform with statutorily fixed rates (*N.J.A.C.* 47:13-8.13(a)).

If a licensee does not show that the annual conduct of games has produced reasonable net proceeds for authorized purposes, that licensee will be required to show cause before the LGCCC why its right to conduct games of chance should not be revoked. *N.J.A.C.* 47:13-6.22. Licensees are required to file post-game reports with the municipal clerk documenting gross receipts from each game. The municipality then forwards such reports to the LGCCC (*N.J.A.C.* 47:13-9.1).

The licensee also is required to maintain such books and records as may be necessary to substantiate each report. *N.J.S.A.* 5:8-37; N.J.S.A 5:8-64; *Cooley's etc., Foundation v. Legalized Games, etc. Com.,* 78 *N.J. Super.* 128, 132 (App. Div.), certif.

172

den., 40 *N.J.* 212 (1963). The municipality and LGCCC may examine pertinent books and records of the licensee and examine agents and employees under oath. *N.J.S.A.* 5:8-38; *N.J.S.A.* 5:8-65.

### 4. Enforcement

The municipalities have the authority to supervise all games of chance conducted under local licenses to determine that such games are legally conducted. *N.J.S.A.* 5:8-30; *N.J.S.A.* 5:8-57. Historically, the municipalities have not be able to devote sufficient revenues to oversee and enforce the Bingo and Raffles Licensing Laws.

Both the municipalities and the LGCCC are empowered to inspect premises where games are held and/or where equipment used in such games are located. Either entity may stop the operation of a game, pending a hearing, which either entity may conduct. *N.J.A.C.* 47:13-10.1 to 10.3. Each entity may suspend or revoke any license for statutory violation. *N.J.S.A.* 5:8-30; *N.J.S.A.* 5:8-57. Conviction of specified statutory violations are disorderly persons offenses and will result in immediate license forfeiture with a one year period of ineligibility for future application. *N.J.S.A.* 5:8-41; *N.J.S.A.* 5:8-68. The municipality or the LGCCC also may declare a violator ineligible to conduct games of chance and bar license application for up to 30 months.

If a licensee fails to timely file a required report, or if a report is not properly verified, or not fully, accurately, and truthfully completed, its license will be suspended until the correction of the default. *N.J.A.C.* 47:13-9.5.

In *Cooley's, supra,* 78 *N.J. Super.* at 131, plaintiff's bingo license was suspended because it had filed false reports of bingo games. After observing discrepancies in filed reports, the executive officer of the LGCCC assigned a team of investigators to audit the licensee's games for several months. As a result of the audit, he concluded that the licensee's reports were false. The Court upheld the licensee's suspension.

Any applicant for or holder of a license may appeal any action of the municipality to the LGCCC, whose decision is binding on all parties. *N.J.S.A.* 5:8-39; *N.J.S.A.* 5:8-66. The Chariman may subpoena witnesses and/or documents. *N.J.A.C.* 47:13-12.4.

## D. LOTTERY

### 1. Mandate

In November l969 the State electorate approved an amendment to the State Constitution by way of exception to the general prohibition against gambling of any kind by authorizing the Legislature to provide for a State lottery. Thereafter the Legislature enacted the State Lottery Law, *N.J.S.A.* 5:9-1 to -25, enabling legislation that became effective on February 16, l970. "(W)hile the State Lottery Law was designed to provide a recreational outlet for those so inclined, its main purpose is to provide revenue for state institutions and for state aid to education." *Karafa v. N.J. St. Lottery Comm'n.,* 129 *N.J. Super.* 449, 504 (Ch. Div. l974). The entire net proceeds of the lottery are constitutionally and statutorily earmarked for State institutions and State aid for education. *N.J.S.A.* 5:9-2.

A Division of the State Lottery ("Division"), including a State Lottery Commission (Commission") and a director, was established in the Department of the Treasury. *N.J.S.A.* 5:9-4. The Commission is vested with the power and duty to adopt pertinent rules and regulations governing the establishment and operation of the lottery necessary to implement the constitutional mandate; to advise the director regarding the operation and administration of the lottery; to report monthly and annually to the Governor and Legislature; and to study continuously the efficacy of the lottery, including the success of the system to prevent the infiltration of organized gambling and crime. *N.J.S.A.* 5:9-7.

The director, who is the secretary and executive officer of the Commission, is empowered to supervise and administer the operation of the lottery. The director must confer regularly with the Commission and upon request make available to the Commission all information and documents of the Division. Additionally, subject to the Commission's approval, the director is authorized to "act on behalf of the Commission as using agency with respect to purchases made by the Division of Purchase and Property of goods and services required in the operation of the lottery." *N.J.S.A.* 5:9-8.

### 2. Staff and Budget

The Commission is composed of the State Treasurer, or his or her designee, and six public members.

173

N.J.S.A. 5:9-5. The public members serve without salary but are entitled to reasonable expenses in an amount not exceeding $5,000 annually for the chairman and $3,500 annually for each of the other commissioners. Id. The director of the Division receives such salary as shall be provided by law. N.J.S.A. 5:9-6. The director, with the Commission's approval, may appoint deputy directors and professional, technical and clerical assistants and employees. N.J.S.A. 5:9-8. For FY89 the operating budget of the Division, derived from the General Fund, is $23,603,000 with revenues anticipated at $510,000.000. Seven special investigative positions are budgeted at $179,722 and overhead at $20,000. For FY88 the operating budget was $22,679,000 with $490,000,000 in revenues.

The monies in the State Lottery Fund may be appropriated only as follows:

(a) for the payment of prizes to the holders of winning lottery tickets or shares, (b) for the expenses of the division in its operation of the lottery, (c) for State institutions and State aid for education as shall be provided by law, and (d) for repayment to the general treasury of the amount of the appropriated fund. [N.J.S.A. 5:9-22.]

Unclaimed prize money is allocated to State institutions and aid for education. N.J.S.A. 5:9-17.

Twice yearly the State Treasurer must publish newspaper accounts of the total revenues received in the State Lottery Fund and the amounts appropriated therefrom. N.J.S.A. 5:9-22. The State Auditor conducts an annual post-audit of all accounts and transactions of the Division. N.J.S.A. 5:9-24.

### 3. Licensing

The director is authorized to license as agents to sell lottery tickets "such persons as in his opinion will best serve the public convenience and promote the sale of tickets or shares." N.J.S.A. 5:9-8. Specifically, before issuing such a license the director must consider such factors as

(a) the financial responsibility and security security of the person and his (or her) business or activity, (b) the accessibility of (the) place of business or activity to the public, (c) the sufficiency of existing licenses to serve the public convenience, and (d) the volume of expected sales. [N.J.S.A. 5:9-11.]

Any person desiring to be licensed as a lottery agent must undergo a preliminary field investigation by the director. If either the requesting party or the proposed location is "obviously unsuitable for licensing" based on the articulated standards, then no application will be issued; this action is deemed tantamount to a license denial. The applicant for a lottery agent's license must complete a prescribed form, which includes consent to credit checks and criminal record searches as well as required disclosure of any arrests or convictions. N.J.A.C. 17:20-4.1 The director may attach conditions to licensure and/or require annual certification regarding continued statutory compliance. Failure to submit such information may result in license suspension or revocation. N.J.A.C. 17:20-4.4. The director must approve any transfer of ownership of licensed premises. N.J.A.C. 17:20-4.10.

On the other hand, the director may deny, suspend or revoke a license for any of the following reasons:

1. Whenever the application for a license or renewal thereof contains knowlingly false or misleading information or is incomplete;

2. Whenever the agent violates any of the provisions of the Act or these rules and regulations or the instructions of the Lottery;

3. When a person:
   i. Has been indicted, arrested for or convicted of a crime, disorderly persons offense or violation of ordinance or administrative regulation relating adversely to the duties of a lottery agent; or

   ii. Has been the subject of a complaint or accusation for such offense; or

   iii. Has failed to notify the Director in writing within five days of any of the above actions;

4. Whenever an agent engages in conduct detrimental to a sound business relationship between the agent and the Lottery;

5. Whenever it is determined that such action would be in the best interest of the Lottery based on actions which reflect upon the agent's moral character or affect the integrity of the Lottery;

6. Whenever an applicant does not, or an agent can no longer satisfy the criteria set forth in *N.J.S.A.* 5:9-11 or these regulations for the issuance of a license;

7. Whenever ownership has been changed without the Director's approval;

8. Whenever the agent fails to meet minimum sales quotas set by the Director;

9. Whenever the agent fails to make prompt and timely payment of a civil penalty imposed under *N.J.A.C.* 17:20-9.1, *et seq.* (*N.J.A.C.* 17:20-5.1(a).)

#### 4. Enforcement

In addition to the grounds for suspension and revocation set forth above, the director may suspend a license for up to 5 consecutive days without notice if the director deems it imminently necessary:

1. to prevent a breach of security;

2. In the event of the misuse of a lottery machine or other lottery equipment; or

3. To protect the lottery from economic harm. (*N.J.A.C.* 17:20-5.1(b).)

The Division may inspect and audit all agent lottery operations, reports and records upon demand. *N.J.A.C.* 17:20-6.3.

Any person who makes or possesses a counterfeit lottery lottery ticket is guilty of a misdemeanor. *N.J.S.A.* 5:9-14.1.

After notice and hearing, the director may impose civil penalties on licensed agents in an amount up to $2,500 per incident for violations of the law. Civil penalties between $2,500 and $5,000 per incident may be assessed by the director, subject to the right of the violator to seek review before the Commission. Pursuant to Commission review, the director may impose civil penalties in excess of $5,000 but not more than $10,000 per incident. *N.J.A.C.* 17:20-9.1 through 9.3. Moreover, the director may order restitution and/or cease and desist orders subject to Commission review and judicial enforcement. *N.J.A.C.* 17:20-9.4.

The Commission may also, in addition to any or all of the above sanctions, issue letter of reprimand or censure. *N.J.S.A.* 5:9-12.1. All hearings and contested cases will be held in the main Lottery Office unless otherwise specified by the director or unless referred to the Office of Administrative Law. *N.J.A.C.* 17:20-5.3. The commission is authorized to issue subpoenas. *N.J.S.A.* 5:9-10.

### E. CASINO GAMING

#### 1. Mandate

The New Jersey Legislature enacted the Casino Control Act (P.L.1977, c.110; *N.J.S.A.* 5:12-1 *et seq.*) in 1977 following a public referendum which approved the legalization of casino gaming in Atlantic City. In providing for the licensure, regulation, and taxation of casino gaming, the Legislature carefully enumerated certain policy considerations which were to be effected. As the New Jersey Supreme Court explained in *Knight v. Margate*, 86 *N.J.* 374, 380-82 (1981):

> Pursuant to this constitutional mandate, the Casino Control Act was enacted by the Legislature in 1977 (*L.* 1977, *c.* 110, *N.J.S.A.* 5:12-1 to 152) to authorize casino gaming and establish the regulatory framework for the casino industry. The statutory administrative controls over casino operations established by the Act are extraordinarily pervasive and intensive. *Cf. Bally Mfg. Corp. v. N.J. Casino Contol Comm'n*, 85 *N.J.* 325 (1981)...At the very heart of the public policy embraced by the new Law is "the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations." *N.J.S.A.* 5:12-1(b) (6). Related directly to this purpose, the Legislature stated that "the regulatory provisions...are designed to extend strict State regulation to all persons...practices and associations related to" casinos and that "comprehensive law-enforcement supervision...is further

designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process." *Id.*

In this vein, because casino operations "are especially sensitive and in need of public control and supervision," the statute dictates that "the regulatory and investigatory powers and duties shall be exercised to the fullest extent consistent with law to avoid the entry" of persons whose economic or occupational pursuits are violative of the "criminal or civil public policies of the State." *N.J.S.A.* 5:12-1(b)(9). These public policy objectives were augmented by later amendments which declared that even though "(c)ontinuity and stability in casino gaming operations" were important, these could not be achieved by allowing persons with "unacceptable backgrounds and records of behavior" to control casinos. *N.J.S.A.* 5:12-1(b)(15); *L.* 1978., *c.* 7, S1.

To best carry out these stated public policies, the Legislature created a two-tiered system of regulation comprised of a decision-making and rule-making body on the one hand, and an investigative and law enforcement body on the other hand. The Legislature conferred upon both agencies extensive powers and broad duties to investigate, license, supervise, and pervasively control legalized casino gaming in all its aspects. *See, e.g., N.J.S.A.* 5:12-75, -76. As the cogent observation of Justice Handler in *Knight v. Margate, supra,* acknowledges:

> It is the pronounced policy of this State to regulte and control the casino industry with the utmost strictness to the end that public confidence and trust in the integrity of the State's regulatory machinery can be sustained. (86 *N.J.* at 392.)

New Jersey's casino legislation thus compels a state regulatory interest in all aspects of casino activities and related operations.

Pursuant to this schematic, the Casino Control Commission ("Commission") was established under *N.J.S.A.* 5:12-50 and essentially performs quasi-judicial functions in issuing casino licenses and registrations and hearing all cases involving alleged violations of the Act. The Commission is also responsible for collecting all fees and taxes imposed by the enabling legislation.

The Division of Gaming Enforcement ("Division") was created by the Legislature pursuant to *N.J.S.A.* 5:12-55 as the investigative and law enforcement arm of this dual regulatory system. The Division is under the immediate supervision of a Director who administers agency work under the direction of the Attorney General. Ultimate responsibility for the organization, administration and conduct of the work of the Division rests exclusively with the Attorney General of New Jersey as head of the Department of Law and Public Safety.

### 2. Licensing and Enforcement

Section 76 of the Casino Control Act sets forth the general duties and responsibilities of the Division. Briefly, the Division is exclusively responsible for conducting investigations into the qualifications of all individuals and entities seeking licensure or registration under the Casino Control Act; conducting investigations relating to any violations of the Casino Control Act, regulations promulgated thereunder and Certificate of Operation as well as prosecuting all such cases before the Casino Control Commission and preparing all appeals taken therefrom; conducting continuing reviews and audits of all phases of casino operations; and investigating the circumstances surrounding any transaction which requires Commission approval.

The substantive work of the Division is divided into two bureaus—Licensing and Compliance. The Bureau of Licensing is responsible for casino entity, employee and service industry licensing, and all related renewals. These investigations are often multifaceted and involve a detailed analysis of financial transactions; a review of Securities and Exchange Commission filings where appropriate and filings with other governmental agencies; and consideration of criminal histories and potential associations with undesirables.

The Bureau of Compliance is responsible for assuring that casino licensees operate their facilities consistent with all pertinent statutory and regulatory requirements. This function includes the auditing of casino operations, the review of slot machine operations, and the implementation of various programs

designed to maintain compliance with the rules of the game, gaming equipment, security and surveillance. State Police personnel, primarily assigned to the compliance functions, are responsible for enforcing all state criminal laws within the casino hotels and in identifying regulatory violations for further investigation by the appropriate Division sections. Cases involving criminal violations of the law are prosecuted by either the Division of Criminal Justice, the Atlantic County Prosececutor, or the Atlantic City Prosecutor.

### 3. Staff and Budget

The combined casino regulatory budget for FY89 is $60.9 million, of which $36.4 million is allocated to the Division. The Division 's workforce of 514 full-time employees is comprised of attorneys, agents, state police personnel, analysts, and support staff. The mix of these diverse disciplines has proven to be invaluable in carrying out the responsibilities bestowed upon the Division. The achievement of the overall mission has been accomplished through constantly refining the organization of the Division in an effort to best utilize all available resources.

All casino regulatory expenses are financed exclusively from the fee revenues— licensing fees and costs directly billed—and the greatest share of the burden of that financing falls on casino licensees, as they are best able to bear that burden and as they receive the greatest benefit from the regulatory process. For example, each casino licensee is charged a $500 annual fee for each slot machine on the casino floor. In addition, all investigative and compliance activi-

ties are billed at the rate $40 per hour.[7] Should the amount of money billed as investigative and licensing fees not approach the actual expenses of the regulatory agencies, the casino licensees on a prorated basis are required to make up the difference through a special assessment at the end of the fiscal year.

Thus, the clear legislative design was for the casino regulatory apparatus to be financially self-sufficient and not dependent upon direct general fund appropriations. This ensures that the regulatory agencies are able to operate with a degree of independence in overseeing the industry and that their investigations and audits of the industry are comprehensive in order to achieve the actual intent of the Legislature in legalizing casino gaming.

### 4. Results

This intentionally intrusive administrative apparatus has assured that only those who meet strict licensing criteria are allowed entry into and continuance within New Jersey's casino industry, that its games are conducted honestly and fairly, and that all casino revenues are properly accounted for. New Jersey's strict regulatory philosophy has also assured stability within the industry and helps instill public trust and confidence, both of which are special benefits to those who obtain the privilege of licensure. Because of the high level of integrity of casino operations in this State, the public patronize the games, large publicly-held companies invested billions of dollars of capital in Atlantic City, and bankers and institutional lenders provide legitimate sources of financing to make all possible.

# III. CONSOLIDATION PROPOSAL

As is evident, the responsibility for regulating legalized gaming in New Jersey has been assigned generally to various state-level governmental agencies. Within each of these units, save the casino control apparatus, are housed the combined quasi-judicial, administrative and enforcement functions which constitute the necessary elements of regulation. For casino gaming, these tasks are allocated within a bifurcated or dual structure deliberately created to achieve a system of checks and balances.

The multitude of gaming regulatory agencies is perhaps best explained by the independent origins,

separate development and unique features of each form of this legalized activity as ultimately embodied in individual enabling statutes. Despite the diversity of all these components however, there is, at least in terms of the State's oversight approach, really much more that binds than separates them. Most importantly, there is a philosophy of strict regulation shared by all, historically rooted in New Jersey's long-standing prohibition of gambling and our tolerance of certain forms only so long as they are pervasively and seriously supervised. Indeed, so extraordinarily sensitive and parochial a concern to the State and its people is gaming, that such a matter is

177

governed directly by the New Jersey Constitution itself.

This philosophy of strict oversight is reflected in the regulatory framework established for each legalized gaming industry and more particularly in the similarity of the various mechanisms designed to achieve this mutual statutory goal. Thus, as a practical matter, there are significant control aspects in terms of licensing and enforcement common to all gaming regulatory agencies.

First, participation in legalized gaming in New Jersey is generally considered a privilege. To obtain that privilege, applicants must demonstrate their suitability for licensure against strict eligibility criteria including good character, honesty and integrity as well as the lack of criminal convictions, habits or associations. Such qualification comprises an essential ingredient in assuring that the grant of a gaming license will serve the public interest—that, if granted a license, an applicant will comply with applicable laws and policies, administrative rules and regulations, be honest and forthcoming with regulatory and investigatory authorities and the public, and operate its establishment and the games in a manner consistent with the public interest.

Secondly, applicants for gaming licenses are generally under an all-encompassing and continuing obligation to disclose. In the discharge of their statutory burdens, applicants must provide any assistance and information necessary to assure that public policies are achieved. No form of concealment is permissible. The imposition of this duty of full disclosure is in recognition of the need not only for public confidence but for full exposition, consideration and assessment of all information which may conceivably bear upon an applicant's fitness to participate in any of the legalized gaming industries.

