Case 1:22-cv-07464-RMB-AMD   Document 90-34   Filed 02/13/23   Page 1 of 8 PageID: 2731

342.73
Sch

# THE BILL OF RIGHTS: A DOCUMENTARY HISTORY

BERNARD SCHWARTZ

## Volume II



RAMSEY PUBLIC LIBRARY
RAMSEY, N. J.

101267

CHELSEA HOUSE PUBLISHERS in association with
McGRAW HILL BOOK COMPANY
New York, Toronto, London, Sydney
1971

resolution which referred to them. This he declared an improper omission, and desired they might be inserted. This was opposed by the majority, but as there was no motion before the convention, the president did not see how a determination could take place, though he wished to know the sense of the members upon this occasion. Mr. Smilie, in consequence of this intimation, moved for the insertion of Mr. Whitehill's articles. Mr. Wilson continued his opposition, and called upon Mr. Smilie to reduce his motion to writing. "Indeed, sir," observed Mr. Smilie, "I know so well that if the honorable member from the city says the articles shall not, they will not be admitted, that I am not disposed to take the useless trouble of reducing my motion to writing, and therefore I withdraw it."

\* \* \*

## The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787\*

It was not until after the termination of the late glorious contest, which made the people of the United States an independent nation, that any defect was discovered in the present confederation. It was formed by some of the ablest patriots in America. It carried us successfully through the war, and the virtue and patriotism of the people, with their disposition to promote the common cause, supplied the want of power in Congress.

The requisition of Congress for the five percent. impost was made before the peace, so early as the first of February, 1781, but was prevented taking effect by the refusal of one State; yet it is probable every State in the Union would have agreed to this measure at that period, had it not been for the extravagant terms in which it was demanded. The requisition was new moulded in the year 1783, and accompanied with an additional demand of certain supplementary funds for twenty-five years. Peace had now taken place, and the United States found themselves laboring under a considerable foreign and domestic debt, incurred during the war. The requisition of 1783 was commensurate with the interest of the debt, as it was then calculated; but it has been more accurately ascertained since that time. The domestic debt has been found to fall several millions of dollars short of the calculation, and it has lately been considerably diminished by large sales of the Western lands. The States have been called on by Congress annually for supplies until the general system of finance proposed in 1783 should take place.

It was at this time that the want of an efficient federal government was first complained of, and that the powers vested in Congress were found to be

\**Pennsylvania and the Federal Constitution*, pp. 454–83.

inadequate to the procuring of the benefits that should result from the union. The impost was granted by most of the States, but many refused the supplementary funds; the annual requisitions were set at naught by some of the States, while others complied with them by legislative acts, but were tardy in their payments, and Congress found themselves incapable of complying with their engagements and supporting the federal government. It was found that our national character was sinking in the opinion of foreign nations. The Congress could make treaties of commerce, but could not enforce the observance of them. We were suffering from the restrictions of foreign nations, who had suckled our commerce while we were unable to retaliate, and all now agreed that it would be advantageous to the union to enlarge the powers of Congress, that they should be enabled in the amplest manner to regulate commerce and to lay and collect duties on the imports throughout the United States. With this view, a convention was first proposed by Virginia, and finally recommended by Congress for the different States to appoint deputies to meet in convention, "for the purposes of revising and amending the present articles of confederation, so as to make them adequate to the exigencies of the union." This recommendation the legislatures of twelve States complied with so hastily as not to consult their constituents on the subject; and though the different legislatures had no authority from their constituents for the purpose, they probably apprehended the necessity would justify the measure, and none of them extended their ideas at that time further than "revising and amending the present articles of confederation." Pennsylvania, by the act appointing deputies, expressly confined their powers to this object, and though it is probable that some of the members of the assembly of this State had at that time in contemplation to annihilate the present confederation, as well as the constitution of Pennsylvania, yet the plan was not sufficiently matured to communicate it to the public.

