UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, AND ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., | Hon. Renée Marie Bumb, U.S.D.J. Hon. Ann Marie Donio, U.S.M.J. Docket No. 22-CV-7463 |
| Plaintiffs, | **CIVIL ACTIONS (ELECTRONICALLY FILED)** |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, | |
| Defendants. | |
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; GIL TAL; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, | Hon. Reéne Marie Bumb, U.S.D.J. Hon. Ann Marie Donio, U.S.M.J. Docket No. 22-CV-7464 |
| Plaintiffs, | |
| v. | |

MATTHEW J. PLATKIN, in his official
capacity as Attorney General of the State of
New Jersey; and PATRICK CALLAHAN,
in his official capacity as Superintendent of
the New Jersey State Police,

    Defendants.

---

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

---

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL
OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, New Jersey 08625
*Attorney for Defendants*

Angela Cai (NJ Bar 121692014)
  *Deputy Solicitor General*
Jean Reilly
  *Assistant Attorney General*
David Chen
Amy Chung
Viviana Hanley
Chandini Jha
Samuel L. Rubinstein
Eileen W. Siegeltuch
  *Deputy Attorneys General*
 Of Counsel And On The Brief

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................... iv

PRELIMINARY STATEMENT .............................................................................1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY ............2

LEGAL STANDARD..............................................................................................3

ARGUMENT ...........................................................................................................4

   I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR PRIVATE PROPERTY DEFAULT RULE CHALLENGES...................4

      A.   Section 7(a)(24) Does Not Violate The Second Amendment....................4

      B.   Section 7(a)(24) Does Not Violate The First Amendment Or The Equal Protection Clause. ........................................................................................21

   II.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGES TO SENSITIVE PLACES RESTRICTIONS. ...................................................................................23

      A.   The Second Amendment Does Not Confer A Right To Carry Firearms On Premises Where The State Is Proprietor. ...................................................23

      B.   Chapter 131's Sensitive Place Designations Are Supported By Historical Tradition. ..........................................................................................28

         1.   Section 7(a)(6) (within 100 feet of public gatherings, demonstrations and events requiring government permits). ...................................................34

         2.   Section 7(a)(9) (zoos)...........................................................................37

         3.   Section 7(a)(10) (public parks, beaches, recreational facilities, and playgrounds); and N.J.A.C. 7:2-2.17(b). .......................................................38

         4.   Section 7(a)(11) (youth sports events)................................................42

         5.   Section 7(a)(12) (publicly owned or leased libraries and museums). ..43

         6.   Section 7(a)(15) (bars and restaurants that serve alcohol)...................46

         7.   Section 7(a)(17) (entertainment facilities). .........................................48

         8.   Section 7(a)(18) (casinos); and N.J.A.C. 13:69D-1.13........................50

9.    Section 7(a)(20) (airports and transit hubs). .........................................53

10.   Section 7(a)(21) (healthcare facilities) and Section 7(a)(22) (addiction and mental health treatment centers). ...........................................................57

11.   Section 7(a)(23) (movie sets). ..............................................................60

12.   Fish & Game Regulations (N.J.A.C. 7:25-5.23(a), (c), (f), (i), (m)) ....60

13.   Section 7(b)(1) Vehicle Restrictions.....................................................62

14.   Multiuse property and Section 7(a)(7) (schools, colleges, universities other educational institutions, and school buses). .........................................67

III.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR CLAIMS AGAINST THE LIABILITY INSURANCE PROVISION................................70

A.    Plaintiffs Lack Standing To Challenge Section 4. ..................................70

B.    The Insurance Requirement Does Not Fall Under The Plain Text Of The Second Amendment ..........................................................................................72

C.    The Insurance Requirement Is Supported By A Historical Tradition Of Shifting The Risk Of Loss From Gun Violence ...............................................73

IV.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR VOID FOR VAGUENESS CHALLENGES. .........................................77

A.    Within 100 Feet Of A Public Gathering ...............................................78

B.    "Vehicle" ...............................................................................................79

C.    "Carry" ..................................................................................................79

D.    "Unjustified Display" Of A Handgun. ...................................................80

E.    Permit Requirements .............................................................................80

V.  PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CHALLENGE TO THE PERMITTING REQUIREMENTS.................83

A.    Permit Fee Increases..............................................................................83

B.    Section 2's Public Safety Disqualifiers...................................................85

C.    Section 3's Permit Procedures ...............................................................88

VI.   PLAINTIFFS CANNOT SUCCEED ON THE MERITS OF THE EQUAL PROTECTION CHALLENGE AGAINST SECTION 8.....................................91

VII.  PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING IRREPARABLE HARM.......................................................................................94

ii

VIII.   AN INJUNCTION WILL RESULT IN EVEN GREATER HARM TO THE STATE AND THE PUBLIC. .......................................................96

IX.   ANY INJUNCTION SHOULD BE NARROW IN SCOPE. .....................98

CONCLUSION ...................................................................................................100

CERTIFICATE OF SERVICE ............................................................................101

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018) ...................................................................................97

*Acierno v. New Castle Cnty.*,
  40 F.3d 645 (3d Cir. 1994) ............................................................................84

*Adams v. Freedom Forge Corp.*,
  204 F.3d 475 (3d Cir. 2000) ..........................................................................94

*Adderley v. Florida*,
  385 U.S. 39 (1966) .........................................................................................24

*Aiello v. City of Wilmington*,
  623 F.2d 845 (3d Cir. 1980) ..........................................................................91

*Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty*,
  39 F.4th 95 (3d Cir. 2022) .......................................................................3, 4, 96

*Andrews v. State*,
  50 Tenn. 165 (1871) ............................................................................29, 30, 36

*Antonyuk v. Hochul*,
  2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ...............................................19

*Antonyuk v. Nigrelli*,
  143 S. Ct. 481 (2023) ..................................................................................2, 20

*Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen*
  *Freeholders of Atl. Cnty.*,
  48 F.3d 701 (3d Cir. 1995) ............................................................................27

*Benisek v. Lamone*,
  138 S. Ct. 1942 (2018) ...................................................................................94

*Bd. of Educ. v. Pico*,
  457 U.S. 853 (1982) .......................................................................................44

*Binderup v. U.S. Att'y Gen.*,
   836 F.3d 336 (3d Cir. 2016)..............................................................87, 88

*Bonidy v. U.S. Postal Serv.*,
   790 F.3d 1121 (10th Cir. 2015) ..............................................................25

*Bldg. & Const. Trades Council of Metro. Dist. v. Assoc. Builders &*
   *Contractors of Mass./R.I., Inc.*,
   507 U.S. 218 (1993)................................................................................27

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
   176 A.3d 632 (Del. 2017) .......................................................................42

*Burton v. Sills*,
   248 A.2d 521, 523 (N.J. 1968)...........................................................81, 82

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
   142 S. Ct. 1002 (2022)...........................................................................97

*Camfield v. United States*,
   167 U.S. 518 (1897)..........................................................................24, 55

*Carr v. State*,
   34 Ark. 448 (1879)..........................................................................66, 67

*Cedar Point Nursery v. Hassid*,
   141 S. Ct. 2063 (2021) .............................................................................6

*City of Phila. v. Att'y Gen.*,
   916 F.3d 276 (3d Cir. 2019)....................................................................99

*Coates v. City of Cincinnati*,
   402 U.S. 611 (1971)................................................................................78

*Cole v. Fisher*,
   11 Mass. 137 (1814) ..............................................................................77

*Colten v. Kentucky*,
   407 U.S. 104 (1972)................................................................................78

*Constr. Ass'n of W. Pa. v. Kreps*,
 573 F.2d 811 (3d Cir. 1978)................................................................95

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
 562 U.S. 277 (2011)............................................................................69

*Cumberland Mut. Fire Ins. Co. v. Murphy*,
 873 A.2d 534 (N.J. 2005)....................................................................70

*District of Columbia v. Heller*,
 554 U.S. 570 (2008)......................................................................passim

*Donahue v. N.J. Tpk. Auth.*,
 No. A-0648-20, 2022 WL 1039690
 (N.J. Super. Ct. App. Div. Apr. 7, 2022) ............................................28

*Donegal Mut. Ins. Co. v. Baumhammers*,
 938 A.2d 286 (Pa. 2007) .....................................................................71

*Dwyer v. Farrell*,
 475 A.2d 257 (Conn. 1984) ..........................................................86, 87

*Elrod v. Burns*,
 427 U.S. 347 (1976)............................................................................95

*English v. State*,
 35 Tex. 473 (1872)........................................................................29, 35

*Erie Ins. Exch. v. Moore*,
 228 A.3d 258 (Pa. 2020) ................................................................. 71

*Eslava v. State*,
 49 Ala. 355 (1873) .............................................................................67

*Fieger v. Michigan Supreme Ct.*,
 553 F.3d 955 (6th Cir. 2009) .............................................................89

*Fischer v. Governor of N.J.*,
 842 F. App'x 741 (3d Cir. 2021) ........................................................72

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
  847 F.2d 100 (3d Cir. 1988)....................................................................95

*Garcia v. San Antonio Metro. Transit Auth.*,
  469 U.S. 528 (1985)........................................................................31, 56

*Geer v. Connecticut*,
  161 U.S. 519 (1896)..............................................................................62

*GeorgiaCarry.org v. Georgia*,
  687 F.3d 1244 (11th Cir. 2012) ...........................................6, 8, 11, 14

*Gerritsen v. City of Los Angeles*,
  994 F.2d 570 (9th Cir. 1993) ...............................................................73

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018)..........................................................................85

*Gholson v. State*,
  53 Ala. 519 (1875) ................................................................................66

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)..............................................................................78

*Greer v. Spock*,
  424 U.S. 828 (1976)..............................................................................24

*Hill v. State*,
  53 Ga. 472 (1874) ....................................................................29, 30, 36

*Hightower v. City of Boston*,
  693 F.3d 61 (1st Cir. 2012)...................................................................92

*Hohe v. Casey*,
  868 F.2 (3d Cir. 1989)..........................................................................95

*Hope v. Warden York Cnty. Prison*,
  972 F.3d 310 (3d Cir. 2020)..............................................................3, 84

*Hughes v. Alexandria Scrap Corp.*,
　426 U.S. 794 (1976) ................................................................................26

*Inganamort v. Bor. of Fort Lee*,
　371 A.2d. 34 (N.J. 1977)........................................................................100

*In re Forfeiture of Pers. Weapons & Firearms Identification Card
　Belonging to F.M.*,
　139 A.3d 67, 79, 84 (N.J. 2016)..............................................................81

*In re Osworth*,
　838 A.2d 465, 470 (N.J. Super. Ct. App. Div. 2003) ..............................82

*Interactive Media Ent. & Gaming Ass'n Inc. v. Att'y Gen.*,
　580 F.3d 113 (3d Cir. 2009)....................................................................78

*Jackson v. City of Joliet*,
　715 F.2d 1200 (7th Cir. 1983) ................................................................28

*Jacobsen v. Harris*,
　869 F.2d 1172 (8th Cir. 1989) ................................................................73

*Jake's, Ltd. v. Coates*,
　284 F.3d 884 (8th Cir. 2002) ..................................................................82

*Jankovich v. Illinois State Police*,
　78 N.E.3d 548 (Ill. App. 2017) ..............................................................83

*Judd v. Ballard*,
　66 Vt. 668 (1894)....................................................................................77

*Kanter v. Barr*,
　919 F.3d 437 (7th Cir. 2019) ..................................................................87

*Kas Oriental Rugs, Inc. v. Ellman*,
　926 A.2d 387, 391 (N.J. Super. Ct. App. Div. 2007) ...............................7

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
　909 F.3d 446 (D.C. Cir. 2018) ...............................................................37

*Kendrick v. Bruck*,
   586 F. Supp. 3d 300 (D.N.J. 2022) ........................................................................85

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ........................................................................44

*Kreimer v. Morristown Bureau of Police*,
   958 F.2d 1242 (3d Cir. 1992) ........................................................................45

*Kuck v. Danaher*,
   822 F. Supp. 2d 109 (D. Conn. 2011) ........................................................................83

*L.A. Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*,
   506 F. Supp. 3d 1018 (C.D. Cal. 2020) ........................................................................98

*Laird v. Tatum*,
   408 U.S. 1 (1972) ........................................................................90

*Lanin v. Borough of Tenafly*,
   515 Fed. App'x. 114 (3d Cir. 2013) ........................................................................95

*LaSpina v. SEIU Pa. State Council*,
   985 F.3d 278 (3d Cir. 2021) ........................................................................37

*Lewis v. Casey*,
   518 U.S. 343 (1996) ........................................................................45

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................43, 55

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ........................................................................30, 68

*McTernan v. City of York*,
   577 F.3d 521 (3d Cir. 2009) ........................................................................95

*Maryland v. King*,
   567 U.S. 1301 (2012) ........................................................................97

*Mielo v. Steak 'n Shake Ops., Inc.*,
    897 F.3d 467 (3d Cir. 2018)....................................................................37

*Moody v. Ward*,
    13 Mass. 299 (1816) .........................................................................77

*Muscarello v. United States*,
    524 U.S. 125 (1998).........................................................................80

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*,
    No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022) ...............75

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018).......................................................................21

*Nekrilov v. City of Jersey City*,
    45 F.4th 662 (3d Cir. 2022) .................................................................33

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932)..........................................................................18

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)................................................................passim

*NFIB v. Sebelius*,
    567 U.S. 519 (2012).................................................................72, 100

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................20, 96

*Nordyke v. King*,
681 F.3d 1041 (9th Cir. 2012) ................................................................92

*Omnistone Corp. v. Cuomo*,
    485 F. Supp. 3d 365 (E.D.N.Y. 2020) ....................................................96

*People v. Chairez*,
    104 N.E.3d 1158 (Ill. 2018) .................................................................42

*Pharmacia Corp. v. Alcon Labs.,*
  201 F. Supp. 2d 335 (D.N.J. 2002) ........................................................................94

*Reeves, Inc. v. Stake,*
  447 U.S. 429 (1980) ..............................................................................................26

*Reilly v. City of Harrisburg,*
  858 F.3d 173 (3d Cir. 2017)...................................................................................4

*Robinson v. Ardoin,*
  37 F.4th 208 (5th Cir. 2022) ................................................................................97

*Rumsfeld v. F. for Acad. & Inst. Rts., Inc.,*
  547 U.S. 47 (2006)................................................................................................21

*Safeco Ins. Co. v. Robert S.,*
  28 P.3d 889 (Cal. 2001) ........................................................................................71

*Shultz v. Heyison,*
  439 F. Supp. 857 (M.D. Pa. 1975) ........................................................................73

*Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.,*
  422 F.3d 141 (3d Cir. 2005).................................................................................92

*Siemens USA Holdings Inc v. Geisenberger,*
  17 F.4th 393 (3d Cir. 2021) .................................................................................71

*Simon v. E. Kentucky Welfare Rts. Org.,*
  426 U.S. 26 (1976).............................................................................................4, 37

*Smith v. State,*
  50 Tenn. 511 (1872).....................................................................................64, 65, 67

*State v. Cousins,*
  110 S.W. 607 (Mo. Ct. App. 1908).......................................................................35

*State v. Cunningham,*
  453 A.2d 239, 239, 244 (N.J. Super. Ct. App. Div. 1982) ...................................82

*State v. Hovis,*
  116 S.W. 6 (Mo. Ct. App. 1909)...........................................................................35

*State v. Livesay*,
　　30 Mo. App. 633 (1888) ........................................................................35

*State v. One Marlin Rifle, 30/30, 30 AS, Serial No. 12027068*,
　　725 A.2d 144, 150 (N.J. Super. Ct. App. Div. 1999) ...........................83

*State v. Shelby*,
　　2 S.W. 468 (Mo. 1886) ...............................................................29, 30, 36

*Storino v. Boro. of Point Pleasant Beach*,
　　322 F.3d 293 (3d Cir. 2003).................................................................71

*Susan B. Anthony List v. Driehaus*,
　　573 U.S. 149 (2014).................................................................54, 55, 96

*Tally v. Ayres*,
　　35 Tenn. 677 (1856)................................................................................77

*Thomas v. Chicago Park Dist.*,
　　227 F.3d 921 (7th Cir. 2000), *aff'd*, 534 U.S. 316 (2002)....................73

*Thrasher v. Abernathy*,
　　No. 1:16-cv-2867 (JMS) 2017 WL 735684 (S.D. Ind. Feb. 24, 2017) ...............73

*Tolchin v. Supreme Ct. of State of N.J.*,
　　111 F.3d 1099 (3d Cir. 1997)............................................................23, 92

*Turner v. Epps*,
　　842 F. Supp. 2d 1023 (S.D. Miss. 2012) .............................................98

*United States v. Bena*,
　　664 F.3d 1180,  (8th Cir. 2011) ...........................................................88

*United States v. Class*,
　　930 F.3d 460 (D.C. Cir. 2019)..............................................................25

*United States v. Decastro*,
　　682 F.3d 160 (2d Cir. 2012)..................................................................86

*United States v. Fullmer*,
　　584 F.3d 132 (3d Cir. 2009)..................................................................78

*United States v. Harris*,
  347 U.S. 612 (1954) ...................................................................78

*United States v. Kokinda*,
  497 U.S. 720 (1990) ...................................................................24

*United States v. Moyer,*
  674 F.3d 192 (3d Cir. 2012)........................................................79

*United States v. Power*,
  No. 20-po-331-GLS, 2023 U.S. Dist. LEXIS 4226
  (D. Md. Jan. 9, 2023) ...............................................................44

*United States v. Ruckman*,
  806 F.2d 1471 (10th Cir. 1986) .................................................25

*United States v. Tallion*,
  2022 WL 17619254 (D. Md. Dec. 13, 2022)...............................25

*United States v. Woods*,
  571 U.S. 31 (2013).....................................................................10

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*,
  453 U.S. 114 (1981)...................................................................24

*United Transp. Union v. Long Island R. Co.*,
  455 U.S. 678 (1982)...................................................................56

*Virginia v. Moore*,
  553 U.S. 164 (2008)...................................................................11

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008)...................................................................99

*Warden v. Nickels*,
  697 F. Supp. 2d 1221 (W.D. Wa. 2010) ....................................42

*Welch v. Durand*,
  36 Conn. 182 (1869) .................................................................77

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ...................................................................................3

*Yates v. United States*,
  574 U.S. 528 (2015) ............................................................................69

## State Constitutional Provisions

N.J. Const. art. VI, § 6 ..........................................................................93

N.J. Const. art. VII, § 2 .........................................................................93

## Statutes

2022 P.L. Ch. 131 ..........................................................................passim

L. 1966, c. 60, § 26 ...............................................................................81

P.L. 2021, c. 371 ...................................................................................93

Ariz. Rev. Stat. § 13-3102(A), *as amended by* S.B. 1108 (2010) ...........20

Conn. Gen. Stat. § 29–28(b) ..................................................................87

N.J.S.A. 2A:151-33(d) ...........................................................................81

N.J.S.A. 2A:158-3 ..................................................................................93

N.J.S.A. 2B:12-4 ....................................................................................93

N.J.S.A. 2C:1-14 ..............................................................................69, 79

N.J.S.A. 2C:2-2(a) .................................................................................79

N.J.S.A. 2C:4-8 .....................................................................................83

N.J.S.A. 2C:12-1(b)(4) .....................................................................80, 81

N.J.S.A. 2C:39-5 ....................................................................................80

N.J.S.A. 2C:39-6 ..............................................................................80, 92

N.J.S.A. 2C:58-3(c) ...............................................................................81

N.J.S.A. 3B:5-2 ..........................................................................................7

N.J.S.A. 3B:5-3-14 .....................................................................................7

N.J.S.A. 5:17-1 ..........................................................................................42

N.J.S.A. 11A:1-1 *et seq* ...........................................................................*93*

N.J.S.A. 13:13A-10 ...................................................................................39

N.J.S.A. 23:2A-10 .....................................................................................61

N.J.S.A. 39:1-1 ..........................................................................................79

N.J.S.A. 41:2A-6 .......................................................................................93

N.J.S.A. 52:17B-2 ......................................................................................93

N.J.S.A. 52:17B-66 ....................................................................................93

N.J.S.A. 55:13C-2.1 ...................................................................................83

N.J.A.C. 7:2–2.17(b) ...................................................................3, 38, 39, 40

N.J.A.C. 7:25-5.23 .....................................................................................61

N.J.A.C. 13:69D–1.1 .......................................................................33, 50, 51

R.1995 d.427 (Aug. 7, 1995) .....................................................................62

27 N.J.R. 2889(a) (Aug. 7, 1995) ..............................................................62

44 N.J.R. 675(a) .........................................................................................51

N.Y. Penal Law § 256.01-d(1) .....................................................................8

Alaska Stat. Ann. § 11.61.220 .....................................................................8

D.C. Code § 7-2509.07 .................................................................................8

Ga. Code Ann. § 16-11-127(b)(4) .................................................................8

La. Rev. Stat. § 40:1379.3(O) ......................................................................8

Ohio Rev. Code Ann. § 2923.126(B)(6) .................................................8

S.C. Code Ann. § 23-31-225.................................................................8

## Court Rules

Fed. R. Civ. P. 4 .................................................................................22

Fed. R. App. P. 8(a) .........................................................................100

N.J. Ct. R. 7:14-5 ..............................................................................93

## Other

A.R. Amar, THE BILL OF RIGHTS: CREATION AND
    RECONSTRUCTION  (1998)...........................................................33

I. Ayres & S. Jonnalagadda, *Guests With Guns: Public Support for
    "No Carry" Defaults on Private Land*, 48 J. L. Medicine & Ethics 183,
    Table A6 (2020) ...........................................................................8

David B. Kopel & Joseph S. Greenlee, *The "Sensitive Places" Doctrine:
    Location Limits on the Right to Bear Arms*,
    13 Charleston L. Rev. 205 (2018) ..............................................31

D. Miller, *Constitutional Conflict & Sensitive Places*, 28 Wm. & Mary Bill of
    Rights J. 459, 476 (2019) ...........................................................23

E. Reuben & S. Cornell, *Firearm Regionalism and Public Carry: Placing Southern
    Antebellum Case Law In Context*,
    125 Yale L.J. Forum 121 (2015)............................................74, 75

GAO, Transp. Sec. Post Sept. 11 Initiatives & Long-Term Challenges,
    (Apr. 1, 2003), https://tinyurl.com/yckvfhyz.........................57

Hr'g before Cong. Subcommittee on Transp. & Maritime Security,
    https://tinyurl.com/5n7bzau5 (Feb. 15, 2022) .......................57

K.S. Abraham, *The Liability Century: Insurance and Tort Law from*

*the Progressive Era to 9/11* (2008).........................................................................76

K.T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*,
   97 Ind. L. Rev. 1439 (2022) .............................................................................33

Library of Congress, *The Beginning of American Railroads and Mapping*,
   https://tinyurl.com/2xxhcv4y .............................................................................56

NJ Motion Picture & Television Comm.,
   https://tinyurl.com/48hm8bfy .............................................................................60

*Restatement 2d of Contracts* § 204 (1981) ............................................................7

S. Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting*,
   1328-1928, 55 U.C. Davis L.R. 2545 (2022) ....................................................74

S. Cornell & N. DeDino, *A Well Regulated Right*,
   73 Fordham L. Rev. 487 (2004) ........................................................................88

U.S. Bureau of Labor Stat., CPI Inflation Calculator,
   https://tinyurl.com/2p98xp7d............................................................................84

## PRELIMINARY STATEMENT

Plaintiffs bring sweeping challenges to both preexisting and new provisions of New Jersey's gun safety laws. But they cannot meet the demanding standard for emergency injunctive relief. On numerous claims, Plaintiffs have not met their burden to establish standing and irreparable injury. And on all, they cannot succeed on the merits of their constitutional challenge.

