# Exhibit A

Alan Schoenfeld
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel. 212-230-8800
alan.schoenfeld@wilmerhale.com

*Counsel for Amici Curiae*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, and ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., | Hon. Renée Marie Bumb, U.S.D.J. Hon. Ann Marie Donio, U.S.M.J. |
| Plaintiffs, | Docket No. 22-CV-7463 |
| v. | **CIVIL ACTIONS (ELECTRONICALLY FILED)** |
| MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, | |
| Defendants. | |

| | |
|---|---|
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF | Hon. Renée Marie Bumb, U.S.D.J. Hon. Ann Marie Donio, U.S.M.J. Docket No. 22-CV-7464 |

NEW JERSEY FIREARM OWNERS;
and NEW JERSEY SECOND
AMENDMENT SOCIETY,

                              Plaintiffs,


                v.


MATTHEW J. PLATKIN, in his official
capacity as Attorney General of the State
of New Jersey; and PATRICK
CALLAHAN, in his official capacity as
Superintendent of the New Jersey State
Police,

                              Defendants.


**BRIEF FOR PROFESSORS OF PROPERTY LAW AS AMICI CURIAE IN
SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF AMICI CURIAE ...............................................................1

INTRODUCTION ........................................................................................2

ARGUMENT ................................................................................................4

I.    NEW JERSEY'S PRIVATE-PROPERTY PROVISION DOES NOT
      IMPLICATE SECOND AMENDMENT RIGHTS GIVEN
      LANDOWNERS' RIGHT TO EXCLUDE .......................................4

      A.    The Right To Exclude Is Foundational To American Property Law
            And Includes The Right To Set The Terms Of Entry .........................5

            1.    Governmental regulation routinely shapes whether and on what
                  terms owners exercise the right to exclude .................................6

            2.    New Jersey's private-property provision is a default rule that
                  reinforces owners' right to make informed choices about
                  whether to exclude carrying entrants ........................................13

      B.    A Constitutional Right To Carry A Weapon Onto Another's Property
            Would Vitiate The Right To Exclude And Should Therefore Be
            Rejected ..............................................................................................14

            1.    There is no constitutional right to carry firearms on private
                  property without a private landowner's consent.......................15

            2.    Neither is there a constitutional right to the presumption that a
                  private landowner welcomes firearms until they have publicly
                  announced their opposition ......................................................22

      C.    Because There Is No Second Amendment Right To Carry Onto
            Another's Private Property Nor To A Presumption That A Private
            Owner Welcomes Firearms, The Private-Property Provision Does Not
            Implicate The Second Amendment And Plaintiffs Fail To Meet *Bruen*
            Step One ..............................................................................................29

II.   NEW JERSEY'S PRIVATE-PROPERTY PROVISION IS CONSISTENT
      WITH HISTORY AND TRADITION ...........................................35

      A.    The State's Analogues Establish The Law's Consistency With History
            And Tradition ......................................................................................35

      B.    Additional Analogues Affirm The Private-Property Provision's
            Consistency With History And Tradition ...........................................37

i

CONCLUSION ...................................................................................................40

## TABLE OF AUTHORITIES

### CASES

Page(s)

*American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40 (1999) ................................................................................... 30

*Baker v. Howard County Hunt*, 171 Md. 159 (1936) .............................. 17

*Berman v. Parker*, 348 U.S. 26 (1954) ..................................................... 33

*Birt v. Ratka*, 886 N.Y.S.2d 293 (2009) .................................................. 18

*Blum v. Yaretsky*, 457 U.S. 991 (1982) .................................................... 30

*Breard v. Alexandria*, 341 U.S. 622 (1951) .......................... 12, 20, 23, 25

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ................... 1, 2, 5

*Central Hardware Co. v. NLRB*, 407 U.S. 539 (1972) ............................ 16

*College Savings Bank. v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999) .............................................. 5, 15

*Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir. 1971) ........................... 20

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................ 2

*Dressler v. Rice*, 739 F. App'x 814 (6th Cir. 2018) ................................. 28

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) ..................... 17

*Hodel v. Irving*, 481 U.S. 704 (1987) ...................................................... 11

*Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426 (1993) .............................. 7

*Hudgens v. NLRB*, 424 U.S. 507 (1976) ................................................. 19

*Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022) .............. 25

*Lawrence v. City of Philadelphia*, 527 F.3d 299 (3d Cir. 2008) ............. 36

*Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) ...................................... 6, 19

*Madden v. Queens County Jockey Club, Inc.*, 296 N.Y. 249 (1947)......................17

*Marsh v. Alabama*, 326 U.S. 501 (1946) .................................................................19

*Martin v. City of Struthers*, 319 U.S. 141 (1943)  ..................................................24

*Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018)..............................25

*New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111
  (2022)......................................................................................................*passim*

*Ploof v. Putnam*, 71 A. 188 (Vt. 1908) ...................................................................17

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) ........................6, 16, 20

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ......................................................26

*Rowan v. U.S. Post Office Department*, 397 U.S. 728 (1970)...........................20, 24

*Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000)................21

*Shelly v. Kraemer*, 334 U.S. 1 (1948) .....................................................................18

*Spanish Church of God of Holyoke, Mass., Inc. v. Scott*, 794 F. Supp.
  2d 304 (D. Mass. 2011) ....................................................................................20

*State ex rel. Qarmout v. Cavallo*, 774 A.2d 612 (Sup. Ct. N.J. 2001) ......................8

*United States v. Woods*, 571 U.S. 31 (2013)............................................................38

*Watchtower Bible & Tract Society v. Village of Stratton*,
  536 U.S. 150 (2002)..........................................................................................23

## DOCKETED CASES

*Koons v. Reynolds*, No. 22-7464 (RMB/EAP), 2023 WL 128882
  (D.N.J. Jan. 9, 2023) ..........................................................................................2

*Siegel v. Platkin*, No. 22-7464 (RMB/EAP), 2023 WL 1103676
  (D.N.J. Jan. 30, 2023) .........................................................................................2

## STATUTES, RULES, AND REGULATIONS

1715 Md. Laws 90 .....................................................................................................37

1741 N.J. Laws 101 ................................................................37

1771 N.J. Laws 346
  § 1 ....................................................................35, 36
  § 2 ..........................................................................36

1865 La. Extra Acts 14, No. 10 § 1 ................................35, 36

1893 Or. Laws 79 ...................................................................38

Ark. Code. Ann. § 5-39-203 .................................................10

Borough of Westville, NJ General Legislation
  § 187-1 ...................................................................11
  § 187-2 ...................................................................11

Del. Code. Ann. tit. 11 § 805 (2010) .................................11

Fl. St. § 934.50(3)(b) (2022) ..............................................10

Miss. Code. Ann. § 97-17-93 ..............................................10

N.J.S.A.
  § 2A:63-1 (2019) ....................................................8
  § 2C:2-2(c)(3) .........................................................28
  § 2C:18-3a .........................................................8, 9
  § 2C:18-3b .........................................................8, 9

Township of Monroe, NJ Municipal Code § 76-1.A(30)(4) ...............11

## OTHER AUTHORITIES

*2 Laws of New-York from The Year 1691, to 1773, inclusive*, (Hugh
  Gaine, ed. 1774) .....................................................37

*4 Digest of the Laws of Texas Containing the Laws in Force, and the
  Repealed Laws on Which Rights Rest, from 1754 to 1875*
  (George Paschal, ed.) .............................................37

