# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, and ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., | Hon. Renée Marie Bumb, U.S.D.J. Hon. Ann Marie Donio, U.S.M.J. |
| *Plaintiffs,* | Docket No. 1:22-cv-07463 |
| v. | **CIVIL ACTIONS** **(ELECTRONICALLY FILED)** |
| MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey, and PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, | |
| *Defendants.* | |

| | |
|---|---|
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; GIL TAL; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, | Hon. Renée Marie Bumb, U.S.D.J. Hon. Ann Marie Donio, U.S.M.J. Docket No. 1:22-cv-07464 |
| *Plaintiffs,* | |
| v. | |

MATTHEW J. PLATKIN, in his official
capacity as Attorney General of the State of
New Jersey, and PATRICK J.
CALLAHAN, in his official capacity as
Superintendent of the New Jersey State
Police,

        *Defendants.*

**BRIEF OF BRADY AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

*Of Counsel:*

Suzan Charlton
James Fitch
Elizabeth Upton
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel.: (202) 662-6000
scharlton@cov.com
jhfitch@cov.com
eupton@cov.com

Douglas N. Letter
Shira Lauren Feldman
**BRADY**
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

David A. Luttinger, Jr. (DL3180)
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel.: (212) 841-1134
dluttinger@cov.com

*Counsel for Amicus Curiae*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... ii

I.      Interests of Amicus Curiae............................................................................ 1

II.     Introduction.................................................................................................... 1

III.    Liability Insurance Is a Proven, Effective, and Constitutional Method of
        Allocating Costs Associated with Risks. ...................................................... 4

        A.      American Liability Insurance Developed in Response to New Legal
                Systems for Imposing Liability............................................................ 6

        B.      American Governments Have Long Required Liability Insurance for
                Risky Activities.................................................................................... 8

        C.      American Courts Have Consistently Recognized Government-Mandated
                Liability Insurance Is Constitutional.................................................. 11

IV.     Mandatory Firearm Liability Insurance Is a Sensible Solution Consistent with
        *Bruen*'s Historical Balance Analysis. ......................................................... 13

        A.      The Insurance Requirement's "Why" Vastly Surpasses Its "How." ................... 15

        B.      The Insurance Requirement's Relative "How" and "Why" Are Consistent
                with the Balance Struck by Historical Regulation. .............................. 18

                1.      The Insurance Requirement Is Consistent with the History of
                        American Governments Allocating the Costs of Firearm Accidents........ 18

                2.      The Insurance Requirement Is Consistent with the History of
                        Financial Requirements Related to Firearms. .......................... 20

V.      Conclusion .................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bauer v. Becerra,*
 858 F.3d 1216 (9th Cir. 2017) ...............................................................21

*Cole v. Fisher,*
 11 Mass. 137 (1814) .............................................................................19

*District of Columbia v. Heller,*
 554 U.S. 570 (2008).........................................................................1, 15

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
 45 F.4th 306 (D.C. Cir. 2022) ................................................................1

*Kwong v. Bloomberg,*
 723 F.3d 160 (2d Cir. 2013)..................................................................21

*McCulloch v. Maryland,*
 17 U.S. 316 (1819)..................................................................................3

*McCoy v. Commonwealth,*
 391 A.2d 723, 724 (Pa. Commw. Ct. 1978) ........................................12

*Meier v. Anderson*
 692 F. Supp. 546, 552–53 (E.D. Pa. 1988), *aff'd,*
 869 F.2d 590 (3d Cir. 1989)..................................................................12

*Moody v. Ward,*
 13 Mass. 299 (1816) .............................................................................19

*Morgan v. Cox,*
 22 Mo. 373 (1856) ................................................................................19

*N.J. Prop. Liab. Guar. Ass'n v. Brown,*
 417 A.2d 117 (N.J. Super. App. Div. 1980) ........................................18

*N.Y. Cent. R.R. Co. v. White,*
 243 U.S. 188 (1917)..............................................................................12

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
 567 U.S. 519 (2012) (Ginsburg, J., concurring) ............................13, 14

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
 142 S. Ct. 2111 (2022)................................................................ *passim*

*Phoenix Ins. Co. v. Erie & W. Transp. Co.*,
117 U.S. 312 (1886)..............................................................................................8

**Statutes**

An Act Authorizing the Corporate Authorities of the Town of Dangerfield,
Fairfield and Springfield ....................................................................................21

1870 La. Acts 127, Persons, Trades, Professions and Occupations Subject to
Taxation, § 3, pt. 6 (1870)..................................................................................21

1844 Miss. Laws, Rates of Taxation § 1, Revenue, An Act to Amend and Reduce
into one the several Acts in Relation to the Revenue of this State, and for other
purposes (1844)...................................................................................................20

1856–1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34,
§ 23, pt. 4. (1856–1857).....................................................................................20

1851 R.I. Pub. Laws 9 § 2 (1851) .............................................................................20

**Other Authorities**

Allstate, *7 Easy Ways to Help Lower Your Car Insurance Premium*,
https://www.allstate.com/resources/car-insurance/how-to-lower-car-insurance-
premiums; ...........................................................................................................11

Allstate, *Safe Driving Bonus*, https://www.allstate.com/auto-insurance/safe-
driver-savings.....................................................................................................11

*Average Cost of Renters Insurance in New Jersey by Coverage Level* (Feb. 6,
2022), https://bit.ly/3W7fEKK; .........................................................................13

Cornelius J. Peck, *Negligence and Liability Without Fault in Tort Law*, 46 Wash.
L. Rev. 225, 226 (1971) .......................................................................................7

Ctrs. Disease Control & Prevention, https://wonder.cdc.gov/ucd-icd10.html (last
accessed Feb. 16, 2023) ........................................................................................1

David B. Kopel, *The First Century of Right to Arms Litigation*.....................................6

