# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD KOONS, *et al.* ) | |
| ) | Civil Action No. 1:22-cv-07464- |
| *Plaintiffs* ) | RMB-AMD |
| ) | |
| v. ) | **CIVIL ACTION** |
| ) | |
| WILLIAM REYNOLDS, *et al.* ) | **(ELECTRONICALLY FILED)** |
| ) | |
| *Defendants* ) | |
| ) | |
| ---------------------------------------------- ) | **CONSOLIDATED ACTIONS** |
| ) | |
| AARON SIEGEL, *et al.* ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | |
| ) | |
| MATTHEW PLATKIN, *et al.* ) | |
| ) | |
| *Defendants*. ) | |

## SIEGEL PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com
*Attorneys for Siegel Plaintiffs*

i

## TABLE OF CONTENTS

INTRODUCTION .................................................................................. 1

ADDITIONAL FACTS ......................................................................... 3

ARGUMENT......................................................................................... 11

I.    Likelihood of Success on the Merits - Standing ......................... 11

    A.   All Claims Satisfy the Timing Requirements of Standing Under the Long Preliminary Injunction Time Frame Plus Plaintiffs' Additional Standing Facts ................................................................ 11

        1.   Zoos.................................................................................... 13

        2.   Airports and Transportation Hubs ............................... 13

        3.   Health Care and Treatment Facilities ......................... 14

        4.   Filming Locations ........................................................... 15

        5.   Insurance Mandate ........................................................ 16

    B.   There Are No Traceability or Redressability Obstacles to Standing.... 17

        1.   Defendants Continue to Misunderstand Traceability and Redressability................................................................. 17

        2.   Zoos Do Not Pose a Traceability or Redressability Problem...... 20

        3.   Casinos Do Not Pose a Traceability or Redressability Problem . 21

        4.   Filming Locations Do Not Pose a Traceability or Redressability Problem ................................................... 22

II.   Likelihood of Success on the Merits ........................................... 22

    A. Plaintiffs' Expert Declarations are Improper and Should be Rejected.. 27

        1.   Expert testimony is not admissible for arguing and explaining historical tradition. ....................................... 27

2.     Defendants' Expert Declarations are Flawed and Misleading .... 30

3.     The Rest of Defendants' Expert Declarations Consist Entirely
       of Prohibited Interest Balancing ..................................................34

B.  Section 7(a)(24) – Private Property ...................................................... 34

       1.     The default ban on carrying a firearm on private property
              violates the Second Amendment. ........................................... 34

       2.     The default ban on carrying a firearm on private property
              violates the First Amendment. ............................................... 43

       3.     The default ban on carrying a firearm on private property
              violates the Equal Protection Clause. ..................................... 48

C.  Section 7(b) – The ban on carrying in vehicles violates the Second
    Amendment. ........................................................................................... 49

D.  Defendants' Arbitrary Aggregation Categories Do Not Satisfy Their
    Burden Under *Bruen*. ............................................................................ 52

       1.     Government as Proprietor ....................................................... 52

       2.     Government and Constitutionally Protected Activity ................ 55

       3.     Crowds ................................................................................... 57

       4.     Vulnerable, Incapacitated, and Children .................................. 57

E.  Section 7(a)(6) – Within 100 feet of Public Gathering. ....................... 58

F.  Section 7(a)(9) – Zoos. ........................................................................ 59

G.  Section 7(a)(10) – Parks, Beaches, Recreational Facilities,
    Playgrounds........................................................................................... 59

H.  Section 7(a)(11) – Youth Sports Events. .............................................. 60

I.   Section 7(a)(12) – Libraries and Museums. .......................................... 61

J.   Section 7(a)(15) – Place Where Alcohol is Served. .............................. 61

K.  Section 7(a)(17) – Entertainment Facilities. ......................................... 62

L.  Section 7(a)(18) and N.J.S. 13:69D-1.13– Casinos.............................. 62

M. Section 7(a)(20) – Airport or Public Transportation Hub. ................... 63

N.  Sections 7(a)(21) and(22) – Health Care Facilities and Treatment
    Centers .................................................................................... 63

O.  Section 7(a)(23) – Public Filming Locations....................................... 65

P.  Fish and Game Regulations. ....................................................... 65

Q.  Section 7(a)(7)and N.J.S. 2C:39-5(e) – Schools . . . and Other
    Educational Institutions – Vagueness and Overbreadth. ...................... 65

R.  Multiuse Property........................................................................ 66

S.  Section 4 – Liability Insurance. .................................................... 66

T.  Void for Vagueness – "Vehicle" ...................................................... 67

U.  Void for Vagueness – "Carry"......................................................... 67

V.  Void for Vagueness – "Unjustified Display of a Handgun" ................ 68

W. Not in the interest of the Public Health, Safety and Welfare. .............. 68

X.  Danger to Self or Others. ............................................................ 69

Y.  Massive Fee Increases.................................................................. 69

Z.  Onerous New Permit Procedures. ................................................ 70

AA.Special Exemption for Judges, Prosecutors, and Attorneys General ... 70

III.  Irreparable Harm ........................................................................ 71

IV.  Balancing the Equities................................................................. 72

CONCLUSION.................................................................................. 73

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abdul-Akbar v. McKelvie*, 239 F.3d 307 (3d Cir. 2001) ............................................. 11

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ................................................................................................. 43

*Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281 (3d Cir. 2015) ................ 17, 18

*Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) ....................... 49

*AmSouth Bank v. Dale*, 386 F.3d 763 (6th Cir. 2004) ................................................. 20

*Antonyuk v. Bruen*, No. 122CV0734GTSCFH, 2022 WL 3999791,
    (N.D.N.Y. Aug. 31, 2022) ............................................................. 38, 40, 41

*Antonyuk v. Hochul*, No. 1:22-cv-0986-GTS-CFH, 2022 WL 16744700,
    (N.D.N.Y. Nov. 7, 2022) ......................................................................... 60

*Antonyuk v. Hochul*, No. 1:22-CV-0986GTSCFH, 2022 WL 5239895,
    (N.D.N.Y. Oct. 6, 2022) ...................................................................... 37, 42

*Arkansas Game & Fish Comm'n v. Murders*,
    327 Ark. 426 S.W.2d 854 (1997) ........................................................... 40

*BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*,
    229 F.3d 254 (3d Cir. 2000) .................................................................. 11

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ........................................... 49

*Buck v. Danzenbacker*, 37 N.J.L. 359 (Sup. Ct. 1875) ................................................. 38

*Burkhart v. Wash. Metro. Area Transit Auth.,*
    112 F.3d 1207 (D.C.Cir.1997) .............................................................. 29

*C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159 (3d Cir. 2005) .................................. 45

*Cheboygan Sportsman Club v. Cheboygan Cnty. Prosecuting Atty*,
   307 Mich. App. 71 N.W.2d 751 (2014)..................................................... 38

*City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985) ....................... 51

*Clark v. Jeter*, 486 U.S. 456 (1988)............................................................................. 51

*Clark v. McDonald's Corp.*, 213 F.R.D. 198 (D.N.J. 2003) ...................................... 12

*Commonwealth v. Patsone*, 79 A. 928 (Penn. 1911)................................................... 43

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)................................ 74

*Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347 (3d Cir. 2014) .................... 18

*Cox v. New Hampshire*, 312 U.S. 569 (1941) ....................................................... 23, 71

*D'Lil v. Best W. Encina Lodge & Suites*,
   538 F.3d 1031 (9th Cir. 2008) ............................................................... 12

*Day v. Caton*, 119 Mass. 513 (1876) .......................................................................... 35

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................... passim

*English v State*, 35 Tex. 473 (1872) ........................................................................... 33

*Espinoza v. Mont. Dep't of Revenue*, 140 S.Ct. 2246, 2254 (2020)........................... 56

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)............................................. 73

*Free Speech Coal., Inc. v. Att'y Gen. United States*,
   974 F.3d 408 (3d Cir. 2020) ................................................................. 45

*Geer v. Connecticut*, 161 U.S. 519 (1896) ................................................................ 67

*Glasscock v City of Chattanooga*, 157 Tenn. 518 (1928) ......................................... 36

*Guyton v. Phillips*, 606 F.2d 248 (9th Cir. 1979) ...................................................... 50

*Haile v. State*, 38 Ark. 564 (1882) ............................................................................ 54

*Heller v. D.C. (Heller II)*, 670 F.3d 1244 (D.C. Cir. 2011) ....................................... 42

*Hereas Materials Tech. LLC v. Pham*,
2011 WL 13227724 (E.D. Pa. May 5, 2011) ........................................................ 74

*Houston v. Marod Supermarkets, Inc*, 733 F.3d 1323 (11th Cir. 2013)...................... 12

*Hunt v. Washington State Apple Advertising Comm'n*,
432 U.S. 333 (1977) ............................................................................................. 16

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992).................... 56

*K.A. ex rel. Ayers v. Pocono Mountain School District*,
710 F.3d 99 (3d Cir. 2013)................................................................................... 74

*Karns v. Shanahan*, 879 F.3d 504 (3d Cir. 2018)....................................................... 51

*Khodara Env't, Inc. v. Blakey*, 376 F.3d 187 (3d Cir. 2004) ..................................... 18

*Knox v. Serv. Emps. Int'l Union, Loc*. 1000, 567 U.S. 298 (2012) ............................ 44

*Lane v. Cotton* (1701) 88 Eng. Rep. 1458, 1464-65.................................................... 39

*Lemuels v. State*, 113 Ark. 598, 166 S.W. 741 (1914) ............................................... 55

*Libertarian Party of Va. v. Judd,* 718 F.3d 308 (4th Cir. 2013)................................. 18

*Macon & W.R. Co. v. Lester*, 30 Ga. 911 (1860) ....................................................... 40

*Madsen v. Women's Health Ctr., Inc*., 512 U.S. 753 (1994)....................................... 49

*Markham v. Brown*, 8 N.H. 523 (1837)....................................................................... 39

*McCullen v. Coakley*, 573 U.S. 464 (2014)................................................................. 49

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................. 28, 32

*Merritt v. Parker*, 1 N.J.L. 460 (1795) ....................................................................... 40

*Miller v. Mitchell*, 598 F.3d 139 (3d Cir. 2010) ........................................................ 45

*Mola Dev. Corp. v. United States,* 516 F.3d 1370 (2008) ......................................... 27

*Murdock v. Pennsylvania*, 319 U.S. 105 (1943) ........................................................ 26

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*,
   No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022) ................ 68

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018) .................... 50

*Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229 (11th Cir.2003).............. 12

*New York State Rifle & Pistol Association v. Bruen*,
   142 S. Ct. 2111 (2022) ..................................................................................... passim

*O'Brien v. Cunard S.S. Co*., 154 Mass. 272, 28 N.E. 266 (1891) ............................. 35

*Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806 (3d Cir. 1989) ........................... 74

*Owen v. State*, 31 Ala. 387 (1858) ............................................................................. 55

*Poe v. State*, 85 Tenn. 495, 3 S.W. 658 (1887) ......................................................... 54

*Point Nursery v. Hassid*, 33 Yale J.L. & Human. 307 (2022)................................... 39

*Reed v. Town of Gilbert, Ariz*., 576 U.S. 155 (2015) ................................................ 45

*Revell v. Port Authority of New York, New Jersey*,
   598 F.3d 128 (3d Cir. 2010) ................................................................................. 14

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc*.,
   487 U.S. 781 (1988)............................................................................................... 44

*Rumsfeld v. United Techs. Corp.,* 315 F.3d 1361 (Fed.Cir.2003) ............................ 27

*Saia v. People of State of New York*, 334 U.S. 558 (1948)........................................ 45

*Sinnickson v. Dungan*, 8 N.J.L. 226 (N.J. 1825) ...................................................... 41

*Smith v. State,* 50 Tenn. 511 (1872) ............................................................... 35

*Solomon v. Cook Cnty. Bd. of Commissioners,*
   559 F. Supp. 3d 675 (N.D. Ill. 2021) ..................................................... 37

*Specht v. Jensen,* 853 F.2d 805 (10th Cir.1988) ........................................... 27

*St. v. State*, 67 Ala. 87 (1880) ...................................................................... 54

*State v Huntley*, 25 N.C. 418 (1843) ............................................................ 34

*State v Smith,* 11 La. Ann. 633 (1856) ......................................................... 33

*State v. Gibson*, 218 N.J. 277, 95 A.3d 110 (2014) ..................................... 36

*State v. Huntly*, 25 N.C. 418 (1843) ..................................................... 33, 54

*State v. Nergaard*, 102 N.W. 899 (Wis. 1905) ............................................ 43

*State v. One 1990 Honda Accord, New Jersey Registration No. HRB20D,*
   *VIN No. 1HGCB7659LA063293 & Four Hundred & Twenty Dollars*,
   154 N.J. 373, 712 A.2d 1148 (1998) ...................................................... 37

*State v. Smith*, 11 La. Ann. 633 (1856) ........................................................ 54

*Stobie Creek Invs., LLC v. United States,*
   81 Fed. Cl. 358 (Fed. Cl. 2008) .............................................................. 29

*Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014) ......................................... 49

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ................................................. 73

*Tinker v. Des Moines Independent Community School Dist.,*
   393 U.S. 503 (1969) ................................................................................ 56

*Toll Bros. v. Twp. of Readington*, 555 F.3d 131 (3d Cir. 2009) ................... 17

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019) ................................ 56

*United States v. Combs*, 2023 WL 1466614 (E.D. Ken. Feb. 2, 2023) ..... 70, 71

*United States v. Neal,* 36 F.3d 1190 (1st Cir. 1994).....................................................29

*United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023) ................................................71

*United States v. Rodriguez,* 162 F.3d 135 (1st Cir.1998)..........................................29

*United States v. Ruckman,* 806 F.2d 1471 (10th Cir. 1986) ......................................56

*United States v. Tallion*, 2022 WL 17619254 (D. Md Dec. 13, 2022).......................56

*Vill. of Schaumburg v. Citizens for a Better Env't,*
    444 U.S. 620 (1980)..........................................................................................36

*W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ..............................44

*Warth v. Seldin*, 422 U.S. 490 (1975)........................................................................16

