**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, and ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC.,, | : : : : : : | No. 1:22-cv-07463-RMB-AMD |
| | : | ***KOONS* PLAINTIFFS'** |
| Plaintiffs, | : : | **REPLY BRIEF** |
| | : | |
| v. | : : | |
| | : | |
| MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, | : : : : : | |
| | : : | |
| Defendants. | : | |
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; GIL TAL; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, | : : : : : : : : | No. 1:22-cv-07464-RMB-EAP |
| | : | |
| Plaintiffs, | : : | |
| | : | |
| v. | : : | |
| | : | |
| MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, | : : : : : | David D. Jensen, Esq. DAVID JENSEN PLLC 33 Henry Street Beacon, New York 12508 Tel: 212.380.6615 david@djensenpllc.com |
| | : | |
| Defendants. | : | |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 3

I.    Plaintiffs' proposed course of conduct falls within the plain text of the Second
Amendment ......................................................................................................... 3

II.   The State has not demonstrated that the challenged regulations are consistent with
this Nation's historical regulation of firearms ........................................................ 6

  a.    This Court's analysis should begin and end with Founding Era history ............. 6

  b.    The State's historical evidence does not justify the Anti-Carry Default ............. 9

    i.    Founding Era Laws Are Hunting Regulations of Long Guns ......................... 10

    ii.   The Reconstruction Era statutes come too late and are not analogous ............ 22

    iii.  A historical tradition cannot be demonstrated by reference to modern statutes
       22

  c.    The challenged "sensitive places" are unsupported by history .......................... 23

    i.    Parks, beaches and recreation facilities .................................................... 28

    ii.   Publicly owned or leased libraries and museums ....................................... 33

    iii.  Bars and restaurants where alcohol that serve alcohol .................................. 36

    iv.  Entertainment facilities ......................................................................... 38

    v.   Airports and public transit hubs ............................................................. 44

    vi.  Health care facilities ............................................................................. 48

    vii. Vehicles .............................................................................................. 51

III.  Plaintiffs have demonstrated irreparable harm in the absence of injunctive relief . 56

IV.  The balance of equities and public interest weigh in favor of granting a preliminary
injunction .......................................................................................................... 58

CONCLUSION .......................................................................................................... 59

**INTRODUCTION**

The sweeping series of "sensitive place" restrictions that the State of New Jersey enacted on December 22, 2022, largely preclude ordinary, law-abiding citizens from exercising the exercise of the right to bear arms for self-defense, contrary to the Second Amendment's "unqualified command." *New York State Rifle & Pistol Ass'n, v. Bruen*, 597 U.S. ___, 142 S. Ct. 2111, 2126 (2022). In its new enactment, and for the very first time in New Jersey history, the State purports to establish a presumptive ban on carrying firearms on every parcel of privately held land, and every privately owned structure, throughout the State. Additionally, the State labels tens of thousands of locations in the State as "sensitive places" and commands that millions of personal vehicles are off-limits to functional handguns for all but a select few. Criminal penalties attach to those who violate (even unwittingly) the State's effective ban on carrying firearms for self defense anywhere during their day-to-day activities.

Plaintiffs Ronald Koons, Nicholas Gaudio, Jeffrey Muller, Gil Tal, Second Amendment Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey Second Amendment Society do not challenge all of New Jersey's newly constructed unconstitutional apparatus, but instead limit their challenge to (1) the presumptive ban of carrying on all private property in the State (the "Anti-Carry Default"), and several of the "sensitive place" designations,

including (2) parks, beaches and recreation facilities (but not playgrounds), (3)

publicly owned or leased libraries or museums, (4) bars and restaurants where

alcohol is served, (5) entertainment facilities, (6) the non-TSA-restricted areas of

airports, (7) healthcare facilities, and (8) vehicles. In two decisions, this Court

already recognized that many of these challenged provisions likely violate the

constitutional right to bear arms for self-defense. *See Koons v. Reynolds*, 1:22-cv-

7464, 2023 WL 128882 (D.N.J. Jan. 9, 2023); *Siegel v. Platkin*, 1:22-cv-7464,

2023 WL 1103676 (D.N.J. Jan. 30, 2023).

The State's and Intervenors' briefs provide no reason for this Court to re-

evaluate what it has already held: the challenged provisions are manifestly

unconstitutional. Since the plain text of the Second Amendment presumptively

protects Plaintiffs' proposed course of conduct, *i.e.*, carrying handguns for self-

defense during their day-to-day lives, the State bears the burden of

"demonstrating" that its modern enactments are "consistent with the Nation's

historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. In order to do

so, the State needs to have evidence of historical laws that similarly burden the

right to bear arms for similar reasons. *Id.* It cannot rely on just *any* laws, but only

those from the Founding that are "well-established and representative." *Id.* at 2133.

The State lacks such evidence in this case. Instead, the State relies on a historical

hodgepodge of non-analogous, outlier restrictions arising mostly from time periods

-2-

that are largely irrelevant. For each of the challenged provisions, the historical tradition is either directly contrary to what the State has enacted, or else the "lack" of genuine historial analogues is dispositive evidence that the State's modern enactment is inconsistent with the Second Amendment. *See id.* at 2131. As the State has not met its burden, the Court should grant Plaintiffs' amended motion for preliminary injunction and enjoin Defendants from enforcing the challenged provisions during the pendency of this litigation.

## ARGUMENT

### I.   Plaintiffs' proposed course of conduct falls within the plain text of the Second Amendment

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Bruen*, the Supreme Court articulated a framework for determining if firearms regulations are constitutional. It begins with the text. If the plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, then that conduct is presumptively protected. *Bruen*, 142 S. Ct. at 2126. The Supreme Court has defined all of the key terms in *Heller* and *Bruen*. "The people" presumptively means "all Americans," "Arms" presumptively includes "all instruments that constitute bearable arms," and, most relevant here, to bear simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008).

In this case, there is no dispute that Plaintiffs are Americans who seek to carry bearable arms. As in *Bruen*, these undisputed facts end the textual inquiry; the inquiry for where and when Plaintiffs may carry becomes historical, for which the State bears the burden of both production and persuasion. *See Bruen*, 142 S. Ct. at 2150 (it is the government's burden to "sift the historical materials"); *id.* at 2130 n.6.

The State attempts to muddy the waters by importing policy goals, federalism principles, and historical analysis into its discussion of the textual inquiry. *See* Defendant's Br. in Opp'n to Pls.' Mots. for Prelim. Inj. at 7–9, 9 n.6, 23–28 (Doc. 91) ("State Br."). For instance, with respect to the Anti-Carry Default, the State devotes significant briefing space to arguing there is no right to enter property without an owner's permission. That is of course true—Plaintiffs do not argue otherwise. But it is also beside the point under the textual inquiry. There is nothing in the text of the Second Amendment that informs a limitation based on private property rights or makes any other locational distinction at all—unlike other Amendments such as the Third and the Fourth. *See* U.S. CONST. amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."); U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated."); *see also Bruen*, 142 S. Ct. at 2134 ("Nothing in the Second Amendment's text draws a home/public distinction.").

Under *Heller* and *Bruen*, historical precedent governs the extent to which the State has the ability to regulate individuals' right to bear arms by means of changing default trespass rules or implementing "sensitive places." "[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2126 (*quoting Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49, n.10 (1961)). It is this Nation's historical tradition of firearm regulation that defines the scope of permissible government regulation. The State cannot avoid this inquiry, nor can it shirk the burden that *Bruen* repeatedly held that it has.

Despite the State's efforts to introduce extraneous considerations, the task for this Court is to address a straightforward question. For all of the challenged provisions of New Jersey's laws regulating Plaintiffs' carrying of arms for self-defense, has the State demonstrated that the historical evidence compels the conclusion that these regulations are consistent with an enduring tradition of firearm regulation? The answer is no.

**II.    The State has not demonstrated that the challenged regulations are consistent with this Nation's historical regulation of firearms**

> **a.   This Court's analysis should begin and end with Founding Era history**

Contrary to the State's argument, the Founding Era is both the beginning and ending of the historical analysis under *Bruen. See* State Br. at 32–33. This Court is bound by two lines of Supreme Court precedent, which mandate (1) that the scope of the Second Amendment with respect to the Federal Government is based on the public understanding in 1791, *see, e.g., Heller*, 554 U.S. at 634–35, and (2) that incorporated Bill of Rights provisions mean the same thing when applied to the States and the Federal Government, *see, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 765–66 (2010); *see also* Mark W. Smith, *"Not all History is Created Equal": In the post-Bruen World,  the Critical Period for Historical Analogues is when the Second  Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), *available at* https://bit.ly/3CMSKjw.

For most of the challenged provisions, the State lacks any evidence of analogues from the Founding Era at all, and instead relies mostly on evidence from the latter half of the nineteenth century. The State argues that the "[a]bsence of analogues from an earlier period is not conflicting evidence if the 19th century record consistently supports the constitutionality of an analogue." State Br. at 33. But this argument fails for at least four reasons.

-6-

First, the State's 19th-century regulations are hardly analogues that can justify the restrictions that New Jersey has imposed in the challenged provisions, *see supra*.

Second, there *is* conflicting evidence. At the Founding, there were places where individuals congregated and were vulnerable to armed attack. But the government's solution at the time was not to *disarm* people, but instead, often to arm them. *See* Amicus Brief of Center for Human Liberty at 24–25, *Antonyuk v Nigrelli*, No. 22-2908 (2d Cir.), Doc. 313 (collecting historical statutes).