Thirdly, our Legislature conferred on gaming regulators extensive powers and broad duties to investigate, license, supervice and pervasively control legalized gaming in all its aspects. This authority inheres not only with respect to applicant investigations, but once licensed and operating, encompasses investigations to ensure gaming is being conducted according to law. These so-called "enforcement" or "compliance" activities of the regulatory agencies share common characteristics. They generally take the form of

reviews of gaming operations through on-site inspections and observations to ensure gaming is being conducted honestly; audits of gaming operations through on-site inspections and observations to ensure gaming operations through on-site inspections and observations to ensure gaming is being conducted honestly; audits of gaming operations including reviews of accounting, administrative and financial records and management controls to ensure accurate recordation of revenues and collection of state tax; and where gaming equipment is involved, testing, inspection and prototype analysis to ensure fairness and integrity of the games. To effectuate this regulatory mission, the overseers have been granted maximum powers to inspect, search and seize.

Given the shared goal for strict regulation and the similarity of means adopted by the regulatory agencies to effectuate this end, serious consideration should be given to the consolidation of all gaming-related law enforcement functions within a single agency in the Department of Law and Public Safety. Centralization will not only help insure consistency and uniformity of approach and implementation, but because of the cross-cutting elements of enforcement in all forms of legalized gaming, will also allow for greater efficiency and effectiveness.[8]

Since the licensing criteria for participation in each form of legalized gaming are essentially identical, procedures for background investigations and financial stability reviews could be standardized and streamlined and information collected could be centrally stored and managed. Also, given the similarity in operational controls, the same could be effected for compliance reviews, audits and inspections. Moreover, in terms of testing and analyzing gaming equipment, DGE's slot prototype approval process and in-house computer system which records and tracks every slot movement and micro-chip within this state can be applied to other gaming devices, especially amusement games.[9]

Consildation in a nutshell will be greatly beneficial in achieving uniform investigatory procedures and regulatory approaches; sharing of acquired expertise and databases; and efficiency in centralizing and streamlining all the cross-cutting elements of gaming related law enforcement. Importantly, as well, consolidation can be accomplished without disruption or difficulty. As previously noted, all gaming

regulatory agencies, excepting the Lottery Commission, are presently housed in the Department of Law and Public Safety under the Attorney General's jurisdication. Even the Lottery Commission relies upon Department of Law and Public Safety personnel to handle background investigations necessary to maintain the integrity of the Lottery's extensive network of agents and vendors. The proposal now under consideration would simply further consolidate and centralize into one gaming regulatory agency what has already been brough together under the large umbrella of the department.

Consolidation makes good sense under the departmental schematic. The Attorney General, of course, ultimately responsible for the organization, administration and conduct of the work of the Department. He is statutorily charged with the responsibility of developing a program designed to accomplish the greatest possible efficiency of operations, including the organization into various divisions and bureaus as he deems necessary to effectively operate the department. See *N.J.S.A.* 52:17B-27. In light of the stated benefits to be realized, the consolidation proposal is not only consistent with this statutory mandate, but is compellingly founded.

# APPENDIX

The following charts appear in a recent paper by R. Lehne, "A Contemporary Review of Legalized Gambling," May 15, 1988.

Table 3

Trends in New Jersey Gaming Revenue, 1950-1985
($ millions)

| Fiscal Year | State General Revenues | Racing | Lottery | Casinos | Total Gaming | Percent of Total General Revenues |
|---|---|---|---|---|---|---|
| 1950 | $ 174 | $12 | | | $ 12 | 6.8 |
| 1955 | 256 | 23 | | | 23 | 8.8 |
| 1960 | 396 | 25 | | | 25 | 6.3 |
| 1965 | 590 | 29 | | | 29 | 4.9 |
| 1970 | 1,366 | 35 | | | 35 | 2.6 |
| 1975 | 2,393 | 36 | $ 36 | | 72 | 3.0 |
| 1980 | 4,654 | 16 | 146 | $ 58 | 220 | 4.7 |
| 1985 | 7,981 | 7 | 391 | 167 | 565 | 7.1 |

Source: State of New Jersey, *Budget,* for years 1852, 1957, 1962 and 1967; and State and Local Government Expenditure and Revenue Commission, "New Jersey Gaming Revenues: Issues and Options."

Table 4

Estimated Gambling Revenues Produced by Gaming Activities, 1987
($ millions)

| Form of Gaming | Estimated Revenue |
|---|---|
| Bingo Raffles | $ 62 |
| Casinos | 2,379 |
| Horseracing | 229 |
| Lottery* | 572 |
| Total Revenue | #3,242 |

Sources: Legalized Games of Chance Control Commission, *Financial Report, Fiscal Year 1986-1987;* Atlantic City Casino Association, *Fact Sheet;* New Jersey Racing Commission, *Annual Report 1986 and 1987;* and New Jersey Lottery, *Annual Report 1987.*

*Note: This amount includes "Other Income."

# ENDNOTES

1. U.S. Const. Amend. X: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the states, respectively, or to the people."

2. Although formally established in the Department of the Treasury, the Division of the State Lottery is represented by the Attorney General in legal proceedings and staffs its investigative function with the Division of the State Police, which is under the authority of the Attorney General.

3. The Attorney General has overall criminal and civil jurisdiction in this State. *See N.J.S.A.* 52:17B-2.

4. Pari-mutuel wagering is the system under which "odds" are posted at the track from time to time until the race is begun, determined by the quantum of the bets placed on the several entries. Those whose wagers were placed on the winning horse share the total stake, less a fixed percentage to the track management, in proportion to their respective contributions or wagers. *State v. Morano,* 134 *N.J.L.* 295, 298-99 (E. & A. 1946).

5. As of 6/10/88, proposed legislation (Senate No. 750) was being considered by the Appropriations Committee that would compensate each commissioner annually in the amount of $7,500. The chairman would receive an additional $1,500 annually.

6. Popular events such as "Casino Nights" and "Monte Carlo Nights" do not constitute permissible legalized games of chance and are illegal.

7. The investigative fees for service industry and employee licensing applications are capped by regulation.

8. The consolidation proposal has reference primarily to the enforcement functions of gaming regulation, namely background and compliance investigations, audits, inspections and other types of reviews to ensure eligibility and continuing suitability for licensure and conformity of gaming operations with applicable rules and regulations. The proposal does not address the quasi-judicial and administrative functions of gaming regulation which presumably will remain where appropriate, within the autonomous, independent agencies where they currently reside. In such cases, the regulatory framework will follow the casino control model which as previously noted is bifurcated rather than unitary with decision-making and administrative functions vested in the Casino Control Commission and investigative, compliance and enforcement activities conducted by the Division of Gaming.

9. Amusement games are for all practical purposes slot machines except that the consideration necessary to participate and the award of prizes in amusement games are limited.

# PROPOSAL TO CONSOLIDATE
## ALL LEGALIZED GAMING ENFORCEMENT FUNCTIONS
## WITHIN A SINGLE AGENCY OF THE
## DEPARTMENT OF LAW & PUBLIC SAFETY

Anthony J. Parrillo
Director
Division of Gaming Enforcement
June 20, 1988

# I. INTRODUCTION

In the forward to the 1984 "Annual Report to Sheriff John Moran," Preston Hubbs, the Commander of the Las Vegas Metropolitan Police Department Intelligence Service Bureau sets forth a brief history of the very early days of legalized gaming in Nevada and eventually reaches the post-war years when Las Vegas was a booming metropolis of approximately 13,000 people and 15 licensed gaming operations:

Though most of these early casinos were small and opened only a few hours each night, their significance and potential was not lost on a New York hoodlum who traveled to the dusty railroad stop from Los Angeles.

Benjamin "Bugsy" Siegel, a gangster with a reputation for both charm and viciousness, had been dispatched to the West Coast to develop the New York mob's interests in Southern California. Siegel the mobster was also Siegel the visionary, and in the desert sand he saw a resort city consisting of lavish casinos with top entertainment and luxurious hotel accommodations. He reasoned that if people were willing to travel to Hot Springs, Arkansas and Havana, Cuba from the population centers of the northeast and midwest to test lady luck, a short drive or train trip from Los Angeles would be no barrier.

The day that Siegel set foot in Las Vegas, the course of our history, growth, and social order was irreversibly altered." (at 1).

To anyone familiar with casino gaming's origins it is not surprising that the industry, despite the commercial success it is today, still carries with it the taint of its past "Mafia" associations. Perhaps no single infamous episode or individuals — with the possible exception of Meyer Lansky — has more haunted and inhibited its progress towards "respectability" than Bugsy Siegel. His prior associations with Frank "Lucky" Luciano, Frank Costello,[1] Lansky and the New York mob undoubtly doomed his chances of ever being known as a legitimate pioneer. His 1947 assassination at his home in Beverly Hills, California provided the final garish chapter that insured his role in the history of organized crime. More importantly,

for years thereafter it provided reason enough for most of the public to assume organized crime and casino gaming were synonymous.[2]

Following Siegel's death, revelations at the Kefauver Committee hearings beginning in 1950 and subsequent investigations involving Parvin-Dohrman, Meyer Lansky, the "Flamingo Skim" and later still the Central States' Pension Fund, Nick and Carl Civella, Joe Agosto and Tony Spilotro served as ongoing reminders that organized crime's involvement in the casino industry had, indeed, survived Bugsy Siegel.[3] As noted by George Sternlieb and James W. Hughes in *The Atlantic City Gamble*: [4]

The vision of Nevada as a haven for mob activities is one of the dominant folk themes of our time, and this traditional linkage of crime and criminals to gaming did hurt initial efforts to win acceptance of casino gaming in New Jersey. The fear of crime still causes the greatest apprehension when the advisability of legalized casino gaming is considered. In a survey by Gambling Business Magazine, the principle reason the eleven (11) governors who responded gave for the general lack of enthusiasm for expanding gaming to their states was crime and the inevitable influx of "unsavory elements".[at 132].

When these elements of the Nevada casino experience are combined with the mob's well publicized casino exploits in pre-Castro Cuba, and given New Jersey's already heightened sensitivities in the aftermath of the 1967 *Life Magazine* articles detailing organized crime's infiltration into the State, the reluctance of New Jersey voters to approve the first casino gaming referendum in 1974 is not surprising. While there are various factors that led to the ultimate passage of the referendum two years later on November 2, 1976, voter approval followed only after repeated public assurances that casino gaming would be conducted under the strictest of state regulation and control.[5] This notion was constantly reiterated, most notably in June of 1977 when Governor Brendan Byrne reminded the public that the critical element in the eventual success of casino gaming would be the government's ability to keep organized crime's "filthy hands out of Atlantic City."[6]

# II. THE CASINO CONTROL ACT / LICENSING REQUIREMENTS KEEPING THE CRIMINAL ELEMENT OUT OF THE INDUSTRY

It was no accident that at the time Governor Byrne issued that now famous warning he held in his hands a copy of the Casino Control Act.[7] The Act was the embodiment of what the casino proponents had promised and what both the law enforcement community and the lawmakers had insisted upon:[8] that New Jersey would have the "strongest regulation of casinos in the world"; that organized crime would not be allowed to infiltrate the industry in any form; that operating controls would be stringent; and, that only those of highest character, integrity and competence would be allowed to participate in the casino operations.[9]

Thus, the Act addressed the threat of organized crime at both the threshold of the process, with a stringent set of licensure requirements mandating a full — and ongoing — background disclosure obligation for all applicants, and after licensure with what many regard as the most demanding regulatory structure in the world.[10]

To address the Act's investigative and enforcement requirements the Legislature created the Division of Gaming Enforcement, operating under the authority of the Attorney General within the Department of Law and Public Safety (N.J.S.A. 5:12-55). The administrative and adjudicative functions within the Act became the responsibility of the Casino Control Commission, a semi-autonomous agency that is "in" but not "of" the Department of Treasury (N.J.S.A. 5:12-50). Within this framework the Division of Gaming Enforcement is responsible for investigation not only those who own, operate or are otherwise employed by casino hotels, but also those individuals and companies supplying the casino hotels with goods and services on a regular basis. Upon completion of the investigative phase the applicants for licensure can be required to prove their suitability at a full evidentiary hearing before the Casino Control Commission. Thus, unlike traditional law enforcement agencies who bear the burden of proving a case against a defendant only after the crime is committed and the damage done, New Jersey's two tiered system is prophylactic-designed to preclude organized crime or other criminal elements from ever being in a position to engage in criminal conduct in the casino industry.[11]

# III. CASINO CONTROL ACT / REGULATORY ENFORCEMENT STRUCTURE — IDENTIFYING AND REMOVING THE CRIMINAL ELEMENT FROM THE INDUSTRY.

Once a casino is licensed, it is the responsibility of the regulators to assure that its day-to-day operations are in strict compliance with the Casino Control Act and the rules and regulations promulgated thereunder.[12] This is primarily accomplished through active on-site and video surveillances as well as regular audits of the casinos' systems of internal and accounting controls. Violations of the Act or the regulations will result in the Division of Gaming Enforcement taking whatever action is necessary to remedy the misconduct, which may include the filing of a formal complaint with the Casino Control Commission.

These measures have a three-fold purpose: to protect the playing public by ensuring that all the games are being conducted fairly and honestly; to protect the operations from unscrupulous patrons, cheats and dishonest employees; and to protect the state's interests — its taxes on casinos' gaming winnings - by ensuring the accurate recordation of all casino revenues and preventing the possible illegal diversion of funds by players, casino employees or casino management.

Additionally, the casino regulatory authorities involved in this effort[13] are also the first line of defense against the organized criminal elements and others associated with them such as loan-sharks, extortionists, prostitutes, frauds and cheats who typify the parasitic groups that are invariably drawn to

the huge amount of cash that flows through a casino on a daily basis, often in unrecorded transactions.

"Casino crimes" such as theft, fraud, cheating at the table games or slots, victimize both the house and the State which relies on taxes from gaming revenues. These types of offenses occur in various ways and range in execution from the very primitive to the ultra-sophisticated. They are perpetrated by both patrons and casino workers acting either independently or in collusion with each other. They can be simple or elaborate, individual or highly-organized efforts. Some large scale cheating scams have had clear ties to known criminal groups[14] while others, no less sophisticated, have had no such apparent relationship.[15] Equally troubling are the seemingly countless lesser schemes involving bogus chips, marked cards, altered dice, slugs and other cheating devices.[16]

Aside from its inherent value as the object of some manner of theft, one of the primary attractions of this cash intensive business is its ready susceptibility to any criminal who merely wants to "wash" the proceeds of some unrelated criminal undertaking — most often from drug dealings.[17] This practice of converting cash to a negotiable instrument, or small bills to large ones, will hopefully be frustrated by enhanced federal and state efforts to require greater "C.T.R." (Currency Transaction Report)[18] accountability.

A related area of concern deals with the manner in which casinos issue credit to their customers. Inevitable competition for the gambling dollar in New Jersey has lead to widespread abuses in this area. Hearings before our State Commission of Investigation in 1983 documented a host of problems — player credit scams, employee collusion, as well as a litany of personal tragedies — all caused by the over-extension and easy availability of gaming credit.[19] Those hearings also brought to light the vulnerability of the credit system to undesirable elements who are able to obtain significant credit advances, amounting to short term interest-free loans[20] for use in illegal pursuits.

In fact, in his testimony before the Commission Colonel Pagano stated that as many as eight different "Cosa Nostra" families had been involved in casino

credit frauds since the opening of the casinos. In some instances the perpetrators would be individuals who, upon accruing a debt to the Cosa Nostra family, were sent to the casinos to obtain the necessary cash or credit, knowing the resulting "marker" (a credit instrument reflecting the patron's debt to the casino) could not be paid.[21]

Two areas which clearly represent a threat to the integrity of casino operations in New Jersey by virtue of both known and suspected organized crime involvement are the ancillary businesses, which provide goods and services to the industry, and the labor unions. While neither has the ability to directly control a casino enterprise, by controlling some portion of the workforce and the markets for goods and services, the very real potential for indirect control is obvious.

With regard to the unions, the threat should come as no surprise. Given the fact that capital construction costs in Atlantic City have surpassed the $3 billion level, the enormous price to be paid for delays in the construction process should be painfully apparent. Labor peace has clearly become an expensive commodity.

In his testimony before the President's Commission on Organized Crime Ronald C. Chance[22] stated that his discussion of organized crime's influence in the unions would use Atlantic City's own Hotel and Restaurant Union Local 54 — as an example, because in Atlantic City Local 54 and the Mob are one and the same." He then went on to describe Local 54 as follows:

> Local 54, in Atlantic City, is a classic case study in organized crime and labor racketeering. Several of the officers of this union and its predecessor unions boast convictions for murder, arson, extortion, drugs, bribes, kickbacks, and racketeering. Next to the ownership of the casino itself, the control of Local 54 is the most important prize in the Atlantic City sweepstakes ... The history of corruption in this union predates the casinos, but the arrival of casino gambling signaled the start of a new quest for control of the local.
>
> In 1978, when the casinos opened, Local 54 began to rise in stature and importance. Prior

184

to the casinos and gambling, they only had about 2,500 members and most of them were employed in seasonal jobs in the hotel and restaurant industry ... The opening of each casino, though, brought between 1,500 and 2,000 new members into the local and they now have about 15,000 members.

Local 54's annual dues income changed from \$269,000 in 1979 to \$1,389,000 in 1982 ... The casinos also contributed about \$15 million or \$16 million a year to health and welfare and pension plans of the International..

The real story, though, is the illegitimate use of the political influence that Local 54 has. Local 54 could make or break any political candidate in Atlantic City. It's the biggest, richest, and the most powerful union in the city. The support of its 15,000 members is something every political candidate wants. [at 241-249].

The unions will undoubtly remain an ongoing source of concern, and the efforts to investigate and regulate them will continue. Although the unions challenged the Act and the State's authority thereunder, the United States Supreme Court in *Brown vs. Local 54* rejected the union's challenge.[23] That decision enabled the New Jersey regulatory authorities to oust Local 54's president, Frank Gerace, from office, on the basis of a finding that he operated his local under the influence of organized crime.[24]

The State's concern with the ancillary industries and the constant threat of union corruption is futher reflected in recent legislation which enlarged the scope of the Act to require the licensure of construction contractors doing business with the casinos.[25] The licensure requirement in this area enables the regulators to provide the same form of preemptive review which has been so successful in keeping orga-

nized crime out of the owership or operation of the casinos.

The other area within the ambit of ancillary licensing that remains a critical concern to the regulators and other law enforcement professionals is the lucrative junket business.[26] Junkets have been defined as:

. . . an arrangement, the purpose of which is to induce any person selected or approved on the basis of his ability to satisfy a financial qualification obligation or [any person who] has a willingness to gamble and to come to a licensed casino hotel for the purpose of gambling, for [whom] any or all of his costs of transportation, food, lodging, entertainment or other services, items or value for said person are directly or indirectly paid by the casino.[27]

Although the types of junkets are as varied as their worldwide points of origin, it is clear from the testimony before this Commission of Colonel Pagano that organized crime is firmly entrenched with the Bonnano, Bruno/Scarfo, Buffalino, Genovese, Patriarca, LaRocca, and Gambino families all having interests, to varying degrees, in illegal junketeering enterprises.[28]

A State Grand Jury Indictment[29] returned in September 1986 provided a detailed look at both the subtle and not so subtle manner in which illegal junketeers ply their trade. That indictment charged 17 persons and 8 corporations with engaging in an organized criminal conspiracy to run unlicensed junket excursions from 16 states, as well as New Jersey, to Atlantic City casinos. The indictment centered on allegations that the defendants—part of a sophisticated criminal cartel emanating from Florida—"controlled junkets—the lifeblood of the casinos—through a vast network of licensed and unlicensed junket representatives and enterprises."