\* \* \*

Affairs were in this situation, when on the 28th of September last, a resolution was proposed to the assembly by a member of the house, who had been also a member of the federal convention, for calling a State convention to be elected within ten days for the purpose of examining and adopting the proposed Constitution of the United States, though at this time the house had not received it from Congress. This attempt was opposed by a minority, who after offering every argument in their power to prevent the precipitate measure, without effect, absented themselves from the house as the only alternative left them, to prevent the measures taking place previous to their constituents being acquainted with the business. That violence and outrage which had been so often threatened was now practised; some of the members were seized the next day by a mob collected for the purpose, and forcibly dragged to the house, and there detained by force whilst the quorum of the

legislature so formed, completed their resolution. We shall dwell no longer on this subject: the people of Pennsylvania have been already acquainted therewith.

\* \* \*

In the city of Philadelphia and some of the eastern counties the junto that took the lead in the business agreed to vote for none but such as would solemnly promise to adopt the system *in toto*, without exercising their judgment. In many of the counties the people did not attend the elections, as they had not an opportunity of judging of the plan. Others did not consider themselves bound by the call of a set of men who assembled at the State-house in Philadelphia and assumed the name of the legislature of Pennsylvania; and some were prevented from voting by the violence of the party who were determined at all events to force down the measure. To such lengths did the tools of despotism carry their outrage, that on the night of the election for members of convention, in the city of Philadelphia, several of the subscribers (being then in the city to transact your business) were grossly abused, ill-treated and insulted while they were quiet in their lodgings, though they did not interfere nor had anything to do with the said election, but, as they apprehend, because they were supposed to be adverse to the proposed constitution, and would not tamely surrender those sacred rights which you had committed to their charge.

The convention met, and the same disposition was soon manifested in considering the proposed constitution, that had been exhibited in every other stage of the business. We were prohibited by an express vote of the convention from taking any questions on the separate articles of the plan, and reduced to the necessity of adopting or rejecting *in toto*. 'Tis true the majority permitted us to debate on each article, but restrained us from proposing amendments. They also determined not to permit us to enter on the minutes our reasons of dissent against any of the articles, nor even on the final question our reasons of dissent against the whole. Thus situated we entered on the examination of the proposed system of government, and found it to be such as we could not adopt, without, as we conceived, surrendering up your dearest rights. We offered our objections to the convention, and opposed those parts of the plan which, in our opinion, would be injurious to you, in the best manner we were able; and closed our arguments by offering the following propositions to the convention.

1. The right of conscience shall be held inviolable; and neither the legislative, executive nor judicial powers of the United States shall have authority to alter, abrogate or infringe any part of the constitution of the several States, which provide for the preservation of liberty in matters of religion.

2. That in controversies respecting property, and in suits between man and man, trial by jury shall remain as heretofore, as well in the federal courts as in those of the several States.

3. That in all capital and criminal prosecutions, a man has a right to

demand the cause and nature of his accusation, as well in the federal courts as in those of the several States; to be heard by himself and his counsel; to be confronted with the accusers and witnesses; to call for evidence in his favor, and a speedy trial by an impartial jury of his vicinage, without whose unanimous consent he cannot be found guilty, nor can he be compelled to give evidence against himself; and, that no man be deprived of his liberty, except by the law of the land or the judgment of his peers.

4. That excessive bail ought not to be required, nor excessive fines imposed, nor cruel nor unusual punishments inflicted.

5. That warrants unsupported by evidence, whereby any officer or messenger may be commanded or required to search suspected places; or to seize any person or persons, his or their property not particularly described, are grievous and oppressive, and shall not be granted either by the magistrates of the federal government or others.

6. That the people have a right to the freedom of speech, of writing and publishing their sentiments; therefore the freedom of the press shall not be restrained by any law of the United States.