Both Chapter 131 and longstanding regulations protect the safety of New Jersey residents and are consistent with the Second Amendment's text and tradition. *Bruen* confirmed the Second Amendment allows states to enact a host of gun regulations that expressly include protecting sensitive places and requiring background checks, and the challenged laws do exactly that. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Indeed, many of the provisions Plaintiffs challenge fall outside the scope of the Second Amendment, and all are supported by longstanding historical tradition. The State supplements the historical evidence submitted at the TRO stage with even more support, including historical statutes, contextual sources, and expert historian analyses.

While this Court previously restrained several provisions of the sensitive-places law in Chapter 131, it did not impose a preliminary injunction. And, since this Court's TRO ruling on January 9, 2023 in *Koons*, the Supreme Court has determined that a similar New York law should not be enjoined while that litigation is ongoing.

1

*See Antonyuk v. Nigrelli*, 143 S. Ct. 481 (2023). That indicates two things: first, that those Plaintiffs had not shown that an injunction was warranted, and second, that issuance of those injunctions was so erroneous that the Second Circuit stepped in with emergency orders to stay them—stays that the Supreme Court left undisturbed. All of the injunctive-relief factors—including the fact that an overwhelming body of history and historical analysis supports the State's arguments on the merits—indicate this Court should act consistent with the orders of the Second Circuit, the only court of appeals to consider the question, and leave the challenged provisions in place while this suit proceeds.

## COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY

Subpart A of the Counterstatement of Facts and Procedural History in the State's TRO opposition briefs explain in detail the various provisions that Plaintiffs challenge. *Siegel* D.E. 15; *Koons* D.E. 21. To avoid needless duplication, the State relies upon its previous descriptions.

Since Plaintiffs filed suit, the cases have been consolidated pursuant to Fed. R. Civ. P. 42. *Siegel* D.E. 34. On January 9, 2023, this Court granted the *Koons* Plaintiffs a TRO, enjoining Section 7's provisions pertaining to public libraries and museums, entertainment venues, bars and restaurants that serve alcohol, the private property rule, and vehicle restrictions. *Koons* TRO Op., D.E. 34. On January 30, 2023, this Court granted in part and denied in part the *Siegel* Plaintiffs' TRO request,

enjoining Section 7's provisions pertaining to casinos and parks, beaches, and recreational facilities, and preexisting regulations pertaining to casinos, N.J.A.C. 13:69D–1.13, and state parks, N.J.A.C. 7:2–2.17(b). *Siegel* TRO Op., D.E. 51.

On February 7, 2023, the *Koons* Plaintiffs filed an Amended Complaint, adding Sections 7(a)(10) (parks, beaches, recreational facilities, and playgrounds); 7(a)(20) (airports and public transit hubs); and 7(a)(21) (healthcare facilities) to their list of challenged provisions. *Koons* D.E. 69, ¶ 38. Both the *Koons* and *Siegel* Plaintiffs also filed amended declarations. This brief addresses all claims, including ones that the *Siegel* Plaintiffs did not press at the TRO stage.

## LEGAL STANDARD

Injunctive relief is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A movant for a preliminary injunction must first establish both "a reasonable probability of success on the merits" and that "irreparable harm would result if the relief sought is not granted." *Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty,* 39 F.4th 95, 102-03 (3d Cir. 2022) (quotation omitted). And because Plaintiffs challenge rules that are longstanding (including pertaining to background checks and restricting firearms in parks, casinos, and game refuges), a heightened standard applies to those claims: they must show "a *substantial* likelihood of success on the merits and that their right to relief [is] indisputably clear." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310,

3

320 (3d Cir. 2020) (alteration in original, quotation omitted) (emphasis added).

Moreover, even if both prerequisites are met, courts must also assess equitable

factors: "whether the relief would result in greater harm to the non-moving party"

and "whether the relief is in the public interest." *Amalgamated Transit Union,*

39 F.4th at 102-03 (quotation omitted). Only if "all four factors, taken together,

balance in favor of granting the requested preliminary relief" should an emergency

injunction be granted. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

## ARGUMENT

### I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR PRIVATE PROPERTY DEFAULT RULE CHALLENGES.

The Constitution does not prohibit Chapter 131's provision that one cannot

carry firearms on someone else's property absent the property owner's consent.

A.   Section 7(a)(24) Does Not Violate The Second Amendment.

To find that Section 7(a)(24) is unconstitutional,[1] this Court would have to

find that there is a Second Amendment right to carry firearms on another's property

---

[1] The State reiterates that Plaintiffs have not shown Article III standing. Plaintiffs' alleged injury—not being able to carry a firearm in their patient's home or their local coffeeshop absent affirmative consent, *Siegel* D.E. 8-2 ¶¶ 8-9; *Koons* D.E. 11 ¶ 18— is not fairly traceable to Section 7(a)(24). *See, e.g.*, *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 42 (1976) (no traceability if harm "results from the independent action of some third party not before the court"). It is a private property owner's independent failure to consent to carrying firearms onto their private land that prevents Plaintiffs from doing so. Section 7(a)(24) changes nothing about the private owner's right to control their property; it merely establishes that silence means they did *not* wish to grant permission to carry in their home or business. *See*

even absent their affirmative consent, so long as the property owner has not expressly forbidden doing so. But first principles and an overwhelming body of history from before the Founding and to the present show that there is no Second Amendment right to carry firearms on another's private property absent consent. Because that is all Section 7(a)(24) addresses, it does not offend the Second Amendment. *See Bruen* 142 S. Ct. at 2129-30 (noting presumptive right to carry only applies to conduct falling within scope of Second Amendment's plain text).

1. There is no Second Amendment right to carry on another's private property in the absence of the property owner's affirmative consent. Any ability to carry firearms on someone else's private property—like *all* other intrusions on private property—is entirely derivative of the property holder's choice to grant consent. Ex. 29 at 209 (Blackstone explaining "every entry … thereon without the owner's leave, and especially if contrary to his express order, is a trespass or transgression … Every unwarrantable entry on another's soil the law entitles a trespass by breaking his close").[2] The property owner's "right to exclude" unwanted individuals—including

---

*infra* at 5-9. In any event, Plaintiffs do not show that enjoining Section 7(a)(24) would *redress* an alleged injury. Plaintiffs offer no evidence that enjoining Section 7(a)(24) would enable them to carry firearms in others' private premises; it is equally possible that the owners—who now discover that their silence is being construed as consent to others to carry firearms into their property—would expressly prohibit firearms, leaving Plaintiffs in exactly the same position.

[2] Unless otherwise specified, "Ex. _" refers to exhibits attached to the attorney declaration filed with this brief. *Koons* D.E. 88 (attaching Exs. 1-50); D.E. 89 (Exs.

individuals with firearms—"is a fundamental element of the property right that cannot be balanced away." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2077 (2021) (quotation omitted); *see also GeorgiaCarry.org v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012) (agreeing any "guest is able to enter or stay on private property only with the owner's permission" and is "removable at the owner's discretion"). A "private property owner[]" enjoys the "exclusive right to be king of his own castle," even when guns are involved. *GeorgiaCarry*, 687 F.3d at 1262; *see also id.* at 1264-66 (discussing historical pedigree of private property right). Said another way, "the Second Amendment does not give an individual a right to carry a firearm on [another's private] premises against the owner's wishes because such right did not pre-exist the Amendment's adoption." *Id.* at 1266.

Because of the centrality of property owners' own preferences, the Legislature does not offend the Second Amendment by adopting a rule governing private property that best *effectuates* private owners' preferences. Sometimes, of course, the private property owner expressly communicates the preference—either to allow or to foreclose carrying on their property. But other times, the private property owner does not do so. And in that case, Legislatures commonly step in to set rules that, *inter alia*, best reflect the most likely preferences of the owners themselves. One

51-100); D.E. 90 (Exs. 100-152). Where additional versions of the same exhibit exist in the record, that is noted in the attorney declaration.

6

standard example is intestacy law. While an individual has a right to control the disposition of her property, intestacy statutes govern how property is distributed when the individual has not spoken on the subject. The statutes serve as a backstop that the individual can overcome by disposing of property by a valid will. *See, e.g.*, N.J.S.A. 3B:5-2 ("Any part of the decedent's estate not effectively disposed of by his will passes by intestate succession to the decedent's heirs as prescribed in N.J.S. 3B:5-3 through N.J.S. 3B:5-14 . . . ."). Other examples come from contract law, where a statute or common law provides terms that will apply to a silent contract—which the contracting parties can always expressly defeat when drafting the contract. *See, e.g.*, *Restatement 2d of Contracts* § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); *Kas Oriental Rugs, Inc. v. Ellman*, 926 A.2d 387, 391 (N.J. Super. Ct. App. Div. 2007). Rules of this kind are usually known as default rules, because if the individual has a different preference, she can surmount the regime the Legislature has supplied simply by expressing it.

For decades, numerous States have adopted defaults addressing the carrying of firearms onto the private property of another. Some apply to all such property,

and sometimes to certain forms of property like residences or houses of worship.[3] And the record confirms that these laws—including Section 7(a)(24)—reflect property owners' likeliest intent when they do not specifically address whether someone could carry firearms onto their property. *See* Ch. 131 § 1(h). The record evidence reflects two important things: that few New Jerseyans actually appreciated that their silence would qualify as permission to others to carry a firearm onto their property, and that the overwhelming majority would prefer their silence would be read as a *prohibition* on carrying firearms on their property. *See* Ex. 21, I. Ayres & S. Jonnalagadda, *Guests With Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L. Medicine & Ethics 183, Table A6 (2020).[4] In other words, in the overwhelming majority of cases, if a property owner has not told her plumber whether he can carry firearms into her home, she does not expect he can, and would not want him to have that entitlement. By bringing New Jersey property law into conformity with the property owners' own preferences and expectations, the

---

[3] *See, e.g.*, Alaska Stat. Ann. § 11.61.220; D.C. Code § 7-2509.07; Ga. Code Ann. § 16-11-127(b)(4); La. Rev. Stat. § 40:1379.3(O); N.Y. Penal Law § 256.01-d(1); Ohio Rev. Code Ann. § 2923.126(B)(6); S.C. Code Ann. § 23-31-225.

[4] In a statistically significant sample of New Jersey respondents, only 19.3% thought that a serviceperson could bring a gun onto a client's property without getting express permission; just 15.8% believed a customer could bring a gun into a private business without express permission; and the vast majority preferred that their silence on the subject foreclose, rather than authorize, carrying on their property. *Id.*

Legislature has thereby ensured the owner remains the "queen of her own castle"—just as the tradition of property law always allowed. *GeorgiaCarry*, 687 F.3d at 1264;[5] *see also, e.g.*, Ex. 21 at 183 (explaining that optimal property defaults effectuate likeliest preferences of affected owners, to minimize the steps property owners must undertake to protect their rights). None of this implicates the text of the Second Amendment, and because Plaintiffs have not met their threshold burden under *Bruen*, "the analysis can stop there." 142 S. Ct. at 2126 (quotations omitted).

2. An overwhelming body of history confirms that the New Jersey Legislature is free to bring state property law into conformity with private property owners' own preferences and expectations by requiring the owners' express consent to carrying a firearm.[6] That history comes from historical statutes of New Jersey and other colonies and States.

---

[5] This Court has previously noted the Legislature could try to accomplish those same goals in other ways, including an educational campaign for informing private property owners of their rights. *Siegel* TRO 1/26/23 OA Tr. 72-73. But the question is not whether Section 7(a)(24) is the *only* way to advance property owner's interests. The question is whether this legislative decision, bringing property owners' understandings in line with the State's actual default property law, is nevertheless unconstitutional. It is not.

[6] This history is relevant at both steps of the *Bruen* analysis. It confirms that the plain text of the Second Amendment is not "infringed" by restrictions on carrying firearms onto the private property of another. And it provides powerful evidence—from New Jersey and other colonies and States—of historical analogues.

a. Begin with the extraordinary evidence from New Jersey itself—which, as additional expert historical declarations attached to this opposition confirm, supports the State. In 1722, the New Jersey Legislature enacted a law that made it unlawful to "*carry any gun*, or hunt on the improved or inclosed lands in any plantation, and on other than his own, unless he have license or permission from the owner of such lands or plantation." Certif. of Joseph Klett, Dir. of State Archives, Ex. A (emphasis added); *see also United States v. Woods*, 571 U.S. 31, 45-46 (2013) (noting that "or" establishes independent, alternative prohibitions). In 1751, that New Jersey law was amended to impose additional penalties for trespass. *See* Klett Cert. ¶ 8, Ex. B. In 1769, the Legislature removed the "improved or inclosed lands in any plantation" qualifier to extend it to all private land by making it unlawful to "*carry any gun*, or hunt or watch for deer, or set any dog or dogs to drive deer or any other game, on any lands not his own, (and for which the owner pays taxes) or is in his lawful possession, unless he have license or permission in writing from the owner or owners or legal possessor." *Id.* ¶ 9; Decl. of Prof. Hendrik Hartog, Ex. C (emphasis added).

New Jersey's prohibition on carrying onto another's property absent express consent persisted for nearly two centuries. In 1771, the Legislature enacted "An Act for the preservation of deer and other game, and to prevent trespassing with guns," which separated out trespassing with guns as its own substantive provision. *Id.* Ex. F. Section 1 of the 1771 Act made it unlawful to "*carry any Gun* on any Lands not his

10

own, and for which the owner pays taxes, or is in his lawful possession, unless he has license or permission, in writing, from the owner or owners, or legal possessor." *Id.* at 344 (emphasis added); Klett Cert. ¶ 12 (noting 1771 Act was carried forward by the 1776 N.J. Constitution). An 1846 statute recodified nearly identical language and remained operative for decades thereafter, including through Reconstruction. *See* Ex. I; Klett Cert. ¶¶ 16-18; Hartog Decl. ¶¶ 40-47. The State is not aware of challenges to any of these provisions on Second Amendment grounds, or any controversy on that score. "The apparent absence of such litigation is particularly striking," *Virginia v. Moore*, 553 U.S. 164, 170 (2008), and helps confirm that the Second Amendment did not encroach on "the special role" that the right to "private property occupied … in American society and in our freedom" as understood by the Founders, *GeorgiaCarry*, 687 F.3d at 1264.

Historical experts confirm that these laws are consistent with the substantive prohibitions contained in Section 7(a)(24) and the interests supporting its default rule. As Princeton History Professor Hendrik Hartog explains, the New Jersey colonial, Founding, and Reconstruction-era provisions established the rule that a "gun owner who carried his weapon on to private property presumptively trespassed, unless he had prior license from the property owner to do so." Hartog Decl. ¶ 30. And they did so specifically "to protect the powerful right of the property owners to prevent armed individuals from coming on to their property without license,"

reflecting the broader reality that the rights of property owners carried "enormous weight" in the colonial and early American period. *Id.* ¶¶ 16, 22. In other words, the historical tradition right here in New Jersey confirms that "there was no right to bear arms on someone else's private property—even if that owner was silent as to consent. Instead, there was an absolute right to exclude firearms which extended to all real property." *Id.* ¶ 31. It is difficult to conceive of better historical evidence than that the same prohibition existed both before, during, and after this State's ratification of both the Second and Fourteenth Amendments.

Although this Court previously distinguished these precursors as being limited to hunting, the current record and additional expert analysis clarifies that is not so. And as both an expert historian and the State Archivist independently confirm, a person would violate the New Jersey gun trespass statutes "by carrying a gun on another's property without written permission from the owner, *regardless of whether the carrying of guns was in order to hunt game*." Hartog Decl. ¶ 21 (emphasis added); Klett Cert. ¶¶ 7, 24-25 (same).

That is also confirmed by contemporaneous records. For example, a 1753 newspaper article describing an individual penalized under the 1751 law described his offense as "carry[ing] a Gun over any inclosed Land, not his own," without any mention of poaching game. Klett Cert. ¶ 14, Ex. G. And an 1880 synopsis of New Jersey law by a municipal association described the 1846 Act exclusively as "An

12

Act to Prevent Trespassing with Guns," and included only the provision on gun trespass, once again without mention of poaching or hunting—a surprising omission if the statute were really so limited. *Id*. ¶ 18, Ex. Q. An 1813 treatise for New Jersey justices of the peace confirms the same. Cai Decl. Ex. 30 at 36 (noting trespass includes "entering a man's house, lands, &c. without license"). And the State has not identified historical articles or summaries that say the contrary.

Reading the historical gun trespass laws to only cover poaching would be a mistake that ignores both the text of the provisions and the drafting conventions of the time. This Court previously suggested that the 1771 Act's title—which says that the statute is "for the preservation of deer and other game, and to prevent trespassing with guns"—indicates that the statute as a whole must have been about hunting and poaching. But as the experts explain, in the colonial period, it was in no way anomalous that a single statute would have included multiple expressly stated purposes reflecting multiple, separate substantive provisions. *See* Hartog Decl. ¶ 23. And that is what this statute does. The 1771 Act confirms it is "for the preservation of deer and other game, *and* to prevent trespassing with guns." *Id.* ¶ 22 (emphasis added); *see also* Klett Cert. ¶ 7 (same for 1722 Act). And then the substantive paragraphs proceed to supply separate provisions. Section 1 of the 1771 Act establishes New Jersey's standalone provision on gun trespass and requires no intent to poach as an element of the offense. In fact, Section 2 (and other sections of the

Act) separately lay out offenses tied to hunting game. That is why the 1753 report and 1880 legal synopsis understand the statute to apply beyond hunting.[7]

Nor are there other bases for distinguishing these laws from Section 7(a)(24). Notably, although the 1722 Act only applied to plantation lands, New Jersey's 1771 and 19th century statutes applied to all private property, including businesses, just as Section 7(a)(24) does. *See* Klett Cert. ¶¶ 18, 23; Hartog Decl. ¶¶ 33-34. And while the 1722 statute referred to "improved or inclosed" lands, that does not mean fenced property, as it might sound to the modern ear. *See* Hartog Decl. ¶ 36. To the contrary, that language just referred to ways in which a property owner would have given notice of his possession/ownership of a parcel of land, in an era during which records of land ownership may not have been easy to come by. *Id.* ¶ 37; *see* Cai Decl. Ex. 29 at 209-10 (Blackstone stating: "For every man's land is in the eye of the law inclosed and set apart from his neighbours; and that is either by a visible and material fence … or by an ideal invisible boundary, existing only in the contemplation of law, as when one man's land adjoins another's in the same field."); Ex. 31 at 21 (John Locke's Second Treatise on Government providing: "As much land as a man tills,

---

[7] Even *if* these laws are motivated in part by concerns about hunting game, that hardly diminishes the support that these statutes provide for Section 7(a)(24): the ultimate substantive prohibitions are precisely the same—to protect private property owners' rights and expectations by prohibiting carry onto their property without their consent. That interest has always existed in the American tradition, *see GeorgiaCarry*, 687 F.3d at 1264, and is equally strong today.