Ayres, Ian & Spurthi Jonnalagadda, *Guests with Guns: Public Support
  for "No Carry" Defaults on Private Land*, 48 J.L. Med. &
  Ethics 183 (Winter 2020) .....................................13, 32

Blocher, Joseph & Darrell A.H. Miller, *What Is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295 (2016) ..............................................7, 13

Blocher, Joseph, *The Right Not to Keep or Bear Arms*, 64 Stan. L. Rev. 1 (2012) .................................................................................21

Ellickson, Robert, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623 (1986) ...........................10

Friend or Foe, Home Page, https://friendorfoe.us; ...................................................32

Mitchell, James T., et al., *Statutes at Large of Pennsylvania from 1682 to 1801 vol III* (Clarence M. Busch, Printer, 1896).......................................37

Merrill, Thomas W. & Henry E. Smith, *What Happened to Property in Law and Economics?*, 111 Yale L.J. 357 (2001) ......................................10

Merrill, Thomas W., *Property and the Right to Exclude*, 77 Neb. L. Rev. 730 (1998) ..................................................................................6

*NJGuns: Friendly Gun Stores*, Reddit, https://www.reddit.com/r/NJGuns/comments/utjdpu/friendly_g un_stores ...........................................................................................32

Paulsen, Jacob, *Businesses That Prohibit Guns or Have No Gun Policies*, Concealed Carry (May 20, 2016), https://www.concealedcarry.com/law/businesses-that-prohibit-guns-or-have-no-gun-policies.........................................................................32

Poppe, Emily S. Taylor, *Choice Building*, 63 Ariz. L. Rev. 103 (2021).................11

*Posted!—List Pro & Anti-Gun,* Apple Store App Designed By Workman Consulting LLC, https://apps.apple.com/us/app/posted-list-pro-anti-gun/id530004581 ....................................................................................32

Strahilevitz, Lior Jacob, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835 (2006) .......................................................7

Zambito, Thomas C., *NY's New Gun Laws Restrict Weapons in Businesses, But Some Owners Welcome Them. Here's Why*, Lohud (July 28, 2022), https://www.lohud.com/story/news/2022/07/28/as-nys-gun-laws-restrict-guns-in-businesses-some-owners-welcome-them/65382470007..........32

## INTEREST OF AMICI CURIAE[1]

Amici curiae are law professors specializing in property law.  Ian Ayres is Oscar M. Ruebhausen Professor at Yale Law School.  Fredrick Vars is Ira Drayton Pruitt, Sr. Professor of Law at University of Alabama School of Law.  Professors Ayres and Vars have researched and written extensively on the relationship between property law and firearm regulation, including in their book *Weapon of Choice: Fighting Gun Violence While Respecting Gun Rights* (Harv. U. Press, 2020).

Amici have an interest in the doctrinal and policy issues implicated by this case, particularly as they relate to the constitutionality of Section 7(a)(24), the private-property provision of Chapter 131 of the 2022 Laws of New Jersey, which was enacted in response to *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).  The historical record and longstanding principles of property law demonstrate that New Jersey's private-property provision accords with the Nation's historical tradition of firearm regulation and does not unconstitutionally impose on conduct protected by the Second Amendment.  On the contrary, New Jersey's provision is firmly rooted in "one of the most treasured" rights of property ownership: the right to exclude.  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063,

---

[1] The views of the amici expressed here do not necessarily reflect the views of the institutions with which they are or have been affiliated, whose names are included solely for purposes of identification.

1

2072 (2021).  In brief, your Second Amendment right to bear arms ends at my property line—and always has.

## INTRODUCTION

The Second Amendment does not guarantee an individual right to bear arms on another's private property over that owner's objection.  This is because the owner's right to exclude is "universally held to be a fundamental element of the property right," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021), and necessarily encompasses the right to set terms of entry with respect to firearms. This is true regardless of whether the property is open to the public.  Neither *District of Columbia v. Heller*, 554 U.S. 570 (2008), nor *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), can be read to announce a right so sweeping as to displace centuries-old property rights.

Just as there is no individual Second Amendment right to bear arms on another's private property contrary to the owner's will, neither is there a freestanding constitutional right to a presumption that a private owner welcomes firearms on their property until they say otherwise—what this Court has called a "rebuttable presumption to carry."  *Siegel v. Platkin*, No. 22-7464 (RMB/EAP) 2023 WL 1103676, at *16 (D.N.J. Jan. 30, 2023) [hereinafter *Siegel* Op.].  Not only is a constitutionally enshrined right to a "rebuttable presumption to carry" unmoored from the text of the Second Amendment, but it also represents an

2

analytically novel attempt to create a substantive right whose function depends entirely on the consent of *another private individual*. That is not how constitutional rights have ever worked. To the contrary, the legislative selection of a default rule as to whether guns are welcome on private property is part and parcel of States' enduring prerogative to reinforce private owners' right to exclude. Thus, New Jersey's private property provision does not implicate the Second Amendment's "plain text." *Bruen*, 142 S. Ct. at 2129-2130.

Even if this Court were to find that the Second Amendment is implicated, New Jersey's private-property provision is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, and should be upheld on those grounds. As an initial matter, amici are unaware of any common law or statutory law of trespass—whether at the time of the Founding or Reconstruction— that excepted carrying of firearms from the general requirement that lawful presence was conditioned on the informed consent of the property owner. Nor are amici aware of any constitutional challenge to general trespass laws on the ground that they failed to provide a presumptive allowance for carrying firearms. The historical analogues cited by the State reflect this baseline understanding of trespass law and collectively establish that state regulations conditioning carrying of firearms on the consent of property owners are in keeping with Second Amendment protections. As the Supreme Court affirmed in *Bruen*, determining

whether proffered historical analogues bear a "relevant similarity" to the law at issue requires assaying "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132-2133.  Attempting to ensure that property owners were informed about the presence of guns on their property, these laws—like New Jersey's provision today—empowered property owners to decide for themselves how best to protect themselves and their property.

In short, longstanding principles of property law and the historical record demonstrate that New Jersey's private-property provision is not an unconstitutional imposition on conduct protected by the Second Amendment and is consistent with the history of firearms regulation.

## ARGUMENT

### I.  NEW JERSEY'S PRIVATE-PROPERTY PROVISION DOES NOT IMPLICATE SECOND AMENDMENT RIGHTS GIVEN LANDOWNERS' RIGHT TO EXCLUDE

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court held that a two-part inquiry guides courts' consideration of Second Amendment claims.  First, the court must ask whether "the Second Amendment's plain text covers an individual's conduct."  142 S. Ct. 2111, 2129-2130 (2022).  Only if the plaintiff has carried their burden with respect to that inquiry does the burden shift to the government to show that the firearm regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130.  Plaintiffs here

have failed to carry their burden because the private-property provision does not implicate the individual right "to carry a handgun for self-defense outside the home." *Id*. at 2122.

Given the foundational status of the right to exclude, there is no constitutional right to enter onto another's property without the owner's permission, much less a Second Amendment right to carry weapons onto another's property without permission. This is true regardless of whether private property is open or closed to the public. And because there is no right to carry onto private property in the first instance, the provision's enabling of private owners to more easily avail themselves of their right to exclude gun possessors raises no constitutional problem. Neither is there a freestanding Second Amendment right to have a private owner's silence on the permissibility of guns construed in either direction. The selection of such a default rule is left to the States, consistent with their time-honored prerogative to reinforce property owners' right to exclude.