*Firearms Research: Accidents*, HARV. SCH. PUB. HEALTH,
https://www.hsph.harvard.edu/hicrc/firearms-research/gun-threats-and-self-
defense-gun-use/ (last visited Feb. 16, 2023) ......................................................2

Fred E. Inbau, *Firearms and Legal Doctrine*, 7 Tul. L. Rev. 529, 549–50 (1932–
33) ........................................................................................................................19

Hannah Farber, *Underwriters of the United States: How Insurance Shaped the
American Founding* (2021)....................................................................................6

iii

*History*, The Philadelphia Contributorship, https://1752.com/about-us/history/ ............................6

*Insurance*, Britannica, https://www.britannica.com/topic/insurance/Historical-development-of-insurance ...................................................................................................6

Insurance Information Institute, *2021 Insurance Fact Book* 90 ..............................................17, 18

James Fleming, Jr., *Accident Liability: Some Wartime Developments*, 55 Yale L.J. 365, 365 (1946) .............................................................................................................7, 10

Jennifer B. Wriggins, *Mandates, Markets, and Risk*, 19 Conn. Ins. L.J. 275, 289 (2013) ..........................................................................................................................5, 9, 11

John Fabian Witt, *Toward a New History of American Accident Law*, 114 Harv. L. Rev. 690, 694 (2001) ..............................................................................................7

Kenneth S. Abraham, *Liability Insurance and Accident Prevention: The Evolution of an Idea*, 64 Md. L. Rev. 573, 576 (2005) ..............................................................7, 8, 10

Matthew Miller et al., *Firearm availability and unintentional firearm deaths* .............................2

*N.J. Gun Permit Applications Are Spiking. How Fear Brought Unprecedented Demand* (Jan. 14, 2021), https://www.nj.com/news/2021/01/nj-gun-permit-applications-are-spiking-how-fear-brought-unprecedented-demand.html .............................1

Occupational Safety and Health Administration, *Business Case for Safety and Health*, https://www.osha.gov/businesscase/benefits ............................................................10

Peter Kochenburger, *Liability Insurance and Gun Violence*, 46 Conn. L. Rev. 1265 (2014) ...................................................................................................5, 9, 10, 11, 17

Rutgers New Jersey Gun Violence Research Center, *2022 Report on Firearms in New Jersey* (2022) ..........................................................................................................17

Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context,* 125 Yale L.J. F. 121, 131 (2015 ........................................6

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?* .................................................20

State Farm, *Be Rewarded With Drive Safe & Save Discounts*, https://www.statefarm.com/insurance/auto/discounts/drive-safe-save; ...................................11

Stephen G. Gilles & Nelson Lund, *Mandatory Liability Insurance for Firearm Owners: Design Choices and Second Amendment Limits* ........................................................14

*Number of Renters Is on the Rise—But Few of Them Have Insurance*, INS. INFO. INS. (Sept. 22, 2014), https://bit.ly/3NXlxW7 ............................................................18

Tom Baker & Charles Silver, *How Liability Insurers Protect Patients and Improve Safety*, 68 DePaul L. Rev. 211, 226 (2019) ...........................................................10

Tom Baker & Thomas O. Farrish, *Liability Insurance and the Regulation of Firearms* ..............................................................................................................................4, 10

Wex S. Malone, *Ruminations on the Role of Fault in the History of the Common Law of Torts*, 31 La. L. Rev. 1, 13 (1970) ...............................................................19

## I.    Interests of Amicus Curiae

Brady is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live.  Brady also has a substantial interest in protecting the authority of democratically elected officials to address the nation's gun violence epidemic.  Brady has filed amicus briefs in many cases involving the regulation of firearms, including *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306 (D.C. Cir. 2022).[1]

## II.    Introduction

The Supreme Court has decided that law-abiding, responsible citizens have a right to guns for self-defense, but it is beyond dispute that the right is not unlimited and, moreover, carries inherent, deadly risk.  Every year, many Americans are killed or injured in gun accidents.  In 2020, more than 500 people died in the United States from unintentional firearm injuries.  *Underlying Cause of Death Database*, Ctrs. Disease Control & Prevention, https://wonder.cdc.gov/ucd-icd10.html (last accessed Feb. 16, 2023).  With gun deaths on the rise[2] and the number of gun owners in New Jersey tripling from 2019 to 2020,[3] the risk of New

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than Brady or its counsel made any monetary contributions intended to fund the preparation or submission of this brief.

[2] In New Jersey, gun deaths increased 20 percent from 2019 to 2020.  *Underlying Cause of Death Database*, Ctrs. Disease Control & Prevention, https://wonder.cdc.gov/ucd-icd10.html (last accessed Feb. 16, 2023).

[3] Alex Napoliello, *N.J. Gun Permit Applications Are Spiking.  How Fear Brought Unprecedented Demand*, NJ.com (Jan. 14, 2021), https://www.nj.com/news/2021/01/nj-gun-permit-applications-are-spiking-how-fear-brought-unprecedented-demand.html.

Jersey residents' being impacted by a firearm accident can only grow.[4]  Beyond the human toll, these accidents result in substantial costs—for example, from personal injuries, property damage, or emergency services, as well as follow-on costs from lost wages, hospital expenses, or lawsuits.  Tragically, these costs are often distributed as randomly and unfairly as the gun accidents that cause them.  To better allocate these costs, New Jersey has adopted a public-private solution: mandatory liability insurance.  N.J.P.L. 2022, c. 131 § 4 (the "Insurance Requirement").

By requiring that anyone who carries a gun in public in New Jersey have a liability-insurance policy covering losses or damages resulting from any accidental use of the firearm, the State adopts a relatively novel use of a tried-and-true method in America of managing recurring, common, and misallocated costs.  In fact, harnessing the private market in this way is a deeply American solution to difficult problems.  For nearly a century, governments have used liability insurance to allocate the costs of the risks that are inherent in a range of activities.  And even before the advent of liability insurance, governments imposed other rules and policies to address such societal costs.