*Wayne Land & Min. Grp. LLC v. Delaware River Basin Comm'n,*
    894 F.3d 509 (3d Cir. 2018) ......................................................................17, 19

*Whitehurst v. Wright*, 592 F.2d 834 (5th Cir. 1979)..................................................50

*Wooley v. Maynard*, 430 U.S. 705 (1977) .................................................................44

*Wrenn v. D.C.,* 864 F.3d 650 (D.C. Cir. 2017)..........................................................73

## Statutes

42 U.S.C. §1983..........................................................................................................17

N.J.S. 23:2A-10(a)(5) .................................................................................................18

N.J.S. 13:13A-10.........................................................................................................18

N.J.S. 13:69D-1.13 .....................................................................................................64

N.J.S. 2C:39-5(e) ........................................................................................................67

N.J.S. 2C:58-3.............................................................................................................23

N.J.S. 2C:58-3(a)(5) ........................................................................... 70

N.J.S. 52:17B-101-108 ........................................................................ 18

N.J.S. 2C:18–3(b) ............................................................................... 36

**Rules**

49 C.F.R. § 1540.111 ............................................................................ 7

**Other Authorities**

11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice
    and Procedure § 2948.1 (2d ed.1995) ...................................... 11

Brian Sawers, *Original Misunderstandings: The Implications of Misreading
    History in Jones*, 31 Ga. St. U. L. Rev. 471 (2015) ................................. 40

Carol M. Rose, *Canons of Property Talk, or, Blackstone's Anxiety*,
    108 Yale L.J. 601 (1998) ....................................................... 40

Cornell & DeDino, A Well Regulated Right: The Early American
    Origins of Gun Control, 73 Ford. L.Rev. 487 (2004) ............................. 27

David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*,
    13 Charleston L. Rev. 205 (2018) .................................................. 25, 59

Eric T. Freyfogle, *On Private Property: Finding Common Ground on
    Ownership of Land* 30-31 (2007) ............................................. 41

Freyfogle & Dale D. Goble, *Wildlife Law: A Primer* 143 (2009) .............................. 38

G. Robert Blakey, *Gaming Lotteries, and Wagering: The Pre-Revolutionary
    Roots of the Law of Gambling*, 16 Rutgers L.J. 211 (1985) ...................... 65

https://claytoncramer.com/primary/peacebonds/Northampton.html ........................... 34

xi

Mark W. Smith, *"Not All History Is Created Equal" In the Post-Bruen World,*
  *the Critical Period for Historical Analogues Is when the Second Amendment*
  *Was Ratified in 1791, and not 1868 (working draft)* (October 1, 2022) .................25

Michael C. Blumm & Lucus Ritchie, *The Pioneer Spirit and the Public Trust:*
  *The American Rule of Capture and State Ownership of Wildlife*,
  35 Envtl. L. 673 (2005)........................................................................................ 38

Thomas W. Merrill, *Property and the Right to Exclude*,
  77 Neb. L. Rev. 730 (1998) .................................................................................. 41

Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L.Rev. 683 (2007)
  (reviewing 20th-century laws) .............................................................................. 27

## INTRODUCTION

On January 30, 2023, this Court granted a Temporary Restraining Order ("TRO") in the *Siegel* portion of these consolidated cases, replicating the TRO granted on January 9, 2023 in the *Koons* case and further expanding the scope of relief by restraining several additional provisions of the subject law, referred to as Chapter 131 or A4769. Plaintiffs now seek preliminary injunctive ("PI") relief as to those same provisions, as well as other unconstitutional provisions of Chapter 131.

Plaintiffs also seek further relief left open by the TRO. Specifically, in connection with the TRO, the Court denied, without prejudice, injunctive relief as to sections 7(a)(9) zoos, 7(a)(20) airports and transportation hubs, 7(a)(21) and (22) healthcare and treatment facilities, 7(a)(23) filming locations, and Fish and Game regulations, holding that Plaintiffs did not demonstrate a sufficient likelihood of injury within the very short time frame of a TRO.

Plaintiffs have supplemented the record as to their standing facts, and those additional facts, along with the previous facts already in the record, support granting a PI as to those provisions, especially given that a PI, lasting through trial and final judgment, applies to a much longer timeframe.

Secondly, at the TRO stage, the Court denied, without prejudice, injunctive relief as to that portion of section 7(a)(10) applicable to playgrounds and 7(a)(11) - youth sports events, tentatively holding that because those locations intersect with schools, it may be appropriate to treat them like schools. Plaintiffs have not challenged the "sensitive place"

designation as to schools per se.  The Court sought additional briefing to further develop these issues.

Because it is easy to draw a bright line between playgrounds and youth sports events that *are* affiliated with schools and those that are not, the Court should grant a PI as to non-school affiliated playgrounds and youth sports events. The latter cannot reasonably be treated like schools and therefore the restrictions on them cannot satisfy the requirements of *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2135 (2022).

As to section 7(a)(6) - public gatherings, Plaintiffs withdrew their request for a TRO in exchange for Defendants stipulating to standing at the PI stage. Plaintiffs seek a PI as to this restriction.

Finally, Plaintiffs seek a PI as to the additional provisions of Chapter 131 not raised at the TRO stage: insurance requirement, massive fee increases, subjective permitting standards, onerous new permitting procedures, and special, discriminatory exemptions from the law.

On the merits, Defendants' PI position suffers from the same fatal flaws as at the TRO stage. They continue to engage in overt interest balancing—a strategy explicitly prohibited by *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008). In fact, they have doubled down on interest balancing.  Defendants refer to "vulnerable" populations, "volatile" situations, or providing a "safe experience" as a justification for these vast restrictions on handgun carry. But the entire point of the right to keep and bear arms under

the Second Amendment is that *the people*—not the State—get to decide when and under what circumstances it is proper to arm themselves for self-defense. That balance was already struck in the Constitution. *Heller*, 554 U.S. at 634-35; *Bruen*, 142 S. Ct. at 2131.

Defendants also rely heavily on historical citations that do not support the proposition for which they are cited—many of which, moreover, were already considered and rejected by *Bruen*. Further, Defendants continue to rely on outliers as well as attempting to aggregate disparate and unrelated citations into arbitrary categories in order to make them seem more numerous than they are. *Bruen* allows none of this.

Chapter 131 effectively prohibits the exercise of the fundamental right of the people to carry arms outside the home for self-defense—in direct violation of *Bruen*, 142 S. Ct. 2111, 2135 (2022), but the bottom line of *Bruen* is that the people have a right to be armed when they leave their homes. The State can restrict that right only in *exceptional* circumstances defined by historical tradition, not by balancing the various interests at stake today. *Id*. at 2156. New Jersey's effort to prohibit the people from being armed *nearly everywhere* cannot be reconciled with the Supreme Court's clear teachings.

## ADDITIONAL FACTS

Plaintiffs primarily rely on the facts already in the record from the TRO stage but note the following additional facts as set forth in subsequent declarations.

**Plaintiff Aaron Siegel**

As indicated in his previous declaration, as a nurse practitioner one of the places

Plaintiff Aaron Siegel works is Skylands Urgent Care in Lake Hopatcong, New Jersey. Siegel checked the practice handbook at Skylands Urgent Care, and he did not find any rule prohibiting the carry of handguns. He also asked his Practice Manager, and he told Siegel that there is no prohibition on him carrying his handgun at Skylands Urgent Care. Siegel would carry my handgun at Skylands Urgent Care, but he refrains from doing so because of Chapter 131 Section 7(a)(21), as he fears arrest and prosecution. Supplemental Declaration of Aaron Siegel, ¶2.

On March 6, 2023, Siegel has a dentist appointment. He has spoken with his dentist, and the dentist's office will allow Siegel to carry his handgun when he is there. He would carry his handgun with him at his upcoming appointment, but he will refrain from doing so because of Chapter 131 Section 7(a)(21), as he fears arrest and prosecution. Supplemental Declaration of Aaron Siegel, ¶3.

Siegel has a chronic degenerative disc disease as well as spinal stenosis—both of which cause him considerable back pain on a regular basis. As a result, Siegel regularly see an anesthesiologist/pain management specialist in New Jersey. He sees him approximately every one to two month for various treatments. In a few weeks, Siegel has an appointment to receive an epidural injection. Several weeks after his epidural he will need to see him again for a follow-up appointment. This is separate and apart from his regular visits for ongoing treatment. Siegel asked the office if they have a policy against handgun carry, and they told him they do not. Siegel would carry his handgun with him at these appointments, but he will refrain from doing so because of Chapter 131 Section

7(a)(21), as he fears arrest and prosecution. Supplemental Declaration of Aaron Siegel, ¶4.

On May 25, 2023, Siegel will be taking his son to the Turtle Back Zoo in West Orange, New Jersey. He would carry his handgun with him when he goes, but for Chapter 131 Section 7(a)(9), as he fears arrest and prosecution. Supplemental Declaration of Aaron Siegel, ¶5.

**Plaintiff Jason Cook**

Plaintiff Jason Cook has plans visit the Popcorn Zoo in Forked River, New Jersey on May 20, 2023 with his family. He would carry his handgun with him when he goes, but for Chapter 131 Section 7(a)(9), as he fears arrest and prosecution. Supplemental Declaration of Jason Cook, ¶2.

On June 22, 2023, Cook's sister and her boyfriend are flying to Florida. Cook will be driving them and dropping them off curbside at Newark Airport. He would carry his handgun with him when he does so, but he will refrain from doing so because of Chapter 131 Section 7(a)(20), as he fears arrest and prosecution. Supplemental Declaration of Jason Cook, ¶3.

As he indicated in his previous declaration dated December 23, 2022, Cook likes to visit movie sets on location. According to an article from February 3, 2023 on Patch.com, "Mean Girls The Musical" will be filming on location all over Middletown, New Jersey during the months of March and April 2023. According to the article, the production will have "Middletown transforming into the Chicago suburb of Evanston,

Ill." *See* https://patch.com/new-jersey/middletown-nj/mean-girls-wanted-monmouth-county-film-extras-report. Cook will be going to Middletown in March and/or April to find some of the locations during the filming so he can watch. Supplemental Declaration of Jason Cook, ¶4-5.

According to an article from February 17, 2023 on NJ.1015.com, "Joker 2" will be filming on location in New Jersey in late March 2023. The article notes "It looks like New Jersey will be standing in for Gotham City again." *See* https://nj1015.com/parts-of-the-joker-sequel-will-be-shot-in-new-jersey/?utm_source=tsmclip&utm_medium=referral (last visited February 24, 2023). Second Supplemental Declaration of Jason Cook, ¶4.

Cook will be researching to see where the filming will be taking place so he can go there and watch. According to the article, Newark and Jersey City may be the places to start his research. *Id*. Second Supplemental Declaration of Jason Cook, ¶5.

Cook would carry his handgun at these filming locations, but he will refrain from doing so because of Chapter 131 Section 7(a)(23), as he fears arrest and prosecution. Supplemental Declaration of Jason Cook, ¶7; Second Supplemental Declaration of Jason Cook, ¶7.

Cook owns his own home and has a homeowner's insurance policy. His policy has a personal liability limit of $100,000, which is less than the $300,000 coverage required by Chapter 131 Section 4. Even assuming homeowner's insurance satisfies the

requirements of Section 4, as Defendants claim, Cook will be forced to purchase more insurance to exercise his right to carry a handgun in compliance with Chapter 131, and he does not wish to purchase more insurance. Second Supplemental Declaration of Jason Cook, ¶2

**Plaintiff Joseph DeLuca**

Plaintiff Joseph DeLuca and his wife will be visiting the Cape May Zoo over this upcoming Memorial Day weekend. DeLuca would carry his handgun with him when they go, but for Chapter 131 Section 7(a)(9), as he fears arrest and prosecution. Supplemental Declaration of Joseph DeLuca, ¶2.

Joseph DeLuca's brother owns and operates a restaurant at South Jersey Regional Airport in Lumberton, New Jersey. DeLuca visits his brother's restaurant approximately bi-weekly. His brother would let him carry his handgun at his restaurant, and DeLuca would do so. However, he refrains from carrying his handgun at the restaurant because of Chapter 131 Section 7(a)(20), as he fears arrest and prosecution. Supplemental Declaration of Joseph DeLuca, ¶3.

**Plaintiff Timothy Varga**

In his previous declaration dated December 23, 2022, Plaintiff Timothy Varga indicated that he had not yet received his permit to carry a handgun. He has since received his permit, and the date of issue is December 13, 2022, prior to the filing of the Complaint in this action. Supplemental Declaration of Timothy Varga, ¶2.

Varga is the Northeast Regional Sales Executive for Ancra Cargo, Inc. He work remotely from his home in Wall Twp. He is on the company's Executive Committee. Supplemental Declaration of Timothy Varga, ¶3.

Once per year, Varga's employer schedules a national meeting of the Executive Committee. This year the meeting is in North Carolina from June 12-15.  Varga is required to attend. He will be flying from Newark Airport, and he wishes to bring his handgun with him in accordance with the requirements of federal law. Varga is licensed to carry his handgun in North Carolina. He would bring his handgun to Newark Airport to transport in his checked baggage on his flight to North Carolina in full compliance with federal law (49 C.F.R. § 1540.111); however, because of Chapter 131 Section 7(a)(20) he will refrain from doing so for fear of arrest and prosecution. Supplemental Declaration of Timothy Varga, ¶4.

Varga has been seeing a chiropractor for treatment of his neck for many years. Over the next 6 to 12 months he will go approximately weekly or bi-weekly for treatment. Varga's chiropractor allows him to carry his handgun when he is there. He would carry his handgun at these appointments; however, because of Chapter 131 Section 7(a)(21) he will refrain from doing so for fear of arrest and prosecution.  Supplemental Declaration of Timothy Varga, ¶5.

**Plaintiff Nicole Cuozzo**

Plaintiff Nicole Cuozzo has a renter's insurance policy. Her policy has a personal liability limit of $100,000, which is less than the $300,000 coverage required by Chapter

131 Section 4. Even assuming renter's insurance satisfies the requirements of Section 4, as Defendants claim, Cuozzo will be forced to purchase more insurance if she wants to exercise her right to carry a handgun in order to comply with Chapter 131, and she does not wish to purchase more insurance. Supplemental Declaration of Nicole Cuozzo, ¶2.