Third, *Bruen* explicitly informs courts on how to address the issue the State raises: lack of Founding Era analogues. Where the government seeks to address a "perceived societal problem," such as violence in a particular place, and it "employ[s] a regulation" that the "Founders themselves could have adopted to confront that problem," such as a "flat ban on the possession of handguns," the absence of any such bans from the Founding is proof that the modern ban is "unconstitutional." *Bruen*, 142 S. Ct. at 2131 (citing *Heller*, 550 U.S. at 631, 634). In other words, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the *lack* of a distinctly similar historical regulation addressing that problem is *relevant evidence* that the challenged regulation is inconsistent with the Second Amendment." *Id.* (emphasis added).

Fourth, the State's proposed approach of relying (in some instances, exclusively) on nineteenth century evidence is directly contrary to the approach taken by the Supreme Court in *Heller*, *Bruen*, *Espinoza*, *Ramos*, and *Gamble*. In *Heller* the Court only looked to "mid- to late- 19th-century commentary" after "surveying what it regarded as a wealth of authority for its reading" of the Second Amendment from the Founding. *Bruen*, 142 S. Ct. at 2137; *see also Heller*, 554 U.S. at 605. In *Bruen*, the Court emphasized that "not all history is created equal" and reiterated that Reconstruction Era evidence was to serve, as in *Heller*, "as mere confirmation of what the Court thought had already been established." *Bruen*, 142 S. Ct. at 2137 (internal quotation marks omitted)); *see also id*. at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."). After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at 2137 (quoting *Heller*, 670 F.3d at 1274, n. 6 (Kavanaugh, J., dissenting)).

In *Espinoza v. Montana Dep't of Revenue*, 591 U.S. ___, 140 S. Ct. 2246 (2020), the Court rejected reliance on a practice adopted in "more than 30 states" because it "arose in the second half of the 19th century," *id*. at 2258–59. Directly contrary to the State's argument in this case, the Court explained that

Reconstruction Era evidence "may reinforce an early practice but cannot create one." *Id*. Consistent with the principle that an early practice can reinforce, but cannot create a contrary understanding, the Court in *Ramos v. Louisiana*, 590 U.S. ___, 140 S. Ct. 1390 (2020), in a single sentence, looked to Reconstruction era treatises, *id.* at 1396–97 & 1396 n.18. Yet it only did so after discussing the history in "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791. *Id.* at 1396. In *Gamble v. United States*, 587 U.S. ___, 139 S. Ct 1960 (2019), the Court mentioned nineteenth century evidence, but it only did so to reject it as inconsistent with the Founding evidence it had already surveyed, *id*. at 1975–76.

In sum, the State may wish to change how the Supreme Court does its historical analysis, but this Court has no basis to do so. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). The Founding era controls.

### b. The State's historical evidence does not justify the Anti-Carry Default

For the first time in New Jersey history, the State has now enacted an extraordinary default ban on carrying firearms by ordinary, law-abiding citizens. As this Court has already held, "[n]o party disputes here that private property owners in New Jersey—and across the country for that matter—have long had the right to exclude firearms from their properties." *Koons*, 2023 WL 128882 at *19. But "New Jersey's attempt to craft how private property owners communicate the

word 'no' works, in effect, to deter a law-abiding citizen who has a permit to conceal carry from exercising his constitutional right under pain of criminal prosecution. That is not how the Second Amendment works." *Id.* The reason is that history provides no "relevantly similar" analogues sufficient to demonstrate that the Anti-Carry Default is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

The State relies on laws that fall into three categories: (i) laws enacted by colonial governments in New Jersey, Pennsylvania, New York, and Massachusetts; (ii) laws from the latter-half of the nineteenth century, including Reconstruction Era laws from Texas and Louisiana, and an 1893 law from Oregon; and (iii) modern day statutes. These purported analogues are neither "relevantly similar," nor can they inform the scope of the Second Amendment as originally understood.

### i. Founding Era Laws Are Hunting Regulations of Long Guns

The State relies on a sequence of New Jersey laws enacted in 1722 (Doc. 84-2), 1769 (Doc. 84-3), and 1771 (Doc. 84-4), and briefly alludes to additional laws from Pennsylvania in 1721 (Doc. 88-33), New York in 1763 (Doc. 88-34), and Massachusetts in 1789 (Doc. 89-1).[1] These statutes enacted before the Second

---

[1] The State also relies on a substantially similar statute in 1846. For the reasons discussed, *supra*, it is not "relevantly similar" either. For instance, it is self-evidently a hunting law and recognized as such at the time—the legal compilers inserting the enacted statute in the "Game" section of the Digest of the Laws of New Jersey. *See* Doc. 84-5 at 2.

Amendment's ratification are not "relevantly similar" to the Anti-Carry Default enacted by New Jersey. In evaluating historical analogues, the Supreme Court instructs courts to consider "why" and "how" a burden was imposed on carrying firearms for self-defense to determine if the laws at issue are "relevantly similar" to a challenged modern regulation. *See Bruen*, 142 S. Ct. at 2132-33. The statutes identified by the State fail both tests.

Start with "why" these laws were enacted. All of these laws are hunting restrictions. This is evident from the substantive provisions, which make repeated references to hunting, the season for deer, and preserving the rights of property owners to hunt on their own land. *See* Doc. 84-2 at 2–4 (banning hunting of deer in "January, February, March, April, May, or June," banning the sale of "any green Deer Skins" during those same months, allowing "Free Native Indians" to hunt and those who "kill[] any kind of Deer within his Fields where Corn is growing"); Doc. 88-33 at 3–4 (allowing deer hunting "betwixt the first day of July and first day of January," banning the sale of "any green deer skins" during non-hunting months, and banning "shoot[ing] at or kill[ing] with a firearm any pigeon, dove, partridge, or other fowl in the open streets of the city of Philadelphia, or in the gardens, orchards and inclosures adjoining upon and belonging to any of the dwelling houses within the limits of the said city"); Doc. 88-34 at 3 (singling out the carrying, shooting, or discharging of "any Musket, Fowling-Piece, or other

Firearm-Arm whatsoever, into, upon, or through any Orchard, Garden, Cornfield, or inclosed Land whatsoever, within the City of New-York, or the Liberties thereof"); Doc. 84-3 at 2–4 (limiting deer hunting season to the "First Day of September and the First Day of January," banning the sale of "any green Deer Skins or fresh venison," limiting the type of "Shot" that may be used to hunt deer to only a "single Slug, Bullet or Ball only," limiting who was "qualified" to hunt on the "waste and unimproved Lands in this Colony," limiting the size of any "Trap of Steel or Iron," but noting that "[N]othing" would "restrain the Owners of Parks, or of Tame Deer, from killing, hunting, or driving their own Deer"); Doc. 84-4 at 1–5 (same); Doc. 89-1 at 2 (making it unlawful to "take away, shoot, kill, or destroy; or . . . cause to be taken away, shot, killed, or destroyed, any Sheep or other stock or creatures"). What the substance provides, the titles confirm. *See* Doc. 84-2 at 2 ("An Act to prevent Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not Qualified"); Doc. 88-33 ("An Act to Prevent the Killing of Deer Out of Season, and Against Carrying of Guns or Hunting By Persons Not Qualified"); Doc. 88-34 at 2 ("An Act to prevent hunting with Fire-Arms in the City of New York, and the Liberties thereof"); Doc. 84-3 at 2 ("An Act for the more effectual preservation of Deer in this Colony."); Doc. 84-4 at 1 ("An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns."); Doc. 89-1 at 1 ("An Act for the Protection and Security

of the Sheep and Other Stock on Tarpaulin Cove Island Otherwise Called Naushon

Island and On Nennemessett Island, and Several Small Islands Contiguous,

Situated in the County of Dukes County"). As Blackstone, who the State otherwise

extensively cites, explained, a statute must be read in "context" and "words are

always to be understood as having a regard" to the "subject matter." 1

BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, 60–62 (1765). Here that

subject matter is indisputably hunting. The State's attempts to argue otherwise are

unavailing.

The State argues that the statutes were designed to protect private property

rights. *See* State Br. at 11–15. However, there is no evidence from the text of the

statutes that some broad theory of property rights motivated the lawmakers.

Instead, New York described that it was seeking to "punish and prevent" "great

Numbers of idle and disorderly Persons" from "hunt[ing] with Fire-Arms, and to

tread down the Grass, and Corn and other Grain standing and growing in the Fields

and Inclosures there." Doc. 88-34 at 2–3. New Jersey explained in 1771 that its

prior "Laws" for the "Preservation of Deer and other Game, and to prevent

trespassing with Guns, Traps and Dogs, have, by Experience been found

insufficient to answer the salutary Purposes thereby intended," so it was passing

another law. Doc. 84-4 at 1–2. Massachusetts was determined to "provide an

additional remedy" because of the "great numbers of Sheep and Deer [which] have

-13-

been killed." Doc. 89-1 at 2. Even if it was true that these laws sought to protect property rights, these statutes protected a particular form of property right—the right accruing in ferae naturae on one's land. *See Arnold v. Mundy*, 6 N.J.L. 1, 46 (1821) ("Deer put into a park, rabbits in a warren, fish in a pond, become private property by caption and detention."); *Pierson v. Post*, 3 Cai. R. 175, 178 (N.Y. Sup. Ct. 1805) ("Most of the cases which have occurred in England, relating to property in wild animals, have either been discussed and decided upon the principles of their positive statute regulations, or have arisen between the huntsman and the owner of the land upon which beasts *feræ naturæ* have been apprehended; the former claiming them by title of occupancy, and the latter *ratione soli* [by reason of the ownership of the soil]."). The provisions in some of these statutes relating to the payment of the fine to the "owner of the soil" and preserving the hunting rights of landowners reaffirm these were limited to that narrow purpose. *See* Doc. 84-3 at 2, 4; Doc. 84-4 at 2, 4. Obviously, the Anti-Carry Default has nothing to do with *this* property right or hunting.