# IV.  LEGALIZED GAMING AND ITS CRITICAL CRIMINAL IMPACTS

As a result of the hearings held before this Commission it is clear that two of the enduring concerns of both the public and the law enforcement community are the impact legalized gaming has had on: (1) illegal gambling; and (2) the Atlantic City/County

crime rate. Although there would appear to be a good deal of overlap in these two areas, i.e. they both deal with the impact of legalized gaming on other criminal conduct. The question of the effort on the crime rate has been the subject of empirical studies

and is blessed with an abundance of statistical research, while the critical questions concerning the impact on illegal gambling are largely theoretical, and not surprisingly, the available research is not easily quantifiable.

What follows is a review (Part A) of the questions regarding gaming's impact on illegal gambling and second (Part B) the "fact and fiction" as to the correlation between casino gaming and the crime rate.

## A. LEGALIZED GAMING AND ITS IMPACT ON ILLEGAL GAMBLING

In a 1974 study entitled *Easy Money*, "Report of the Task Force on Legalized Gambling sponsored by the Fund for the City of New York and the Twentieth Century Fund," the authors reflected upon the then prevalent law enforcement and societal concerns relating to legalization of gaming:

. . . in state after state, the traditional taboo against gambling is being overcome by the need for new revenue and the desire to rehabilitate depressed areas and promote tourism. Excited by the success of the New Jersey Lottery and the projected earnings of the New York's Off-Track Betting System (OTB), many legislators are prepared to welcome gambling as the alternative to higher state taxes.

Frustrated law enforcement officials, too, are calling for legalization. They say their efforts are hopelessly compromised by judges — and a public — who do not take the gambling laws seriously. Plea bargains are common; fines are low; and jail sentences are very rare. Get the gambling laws off our backs, police spokesmen say; let us concentrate our efforts on serious crimes.

Many observers also maintain that the present laws make possible a lucrative monopoly of the illegal gambling industry for organized crime. According to this reasoning, the large criminal syndicates, protected from legitimate competition, make millions of dollars from gambling and use the earnings to underwrite other, more pernicious, illicit enterprises: narcotics, loan-sharking, hijacking, and prostitution. Worst of all, illegal gambling provides both the motive

and the financing for police graft and political corruption. Only legal competition, it is contended, can cut off the source of income and reduce the capacity of organized crime to buy official protection. So long as anti-gambling statutes are on the books, the underworld will enjoy an enormous source of revenue and power, and the gambling public will be forced to patronize illegal establishments.

Joining these proponents of legalization are increasing numbers of people who consider the current gambling laws morally unsound. They favor legal gambling not on financial or law-enforcement grounds, but because the present system, in which some states outlaw private poker playing and others permit church-operated bingo, is discriminatory and hypocritical and undermines public respect for the law. Legalization will end this hypocrisy and get gambling into the open where it can be suitably regulated and controlled.[at 28-29].

While less expansive in its analysis, the Pennsylvania Crime Commission's 1987 Report presents one law enforcement perspective suggesting that at least some of the goals of the 70's have yet to be realized.

Historically, some advocates of legalized gambling have argued that this "enlightened" public policy would eliminate, or at least reduce, revenues to organized crimes. Again, nothing could be futher from the truth. The research demonstrates quite convincingly that partially and ill-conceived expanding legal gambling markets only serves to enlarge the number of people who gamble. This, in effect, creates an entirely new clientele for illegal profiteers. Moreover, there is ample evidence to suggest that the legalization of gambling which is privately operated is quite susceptible to organized crime exploitation, if not direct control. To argue that legalized casino gambling, for example, has removed this form, of gambling from the province of organized crime is naive at best, and ignorant at its worst.[at 14].

On October 15, 1987 this Commission heard from representatives of the F.B.I., N.J. State Commission of Investigation, and the N.J. Division of Gaming

Enforcement and Criminal Justice. No one suggested that legalized gaming had accomplished what some of its early law enforcement proponents had hoped for: *i.e.* take the profit out of illegal gaming by providing a legal market for its players.

N.J. State Police Superintendent Clinton Pagano suggested that "the legalization has no or little negative effect on illegal gambling in New Jersey."[30] In fact, he went on to note:

The legalization of gambling has augmented in many respects organized criminal enterprises, giving them new opportunities to spread out and operate.

Enforcement statistics provide additional indications that illegal gambling activities still continue unabated. Gambling arrests in New Jersey before and after the advent of casino gambling in Atlantic City disclosed the following: first, that the actual volume of arrests... has remained substantial between 1977, which was pre-casino, and 1986, which is probably the last year that we have the figures for now, indicating that there is substantial illegal gambling activity occuring in our state.

Prior years percentage change rates during the decade are negligible, showing no telling pattern of decline or increase, futher indicating that illegal gambling operations continue to co-exist with legalized gambling. [*Id.* at 11 and 17].

John McGinley, Special Agent in Charge of the F.B.I.'s New Jersey office, described legalized gaming's impact as "minimal" [*Id.* at 65], but warned that the legalized industry had

. . . created a new market of gamblers that does not either compete with illegal groups or hurt their operations at all. It has, though, created an ever broader acceptance of gambling and has made it harder for law enforcement to verbalize why illegal gambling should be prosecuted.

Interestingly, he indicated that "illegal gambling *per se* is of little interest to the F.B.I. or really to any federal agency,"[31] other than as it is relates to "orga-

nized crime" (as a source of income) or the invariable corruption of our political or law enforcement systems that most criminal justice experts feel is an inescapable byproduct of illegal gambling. [*Id.* at 62,64].

Like Colonel Pagano, who relied in part on information provided by cooperating witness Thomas Delgiorno,[32] Mr. McGinley cited information provided by former organized crime figures (Cafaro, Caramandi, Lenardo and DelGiorno as well as Frattiano) to support his position that illegal gambling is a "major source of income for La Cosa Nostra." [*Id.* at 63]. In fact, former N.J. State Police Deputy Superintendent Justin Dintino (now Chief of Intelligence and Organized Crime for the State Commission of Invesigation) and Colonel Pagano [*Id.* at 13] while disagreeing with some federal authorities who rated gambling as organized crime's "number one" revenue source, stated that it is clearly "number two" (behind narcotics) as far as income is concerned.[33]

Despite their different views as to whether gambling or narcotics is the number one moneymaker, all three of these witnesses (Pagano, McGinley, and Dintino) agreed that within the illegal gambling hierarchy, "sports" betting was unquestionably the primary source of income.[34] To the extent that sports bookmaking is the only *major* form of gambling that has not been legalized in New Jersey (or any other state jurisdiction other than Nevada) speculation is only natural as to what impact legalized sports betting would have on the illegal market. In its 1987 Report, the Pennsylvania Crime Commission addressed this precise issue:

The available data on illegal gambling seems to suggest that sports bookmaking is by far, the largest revenue producer for organized crime. When compared to numbers — the illegal lottery—sports bookmaking is estimated (1974) to be a 2.4 billion dollar industry. Numbers, on the other hand, represents a 1.4 billion dollar market. Hence, if public policy makers and legislators, believe that legalization of gambling will remove this activity from the province of organized crime, then sports bookmaking would be the next likely candidate for legalization. There is no reason, however, to believe that legalization of gambling

will dimish organized crime. Producing reve-
nue for the state is clearly the primary justifica-
tion of any legalization of gambling. [at 14].[35]

It seems clear that whatever rationale is used to
justify gambling activity that is either operated or
controlled by the government, most law enforce-
ment professionals agree that legalization has a neg-
ligible impact on, and in some ways enhances the
illegal markets. One very practical explanation for
this is what Colonel Pagano described as the ability of
the illegal entrepreneurs to "outmarket" their legiti-
mate counterparts. In addition to offering a greater
variety of wagering opportunities (*e.g.* sports bet-
ting, ethnic card parlors, cock fights *etc.*), the illegal
enterprises also have the edge in the following areas:

1. there are no state or federal taxes paid by bettors
   or operators;

2. regular customers, regardless of "traditional"
   credit requirements usually maintain credit
   accounts with their "bookies" with whom they
   "settle-up" on a weekly basis;

3. there are a few, if any, betting minimums (*e.g.*
   "nickel" numbers bets are still permitted) or
   maximums imposed;

4. they provide greater convenience in that gam-
   bling activity is often offered locally, and wagers
   can usually be placed by phone with winnings
   and losses paid and collected in person by "run-
   ner" who work for illegal enterprise;

5. most important, in the area of the illegal lottery is
   the fact that the odds are better in the illegal daily
   "number" (*e.g.* between 500 and 600 to 1 pay-
   out) and the winner is paid in a lump sum rather
   than some form of multi-year annuity, currently
   used for most "millionaire" type lotteries.[36]

To the extent both the illegal and legal gambling
markets appear to be thriving, it is difficult to argue
with the law enforcement experts who suggest that
legalization has simply introduced more of the popu-
lation to gambling without dimishing the returns to
the illegal enterprises. As Chief Justin Dintino put it:

If government is serious about reducing the
income of organized crime, it has to compete

with organized crime, by paying better odds
than organized crime is paying, such as the
lottery, and not taxing gambling winnings.
Organized crime offers credit, telephone bet-
ting, better odds and, most important tax-free
winnings. I emphasize that. [37]

## B. CASINO GAMING AND ITS IMPACT ON CRIMINAL CONDUCT

It just doesn't make sense—no sense at all.
Here we're trying to close down crack houses
and the Mayor wants to invite into the city an
even greater influence in the spread of drugs.
Everyone knows that where casinos come, pros-
titution comes, drugs, racketeers come and the
Mafia comes. — The Reverend William
Quick.[38]

The author who quoted Reverend Quick in the
*Detroit Free Press*, staff writer Michael G. Wagner,
stated it even more bluntly:

Casinos means the mob. There's no question
about that. And they mean that crime rises.
The potential for corruption soars. *Id.*

While a special 67-member Detroit Commission is
currently weighing a proposal to legalize casino gam-
ing for that city, the fears expressed are not new.
When Floridians were addressing the issue in 1986
the opponents of the proposal rallied behind the
same "Atlantic City" statistics, *i.e.* the F.B.I. crime
index showing that the number of violent crimes in
Atlantic City had more than doubled from 1978 to
1986, and the property crimes such as burglary, lar-
ceny and auto theft had more than tripled.[39]

No matter who is assessing the impact of casino
gaming on New Jersey, no one disagrees with the
conclusion that both crime and criminals are more
prevalent in Atlantic City now than before the
advent of the casinos. Few would even quarrel with
the large percentage increases which are quoted.
However, there are clearly two distinct schools of
thought with respect to which statistics present the
"fairest" picture of Atlaintic City. In essence, the
issue turns on whether Atlantic City's 32 million
visitors are "factored-in" when caculating the crime
*rate*, as opposed to simply tallying the total number
of crimes committed. When dealing with a year

round local population base of approximately 38,000 the impact of a daily transient population often as high as "several hundred thousand" on peak summer weekends, but which, at least, averages some 87,000 visitors *daily*, simply cannot be overlooked.[40]

The two sides of this issue are thoroughly, if not conclusively, discussed in studies conducted by Jay S. Albanese, Ph.D. "The Effect of Casino Gambling on Crime," *Federal Probation*, June 1985 at 39 to 44 and Joseph Friedman and Simon Hakim, "Casinos and Crimes: Atlantic City's Experience," *Casino Gaming*, May 1987 at 9 to 13.

Friedman and Hakim concluded from their study that there was an increase in crime in the Atlantic City region when comparing the post and pre-casino years for three "semi independent reasons":

1. Tourists coming to the city basically to gamble may develop a criminal motivation and commit crimes as they need more cash or as they spot attractive crime opportunities. These criminals stay temporarily in the region.

2. Casinos attract criminals who settle in the region to enjoy the various illegal opportunities associated with gambling. Prostitutes, drug dealers, robbers, thieves and other professional criminals find Atlantic City and its environs an attractive location for their activities.

3. Any type of economic growth causes increased crime. When a region grows as a result of any prosperous economic base industry it is expected to house more criminals. Even if the share of criminals in the general population stays constant larger population size means more criminals. [*Id.* at 9]

As they went on to note, the critical question regarding issue number three is whether on a comparative basis casinos generate more crime than other types of economic development of comparable magnitude. Without explaining how the daily transient population was factored into their calculations, they concluded that:

The level of all types of crime is higher in the post-casino years (1978-1984) than it was before in the years preceding the introduction

of casino gaming to Atlantic City, even when variables such as the population and its social economic profile are taken into account.

In a commentary responding to the Hakim Friedman study Peter Sheridan, attorney for the Atlantic City Casino Association observed that:

Statistics are wonderful tools, but you must look at what has happened here and the fact that we have such an abundance of tourists each year. Often in the statistics utilized, there is no factor to adjust for the increased number of vistors. It is unfair to compare crime rates today with crime rates of 1977 without making an adjustment for the great influx of visitors into the city. Admittedly, there are crime problems in Atlantic City, but none that is usually high when considering the number of people that are in the town on a daily basis.[41]

In a companion piece that also responded to the Hakim-Friedman study Anthony Marino, Manager for Statistical Analysis in Computer Services for the New Jersey Expressway Authority, took similar issue with their statistical analysis noting that the F.B.I. crime index statistics are based on the resident population, in this case approximately 38,000 people. As he put it:

The chances of getting murdered, raped, robbed, or beaten up in Atlantic City have actually decreased dramatically since casinos came to town. The actual numbers of such offenses and other non violent crimes logged in the F.B.I.'s UNIFORM CRIME REPORT have gone up since 1977. But the crime rate went up at an even higher percentage because the F.B.I. bases its crime rate on Atlantic City's year round population. When the millions of resort tourists and tens of thousands of employees who work but don't live in the city are figured in, the crime rate has taken a steep drop.[42]

The Albanese article noted above would describe this disparity and analysis as one that ignores the critical element of the *risk* of crime as opposed to the number of index crimes in any one year. Stated differently, Albanese places greater weight on the crime rate as opposed to the number of crimes being committed, *e.g.* if ten people out of one hundred are

victimized by crime in 1986 and if the next year the population has doubled to two hundred and the number of victims has doubled to twenty, the rate or risk of crime has remained the same. In fact, Albanese concluded that,

> this means that increases in index crime are best accounted for by increases in the average daily population of Atlantic City, suggesting that growth in the number of visitors to Atlantic City has surpassed increases in crime to the point that the personal risk of victimization is declining to some extent. Therefore, the increase in serious crime in Atlantic City has been more than offset by an increasing population there. The result has been a slight *reduction* in the likelihood of being victimized there.[43]

A final factor to be considered, which is alluded to in the Albanese study, is the effect of enhanced enforcement on the crime statistics which are col-lected[44] by the New Jersey State Police. These figures are *not* adjusted to account for the transient/visitor population. With respect to the issue of enhanced enforcement consider that the Atlantic City Police Department numbering 378 is augmented by 85 additional New Jersey State Troopers who investigate criminal conduct within the casino facilities. Consider further that there are an additional 2,150 security personnel throughout Atlantic City's twelve casinos who are also responsible for policing the actions of all the casino/hotel patrons and other guests. Clearly, given this level of "enforcement" personnel — probably unparalleled in terms of intensity — coupled with the enormous number of daily visitors, there should be little doubt why arrests, prosecutions and convictions flow fron Atlantic City in such an apparently inordinate volume. While no statistics exist to support this proposition, there is probably no jurisdiction where a criminal is as likely to be caught as in Atlantic City. The crime index in Atlantic City shouldn't be defended, it should be cited as a benchmark of effective law enforcment.

## V. CONCLUSION AND RECOMMENDATIONS

Among the chief concerns uniformly voiced by public officials and private citizens considering legalized gaming in their jurisdictions is crime, especially the organized and street varieties. This is so because whatever economic benefits flow from legalized gaming, the societal costs almost invariably include the "crime" phenomenon. Our focus on this issue is but part of this Commission's broader study identifying and measuring all costs and benefits to shed light on the real contribution of legalized gaming to the welfare of the State and to serve as a guideline for public policies. In assessing its impact on crime, the Commission has concentrated on one particular form — casino gambling — because its unique characteristics make it readily susceptible to and a vulnerable target for criminal elements.

The Commission finds that casino gaming is unique and has had a checkered history in other jurisdictions, particularly Nevada where organized crime figures dominated the industry's early development.[45] So strong is the historical basis for this belief that a widespread public perception linking casino gambling with organized crime has persisted at least as late as 1982[46] despite the movement toward a professional, regulated industry in Nevada largely devoid of such influences, the introduction of large publicly-held companies under the supervision of the Securities and Exchange Commission and finally, the start-up in 1977 of New Jersey's comprehensive casino regulatory machinery.

The Commission also finds that as a result of New Jersey's strict regulatory scheme and law enforcment diligence, organized crime has not in fact infiltrated the operation, management or owership of the casino industry in this State, the games in Atlantic City are conducted fairly and honestly, and all casino revenues are being accurately recorded. This strong regulatory apparatus as well as government's rock-hard commitment to use it are largely responsible, we find, for an improvement over a five-year period in the public's perception that it is less likely casino gambling in Atlantic City would fall under the control or influence of organized crime.[47] Because this improved perception reflects more accurately the reality of the situation, and because public confidence in the integrity of casino operations and of the

regulatory process is so vital to their continued existence,[48] the Commission strongly recommends that this perception be reinforced and strengthened.

The Commission also recognizes, however, that as a general proposition, organized crime gravitates to the points of least resistence and thus remains today on the fringes of casino gaming, eagerly attempting back door access into the casino/hotels through the service industries and labor unions where the threat of organized crime infiltration is most acute. While the large majority of ancillary businesses (some 11,000 as of 1987 including about 3,800 New Jersey-based firms) servicing the casino industry are legitimately run,[49] organized crime has managed to make some inroads through the use of fronts and other means of hidden ownership in certain segments of the support services sector, particularly as concerns the lucrative junket business.

The Commission further finds that the Casino Control Act, particularly as most recently amended to upgrade junket licensure and expanded regulatory jurisdiction over construction companies and labor unions, provides law enforcement the necessary tools to ward off organized crime influence even at the peripheral layers of casino gaming. The confluence of strict eligibility criteria, full disclosure laws and tough licensing burdens which has been so effective in ridding the casino industry of the taint of organized crime can meet with an equal degree of success if applied with the same vigilance and effort at the ancillary level. We therefore recommend continuation of law enforcement diligence and deployment of the full panoply of statutory powers in this area to the end of ensuring that organized crime benefits neither directly nor indirectly from casino gaming.

A related area of concern is casino-specific crime — offenses such as theft, fraud, cheating at the table games or slots — which victimize the industry and the State which relies on taxes from gaming revenues. No one knows for sure how much these cheating gambits cost the casino industry but just those scams that are detected and prosecuted suggest the losses could run into the tens of millions of dollars. In New Jersey alone, in only 1987, 47 individuals were arrested and indicted on charges related to cheating at the casino games. Those cases involved more than $3.5 million in illegal casino winnings.

While several of these scams involve organized criminal conspiracies, many are not as elaborately planned and excuted, yet their cumulative effect can be just as devastating. Particularly in the area of casino credit and currency transaction reporting which are both vulnerable to organized criminal schemes, the Commission finds that in the past loose and informal casino practices and policies have facilitated and contributed to the industry's own victimization.[51] Recent statutory and regulatory reforms tightening credit controls as well as heightened federal and state oversight of currency transaction reporting promise to minimize the risks otherwise posed by this cash-intensive business. Given the particular vulnerability of and special law enforcement concerns with casino credit and currency reporting, the Commission wholeheartedly endorses these reforms and recommends, after a suitable period of implementation, enhanced regulatory review of the industry's compliance in both areas to determine whether controls need even further strengthening.

The Commission also recognizes the increasing sophistication and complexity of other types of casino-specific crimes and urges casino regulators to keep pace with advancements in gaming technology. Given the mutuality of interests involved, the Commission further supports a close coordinated effort between industry and regulators to crack down hard on this problem.