7. That the people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to, and be governed by the civil powers.

8. The inhabitants of the several States shall have liberty to fowl and hunt in seasonable time on the lands they hold, and on all other lands in the United States not inclosed, and in like manner to fish in all navigable waters, and others not private property, without being restrained therein by any laws to be passed by the legislature of the United States.

9. That no law shall be passed to restrain the legislatures of the several States from enacting laws for imposing taxes, except imposts and duties on goods imported or exported, and that no taxes, except imposts and duties upon goods imported and exported, and postage on letters, shall be levied by the authority of Congress.

10. That the house of representatives be properly increased in number; that elections shall remain free; that the several States shall have power to regulate the elections for senators and representatives, without being controlled either directly or indirectly by any interference on the part of the Congress; and that the elections of representatives be annual.

11. That the power of organizing, arming and disciplining the militia (the manner of disciplining the militia to be prescribed by Congress), remain with the individual States, and that Congress shall not have authority to call or march any of the militia out of their own State, without the consent of such State, and for such length of time only as such State shall agree.

That the sovereignty, freedom and independency of the several States

# MASSACHUSETTS RATIFYING CONVENTION, 1788

*Commentary*

New Jersey and Georgia speedily followed Pennsylvania in ratifying the federal Constitution (each by unanimous votes) on December 18, 1787, and January 2, 1788 respectively. On January 9, Connecticut ratified by a large majority (128 to 40). In none of the three Ratifying Conventions (so far as we know from the skimpy records available) was there express attack upon the absence of a Bill of Rights. The same was not true in Massachusetts—the next state to ratify. Its Convention was sharply divided between the Federalists and Antifederalists and it was only after a month of debate (much of it devoted to the Bill of Rights issue) that Massachusetts was able to vote ratification.

The Massachusetts ratification was in many ways, the key action in the post-Philadelphia Convention movement to secure a federal Bill of Rights. Massachusetts was the first state officially to propose ratificatory amendments, which were transmitted to Congress together with the state's ratification (thus adopting the method proposed by the Pennsylvania minority, but turned down by that state's Convention majority). It is not known whether the Massachusetts delegates were directly influenced by the Pennsylvania minority example. There is evidence that the Philadelphia newspapers containing the Address of the Pennsylvania minority did not reach Boston until after the Massachusetts Ratifying Convention adjourned. (Antifederalists saw this as evidence of a conspiracy among Federalists in the post offices). It is nevertheless all but inconceivable (bearing in mind the intense interest in the result of the ratification contest in the crucial states like Pennsylvania) that some news of the Pennsylvania minority proposals did not reach the Massachusetts delegates.

What is particularly noteworthy about the Massachusetts ratificatory amendments is that they were drafted by the Federalist leaders in the Convention themselves. When the delegates convened, on January 9, 1788, it soon became apparent that the Convention was closely divided between supporters and opponents of the Constitution. (As the debate went on, indeed, it even seemed that the Antifederalists had a narrow margin.) Without some concession to the widespread feeling that a Bill of Rights was necessary, the Massachusetts ratification itself might be in danger. The Federalist leaders decided upon the introduction of proposed amendments to be sent with the ratification as a compromise. The amendments were drafted by Theophilus Parsons (who had also written the *Essex Result,* [*supra* p. 344]). The shrewd move was then made of allowing John Hancock, the Convention president, to introduce them as his own handiwork. Hancock had been reputed to be an Antifederalist and getting him to sponsor the amend-

ments dissipated much of the opposition, particularly since the motion to consider the Hancock amendments was made by Samuel Adams who was also considered an Antifederalist. Adams and other Antifederalists joined in praising the proposed amendments. As Dr. Jarvis summed it up, "The amendments have a tendency to remove many objections which have been made to it"—i.e., the Constitution.