14

plants, improves, cultivates, and can use the product of, so much is his property. He by his labour does, as it were, enclose it from the common."). And in any event, no qualifications on land appeared in the 1771 and 1846 provisions; instead, both spoke to carrying firearms on the private property of another without the latter's consent. The history requires upholding New Jersey's default rule today.

b. Nor was New Jersey the only state at either the Founding or Reconstruction to enact laws to protect private property owners from intrusion of unwanted firearms. The rule that entry on another's land without express permission constitutes trespass is rooted in statements of English common law. Ex. 29 at 209 (Blackstone noting "every entry …without owner's leave" is a trespass, although it is "especially" so if contrary to prior notice); *id.* at 210 ("And every such entry or breach of a man's close carries necessarily along with it some damage or another"); Klett Cert. ¶ 13. At least three of thirteen colonies (including New Jersey) and one county chose to codify restrictions on trespass with guns in the 18th century, and three others did so in the 19th century. And there are *no* decisions the State or its experts have found that contemporaneously call any of these laws into constitutional question. That is a powerful tradition indeed.

The colonial and early American era featured similar gun trespass statutes in Pennsylvania, New York, and Massachusetts. Pennsylvania's law, passed in 1721, made it unlawful to "carry any gun or hunt on the improved or inclosed lands of any

plantation other than his own" without express permission from the owner. Ex 33. New York's 1763 law said it was unlawful for "any person … other than the owner, proprietor, or possessor" to "carry, shoot, or discharge any … firearm whatsoever, into, upon, or through any orchard, garden, cornfield, or other inclosed land whatever, within the city of New York or the liberties thereof, without license in writing first had" from the owner or possessor.[8] Ex 34. Massachusetts enacted a law in 1789 that applied to several islands in Dukes County, making it unlawful to "be seen with any gun or guns" unless one has "the special licence of the proprietors of the said Islands, or shall be able to shew sufficient reason therefor." Ex. 51. Like the New Jersey provision, and like Section 7(a)(24), these laws required individuals to obtain a property owner's consent before carrying firearms onto their lands.[9]

Reconstruction-era evidence leads to the same result. For example, in 1865, Louisiana barred "carry[ing] fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor." Ex. 14. This law persisted through at least 1915. Ex. 37 at 599. Texas in 1867 made it "not lawful for any person or persons to carry firearms on the inclosed premises or plantation of any citizen,

---

[8] As explained above, foundational sources on property law confirm that in the early 18th century, "inclosed" did not mean fenced in, but referred to property ownership.

[9] Maryland's law, enacted in 1715, provided that it was unlawful to "be seen to carry a gun upon any a person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned." Ex. 32.

without the consent of the owner or proprietor." Ex. 35. And Oregon enacted a statute in 1893 providing that "it shall be unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof." Ex. 36. These examples, like the 1771 and 1846 New Jersey versions, do not mention hunting in the substantive provisions forbidding trespassing with guns on another's private land.

There is also no basis to treat this historical reality as an outlier. Simply put, during the ratification periods of the Second and Fourteenth Amendments, at least *six* states codified laws at various times that prohibited the carrying of firearms on private property without express consent. To be sure, these States have not always maintained this rule; New Jersey itself adopted a different default in 1895 as to ordinary trespass, Hartog Decl. ¶ 46; Klett Cert. ¶ 19, although the provision on trespass with guns persisted until 1928, Klett Cert. ¶ 25. But the State is aware of no evidence that these changes reflected the belief that these property rules were unconstitutional. That is a far cry from *Bruen*, in which the Court identified actual historical evidence suggesting New York's public carry law was inconsistent with historical courts' views of the Second Amendment. *See, e.g.*, 142 S. Ct. at 2146-47 (citing "antebellum state-court decisions [that] evince a consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second

17

Amendment"); *id.* at 2153 (refusing to credit "single" supportive law specifically when it "contradicts the overwhelming weight of other evidence").

Instead, the mere fact that States experimented with different defaults, and that some other States had a different default altogether, is the natural result of our federalist system—in which States adopt different policy choices. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). And while the Second Amendment does take certain policy choices off the table, *see District of Columbia v. Heller*, 554 U.S. 570, 636 (2008), the fact that four out of thirteen colonies had requirements like Section 7(a)(24), others used similar defaults at Reconstruction, *and* no other historical evidence suggests any States viewed these choices as unconstitutional, makes clear this is not one of them.

3. Nothing in the Second Amendment's precedents is to the contrary. *Bruen* addressed an important but specific question: whether the Second Amendment right announced in *Heller* was limited to the home, or whether it protected individuals in public as well, and a majority of the Justices resoundingly answered in favor of the latter. *See Bruen*, 142 S. Ct. at 2135 ("[T]he Second Amendment's plain text … presumptively guarantees … a right to bear arms *in public* for self-defense"); *id.* at 2126 (stating that "the Amendment's core generally covers carrying *in public* for self defense") (quotations omitted); *id.* at 2134 (noting *Heller* itself does not "draw[] a home/public distinction") (emphases added).

18

But confirmation that individuals have a right to carry a firearm "in public" hardly addresses whether they have even a presumptive right to do so on somebody else's property—a question that did not arise in *Bruen* and that the majority thus had no basis to consider. After all, everyone understands that while it is the government that sets policies prohibiting urinating or graffiti "in public," it is one's neighbor who decides whether to let you into his home to use the restroom or asks you to help repaint a handrail in his garden. The Second Amendment speaks to *public* carry, but an owner remains the master of her *private* land—and property law is allowed to effectuate her goals. That is why no party in *Bruen* briefed, and no justice cited, doctrines of private property generally, or the specific Founding- and Reconstruction-era history discussed here. *Bruen* is a significant ruling that sets the framework for much of this case, but it says nothing about Section 7(a)(24).[10]

---

[10] This Court has previously suggested that the district court decision in *Antonyuk v. Hochul*, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), supports its decision to restrain Section 7(a)(24), but that view is mistaken in three respects. *First*, this Court's TRO goes significantly further than the *Antonyuk* preliminary injunction. The district court in *Antonyuk* actually *agreed* with New York that the private property default was permissible with respect to residences, but took a different view as to properties open to the public. *Id.* at *81. Although New Jersey disagrees with *Antonyuk*'s view of the latter, given the history described above, it is notable that *Antonyuk* thus undercuts a significant portion of the restraint on Section 7(a)(24). *Second*, the district court in *Antonyuk* agreed that New Jersey's 1771 statute was *not* limited to poaching. *Id.* at *80. And third, of course, a panel of the Second Circuit stayed even the more limited *Antonyuk* injunction, which indicates that the Second Circuit panel concluded that New York was likely to prevail as to the entirety of its private property rule. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). The Supreme

19

Plaintiffs' only other response is that before passage of Section 7(a)(24), they could have taken advantage of a neighbor's and/or customer's silence and brought firearms onto their property. But that misses the point. As a threshold matter, while that may have been true in New Jersey in 2022, two centuries of law and practice in this State was to the contrary. *See supra* at 10-15. For another, that view ignores that other jurisdictions had similar prohibitions for decades.[11] Most fundamentally, however, the mere fact that Plaintiffs in 2022 could have previously taken advantage of a property owner's silence does not mean they have the *constitutional right* to do so. In the absence of a constitutional mandate, States are free to have either approach to effectuating an owner's silence. And that is normal under the Second Amendment.[12] It is no different here. New Jersey had, for centuries, the same property default contained in Section 7(a)(24). Other colonies did too. And other States maintain that rule today. While the Second Amendment takes some choices off the table, this property law default is not one of them.

---

Court then allowed that stay to stand—the only time it has confronted a law like Section 7(a)(24). *Antonyuk*, 143 S. Ct. at 481.

[11] *See, e.g.*, Ex. 40 at § 23-31-215(M)(10); Ex. 39 at La. R.S. § 40:1379.3(O) (South Carolina's no-carry default rule at medical facilities and Louisiana's no-carry default rule at private residences and certain other locations both enacted in 1996).

[12] *Compare* Ariz. Rev. Stat. § 13-3102(A), *as amended by* S.B. 1108 (2010), https://tinyurl.com/2p8kkn6a (reflecting a policy choice to have *no* public-carry licensing requirements), *with Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring) (stating "the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense").

B. Section 7(a)(24) Does Not Violate The First Amendment Or The Equal Protection Clause.

*Siegel* Plaintiffs' argument that Section 7(a)(24) violates the First Amendment is ill-conceived. The compelled speech doctrine they invoke only applies if the government action "compel[s] individuals to speak a *particular* message" and, in so doing, alters the message the person wishes to send. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (emphasis added). That includes "situation[s] in which an individual must personally speak the government's message," as well as when a State "force[s] one speaker to host or accommodate another speaker's message." *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 63 (2006). Neither is true here.

Nothing about Section 7(a)(24) compels property owners to send a message on behalf of the government or any other entity. Instead, property owners are free to express their own message about what they prefer regarding firearms on their property. Those who wish to allow firearms on their property simply would indicate consent, but the State does not control the manner of speech. A property owner may express her consent by posting a sign without any limitation as to format, or indicate consent to each visitor directly. Establishing a default rule does not compel speech. After all, it would be absurd to claim that it is *compelled speech* to require that anyone wishing to depart from default intestacy rules write a will. *See supra* at 7. Section 7(a)(24) is no different.

21

Plaintiffs' theory is also self-contradictory: The injunction they seek would pose the very compelled speech "problem" they advance. After all, if "espous[ing] a belief one way or the other" as to whether one consents to firearms on their property is compelled speech, *Siegel* Br., D.E. 8-41, then requiring property owners who wish to *exclude* firearms to speak also compels speech in precisely the same manner. And given that empirical evidence shows the vast majority of New Jerseyans both did not understand that remaining silent gave persons the ability to carry onto their private property *and* preferred a rule in which their silence had the opposite impact, *see supra* at 8, Section 7(a)(24) actually *reduces* the need for property owners to speak to express their preference. Under Plaintiffs' own theory, the State's approach would ultimately compel less speech than any alternative, and would support any level of scrutiny the First Amendment requires.

Plaintiffs' Equal Protection claim regarding Section 7(a)(24) also fails. While they insist that the provision "treats individuals differently solely based on whether or not they are choosing to exercise their Second Amendment right to bear arms," *Siegel* Br. at 45, that is inaccurate. Nothing about Chapter 131 alters the substantive limitation that there is no right to carry on private property against the consent of the property owner. *See supra* at 5-9. Instead, the only change that Section 7(a)(24) makes is to confirm that property owners who permit firearms need to make their preferences explicit. While that means owners who *do not* consent to firearms on

22

their property need not speak, that is not a classification that involves suspect classes or fundamental rights. *Tolchin v. Supreme Ct. of State of N.J.*, 111 F.3d 1099, 1113-14 (3d Cir. 1997) (legislation that does not involve suspect classes or fundamental rights subject to rational basis review). Instead, it is a simple rule about preference-communication that is amply supported by rational basis. *See, e.g.*, Ch. 131 § 1(h) (noting rule is "in line with both the reasonable expectations and property rights of New Jersey property owners."); *see also supra* at 8.

## II. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGES TO SENSITIVE PLACES RESTRICTIONS.

### A. The Second Amendment Does Not Confer A Right To Carry Firearms On Premises Where The State Is Proprietor.

As a threshold matter, many of Plaintiffs' claims fail because they cannot bear their burden under *Bruen* to show that the challenged regulation falls within the scope of the Second Amendment. 142 S. Ct. at 2129-30. If Plaintiffs do not meet the threshold burden, "the analysis can stop there." *Id.* at 2126 (quotation omitted). Some government-owned properties—like public libraries, airports and transit hubs, public buses, and government-owned entertainment facilities and hospitals[13]—are

---

[13] That is not to say that the government can prohibit firearms in *all* areas it happens to own, such as sidewalks and the proverbial public square. But "it is a giant leap" to say the state could impose no restrictions on government-owned locations designated for specific purposes, like libraries, airports, and hospitals. *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 131 (1981).

not subject to the Second Amendment for reasons independent of *Bruen*'s discussion of "government buildings" as "sensitive locations" in which there is no presumptive right to carry, *see Bruen*, 142 S. Ct. at 2133.

"The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 385 U.S. 39, 47 (1966) (rejecting First Amendment claim by protestors at jail because "[n]othing in the Constitution of the United States prevents" removing them from the "curtilage of the jailhouse");[14] *see also Camfield v. United States*, 167 U.S. 518, 524 (1897) ("[T]he government has, with respect to its own lands, the rights of an ordinary proprietor … precisely as a private individual"); *Greer v. Spock*, 424 U.S. 828, 836 (1976) (holding "no generalized constitutional right to make political speeches or distribute leaflets" at military base, including areas open to public); *cf. United States v. Ruckman*, 806 F.2d 1471, 1472 (10th Cir. 1986) (holding Fourth Amendment did not apply to search of defendant's "home" in cave on federal land, because "[w]ith respect to its own lands, the government has the rights of an ordinary proprietor").

---

[14] In the First Amendment context, a government acting as proprietor "does not enjoy absolute freedom from First Amendment constraints" but is rather subject to a reasonableness standard for nonpublic forums. *See United States v. Kokinda*, 497 U.S. 720, 726-727 (1990). But the *Bruen* Court has eschewed any means-end scrutiny for Second Amendment claims: so long as the conduct falls outside the Second Amendment's scope, "the analysis can stop there." 142 S. Ct. at 2126 (quotation omitted).

The Second Amendment is no different. In upholding a firearms ban on the grounds of the U.S. Capitol, the D.C. Circuit noted that the government, "like private property owners—has the power to regulate conduct on its property." *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019). Notably, *Class* fits perfectly with *Bruen*'s two-step framework. *Class* explained that allowing the government to limit carrying of firearms on government-owned property "does not impinge upon a right protected by the Second Amendment" in the first place, *id*. at 463 (quotation omitted)—an inquiry *Bruen* made clear still applies when it required courts to ask whether "the regulated conduct falls beyond the Amendment's original scope" altogether. 142 S. Ct. at 2126; *see also Class*, 930 F.3d at 465 (expressly declining to "reach the second question"—the means-end scrutiny approach subsequently abrogated by *Bruen*). Nor does *Class* stand alone in reaching its conclusion. *See Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1123 (10th Cir. 2015) (upholding firearms ban on U.S. Postal Service property); *United States v. Tallion*, 2022 WL 17619254, at *5 (D. Md. Dec. 13, 2022) (upholding firearms ban on NIH campus).

And even if this Court refuses to apply this well-worn constitutional rule to all government-owned properties, there is a specific set of properties for which the government-as-proprietor doctrine finds especially powerful support: When the government owns or operates property as a "market participant." This doctrine, most pellucidly set out in the Commerce Clause and preemption contexts, explains that

when the government is acting as a "market participant" rather than in its traditional sovereign/regulatory capacity—that is, when it is providing a good or service in the competitive private marketplace, like when it maintains a concert venue—the State is not subject to the ordinary constitutional restrictions that bind sovereigns. Instead, it confronts only the same constitutional restrictions to which its private competitors are subject. *See Reeves, Inc. v. Stake*, 447 U.S. 429, 439 (1980) (confirming "when acting as proprietors, States should similarly share existing freedoms from federal constraints"); *see also id.* at 436 (distinction "between States as market participants and States as market regulators makes good sense and sound law.") (citing *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976)).

That doctrine explains why South Dakota was allowed to operate a cement plant that confined sales only to in-state buyers, even though such a rule would normally have violated the dormant commerce clause but for the market-participation exception. *See id*. And it explains why the Massachusetts Water Resources Committee was allowed to impose requirements on contractors that otherwise were preempted by the National Labor Relations Act. *See Bldg. & Const. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993) (holding that if "a State owns and manages property … the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*," not state proprietors).

26

That rule applies to firearm carry policies at a wide number of the challenged venues where there is no question that "the government was participating directly in some aspect of the market as a purchaser, seller, or producer." *Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. Cnty.*, 48 F.3d 701, 716 (3d Cir. 1995). It is constitutionally indisputable that private companies are allowed to prohibit the carrying of firearms in their businesses. So wherever any private company that owns a concert venue, museum, hospital, or bus service wishes to prohibit firearms, they may. But that applies here too: whatever this Court concludes about the validity of treating concert and entertainment venues, museums, hospitals, or bus services as sensitive places, the Second Amendment is not offended when these venues are *government-owned* and restrict firearms. *See Bldg. & Const. Trades*, 507 U.S. at 231-32 (allowing government to act under Constitution "where analogous private conduct would be permitted").

To ground this in an illustrative real-world example, while MetLife Stadium has a prerogative as a private owner to ban weapons, the same must be true for PNC Bank Arts Center ("PNC"), which is a concert venue that happens to be owned by a government entity.[15] It makes little sense to say that, when competing for concertgoers' business, PNC lacks the ability to make security decisions like

---

[15] *See Donahue v. N.J. Tpk. Auth.*, No. A-0648-20, 2022 WL 1039690, at *1 (N.J. Super. Ct. App. Div. Apr. 7, 2022).

banning firearms. Both venues compete in offering a service to patrons—of which the ability to restrict weapons is one component. Whatever this Court concludes about entertainment venues as sensitive places, the Legislature was free in Chapter 131 to decide for PNC—when the State acts as *owner*—that firearms may not be carried. That is the teaching of the market-participant exception.

In sum, the Second Amendment is a "negative rather than positive libert[y]," and curtails the government's ability to regulate arms-bearing. *Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir. 1983) (Posner, J.). But when the government chooses to offer a nonessential service—such as a public library or concert hall— and the individual chooses to enter, he does so on that premise owner's terms; that is no violation of the Constitution.

      B.  <u>Chapter 131's Sensitive Place Designations Are Supported By Historical Tradition.</u>

Even if the Second Amendment is implicated, laws prohibiting firearm carriage in sensitive places have been a part of our Nation's historical tradition without doubt of their constitutionality. Early English law prohibited firearms in sensitive places. *See, e.g.*, Exs. 41; 42; Decl. of Dr. Brennan Gardner Rivas, Ex. B; Decl. of Patrick Charles, Ex. 5 ¶¶ 11-12 (English prohibitions of weapons at any "church, fair, market, or other congregation"). American colonies and states likewise designated sensitive places, including Delaware's 1776 Constitution prohibiting firearms—even militia musters—at polling places, Ex. 43 at art. 28; Maryland's

prohibition of arms in its Legislature at the time of the Founding, *see* Md. Assemb. Proc. (1773) Ex. 4; and a 1792 North Carolina statute that no man shall "go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers." Rivas Decl. Ex. F. In the 19th century, both as populations grew and cheap revolvers flooded consumer markets, *see* Rivas Decl. ¶¶ 18-19, states codified more express and location-specific armed carriage prohibitions. *See id.* ¶ 8; Charles Decl. ¶ 14. That includes the midcentury sensitive-places prohibitions enacted in Louisiana, Texas, Tennessee, Georgia, and Missouri. Local governments spanning from Harrisburg, Kent County, Maryland to Provo City, Utah did the same. *See* Charles Decl. ¶¶ 14-15, 17; Rivas Decl. ¶¶ 31-32.

Moreover, and critically, not one of these "sensitive places" prohibitions was found to be unconstitutional by any contemporaneous court or legal commentator. *See* Charles Decl. ¶ 18. To the contrary, courts consistently affirmed the validity of such laws. *See English v. State*, 35 Tex. 473, 478–79 (1872); *Hill v. State*, 53 Ga. 472, 475 (1874); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886); *Andrews v. State*, 50 Tenn. 165, 182 (1871); *State v. Reando* (Mo. 1878), *attached as* Charles Decl. Ex. 23; *see also* Rivas Decl. ¶¶ 26-30. These courts understood that carrying guns in certain locations like public gatherings was "a provocation to a breach of the peace" and "dangerous to human life." *Hill*, 53 Ga. at 476; *see also Shelby*, 2 S.W. at 469; *Andrews*, 50 Tenn. at 182. As the Georgia Supreme Court put it in 1874, it would be

unthinkable to suppose "that the framers of the constitution ever dreamed . . . . that in guaranteeing the right to keep and bear arms . . . they were authorizing" the carriage of arms in sensitive places like public gatherings, a practice "utterly useless and disgraceful in a well ordered and civilized community." *Hill*, 53 Ga. at 478-79. In a similar vein, a contemporary legal treatise observed: "Carrying [pistols] for defence, *in the more settled parts of the land*, savors of cowardice rather than of prudence; a well-behaved man has less to fear from violence than from the blunders of himself and friends in managing the pistol he might carry as a protection." Ex. 44, B.V. Abbott, *Judge and Jury: A Popular Explanation of Leading Topics in the Law of the Land* 333-34 (1880) (emphasis added).

That helps explain the clarity of the Supreme Court's holding on this score: "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26; *see also Bruen*, 142 S. Ct. at 2133; *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). "[I]t [is] settled" that firearm carriage may be banned in locations that are sensitive, including: legislative assemblies, polling places, courthouses, schools, and government buildings. *Bruen*, 142 S. Ct. at 2133. From the Court's analysis, a few guideposts for the ultimate question—what places qualify as sensitive—emerge.