## A.    The Right To Exclude Is Foundational To American Property Law And Includes The Right To Set The Terms Of Entry

The right to exclude others from interfering with one's property is "one of the most treasured" rights of property ownership. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021); *see also College Sav. Bank. v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999) (characterizing the right as the "hallmark of a protected property interest"). It was likely the "first step

in the evolution of property rights in land" and should be viewed as the "sine qua non" of property.  Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 730, 745-747 (1998).  Moreover, the right to exclude has always inhered in all forms of real private property, regardless of whether private property has been opened to the public to serve a commercial function or remains closed.  Indeed, the United States Supreme Court has consistently reaffirmed that property does not "'lose its private character merely because the public is generally invited to use it for designated purposes.'"  *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81 (1980) (quoting *Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972)); *see also Lloyd Corp.*, 407 U.S. at 569 ("The essentially private character of a store … does not change by virtue of being large or clustered with other stores in a modern shopping center.").

### 1. Governmental regulation routinely shapes whether and on what terms owners exercise the right to exclude

The district court characterized New Jersey's private-property provision as the usurpation of private owners' individual rights to exclude firearms from their properties.  *See Koons v. Reynolds*, No. 22-7464 (RMB/EAP), 2023 WL 128882, at *19 (D.N.J. Jan. 9, 2023) [hereinafter *Koons* Op.].  But a private individual's right to exclude is not self-actualizing or exercised in isolation.  It is nested within a broad range of criminal, tort, and property laws that give shape to that right, imposing liability on those who violate an owner's terms of entry, setting default

rules around which an owner and potential entrants can negotiate claims of access, and regulating informational exchange between parties.  A brief survey of these regulatory traditions makes clear that the private-property provision exists comfortably within them.

First, States routinely shape how owners make exclusion decisions in the first instance.  Legislation promoting the disclosure of information by prospective entrants can lower costs associated with the discovery of that information, enabling property owners to execute terms of entry that more closely align with their preferences and thereby reinforcing the right to exclude.  *See* Strahilevitz, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835, 1837-1838 (2006).  Alongside regulations of informational exchange, tort rules imposing liability for wrongdoing or injury arising on an owner's premises can influence owners' decisions to exclude certain people or forms of behavior.  For instance, a private owner bears a duty to protect guests from foreseeable dangers present on the land or posed by other guests.  *See, e.g.*, *Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 433 (1993).  In the context of firearms possession, such liability may affect owners' decisions to admit guns onto their premises even though these rules do not explicitly regulate guns as such.  *See* Blocher & Miller, *What Is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295, 298 (2016).

Second, States have long exercised their police power to enforce private exclusion decisions through the law of trespass.  New Jersey's criminal trespass statute provides that "[a] person commits an offense if, knowing that he is not licensed or privileged to do so, he enters or surreptitiously remains in any research facility, structure, or separately secured or occupied portion thereof ….  The offense is a crime of the fourth degree if it is committed in a dwelling."  N.J.S.A. § 2C:18-3a.  If the trespassed area is not one of the enumerated (*e.g.*, "structures" or "dwellings"), then "[a] person commits a petty disorderly persons offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by" "[p]osting" or "[f]encing." *Id.* § 2C:18-3b.  Trespass statutes peg an entrant's lawful status to the informed consent of the private owner, enabling owners to enforce their chosen terms of entry with the backing of the State's criminal sanction.  *See, e.g.*, *State ex rel. Qarmout v. Cavallo*, 774 A.2d 612 (Sup. Ct. N.J. 2001) (finding the criminal trespass statute applicable where defendants were given permission to enter another's land to dump clean fill but instead dumped solid waste).  The law of civil trespass similarly reinforces an owner's right to exclude by empowering owners to demand compensation for unlawful entry.  *See, e.g.*, N.J. Rev. Stat. § 2A:63-1 (2019) ("Any person who, while carrying a gun, shall trespass on any lands" after having been "forbidden so to trespass by the owner" or "after such owner … has

8

given public notice … shall be deemed guilty of trespass at the suit of such owner[.]").

Third, and most relevant to the instant challenge, a private owner's right to exclude is shaped by general default rules, or presumptions about the owner's terms of entry, that govern until the owner announces otherwise.  With respect to the law of trespass, every State has—and must have—a default rule stipulating whether the absence of a physical fence or a public notice communicates consent to enter.  As this Court noted, New Jersey's ordinary criminal trespass statute places the burden "on the landowner to indicate to others not to trespass."  *Koons* Op. at *17.[2]  But trespass default rules vary dramatically across the fifty States, evincing their flexible and non-constitutional status. For instance, Mississippi's statute places the burden on the *entrant* by stating that trespassing occurs when a person "knowingly enters the lands of another without the permission of or without

---

[2] Respectfully, New Jersey's default-rule arrangement for purposes of ordinary trespass is more nuanced than the Court's reading suggests.  While N.J.S.A. § 2C:18-3b requires the existence of a public posting or fencing enclosure as an offense element, and therefore places the informational burden with the landowner, § 2C:18-3a does not include such a requirement, and therefore places the burden with the entrant.  Section 2C:18-3a does requires that the trespasser "know[] that he is not licensed or privileged" to enter, but such a mens rea requirement is compatible with either default rule (*i.e.*, a person can know that he has not been given affirmative permission to enter another's property regardless of whether the property is marked with "no trespass" signs).  In any case, such details pertaining to the State's general trespass statute do not answer the constitutional question of whether there is a right to carry onto another's property.

being accompanied by the landowner."  Miss. Code. Ann. § 97-17-93; *see* Ark. Code. Ann. § 5-39-203 (likewise placing burden on entrant).

States have also long adopted and reformulated default rules calibrated to particular activities.  For example, most States over the course of the nineteenth century reversed the default rule as to whether domesticated cattle were permitted to graze on the land of another property owner, thereafter placing the burden on visiting cattle ranchers to affirmatively obtain an owner's consent to graze.  *See* Ellickson, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623, 660-661 & n.95 (1986).  Before and after the shift in default, property owners were free to opt out of the default and permit, or prohibit, grazing.  But state legislatures decided for reasons of public policy that it was best to place the initial responsibility with the cattle owner rather than with the landowner.  *See* Merrill & Smith, *What Happened to Property in Law and Economics?*, 111 Yale L.J. 357, 389-390 (2001).  Similar inversions of default rules have occurred historically with respect to hunting on private land and, as is relevant to the *Bruen* Step Two analysis, the carrying of guns on private land.  *See* Part II *infra*.  And through to the present day, the reformulation of default rules remains an important strategy by which States support private landowners and the integrity of private property.  *See, e.g.*, Fla. Stat.§ 934.50(3)(b) (2022) (prohibiting the "use [of] a drone equipped with an imaging device to record an imagine of

10

privately owned real property … without [the owner's] written consent"); Del.
Code. Ann. tit. 11 § 805 (2010) (prohibiting "religious symbol burning" upon
private property "without the express written consent of the owner"); Township of
Monroe, NJ Municipal Code § 76-1.A(30)(4) (prohibiting the consumption of
alcohol in or upon "[a]ny private property, not his or her own, without the express
permission of the owner"); Borough of Westville, NJ General Legislation § 187-1,
-2 (2007) (proscribing the "defac[ing]" of private property, which includes
"graffiti," "without the express consent of the owner").[3]

The significant variation in private-property default rules, across American
history and at present between the fifty States, makes evident that default rules are
not—and have never been—fixed by federal constitutional law.  New Jersey is free
to adopt new default rules pertaining to ordinary trespass through statutory
amendment, just as it is free to adopt new default rules particularized to grazing,
hunting, solicitation, consuming alcohol, and carrying guns (and these default rules
need not point in the same direction).  The flexible and non-constitutional status of