Courts have also long recognized liability-insurance mandates as constitutional.  Although such mandates are a relatively recent development in the specific context of firearm

---

[4] According to research posted by the Harvard School of Public Health, a higher number of guns in a state correlates with a higher number of unintentional firearm deaths.  Harvard Injury Control Research Center, *Firearms Research: Accidents*, HARV. SCH. PUB. HEALTH, https://www.hsph.harvard.edu/hicrc/firearms-research/gun-threats-and-self-defense-gun-use/ (last visited Feb. 16, 2023) ("For every age group, where there are more guns, there are more accidental deaths.  The mortality rate was 7 times higher in the four states with the most guns compared to the four states with the fewest guns.") (citing Matthew Miller et al., *Firearm availability and unintentional firearm deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (2001)).

regulation, implementing a proven, established mechanism for addressing risk in a new context does not make that regime any less constitutional.

Although the Constitution enshrines certain gun rights, the Supreme Court has recognized that the Second Amendment must apply in contexts not present or contemplated at America's founding. Specifically, the Supreme Court stated in *Bruen* that the Second Amendment was "intended to endure for ages to come," and thus "can, and must, apply to circumstances beyond those the Founders specifically anticipated." 142 S. Ct. at 2132 (quoting *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819)).

Insurance as we know it was in its infancy when the Second Amendment was ratified, and thus the founders could not have "specifically anticipated" insurance requirements related to the carrying of firearms. But liability insurance grew up in tandem with the development of American tort law, and today it forms an integral part of our systems for spreading—and even reducing—the costs associated with many kinds of risks. Thus, regardless of whether early Americans could have foreseen such a public-private mechanism to address financial risks, the Insurance Requirement certainly achieves cost-allocating ends that they would have supported. As *Bruen* directed, cases such as this that involve significant changes to the circumstances existing at the founding require a "more nuanced approach." 142 S. Ct. at 2132. Consistent with the approach set out in *Bruen*, the Insurance Requirement accomplishes this cost allocation in a way that is consistent with the "how" and "why" of historical firearm regulations. Indeed, the Insurance Requirement achieves the same "why" of historical regulations that also allocated the costs of firearm accidents, but through a nuanced "how" that takes modern societal concerns and solutions into account. New Jersey's Insurance Requirement will protect gun owners and gun-

3

accident victims in the event of an accident.  And it should also lead to broader adoption of safe

gun practices, as has occurred as a result of other insurance regimes.

III.    **Liability Insurance Is a Proven, Effective, and Constitutional Method of Allocating Costs Associated with Risks.**

For as long as there have been humans, there have been accidents.  And, because of this,

modern life entails physical risks given our relatively crowded living conditions, rapid pace, and

extensive use of large and complex machinery and equipment.  Many daily activities we take for

granted are some of the most risky, such as driving a car.  This everyday activity opens drivers

up to the risk of getting into an accident that does damage to their car or someone else's, causes

injuries or deaths, results in lost work, or even leads to a lawsuit.  As this example demonstrates,

risks of bodily or property harm create financial costs.  Such financial costs include property

repairs or replacement, doctors' or hospital bills, lost wages, and legal fees.

In many instances, the costs of accidents are distributed randomly and unfairly.  If one

person involved in an accident cannot or will not pay, another person might end up bearing a

disproportionate portion of the costs.  *See, e.g.*, Tom Baker & Thomas O. Farrish, *Liability

Insurance and the Regulation of Firearms*, in Suing the Gun Industry, at 3 (Timothy D. Lytton

ed., 2005) (describing the "financial ruin" that can befall those left paying for risks in the

absence of insurance).  If none of those involved can pay, then others may have to cover the

costs—for example, public or private services, or ultimately, taxpayers.

Liability insurance solves many of these cost-allocation problems.  Through liability

insurance, insurers agree to cover, among other things, the risk of a third party's making a claim

against the policyholder for accidental injuries the policyholder caused.  The cost of those claims

is transferred to insurance companies, which in turn spread that cost to their customers through

risk-based premiums.  *See, e.g.*, *id.* ("loss spreading is the main attraction of liability insurance");

4

Peter Kochenburger, *Liability Insurance and Gun Violence*, 46 Conn. L. Rev. 1265, 1270–71 (2014) (describing how insurers adjust premiums based on risk). Thus, the costs associated with risks can be distributed among those who engage in and purchase insurance for the risk-carrying activity, rather than being borne out-of-pocket by an unlucky few (*e.g.*, accident victims), or covered directly or indirectly by others who may have no relationship at all to the activity (*e.g.*, taxpayers). These principles about risk and risk management through modern insurance practices certainly apply to the activity of carrying guns in public, given the substantial possibility of a truly catastrophic injury or death when accidents with firearms do occur.

Governments have regularly used public-private liability-insurance systems, rather than direct regulation, to address the reality that risk is attendant to many daily activities, such as driving a car or going to work, and to influence consumer behavior and encourage safer practices. For example, the costs of car accident risks have been addressed through automobile insurance. *See, e.g.*, Jennifer B. Wriggins, *Mandates, Markets, and Risk*, 19 Conn. Ins. L.J. 275, 289 (2013) (describing how auto insurance mandates achieved cost-spreading goals). Other familiar examples of insurance-based solutions to risks include worker's compensation, which spreads the costs of workplace injuries, and medical malpractice insurance, which does the same for the costs of medical liabilities.

These insurance systems are vital to Americans' ability to carry on daily life without fear of crushing, unexpected costs. But the environment that enabled these insurance-based solutions to thrive did not spring up overnight. Rather, American liability insurance—and ultimately, government-mandated liability insurance—developed in step with other legal and societal changes over our nation's history. This section provides a brief overview of this development.