**Ria Jairam**

Ria Jairam is a member of Plaintiff Association of New Jersey Rifle & Pistol Clubs, Inc. ("ANJRPC").  She is what is often referred to as a monetized YouTuber. She makes films and uploads them to YouTube.com, where both subscribers to her channel and non-subscribers view her films. Jairam has more than 13,000 subscribers to her YouTube.com channel. Every time a person views her films, she is paid money by YouTube.com. Declaration of Ria Jairam, ¶1-2.

Most of Jairam's films involve educating her viewers on various aspects of amateur ("ham") and other radio communications. She frequently films in public locations. Declaration of Ria Jairam, ¶3.

Linked below is one of Jairam's films, shot on location in Lincoln Park, New Jersey. The film depicts a test she conducted of a Retevis General Mobile Radio Service ("GMRS") radio. The film begins inside the home of a friend. She then walks outside on public streets to test the performance of the radio's antenna.

https://www.youtube.com/watch?v=ZUFkHx76Fqk Declaration of Ria Jairam, ¶4.

9

Below is another one of Jairam's films. This one was filmed on Garrett Mountain at Rifle Camp Park in Passaic County, New Jersey showing various radio activities.

https://www.youtube.com/watch?v=ToWg8FOG5ps Declaration of Ria Jairam, ¶5.

Jairam currently holds a New Jersey permit to carry a handgun. She would carry her handgun while making these films in public, but she refrains from doing so because of Chapter 131 Section 7(a)(23), as she fears arrest and prosecution. Declaration of Ria Jairam, ¶6.

**Ronald D'Angelo**

Ronald D'Angelo, is a member of Plaintiff ANJRPC. Declaration of Ronald D'Angelo, ¶1.

He owns a small airplane that he keeps at Monmouth Executive Airport in Wall Township, New Jersey. He flies once or twice per week among various airports in New Jersey, including but not limited to Lakewood Airport, Old Bridge Airport, Trenton Airport, Cape May/Wildwood Airport, and Atlantic City Airport. He also spends 4 or 5 days per week at Monmouth Executive Airport maintaining his plane. Declaration of Ronald D'Angelo, ¶2.

D'Angelo is also the holder of a New Jersey permit to carry a handgun. He would carry his handgun to these airports and have it with him when he flies, but he refrains from doing so because of Chapter 131 Section 7(a)(20), as he fears arrest and prosecution.

Declaration of Ronald D'Angelo, ¶3-4.

## ARGUMENT

Most of Defendants' arguments are simply a repetition of their previous arguments from the TRO stage. Accordingly, Plaintiffs hereby incorporate by reference the arguments in their previous briefs.

## I. Likelihood of Success on the Merits - Standing

Defendants so desperately wish to avoid an actual determination of the constitutionality of this law that they continue to twist standing principles beyond recognition.

### A. All Claims Satisfy the Timing Requirements of Standing Under the Long Preliminary Injunction Time Frame Plus Plaintiffs' Additional Standing Facts

In the PI context, standing requires only that the threat of irreparable injury arise prior to a trial on the merits. *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 321–22 (3d Cir. 2001); *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp*., 229 F.3d 254, 263 (3d Cir. 2000) (*citing* 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2948.1 at 139 (2d ed.1995) as "explaining that imminence requires that the harm will occur before a trial on the merits can be had").

At the TRO stage, the Court held that the Plaintiffs had not shown sufficient imminence for the threat of irreparable harm during the very short TRO timeframe as to the restrictions for zoos, airports and transit hubs, healthcare facilities, public filming

locations, and hunting (fish and game). However, at the PI stage the timeframe is years rather than weeks.  Thus, in a timeframe of years rather than weeks, Plaintiffs' previous allegations of regular activity are sufficient for all claims.

To show standing, courts have routinely found it sufficient if a plaintiff alleges that she does something regularly. *See, e.g., D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1037–38 (9th Cir. 2008) (finding a real and immediate threat of future injury where the "plaintiff demonstrates an intent to return to the geographic area where the accommodation is located and a desire to visit if it were made accessible" through the regularity of the plaintiff's visits to the area, a stated intent or plan to return to the accommodation, and an explanation of why the plaintiff preferred the accommodation at issue over others); *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir.2003) (noting that the plaintiffs *frequently* visited the park); *Houston v. Marod Supermarkets, Inc*, 733 F.3d 1323, 1340 (11th Cir. 2013) (noting that the plaintiff lived approximately 30 miles from the store and drove by the store on a regular basis); *cf. Clark v. McDonald's Corp*., 213 F.R.D. 198, 229 (D.N.J. 2003) ("Plaintiff Clark, unlike the plaintiff in [*Lujan*], has at least offered a "specification of when the some day will be." It will be "upon remediation," i.e., the day that the architectural barriers alleged to exist at the restaurants Clark has visited are removed or cured.")

Accordingly, none of the Court's concerns about standing from the TRO stage are applicable at the PI stage. Plaintiffs' original standing allegations are sufficient. For example, the Court held that Plaintiff Siegel's annual hunting event with his son was

insufficient to confer standing to challenge the Fish and Game regulations, as it would not be hunting season during the TRO timeframe. However, during the much longer PI timeframe Plaintiff Siegel's irreparable injury will certainly arise.

Nevertheless, to add a belt to the pre-existing suspenders, Plaintiffs have provided additional standing facts to remove any doubt that standing exists as to all claims.

### 1.      Zoos

Plaintiff Siegel has specific plans to visit the Turtle Back Zoo on May 25, 2023. Plaintiff Cook has plans to visit the Popcorn Zoo on May 20, 2023. Plaintiff DeLuca has plans to visit the Cape May Zoo over this coming Memorial Day weekend.

### 2.      Airports and Transportation Hubs

Plaintiff Cook will be driving his family to Newark Airport on June 22, 2023. Defendants attempt to wave this away by suggesting that he would fall within the parking lot provision of 7(c)(4). But 7(c)(4) applies only to transporting a handgun from a parked vehicle to a non-prohibited place. It does not permit someone to drive into a prohibited area and linger there.  Nor do Defendants explain how Plaintiff Cook would be protected by the public right of way provision of 7(d). Plaintiff Cook could easily be called up on to exit his car and help his family members onto the curb or into the terminal with their bags. If he did so, he would plainly be subject to arrest and prosecution.

Plaintiff DeLuca regularly visits his brother's restaurant at South Jersey Regional Airport. Defendants speculate that he can reach the restaurant via a public right of way.

But the restaurant is not itself a public right of way. It is on airport property. 7(a)(20) is not limited to airport "terminals." It say "airports," and by its terms 7(a) includes all of the grounds of the airport. Plaintiff DeLuca has standing to challenge 7(a)(20).

Plaintiff Varga has concrete plans to fly to North Carolina in June. Defendants speculate "it is far from clear that dropping off checked luggage in accordance with TSA regulations would somehow implicate a violation of Chapter 131." But, how would it not? Plaintiff Varga would be walking through the airport terminal to the ticket counter with a gun in his bag. Nothing in 7(a) exempts such conduct, and it is well established that travelers do get arrested when flying out of Newark Airport. *See, e.g., Revell v. Port Authority of New York, New Jersey*, 598 F.3d 128 (3d Cir. 2010).

ANJRPC member Ronald D'Angelo owns his own plane and once or twice a week flies from Monmouth Executive Airport in Wall Township, New Jersey where his plane is kept, to various airports in and around New Jersey. He also goes to Monmouth Executive Airport 4 to 5 times per week to maintain his plane. D'Angelo has a permit to carry a handgun, and but for Chapter 131 he would bring his gun with him to these airports.

### 3. Health Care and Treatment Facilities

Plaintiff Siegel works at Skylands Urgent Care. He confirmed that his employer would allow him to carry his handgun there, and he wishes to do so. On March 6, 2023 he has an appointment with a dentist who will allow him to carry his handgun. Similarly,

Plaintiff Siegel sees an anesthesiologist every month or two for pain management due to chronic back pain. The medical practice would allow Siegel to carry his handgun there, and he wishes to do so.

Plaintiff Varga sees a chiropractor every week or two for neck treatment. He would allow Varga to carry his handgun there, and Varga wishes to do so.

### 4. Filming Locations

Interestingly, in their brief, Defendants label the restriction in 7(a)(23) as "movie sets." But, that is not how the provision reads. It reads much more broadly (e.g. including news coverage, YouTubers, etc.).  This is yet another example of Defendants doing everything possible to avoid a substantive determination by this Court of the law's validity.

Nevertheless, Plaintiff Cook has learned that "Mean Girls the Musical" and "Joker 2" will be filming on location in New Jersey this coming March and April.  Mean Girls will be filming all over Middletown, as the news article explained. It has not yet been revealed where Joker 2 will be filming. Since Plaintiff Cook enjoys attending filming locations he will be seeking these out, and he is highly likely to succeed in finding them. Outdoor film sets for major motion pictures such as these can only be kept secret for so long.

Further, ANJRPC member Ria Jairam is a monetized YouTuber and regularly films her videos in public places. Because she is a member of Plaintiff ANJRPC, ANJRPC has

15

standing to challenge 7(a)(23) on her behalf. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 342-43 (1977); *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

### 5.    Insurance Mandate

Defendants assert that most homeowner's and renter's insurance policies will satisfy the $300,000 liability insurance requirement set forth in Section 4 of Chapter 131, and that therefore Plaintiffs cannot demonstrate standing to challenge Section 4. Of course, the assertion is merely a prediction of what New Jersey's insurance market might look like once firearms liability is priced into annual renewals. In fact, this is just a guess.

Moreover, it is a guess at odds with logic: Additional coverage will, in this as in any market, incur additional costs. [1] The insurance market may look nothing like Defendants' prediction once the dust settles. And, certainly, Defendants' expert Kochenberger cannot say specifically what Plaintiffs' insurance situation is or will be. Even now only 37% of renter's even have renter's insurance. *See* Insurance Information Institute, September 22, 2014, https://www.iii.org/press-release/number-of-renters-is-on-

---

[1] Defendants attempt to skirt this obvious point by asserting that, unbeknownst to all, New Jersey *already* requires such coverage.  *See* Op. at 70 n.70.  The fact that all Defendants' can muster to support this point is a case involving a teenager with a BB gun and two out-of-state cases in fact proves the opposite point.  It strongly suggests that New Jersey insurers were not aware they were required to cover adults' use of their guns as part of homeowners insurance and, thus, that insurers will soon factor such new information into prices. And this stands to reason: if the state were correct that New Jersey already required such coverage, what would be the point of passing a new law to mandate it?

the-rise-but-few-of-them-have-insurance-092214 (last visited February 24, 2023).

More important, this is now beside the point, as both Plaintiffs Cook and Cuozzo have indicated that their homeowners and renters policy limits are only $100,000 and would not meet the $300,000 requirement of the Chapter 131 even if Defendants are correct in their speculation as to what types of policies would satisfy the new law. Plaintiffs Cook and Cuozzo object to being forced to buy more insurance as a condition to exercising their fundamental right to carry a handgun for self-defense. These additional costs, as even Defendants implicitly concede, are classic grounds for standing.

**B.   There Are No Traceability or Redressability Obstacles to Standing**

**1.   Defendants Continue to Misunderstand Traceability and Redressability.**

Defendants continue to insist that the law requires "but for" causation to satisfy the requirements of traceable and redressability. They remain incorrect.

"Redressability is not a demand for mathematical certainty. It is sufficient for the plaintiff to establish a 'substantial likelihood that the requested relief will remedy the alleged injury in fact.'" *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 143 (3d Cir. 2009) (citation omitted). If a favorable judgment "would substantially lighten [the plaintiff's] regulatory burden," then its injury has been redressed. *Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281, 293 (3d Cir. 2015); *Wayne Land & Min. Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 525 (3d Cir. 2018) (A decision that would remove a fracking ban on the plaintiff's property was sufficient to confer standing.)

17

The Third Circuit has been clear that "there is room for concurrent causation in the analysis of standing." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014) (citing *Libertarian Party of Va. v. Judd,* 718 F.3d 308, 316 (4th Cir. 2013)); *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004) (Alito, J.) ("Article III standing demands 'a causal relationship,' but neither the Supreme Court nor our Court has ever held that but-for causation is always needed."). "[I]ndeed, 'an indirect causal relationship will suffice, so long as there is a fairly traceable connection.'" *Id.* (quoting *Toll Bros. Inc.,* 555 F.3d at 142).

Here, relief against enforcement of Chapter 131 would lift the main criminal sanction that would arise from carrying in the challenged locations and "substantially lighten [Plaintiffs'] regulatory burden." *Am. Farm Bureau Fed'n*, 792 F.3d at 293.

Further, as the chief law enforcement officer of the State of New Jersey, all law enforcement personnel and activities are subordinate to Defendant Attorney General Platkin, including the State Park Police. *See* N.J.S. 52:17B-101-108. Thus, the Attorney General has ultimate jurisdiction over all criminal matters throughout the State, regardless of under what statute they arise, and which agency may have general administrative or civil enforcement authority. *See, e.g.* N.J.S 23:2A-10(a)(5), (f) (Attorney General may bring criminal charges for violation of Fish and Game regulations). And, even if N.J.S. 13:13A-10 only applies to one park, it is an example of the Attorney General's concurrent jurisdiction. As noted above, the Attorney General still exercises supervisory authority

over of all law enforcement agencies throughout the State.[2] There is no exception for the

State Park Police. *See, e.g.,* Attorney General Law Enforcement Directive No. 2022-4,

April 29, 2022, on Vehicular Pursuit and Use of Force Policy:

> . . . pursuant to the authority granted to me under the New Jersey Constitution and the Criminal Justice Act of 1970, N.J.S.A. 52:17B-97 to -117, which provides for the general supervision of criminal justice by the Attorney General as chief law enforcement officer of the state in order to secure the benefits of a uniform and efficient enforcement of the criminal law and the administration of criminal justice throughout the state, I hereby direct all law enforcement and prosecuting agencies operating under the authority of the laws of the state of New Jersey to implement and comply with the Use of Force Policy as revised by this Directive (the April 2022 UOF Policy), including the revised Addendum B (the April 2022 Vehicular Pursuit Policy), and to take any additional measures necessary to update their policies accordingly.