Next consider "how," i.e., the burden imposed on law-abiding citizens. With the exception of New York's 1763 hunting law, all of these laws only ban carrying a "gun."[2] This is an essential limiting feature of these laws. Noah Webster

---

[2] For instance, Pennsylvania's 1721 statute made it unlawful "to carry any gun or hunt on the improved or inclosed lands of any plantation," but when it referred to shooting *in* "the open streets of Philadelphia" or "gardens, orchards, and inclosures

provided the following definition of "gun" in 1828: "GUN, noun. An instrument consisting of a barrel or tube of iron or other metal fixed in a stock, from which balls, shot or other deadly weapons are discharged by the explosion of gunpowder. The larger species of guns are called cannon; and the smaller species are called muskets, carbines, fowling pieces, etc. But one species of fire-arms, the pistol, is *never called a gun*." *Gun*, NOAH WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828). This means that those "guns" being banned while trespassing are exactly (and only) the instruments used in hunting: long guns. Not only does this reaffirm that these statutes are hunting statutes, but it also demonstrates that these statutes imposed a materially different burden on ordinary, law-abiding citizens. The Anti-Carry Default is not limited to long guns or implements useful for hunting, but instead bans handguns—"the most popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629.

The Court need not only take Noah Webster's word for it—contemporary enactments by the New Jersey legislature confirms this differing usage between "Gun" and "Pistol." For instance, in the 1777 "Act for the better regulating the

---

adjoining upon and belonging to any of the dwelling houses" in the city, it did not similarly ban carrying a "gun," but instead made it unlawful to "shoot at or kill with a firearm any pigeon, dove, partridge or other fowl." Doc. 88-33 at 4. Thus, Pennsylvania made a distinction between the mode of weapon useful to hunting versus any firearm that individuals may have in the city with which they may wantonly target birds for sport.

Militia," New Jersey mandated that "every person above directed to be enrolled shall bear Arms," specifically "as soon as possible, furnish himself with a good Musket" and, inter alia, "twenty-three Rounds of cartridges suited to his Gun." 1777 N.J. Laws 26, Ch. XX, § 4 (attached as Ex. 1). But "in Lieu of a Musket," a "good Rifle Gun with all its necessary Apparatus" would suffice. *Id*. In the same statute, New Jersey found it "useful and necessary" to also establish "three Companies of Horse" troopers. *Id*. § 23. Each individual "Trooper" was required to "furnish himself with a good Horse, a good Bridle and Saddle, Holsters and Case of Pistols well fitted, a sword or cutlass, a well fixed Carbine . . . " *Id*. § 25. The State would provide "Gun-powder" and "three Pounds of Ball fitted to his Carbine and Pistols." *Id*. § 26. New Jersey made similar distinctions in its 1780 militia act between the "muskets" and "Rifle guns" for ground troops and a "Pair of Pistols" for those on horse. *See* 1780 N.J. Laws 39, Ch. XIII, §§ 11, 54 (attached as Ex. 2). In 1798 and 1806, New Jersey regulated fines for "non attendance" by members of the militia: "fifty cents" "if any militia man shall appear on parade without his musket or firelock," or "if a trooper [is] without his sword and pistols." 1798 N.J. Laws 609, 613, Ch. DCCCXXII, § 6 (attached as Ex. 3); 1806 N.J. Laws 771, 775, Ch. CLVI, § 3 (attached as Ex. 4). In 1829, New Jersey banned "fight[ing] a duel" with a "rapier or smallsword, backsword, pistol, or other dangerous weapon." 1829 N.J. Laws 102, 112, § 56 (attached as Ex. 5).

The New Jersey distinction between "guns" and "pistols" is evidenced in other states as well. In 1746, Massachusetts provided that "no person shall . . . discharge any gun or pistol, charged with shot or ball, in the town of Boston. . . ." *See* Act of May 28, 1746, ch. X, Acts & Laws of Massachusetts Bay 208 (attached as Ex. 6). In 1770, Georgia mandated that individuals on Sundays carry arms to "any church, or other place of divine worship," providing that an individual met their obligation by "carry[ing] with him a gun, or a pair of pistols, in good order and fit for service." 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES, COLONIAL AND REVOLUTIONARY 138, 1768–1773 (attached as Ex. 7); A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 157 (Watkins, eds.) (attached as Ex. 8). In 1812, Delaware made it unlawful for individuals "to fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol, within any of the towns or villages of this State." 1812 Del. Laws 522 (attached as Ex. 9). Vermont followed suit in 1818, providing that "[n]o non-commissioned officer, private or citizen shall unnecessarily fire a gun, single musket or pistol in any public road or near any house, or place of parade . . . ." 1818 Vermont Acts & Resolves 64, § 42 (attached as Ex. 10). New Hampshire similarly made it unlawful "within the compact part of the town of Portsmouth" to "fire or discharge any cannon, gun, pistol, or other firearms." 1823 N.H. Laws 73-74, An Act to Establish

-17-

a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4 (attached as Ex. 11).

"What's in a name?"—in this instance, the difference between naming "guns" and omitting "pistols" is significant. *See* Catie Carberry, "What's in a name? The Evolution of the Term 'Gun'" (2019), https://bit.ly/3Z8Y4XZ (last visited Feb. 24, 2023). "[T]here is consistency in the use of 'gun' in isolation: nearly all of the laws that mention guns but not pistols address hunting. Perhaps in such cases though it was unlawful to carry guns, it was lawful to carry pistols as they were not hunting weapons." *Id.* Moreover, the Founding Era evidence is confirmed by the usage that followed "throughout the 19th century." *Id.* For instance, in 1885, New Jersey made it unlawful "to sell, hire or loan to any person under the age of fifteen years any gun, pistol, toy pistol, or other fire-arms. . . ." 1885 N.J. Laws 52, An Amendment to an Act to Prevent Vending, Using, or Exploding of Guns, Pistols, Toy Pistols, or Other Fire-Arms to or by Persons under the Age of Fifteen Years in this State, ch. 44, § 2 (attached as Ex. 12). Accordingly, the State's identified laws cannot serve as analogues for banning pistols or other handguns for self-defense because these regulations did not purport to ban them.

Moreover, the burden from these statutes appears to be limited to trespassing on land, rather than entering into taverns, shops, or dwelling houses. For instance,

-18-

New Jersey's 1722 statute, New York's 1763 law, and Pennsylvania's 1721 statute all refer to "inclosed Land" when referencing carrying guns. *See* Doc. 84-2 at 2; Doc. 88-33 at 3; Doc. 88-34 at 442. As the Supreme Court of Judicature of New Jersey explained in 1842, "improvements is a legal and technical word, and means inclosures, or inclosed fields: lands fenced in, and thus withdrawn and separated from the wastes or common lands." *State v. Hopping*, 18 N.J.L. 423, 424 (1842). The State's only reported enforcement of New Jersey's statute occurred on "inclosed land." *See* State Br. at 12. Massachusetts's law only applied to particular islands off the coast in Buzzards Bay, as opposed to a statewide restriction. *See* Doc. 89-1 at 1.

Moreover, the use of the broader term "lands" not only further exemplifies that these were hunting laws, but also represents a notable omission: *none* of the statutes make any reference to dwelling-houses or buildings of any kind with their broad prohibitions on carrying "guns." The fact contemporaneous statutes, including Pennsylvania's 1721 statute, directly regulated conduct in and around such places leads to the strong inference that these laws simply did not apply to business on main street. In 1799, New Jersey enacted "An act to describe, apprehend, and punish disorderly persons," providing if anyone "shall be found in or upon dwelling-house, warehouse, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with

-19-

an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person." 1799 N.J. Laws 562, ch. DCCCVI, § 2 (attached as Ex. 13). In 1811, New Jersey banned the construction of a "powder magazine" on one's "own land," if it was within a half-mile "town or village, house of public worship, dwelling-house, or out-house." 1811 N.J. Laws 300, An Act to regulate Gun-Powder Manufactories and Magazines within this state. These laws are in addition to the discharge restrictions cited above which explicitly regulated activity in commercial centers of towns and villages (attached as Ex. 14).

In sum, a series of laws that regulated hunting activity, generally on rural land, often fenced in, while individuals carried "[long] guns," simply does not impose a comparable burden to a presumptive ban on carrying a handgun for self-defense while going about one's errands or everyday life upon or in every single piece of privately held land and structure within the State.

Moreover, the State's purported analogues are only a fraction of the story. Contemporaneous with the State's cited statutes, there were hunting regulations throughout the colonies and early United States that regulated trespassing *while hunting*. These other statutes underline that, if there was any widespread tradition of carry prohibitions on private property during the Founding, these were limited to hunting activity. *See, e.g.,* THE PUBLIC LAWS OF SOUTH CAROLINA 276 (1790) (attached as Ex. 15); ACTS AND LAWS OF THE STATE OF CONNECTICUT 37 (1784)

(attached as Ex. 16); "Hunting," A MANUAL OF THE LAWS OF NORTH CAROLINA 234–236 (1814) (attached as Ex. 17); DIGEST OF THE LAWS OF GEORGIA 428 (1800) (attached as Ex. 18). Additionally, at least one Founding Era law imposed an opposite burden than the one imposed by the Anti-Carry Presumption. In North Carolina, the property owner had to post signage *banning* hunting for the hunting carry restriction to apply. S*ee* A MANUAL OF THE LAWS OF NORTH CAROLINA, *supra*, at 236. Even if New Jersey's statutes applied outside of the hunting context (they did not, *see infra*), they were outliers. The laws of a single state cannot establish a tradition of American firearm regulation. *See Bruen*, 142 S. Ct. at 2153.