No discussion of the general issue can be compete without reference to street crime — the single most common factor cited in arguments against legalization of casino gaming. Although much has been written and spoken about the surging crime rates of transient resort cities like Reno, Las Vegas, and Atlantic City and how casinos act like a magnet to attract the criminal parasites who prey on the millions of tourists who visit these cities each year, the Commission is unaware of any generally accepted study conclusively establishing the link between casino gambling and crime.

Lest there be any doubt, experience in both Nevada and New Jersey suggests that street crimes increase as a result of casino gambling. Indeed, Index Crime in Atlantic City sharply rose after the advent of casino gaming. While this upsurge in post '78

191

Atlantic City street crime is a highly significant consideration for this Commission, we believe it also important to assess the *crime rate* and the *risk* of crime to citizens in Atlantic City. In other words, any accurate analysis of the street crime issue must take into acount changes in: the population at risk, criminal opportunities, law enforcement resources and priorities, and crime rates elsewhere in the State. Stated somewhat differently, the real question is whether casinos have an *independent effect* on serious crime in Atlantic City or whether the rise in Index Crime is due to other factors incidental to casino gaming, namely increases in population, opportunities, police manpower or criminal incidents throughout the State.

Given the inconclusiveness of the studies and information in the record before us, the Commission is unable to render a definitive answer. Because of the importance of the "casino crime link" issue in any public policy assessment of casino gaming, however, the Commission strongly recommends an analysis and evaluation of the problem as part of the function and responsibility of the permanent advisory structure suggested elsewhere in this report.

Equally inconclusive is any data regarding the impact of legalized gaming on illegal gambling. This Commission has heard from law enforcement experts in New Jersey who contend that legalized gaming has not only failed to curb illegal gambling but in fact

has been conducive to its growth. We are also aware of reports form New York, however, which contend that the three- and four-digit state lottery games in that State have significantly cut into the appeal of numbers betting in many areas, citing the Buffalo region in particular.[51] Both positions appear to be based more on experience, observation and impression than statistical support since the impact on the illegal gambling business has not been studied under any exacting scrutiny and would be most difficult, in any event, to quantify.

The Commission strongly suspects that whatever recent successes have been realized, illegal gambling, especially the numbers rackets and sports betting, remains a major problem. The reasons appear to be several. First, illegal gambling is the mainstay of organized crime groups. Considered basically an innocuous activity, numbers and sports book traffic is so deeply rooted in certain areas that it has become culturally acceptable and part of the local economy in some neighborhoods. And finally, from a competitive perspective, illegal gambling offers better odds, easier credit and confidentiality.

As with street crime, the Commission recommends as part of the State's continuing review of gaming policy issues, an in-depth study of the impact of legal gaming in all its forms on illegal gaming.

192

# G. SUBCOMMITTEES' RECOMMENDATIONS

# The Subcommittee on Economic Impact

The Subcommittee on Economic Impact has met and agreed, in principle, to adopt the following recommendations.

The Subcommittee advises the entire Advisory Commission to adopt the following recommendations for inclusion into its final report.

## Recommendation 1

*There should be increased reporting by the various segments of the gambling industry of part-time and full-time employment.* Because there are a number of reporting requirements already in place, the marginal cost of obtaining this information is small and could be contained in annual reports or budgetary data.

## Recommendation 2

*The employment multiplier model needs to be updated to include structural changes in the New Jersey Economy.* As the service and information sectors of the State and Local Economies increase, the magnitude of the employment multiplier will change. The multiplier developed by the Office of Economic Policy and Planning drives many of the figures in this and other reports and is in need of revision.

## Recommendation 3

*The income multiplier model needs to be updated to include structural changes in the New Jersey Economy.* For many of the same reasons outlined in Recommendation 2, this model needs to be revised. As new gambling legislation is offered there must be objective analysis of the economic effects of this industry. For example, the current campaign of the casino industry to make known its economic benefits must be scrutinized with great care.

## Recommendation 4

*Economic Models of Revenue Prediction should be developed for the three sources of gambling revenue for the State.* While economic prediction is still a relatively young science, a literature about gambling econometric models is emerging. These models are

useful to policymakers by attempting to predict aggregate amounts of revenue, as well as what might happen to revenues when controllable variables (e.g. tax rates) changed.

## Recommendation 5

*There should be a centralized clearing house of information whose function it is to monitor, on a continuous basis from all segments of the gambling industry, indicators and patterns of economic development.* This information could be gleaned from a number of state agencies, County departments and industry sources, concerning the continuing impact of gambling on economic development.

## Recommendation 6

*There should be an annual report concerning the economic and social costs and benefits of gambling for Atlantic County.* In the late 1960s the Federal Government issued a monograph entitled, "Toward a Social Report." This report addressed both the distributional and quality of life issues connected with economic growth. Because of Atlantic County's unique relationship with the gambling industry, this report, (which will hopefully be prepared by those outside the industry and political infrastructure), would address those same concerns as "Toward a Social Report." This report could be used by policymakers to develop changes in existing gambling legislation as well as for a discussion of new programs.

## Recommendation 7

*The State should consider creation of a budget stabilization fund to provide a cushion against a fall-off in gaming revenues.* The Lottery and the Casino Fund have been used to fund social programs that have become an important part of the safety net New Jersey provides to its needier citizens. Although revenues from the two have consistently trended upward during the 1980s, both will have had ample room for expansion either through the addition of new casinos or new games attracting new audiences. There is no guarantee that the casinos and the Lottery will continue to grow at prior rates and may eventually dip, as similar industries have in other states. To guard against damage to the programs they support, the State should consider a budget stabilization fund

193

dedicated to gambling, or a general fund that could be used to fund programmatic shortfalls.

### Recommendation 8

*The State programs that receive dollars from gambling tax revenue should be evaluated annually on a cost-benefit basis.* The State already has an elaborate budget process that works to reduce unnecessary expansions of personnel and equipment. But there is no regular, legislative mechanism for reconsideration of entire programs and their funding. There is, however, a natural trend to expansion of programs, as new needs are identified. The Casino Fund, which for several years had surpluses, is now expected to run a deficit in the early l990s. Thus, there is a need for continuing reevaluation of programs.

### Recommendation 9

*Serious consideration should be given to consolidation of elements of enforcement in a single agency.* There are cross-cutting elements of enforcement in all of the forms of gambling that might be handled more efficiently through a single agency. The Lottery, for instance, is charged with reducing the influence of organized crime, and relies upon law enforcement officials to assist with background data necessary to maintain the integrity of the Lottery's extensive network of agents and vendors. Legalized games of chance are similar mechanically to the slot machines already scrutinized by the Division of Gaming Enforcement. Like the Lottery and the Casino Control Commission, the Racing Commission utilizes law enforcement officials to regulate participation in racing.

### Recommendation 10

*The State should commission a demographic study of gambling in New Jersey.* Various gaming organizations routinely purchase studies of their own for marketing purposes, but no single organization or study looks at the demographics of gambling for the sole purpose of learning who gambles in New Jersey and how much. Such a study would help the State identify the sources of the gaming dollar, and would assist policymakers in determining how best to regulate gaming and deal with its negative influences.

# THE SUBCOMMITTEE ON COMPULSIVE GAMBLING

**Proposed Outline of Recommendations by: Ronald Dancer**
**May 21, 1988**

## I. Social Impact

[Editor's Note: This section of Mr. Dancer's recommendations is the entire report of the Subcommittee on Compulsive Gambling.]

A. *Recommend* establishing within Department of Health an office of Compulsive Gambling providing a comprehensive compulsive gambling program of education, treatment and research as outlined in Assembly Bill 516.

[Proposed Amendment to A516: Representative from N.J. Psychological Association on advisory panel.]

B. *Recommend* all State gambling enterprises (public and private) promote and disseminate on promotion materials a cautionary statement with referral information for compulsive gambling.

C. *Recommend* all state gambling enterprises (public and private) inform employees or vendors of the illness of compulsive gambling.

D. *Recommend* that State Brokerage Firms be informed of the negative impact of compulsive gambling and encourage remedial steps.

E. *Recommend* the Department of Health to award research grants relative to the incidence and prevalence of pathological gambling and its social impacts. ("STATE OFFICE" BILL)

F. *Recommend* stringent enforcement of the Minors minimum gambling age limits and enforced by meaningful sanctions.

G. *Recommend* that Departments of Education and Human Services initiate public and youth awareness programs on the illness of compulsive gambling. ("STATE OFFICE" BILL)

H. *Recommend* the Judicial system provide an awareness program of the illness of compulsive gambling with required evaluation and treatment for compulsive gamblers convicted or incarcerated, especially embezzlers. ("STATE OFFICE" BILL)

I. *Recommend* compensable insurance coverage for pathological gambling treatment. ("STATE OFFICE" BILL)

J. *Recommend* that all Gambling advertising be "informational" in nature and not "hard sell."

K. *Recommend* Federal legislation to control interstate lottery advertising insuring uniform "information" and not "hard sell" advertising.

## II. Revenue Raiser

A. Pressure public benefits and human services of the finite gambling dollar and *Recommend* that with any future expansion of gambling, appropriate commensurate measures, financially and administratively, be provided to ameliorate negative social impacts.

B. To maximize revenues from existing forms of legalized gambling while minimizing social costs, the Commission *Recommends:*

(1) for the casino industry: Develop in Atlantic City a convention facility and airport.

(2) for the lottery: Oppose regional and multi-interstate lottery operations.

(3) for the racing industry:

(a) Just as casino revenues benefit senior citizens and lottery revenues benefit education, the State's Racing Pari-Mutuel tax revenues (less Racing Commission expenses) should benefit specific purposes as outlined in proposed legislation —

the "N.J. Horse Industry Growth and Development Fund"* which addresses both economic development and social concern programs, such as, funding for:

— the State Office on Compulsive Gambling
— the N.J. State Horse Park
— Adult Education Program for Backstretch Employees
— Drug and Alcohol Abuse Programs
— Job Training and Placement
— Tourism and Marketing
— On-site Track Employees Housing

(b) Rescind the 1942 prohibition of Sunday Pari-Mutuel Wagering on Horse Racing and provide the Racing Industry with Sunday business and entertainment opportunities as permitted for the N.J. Lottery, Casinos, and neighboring Horse Racing States. If approved, the permitted race days per week should not exceed (6).

C. Recommend to annually monitor the percentage of State Budget derived from gambling revenues.

### III. Conduct of Gambling

A. Recommend the continuance of present-day gambling Regulatory Agencies and oppose a Division of Gaming Enforcement takeover of all gambling activities. Recommend game of chance be transfered from Division of Alcohol and Beverage Control to Division of Gaming Enforcement.

B. Recommend support for Federal Bill to control Indian Reservation Gambling.

C. Recommend increased State funding to eradicate illegal betting.

D. Recommend permanent status for the "Governor's Advisory Commission on Gambling."

## *The New Jersey Horse Industry Growth and Development Fund

The New Jersey Horse Industry Growth and Development Fund shall be administered by the N.J. Racing Commission and provide appropriations of:

(1) $150,000 Annually to the State office of Compulsive Gambling within the Department of Health, and

(2) $200,000 Annually to the N.J. Department of Education to provide "backstretch" Racetrack employees with an adult Education Program designed to assist employees with reading, writing and speaking the English language and attaining primary and/or secondary school GED certification.

(3) $300,000 Annually to the New Jersey State Horse Park, and

(4) $75,000 Annually to the Division of Alcohol and Drug Abuse to establish an informational, referral and educational program on alcohol and drug abuse for N.J. Racetrack employees.

(5) the balance of available monies to the "New Jersey Horse Industry Growth and Development Fund" which shall provide for, but not limited to:

(a) the establishment of a State-wide promotion and marketing co-ordinator

(b) develop and implement programs with the N.J. Division of Tourism promoting the State's horse industry

(c) funds for the televising and promoting of New Jersey Horse races which are of national interest, such as the Hambletonian

(d) job training and placement for backstretch employment at N.J. Racetracks and horse farms and provide N.J. unemployment and welfare offices with job opportunity directories.

(e) provide on a 50% matching fund basis with Racetrack operations, funds for capital improvement projects, such as on-site track

employee housing and upgrading racetrack facilities and patron amenities. Privately-owned racetracks shall be permitted to utilize N.J. Sales and Use Tax amounts paid to the State, as a credit for 50% matching funds, since quasi-state owned tracks are excempt from the tax.

Legislation establishing a *New Jersey Horse Industry Growth and Development Program* which addresses economic needs, as well as social concerns in the one billion dollar racing industry.

Annual funding for the program to be provided from the surplus of State revenues which are derived from the tax on pari-mutuel wagers less the operating expenses of the N.J. State Racing Commission.

| | |
|---|---|
| Est. Annual State-tax receipts from pari-mutuel wagering: | $7,000,000 |
| Est. Annual N.J. Racing Commission expenses : | (3,000,000) |
| Est. Annual State Pari-Mutuel tax surplus: | $4,000,000 |

The State Tax on pari-mutuel wagering is 1/2 of 1% of every dollar bet at New Jersey racetracks. Therefore, it is the Racing Industry fan base that is providing the State Treasury with funds to appropriate the "N.J. Horse Industry Growth and Development Fund." It is prudent for the State to re-invest surplus pari-mutuel taxes into the 1 billion dollar Racing Industry which should engender the State's economy with the dividends as a result of a healthier industry.

New Jersey State Library

197

# POSSIBLE RECOMMENDATIONS
# TO THE
# GOVERNOR'S ADVISORY COMMISSION ON GAMBLING
* * * *
# CURRENT AND EMERGING PUBLIC POLICY ISSUES

## I.  ISSUE: Creation of a State Advisory Body

New Jersey would benefit by the establishment of an advisory body to review the ongoing policy issues which relate to all forms of legalized gambling in our state — to provide a centralized source to review, research and analyze issues relating to all forms of gambling — which, due to the complexity of the issues, could keep pace with the ever changing law enforcement issues, technological advances and concerns relating to competitiveness between the forms of legalized gambling within New Jersey and competitive challenges from other jurisdictions with legalized forms of gambling.  This advisory body would be called the Office of Gaming Policy and would be a part of the executive branch of government, in but not of, the Department of Treasury. This Office of Gaming Policy would act as a clearinghouse of information and, in an advisory capacity, provide sound recommendations to the Governor and Legislature.

As an adjunct to the Office of Gaming Policy, there should be created a Council of Gaming Officials comprised of the ex-officio representatives of gambling interests in New Jersey.

The Council of Gaming Officials will provide information about the operations of legalized gambling in New Jersey to the Office of Gaming Policy.

RECOMMENDATION: Be it resolved by the GACG that an Office of Gaming Policy should be established in, but not of, the Department of Treasury and that a Council of Gaming Officials act as an adjunct to it.

## II.  ISSUE:  Public Confidence in Legalized Gambling Activities in New Jersey

Casino industry leaders and regulators often agree that preservation of the "integrity" of casino games, the industry, and the regulatory process is essential, but at times the definitions of integrity vary. The economic vitality of the industry and the state's interest depend on this important issue. Compromise in this area is not acceptable. It is essential that everyone have a clear understanding that the role of the Casino Control Commission is to preserve the best interests of the state, not the best interests of the industry unless those interests are similar; sometimes they are, sometimes not.

New Jersey's ten years of experience with legalized casino gambling in Atlantic City has clearly demonstrated that many of the wide-ranging economic benefits of casino gambling were underestimated while some of the social problems and development issues were not anticipated. The one consistent theme presented by the state and supported by the industry has been the need to maintain public confidence in the casino experience. State gaming officials have the responsibility of assuring in both appearance and fact, the integrity of the casino gambling industry and the credibility of the state institutions established to regulate it. Casino industry members are held to very high standards as they undergo in-depth scrutiny on an ongoing basis. The model New Jersey has established through the careful craftsmanship of the Casino Control Act is recognized around the world as the preeminent example of an incredibly successful regulatory scheme. Strict controls which are carefully reviewed and conscientiously observed and enforced have contributed in many ways to the success of the casino experience in New Jersey. The record before the GACG does not demonstrate that the other forms of legalized gambling are as carefully scrutinized.

RECOMMENDATION: The GACG adopts this clear statement of philosophy:

Be it resolved by the Governor's Advisory Commission on Gambling that the importance of preserving the integrity of casino gambling in New Jersey must remain paramount in the structure of the regulatory systems and in

198

the philosophy of the state's decision-making mechanism regarding the casino industry. The economic vitality of the industry, the public confidence in the operations of the casinos and worldwide image of the great State of New Jersey depend on our strict adherence to this principle. Be it further resolved that the benefits of the strict standards of regulation which apply to the casino industry should be applied where appropriate, to the regulatory schemes of the other forms of legalized gambling in New Jersey.

### III. ISSUE: Restrictions on Family Members of Certain State Employees

The New Jersey Statutes governing the relationship between employees of state government, the family members of the employees of state government and casino employees, and the casino industry in general were last reviewed on a comprehensive basis in 1984. At that time, the Legislature acted to end, on a temporary basis, certain prohibitions imposed on family members of certain state employees. The effect of that legislation expired on January 6, 1985. In light of the confusion this caused and the sensitivity of this question, a comprehensive review of this subject is in order.

RECOMMENDATION: The Governor's Advisory Commission on Gambling recommends to the Governor and the Legislature that a Study Commission be constituted to review the relationship established in the Conflicts of Interest Law between New Jersey State employees, their family members and casino employees and the casino industry.

### IV. ISSUE: State Dependence on Gambling Revenues

Testimony before the GACG has demonstrated that since Resorts first opened in Atlantic City ten years ago, casino revenues have shown a continuous growth pattern. This has meant that each year, the money available to the Casino Revenue Fund has increased. More programs to be funded by the Casino Revenue Fund are constantly under consideration by the Legislature.

Public pressure is often produced by the special constituencies which would benefit by any expansion of existing programs. As long as this upward trend continues, there may be no cause for concern. But, if factors develop which lead to a drop or even a diminished *rate* of growth of the revenues, several questions will emerge.

How should New Jersey fund program commitments if revenues decline?

Should regulatory changes to relax standards and controls ever be designed only on the basis that the changes will increase revenue?

How can New Jersey best prepare for the competitive challenge Atlantic City may face from efforts to legalize casino gambling in other states? The New Jersey statute and the New Jersey experience have become models for the legalization of casino gambling in other parts of the world. Are we prepared to withstand direct increased competition and if not, what steps should the state take to enhance its ability to compete?

Should there be expanded uses for the available funds?

Will these expanded uses create an additional dependence on casino revenues?

Should consideration be given to some limit or cap on the percentage of the state budget which comes directly from gambling revenues?

Answers to these questions could provide a master plan for state action where necessary. Similar concerns and questions also apply to revenue from the Lottery. The enabling legislation which established the scope and parameters of the operation of the State Lottery provided no restraint on the amount of revenue which could or should be collected. The success of the operations of the Lottery are measured only by the amount of revenue it produces.

The GACG has not been able to find a clearly articulated policy which provides guidance to the Lottery Commission with respect to the growth and development of the agency. It appears that there is an ever-increasing trend to grow, grow, grow. New Jersey would benefit by the adoption of a policy which

199

emphasizes controlled growth and a balance of social concern as a tool to measure the success of lottery activities.

RECOMMENDATIONS: The Governor's Advisory Commission on Gambling recommends that the Casino Revenue Fund Study Commission be reconstituted to priority programs funded by the Casino Revenue Fund. This priority ranking will help New Jersey prepare for any change in revenue, be the change an increase, reduction in rate of growth, or reduction in actual revenue.