Some of the Antifederalists objected that the Hancock amendments were far from the Bill of Rights that was necessary. Nor would it be as difficult as the Federalists claimed to draw up a Bill of Rights: "any gentlemen in that Convention could form one in a few hours, as he might take the bill of rights of Massachusetts for a guide." Parsons made the standard answer, "that no power was given to Congress to infringe on any one of the natural rights of the people." Apparently this was not enough for some delegates and Adams then introduced amendments to be added to the Hancock proposals. These would have gone far in the direction of a Bill of Rights, since they included (as the Convention *Journal* for February 6 tells us) guarantees of freedom of the press and conscience, right to bear arms, to petition for redress of grievances, and against unreasonable searches and seizures. We do not have any report of the debate on the Adams motion, only the statement in the *Journal* that "the question being put was determined in the negative." (The report of the debates erroneously states that Adams withdrew his amendments.)

Defeat of Adams' additional amendments marked the real end of the ratification debate. Later on the same day, the Convention voted to ratify the Constitution and, at the same time, to "remove the fears and quiet the apprehensions of many of the good people of this Commonwealth," recommended to Congress the amendments proposed by Hancock. The final vote was surprisingly close (187 to 168), indicating the wisdom of the Federalists in appropriating the amendment issue for themselves.

As the letter from Benjamin Lincoln to Washington points out, after Hancock introduced his proposed amendments, the Antifederalists wanted the ratification to be upon condition that the amendments be adopted. Such a ratification would have been equivalent to none at all, since it would have required a Second Constitutional Convention to make the amendments. At the same time, when Massachusetts and four other states recommended amendments as part of their ratifications, it placed almost irresistible pressure on the first Congress elected under the Constitution to initiate the amending process. The proposed amendments introduced by Hancock thus led directly to the federal Bill of Rights.

The Massachusetts proposed amendments themselves consisted of nine articles. Four of them were included in the 12 amendments approved by Congress in 1789: the first, that all powers not expressly delegated to the Federal Government be reserved to the states (later guaranteed in the Tenth Amendment); the second governing representation in the House (a similar

nays, whether this Convention will accept of the report of the Committee made on Monday last; and, the question being put, passed in the negative.

It was then voted that 4 o'clock, P.M., be assigned for that purpose.

A motion was made and seconded, that the report of the Committee made on Monday last, be amended, so far as to add the following to the first article therein mentioned, viz.: "And that the said Constitution be never construed to authorize Congress to infringe the just liberty of the press, or the rights of conscience; or to prevent the people of the United States, who are peaceable citizens, from keeping their own arms; or to raise standing armies, unless when necessary for the defence of the United States, or of some one or more of them; or to prevent the people from petitioning, in a peaceable and orderly manner, the federal legislature, for a redress of grievances; or to subject the people to unreasonable searches and seizures of their persons, papers or possessions." And the question being put, was determined in the negative.

Adjourned to 3 o'clock, P.M.

Met according to adjournment.

The Convention proceeded to the consideration of the report of the Committee on the subject of the propositions of his Excellency the President, of the 31st ultimo, made on Monday last, and the question, whether this Convention will accept of the said report, being put, was determined by yeas and nays, as follows, viz.:

[Yeas, 187–Nays, 168—for the actual vote, see *infra* p. 714].

### Massachusetts Convention Debates, 1788*

[Wednesday, January 23]

Col. Varnum, in answer to an inquiry, why a bill of rights was not annexed to this Constitution, said, that, by the constitution of Massachusetts, the legislature have a right to make all laws not repugnant to the Constitution. Now, said he, if there is such a clause in the Constitution under consideration, then there would be a necessity for a bill of rights. In the section under debate, Congress have an expressed power to levy taxes, &c., and to pass laws to carry their requisitions into execution: this, he said, was express, and required no bill of rights. After stating the difference between delegated power and the grant of all power, except in certain cases, the colonel proceeded to controvert the idea that this Constitution went to a consolidation of the Union. He said it was only a consolidation of strength, and that it was apparent Congress had no right to alter the internal relations

---

*The Debates in the Several State Conventions on the Adoption of the Constitution, Vol. 2, pp. 78–183.