*First*, relatively few analogues are sufficient to establish the constitutionality of a sensitive-place restriction. The historical evidence reviewed by the *Bruen* Court in reaching its "settled" conclusion about the constitutionality of firearms bans at schools and government buildings contained "relatively few" examples. *See* Charles Decl. ¶ 10 (discussing evidence contained in the only two sources cited by the *Bruen* court in its conclusion).[16] That is especially so when no contemporary evidence suggests the historical analogue was invalid. And that makes eminent sense: a state's policy choice not to enact a law is not evidence that enacting the law would be unconstitutional, but may well simply reflect its own policy choice, a feature of our system of federalism. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985) ("The essence of our federal system is that within the realm of authority left open to them under the Constitution, the States must be equally free to engage in any activity that their citizens choose for the common weal."). To mark constitutionality according to what a majority (or any specific number) chose during

---

[16] They are: David B. Kopel & Joseph S. Greenlee, *The "Sensitive Places" Doctrine: Location Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018) and Br. of Amicus Curiae the Independent Inst. in Support of Pets., *Bruen*, No. 18-280, at 11-17. The referenced article identified only *one* Founding-era state that prohibited firearms at legislative assemblies, *one* such prohibition at polling places, and *none* at courthouses, schools, and/or government buildings. *See* 13 Charleston L. Rev. at 234-36. Similarly, the referenced amicus brief cited only two statutes barring firearms possession in government buildings and one policy banning guns on a university campus. Independent Inst. Br. at 11-12, 14-15.

the Founding or Reconstruction era would be to don the "regulatory straightjacket" that *Bruen* was careful to avoid. 142 S. Ct. at 2133.

*Second*, the list of "sensitive places" enumerated in *Bruen* and *Heller* is not comprehensive. Instead, courts are invited "to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 142 S. Ct. at 2133 (emphasis added). *Third*, modern and historical laws are *relevantly* analogous when they impose comparable burdens and share comparable justifications—that is, matching up the "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* (emphases added). They need not be "historical twin[s]." *Id.*[17]

*Finally*, Plaintiffs' contention that this Court must look to historic analogues exclusively from the Founding era is simply wrong. First, *Bruen* made no such determination. 142 S. Ct. at 2138. And the Court never framed the issue as whether it should exclusively rely on one or the other, but rather how much weight to give to the evidence from each era. *Id.* (framing debate in terms of "primary" reliance); *cf. Nekrilov v. City of Jersey City*, 45 F.4th 662, 684 (3d Cir. 2022) (Bibas, J., concurring) (noting in Fifth Amendment case that the Fourteenth Amendment "may well be relevant to the meaning of the Clause as incorporated against the states").

---

[17] Place-based firearm restrictions all share a "how"—that is, they impose a comparable burden by banning firearm carriage in places that are sensitive.

Second, it is "unnecessary to choose between" the two eras where, as here, the evidence from them does not conflict. *Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring). Absence of analogues from an earlier period is not conflicting evidence if the 19th century record consistently supports the constitutionality of an analogue. Finally, to the extent this Court does perceive a historical conflict regarding any given sensitive place, the Court should "primarily rely" on Reconstruction era evidence. As the *Bruen* Court explained, it was the Fourteenth Amendment's ratification in 1868 that bound the States to "respect the right to keep and bear arms," and "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2136 (emphasis added); *see id.* at 2137-38 (similar).[18] And the historical record immediately following 1868 is also instructive. *See Heller*, 554 U.S. at 603-06, 614-18 (confirming Second Amendment's post-ratification history relevant in challenge against District of Columbia).

   The below provision-by-provision analysis shows that a faithful application of *Bruen*'s framework yields the conclusion that the various places in which Section 7(a) prohibits handgun carry all qualify as "sensitive."

---

[18] As the two prominent legal scholars the Court cited explain, "When the people adopted the Fourteenth Amendment … they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." K.T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L. Rev. 1439 at 1441, 1452-53 (2022); *see also* A.R. Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223 (1998).

### 1. Section 7(a)(6) (within 100 feet of public gatherings, demonstrations and events requiring government permits).

Plaintiffs' challenge to the prohibition of firearms within 100 feet of a public assembly fails on the merits.[19] There is robust and specific historical support for laws prohibiting firearms at public gatherings. American colonies and states imposed regulations of firearms at assemblies, *see* Charles Decl. ¶ 13 (collecting 18th century laws), and numerous statutes specifically prohibited firearms carry at "public assemblies" and "public gatherings" without qualification. *See, e.g.*, Ex. 5 (Tex. 1870); Ex. 8 (Tenn. 1869);[20] Ex. 22 (Ga. 1870); Ex. 9 (Tex. 1871);[21] Ex. 45 (Mo. 1874); Ex. 10 (Mo. 1879);[22] Ex. 149 (N.M. 1869); Ex. 80 (Ariz. 1889); Ex. 81

---

[19] To the extent Plaintiffs claim that they may unwittingly wander within 100 feet of a public assembly requiring a permit, that is addressed in Part IV.A, *infra*.

[20] The Court indicated that it thought *Bruen* had construed this Tennessee statute, *Koons* TRO Op. 35, but *Bruen* did not. *See Bruen*, 142 S. Ct. at 2147 (addressing 1870 Tenn. Acts ch. 13, § 1 (Ex. 38), not 1869 Tenn. Pub. Acts ch. 22§ 2 (Ex. 8)).

[21] Although the Court rejected reliance on this statute because it exempted "persons authorized or permitted by law to carry arms at the places," *Koons* TRO Op. 34-35, there is no support for the idea that civilians would have qualified for the statute's exception. There was no general firearm permitting scheme in 19th-century Texas, Rivas Decl. ¶ 24, and thus the only persons "permitted by law to carry arms at the places" would have been peace officers and like officials. Chapter 131 has a similar exception for law enforcement officials. *See id.* § 7(a).

[22] Nor should the Court continue to reject this analogue based on its carveouts. *Koons* TRO Op. 35. The Court previously noted that the statute has an exemption for "persons moving or traveling peaceably through [the] state." But that hardly applies to individuals stationary in a sensitive location, such as attending a public assembly. In any event, as discussed in detail *infra*, Part II.B.13, such exceptions for persons "on a journey" were narrowly construed only to cover persons traveling away from

34

(Okla. 1890). Local authorities also banned firearms in, *inter alia*, "public assemblage[s]." Charles Decl. ¶¶ 14-16; *id.* Ex. 16 (Columbia, Mo. 1890); Ex. 24 (Stockton, Kan. 1887).

The fact that courts affirmed the validity of states' firearms restrictions at public gatherings confirms their constitutionality. *See, e.g.*, *English*, 35 Tex. at 478-79 (characterizing as "ridiculous" the notion "that any one should claim the right to carry upon his person" a firearm "into a peaceable public assembly" and that "[t]he history of our whole country but too well justifies the enactment of such laws" prohibiting such carry); *Hill*, 53 Ga. at 475-76 (holding bringing guns into a public assembly was "improper," "a provocation to a breach of the peace," and "dangerous to human life" and that it was "absurd" to think "the framers of the constitution ever dreamed . . . they were sacrificing the . . . peacefulness and good order of their other necessary public assemblies"); *Shelby*, 2 S.W. at 469 (upholding

---

their home communities. *Compare State v. Cousins*, 110 S.W. 607 (Mo. Ct. App. 1908) (determining that exception would have applied to person traveling between Missouri and Arkansas, but for his failure to act peaceably) *with State v. Hovis*, 116 S.W. 6, 7 (Mo. Ct. App. 1909) (exception did not apply in the "ordinary [case] of a young man going about with a deadly weapon concealed upon his person"). Further, this Court focused on the statute's provision for a defense to the charge of carrying a weapon where a defendant had been "threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property." Ex. 10 (§ 1275). This is, however, an affirmative defense rather than an exception to the prohibition. *See State v. Livesay*, 30 Mo. App. 633, 637 (1888). In any event, this exception is not relevant to Plaintiffs' challenge, since they want to carry in sensitive locations without any threats or good cause.

Missouri prohibition because guns at public gatherings could lead to "mischief" and potential "lawlessness"); *Andrews*, 50 Tenn. at 182 (a "man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them"). And contemporaneous treatises and newspaper articles confirmed these sentiments. Exs. 46 (*Norman Transcript* in 1890: "Everybody hopes the bill . . . to prevent the carrying of concealed weapons in Oklahoma, may soon become a law"); 47 (*Missouri Republican* in 1872 criticizing "habitually carr[ying] a concealed weapon"); 48 (*Moniteau Journal* in 1872, same); 44 (Abbott treatise); Charles Decl. ¶ 13 & Ex. 11.

These historical restrictions share Chapter 131's animating rationale: now, as before, assemblies like protests, marches, and demonstrations are paradigmatic First Amendment activity that are critical to the functioning of our democracy.[23] Prohibiting firearms to protect such First Amendment interests is valid for the same reasons that such prohibitions at polling places and courthouses are valid. *Bruen*, 142 S. Ct. at 2133. To hold otherwise would run the risk that individuals assembling would be intimidated from attending these events and would be chilled from

---

[23] *See, e.g.*, D. Miller, *Constitutional Conflict & Sensitive Places*, 28 Wm. & Mary Bill of Rights J. 459, 476 (2019) (collecting English law deterring "unlawful assemblies" by restricting armed gatherings).

exercising their First Amendments rights.[24]

### 2. *Section 7(a)(9) (zoos).*

Plaintiffs cannot succeed on their challenge to the prohibition of firearms at zoos. As a threshold matter, as the Court held in denying a TRO, lack of traceability and redressability dooms this claim. *Siegel* TRO Op. 18. Both zoos and aquariums "maintain policies prohibiting firearms outright," *see, e.g.*, Exs. 49A & 49B, so Plaintiffs cannot "claim they would carry [firearms] at these institutions 'but for' Chapter 131." *Siegel* TRO Op. 17-18; *see, e.g.*, *Simon*, 426 U.S. at 42.[25]

In any event, Plaintiffs' challenge fails on the merits because the historical record supports firearms bans at zoos. The first three modern American zoos—Central Park Zoo in New York, Philadelphia Zoo in that city's Fairmount Park, and Lincoln Park Zoo in Chicago—all opened during the Reconstruction era.[26] Ex. 51. Since firearms were banned at the parks that encompassed the zoos,[27] carrying

---

[24] Plaintiffs' suggestion that polling places and courthouses are sensitive places because officials are at risk of assassination, *Koons* TRO Br. 24, finds no support in history. And their argument that a place is sensitive because of the presence of police, *id.* at 23, was an argument expressly rejected by *Bruen*, 142 S. Ct. at 2134.

[25] *See also LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 284 (3d Cir. 2021); *Mielo v. Steak 'n Shake Ops., Inc.*, 897 F.3d 467, 480 (3d Cir. 2018); *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018).

[26] *See* Ex. 50 at 343-47; K. Rumore et al., Chicago Tribune (Aug. 28, 2018), https://tinyurl.com/396sams2.

[27] *See* Ex. 23 (Central Park Ordinance, 1861); Ex. 24 (Fairmount Park Rules, 1870); Ex. 26 (Chicago Ordinances, 1881).

firearms has been prohibited in zoos from their inception.

Moreover, prohibitions on firearms at zoos are constitutional for the same reason such prohibitions at schools are constitutional, *Bruen*, 142 S. Ct. at 2133: children are the primary visitors of zoos.[28] Although adults visit too, zoos are tailored to children and have programs specially designed to attract and engage them. Finally, other analogues support the restriction. Zoos are public gatherings and thus the historic analogues cited in Point II.B.1 support this provision. *See, e.g.*, Ex. 9 (1871 Texas law prohibiting firearms in any "place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind"). And given the risk of poaching animals at zoos,[29] the analysis in Point II.B.12 applies here, too.

> 3. *Section 7(a)(10) (public parks, beaches, recreational facilities, and playgrounds); and N.J.A.C. 7:2-2.17(b).*

Plaintiffs' challenges to subpart 10 and N.J.A.C. 7:2-2.17(b)[30] fail on the merits because there is a longstanding history of firearms prohibitions at local, state,

---

[28] According to the Association of Zoos and Aquariums (AZA), 69% of zoo visitors are parties with children, and 59% of all visitors are children age 11 or younger. *See* AZA, https://tinyurl.com/mrcwnsvn (last visited Feb. 13, 2023). Early zoos also attracted many children. *See* Ex. 50 at 346-47 (noting popularity of Central Park Zoo with children).

[29] *See* AZA Statement (Mar. 7, 2017), https://tinyurl.com/5ktesfkk.

[30] Plaintiffs misdirect their claims against N.J.A.C. 7:2-2.17(b) at the New Jersey State Police and Attorney General when neither enforces these regulations. It is the State Park Police—who are not named as defendants—that enforce this regulation.

and national parks. As the State explained in TRO briefing, early public recreational parks like New York's Central Park, Philadelphia's Fairmount Park, and Chicago's Lincoln Park all prohibited firearms in their nascent days in the mid-19th century. *See* Exs. 23, 24, 26; *see also* Exs. 25, 27, 28 (St. Louis, St. Paul, and Pittsburgh). And the State has since found additional historical evidence of firearms prohibitions in parks in a variety of municipalities and states. *See* Ex. 52 (Mich. 1895)*; Ex. 53 (*Minn. 1905); Ex. 54 (Wisc. 1917); Ex. 55 (N.C. 1921); Ex. 56 (N.J. 1937); Ex. 57 (Hyde Park, Ill. 1875); Ex. 58 (Danville, Ill. 1883); Ex. 59 (St. Louis, Mo. 1883); Ex. 60 (Salt Lake City, Utah 1888); Ex. 61 (Williamsport, Pa. 1891);  Ex. 62 (Springfield, Mass. 1891); Ex. 63 (Grand Rapids, Mich. 1891); Ex. 64 (Lynn, Mass. 1891); Ex. 65 (Peoria, Ill. 1892); Ex. 66 (Spokane, Wash. 1892); Ex. 67 (Wilmington, Del. 1893); Ex. 68 (Canton, Ill. 1895); Ex. 69 (Indianapolis, Ind. 1896); Ex. 70 (Pittsburgh, Pa. 1897); Ex. 71 (Reading, Pa. 1897); Ex. 72 (Boulder, Colo. 1899); Ex. 73 (Oakland, Cal. 1909); Ex. 74 (Birmingham, Ala. 1917). Early national parks did the same. *See* Ex. 75 (detailing firearms bans at numerous parks).

While this Court preliminarily held that Chapter 131 went "much further" than the "historical precedent for restricting public carry in parks located in densely

---

*Siegel* Plaintiffs are wrong to say N.J.S.A. 13:13A-10 suggests the Attorney General enforces N.J.A.C. 7:2-2.17(b). That statute applies only to the Delaware River and Canal Park. And its only reference to the Attorney General is not to enforcement of the regulation, but rather only to approval of the appointment of peace officers.

populated areas," because it prohibits firearms "in *all* public parks," *Siegel* TRO Op. 26-27, Chapter 131 does not in fact do so. Its prerequisite—that the relevant governing authority designate the park as a gun-free zone—means that the statute does not automatically sweep all parkland and beaches under its ambit.[31]

And this Court's conclusion that "[s]ix cities do not speak for, what was by 1893, 44 states," *Siegel* TRO Op. 27, should be revisited given that parks at the time primarily were city parks[32] and regulated by local governments. In terms of development, public parks—open public spaces for recreation and leisure—were distinguished from the proverbial common town square.[33] And it makes sense that before suburbs came into existence, there was little need for parks outside of cities.[34] (After all, rural areas hardly need parks). Instead, the fact that the earliest public

[31] Plaintiffs note that Bayonne and Camden, Monmouth, and Union Counties have done so. But all are densely populated. Exs. 76, 77. And even if the Court disagrees with the State's arguments here, it should not enjoin restrictions at all parks, since designating urban parks as sensitive would be constitutional under the Court's TRO analysis. And at a minimum, the Court should clarify that its prior injunction of N.J.A.C. 7:2-2.17(b) only applies to handguns, since Plaintiffs do not challenge the regulation as it applies to "other weapons capable of injuring persons or wildlife."

[32] R. Rosenzweig & E. Blackmar, THE PARK AND THE PEOPLE: A HISTORY OF CENTRAL PARK, 4-5 (1992) ("[I]n the late eighteenth and nineteenth centuries, parks [globally] increasingly became identified with cities.") (Ex. 50).

[33] Ex. 50 at 240 (quoting Frederick Law Olmstead, that Central Park was intended to be "distinguish[ed]" from "common spaces"); *id*. at 246.

[34] Suburbs began developing in the late 19th Century. *See* Library of Congress, City Life in the Late 19th Century, https://tinyurl.com/ynfar2tr; Ex. 50 at 5.

parks in America prohibited firearms since inception in the Reconstruction era, and the fact that the record contains even more widespread examples of prohibiting firearms at parks across the country by both local and state governments, serves as powerful historical evidence supporting New Jersey's modern park restrictions.

The historical analogues listed above span more than just densely-populated cities like New York and Chicago; for example, Springfield and Lynn, Massachusetts had total populations in 1890 of 40,000 to 50,000, about one-tenth that of Boston at the time, Ex. 84, and both banned firearms at their parks, Exs. 62 & 64. And even places like Central Park were not "urban" in the modern sense in the mid-19th century. *See* Ex. 50 at 62 (noting "[a]t midcentury, then, uptown Manhattan was a 'suburb' in the sense of a settlement outside the densest urban concentration," consisting of large farms and estates, shops, and factories). That the historical record supports firearms restrictions even at parks in *non-densely* populated places supports New Jersey's modern rules. After all, New Jersey is the nation's densest state, Ex. 76, and its parks can be densely populated, especially during events. *See* Madden Cert. ¶ 14 (estimating over 60,000 visitors to state parks for July 4 events); Fedorczyk Cert. ¶ 13.[35] Given that parks and beaches are also

---

[35] Two pre-*Bruen* cases regarding public parks cited by this Court, *see Siegel* TRO Op. 27-28, are easily distinguishable. *People v. Chairez*, 104 N.E.3d 1158, 1162, 1175 (Ill. 2018), applied "elevated intermediate scrutiny" to a park ban, but *Bruen* rejected any "means-end scrutiny in the Second Amendment context," 142 S. Ct. at

used for family recreation, *see* Madden Cert. ¶¶ 9-11, the history of firearms regulations at schools and crowded public assemblies, *see* Parts II.B.1, 4, 7, also supports the validity of subsection 10.

### 4. *Section 7(a)(11) (youth sports events).*

Chapter 131 prohibits the carrying of firearms at "youth sports events, as defined in N.J.S.5:17-1." *Id.* § 7(a)(11). N.J.S.A. 5:17-1(b) defines these events as "a competition, practice or instructional event involving one or more" types of team: (1) "interscholastic sports teams," (2) non-profit sports teams; and (3) county or municipal recreational teams. All of these teams are highly likely to compete at schools, colleges, or universities, where Plaintiffs agree guns may be constitutionally prohibited. *See, e.g.*, 2023 N.J. USATKD State Championship https://tinyurl.com/mr2tt56r (state championship to be held at Middlesex College). Thus, this Court correctly concluded that "schools and youth sports events, intersect, that is, youth sports events fall within the sphere of schools" and "youth sports events are a 'sensitive place'" under *Bruen*. *Siegel* TRO Op. 29.[36]

---

2127. And *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 637, 654 (Del. 2017), reviewed a firearm ban at parks under the *Delaware* Constitution, which that state's courts have interpreted to be broader than the Second Amendment. *See Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wa. 2010) ("As with a government building or school, a city-owned park where children and youth recreate is a 'sensitive' place where it is permissible to ban possession of firearms.").

[36] Plaintiffs also lack standing to challenge the prohibition of guns at youth sports events. Plaintiff Siegel, the sole Plaintiff to challenge this provision, alleges that he

5. *Section 7(a)(12) (publicly owned or leased libraries and museums).*

Chapter 131's restrictions on firearms at public libraries and museums are supported by several historical traditions.[37] First, libraries and museums are sensitive places for the same reason that schools are. *Bruen*, 142 S. Ct. at 2133. Modern libraries serve children: entire sections are dedicated to their books and activities. Museums are likewise frequent destinations for class trips and families. Plaintiff Siegel confirms this when he says he "frequently" takes his 13-year-old son to "the public library" and "museums throughout New Jersey." Siegel D.E. 8-2 ¶¶ 3, 13. In short, public libraries and museums fall within the scope of schools because they all provide an environment where children gather to expand their knowledge of the world in which they live. As such, they are sensitive places under *Bruen*.

Second, public libraries and museums are, by definition, government

---

takes his son to Tae Kwon Do competitions, but does not indicate when or how often these competitions occur, Siegel Decl., D..E. 8-2 ¶¶ 3, 12, 41, and cannot demonstrate imminent injury. Moreover, the competition itself (or the competition venue) may ban firearms. Plaintiff Siegel's inability to carry would then not be traceable to subsection 11. *See supra* at Part II.B.2 (collecting traceability and redressability caselaw).