---

[3] Default rules across other areas of property law are likewise routinely
adjusted by legislatures.  In the context of intestacy law, which governs how
property is distributed at death, States have long refashioned presumptions over
distribution that control until an owner opts out.  *See* Poppe, *Choice Building*, 63
Ariz. L. Rev. 103, 112-117 (2021) (discussing how intestacy laws impose default
rules); *see also Hodel v. Irving*, 481 U.S. 704, 717 (1987) ("reaffirm[ing] the …
broad authority [of States] to adjust the rules governing the descent and devise of
property"); *see also* Defs.' Br. 6-7 (discussing intestacy).

property defaults is understandable considering that the regulation of private property is largely left to the States and that default rules do not *ban* private behavior (constitutionally protected or otherwise)—they simply establish baseline terms from which private owners can easily depart.  It has always been States' legislative prerogative to set and adjust these rules in accordance with public policy, including tailoring rules to the expectations and preferences of private owners so as to reduce opt-out costs and produce more efficient arrangements. The Supreme Court recognized this very point in *Breard v. Alexandria*, 341 U.S. 622 (1951), a decision upholding a municipal default rule that presumptively disallowed door-to-door solicitation (a constitutionally protected activity) unless an owner expressly consented.  The Court understood that the City's selected rule, rather than the opposite rule, made it more likely that owners would have their preferred terms of entry enforced: "A householder depends for protection on his city board rather than churlishly guarding his entrances with orders forbidding the entrance of solicitors.  A sign would have to be a small billboard to make the differentiations between the welcome and unwelcome that can be written in an ordinance once cheaply for all homes."  *Id.* at 640.

### 2. New Jersey's private-property provision is a default rule that reinforces owners' right to make informed choices about whether to exclude carrying entrants

With respect to the question of whether visitors can bring guns without an owner's express permission, State institutions must adopt one of two default rules: An owner's silence will be construed as either permission or prohibition. That choice can be made through legislation, as in the case of New Jersey's provision, or it can be made by courts through a common-law judicial process involving individual adjudications of alleged trespasses. *See* Blocher & Miller, *supra,* at 315 n.128 (describing these two options).

New Jersey's shift from a "yes-carry" to a "no-carry" default was driven by concerns similar to those driving default shifts in the aforementioned grazing and solicitation contexts. Crucially, there had been widespread misunderstanding about the state of the law. Of polled New Jersey residents, 78.9% did not know whether a "plumber is allowed to bring gun without permission," 71.9% did not know whether a "friend is allowed to bring gun without permission," and 70.2% did not know whether "customers are allowed to bring gun into business." *See* Ayres & Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, tbl.A6 (Winter 2020). And the minority of respondents who did believe they knew the law were often *wrong*—for instance, respondents were nearly evenly split on the question of

whether customers are allowed to bring guns into private businesses. *Id*. The upshot of this confusion was that owners who preferred not to have guns on their premises were often unknowingly permitting guns. That is not just bad policy; it also imperils the right to exclude and its foundational status within our constitutional system.

Moreover, the likely increase in concealed-carrying rates after *Bruen* has only deepened the informational deficit facing private owners. Rather than force storekeepers or landowners to clarify the individual carrying status of every visitor (or if a public notice is posted to clarify that every visitor saw it), the New Jersey legislature made a reasonable determination that the informational burden should be placed with visitors—who, after all, have no legal entitlement to being on another's private property in the first instance.

### B.    A Constitutional Right To Carry A Weapon Onto Another's Property Would Vitiate The Right To Exclude And Should Therefore Be Rejected

Plaintiffs bear the burden of demonstrating that "the Second Amendment's plain text covers [their] conduct." *Bruen*, 142 S. Ct. 2111, 2129-2130 (2022). The private-property provision does not ban the carrying of firearms onto another's private property; it simply recasts the meaning of a private owner's silence on the issue. In turn, Plaintiffs must demonstrate that the "conduct" encumbered by the provision—the act of carrying a gun onto another's private property without first

obtaining that owner's permission—is "cover[ed]" by the Second Amendment

plain text.  For that to be so, Plaintiffs must *affirmatively establish* one of the

following two propositions as true: (1) that the Second Amendment text provides a

right to carry on certain classes of private property that trumps the objections of

private owners; or (2) that the Second Amendment text provides a standalone right

to a rebuttable presumption that a private owner welcomes firearms unless they

state otherwise.  For a host of analytical and doctrinal reasons, both

propositions fail.

### 1.  There is no constitutional right to carry firearms on private property without a private landowner's consent.

Recognizing a Second Amendment right to carry onto another's property

over their objection would be an unprecedented abrogation of the owner's right to

exclude—the "hallmark of a protected property interest."  *Florida Prepaid*, 527

U.S. at 673.  Such a right would bar States from enforcing through criminal-

trespass actions private owners' decisions to exclude firearms, whether those

actions are brought under general criminal-trespass statutes or firearm-specific

statutes like New Jersey's private-property provision.[4]  This Court has

appropriately noticed some of the problems with formulating the *Bruen* right to

---

[4] Such a constitutional right may also impede civil-trespass actions brought
by private owners against unwelcome firearm possessors; however, the story is
more complicated in this private-civil context considering that the Constitution
restrains state actors rather than private parties.

public carry in such a way. *See Koons* Op. at \*19; *Siegel* Op. at \*16. The Second Amendment—like virtually all other constitutional rights—does not override the right to exclude of private owners or hamstring legislative efforts to shore up that right. Attempts to shoehorn constitutional rights into the private-property context, including the proposal to recognize a constitutional right to a rebuttable presumption, *see* Section I.B.2 *infra*, should also be rejected.

At the outset, nothing in *Bruen* establishes that the "public right to carry" extends into another's private property. Justice Thomas's majority opinion uses the term "public" without further elaboration, even though the Court is careful to use qualified language like "quasi-public" or "property open to the public" when referring to private commercial sites in other contexts—suggesting that the legal meaning of "public" has long been distinct from private real property. *See, e.g.*, *Central Hardware Co. v. NLRB*, 407 U.S. 539, 547 (1972) ("The only fact relied upon for the argument that [private parking lots] have acquired the characteristics of a public municipal facility is that they are 'open to the public.'"); *PruneYard*, 447 U.S. at 81 (noting that private commercial property "does not 'lose its private character'"). More crucially, construing "public" to include private property, even if limited to private property open to the public, is at odds with basic tenets of constitutional law.

16

In codifying a pre-existing common-law right, the Second Amendment "did not expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights," including an "owner's exclusive right to be king of his own castle." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2111. Rather, the right to bear arms was clearly circumscribed by the common law of trespass, which reflected an unfettered right to exclude armed individuals and never granted special treatment for firearms. *See, e.g.*, *Baker v. Howard Cnty. Hunt*, 171 Md. 159, 188 (1936) (surveying the history of "the relative rights of fox hunters and the owners of the land over which they hunt" and finding "no doubt that … if the hunter himself goes on the lands of another against the owner's will, he is a trespasser"). This is not to say that the right to exclude, as instantiated through the law of trespass, was absolute. For example, the common law of trespass long accommodated defenses of necessity as well as "reasonable access" requirements meant to constrain innkeepers and common carriers from arbitrarily excluding patrons. *See, e.g.*, *Ploof v. Putnam*, 71 A. 188, 189 (Vt. 1908) (necessity defense); *Madden v. Queens Cnty. Jockey Club, Inc.*, 296 N.Y. 249, 253 (1947) (reasonable access). But unlike these longstanding black-letter limitations, a constitutional defense to the law of trespass based in the right to bear arms was never recognized—much less even considered—by courts.