### A. American Liability Insurance Developed in Response to New Legal Systems for Imposing Liability.

In a broad sense, people have used "insurance" to spread the costs associated with risks since ancient times.  *See Historical Development of Insurance*, Britannica, https://www.britannica.com/topic/insurance/Historical-development-of-insurance.  Certain forms of insurance—for example, insuring against fires or marine risks—were prevalent in England in the 17th and 18th centuries, and likewise took root in early America.  *See id*; *see also* Hannah Farber, *Underwriters of the United States: How Insurance Shaped the American Founding* (2021).  Indeed, Benjamin Franklin was one of the first proponents of insurance in the American colonies, and founded an early fire-insurance company in 1752.  *See History*, The Philadelphia Contributorship, https://1752.com/about-us/history/.

In the context of firearm regulations, in the roughly 20 years leading up to and shortly after the ratification of the Fourteenth Amendment, nine jurisdictions enacted "surety statutes" requiring individuals to have a bond posted before they could carry a firearm.  *See* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context,* 125 Yale L.J. F. 121, 131 (2015); David B. Kopel, *The First Century of Right to Arms Litigation,* 14 Geo. J.L. Pub. Pol. 127, 131 fn. 14 (2016).  The *Bruen* Court rejected any notion that such requirements were "a severe constraint" on Second Amendment conduct, observing that "the surety laws did not *prohibit* public carry in locations frequented by the general community," and that "the burden these surety statutes may have had on the right to public carry was likely too insignificant to shed light on" the regulation at issue.  142 S. Ct. at 2148–149.  At the same time, the Court recognized that the minimal economic burden that these statutes imposed promoted public interests, including the "prevention" of gun-related harms, and "provid[ing] financial incentives for responsible arms carrying."  *Id.* at 2150.

Over time, a system for *insuring against* liability sprang up in response to new and changing laws for *imposing* liability.  In early English and American common law, individuals who caused accidents were often held strictly liable.  This strict approach to holding those deemed responsible for accidents liable continued for all kinds of torts until the middle of the 19th century.  *See, e.g.*, Cornelius J. Peck, *Negligence and Liability Without Fault in Tort Law*, 46 Wash. L. Rev. 225, 226 (1971) ("Scholars today agree that a rule of strict liability prevailed at the early stages of development of the common law, usually rendering an actor liable if he in fact caused injury to another."); James Fleming, Jr., *Accident Liability: Some Wartime Developments*, 55 Yale L.J. 365, 365 (1946) ("Before the industrial revolution, liability was imposed in this field [of accidents], without much regard to fault, upon the person whose act directly produced the harm.").

For a number of reasons—among them, the sheer increase in accidents giving rise to liabilities, due to industrialization, modern warfare, and other societal changes—American courts in the mid-1800s developed a negligence standard, under which liability would be imposed only if  "the actor were guilty of some fault or neglect."  Peck, at 227; *see also* John Fabian Witt, *Toward a New History of American Accident Law*, 114 Harv. L. Rev. 690, 694 (2001) (describing the "accident crisis" during the 19th century, which gave rise to changes in the tort system, as well as insurance-related innovations).

As negligence law emerged, so did liability insurance, "to insure against the consequences of negligence."  Kenneth S. Abraham, *Liability Insurance and Accident Prevention: The Evolution of an Idea*, 64 Md. L. Rev. 573, 576 (2005); *id.* at 573 (describing the "symbiotic relationship between tort liability and insurance during this entire period" of "the middle of the nineteenth century to the present").  The precursors of modern liability insurance

7

were first sold in the United States in the second half of the 19th century.  *See, e.g.*, *id.* at 580

("Liability insurance was first marketed in the United States in the 1880s, having been imported

from Great Britain, where it was also a very recent invention."); *Accident Insurance*, 4 Am. L.

Rev. 585, 585 (1873) (Late-19th century commentator stating that "[a]ccident insurance is of

modern origin"; "the first American company is only ten years old").

As liability insurance became more prevalent, Americans came to understand that this

insurance was both a way to protect defendants from liability and an important mechanism for

covering the costs of accidents, for the benefit of victims.  The Supreme Court was quick to

recognize this benefit as well.  In 1886, the Court recognized that "[b]y obtaining insurance," the

insured "increases his means of meeting th[e] responsibility" to compensate the victims of his

negligence.  *Phoenix Ins. Co. v. Erie & W. Transp. Co.*, 117 U.S. 312, 324 (1886).

Thus, although insurance as we now know it did not exist in the United States at the time

of the founding, modern liability insurance has developed in step with the evolution of accident

risk, costs, and the legal systems for assigning those costs over our nation's history.

## B.     American Governments Have Long Required Liability Insurance for Risky Activities.

Given these symbiotic benefits involving American tort law and liability insurance, it did

not take long for governments to begin *requiring* liability insurance as a way to ensure payment

of accident costs.  Around the turn of the 20th century, states began enacting workers'

compensation laws to address the skyrocketing costs of industrial accidents.  *See* Abraham, at

585.  A few years after that, states applied the same principle to car accident liability through

mandatory auto insurance.  *See id.* at 594.  As government-required liability insurance created

large risk pools, liability insurance came to be understood as not merely a way for the insured to

"meet its responsibility" to pay for the costs of accidents—as the Supreme Court recognized in the late 1800s—but also as a powerful mechanism for "spreading the risk of loss." *Id.* at 606.