Finally, Defendants ignore that Plaintiffs seek not only injunctive relief but also a

declaratory judgment. *See, e.g., Wayne Land & Min. Grp. LLC,* 894 F.3d at 522–24. Thus,

even if an injunction would not strictly bind a party that is not joined as a defendant a

declaratory judgment would. As creations of the State, Bayonne, Union County, the State

Parks Service, and the Division of Fish and Wildlife would all be bound to follow a

declaratory judgment that the challenged prohibitions are unconstitutional. If Plaintiffs

prevail, none of those agencies, entities, or subdivisions would get a second bite at the

apple. The State of New Jersey gets one chance to defend the constitutionality of those

---

[2] In any event, Plaintiffs have sought all appropriate relief, and so the Court could always word its injunction broadly enough to make clear that the Attorney General is bound to ensure that no local or State jurisdiction acts inconsistent with the relief granted.

laws. None of its agencies, statutory creations, or subdivisions is entitled to a second chance.

At worst, they would be on notice that their own prohibitions are unconstitutional, which itself would redress any injury independent of the State law. For example, if the State Park Police tried to arrest Plaintiff Siegel for carrying in a state park after this Court held the State prohibition on carrying in parks unconstitutional, the police would be wide open to a claim for damages under 42 U.S.C. §1983. *AmSouth Bank v. Dale*, 386 F.3d 763, 786 (6th Cir. 2004) ("The 'useful purpose' served by the declaratory judgment action is the clarification of legal duties for the future, rather than the past harm a coercive tort action is aimed at redressing.").

### 2.  Zoos Do Not Pose a Traceability or Redressability Problem

Defendants argue that Plaintiff Siegel does not have standing to challenge 7(a)(9) because the Turtle Back Zoo independently bans weapons. As explained above, concurrent causation is sufficient to confer standing, and therefore such a policy does not defeat Plaintiff Siegel's claim.

But even so, the Turtle Back Zoo is part of the Essex County Parks System, and therefore does not have an independent right to restrict the Second Amendment rights of visitors to the zoo. *See* https://essexcountyparks.org/south-mountain (last visited February 23, 2023).

Further, Defendants ignore that Plaintiff Cook has specific plans to visit the

Popcorn Zoo, which has no prohibition on handgun carry, and Plaintiff DeLuca has specific plans to visit the Cape May County Zoo, which has no policy against handgun carry and which is a government owned zoo like the Turtle Back Zoo and therefore could not lawfully do so in any event. *See* https://www.capemaycountynj.gov/1008/Park-Zoo (last visited February 23, 2023).

Finally, Plaintiff Siegel has stated that he frequently takes his son to the Van Saun/Bergen County Zoo, another county-owned zoo without a prohibition on handgun carry. *See* https://www.co.bergen.nj.us/bergen-county-zoo/zoo-main (last visited February 23, 2023).

### 3. Casinos Do Not Pose a Traceability or Redressability Problem

Defendants also contend that Plaintiffs lack standing to challenge the casino restrictions because all New Jersey casinos have now banned handgun possession. But the record does not reflect that. Defendants merely cite a trade association press release that says only "all of the Atlantic City casinos are exercising their rights, as private property owners, to prohibit the carrying of firearms on their premises."

But nothing in the record indicates that all nine Atlantic City casinos *have actually done so*. In fact, none of the casino websites reflect *any* policy prohibiting firearms except as follows: Ocean Casino-Resort and only as to their Ovation Hall concert venue; the Borgata, found on its MGM/Resorts parent webpage; and Hard Rock Hotel and Casino, again only as to their entertainment venues. And yet these casino websites are replete

with pet policies, responsible gaming and conduct policies, and health and safety policies. *See generally* casino websites linked at https://casinosnj.org/ (under "Members") (last visited February 17, 2023).

### 4.    Filming Locations Do Not Pose a Traceability or Redressability Problem

The Gorelick Declaration asserts that access to public filming locations is "typically restricted and controlled," but he does not purport to and cannot in fact speak for *all* film sets on public streets and locations, and certainly not for the two specific productions that Plaintiff Cook intends to seek out and visit (Mean Girls The Musical and Joker 2). It is certainly extremely unlikely that either of these public filming locations will be so fully closed and controlled that folks would not be able to stand on a public street or sidewalk and watch in a way that would trigger the prohibition of 7(a)(23).

Further, ANJRPC member Ria Jairam's YouTube activities provide independent standing to challenge 7(a)(23).

Plaintiffs have standing to assert all of their claims.

## II.    Likelihood of Success on the Merits

As this Court held at the TRO stage, "the plain text of the Second Amendment clearly covers the conduct at issue" in this case.  Dkt. 34 at 28; *see Bruen*, 142 S. Ct. at 2126.  The burden therefore shifts to defendants to show that Chapter 131's restrictions are likely consistent with the Nation's historical tradition of firearms regulation. *See* Dkt.

34 at 29; *Bruen*, 142 S. Ct. at 2126. Just as at the TRO stage, Defendants fail to carry this burden.

Indeed, Defendants continue to fight the clear rules laid out in *Bruen*, even though *Bruen* explains these rules at least *nine* different times, *Bruen*, 141 S. Ct. at 2126; *see id.* at 2127, 2130, 2133, 2135, 2138, 2149 n.25, 2150, 2156, and this Court further explicated them in its TRO ruling.  In *Bruen*, the Supreme Court clarified the test to be applied under the Second Amendment: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. at 2129–30. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2130.

Every aspect of Chapter 131 impacts the carrying of handguns in public—the very activity at issue in *Bruen*. As such, every challenged provision of Chapter 131 plainly falls within the text of the Second Amendment. *Id*. at 2134-35. Therefore, Defendants bear the burden to demonstrate that each of the challenged provisions are consistent with the historical tradition of firearm regulation. *Id*. at 2130.

Consistency with historical tradition requires comparing the challenged regulation with regulations that existed at the time of the Founding. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of

23

a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131.

Here, the societal problem sought to be addressed by the challenged provisions is the same as it was in *Bruen* and in *Heller*: "handgun violence," primarily in "urban area[s]." 142 S. Ct. at 213. Similarly, the nature of the prohibitions and rules challenged here are exactly the same as in *Bruen*: to restrict the ability of individuals to carry handguns in public for self-defense. Defendants thus are not entitled to resort to reasoning by historical analogy, as *Bruen* leaves that path only only for "unprecedented societal concerns," "dramatic technological changes," or "modern regulations that were unimaginable at the founding." *Id.* at 2132. The challenged provisions involves none of those things.

Therefore, Defendants cannot resort to historical consistency by analogy. Rather, they must show that these same types of restrictions and requirements were part of the historical tradition in or about 1791. They have not done so.

As the Supreme Court explained in *Bruen*, "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited— e.g., legislative assemblies, polling places, and courthouses . . . ." 142 S. Ct. at 2133. As those limited examples reflect, the only restrictions on being armed in public found in the historical tradition related to places where the function of governing takes place, so as to prevent "Violence or Force being used at the [] Elections" or "violent intimidation of the

24

courts of justice." D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 233-34, 244-45 (2018).

Importantly, Defendants attempt to carry their burden almost exclusively by reference to regulations around 1868, the time of the ratification of the Fourteenth Amendment, or even substantially later. Although the Court in *Bruen* noted the existence of a scholarly debate as to whether 1791 or 1868 is more relevant to the historical analysis, the Court was clear that in prior instances of originalist analysis of the provisions of the Bill of Rights, *the Court has looked to 1791 as the relevant timeframe*. *Id*. at 2137. ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government. [Citations omitted]. And we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.") *See also* Mark W. Smith, *"Not All History Is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868 (working draft)* (October 1, 2022), available at https://ssrn.com/abstract=4248297 or http://dx.doi.org/10.2139/ssrn.4248297. But in all events, Defendants fail either way, as there has never been any clear and established tradition of prohibiting the carrying of firearms in the vast array of places covered by New Jersey's law.

Defendants have not shown any historical tradition for the challenged prohibited places. Moreover, in attempting to do so they have introduced pernicious theories that would undermine constitutional rights more broadly, such as that the government may treat *any* public property as though it were proprietary property, or that exercise of one constitutional right may be forbidden where another is engaged in.  Nor have they shown any tradition for the subjective permit qualifiers and multiple interviews, reference essays, and open-ended discovery in N.J.S. 2C:58-3 and 4 as a condition to exercising the right to keep and bear arms. To the contrary, the Court was clear in *Bruen* that licensing may only involve "narrow, objective, and definite standards." 142 S. Ct. at 2138 n.9.

Finally, Defendants are unable to support imposing an insurance requirement or the exorbitant increase in fees. First, because some of the fees go to the Victims of Crime Compensation Office, they are plainly unconstitutional under *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). Any fee imposed on the exercise of a constitutional right must be designed solely "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Id. See also Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943).  Forcing law-abiding citizens to shoulder the burden of compensating victims of gun crimes just because they choose to exercise their Second Amendment rights manifestly does not meet that standard.

Further, however, for Defendants to even avail themselves of the *Cox* rule, the underlying administration cost must *itself* be constitutional. If this were not so, a State

26

could easily suppress political rallies by mandating 10,000 police officers at every rally and then charging the organizer the associated astronomical fee.

In the context of the Second Amendment, that means that the costs of administration sought to be offset (i.e. licensing costs) must be consistent with the historical tradition of firearm regulation. 142 S. Ct. at 2129-30. Defendants have not even attempted to show that the excessive administrative cost of New Jersey's idiosyncratically costly licensing process meets that standard.

Finally Defendants are well aware that *Bruen* does not permit a defendant to establish historical tradition with one or even a few examples: "we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation." *Bruen,* 142 S. Ct. at 2142 (emphasis in original); *see also id*. at 2149 ("a handful of other examples in Massachusetts and the District of Columbia . . . is surely too slender a reed on which to hang a historical tradition of restricting the right to public carry.")

Defendants must establish an *historical tradition*, not merely cite historical outliers. It is for this reason they have struggled to aggregate their meager examples and shoehorn them into larger artificial categories.

A.    **Plaintiffs' Expert Declarations are Improper and Should be Rejected.**

    1.    **Expert testimony is not admissible for arguing and explaining historical tradition.**

Defendants have attempted to provide expert declarations purporting to argue and

27

explain historical tradition. This is improper.[3]

Historical tradition is a legal inquiry, not a factual one. Historical tradition is an inquiry about the state of the law at various points in our Nation's history. This much was made clear in *Bruen*:

> The dissent claims that *Heller*'s text-and-history test will prove unworkable compared to means-end scrutiny in part because judges are relatively ill equipped to "resolv[e] difficult historical questions" or engage in "searching historical surveys." *Post*, at 2177, 2179. We are unpersuaded. The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That "legal inquiry is a refined subset" of a broader "historical inquiry," and it relies on "various evidentiary principles and default rules" to resolve uncertainties. W. Baude & S. Sachs, Originalism and the Law of the Past, 37 L. & Hist. Rev. 809, 810–811 (2019). For example, "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States* v. *Sineneng-Smith*, 590 U.S. ——, ——, 140 S.Ct. 1575, 1579, 206 L.Ed.2d 866 (2020). Courts are thus entitled to decide a case based on the historical record compiled by the parties.

142 S. Ct. at 2130 n.6.

In fact, neither *Heller*, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), nor *Bruen* involved *any* factual or expert testimony on historical tradition at the trial court level or otherwise. All of the history in those cases was developed during briefing. *See, e,g, McDonald*, 561 U.S. at 899–900 (2010) (Stevens, J., dissenting, relying on briefing and law review articles).

---

[3] Indeed, all it really does is serve to invalidly increase the page length of Defendants' brief from the allowed length of 100 pages to 155 pages: The Charles declaration is 11 substantive pages, Hartog 12 pages (6 pages single-spaced), Klett 12 pages (6 pages single-spaced), and Rivas 20 pages.

Nor would factual or expert testimony on the law be admissible in any event. Fed. R. Evid. 602 requires fact witnesses to have "personal knowledge of the matter" of their testimony. Personal knowledge can include "inferences and opinions, as long as they are grounded in personal observations and experience." *United States v. Rodriguez,* 162 F.3d 135, 144 (1st Cir.1998) (quoting *United States v. Neal,* 36 F.3d 1190, 1206 (1st Cir. 1994)). There is no personal experience of the nineteenth-century laws at issue here or of any other matter. This testimony on historical tradition is simply a supposed expert witness attesting to what the law was, and that is not allowed:

> A witness cannot be allowed to give an opinion on a question of law.... In order to justify having courts resolve disputes between litigants, it must be posited as an a priori assumption that there is one, but only one, legal answer for every cognizable dispute. There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge.... To allow anyone other than the judge to state the law would violate the basic concept.

*Specht v. Jensen,* 853 F.2d 805, 807 (10th Cir.1988) (omissions in original) (reversing trial court's admission of expert testimony on legal issues at trial). See *Burkhart v. Wash. Metro. Area Transit Auth.,* 112 F.3d 1207, 1213 (D.C.Cir.1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge.") (reversing trial court's admission of expert testimony on legal issues at trial). "This holds just as true when the finder of fact is the court, if not more so; the court is well equipped to instruct itself on the law." *Stobie Creek Invs., LLC v. United States*, 81 Fed. Cl. 358, 360–61 (Fed. Cl. 2008) (collecting cases). Even in a bench trial, the court still must act as a "gatekeeper" against improper

expert testimony. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020).

Finally, even if these somehow were proper, Mr. Klett's opinion should be rejected on the merits alone. Mr. Klett is an archivist. He has no basis to opine on the meaning or significance of any of the laws discussed in his declaration, and yet he has attempted to do so. As an archivist, the most he could validly do is tell the Court what laws are found in the official archives. By going beyond that and discussing the nature and meaning of the laws, he has overstepped his experience and credentials.

These expert declarations on history are improper and should be rejected.