### ii. The Reconstruction Era statutes come too late and are not analogous

The State's citation to Reconstruction Era laws in Louisiana and Texas, and an 1893 law in Oregon come too late. In any event, both Texas and Oregon's laws are " 'anti-poaching laws,' aimed at preventing hunters . . . from taking game off of other people's lands (usually enclosed) without the owner's permission, which was a pernicious problem at the time." *Antonyuk v. Hochul*, No. 22-CV-986, 2022 WL 16744700, at *79 (N.D.N.Y. Nov. 7, 2022). "The Louisiana law appears historically inconsistent and unconstitutional." *Koons*, 2023 WL 128882 at *17. Thus, these laws, like the earlier ones cited by the State, do not pass *Bruen*'s "how" and "why" analysis.

### iii. A historical tradition cannot be demonstrated by reference to modern statutes

The State again points to modern day statutes to justify its Anti-Carry Default. *See* State Br. at 8 n.3. This Court correctly rejected reliance on these statutes before, and the State offers no reason to accept these modern statutes now. *See Koons*, 2023 WL 128882 at *17 ("[C]ontemporary statutes that conflict with our nation's history and tradition have no place in a Second Amendment analysis."). Moreover, according to the State's own cited article, what New Jersey is attempting to do is just as out-of-step with trespass restrictions across the country *today* as it is with the Founding. *See* State Br. at 8 (discussing Ian Ayres

-22-

and Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry"
Defaults on Private Land*, 48 J. L. MED. & ETHICS 183 (2020)). The authors note
that, as of 2020, "[t]wenty-five states have flipped the default *for hunting*,
requiring that hunters obtain permission before entering private property." *Id*. at
184 (emphasis added). This is notable because it is consistent with the tradition at
the Founding, as discussed above—regulating trespassing with a gun while
hunting, but not all property generally. The authors further note that, as of 2020,
"no state has adopted generalized 'no carry' defaults for retail establishments." *Id*.
Moreover, as of 2020, "forty-seven jurisdictions allow[ed] carry into private
residences." *Id*. What the State's own source makes clear is this: the Anti-Carry
Default Ban was an outlier at the Founding, and it is unquestionably an outlier
now.

### c.  The challenged "sensitive places" are unsupported by history

For the other challenged provisions, the State resorts to labeling certain
categories of locations as "sensitive places." Before considering each of the
claimed "sensitive places" in which the State has banned firearms, it is necessary
to establish the correct mode of analysis.

First, labeling something a "sensitive place" does not make it a
"presumptively lawful" prohibition on firearms. *See* State Br. 30. The Supreme
Court's use of the phrase "presumptively lawful" in *Heller* cannot be read to

override *Bruen*'s later and careful explication of the governing standard for the

Second Amendment generally, and for sensitive places specifically. At most,

*Heller*'s statement only indicated that the Court presumed that further historical

analysis would demonstrate that such sensitive place restrictions were part of the

Nation's tradition. After all, *Heller* explained that it "d[id] not undertake an

exhaustive historical analysis." 554 U.S. at 626.

Bruen itself proves that *Heller*'s "presumptively lawful" language does not

change the analysis because *Bruen* undertook precisely that historical analysis with

respect to sensitive places. And that analysis shows that the government cannot just

put the label "sensitive" on a location and therefore ban firearms there. *Bruen*

rejected exactly such an argument for the island of Manhattan. *See Bruen*, 142 S

Ct. at 2134. Rather, when *Bruen* reviewed the "historical record," the Court

identified three—and only three—recognized sensitive places. None of these

presumptively lawful locations are at issue in these proceedings.

Second, reliance on "relatively few" analogues is not sufficient, State Br. at

31, because what is required is sufficient evidence to overcome the Second

Amendment's "unqualified command" by establishing an "enduring American

tradition of state regulation." *Bruen*, 142 S. Ct. at 2126, 2155. We know that the

three recognized sensitive places are sensitive because of extensive evidence that

comprehensive security was provided for in these locations and that these were

locations critical to the function of democratic governance where assassination or intimidation risk was acute. *See Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220, at *14 (W.D.N.Y. Nov. 3, 2022) (explaining these "are civic locations sporadically visited in general, *where a bad-intentioned armed person could disrupt key functions of democracy*. Legislative assemblies and courthouses, further, are typically secured locations, where uniform lack of firearms is generally a condition of entry, and *where government officials are present and vulnerable to attack.*"). As the Center for Human Liberty Amicus Brief in *Antonyuk* in the Second Circuit demonstrates, there is extensive evidence to justify these restrictions from across the early American states. *See* Amicus Brief of Center for Human Liberty, *Antonyuk v Nigrelli*, No. 22-2908, Doc. 313 at 8–17 (2d Cir.) (collecting statutes regulating or providing for security in courthouses, legislative assemblies, and polling places).

Contrary to the Intervenors' argument, these were not "sensitive places" because individuals exercised "core constitutional rights" in these locations. *See* Br. of Intervenors-Defendants (Doc. No. 75) ("Intervenors Br."). To begin with, the Intervenors' argument is a contradiction in terms because the exercise of Second Amendment rights is just as "fundamental"—just as "core"—as the exercise of any other constitutional right. *McDonald*, 561 U.S. at 780 (plurality op.) (explaining that the Second Amendment is not "a second-class right, subject to

an entirely different body of rules than the other Bill of Rights guarantees"). But, moreover, the Intervenors' argument proves too much because constitutional rights can be exercised everywhere in any place, thus the metric for delineating "sensitive places" cannot turn on such an amorphous standard because it "would eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S. Ct. at 2134.

Third, the Court must be wary of the level of generality of a claimed analogue. *See* Intervenors Br. at 5 (arguing for a "flexible 'analogic approach'"). "[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Koons*, 2023 WL 128882, at *6 (quoting *Bruen*, 142 S. Ct. at 2133) (cleaned up). If a location existed at the Founding and the problem being regulated by the State now was also familiar to the Founders in their time, then the only relevantly similar regulation from the Founding would be a regulation applying to *that* location. *Id*. And the identified analogue must be both "well-established and representative." *Bruen*, 142 S. Ct. at 2133. *Bruen* instructs that there is only a need to look farther afield at other analogues to the extent a location is "new" or the restriction addresses "novel modern conditions." *Id*. at 2134. For instance, airports (in the areas past TSA screening) would be a "new" sensitive place responding to "novel modern conditions."

Fourth, the Court must reject the State's attempt to carve out new tests that neither the Second Amendment nor *Bruen* endorses. Specifically, the State argues that the Government has an overarching Bill of Rights-defeating, extra-constitutional power to restrict constitutional rights any time it acts as "proprietor." This boils down to nothing more than a policy argument that the State may find it hard to "compete" with private institutions if it has to follow the Constitution in a manner private parties do not. *See* State Br. at 28. Such a policy concern is "off-limits" from the Second Amendment analysis. What is more is that this argument fails for the fundamental reason that *Bruen* established a singular implementing framework to determine if state action violates individuals' Second Amendment right: is the government's regulation consistent with historical tradition? So regardless of whether the Supreme Court has permitted governments to narrowly restrict constitutional rights as a proprietor under doctrines explicating other constitutional rights (e.g., procedural due process, free speech, and the Fourth Amendment), governments may only do so with respect to the Second Amendment if there is an "enduring American tradition of state regulation" enabling such a proprietor power. *See Bruen*, 142 S. Ct. at 2154. But the State has brought forth exactly *zero* historical evidence to support is proprietorship argument, thus failing at the starting gate. What *Bruen* demands is a location-by-location analysis of the relevant historical evidence; the State cannot short circuit that or shirk its burden

-27-

by claiming it is a proprietor. To the extent pre-*Bruen* Court of Appeals decisions are to the contrary, they are unavailing.

### i. Parks, beaches and recreation facilities

In its prior decision, this Court found that State's historical citations failed to show that Chapter 131's ban on carry in "a park, beach, [or] recreation facility or area . . . designated as a gun free zone" was consistent with the country's historical tradition of firearm regulation. *See Siegel*, 2023 WL 1103676 at *11-12.[3] Specifically, the State had cited only two examples of bans on carrying guns in parks, both of which were municipal laws from Reconstruction or the period shortly preceding it—New York's Central Park in 1861 and Philadelphia's Fairmont Park in 1870. *See Siegel*, 2023 WL 1103676 at *11. Beyond that, the State had also pointed to four other examples of municipal park bans that dated from 1881 to 1893. *See id.* After noting that "there is uncertainty regarding . . . the key time period for this Court's analysis of historical evidence," *id.* at n.3, the Court considered all of the cited historical evidence to conclude that "[s]ix cities do not speak for, what was by 1893, 44 states," *id.*

In its current briefing, the State cites additional examples of park restrictions from the late nineteenth and early twentieth centuries. *See* State Br. p. 39. The

---

[3] The Court upheld section 7(a)(10)'s prohibition on carry in playgrounds. *See Siegel*, 2023 WL 1103676 at *10. The *Koons* Plaintiffs here do not challenge this part of the statute. *See* Amended Complaint (Doc. No. 69) ¶ 37.

State contends that its evidence shows that "the earliest public parks in America prohibited firearms since inception in the Reconstruction era," thus supplying a historical tradition to justify its current ban. *See id.* at 40-41. However, the very earliest evidence that the State can point to dates to 1861, and the bulk of it comes from well after Reconstruction. *See id.* at 39.