Be it further resolved, that the GACG recommends that there be no affirmative action on the part of the Lottery to show continuous growth in revenues and that the extension of Lottery operations be subject to the same evaluations that apply to the extension of other forms of gambling.

## V. ISSUE: Directive of the State Constitution

The GACG has identified possible inconsistencies which exist within the philosophy and content of the State Constitution whereby restrictions on all forms of gambling apply except by exceptions specifically itemized. And, where revenue dedications are fixed thereby, creating special constituencies which rely on those revenues and then consistently support programs to expand those forms of gambling.

RECOMMENDATION: The GACG advises the Governor and the Legislature to consider a review of the State Constitution to determine whether it accurately reflects the state's real posture with respect to legalized gambling.

## VI. ISSUE: State Policy with Respect to the Horse Racing Industry

The GACG recognizes the positive contribution made to the State of New Jersey by the horse racing industry. This contribution is measured as we view the tourism attractions it creates which support other activities and improves the recreational mix in New Jersey. The record before this body suggests that there exists no public or private impetus for the racing industry to compete with the other forms of gambling and other racing outlets in neighboring states.

Survival of the racing industry in New Jersey is in the best interest of our state.

RECOMMENDATION: The GACG recommends that the 1942 prohibition of Sunday Pari-Mutuel wagering on horse racing be rescinded.

## VII. ISSUE: How Much More Gambling Should New Jersey Approve?

The twin subjects of how much more legalized gambling New Jersey can endure and what the impact of those additions will be are closely entwined subjects. They may be summed up best by a comment made during one of the public hearings of this Commission when a member asked rhetorically, "Is it the state policy to maintain the economic health" of the lottery, racing and the casino industry?

Implicit in that question is the concern about whether various types of gambling need to change to meet changing conditions and what impact those changes have, in turn, on other forms of gambling.

Horse racing is a classic study. In 1973, the state received $40 million in racing revenues and combined with $57 million from the recently legalized lotteries contributed 4.6 percent of the state budget of $2.4 billion (see attached table).

But things changed soon after that high-water mark. By 1976, the Meadowlands track was operational. By 1978, the first casino had opened. Added competition for racing fans' dollars came from racetracks in New York, Pennsylvania and Delaware.

By 1978, the state tax revenues from racetracks were down to $22 million; in 1983, again five years later, it was down to $12 million. It is estimated that in 1988, another five years later, it will be down to $6 million.

On December 15, 1976, a representative of the Atlantic City Racetrack testified before the Assembly Committee on State Government, Federal and Interstate Relations Committee which was considering the Casino Control Act. The representative that day predicted that the increased competition for the entertainment dollar would ultimately result in a decrease in the quality of racing and would eventually lead to

200

that sport losing its attractiveness for the public.

His words proved prophetic. Marketing surveys by the racing industry show that fully 80 percent of racing fans also play the lottery and go to the casinos. Furthermore, it is unlikely that newcomers to racetracks will be willing to devote the time necessary to become knowledgeable about racing when confronted with the lottery and the casinos and their lure of instant winning and losing.

Horse racing continues to be a billion dollar business in New Jersey and makes significant contributions both financially and socially to the state. More than 17,000 persons are employed in industries directly related to horse racing and the industry has played a vital role in preserving farmland in a state where open space is rapidly vanishing.

In an effort to stimulate interest in horse racing and to protect the ancillary horse breeding industry that surrounds racing, New Jersey, in 1983, became the first state to simulcast racing. (Simulcasting is the use of electronic technology to transmit a live showing of a race to patrons at a track in another part of the state.)

Initially, the law was declared unconstitutional but it was subsequently approved and last year $250 million was bet at New Jersey tracks on simulcast races.

In short, the state expanded its gambling policy to ensure the economic well-being of the racing interest.

While racing revenues were declining over the past 15 years, the state treasury has been reaping increasingly larger amounts from the lottery and the casinos. In 1971, the first year of the lottery, the state received $33 million. By 1978 it had almost tripled, reaching $96 million and the first casino chipped in with $2 million.

In fiscal 1986, the lottery contributed $419 million to the state treasury and the casinos contributed $186 million and the state was now collecting more than seven percent of its tax revenues from the gambling industry.

Lottery ticket sales in this state have grown from $72 million in the first year of operation to close to $1 billion last year. And the per capita ticket sales have grown from $10 per person in 1971 to $133 per person in 1986. New Jersey does have one of the best records of returning money to the winners and also to the state. Half of the ticket sales are awarded in prize money and 42 percent goes back to the government to finance the programs outlined earlier.

Should the lottery receipts level off or, worse, dip down, to a point where the state will no longer be able to depend on $150 million in lottery funds for state aid to local school districts as it did in fiscal 1986, will the state approve New Jersey's participation in the new multi-state lottery trend?

Should we permit such an expansion? Should we authorize casinos to engage in multi-casino megabuck slot machine jackpots if revenues for senior citizen programs fall short? Or should we permit an extension of the casino gambling hours?

But the circle has no end. New growth in terms of additional lottery and casino inducements to attract more leisure dollars will surely impact negatively on the racing industry.

This will lead ultimately to a request for Sunday racing, a subject which has already been mentioned to the Commission. Racing on Sundays will be followed, at least initially, by dark Mondays and/or Tuesdays. But what then of the impact on the casinos and the lottery?

We are back to whether it should be the state policy to maintain the economic health of the three major gambling industries in this state. Unfortunately, we have had no testimony from representatives of churches, volunteer fire companies, American Legion Posts, or other charitable organizations who have traditionally benefitted from bingo games as a means of raising funds.

But surely, small local charitable groups have been hurt by these multimillion dollar attractions and yet, the state makes no claim to guaranteeing their continued success.

The question of expansion of legalized gambling leads inevitably to off-track betting which has been legalized in New York since 1970 and to sports betting, which is legalized only in Nevada.

201

Beyond these two are telebetting or telephone betting although there has been no movement toward this form of gambling as far as can be determined.

Off-track has not been a great success in New York but has been a steady source of income for the state. Sports betting, on the other hand, has been a great success in Nevada where it is legal to bet on baseball, basketball, football and boxing in other parts of the country.

Sports betting has sparked only limited interest in New Jersey at this time, but it has served to give Las Vegas and other Nevada cities a high profile during championship boxing matches, Super Bowl weekend and at other times of the year when major sports events are played.

Sports betting attracts a heavy play or "handle" but has a limited "win" for the operators. In 1987 in Nevada, the handle was in excess of $1 billion, but the "win" (the amount that the casino retains after paying off the bets) was only $29,821,195.

Of the $221.9 million which Nevada collected in taxes from legalized casino gaming, a very minor portion came from sports betting.

The presence of betting parlors in Nevada has been mentioned as one reason why no major league sports franchise exists there and any move to approve sports betting in New Jersey should be measured against its impact on pro basketball and football which attracts millions of people to the Meadowlands Complex each year and its potential negative impact on attracting major league baseball to this state.

Does New Jersey need the kind of money that it could collect from off-track betting? Or from sports betting? The present economic conditions in this state would indicate not. Rather, the great debate these days in New Jersey revolves around the size of the surplus in the state budget and the establishment of a "rainy day" fund to meet future crises.

If there is no compelling economic reason for the expansion of gambling in this state at this time, what then of the social concerns of such actions. Will Sunday racing or around-the-clock casino gambling lead to greater numbers of compulsive gamblers or attract more teenagers?

Will a multi-state lottery, with its lure of instant riches for one person, become a snare for people in lower socio-economic conditions who are seeking a quick fix?

The answers are obvious. The only unknown is the exact number of new compulsive gamblers or teenagers who will become trapped and how many welfare checks will be spent to buy lottery tickets.

RECOMMENDATIONS:

1. It should be the recommendation of this Commission in the face of these factors that no expansion of new forms of gambling (sportsbook, dog racing, Jai Lai) be considered for at least five years and no extension of existing gambling be permitted for a specified period of time with the possible exception of Sunday racing.

2. During that time the state should improve its program for treatment of compulsive gamblers and make a determined effort to bring underaged gamblers under control. It should also develop a set of criteria which will measure the economic, environmental and social costs and benefits of any extension of the existing forms of gambling.

## VIII. ISSUE: Political Participation by Gambling Interests

Political participation by persons associated with the gambling industry is probably one of the least understood issues which this Commission faced. There is a general perception that all participation by casino personnel is banned. The question is further compounded by the absence of any prohibition on political participation by executives in the racing industry or by the state's 4,200 lottery agents.

Historically, the ban on political participation within the casino industry came about because of the heavy influence which the casino industry had in the Nevada industry. A study of the financial contributions by Nevada casinos will show that the industry is the heaviest contributor in every election and will disclose further that a large segment of state legislators sitting in any session in Carson City has some association — direct or indirect — with the casino industry.

This is not meant to be critical of Nevada. Conditions in that state are far different than they are in New Jersey. There the casino industry is the biggest employer and pays the biggest share of the cost of government. Those conditions do not exist in New Jersey. This is a diversified state with heavy concentrations of industrial, commercial and service industries and it's vital that none of these elements ever acquire a strong hold on our government or economy.

There was a strong sentiment for these restrictions when the Casino Control Act was being considered. The minutes of the public hearings in 1977 clearly show the concerns of state legislators who worried that the industry might demonstrate a presence and degree of influence which would be unfortunate and unacceptable.

It's interesting to note, too, that the initial Casino Control bill (A-2366) provided that casino executives and license holders could make contributions up to $1,000 but the Legislature during its committee process deleted that provision and put an outright ban on political financial contributions by key employees.

It is not the intention of this Commission to deny that this is a fundamental question and the present restrictions carry with them an unfortunate negative connotation. But a continuation of these restrictions is felt to be a necessary step to assure a public perception that the gambling industry has not infiltrated — or worse, has invaded — the political process in this state.

The restrictions on political activity are not unique to the casino industry. Indeed, some other segments of our population, both statewide and nationally, have been required to surrender certain inalienable rights because of the sensitivity of their work. In New Jersey, for example, members of the judiciary, from the Supreme Court down to the court crier *and their spouses* are not permitted to engage in political activity.

Federal employees are covered by the Hatch Act. They may not hold elective office, participate in partisan politics or be solicited for campaign contributions.

There are, unfortunately, some loopholes in the present New Jersey restrictions which permit certain professionals and consulting firms to make the type of political contribution which the casino license holder is expressly prohibited from doing.

### RECOMMENDATIONS:

The GACG recommends that the current limitations on political participation be strictly maintained and that firms which perform professional services or do consulting work for a casino license holder be banned from making political contributions.

Further, that the same ban should be extended to racetrack operators, professional firms and consulting groups that are under contract to racetracks or to the Lottery Commission.

Finally, we recommend that it shall be illegal for any representative of a political party to seek a political contribution from any employee in the casino, racing or lottery industries.

### IX. ISSUE: Unlimited Political Participation by Casino Interests

Presentations have been made to the GACG which describe the expanding economic impact of the casino industry. This expanding economic impact automatically brings expanded political power. Testimony at the public hearings held by the GACG raised questions about the participation of casino interests in the political process. Several issues become obvious. There is a significant potential voting block of casino employees. Political contributions at the state level by law firms, consulting firms, accounting firms, service industries and others representing casinos among their other clients are happening. The state should know how significant the contributions are and whether or not they are problematic. It should also be recognized that current limitations on participation by casino interests have served a useful public purpose of assuring the public that the gambling industry has not invaded the political process of this state.

### RECOMMENDATIONS:

1. The GACG requests that the New Jersey

Case 1:22-cv-07464-RMB-AMD Document 89-39 Filed 02/13/23 Page 236 of 282 PageID: 2523

Election Law Enforcement Commission review this issue and report at the earliest possible time the information they have on this subject to the Governor and Legislature.

2. The GACG requests that the Office of the Attorney General review the Lobbyist Disclosure Forms and evaluate the impact of political contributions made by law firms, accounting firms, consulting firms, lobby-

ing firms, service industries and others representing casino clients to political candidates at the state level and report such findings to the Governor and the Legislature.

3. The GACG recommends to the Legislature that those Legislative leaders who are reviewing possible changes to the campaign financing laws review this subject.

204

# H.   ARNOLD WEXLER'S SUBMISSIONS

# RECOMMENDATIONS TO GOVERNOR'S ADVISORY COMMISSION
# ARNOLD WEXLER, EXECUTIVE DIRECTOR
# JUNE 10, 1988

**Note:** Listed in this appendix are these numerous problems in the area of compulsive gambling which the Commission recognizes are problems, and without specifically naming each one of them in the recommendations section, the Commission recognizes these concerns and believes they should be reviewed by the appropriate body.

## I. YOUTH

A. Fines for gambling industry for youth underage found gambling.

B. Education of youth from elementary level up, including information about compulsive gambling in the textbooks.

## II. OUTREACH

A. The message "If you or someone you know has a gambling problem, call 1-800-Gambler" should be depicted on the following:

1. lottery machines
2. lottery tickets
3. brochures distributed at lottery vendors
4. racetrack programs
5. racetrack tickets
6. casino rooms
7. casino markers
8. casino gaming guides
9. public telephones
10. elevators
11. buses and limousines
12. signs in bingo halls
13. raffle tickets
14. boardwalk games of chance

B. The above hotline message should be given at the end of all radio, television, print media and billboard advertising of gambling.

## III. COURTS

A. All fines from court cases involving gambling (gamblers/bookmakers) should go into a fund to help compulsive gamblers (i.e. victim's fund).

B. There should be an educational program about compulsive gambling for the New Jersey judicial system.

## IV. INFORMATIONAL

A. Brochures should be put in the rest areas along the Atlantic City Expressway, New Jersey Turnpike, and Garden State Parkway.

B. A brochure for the elderly should be distributed on buses and made available on a rack in casino bus depots.

## V. CASINOS

A. All fines given to casinos for any violation of the rules should go into a fund for compulsive gambling education, research, and treatment.

B. If someone has an uncollected or partially collected marker, they shouldn't be allowed to have credit again until the marker is completely satisfied.

C. The 2% tax write-off for casinos should be eliminated.

## VI. TREATMENT

A. A halfway house for compulsive gamblers is desperately needed.

B. There is need for more treatment for compulsive gamblers.

# PROBLEM GAMBLING AND PUBLIC POLICY: ALTERNATIVES IN DEALING WITH PROBLEM GAMBLERS AND COMMERCIAL GAMBLING

by
**William R. Eadington**
Professor of Economics
University of Nevada Reno

# I. INTRODUCTION

Over the past two decades, many commercial gambling industries in the United States and abroad — casinos, lotteries, on-track and off-track horse race betting, bingo, and others — have evolved in significant ways. In general, commercial gambling has become more sophisticated, more legitimate, more corporatized, and more broadly accepted, in terms of management structure and policy, customer development, and the general public's perception of gambling industries. Legalization of gambling in various forms has occurred in many states and countries, as governments have looked to commercial gambling as a means of raising tax revenue, revitalizing otherwise declining economic areas, crowding out illegal gambling, or just meeting consumer demand for legal gambling activities and related services.

Yet, in spite of the rapid and generally positive changes that have occured in these industries, one area of serious controversy remains: how much damage does commercial gambling do to individual society members? In spite of considerable attention given to this problem in professional journals and meetings, the magnitude and severity of problem gambling, as it relates to commercial gaming industries, is not well understand (See, for example, Eadington, 1982a; Eadington, 1985; Eadington, 1988). The issue of the individual effects of the presence of commercial gambling on society can be summarized by the following questions: What will increased access to commercial gambling opportunities do to individuals with potential or actual gambling problems, and what can be done at various policy levels to mitigate these problems?

One of the difficulties perceived by those involved in the treatment of problem gamblers is the observation that the more prevalent commercial gambling is in society, the more problems individuals who are prone to excessive gambling will have. Yet, it is apparent that commercial gambling is going to continue to spread in a variety of forms in many parts of the country. Thus, from a policy perspective, it becomes important to examine the issue of gambling not in terms of whether or not it should exist in society (because certainly it does and it will), but rather in terms of how private sector and public sector entities linked to commercial gambling can direct their actions to mitigate the severity of gambling related problems.

The purpose of this analysis is to examine some of the policy options that are available at various institutional levels which deal with the issue of problem gambling in an environment with commercial gambling industries. Self-regulation and constraint within the commercial gambling organization are examined in light of their likely effectiveness and the trade-offs between organizational goals and the economic impact of the actions. The effectiveness of statutes and regulations by governmental bodies that deal with the issue, with respect to the trade-offs on the demand, growth, revenue, profit and job-creating potential for the gambling industries, is discussed. Finally, methods of cooperation between commercial gambling operators, regulatory authorities, and health service professionals are evaluated in light of how they might mitigate the overall social costs associated with problem gambling.

# II. DEFINITIONS AND SCOPE OF THE PROBLEM

One of the major difficulties inherent in studying problem gambling is that of identifying and then measuring the social costs attributable to problem gambling. The difficulties begin with attempts to define "pathological" or "compulsive" gambling. Probably the best known current definition is the one put forth in the American Psychiatric Association's DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IIIR) (Custer, 1988; Lesieur, 1988). Though it describes pathological gambling as a degenerative disease with certain common traits and symptoms, there still is considerable dispute within the psychological community as to the applicablity of this "medical model" (Dickerson, 1988).

The courts have been working with the issue of pathological gambling for the past decade, and they seem to have gotten caught up in the same areas of ambiguity. Though they have expressed willingness to accept expert analysis as to the existence of pathological gambling as an illness or mental disorder, they have been reluctant to allow compulsive gambling as the basis of a defense in non-gambling offenses, such as robbery, forgery, or embezzlement (Rose, 1988). They are concerned that the acceptance of compulsive gambling as an illness or mental disorder would be an acknowledgement of the loss of free choice by the problem gambler, which would imply a shifting of responsibility away from the individual for his or her actions.

Even if there was a common understanding of what constituted a pathological gambler, there is still no clear litmus test, no on-the-spot equivalent of a blood-alcohol reading, that would allow for the unambiguous classification of a pathological gambler. It is largely an invisible problem, with symptoms quite hard to distinguish from the actions of non-pathological gamblers. Futhermore, if a person is truly a pathological gambler, that person may literally be the last to know. Oftentimes, a problem gambler is convinced the reasons he or she is losing are due to bad strategies, bad money management, or bad luck; an illness or mental disorder is probably far from such a person's conscious mind.

In the reality of the world of commercial gambling, this creates a significant difficulty for either the gambling proprietor or the regulator who is concerned in addressing this issue. If pathological gambling is an invisible problem, how can it be mitigated without interfering with the rights of those who want to gamble and are perfectly competent to make rational decisions with respect to their own gambling? Lacking such clear evidence of identification, the best that can be hoped for is the creation of a gambling environment where the potential for severe damage to an individual from excessive gambling can be mitigated. That environment can be created through the actions of commercial gambling operators, through regulatory or statutory edict, or through mutual cooperation between the gambling industries and regulatory bodies.

# III. ENLIGHTENED SELF-INTEREST, SELF-REGULATION, AND THE GAMBLING ENTERPRISE

The following discussion concentrates on casino gaming organizations because of the wide variety of approaches that have been taken to regulate casino operations in various countries throughout the world (Kelly and Eadington, 1986; McMillen and Eadington, 1986). However, many of the points made can be broadly applied to other commercial gambling organizations.

Assume for the time being that a casino operation became convinced that eliminating pathological

gambling within their facility was in their best interests. What implications might follow from this position?