[37] Plaintiffs face similar standing problems as here. Many publicly owned libraries and museums had pre-existing policies that prohibited firearms, and Plaintiffs therefore cannot demonstrate traceability. *See* Exs. 49C, 49D, 49T. Just as Plaintiffs have not proven that, but for Chapter 131, they could carry a gun in zoos, *see supra* at Part II.B.2; Siegel TRO Op. 17-18, the same is true for libraries and museums. For another, Plaintiffs aver nothing about imminent future visits, and nothing in their declarations suggest visits to public libraries and museums are part of their "daily lives." *Koons* TRO Op. 23; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).

buildings. As discussed above, *supra* at Part II.A, the government's role as property owner allows prohibition of firearms without implicating the Second Amendment.

Third, under the Supreme Court's settled Second Amendment jurisprudence, government buildings such as libraries are squarely sensitive places under *Heller*, *McDonald*, and *Bruen*. There is little reason to think that the Supreme Court meant to limit the term "government buildings." *See United States v. Power*, No. 20-po-331-GLS, 2023 U.S. Dist. LEXIS 4226, at **11, 21 (D. Md. Jan. 9, 2023) (noting *Bruen*'s examples of government buildings and schools as sensitive places "are unqualified—the *Bruen* Court did not narrow the applicability of these examples in any way"). And even if there were some qualification, public libraries and museums are venues where constitutionally protected activity occurs, like polling places or courts—examples specifically named in *Bruen. See Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) (holding First Amendment protects "right to receive information and ideas"); *see also Bd. of Educ. v. Pico*, 457 U.S. 853, 866, 868 (1982); *Kreimer v. Morristown Bureau of Police*, 958 F.2d 1242, 1255 (3d Cir. 1992).[38]

---

[38] Plaintiffs' First Amendment claim that they have a constitutional "right to access a public library" and their exercise of this right "cannot be conditioned on the forfeiture or violation of [their Second Amendment right to bear arms]," *Siegel* Compl. ¶¶ 326-28, ignores the Third Circuit's decision in *Kreimer*, where the Court held that a library is "obligated only to permit the public to exercise rights that are consistent with [its] nature," and bringing a loaded weapon into a space for quiet study is reasonably likely to disturb other patrons and "need not be tolerated." 958 F.2d at 1261-62 (3d Cir. 1992); *cf. Lewis v. Casey*, 518 U.S. 343, 350 (1996) (right to access courts can be conditioned on giving up the right to bear arms).

Fourth, firearms were historically prohibited at analogues for public libraries and museums. Reconstruction-era statutes and ordinances specifically identified "place[s] where persons are assembled for educational, literary or scientific purposes" as sensitive. *See* Ex. 5 (Tex. 1870); Ex. 9 (Tex. 1871); Ex. 78 & 79 (Mo. 1874 & 1883); *see also* Ex. 82 (Mont. 1903). Local governments did the same. *See* Charles Decl. Ex. 16 (Columbia, Mo. 1890); Ex. 24 (Stockton, Kan.). Further, while still territories, Arizona in 1889 (Ex. 80) and Oklahoma in 1890 (Ex. 81) also enacted statutes that tracked—practically verbatim—the language of the Texas statute. The fact that a statute was repeatedly enacted in several states and territories over the course of more than thirty years during the Reconstruction era is significant evidence of its constitutionality.

Nor have Plaintiffs shown any evidence to the contrary. While Benjamin Franklin may have founded the first lending library in Philadelphia in 1731, that a *private* library *chose* not to prohibit firearms is no evidence that *public* libraries *could not* do so. Indeed, it makes sense that the firearms prohibitions codified above emerged in the mid-19th century as both public libraries and firearms became more widespread. *See* Rivas Decl. ¶ 18; Ex. 83. And even if libraries chose as a policy matter not to restrict firearms at the time, that is not evidence that such restrictions would have been unconstitutional. Indeed, case law upholding 1870s Texas and Missouri's statutes that designated educational, literary, and scientific institutions as

sensitive places confirms the opposite. *See supra* at Part II.B.1.

### 6. *Section 7(a)(15) (bars and restaurants that serve alcohol).*

Historical tradition supports Chapter 131's prohibition on carrying a firearm in places where alcohol is sold for consumption on the premises.[39] Plaintiffs' challenge fails on the merits. Firearms restrictions at restaurants that serve alcohol are relevantly similar to historical prohibitions on carrying firearms at social public assemblies. *See infra* at Part II.B.7 (collecting analogues). These statutes are concerned with introducing firearms into active and potentially chaotic social scenes, where use of a firearm—even in self-defense—would create an intolerable risk of harm to bystanders, and where the possibility of the loss, theft, or accidental discharge of a firearm may be high. *See infra* nn.91-92. Those same concerns likewise animate subsection 15. To support the constitutionality of a modern firearm regulation, *Bruen* requires only the identification of a historical regulation that "impose[s] a comparable burden . . . and . . . is comparably justified." *Id.* at 2133.

---

[39] Plaintiffs' claims suffer Article III standing problems. First, they only attest to visiting restaurants, and make no mention of bars or any other place that serves alcohol. Accordingly, at a minimum, the Court should deny further preliminary injunctive relief as to the latter locations. Second, they have not established—or even inquired—that any restaurant they intend to visit would otherwise allow patrons to carry firearms. Thus, the same logic that this Court adopted to find lack of causation for *Siegel* Plaintiffs' challenges to healthcare facilities and zoos, *Siegel* D.E. 51 at 17-18, applies to Plaintiffs' allegations here. That there are many restaurants around the state is not relevant to the analysis. After all, the same was true for healthcare facilities, but the Court correctly determined that the relevant question is whether any of the ones Plaintiffs allege they *will* visit would otherwise permit firearms.

And these analogues are even more apt when combined with the historical evidence that legislatures were also concerned about mixing firearms and vulnerable and incapacitated people. Plaintiffs do not appear to contest that the primary rationale for restricting guns at schools, for example, is that they are filled with persons whose judgment is underdeveloped. That places that serve alcohol are filled with persons whose judgment is impaired is a relevant similarity, even if the cause of the impairment is different.[40] That impairment impacts not only the person's ability to safely *use* firearms, but also to escape or otherwise defend themselves in case of a firearms incident.[41]

Plaintiffs' only response is to say that not everyone who visits a restaurant that serves alcohol is intoxicated. But that distinction also applies to firearms prohibitions at schools. Nothing in *Heller*, *McDonald*, or *Bruen* suggests that school restrictions can only lawfully apply against students and not staff. After all, *Bruen* does not require any means-end scrutiny, so the objection that a firearms prohibition is not

---

[40] Some Reconstruction-era states recognized that firearms and alcohol are a poor mix. *See, e.g.*, Ex 12 (1867 Kansas ban on carriage of pistols by intoxicated persons).

[41] Numerous public health studies support this understanding. *See* C. Branas et al. (2016), Ex. 136 at 40-43 (metanalysis of literature showing that alcohol use by victims or perpetrators increases the risk of firearm violence); J. Jay (2019), Ex. 137 at 64 (finding "that the risk of firearm violence incidence is higher in the area around [alcohol outlets], even after accounting for differences in the physical and social environment surrounding those institutions"); P.J. Trangenstein et al. (2018), Ex. 138 at 2241 (similar).

47

narrowly tailored is not relevant to the history-based inquiry. And historical alcohol-and-firearms restrictions worked expansively to restrict more than just firearm carry by individuals who were actually intoxicated. For example, an 1880 legal treatise noted that "keeping pistols … [and] toying with them at picnics, on board steamers, and in saloons" are "practices upon which every good citizen will frown, and which the law of the land is every year more explicitly discouraging." Ex. 44 at 333. The treatise further observed that "in more settled parts of the land . . . a well-behaved man has less to fear from violence than from the blunders of himself and his friends in managing a pistol he might carry as a protection," *id.* at 333-34, underscoring the potential risks of firearm access in places where firearms accidents are more likely, whether initiated by the carrier or by individuals nearby. Similarly, an 1859 Connecticut statute prohibited "the sale of spirituous or intoxicating liquor" within one mile of any military ground or encampment. Ex. 11 at 62. While the Court rejected this statute as a regulation of the military, *Koons* D.E. 34 at 32-33, the Connecticut restriction effectively prevented the sale of alcohol *to anyone* within one mile of a military encampment—*i.e.*, within an area containing a large concentration of persons carrying firearms.

### 7.  Section 7(a)(17) (entertainment facilities).

Plaintiffs cannot succeed on the merits of their challenge to the prohibition on carrying a firearm in an "entertainment facility . . . including but not limited to a

theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held." Ch. 131 § 7(a)(17).

The law's validity is buttressed not only by numerous historical prohibitions on guns at public assemblies generally, but also prohibitions at *social* assemblies specifically—the very sensitive places prohibited by subsection 17. The latter tradition began at the nation's Founding, with states like North Carolina explicitly providing that persons shall not "go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, nor in no part elsewhere." Rivas Decl. Ex. F; *see also* Ex. 6 (Va. 1786).[42] New Orleans in 1816, Ex. 7, prohibited "any person to enter into a public ball-room with any … weapon."[43] Other states in the Reconstruction period broadly prohibited firearms at social assemblies. *See* Ex. 5

---

[42] This Virginia law prohibited individuals from being "armed by night [or] by day, in fairs or markets, or in other places, in terror of the county." Ex. 6. This Court's earlier determination that the law prohibited being armed at fairs and markets *only if* the individual is also acting in terror of the county is no reason to discount this analogue. The presence of handguns at crowded venues inherently can cause fear and panic—an understanding reflected in the common law. *See* Rivas. Decl. ¶ 7 n.3."

[43] The Court previously rejected this ordinance as an analogue to subsection 17 because "there appears to be many differences between the public ballrooms of 1831 and modern-day concert venues and amusement parks." *Koons* D.E. 34 at 36. While ballrooms in 1816 New Orleans may not have hosted precisely the same musical or theatrical events that are common today at MetLife Stadium, that does not mean that the ordinance is not "*relevantly* similar." *Bruen*, 142 S. Ct. at 2132 (emphasis added). In fact, any differences only amplify the concerns motivating a prohibition on firearms in ballrooms: modern entertainment venues are likely *more* crowded, and the risk of public chaos in the age of mass shootings only amplifies—not dampens— the force of historical prohibitions on firearms in crowded venues.

49

(Tex. 1870) (prohibiting firearms at gatherings at any "ballroom, social party, or . . . any other public assembly")); Ex. 8 (Tenn. 1869) (prohibiting firearms "concealed or otherwise" at "any fair, race-course, or other public assembly"); Ex. 9 (Tex. 1871); Exs. 10, 78, 79 (Mo. 1874, 1879, 1883); Ex. 22 (Ga. 1873); *see also supra* nn.20-22 (addressing Court's critiques). As discussed above, these statutes, like subsection 17, evidence a concern with introducing firearms into potentially chaotic social scenes where considerable numbers of people gather, where defending one's self with a firearm creates an intolerable risk of harm to bystanders, and where the possibility of the loss, theft, or accidental discharge of a firearm may be high. *See, e.g.*, Nason Cert. ¶¶ 8-11, 13; Rebuck Cert. ¶¶ 10-12; *see infra* nn.91-92[44]

### 8.   *Section 7(a)(18) (casinos); and N.J.A.C. 13:69D-1.13.*

The *Siegel* Plaintiffs challenge the prohibition on carrying a firearm in a casino and appurtenant premises under subsection 18 and N.J.A.C. 13:69D-1.13, which has prohibited the "possess[ion of] any pistol or firearm within a casino or casino simulcasting facility without the express written approval of the Division [of

---

[44] Many, if not most, arenas, theaters, and event centers also independently prohibit weapons, and Plaintiffs have made no attestation that any that they wish to visit would otherwise allow them to carry guns. *See* Ex. 49 (numerous entertainment venues listing no-weapons policy on website); Nason Cert. ¶ 14 (all racetracks and sportsbooks exercising private prerogative to prohibit firearms). Consequently, Plaintiffs have not established that Chapter 131 is the cause of their inability to carry. At the very least, an injunction as to racetracks—all of which ban firearms—should not issue. *See infra* at 51 (same for casinos).

Gaming Enforcement]" since 2012. 44 N.J.R. 675(a); *see also* Rebuck Cert. ¶ 7 (noting predecessor regulation existed since 1978). This Court should decline to enjoin these provisions for two reasons.

First, the fact that *every* casino in the state has now independently banned firearms, *see* Rebuck Cert. ¶ 9; Stmt., N.J. Casino Assoc., https://tinyurl.com/yfhhzhhy (Feb. 6, 2023), means a preliminary injunction cannot possibly redress any injury to Plaintiffs. The Article III problem is plain: regardless of what this Court determines on the merits of Plaintiffs' challenge, no Plaintiff can carry in any casino in New Jersey, rendering any ruling patently advisory.[45]

Second, restricting firearm possession in casinos is consistent with the Second Amendment. Modern casino regulations address an "unprecedented societal concern[];" therefore, "the lack of a distinctly similar historical regulation" does not weigh against the regulation's constitutionality. *Bruen*, 142 S. Ct. at 2131-32. Although the State is not aware of Founding or Reconstruction era statutes specifically banning firearms in casinos or other centralized gaming establishments, that is simply because nothing like modern casinos existed during the Founding or Reconstruction. Indeed, historical sources show that gambling was largely outright

---

[45] And as discussed below, *infra* at Part VII, Plaintiffs' decades-long delay in seeking relief against casino regulations means they cannot show irreparable harm.

illegal in many places during these periods.[46] Thus, "[t]he regulatory challenges posed by firearms" in casino complexes are challenges that could not have "preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132.

Instead, restrictions on firearms at casinos are supported by two strands of historical analogues that are relevantly similar: crowded social assemblies and individuals with impaired judgment. Just like concert venues and stadiums, casinos are "large, enclosed" spaces, "filled with patrons and workers, where an active shooter event or the accidental discharge of a firearm could have a particularly severe impact." Rebuck Cert. ¶ 11. The historical analogues that supported prohibitions of firearms at entertainment venues likewise support the same restriction at casinos. *See supra* at Part II.B.7. And casino complexes (and sportsbooks at racetracks) involve congregations of people with impaired judgment (*i.e.*, the intoxicated and hyper-stimulated from the effects of gambling). *See* Nason Cert. ¶ 10. Data from DGE shows that misplaced firearms create security problems in the casino complex, which will only be exacerbated with greater numbers of firearms. *See* Rebuck Cert. ¶ 10. The impairment of individuals gathered there makes the introduction of

---

[46] *See, e.g.*, Ex. 89 at 4 (noting gambling was illegal in New Jersey until 1939); Ex. 86 (NJ acts to prevent gaming passed 1797; supplemented 1853 & 1854), lotteries (passed 1846; supplemented 1858), and horseracing (passed 1846)); Ex. 85 (colonial NJ gaming law); Ex. 87 (1874 revision to NJ gaming ban); G.G. Fenich (1996), Ex. 88 at 66-68 (noting numerous gaming restrictions in other states).

firearms dangerous, both in terms of firearms handling and reacting to a shooting event, even if accidental. *See infra* n.84. The historical analogues that support prohibiting firearms at places where individuals with impaired judgment gather likewise support subsection 18. *See supra* at Part II.B.6.

### 9.   Section 7(a)(20) (airports and transit hubs).

As the Court correctly determined in its TRO Order, Plaintiffs lack standing to challenge the prohibition on carry at airports and transportation hubs. *Siegel* D.E. 51 at 19. And even if they had standing, the challenge fails on the merits.

*First*, Plaintiffs' allegations do not establish that their desired conduct is prohibited by subsection 20 or that this provision will be enforced against them. Simply dropping off or picking up passengers falls within Section 7(c)(4)'s exception for brief presence in a sensitive place's parking lot and under Section 7(d)'s exception for travel along a public right of way. Similarly, it is far from clear that dropping off checked luggage in accordance with TSA regulations would somehow implicate a violation of Chapter 131. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (*SBA List*) (no justiciability if enforcement is not "sufficiently imminent"); Plaintiff DeLuca's visits to his brother's restaurant at South Jersey Regional Airport, *Siegel*, D.E. 42 ¶ 3, do not even seem to involve subsection 20 because the restaurant appears to be a standalone building (not in the

airport terminal) accessible via a public right-of-way.[47] And when Plaintiff Tal flies his private plane at Old Bridge Airport, it does not appear necessary for him to use anything other than a public right of way to reach the plane.[48] Regardless, nothing in his declaration or in any of the others' specifies an intent to carry a loaded gun through the non-sterile areas of airports. As such, they all lack standing either because they have not demonstrated concrete injury or because they cannot establish a credible threat of enforcement against them for the conduct they wish to undertake. *See SBA List*, 573 U.S. at 159.

As to public transportation hubs, the only relevant statements from the declarations are that Plaintiff Siegel "sometimes" takes the train to Newark Penn Station when he "sometimes" attends Devils Hockey games at the Prudential Center, *Siegel* D.E. 8-2 ¶ 17, and that Plaintiff DeLuca "on occasion" takes a PATCO train from Ashland Station in Voorhees, *Siegel* D.E. 8-4 ¶ 13.[49] Both of these temporally vague averments lack the immediacy necessary to establish that injury is imminent.

---

[47] *See* South Jersey Regional Airport, *Airport Services Based at South Jersey Regional*, *at* https://sjrairport.com/services/ (listing Runway Café as only restaurant); Dennis Malloy, *Hole-in-the-Wall NJ Restaurant with a Soaring View*, Oct. 11, 2022, *at* https://nj1015.com/runway-cafe-lumberton/.

[48] *See* Old Bridge Airport, https://oldbridgeairport.com/our-airport/ (airport photo). Nor does he explain why a firearm is needed for self-defense in a private plane.

[49] Plaintiff Tal's claim that he "could commute" via public transit from his home in Colts Neck to his workplace in Parsippany, *Siegel* D.E. 70 ¶ 21, is pure speculation; he does not allege that he has ever undertaken this somewhat lengthy and convoluted commute even once.

*See Lujan*, 504 U.S. at 564. Further, the Prudential Center independently subjects all guests to a security screening and denies entry to anyone in possession of a firearm. Ex. 49F. Thus, Plaintiff Siegel cannot plausibly claim that he would carry his firearm while taking the train to Newark Penn Station en route to the Prudential Center. Finally, Plaintiffs have not established that Ashland Station is a "transportation *hub*" such that Plaintiff Cook would face a credible threat of prosecution if he were to carry there. *See SBA List*, 573 U.S. at 159.

**Second,** even if Plaintiffs had standing, their challenge should fail on the merits because public airports and transit hubs are quintessential places where the government acts in its proprietary capacity. *See supra* at Part II.A. As a result, the government exercises its "rights of an ordinary proprietor … precisely as a private individual" in prohibiting firearms at airports and public transit hubs, *Camfield*, 167 U.S. at 524, and the Second Amendment is not implicated.

**Third**, the historical record supports these restrictions under a Second Amendment analysis. Airports and modern transportation hubs did not exist in the Founding or Reconstruction eras. Airports did not emerge in the U.S. until 1919,[50] and their modern scale and complexity present security concerns not present in the

---

[50] *See Bader Field: Past, Preset and Future*, Federal Aviation Admin. (2006) https://tinyurl.com/32vnp65c.

Founding or Reconstruction era.[51] Mass transit in general in the modern form simply did not exist as of Reconstruction.[52] Due to the unprecedented nature of the scale and complexity of modern airports and transportation hubs, "[t]he regulatory challenges posed by firearms" in these places did not "preoccup[y] the Founders in 1791 or the Reconstruction generation in 1868," and therefore the absence of "distinctly similar historical regulation[s]" is not determinative. *Bruen*, 142 S. Ct. at 2131-32; *but see* Ex. 15 (1876 Iowa ban on "present[ing]" firearms at trains). Rather, if a modern regulation addresses an "unprecedented societal concern[]" spurred on by "dramatic technological changes," then *Bruen* instructs that the historic analogues analysis requires a "nuanced approach." 142 S. Ct. at 2132.

What is determinative is that subsection 20 prohibits firearms in places (*i.e.*, airports and public transportation hubs) that are legitimately "sensitive." Both types of locations congregate masses of people, and transit infrastructure and technology

---

[51] For example, EWR Airport serves nearly 3.5 million passengers monthly. *See* Ex. 90. The entire population of New Jersey was under 700,000 in 1860. *See* Ex. 76.

[52] Railroads in the U.S. were in their infancy in the 1820s and 30s. *See* Library of Congress, *The Beginning of American Railroads and Mapping*, https://tinyurl.com/2xxhcv4y, and subway systems did not emerge until the very end of the 19th century, *see* "Subway," *Encyclopedia Britannica*, (Aug. 5, 2021), https://tinyurl.com/3jh3ujff. That passenger railroads were largely private until recent years may have contributed to any lack of widespread government regulation of firearms there. *See United Transp. Union v. Long Island R. Co.*, 455 U.S. 678, 686 & n.12 (1982) (noting that only 2 of 17 existing commuter railroads in 1979 were publicly owned), *overruled on other grounds by Garcia*, 469 U.S. 528.

are sensitive.[53] The safe and effective functioning of mass transportation in today's society is as critical as the safe and effective functioning of courts, legislative assemblies, and schools, *see Bruen*,142 S. Ct. at 2133; and it presents all the same challenges as other crowded, chaotic social venues. *See* Part II.B.7.