17

The historical absence of any firearms-related exception to the right to exclude dovetails with the more general relationship, as elaborated by the federal courts in modern times, between the owner's right to exclude and the federal constitutional rights of non-owners.  Put simply, an entrant's federal constitutional rights *have virtually no bearing on another's use of their private property.*  Amici are aware of only two potential instances where a private owner's use of their property has been constrained by the federal constitutional rights of non-owners: the judicial enforcement of racially restrictive covenants and restrictions on street expression imposed by privately-run company towns.  But neither offers a rationale relevant to the Second Amendment.

In *Shelly v. Kraemer*, 334 U.S. 1 (1948), the Supreme Court found that the judicial enforcement of a racially restrictive covenant was prohibited by the Equal Protection Clause.  Its analysis turned on the fact that the "[t]he owners of the properties were willing sellers" and that "but for the active intervention of the state courts, … petitioners would have been free to occupy the properties in question without restraint." *Id*. at 19.  In other words, *Kraemer* pit both the sellers' common-law right to disposition of the property and the buyers' constitutional right to equal treatment against the rights of the other neighborhood residents to enforce the covenant they had collectively enacted.  A neighbor's right to enforce a covenant against the potential buyer of another property may seem analytically

similar to the right to exclude, but such an enforcement right has never been given nearly as much legal force. *See, e.g., Birt v. Ratka*, 886 N.Y.S.2d 293, 293 (2009) (extinguishing a restrictive covenant solely because it "is of no actual and substantial benefit to the persons seeking its enforcement"). Thus, *Kraemer* cannot stand for a general constitutional limit on the right to exclude because it did not even involve such a right; that property rights were involved on both sides of the ledger makes it additionally difficult to isolate the role of the equal-protection right in the Court's analysis.

The only other arguable occasion where constitutional rights have limited the right to exclude involves the privately run "company towns" once prevalent in the American South. In *Marsh v. Alabama*, 326 U.S. 501 (1946), the Supreme Court held that a private company maintaining complete ownership over an Alabama town was barred by the First Amendment from forbidding street distribution of religious materials. The Court stressed, however, that the company town had "all the characteristics of any other American town," *id*. at 502, and later definitively limited *Marsh*'s reach to the company towns of yesteryear. *See Lloyd Corp.*, 407 U.S. at 568 (recognizing that "this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned"); *Hudgens v. NLRB*, 424 U.S. 507, 516-517 (1976) (recognizing that *Marsh*'s rationale only applies to private property that "has taken

19

on all the attributes of a town"). Whatever doubt remained as to whether non-owners' First Amendment rights have any traction on another's private property was resolved in *PruneYard*, where the Court was clear that "when a shopping center owner opens his private property to the public for purpose of shopping, the First Amendment to the United States Constitution does not thereby create individual rights in expression." 447 U.S. at 81. Entrants thus do not have constitutionally protected rights of expression on private property, regardless of whether the property is open or closed to the public.

Other First Amendment rights likewise end at the private-property line, regardless of whether the property is open or closed to the public. *See, e.g.*, *Rowan v. U.S. Post Office Department*, 397 U.S. 728, 737-738 (1970) (holding that "[t]he asserted [First Amendment] right of a mailer [to send unwanted material to an unreceptive addressee] … stops at the outer boundary of every person's domain" as "[t]o hold less would tend to license a form of trespass"); *Breard*, 341 U.S. at 645 (upholding a municipality's default rule that door-to-door solicitation was presumptively disallowed absent an owner's express prior consent, because "[i]t would be … a misuse of the guarantees of free speech and free press to … force a community to admit the solicitors of publications to the home premises of its residents"); *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment [right to newsgathering] is not a license to trespass[.]"); *Spanish*

*Church of God of Holyoke, Mass., Inc. v. Scott*, 794 F. Supp. 2d 304, 313 (D.

Mass. 2011) (rejecting a defense to trespass based in the right to religious

exercise).  In short, a private owner's fundamental control over their dominion

means that they can decide to prohibit potential entrants carrying firearms, just as

they can decide to prohibit handbill distributors, association members,

newsgathering journalists, or religious observers.[5]

In turn, finding a right to carry onto another's private property would be

remarkable on two fronts: it would introduce a constitutional defense to trespass

that has never before existed, and would be the first time since *Logan Valley Plaza*

in 1968 (which the Court overturned soon thereafter) that a federal constitutional

right was found to override the exclusion right inhering in private property

including private commercial property.  Had the Court in *Bruen* wished to upset

the constitutional status of the right to exclude and private property at large, it

would have said so.  *Cf. Shalala v. Illinois Council on Long Term Care, Inc.*, 529

---

[5] Analogies to the First Amendment reveal an additional reason why the
Second Amendment does not restrict an owner's right to exclude gun possessors:
Just as First Amendment rights to free speech or religious exercise include the
bilateral rights not to speak or not to practice, so too should the Second
Amendment right to bear arms in self-defense encompass the freedom not to keep
or bear them.  *See* Blocher, *The Right Not to Keep or Bear Arms*, 64 Stan. L. Rev.
1, 26-50 (arguing that being forced to have a gun brought into one's home
constitutes compelled keeping).

U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

**2.   Neither is there a constitutional right to the presumption that a private landowner welcomes firearms until they have publicly announced their opposition**

In undertaking the *Bruen* Step One analysis, this Court suggested that there may be a constitutional right to a *presumption* to carry onto another's private property even if there is no right to carry onto another's private property *per se* (that is, a right to carry that trumps the owner's opposition).  *See Siegel* Op. at *17. Such a freestanding constitutional right to *only a presumption* may seem like a practical compromise between the interests of licensed carriers and those of private owners, one that avoids the doctrinal disorder wrought by a right that supersedes a private owner's objection.  But this proposition is likewise analytically and doctrinally unworkable.

Most importantly, the proposal to constitutionalize a presumption is entirely divorced from the text of the Second Amendment.  Constitutional rights do not arise from nowhere and should not be newly fashioned by lower courts; they instead must be anchored in constitutional text and tradition.  But nothing in the history of the Supreme Court's constitutional jurisprudence, much less in *Bruen*, suggests that an individual substantive right like the right to public carry depends on the permission of *another private individual* (*i.e.*, a private owner).  Either there

is a substantive right to carry onto private property, in which case States would be prohibited from enforcing an owner's opposition through criminal prosecution and there would be no need to constitutionalize a rebuttable presumption, or there is no such right to carry onto another's property over their objection.  But there is no in-between option in the novel form of a constitutionalized "rebuttable presumption."

In fact, the Supreme Court has made clear that property defaults fall under the States' police powers as opposed to being permanently fixed by the federal Constitution.  In *Breard*, also discussed above, the Court rejected a First Amendment challenge to an ordinance that presumptively disallowed the door-to-door soliciting of periodicals but allowed homeowners to opt out of that default by providing prior consent to solicitors.  The Court recognized that the selling of periodicals "does not put them beyond the protection of the First Amendment," but that the City was permitted to set a no-soliciting default because "[r]ights other than those of the advocates"—namely, homeowners' rights to exclude solicitors—"are involved."  341 U.S. at 642.  The no-soliciting default alleviated homeowners from "churlishly guarding [their] entrances with orders forbidding the entrance of solicitors," *id.* at 640, but still respected the constitutionally protected status of solicitation by providing owners with the possibility of opting out.  Indeed, the fact that a no-solicitation *default* preserves the private homeowner's ultimate authority to admit or exclude solicitors, thereby reinforcing rather than undercutting their

23

right to exclude, distinguishes it constitutionally from a no-solicitation *ban* or a

regulation that reappropriates discretionary authority over entry decisions to the

State.  *See, e.g.*, *Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S.