Indeed, the cost-sharing aspects of liability insurance are particularly effective when implemented at a community scale, which can often be achieved only through insurance mandates. If only the lowest-risk individuals purchase insurance, and the riskiest individuals go uncovered, many of the benefits of liability insurance are reduced: victims' ability to recover compensation for their injuries will depend on whether the individual who caused the accident has sufficient funds, and uninsured individuals may bear astronomical medical or legal costs of an accident. *See, e.g.*, Kochenburger, at 1295 (describing problems where "[t]hose most likely" to cause injury "are not likely to be insured"). Conversely, if only the highest-risk individuals purchase insurance, because they know they are the most likely to make a claim, insurance companies may have to charge higher rates. Wriggins, at 287 (describing the problem of "adverse selection"). Thus, "rates go up . . . and the victims of many accidents go uncompensated, which spreads the costs throughout society." *Id.* at 291. By including as many of the individuals in a community as possible who are participating in a risk in the risk pool, however, "insurance markets can work better for the benefit of consumers." *Id.* at 288. Insurance mandates require that participants in an activity carrying some level of risk obtain insurance, and thus help ensure that the costs of the risk are distributed optimally.

As the positive results of such cost-sharing became evident, Americans came to see that the powerful combination of tort-law reform and liability insurance was capable of allocating the costs of accident risks in ways that the old system never could have. As one commentator writing in the mid-20th century put it, "[t]here is a growing belief that in this mechanical age the victims of accidents can, as a class, ill afford to bear their loss; that the social consequences of

9

uncompensated loss are dire and far exceed the amount of the loss itself; and that more good will come from *distributing these losses among all the beneficiaries of mechanical progress than by letting compensation turn upon an inquiry into fault*," as it had under the early American tort system.  Fleming, Jr., at 365 (emphasis added).

By the 1960s and 1970s, Americans began considering not only the victim-compensation and cost-spreading benefits of the tort-liability-insurance system, but also "the relation between liability insurance and accident *prevention*."  Abraham, at 610 (emphasis added).  Insurance companies have a financial interest in gathering detailed actuarial information that will help them price risks.  *See* Baker & Farrish, at 5 ("Once an insurance institution assumes responsibility for the financial consequences of a given harm, it has an incentive to prevent that harm.").  Insurance companies can use that information to incentivize behaviors that they determine reduce risks.  *See, e.g.*, Kochenburger, at 1270–71 ("There is a long and often favorable story to tell of how insurance has enhanced public safety.").  The benefit for the insurance companies is reduced payouts and the benefit for society is risk prevention.

For example, in workers' compensation—an area in which New Jersey and other governments require insurance—insurance companies offer better rates to businesses that make their workplaces safer.  *See* Occupational Safety and Health Administration, *Business Case for Safety and Health*, https://www.osha.gov/businesscase/benefits (noting multiple studies that find safer workplaces result in lower workers' compensation costs).  Similarly, medical malpractice insurance identifies risky providers, encourages safer practices, and collects data that pinpoint the causes of medical errors.  Tom Baker & Charles Silver, *How Liability Insurers Protect Patients and Improve Safety*, 68 DePaul L. Rev. 211, 226 (2019) ("Liability insurers and their industry groups have facilitated and supplemented the work of physicians and their professional

societies by sharing closed claim data, providing analyses, and developing treatment guidelines of their own."). Car insurance also offers lower premiums for certain vehicle safety measures and rewards safe drivers. *See, e.g.*, Allstate, *7 Easy Ways to Help Lower Your Car Insurance Premium*, https://www.allstate.com/resources/car-insurance/how-to-lower-car-insurance-premiums; State Farm, *Be Rewarded With Drive Safe & Save Discounts*, https://www.statefarm.com/insurance/auto/discounts/drive-safe-save; Allstate, *Safe Driving Bonus*, https://www.allstate.com/auto-insurance/safe-driver-savings.

Beyond their practical benefits, liability-insurance mandates are also consistent with American free-market ideals and approaches to complex societal issues. Rather than a top-down government program, mandatory liability insurance creates a public-private partnership "based on the very American idea that competition among insurance companies, combined with laws requiring coverage, will benefit consumers more than having a government program alone deal with the situation." Wriggins, at 297. The resulting system "might not only be more effective and less costly than a government program," but also minimizes "governmental intrusion." Kochenburger, at 1296.

In sum, liability insurance—and in particular, government-mandated liability insurance—is a powerful public-private system for allocating and even preventing risks. These benefits are not so different from early government attempts to allocate responsibility for accidents, and are achieved through a free-market approach that is consistent with American ideals.

### C.     American Courts Have Consistently Recognized Government-Mandated Liability Insurance Is Constitutional.

When government mandates for liability insurance were first implemented, they faced legal challenges similar to the one Plaintiffs bring here. But courts have had no difficulty

recognizing that liability-insurance mandates are solidly constitutional.  *See, e.g., N.Y. Cent. R.R. Co. v. White*, 243 U.S. 188 (1917) (upholding early workers' compensation scheme).

Nearly 100 years ago, in *Ex parte Poresky*, the Supreme Court considered a suit involving a Fourteenth Amendment challenge to Massachusetts' compulsory automobile liability insurance law.  290 U.S. 30, 31 (1933).  The Court swiftly denied the claim, citing the other "decisions of this Court bearing upon the constitutional authority of the state, acting in the interest of public safety, to enact the statute assailed."  *Id.* at 32.  Auto insurance has not faced serious constitutional challenge since.  Today, nearly every state requires liability insurance for car owners.

Similarly, both state and federal courts have upheld medical malpractice insurance requirements against constitutional challenges.  For example, in *McCoy v. Commonwealth*, a state court considered "the constitutionality of the mandatory insurance provisions" of a state medical malpractice insurance act under a Fourteenth Amendment challenge.  391 A.2d 723, 724 (Pa. Commw. Ct. 1978).  The law required doctors to "either purchase insurance or develop a plan of self-insurance," and required the state licensure board "to suspend or revoke the license of a health care provider upon a failure to comply with the mandatory insurance provisions."  *Id.* at 726.  Upholding the statute, the court held that the state had the authority "to recognize the problem of malpractice insurance availability and to deal with it."  *Id.* at 727.