### 2.     Defendants' Expert Declarations are Flawed and Misleading

Even if they somehow could be admitted, Defendants' expert declarations are fundamentally flawed.  The state's two historical declarations fight *Bruen* at every turn, often rely on selective or misleading quotations of legal sources, and are simply wrong on the merits.  Its other declarations go to interest balancing forbidden under *Bruen*.  All should be rejected.

### a.     Patrick Charles

The first substantive flaw in the Charles Declaration is its improper focus on aggregation of disparate historical citations. This is the same flawed approach used by Defendants in the TRO phase. Charles erroneously looks at the citations "from a macro level" ¶17. *Bruen* allows no such thing.  If it did, every place could be a sensitive place

and the very core of *Bruen* would be destroyed.  This is exactly what Chapter 131 seeks.

In ¶10, Charles mistakenly asserts that *Bruen's* approved generally of prohibitions in government buildings. This is mistaken.  *Bruen's* reference to "government buildings" is merely a reference to that language in *Heller*, which did not elaborate on sensitive places.  *Bruen* does, and specifically notes that "the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited— e.g., legislative assemblies, polling places, and courthouses." 142 S. Ct. at 2133.

Charles also insists on improperly citing to and applying the Statute of Northampton:

> For nearly five centuries in England, from the late thirteenth century through the late eighteenth century, what constituted a "sensitive place" in which arms bearing could be prohibited was rather broad. It encompassed densely populated areas, as well as areas where people regularly congregated or conducted commerce. The text "fairs" and "markets" language contained within the 1328 Statute of Northampton makes this abundantly clear. 2 Edw. 3, c. 3(1328).

¶11.

The Court in *Bruen* held that the statute and other statutes based on it only applied to carrying arms to the terror of the people, that is, the offense of affray, not the mere carrying of arms in and of itself.  142 S. Ct. at 2139-43. More broadly, the *Bruen* court roundly rejected reliance on "medieval law[s]" such as those now proffered by Charles in interpreting the Second Amendment.  *Id.* at 2136; *see id.* at 2139-40.

Charles makes the claim "historians can say with certainty that state and local

31

governments were well within their authority to prohibit armed assemblies circa the late eighteenth century, no matter whether said assemblies were deemed the militia or not." Charles cites his own work, which is generally not a persuasive approach, particularly as his work has been found persuasive only by Supreme Court *dissents*. *See Bruen*, 142 S. Ct. at 2180-98 (Breyer, J., dissenting); *McDonald*, 561 U.S. at 914 (2010) (Breyer, J., dissenting); *cf. Rogers v. Grewal*, 140 S. Ct. 1865, 1870 n.3 (2020) (Thomas, J., dissenting from denial of certiorari) (citing Charles only to observe that "other scholars" had "repudiated" his analysis). He also cites a series of statutes whose titles alone suggest he is being misleading: "An Act to Prevent Routs, Riots, and Tumultuous assemblies," Ex. 8 "An Act For The More Speedy And Effectual Suppression Of Tumults And Insurrections," Ex. 7 "An ACT against riots and rioters." Ex. 10. Rioters are not "ordinary, law-abiding citizens [who] have a … right to carry handguns publicly for their self-defense," and vice versa. *Bruen*, 142 S. Ct. 2111. A look at the text of these statutes confirms the mismatch, as they are all aimed at armed *mobs* "unlawfully … assembled." Similarly, "An ACT to prevent hunting with Fire-Arms in the City of New-York," Ex. 9, is not "relevantly similar" to New Jersey's new enactment aimed at peaceable carriage for self-defense. *Bruen*, 142 S .Ct. at 2132.

Charles similarly misleads in his reliance on William Rawle's A VIEW OF THE CONSTITUTION OF THE UNITED STATES (2d ed., 1829) which the *Bruen* court held *supports* the right to bear arms in public. 142 S. Ct. at 2148.

All subsequent claims in Charles' expert declaration are to post-1868 statutes with two exceptions that "prohibited dangerous weapons within legislative assemblies." This is consistent with limitations on being armed in the presence of legislative bodies discussed in *Bruen*. In addition, many are city ordinances and territorial statutes of the sort discounted as outliers to the American tradition by *Bruen*, 142 S. Ct. at 2156, 2157.

The Charles Declaration is wholly misleading and unreliable and should be rejected on its merits.

### b.    Brennan Gardner Rivas

The Rivas Declaration is similarly misleading and should be rejected. There is not a single source on which she relies, or interpretation thereof, that was not squarely *rejected* by the *Bruen* court. Rivas attempts to rely on a series of historical sources that supposedly "broadly prohibited the carrying of firearms and other deadly weapons in public." Rivas Decl. 3. Not only was this conclusion rejected by *Bruen*, so too did the *Bruen* court consider and reject the sources and arguments on which Rivas relies to reach it: the Statute of Northampton, *see* Rivas at 2-3, *but see Bruen*, 142 S.Ct. at 2139-42; its American successors, *see* Rivas at 4-5, *but see Bruen*, 142 S.Ct. at 2142-45; 19th century surety statutes, *see* Rivas at 5, *but see Bruen*, 142 S.Ct. at 2148-50; and a series of 19th century court cases including *State v Huntly*, 25 N.C. 418 (1843) *see* Rivas at 6, *but see Bruen*, 142 S.Ct. at 2139-42; *State v Smith,* 11 La. Ann. 633 (1856) *see* Rivas at 6, *but see Bruen*, 142 S.Ct. at 2146 n.17; and *English v State*, 35 Tex. 473 (1872), *see* Rivas at

16, *but see Bruen*, 142 S.Ct. at 2153.  Rivas gives the game away in a footnote: in her opinion, *Bruen* was wrong.  *See* p. 4, n.3.  Indeed, in the words of one of the sources she cites, it was "[f]ugazi."  *See id*.  Regardless of Rivas's personal academic opinions, this court does not have the ability to relitigate *Bruen*.  And to submit a declaration doing so in this manner is borderline sanctionable, not to mention completely unreliable.

### 3.   The Rest of Defendants' Expert Declarations Consist Entirely of Prohibited Interest Balancing

Other than these two historical declarations attempting to refight *Bruen*, Defendants present only policy-laden Declarations that attempt interest-balancing prohibited under it.  These declarations analyze New Jersey's policy choices regarding the carry of handguns at various places. None of this is relevant under *Bruen*. New Jersey simply does not get to decide that it thinks the carry of handguns by law abiding individuals in certain places is a bad idea any more than New Jersey gets to decide that certain words or ideas should not be uttered. New Jerseyans, just like all Americans, have a fundamental right to choose to arm themselves in case of violent confrontation regardless of whether the State of New Jersey disagrees with their decision.

### B.   Section 7(a)(24) – Private Property

#### 1.   The default ban on carrying a firearm on private property violates the Second Amendment.

The plain text of the Second Amendment "protect[s] an individual's right to carry a handgun for self-defense outside the home. *Bruen*, 142 S. Ct. at 2122. Yet the

Defendants wrongly argue that there is no right to carry a firearm on publicly owned property whatsoever, which would limit the right exclusively to privately owned property. Section 7(a)(24) then imposes a default ban on carrying on "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property" without first receiving affirmative permission from the property owner. Thus, in Defendants' view, the right to carry a firearm only exists in places where the individual has received permission, and is not one of the other 25 enumerates places in Section 7(a). That is wrong.

**1.** Defendants and their amici law-school professors attempt to frame the issue as one of carrying a firearm on another's property over their objection. That is not what Section 7(a)(24) does. Instead, by force of law, it construes silence as objection. But as any first-year law student knows standing silent is not objecting. *Day v. Caton*, 119 Mass. 513, 515 (1876) (Property owner was liable for half of the cost of a wall built on the property line when he remained silent and didn't object to the construction.); *O'Brien v. Cunard S.S. Co*., 154 Mass. 272, 273, 28 N.E. 266, 266 (1891) (immigrant had no tort claim against doctor for vaccinating her when she went along with the process without objection). Section 7(a)(24) thus turns the common law on its head. Moreover, it diminishes the property owner's "'exclusive right to be king of his own castle,'" State Br. at 6 (citation omitted) because the state is making choices about who can enter the property for the property owner. Absent section 7(a)(24), private property owners would

still be able to exclude people from carrying firearms on their property if they choose to do so by providing notice. N.J.S.A. 2C:18–3(b); *see also, e.g., Edwards*, No. 20-cv-1991, 2020 WL 6449111, at *4 (E.D. La. Nov. 3, 2020) ("[A] private business may refuse service to any person for any non-discriminatory reason, e.g., 'No Shirt, No Shoes, No Service.'"). But as the New Jersey Supreme Court has noted, "'where a landowner wishes to assert his right to exclude from open land and to have the backing of the criminal law, it is not too much to ask him to give notice.'" *State v. Gibson*, 218 N.J. 277, 289, 95 A.3d 110, 116 (2014) (citation omitted). This is all the more so when the conduct in question is otherwise constitutionally protected.

Defendants continue to try to subvert *Bruen* by arguing that Section 7(a)(24) restrictions do not touch the conduct protected by the Second Amendment.[4] This is nonsense, for the same reason identified in this court's TRO order: "the plain text of the Second Amendment clearly covers the conduct at issue" in this case, *i.e.*, carrying firearms in public. Dkt. 34 at 28. *Bruen* imposes a "plain test" inquiry at this stage, 142 S. Ct. at 2126, and New Jersey's constant attempts to bake in other considerations is

---

[4] The Supreme Court struck an ordinance that required "'every charitable organization, which solicits … contributions from persons in the village by door-to-door solicitation'" to obtain a permit because the villages interests "could be sufficiently served by measures less destructive of First Amendment Rights. *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 624, 636 (1980). If door-to-door solicitations trigger First Amendment scrutiny, then there has to be some Second Amendment scrutiny attached to private property. *Bruen*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'"

merely fighting the Supreme Court's opinion. Thus, it is their burden to show that the default ban is consistent with the "Nation's historical tradition of firearms regulation." *Bruen*, 142 S. Ct. at 2126. It is not.

**2**. The sources relied on by Defendants do not show that there is a sufficient historical tradition of reverently similar analogues to support Section 7(a)(24)'s default ban.

a. *An Act to Prevent the Killing of Deer Out of Season, and Against Carrying Guns and Hunting by Persons not Qualified*. The state spills considerable ink over this statue and gets it wrong at every turn.

First, the statute is clearly about poaching. Every other court to examine the statute has found that to be the case. *Solomon v. Cook Cnty. Bd. of Commissioners*, 559 F. Supp. 3d 675, 691, n.10 (N.D. Ill. 2021); *Antonyuk v. Hochul*, No. 122-cv-986, 2022 WL 5239895, at *21 (N.D.N.Y. Oct. 6, 2022). And the New Jersey Supreme Court characterized the statute and its subsequent versions as "fish and gaming statutes." *State v. One 1990 Honda Accord, New Jersey Registration No. HRB20D, VIN No. 1HGCB7659LA063293 & Four Hundred & Twenty Dollars*, 154 N.J. 373, 389–90, 712 A.2d 1148, 1155–56 (1998).

It is also not clear that the statute could have been enforced against individuals for only carrying a firearm. In, *State v. Burroughs*, the defendant was indicted for trespassing and removing a cornerstone on another's property "'with force and arms.'" 7 N.J.L. 426,

37

426–27 (1802). The New Jersey Supreme Court ruled that the trespass was "of a private character altogether, and in which the public have no kind of interest; an action may be sustained at the suit of the person injured, but there is no precedent to be found of an indictment for such an act." *Id.* at 427. That goes completely against the Act, which directed a portion of the fines to go toward the public good or the complaining witness. Klett Certification at 13. The 1751 supplement to the Act resolves all doubt that this is a criminal statute: The Justice of the Peace could issue a Warrant and convict offenders. Klett Certification at 21. Yet, a trespass of that nature—with arms—was not an indictable offense because there was no "corruption of morals." *Burroughs*, 7 N.J.L. at 427 n.a1.

Moreover, Section 4 addresses the harm that the statute seeks to remedy, and it is the hunting on others enclosed lands: "And Whereas divers Abuses have been committed, and great Damages and Inconveniences arisen by persons carrying of Guns and presuming to hunt on other Peoples land." Klett Certificate at 13. It is clearly a poaching statute.[5] The Act also addresses the harms of setting traps and spring guns on other's land

---

[5] Section 4 also forbids carrying a firearm or hunting on unenclosed areas of property without permission, if the offender owns less than 100 acres of land or is not qualified to vote in generally assembly elections. These class-based hunting restrictions were common in England. Michael C. Blumm & Lucus Ritchie, *The Pioneer Spirit and the Public Trust: The American Rule of Capture and State Ownership of Wildlife*, 35 Envtl. L. 673, 683, n.66 (2005) ("If an English citizen did not possess the requisite money or land specified by these qualification statutes, he was effectively prohibited from hunting, even on his own land.").

without their knowledge. That harm that was being addressed, hunting on private lands, remained the same for 150 years:

> a supplement to the game act, approved March 21st, 1873, which recites and provides as follows: "*Whereas,* many irresponsible persons are trespassing with guns on lands not their own, doing much damage to stone fences, and so forth, *in search of game*, for which the owners had no redress on account of the action now being debt; therefore, *be it enacted,* that, hereafter, all actions brought under the first section of the act, &c., shall be actions of trespass."

*Buck v. Danzenbacker*, 37 N.J.L. 359, 360 (Sup. Ct. 1875). It is also why the statute only applied to enclosed or fenced-in lands. *Antonyuk v. Bruen*, No. 122CV0734GTSCFH, 2022 WL 3999791, at *35 n.46 (N.D.N.Y. Aug. 31, 2022).