Contrary to the State's tacit assertion, public parks are not a new development that would have been unfamiliar to the Founders. Boston Common is considered "America's oldest park," and Colonists established it in 1634. Not only was it commonly used for militia purposes (making it not a gun-free zone), "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *See* Anne Beamish, *Before Parks: Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 4-6 (2021). In New York, City Hall Park began as a "public common" in the seventeenth century. *The Earliest New York City Parks*, NEW YORK CITY DEPT. OF PARKS AND RECREATION, available at https://on.nyc.gov/3hBZXfe (last visited Feb. 23, 2023). In 1773, New York established Bowling Green Park "for the Recreation & Delight of the Inhabitants of [New York] City." *Id.* And, in the South, Savannah remodeled its open and unplanted areas into landscaped neighborhood parks—which became the

landscaped parks that residents know today—"around 1800." *See* Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. OF SOC'Y OF ARCH. HIST. 47, 48 (1961).

However, park regulations from the time of the Founding do not supply a historical tradition that can support the State's present ban on carrying guns in parks. Rather, they at most support a historical tradition of prohibiting the discharge of guns in parks. For example, a 1798 Rhode Island law made it illegal to "fire any gun, musket, blunderbuss or pistol, loaded with a bullet or shot, in or across any road, street, *square* or lane. *See* THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 568 (1798) (emphasis added) (attached as Ex. 19). An 1812 Delaware law, previously discussed, prohibited the "fir[ing] or discharg[ing] [of] any gun ordnance, musket, fowling piece, fusee or pistol within or on any of the *greens*, streets, alleys or lanes of any of the towns and villages within th[e] State." *See* 1812 Del. Laws 329 (attached as Ex. 20); *see also Antonyuk*, 2022 WL 16744700, at *65 n.107. Somewhat similarly, in 1763 New York City prohibited the "Fire and discharge of any gun" by "any Children, Youth, apprentices, Servants, or other persons . . . at any mark, or at random against any fence, pales or other place in any street, lane or alley, or *within any orchard, garden* or other inclosure, or *in any place where persons frequent to walk*." *See* Supp. App'x of New York City, *NYSRPA v. New York*, No. 18-280 at

SA6 (U.S. 2019), available at https://bit.ly/3TNf8Q4 (last visited Feb. 23, 2023).

The Colony of New York enacted a similar law in 1769. *See* 5 LAWS OF THE

COLONY OF NEW YORK 12 (1894) (attached as Ex. 21). Of course, "[i]t is . . .

implausible that" "general prohibition[s]" against discharging a firearm "would

have been enforced against a citizen acting in self-defense." *Heller*, 554 U.S. at

631–33.

Moreover, these discharge restrictions presuppose that individuals possessed

firearms in these places. After all, there would be no need to regulate discharging

firearms if individuals lacked them. Thus, it is evident that firearms would be

carried in green spaces frequented by passersby during the Founding. The State's

failure to bring forth any evidence that the Founding generation banned such

firearms is dispositive proof that "the challenged regulation is inconsistent with the

Second Amendment." *See Bruen*, 142 S. Ct. at 2131. In addition, because there is

evidence that civic leaders addressed potential effects of firearm carriage "through

materially different means"—discharge restrictions—the "modern regulation is

unconstitutional." *See id.*

In all events, the State's evidence—both then and now—comes too late. All

of the State's new references except for one—an 1875 ordinance from Hyde Park,

Illinois—come from well after the end of Reconstruction. *See* State Br. p. 39. Even

assuming, arguendo, that authorities from the time of the Fourteenth Amendment's

adoption are pertinent, this new citation would not change the analysis. It reflects a prohibition on carrying firearms in a single location (South Park) in the Chicago area. *See* Hyde Park, Ill. South Park Ordinances § 6 (1876) (Doc. No. 89-7).

The balance of the State's new examples date from 1883 to 1937. *See* State Br. p. 39. While the pertinent moment in time is 1791, for reasons discussed previously, even if laws from the time of the time of the Fourteenth Amendment are pertinent, "not all history is created equal." *Bruen*, 142 S. Ct. at 2136. Indeed, while the Court in *Bruen* considered authorities that came from after Reconstruction, at least for sake of argument, it also cautioned that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence," and that twentieth century evidence "does not provide insight . . . when it contradicts earlier evidence." *See id.* at 2154 & n.28 (citing *Heller*, 554 U.S. at 614). And notably, the latest authority that the Court addressed in its discussion of authorities from "around the adoption of the Fourteenth Amendment" was a decision from 1875. *See id.* at 2153 (quoting and citing *State v. Duke*, 42 Tex. 455 (1975)).[4] In contrast, the authorities

---

[4] The Court also referenced an 1887 West Virginia law, and an 1891 decision upholding it, as the only other state that "adopted a similar public-carry statute [to Texas] before 1900." *See Bruen*, 142 S. Ct. at 2153 (citing W. Va. Code, ch. 148, § 7 (1887); *State v. Workman*, 14 S.E. 9, 35 W. Va. 367 (1891)).

that the Court considered in its discussion of "late-19th-century evidence" dated from 1869 to 1905. *See id.* at 2154-56 (citations omitted).

Almost all of the State's other new authorities come after these thresholds, as well as after Reconstruction's generally recognized end in 1877. *See Virginia v. Black*, 538 U.S. 343, 353 (2003); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 120 (1996) (Souter, J., dissenting). Thus, when Reconstruction ended, the State's historical evidence shows a total of *three* municipal park bans in a country then consisting of 38 states. And moreover, all of those bans were less than 20 years old. This falls far short of an established historical tradition.

### ii.  Publicly owned or leased libraries and museums

The Court found previously that the State's cited evidence did not justify section 7(a)(12)'s prohibition on carrying guns in "a publicly owned or leased library or museum" for two essential reasons. First, a 1773 Maryland law that prohibited bringing guns into the house of the legislative assembly was not analogous. *See Koons*, 2023 WL 12882 at *13 (citing 1773 Md. Laws 338, § 5). And second, an 1870 Texas law that prohibited guns in, pertinently, "places where persons are assembled for educational, literary or scientific purposes" was not sufficient to show the existence of a historical tradition. *See id.* (quoting 1870 Tex. Gen. Laws 63, Doc. No. 20-5).

The State now identifies some additional laws that, it claims, support the existence of an historical tradition that would justify a prohibition on carrying guns in public libraries and museums. *See* State Br. p. 45. Most of these come far too late to have any serious bearing. The State has not identified any Founding era historical analogues, or indeed, any analogue that existed before 1870—despite the fact that by 1850, the United States Census reported 1,217 public libraries in the country. *See Koons*, 2023 WL 128882 at *13 (citation omitted).

Of the State's new evidence, the only statute that could have any potential relevance[5] is an 1874 Missouri law that prohibited people from carrying guns and other weapons in several places, including "any place where people may be assembled for educational, social or literary purposes." *See* State Br. p. 45 (citing 1874 Mo. Laws 43, Doc. No. 89-28).[6] However, the Court in *Bruen* refused to find a historical tradition on the basis of an 1871 Texas law that broadly precluded the carry of guns, instead characterizing the restriction as an "outlier." *See Bruen*, 142 S. Ct. at 2153. Furthermore, and notably, the Court warned against placing

---

[5] As a reference from the twentieth century, the 1903 Montana law, *see* State Br. p. 45 (citing 1903 Mont. Laws 49, Doc. No. 89-32), "does not provide insight," *see Bruen*, 142 S. Ct. at 2154 n.28.

[6] This prohibition applied only if guns or other weapons were "concealed about [the] person," meaning it was not a ban on carrying guns in these places in open view. *See* 1874 Mo. Laws 43 (Doc. No. 89-28). In 1875, the Missouri legislature enacted a new law that eliminated the requirement of concealment. *See* 1875 Mo. Laws 50-51 (Doc. No. 86-21). In 1883, the legislature increased the punishment. *See* 1883 Mo. Laws 76 (Doc. No. 89-29).

substantial reliance on territorial laws from the West because they represented very little of the country's population at the time, were subject to little judicial scrutiny and were often "short-lived." *See id.* at 2154-55. The State's showing—that during Reconstruction, a total of two Western states enacted laws against carrying guns in libraries and museums—is insufficient to show the existence of an historical tradition either at the time of the Founding, or at Reconstruction.

Recognizing its lack of historical evidence, the State attempts to analogize to schools by arguing that libraries and museums likewise "provide an environment where children gather to expand their knowledge of the world in which they live." *See* State Br. p. 43. However, the Supreme Court has not identified all institutions where children, to expand their knowledge of the world or otherwise, as "sensitive places"—and attempting to do so would take one far beyond schools. After all, children gather in innumerable places. Moreover, the bulk of historical evidence shows that historical restrictions only barred students possessing guns at schools, not adults. *See* Amicus Brief of Center for Human Liberty, *Antonyuk v Nigrelli*, No. 22-2908, Doc. 313 at 20–22 (collecting historical restrictions).

Next, the State invokes the Supreme Court's statement that prohibitions on carrying guns in "government buildings" are "presumptively lawful" and contends that this statement acts to exempt any prohibition that concerns a "public" building. *See* State Br. p. 44. But this proves too much. When the Supreme Court cautioned

that it did not intend "to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places," the two "sensitive places" it identified were "schools and government buildings"—a differentiation that presupposes that the term "government buildings" does not include "schools," even though schools are normally in public buildings. *See Heller*, 554 U.S. at 626; *accord Bruen*, 142 S. Ct. at 2133; *McDonald*, 561 U.S. at 786.

Moreover, and contrary to the States' argument, *see* State Br. p. 44, the Court in *Bruen* did indeed distinguish between different types of "government buildings" by providing three specific examples of historical sensitive places "where weapons were altogether prohibited": "legislative assemblies, polling places, and courthouses." *See id.* at 2133. It was by drawing "analogies to those historical regulations" that courts potentially justify "new and analogous" sensitive place restriction. *See id.* at 2133 (emphasis omitted).