First, the organization would have to train its management staff to identify certain signs of pathological gambling, whether it be the frequent drawing from one's wallet of additional cash, the bouncing of checks, or the anger displayed in the casino's parking lot by large losers. Second, some type of strategic policy would have to be established mapping out how the casino should deal with players with apparent gambling

problems. These could range from outright banning of players from the facility, to the casino providing advice to the problem gambler about the availability of counselling services or of Gamblers' Anonymous chapters in the area, to discussions on the realities of the probabilities that govern casino games, slot machines and devices.

The difficulties of an individual casino implementing such a policy are obvious. Ideally, such a casino would only want rational pleasure-seeking gamblers who are freely choosing to risk (and usually lose) portions of their discretionary budgets. This would not include those players who over time were clearly depleting their wealth at the expense of their gambling habit. It would obviously be almost impossible for casino management to discern such a sequence of events amoung casual or occasional visitors to the facility, so attention would have to concentrate on regulars. The casino's management would then have to classify regulars as either normal or pathological, perhaps by estimating the income of gamblers against their rates of loss to see if in fact some individuals are losing to the gambling establishment at a rate fast enough to deplete their wealth. When that is the case, then management would have to make a determination as to the mental state of such individuals. Clearly, this approach leaves a lot to be desired.

But it is possible that seasoned casino personnel can tell who many of the degenerate gamblers in their facilities are. However, even if they were known to be pathological gamblers, and were then either encouraged to leave or banned from further participation in the casino, it is likely that they would wander out the front door of the casino, find its closest competitor, and continue to lose until total financial ruin or psychological "rock-bottom" set in. If this were the case, the only solace for the casino in question would be the knowledge that it "did the right thing" by not directly bringing about the gambler's ruin.

A related line of argument is that by denying individuals who are pathological gamblers access to the gambling within their casino, then management is participating in non-value-maximizing behavior, i.e., it is sacrificing profits to fulfill other objectives. If the casino firm is publicly owned, this would have the effect of lowering the market value of the firm's stock. In these circumstances, the firm runs the risk of becoming a take-over target to outsiders who recognize both the undervalued stock and the non-value-maximizing behavior. Should such a take-over transpire, then the asset value of the firm could increase if the new management forgoes non-value-maximizing behavior and only concentrates on bottom line performance. Even without an actual take-over, management is made aware of the possibility that their attempts to be humane with respect to pathological and problem gamblers can increase their vulnerability to external forces. Thus, the incentives for any management are to ignore the non-value-maximizing behavior and concentrate on company profits as the primary objective of the enterprise (Schleifer and Vishny, 1988).

Another consideration is that in many gambling establishments, regular gamblers contribute a significant portion to the total revenues of the gambling operation. If it was determined that many of these regulars were in fact pathological (however it is defined), then their removal would threaten revenue generating capabilities, and even possibly the continuing economic viability, of the gambling operation. If indeed this is generally the case, there may be no resolution to the conflict between pathological gambling and commercial gambling operations.

Thus, the traditional lines of argument that would be offered by casinos in competitive environments as to why they should not have to be concerned with the plight of the pathological gambler are:

a) it is difficult to classify a gambler as being pathological;

b) even if gamblers could be correctly identified as pathological, then denial of access to one casino facility would only induce them to gamble and lose elsewhere;

c) any sanctions against pathological gamblers instituted by individual gambling operations would result in lower revenues, lower profitability, and an inherently weaker financial position, thus jeopardizing the economic viability of the operation and perhaps management's position in the organization;

d) pathological gamblers might be too important a source of gaming revenues for casino management to unilaterally exclude them from gambling.

In conclusion, even if one were dealing with private sector gambling organizations who were legitimately concerned with problems of pathological gambling, it would be unrealistic to expect them to be self-regulating in dealing with the issue. On the other hand, it is not out of the question for some, if not many gambling organizations to recognize the image and legitimacy problems that pathological gambling can create for the commercial gambling industry. Thus, if a set of regulations were imposed on the entire gambling industry, so that all competitors would be equally constrained in dealing with problem or pathological gamblers, the likelihood of success would be greater than depending upon self-regulation. Alternatively, in those jurisdictions where casinos are established as franchised monopolies, insulated from direct competition from other casinos and protected from take-overs, they could choose to be more paternalistic and benevolent in their dealings with problem gamblers, though there is no strong reason to suspect that they would choose to do so.

# IV. REGULATION AND PUBLIC POLICY APPROACHES TO PROBLEM GAMBLING

If self-regulation of problem gambling by gambling organizations is unrealistic, how effective can the alternative of regulation by governmental bodies be expected to be? A starting point to analyze this question is to examine the practices of jurisdictions in various locations in the United States and in other countries.

Throughout the world, a wide variety of approaches has been taken for dealing with the problem of pathological gambling. Often, however, these strategies are easy to implement because the casinos operate in a monopoly situation subject to strict governmental oversight, and the government is effectively a partner in casino operations because of tax policies and contractual relations. Thus, competitive pressures are quite different than in American casino markets, and there is seemingly less concern over revenue maximization as an organizational objective at the expense of other noneconomic objectives.

Many casinos in other countries utilize entrance fees and identity checks at the entrance to the gaming areas. With this type of screen, some restrictions appropriate for the control of the problem gambler are possible. For example, in France, locals are prohibited from playing in the main portion of the casino, and a person can be banned from playing in the casino because of irresponsible gambling. Individuals can also request that the casino ban them from entering in future visits if they fear they will not be able to control their gambling losses in future visits. Also, family members can petition a casino to ban a gambler. Variations of these restrictions are present in some of the German and Austrian casinos.

In general, the continental European casinos adhere to a philosophy that casino gambling is parasitic and potentially damaging to local populations because of problem gambling. Therefore, by design, it is made difficult for locals to enter the casino. Futhermore, because it is felt that casinos can do serious damage to any players who overindulge, casino management is apparently conditioned to be more sensitive to such situations and can ban a gambler from entering the casino to protect him from himself. This degree of paternalism, which would be difficult to apply in the United States, is probably due to a mix of social concern for the potential ruining effects of gambling, and the enlightened self-interest of casino officials who realize that they are involved in a tolerated, though controversial industry.

The British experience with casino gambling also provides a number of indications on the alternatives available for dealing with problem gambling, and their likely effectiveness. The casino industry in the United Kingdom is strictly regulated in a number of ways to adhere to the philosophy that commercial gambling is only supposed to cater to unstimulated demand for gambling. Therefore, people who want to participate in casino gambling will have to seek it out, and those who do not will be attracted to it by promotional or marketing efforts. It also reflects an underlying attitude

that casinos should not be allowed to entice or exploit those individuals who choose to gamble in British casinos.

Thus, anything that would appear to broaden the general appeal of casino gambling in the United Kingdom is proscribed by law or regulation. For example, the British casino industry is run strictly on a club basis with members and bona fide guests as the only allowed participants at the casino games. Any advertising to the general public is forbidden, and signage on the exteriors of casinos is severely limited. Futhermore, new members of clubs that offer gaming must sign a form that states they wish to gamble; they must then wait 48 hours before they are allowed to gamble for the apparent purpose of discouraging impulse gambling. Alcohol is not allowed at the gaming tables in British casinos, because it might impair judgment when gambling. Live entertainment is not allowed in casino clubs on the basis that it might induce individuals to join the clubs for reasons other than gambling, but then they could be drawn into gambling. Certain "suckers" bets are forbidden at blackjack and craps, and casinos are required to provide printed strategies of good play to players.

However, the most important facet of British regulation is the prohibition against credit. British casinos are allowed to offer check cashing services, but checks must be processed through the drawer's bank within two banking days (Eadington, 1987). Furthermore, violations of credit regulations are taken quite seriously; such violations led either directly or indirectly to a number of major casino companies losing their licenses in London between 1979 and 1981 (Kent-Lemon, 1984; Miers, 1981).

The American casinos of Nevada and Atlantic City provide a very different approach to the issue of dealing with the problem gambler. For the most part, the problem gambler is officially ignored. Individuals who choose to participate in casino games are assumed to be rational and are held responsible for their own actions, including their gambling losses. Futhermore, instead of the restrictive low-key approach to casino marketing which is implicit in continiential European casinos and explicit in the United Kingdom, American casinos have become expert at providing various marketing strategies to maximize casino participation by the general public.

Where European and British casinos tend to be invisible, American casinos are relatively unrestricted in terms of their efforts to broaden demand for gambling services through marketing efforts. In Nevada, there is very little restriction placed upon casinos in terms of how they can promote their gaming facilities, and Atlantic City is only slightly more limiting.

Among the practices that have evolved over the years that are germane to the issues of marketing and gambling stimulation are:

a) pricing policies that offer food, hotel rooms, entertainment, convention services, transportation (such as busing) and other activities at prices near or below cost, in the expectation that additional casino revenues from increased levels of business will more than cover the promotional costs;

b) extensive use of complimentary services in the casino environment, ranging from free drinks to slot machine and keno patrons to free room, food and beverage privileges throughout the casino facility for "higher rollers" (Swartz, 1984);

c) the provision of incentives for cashing paychecks in the casino that run from free drink coupons and "lucky bucks" to free players on slot machines or free chances at draws on vehicles or other substantial prizes;

d) easily available credit to high-end-of-market casino patrons (Eadington, 1987), and bank teller machines available within the casinos;

e) the provision of a wide variety of non-gaming activities whose primary purpose is to increase the level of patronage in the casino and the overall profitability of the operation. These range from high quality floor shows and big name entertainment to world class boxing matches, car races, and other sponsored sporting events;

f) the organization of gaming oriented events to provide excuses for the casino to invite good players to the casino property and to provide players with additional excuses to visit the casino. These would include such activities as player tournaments covering blackjack, craps, slot machines, keno, and other casino games, as well as organized activities

built around major sporting events, such as Super Bowl or the Kentucky Derby;

g) the identification of important players through observation, credit records, or new player-tracking technologies, and the development of player relations with direct mailings and other personal contact;

h) advertising campaigns emphasizing luck, chance, escapism, inexpensive food, lodging and entertainment, and other themes that potential visitors to casinos find enticing (Hess and Diller, 1969);

i) extensive use of signage, lighting, noise, ambience, and other sensory experiences to create a "theme" that allows the player to escape and fantasize while gambling.

Most of these activities form the basis for modern marketing strategies within American casinos. How many are also contributory to problem gambling is clearly debatable. On the surface, some seem clearly more predatory than others. For example, paycheck cashing could be constructed as being highly exploitative to individuals with low tolerance for control over their gambling. Also, the serving of complimentary alcoholic beverages at the gaming tables would tend to lower inhibitions and impair judgment, and liberal granting of credit within the casino, or the presence of bank teller machines, would also encourage individuals who are impulsive to lose more than they otherwise would.

On the policy level, restrictions on the above facets of casino marketing would create a direct trade-off between the revenue generating capabilities of the gambling operations and the protection of the problem gambler from himself. Futhermore, in markets where casinos already exist, most of the marketing strategies are viewed by casino patrons as desirable services provided by the casino. Indeed, the reason marketing programs are effective is because the customers perceive them as attractive, and much of the psychology

of patrons in American casinos is to take advantage of the "good deals" the casinos offer. Futhermore, just how significant such restrictions would be is an empirical question for which there is very little available credible data because of the paucity of good empirical work in this area.

It is far more realistic to consider restrictions on the marketing activities of a gambling industry that is just beginning, say, through new legislation, rather than one which has been in existence and has incorporated such practices as part of overall operations. It can be argued that as long as there is excess demand for legal gambling services, gambling industries that are created through legislation with varying degrees of regulatory control or varying tax rates can be profitable. Different tax rates or different regulatory structures would affect the overall size, tax revenue generating capability, employment implications, and other quantitative aspects of the gambling industry, but it would not necessarily undermine the industry's economic viability (Eadington, 1982b).

In terms of jurisdictions considering creating commercial gambling industries through legislation, a fundamental question deals with the wisdom of such an endeavor. As a matter of strategy, public policy makers should attempt to weigh all the social and economic costs and benefits associated with creating a new commercial gambling industry, including among the benefits such things as tax revenue generation, job creation, fulfillment of consumer demand, and economic stimulation. The costs to be considered should include, among other things, the amount of economic displacement that will occur through redirected spending patterns as a result of the new gambling industry, the effects on localized crime rates, and the social costs attributable to problem and pathological gamblers. Regulations and constraints should be developed that reasonably and cost-effectively address these concerns. If, at that point, aggregate benefits do not exceed aggregate costs, or the proposed gambling industry is not economically viable, then creation of a new gambling industry would not be a wise move.

211

# V. COOPERATIVE ATTEMPTS AT DEALING WITH THE PROBLEM GAMBLER

The need to develop broad strategies for dealing with pathological gambling that have a good likelihood of success is going to continue to increase as commercial gambling expands in this country. Clearly, one of the negative aspects of the spread of commercial gambling in America is the difficulty of the individual who has a gambling problem to escape from the places where gambling is offered. When serious gambling could only be found in Nevada, at the race tracks, or through illegal outlets, a problem gambler could relocate himself or herself away from those places where gambling was present. If, however, we are moving toward a situation where commercial gambling is present in nearly every community in a wide variety of forms, schizophrenic problem gamblers may end up with having no place to hide.

If the plight of the problem gambler in jurisdictions with commercial gambling is going to be addressed successfully, then a number of things must happen. A high degree of understanding of the issues will have to be established among interested groups, institutionalized programs for dealing with problem and pathological gamblers will have to be developed and implemented, and each of the interested groups will have to acquire some sense of the impacts of the

programs and the constraints on the interests of the other groups. When a better understanding of the realities of problem gambling and commercial gaming are established, effective lines of communication amoung groups must be developed and cooperative endeavors pursued. Appropriate regulations and constraints on commerical gambling operations and on players will have a much better chance of being implemented and becoming effective if a degree of cooperation exists among the interested groups.

Certainly, such an approach would not be a panacea to all the problems that arise as a result of pathological gambling, but it is probably better than the alternatives of either hoping that self-regulation by commercial gambling industries will adequately deal with the problems as they arise, or proscribing a wide variety of actions by gambling operators based on the judgment of regulators or legislators alone. Perhaps by establishing advisory committees that reach across various groups who all share an interest in the effect of the spread of gambling on different facets of society, a deeper level of understanding of conflicting issues could be achieved that will ultimately lead to better public policies toward problem and pathological gambling.

# REFERENCES

Custer, R.L. (1988), Pathological gambling as presented in the American Psychiatric Association's Diagnostic and Statistical Manual-III-Revised. In *Gambling Research: Proceedings of the Seventh International Conference on Gambling and Risk Taking*, University of Nevada Reno, Volume 5, pp. 74-77.

Dickerson, M. (1988), The future of gambling research - learning from the lessons of alcoholism. In *Journal of Gambling Behavior*, Volume 3, Number 4, pp. 248-256.

Eadington, W.R. (1988), *Gambling Research: Proceedings of the Seventh International Conference on Gambling and Risk Taking*, University of Nevada Reno (five volumes).

Eadington, W.R. (1987), Credit play and casinos: profitability, legitimacy, and social responsibility. In *Journal of Gambling Behavior*, Volume 3, Number 2, pp. 83-97.

Eadington, W.R. (1985), *The Gambling Papers: Proceedings of the Sixth National Conference on Gambling and Risk Taking*, University of Nevada Reno (thirteen volumes).

Eadington, W.R. (1982a), Regulatory objectives and the expansion of casino gambling, *Nevada Review of Business and Economics*, fall, pp. 4-13.

Hess, H.F. and J.V. Diller (1969), Motivation for gambling as revealed in the marketing methods of the legitimate gambling industry. In *Psychological Reports*, Volume 25, August, pp. 19-27.

Kelly, J. and W.R. Eadington (1986), The regulation of casino gambling in Europe: a comparative analysis. In *Nevada Public Affairs Review*, Number 2, pp. 56-64.

Kent-Lemon, N. (1984), Significant influences on the United Kingdom casino industry since 1960. In *Annals of the American Academy of Political and Social Science*, Volume 474, July, pp. 72-79.

Lesieur, H. R. (1988), Altering the DSM-III Criteria for Pathological Gambling. In *Journal of Gambling Behavior*, Volume 4, Number 1, pp. 38-47.

McMillen, J., and W.R. Eadington (1986), The evolution of gambling laws in Australia. In *New York Law School Journal Of International and Comparative Law*, Volume 8, Number 1, pp. 167-192.

Miers, D. (1981), The mismanagement of casino gaming. In *British Journal of Criminology*, Volume 21, January.

Rose, I.N. (1988), A new deal for problem gamblers: compulsive gambling and the law. In *Gambling Research: Proceedings of the Seventh International Conference on Gambling and Risk Taking*, University of Nevada Reno, Volume 3, pp. 223-252.

Schleifer, A., and R.W. Vishny (1988), Value maximization and the acquisition process. In *Journal of Economic Perspectives*, Volume 2, Number 1, Winter, pp. 7-20.

Swartz, S. (1984), Want a nifty suite in Atlantic City? Just lose $900,000. In *Wall Street Journal*, December 27, p. 1 ff.

# I. DR. CHARLES I. ZADIKOW'S RECOMMENDATIONS

# RECOMMENDATIONS FOR TREATMENT AND RESEARCH WITH COMPULSIVE GAMBLERS

Submitted to the
Governor's Advisory Commission on Gambling for New Jersey

By Commissioner Charles I. Zadikow, Psy.D.
April, 1988

Endorsed by
The New Jersey Psychological Association
Wayne T. Young, Ph.D.
President

# I. PATHOLOGICAL GAMBLERS

The professional literature on gambling includes two very different belief systems. One is that pathological gambling is psychological in nature, and the other is that pathological gambling is a physical disease process. Some authors maintain that there is an interactive relation between the psychological and physical processes. Treatment in any particular setting would, therefore, depend upon one's belief system. It is even possible that some pathological gamblers are more psychologically oriented and that some are more physically oriented in their addictions. Perhaps more than one type of treatment is required so that different types of people could most appropriately be placed into one or another treatment modality which would be more effective for them individually. Gamblers Anonymous (GA), for example, has many drop-outs. What alternatives do we have for them? Why do they drop out? How can we begin to serve a wider range of people who need and want help with their gambling problems?

There are many beliefs expressed in the literature and in GA and there are many assertions as to the best ways to help treat pathological gamblers, but how do we know which may be the most effective? We need to develop the most reliable tools with which to identify problem gamblers. We need to ascertain what the general and core issues are for gamblers. Then we need to identify the most effective and powerful methods of treatment, matching people with the most appropriate treatments. Some gamblers (and when I refer to gamblers for the purposes of this paper, I am only referring to pathological or compulsive gamblers) may work best in peer-pressure self-help groups (such as GA), some may work best within peer-pressure groups within a clinic or hospital setting. Some may function most effectively on an in-patient basis, others on an out-patient basis. Still others may benefit most from individual therapies on an out or an in-patient basis. Some may be most effectively treated in conjunction with their spouses and/or family members. Others may be best treated with a combination of techniques. Is there a best combination of techiniques that would be most effective with the largest number of people?

# II. RESEARCH AND TREATMENT

It is our contention that the mroe we can understand and explain an issue, the more we can generate useful concepts and hypotheses. Subsequently, we can be more effective in dealing with the problem.

New Jersey is currently in a unique position to launch the most ambitious and comprehensive set of organized researches into these questions. It is this author's opinion that we must begin to understand, as fully and comprehensively as possible, the basic reasons for becoming pathological gamblers and then, why they continue to practice such self-destructive behaviors. (As an aside, let it be stated that during these researches treatment must go foward, but we must be flexible and willing to modify our positions and treatments, as research may indicate.) The more completely we can understand why the gambling began, the more light will be shed on why it continues. This understanding can then be a benefit to any treatment strategy.