Indeed, Plaintiffs appear to accept the constitutionality of federal TSA firearm restrictions, *see Koons* Am. Compl., D.E. 69 ¶ 37, implicitly acknowledging that airports are constitutional sensitive places. This makes their argument as to the pre-security screening area in airports puzzling. After all, any discounting of the relevant historical basis offered here would mean that firearms regulations *anywhere* in the airport would be impermissible, an unprecedented and unthinkable proposition that would pose catastrophic risk to national security.

> 10. Section 7(a)(21) (healthcare facilities) and Section 7(a)(22) (addiction and mental health treatment centers).

Plaintiffs challenge the prohibition on carrying a firearm in "a health care facility," ch. 131 § 7(a)(21), and facilities that "provide[] addiction or mental health treatment or support services," *id.* § 7(a)(22). Their challenges fail because they lack standing to launch them, and in any event, they are meritless.

---

[53] *See, e.g.*, A. Holgersson & U. Bjornstig (2013), Ex. 150 (noting terror attacks against transit centers are "a relatively recent phenomenon" over past 50 years); Hr'g before Cong. Subcommittee on Transp. & Maritime Security (Feb. 15, 2022), https://tinyurl.com/5n7bzau5; GAO, Transp. Sec. Post Sept. 11 Initiatives & Long-Term Challenges (Apr. 1, 2003), https://tinyurl.com/yckvfhyz.

*First,* Plaintiffs lack standing to challenge subsection 22 as their declarations do not contain a single reference to an addiction or mental health treatment center. Further, while their supplemental declarations cure their standing problems as to urgent care centers and clinics, they do not cure all the standing challenges against other types of facilities, like hospitals and nursing homes. Their PI challenge is thereby limited in scope, as the Court anticipated. *Siegel* D.E. 51 at 18 n.7.

*Second,* Plaintiffs' challenges fail on the merits. For reasons explained *supra*, Part II.A, to the extent that healthcare facilities covered by subsections 21 and 22 are owned or operated by the government, the proprietor's safety rules fall outside the scope of the Second Amendment. But even were that not so, the Second Amendment does not prohibit regulations of healthcare facilities. As with casinos and airports, nothing like these locations existed during the Founding or Reconstruction. Health care delivery in large and technologically complex settings did not exist in the 18th or 19th century. Dramatic changes in the scale, sophistication, and complexity of hospitals and health care delivery since the 18th century—including a shift from home-based to institution-based care[54]—present novel challenges, like how to keep health care workers and patients safe in large hospitals filled with vulnerable patients and sensitive technologies. Further, it is not clear that equivalents to modern

---

[54]   *See* B.M. Wall, *History of Hospitals*, UPenn Nursing, https://tinyurl.com/ymrawt2n.

addiction or mental health treatment facilities existed during the Founding or Reconstruction.[55] Asylums existed and housed the mentally ill, but in the 18th and 19th centuries these institutions were more in the nature of prisons than treatment facilities—indeed, the mentally ill were sometimes housed in jails even when they had not committed crimes. Ex. 91 at 2. Because "[t]he regulatory challenges posed by firearms" in modern health care facilities and addiction or mental health treatment facilities are challenges that could not have "preoccupied the Founders in 1791 or the Reconstruction generation in 1868," the absence of "distinctly similar historical regulation" is not determinative. *Bruen*, 142 S. Ct. at 2131-32.

But the analogical reasoning *Bruen* called for should be clear: facilities of this type are "sensitive" because they involve vulnerable people, delicate procedures, scientific pursuits, and carefully calibrated equipment. *See generally* Adelman Cert. *Bruen* casts no doubt on such prohibitions. Healthcare facilities encompassed by subsections 21 and 22 involve congregations of vulnerable members of society (*i.e.*, persons who are physically or mentally impaired, on medication, or in the midst of receiving sensitive medical treatments). *See supra* at Part II.B.5, 6. Moreover, health care facilities are also akin to "public assemblies" where people gathered for educational or scientific purposes, and are thus supported by the numerous historical

---

[55] *Compare* Adelman Cert. (describing modern settings for mental health and addiction treatment, intermediate care facilities for persons with developmental disabilities, and nursing homes).

regulations for such locations. *See* Parts II.B.1, 5, 7.

> 11. *Section 7(a)(23) (movie sets).*

Plaintiffs' challenge to subsection 23's carry restrictions on motion picture and television sets also fails. First, Plaintiffs have an intractable redressability problem. Movie sets are closed and do not permit *anyone* to enter regardless of whether they have firearms. Gorelick Cert. ¶ 4.[56] Second, even if Plaintiffs are able to clear the standing hurdle, their merits arguments fall flat. *Bruen* requires a "nuanced approach," not a "dead ringer" when drawing analogies implicating "dramatic technological changes" such as motion pictures. 142 S. Ct. at 2132-33. Filming locations are where crowds gather, including crews and onlookers, and thus historical prohibitions on firearm carry in cramped, crowded places are analogous. *See supra* at Parts II.B.1 & 7.

> 12. *Fish & Game Regulations (N.J.A.C. 7:25-5.23(a), (c), (f), (i), (m))*

Plaintiffs lack standing to challenge longstanding Fish and Game regulations. First, as the Court correctly pointed out, any deer hunting Plaintiffs allege they intend to engage in would not occur until fall or early winter, and thus is not sufficiently

---

[56] The Jairam declaration fails to allege facts sufficient to demonstrate either that making a YouTube video falls within the definition of "motion picture or television images" or that there is a credible threat of enforcement for such activity. *Cf.* NJ Motion Picture & Television Comm., https://tinyurl.com/48hm8bfy ("[F]ilmmakers in New Jersey are required to carry general liability insurance in the amount of $1 million" before they shoot their motion picture or television show).

imminent for a PI. *Siegel* TRO Op. at 19. Second, no Plaintiff has alleged an intention to do anything that would violate the challenged regulations, which regulate specific forms of ammunition and types of hunting. Siegel, the lone Plaintiff whose declaration mentions hunting, only generically alleges that he takes his son deer hunting every year. Siegel Decl. ¶ 15. Third, any purported injury Plaintiffs would suffer is not redressable through an injunction, since defendants do not enforce N.J.A.C. 7:25-5.23.[57]

Plaintiffs also lose on the merits.[58] In *Geer v. Connecticut*, 161 U.S. 519 (1896), the Supreme Court explained in exhaustive detail that the "State has an absolute right to control and regulate the killing of game as its judgment deems best in the interest of its people." *Id.* at 530; *see also id.* at 522-33 (tracing through history the sovereign's absolute power over game). Game laws "have been in force in many of the older States since the organization of the Federal Government."[59] *Id.* at 533;

---

[57] Plaintiffs' reliance on N.J.S.A. 23:2A-10(a)(5), (f) for the contrary proposition is misplaced. That refers to "The Endangered and *Nongame* Species Conservation Act," and does not cover these Fish and Wildlife regulations. *See* N.J.S.A. 23:2A-1 (emphasis added). And the cited law requires the DEP Commissioner of the Department of Environmental Protection to determine if a violation exists and *then* petition the Attorney General to bring a criminal action. N.J.S.A. 23:2A-10(a)(5). No such thing has happened here.

[58] Also militating against a PI is the fact that the regulations have existed for decades, but Plaintiffs only now seek emergency relief. *See* R.1995 d.427 (Aug. 7, 1995); 27 N.J.R. 2889(a) (Aug. 7, 1995).

[59] *See* Ex. 13 (N.J. 1771); Ex. 92 (N.C. 1776); Ex. 93 (Ga. 1800); Ex. 94 (Md. 1837).

*see also id.* at 528 (noting Reconstruction era laws and cases).[60]

### 13.   Section 7(b)(1) Vehicle Restrictions

Nor are Plaintiffs likely to succeed on the merits of their challenge to Chapter 131's vehicle carry restrictions, which merely specify *how* firearms are to be carried in a vehicle: "unloaded" and in a "securely fastened case" or "in the trunk." *Id.* § 7(b)(1). These restrictions are consistent with historical regulations of firearms.

As to public transit vehicles (buses and vans),[61] the government-as-proprietor exception—in particular, as market participants that compete against private buses—applies fully. *See supra* at Part II.A. Further, the concerns that animate regulating carry on crowded buses are relevantly similar to those supporting prohibitions on firearms in other crowded locations. *See supra* at Part II.B.7. In each of these places, large numbers of people congregate in confined spaces, increasing the risk of accidental discharge and making self-defense using a gun impracticable given the risk of harming bystanders.[62] As a result, some states prohibited firearms and

---

[60] *See, e.g.*, Ex. 95 (Ohio 1868); Ex. 96 (Wisc. 1872); Ex. 97 (Conn. 1872); Ex. 98 (Ore. 1872); Ex. 99 (S.C. 1873).

[61] No Plaintiff alleges they will imminently ride one, so this claim is not justiciable.

[62] The Court's dismissal of these concerns as "pass[ing] empirical judgment on the wisdom of a regulation" misconstrues the State's argument. *Koons* D.E. 34 at 49 n.26. *Bruen* held that the "purpose" of the regulation restricting firearms was one metric that could "render regulations relevantly similar under the Second Amendment." 142 S. Ct. at 2133. Here, the purpose of the public transportation restrictions and historical regulations restricting firearms in crowded places is the

munitions in and around railroads, arguably the only "mass transport" at the time.[63]
*See, e.g.*, Ex. 15 (Iowa in 1876 prohibiting "present[ing] or discharg[ing] any gun,
pistol, or other fire arm at any railroad train, car, or locomotive engine"). Section
7(b)(1) does not go as far—it only requires storage in a particular way.

Next, as to private vehicles, Section 7(b)(1) passes constitutional muster
because the "regulatory challenges posed by firearms [in private automobiles] today
are not … the same as those that preoccupied the Founders in 1791 or the
Reconstruction generation in 1868," when automobiles did not exist. *Bruen*, 142 S.
Ct. at 2132. Given the speed of modern cars, the great distances they can travel, and
the existence of an organized police force that conducts routine traffic stops, the
Court must take a "nuanced approach" because past legislatures did not face such
"unprecedented societal concerns or dramatic technological changes." *Id*. at 2132.

Indeed, the advent of cars brought contemporaneous state regulation of
carrying firearms therein. *See, e.g.*, Ex. 16 (Iowa in 1926 prohibiting carry of
firearms in "motor vehicle" unless "unloaded" and "contained in a case"); Ex. 17
(Maine in 1917 prohibiting "loaded" firearm in "any motor vehicle"). The Court

---

same: preventing the misuse and accidental discharge of firearms in places where
large casualties could result.

[63] Because publicly operated mass transportation did not exist at the Founding or
Reconstruction, *see supra* at Part II.B.9, provisions such as these serve as the most
analogously similar historical statutes for Section 7(b)(1).

dismissed these analogues because they did not specifically prohibit the carry of pistols or revolvers, *Koons* D.E. 34 at 50 n.27, but the Court's search for a "historical twin" is precisely what *Bruen* held was not required. *Id.* at 2133.

Moreover, the "travel" laws of the Founding and Reconstruction eras addressed relevantly similar problems in relevantly similar ways. In the late 18th century, America "had laws that broadly prohibited the carrying of firearms and other deadly weapons in public, including while travelling." Rivas Decl. ¶ 6. In the mid-19th century, some States restricted firearm carry beyond what Section 7(b)(1) does by prohibiting public carry of firearms altogether, including while "riding." For example, in 1821, Tennessee prohibited the carry of any "belt or pocket pistols" "publicly or privately," and enforced the prohibition against individuals while riding. Ex. 20; *see Smith v. State*, 50 Tenn. 511, 512 (1872) (defendant arrested "carrying the weapon while riding through the neighborhood"). And in 1871 Texas forbade carrying "any pistol," on someone's "person, saddle, or in his saddle bags." Rivas Decl. Ex. K.[64] Like Section 7(b)(1), "[t]he evil intended to be corrected [through these statutes] is the carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating."

---

[64] *See also* Ex. 100 (W. Va. 1887) (prohibiting "carrying about his person any revolver or other pistol" except between specific locations and for good cause); Ex. 101 (Kan. 1881); Ex. 102 (Ark. 1875); Ex. 103 (Va. 1847); Ex. 104 (W. Va. 1868); Ex. 147 (Terr. of Wyo. 1875); *cf.* Ex. 152 (East Jersey 1686).

*Smith*, 50 Tenn. at 513-14. And jurisdictions in the Reconstruction era recognized the importance of safe storage of ammunition, just as Section 7(b)(1) does in requiring unloading handguns. *See* Ex. 105 (1872 Portland, Or. ordinance requiring gunpowder in vehicles to be "securely packaged in close packages" and "securely covered"); Ex. 148 (1887 Lynchburg, Va., similar). Together, these statutes demonstrate a historical tradition of regulating the manner of carrying arms while in vehicles—even before automobiles were invented.

Further, other States prohibited carry of pistols and other weapons in a concealed manner. *See* Ex. 111 (Ga. 1861); Ex. 110 (Ohio 1859); Ex. 109 (Va. 1838); Ex. 18 (Ark., 1838); Ex. 19 (Ala., 1839); Ex. 108 (Ind., 1819); Ex. 107 (La. 1813); Ex. 106 (Ky. 1813).[65] While some of these statutes contained exemptions for those "upon a journey," *see, e.g.*, Exs. 18, 108, 106, this "travel exception was narrowly defined by state courts," Rivas Decl. ¶ 12. The "kind of 'travel' which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern

---

[65] *Bruen* concluded that these concealed-carry statutes were not analogous to the New York law prohibiting public carry at issue in that case because these historical statutes prohibited only concealed carry and allowed open carry. 142 S. Ct. at 2146. However, "individuals generally did not view concealed carry laws as giving permission to openly carry in populated places during a person's ordinary activities." Rivas Decl. ¶ 9 (citing cases). In any event, here, Section 7(b)(1) does not ban handgun carry in a vehicle altogether; it only regulates the manner in which a handgun in a vehicle must be carried. It is therefore analogous to the concealed carry statutes, as both restrict manner of carry.

transportation." *Id.* "Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life—courts, magistrates, constables, and the security of being among one's neighbors." *Id*. That is the relevant parallel for Section 7(b)(1), since it—and all of Section 7—by definition only applies within New Jersey.

Contemporary precedents upholding these laws underscore their validity as precursors. For example, in *Carr v. State*, 34 Ark. 448 (1879), the Arkansas Supreme Court held that the state's concealed carry ban applied to people "mixing with the people in ordinary intercourse, about the streets," and thus someone in transit through town should "have deposited his pistols with his baggage, and not carried them on his person." *Id*. at 449; *see also Gholson v. State*, 53 Ala. 519, 521 (1875) (journey exception applied only when travelling outside "the ordinary habits, business, or duties of the person, to a distance from his home"); *Eslava v. State*, 49 Ala. 355, 537 (1873) (concealed carry ban applied to someone "going to and from his residence and to his place of business" as well as to "[t]ravel … within the ordinary line of the person's duties, habits, or pleasure"); *Smith*, 50 Tenn. at 513 (concealed carry prohibition applied to a "ramble in one's own neighborhood across the lines of contiguous counties"). Like Section 7(b)(1), these statutes restricted the carry of firearms in transit and aimed to prevent individuals from being "about the

66

streets armed in a manner which, upon a sudden fit of passion, might endanger the lives of others." *Carr*, 34 Ark. at 449.[66]

>    14. *Multiuse property and Section 7(a)(7) (schools, colleges, universities other educational institutions, and school buses).*

At the TRO stage, the Court correctly denied the *Siegel* Plaintiffs' challenge to subsection 7 as it relates to multipurpose facilities, and it should do so again at the PI stage. Plaintiffs allege that subsection 7's prohibition on firearm carry in a "school, college, university, or other educational institution, and on any school bus" may be enforced against them on properties connected to those institutions and at certain classes they attend.[67] *Siegel* Br. 24-27. This argument is misguided, and the Court should once again deny relief.

To begin, Plaintiffs agree, as they must,[68] that Chapter 131's prohibition of guns at "a traditional K through 12 school" is constitutional. *Siegel* 1/26/23 OA Tr.

---

[66] One study of road rage in Arizona found that "drivers who carried a gun in their car were three times as likely to report engaging in several rude, hostile and illegal driving behaviors." M. Miller et al. (2002), Ex. 139 at 811. That is, "hostile behavior behind the wheel is strongly associated with carrying a firearm in the car, even after controlling for age, gender, driving frequency, race, education, income, marital status and history of firearm victimization on the road." *Id.*

[67] Plaintiffs do not allege that they *ever* visit colleges, universities, or childcare facilities, including daycares. Similarly, they do not allege that they ride on school buses. Therefore, firearms prohibitions at these specific venues within subsections 7 and 8 are not at issue in this case.

[68] *See Bruen*, 142 S. Ct. at 2133 (recognizing "longstanding laws forbidding the carrying of firearms in sensitive places such as schools") (quoting *Heller*, 554 U.S. at 626) (internal quotation marks omitted); *id.* (schools are "settled" as "sensitive

at 6:25; 9:11-13; 33:22; *Siegel* Br. 24. Instead, they contend that the terms "school" and "other educational institutions" are overbroad and cause them to avoid certain locations. *Siegel* Br. 26-27. But as the State explained at oral argument, Plaintiffs misread the statute. Tr. at 30-32.

Title 2C, New Jersey's criminal code—in which Chapter 131 also sits—defines "school" as "a public or nonpublic elementary or secondary school within this State offering education in grades K through 12, or any combination thereof, at which a child may legally fulfill compulsory school attendance requirements." N.J.S.A. 2C:1-14(r). None of Plaintiffs' various allegations about bagpipe sessions, Bible studies, motorcycle lessons, and other voluntary classes that Plaintiffs wish to attend while carrying firearms fits this definition, so they do not fall within the scope of subsection 7's prohibition. *See Siegel* TRO OA Tr. 30:22-32:23.

Nor can the term "other education institution" be stretched to cover the areas Plaintiffs allege they frequent. Under "the canon of *ejusdem generis*, which limits general terms [that] follow specific ones to matters similar to those specified," "other educational institution" should be narrowly read to encompass only those institutions similar to the previous categories, *i.e.*, academic settings such as K-12 schools, colleges, and universities that are subject to the regulatory power of the State

---

places"); *McDonald*, 561 U.S. at 786 ("repeat[ing] *Heller*'s] assurances" that schools are protected sensitive places).

Departments of Education and Higher Education. *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 294 (2011) (quotation omitted); *Yates v. United States*, 574 U.S. 528, 545 (2015). Indeed, Plaintiff Koons seems to have no problem understanding what the phrase means. *See Koons* D.E. 10 ¶ 10 ("I understood I could not carry a gun at education facilities … .").[69]

And Plaintiffs' multiuse property argument is a straw man: the conduct they intend to engage in does not actually violate Chapter 131. Section 7(d) already exempts from liability someone who is otherwise qualified to carry a firearm and is "traveling along a public right-of-way that touches or crosses any of" the sensitive places. *Id.* Thus, where a sensitive place is located in a multi-use property with non-sensitive places, carrying a gun to the non-sensitive place is permitted. *See* Tr. at 24:12-28:20. And Section 7(c)(4) makes clear that Plaintiffs can "transport a concealed handgun between a vehicle parked within a prohibited parking area and a place other than a prohibited place." *Id.* The *Siegel* Plaintiffs' request for a PI should be denied as it relates to multiuse properties and subsection 7.

---

[69] For the same reasons, *Siegel* Plaintiffs' void-for-vagueness argument regarding the definition of "schools" and "educational institution" fails. Br. 43.

## III.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR CLAIMS AGAINST THE LIABILITY INSURANCE PROVISION.

### A. Plaintiffs Lack Standing To Challenge Section 4.

As a threshold matter, Plaintiffs lack Article III standing. The record is devoid of evidence regarding whether any Plaintiff already maintains qualifying insurance. And there is good reason to think they do. Homeowner's, renter's and personal liability policies cover accidental injury, loss, or death related to use of firearms, regardless of whether the relevant incident took place inside or outside of the home, unless expressly excluded in the policy. *See* Kochenburger Cert. ¶ 12 (finding no evidence of such exclusions after reviewing numerous policies).[70] Thus, Plaintiffs have not shown they would be harmed by the insurance requirement. *See Storino v. Boro. of Point Pleasant Beach*, 322 F.3d 293, 297 (3d Cir. 2003) (finding no Article

---

[70] In *Cumberland Mut. Fire Ins. Co. v. Murphy*, 873 A.2d 534 (N.J. 2005), for example, an equally-divided New Jersey Supreme Court affirmed a decision requiring a homeowner's insurance policy to cover an injury resulting from teenagers shooting a BB gun at cars. Notably, the insurer did not dispute coverage on the basis that the event took place outside the home and involved firearms. *See id.* at 536. Rather, at issue was whether the act fell under an exclusion for intentional acts. *Id.* at 538; *accord Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286 (Pa. 2007); *Safeco Ins. Co. v. Robert S.*, 28 P.3d 889 (Cal. 2001) (homeowner's insurance required to defend wrongful death action when son of insured accidentally shot and killed another); *Erie Ins. Exch. v. Moore*, 228 A.3d 258 (Pa. 2020) (where insured intended shooting, but accidentally shot third person, homeowner's and personal liability policies required to cover personal injury action).