150 (2002) (striking down an ordinance requiring that solicitors obtain a City

official's permission to engage in door-to-door solicitations); *Martin v. City of

Struthers*, 319 U.S. 141, 143-144, 147 (1943) (striking down ordinance banning

handbill and circular distribution because "[it] submits the distribut[o]r to criminal

punishment for annoying the person on whom he calls, even though the recipient

of the literature distributed is in fact glad to receive it" and thus no longer "leav[es]

to each householder the full right to decide whether he will receive strangers as

visitors").[6]  New Jersey's no-carry default exhibits an identical constitutional

structure: it alleviates the need for a home or store owner to closely monitor the

influx of guns (*i.e.*, to ensure that carrying entrants have not ignored or overlooked

a notice posted at an entrance), while preserving the owner's ultimate authority to

admit or exclude guns.  Opting out of New Jersey's no-carry default through one of

---

[6] The Court adopted similar reasoning in *Rowan v. U.S. Post Office Department*, 397 U.S. 728 (1970).  Congress had passed a statute under which a homeowner could ask the Postmaster General to issue a prohibitory order to a mailer, requiring that the mailer stop all future mailings to the household.  In finding the statute consistent with the First Amendment, the Court emphasized how the scheme vested ultimate authority to make mail-related exclusion decisions with homeowners rather than with the federal government.  *See id.* at 738 ("In effect, Congress has erected a wall—or more accurately permits a citizen to erect a wall—that no advertiser may penetrate without his acquiescence.").

the many means available to owners (*e.g.*, online posts or physical signs) is also much less burdensome than opting out of the no-solicitation default in *Breard*, which required homeowners to "request[] or invite[]" solicitors prior to their arrival (*e.g.*, by contacting a regional representative beforehand or inviting them onto the property from the street).  *See* 341 U.S. at 624.

Still, in deciding whether to constitutionalize a "rebuttable presumption," this Court assumed that individuals have a right to such a presumption in certain First Amendment contexts: "[A] state cannot pass legislation that praying before a meal is unlawful unless a restauranteur expressly consents ….  Nor could the State ban an individual from wearing a political T-shirt in an office park unless the leasing agent expressly consents."  *Koons* Op. at *17 n.20   But amici are not aware of any historical attempt to enact one of these hypothetical statutes so there is no constitutional precedent from any court to anchor this analogy.  Furthermore, the Supreme Court cases referenced in the Court's footnote—*Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), and *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876 (2018)—address governmental *prohibitions* of protected conduct arising on *public property* (*e.g.*, a ban on prayer on a public football field and a ban on wearing political insignia inside a polling place), and thus do not shed

light on how a default-shifting statute recasting the meaning of a private owner's

silence *vis-à-vis* prayer or political attire would figure into the First Amendment.

In any case, there are significant doctrinal differences between the First and

Second Amendments that complicate attempts to draw this parallel.  The Religion

Clauses and Free Speech Clause are ordered around content and viewpoint

neutrality principles barring the government from favoring certain forms of

individual speech over others, which makes it unlikely that any statute involving

"prayer" or "political T-shirt[s]" would pass constitutional muster.  *See, e.g.*,

*Bremerton Sch. Dist.*, 142 S. Ct. at 2422 ("A government policy will not qualify as

neutral if it is specifically directed at … religious practice." (quotations omitted)).

In other words, a statute requiring a restaurant entrant to obtain the owner's

express consent before prayer would be unconstitutional not because the entrant

has a constitutional right to pray on another's private property or to a related

rebuttable presumption, but because the State is barred *as such* from singling out a

particular religious practice like "prayer."[7]  But there is no comparable Second

---

[7] This is also why a default rule proscribing the posting of a specific symbol like a swastika on another's property without their permission would raise a constitutional problem.  There is, of course, no constitutional right to post such a symbol on another's property over their dissent, nor a constitutional right to the presumption that the depiction is permitted until the owner expressly states otherwise.  But the State is still generally barred from singling out a particular message based on its content or viewpoint.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992).

Amendment neutrality principle—for example, it is not the case that all regulations involving "firearms" or "guns" axiomatically meet *Bruen* Step One and are thus presumptively unconstitutional (otherwise the *Bruen* Court could have said as much without undertaking a Step One interpretation of "keep and bear arms"). Nor is it the case that States are presumptively barred from pursuing non-neutral legislative purposes like reducing gun violence through, say, voluntary gun-buyback programs.

This Court also saw the need for constitutionalizing a rebuttable presumption given concerns that the private-property provision criminalizes innocent conduct. *See Koons* Op. at *18-19 ("[A] gun owner faces prosecution even when he does not know that the property owner does not consent to his possession of a firearm …."). But there is no unique scienter problem created by the flipping of the default rule. Under the new "no-carry" default, every gun carrier in New Jersey is on notice that guns are not allowed on another's private property absent a clear manifestation of consent by the landowner. Furthermore, under a "yes-carry" default rule gun carriers must still confirm that consent has not been revoked through a physical sign or some other communication—a requirement that in its own right raises concerns around innocent conduct (*e.g.*, a

delivery driver carrying a concealed gun may only first see a homeowner's "no guns" sign after crossing onto the property and arriving at the front door).

Indeed, courts and juries applying a "yes-carry" default rule must grapple with difficult interpretative questions of criminal intent and consent.  Perhaps a store owner posts a "no handguns" sign only online, or the owner fixes a "no handguns" sign on one but not both store entrances, or the visitor carries not a handgun but a long gun, or a store owner ambiguously tells a carrying visitor only that "I'm not comfortable with guns in my store."  *See, e.g.*, *Dressler v. Rice*, 739 F. App'x 814, 817 (6th Cir. 2018) (involving a criminal-trespass action where a store employee instructed an entrant, who had hearing problems, that firearms were not allowed in the store).  The interpretative complications are in fact likely *worse* under the old rule given the widespread misunderstanding of what the law was. *See* Section I.A *supra*.  In any case, courts can be expected to refine the law of trespass as complications arise under either rule, through the application of interpretative canons and gap-filling rules like New Jersey's presumption in favor of scienter when a criminal statute does not specify the required mental state.  *See* N.J.S.A. § 2C:2-2(c)(3) ("Construction of statutes not stating culpability requirement.").  The new law thus does not criminalize innocent conduct or pose complications to which courts are unaccustomed.

**C.    Because There Is No Second Amendment Right To Carry Onto Another's Private Property Nor To A Presumption That A Private Owner Welcomes Firearms, The Private-Property Provision Does Not Implicate The Second Amendment And Plaintiffs Fail To Meet *Bruen* Step One**

There is no freestanding Second Amendment right to have a private owner's silence regarding the issue of guns construed in a particular direction, just as there is no constitutional right to either default rule informing the meaning of the absence of a physical fence for purposes of trespass. Neither is there a constitutional right to carry weapons onto another's property over their objection. The fact that the new law enables private owners to more easily avail themselves of their right to exclude gun possessors is thus of no constitutional concern. The provision does not, therefore, implicate the text of the Second Amendment and this Court need not reach Step Two of the *Bruen* test.