Likewise, in *Meier v. Anderson*, when doctors challenged a related provision of the same law, a federal court held that the state's actions in "controlling the medical malpractice insurance market" were within its constitutional authority.  692 F. Supp. 546, 552–53 (E.D. Pa. 1988), *aff'd*, 869 F.2d 590 (3d Cir. 1989) (internal quotation marks omitted).  More recently, in her concurring opinion addressing the individual insurance mandate contained in the Affordable

Care Act, Justice Ginsburg pointed out that Plaintiffs had "abandoned any argument pinned to substantive due process" as they originally put forth and "concede that the provisions here at issue do not offend the Due Process Clause." *Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 613 (2012) (Ginsburg, J., concurring) (citations omitted).  Though the Affordable Care Act's Individual Mandate was ultimately upheld as a tax, the substantive due process claims against it in *Sebelius* had been abandoned.

Thus, it has been well established for nearly a century that government insurance requirements do not present serious constitutional issues.

## IV.     Mandatory Firearm Liability Insurance Is a Sensible Solution Consistent with *Bruen*'s Historical Balance Analysis.

New Jersey's Insurance Requirement is part of a developing body of firearm-related liability-insurance requirements that are a continuation of the historical development outlined above.  The New Jersey Insurance Requirement, like its forerunning insurance mandates, is constitutional because it does not implicate the Second Amendment at all.  But to the extent the Insurance Requirement is found to infringe upon Second Amendment rights, any burden is fully consistent with the nation's historical tradition of firearm regulation, particularly in light of its minimal nature because most New Jerseyans already possess qualifying policies and, for those who do not, obtaining a policy presents only a slight financial burden.[5]

---

[5] For example, the average cost of New Jersey homeowners' insurance that provides the $300,000 liability coverage needed under the Insurance Requirement is $1,267 per year, making New Jersey the sixth least-expensive state for homeowners' insurance in the nation.  *New Jersey Homeowners Insurance*, INSURANCE.COM (Nov. 7, 2022), bit.ly/3K9w0PW.  Renters' insurance is even cheaper.  A renters' policy providing $300,000 in liability coverage costs an average of $249 per year, which is also lower than the national average of $347 per year for the same coverage.  *See Average Cost of Renters Insurance in New Jersey by Coverage Level*, INSURE.COM (Feb. 6, 2022), https://bit.ly/3W7fEKK; *How Much Is Renters Insurance in 2023?*, INSURANCE.COM (Feb. 3, 2023), bit.ly/3jYhpMH.

New Jersey's Insurance Requirement directs anyone who "carries a handgun in public" in New Jersey to carry liability insurance. The conduct at issue in the law is the procurement of liability insurance, which is entirely outside the original scope of protected Second Amendment activity. Thus, New Jersey's Insurance Requirement in no way affects an individual's right to *keep or bear arms*, making the Second Amendment inapplicable. *See, e.g.*, Stephen G. Gilles & Nelson Lund, *Mandatory Liability Insurance for Firearm Owners: Design Choices and Second Amendment Limits*, 14 Engage: J. Federalist Soc'y Prac. Grps. 18, 21 (2013) ("There is . . . no general constitutional rule that citizens must be exempted from the obligation to internalize the costs of exercising their constitutional rights."). Insuring an activity is not the same as engaging in the activity itself. *See Sebelius*, 567 U.S. at 558. As the Supreme Court recognized in *Bruen*, only if a plaintiff shows that "the Second Amendment's plain text covers [the] conduct" at issue does the analysis proceed to an analogical inquiry comparing modern and historical laws. 142 S. Ct. at 2126.

Even if the Insurance Requirement were found to infringe upon Second Amendment rights, any burden that it does impose is fully consistent with the nation's historical tradition of firearm regulation. Under *Bruen*'s analogical test, there is admittedly no historical "twin" or "dead ringer" for New Jersey's Insurance Requirement. *Id.* at 2133. Indeed, both liability insurance and the very social, legal, and financial systems that underpin it—much like the modern firearms at issue—might have been inconceivable to the founding generation. But *Bruen* explicitly provides that such historical "twins" are not required. Instead, a regulation need only be analogous to, and therefore consistent with, historical regulations.

The Second Amendment is flexible enough to admit "modern regulations that were unimaginable at the founding." *Id.* at 2132. In order to maintain this flexibility, the *Bruen* test

disregards superficial comparisons, and instead involves a higher-level analogical inquiry that focuses on "two metrics": the "how" and the "why" of the way that "regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. As *Bruen* explained, assessing and weighing a challenged regulation's "how" and "why" is necessary to determine whether the regulation imposes a "comparable burden" that is "comparably justified" when compared with founding-era restrictions. *Id.*

If the "how" and "why" are comparable to historical regulations, then the regulation is in keeping with the "balance struck by the founding generation," and is constitutional. *Id.* at 2133 n.7. This focus on "balance" is not the "independent means-end scrutiny" of "federal judges" that *Bruen* rejected, *id.*, or the "freestanding 'interest-balancing'" that *Heller* criticized, 554 U.S. at 634. Rather, *Bruen*'s inquiry into the balance of "how" and "why" is grounded in the "interest balancing *by the people*," as evidenced by historical regulations. 142. S. Ct. at 2133 n.7 (quoting *Heller*, 554 U.S. at 635).

Here, the justification for the Insurance Requirement is so great, and its relative burden, if any, is so minimal, that it is plainly in line with the kinds of firearm-related regulations that have always been accepted as constitutional.

### A. The Insurance Requirement's "Why" Vastly Surpasses Its "How."

The comparative benefits and burden of liability-insurance requirements in general have been discussed in some detail above. These considerations apply with equal, or even greater, emphasis in the context of firearms. Among the greatest public benefits of New Jersey's Insurance Requirement—its reasons "why"—are its ability to more efficiently and fairly allocate the cost of firearm accidents and incentivize responsible firearm practices.