The fact that Section 4 goes to prohibit carrying a gun or hunting on another's property does not mean that poaching was not the issue that the statute sought to address. Poaching is a hard crime to police and prosecute because it generally takes place in remote areas without witnesses around and requires proof beyond a reasonable doubt. Eric T. Freyfogle & Dale D. Goble, *Wildlife Law: A Primer* 143 (2009). Hunting regulations are often drafted overly broad, where possession of a firearm in areas where wildlife is present is prima facie evidence of hunting. Courts are constantly taking a narrow reading of the statutes. For example, a Michigan court found that a statute in the natural resources code that prohibited hunting *or* discharging a firearm within 150 yards of a dwelling was strictly limited to hunting and did not apply to shooting ranges. *Cheboygan Sportsman Club v. Cheboygan Cnty. Prosecuting Atty*, 307 Mich. App. 71, 82–83, 858 N.W.2d 751,

757 (2014). The Arkansas Supreme Court struck on overbroad restriction on hunting on or across a road because the plain language of the regulation prohibited possessing a firearm on a public road, which was otherwise lawful. *Arkansas Game & Fish Comm'n v. Murders*, 327 Ark. 426, 938 S.W.2d 854 (1997); *see also Ex parte W.F.,* 214 So. 3d 1153, 1159 (Ala. 2015) (reversing a lower court's holding that being present in an area where wildlife was present with a firearm and light after dark was prima facie evidence that the accused was night hunting.).

The 1751 Supplement to the Act makes it clear that the goal was to draft the most overlabored poaching statute possible. To respond to additional harms done by setting traps for cattle, *see* Section 1, Klett Certification at 18-19, the statuette now forbids anyone "to carry a Gun or Guns, or hunt or watch for deer, or any other Game, or let in any Dog, or Dogs to drive Deer, or any other Game," Section 7, Klett Certification at 21. The 1771 amendments do not alter the actual offenses in substance. Everything that was previously prohibited is still prohibited with the same costs. The offenses were just broken into two sections. Klett Certification at 51-52. The 1847 Amendments still have the prohibition Chapter 3, which was enacted for the preservation of game. Klett Certification at 79-80.

It is unquestionable that the statute's purpose was to prevent property damage caused by uninvited hunters on enclosed lands. *Antonyuk v. Bruen*, No. 122CV0734GTSCFH, 2022 WL 3999791, at *35, n. 46 (N.D.N.Y. Aug. 31, 2022) (citing

*Sinnickson v. Dungan*, 8 N.J.L. 226, 226 (N.J. 1825)). It is not relevantly similar to the default private property ban because it fails the "why" factor. CITATION. And even if this statute was not exclusively about poaching, it is just one statute, which is not enough to establish a historical tradition.

b. *Other Colonial Laws*. The state then relies on several other colonial laws in misplaced arguments.

The state and its professor amici reference a 1715 Maryland poaching statute. State Br. 15 Amici Br. 37. That statute is limited to plantation land and "expressly applies only to persons who were previously convicted of poaching." *Antonyuk,* 2022 WL 3999791, at *35. It fails for the same reasons that the NJ statute is not an appropriate analogue.

Both the state and the professor amici reference a 1721 Pennsylvania statute. State Br. at 15-16. Amici Br. *38. That statute is exclusively limited to enclosed and fenced-in lands of *any plantation*. *Antonyuk,* 2022 WL 3999791, at *35 n.46. The 1763 New York law relied on by the state its amici likewise is limited to "any orchard, garden, cornfield, or other *inclosed* [sic.] land whatever, within the city of New York." State Br. at 16.; Amici Br. *38. And the 1789 Massachusetts law relied on by the state doesn't go as far as the state claims. That law was for the "Protection and Security of the Sheep and Other Stock." The statute forbid anyone to "take away, shoot, kill or destroy ; or shall cause to be taken away, shot, killed or destroyed , any Sheep or other stock or creatures."  Nor was

the statute a complete ban on carrying a firearm. It allowed individuals to carry if they had sufficient reason, Citation, and that limitation is now invalid after *Bruen*.

All of these laws applied exclusively to enclosed improved lands or enclosed farmlands. They were designed to prevent poaching game and the taking of livestock. *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 5239895, at *21 (N.D.N.Y. Oct. 6, 2022). They are not relevantly similar under *Bruen*.

c. *Revolutionary to Reconstruction Era Laws*. The revolutionary to reconstruction era precedents relied on by Defendants suffer from the same flaws.

The 1867 Texas and 1893 Oregon statutes, State Br. at 16; Amici 28, prohibited carrying on enclosed lands only, and the Texas statute was specifically limited to plantations. The 1865 Louisiana statute does appear to broadly restrict the carrying of firearms on any plantation or premises. State Br. *16. But that is one precedent, and one cannot establish a historical tradition. *Bruen*, 142 S. Ct. at 2142 ("we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation."); *Heller v. D.C. (Heller II)*, 670 F.3d 1244, 1292 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (six state laws are not enough to establish a historical tradition under the Second Amendment.).

\*     \*     \*

At most, the state has established that there was a historical tradition of preventing

individuals from hunting on enclosed areas of private property.[6] But Section 7(a)(24) goes much farther in its restriction. It is a generalized restriction on the "core lawful purposes of self-defense" under the Second Amendment, *Heller*, 554 U.S. at 630, which *Bruen* recognized presumptively extends to carriage outside one's own home, 142 S. Ct. 2111, 2126.  Hunting, while an ancient reason for gun ownership, is not at the core of the Second Amendment, and the state cannot rely on old hunting restrictions to support its current broad frontal assault on public carriage under the Second Amendment. It thus falls short of establishing a historical tradition that is relevantly similar restriction on the right to keep and bear arms. Defendants failed to meet their burden, and Section 7(a)(24) should be enjoined.

### 2.  The default ban on carrying a firearm on private property violates the First Amendment.

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213

---

[6] Defendants also claim that it is significant that none of these laws were challenged under the Second Amendment when they were passed. But at the time it was understood that the Second Amendment, like the rest of the bill of rights, only applied to the Federal government. And because the state has always owned the wildlife in its sovereign capacity, it would have made little sense to challenge a poaching restriction under the Second Amendment. *Commonwealth v. Patsone*, 79 A. 928, 929 (Penn. 1911) (wildlife is the property of the state); *State v. Nergaard*, 102 N.W. 899, 901 (Wis. 1905) (describing the common law right to hunt and fish as whatever rights the state granted the individual and upholding a restriction on how much fish could be harvested and sold).

(2013) (citations omitted). Section 7(a)(24) strikes at the heart of that principle. Under it, property owners must now affirmatively invite individuals who choose to exercise their Second Amendment rights onto their property—even if they wish to allow those individuals to enter their property without making a statement. That cannot stand under the First Amendment.

**1.** Section 7(a)(24) violates the First Amendment in a number of ways. Fist, it forces people to speak the state's preferred policy, which the First Amendment forbids. *E.g., Knox v. Serv. Emps. Int'l Union, Loc*. 1000, 567 U.S. 298, 309 (2012) (citations omitted) ("The government may not … compel the endorsement of ideas that it approves.). Defendants admit that requiring property owners to give affirmative consent to enter their property, Section 7(a)(24) codifies the people's preferred policy. State Br. at *22. It can be struck on that principle alone.

**2.** "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc*., 487 U.S. 781, 795 (1988) (citation omitted); *see also W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (state cannot compel flag saluting*); Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (state could not require drivers to display state motto on their license plates). "Content-based laws … are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The law must also be "'the least restrictive means of advancing that interest'" *Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408, 420 (3d Cir. 2020) (citation omitted).

Defendants never identify an interest in response to this argument. The closest they come to is alleging that the default prohibition is what the people want. That is not enough, *Knox,* 567 U.S. at 309, for "the freedoms of the First Amendment"—not "the various community interests"—is the "preferred position." *Saia v. People of State of New York*, 334 U.S. 558, 562 (1948).

Moreover, Section 7(a)(24) is not the least restrictive means of accomplishing the state's policy. The general trespass statute requires that property owners put individuals on notice that they may be trespassing. N.J.S.A. 2C:18–3(b); *Gibson*, 218 N.J. at 289, 95 A.3d at 117 (discussing the effects and differences of "no loitering" and "no trespassing" signs under the statute). Again, the New Jersey Supreme Court noted that "'where a landowner wishes to assert his right to exclude from open land and to have the backing of the criminal law, it is not too much to ask him to give notice.'" *Gibson*, 218 N.J. at 289, 95 A.3d at 117. That is the least restrictive means to accomplish state's preferred policy, and that means that Section 7(a)(24) fails.

**3.** Even if Section 7(a)(24) is not viewpoint based, it is still subject to First Amendment Scrutiny. *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 188 (3d Cir. 2005); *Miller v. Mitchell*, 598 F.3d 139, 152 n.14 (3d Cir. 2010). Thus, Section 7(a)(24) is at

least subject to intermediate scrutiny. *Stuart v. Camnitz*, 774 F.3d 238, 250 (4th Cir. 2014) (applying intermediate to compelled speech statute); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 45 (D.C. Cir. 2014) (Brown, J., dissenting) (Viewpoint-neutral compelled speech is subject to intermediate scrutiny, while viewpoint-based compelled speech is subject to strict scrutiny.). To survive intermediate scrutiny, a neutral speech restriction must be "'narrowly tailored to serve a significant governmental interest.'" *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363–64 (3d Cir. 2016) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994)). To do that, the government must "'demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests.'" *Id.* (quoting *McCullen v. Coakley*, 573 U.S. 464, 495 (2014)).

Again, Defendants have not identified an interest here aside from the study indicating that it is the people's preferred policy. State Br. *22. That is not enough. Nor have Defendants demonstrated that the general trespass statute, which requires notice, cannot achieve its desired outcomes.

**4.** Defendants' counterpoints completely miss the mark. They first argues that the statute is no different than the state's intestacy rules for those who die without wills. But even assuming that statute compels a person to speak by disposing of their property under the statute, which it doesn't because nobody is required to conspicuously post their will for it to take effect, that speech would only occur after the person dies. But the deceased

do not have constitutional rights, and cannot bring Section 1983 claims for "events occurring Post obitum." *Whitehurst v. Wright*, 592 F.2d 834, 840 (5th Cir. 1979); *Guyton v. Phillips*, 606 F.2d 248, 250 (9th Cir. 1979) (the dead are not a "person" under Section 1983).[7]

Nor is the claim "self-contradictory." State Br. at 22. Defendants wrongly argue that the injunction would create more compelled speech because people who don't want firearms on their property would have to provide that notice. *Id*. That is not the case because a trespass notice is akin to a warning that delivers factual and noncontroversial information, which is not compelled speech. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2376 (2018). That is important because trespass has traditionally been a private offense against the individual; it was not indictable unless it affected the public at large. *Burroughs*, 7 N.J.L. at 427. That is why the property owner must issue the trespassory warning, i.e., a factual notice informing others not to enter the property. *E.g., Gibson*, 218 N.J. at 289, 95 A.3d at 116 ("The heart of *N.J.S.A.* 2C:18–3(b) is the notice provision."). It is how the owner "'asserts[s] his right to exclude.'" *Id*.

Defendants' arguments miss the mark, and Section 7(a)(24) should be preliminary enjoined because it violates the First Amendment.

---

[7] And even if there is compelled speech, that statute very well may be the least restrictive means of disposing of intestate property.

### 3. The default ban on carrying a firearm on private property violates the Equal Protection Clause.

If unequal treatment occurs in the context of exercising a fundamental right, or the government is motivated by animus toward a disfavored group, courts apply heighted scrutiny. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985). Section 7(a)(24) does just that. In New Jersey, trespassers who are exercising their First Amendment rights against the property owner's wishes are subject to N.J.S.A. 2C:18–3(b). *E.g. Karns v. Shanahan*, 879 F.3d 504, 523 (3d Cir. 2018) (holding that officers had probably cause to arrest ministers for knowingly preaching at a train station without permission to do so). Section 7(a)(24) subjects individuals to harsher penalties for the same offense—merely because they are exercising their Second Amendment rights. As such, it should be subjected to "the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

In response, Defendants merely reverts to misclassifying the claim as seeking to carry a firearm on property against the owner's will. State Br. at 22–23. As explained above, that is not what Section 7(a)(24) does, and that is not what plaintiffs are seeking to do. And as further explained above, Defendants cannot meet their burdens under any form of heightened scrutiny.

**C.   Section 7(b) – The ban on carrying in vehicles violates the Second Amendment.**

In *Bruen*, the state of New York allowed Mr. "Koch to 'carry to and from work'" only, and the Supreme Court held that was not enough to satisfy the Second Amendment. *Bruen*, 142 S. Ct. at 2125. New Jersey's law not only prohibits carriage both on private and public property (thus reinventing the offending act from *Bruen* as the sum of its parts, instead of the whole), it places even more severe restrictions on carriage in a vehicle than were present in that case. Defendants are as wrong on this front as it is on all others.

1. To begin, Defendants conflate the concepts of "carry," "transport" and "storage." State Br. at 62–63. In so doing, Defendants argue that they are just regulating the manner of carry, i.e., how one carries a firearm in a vehicle. Not so. The Second Amendment preserved the right to "public carry for self-defense," *Bruen*, 142 S. Ct. at 2156, to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person." Heller, 554 U.S. at 584 (cleaned up).  It is a core aspect of *Heller* that a law requiring a citizen to "render [her firearm] inoperable" does not satisfy the Second Amendment's protections.  *Heller*, 554 U.S. at 628.  Since section 7(b), as Defendants admit, requires citizens to carry their firearms in their vehicles "unloaded" and in a "securely fastened case" or "in the trunk," *see* Op. 62, it plainly violates *Heller* and *Bruen.*

Defendants' attempt to defend this law as a "manner restriction" falls woefully short.  A manner restriction refers to how the person may or may not carry the firearm,

49

i.e., "in a manner likely to terrorize others," or whether the arm is carried openly or concealed, *Bruen*, 142 S. Ct. at 2150 ("States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly."). That is not what Defendants are doing here—rather, it is imposing an "inoperab[ility]" requirement foreclosed by *Heller*.

2. Public transportation. Public transportation is not a sensitive place merely because many people take public transportation. State Br. at 62. The Supreme Court rejected the notion that a place is sensitive merely because people congregate there and there is a law enforcement presence. *Bruen*, 142 S. Ct. at 2133–34.

Defendants must point to relevant historical citations to justify the restriction. They have failed to do so, citing only one 1876 statute from Iowa, which is not enough. Def. Br. at 63; Cai Declaration at 121. But that statute read as a whole appears to prohibit brandishing, not merely carrying, a firearm. In addition to throwing objects at trains, it makes it an offense to "present or discharge any gun, pistol, or other fire arm at any railroad train, car, or locomotive engine." (Emphasis added).