### iii.  Bars and restaurants where alcohol that serve alcohol

The Court found that the historical evidence supplied previously "presented no historical support to permit New Jersey to restrict concealed carry in bars and restaurants where alcohol is served." *Koons*, 2023 WL 128882 at *14. That evidence consisted of an 1867 Kansas statute and an 1879 Missouri statute, both of which prohibited people from carrying guns while intoxicated. *See* Mo. Rev. Stat. § 24.1274 (1879) (Doc. No. 20-10); 1867 Kan. Sess. Laws 25 (Doc. No. 20-12). A

-36-

prohibition on carrying guns while intoxicated "has no relevance here as the restriction at issue clearly does not address possession of firearms by intoxicated persons." *Koons*, 2023 WL 128882 at *14. The Court also rejected the State's attempt to rely upon an 1859 Connecticut statute that prohibited gambling and the sale of liquor "within one mile of any military parade-ground, muster-field or encampment." 1859 Conn. Pub. Acts 61, 62 (Doc. No. 20-11). This law was simply "not historical evidence probative of the restriction of one's right to carry a firearm anywhere where alcohol is served." *Koons*, 2023 WL 128882 at *14.

In its current briefing, the State identifies only one other historical source—an 1880 treatise that generally discourages the carrying of handguns, and particularly opines that "every good citizen will frown" on "toying with" handguns "at picnics, on board steamers, and in saloons." *See* State Br. p. 48 (quoting BENJAMIN VAUGHAN ABBOTT, JUDGE AND JURY: A POPULAR EXPLANATION OF LEADING TOPICS IN THE LAW OF THE LAND 333-34 (1880), Doc. No. 88-44). Then, as now, firearms engendered different feelings in different people. But what is pertinent is that the State has not identified even a *single* law that prohibited law-abiding citizens from carrying or possessing guns in bars or restaurants from either the Founding or Reconstruction.

In apparent recognition of this, the State attempts to analogize bars and restaurants that serve alcohol to "social public assemblies" that can have

"potentially chaotic social scenes," as well as to schools that are "filled with persons whose judgment is underdeveloped." *See id.* at 46-47. The State cites statistical evidence to support the (somewhat unremarkable) proposition that alcohol is associated with physical violence. *See id.* at 47 n.41. The Court can reject both arguments easily because bars and restaurants existed throughout American history, as have the ills associated with alcohol and firearms. As such, the dearth of historical tradition is dispositive.

### iv.  Entertainment facilities

In its prior decision, the Court found that the historical authorities the State provided "do not support the specific restricted locations as set forth in the legislation," to wit, "'a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held.'" *See Koons*, 2023 WL 128882 at *14 (quoting 2022 N.J. Laws c. 131, § 7(a)(17)). Now, the State now identifies some additional laws, but these laws likewise fail to establish a historical tradition that could justify the State's broad ban on entertainment facilities.

First are colonial and state laws that adopted variants of the Statute of Northampton are not "relevantly similar." *Bruen*, 142 S. Ct. at 2132. Originally, in connection with the motion for a temporary restraining order, the State cited a

1786 Virginia statute that, using language drawn from the Statute of Northampton, prohibited one to "go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the county." *See* 1786 Va. Acts 35. However, and as the Court found, this did not show a tradition of banning the carry of guns because "it falls within a category of laws for which a common theme is to 'prohibit bearing arms in a way that spreads "fear" or "terror" among the people.'" *Koons*, 2023 WL 128882 at *14 (quoting *Bruen*, 142 S. Ct. at 2145). Now, the State points to a 1792 North Carolina statute that, like the 1786 Virginia statute, purportedly enacted language drawn from the Statute of Northampton. *See* State Br. p. 49. The alleged law is contained in a compilation that "later compilers wrote . . . 'was utterly unworthy' as 'omitting many statutes, always in force, and inserting many others, which never were, and never could have been in force.'" Stephen P. Halbrook, Faux Histoire *of the Right to Bear Arms:* Young v. Hawaii *(9th Cir. 2021)* at 21 (2021), at

https://www.independent.org/pdf/research_articles/2021_07_14_halbrook.pdf. What is more, in reviewing a conviction for carrying a firearm in a dangerous and unusual manner in 1843, the North Carolina Supreme Court evinced no awareness of the law, as it discussed the Statute of Northampton directly and not this purported analogue. *See State v. Huntly*, 25 N.C. 418, 420 (1843). And even with respect to the Statute of Northampton, the court stated that "whether or not this

statute was or was not formerly in force in this State, it certainly has not been since the first of January, 1838," when State law formally declared that the statutes of England and Great Britain ceased to have effect. *Id*. And notably, while the *Bruen* dissenters cited this law as a Statute of Northampton analogue, the majority did not. *Compare Bruen*, 142 S. Ct. at 2145, *with id.* at 2185 (Breyer, J., dissenting).

In any event, regardless of the validity of the North Carolina law, its language was "lifted from the Statute of Northampton virtually verbatim (vestigial references to the King included," *id.*—another clue that something is amiss—and the Supreme Court resolved the meaning of the Statute of Northampton and its state analogues in *Bruen*. Specifically, the Court ruled that at the time of the Founding, the Statute of Northampton and its derivatives stood to "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. And in *Huntly*, the North Carolina Supreme Court interpreted the common law offense of "riding or going about armed," which the court explained the Statute of Northampton had codified, as requiring proof that the act was "to the terror of the people." *See State v. Huntly*, 25 N.C. (3 Ired.) 418, 420 (1843); *see also State v. Dawson*, 159 S.E.2d 1, 6-7, 272 N.C. 535, 541-42 (1968).

The State also attempted to defend against the temporary restraining order by point to an 1869 Tennessee law, an 1870 Texas law, an 1879 Missouri and an 1816 New Orleans ordinance. *See Koons*, 2023 WL 128882 at *14-15. The 1869

Tennessee law prohibited carrying handguns into a "fair, race course, or other public assembly of the people." *See* 1869 Tenn. Pub. Acts 23, Doc. No. 20-8. "[W]hether the 1869 Tennessee statute applied to long guns is uncertain," David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 253 (2018), thus it appears to have left at least one method for self-defense open, *cf. Bruen*, 142 S. Ct. at 2146–47.

The 1870 Texas law prohibited bringing any type of firearm into a much wider range of places: "any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purpose, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly." *See* 1870 Tex. Gen. Laws 63, Doc. No. 20-5. Notably, however, the Texas statute included an exception for "persons authorized or permitted by law to carry arms at the places." *See id.* The 1879 Missouri law prohibited concealed carry (anywhere) and also prohibited carrying guns "into [a] church or place where people have assembled for religious worship, or into any courtroom during the sitting of the court, or into any other public assemblage of persons met for any lawful purpose." *See* Mo. Rev. Stat. § 24.1274

(1879), Doc. No. 20-10. However, the Missouri law provided exceptions for those "moving or traveling peacefully" or who had "been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property." *See id.* § 24.1275. Finally, the 1816 New Orleans ordinance made it illegal to enter a "public ball-room" with "any cane, stick, sword or any other weapon." *See* Gen. Digest of the Ords. & Res. of the Corp. of New Orleans 371, Doc. No. 20-7. Thus, and setting other issues aside, only the Texas law covered a swath of conduct that was broad enough to be comparable to the State's definition of "entertainment facility," and that law came with an exception.

The Court concluded that these authorities did not show the existence of a justifying historical tradition. *See Koons*, 2023 WL 128882 at *14-15. The Texas law was likely an "outlier," but in any event, it was "distinguishable" because it provided an exception for those "authorized or permitted by law to carry arms." *See id.* The Missouri law—which, significantly, came after the end of Reconstruction, thus rendering any relevance it might have quite limited—also included exceptions that left people with some ability to defend themselves. *See id.* at 35. The Tennessee law, covering only a "fair, race course, or other public assembly" was too narrow to justify "the broad number of locations set forth in Section 7(a), subpart 17 of the statute." *See id.* And finally, the New Orleans ordinance was not particularly analogous in light of "many differences between the

-42-

public ballrooms of 1831 and modern-day concert venues and amusement parks."
*Id.* In any event, "one example does not a tradition make," and the single city
ordinance did not amount to an established historical tradition. *See id.*

The State now identifies two additional Missouri laws that date to 1874 and
1883 and a Georgia law from 1873. *See* State Br. p. 50. Aside from showing that
the basic language of the Missouri law appears to date to 1874, the additional
Missouri laws add very little. *See* Mo. Rev. Stat. § 24.1274 (1874), Doc. No. 89-10
(also prohibiting concealed carry); Mo. Rev. Stat. § 24.1274 (1883), Doc. No. 89-
29 (increasing penalties).

The Georgia law, on the other hand, indeed prohibited the carry of handguns
and other weapons "to any Court of justice, or any election ground, or precinct, or
any place of public worship, or any other public gathering in this State, except
militia muster grounds." Ga. Code § 4528 (1873) (Doc. No. 88-22). However, both
this statute and *Hill v. State*, 53 Ga. 472 (1874), the Supreme Court of Georgia
decision that upheld it, are the product of a fundamental understanding of the right
that the Second Amendment secures. In *Hill*, the court interpreted a state
constitutional provision that had language similar to that of the Second
Amendment—but it used a militia-based interpretation of the right, and it
accordingly upheld the cited law. *See id.* at 475-476. When the Court assessed the
weight of various historical authorities in *Bruen*, it concluded that authorities

-43-

premised on "a fundamental misunderstanding of the right to bear arms" did not stand to "inform 'the origins and continuing significance of the [Second] Amendment.'" *See Bruen*, 142 S. Ct. at 2155 (quoting *Heller*, 554 U.S. at 614); *see also Young v. Hawaii*, 992 F.3d 765, 837 (9th Cir. 2021) (en banc) (O'Scannlain, J., dissenting) (explaining that decisions, including the Georgia Supreme Court's decision in *Hill v. State*, 53 Ga. 472, 475 (1874) "offer little instructive value").