Our efforts toward understanding, futher, would seem to dictate a two-pronged approach. One prong would be psychological and the second, physiological.

Two major methods of understanding in psychology are Phenomenology and Psychodynamics. Phenomenological understanding is descriptive of experience. It is very helpful in developing hypotheses for understanding human behavior. Presentations by ex-gamblers, for example, are typically phenomenological. The ex-gambler may describe what the process of gambling was like for him. He may tell us of powerful needs and compulsions, of the terrible despair and dashed hopes, of the enormous and tearing changes in the quality of his life and of the awful destructiveness to his family and work. We could go on and on, of course, but let it suffice to say that as dramatic and compelling as this presentation is, as intense and moving as it may be, it does not explain what has happened or why the gambler gambled. Its usefulness lies more in the area of helping the listener empathize and identify with the terrible plight of the pathological gambler, and to provide us with possible directions towards futher understanding.

214

For explanation, we must turn to psychodynamics (which includes, of course, the psychological concepts involved in family systems theories, etc.). This defines the effort, for instance, of attempting to find connections between various elements within the phenomenological narrative in a manner which demonstrates relationships between and/or among disparate elements. Then we can begin to answer the questions we have been posing. Explanation helps us to answer why the gambler struggles to win money, why it is so compelling to continue the chase even after many losses and against all odds. When we know the answer to these questions, then we can begin to develop treatment methodologies that deal with the underlying issues. Hopefully, we may even reach a point where we can go beyond helping the gambler *control his need to gamble*. We could reach the enviable position of helping the gambler *free himself of his pathological needs to gamble*.

With explanatory concepts professionals can more objectively develop creative ideas and newer treatments more quickly. The more we can explain about the gambler, the more alerted we become to impor-

tant issues that will arise in treatment. These become significant cues for us not only for the direction of the treatment but also for the type of treatment provided. There is no single treatment that is best for everyone. People are individuals and treatments should be tailored to them, rather than having the gambler fit the treatment.

In an effort toward researching these problems in the most comprehensive ways, we need to develop a team approach. We need seasoned expert professionals of different disciplines to work together, integrated into an all-out effort. A physiologist could be expected to understand the physiological determinants involved in the pathological aspects of gambling. The production and release of endorphins, for example, is an issue mentioned in the literature. We would also need psychologists representing various forms of psychological treatments involved in both treatment and research areas. We would require the help of a psychiatrist with experience in the dispensing of drugs which may be offered to gamblers as part of their treatment. An expert in self-help groups would also be a valuable member of this team approach.

## III.  AN OFFICE ON COMPULSIVE GAMBLING

Toward these ends, the development of an Office on Compulsive Gambling is recommended. This Office would have two separate and independent staffs for research and for treatment. This would be done in order to maintain the integrity of each individual unit and to keep each function (research vs. treatment) as free from subjective influence and bias as possible. A seasoned and experienced group of consultants would be part of each unit's staff in order to help bring the quality of the work up to as high a level as possible. It is expected that this sort of team approach would be most effective in generating a wide range of creative ideas.

Anything less than this means we are willing to forfeit the development of the best possible treatment for gamblers in the future. Anything less than this means we are willing to submit to a "cost-effective" short-term and short-sighted approach to a very difficult and complex series of problems. Our best insurance for the development of the most cost-effective treatment is to spend now, so that we may also develop the most *human-effective* methodologies for the future. The more we spend now, the less

we will have to spend later. If we do not follow this type of paradigm, we will be caught forever in spending monies on many questionable and ineffectual techniques without ever knowing it. That is *not* cost-effective even though it will be cheaper, especially in the short-run.

Furthermore, the Office on Compulsive Gambling would be responsible for developing treatment programs in various parts of New Jersey. They should also be involved in overseeing gambling treatment units that are outside of the state programs for the purposes of evaluation and approval. Perhaps, even some certification process may be instituted.

The Office should also concern itself with Certified Gambling Counselors (CGC). We believe that these CGC's will be placed in an unfair position of responsibility due to the restricted nature of their training. It must be kept in mind that pathological gambling is a symptom that occurs within a whole person who may be subject to other addictions, who is quite likely to be very compulsive and impulsive, and whose character structure is composed of

215

complex psycho-dynamics. Gamblers range far and wide within the psychiatric diagnoses and cover the gamut of a mental health professional's knowledge and experience. It would appear to this writer that we are expecting far too much of CGC's, and it is as unfair to them as to their clients. While it is important to be able to identify with and empathize with one's clients (This appears to be one of the major rationales for employing recovering alcoholics to treat more active alcoholics and which, one may assume, will also be the case with gamblers.), treatment of a major health disorder has to add explanatory understanding to the empathy.

When we consider all of these issues, shouldn't the research and treatment of the Pathological Gambler be left to those many professionals who are already active in the state and who already have the benefit of advanced training? These include Psychologists, Psychiatrists and Clinical Social Workers with advanced degrees. These are people who have learned how to conduct psychotherapy and to help their clients

resolve their internal conflicts. Would it not make the most sense to train these people within what may be considered the subspeciality of gambling rather than to simply teach people the subspeciality by itself? Those professionals already in the field know how to work with people's conflicts and psychodynamics. What they may need to learn are some specific psychodynamics and alternate treatment strategies which they could then add to their already great fund of knowledge and experience. This cannot be stressed too much. Would you rather have a heart surgeon who is a trained M.D. operate on your heart or someone who has learned solely about the heart itself? What if something goes wrong with your kidneys during surgery?

If we are to have CGC's (and indeed, this seems to be the case) perhaps they could practice under the supervision of other licensed mental health professionals. To have these counselors work independently is, however, in this author's opinion, a questionable practice which needs to be further examined.

# J. WALTER N. READ'S COMMENTS

# COMMENTS
## WALTER N. READ, CHAIRMAN
## NEW JERSEY CASINO CONTROL COMMISSION

This commission was faced with an extremely broad mandate. In fact, given its limited staff and resources, the commission probably could not hope to provide the broad range of answers that the legislation sought.

Nonetheless, there was established a wide range of testimony from the public, some valuable position papers from individuals within the legalized gambling and regulatory communities, and some research papers provided by outside consultants.

The data covered social, economic, health and political aspects of the impact that gambling is having on the lives of the residents of this state.

Surprisingly, there are gaps in the testimony. For example, no member of the Atlantic City government came forth to testify and little or no research was developed by the paid consultants on the negative economic impact of casino gambling on the Atlantic City business community.

Notwithstanding these shortcomings, the commission struggled to bring forth a report which makes some very worthwhile recommendations. Other recommendations unfortunately come up short of making meaningful suggestions to deal with issues which need to be addressed.

Certainly, there is no objection in this quarter to the recommendations regarding the formulation and funding of programs to assist compulsive gamblers. The problems of the pathological gambler have been well documented both before this commission and in other forms. The problem only grows greater with each passing day that the state fails to meet it.

It is time that the state establish a program to provide research and diagnostic help for compulsive gamblers and that a funding mechanism be found which will allow the programs to continue without interruption or diminution.

Likewise, there is no quarrel here with the recommendations to assist the horse racing industry.

Specifically there is no quarrel with the recommendation that the 1942 prohibition against Sunday racing be lifted as long as the number of racing days in a week does not exceed six. Such a plan would permit the New Jersey tracks to compete more evenly for the leisure dollar against forms of legalized gambling that did not exist nearly a half century ago.

Recommendations that New Jersey must never find itself dependent upon gambling revenues as a major source of state financing are certainly acceptable. Equally acceptable is the suggestion that New Jersey should not put a cap on the amount or percentage of revenues which the state should take from legalized gambling. Our hope is that the state will always be able to balance these two diverse concepts.

More important is the concern that New Jersey should never weaken its regulatory systems to enhance the state's fiscal picture or to assist any form of legalized gambling to compete with outside jurisdictions.

A continuing concern also is whether the expansion of social and educational programs currently funded by gambling revenues will put pressure on future legislatures and governors to increase the tax on established gambling forms.

While there is no definitive recommendation for the legislature on this issue because conditions can change abruptly, there are historical perspectives, from economic, moral and ethical viewpoints, which should stand as guideposts in the future.

The importance of this question cannot be overestimated. It is the crucible which will measure what kind of state New Jersey will become as we head into the 21st century.

Unfortunately, while recommendations about compulsive gambling or racing dates or even spending caps may help to formulate sound state policy, they are not sufficiently widespread to cover the broad mandate of this commission. There are crucial questions which New Jersey faces today that must fall within the purview of this commission if it is to fulfill its responsibilities.

217

To ignore an issue or to simply call for a study committee does not seem to be what the legislature had in mind when it constituted this commission. Questions about the economic impact of legalized gambling, its social impact on the citizens of this state, the expansion of gambling, competition from other states, the state's policy on advertising gambling and the dangers of political participation by persons in the gaming industry need to be addressed along with other vital issues.

The twin questions of how much more legalized gambling New Jersey can endure and what will the impact of expanding gambling be are closely entwined subjects. They may be summed up best by a comment made during one of the public hearings of this commission when a member asked rhetorically, "Is it the state policy to maintain the economic health" of the lottery, racing and the casino industry?

Implicit in that question is the concern about whether various types of gambling need to change to meet changing conditions and what impact those changes have, in turn, on other forms of gambling.

Unfortunately, we have had limited testimony from representatives of churches, volunteer fire companies, American Legion Posts, or other charitable organizations who have traditionally benefitted from bingo games or games of chance as a means of raising funds.

Small local charitable groups have been hurt by these multimillion dollar attractions and yet the state makes no claim to guaranteeing their continued success. Are the fire companies and the ambulance crews and the veterans posts to be injured fatally or should we build some safeguards into the law? Unfortunately the commission didn't address the question.

If there is no compelling economic reason for the expansion of gambling in this state at this time, what then of the social concerns of such actions. Will around-the-clock casino gambling lead to greater numbers of compulsive gamblers, attract more teenagers or have a subtantial negative impact on the active social gambler? Will a multi-state lottery, with its lure of instant riches for one person, become a snare for people in lower socio-economic conditions who are seeking a quick fix?

The answers are obvious. The only unknown is the exact number of new compulsive gamblers or teenagers who will become trapped and how many welfare

checks will be spent to buy lottery tickets or how many lottery tickets will be responsible for more welfare checks.

It should be the recommendation of this commission in the face of these factors that no new forms of gambling be permitted and no extension or expansion of existing gambling be permitted for a specified period of time with the possible exception of Sunday racing.

During that time the state should improve its program for treatment of compulsive gamblers and make a determined effort to bring underaged gambling under control.

And during that same time in the broadest public debate possible, the state should decide whether it wants to commit to maintaining the economic health of the various forms of gambling which now exist in New Jersey.

Closely tied to the question of the economic health of the various forms of gambling is the equally nagging question of the state's policy on advertising of gambling.

Advertising by definition means to make public announcements to proclaim the qualities of a product or business so as to increase the sales of that company or business. Most of us think today of advertising as something we read in newspapers and magazines or hear on radio and television. But advertising in America today is much broader than that and it invades our lives constantly and often subliminally.

There is a fundamental question of whether government should follow the lead of private industry in trying to "sell" its citizens on a get-rich-quick scheme. Testimony before this commission was strong and ranged from "abolish all lottery advertising" by one witness to a more moderate approach by another witness that "we must never hold out the hope of the 'big win' as a panacea of one's ills."

It should be a matter of grave concern to our society that a casino can open a "how-to-play" exhibit at a shopping mall. Or that "how to gamble" films are shown on cable television. It should be a matter of concern that a board of education offers classes on gambling. Worse still is the response that such classes are a matter of local option and society as a whole through its governmental agencies can't or won't express outrage.

218

It should be the recommendation of this commission that all forms of gambling industry be required to furnish information on the dangers of compulsive gambling in all its print and electronic advertising as well as being prominently displayed at race tracks, casinos and on lottery ticket dispensing machines.

It should also be the recommendation of this commission that the legislature create an Advertising Review Council to monitor on a continuing basis the marketing policies of the gambling interests in this state. Such a council should be without the power to penalize an industry or a license holder but rather to bring to the attention of the legislature and the public any flagrant violation of good advertising policy.

It should also be the recommendation of this commission that all forms of gambling in this state should police themselves better to avoid overstepping the bounds of propriety or good taste.

A serious fundamental question about the disposition of the revenues generated by the lottery and the casino industry came before the commission regrettably at the 11th hour. Realistically, there is little likelihood that such a dramatic and constitutional question could be enacted at the present time but it is an issue which goes to the heart of the reason for creating such a commission.

This commission should not be bringing forth "pie in the sky" proposals but it should be prepared to make recommendations on serious issues which may ultimately have to be addressed by some future legislature. If this state faces a severe economic crisis at some point in the near future, can it continue to funnel money into dedicated funds for the benefit of a limited segment of our population or should such funds go into the general fund for the benefit of all the citizens of this state?

At the very least this commission should recommend that Senator Costa's Casino Revenue Study Committee which seeks to rank in a priority order the various programs now authorized under the Casino Revenue Fund should be re-constituted. And a similar committee should undertake a study of the uses and the priorities of programs funded by lottery revenues.

Such a proposal is sure to be greeted by howls of indignation by favored segments of the population but New Jersey legislative history is replete with examples of citizen outrage before a crisis forces a distasteful accept-

ance by the lawmakers and the citizenry at large.

This commission could have been the catalyst to provide the response to some still-unseen crisis.

Testimony at the public hearings raised questions about the participation of casino interests in the political process. Political contributions at the state level by law firms, consulting firms, accounting firms, sevice industries and others representing casinos among their other clients are happening. The state should know how significant the contributions are and whether or not they are problematic. It should also be recognized that current limitations on participation by casino interests have served a useful public purpose of assuring the public that the gambling industry has not invaded the political process of this state.

The ban on political participation is not absolute as two recent cases before the Casino Control Commission would demonstrate nor as widespread as generally portrayed. Of the 44,000 persons currently employed in the casino industry, less than five percent are barred from making contributions to political organizations or candidates.

A continuation of these restrictions is felt to be a necessary step to assure a public perception that the gambling industry has not infiltrated the political process in this state.

The present restrictions on political participation are not unique to the casino industry. Federal employees are covered by the Hatch Act which bars them from elective office and partisan politics and also makes it a crime to solicit them for a political contribution for campaign purposes. Members of the New Jersey judiciary and their spouses are another group not permitted to participate in politics.

The feeling here is that:

1.  There should be absolutely no relaxation of the present law and regulations.

2.  There should be a thorough review to determine whether or not firms which perform professional services or do consulting work for a casino license holder should be banned from making political contributions, so that which is prohibited directly cannot be achieved indirectly.

219

3. The same treatment should be extended to race track operators, professional firms and consulting groups that are under contract to race tracks or to the Lottery Commission.

4. It should be illegal for any representative of a political party to seek a political contribution from any employee in the casino, racing or lottery industries.

The testimony of some witnesses about the possibility of creating a type of regional agency to assist in the future developement of Atlantic City as a destination resort has not been mentioned.

It is not the first time that such an idea has been proposed, nor is it likely to be the last. Indeed, former Governor Byrne once suggested a cabinet-level super agency to supervise the city but the plan never gained public support. In his view, the failure to have that in place prior to approval of casino gaming was the greatest single ommission. Of course, simply the threat of a state takeover has often been used by critics of the city or even of the gaming industry in attempts to force the government to take some action.

No member of the Atlantic City government has come forward to testify before the commission but it is probably safe to conclude that the city fathers would not endorse any idea which threatened to dilute their control over the city.

It should be noted, too, that one witness expressly rejected the notion of a state takeover, pointing out that nothing will take shape in Atlantic City until all the significant city groups—government, business and civic organizations—can agree on a course of action and enthusiastically work to bring it into reality. One wonders if that day will ever come.

More than a decade has passed and there is still an apparent lack of expertise in vital areas of local government. Further, there continues to be a growing concern that another jurisdiction in this country will eventually authorize casino gambling and will become a direct competitor for future development dollars and casino patrons.

In short, the question becomes whether the failure of the city government to rehabilitate the city's physical appearance and to make the life-style of its citizens more comfortable despite the infusion of new capital necessitates the state taking on a greater role to guarantee the success of the Atlantic City experiment.

The question is too broad for the limited talents of this commission which does not have the resources or the time to undertake a comprehensive study.

Furthermore, it is so great a challenge to our concept of home rule that it ought to be discussed at the highest levels of state government as well as its grass roots. It should become a part of a statewide dialogue of whether any municipality should surrender any of its cherished rights in exchange for future development.

It is a problem worthy of debate. This commission had a chance during its time to achieve a lasting place in New Jersey history by prompting a frank and open discussion of this basic constitutional question.

If this minority report serves no other purpose than to bring these crucial issues to the attention of the people of this state then it will have served its purpose.

Finally, it is the feeling here that the commission has failed to meet the obligations spelled out in the creating legislation. Assembly bill 1453 said "it shall be the duty of the commission to study the social impacts of gaming as a revenue-raising operation, and to determine the best way to conduct legalized gaming in this state."

It seems clear that the majority report does not fulfill that mandate. While some laudable recommendations are forthcoming, an opportunity to have made a lasting contribution to the future welfare of this state was lost.

## K. BISHOP HERLUF M. JENSEN'S SUBMISSIONS

# RECOMMENDATIONS FOR THE FINAL REPORT OF THE GOVERNOR'S ADVISORY COMMISSION ON GAMBLING SUBMITTED BY BISHOP HERLUF M. JENSEN MAY 20, 1988

Recommend:

1. That the Attorney General's Office be authorized to establish a state gaming enforcement agency which should be totally separate in function and financial support from the Casino Control Commission and the Division of Gaming Enforcement. The purpose of this proposed office is to control non-casino gambling in New Jersey. Membership of the governing board should consist of no persons who profit from gambling or expend gambling generated income.

2. That a majority of the members of each state regulatory gambling control group consists of persons unrelated to the conduct, income or expenditure of state gambling revenues.

3. That a brief but visible and cogent statement of the odds be printed upon each ticket, machine, casino pit or window at all commercial gambling establishments, in English and Spanish and that the Gambler's Anonymous phone number be written at the bottom of each notice.

4. With reference to non-profit groups, i.e. churches and fraternal organizations, that they be required to post the gross and net proceeds' records for the previous six months near the entrance of any such places of gambling.

5. That it become the guiding policy that no new forms of gambling be introduced to New Jersey, including without limitation sports betting, jai-alai, dog racing, a sweepstakes for housing, casino nights for non-profits, dial-a-bet, off track racing, Sunday racing, linking of slot machines between casinos, expansion of casinos outside Atlantic City, additional race tracks, linking New Jersey lottery with out-of-state lotteries, etc.

6. That serious attention needs to be given to the programs of the state becoming dependent upon the gambling revenues.

7. That the casinos be prohibited from extending credit in any form, including the use of credit cards and the holding of checks.

8. That legislators be prohibitied from owning any stock in any gambling casino or any publicly traded company that owns casinos.

9. That lawyers or agents of casinos must be required to inform the Election Law Enforcement Commission in writing for a publicly available record of any New Jersey political contribution, including the name of any client of theirs or their firm who directly or indirectly are related to income from any form of New Jersey legalized gambling.

10. That the state of New Jersey finance a program of assistance to compulsive gamblers, such as the Council on Compulsive Gambling, and that such a program be financed by out of tax revenues equitably provided by the three forms of legalized gambling above and beyond their present tax rates. Such a program should include both out-patient and in-patient treatment, research on the illness, and care for affected members of the family of the compulsive gambler.