III injury where plaintiffs "have not yet incurred damages as a result of the adoption of" challenged law, and allegation of future damage is purely speculative).

Further, to the extent Plaintiffs' claim hinges on the cost of obtaining such insurance, that claim is not ripe. Section 4 will not go into effect until July 22, 2023;[71] it is premature to speculate on the cost of policies that may become available in the intervening months. Given that options may be made available in either the admitted market or the surplus line market as the insurance market develops in the coming weeks and months, *see* Kochenburger Cert. ¶ 16, any claim based on the cost or availability of insurance should not be adjudicated at a PI posture. *See Siemens USA Holdings Inc v. Geisenberger*, 17 F.4th 393, 413 (3d Cir. 2021) (noting a judgment "may lack conclusiveness because, even when the issue is a facial challenge to a state statutory provision, further factual development may be useful to understand how the statute is interpreted and put into operation by the state whose law it is"). Furthermore, no Plaintiff states that they anticipate being unable to comply with the insurance requirement for public carry—that is, if they do not already satisfy the requirement through existing coverage. Plaintiffs need to do more than point to the existence of the law to have standing. *See Fischer v. Governor of N.J.*, 842 F. App'x 741, 749 (3d Cir. 2021).

---

[71] For similar reasons, Plaintiffs also cannot demonstrate irreparable harm, since Section 4 poses no harm to Plaintiffs in the interim. Moreover, any harm is monetary in nature and is thus not irreparable. *See infra* at Part VII.

71

B. <u>The Insurance Requirement Does Not Fall Under The Plain Text Of The Second Amendment</u>

Even if Plaintiffs had standing to challenge Section 4, nothing in the Second Amendment's plain text covers rules of financial responsibility for firearm-carriers. While the financial instrument of insurance is related to the fiscal consequences of carrying a firearm, requiring it is not a regulation of who can bear arms. As the Supreme Court explained in *NFIB v. Sebelius*, 567 U.S. 519, 558 (2012), requiring someone to buy health insurance—even under penalty—is "not the same thing" as the underlying thing to be insured: that is, "health care consumption." Although health insurance and health care are of course related, the regulation of insurance is distinct from regulation of healthcare. The same logic applies to Section 4's requirement that a gun carrier insures for injury or damage resulting from accidental shootings: it is distinct from regulating bearing of arms.

Indeed, the liability insurance requirement is no different from obligations appurtenant to carrying firearms. That includes background checks—including fingerprinting, application fees, and firearms training instruction, which fall outside the text of the Second Amendment. *See Bruen* 142 S. Ct. at 2138 n.9; *id.* at 2162 (Kavanagh, J., concurring). Section 4 imposes no new restriction on the places where a person may carry or the types of weapons they may possess, and the burden it imposes on the right to bear arms is no more than an incidental burden.

72

C.  <u>The Insurance Requirement Is Supported By A Historical Tradition</u>
<u>Of Shifting The Risk Of Loss From Gun Violence</u>

Even if this Court finds that the insurance liability provision falls within the text of the Second Amendment,[72] it should nevertheless uphold the law. The regulation is supported by a historical tradition in which states took measures to shift the risk of loss from gun violence away from the victim. That tradition took at least two separate forms: surety laws for carrying firearms, and cases imposing strict liability for gun accidents.

### 1. Surety Laws

The practice of requiring sureties for publicly carrying firearms dates back to the common law tradition in England and American colonies. *See* Rivas Decl. ¶ 7;

---

[72] And courts have not treated insurance requirements for other constitutionally protected rights as infringements on those rights. For example, courts have upheld laws requiring liability insurance before First-Amendment activity that may cause damage. *See, e.g.*, *Thomas v. Chicago Park Dist.*, 227 F.3d 921, 925 (7th Cir. 2000), *aff'd*, 534 U.S. 316 (2002) (insurance requirement for park rallies); *Gerritsen v. City of Los Angeles*, 994 F.2d 570, 579 (9th Cir. 1993) (insurance bond requirement for hanging street banners); *Jacobsen v. Harris*, 869 F.2d 1172, 1174 (8th Cir. 1989) (insurance requirement for putting news racks on city property). Similarly, courts have rejected right-to-travel challenges to compulsory auto insurance rules, acknowledging that the Constitution protects the right to travel but holding that insurance requirements do not fall within the scope of the right. *See, e.g.*, *Thrasher v. Abernathy*, No. 1:16-cv-2867 (JMS), 2017 WL 735684, at *6 (S.D. Ind. Feb. 24, 2017); *Barber v. Ala.*, No. 2:11-cv-3249 (AKK), 2012 WL 1340090, at *11 (N.D. Ala. Apr. 16, 2012); *Shultz v. Heyison*, 439 F. Supp. 857, 860 (M.D. Pa. 1975).

*see also* Ex. 116 at 37.[73] In the 19th century, at least 10 jurisdictions (7 states, 2 territories, and the District of Columbia) codified "surety laws" that provided that certain people could be required to post bond in order to carry a firearm.[74] These surety laws—which required the gun carrier to provide monetary or other bond to cover harm resulting from such activity, work much like liability insurance. Just as surety laws shifted the risk of harm arising from firearms from victims to the bearers by requiring a financial guarantee, so too does Section 4's insurance requirement.

While the *Bruen* Court found that surety laws "were not bans on public carry," 142 S. Ct. at 2148,[75] that is precisely the point: neither is liability insurance. And although the *Bruen* Court noted that some of the surety statutes required an accusation that the person is likely to breach the peace, *id.*, some states' surety statutes broadly applied to any person who carried a weapon "without reasonable cause." *See* Ex. 103 (Va. 1847); Ex. 104 (W. Va. 1868).

---

[73] *See also* E. Reuben & S. Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law In Context*, 125 Yale L.J. Forum 121, 130-31 (2015); S. Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting*, 1328-1928, 55 U.C. Davis L.R. 2545, 2555 (2022).

[74] Ex. 112 (Mass. 1835);  Ex. 113 (Terr. of Wisc. 1838); Ex. 114 (Me. 1840); Ex. 115 (Mich. 1846); Ex. 103 (Va. 1847); Ex. 117 (Terr. of Minn. 1851); Ex. 118 (Ore. 1854); Ex. 119 (D.C. 1857); Ex. 120 (Pa. 1860); Ex. 104 (W. Va. 1868).

[75] Although *Bruen* noted an absence of evidence of enforcement of surety laws, scholars have noted that the lack of evidence does not indicate lack of enforcement, because many decisions of justices of the peace would not have been published. *See* E. Reuben & S. Cornell, *supra* note 73, at 130 n.53.

74

The only court to have considered legislation similar to Section 4 agreed. In *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, ("*NAGR*"), No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022), the court upheld a San Jose ordinance requiring certain gun owners to possess liability insurance. That court found that historical surety laws "bear striking analogical resemblances" that supports the constitutionality of the ordinance. *Id.* at *11. The court rejected efforts to distinguish the surety laws on the basis that they "imposed a financial burden only *after* 'cause has been shown *specific to the individual.*'" *Id.* The court noted that this distinction "does not bear upon the metrics identified in *Bruen* ('how and why the regulations burden a law-abiding citizen's right to armed self-defense')." *Id.* The court also noted that insurers may set lower prices for lower risk individuals, and vice versa. *Id.* As such, the court found that plaintiffs were not likely to succeed on the merits, *id.* at *12, as should this Court.

### 2. Strict Liability For Gun Accidents

Another historical tradition supports Section 4: early in the 19th century, state courts imposed strict liability or demanding standards of care on gun owners, which virtually assured those owners would compensate victims of gun negligence for their loss. Insurance and tort are related both in their historical development and impact on allocating the risk of loss. *See generally* K.S. Abraham, *The Liability Century: Insurance and Tort Law from the Progressive Era to 9/11* (2008). While insurance

75

requires a policyholder to pay a premium upfront—and in doing so shifts the risk of loss—strict liability and other related tort regimes similarly shift the risk of loss away from victims by ensuring victims would be compensated by adopting no-fault standards or other lower burdens of proof. Both put the gun owner on notice that they may be responsible for the financial harm from accidents or negligence, and create incentives for gun owners' behavior. The animating idea behind both systems of private economic regulation is the same: making sure victims are made whole financially. Accordingly, the *NAGR* court found that "whether the standard was strict liability or negligence, the Nation nonetheless maintained a 'historical tradition' of shifting the costs of firearm accidents from the victims to the owners of the implicated firearms." *NAGR*, 2022 WL 3083715, at *11.

The tort law approach to compensating victims can be traced to cases like *Cole v. Fisher*, 11 Mass. 137, 139 (1814), which held that "[t]he party injured, either in his person or property, by the discharge of a gun, even when the act is lawful . . . is entitled to redress in a civil action." Similarly, *Moody v. Ward*, 13 Mass. 299, 301 (1816), held that militia commanders allowing troops to fire near highways would be "legally responsible for all damage sustained by a citizen in consequence of such neglect." And in *Welch v. Durand*, 36 Conn. 182 (1869), the Connecticut Supreme Court held a defendant liable for injury to plaintiff because defendant's bullet

ricocheted and hit him, without inquiry into blame or fault: "It is an immaterial fact that the injury was unintentional." *Id.* at 185.[76]

That these early American courts saw no problem with requiring firearm owners to internalize the unintended costs associated with use or misuse of their guns is powerful evidence that such risk-shifting regulations do not violate the Second Amendment. While insurance markets have matured and the State now chooses to regulate via insurance rather than via tort, the economic principles and burdens on gun ownership are similar. Both the surety and tort historical evidence thus support Section 4.

## IV.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR VOID FOR VAGUENESS CHALLENGES.

The provisions challenged by the *Siegel* Plaintiffs are not vague. A criminal statute is void for vagueness only if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *United States v. Harris*, 347 U.S. 612, 617 (1954). The doctrine "is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently

---

[76] *See also Judd v. Ballard*, 66 Vt. 668, 672 (1894) ("Neither an intention to injure the plaintiff, nor an intention to do the act which caused the injury, is essential."); *Tally v. Ayres*, 35 Tenn. 677, 680-81 (1856) (holding "[t]he act of taking a *loaded* gun into a place of public resort--no necessity or cause being shown for doing so-- and leaving it exposed in the store, was an uncalled for and reckless act").

specific to provide fair warning that certain kinds of conduct are prohibited." *Colten v. Kentucky*, 407 U.S. 104, 110 (1972). In other words, "[s]imply because a criminal statute could have been written more precisely does not mean the statute as written is unconstitutionally vague." *United States v. Fullmer*, 584 F.3d 132, 152 (3d Cir. 2009) (quotation omitted); *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). "[I]mprecise but comprehensible normative standard[s]" are enough. *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). Finally, Plaintiffs can only prevail on their facial claims if they demonstrate each challenged provision "is impermissibly vague in all of its applications." *Interactive Media Ent. & Gaming Ass'n Inc. v. Att'y Gen.*, 580 F.3d 113, 116 (3d Cir. 2009).

A. <u>Within 100 Feet Of A Public Gathering</u>

Plaintiffs allege that "a typical person cannot know which events require a permit," *Siegel* Compl. ¶ 307, but Chapter 131 only prohibits someone from "*knowingly* carry[ing] a firearm" near such gatherings. Ch. 131, § 7(a). Absent a contrary indication, that mens rea requirement applies "with respect to each material element of the offense." N.J.S.A. 2C:2-2(a). Such scienter requirements "alleviate vagueness concerns because a *mens rea* element makes it less likely that a defendant will be convicted for an action committed by mistake." *United States v. Moyer,* 674 F.3d 192, 211–12 (3d Cir. 2012) (quotation omitted). As such, this claim fails.

B. "Vehicle"

Plaintiffs quibble that because Chapter 131 does not define "vehicle," the law's vehicle restrictions are void for vagueness. But New Jersey law—including Title 2C, where Chapter 131 resides—expressly define the term. *See* N.J.S.A. 39:1-1 (defining vehicle as a "device … by which a person or property … may be transported upon a highway, excepting devices moved by human power or used exclusively upon stationary rails or tracks or low-speed electric bicycles, low-speed electric scooters, or motorized bicycles"); *id.* (defining "motor vehicle" similarly); N.J.S.A. 2C:1-14(n) (noting "motor vehicle" in criminal code "shall have the meaning provided in N.J.S.A. 39:1-1").

C. "Carry"

Although no Plaintiff avers he or she is actually uncertain as to what "carry" means, they challenge the term as unconstitutionally vague. *Siegel* Br. 43, n.6. But the word "carry" has been used throughout New Jersey's criminal firearm statutes for decades prior to Chapter 131, *see, e.g.*, N.J.S.A. § 2C:39-5, and the law defines the bounds for what conduct is excluded, *see, e.g.*, N.J.S.A. 2C:39-5(g) (exempting from criminal liability certain persons "receiving, possessing, carrying or using" a firearm); 2C:39-6(a) (exempting from criminal liability "Members of the Armed Forces … while traveling between places of duty and carrying authorized weapons"). Moreover, the Supreme Court has concluded that the term "carry a

79

firearm" in federal firearm statutes was not ambiguous when interpreting it to encompass conveyance in a motor vehicle. *Muscarello v. United States*, 524 U.S. 125, 139 (1998). Indeed, *Heller* itself characterized the right to "bear" arms to mean the right to "carry" them, 554 U.S. at 584, and the Court used "carry" throughout its opinion in *Bruen*. It is hard to imagine that the word "carry" in Chapter 131 is unconstitutionally vague when the Court has used the same word in the same way to interpret the Second Amendment.

### D. "Unjustified Display" Of A Handgun.

Section 5(a)(5) prohibits the holder of a carry permit from "engag[ing] in an unjustified display of a handgun." Plaintiffs are wrong to suggest that just because N.J.S.A. 2C:12-1(b)(4) prohibits certain conduct pertaining to firearms, Section 5(a)(5) is somehow unconstitutionally vague. *Siegel* Compl. ¶ 84. N.J.S.A. 2C:12-1(b)(4) is an aggravated assault statute: a person violates it when he "[k]nowingly" and "under circumstances manifesting extreme indifference to the value of human life points a firearm . . .  at or in the direction of another, whether or not the actor believes it to be loaded." A person of ordinary intelligence understands that "unjustified display" covers a broader range of conduct than *pointing a gun at another* with "extreme indifference to the value of human life." *Id.*

### E. Permit Requirements

Plaintiffs cannot succeed on the claim that two updated permit requirements—

merely making two existing provisions *more* specific—are void for vagueness. *Compare* N.J.S.A. 2C:58-3(c) (prior version) *with* Ch. 131, § 2(c); *compare* N.J.S.A. 2C:58-3(c)(5) (prior version) *with* Ch. 131, § 2(c)(5).

The New Jersey Legislature originally enacted the "public health, safety or welfare" disqualifier in N.J.S.A. 2C:58-3(c)(5) in 1966. *See Burton v. Sills*, 248 A.2d 521, 523 (N.J. 1968).[77] The provision was meant to encompass "unfit individuals who, though not strictly within the enumerated classes, should not in the public interest be entrusted with firearms." *Id.* In other words, those who did not technically fit another disqualifier, but nonetheless posed obvious dangers, would not receive firearms permits. *See In re Forfeiture of Pers. Weapons & Firearms Identification Card Belonging to F.M.*, 139 A.3d 67, 79, 84 (N.J. 2016) (petitioner was not subject to any other disqualifiers, but court held N.J.S.A. 2C:58-3(c)(5) applied, citing undisputed evidence regarding petitioner's behavior in prior domestic disputes); *In re Osworth*, 838 A.2d 465, 470 (N.J. Super. Ct. App. Div. 2003) (applicant acknowledged prior violations of firearm law, where charges were dropped); *State v. Cunningham*, 453 A.2d 239, 239, 244 (N.J. Super. Ct. App. Div. 1982) (applicant admitted to having shot his wife, where charges were dropped).

---

[77] *Burton* discussed a predecessor statute, N.J.S.A. 2A:151-33(d), *see* L. 1966, c. 60, § 26 p. 493, which is identical to the pre-Chapter 131 version of N.J.S.A. 2C:58-3(c)(5) in relevant respects.

Chapter 131 only makes that provision even *more specific* by expressly stating "not be in the interest of public health, safety, or welfare," means to "lack[] the essential character of temperament necessary to be entrusted with a firearm." *Id.* § 3(a)(5). Given that the previous standard was already not vague, *see Burton*, 248 A.2d at 523, the more specific standard could not be, either.[78]

The "danger to self or others" disqualifier described in Chapter 131's Section 3(a) operates in substantially the same way.[79] That more concrete requirement replaces the previous "good character and good repute" requirement, and ensures that only "law-abiding, responsible citizens" who are not dangerous may carry a firearm. *Bruen*, 142 S. Ct. at 2131 (quotation omitted). Indeed, the "danger to self or others" standard is commonly employed in other New Jersey statutes. *See, e.g.*, N.J.S.A. 55:13C-2.1 (admission of mentally ill into homeless shelter); N.J.S.A. 2C:4-8 (commitment of a person acquitted by reason of insanity). And other courts have upheld similar firearm permit requirements against vagueness challenges. *See, e.g.*, *Kuck v. Danaher*, 822 F. Supp. 2d 109, 133 (D. Conn. 2011) (upholding permit requirement limiting carry to "suitable person[s]"); *Jankovich v. Illinois State Police*,

---

[78] Other courts have rejected "as frivolous" the contention that "an ordinance authorizing revocation if the licensee is 'a menace to the health, safety, or general welfare of the community' confers unbridled discretion." *Jake's, Ltd. v. Coates*, 284 F.3d 884, 890 (8th Cir. 2002).

[79] Ch. 131, § 2(c), which governs permits to purchase, is similar: "likely to engage in conduct … that would pose a danger to self or others."

78 N.E.3d 548, 561, 565 (Ill. App. 2017) (upholding requirement that a person "does not pose a danger to himself, herself, or others" to obtain permit). Finally, that both challenged provisions are not impermissibly vague is further evidenced by the fact that when reviewing the prior standard, New Jersey courts have not hesitated to reverse denials of applications when a police chief fails to meet the statutory standard. *See, e.g.*, *State v. One Marlin Rifle, 30/30, 30 AS, Serial No. 12027068*, 725 A.2d 144, 150 (N.J. Super. Ct. App. Div. 1999).

## V.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CHALLENGE TO THE PERMITTING REQUIREMENTS.

*Siegel* Plaintiffs challenge three aspects of Chapter 131's permitting requirements: (1) increased fees; (2) updated public safety disqualifiers in Section 2; and (3) various updated procedural components in Section 3, including the reference and interview requirements. These challenges are unlikely to succeed.[80]

### A.   Permit Fee Increases

Plaintiffs' challenge to Chapter 131's adjustment of permitting fees fails both because permit fees fall outside of the scope of the Second Amendment and because precise historical analogues exist. In *Bruen*, the Court recognized that conditions

---

[80] Chapter 131 amended pre-existing permitting provisions, but left the operation of these provisions substantially unchanged. Plaintiffs, in seeking a "preliminary injunction that will alter the status quo[,] bear[] a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994), and must show an "indisputably clear" right to relief. *Hope*, 972 F.3d at 320 (citations omitted).

may be placed on the issuance of permits. 142 S. Ct. at 2138 n.9; *see also id.* at 2162 (Kavanagh, J., concurring). While *Bruen* did caution against "exorbitant" fees, *id.* at 2138 n.9, the fee increases here are modest at best.

Chapter 131 increases the fee for a permit to purchase a handgun from $2 to $25; the application fee for a firearms purchaser identification card from $5 to $50; and the fee for a permit to carry from $50 to $200. These amounts reflect adjustment for inflations and modern costs of background checks and policing technology compared to 50 years ago. *See* Section 1(i) (legislative findings). For instance, a $50 fee in 1970 is equivalent to roughly $390 today.[81]

As such, the fee increases do not burden the right to bear arms. But, even if the right were implicated, the historical record shows numerous states and localities imposed taxes and fees on privately held firearms.[82] Those amounts, when adjusted for inflation, amply support the fees levels in Chapter 131 today. For example, while the Bureau of Labor Statistics inflation calculator only goes back to 1913, it shows

---

[81]*See* U.S. Bureau of Labor Stat., CPI Inflation Calculator, https://tinyurl.com/2p98xp7d. Moreover, the fees imposed are modest compared to the other costs of firearm ownership, since handguns cost at least hundreds of dollars, excluding necessary accessories like holsters and ammunition. *See, e.g.*, https://monmoutharms.com/; https://shop.thearsenalgunshop.com/; https://aliengearholsters.com/blog/costs-of-gun-ownership/.

[82] Ex. 121 (Miss. 1844); Ex. 122 (N.C. 1856); Ex. 123 (Ga. 1866); Ex. 124 (Ala. 1867); Ex. 125 (Miss. 1867); Ex. 126 (Evanston, IL 1893); Ex. 127 (Lincoln, NE 1895); Ex. 128 (Va. 1903); Ex. 129 (Ga. 1910); *cf.* Ex. 130 (Ohio 1884 vendor fees).

that even if Mississippi's 1867 tax of $5 to $15 per pistol remained in 1913, that tax would be roughly $151 to $450 today. *See supra* at n.81.