Even accepting that there is neither a constitutional right to carry onto another's private property over their objection nor a right that constitutionally identifies an owner's silence with implied consent, Plaintiffs may argue that the provision encumbers the *Bruen* right to carry *beyond private property* (*i.e.*, on public property). But the right to public carry, of whatever ultimate scope, is perfectly compatible with the private-property provision. The provision does not restrict an individual's ability to obtain a gun and carry it on public property, and therefore has no resemblance to previously challenged firearm laws including that

at issue in *Bruen*.  In other words, an individual can exercise the maximum extent

of the *Bruen* right all the while complying with the provision's consent

requirement.

　　　　To the extent Plaintiffs are claiming that the provision implicates the text of

the Second Amendment because it may have the *effect* of reducing rates of public

carry (*i.e.*, gun owners seeking to enter a mix of public and private properties over

the course of a day may personally decide to leave their guns at home), any such

"effects" theory of the Second Amendment is untenable.  The defects of such a

theory are particularly acute in the context of this case.

　　　　First, any downstream effect from shifting the default rule remains the direct

and proximate result of the individual decisions of private owners, who continue to

retain the final word as to whether guns are permitted on their premises.  An

effects-based theory of injury would require parsing whether changes in carry or

ownership rates are causally attributable to private decisions or to the State's

enactment of a new default rule, which would raise a variety of conceptual

difficulties pertaining to the causation dimension of the state-action requirement.[8] It would also raise a host of challenging empirical questions—for example, even if it turns out that owners are excluding gun carriers more frequently than before (a very difficult proposition to test), it will still be nearly impossible to tell whether that effect is attributable to the default rule as such or to owners' improved understanding of the state of the law and the changing rates of concealed carry.

Second, aside from the Supreme Court's passing references to potential as-applied challenges to "shall-issue" licensing regimes that in practice operate as "may-issue" regimes, *see Bruen*, 142 S. Ct. at 2138 n.9; *id*. at 2162 (Kavanaugh, J., concurring), nothing in either *Heller* or *Bruen* indicates concern for a statute's downstream effects on ownership or carry rates. In fact, concern over a law's indirect impact on protected conduct is characteristic of the means-end analysis steadfastly rejected in *Bruen*. *See id.* at 2129.

---

[8] There is no state action, and thus no constitutional rights violation, where the "[a]ction taken by private entities [is] with the mere approval or acquiescence of the State." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999); *see also Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[C]onstitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains."). Perhaps the provision will enable owners to exercise their right to exclude gun possessors more readily, but that alone is not enough to warrant the invocation of constitutional standards considering how practically easy (and without any risk of legal liability) it is for owners to opt out through the posting of a sign announcing the permissibility of firearms. The fact that private owners, not the State, have the first and final word distinguishes this situation from unconstitutional legislative attempts to assign private entry determinations to State actors.

Third, an effects theory would sweep whole swaths of State regulation into the Second Amendment context.  Countless laws and regulations—including those that facially have nothing to do with firearms, like basic tort or criminal liability for injuries caused by accidental discharges—have significant if not comparatively greater disincentivizing effects than a "no-carry" default with respect to both gun possession at large as well as private owners' decisions to exclude gun possessors. *See supra* Section I.A.1.  Even a general criminal-trespass statute in combination with the old default rule (a "yes-carry" default) has a disincentivizing effect that may approximate the size of the effect under the new "no-carry" default, considering that countless storekeepers and landowners have and will prohibit guns by leveraging the risk of criminal-trespass liability under either default rule.

And fourth, even if effects were to somehow matter constitutionally, the relevant measurement is the reduction in carrying caused by landowners who prefer to permit visitors to carry guns but for some reason fail to contract around the no-carry default.  But the size of this effect is likely circumscribed given the broad support for a "no carry" default.  *See* Ayres & Jonnalagadda, *supra*, at 187-189, tbl.A4 (finding that only 21.1% of New Jersey respondents said that a plumber should be allowed to bring a gun onto one's premises without express permission, only 22.8% said that a visiting friend should be allowed to bring a gun

without express permission, and only 33.3% said that a customer should be allowed to bring a gun onto commercial property without express permission).[9]

In a separate vein, Plaintiffs may suggest that the *Heller* right to control the presence of guns on one's own private property is implicated because the provision will allegedly make it more difficult for property owners to invite guns onto their premises. But the provision imposes no legal liability on owners such that there is no standing for this theory of injury. In any event, the provision does not in any way restrict an owner's choice to possess guns himself or to allow guns for potential entrants; it simply alters the meaning of an owner's silence on the issue. Ultimately, the legislative selection of this default rule, just like the selection of a

---

[9] In addition, the effect is likely circumscribed because, even before the passage of the private-property provision, gun-friendly businesses had been holding themselves out as such to capture what market demand there is. *See, e.g.*, Zambito, *NY's New Gun Laws Restrict Weapons in Businesses, But Some Owners Welcome Them. Here's Why*, Lohud (July 28, 2022), https://www.lohud.com/story/news/2022/07/28/as-nys-gun-laws-restrict-guns-in-businesses-some-owners-welcome-them/65382470007 (describing the positive customer support received by businesses that have posted "[c]oncealed [c]arry is welcome here" signs)]. Online databases and apps are also emerging to help gun owners locate gun-friendly businesses. *See, e.g.*, Friend or Foe, Home Page, https://friendorfoe.us; *Posted!— List Pro & Anti-Gun,* Apple Store App Designed By Workman Consulting LLC, https://apps.apple.com/us/app/posted-list-pro-anti-gun/id530004581; *NJGuns: Friendly Gun Stores*, Reddit, https://www.reddit.com/r/NJGuns/comments/utjdpu/friendly_gun_stores; Paulsen, *Businesses That Prohibit Guns or Have No Gun Policies*, Concealed Carry (May 20, 2016), https://www.concealedcarry.com/law/businesses-that-prohibit-guns-or-have-no-gun-policies. There is presently no evidence for the view that the new law will inhibit gun carriers from engaging in commercial activity like buying gas or eating out.

presumption pertaining to trespass generally, is committed to a state's police power rather than controlled by federal constitutional rights. *See Berman v. Parker*, 348 U.S. 26, 32 (1954) (noting that "the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation").

*     *     *

At bottom, Plaintiffs are arguing that the constitutional rights of potential entrants override the private choices of landowners regarding access to their property. For good reason, that is not how constitutional law works. The private-property provision enjoys considerable public support precisely because the public sees it as the better default rule—*i.e.*, it makes it easier for private owners who do not want guns on their premises to maintain those terms of entry, though enables those who would like to permit guns to do so. The extent to which the private-property provision will influence the influx of guns onto private premises is difficult to predict—perhaps it will have the effect of increasing the proportion of owners who exercise their right to exclude gun possessors, though this may be offset by the decisions of other owners to welcome firearms through signs, notices, or other low-cost expressions of consent. But what is not hard to predict is that any such net effect will be the result of private owners' preferences as to how to protect their property, not those of the State.

## II. NEW JERSEY'S PRIVATE-PROPERTY PROVISION IS CONSISTENT WITH HISTORY AND TRADITION

For the reasons stated above, the Second Amendment is not implicated by the provision.  But even if it were, New Jersey's private-property provision should still be upheld as "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.

### A. The State's Analogues Establish The Law's Consistency With History And Tradition

The historical analogues on which the State relies amply support the proposition that New Jersey's private-property provision is consistent with the nation's history and tradition.  In *Bruen*, the Supreme Court affirmed that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar,'" and that two metrics that might be relevant to that inquiry are "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Bruen*, 142 S. Ct. at 2132-2133.  And it instructed that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin."  *Id*. at 2133.