***First***, and as discussed above, liability insurance excels at reallocating and spreading risk. As with many other risky activities that have benefited from liability-insurance systems, poorly

allocated risk is inherent in firearm ownership.  Firearms unavoidably are involved in some number of accidents and their attendant costs, including emergency response, healthcare, property damage, lost work, and lost quality of life.  Requiring that firearm users carry liability insurance means that these costs are not borne by victims or their families, by taxpayers, or solely by unlucky gun owners whose firearms are involved in accidents, but are instead fairly allocated among those who choose to engage in the risky activity—carrying a firearm in public—and shared with insurers who underwrite the risk.  The mandate further ensures such liability insurance is adopted on a community scale, thereby greatly enhancing the cost-sharing effects.

*Second*, liability insurance can create financial incentives for responsible firearm ownership and thus, risk reduction.  As discussed above, insurance companies have a demonstrated ability to influence individual behavior by providing financial incentives to responsible policyholders.  Such incentives tend to reduce accidents, as shown in the areas of auto insurance, workers' compensation, and malpractice insurance.

Here, the Insurance Requirement guarantees that New Jersey gun owners will comprise a sizable segment of the regional liability-insurance market.  As with any large population of customers, insurance companies have a financial interest in limiting their payouts for accident claims.  As they have done in other contexts, insurance companies can reduce their payouts for gun accidents by incentivizing safe practices that reduce such accidents.

Much as liability-insurance providers have incentivized safer driving and safer workplaces, insurance companies can offer premium discounts to incentivize safe firearm practices.  Incentives for safe firearm practices, such as safe storage and the use of cable locks, trigger locks, or other safety designs, can result in positive changes in all aspects of firearm carry

16

and use.  For example, New Jersey unfortunately has low rates of safe gun storage.  Safe gun

storage is a practice that could be incentivized through private market insurance mechanisms.

Recent research from the Rutgers New Jersey Gun Violence Research Center shows that only

53.2 percent of New Jersey firearm owners "always" store their firearms in a locked location

(*e.g.*, a gun safe), while approximately 25 percent never do; and that only 71.5 percent of New

Jersey firearm owners "always" store firearms with a locking device in place (*e.g.*, a cable lock),

and approximately 15 percent never do, or do only occasionally.  Rutgers New Jersey Gun

Violence Research Center, *2022 Report on Firearms in New Jersey*, at 5–6 (2022).  Popularizing

safe storage practices is a simple way to reduce firearm-related risks statewide.  In particular,

because most gun owners will likely satisfy their insurance requirement, at least initially, through

homeowners' or renters' insurance, these insurers may well consider factoring storage practices

into premium calculations.  By incentivizing these safe behaviors for New Jerseyans with public-

carry licenses, insurance can thus promote firearm safety in addition to protecting the insured

and accident victims from financial losses associated with accidents.

     Although the Insurance Requirement is conduct separate and apart from that protected by

the Second Amendment, to the extent that it presents a burden to those subject to it, that burden

is trivial.  Indeed, this requirement is quite consistent with the status quo, because most people

*already own* qualifying insurance, or can easily obtain it.  *See* Insurance Information Institute,

*2021 Insurance Fact Book* 90.  Homeowners' and renters' insurance policies already cover

liability for accidental harms, including from firearms.  *See* Kochenburger at 1275 (surveying

policies); *see, e.g.*, ISO, Homeowners 3-Special Form (HO 00 03 05 11) (2010) (standard

homeowners policy form, which includes "accident[s]" resulting in both "Bodily injury" and

"Property damage" under its definition of a covered "Occurrence," and does not exclude

firearms); *see also, e.g.*, *N.J. Prop. Liab. Guar. Ass'n v. Brown*, 417 A.2d 117, 118 (N.J. Super. App. Div. 1980) (holding that "homeowners insurance policy . . . covered an occurrence at [the policyholder's] business office when a revolver which he was showing to [a friend] was accidentally discharged, resulting in serious bodily injury to [the friend]").

Many people already carry such coverage, including 93 percent of homeowners. *See* Insurance Information Institute, *2021 Insurance Fact Book* 90. Although the number of insured renters is lower,[6] New Jersey residents who do not currently carry homeowners' or renters' insurance can easily obtain it with an off-the-shelf policy sold by many insurance companies authorized to do business in New Jersey.

Thus, the benefits that gave New Jersey legislators reason to enact the Insurance Requirement—its "why"—are substantial relative to its minimal burden—its "how."

## B. The Insurance Requirement's Relative "How" and "Why" Are Consistent with the Balance Struck by Historical Regulation.

Given the Insurance Requirement's significant benefits and minimal burden, it is undoubtedly "comparable" with the justification and burden of historical regulations. *See Bruen*, 142 U.S. at 2133. This is clear from comparing the "how" and "why" of the Insurance Requirement with historical regulations.

### 1. The Insurance Requirement Is Consistent with the History of American Governments' Allocating the Costs of Firearm Accidents.

As explained in the State's briefing, early American governments allocated the costs of firearm accidents (the "why") by employing a draconian "how": *strict liability* for gun owners.

---

[6] *See Number of Renters Is on the Rise—But Few of Them Have Insurance*, INS. INFO. INS. (Sept. 22, 2014), https://bit.ly/3NXlxW7.

The transition from a strict-liability approach to the modern negligence system in the United States, discussed in Section III.B, applies to firearm accidents as well.

Early American courts inherited their strict-liability approach to firearm accidents from the English common law, where the rule had been that "where one shoots at [a mark] and wounds a man, although it be against his will, yet he shall be called a trespasser against his will." *See* Wex S. Malone, *Ruminations on the Role of Fault in the History of the Common Law of Torts*, 31 La. L. Rev. 1, 13 (1970) (quoting *Tithe*, Y.B. 21 Hen. 7, f. 27, pl. 5). Strict liability continued to be the rule in both England and the United States throughout the founding era; indeed, an American commentator writing as late as the 1930s noted that cases involving gun accidents "all indicate the strict accountability to which a person has been held for injury caused to another in the vicinity by a discharge incident to the handling of a firearm." Fred E. Inbau, *Firearms and Legal Doctrine*, 7 Tul. L. Rev. 529, 549–50 (1932–33); *see also, e.g.*, *Moody v. Ward*, 13 Mass. 299 (1816); *Cole v. Fisher*, 11 Mass. 137 (1814).