3. Private vehicles. Defendants' attempts to show a tradition of restricting carriage in private vehicles fair no better, and often involve selective omissions. Defendants lead off with a 1926 Iowa statute, Def. Br. at 63, but omit the fact that the statute expressly exempted "pistol[s] or revolver[s]" from the general ban, Cai Declaration at 125. And the sections directly above and below that statute clearly regulate poaching. *Id*. Likewise, the

50

1919 Maine statute cited by Defendants is titled "Prohibiting Hunting from Automobiles," only prohibited driving with "a rifle or shotgun." Cai Declaration at 129–30. These poaching statutes are not relevant historical analogues because they served different purposes.

Nor is there a historical tradition of banning firearms, either when traveling or driving locally. Defendants argue that banning concealed carry did not necessarily allow for open carrying. Def. Br. at 65 n.65 (citing Rivas Decl. ¶ 9). Not only does *Bruen* say the opposite, 142 S. Ct. at 2150, but the cases, including the ones referenced in the Rivas Declaration do, too. *State v. Huntly*, 25 N.C. 418, 423 (1843) ("the carrying of a gun, per se, constitutes no offence."); *State v. Smith*, 11 La. Ann. 633, 634 (1856) (carrying partially concealed was unusual when the statute banned concealed carry, which was defined as "'not appear[ing] in full open view.'"); *see also Haile v. State*, 38 Ark. 564, 565 (1882); *St. v. State*, 67 Ala. 87, 88 (1880). These statutes clearly regulate the manner of carry. And because they allowed carrying openly, they do not serve as analogues to completely ban carrying in personal vehicles within one's own community. Defendants' arguments here are wrong. Def. Br. at 65.

Defendants also wrongly argues that restricting firearms in vehicles traveling great distances is historically permissibly. To the contrary, carriage rights were historically felt *most* acutely (and protected all the more) when they were traveling. Many states banned concealed in favor of allowing open carry. But those statutes had exceptions allowing for

concealed carry when one was on a journey. Kentucky did that in 1813. Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky (Frankfort: Gerard & Berry, 1813), 100-101. Indiana did it in 1820. Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly (Jeffersonville: Isaac Cox, 1820), 39. And Texas did it in 1871. 1871 Texas Laws ch. 34 at 25. Leaving the county was enough to be on a journey. *Poe v. State*, 85 Tenn. 495, 3 S.W. 658, 659 (1887); *Lemuels v. State*, 113 Ark. 598, 166 S.W. 741, 742 (1914); *Owen v. State*, 31 Ala. 387, 388 (1858) (Carry prohibition exempted individuals who were "traveling, or setting out on a journey."). Thus, the historical tradition for even regulating the manner of carrying while traveling is not only sparse, but cuts *against* Defendants.

Defendants have failed to meet its burden yet again. The Court should issue the preliminary injunction and prohibit enforcement of Section 7(b)(1).

### D. Defendants' Arbitrary Aggregation Categories Do Not Satisfy Their Burden Under *Bruen*.

Defendants repeat their fatal error from the TRO stage. They are unable to show any actual historical tradition supporting the specific restrictions they seek to justify, and therefore they have instead created arbitrary categories through which they have attempted to aggregate disparate historical citations.

#### 1. Government as Proprietor

Defendants again seek to shortcut their burden under *Bruen* by claiming that the State may prohibit carry on government property as the owner, but nothing in *Bruen*

allows that. The Court was very clear. The only thing that permits a state to prohibit the carry of handguns is historic tradition. *Id*. at 2129-30. Defendants have not shown any historical tradition of states prohibiting handgun carry on property owned by the state. Indeed, if that were the historical tradition, then *Bruen* would not need to have gone out of its way to single out "legislative assemblies" and "courthouses" as among "the relatively few" sensitive places where firearms may be prohibited, 142 S. Ct. at 2133, as those places are virtually by definition owned by the government.

Notably, the only Second Amendment cases Defendants invoke in support of their government-as-proprietor argument predate *Bruen* and its recognition of a general right to carry, including *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019), a case specifically abrogated by *Bruen, see* 142 S. Ct at 2127 n.4, and *United States v. Ruckman,* 806 F.2d 1471 (10th Cir. 1986), a case having nothing at all to do with the government as proprietor concept or the Second Amendment. In *Ruckman*, the defendant had no Fourth Amendment expectation of privacy because he was trespassing on government land.[8]

But even in the First Amendment context, the government-as-proprietor rule does not allow state to wholesale deny the exercise of a constitutional right. The government's treatment of speech must be consistent with the kind of forum it has provided. *Int'l Soc.*

_____

[8] Defendants also cite an unreported district court decision, *United States v. Tallion*, 2022 WL 17619254 (D. Md Dec. 13, 2022). *Tallion* is an extreme outlier, construing *Bruen* and *Heller* in a wholly idiosyncratic and improper way, also having nothing to do with the government-as-proprietor concept.

*for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 677–79 (1992) ("These cases reflect . . . a "forum based" approach for assessing restrictions that the government seeks to place on the use of its property"). And even in the least protected First Amendment forum the restriction on speech cannot be "an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Id.* at 679. *See also Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 509 (1969) (government can only regulate speech in public schools where it would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school").

Finally, even if the government-as-proprietor doctrine did apply to the Second Amendment, it could only apply to State owned property. The state is trying to efface the well-established distinction between spaces in which the state acts as a proprietor (e.g., of a state-owned office building) and spaces which belong *generally* to the public. Under this well-established distinction, the State of New Jersey is not considered the "proprietor" of a local public library, museum, beach, park, etc., all of which are encompassed by Chapter 131. To allow New Jersey to extend the narrow exception for spaces where the state is a true proprietor to all *public* spaces would pose a grave threat not only to Second Amendment rights but to all constitutional rights.  Such an attempt must be emphatically rejected.

The government-as-proprietor doctrine cannot justify any of the prohibitions.

## 2.    Government and Constitutionally Protected Activity

*Bruen* does not permit a defendant to establish historical tradition with one or even a few examples: "we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation." *Bruen,* 142 S. Ct. at 2142 (emphasis in original); *see also* id. at 2149 ("a handful of other examples in Massachusetts and the District of Columbia . . . is surely too slender a reed on which to hang a historical tradition of restricting the right to public carry.") But neither does *Bruen* enable the state to cobble together a *gestalt* tradition by artificially conflating categories. In *Bruen* itself, in response to the state's contention that it could "expand[] the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement," the Court stated that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2134. And the Court emphasized that historical record revealed "relatively few" examples of sensitive locations. *Id.* at 2133.

Defendants must establish an *historical tradition*, not merely cite historical outliers. It is for this reason they have struggled to aggregate their meager examples and shoehorn them into larger artificial categories. Yet that is equally unavailing. And one such artificial category, "Government and Constitutionally Protected Activities," is not only analytically flawed, but constitutionally dangerous.

As the Supreme Court explained in *Bruen*, "the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether

55

prohibited—e.g., legislative assemblies, polling places, and courthouses . . . ." 142 S. Ct. at 2133. As those limited examples reflect, the only restrictions on being armed in public found in the historical tradition related to places where the function of governing takes place, so as to prevent "Violence or Force being used at the [] Elections" or "violent intimidation of the courts of justice."  David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 233-34, 244-45 (2018).

The "function of governing" is not the same as places where "constitutionally protected activity" occurs, and the two may not be aggregated under a *Bruen* analysis just so Defendants can try to satisfy a clear numerosity requirement. Moreover, Defendant's proposed category is not only artificial, but constitutionally dangerous:  It not only allows but positively *invites* the state to condition the exercise of one constitutional right (e.g., freedom of speech) on the foregoing of another (bearing arms).  This is contrary to basic constitutional principles.  *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S.Ct. 2246, 2254 (2020).

Moreover, defendants' examples are yet again too few and too late to constitute a tradition.  If three out of 13 colonies was insufficient in *Bruen*, 142 S. Ct. at 2142, then certainly three out of 37 states (as of 1869-73) is insufficient to establish a tradition.

Second, as indicated above, 1868 is not the correct time frame. Defendants have not provided any example from around 1791. But even if 1868 could be used as *part* of the analysis, Defendants have provided literally nothing prior to 1869.

None of the challenged restrictions can be justified under the artificial rubric of

"government and constitutionally protected activity."

### 3.   Crowds

This is another attempt to artificially aggregate dissimilar locations in order to satisfy *Bruen*'s numerosity requirement. The attempt fails.

*Bruen* specifically held that crowds do not justify a prohibition on carry. 142 S. Ct. at 2134.

### 4.   Vulnerable, Incapacitated, and Children

These cannot possibly be valid aggregations under *Bruen*.[9] Vulnerable people are *exactly* the type of people who would benefit from the defensive protection provided by law-abiding citizens carrying concealed handguns. To say otherwise is simply impermissible interest balancing – specifically prohibited under *Bruen*.  And no one is arguing that incapacitated people should *themselves* be allowed to carry a handgun.

---

[9] "It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. *See* Part III–B, *infra*. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department."

*Bruen*, 142 S. Ct. at 2133–34.

To say that a sensitive location can be anywhere children gather is to gut *Bruen* in its entirety. Children are virtually everywhere except places like adult theaters, bars, or casinos.  And children are at least as entitled to benefit from the protection of lawful self-defense as adults. There is no historical tradition that supports restricting the right to bear arms merely because there are children, even a lot of children, present.

### E.    Section 7(a)(6) – Within 100 feet of Public Gathering.

Defendants attempt to knit together a series of disparate 19th Century laws to support some sort of generic prohibition of arms at a "public gathering."  But, it is not at all clear what "public gathering" or "public assembly" meant in 1869-73, and it is Defendants' burden to show such meaning. Plaintiffs have already debunked, *supra*, the efforts of Charles and Rivas in this regard.

In *Antonyuk v. Hochul*, No. 1:22-cv-0986-GTS-CFH, 2022 WL 16744700, at \*76 (N.D.N.Y. Nov. 7, 2022), in enjoining the New York law at issue, the court noted the following:

> The Court has not yet been able to find a definition of the term in 18th and 19th century dictionaries. . . . in four of the six historical laws cited, a "public assembly" (or "public gathering") appears to be likened to assemblies involving the deliberation or exercise of one's constitutional rights, or the performance of a public duty pursuant to those rights (such as "vot[ing]," "muster[ing]," or "perform[ing] any other public duty").

The court also held that the same laws as the State relies on here were not sufficient to establish a tradition. *Id*.

58

**F.      Section 7(a)(9) – Zoos.**

Defendants make the mistake of citing only to late 19th Century park ban to support their zoo ban. But *Bruen* does not allow this. Regardless of the subject of the regulation, if the specific location did not exist at the time of the Founding then Defendant must find an analogous historical tradition from the time of the Founding. Not only are none of Defendants' citations from the Founding period (1791), but if three citations of 13 original states was insufficient in 1791 to establish a tradition, then three out of more than 37 states in the late 19th Century certainly cannot. And as explained above, there is no permissible basis to prohibit carry merely because children gather.

**G.      Section 7(a)(10) – Parks, Beaches, Recreational Facilities, Playgrounds.**

The Court correctly issued a TRO as to parks, beaches, and recreational facilities and should issue a PI for the same reasons. Nothing in Defendants' new papers change that. Defendants' additional citations are all from the late 19th Century or the 20th Century, all well outside the permissible timeframe under *Bruen*.

However, the Court also tentatively denied relief as to playgrounds without prejudice, noting an intersection between playgrounds and schools but also noting the need for additional briefing.

The Court should grant a PI as to playgrounds not affiliated with schools. This is an easy bright line to draw. Playgrounds connected with schools are literally part of the

school. Plaintiffs do not challenge the prohibition as to schools and therefore do not challenge any prohibition as to playgrounds that are part of schools.

But many playgrounds have nothing to do with schools but are part of ordinary parks or are themselves standalone parks. For the same reason there is no historical tradition supporting a prohibition of carry in parks, there is no historical tradition supporting a prohibition in non-school playgrounds.

### H.   Section 7(a)(11) – Youth Sports Events.

As with playgrounds, the Court also tentatively denied relief as to youth sports events without prejudice, noting an intersection between youth sports events and schools.

As with playgrounds, this issue is readily parsed. 7(a)(11) defines "youth sports event" by reference to N.J.S. 5:17-1, which is broadly drawn to include not just interscholastic sports but also other sports such as municipal programs (e.g. rec and travel) and private non-profit sports programs.

But as with playgrounds, there is no basis to treat all youth sports like schools. They are not. Non-scholastic sports are just that--non-scholastic. Defendants argue that even non-scholastic sports events can take place at a school property. In that sense, Defendants concede that a non-scholastic youth sports program that does *not* take place on a school property should not be treated like a school.

But even for those that do, a building does not by itself make an event "school." Defendants themselves argue that 7(a)(7) "Schools . . . and other Educational Institutions"

60

should be construed narrowly as K through 12 and other institutions "subject to the regulatory power of the Departments of Education and Higher Education." Brief at 68. For the same reason, sports programs not affiliated with a K through 12 school and not "subject to the regulatory power of the Departments of Education and Higher Education" should not be treated like a school merely because they take place on school property during off hours.

So while non-scholastic youth sports events *not* on school property plainly cannot constitutionally be a prohibit place, neither can non-scholastic youth sports events which happen to take place on a school property during non-school hours.

## I.      Section 7(a)(12) – Libraries and Museums.

The Court correctly issued a TRO as to libraries and museums and for the same reasons should issue a PI. As explained above, there is no "children" rule in *Bruen*. Defendants offer nothing new other than impermissible interest balancing and late 19th Century outliers vaguely referring to "educational, literary or scientific purposes." Notably, even the small handful of outliers includes a territory (1889 Arizona), something specifically rejected in *Bruen*. [CITE] Defendants' "experts" Charles and Rivas try the same thing. They all should know better.