Thus, the State's historical evidence shows at most a single law from a single state (Missouri) and a single law from a single city (New Orleans), which plainly fails to show the existence an American historical tradition of prohibiting guns from any place considered an "entertainment facility."

### v. Airports and public transit hubs

The Court declined to issue a temporary restraining order as to section 7(a)(20)'s ban on carrying guns in airports because it found these were "not locations where [the *Siegel*] Plaintiffs frequent as part of their ordinary, daily lives." *Siegel*, 2023 WL 1103676 at *8. The evidence before the Court at the time showed that Plaintiffs Cook and Siegel made trips to the Newark and Atlantic City from time to time for the purpose of dropping off or picking up friends and family members. *See id.* The Court found there was no "intent to conceal carry in the immediate future." *Id.*

While the Plaintiffs in this action did not originally challenge section 7(a)(20), they have now filed an Amended Complaint and additional declarations to establish its invalidity.[7] First is Plaintiff Gil Tal, who recently obtained a New Jersey permit to carry and has an airplane that he stores at the Old Bridge Airport. *See* Dec. of G. Tal ¶¶ 9-10, 19 (Doc. No. 70). Plaintiff Tal would carry his handgun with him to the plane and while traveling were it not for Chapter 131's designation of airports as prohibited "sensitive places." *See id.* ¶ 19. And significantly, Plaintiff Tal flies his plane as many as two to three times per week when weather permits, meaning that the injury he faces is imminent and concrete. *See id.* Beyond that, Plaintiff Tal only recently obtained his New Jersey permit to carry, but he lived previously in Staten Island, where he had a New York license to carry a handgun. *See id.* ¶ 4. When he lived in Staten Island, Plaintiff Tal used public transit on a regular basis, and he often carried a handgun while doing so. *See id.* ¶ 5. Now that he lives in New Jersey, he uses public transit less, but he still can use public transit to commute to work—and would do so, were it not illegal for him to carry his handgun through public transit hubs. *See id.* ¶ 21. In order to make this commute, Plaintiff Tal would need to use the Newark Broad Street station, the

---

[7] *Koons* Plaintiffs do not challenge any restrictions on firearms in areas after TSA screening as the presence of comprehensive security by the government renders those areas sufficiently analogous to recognized sensitive places at the Founding.

Secaucus Junction station or the Hoboken Station, which are by all indications "public transportation hubs." *See id.*

In his original declaration, Plaintiff Nicholas Gaudio testified that he had in the past checked his handgun as baggage at Trenton-Mercer Airport, and further, that he understood that Chapter 131's designation of airports as "sensitive places" would prevent him from doing so in the future. *See* Dec. of N. Gaudio ¶¶ 12-13 (Doc. No. 11). Plaintiff Gaudio has now provided a supplemental declaration in which he explains that he takes commercial flights one to two times per year, and that he normally checks a handgun as baggage when he doing so. *See* Supp. Dec. of N. Gaudio ¶ 5 (Doc. No. 71). Since Chapter 131 has become law, he has refrained from checking handguns as baggage in New Jersey airports, as he fears criminal prosecution for violating the "sensitive place" prohibition. *See id.* ¶ 6. Recently, and during the pendency of this case, Plaintiff Gaudio flew to and from Florida with his family, and he booked a flight from Philadelphia rather than Trenton in part so that he would be able to check his handgun as baggage. *See id.* This issue will continue to arise as long as this part of Chapter 131 is in effect. *See id.* Thus, section 7(a)(20)'s prohibition on airports has interrupted Plaintiff Gaudio's concrete plans, and it will by all indications continue to do so for so long as it remains in effect.

The State argues, nonetheless, that there is no imminent threat of enforcement. *See* State Br. p. 53. The State points to a picture of the airport posted on the internet to argue that Plaintiff Tal can access his plane at the Old Bridge Airport using a public right of way. *See id.* at 54. However, the State provides no basis for its supposed "right of way" exception to exist. Section 7(a)(20) prohibits the carry of handguns in any "airport," which the Old Bridge Airport indisputably is. Section 7(c) provides an exception for transporting guns out of parking lots at prohibited location, but that exception only allows the person to transport the handgun "between a vehicle parked within [the] prohibited parking lot area and a place *other* than a prohibited place enumerated in subsection a. of this section." *See* 2022 N.J. Laws c. 131, § 7(c)(4) (emphasis added).

Similarly, the State also opines that it is "far from clear that dropping off checked baggage in accordance with TSA regulations would somehow implicate a violation of Chapter 131." *See* State Br. p. 53. This framing of the issue just places things backwards. Defendants have the statutory duty to enforce the criminal laws of New Jersey, and the statute at issue here makes it a serious crime to "carry" a handgun "in or upon any part of the buildings, grounds or parking area of . . . an airport." 2022 N.J. Laws c. 131, § 7(a)(20). The statute's parking lot exemption does not apply because a person carrying a handgun to the baggage check are is not traveling to "a place other than a prohibited place enumerated in subsection a." The

-47-

Defendants have not disclaimed enforcement at airports. Moreover, authorities have arrested travelers attempting to check handguns at airports for violating New Jersey's gun laws in the past. *See Revell v. Port Auth. of N.Y. and N.J.*, 598 F.3d 128, 130-31 (3d Cir. 2010).

The State also argues that Plaintiff Tal's testimony that he would use public transportation hubs sometimes if he could carry in them is "pure speculation." *See* State Br. p. 54 n.49. This, however, ignores the actual import of Plaintiff Tal's testimony. While Plaintiff Tal only recently obtained a New Jersey permit to carry, and has never been able to carry a handgun in New Jersey public transportation hubs, he previously carried a gun while using public transportation on a regular basis—making his desire to resume doing so in the future credible and tangible, rather than "pure speculation."

### vi.  Health care facilities

The Court declined to enter a temporary restraining order against 7(a)(21)'s prohibition on carrying handguns in health care facilities because it found a lack of traceability or redressability. *See Siegel*, 2023 WL 1103676 at *8. Specifically, the Plaintiffs submitting affidavits did not allege "that but for Chapter 131, Section 7(a), Subpart[ ] 21 . . . , they would conceal carry at" the health care facilities they had identified. *See id.* Furthermore, the Court observed that some of the health care

facilities the Plaintiffs had identified might "maintain policies prohibiting firearms outright." *Id.*

The Plaintiffs here did not originally challenge section 7(a)(21)'s ban on carrying handguns in health care facilities, but they have now filed an Amended Complaint and additional declarations to show the invalidity of the provision. Most notably, Plaintiff Gil Tal is the owner of a men's health clinic in Parsippany, New Jersey. *See* Dec. of G. Tal ¶ 3 (Doc. No. 70). More specifically, he is a part owner of the management company where the clinic operates, but he does not have an ownership interest in the medical practice himself, since he is not a physician. *See id.* The "sensitive place" restrictions do not apply to a person who is "carrying a firearm within the authorized scope of an exemption set forth in N.J.S.2C:39-6," *see* 2022 N.J. Laws ch. 131, § 7(a), and one of these exemptions authorizes a person to carry a handgun "about the person's place of business, *see* N.J.S.A. § 2C:39-6(e). However, because Plaintiff Tal does not own any part of the medical practice, he has always understood that he cannot rely on this exemption to carry a handgun at the clinic. *See* Dec. of G. Tal ¶ 8; *see also State v. Valentine*, 307 A.2d 617, 619, 124 N.J. Super. 425, 427 (App. Div. 1973); *accord State v. Tanco-Brito*, No. A-4218f-13T2, 2015 WL 1334873, *7 (App. Div. Mar. 26, 2015). But for the "sensitive place" restriction, Plaintiff Tal would carry a handgun when he works at the clinic, which is about four days per week. *See* Dec. of G. Tal ¶ 18. Moreover,

this is not a hollow or speculative assertion on the part of Plaintiff Tal. Plaintiff Tal

has a second clinic located in North Carolina, and he routinely carries a handgun

when he works there. *See id.* ¶¶ 16, 18.

The testimony of some of the other Plaintiffs is also pertinent. For example,

after Plaintiff Nicholas Gaudio obtained his New Jersey permit, and before Chapter

131 came into force, he carried his handgun both at routine doctor and dentist

appointments, and also when he had to take his daughter to the pediatric

emergency room last fall. *See* Dec. of N. Gaudio ¶ 9 (Doc. No. 11). Put simply, he

carried "while conducting [his] everyday suburban activities." *Id.* ¶ 10. Likewise,

Plaintiff Jeff Muller also began carrying a handgun on a regular basis after he

obtained a permit in 2011 and "carried . . . pretty much everywhere, and most of

the time." *See* Dec. of J. Muller ¶¶ 8-9 (Doc. No. 12). This included "during

appointments with both my physician and the dentist, as well as at other health care

facilities." *Id.* ¶ 10. However, in light of Chapter 131's enactment, both Plaintiff

Tal and Plaintiff Muller now refrain from carrying a handgun—but they would

resume doing so if the "sensitive place" restrictions did not apply, and particularly,

if they could carry a gun while (pertinently) attending an appointment with their

doctor. *See id.* ¶¶ 15-16, 19; *see also* Dec. of N. Gaudio ¶¶ 13, 18.

True, neither Plaintiff Tal nor Plaintiff Muller have provided testimony

indicating that they plan to visit a specific health care facility on a particular day in

the future. This may indicate that their injury is not so imminent as to justify

temporary restraints, but it does not mean that they face no injury, nor that injury

would only arise in the context of a previously scheduled appointment. Indeed, and

to the contrary, while some visits to health care facilities are planned, many are

not, and an individual—or their spouse, child or parent—may need medical

treatment without any prior notice. In this respect, health care facilities are

qualitatively different from (for example) polling places and courtrooms.