11. That the Casino Control Commission be authorized to exercise a more active role in the redevelopment of Atlantic City, specifically as this pertains to the need for housing for low wage earners and other service personnel, and by the redevelopment of the commercial district which provides needed shopping facilities. In any community, people need access to grocery stores, fuel delivery services, pharmacies, and any number of other commercial operations that are not generally identified with resort operations or the boardwalk. Attention needs to be given to how to make Atlantic City livable for its citizens, and not simply for its visiting patrons. Reference here is made to the potential sweeping powers inherent in the Casino Control Commission.

221

12. That the number of games and hours of operation be limited, not to exceed those already in existence.

13. That care be taken not to erode the powers and functions of the Casino Control Commission or the Division of Gaming Enforcement, but rather that these two agencies be strengthened so that they can best serve the interests of the public, and so that they can be held to highest standards of public accountability.

14. That there be no expansion of political activity by casino licensed employees.

15. That the Casino Control Commission be directed to monitor more carefully the employment practices of the casinos in order to insure a higher standard of compliance with the goals for equal employment as stated in the Casino Control Act. Unemployment in Atlantic City continues to be inordinately high among the least skilled and educated persons, but with creative and concerned

programs of personnel training, much could be done to improve the situation. The casinos need to be held accountable for such training programs.

16. The Governor is urged to establish an independent research group to evaluate whether the Lottery Commission is focusing its advertisements and sales disproportionately in low income communities, thus possibly deriving a large share of income, almost as a hidden tax, from those in our society least able to pay.

17. That there be no limit to the number of casinos in Atlantic City.

18. That the control and restrictions now applicable to the advertising engaged in by the lottery, the casinos, and horse racing be continued, and that there continue to be concern expressed as to the effect of state encouraged gambling upon our young people, upon those addicted compulsively to gambling, and upon those persons least able to afford gambling losses.

# COMMENTS BY HERLUF M. JENSEN
## BISHOP OF NEW JERSEY SYNOD
## EVANGELICAL LUTHERAN CHURCH IN AMERICA

The Governor's Advisory Commission on Gambling was established with very broad purposes, namely, to study the social and economic impact of legalized gambling in New Jersey and to provide recommendations to the Governor and the Legislature regarding its future.

At the first meeting, Assembly Speaker Charles Hardwick underscored the premise that legalized gambling is here to stay and that this now permanent feature of the New Jersey socio-economic landscape required some study and thinking concerning its future.

Given the premise that legalized gambling is here to stay, I have given support, albeit lukewarm, to most of the recommendations in the Report. Nonetheless, I wish to associate myself with the written comments prepared by Walter N. Read, Chairman of the New Jersey Casino Control Commission, and especially those items which point to the shortcomings of the overall Report.

The Report of the Commission is, in my judgment, too congratulatory. It speaks commendatorily of the considerable positive economic benefits derived from the gambling and gaming industry and is weak on the negative social impact. To be sure, it notes the problem of the growth of numbers of persons compulsively involved or addicted to gambling. Yet it seems to say that legalized gambling should not be faulted for this. I grant that whatever there is present or lacking in a personality structure that leads to compulsive behavior, its existence cannot be attributed to the establishment of legalized gambling. Neither, I suppose, can alcohol rightly be blamed for the growth of persons afflicted by alcoholism, nor the growth of the drug disease in our society to the existence of drugs.

Nonetheless, in so far as the availability of legal forms of gambling creates the occasion and provides the seed bed for the growth of several hundred thousand compulsive gamblers, it seems to me that compulsive gambling is a social impact not sufficiently addressed in the Report. When we realize that the behavior of every compulsive gambler affects other members of his or her

family on whom the impact can be devastating, then we speak not merely of three or four thousand people, but probably of two or three times that number.

Moreover, with the availability of "equity-line" financing, it is possible for a person literally to "blow" a family's economic base in a very brief period of time.

Anyone who travels to Atlantic City and explores the non-boardwalk part of the city can readily see numerous, nearly countless, commercial businesses now boarded up, and in any event not prospering. In terms of residences, much of the city (and not the inlet section only) has been devastated and not rehabilitated. Many long term residents of the city have been driven out and forced to seek other places to live. Poverty, especially among the people of color and the Hispanic people, is extensive. Churches which once had a strong membership composed largely of people living in Atlantic City now struggle to survive with a membership dispensed to other municipalities. Churches have been adversely affected in a number of other ways and, in some cases, have been forced into adversarial relations with the casino industry. Some, with no help from the casino industry and with meager and diminishing resources, have sought to be centers of hospitality for a growing number of hurting people — some who have lost their shirts, some who are hungry, some who are homeless, and many who have been devastated by a loss of self-respect and do not know where to turn for help.

The Report, it seems to me, takes much too gentle a view of the prevalence and magnitude of crime. To be sure, crime goes with the territory, even as prostitutes flock to bars near military bases. But, is that really as acceptable a price to pay for the purported economic benefits as this Report seems almost to take for granted?

We have also heard reports from law enforcement officials indicating that it has become more difficult to prosecute successfully those who engage in illegal gambling, which they attribute to the growing view that if the State condones gambling, illegal gambling isn't a serious crime. How do we assess the long term effect on, for example, young people whose morals and consciences are shaped in a society nearly saturated with the

223

view that gambling is a great economic benefit to society?

I confess that something within me chuckles with glee when I hear the sad story of those who the other night paid $1,500 for a ringside seat which they didn't reach before the so-called boxing match was over. What a metaphor wherewith to describe a huge scam — an enormous lay-out for that which purports to be enter-tainment, and in just a brief time it's all over, except that some fat-cats prospered, and many gullible people were taken in. What a price for entertainment!

It has been said that one of the contributing factors to the fall of Rome was the confused cry of people for "Circus et Pane." We're doing apparently a very successful thing in providing our people with Circus, but the cry of others for "bread" seems hardly to be heard.

224

## L. THOMAS D. CARVER'S COMMENTS

# SUBMISSION FOR THE RECORD
## GOVERNOR'S ADVISORY COMMISSION ON GAMBLING

### BY THOMAS D. CARVER
### PRESIDENT
### CASINO ASSOCIATION OF NEW JERSEY

# CASINOS AND THE POLITICAL PROCESS

There was much trepidation in New Jersey after the voters approved casino gambling in Atlantic City in November of 1976. Based on a sordid history in its early years and fueled by popular novels and films, New Jersey approached the advent of the casino era with great trauma.

The ten year history of casinos in Atlantic City has proven that the fears and anticipations of 1976 were based less on fact than on fiction. Economically, the promises of casino advocates have been met and surpassed many times over. Conversely, beliefs that economic generation supplied by the industry would physically change Atlantic City have been shaken to their foundations. Fears that the state would be unable to cope with casino dynamics or be incapable of keeping organized crime from the industry were also proven to be unfounded. The New Jersey regulatory system, now recognized as a model for the future operations in other states, has met the task with the assistance, cooperation and full fledged acceptance of the industry itself.

## POLITICAL SEGREGATION OF CASINOS

In order to effect its goals, the state sought in every way possible to segregate the industry from political involvement ordinarily enjoyed by American industry. Many casino executives are prohibited from becoming involved in the political process on both the local and state level. After ten years, the question still remains whether this political prohibition is justified, or, if valid, then is it still viable today?

## NEVADA — NEW JERSEY — THE FACTS

Nevada is often cited to show what can happen when casinos become involved in politics. However, is such a comparison valid? Casino gambling in Nevada and New Jersey are similar only in that some of the games (craps, slots, baccarat, etc.) are the same. Almost all else is different and has been since New Jersey's first casino opened in 1978. The theory of regulation and reasons for introducing casinos differ markedly in each state. Just as its gaming enterprises differ, so do the two states. The two states differ in attitude, population, physical characteristics, needs, problems, economics, or any other normal standard of measurement.

In Nevada, the casino industry is the state in an economic sense. Casinos directly and indirectly supply approximately 86% of the state's budget. The industry is the largest employer by far, and all of Nevada's major cities, with the exception of Carson City, the capital, exist mainly as a result of the presence of casinos. Casinos are the reason for the state's high tourism and convention profile. The Commission was advised that at one point, 38 out of 42 legislators had associations with the casino industry. Nevada's legislators, as well as Governors and representatives to Washington, have a long history of casino involvement. Nevada grew and prospered after World War II as a result of a single economic base — casino gambling. Obviously, the industry will continue to play a totally disproportionate role to any other business for the foreseeable future.

Contrast this to New Jersey. Casinos, while a critically important industry in southern New Jersey and overall in terms of tourism, supply approximately 4% of the state's budget. Coupled with the state operated gaming outlets of lottery and paramutuel horse racing, the figure grows to 7%. In addition, casinos are sited in a single city, far removed from the state's centers of power and commerce. This will not change for two reasons. The constitution does not permit the spread of casinos. In addition, the existence of casinos elsewhere in New Jersey would lead to economic disaster for most of the industry, as well as Atlantic City itself. It is true that casinos in New Jersey now employ 40,000 state residents, and the number will grow. However, about 68% live in a single county (Atlantic) with the remainder spread throughout the remaining counties of southern New Jersey, and such conditions will prevail for some time to come. The point is, the industry simply is not of the magnitude to "infiltrate" or "invade" Trenton as suggested by others on this Commission.

## CASINOS AND CASINO PEOPLE

Most casinos are publicly traded corporations which operate under federal regulations. They are required to report their corporate finances each quarter under procedures regulated by the Securities Exchange Commission. They are overseen by outside boards which carry out the normal fiduciary responsi

bilities for the corporate shareholders. There are exceptions, such as Trump's Castle and Trump Plaza, but whatever their business format, the twelve operating casinos are each licensed by the New Jersey Casino Control Commission. This, per se, is testiment of their corporate good character. Indeed, each carries the affirmative burden to prove qualification for licensure by clear and convincing evidence, a test unparalleled in all of American business. The same affirmative standard and level of proof attach to each executive holding a key casino license. There is little argument that some members of the legislature in the past ten years would not have been able to pass such scrutiny and become licensed under such procedures. Not that such office holders had done anything of criminal intent or nature, or committed less severe offenses, but wrongdoing alone is not the test of casino licensing. The investigative process is much broader and takes into account associations, familial relationships and other activity considered less than suspicious under normal circumstances. The process creates a dichotomy in that the only people in New Jersey who affirmatively prove their good character are also the only people in New Jersey simultaneously banned from specific levels of basic political participation. Casino employees are common, decent working people, just like other New Jerseyans.

## OTHER FACTORS — ATLANTIC CITY

Are there not other factors which necessitate keeping or, as argued by others on the Commission, broadening the ban? One such concern was, and has been, Atlantic City itself. It was assumed early on that the sophisticated, free spending casinos would, if allowed, take over the city. In the process, the theory went, casinos would satisfy their own needs to the detriment of the local populace. Therefore, casinos were politically kept out.

The net result of this failure is evident. Except for construction carried out by casinos or by others directly with casino funds, the city has shown little overall improvement. No overall acceptance plan for redevelopment exists, and the city is divided politically into six wards of about eight square blocks each. Although casinos pay over 62% of the city's budget, the majority of it in school costs and supplies additional millions in luxury taxes for housing and convention facilities, the industry is treated as a tangential adjunct by its host community and government.

This fact was driven home once again with the industry's failure to have the city follow up on recommendations of a Touche Ross audit of the city's management and operation of government services. The casino funded $250,000 study was sidestepped by the fractious city council.

Would Atlantic City have been better off today if casino executives had been allowed the privilege of direct involvement? Many think it would. It is interesting to note that those most directly involved, the Mayor of Atlantic City, members of council, and the area's state office holders, have all called for a relaxation or even abandonment of the prohibition at one time or another. Most recently, Assemblywoman Dolores Cooper, a run-off loser in the last Mayoral election, stated, "They [casino people] should have been leading us. They have the experience, the brainpower, the know-how to revitalize the city. We were the neophytes."

Would more key casino executives have chosen to live in Atlantic City if they had a chance to make a difference? Probably! Would they have destroyed the city in order to rebuild it? Would they have ignored housing, welfare, or the health of city residents? Not likely. Would they have rebuilt the waterfront, added new and exciting attractions, restored grandeur, and also improved the schools their children attended? Most assuredly.

Under any reasonable standard, Atlantic City has not benefitted from the political segregation of key casino personnel.

## STATE GOVERNMENT

It is true that casino employees might have voted to elect a state senator or an assemblyman in the past decade. It is also true that casinos have lobbied officials for better transportation, state assistance in improving convention facilities, and in beach restoration. In fact, all Atlantic County legislators, elected with the votes of casino and non-casino people, have supported such an agenda for the past several years.

What is odd is that some argue that a single industry, situated in a far corner of this dynamic state, could effect its ends within the state legislature when other far more powerful industries cannot do so. The

petro chemical and utility industries, unions, bank and insurance companies, and ultimately the state's legal community all attempt daily to protect and legislate their interests with only a modicum of success.

The reason is simple — none of these institutions is monolithic. Neither is the casino industry. Like unions and the state bar, the interests of its people are diverse. Our employees live in different communities, have different needs, face differing problems. They worry about growth, schools, airport noise and a myriad of other problems, just as the attorneys, the bankers, and the union members. They belong to both political parties, and many would support a candidate named Jesse Jackson, regardless of party, just as would their minority brethren in Jersey City, Camden, Newark or Paterson.

## CASINOS AND REGULATIONS

But there is a difference, a major difference, concerning casinos. From a regulatory viewpoint, the industry is unique and cannot be compared to others in New Jersey. Its very uniqueness provides the state with the protection it seeks to abate fears of a casino "invasion" of state government. That protection, indeed a virtual guarantee, is the regulatory process under which casinos operate. Any act of corruption, any vote or action of conflict would go to the heart of the licensing process. Unlike other office holders, casino personnel committing such actions could, and most likely would, lose their ability to work as a result of state regulatory action. Not only would the individual suffer, but so would the corporation. Would that other special interests have such oversight? Trial attorney legislators continually campaign and vote on no-fault insurance. Real estate legislators seek to effect state redevelopment plans. Bank and insurance personnel cast votes on legislation affecting those industries. In many cases these legislators have sought to block legislation in committee without fear of state retribution over conflict of interest issues. An actual "invasion" by the casinos might go unnoticed in Trenton.

## AN ALTERNATIVE

If not a prohibition, then what? How can the state protect its stranglehold on casino personnel? Perhaps James Madison expressed the issue clearly in 1787 when he declared the purpose of the constitution was

to "secure the public good and private right." The issue confronting the commission and this state is how the private rights are to be "secured" while simultaneously maintaining the "public good." To address this issue, the inadequacy of the present law must be reviewed. There are two shortcomings in the present law. As noted, the law assumes the historical premise that "casinos are corrupt." To the contrary, the recurring licensing process in New Jersey is so rigorous and oversight of operations so close, that it has effectively weeded out the less reputable ab initio. Hence, New Jersey must have confidence in the licensing system. If a person obtains a casino employee license, his or her personal integrity and character have been favorably reviewed, and, therefore, the historical corruption argument is overcome.

Secondly, the law addresses the constitutional rights issue in absolute terms. That is to say, there is no alternative but for total suspension of constitutional rights. To the contrary, there is a middle ground which adheres to Madison's principle to secure both the common good and private rights.

To date, the traditional constitutional test in an instance such as this where compelling state interest clashes with constitutional rights has not been applied. The traditional test queries: What is the least onerous means of infringing on a person's rights and satisfy the state's interest? Summarized below are two recommendations which protect private rights and satisfy the state's concern.

First, the law (N.J.S.A. 5:12-138) which prohibits political contributions by casino corporations and casino managers, key employees, and principle agents should be amended. Employees should be permitted to contribute a *limited* amount to political campaigns. Presently, some federal and state election laws "cap" the contribution of an individual to a candidate. Similarly, this approach should apply to casino employees. The "cap" should be reasonable and extend to include state, county and municipal elections. This will prevent an employee or principal agent from affecting the outcome of an election and thereby satisfy the state's concern, but it will also allow the employee to participate in the electoral process.

However, the section of the law which prohibits corporate contributions should be maintained. The

227

reason is that large corporations could control the outcome of an election by extravagant contributions. This prohibition is similar to those that exist for a host of business entities including banking and insurance companies.

Second, the present conflicts of interest law which prohibits a casino employee from serving as a state legislator should be repealed. As set forth previously, it is inconceivable that casino employees will gain control of the legislature. Takeover of government by the casino industry is equally implausible. The law should be amended to read that the casino employee/legislator shall abstain from voting and sponsoring casino legislation. This amendment permits an individual to hold office, but prevents undue influence by the industry.

## THE ACTUAL ISSUE

The real issue after ten years is whether New Jersey has faith in itself and its institutions. It is ironic, given the testimony of Joel Jacobson and other former regulators, that the industry argues for faith in and adherence to the strict regulatory licensing process. In fact, contrary to Mr. Jacobson's oft stated claims that the industry seeks to deregulate, it has long ago accepted New Jersey's strict regulatory scheme.

Few regulations have been relaxed in the past ten years, and those that have been do not concern matters of integrity. In fact, contrary to some statements before the commission, many regulations have been intensified over industry objections. All regulated industries chafe periodically. Casinos are no different. Utilities, banks, and insurers often seek redress from the regulatory process.

Conversely, bureaucracies defend the status quo — no change is good in itself. Regulation works, and therefore the only course is to do the same or more of it. That is precisely the argument set forth by certain members of this Commission. The success of strict

regulation and licensing standards argue for the integrity of the persons within it; therefore, they should be permitted full participation enjoyed by other citizens of New Jersey.

Therefore, the following recommendation is offered on this issue:

The Governor's Advisory Commission, having registered its confidence in the regulatory system which oversees the casino industry, and having concluded that the system has assured public confidence that New Jersey casinos can be licensed and operated to the standards of high character and integrity called for in the Casino Control Act; the Commission having uncovered no rationale why the provisions of the Act, prohibiting direct political involvement by key casino personnel, should not be amended, and

the Governor's Advisory Commission having reason to believe that the prohibition has actually served to retard the redevelopment of Atlantic City, and

the Commission having found no evidence that granting key casino personnel rights of full political participation on the state level poses a direct or remote threat to the government of New Jersey; therefore,

the Governor's Advisory Commission on Gaming recommends that the state legislature repeal the political contribution prohibition for casino employees or alternatively adopt a cap for each election of $1,000.00. To amend the conflict of interest statute to permit a casino employee to serve as a legislator or city official, so long as they meet other requirements (residency and age), and to modify other prohibitions so spouses of judges and other officals may work in the industry, so long as the official disqualifies himself from casino matters.

**M. SENATOR RICHARD J. CODEY'S
COMMENTS**

# COMMENTS BY SENATOR RICHARD J. CODEY

I am writing in reponse to the report and recommendations of the Governor's Advisory Commission on Gambling.

I support the recommendations with two exceptions.

The first exception relates directly to Recommendation #1. I do not think that a permanent advisory group concerned with gaming will serve any useful purpose and I do not see the need for such a group at this time.

The other reservation I have with the report is more general in nature. I am disappointed with the lack of specific detailed recommendations and findings. Most of the recommendations are either self-evident or have been discussed extensively in the legislature, in the media, and by other entities prior to the issuance of this report by the commission. No new ground has been broken.

Many important issues are not even discussed. There are no recommendations dealing with off-track betting. There is no discussion of the effect of one type of gaming on other forms. The lack of tourist amenities and convention facilities in Atlantic City is hardly mentioned. Transportation, airports, parking and traffic problems are not addressed. Numerous other issues also merit some consideration.

In summary, while I support many of the findings of the commission I do not think the report provides enough specific information or direction to those who are concerned with gaming in New Jersey.

14216YE(665
5-21-98  160265  MC