      B. <u>Section 2's Public Safety Disqualifiers</u>

Plaintiffs' challenge to Section 2's public safety disqualifiers fails for multiple reasons. First, Plaintiffs lack standing. Not a single Plaintiff alleges that she has been or is likely to be disqualified on the basis of Section 2's permit criteria. Rather, Plaintiffs' objections to this particular provision are abstract, "generalized grievances" that are insufficient to invoke federal-court jurisdiction. *Gill v. Whitford*, 138 S. Ct. 1916, 1932 (2018) (quotation omitted); *see also Kendrick v. Bruck*, 586 F. Supp. 3d 300 (D.N.J. 2022) (plaintiffs who never applied for firearm purchase permits lacked standing to challenge permit requirements); *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) (same). Moreover, as discussed above, *supra* at IV.E, the challenged provisions in Section 2 are more narrowly defined than the prior permitting rules, and *more* favorable to the applicant. Plaintiffs thus cannot demonstrate injury-in-fact from the amendment.

Second, even if Plaintiffs could challenge the permitting requirements on the merits, their argument misunderstands *Bruen*. The Supreme Court emphasized that its ruling did not affect the constitutionality of licensing regimes "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible

citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635).[83] *Bruen* recognized that the right to bear arms may properly be limited to those who can safely "be entrusted with a weapon," *id.* at 2123 n.1 (quoting *Dwyer v. Farrell*, 475 A.2d 257, 260 (Conn. 1984)). That is precisely the function and animating intent behind the challenged provisions of Sections 2.[84]

In fact, *Bruen* cited with approval the very standard used here. The Court cited Conn. Gen. Stat. § 29–28(b), a law that gives reviewing officials the "discretion to deny a concealed-carry permit to anyone who is not a 'suitable person,'" and which "precludes permits only to those 'individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon.'" *Id.* at 2123 n.1 (quoting *Dwyer*, 475 A.2d at 260). Here, the challenged provisions operate similarly. Section 2 prohibits permits to those who "pose a danger to themselves or others" or lack "the essential character of temperament necessary to be entrusted with a firearm"—a standard endorsed by *Bruen* itself.

---

[83] *See also id.* at 2161-62 (Kavanaugh, J., concurring) ("Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense"); *id.* at 2157 (Alito, J., concurring) (emphasizing that *Bruen* "decides nothing about who may lawfully possess a firearm" and does not disturb "anything that [Supreme Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns").

[84] Indeed, the Court explicitly approved of procedural licensing requirements to ensure individuals can be entrusted with a firearm such as a "background check, a mental health records check, and training in firearms handling." *Id.* at 2162 (Kavanaugh, J., concurring).

Third, individuals who pose a danger to public safety have historically been deemed outside the protections of the Second Amendment. Indeed, "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). These legislatures did so for the same reasons animating the challenged provisions: a concern about "threatened violence and the risk of public injury." *Id.* at 456; *see also Binderup v. U.S. Att'y Gen.*, 836 F.3d 336, 368 (3d Cir. 2016) (Hardiman, J., concurring in part) ("[T]he best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public"). For example, several colonial-era statutes disarmed anyone who was found to be "disaffected to the Cause of America, or who refuse[d] to associate to defend by Arms the United American Colonies."[85] And as *Heller* noted, a proposal of the Pennsylvanian Minority of the Convention that was "highly influential" to the drafting of the Bill of Rights states, "The people have a right to bear arms … unless for crimes committed, or real danger of public injury from individuals." 554 U.S. at 604; *see* Ex. 134 at 665.

---

[85] *See* Ex. 131 (Mass. 1776); Ex. 132 (Pa. 1777); Ex. 133 (Va. 1777); *see also* S. Cornell & N. DeDino, *A Well-Regulated Right*, 73 Fordham L. Rev. 487, 507-08 (2004) (to obtain pardon for having participated in Shay's Rebellion in 1787, a person needed to take oath of allegiance and "deliver his arms to the state for a period of three years.").

Further, historical evidence shows those who were not "peaceable" or "virtuous"—even if not violent—were categorically outside the ambit of the Second Amendment right. As the Third Circuit put it, "most scholars of the Second Amendment agree that . . . the government could disarm 'unvirtuous citizens.'" *Binderup*, 836 F.3d at 348 (internal citation and quotation omitted); *see also United States v. Bena*, 664 F.3d 1180, 1183-84 (8th Cir. 2011) (noting "historical support for a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible"). Indeed, Samuel Adams's proposal for the Second Amendment—which *Heller* itself cited as relevant historical evidence, 554 U.S. at 604—"would have expressly limited the right to "peaceable citizens." *Binderup*, 836 F.3d at 367 (Hardiman, J., concurring in part); *see* Ex. 135. In short, the Second Amendment only applies to "law-abiding, responsible citizens," *Bruen*, 142 S. Ct. at 2131, a term excluding those "judged to be a threat to the public safety" or not "peaceable" or "virtuous."

   C. Section 3's Permit Procedures

Plaintiffs' claim that the Second Amendment bars law enforcement from performing a reference check, interview, and review of *public* social media information fails. *First*, no Plaintiff demonstrates Article III injury. None alleges that anything about these procedures has deterred him from applying or that he is unable to comply with the procedures. They therefore lack standing on their Second

Amendment claims. *See supra* at Part V.B. Nor do they have standing to pursue First Amendment claims. While Plaintiffs generally claim that these measures chill their speech, they "make no attempt to articulate, with any amount of specificity, their intended speech or conduct" that would be chilled. *Fieger v. Michigan Supreme Ct.*, 553 F.3d 955, 964 (6th Cir. 2009).

And any such allegation would be implausible. Every Plaintiff who wishes to obtain a carry permit has already obtained one,[86] and had already supplied the police with three references without complaining about chilling of speech (none alleges they could not proffer a fourth in the renewal process). And nothing prevented law enforcement from doing follow-up interviews or reviewing public postings before. In other words, the fact that Plaintiffs never challenged the preexisting rules not only shows lack of imminent injury, but also undermines their argument about subjective chill. For these reasons, Plaintiffs lack standing. *See Laird v. Tatum*, 408 U.S. 1, 13 n.7 (1972) (no standing if plaintiffs "themselves are not chilled, but seek only to represent those . . . whom they believe are so chilled").

*Second*, Section 3's character reference and investigation requirements do not violate the Second Amendment because they serve to ensure that only law-abiding citizens who are not a danger to themselves or others are authorized to possess firearms. *See* Part V.B, *supra.* These provisions are cabined to safety risk. Section

---

[86] Plaintiff Henry does not allege she seeks a carry permit. *Siegel* D.E. 8-8.

3(b) provides that character references attest to their knowledge of the applicant's drug and alcohol use and whether he is "likely to engage in conduct" that "would pose a danger to the applicant or others." Likewise, Section 3(c) provides that law enforcement review public information and interview the applicant and references to determine if the former has a "history" of "threats of violence," has "suicidal ideation, or has recently had "criminal charges" brought against him. These background-check inquiries are precisely the type of legitimate regulation that *Bruen* spoke of approvingly, and achieve the aims that animated colonial era laws.

*Third*, Plaintiffs misunderstand Section 3(c)'s requirements and applicable First Amendment law. Plaintiffs' assertion that a licensing officer can deny a permit based on whom the applicant "associate[s] with at home or online" and condition licenses to only those who engage in "government-approved speech and association" is flatly wrong. *Siegel* Compl. ¶ 321. Section 3(c) explicitly limits law enforcement's interviews of the applicant and their references to a very specific inquiry: "whether the applicant is likely to engage in *conduct* that would result in harm to the applicant or others." (emphasis added). The interviews seek only to confirm what *Bruen* has emphasized is proper: that the Second Amendment right is limited to law-abiding citizens. And the public social media review is limited to information "reasonably necessary to conduct the review of the application."

90

Similarly, Plaintiffs cannot succeed on their theory that police cannot review public postings that evince dangerousness. Their argument that the law prevents them from speaking anonymously/privately on the internet, *Siegel* Compl. ¶ 319, is a nonstarter, because the statute by its own terms only permits police to review *public* social media postings. Moreover, what Section 3 identifies is dangerous *conduct* - "harm to the applicant or others"- not speech: *See Aiello v. City of Wilmington*, 623 F.2d 845, 857 (3d Cir. 1980) ("[A]n impermissible chill is created when one is deterred from engaging in *protected* activity.") (emphasis added). And for similar reasons, because Section 3(c) furthers the state's key interest in public safety and burdens no more speech than needed, it easily passes constitutional muster under intermediate scrutiny, even if such a heightened standard applied.

## VI.   PLAINTIFFS CANNOT SUCCEED ON THE MERITS OF THE EQUAL PROTECTION CHALLENGE AGAINST SECTION 8.

The *Siegel* Plaintiffs' claim that Section 8's exemption for judges, prosecutors, and attorneys general violates the Equal Protection Clause lacks merit.[87] A law is reviewed under rational basis unless it "establishes a classification that implicates fundamental rights or draws upon suspect distinctions such as race,

---

[87] Nor can this claim be the basis for a PI, because Plaintiffs cannot show irreparable harm. Here, the Legislature broadened N.J.S.A. 2C:39-6(a)(4)—which previously exempted subsets of same categories from carry restrictions—to cover all prosecutors, all judges, and all attorneys general. To the State's knowledge, Plaintiffs never challenged the constitutionality of the prior version of the statute.

religion or alienage." *Tolchin*, 111 F.3d at 1113–14. Section 8 draws no classification based on any protected characteristic. And if the "Second Amendment challenge fails, the equal protection claim is subject to rational basis review," not strict scrutiny as Plaintiffs contend. *Hightower v. City of Boston*, 693 F.3d 61, 83 (1st Cir. 2012); *Nordyke v. King*, 681 F.3d 1041, 1045 n.2 (9th Cir. 2012) (en banc).[88] Plaintiffs cannot show they "received different treatment from that received by other individuals similarly situated," and their challenge fails. *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (citation omitted). This is so for numerous reasons.

*First,* by virtue of their extensive vetting, their training, and the codes of conduct they must follow, the exempted are simply not similarly situated to the non-exempt. Judges, prosecutors, and attorneys general are strenuously vetted in numerous ways—not only as attorneys, but also as government employees subject to selection criteria, background checks, and screening procedures. N.J. Const. art. VI, § 6 (nomination and confirmation procedures for state court judges); N.J.S.A. 2B:12-4 (same for municipal judges); N.J. Const. art. VII, § 2 (county prosecutors); N.J.S.A. 52:17B-2 (attorney general); N.J.S.A. 11A:1-1 *et seq.* (Civil Service Act provisions). They also take the specific oath of their respective positions. *See*

---

[88] Conversely, if the Court does find a Second Amendment violation, then the remedy—allowing Plaintiffs to carry—moots any equal protection challenge.

N.J.S.A. 2A:158-3 (oath of prosecutors); N.J.S.A. 41:2A-6 (oath of state judges); N.J. Ct. R. 7:14-5 (oath of municipal court judges). Judges must follow the Code of Judicial Conduct, and prosecutors and attorneys general likewise must follow numerous ethics and conduct policies. *Second*, because of the work they do, including high profile disputes, judges, prosecutors, and attorneys general are subject to heightened risk. Indeed, those risks spurred the enactment of Daniel's Law (P.L. 2021, c. 371), which protects the personal information of judges and law enforcement. *Third*, individuals exempted under Section 8(a)(12) have heightened training requirements: they must "take and successfully complete a firearms training course administered by the Police Training Commission" pursuant to N.J.S.A. 52:17B-66 and must "annually qualify in the use of a handgun or similar weapon prior to being permitted to carry a firearm." Ch. 131, § 8(a)(12).

Thus, judges, prosecutors, and attorneys general are not similarly situated to the general public, and there is no equal protection problem with Section 8(a)(12).[89]

---

[89] The fact that Plaintiffs ignored the eleven other classifications of exemptions in Section 8 demonstrates the illogic of their position: it makes no sense to argue that the Section 8(a)(12) classification would violate the Equal Protection Clause when the others evidently do not.

## VII.   PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING IRREPARABLE HARM.

Courts cannot grant injunctive relief "unless the moving party shows that it specifically and personally risks irreparable harm." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000). Plaintiffs fail their burden for several reasons.

*First*, for challenges to preexisting statutes and regulations, Plaintiffs cannot show irreparable harm because they could have challenged the casinos, parks, and game reserves rules for decades prior to Chapter 131's enactment, but chose not to. Although this Court did not address this argument at the TRO stage, Plaintiffs' inability to overcome this problem is a standalone basis for denying a PI as to those claims. That is because delay "knocks the bottom out of any claim of immediate and irreparable harm" and offers a "dispositive basis" for rejecting a PI request. *Pharmacia Corp. v. Alcon Labs.*, 201 F. Supp. 2d 335, 383 (D.N.J. 2002); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (affirming denial of preliminary injunctive relief where there was an "unnecessary, years-long delay"); *Lanin v. Borough of Tenafly*, 515 Fed. App'x. 114, 117-18 (3d Cir. 2013) ("Delay" in seeking preliminary injunction "tends to indicate" lack of "urgent need for speedy action to protect the plaintiffs' rights").

*Second*, for claims where Plaintiffs cannot show Article III injury, they also have no irreparable harm. *See McTernan v. City of York*, 577 F.3d 521, 528 (3d Cir.

2009). The same is also true when Plaintiffs cannot show redressability. A prime example is Plaintiffs' claim regarding Section 7(a)(18): because all casinos independently ban firearms, a PI cannot redress Plaintiffs' inability to carry there.

*Third*, even if Plaintiffs meet the minimum requirements of standing, they still need to show that alleged harm is irreparable. "Constitutional harm is not necessarily synonymous with [] irreparable harm." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989). Indeed, in the nearly half century since *Elrod v. Burns*, 427 U.S. 347 (1976), neither the Supreme Court nor the Third Circuit has extended even a *presumption* of irreparable harm in cases involving non-First Amendment challenges. *See, e.g.*, *Constr. Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 820 n.33 (3d Cir. 1978) (declining to extend *Elrod* to equal protection claims). There are several reasons why Plaintiffs run into problems on this front.

For example, *Siegel* Plaintiffs' challenges to the insurance requirement in Section 4 and the fees requirement in Sections 2 and 3 are redressable by damages and thus not irreparable. *See Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102–03 (3d Cir. 1988). And for several claims, Plaintiffs are not entitled to an *emergency* injunction because they cannot show the alleged injury—even if imminent enough for Article III purposes—will occur in the PI period. *See, e.g.*, *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367 (E.D.N.Y. 2020) ("[P]laintiffs' demonstration of irreparable harm must be considered in

95

conjunction with the time frame involved"). For example, the insurance provision does not take effect until July 2023, making a PI unwarranted. The same is true for Plaintiffs who have not demonstrated that they intend to visit the challenged sensitive location in the imminent future. *See, e.g., supra* at Part II.B.4 (youth sports); II.B.9 (transit hubs).

Finally, for claims where Plaintiffs cannot show likelihood of enforcement—and particularly not during the PI period—no injunction can issue. That applies especially to Plaintiffs' claims pertaining to how they would like to carry at multiuse properties and airports. *See SBA List*, 573 U.S. at 159.

## VIII.   AN INJUNCTION WILL RESULT IN EVEN GREATER HARM TO THE STATE AND THE PUBLIC.

Even if Plaintiffs meet their burden on the likelihood of success on the merits and irreparable harm, a PI is still not warranted because this Court must consider whether all four PI factors "balance in favor of granting the requested preliminary relief." *Amalgamated Transit*, 39 F.4th at 102-03. When "the Government is the opposing party," the final two factors—"harm to the opposing party" and "the public interest"—merge. *Nken*, 556 U.S. at 435. Both weigh strongly against a PI.

The State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also Robinson v. Ardoin*, 37 F.4th 208, 227 (5th Cir. 2022); *Cameron v. EMW*

*Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1011 (2022). That harm is especially pronounced where, as here, there is "an ongoing and concrete harm to [the State's] law enforcement and public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Here, Plaintiffs challenge permitting requirements that have existed for decades to ensure that firearms do not fall into the hands of individuals who pose a danger. An injunction would inflict unprecedented risks to public safety if the State is forced to allow an individual who poses a risk of "harm to the applicant or others" or whose background check indicates dangerousness and unfitness to possess or carry firearms. And the risks of allowing firearms in sensitive places like a crowded stadium, bus, bar, or protest; in an emergency room, youth soccer game, or children's library; or amidst families picnicking at Liberty State Park or at Point Pleasant Beach, are grave. As the declarations of several relevant agency employees confirm, many locations at issue in this case pose unique risks if many civilians can concealed-carry there. And the risk is not merely of unlawful, intentional acts. An accidental shooting, a misunderstanding, or arguments that would have otherwise ended in hurt feelings could now result in mass chaos and bystander injury,[90] not to

---

[90] Numerous studies show that the mere presence of weapons increases hostile appraisals—*i.e.*, when a person is in the presence of a firearm, they are more likely to perceive others as hostile, increasing the likelihood that they will react aggressively to ambiguous situations. *See* A.J. Benjamin Jr. *et al.* (2018), Ex. 140,

mention the risks that flow from possible loss or theft of a firearm in these sensitive places.[91] Further, law enforcement effectiveness in responding to violent crime is hampered the more persons who are concealed-carrying in an area.[92]

A shooting death or injury cannot be undone. Chapter 131 protects the public from "the single most irreparable harm of all"—"death itself." *Turner v. Epps*, 842 F. Supp. 2d 1023, 1028 (S.D. Miss. 2012); *see also L.A. Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*, 506 F. Supp. 3d 1018, 1036 (C.D. Cal. 2020) ("There can be no dispute that serious injury or death constitutes irreparable harm."). The public interest and equitable factors militate against an injunction.

## IX.   ANY INJUNCTION SHOULD BE NARROW IN SCOPE.

Finally, even if this Court disagrees with any portion of the State's position, any injunction should be limited to providing Plaintiffs with relief, but no more. *See*

---

at 359; *compare* D. Hemenway *et al.* (2022), Ex. 141, at 8 (reviewing over 400 news articles on defensive gun use and finding that in about 1 in 5 instances, "either both parties were engaging in illegal behavior . . . or it was difficult to distinguish the perpetrator from the victim"). By contrast, epidemiological studies have found "little evidence that self-defense gun use reduces the likelihood of victim injury during a crime." D. Hemenway & S.J. Solnick (2015), Ex. 144, at 27.

[91] Hundreds of thousands of guns are stolen each year, and persons who carry firearms for self-defense are over three times as likely to have a firearm stolen compared to others. *See* D. Hemenway *et al.* (2017), Ex. 142, at 4.

[92] *See, e.g.*, J. Donoghue *et al.* (2022), Ex. 143, at 29 (finding that, when states switched to shall-issue carry permit regimes, those jurisdictions experienced a 13 percent decline in violent crime clearance rates—as well as a 35 percent increase in gun theft); J. Donoghue *et al.* (2019), Ex. 145; Siegel *et al.* (2017), Ex. 146.

*City of Phila. v. Att'y Gen.*, 916 F.3d 276, 292 (3d Cir. 2019) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs.") (citation omitted). Moreover, facially enjoining a provision is not warranted where Plaintiffs have not shown the law is "unconstitutional in all of its applications" or lacks a "plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). Indeed, at the TRO stage, the Court was right to point out that if Plaintiffs can only show a likelihood of success on their claims as to certain outpatient clinics but not the remainder of Section 7(a)(21)—such as hospitals, nursing homes, or residential treatment facilities, the Court should not enjoin the totality of the statute. *See Siegel* TRO at 18, n.7. The same logic applies now, for example, to subsection 10 as to parks in urban and dense areas (for which the Court already found historical support), parks regulations as to non-firearm weapons (which Plaintiffs do not challenge), to subsection 15 as to bars (for which no Plaintiff avers standing), and subsection 17 as to types of entertainment facilities that Plaintiffs do not aver an intent to visit. After all, Plaintiffs appear to agree that an injunction can be narrowly drawn: they challenge subsection 9 as to zoos, but acknowledge that it is severable from the remainder of the provision covering nursery schools, pre-schools, and summer camps.

That approach is further underscored by the fact that every provision and application of Section 131 is severable. Section 11 contains an express severability

clause: "if any provision, or application of any provision … is held invalid by any court, the holding or judgment shall not affect the remaining provisions or applications of the provisions thereof." New Jersey law provides that "[c]ourts will enforce severability where the invalid portion is independent and the remaining portion forms a complete act within itself." *Inganamort v. Bor. of Fort Lee*, 371 A.2d. 34, 40 (N.J. 1977); *see also NFIB*, 567 U.S. at 586 (noting severability clause "confirm[s] that we need go no further" than to invalidate only the constitutionally problematic provision—there, the Medicaid expansion penalty).

## <u>CONCLUSION</u>

This Court should deny a preliminary injunction and rescind temporary restraints. In the alternative, the State requests a stay of any injunction so that it can appeal to the Third Circuit. *See* Fed. R. App. P. 8(a).


Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
By:   */s/Angela Cai*
Angela Cai
Deputy Solicitor General


Dated:  February 13, 2023

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 13, 2023, I electronically filed the foregoing Opposition To Plaintiffs' Motion for a Preliminary Injunction with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

By: <u>*/s/Angela Cai*</u>
   Angela Cai
   Deputy Solicitor General

Dated:  February 13, 2023

101