In its brief opposing Plaintiffs' motion for a temporary restraining order, the State identified two historical analogues: a 1771 New Jersey law and an 1865 Louisiana law.  *See* 1771 N.J. Laws 346, § 1; 1865 La. Extra Acts 14, No. 10 § 1.

35

ECF No. 21 at 31.  The Court rejected those analogues, reasoning that the New

Jersey law was "to address the problem of poaching and trespass" and the

Louisiana law "appears historically inconsistent and unconstitutional, and in any

event, it is but one example."  *Koons* Op. at *17.  But this analysis overlooks

important historical context as well as the existence of many other analogues,

rendering neither law an historical outlier.

Respectfully, the Court misread the 1771 New Jersey law.  Titled "An Act

for the preservation of deer, and other game, *and to prevent trespassing with guns*"

(emphasis added), the law was not exclusively directed at unwanted hunting.  That

fact becomes apparent upon review of the statutory structure and text.  Section one

is titled "No person to carry a gun on lands not his own" and reads "That if any

person or persons shall presume, at any time after the publication hereof, to carry

any gun on any land not his own, and for which the owner pays taxes, or is in his

lawful possession, unless he hath license or permission in writing from the owner

or owners …shall … forfeit and pay to the owner of the soil … the sum of forty

shillings."  1771 N.J. Laws 346, § 1.  The statute makes no mention of hunting

until Section two, which is titled "No person to drive deer or other game" and

specifies "to hunt or watch for deer with a gun, or set in any dog or dogs to drive

deer, or any other game, on any lands not his own."  *Id.* § 2.  If the statute were

meant to prohibit only conduct relating to hunting or poaching, Section one would

36

be rendered superfluous.  *See also* Defs.' Br. 10-15 (analyzing the 1771 statute).

The 1865 Louisiana law was similarly directed at the unwanted influx of guns onto

private premises, as it barred "any person or persons to carry fire-arms on the

premises or plantations of any citizen, without the consent of the owner or

proprietor, other than in lawful discharge of a civil or military order."  1865 La.

Extra Acts 14, No. 10 § 1.  The text of both statutes therefore plainly prohibits the

possession of guns on another's property without first obtaining consent.  That

plain and unambiguous textual meaning should control.  *See Lawrence v. City of*

*Philadelphia*, 527 F.3d 299, 316-317 (3d Cir. 2008) ("The plain meaning of the

text should be conclusive, except in the rare instance when the court determines

that the plain meaning is ambiguous.").

> **B.    Additional Analogues Affirm The Private-Property Provision's**
> **Consistency With History And Tradition**

The Court's observation that it should not stake its interpretation "upon a

single law"—or perhaps even two—is well taken.  *See Koons* Op. at \*13, \*17.  But

there are many other historical instances of no-carry default rules that together

amount to a regulatory tradition.  For example:

> (1)    A 1715 Maryland law barred certain categories of persons—those
> "convicted of [certain crimes], or other crimes, or … of evil fame, or
> any vagrant, or dissolute liver"—from "shoot[ing], kill[ing], or
> hunt[ing], *or … carry[ing] a gun*, upon any person's land, whereon
> there shall be a seated plantation, without the owner's leave," 1715
> Md. Laws 90 (emphasis added);

(2)     A 1721 Pennsylvania law barred persons from "*carry[ing] any gun or*
        hunt[ing] on the improved or inclosed lands of any plantation other
        than his own, unless he have license or permission from the owner of
        such lands or plantation," Mitchell et al., *Statutes at Large of
        Pennsylvania from 1682 to 1801 vol III*, 254-55 (Clarence M. Busch,
        Printer, 1896)) (emphasis added);

(3)     A 1722 New Jersey law barred persons from "*carry[ing] any Gun, or*
        hunt[ing] on the improved or inclosed Lands in any Plantation, other
        than his own, unless he have License or Permission from the Owner
        of such Lands or Plantation," 1741 N.J. Laws 101 (emphasis added);

(4)     A 1763 New York law barred persons from "*carry[ing]*, shoot[ing] *or*
        discharge[ing] any Musket, Fowling-Piece, or other Fire-arm
        whatsoever, into, upon, or through any Orchard, Garden, Corn-Field,
        or other inclosed Land whatever, within the City of New-York, or the
        Liberties thereof, without License in Writing first had and obtained
        for that Purpose from such Owner, Proprietor, or Possessor," *2 Laws
        of New-York from The Year 1691, to 1773, inclusive*, 441-442 (Hugh
        Gaine, ed. 1774)) (emphasis added);

(5)     An 1866 Texas law barred persons from "carry[ing] firearms on the
        inclosed premises or plantation of any citizen, without the consent of
        the owner or proprietor, other than in the lawful discharge of civil or
        military duty," *4 Digest of the Laws of Texas Containing the Laws in
        Force, and the Repealed Laws on Which Rights Rest, from 1754 to
        1875*, 1321-22 (George Paschal, ed.); and

(6)     An 1893 Oregon law barred persons, "other than an officer on lawful
        business, [from] being armed with a gun, pistol, or other firearm, [and
        going] or trespass[ing] upon any enclosed premises or lands without
        the consent of the owner or possessor thereof," 1893 Or. Laws 79.

It is true that some of these statutes make reference to "hunting," "poaching," or

"killing," but these additional prohibitions are each set off with the disjunctive

"or."  The ordinary purpose of "or" is to denote alternatives.  *See United States v.
Woods*, 571 U.S. 31, 45-46 (2013).  And that is the most natural reading here.

Moreover, the purpose of these historical analogues and the New Jersey provision—or their *why*, to borrow the phrasing in *Bruen*—is the same: to support the ability of owners to protect themselves and their property.  By ensuring that owners are informed of the presence of guns and given a chance to consent, the analogues empowered owners to decide whether permitting guns would enhance or undermine their safety and security.  That interest in reinforcing owners' rights to make informed choices about whether to exclude guns is at the very core of the private-property provision.  *See* Section I.A.2 *supra*.

Finally, a history and tradition of restricting the carrying of guns onto private property is also reflected in the endless array of general trespass laws—at both the Founding and Reconstruction—that did *not* include an exception for firearms.  In conditioning lawful presence on the consent of the landowner, these laws necessarily constrained gun carrying but were never challenged or nullified on the ground that they failed to adequately accommodate the common-law right to keep and bear arms.  *See* Section I.B.1 *supra*.  In this light, the historical analogues should not be viewed as *sui generis* attempts to regulate guns on another's private property.  They simply gave additional expression to a longstanding baseline understanding of the law of trespass and the right to exclude.  By extension, the new law would not have raised constitutional concern or have been seen as

39

encroaching upon the common-law right to bear arms at either the Founding or Reconstruction.

## CONCLUSION

History, tradition, and enduring principles of property law establish that New Jersey's private-property provision is constitutional.  Not only does this context show that the Second Amendment cannot be fairly read to trammel on property owners' right to exclude, but it also establishes that the provision is concordant with a long and extensive history of firearm regulation.  The Court should deny Plaintiffs' motions for preliminary injunction.

Dated: February 14, 2023         /s/ Alan Schoenfeld
       New York, NY              Alan Schoenfeld
                                 WILMER CUTLER PICKERING
                                    HALE AND DORR LLP
                                 7 World Trade Center
                                 250 Greenwich Street
                                 New York, NY 10007
                                 Tel. 212-230-8800

                                 *Counsel for Amici Curiae*