As the negligence standard emerged and replaced strict liability in American tort law generally, courts also applied this reform to cases involving firearm accidents. For example, in an 1856 case involving an accidental shooting, a Missouri court compared the old and new standards, noting that "the old system of actions" was "much stricter," because "it was no defence, in such cases, that the act occurred by misadventure, and without the wrong-doer's intending it." *Morgan v. Cox*, 22 Mo. 373, 376–77 (1856).

Importantly, regardless of the liability standard courts have applied, the government has always used the law to assign responsibility for the costs of accidents. By requiring liability insurance that covers the costs of firearm accidents, New Jersey is merely continuing this traditional government role of assigning responsibility and allocating these costs. The difference

between then and now is that, compared to the strict-liability standard that founding-era American governments applied against gun owners, the Insurance Requirement employs a much less burdensome and more effective "how," and achieves the "why" of allocating responsibility and costs in a much more effective way.

### 2. The Insurance Requirement Is Consistent with the History of Financial Requirements Related to Firearms.

To the extent that the Insurance Requirement is a burden to gun owners, it is only a minimal *financial requirement* associated with gun ownership, which American governments have always imposed and courts have not struck down.[7]

Notably, it is not clear that early Americans considered such financial requirements to implicate the Second Amendment at all. *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 154 (2022) (stating that these financial requirements "posed no constitutional issues for Americans in the pre-Civil War era," and only "intensified" in the period following the Civil War). For example, some of the same 19th-century laws that required "rifle" and "pistol galleries" to pay annual sums applied equally to "bowling alleys," demonstrating that early Americans did not understand the Second Amendment to create any special constitutional protection from payments related to gun use. *See* Laws of the State of Texas, An Act

---

[7] *See, e.g.*, 1844 Miss. Laws, Rates of Taxation § 1, Revenue, An Act to Amend and Reduce into one the several Acts in Relation to the Revenue of this State, and for other purposes (1844) (Mississippi law requiring "two dollars on each dueling or pocket pistol"); 1851 R.I. Pub. Laws 9 § 2 (1851) ("[T]wo hundred dollars per annum on any person who shall own or keep a pistol gallery [or] rifle gallery."); Ordinances and Joint Resolutions of the City of San Francisco § 13 (1854) (San Francisco ordinance requiring "ten dollars per quarter" required from "[e]very person, house, or firm engaged in keeping a pistol or rifle shooting gallery"); 1856–1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4. (1856–1857) ("On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents . . . .").

Authorizing the Corporate Authorities of the Town of Dangerfield, Fairfield and Springfield, to tax ten pin alleys, billiard tables, and pistol galleries § 1 (1860); 1870 La. Acts 127, Persons, Trades, Professions and Occupations Subject to Taxation, § 3, pt. 6 (1870).

Similar financial burdens have endured to the present day, and in evaluating constitutional challenges to them, courts have rightly questioned whether such fees implicate the Second Amendment at all.  *See, e.g.*, *Bauer v. Becerra*, 858 F.3d 1216, 1227 (9th Cir. 2017) (stating "we need not—and do not—decide whether [a firearm sale] fee implicates the Second Amendment" because it would survive under either level of scrutiny, while applying the pre-*Bruen* two-part test); *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013) (declining to "definitively decide" which scrutiny standard applied, because the fee was constitutional regardless).

Regardless, the historical tradition of financial burdens on gun users shows that early Americans understood such requirements to be consistent with the Second Amendment, and modern courts have not hesitated to uphold gun-related fees and costs as constitutional.  *See, e.g.*, *Bauer*, 858 F.3d 1216; *Kwong*, 723 F.3d 160 (upholding "residential handgun licensing fee").

Thus, to the extent that the Insurance Requirement implicates the Second Amendment by imposing a minimal financial burden on a subset of New Jersey gun owners, it is consistent with many other firearm-related financial requirements throughout American history.  If anything, the liability-insurance requirement has vastly more potential for benefit than a simple fee, and therefore uses a familiar "how"—insurance—to achieve a "why"—the efficient and fair allocation of the costs of firearm accidents—that considers historical regulations in the context of modern societal concerns and solutions.

## V.      Conclusion

For the foregoing reasons, as well as the reasons set forth in Defendants' briefing,

Plaintiffs' Motion for Preliminary Injunction should be denied.

Dated: February 16, 2023                              Respectfully Submitted,

                                                      /s/  *David A. Luttinger, Jr.*
*Of Counsel:*                                         David A. Luttinger, Jr. (DL3180)
                                                      COVINGTON & BURLING LLP
Suzan Charlton                                        The New York Times Building
James Fitch                                           620 Eighth Avenue
Elizabeth Upton                                       New York, NY 10018-1405
COVINGTON & BURLING LLP                               Tel.: (212) 841-1134
One CityCenter                                        dluttinger@cov.com
850 Tenth Street, NW
Washington, DC 20001-4956                             *Counsel for Amicus Curiae*
Tel.: (202) 662-6000
scharlton@cov.com
jhfitch@cov.com
eupton@cov.com

Douglas N. Letter
Shira Lauren Feldman
BRADY
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on February 16, 2023, I electronically filed the foregoing BRIEF OF

BRADY AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' OPPOSITION TO

PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION with the Clerk of the United

States District Court for the District of New Jersey.  Counsel for all parties are registered

CM/ECF users and will be served via CM/ECF.

/s/ <i>David A. Luttinger, Jr.</i>

Dated: February 16, 2023                    David A. Luttinger, Jr. (DL3180)