## J.      Section 7(a)(15) – Place Where Alcohol is Served.

The Court correctly issued a TRO as to places where alcohol is served and for the same reasons should issue a PI. Defendants try to parse the literal language of 7(a)(15)

61

for standing purposes to save "bars," but they are mistaken. Though normally phrased disjunctively ("bars or restaurants") the State plainly chose a single feature for prohibition: places where alcohol is served, and for that reason the Court correctly treated them as a single prohibition for standing purposes.

### K.    Section 7(a)(17) – Entertainment Facilities.

The Court correctly issued a TRO as to entertainment facilities and for the same reasons should issue a PI. Defendants respond only with the material in the Rivas Declaration thoroughly debunked above.

### L.    Section 7(a)(18) and N.J.S. 13:69D-1.13– Casinos.

The Court correctly issued a TRO as to casinos and for the same reasons should issue a PI. Defendants' erroneous standing argument is addressed above.

In addition to more impermissible interest balancing, Defendants further argue that they may analogize to wholly dissimilar laws because casinos represent an "unprecedented societal concern." This is incorrect. Gaming houses and wagering on horses was well known to the American colonists even if those activities enjoyed various conditions of legality during the colonial years. G. Robert Blakey, *Gaming Lotteries, and Wagering: The Pre-Revolutionary Roots of the Law of Gambling*, 16 Rutgers L.J. 211, 232-67 (1985). Casinos cannot be an unprecedented societal concern. The distinct lack of historical firearms regulation associated with gambling dooms the casino prohibitions.

**M.    Section 7(a)(20) – Airport or Public Transportation Hub.**

Defendants' standing and government-as-proprietor arguments have been fully addressed above. All Defendants are left with a single outlier, more impermissible interest balancing, and just another version of the "crowds" argument that was roundly rejected in *Bruen*.

Further, Defendants' attempt to divide 7(a)(20) into two separate prohibitions fails for the same reasons as with places that serve alcohol.  The State grouped airports and transportation hubs together for a substantive reason and the State should not now be allowed to disavow that intentional grouping to achieve an artificial litigation advantage. Even though Plaintiffs have already separately demonstrated standing for places like Newark Penn Station, standing for airports confers standing to challenge all of 7(a)(20).

**N.    Sections 7(a)(21) and(22) – Health Care Facilities and Treatment Centers**

Defendants acknowledge that Plaintiffs have standing to challenge 7(a)(21). But in its TRO opinion, the Court raised a question as to whether Plaintiffs have standing to challenge the entirety of 7(a)(21) or only those specific types of facilities they actually visit. The answer is the former. The reason is several fold.

First, the prohibition in 7(a)(21) is as to "health care facilities." The long list that follows merely sets forth examples of the category. The provision is worded in exactly the same way as entertainment facilities under Section 7(a(17) and private property under Section 7(a) (24). For the same reason Plaintiffs need not visit all of the examples listed

in 7(a)(17) or 7(a)(24) to challenge the entire entertainment and private property categories, they also need not visit every listed health care facility.

Second, because the language chosen by the Legislature is intentionally comprehensive ("including but not limited to") the Legislature has complete control over the number of examples it lists. Thus, if Plaintiffs were required to visit each different example, the State could exercise complete control over the standing requirement by listing as many different examples it chooses without changing the provision meaning (e.g. Essex County hospitals, Bergen County hospitals, Trenton clinics, West Milford clinics, etc.).

Thus, Plaintiffs may challenge the entire provision.

Plaintiffs may also challenge 7(a)(22). The Legislature's choice to separate out (21) and (22) is largely arbitrary. It is not materially different than if the Legislature had chosen to list each example in 7(a)(21) in a separately numbered paragraphs. Any other approach raises form over substance.

On the merits, changes in technology or health care delivery methods are no more relevant here than changes in handgun technology or the population density of New York were relevant in *Bruen*. Defendants cannot show any historical tradition in prohibiting carry in medical facilities. The Court should issue a PI as to all of 7(a)(21) and (22).

### O.     Section 7(a)(23) – Public Filming Locations.

Defendant once again attempts to invoke crowds to justify this prohibition, even though *Bruen* explicitly rejected such a criterion.

### P.     Fish and Game Regulations.

Defendants' reliance on *Geer v. Connecticut*, 161 U.S. 519 (1896) is misplaced. Plaintiff Siegel does not wish to hunt with his handgun. He merely wishes to carry his handgun for personal protection while hunting. Each of the challenged Fish and Game regulations prohibits him from doing that, but there is no historical tradition supporting such prohibitions.

### Q.     Section 7(a)(7) and N.J.S. 2C:39-5(e) – Schools and Other Educational Institutions – Vagueness and Overbreadth.

As in the TRO hearing, Defendants argue that these provisions are not unconstitutionally vague because they should be construed narrowly to mean only "a traditional K through 12 school" and "academic settings such as K-12 schools and, colleges and universities that are subject to the power of the State Department of Education and Higher Education." If so, the Court should explicitly construe these provisions as such.  Plaintiffs need to be able to rely on more than just the litigation position of the State in a brief or at oral argument if they wish to avoid arrest and prosecution. Plaintiffs need the certain of a ruling of this Court for such reliance.

### R.    Multiuse Property.

As with schools, Defendants made a concession at oral argument during the TRO hearing in an attempt to avoid Plaintiffs' claims. As with schools, Plaintiffs need a clear holding of the Court to be able to rely on that concession. This is especially true for multiuse properties as it is not at all clear that 7(c)(4) and 7(d) operate the way Defendants claim. The Court should explicitly construe Section 7 in the way that avoids the multiuse property problem.

### S.    Section 4 – Liability Insurance.

Defendants and their amicus Brady primarily employ forbidden interest balancing in an attempt to justify the unjustifiable, unconstitutional requirements of Section 4 that a person must purchase liability insurance as a condition to the exercise of her right to bear arms. But, as a matter of law, interest balancing is not a legitimate basis to impose such a condition on the exercise of the fundamental constitutional right. The sole question at issue is whether there is an historical tradition consistent with mandating that liability insurance be purchased as a condition of exercising the constitutional right to bear arms.

Defendants' and Brady's attempt to show an historical tradition clearly fails as well. The mere existence of historical strict liability rules for persons who *actually* cause injury is dramatically off-target and cannot establish the existence of a much broader historical tradition supporting a general insurance requirement for everyone who exercises her right to carry a handgun.

Also, *Bruen* already disposes of Defendants' argument on the several outlier surety laws raised. Surety laws applied only to individuals shown to be dangerous. Such laws cannot support an insurance requirement that applies to everyone who wishes to exercise her right to bear arms. 142 S. Ct. at 2120.

Defendants rely on *Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose* ("NAGR"), No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022), but *NAGR* was simply wrongly decided because the court in *NAGR* ignored the critical and dramatic difference between a surety law applicable only to a known dangerous person and an insurance requirement imposed on everyone. The two are not even close, and to conflate one with the other is to blur the line between two fundamentally different circumstances.

**T.  Void for Vagueness – "Vehicle"**

As at the TRO hearing, Defendants argue that the term "vehicle" in Chapter 131 Section 7(b) is not vague because of the definition of the term in N.J.S. 39:1-1 of the Motor Vehicle Code. But nothing in Chapter 131 invokes that definition. In the event Section 7(b) is not otherwise enjoined, if Plaintiffs are to rely on the definition in 39:1-1, the Court should hold that the 39:1-1 applies. Plaintiffs cannot merely rely on the conjecture in a brief.

**U.  Void for Vagueness – "Carry"**

Defendants' reference to the word "carry" in other statutes does not make the term less vague. There are no cases construing the term "carry" under New Jersey law.

Previously, liability under New Jersey gun law has turned on possession and transportation, not something called "carry." To the extent Chapter 131 purports to regulate something called "carry' as distinct from possession or transportation it is wholly unclear what the difference is.

## V.     Void for Vagueness – "Unjustified Display of a Handgun"

Defendants' response to this claim is a non-response. There is simply no way to know what that statute prohibits, and it is therefore unconstitutionally vague.

## W.     Not in the interest of the Public Health, Safety and Welfare.

Defendants argue that the language added by Chapter 131 to N.J.S. 2C:58-3(a)(5), "lacking the essential character of temperament necessary to be entrust with a firearm." makes the provision, "even more specific." They are mistaken. In fact, the new language makes an already subjective provision even more so. Nowhere does the statute define what the requisite essential character is, thereby inviting all sorts of subjective determination by the permitting authorities, all in violation of *Bruen*'s clear holding that permitting regimes that turn on the discretionary opinions of licensing officials, rather than "narrow, objective, and definite standards," are unconstitutional.  142 S. Ct. at 2138 & n.9; *see id.* at 2161 (Kavanaugh, J., concurring).

Further, Defendants make no attempt to show any historical tradition to support such a freestanding non-specific disqualifier under *Bruen*. *See also United States v. Rahimi*, 59 F.4th 163, 176 (5th Cir. 2023) (historical statutes disarmed dangerous people

68

by class or group, not after individualized findings); *United States v. Combs*, 2023 WL 1466614 (E.D. Ken. Feb. 2, 2023).

Defendants mistakenly claim that *Bruen* footnote 1 approves of similar language under Connecticut law.  But *Bruen* footnote 1 does no such thing.  All footnote 1 stands for is the general proposition that "shall issue" permitting schemes can be constitutional. *See Rahimi* 59 F.4th at 170 n.5.

### X.   Danger to Self or Others.

Defendants misunderstand this claim.  The full disqualifier is as follows:

known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others,

This provision is replete with subjectivity in violation of *Bruen* footnote 9, using words such as "suggesting," and "likely" in conjunction with "danger to self or others." Such language invites subjective arbitrary conduct by licensing officials.

Similarly, Defendants make no attempt to show any historical tradition to support such a freestanding non-specific disqualifier under *Bruen, Rahimi,* and *Combs*.

### Y.   Massive Fee Increases

Defendants entirely ignore that portions of the fees go to go to the Victims of Crime Compensation Office, making them plainly unconstitutional under *Cox.*

Further, Defendants make no attempt to show that any of the fees address valid regulatory cost under *Cox* or *Bruen*. All they do is cite late 19th and 20th Century tax laws. This is not a relevantly similar tradition under the requirements of *Bruen*.

**Z.     Onerous New Permit Procedures.**

First, Defendants standing argument is frivolous. All permit holders must renew every two years. This falls squarely within the timeframe of a PI.

Second, there is an enormous difference between a permit procedure in which the police access resources already available to them and one, like this one, which requires both the applicant and four references to produce massive amounts of arbitrary information at the whim of the police chief, including a potential interview and written essay. Defendants make no attempt to show any historical tradition supporting this process.

Third, the onerous process will chill the speech and associational choices of the applicant as she will not know what statements both on the internet and in private and what personal associations might disqualify her for a permit at the whim of the police chief.

**AA.   Special Exemption for Judges, Prosecutors, and Attorneys General**

None of the claimed differences are real or material to the disparate treatment. Carry permit holders are also all highly vetted and trained. None of the alleged difference

justify treating Judges, Prosecutors, or Attorneys General differently in schools, polling places, energy plants, or any other sensitive place.

## III.    Irreparable Harm

Defendants argue that constitutional injury alone is not sufficient to constitute irreparable harm outside the First Amendment context. First, since Plaintiffs have alleged several First Amendment claims, this does not defeat a TRO as to those claims. Second, the inability to carry a firearm to protect oneself is irreparable harm regardless of whether it is constitutionally protected, as the kind of injury one could suffer if unable to defend against an unanticipated violent encounter is irreparable in the most of obvious of senses.

And Defendants are simply wrong. The loss of a fundamental right is always irreparable. The Second Amendment is not a second class right subject to lesser protection that the fundamental rights protected by the First Amendment or other constitutional provisions. *McDonald,* 561 U.S. at 779; *Bruen* 142 S. Ct. at 2156. Thus, an infringement of a Second Amendment right is as irreparable as an infringement of a First Amendment right. *See, e.g.*, *Wrenn v. D.C.,* 864 F.3d 650, 667 (D.C. Cir. 2017) (Second Amendment); *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (Second Amendment). To the extent *Hohe v. Casey* reasoned that "Constitutional harm is not necessarily synonymous with the irreparable harm" even in the *First* Amendment context, 868 F.2d 69, 73 (3d Cir. 1989), it is plainly no longer good law. *See, e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) ("the loss of free exercise rights 'for even minimal periods of time'"

71

constitutes irreparable injury).

Defendants claim that the insurance requirement is compensable by damages, but they do not explain how.

Finally, Defendants argue that Plaintiffs cannot show irreparable harm because they did not previously challenge the pre-existing prohibitions. This ignores that prior to the 2022 *Bruen* decision, most New Jerseyans could not obtain a Handgun Carry Permit because of the justifiable need requirement, including these Plaintiffs. In all events, a plaintiff does not forfeit the right to seek an end to an ongoing irreparable injury by failing to do so at the absolute earliest possible juncture.

## IV.   Balancing the Equities

The State cannot seriously claim that balancing the equities favors the State. The status quo ante, prior to enactment of Chapter 131, prevailed for six months since June 23, 2022 while the State did nothing. It took the State six months to pass a law, and all the while it was not worried about law-abiding New Jerseyans exercising their constitutional right to bear arms. Plaintiffs, on the other hand, sued literally as the ink was drying on the Governor's signature.

All a PI would do is restore the status quo that existed from June 23, 2022 through December 21, 2022.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.

1998), for "the enforcement of an unconstitutional law vindicates no public interest," *K.A. ex rel. Ayers v. Pocono Mountain School District*, 710 F.3d 99, 114 (3d Cir. 2013); *Wrenn*, 864 F.3d at 667.

Balance of the equities generally favors parties seeking to preserve the status quo. *E.g.*, *Hereas Materials Tech. LLC v. Pham*, 2011 WL 13227724, *1 (E.D. Pa. May 5, 2011); *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 813 (3d Cir. 1989) (the "preservation of the status quo represents the goal of preliminary injunctive relief in any litigation.").

## <u>CONCLUSION</u>

This Court should issue a preliminary injunction order prohibiting enforcement of the foregoing provisions of law.

Dated: February 24, 2023

Respectfully submitted,

s/ Daniel L. Schmutter
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com