On the merits, the State concedes there is a lack of similar historical

analogues, but asserts this is because of "[d]ramatic changes in the scale,

sophistication, and complexity of hospitals and health care delivery since the 18th

century." *See* State Br. pp. 58-59. That said, the State invokes the authorities it

cited in respect of libraries, museums and entertainment facilities to justify the ban

on carrying handguns in health care facilities. *See id.* at 59-60. But just as those

authorities do not show the existence of a historical tradition that could justify a

ban on bearing arms in these forums, they likewise fail to show a justification that

could apply here.

### vii.  Vehicles

The Court found that the State's historical evidence did not show that

section 7(b)'s ban on carrying functional handguns in vehicles was consistent with

a historic tradition of firearm regulation. *See Koons*, 2023 WL 128882 at *21. The

State had cited an 1821 Tennessee law and an 1838 Arkansas law, which both restricted the carry of guns, but provided an exception for an individual who was on a "journey." *See* JOSIAH GOULD, A DIGEST OF THE STATUTES OF ARKANSAS, ALL LAWS OF A GENERAL AND PERMANENT CHARACTER IN FORCE THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY 381-82 (1837) (Doc. No. 20-18), 1821 Tenn. Pub. Acts 15 (Doc. No. 20-20). As another District Court has observed, the "journey" exception "actually proved that firearms were generally permitted." *See Koons*, 2023 WL 128882 at *20 (citing *Antonyuk v. Hochul*, No. 1:22-CV-0986, 2022 WL 5239895, *17 (N.D.N.Y. Oct. 6, 2022)).

Beyond that, the Court rejected the State's appeal to an 1839 Alabama statute that prohibited concealed carry, but did not address "journeys," because concealment was "an issue not relevant here." *Id.* (citing 1839 Ala. Laws 67, Doc. No. 20-19). Furthermore, the Court found that an 1876 Iowa law that prohibited shooting guns at trains did not support the existence of a tradition of banning guns from in and around mass transit. *See id.* a n.26 (quoting and citing Iowa Code ch. 3, § 1 (1880), Doc. No. 20-15). And, finally, the Court rejected the State's attempt to rely on two twentieth century laws that prohibited people from carrying functional rifles and shotguns in cars, but allowed them to carry loaded handguns. *See id.* at n.27 (citing and quoting 1929 Iowa Acts 90, § 30, Doc. No. 20-16; 1919 Me. Laws 193, Doc. No. 20-17). These laws were not analogous because the

prohibition at issue did not include an exception that could accommodate the right to bear arms. *See id.* (Moreover, and as discussed previously, laws from the twentieth century generally have bearing in defining either the scope of the right or the scope of historically valid restrictions.)

In its current briefing, the State analogizes "crowded buses" to "crowded locations," and invokes the support it relies on to support the ban on carrying handguns from entertainment facilities, as well as the authorities it cited previously. *See* State Br. pp. 62-63. But again, just as the State's limited authorities do not show a historical tradition that could justify a ban on bearing arms in entertainment facilities, they likewise do not show the existence of a historical tradition that could ban the carry of handguns in "vehicles." In apparent recognition of this, the State attempts to provide more authority. Specifically, the State cites two municipal laws that restricted the storage of gunpowder to argue for "a historical tradition of regulating the manner of carrying arms while in vehicles." *See id.* at 63-65 (citations omitted). But restrictions on the storage of gunpowder reflect concerns with preventing fires and explosions, not a tradition of prohibiting the bearing of arms. *See Heller*, 554 U.S. at 632.

Finally, the State offers the declaration of Dr. Brennan Gardner Rivas, as well as three nineteenth century cases, to argue that "journey" exceptions applied narrowly. *See* State Br. pp. 64-67 (citations omitted). However, this demonstration

-53-

does not appear to have any relevance. That is, even if there were a historical tradition of construing "journey"-based exceptions narrowly, this would not support the ban on carrying functional handguns in vehicles, which is what is at issue here. To the contrary, the existence of exceptions for individuals on a "journey" shows an intent to specifically permit individuals to carry guns while traveling, rather than showing a tradition of banning the carry of guns while traveling—and this is true whether the exception applies broadly or narrowly. Moreover, to whatever extent the issue does have any relevance, Dr. Rivas's contentions that "[t]he travel exception was narrowly defined by state courts" and did not involve "the kind of travel associated with modern transportation" lack support. *See* Dec. of B. Rivas ¶ 12 (Doc. No. 85). Dr. Rivas does not provide any citations or other support to provide these conclusions. *See id.* Moreover, while she states that she has expert knowledge "about historical gun regulations that pertained to travelers, and nineteenth century gun regulations in Texas," *id.* ¶ 5, her thesis "was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s," 2, and the bulk of her legal analysis concerns state and local laws in Texas. *See id.* ¶¶ 2, 5, 15-32 (citations omitted). But as discussed previously, Reconstruction era gun laws in Texas were an "outlier" that did not reflect the understanding that prevailed throughout most of the rest of the country.

-54-

III.    **Plaintiffs have demonstrated irreparable harm in the absence of injunctive relief**

When it issued its temporary restraining order against the challenged "sensitive place" restrictions, this Court found that the alleged constitutional deprivations were "irreparable by their very nature." *See Koons*, 2023 WL 128882 at *22. That is, because the Second Amendment secures a personal right to bear arms for self-defense, "state restrictions that are so extensive and burdensome as to render the right illusory must constitute irreparable injury." *Id.* at 53-54 (citing *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953 (S.D. Cal. 2020), *vacated and remanded on other grounds sub nom. Rhode v. Bonta*, No. 20-55437, 2022 WL 17099119 (9th Cir. Nov. 17, 2022); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016)). Furthermore, "the fundamental interests that the Second Amendment protects—like those of the First Amendment—are not easily remediable by monetary damages or other non-injunctive relief." *Id.* at 55 (citing *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)).

In its current briefing, the State argues that "neither the Supreme Court nor the Third Circuit has extended even a presumption of irreparable harm in cases involving non-First Amendment challenges." State Br. p. 95 (citing *Constr. Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 820 n.33 (3d Cir. 1978)) (emphasis omitted). It is true that the Supreme Court has squarely ruled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury." *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373-74 (1978) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)). However, this does make the inverse true, and the State points to no authority that would stand for the proposition that the loss of constitutional freedoms other than First Amendment rights is categorically *not* irreparable injury.

The State points particularly to the *Siegel* Plaintiffs' challenge to Chapter 131's insurance requirements, arguing that these claims "are redressable by damages and thus not irreparable." *See* State Br. p. 95. While the Plaintiffs in the present case have not challenged these requirements, and thus lack a direct interest in the outcome of this controversy, we respectfully suggest that this claim can be illustrative of when a deprivation of Second Amendment rights does and does not amount to irreparable injury. Suppose, on the one hand, that compliant insurance products were available, but that their price was excessive. Standing alone, the appropriate remedy would be a money damages judgement that compensated individuals for the excessive payments that had made. One the other hand, if the compliant insurance products were not available at all, then this would completely prevent individuals from bearing arms—and an award of money damages would not rectify the wrong. In that scenario, a money damages judgment would provide an aggrieved individual with a quantum of cash, but that cash would not enable the individual to bear arms, making it an inadequate remedy at law. Between these two

points, there would likely be an irreparable injury if the insurance products were so excessively expensive that they prevented people from exercising their rights.

The essential takeaway is that the case at bar does not present claims for which money damages could be adequate compensation. The Plaintiffs here contend that Chapter 131's "sensitive place" restrictions prevent them from carrying guns, not that those restrictions make the act of bearing arms more expensive. Indeed, and notably, while the State contends that a deprivation of Second Amendment rights is not a categorically irreparable injury, it does not offer any explanation of how a money damages judgment could remedy the injuries that the Plaintiffs here complained of. The Plaintiffs seek to exercise their right to bear arms in the face of a law that prohibits them from doing so, and as such, money damages are inherently irreparable.

## IV. The balance of equities and public interest weigh in favor of granting a preliminary injunction

The Court concluded previously that the balance of equities and the public interest weighed in favor of injunctive relief because ultimately "[n]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *See Koons*, 2023 WL 128882 at *24 (quoting *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003)). Moreover, it was significant that relief would only inure to the benefit of individuals who had "already gone through the State's vetting process to obtain a permit." *Id.* It was not a situation where the

-58-

State lacked a system for ensuring that individuals seeking to carry guns in public had been adequately trained and qualified. *Cf. Shepard v. Madigan*, 734 F.3d 748, 750 (7th Cir. 2013) (it was "unreasonable" to stay laws that flatly prohibited people from carrying of handguns where the legislature was implementing a new regulatory scheme that would impose training requirements and additional qualifications.

In response, the State asserts that when the government is the opposing party, the considerations of harm to the other party and the public interest merge. *See* State Br. p. 96 (citing Nken, 556 U.S. at 435). Furthermore, the State argues that the inability to enforce a law "inflicts irreparable harm on the State." *Id.* (quoting *Abbott v. Perez*, 585 U.S. ___, 138 S. Ct. 2305, 2324 n.17 (2018)) (other citations omitted). Both statements are true, but the larger issue of success on the merits subsumes them. The challenged "sensitive place" restrictions deprive the Plaintiffs (and all New Jersey citizens) of their right to bear arms, and as such, a preliminary injunction causes the State no irreparable harm, regardless of whether or how one considers the issues of harm to other parties and the public interest.

## CONCLUSION

The Court should preliminarily enjoin Defendants from enforcing the challenged provisions.