**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

1

2

_____

3

| | | |
|---|---|---|
| **RONALD KOONS, et al.** | ) | **CIVIL ACTION NUMBER:** |
| _**Plaintiffs**_, | ) | |
| **vs.** | ) | **1:22-cv-07464-RMB-AMD** |
| | ) | |
| **WILLIAM REYNOLDS, in his official** | ) | |
| **capacity as the Prosecutor of** | ) | |
| **Atlantic County New Jersey, et al.,** | ) | |
| _**Defendants**_. | ) | |
| **and** | ) | |
| | ) | |
| **NICHOLAS P. SCUTARI, President of** | ) | **ORAL ARGUMENT ON** |
| **The New Jersey Senate, and** | ) | **PLAINTIFFS' MOTIONS FOR** |
| **CRAIG J. COUGHLIN, Speaker of the** | ) | **PRELIMINARY INJUNCTION** |
| **New Jersey General Assembly,** | ) | |
| _**Intervenors-Applicants**_.) | | **\*CONSOLIDATED CASES\*** |

_____

Mitchell H. Cohen Building & U.S. Courthouse
4th and Cooper Streets
Camden, New Jersey 08101
Friday, March 17, 2023
Commencing at 10:09 a.m.


<u>B E F O R E</u>:            THE HONORABLE RENÉE MARIE BUMB,
                             CHIEF UNITED STATES DISTRICT JUDGE


<u>A P P E A R A N C E S</u>:

DAVID JENSEN PLLC
BY:  DAVID D. JENSEN, ESQUIRE
33 Henry Street
Beacon, New York 12508
For the Koons Plaintiffs


John J. Kurz, Federal Official Court Reporter
John_Kurz@njd.uscourts.gov
(856)576-7094

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

_United States District Court_
_District of New Jersey_

<pre>
1                   UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
2      _____

3      AARON SIEGEL; JAMES COOK;        )   CIVIL ACTION NUMBER:
       JOSEPH DELUCA; NICOLE CUOZZO;    )
4      TIMOTHY VARGA; CHRISTOPHER       )   1:22-cv-07463-RMB-AMD
       STAMOS; KIM HENRY; and           )
5      ASSOCIATION OF NEW JERSEY RIFLE &)
       PISTOL CLUBS, INC.,              )
6                   Plaintiffs,         )
                                        )
7      vs.                              )   *CONSOLIDATED CASES*
                                        )
8      MATTHEW J. PLATKIN, in his official)
       capacity as Attorney General of )
9      New Jersey; and PATRICK J.       )
       CALLAHAN, in his official capacity )
10     as Superintendent of the New Jersey)
       Division of State Police,        )
11                  Defendants.         )
       and                              )
12                                      )
       NICHOLAS P. SCUTARI, President of)
13     the New Jersey Senate, and       )   ORAL ARGUMENT ON
       CRAIG J. COUGHLIN, Speaker of the)   PLAINTIFFS' MOTIONS FOR
14     New Jersey General Assembly,     )   PRELIMINARY INJUNCTION
                  Intervenors-Applicants.)
15     _____

16     A P P E A R A N C E S:  (Continued)

17     HARTMAN & WINNICKI, P.C.
       BY:  DANIEL L. SCHMUTTER, ESQUIRE
18     74 Passaic Street
       Ridgewood, New Jersey 07450
19     For the Siegel Plaintiffs

20     OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
       BY:  ANGELA CAI, DEPUTY SOLICITOR GENERAL
21          JEAN REILLY, ASSISTANT ATTORNEY GENERAL
       R.J. Hughes Justice Complex
22     25 Market Street, P.O. Box 080
       Trenton, New Jersey 08625
23     For the Defendants Attorney General Platkin and Superintendent
       of NJ State Police Callahan

24

25
</pre>

1    **A P P E A R A N C E S:** (Continued)

2    KOLOGI SIMITZ
     BY:   EDWARD J. KOLOGI, ESQUIRE
3          MICHAEL SIMITZ, ESQUIRE
     500 North Wood Avenue
4    Linden, NJ 07036
     For the Intervenors Scutari and Coughlin
5

6    CULLEN and DYKMAN, LLP
     BY:   STEVEN SIEGEL, ESQUIRE
7    433 Hackensack Ave.
     Hackensack, New Jersey 07601
8    For the Intervenors Scutari and Coughlin

9

10   **A L S O   P R E S E N T:**

11   Arthur Roney, The Courtroom Deputy

12   Tate Wines, Judicial Law Clerk

13   Jordan Pino, Judicial Law Clerk

14   Michael O'Leary, Judicial Law Clerk

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*

 1          (PROCEEDINGS held in open court before The Honorable

 2   Renée Marie Bumb, Chief United States District Judge, at

 3   10:09 a.m. as follows:)

 4          THE COURTROOM DEPUTY:  All rise.

 5          THE COURT:  Good morning.  Good morning.  Have a

 6   seat, you all.  Thank you.

 7          Okay.  So we're here for oral argument in the case,

 8   consolidated case Koons, et al., Siegel, et al., versus

 9   Reynolds.  The docket number is 22-7464.  So I'll start with

10   appearances, please.

11          MR. JENSEN:  Good morning, Your Honor.  David Jensen.

12   I am counsel for plaintiffs, the plaintiffs in Koons.

13          THE COURT:  Okay.  Good morning.

14          MR. SCHMUTTER:  Good morning, Your Honor.  Daniel

15   Schmutter from the firm of Hartman & Winniki for the Siegel

16   plaintiffs.

17          THE COURT:  Okay.  Good morning.

18          MS. CAI:  Good morning, Your Honor.  Angela Cai for

19   the State defendants.

20          THE COURT:  Good morning.

21          MS. REILLY:  Assistant Attorney General Jean Reilly

22   for the State, Your Honor.  Good morning.

23          THE COURT:  Good morning.

24          MR. KOLOGI:  Good morning, Your Honor.  Edward

25   J. Kologi, Kologi Simitz, on behalf of Senate President

 1  Nicholas Scutari and Speaker Craig Coughlin.

 2           THE COURT:  Good morning.

 3           MR. SIEGEL:  Good morning, Your Honor.  Steven Siegel

 4  with the firm of Cullen and Dykman.  We're co-counsel for the

 5  Senate President and the Assembly Speaker.

 6           THE COURT:  All right.  Good morning.

 7           MR. SIEGEL:  Good morning.

 8           THE COURT:  So we'll start with, as I said, this is

 9  oral argument on the motions for preliminary injunction.  I

10  have been advised by all parties that there is no intent on the

11  part of either side to present testimony.

12           So, Mr. Jensen, Mr. Schmutter, have you collaborated

13  with each other to figure out division of labor, or how do you

14  wish?

15           MR. SCHMUTTER:  No, Judge.  But certainly, since

16  Koons is the lead case, I have no problem if Mr. Jensen begins.

17           THE COURT:  All right.  I'll hear from you,

18  Mr. Jensen.  And my practice is to interrupt when I have

19  questions, if you don't mind.

20           MR. JENSEN:  Okay.  That sounds good.

21           THE COURT:  Okay.  Thank you.

22           MR. JENSEN:  Okay.  Well, good morning, Your Honor.

23  It was about two and a half months ago when I first appeared

24  before you in this case, and we had a discussion about the

25  governing law and went through the historical analogs that the

1    State had provided in support of these sensitive place

2    restrictions or denominated sensitive place restrictions.   And

3    I think what we would submit at this juncture is not that much

4    has actually changed since the hearing we had at the beginning

5    of January.

6           Certainly a number of briefs have been submitted and

7    there has been some points made.   There's some things I'd like

8    to clarify; I'm sure Dan would as well.   But overall, the

9    big-picture question, which is have we shown the existence of

10   an enduring American tradition that upholds these types of

11   regulations, I think the question [sic] is no.

12          One other big-picture issue we have is, which I think

13   has been alluded to some in the briefing, but is this question

14   of on standing, the issue of standing, which was somewhat

15   significant to some of the claims, not so much the claims that

16   were in our original case, although potentially one or two of

17   the claims that have been added to that case, and the question

18   of does the requirement of standing change when the posture

19   moves from a temporary restraining order to a preliminary

20   injunction?   And I would submit that it does on the rationale

21   that a temporary restraining order is looking to address an

22   exigency that is going to arise between the time that the

23   application for relief is being filed and the time that the

24   Court is actually ruling on the merits of the motion, whether

25   it's a preliminary injunction or a final injunction.

1          In the context we're at now, you know, ostensibly

2     this is a preliminary injunction.  I don't think it's really

3     much of a secret that there's going to be at least one notice

4     of appeal filed following this hearing and that from here, to a

5     large extent, this controversy is going to move up to the

6     Circuit.

7          THE COURT:  But I wanted to back up, what do you mean

8     by the requirement of standing?  You're not saying that

9     standing is not necessary.

10          MR. JENSEN:  No.  But I'm saying that the window of

11     when injury is likely to be imminent opens up more when the

12     context is a preliminary or, for that matter, a permanent

13     injunction as opposed to a temporary restraining order.

14          So one thing I would point to you specifically is one

15     issue that came up, and now I'm kind of stepping on Dan's toes

16     here, but one issue that came up in the Court's decision on the

17     Siegel motion in the context of airports was, well, is this

18     actually imminent?  Does anyone have any plans of going to the

19     airport in a way that's going to be jeopardized or impacted by

20     these restrictions between now and when the Court is going to

21     be addressing things more at length?

22          Now, as an aside, I'm not -- you know, one of the

23     things that actually came up when we were putting in our

24     affidavits on that point, you know, Gil Tal is actually a pilot

25     with a plane at a small airport.  Nick Gaudio, one of our

1  plaintiffs, I didn't even know this at the time we were putting
2  our papers together, but was actually taking a trip with his
3  family over Christmas and routed the flight through
4  Philadelphia in part to avoid the risk of arrest at the Camden
5  airport.

6          So the point being that it's not always that easy to
7  say that something -- that an injury isn't necessarily imminent
8  in no small measure because our lives are not always that
9  planned out in such methodical detail.

10          THE COURT:  I think what you're saying is that at the
11  time of a TRO inquiry, it's whether or not the injury is
12  imminent.  At the time of a permanent injunction, it is less
13  so.  I think that's what you're saying.

14          MR. JENSEN:  Or -- that's what I'm saying.  I think
15  an alternative way of saying it would be that the proximity
16  needed for an injury to be imminent is probably longer in the
17  context of a preliminary injunction than a temporary
18  restraining order, although that may be six of one and half
19  dozen of the other.

20          Definitely one of the big-picture issues that emerges
21  in the briefs, and in particular, in reading over the Court's
22  decision in the Siegel matter, I saw this as something that the
23  Court seemed to really be reaching out for -- and to be fair, I
24  think if I was in the context of being the judge or a law clerk
25  for the Court, I would be having similar questions -- is this

    1    idea of, you know, in *Bruen*'s discussion of sensitive places,

    2    we have basically two sets of data points, and the Court

    3    doesn't really tell us how we get from one to the other.  But

    4    we start out saying -- and where am I looking at here?

    5            We start out talking -- so pages 21, 33 to 34 of the

    6    decision, but the section that's discussing sensitive place

    7    restrictions, let me just read to you from sort of the key part

    8    of the decision.

    9            "Although the historical record yields relatively few

   10    18th- and 19th-Century 'sensitive places' where weapons were

   11    altogether prohibited -- for example, legislative assemblies,

   12    polling places, and courthouses -- we are also aware of no

   13    disputes regarding the lawfulness of such prohibitions."

   14    Following that, there's a citation to an article by David Kopel

   15    and Joseph Greenlee called the "Sensitive Places Doctrine," as

   16    well as a reference to one of the amicus briefs that was

   17    submitted in the case.  "We therefore can assume it settled

   18    that these locations were 'sensitive places' where arms

   19    carrying could be prohibited consistent with the Second

   20    Amendment."  And then it goes on to talk about how well, you

   21    know, in both *Heller* and *McDonald* we said, we don't mean to

   22    cast doubt on longstanding prohibitions on the carry of

   23    firearms in schools and government buildings.

   24            Now, I mean, the issue or at least one of the issues

   25    that comes up here is when you actually look up, in particular,

1    this article by David Kopel and Joseph Greenlee, what you see

2    that their conclusion is, is that as far as this idea of

3    prohibiting firearms from schools and, for that matter,

4    probably a generalized interest in prohibiting firearms from

5    government buildings, you don't actually really see any direct

6    historical analog, and that's true whether we're citing the

7    focus of inquiry at 1791 or 1868.

8              THE COURT:  I think that's -- and you are correct,

9    that the article discusses that there are, in fact, no

10   historical analogs to support that conclusion.

11             But I think it's fair to say that the Supreme Court

12   was, in essence, saying it's just not fairly debatable, but

13   that there should be no guns in schools.  Isn't that what the

14   Supreme Court was really saying?

15             MR. JENSEN:  Well, I think at the end of the day,

16   it's kind of hard to get around that, because it -- you know,

17   *Heller*, *McDonald*, and *Bruen* all refer to restrictions on

18   carrying guns in government buildings and schools as being

19   presumptively lawful.  And certainly at least prior to *Bruen*

20   coming down, there was a significant amount of debate in the

21   federal courts about exactly what that presumptively lawful

22   language meant.  You know, at one extreme it means that these

23   are categorically lawful, discussion over.  And at the other

24   extreme it means that the Court has to apply scrutiny, but it

25   looks like presumptively these pass.

1          I'm going to suggest that, particularly given that

2   the statements are dicta, it's probably better to look at the

3   presumptively lawful examples as things that are presumptively

4   lawful, meaning they pass scrutiny.  But in the big picture, I

5   think it would be a little bit daft to say that the Court isn't

6   communicating in pretty clear terms that they think that

7   restrictions on schools and government buildings as a general

8   proposition are going to be held up, right?

9          So the two data points we have are -- we've got three

10  examples that were provided: legislative assemblies, polling

11  places, and courthouses.  And we've got an end result that says

12  government buildings and schools.  And as a side note, simply

13  by virtue of the categories we've been naming, I'm not sure

14  that any building that is simply owned by the government is

15  going to qualify as a government building because if it did,

16  for one thing, you wouldn't need to list schools.  Schools are

17  normally owned by the government.

18         How do we bridge the gap these between those two

19  points?  And normally when we're talking about rules of law,

20  we're using deductive reasoning.  Negligence is the failure to

21  observe reasonable care.  What is reasonable care?  We take

22  general principles, we apply those to specific facts, we come

23  to a result.

24         THE COURT:  Can I interrupt you, Mr. Jensen?

25         MR. JENSEN:  Of course.

1        THE COURT:  I'm not quite sure I'm following exactly

2  where you are going.  Are you suggesting that what the Supreme

3  Court ruled, which you say in dicta, is an exception to the

4  *Bruen* ruling or a part of the *Bruen* ruling?  What exactly are

5  you saying?

6        MR. JENSEN:  I think we have to take it as an

7  application of the *Bruen* ruling or an application of *Heller*,

8  *McDonald*, and *Bruen* that hasn't come before the Court yet.  If

9  we accept it as a general proposition that the Court is going

10 to wind up upholding schools and government buildings and that

11 the historical record in terms of a tradition of regulation

12 supports legislative assemblies, polling places, and

13 courthouses --

14       THE COURT:  Which those are the government buildings.

15 Because you've said government buildings much more broadly.

16 But *Bruen* discusses government buildings in terms of

17 legislative assemblies, courthouses, and polling places.

18       MR. JENSEN:  Well*, Bruen* discusses legislative

19 assemblies, polling places, and courthouses as the examples

20 that can be found in the historical record showing traditions,

21 which is also my takeaway of what the Kopel and the Greenlee

22 article says.  But the Kopel and the Greenlee article also

23 says, well, this doesn't really get you to schools.

24       So how do we take --

25       THE COURT:  No.  But are you reading "government

 1    buildings" more expansively than legislative assemblies,

 2    polling places, and courthouses?

 3            MR. JENSEN:  Well, I think inferentially government

 4    buildings can't mean simply any building that's owned by the

 5    government, because otherwise there would be no reason to

 6    specify courthouses and legislative bodies.  Polling places are

 7    a little bit different because a lot of times those are

 8    privately owned.

 9            THE COURT:  No.  I just wanted to understand what

10    your argument was, because you keep saying "government

11    buildings," and I didn't know if you were expanding that beyond

12    legislative assemblies and courthouses.  And you are or you

13    aren't?

14            MR. JENSEN:  I am and I'm not.  Sorry.  I realize

15    that's not a really square answer.  But normally we're using

16    deductive reasoning.  Here we need to use inductive reasoning.

17    What are the common threads that run between legislative

18    assemblies, polling places, and courthouses that would get us

19    to an end result that includes schools?

20            And I think the answer to that is all of these are

21    places that have a certain level of security attached to them,

22    right?

23            THE COURT:  Tell me why you're making this argument.

24    What sensitive place restrictions is it going to in this

25    legislation, so I can follow your argument?

1          MR. JENSEN:  Well, I think, frankly, it goes to all

2    of them, because what we're talking about is what's the actual

3    analytic model that we're going to use to address whether these

4    pass muster.  And in particular, do they line up with the

5    historical tradition?

6          THE COURT:  Okay.

7          MR. JENSEN:  So what we can take as more or less a

8    given is the Supreme Court saying legislative chambers, polling

9    places, and courthouses, there's a historical tradition for

10   those.  The Supreme Court is also saying we can use analogy to

11   build out other acceptable sensitive place restrictions, and

12   it's basically offering up we think "schools" passes muster.

13          So if you're looking at it from that perspective,

14   which I think is a good perspective to be looking at it from,

15   the question becomes:  What are the defining characteristics of

16   those three historical categories, legislative assemblies,

17   polling places, and courthouses?

18          And what I would suggest to you is the defining

19   characteristic in all of those places is there is some level of

20   security present and a restriction on entry.  And one thing

21   that's significant to note about that, and in particular, when

22   we're looking at the lack of support for schools and any

23   relevant time period is that the nature of schools has very

24   likely changed in the time period from 1791 or even 1868 to the

25   present.

1          Now, if you go to a school, a school normally has a

2    controlled perimeter.  You have to get buzzed through via a

3    security camera.  That would also be true of places like the

4    secured portion of an airport.  Because the big-picture idea

5    here is that --

6          THE COURT:  And a stadium.

7          MR. JENSEN:  I suppose it depends on exactly what the

8    nature of the stadium is.  I mean, is it -- again, taking

9    that -- taking the approach I just offered up as an example,

10   you'd have to say that a pretty significant question would be

11   what's the level of security that's present there?

12         Maybe an alternative way of framing it is saying

13   that, well, people always have a constitutional interest in

14   being able to protect themselves.  Is there something about

15   this particular place where we can say that someone isn't

16   really giving that up by walking in there without a defensive

17   weapon.

18         Certainly, again, if we're talking about places like

19   courthouses, legislative assemblies and, to some extent,

20   polling places, depending on exactly how the polling place is

21   being run, that would be true.

22         The one other example we have, and it's not clear --

23   the one other clear historical example we have and the only

24   thing that's a little up in the air is exactly how much weight

25   do we give to this, but we have the Statute of Northampton and

1    derivatives of it that were enacted in various colonial states.

2    And, you know, the Supreme Court discussed the Statute of

3    Northampton at some length in *Bruen*.  Most of that discussion

4    focused on the -- here, let's actually start out -- well, not

5    start out, let's take a look just briefly at what the Statute

6    of Northampton said.

7         "No person shall come before the King's justices, or

8    other of the King's ministers doing their office, with force

9    and arms, nor bring no force in affray of the peace, nor go nor

10   ride armed by night nor by day, in fairs, markets, nor in the

11   presence of the justices or other ministers, nor in no part

12   elsewhere, upon pain to forfeit their armor to the King and

13   their bodies to prison at the King's pleasure."

14        So a significant amount of the Court's discussion is

15   addressing this language about fairs and markets and to the

16   terror of the people.  But what's also not really being

17   discussed too much is that this also prohibits coming before

18   the King's justices or the King's ministers doing their offices

19   with arms.  The King's ministers doing their offices has the

20   qualification of with force, which means that it may not be an

21   absolute prohibition, but certainly I think it's fair to say

22   that a takeaway from here is that, as a matter of English law

23   in existence at the time of the Declaration of Independence, it

24   would be fair to say that there was a tradition of restricting

25   the ability to bring arms in front of the King's justices,

```
 1   which basically amounts to courthouses.

 2            THE COURT:  I want to make sure I'm understanding

 3   what you're saying to me.  Because for a moment I thought you

 4   might have been undercutting Mr. Schmutter's position.  I

 5   thought that what you were saying to me is that if we look at

 6   to what the Supreme Court's underlying reasoning might be as to

 7   why the historical analogs support such restrictions, one of

 8   the characteristics that you focused on is that these were

 9   places where typically there's some level of security and

10   there's a restrictive entry.

11            That characteristic applies in stadiums, airports,

12   casinos, whatever.  And we can debate that in a moment.  Is

13   that what you're saying?  Or are you adding to that

14   characteristic but it must be in advance of a government

15   function?

16            And what do you say the Supreme Court said?  Because

17   if it's only the characteristic of, well, if there's some level

18   of security there, then I don't think that's the position your

19   co-counsel takes.

20            MR. JENSEN:  Well, no, I don't think that some level

21   of security on its own is enough.  And in particular, when

22   we're talking about stadiums and casinos, because while there

23   may be some level of security, this isn't a situation where

24   people are going through metal detectors and there's armed

25   security present or very readily available.
```

1          With regard to an airport, the secure part of it,

2     yeah, that would definitely be the case.  But I thought we had

3     made it pretty clear, we weren't trying to challenge

4     restrictions on carrying within the secure area of an airport.

5     We're talking about both the ability to access a private plane

6     as well as the ability to check baggage.

7          THE COURT:  No; with respect to airports.

8          But I just thought you were taking somewhat of a

9     detour by making the argument that what was really most present

10    in the mind of the Supreme Court was, well, if there's

11    traditionally a level of security at the establishment,

12    whatever that is, then the restriction would be acceptable.

13    I'm just -- are you qualifying that or is that your position?

14    Because I don't think that's Mr. Schmutter's position.

15          MR. JENSEN:  Well, I think it has to be a fairly high

16    level of security.  If -- if -- preliminarily, if a property

17    isn't being used in the actual administration of government,

18    it's a little difficult to see how this would be anything other

19    than an application of private property owner rights in the

20    first place, meaning that I think it's implicit that if we're

21    talking about security restrictions, well, starting out with

22    the first three, legislative assemblies, polling places and

23    courthouses, by definition, these are government buildings

24    carrying out government functions.

25          I have trouble actually coming up with a really

```
 1   direct -- a really good analogy that wouldn't involve
 2   governmental functions.  Although perhaps a couple that would
 3   be good would be the ones you just offered up, would be
 4   stadiums and casinos where there may be some level of entrance
 5   restriction, but this isn't a level of entrance restriction
 6   that it's that easy to analogize to a court or to a legislative
 7   assembly, right?
 8               THE COURT:  Well, talk to me about -- and the State
 9   makes much of this -- talk to me about, for example, the PNC
10   Center.  It's government owned, right?
11               MR. JENSEN:  It -- it's government owned.  It could
12   be privately owned, which is significant.  It's significant
13   because -- why should the level of restriction depend on who
14   the owner of the property is when we're not talking about
15   something that is a governmental function?
16               THE COURT:  Well, that's my question to you.  Are you
17   limiting -- we seem to be going around in circles.  But are you
18   limiting -- are you saying to me that if there is a presence of
19   security present, that there are measures in place to restrict
20   entry, that in addition to those characteristics there must be
21   a governmental function and those are the types of places the
22   Supreme Court has said in *Bruen* are proper to restrict guns.
23   Is that what you're saying?  Is it those two characteristics?
24               MR. JENSEN:  Well, okay.  It --
25               THE COURT:  Because as I sit here and listen to you
```

1    now, Mr. Jensen, it seems to me that you're almost advocating

2    that the restriction to the PNC Center is proper under *Bruen*.

3    What am I missing?

4              MR. JENSEN:  Okay.  So, first of all, this has to be

5    something that we can analogize to those three restrictions

6    that have already been offered up as historically valid

7    examples.

8              THE COURT:  Right.  And I thought that you had made

9    the State's case for them on the PNC Center by your arguments.

10   I just want to make sure I'm understanding you correctly.

11             MR. JENSEN:  Okay.  So the fact that something is a

12   government building standing alone doesn't make it analogous to

13   those three categories.

14             THE COURT:  Okay.  Because?

15             MR. JENSEN:  Well, first of all, because all three of

16   those categories are carrying on government functions.

17             What I don't want to foreclose is the possibility

18   that sensitive place restrictions can validly apply in places

19   that are owned by private parties.

20             The starting premise is we have those examples, the

21   three, you know, legislative assemblies, polling places,

22   courthouses.

23             THE COURT:  So it's critical to your argument that

24   there be a government function?

25             MR. JENSEN:  I wouldn't necessarily say it's

```
 1    critical, but I think that's a pretty key component of it.

 2              THE COURT:  Okay.

 3              MR. JENSEN:  And let me give you a good -- what I

 4    think is a good example.

 5              What if an airport is privately owned and they have a

 6    TSA-controlled security perimeter?  An airport is not really

 7    performing a government function, and here it's not owned by

 8    the government, but it's much easier, at least for me, to

 9    analogize between those three examples and the example of the

10    secure area inside an airport.

11              If we're talking about stadiums in general, this

12    sounds a lot more like fairs and markets where the simple fact

13    that you have a number of people assembled together is

14    historically not a valid reason for the regulation.

15              So I appreciate the back-and-forth because I think we

16    actually did dress up the nuances here some.  But what I would

17    say is that the fact of governmental function is not an

18    absolute requirement, but certainly, certainly that is a common

19    theme that runs between those three examples the Supreme Court

20    gave.

21              Another common theme as stated is this notion of

22    security.  I think it might be a little bit much to read that

23    as saying that a sensitive place restriction would never be

24    valid anywhere that was not a government building carrying on a

25    government function.
```

 1            THE COURT:  Okay.  Fair enough.

 2            And if it were the government providing the security,

 3  what would you say to that?

 4            MR. JENSEN:  I think it's going to be the same thing

 5  about whether or not it needs to be a government building

 6  performing a government function.  That would certainly be a

 7  factor that would weigh somewhat strongly in favor of saying

 8  it's easier to analogize this to the historical examples we

 9  have.  But if you're looking at something like a school, it may

10  not be the government that's providing the security.  It

11  could -- it could -- you could have police officers providing

12  security at the school.  You could have private officers,

13  private security companies providing security at the school.  I

14  don't know that you can attach dispositive significance to

15  that.  But I think it would be a very strong factor.

16            Okay.  Honestly, there's probably a long list of

17  things I could potentially go into, but one of the points that

18  I don't think really came out that well in the briefing but I

19  think needs to be observed, and this is going in a somewhat

20  different direction than we've been talking about, but one of

21  the sensitive place restrictions at issue here is the

22  restriction on restaurants and bars that serve alcohol.  And

23  one of the points that's been made is, well, can we limit this

24  as being valid just in the context of bars?

25            And so the first -- I mean, one question of course

 1   is, would the restriction be valid in bars?  But stepping back

 2   from that, there's a somewhat more basic issue here, which is

 3   that if you look through the actual liquor laws of New Jersey,

 4   we really don't have a license classification that applies to

 5   bars per se.  We've got a whole bunch of licenses that allow

 6   for on premises alcohol sales, but it's not like you can say

 7   someone who has this license or that license is running a bar

 8   versus someone who has that license or this license is running

 9   a restaurant.

10        The Legislature didn't provide a definition for the

11   term "bar."  And while I think most of us can come up with a

12   rough definition of bar or maybe what we think a bar looks

13   like, that does really make some problems of application in

14   terms of how you would even be able to limit that order because

15   how would you provide any sort of bright line rule saying so

16   this is where the restriction is valid and this is where it

17   isn't?

18        Beyond that, unless you have anything further, it

19   might be a good time to turn this over to Mr. Schmutter.

20        THE COURT:  Mr. Schmutter.  Thank you, Mr. Jensen.

21        MR. JENSEN:  Thank you.

22        THE COURT:  Good morning.

23        MR. SCHMUTTER:  Thank you, Your Honor.  You know, I

24   think I'll go first to the security sensitive places thing that

25   Your Honor was just discussing with Mr. Jensen.

*United States District Court*
*District of New Jersey*

```
 1              THE COURT:  And I know you will talk very slowly,
 2     Mr. Schmutter.
 3              MR. SCHMUTTER:  Very slowly, Your Honor.
 4              THE COURT:  Because if I don't ask you, Mr. Kurz
 5     will.
 6              MR. SCHMUTTER:  By the way, I think Your Honor's
 7     approach last time was actually extremely helpful, not that
 8     it's your responsibility to do that, but thank you for doing
 9     that.
10              We don't think security gets you there.
11              THE COURT:  Okay.
12              MR. SCHMUTTER:  As Your Honor is aware, we so far
13     have only seen one thing that gets you a sensitive place.
14     That's "governance."  And it's actually narrower than
15     government functions, because as Your Honor knows, the State
16     claims that libraries and museums and all that stuff is
17     government functions.  It's the function of governance.
18     Legislatures, courthouses, polling places, those are the three
19     Bruen sensitive places.
20              The thing they have in common is they are all
21     governance activities.  The Legislature governs.  The courts
22     are part of government governance.  Voting is part of that
23     whole process.  There is nothing else in the record that shows
24     any kind of historical tradition.  And I want to make an
25     important point.  I think we make this in our brief, but it
```

 1   bears emphasizing.

 2           When you read *Bruen* carefully and you read the

 3   "sensitive place" section carefully, and I think we talked

 4   about this at the TRO stage, there is a difference between

 5   *Bruen*'s discussion of the *Heller* dicta, schools and government

 6   buildings, and the following sentence in which they actually

 7   identify actual historical sensitive places: legislatures,

 8   courthouses, and polling places.

 9           I think Your Honor pointed out something very

10   important in the colloquy with Mr. Jensen.  The *Heller* dicta is

11   just that.  It's dicta.  When the Court throws out government

12   buildings, sensitive places and government buildings were not

13   an issue in *Heller*.  That's, as we all know, now that Justice

14   Stevens has retired, we all know where all that dicta came

15   from.  There's a whole bunch of dicta in *Heller* that's very

16   frustrating because it has nothing to do with the case.  We now

17   know that that was basically to get Justice Kennedy's vote.

18   That's what Justice Stevens told us in his book.

19           So the Court goes there, but *Bruen* does not adopt --

20   the Court in *Bruen* did not adopt that.  It mentions the dicta.

21   It then goes on to do its own analysis for the sensitive places

22   which is just the three governance functions, because --

23           THE COURT:  Are you deviating from Mr. Jensen or are

24   you expanding upon what he said?  This is where I'm having

25   somewhat of -- I want to make sure I'm not misunderstanding.

         1   And I think Mr. Jensen has sort of steered me clear in my

         2   thinking.

         3            I thought at one point Mr. Jensen was saying that

         4   what was critical in the *Bruen* decision is that there must be

         5   some element of security.  It wasn't an essential -- it wasn't

         6   the ingredient, but it was a key component.  Do you agree with

         7   that or don't agree with that?

         8            MR. SCHMUTTER:  We agree that the three *Bruen*

         9   examples all exhibit security.  Security by itself doesn't get

        10   you there.

        11            THE COURT:  Okay.

        12            MR. SCHMUTTER:  Which is why the PNC Bank Center,

        13   which is why stadiums, which is why other plainly not

        14   historical locations don't get to be sensitive places because

        15   they have security.  That's not -- that's not the historical

        16   tradition.  Remember, it's about historical tradition.  And

        17   when you look at Kopel and Greenlee, it's about governance.

        18   And the reason is because it is historically critical that the

        19   governance function not be subject to violent coercion.  You

        20   don't want legislatures to fear violent coercion in the

        21   Legislature.  Judges --

        22            THE COURT:  Do you agree -- I am digressing, but I am

        23   curious since you have discussed your position about dicta in

        24   *Heller*, do you find that this is dicta in *Bruen*?

        25            MR. SCHMUTTER:  No.  Because sensitive places was a

1   position that New York took in *Bruen*.  So New York said oh,

2   yeah, it's really crowded, so it's all sensitive, these are all

3   sensitive places.  So they actually argued that.  So it did --

4   it was -- it did matter to the outcome of the case, they talked

5   about sensitive places, not so in *Heller*.  That was thrown in

6   there for the benefit of getting that vote which, you know,

7   happens.  It's a shame, but it happens.  It's just one of those

8   things, I guess, you do on a -- at the Supreme Court.  But

9   *Bruen*, it was an actual issue, so it's not dicta in *Bruen*.

10          But importantly, you know, we -- it's critical to

11   distinguish between the previous sentence that talks about the

12   *Heller* dicta and *Bruen*'s actual holding, which is that there

13   are three sensitive places that they're aware of:

14   Legislatures, courthouses, polling places.  And that remains

15   true.  There's nothing in this record that expands beyond those

16   sensitive places.  And we've talked about this a lot.  We

17   talked about it at the TRO.  We talked about it again because

18   of the Patrick Charles affidavit, which, as Your Honor knows,

19   we think it's improper; but nevertheless, let's talk about what

20   Charles said.  His opening line practically is this concept of

21   macro-level historical analysis.

22          Macro-level historical analysis is just the same

23   let's aggregate, let's make these arbitrary aggregations

24   because we know that we don't have enough historical citations

25   to justify any of these sensitive places.  So Charles goes into

```
 1   the same analysis that we argued was improper at the TRO stage.
 2   It's just as improper now.  You don't get to aggregate just
 3   because you know that you only have one or two or three
 4   citations to rely on, because we know that one or two or three
 5   are not good enough.  The Court told us that in Bruen.
 6           So as we stand here, there's still nothing in the
 7   record to support anything other than legislatures,
 8   courthouses, and polling places.
 9           You know, I think, as Mr. Jensen said, the record
10   hasn't improved since the TRO stage.  They've tried and they've
11   dressed it up.  I mean, my God, the Rivas declaration
12   literally, I mean Your Honor saw it in our brief.  We have this
13   giant string cite in which we show how in Bruen the Court
14   disapproved of every single one of her citations, but
15   they're -- you know, this is --
16           THE COURT:  I didn't hear you.  Disapprove what?
17           MR. SCHMUTTER:  Disapproved of every single one of
18   Rivas's citations, is literally rejected in Bruen.  Your Honor
19   saw that giant string cite that we had basically, like here's a
20   citation, here's the citation to Bruen.  Here's another one of
21   her citations, here's the citation to Bruen, one after the next
22   after the next after the next.
23           The State's position is fundamentally we don't like
24   Bruen.  That's what it's been from the beginning.  It's what it
25   remains today.  All they're doing is they're saying we don't
```

 1   like *Bruen*.  It's what all this interest balancing stuff is.

 2              You know, we've got all these government officials

 3   submitting declarations about how terrible guns are.  That's

 4   interest balancing.  Yeah, I get it, the State of New Jersey

 5   doesn't like people -- doesn't want people carrying guns, but

 6   the Supreme Court says you can't do that.  People have a right

 7   to exercise the right to keep and bear arms.

 8              So, you know, we are here today with basically the

 9   same record that they tried to produce at the TRO stage.  They

10   haven't made it any better.

11              Now, one thing that has improved, and Your Honor

12   alluded to this as well in the colloquy with Mr. Jensen, is

13   standing.  So we agree that it is much easier to show standing

14   at the PI stage than at the TRO stage, because as Your Honor

15   observed in the ruling, the TRO ruling in Siegel, Your Honor

16   held that some of the sensitive place challenges, there was not

17   a reasonable prospect that the injury would occur during the

18   TRO phase, which is typically a couple weeks.  In this case

19   it's a couple months.  But the PI extends out to the end of the

20   case.  So the PI time frame is really literally years.

21              And so, you know, look, Your Honor, we -- our

22   contention is and has been from the beginning that we've pled

23   and shown plenty of standing facts from the beginning that

24   satisfy standing in every one of the claims.  However, because

25   the State, I mean the State has focused on standing so much,

1   Your Honor may recall the question to counsel, don't you

2   want -- don't you want an up or down ruling on the merits?

3   Don't you want to know if your statute is constitutional or

4   not?  The answer is obviously no, they don't.  They don't want

5   a ruling on the merits.  I think they recognize how vulnerable

6   the statute is from a constitutional perspective, so they're

7   doing everything they possibly can to bring these standing

8   arguments.  So we, in our supplemental submissions, both our

9   initial supplemental submissions at the beginning of the PI

10  briefing and then subsequently as well in our reply papers, we

11  went belt and suspenders and another belt and another pair of

12  suspenders with standing facts.  Our people have actual

13  doctor's appointments.  Our people have checked and they're

14  allowed to carry.  Aaron Siegel is allowed to carry at his

15  urgent care center where he works.  We have people who actually

16  are going to the zoos Memorial Day weekend and things like

17  that.  So we have, you know, like -- I don't think it was

18  necessary.  I think we made an adequate record before, for the

19  PI phase.

20          But nevertheless, we really -- we just wanted to just

21  load the record up as much as we possibly could because this

22  case should not be decided on standing.  It should be decided

23  on the merits.

24          THE COURT:  Let me ask you about standing with

25  respect to the permit process.

```
 1              MR. SCHMUTTER:  Yes.

 2              THE COURT:  All of your plaintiffs already have their

 3    permits, other than from my reading, other than Cuozzo; am I

 4    right?

 5              MR. SCHMUTTER:  No.  Kim Henry.  Kim Henry has none

 6    of the permits.  She is a single mom who's hiding from her

 7    violent ex-boyfriend.  She's not currently working because

 8    she's in danger from her boyfriend and so she's very low

 9    income.  She's on assistance essentially, lives with her

10    mother.  She hasn't applied for any of that stuff because she

11    can't afford it.  So she is one of the key --

12              THE COURT:  What steps has she taken?

13              MR. SCHMUTTER:  She hasn't done anything yet.

14              THE COURT:  Okay.  And what about Cuozzo?  What steps

15    has she taken?

16              MR. SCHMUTTER:  Cuozzo, I don't recall.  I think she

17    has applied -- I'm not sure.  I have to go back and look at the

18    record, Your Honor.  I don't recall what Cuozzo has done.

19              THE COURT:  Because isn't the concern there is that

20    if -- let's use Cuozzo, for example, applies and is granted a

21    permit, where's the issue?

22              MR. SCHMUTTER:  Cuozzo or Henry?  I'm not following.

23              THE COURT:  Well, Cuozzo hasn't finished her permit

24    process, has she?

25              MR. SCHMUTTER:  I believe that's correct.
```

```
 1              THE COURT:  Okay.  If she's granted a permit, where
 2   is there a standing issue?
 3              MR. SCHMUTTER:  As to which claim?  I'm sorry, I'm
 4   not following.
 5              THE COURT:  As to the -- well, you've challenged the
 6   issue with respect to the permit process.
 7              MR. SCHMUTTER:  Oh, oh.  I'm sorry.  Everybody has to
 8   renew every two years.  Everybody is going to have to renew
 9   within the reasonable time frame of a preliminary injunction.
10              THE COURT:  But the law says that if you have to
11   reapply -- or you have to renew in two years, the law on its
12   face says what is applicable two years from now are the same
13   standards that were in place when you applied.  And for I don't
14   know how many of the plaintiffs, most of them, the law doesn't
15   apply by the plain terms of the legislation.  Do you agree with
16   that?
17              MR. SCHMUTTER:  No.  I'm not following.  Is Your
18   Honor saying that if I got a permit before December 22nd, the
19   new standards never apply to me?
20              THE COURT:  That's how I read the legislation.
21              MR. SCHMUTTER:  I don't believe that's what the
22   statute says.  If I --
23              THE COURT:  Well, let's have a look at it.
24              MR. SCHMUTTER:  I'm pretty sure when you renew,
25   you're subject to the new standards, the new fees, the new
```

```
 1   standards, everything.  I don't think you're forever governed

 2   by the old standard.

 3              THE COURT:  Well, let's take a look.

 4              MR. SCHMUTTER:  I don't have the statute in front of

 5   me, Judge.  It's the first I've --

 6              THE COURT:  You don't have it memorized?

 7              MR. SCHMUTTER:  Almost.  98 percent memorized, Judge.

 8   But I've not heard this argument before.  So I didn't look at

 9   it from that perspective, but I'm almost positive that's not

10   correct.

11              THE COURT:  "And they thereafter be renewed every two

12   years, in the same manner and subject to the same conditions as

13   in any case of original applications."

14              Seems pretty clear to me.

15              MR. SCHMUTTER:  Is that the old law or is that the

16   new statute?  Because that --

17              THE COURT:  That is the new statute, Mr. Schmutter.

18              MR. SCHMUTTER:  Judge, I'm sorry.  I apologize.  I'm

19   going to have to look at the context.  This is the first time

20   I'm hearing about this.

21              THE COURT:  Okay.  Well, it just seems to me that --

22   and maybe it's a legislative oversight, but, you know, it's not

23   for this Court to rewrite legislation.  But it seems to me that

24   the Legislature contemplated that if you got your application

25   to carry before the law was enacted, that the standards that
```

 1   were in place before the legislation, pardon the pun, carry

 2   with you.

 3            MR. SCHMUTTER:  Well, on behalf of all the people who

 4   already had their permits, I certainly -- I'm sure they would

 5   love that to be the case.  I don't think it's the case.

 6            THE COURT:  Well, it seems to me to be pretty plain

 7   on its face unless someone tells me that I'm interpreting it

 8   incorrectly.  "In the same manner and subject to the same

 9   conditions as in the case of original application."  Seems

10   pretty clear to me.

11            MR. SCHMUTTER:  And so Your Honor's thought is that

12   applies to fees as well; is that right?

13            THE COURT:  It's not My Honor's thought.  This is

14   what the Legislature ruled.

15            MR. SCHMUTTER:  No.  Judge, look, I apologize.  It's

16   literally the first time I --

17            THE COURT:  And perhaps some of you might say this is

18   because it was rushed to legislation, perhaps.  But it's not

19   for this Court to rewrite legislation.

20            MR. SCHMUTTER:  Well, certainly then Nicole Cuozzo

21   and Kim Henry have standing.

22            THE COURT:  That's why I'm raising the question.

23            MR. SCHMUTTER:  Well, certainly they have standing

24   then, because if they don't have their permits yet, they're

25   subject to the new rules.

```
 1              THE COURT:  But my question is, is that who's to say
 2   they won't get their permits?
 3              MR. SCHMUTTER:  But then --
 4              THE COURT:  And then let me follow this through with
 5   you.
 6              MR. SCHMUTTER:  Sure.
 7              THE COURT:  And then the question becomes, assuming
 8   you're correct and I agree with you, your argument will then
 9   be, but two years down the road, Judge, they'll have to go
10   through this process again.  Let's just play it out.
11              And my question for you then, is that, you know, that
12   seems to me to be more of a permanent injunction as opposed to
13   a preliminary injunction issue because two years down the road
14   is two years down the road.
15              MR. SCHMUTTER:  So two thoughts on that.  So to the
16   extent that Cuozzo and Henry do not yet have their permits,
17   they currently have standing to object to the procedures.  It's
18   not a matter of not getting the permits.  This isn't a permit
19   denial concept.  This is it's unconstitutional to require them
20   to do the things that the statute requires.  So it's
21   unconstitutional to make them go through the procedures that
22   we're objecting to, and it's unconstitutional to subject them
23   to the standards we're objecting to, and it's unconstitutional
24   to subject them to the fees that we're objecting to.
25              So to the extent that neither Cuozzo nor Henry
```

1    currently have a permit, they have standing right now to object

2    to that right now.

3             THE COURT:  Okay.

4             MR. SCHMUTTER:  Now, the second argument is, I do

5    think actually two years is within the preliminary injunction

6    time frame.

7             THE COURT:  Preliminary or permanent?

8             MR. SCHMUTTER:  Preliminary.

9             THE COURT:  Well, why?

10            MR. SCHMUTTER:  Because preliminary goes out till the

11   end of the case.  We don't know when this case is going to end.

12   As Your Honor knows, cases last years.  We shouldn't -- I don't

13   think for standing purposes we can prejudge when the end of the

14   case is going to be.

15            THE COURT:  But why can't I just revisit it at a

16   later date?  Why do I have to visit now in a preliminary

17   injunction if it's not even pending for two more years?  That

18   doesn't seem correct to me.

19            MR. SCHMUTTER:  Because I don't -- I'm not aware --

20            THE COURT:  Because what I would say to you is,

21   Mr. Schmutter, let's revisit this issue in a more timely

22   fashion two years from now or a year and a half from now,

23   but --

24            MR. SCHMUTTER:  Yeah.  I think we have the right to

25   seek preliminarily injunctive relief for injury at any time

 1   during the relevant time frame.  Unlike a TRO, which is

 2   emergency, you know, hair-on-fire stuff, preliminary injunction

 3   is not.  Preliminary injunction is simply what should the

 4   conditions be while the case is being litigated.  And it's

 5   generally dealt with at the beginning of the case.  I'm not

 6   aware that --

 7             THE COURT:  And if I decline to issue it now and say

 8   I'll decide it down when it becomes more quote-unquote ripe,

 9   would you fault me?

10             MR. SCHMUTTER:  I think so, yeah.  I think that's

11   wrong, Judge.  I think that's not the correct approach.

12             THE COURT:  Okay.

13             MR. SCHMUTTER:  I mean, I hear Your Honor and I hear

14   the point Your Honor is making.  I don't think that's the

15   correct way for preliminary injunctions to happen.

16             I think preliminary injunctions, a litigant is

17   entitled to a preliminary injunction if they satisfy the

18   requirements at the time that the motion is made.

19             THE COURT:  Okay.

20             MR. SCHMUTTER:  And it applies through the time frame

21   of the preliminary injunction, which is the entire case.

22             THE COURT:  Fair enough.

23             So assume you're correct and all of the factors for

24   the issuance of a preliminary injunction are met, irreparable

25   injury, balancing of the equities, et cetera, et cetera, you

```
 1    have some facial attacks on some of this legislation.  Why do I
 2    have to decide those now?  Because where's the irreparable
 3    injury?
 4            Let me start with the one that comes to my mind is
 5    your challenge, your equal protection challenge as to the
 6    provision that exempts judges and others.  Why do I have to
 7    decide that now?
 8            MR. SCHMUTTER:  Because all of the plaintiffs suffer
 9    that injury now.
10            THE COURT:  How are they being injured by the fact
11    that someone else might be getting a carry permit when they
12    themselves have one?
13            MR. SCHMUTTER:  Because they can't carry in places --
14            THE COURT:  After all, I mean, you are promoting the
15    right to carry a firearm.  So how can you argue that your
16    plaintiffs are being irreparably injured when someone else also
17    has the right to carry a firearm?  What am I missing?
18            MR. SCHMUTTER:  Because right now -- I'm sorry,
19    Judge.  I interrupted you.
20            THE COURT:  What am I missing?
21            MR. SCHMUTTER:  Right now today the constitutional
22    injury is that they can't carry in the sensitive places that
23    judges, prosecutors, and attorneys general can.
24            THE COURT:  But if I say they can?
25            MR. SCHMUTTER:  I'm sorry?
```

```
 1              THE COURT:  If I say they can, what's the irreparable
 2    injury?  If I say, if this Court rules that your clients can,
 3    what is the irreparable injury now with respect to your
 4    challenge, the equal protection challenge?
 5              MR. SCHMUTTER:  Because they're all -- there's still
 6    restrictions.  We haven't challenged everything in the statute.
 7    We've sought relief on some things.  But there are all sorts of
 8    things we haven't challenged that judges, prosecutors, and
 9    attorneys general have the right to do that we don't.  For
10    example, judges can carry in schools.  Attorneys general that
11    work for the Attorney General's Office can --
12              THE COURT:  But you don't want to -- okay.
13              MR. SCHMUTTER:  -- can carry in schools.  I mean --
14              THE COURT:  You don't want to carry in schools, so
15    I -- can you focus --
16              MR. SCHMUTTER:  You can carry in -- I mean, we can
17    pick a -- I'm sorry, Judge.  I interrupted you.
18              THE COURT:  I want you to focus on the irreparable
19    injury part of the aspect.  Because if I don't have to decide
20    the equal protection challenge with respect to that provision,
21    I don't want to.
22              And so you would have to persuade me, and the
23    reason -- the way I get there is I find no irreparable injury.
24    So you will have to -- and maybe I'll order further briefing on
25    it -- you'd have to show me how your plaintiffs are being
```

1    irreparably injured.  Here's the example that we just

2    discussed.  You say, well, judges can carry in schools, but

3    your plaintiffs don't seek to carry in schools.  So that's not

4    irreparable injury, right?

5              MR. SCHMUTTER:  Well --

6              THE COURT:  What I'm saying is, you have to at least

7    address the irreparable injury stage to persuade me why I need

8    to rule now.  That's all I'm saying.  And I don't know that

9    you've done that.  Have you?

10             MR. SCHMUTTER:  Yes.  So let me answer in two ways,

11   Judge, because there's actually more to it than I think is

12   clear.

13             The exemption that we're challenging doesn't just

14   allow judges, prosecutors, attorneys general to carry in the

15   sensitive places.  They're exempt from all of the restrictions

16   in 2C:39-5.  That means that Your Honor could walk into a

17   school with a machine gun.  I mean, that is -- this exemption

18   is really, really broad.  And so there's a whole swath of

19   things that my clients can't do that the exempt individuals

20   can, including carrying in schools or carrying in other places

21   that we haven't challenged.

22             THE COURT:  That's a statement that you've made.  But

23   now let's deal in reality.  What is it that your plaintiffs

24   want to do that you say these other individuals can do?  And by

25   the way, what's your classification on your equal protection

1    challenge?

2             MR. SCHMUTTER:  I'm sorry?

3             THE COURT:  What is the classification?

4             MR. SCHMUTTER:  Classification is -- is the exercise

5    of a constitutional right.  So you can't discriminate -- under

6    the equal protection clause, you can't discriminate on the

7    exercise of a constitutional right.  So our people want to

8    exercise their Second Amendment rights.  They're being

9    discriminated against in the exercise of their constitutional

10   right because they don't fall into the classification of

11   judges, prosecutors, and attorneys general.

12            THE COURT:  Okay.  And so now let's flesh that

13   further out.  Where?

14            MR. SCHMUTTER:  Everywhere they want to.  Our people,

15   my plaintiffs, the allegations regarding the suspect

16   classification is about they would carry anywhere.  They would

17   carry everywhere.  But they're not asserting that they have a

18   Second Amendment right to carry in the nonchallenged locations.

19   They're asserting that they should be able to carry where these

20   other people should be able to carry, and that's an equal

21   protection claim.

22            And I guess I don't know if Your Honor is looking for

23   an allegation in the complaint that says -- where Aaron Siegel

24   says I would carry in schools if only I were a judge or a

25   prosecutor.  That's not in the record.

```
 1              THE COURT:  No.  It's not only if I were a judge.
 2   But why can a judge carry in a school and I can't carry in a
 3   school?  But your clients are not looking to carry in schools.
 4              MR. SCHMUTTER:  That's not true.
 5              THE COURT:  They are?
 6              MR. SCHMUTTER:  They would carry anywhere they were
 7   allowed to carry.  What these plaintiffs have made clear is
 8   that they carry for personal defense, they carry for defense of
 9   themselves, their families and the people around them.
10              All you have to do is look at Varga and Cuozzo, the
11   church plaintiffs.  They're not just protecting themselves.
12   They're protecting the church community.  That's what this is
13   all about for them.  So these plaintiffs would carry anywhere
14   they could carry.  I think the record reflects that -- for
15   example, let's look at Varga.  They have the 14-acre campus and
16   they lease one of their buildings to a school.  I think it's
17   absolutely clear that Tim Varga would carry in that school if
18   he could.  I think that if he -- if there were a way for him to
19   carry in the school constitutionally and lawfully, I think he
20   absolutely would carry in the school if he walked into that
21   building.  He's on the security committee.
22              THE COURT:  If the classification is one that's
23   professional-based, then it's a rational basis test, correct?
24              MR. SCHMUTTER:  I'm sorry?
25              THE COURT:  It's a rational basis test, correct?
```

1              MR. SCHMUTTER:  No.  It's strict scrutiny.

2              THE COURT:  If it's professional-based?

3              MR. SCHMUTTER:  It's still strict scrutiny because it

4    implicates -- it impairs the exercise of a constitutional

5    right.  It's only rational basis if there's no constitutional

6    right involved, right?

7              So if I said --

8              THE COURT:  But how is that a suspect class?

9              MR. SCHMUTTER:  I mean, the cases that we cite make

10   that clear.  If I said, oh, judges are allowed to buy 50-ounce

11   Slurpees and I'm not, that's rational basis because there's no

12   suspect class.  There's no impairment of a constitutional

13   right.  I don't know if you have a constitutional right to --

14   maybe you do actually because the New York case, it was

15   stricken.  But if we're talking about Slurpees, that's probably

16   rational basis.  If we're talking about a right to keep and

17   bear arms, that's strict scrutiny.  That's a pretty bright

18   line.

19             If you're being discriminated against in the exercise

20   of a constitutional right, you get strict scrutiny.  I think

21   the law is -- I think the citations support that really pretty

22   plainly, Judge.

23             THE COURT:  Okay.

24             MR. SCHMUTTER:  Did I answer all Your Honor's

25   questions on those?  I hope I did.

 1          Okay.  I want to talk a little bit more about

 2   irreparable harm because -- and there's a few cases that I want

 3   to cite to the Court that were not in the briefs.  I circulated

 4   them to counsel on Monday so they know that I'm going to be

 5   talking about some of these cases.

 6          I guess I want to talk about -- because the State has

 7   argued that the economic harms like the fees and the insurance

 8   are not irreparable.  And that really -- that takes an

 9   incorrectly non-nuanced approach to what economic harm is.

10          Of course, the general rule is that when you have

11   money damages, you don't have irreparable harm.  But the first

12   thing you have to do, first of all, is look at things like

13   sovereign immunity, right?  I have no idea how we would recover

14   the cost of insurance from the State.  I don't know if the

15   State is going to waive sovereign immunity.  I tend to doubt

16   it.  But, I mean, you look at cases like *Baker Electric*

17   *Cooperative vs. Chaske*.  By the way, I have copies for the

18   Court.  Did Your Honor want me to --

19          THE COURT:  Just give me the citations, please.

20          MR. SCHMUTTER:  Okay.  So *Baker Electric Cooperative*

21   *vs. Chaske,* it's 28 F.3d 1466.  That's an Eighth Circuit case.

22   That stands for the basic principal that just because there's

23   economic harm, if there's a sovereign immunity problem, you

24   can't recover.  That's irreparable harm.  So that's just one of

25   the classic examples.

 1          Another example is where you can't be reasonably

 2     certain about damages.

 3          THE COURT:  But there's no sovereign immunity against

 4     the individual who's collecting on behalf of the State.  So I

 5     don't think that the plaintiffs need to be concerned there.  I

 6     don't know that we need to get too bogged down in this

 7     analysis, Mr. Schmutter.

 8          MR. SCHMUTTER:  That's fine, Judge.  Let me just --

 9     if I could just throw a couple citations out real quick.  I

10     just want to make sure it's in the record.

11          THE COURT:  All right.  Go ahead.

12          MR. SCHMUTTER:  I know, Your Honor.  I understand.  I

13     hear Your Honor.

14          *Husky Ventures vs. B55 Investments*, that's a

15     Tenth Circuit case, 911 F.3d 1000, that talks about, you know,

16     you have to have a reasonable certainty about the damages to

17     recover, and if you don't, it's irreparable.

18          One thing I do want to talk about though and

19     emphasize is I want to go back to Kim Henry.  Because it is

20     incorrect for the State to say if it's just about money, pay up

21     and then maybe at the end of the case you can recover the fees.

22     That is not the case with people who are indigent and poor and

23     can't afford the fees.

24          Now, this is what Kim Henry has to do when she wants

25     to protect herself from her violent ex-boyfriend.  So she needs

1    a permit to purchase a handgun.  That fee went from $2 to $25.

2    She has to get an FID card, Firearms Purchaser Identification

3    card.  That fee went from $5 to $50, $75.  Then she has to do

4    her $200 carry permit fee.  So $275 just to exercise the right

5    to keep arms and the right to bear arms, but she also has to

6    buy a firearm.  She has to buy ammunition.  She has to buy

7    training.  And every dollar that she has to expend, which she

8    doesn't have for the $275 in fees, is money that she cannot

9    spend on the actual exercise of her right.

10           And actually, there's an unreported decision out of

11   Illinois, I know it's not authoritative, but just conceptually

12   I think it's relevant to discuss.  It's ACLU of Illinois

13   versus -- I forgot who the defendant is.  But it's a district

14   court case in Illinois, and that's a case where there was --

15   they had a $1,000 lobbying fee.  Couldn't lobby without paying

16   the $1,000 fee, and the Court struck it down and issued a

17   preliminary injunction and said every dollar that ACLU of

18   Illinois has to spend on their lobbying fee is a dollar they

19   can't spend on their First Amendment activities, so it's

20   irreparable and we can enjoin them.

21           That's exactly Kim Henry and everybody like her who

22   for every dollar they to spend on these exorbitant fees -- and

23   Your Honor will recall exorbitant fees is right out of

24   footnote 9 in *Bruen* -- is money that they can't be spending on

25   what they need to be purchasing, such as their firearm, their

     1    ammunition, their training.

     2              THE COURT:  And how do you suggest the Court go about

     3    resolving the issue you have raised?  Is it an individualized

     4    inquiry as to whether or not someone's Second Amendment right

     5    is being infringed because of the nature of the fee?  Because

     6    $25 to one individual may not be the same as to another

     7    individual.  And so how do you suggest that this Court go about

     8    determining it, the issue you've raised?

     9              MR. SCHMUTTER:  We think it's a facial challenge,

    10    Judge.

    11              THE COURT:  It's a facial challenge?

    12              MR. SCHMUTTER:  Correct.  We think that all you need

    13    is some people for whom it is a hardship and demonstrates the

    14    footnote 9 problem of an exorbitant fee.  And of course as Your

    15    Honor knows from the papers, there's all kinds of other

    16    problems with the fees.  There's the *Cox* problem.  There's the

    17    *Bruen* problem.  You know, there's all sorts of issues.

    18              THE COURT:  So am I to just look at the record as a

    19    whole?  Just help me understand your argument.  Am I to look at

    20    the record as a whole and say well, every other plaintiff who

    21    is part of this record has been able to afford the fee but one

    22    and therefore the Court concludes?  Or am I to say because one

    23    of all of the plaintiffs cannot afford to pay the fee, the

    24    Court concludes?  Which is it that I'm to do?

    25              MR. SCHMUTTER:  The second.  It's a facial challenge,

1    Judge.

2            THE COURT:  Okay.

3            MR. SCHMUTTER:  By the way, it's not just Kim Henry.

4    Because don't forget --

5            THE COURT:  How do you get around the Second Circuit

6    upholding a fee of $300?  You just say they're wrong, right?

7            MR. SCHMUTTER:  I'm sorry?

8            THE COURT:  The Second Circuit upheld a fee of $300.

9    Do you say the Second Circuit got it wrong?  Is that what you

10   say?

11           MR. SCHMUTTER:  Is Your Honor talking about *Kwong*?

12           THE COURT:  Yes.

13           MR. SCHMUTTER:  Well, first of all, *Kwong* is

14   pre-*Bruen*.  But, yes, the Second Circuit got it wrong in *Kwong*,

15   and here's why.  And this goes to *Cox*, because *Kwong* is a

16   *Cox* case.  So -- and actually I was a little surprised.  The

17   State has not tried to defend the fees under *Cox* at all.  The

18   *Cox* analysis is twofold.  *Cox* tells us that the fee connected

19   to the exercise of a constitutional right is invalid if it does

20   not directly cover the costs of regulation.

21           So already the victims-of-compensation-fund stuff,

22   that is unlawful.  We know that immediately, and each of the

23   fees has a victims-of-compensation-fund component.  That goes

24   away, right away.  That's easy.  They didn't even try to defend

25   it.  But there's more to *Cox*, right.  But -- and this is in our

```
 1   brief and Your Honor read this, but before you even get to does

 2   the fee -- is the fee directly related to covering the cost of

 3   regulation, the activities that give rise to the cost have to

 4   have the Bruen justification.

 5              So, for example, the State of New Jersey could pass a

 6   statute that says we are going to evaluate an application --

 7              (Pause.)   (Microphone feedback.)

 8              The State of New Jersey could pass a law that says we

 9   think it's so important that people be vetted properly before

10   they get a carry permit, we're going to have seven different

11   police officers do seven independent investigations just to

12   make sure we get it right, and that's going to cost $1,500 or

13   $2,000.

14              If you take the Kwong approach, all you're doing is

15   you're comparing the cost of seven investigations versus the

16   actual fee.  If it matches, boom, it's constitutional.  That

17   misses the point.

18              You first have to ensure that the process itself is

19   constitutional before you even figure out what the cost is.  So

20   the seven investigations would be subject to a Bruen analysis.

21   Is there a historical tradition that supports this process?

22   And that's the argument we made, and they didn't even try to

23   justify it.

24              So they don't even get to Cox.  They can't justify

25   their process.  And they don't even argue that the numbers are
```

     1    consistent with the costs.  They don't even go to *Cox*, which I

     2    don't understand.  Well, I'm not going to say another -- but I

     3    was surprised not to see that.  So there are so many things,

     4    they lose on the fees for so many independent reasons we think

     5    that's absolutely critical.

     6           Now, there's another aspect of irreparable harm.  I

     7    know Your Honor didn't want to talk so much about irreparable

     8    harm, but I'll throw one thing out.  *Lingle vs. Chevron*, which

     9    is nominally a takings case, but what *Lingle* says -- and I'll

    10    give Your Honor the citation, 125 Supreme Court 2074.  It's a

    11    2005 Supreme Court case.  It is ostensibly a takings case.  And

    12    it's a case in which the Supreme Court rejects what had

    13    theretofore been a basis to find a taking.  And the Supreme

    14    Court said you know what, this is not a valid taking theory.

    15    So they rejected that case.

    16           But there's something else implicit in what they say,

    17    which is actually really important.  So what they say is this

    18    might or might not be a taking, but it's also an argument for

    19    due process violation.  It demonstrates that violations can be

    20    dual violations.

    21           The fees, for example, are not just monetary actions.

    22    They're not just monetary penalties.  They're also themselves

    23    constitutional violations, that is, they have a separate status

    24    as a Second Amendment violation.  So making someone pay the fee

    25    is not simply taking money out of their pocket.  It's violating

                          *United States District Court*
                            *District of New Jersey*

```
 1    their Second Amendment right.  That's an irreparable harm that
 2    getting your fee back at the end of the case somehow doesn't --
 3    doesn't compensate for.  So you don't have compensation for the
 4    constitutional harm itself.  That's an independent basis for
 5    irreparable harm.  So we're going to ask the Court to think
 6    about it from that perspective because that's sort of implicit
 7    in what Lingle is talking about by showing the dual nature of
 8    the taking allegation.

 9              THE COURT:  What do you think the fee should be?

10              MR. SCHMUTTER:  Well, I mean, as a standard today, I
11    think the fee should be what it was before.  Now, are those
12    constitutionally justifiable?  I don't know.  We're not
13    challenging the old fees.  The old fees may be challengeable as
14    well.

15              THE COURT:  Well, let me press you.  You don't have a
16    position as to whether or not the old fee was unconstitutional?

17              MR. SCHMUTTER:  We don't.  We're not taking a
18    position on that, Judge.  We really haven't -- we haven't
19    thought about the analysis of that.

20              I will say I'm not aware of any historical tradition
21    for these kinds of fees.

22              THE COURT:  So then why wouldn't you be challenging
23    it?

24              MR. SCHMUTTER:  I mean, Judge, we have to make
25    decisions when we litigate.  There's other stuff we're not
```

```
 1  challenging as well that we probably could.

 2            THE COURT:  Okay.

 3            MR. SCHMUTTER:  By the way, honestly, Judge, there's

 4  other stuff in the statute we probably could be challenging,

 5  but we're not.  And that doesn't mean we won't one day

 6  challenge them.  But importantly, we think going from 2 to 25

 7  and going from 5 to 50 and going from 50 to 200 is plainly

 8  unconstitutional.  And if we're back before Your Honor some day

 9  saying the old fees are unconstitutional, too, there's nothing

10  wrong with that, you know, we have to decide which claims we're

11  going to bring when we're going to bring them.

12            Judge, I'm not going to talk about traceability or

13  redressability.  We've briefed that.  The briefs are very

14  clear.

15            I do want to point out one thing, though.  And it's

16  in our brief, but I do want to emphasize it.  When we were here

17  on the TRO, the Court did a very helpful analysis with my

18  friend on the other side about the breadth and scope of

19  schools, the school's provision, and the breadth and scope of

20  multi-use property problem.  And in the Opinion, the Court, as

21  I read it, and I just want to make sure I'm not

22  misunderstanding it, the Court basically said the State

23  conceded these issues and therefore we don't have to go there.

24  That's kind of how I read the Opinion, and that was very

25  helpful.
```

1          Here's the problem we face:  I'm not sure that people

2    like my clients and others, members of ANJRPC or anybody in New

3    Jersey who wants to exercise their Second Amendment rights, I'm

4    not sure they can rely on a concession of counsel during oral

5    argument.  I believe we need a finding or a holding or a

6    construction of those statutes as the State has conceded.

7          In other words, I think we need, in the PI phase, the

8    Court to actually find that those statutes mean that.

9          THE COURT:  It will be an order embodying the

10   concession.  That's your finding.  That's the Court's finding.

11         MR. SCHMUTTER:  As long as the order says that.

12         THE COURT:  Okay.

13         MR. SCHMUTTER:  I don't think the previous order said

14   that.  I don't think the previous Opinion went that far.  So

15   that's what we're asking for.  We're asking for the Court to

16   take it to the level that is actually enforceable, because I

17   worry that -- I worry that the record in the TRO phase is a

18   little bit unclear that -- I'm not 100 percent sure that if a

19   police officer arrested someone in the parking lot of a

20   multi-use property, I'm not 100 percent sure that that person

21   can completely rely on the record in the TRO.  So we're just

22   asking for something more enforceable.  That's all.

23         THE COURT:  I will take it under advisement.  But

24   thank you.

25         MR. SCHMUTTER:  Thank you, Judge.

 1            I want to actually point out something really

 2    interesting.

 3            We received an email from counsel the other day.  I'm

 4    reluctant to cite --

 5            THE COURT:  From Ms. Cai?

 6            MR. SCHMUTTER:  Yes.  I'm reluctant to cite cases

 7    that the other side says they want to cite, but it's such a

 8    good case for us I can't help it.  So the email said oh, we may

 9    cite *NRA* vs. *Bondi*, Eleventh Circuit case.

10            This case to me is the absolute best example of why

11    1791 is the time frame and not 1868.  So *Bondi* just came out, I

12    guess, last week.  *Bondi* is a challenge to Florida's law

13    prohibiting the acquisition -- or I'm sorry, the purchase of

14    firearms for adults age 18 to 20.  So no purchases.  Not just

15    handguns, because many states in many jurisdictions --

16            THE COURT:  I thought it was a Ninth Circuit case.

17    Am I wrong?

18            MR. SCHMUTTER:  Eleventh Circuit case.  It's Florida.

19    It's Florida law.

20            THE COURT:  Okay.

21            MR. SCHMUTTER:  And so the Court -- what the Court

22    says is they come straight out and say it's

23    Fourteenth Amendment, that means it's 1868, not 1791.  And the

24    reason *Bondi* is such a great case is that the Court makes it

25    absolutely clear there are no historical citations from the

*United States District Court*
*District of New Jersey*

1    Founding, none, that support the law.

2            So we have this great binary situation.  No citations

3    from 1791 and then a bunch of citations the courts rely on from

4    Civil War and construction time frame.  And they say it's 1868,

5    therefore, the law is valid.

6            Now, what does this illustrate?  It illustrates why

7    that can't possibly be right.  As the Supreme Court said in

8    *Bruen*, there is only one version of the right.  First

9    Amendment, the Second Amendment, the Fourth Amendment, they

10   mean the same thing as to the federal government as to state

11   government.  There aren't two different versions of it.  What

12   does that mean?

13           Under the *Bondi* reasoning of the Eleventh Circuit, if

14   Congress enacted the exact same law, because 18 U.S.C. 922

15   works differently.  But if 18 U.S.C. 922 were amended to

16   provide the exact same restriction as the Florida law,

17   according to the way the Eleventh Circuit looks at it, the

18   federal statute would be invalid because the

19   Fourteenth Amendment has nothing to do with federal law, right?

20   The federal government is governed by 1791 because that's the

21   time frame, but the state law is governed by 1868, the result

22   would be different.

23           The federal law would be unconstitutional under the

24   Second Amendment but the state law would be constitutional.

25   The Supreme Court is 100 percent clear that that's not how it

1   works.  You can't have a provision of the Constitution that

2   applies differently to state law and federal law.  So *Bondi* is

3   a magnificent illustration on why the time frame has to be

4   1791.

5           The only other thing I think that I'll point out,

6   Your Honor saw our briefing on playgrounds and youth sports.

7   We think there's a very good bright-line rule that the Court

8   can apply, school ones and nonschool ones, and we think that's

9   what the Court should do.

10          I guess the last thing I'll say is simply that it's

11  in our briefs, but we want to emphasize because the State

12  hasn't really responded to this at any point, *Bruen* doesn't --

13  you don't automatically go to analogies in *Bruen*.  You only get

14  analogies -- get to analogize under three circumstances, right?

15  It's unprecedented societal concerns.

16          THE COURT REPORTER:  I'm sorry?

17          (Clarified the record.)

18          MR. SCHMUTTER:  Unprecedented societal concerns,

19  which we know doesn't apply here because the concerns here are

20  exactly the same as in *Heller*, *McDonald*, and *Bruen*, handgun

21  violence, right?  They didn't parse technology.  They didn't

22  parse modern versus historic.  It's just handgun violence,

23  okay.  So that's the -- so they don't get to analogize on

24  ground one.

25          Ground two is, you know, massive changes in

```
 1   technology.  Again, that doesn't apply here because the
 2   technology of handguns is not what counts.  Again, Heller,
 3   McDonald, Bruen, a technology didn't fall into it.  So, again,
 4   it's handguns and handgun violence.
 5            And the third one is regulations that could not have
 6   been imagined at the time of the Founding.  They don't have any
 7   of that either.  So they don't get to analogize.  They actually
 8   have to provide the specific things.  There were museums back
 9   then.  There were libraries back then.  There were
10   entertainment venues back then.  It doesn't matter that PNC
11   Bank Art Center looks different than a theater in Boston in the
12   18th century.  None of the cases differentiate between what the
13   modern look is and what the historical look is.  That's not a
14   thing.  So they actually don't get to analogize.  They actually
15   have to bring specific examples of the same thing.
16            Now --
17            THE COURT:  How do you get to --
18            MR. SCHMUTTER:  -- their analogies don't work anyway.
19            THE COURT:  Well, okay.  I was going to ask you about
20   airports, how you get there.
21            MR. SCHMUTTER:  Well, you get to airports because all
22   airports really is are crowded places.
23            THE COURT:  Are what?
24            MR. SCHMUTTER:  All airports really are are crowded
25   places.  There's nothing about dropping, you know, there's
```

1    nothing about checking in at the counter or curbside check-in

2    or going to have a bite to eat at McDonald's that's outside the

3    TSA area, there's nothing different about those things.  The

4    fact that there are airplanes on the tarmac, that has nothing

5    to do with security because you're not bringing guns onto the

6    airplane.  So what they care about with airplanes and

7    transportation terminals is just a place where people gather.

8    There's nothing modern about that condition, right?  If we were

9    saying, Judge, we should be allowed to carry guns on airplanes,

10   okay, that's a totally different thing, right?  Airplanes have

11   their own special concerns, right?  They're pressurized.  They

12   get hijacked.  We're not arguing that.

13          The thing that they say they're protecting against is

14   an ordinary condition of people just milling about in crowds.

15   There's nothing modern about that.  That is the same thing that

16   we've seen before, and we know that crowds don't work.  *Bruen*

17   was 100 percent clear that simply because something is crowded,

18   that is not a proper sensitive place.

19          If Your Honor doesn't have any more questions, I'll

20   sit down.  I don't know if Your Honor has any questions for me.

21          THE COURT:  Thank you.

22          MR. SCHMUTTER:  Thank you, Judge.

23          THE COURT:  We'll take a five-minute break.  And,

24   Ms. Cai, I'll hear from you.

25          THE COURTROOM DEPUTY:  All rise.

*United States District Court*
*District of New Jersey*

 1          (Recess was taken from 11:25 a.m. to 11:31 a.m.)

 2          THE COURTROOM DEPUTY:  All rise.

 3          THE COURT:  Okay.  You can have a seat.  Thank you.

 4          Mr. Schmutter, you wanted to say a few more things?

 5          MR. SCHMUTTER:  Yes, Judge.

 6          THE COURT:  Okay.

 7          MR. SCHMUTTER:  So since we took a break, we have two

 8  clarifying helpful things hopefully.

 9          THE COURT:  Okay.

10          MR. SCHMUTTER:  On the issue of renewal.

11          THE COURT:  Yeah.

12          MR. SCHMUTTER:  So we looked at the language.  We

13  think that the language that says "and they may thereafter be

14  renewed every two years in the same manner and subject to the

15  same conditions as in the case of original applications," the

16  plural we think makes it clear that they're not saying that

17  individual person's original application, but renewals work the

18  same way as original applications in the general sense.

19          So when you renew --

20          THE COURT:  Okay.  You lost me.

21          MR. SCHMUTTER:  Okay.

22          THE COURT:  Why are you making the State's case for

23  them?

24          MR. SCHMUTTER:  Well, we're not making the State's

25  case for them.  We just want to make sure -- I mean I

                    *United States District Court*
                      *District of New Jersey*

1    understand that for people who --

2            THE COURT:  Why are you quarreling with the Court's

3    interpretation?

4            MR. SCHMUTTER:  Because some people benefit from that

5    interpretation but some people don't.

6            THE COURT:  Right.  That's true.  And I have no idea

7    in the case of Muller, for example, who got an application

8    based upon justifiable need, which is now unconstitutional, and

9    in two years from now when he goes forward and tries to show a

10   justifiable need which is now unconstitutional, I have no idea

11   what happens.  But it seems to me that this is indicative of

12   legislation that was not clearly thought out.

13           MR. SCHMUTTER:  Well, we agree that there's plenty in

14   here that was not thought out, Judge.

15           THE COURT:  Okay.  So I don't understand why you're

16   making the State's case.

17           MR. SCHMUTTER:  I'm not sure that I'm making the

18   State's case.  Well, we're making a record, Judge.

19           THE COURT:  Okay.

20           MR. SCHMUTTER:  And --

21           THE COURT:  So how could this Court be faulted if, in

22   the same manner and subject to the same conditions as in the

23   case of original applications, this Court rules that with

24   respect to all of the plaintiffs who have carry permits, they

25   are subject to the same conditions before?  I have no idea in

 1  Mr. Muller's case what happens.  But is it the Court's problem

 2  or is it the Legislature's problem?  It seems to me the latter.

 3       MR. SCHMUTTER:  Certainly when the Legislature does

 4  ridiculous stuff, it is their problem, and I totally

 5  understand.

 6       THE COURT:  Okay.  And so if this Court interprets it

 7  that way and part of it as a result is unconstitutional because

 8  Mr. Muller cannot be forced to reapply showing justifiable

 9  need, I don't know the answer.  But my guess is neither does

10  the State.

11       MR. SCHMUTTER:  Thank you, Judge.

12       I guess the bottom line is, I wouldn't want to have

13  an adverse standing ruling turn on that, I guess.

14       To the extent -- and I don't know what the Court is

15  going to rule, and I don't know exactly how that plays out.  My

16  point is simply that I'm hoping that there's no adverse

17  standing ruling that turns on this interpretation.  That's all,

18  Judge.

19       THE COURT:  Okay.  So let me assume you're playing

20  devil's advocate.  Try it again.

21       MR. SCHMUTTER:  The analysis?  Oh.

22       The statute can be read and perhaps should be read

23  when the Legislature refers to "the same manner and subject to

24  the same conditions as in the case of original applications,"

25  plural, they're simply referring to a comparison of the two

1   processes generally, not the process that a particular

2   applicant undertook the first time versus the second time.

3          So if you want to know how to renew, you look to the

4   requirements when you first apply, the original application.

5   So you go to the part of the statute that says how to apply for

6   the first time.  That's how you know the things you have to do

7   on renewal.  That's the interpretation that I was just

8   ascribing.

9          THE COURT:  That's a stretch.

10          MR. SCHMUTTER:  Thank you, Your Honor.

11          THE COURT:  This is the same language that applied in

12   the former law.  You would not be making that argument to me, I

13   suspect, under the former law.

14          MR. SCHMUTTER:  Well, we're not under the former law,

15   I guess, Judge, so I'm not sure.  But I understand the Court's

16   thought process.

17          THE COURT:  Yeah.  Okay.

18          MR. SCHMUTTER:  Thank you.

19          THE COURT:  Okay.

20          MR. SCHMUTTER:  And just a quick citation.  We talked

21   a lot about equal protection as to the suspect classification.

22   I just want to go over one more citation, *Illinois State Board*

23   *of Elections,* 440 U.S. 173.  That's a strict scrutiny case.

24   Well, the Court does strict scrutiny but doesn't call it strict

25   scrutiny.  But Justice Blackmun in concurrence makes it clear

1   that he understands that it's strict scrutiny -- they're

2   talking about strict scrutiny.  When you look at the case,

3   they're clearly talking about strict scrutiny.  So that's just

4   an additional citation that the Court can rely on.

5            I do apologize.  Can I make one more point?  I know I

6   sat down and I know Your Honor wants to hear from Ms. Cai.

7            THE COURT:  Go ahead.

8            MR. SCHMUTTER:  So I forgot to get to this.  This is

9   something -- I think this is actually very important.  It

10  applies to the challenged standards, the new standards.

11           The amended standard under 2C:58-3(c)(5), the public

12  health, safety and welfare, the new version of that, and also

13  this new sort of general language known in the community, Your

14  Honor is aware of the couple of challenges we're making.

15           Just to clarify what the actual challenge is, there

16  are -- there is no historical traditions, and this is a

17  straight-up *Bruen* analysis, there is no historical tradition

18  for a freestanding ad hoc dangerousness assessment.  Every

19  historical citation in any case, *Range*, *Rahimi*, any of these

20  cases that deal with individuals and who they are, they're

21  always citing to categorical disqualifiers, legislative

22  categorial disqualifiers.  There is no precedent *and no Bruen*

23  history that justifies these ad hoc determinations, and that's

24  why these approaches are problematic.  Because what they do is

25  they basically vest in an individual the discretion to decide

```
 1    on their own I think that guy's facts are problematic, and
 2    therefore, I'm going to say he's divested of his right to keep
 3    and bear arms.  It's an enormous difference to have vested that
 4    kind of discretion in a public official and basically say, ah,
 5    you don't like it, tell it to the judge.  You know, these
 6    constitutional rights don't work under a "tell it to the judge"
 7    approach.  That's very important.  And Range hasn't been
 8    cited --
 9              THE COURT:  Would you ever draft or be in favor of
10    legislation that does give some flexibility to an approving
11    official if there are red flags that are going off in his or
12    her mind?
13              MR. SCHMUTTER:  No.  I think what we need is the
14    Legislature has to say what counts.  That's what matters.
15              And the Legislature can say whatever they want and
16    then we get to test that ex ante against the historical
17    tradition.  That's why it's so -- that's what the big
18    difference is.
19              THE COURT:  But the legislation here refers to acts
20    or statements, for example.  You're not suggesting that the
21    legislation has to lay out with specificity what those acts or
22    statements might be that cause a police chief to say this
23    person really should not be carrying a firearm?
24              MR. SCHMUTTER:  There needs to be enough that the
25    applicant knows in advance what's going to get him in trouble.
```

*United States District Court*
*District of New Jersey*

1    You need to know.  That's why --

2            THE COURT:  Getting him in trouble or prevent him

3    from carrying a firearm?

4            MR. SCHMUTTER:  That's what I meant.  In other words,

5    that's going to prevent him -- divest him of his constitutional

6    right.  If you look at how --

7            THE COURT:  But there's a give-and-take.  There's a

8    back-and-forth in this legislation.  There's an appeal process;

9    you agree with that?

10           MR. SCHMUTTER:  There is an appeal process.

11           THE COURT:  Okay.

12           MR. SCHMUTTER:  That's the "tell it to the judge"

13   approach.

14           THE COURT:  But are the plaintiffs really suggesting

15   to this Court that there should not be some sort of gatekeeping

16   function on the part of the police chief?

17           MR. SCHMUTTER:  Correct.  The gatekeeping function is

18   the Legislature.  The Legislature's job is to do that.  And the

19   historical tradition shows that.  It's always categorical.

20   There's never been in the relevant history this ad hoc ability

21   to divest people of the constitutional right to keep and bear

22   arms.

23           THE COURT:  And so help me understand that.  So

24   according to you, the Legislature should be prescient and list

25   out every conceivable scenario, act, or statement that might

     1    cause a police chief concern to say to himself or herself:

     2    This person should not carry a handgun.  Is that your position?

     3              MR. SCHMUTTER:  Our position is that the Legislature

     4    needs to spell out enough specificity that a person can know in

     5    advance which behaviors and which conduct and which facts will

     6    prevent them from exercising their right.  And, in fact, Judge,

     7    that's how most of the country works.  Most statutes, most

     8    statutes dealing with the right to carry or the right to

     9    possession have only enumerated categories.  It's very unusual

    10    to do it this way.

    11              THE COURT:  So is it a void-for-vagueness challenge

    12    that you're bringing?

    13              MR. SCHMUTTER:  We're bringing both.  We are bringing

    14    a void-for-vagueness challenge.  It's in the case because

    15    vagueness, you get both a notice problem and an arbitrary --

    16    you know, an unbridled discretion problem.  There's two pieces,

    17    two different components.

    18              THE COURT:  But if there's a give-and-take and

    19    there's an appeal process and the process is taken out of the

    20    hands of the police chief and into the hands of a court, what

    21    do you say about that?

    22              MR. SCHMUTTER:  That doesn't solve the problem,

    23    because you still have the notice issue, right?  So once you

    24    are litigating whether your denial was valid, it's too late,

    25    right?  So you don't have the notice issue of what kinds of

1    behaviors actually will divest you.  Because when you look at

2    legislatures, you look at Congress, right?  You look at

3    18 U.S.C. 922(b) and (g), you look at legislatures all over the

4    country, they take an enumerated approach in almost every

5    instance.  It's only in sort of the quote-unquote anti-gun

6    states, like New Jersey, New York and a couple others, that

7    have these sort of ad hoc, this reservation of an ad hoc

8    process.  And it's not satisfactory to deprive someone a

9    constitutional right by simply saying, oh, you can always go to

10   court, because it's a deterrent -- it is a problem --

11             THE COURT:  But it seems to me that you're asking for

12   too much, Mr. Schmutter.  It seems to me that you're asking for

13   a laundry list of disqualifiers so that someone who wants to

14   carry a handgun knows whether or not he or she should even

15   bother.

16             MR. SCHMUTTER:  That's how it's done almost

17   everywhere in the country, Judge.

18             THE COURT:  A laundry list?

19             MR. SCHMUTTER:  Yeah.  Yeah.  Literally in the

20   statute A, B, C, D.  That's how it's done.  In fact, it's done

21   in New Jersey, too.  New Jersey has its list of disqualifiers

22   and then it has these ad hoc additional catch-all categories.

23   It's the ad hoc additional catch-all categories that are the

24   problem.

25             THE COURT:  All right.  I want further briefing on

 1    that issue.

 2              MR. SCHMUTTER:  Thank you, Judge.

 3              MR. JENSEN:  Can I just finish very briefly?  I

 4    promise I'll be quick.  It was just one point.  With both

 5    Mr. Schmutter and I, there was a great deal of discussion about

 6    sensitive places and the historical analogies, government

 7    functions, security.

 8              What I want to just throw out there was this:  I

 9    think Mr. Schmutter and I, our approaches here are pretty

10    consistent.  There's one distinction here where things are a

11    little bit different.  The statement that we don't intend to

12    cast doubt on longstanding restrictions on carrying firearms in

13    government -- sensitive places such as government buildings and

14    schools.  We're both in agreement that's dicta.  I think the

15    difference is I'm reading that dicta a little stronger than

16    Mr. Schmutter is.  And what I'm reading it is to say that, you

17    know, it may be dicta, but this is dicta the Supreme Court said

18    three times in 14 years, it seems like they're going to get to

19    that end result.  If we --

20              THE COURT:  But the dicta that you're reading is two

21    key components.  One is security is in place.  The second is

22    that there is a governmental/governance issue at play.

23              MR. JENSEN:  Well, how do we get to an end result

24    that says that a restriction in schools is valid if the only

25    factor is whether there is a government function at play?  At

```
 1 | least under San Antonio Independent School District, there's no
 2 | fundamental right to education.  That's not, I don't think,
 3 | fairly stated to be a governmental function.  So if
 4 | governmental function was the only criteria, a restriction in
 5 | schools would not be valid.  And at least, to an extent, I'd
 6 | say the Supreme Court has indicated pretty clearly, yeah, we're
 7 | going to uphold a restriction in schools.  So --
 8 |           THE COURT:  I think it's not even debatable.  And how
 9 | the Supreme Court got there, one can debate.
10 |           MR. JENSEN:  Well, that's the whole issue though,
11 | isn't it?
12 |           THE COURT:  Well, perhaps it is.  Perhaps it isn't.
13 | But I think the Supreme Court was very clear, no guns in
14 | schools, period, full stop.  And we can have this academic
15 | exercise about whether or not that was right, that was wrong.
16 | It's an academic exercise.  The Supreme Court ruled no guns in
17 | schools, full stop.  Right?
18 |           MR. JENSEN:  I'll be sure not to take my gun to a
19 | school.
20 |           THE COURT:  I hope not.
21 |           MR. JENSEN:  But --
22 |           THE COURT:  I mean, it's not -- it's not even
23 | debatable.
24 |           MR. JENSEN:  But if it's not even --
25 |           THE COURT:  Nor should it be.
```

*United States District Court*
*District of New Jersey*

1          MR. JENSEN:  If it's not even debatable, how do we

2    get from those three historical examples to schools?  And it

3    has to be more than just governmental function.

4          THE COURT:  Well, you'll all find out once I get this

5    off my plate, okay?

6          MR. JENSEN:  Fair enough.

7          The other thing that goes along with that is the fact

8    that children are present, which I took to be a key part of the

9    Court's prior ruling, doesn't really factor into this because

10   however you were drawing these analogistic lines, I don't see

11   how the presence of children bears on this.

12         THE COURT:  Well, I think that it's a fair -- I think

13   that is a question that has been raised by any academicians as

14   well as others.  Was that in the mind of the Supreme Court?

15   There have been many who have written of it.  It's a question.

16   It's a question that the Supreme Court will have to answer.  We

17   all recognize that.

18         MR. JENSEN:  Yeah.

19         THE COURT:  We all recognize that *Bruen* has left open

20   some issues.  It is for the lower courts to figure them out as

21   best we can.  But I think we can all agree, we are waiting for

22   the Supreme Court.

23         MR. JENSEN:  We're waiting for the Supreme Court, but

24   we need to do our best job of using predictive judgment to try

25   to get the right result.

```
 1              THE COURT:  100 percent.
 2              MR. JENSEN:  And that's why I'm trying to nurse this
 3    discussion in the direction of we've got three examples, we've
 4    got two inconclusions.  How do we get from those examples to
 5    those conclusions?  And that's it.  Thank you for indulging the
 6    additional time.
 7              THE COURT:  Ms. Cai, you've waited very patiently.
 8    So I would like you to respond to anything that you have heard
 9    here today and then I do have, as I promised, a series of
10    questions for you.
11              MS. CAI:  Of course, Your Honor.  And let me just set
12    the stage organizationally.
13              THE COURT:  Yes.
14              MS. CAI:  I think there will be a pretty clean
15    division between me and Ms. Reilly as well as Mr. Kologi.  So I
16    am going to speak on the challenges to the place-based
17    restrictions, so basically parts 1 and 2 of our brief, and
18    those arguments raised today as well as in the reply briefs.
19              Ms. Reilly will address the vagueness challenges, the
20    insurance challenges, permitting challenges, and the equal
21    protection exemption challenges.
22              THE COURT:  Okay.
23              MS. CAI:  So those other sections, and Mr. Kologi of
24    course will speak for the Legislature.
25              If Your Honor wants to go in a certain order, I'm
```

 1   happy to do that.  And what I did want to do today is, you

 2   know, there's already been a lot of discussion, what I want to

 3   do is focus on the merits.  And I want to focus on new points

 4   either raised today or in the reply briefs because of course

 5   Your Honor already has our submissions.

 6          And this is the order I want to go in, but I'm happy

 7   to change that order.  The first is just, you know, what does

 8   *Bruen* direct us to do, some big-picture observations, which

 9   both Mr. Jensen and Mr. Schmutter spent a lot of time on, I

10   want to respond to that.

11          Two, I want to highlight a few provisions,

12   place-specific provisions.  I'm happy to talk about any

13   provision that Your Honor wants to talk about, but I did want

14   to highlight public assemblies, parks and zoos, hospitals and

15   casinos.

16          THE COURT:  Transportation hubs; we'll get to that.

17          MS. CAI:  All right.  I'll add that to the list.

18          And that will relate to the third thing I want to

19   talk about which didn't -- well, it came up a little bit today,

20   but we did want to respond to their arguments about the

21   government-as-proprietor or government-as-market-participant

22   doctrines.  I did want to talk a little bit about the private

23   property rule, but mostly so that I can get some documentary

24   responsive evidence into the record.

25          Finally, a quick response on the objection to the use

1 of experts, and maybe a word or two on the scope of any

2 injunction.  That's what I plan to do today.  And I'm happy to

3 answer Your Honor's questions as they come or, you know, at the

4 end or whatever it is.  And of course then Ms. Reilly will

5 present on the other issues, and Mr. Kologi will speak on

6 behalf of the presiding officers.

7    All right.  So let's get to it.  On the merits, I

8 want to make a couple of points that we want to highlight for

9 the Court's consideration.  For what is *Bruen* asking for?  It's

10 asking for historical evidence of what the people understood

11 the Second Amendment allowed.  That's the point of the

12 historical analogy.  And that's what all of the cases that have

13 taken *Bruen*, including the Eleventh Circuit case *NRA vs. Bondi*

14 is trying to do.  And I think on that we do agree.  But how to

15 do that analysis I think is an important one.

16    And I want to start with something that plaintiffs

17 talk about in their brief but don't talk about today, which is

18 what to do with the absence of analogs at a particular point in

19 time when there is the existence of analogs at other points in

20 time.

21    And so generally speaking, this is really just about

22 burden of proof and what's enough to evaluate that under the

23 *Bruen* test.

24    So I want to highlight what *Bruen* actually said.  It

25 said that what matters for adjudicating Second Amendment cases

```
 1    is, as in all cases, party burdens.  In footnote 6 of the
 2    majority opinion, the Court said:  "Courts are thus entitled to
 3    decide a case based on the historical record compiled by the
 4    parties."
 5              Here, the State has compiled a large historical
 6    record in support of its position.  We've amply met, I think,
 7    the burden of production with respect to historical documents
 8    and expert declarations that provide historical contextual
 9    facts.  Against this, the plaintiffs haven't offered
10    counteracting historical evidence.  They do nitpick at specific
11    pieces of evidence, but they haven't come up with here's an
12    example of a similar restriction that either the populous
13    thought was unconstitutional, that the courts held were
14    unconstitutional, or was very quickly abrogated by a later
15    Legislature either on the basis that it was unconstitutional or
16    invalid in some way.  And so --
17              THE COURT:  That's because they can't find
18    restrictions.
19              MS. CAI:  Right.  But I think that's key because why
20    at any given point in time restrictions may be lacking is not
21    necessarily constitutional evidence.  So let me give you an
22    example.
23              I am unaware of -- and perhaps there is and we just
24    haven't found it yet -- historical evidence of New Jersey
25    banning firearms specifically at ballrooms.  That is true.  We
```

1   have evidence of other states or other jurisdictions doing so

2   but not New Jersey.  But what does that mean, right?

3           I think if you think about what everyone agrees on is

4   in 1791 through 1868, the Second Amendment did not apply to New

5   Jersey.  It only applied against the federal government.  There

6   is no New Jersey constitutional provision on an individual

7   right to bear arms at the time.  And so the State's lack of

8   restriction on firearms is almost certainly not because it was

9   concerned about the Second Amendment because that didn't even

10  exist.  The lack of an analog is most likely the product of

11  policy.  So the State doesn't regulate any number of things

12  because it doesn't see a policy problem, perhaps because it

13  doesn't notice the policy problem.  That is true sometimes.  Or

14  because people have not behaved in such a manner to create a

15  policy problem.  So the absence of analogs at any given point

16  in time by itself is not counterfactual or countervailing

17  evidence against what we presented.

18          And so at no point does the plaintiffs -- do the

19  plaintiffs bring what the *Bruen* Court had, which is New York

20  provided historical evidence and the Court said actually courts

21  interpreting that evidence at the time did not think that that

22  regulation was actually constitutional, or it did not believe

23  that that regulation actually covered what you think it covers.

24  That is lacking here in most respects.  And I think that's

25  really important in terms of what *Bruen* says the burdens of the

```
 1   parties have to be.  And it's not different than in any other,
 2   you know, litigation where you provide fact evidence.
 3          THE COURT:  So you make some fair points.  But it
 4   seems to me that you're sort of sweeping over the principle
 5   that the lack of evidence itself can stand for the proposition
 6   that the restriction is unconstitutional.
 7          MS. CAI:  So I think it depends, Your Honor.  So if
 8   there is a lack of evidence because the location -- we're
 9   talking about locations here, not types of guns.  If the
10   location simply didn't exist until the 20th century, there
11   couldn't possibly be that kind of exact kind of analogy.
12          The other thing is if the location technically
13   existed but the way in which people interacted at that location
14   was so different, right?  So we give the example of mental
15   health and addiction treatment centers.  Historically they were
16   more in the form of incarceration than voluntary treatment, and
17   so there's no such analog, even though the place literally did
18   exist in the exact same way.  Ben Franklin's library did exist,
19   but it's not a place where general members of the public and
20   children went to spend time to learn, right?  And so that's the
21   kind of analysis and nuance that we need.
22          And the second is, I think it's one thing if there
23   were no examples whatsoever.  That might be, you know, one of
24   the things a court would want to consider.  What we have here
25   certainly for at least several of the provisions, and I think,
```

```
 1   you know, almost all of them, is more nearly identical
 2   historical regulations that were then upheld by the state
 3   courts evaluating them at the relevant time -- and I'll talk
 4   about that in a second -- as well as historical evidence from
 5   other contexts, such as legal commentators and treatises,
 6   historical newspapers, discussing them as entirely valid and
 7   uncontroversial.  So I think we have to take all of that into
 8   context.  And so that was point one.
 9              Point two is what is the kind of analogizing the
10   level of specificity that we're doing here?  I think it's
11   interesting because what I heard from the plaintiffs are a
12   couple of things and I just want to state the State's position
13   on them.  The first is the line about government and schools
14   being presumptively constitutional regulations, just dicta or
15   not.  I'm actually not sure who thinks it's dicta and who
16   doesn't.  It's not dicta, and I think Mr. Schmutter said in
17   *Bruen* it wasn't dicta.  But whatever the analysis is, it was
18   repeated three times, right.  It started in *Heller*, which
19   evaluated the historical tradition.  It was repeated in
20   *McDonald* in a very specific manner.  At page 786 of *McDonald* --
21              THE COURT:  Are we talking about guns in schools?
22              MS. CAI:  This is government buildings and schools,
23   that line in general.
24              THE COURT:  Okay.
25              MS. CAI:  And so *in McDonald*, the Court said we are
```

1   reassuring the states that just because we're now recognizing

2   the incorporation of the Second Amendment against states, we're

3   not -- that does not disturb what we said in *Heller*, which is

4   that regulations at government buildings and schools are

5   presumptively constitutional, and then it was said again in

6   *Bruen*.

7            So I think it's one thing if it's a stray line in one

8   decision, right?  But the Court's commitment to that makes it

9   much less -- much stronger than mere dicta.  And I think even

10  if you agree with Mr. Jensen that the Court was just looking at

11  the historical record on an issue that wasn't squarely before

12  it yet, I think what you would still have to look at is how the

13  Court would be applying its own stated test for how to do

14  historical analysis.  And from there, there are a few

15  observations that I think are worth making.

16           The first is that there is now I think no dispute

17  that the record that the Supreme Court was looking at was not

18  terribly fleshed out.  It was two sources.  It was an amicus

19  brief and the Kopel and Greenlee article.  And I don't think

20  there's any difference in terms of what they presented.  And

21  the Kopel and Greenlee article we don't think is a

22  comprehensive view of what is out there certainly on all

23  sensitive places.  But I don't know if we've come up with any

24  other legislative assemblies, for example, that ban firearms

25  than the two that Kopel and Greenlee identify.

1          On that specific record the Court specifically cited,

2     it could draw the conclusion definitively three times that

3     legislative assemblies are presumptively constitutional.  And

4     it is true that Kopel and Greenlee didn't find any historical

5     evidence on schools.  I think there actually are some, but

6     that's of course not before this Court.  Nonetheless that's not

7     the point.  The point is, what is the Court doing when it does

8     the historical analogy test?  And I think it does what it said

9     it did.  You're looking for evidence of a historical tradition

10    at the relevant time that was longstanding and unchallenged,

11    and that's exactly what we presented to this Court.

12          Now, I do want to make an observation about how --

13    what I think is a contradiction in what the plaintiffs have

14    been saying but it became crystallized today, and that is what

15    level of abrogation you can do.

16          So Mr. Jensen has always said that their position is

17    that if there is high levels of security at a particular

18    location, and he pointed to this courtroom as an example, and

19    perhaps there were others, that is one basis for which you can

20    analogize.  And so if you had, you know, a ton of security at

21    schools -- I think he alluded to that.  I don't actually think

22    most schools have that level of security -- but if you did,

23    then perhaps that would go in favor of that justification.

24          We don't agree with that as the actual justification,

25    but just running with that idea for a second, that's an

 1   aggregation, right?  That is taking something that may or may

 2   not have existed in the historical record based on a principle

 3   and applying it analogically to other locations.  And so I

 4   think that is what *Bruen* is asking for.  And I agree with the

 5   more philosophical or the underlying methodology that

 6   Mr. Jensen was pointing out there.  But I think what's

 7   interesting is how they pick and choose what they want to

 8   analogize and what they don't.

 9          So, for example, Mr. Jensen read to you the Statute

10   of Northampton, specifically the provision -- and I may not

11   have every single word here.  I was just writing it down, but

12   that a person cannot go ride armed by day -- by night or day in

13   fairs, markets, nor in the presence of justices and ministers.

14   He highlights how the last part about justices and ministers is

15   the basis for restriction -- sensitive places restriction at

16   courthouses.  Perhaps that's so.  We're fine with that.  That

17   may be so, and there may be other justifications.  That

18   challenge is not before us.

19          But what he wants to read out of that very sentence

20   is where it also says one cannot go ride by night or day in

21   fairs and markets.  And so you can't have it both ways.  You

22   can't rely on the Statute of Northampton for the provision of

23   courthouses but then you read out the fairs and markets

24   language.

25          THE COURT:  Well, but in fairness, I think the State

1    is guilty of the same sin, if you will, because the State seems
2    to ignore the "in terrorem" language.
3         MS. CAI:  We can discuss what that means.  I think
4    the State's position is that additional historical evidence
5    that the *Bruen* court did not consider demonstrates that the
6    words "in terrorem," in terrorem of the people or in terrorem
7    of the county, is not a qualifier on the way in which a person
8    is behaving, but rather the act of carrying in those places
9    would be in terrorem of the county.
10        Now, that's an open debate, right?  I agree with Your
11   Honor that that is something that you'd have to look at the
12   history and interpret what that means, and that's very
13   important.  That's just our position on that.  But I don't
14   think there's a way to read "in the presence of justices and
15   ministers" as applying legitimately to restrictions at
16   courthouses and reading out of the very same statute fairs and
17   markets which all were collected together.
18        All right.  So one last question, and I don't think
19   the Court needs to resolve this question, but the plaintiffs
20   talk about it a lot so I do want to address it and put a couple
21   points into the record is the time frame analysis.
22        I find it interesting that Mr. Schmutter cites
23   *NRA vs. Bondi* for the opposite conclusion that the Eleventh
24   Circuit made, but I'll put that aside for one second, which is
25   it would be one thing if there was countervailing evidence that

1   the Founding generation saw certain sensitive place

2   restrictions as unconstitutional and then that changed in 1868.

3   Then you would have a conflict between those two

4   interpretations and then the question would be which

5   interpretation matters.  I agree with that.  That's not what we

6   have here.  You have -- we say -- I mean, we do have evidence,

7   and I understand that Your Honor is not necessarily persuaded,

8   but, you know, we think it's persuasive, that the English

9   common law tradition had been incorporated into certainly the

10  common law of states as well as the statutes of states in terms

11  of the Statute of Northampton and what it prohibited even at

12  the Founding era.  Certainly on the private property rule,

13  there were specific statutes, and I'll get to that later.

14          But even if Your Honor did not agree, all there would

15  be would be the absence of analogs at the Founding and then the

16  presence of many analogs in the Reconstruction period beginning

17  in the 1860s.  And, in fact, what you saw was like a -- I want

18  to say resurgence, but that's not the quite right word -- a

19  move to adopt more sensitive place restrictions precisely at

20  the moment when the states ratify the Fourteenth Amendment.

21  And so it would be very strange, I think, for states to

22  understand this is now incorporated against us, which cases

23  like *English versus Texas* do recognize, and now we're adopting

24  additional regulations and we're interpreting them to be

25  constitutional, if that was all incorrect.

```
 1            But I think one thing that plaintiffs cite that I
 2   think actually makes this point very well is the Gamble case,
 3   which the Koons plaintiffs cite.  And there, you know, it's a
 4   case -- the case is about double jeopardy, but the key is that
 5   the Court declined to overrule the longstanding dual
 6   sovereignty doctrine in interpreting the double jeopardy
 7   clause, but it interpreted 19th century evidence.  Why did it
 8   do that?
 9            Justice Thomas pointed out in his concurrence that
10   the reason there were few Founding era examples of dual
11   sovereignty prosecutions is not because it was believed to be
12   unconstitutional, rather he said:  "The Founding generation saw
13   very limited potential for overlapping prosecutions by the
14   states and the federal governments.  Thus, the founders,
15   therefore, had no reason to address the double jeopardy
16   question that the court resolves today."
17            I submit to you this is the exact same situation
18   we're in, especially as to places like airports, train
19   stations, public libraries, zoos, recreational parks, casinos,
20   hospitals.  And I think that's important for how to resolve a
21   situation like today.  You would look at the methodology that
22   the Gamble Court used, which is to look at cases on the double
23   jeopardy clause from 1847, 1850, 1852, and then 1922 as
24   "cementing the foundation laid by those prior 19th century
25   cases."
```

```
 1              If this Court sees a conflict between actual evidence
 2    at the Founding and evidence at Reconstruction, I want to make
 3    one clarification.  We don't think and we couldn't think that
 4    the Second Amendment means different things against the federal
 5    or state government.  That is foreclosed by Supreme Court
 6    precedent.  But our argument is not that.  Our argument, which
 7    is also the same position advanced by many leading
 8    constitutional scholars, the only ones that the Bruen court
 9    cited is when states adopted or ratified the
10    Fourteenth Amendment so that the Second Amendment incorporated
11    against them.  The Second Amendment took on the meaning and
12    took on the meaning that the states understood at the time such
13    that whatever conflict there was with the 1791 meaning had
14    changed, and so the same meaning now applies against everybody,
15    the states and the federal government.
16              And as the Bondi Court explained, the opposite rule
17    would be illogical.  And what the Court said, it said it makes
18    no sense to suggest that the states would have bound themselves
19    to an understanding of the Bill of Rights that they did not
20    share when they ratified the Fourteenth Amendment.
21              And I'll give you an example outside of the Second
22    Amendment context that I think makes this fairly clear.  And
23    this is from the Amar book that we cite in our brief, although
24    in a slightly different section.  I can send Your Honor the
25    pages.  The right to petition government under the First
```

1   Amendment obviously existed since the Founding, but it was

2   thought of as a political right of people who held the right to

3   vote and, you know, the participated democracy at that time.

4          By 1866, however, the right was seen to cover more

5   than just those individuals, white male voters.  It was seen to

6   cover the right of nonvoters, specifically women, to petition

7   the government for representation.

8          Obviously today, we don't look to the right to

9   petition as defined by the 1791 meaning.  We look to it as

10  found by the 1860 meaning, to encompass those who do not have a

11  right to vote.  That's just another -- I mean, there are other

12  examples like that, but that one I think is relatively

13  uncontroversial.

14         And so if it's the case that the Founding generation

15  saw sensitive place restrictions at public assemblies as

16  unconstitutional and then in 1868 and onwards the state saw it

17  as constitutional, you wouldn't be going into this analysis.

18  We don't have that here.  Instead what you have is a

19  longstanding tradition beginning with really British common law

20  but certainly lasting through and invigorated by the states

21  during the critical Reconstruction period when, you know, the

22  relationship between states and federal governments changed in

23  a way that still exists today.

24         Okay.  So that's the three big-picture observations I

25  had about *Bruen*.  And now I just want to discuss the specific

1    provisions.  And since we are on the topic of public

2    assemblies, I'll start there.

3         What's very interesting from what Mr. Jensen talked

4    about is, in addition to security, one of the other things that

5    Your Honor and Mr. Jensen were talking about is whether or not

6    a place-based restriction would be constitutional if the place

7    was used for governance.  And it's not clear to me there's

8    anything in the historical record supporting that governance as

9    the rationale, but there is historical evidence for supporting

10   the idea of exercising other constitutional rights as a

11   rationale for why a place-based restriction would occur.

12        And so that comes from some of the cases that we've

13   cited to this Court, including cases like *Andrews*, the

14   *Tennessee* case, and the *Shelby* case.  But backing up for a

15   second, in terms of what we've actually provided to this Court,

16   we've cited examples of eight different jurisdictions that

17   enacted firearms restrictions specifically on public assemblies

18   and gatherings.  Some of these are one-for-one analogs.  They

19   literally say public gatherings or public assemblies in the

20   same way.

21        And as we noted in our brief, these restrictions are

22   nothing new because English common law and statutes prohibited

23   armed assemblies as well, and this is well supported by the

24   historical evidence in the Charles declaration.  And what's

25   telling about these statutory restrictions is that as soon as

*United States District Court*
*District of New Jersey*

```
 1    the laws were enacted, the courts uniformly upheld them.  And
 2    that is precisely the kind of evidence that the Bruen Court
 3    says is particularly helpful.
 4              THE COURT:  Along those lines, the State cites laws,
 5    ordinances, primarily from southern states, some Midwest
 6    states.  Is it your position that that is representative of the
 7    nation?
 8              MS. CAI:  It is, Your Honor.  And I have two points
 9    to make on that.  The fact that some states in a geographic
10    region tended to see a policy problem arise such that they
11    wanted to respond to it is a matter of policy, right?  I don't
12    think there's any understanding that northern states and
13    southern states understood the right to bear arms differently,
14    especially for the ones that had similar state constitutions.
15    And I don't think there's any reason to discount analogs,
16    especially when they were -- it would be one thing if you
17    thought that the analogs were justified or sorry, were
18    motivated by some kind of animus or tradition that we didn't
19    believe anymore.  That's an open question of whether or not
20    those analogs are equally applicable.
21              The analogs that we're citing from the Reconstruction
22    period, as the Rivas declaration makes very clear -- and she is
23    an expert on Reconstruction Texas firearm law, so it's really
24    hard to get any better than that -- is that this was the
25    response of radical Reconstruction Republican government trying
```

*United States District Court*
*District of New Jersey*

 1   to provide safety for freed people exercising their right to

 2   just be around the world.  And so that's why they started

 3   enacting these restrictions.  And perhaps those were

 4   controversial as a policy matter at the time, but they were

 5   certainly held to be constitutional.  And even when the

 6   Republicans left office in Texas, those laws remained on the

 7   books.

 8              And so I heard -- I don't remember which brief it

 9   was, but one of the reply briefs made the argument that because

10   Texas and Missouri were western states, that we should discount

11   those.  I mean, I haven't -- I'm not an expert in history, but

12   this is sort of a high school level understanding, Missouri's

13   joining of the union and Texas's joining of the union were

14   pivotal moments in understanding why we fought the Civil War,

15   why all of this happened in the first place.  So I don't think

16   you can discount them just because they were to the west of

17   some other states and in the south.

18              And it would be one thing if the territorial laws, of

19   which we cite very few, were the only evidence, right?  I would

20   understand if, you know, the Yukon -- or not Yukon territory,

21   because that's not in the United States, but some territory at

22   one time had a statute that no other state adopted, that would

23   be shaky evidence; not dispositive, but shaky.  We don't have

24   that here.

25              When we cite territorial laws, those are just

 1   demonstrating the breadth of the tradition; that it began in

 2   states and other places that wanted to become states, were

 3   about to become states, also adopted the same regulations.

 4           And so I think the final thing I wanted to note is

 5   that even the security rationale I think would justify banning

 6   guns at public assemblies and demonstrations because we only

 7   restrict firearms carry when they're permitted public

 8   assemblies and demonstrations, right?  It's things that the

 9   government has advanced notice of.  The whole point of the

10   permit process is so the government can manage the security

11   around a big rally or a big protest.  And so I think that is a

12   very direct example of why the security justification would

13   also apply to this situation.

14           And so to the extent the State is providing security

15   of the people gathered there to exercise one of their most

16   fundamental rights to public assembly and public speech, I

17   think that very well is the same kind of rationale that

18   Mr. Jensen is using to justify or to say that the Supreme

19   Court's decisions in *Heller, McDonald*, and *Bruen*, when it said

20   that constitutional restrictions on government buildings are

21   constitutional.  So that's public assemblies.

22           The next I wanted to talk about is parks and zoos.

23   And the analytical link there is the earliest relevant versions

24   of historical zoos were all in parks.  And, in fact, the

25   earliest zoos were in the earliest recreational parks, so the

```
 1   historical evidence is the same.

 2              THE COURT:  Can I back up for a second?  So what's

 3   your position on public gatherings outdoors where there's no

 4   metal detectors?

 5              MS. CAI:  Yeah, I don't think you need metal

 6   detectors, right?  So security is not -- I don't think the

 7   founders had metal detectors when they enacted some of those

 8   restrictions at public assemblies in Maryland, for example.

 9   That's not quite the same.

10              THE COURT:  But how do I get there with this

11   legislation, because it restricts public assemblies?  It

12   doesn't say public assemblies where the government is providing

13   security.  It doesn't say -- none of these restrictions say

14   "where the State is providing security."  So help me understand

15   how I get there.

16              MS. CAI:  Your Honor, the permitting process, right,

17   puts the government on notice that a gathering of some size is

18   happening.

19              THE COURT:  Okay.

20              MS. CAI:  And the point of that is to respond to

21   security concerns at those gatherings.  And so it may not be

22   possible --

23              THE COURT:  But you're not standing here before me

24   saying -- I don't think you are -- that once there is a

25   gathering for which a permit is required, that the State will
```

```
 1   guarantee that it will secure the gathering?

 2              MS. CAI:  Of course not.  But the State is now on

 3   notice that a gathering is occurring.  And depending on the

 4   number of people and the kind of gathering it is will calibrate

 5   how much security and law enforcement to be there as a backup

 6   for if anything happens.

 7              And so I don't know if there's any support in the

 8   record that the level of security provided at legislative

 9   assemblies, polling places, or courthouses is what the

10   historical analysis turned on.  There's no --

11              THE COURT:  No.  But I think you've got a *Bruen*

12   problem, because that's exactly what the Court talked about;

13   that the State can't get up and say -- because they gave the

14   example of Manhattan, you got police everywhere.

15              MS. CAI:  Of course.

16              THE COURT:  And so if you're going to have a

17   gathering at Times Square and the State is going to take the

18   position, well, you got police everywhere, they're on the

19   lookout, I think *Bruen* squarely rejected that.

20              MS. CAI:  And we're not saying --

21              THE COURT:  How do you get around that?

22              MS. CAI:  We're not saying that all of Jersey City,

23   all of Camden is a sensitive place.  That's not what we're

24   saying at all.  But of course, *Bruen* recognized that some

25   government-provided security specifically for that location --
```

 1    and I don't mean all police officers in Camden protect Camden.

 2    I mean for the very location and the very activity that's going

 3    on there --

 4              THE COURT:  I.e., the polling place and the

 5    courthouse?

 6              MS. CAI:  You know, Your Honor, polling places

 7    actually, you know, there's no armed security at polling places

 8    by law in New Jersey and many other states.  So I don't think

 9    it turns -- I don't think it turns on that.  And so we're

10    talking about something that I think is not really the

11    justification.  It's just an alternative argument.

12              THE COURT:  No.  But I think --

13              MS. CAI:  But I think it's interesting because I

14    think it may help some places that don't have other

15    justifications that are analogically relevant, right?

16              So I suppose one could argue that if the security

17    provided is analogous to what the historical level of security

18    was provided at legislative assemblies, polling places, again,

19    that would be a very deep historical analysis that I

20    acknowledge no party has submitted to the Court on what level

21    of security was provided at these locations.  That's why I

22    don't think that's actually the justification.  It has to be

23    what I think comes from the language of the statutes that we're

24    citing, right?  What they're concerned about is both places

25    where volatile conditions could occur, because the statutes

United States District Court
District of New Jersey

1     from Texas and Missouri and Tennessee, they all looked at

2     places where people are gathered socially and/or in some kind

3     of assembly in that meaning.

4           And also they were especially concerned about places

5     where those gatherings were for all purposes but also

6     especially for educational, literary, and scientific purposes

7     and social purposes.

8           So you can think and draw some lines for why those

9     things were singled out as especially important.  But we would

10    submit to you that the thing that matters for drawing the

11    analogy in this case is the exercise of constitutional rights.

12    And so just as it is so important that when people go to vote,

13    they are not intimidated by the presence of guns.  When they go

14    to participate in petitioning the government and to seek

15    redress for grievances at the courthouses, that the same is

16    true.  When they go and participate in democracy by attending

17    legislative assemblies, that is the same rationale that applies

18    to when people go and protest or gather to express their

19    freedom of speech.

20          All right.  So parks and zoos.  All I want to say

21    here is that the level of even if we were going with a

22    numerosity standard, which we don't agree is what *Bruen* calls

23    for, the State has provided nearly 30 state and local firearms

24    prohibitions.  I actually have now become aware of more.  But I

25    don't think the difference is going to turn on 30 versus 40.

1   So we can submit that to the Court if Your Honor wants, but

2   that's kind of not the point, right?

3        The point is that the most prominent recreational

4   parks in America at the time and today, Central Park and

5   Fairmount Park, when they opened, prohibited firearms

6   immediately, and other parks followed thereafter.  When

7   national parks first became a thing in the late 19th and early

8   20th century, they did the same.  And that spans big cities as

9   Your Honor noted in your TRO Opinion and also smaller towns

10   like Springfield, Massachusetts and some of the other towns

11   that we've cited.  And plaintiffs have nothing to refute this

12   evidence.

13        Instead, they cite to laws regulating firearm

14   discharge at public squares and commons in the Colonial era.

15   So it's not clear to me why more restrictions or other

16   restrictions at other places somehow discount restrictions that

17   were also adopted at other places.  That doesn't really

18   logically make sense to me.  But I think what's also key is

19   that the very language of the 18th century statutes they cite

20   don't say "parks."  Instead they group things like "greens"

21   with streets, alleys or lanes.

22        And so under the doctrine -- I can never pronounce

23   this right -- noscitur a sociis, or something like that, things

24   generally take on the meaning of the list that they're a part

25   of, these statutes clearly indicate that there's a difference

1    between recreational parks and the proverbial Boston common

2    town square that you would stroll through on your way to

3    something else.

4              And that's true in Mr. Jensen's Exhibit 19.  The 1789

5    Rhode Island statute that says no shooting guns in or across

6    any road, street, square or lane.  I don't think that means

7    that historically firearm restrictions at large parks would be

8    prohibited just because they only restricted discharge in the

9    lane that you -- or the square on the lane that you're walking

10   through.  And our evidence shows the concept of a park was

11   defined to be different from a town square.  That was the whole

12   point that parks became a thing in the 19th century.  And so

13   Exhibit 50 has the progenitor of Central Park and Prospect Park

14   and many other parks, Frederick Law Olmsted explaining that

15   parks were created to be a contrast to the town square.

16             THE COURT:  You can have firearms in national parks

17   now, can't you?

18             MS. CAI:  Your Honor, I don't know the answer to

19   that.

20             THE COURT:  I think you can.

21             MS. CAI:  And it may depend on the location and the

22   specifics, but that's also what Chapter 131 does.  It provides

23   for the specific regulator of the park to set rules for what

24   parks are off limits and what are not.

25             Let me just remind myself of where else I'm going

1    next.  Hospitals.  Okay.

2           THE COURT:  I think the law is, is that it depends if

3    the national park is located in a state which allows firearms,

4    then you can.  And you don't -- well, okay.

5           MS. CAI:  Right.  But I guess, Your Honor, to that,

6    we don't look to the current policy decisions, right, and that

7    there could be policy decisions there.  What matters is when

8    they were created, and we have an exhibit showing the policies

9    at that time.

10          THE COURT:  Yes.

11          MS. CAI:  Okay.  Hospitals, I did want to get to

12   because there is a difference in terms of what has been alleged

13   before and now at least in terms of standing.

14          THE COURT:  I think we can pass by hospitals.

15          MS. CAI:  Okay, Your Honor.  I just -- okay.

16          So casinos, I don't actually want to spend too much

17   time on this, except Mr. Jensen -- or Mr. Schmutter filed a

18   number of items on the docket last night that I do want to --

19          THE COURT:  So here's my question on casinos.

20          MS. CAI:  Yes.

21          THE COURT:  If an individual, if a plaintiff with a

22   concealed carry permit walks into the Tropicana, is the State

23   going to prosecute him for trespassing or for a violation of

24   A18?

25          MS. CAI:  Currently, Your Honor, because of your

 1  injunction, trespassing.

 2          THE COURT:  Okay.  And if the injunction does not

 3  issue?

 4          MS. CAI:  I think it -- well, if the injunction does

 5  not issue but the casino also maintains its current rules, I

 6  think you could do either.

 7          THE COURT:  Okay.

 8          MS. CAI:  Now let me give you another example that

 9  may be clarifying.  If the injunction is in place --

10          THE COURT:  Yes.

11          MS. CAI:  -- and the Tropicana says actually we are

12  not prohibiting firearms, the State would not be prosecuting

13  just the presence of firearms at the Tropicana.

14          THE COURT:  Try that again.

15          MS. CAI:  So if Your Honor's injunction stands, and

16  let's say the Tropicana -- I'm not saying they will, but, you

17  know, if they decide we changed our mind, we're changing our

18  policy to say firearms allowed, the State would not be

19  prosecuting someone from carrying a handgun into the Tropicana

20  in that instance.  Because the injunction on Chapter 131 would

21  be in place so there is no --

22          THE COURT:  No.  I want you to assume this Court has

23  had no involvement in this case.

24          MS. CAI:  Okay.

25          THE COURT:  A18 is on the books.

 1          MS. CAI:  Okay.  So first, the DGE regulations that
 2    have existed since 1970 already prohibited this.  So whether
 3    it's that or A18, that would be the thing.
 4          THE COURT:  Is the State going to prosecute on the
 5    A18?  If Mr. Koons walks into the Tropicana with a firearm, is
 6    he getting prosecuted under A18?
 7          MS. CAI:  Let me ask you a question about what the
 8    other relevant fact, which is has the Tropicana in your
 9    hypothetical, Your Honor, also prohibited firearms?
10          THE COURT:  Let's answer that -- how about I answer
11    that with a question or answer it with let's assume -- let's
12    take it one by one.  The Tropicana doesn't take a position.
13    A18 is on the books, okay, and Mr. Koons walks in with his
14    firearm, is the State prosecuting him?
15          MS. CAI:  Yes.
16          THE COURT:  Okay.
17          MS. CAI:  Unless he's a law enforcement officer or
18    other exemption carrier.
19          THE COURT:  The Tropicana says no firearms allowed,
20    A18 is on the books.  When Mr. Koons walks into the casino, is
21    he getting prosecuted for trespassing or A18?
22          MS. CAI:  It could be either, Your Honor.
23          THE COURT:  Okay.  And then I guess the third
24    scenario is -- I'll leave it at that.
25          MS. CAI:  Okay.  So what I wanted to make clear on

                         *United States District Court*
                           *District of New Jersey*

```
 1   the record is that Mr. Schmutter appears to acknowledge that
 2   the casino's independent choice in February to ban firearms
 3   dooms their application for a PI.  Instead, he files --
 4              THE COURT:  Well, no, I don't think so.  I think he
 5   basically has said that the individual casino owners are in
 6   cahoots with the State.
 7              MS. CAI:  Right.  But that's why he's trying to say
 8   that.  And I'm just trying to clarify to Your Honor that that
 9   is absolutely not true.
10              THE COURT:  Okay.
11              MS. CAI:  So number one, the DGE director never
12   directed the casinos to ban firearms in any way, shape or form.
13   And I say that as an officer of the court.  No evidence
14   suggests that.
15              THE COURT:  Well, they certainly were communicating
16   with each other; we can agree on that.
17              MS. CAI:  What the evidence shows, yes, is that there
18   was communication.
19              THE COURT:  And the State was certainly very curious
20   what the casinos were doing.
21              MS. CAI:  Yes.  And that's very important.  And
22   that's what I wanted to address.
23              The DGE director inquired as to what decisions the
24   casinos had made and what the association was going to announce
25   and when it was going to announce it.  That's highly relevant
```

```
 1    to the law enforcement's ability to enforce security
 2    appropriately and to understand the security posture at the
 3    casinos.
 4              There are a lot of -- there are a lot of
 5    responsibilities at the casinos from law enforcement that's
 6    divided up between different branches of the Attorney General's
 7    Office as well as local law enforcement in Atlantic City, and
 8    they need to know whether firearms are going to be allowed
 9    inside casinos or not so that if there is an incident, they
10    know how to respond.  And that's especially true in February
11    when Super Bowl weekend was coming up and there's more
12    activity.  I don't have anything to show for that.  But I think
13    it's a commonly known fact that sports wagering goes up in the
14    casinos around that time.
15              And the timing of the casinos' decisions,
16    Mr. Schmutter was trying to cast aspersions on that.  It's
17    obviously because they needed to make a decision in response to
18    this Court's January 30th injunction which for the first time
19    in about 50 years restricted firearms at casinos -- or lifted
20    the restrictions on firearms at casinos.  And so the fact that
21    they made the decision in that time period is an obvious
22    reaction to the reality they're facing.
23              And what the documents that Mr. Schmutter submitted
24    shows is that after the casinos had already made that decision,
25    the casino association, which is just a trade association that
```

```
 1    the DGE does not regulate, told the DGE that it was going to

 2    publicize that information, and the email shows the director

 3    was asking whether that has happened yet, the publicization.

 4    And he was sent just a final copy of the press release.  That's

 5    all.  And so --

 6              THE COURT:  I don't think we really need to belabor

 7    the record.  I don't know that it's really relevant.  I think

 8    that Mr. Schmutter raises an interesting issue as to really the

 9    back-and-forth between the casino commission and the State.

10    It's an interesting issue.  It's not one I don't think that

11    this Court needs to resolve once I have now understood that the

12    State retains the discretion whether to prosecute under

13    trespassing or A18.  I think it really -- that resolves the

14    issue of standing, so I think we can move on.

15              MS. CAI:  If I may say one more point on that

16    particular point.

17              THE COURT:  Yes.

18              MS. CAI:  I don't think plaintiffs have alleged that

19    they would be going to the casino with a firearm if they were

20    only going to be facing criminal trespass penalties, but they

21    wouldn't be going if they were facing Chapter 131 penalties.

22              THE COURT:  Well, but I think the issue is that I

23    don't know at what point will the casinos change their mind.  I

24    don't know.

25              MS. CAI:  That's true.
```

```
 1          THE COURT:  And so none of us do.  I mean, the
 2   casinos may change their mind tomorrow, just like any private
 3   property owner might change his mind or her mind tomorrow.  So
 4   I don't think that the State can stand before me and say
 5   there's no standing because the private property owner has a no
 6   guns sign.  I think we have to presume that that is fluid.
 7          MS. CAI:  Respectfully, Your Honor, I disagree.
 8   Article III requires there to be a present case for
 9   controversy, and right now there is not.  And what it also
10   requires is that even cases that plaintiff cites makes clear
11   that it has to be the cause of the -- or rather, if they
12   received a favorable court ruling, it could then do the thing
13   that they want to do.  And that is clearly not the case
14   presently.  A favorable court ruling which Your Honor had
15   already issued in the TRO, but if it were to reissue it, would
16   not allow plaintiffs to carry firearms in a casino.
17          And so under their own language, they cite --
18          THE COURT:  But that's a but-for causation, which the
19   Third Circuit doesn't require.
20          MS. CAI:  So, Your Honor, I'm quoting from Sherwin
21   Williams, which is a 2020 decision written by Judge Hardiman,
22   which makes clear that the operative fact in the case that
23   plaintiffs cite, Khodara, was, quote, "it was undisputed," in
24   that case, "if the plaintiff received a favorable ruling, it
25   would develop the landfill," which is the remedy he was
```

```
 1   seeking.  So that's just not true in our case.
 2            And so if we prevail on -- they're not saying, you
 3   know, if I prevail on Chapter 131, I am walking into the casino
 4   with a firearm.  They can't say that.
 5            THE COURT:  All right.
 6            MS. CAI:  Okay.  So finally, Your Honor wanted to
 7   talk about transit hubs.  You know, the beginning of my
 8   analysis on transit hubs actually begins with the
 9   government-as-proprietor doctrine, but I can skip over that
10   part and just talk about --
11            THE COURT:  I want you to -- yeah.
12            MS. CAI:  -- historical evidence.
13            THE COURT:  I want you to tell me, what is a public
14   transportation hub?  There is no definition in the legislation.
15   Could you help me understand what that is?  And then I'm going
16   to give you some examples and you tell me whether or not that
17   is a public transportation hub.
18            MS. CAI:  Sure, Your Honor.
19            THE COURT:  Because if I don't know, I'm not so sure
20   the plaintiffs know.
21            MS. CAI:  Okay.  Your Honor, I think, and I don't
22   have the specific cite right in front of me, I think there are
23   state either statutes, regulations, or other understandings and
24   in the transportation context that transportation hubs are
25   places where multiple modes of transportation intersect.  And
```

```
 1    it doesn't have to be modes as in trains and buses.

 2                THE COURT:  Okay.

 3                MS. CAI:  But, for example, Trenton Transit Center is

 4    certainly a transit hub because both Amtrak and New Jersey

 5    Transit and the -- and the SEPTA, for example, those modes of

 6    transit all intersect there.

 7                THE COURT:  So where modes of transportation, are you

 8    giving me -- is there a definition somewhere that I should be

 9    looking to?  Or are you just going from case law?  Tell me what

10    you're doing.

11                MS. CAI:  My understanding is that that's certainly

12    the Port Authority's understanding.  Now, obviously that's a

13    different agency than the State.

14                THE COURT:  Yes.

15                MS. CAI:  And I'm sorry, Your Honor.  I don't have

16    that specific citation, but we can provide that to the Court.

17                THE COURT:  Well, let me ask you some questions.  Is

18    a bus stop at Exit 3 of the turnpike a --

19                MS. CAI:  No, no, it is not.

20                THE COURT:  Okay.  But that's where cars and trucks

21    and, I don't know, horses intersect.

22                MS. CAI:  I think the fact that the bus stop happens

23    to be on another road, I mean it's the same road that carries

24    both buses and -- well, I guess that's not really the

25    distinction.
```

 1          That's just not a hub in any way, right?  That's just

 2     one station where you're only going to that station for the

 3     purpose of getting on one mode of transportation, which is the

 4     bus.  You're not going to the bus stop to get in a car or a

 5     truck or a train or anything like that.

 6          THE COURT:  So tell me -- okay.  Well, let's

 7     continue.  So is a marina a transportation hub?

 8          MS. CAI:  I don't think so, Your Honor, because my

 9     understanding is only boats are there.

10          THE COURT:  Okay.

11          MS. CAI:  I confess, I don't know enough about

12     marinas to have an understanding of that.

13          THE COURT:  But that's my point, Ms. Cai.  And I

14     don't -- if you don't know what a transportation hub is, how

15     would these plaintiffs?

16          MS. CAI:  Well, Your Honor, I don't think a

17     void-for-vagueness -- and Ms. Reilly is going to address this

18     in a bit, but I can preview, which is that a void-for-vagueness

19     analysis, which I don't think plaintiffs have even brought

20     against transportation hubs, doesn't turn on whether or not any

21     particular person, including a particular lawyer, has questions

22     on the edge cases or certain applications thereof.  They're

23     trying to invalidate the statute, period.  And so there are

24     definitely places that I think everyone agrees are obviously

25     transportation hubs.

```
 1           THE COURT:  But before -- they're asking this Court
 2      to invalidate a restriction.  I have to know what restriction
 3      it is that they're asking me to invalidate.  So would it be
 4      error for me to sua sponte raise the question of what a
 5      transportation hub is?  Because I certainly don't want to go
 6      there.
 7           MS. CAI:  I do think that a plaintiff would have to
 8      demonstrate that they -- well, if they have not pled or nor has
 9      anyone averred that they are confused by what a transit hub is,
10      and so there is no constitutional injury in that sense.
11           THE COURT:  I'm not so sure that's fair.  I think
12      they have submitted several declarations where they have talked
13      about driving through or near or by the Newark Airport or by
14      the -- one of the -- I don't remember now.
15           And that raises, I think, very fair points, which is,
16      is someone who is on the turnpike in the perimeter of the
17      Newark Airport violating this restriction?
18           MS. CAI:  No, Your Honor.  It has to be the airport
19      itself.  And of course there's also the exception for -- and
20      this is in Section 7(d) on accessing the roads at a public
21      right-of-way where you're not restricted.  And so if you're
22      driving on the pickup lane of Newark Airport, that's not a
23      violation to have -- well, you would have to abide by the
24      vehicle restrictions, but that's not a violation of Section
25      A20.
```

1        THE COURT:  Okay.  You can understand my concern.

2  And one of the plaintiffs has a boat at one of the marinas, I

3  think by Atlantic City.  So your view is that's not considered

4  a transportation hub or it would not -- it certainly isn't an

5  airport.  We can all agree on that.

6        What about privately owned airports?

7        MS. CAI:  Your Honor, I think they are airports.  The

8  definition of airport is -- I mean, they have "airport" in the

9  name, and so it doesn't matter if they're privately owned or

10  publicly owned.

11        I will note, however, that it's not clear to me that

12  plaintiffs have demonstrated that there is a self-defense right

13  to have a handgun when they're on an airplane, which is what

14  they're trying to do, right?  They're trying to bring the

15  handgun on to their private aircraft when they fly.  It's not

16  clear to me what kind of right, Second Amendment right would be

17  vindicated by that kind of activity.  It's a very unusual set

18  of circumstances.  I clearly have not thought about private

19  planes.

20        But I don't think that the prohibition -- rather I do

21  think that the prohibition on airports does apply generally to

22  airports even if they're privately owned.

23        THE COURT:  Okay.  And then they've made the argument

24  about like a restaurant or a store on that property.  Is that

25  considered a transportation hub?

```
 1              MS. CAI:  No, Your Honor.  I mean, the restaurant
 2    that they've pointed to, we've gathered from the, you know,
 3    reporting on what the restaurant is, it's just a stand-alone
 4    building that serves food.  It's not an airport at all.
 5              Now, it's one thing if it's the McDonald's inside the
 6    Newark Airport Terminal B, right?  That's a very different
 7    situation because you're in the airport in order to be in the
 8    restaurant.
 9              THE COURT:  Yeah.  That's a different situation.
10              And what about what many of the plaintiffs -- well,
11    not many, I think a couple, talk about dropping off family and
12    friends at the airport.  Are they in violation of this
13    provision?
14              MS. CAI:  No, Your Honor.
15              THE COURT:  Why?
16              MS. CAI:  Because they are -- well, so this is the
17    provision in Section 7(d) where it says the holder of a validly
18    and lawfully issued permit shall not be in violation of
19    subsection (a) -- which is where all the places are
20    enumerated -- while the holder is traveling along a public
21    right-of-way that touches or crosses any of the places
22    enumerated in section (a) of this section.
23              THE COURT:  Where are you?
24              MS. CAI:  This is subsection 7(d).
25              THE COURT:  All right.  I'll find it.
```

*United States District Court*
*District of New Jersey*

```
 1              MS. CAI:  Yes, Your Honor.
 2              I will note that I think in one of the supplemental
 3    declarations, and I apologize, I don't remember the name of the
 4    plaintiff, I think he noted that he may want to go into the
 5    airport terminal with the firearm.
 6              THE COURT:  Yeah.
 7              MS. CAI:  On picking up and dropping, that is
 8    prohibited, right.  The rule says, the whole point is, you
 9    know, even outside of the TSA area but in the airport itself
10    you can't be carrying a handgun on your hip in those areas.
11              THE COURT:  Yeah.  So what about one of the
12    plaintiffs who I think he travels to New Hampshire and so he
13    avoids -- and he's permitted to take his firearm to New
14    Hampshire, but he has to fly out of another airport?  He
15    disassembles the firearm, he takes it to that other airport,
16    and he travels to New Hampshire.  Can he -- he can't -- there's
17    no way under this legislation that he can disassemble his
18    firearm and take it, fly on a plane out of Newark to New
19    Hampshire?
20              MS. CAI:  So certainly he couldn't take it as
21    carry-on luggage.  That's already prohibited by TSA rules.  As
22    to checked luggage, I think it depends on the facts of the
23    case, how long he's lingering in the pre-TSA area.  If he's
24    just dropping off the luggage, and I think there's actually
25    when you go to the airport, they're actually outside, luggage
```

```
1    drop-off areas, I would think that would have to be at least

2    just a de minimis, if any, violation at all of the statute.

3              THE COURT:  So where is that?  Is that the 7(d) you

4    just cited to me?

5              MS. CAI:  The de minimis is in Section 7(a).  We've

6    discussed this before.

7              THE COURT:  We talked about that the last time.

8              MS. CAI:  Exactly, we did.

9              THE COURT:  So the State would take the position that

10   you can take your firearm to the airport as long as you're just

11   dropping off your checked luggage, and so he could fly from

12   Newark to New Hampshire?

13             MS. CAI:  If that's all he is doing.

14             THE COURT:  What do you mean all he is doing?

15             MS. CAI:  Some people are doing other things with the

16   firearm.  They're going into --

17             THE COURT:  He's having a cup of coffee on the

18   sidewalk; you'd have a problem with that?

19             MS. CAI:  Correct.  If he's having a cup of coffee in

20   the Starbucks before the TSA check area, before he drops off

21   his bag, if he's going to be sitting there for hours and hours,

22   I think that would be a problem.  Because what we're concerned

23   about or what the state -- the legislation is concerned about

24   is gun events at airports, which is a place that did not exist

25   at the Founding.  And in light of 9/11 and many other
```

 1    incidents, having a gun in any way, shape or form in that area

 2    is a huge security concern not just for the State, but for Port

 3    Authority, national security, et cetera.

 4              THE COURT:  Yeah.  And we talked about this before,

 5    and I don't want to digress, but the de minimis, so even though

 6    it is de minimis, the problem with the argument, the de minimis

 7    argument that the State has made -- and they've made it to me

 8    before -- is that it really by then, the plaintiff is already

 9    charged and the plaintiff then bears the burden under the

10    statute, as I recall it, to check -- to persuade the Court that

11    it was de minimis.

12              But in any event, I don't want to get too bogged down

13    in that.  Your next point, please.

14              MS. CAI:  Those are all the places that we wanted to

15    cover.

16              THE COURT:  Okay.

17              MS. CAI:  But if you wanted to talk about more on

18    transit, I'm happy to answer any other questions from the

19    Court.

20              THE COURT:  I think I'm good.

21              MS. CAI:  Okay.  So I did, and this part does relate

22    to public transit as well.  The government-as-proprietor and

23    government-as-market-participant doctrines, those are related

24    but different doctrines.  I think the bottom line is that the

25    plaintiffs have not really responded to the core constitutional

```
 1   principles here.

 2              And what the two doctrines say is the following:

 3   When the government is operating a premise like a library, a

 4   hospital, a jail, a stadium, whatever it is, and it sets

 5   building rules or premises rules, it is operating as the

 6   proprietor of the premises and not as a sovereign regulator of

 7   the people.  I think Mr. Jensen basically acknowledged this in

 8   his argument earlier.

 9              We're not talking about highways, the streets, the

10   town square.  We're talking about places where it is obvious

11   from the kind of regulation and what the government is doing

12   that it is taking the place of the owner as the owner of the

13   building or the land just as a private individual who happens

14   to own that would.

15              THE COURT:  Yeah.  And I don't really understand this

16   argument.  I think it's -- I mean, if the State is the

17   proprietor like any other private business owner, it can post a

18   sign "no guns."  We all agree on that.  It's not acting as a

19   sovereign, it's acting as a proprietor, right?

20              MS. CAI:  I agree with that, Your Honor.  But I don't

21   think plaintiffs agree with that.

22              THE COURT:  Well, what they say, and this is what I

23   would like you to address is, so you don't need -- this

24   legislation -- this legislation is dealing with the state as a

25   sovereign, not the state as a proprietor.  Because there is
```

```
 1    nothing preventing the state as a proprietor.  If it owns

 2    the -- if it owns the car vehicle, then it doesn't want guns in

 3    its vehicle.  They're not quarreling with that, at least I

 4    don't think they are.  But when you are acting as a sovereign

 5    is where they quarrel.

 6              MS. CAI:  I guess I'm a little confused, Your Honor,

 7    because I think this is the State's way of saying in one fell

 8    swoop, these are the places where we act as proprietor --

 9              THE COURT:  Well, you can't pretend to act as a

10    proprietor.  You either own it or you don't, right?

11              MS. CAI:  Yes, Your Honor.  And to be clear, this

12    argument only applies to the state-owned libraries, hospitals,

13    jails.  So I understand that there are other parts of the

14    statute that this government-as-proprietor doctrine would not

15    apply to.  And so let's take the section on zoos, for example,

16    right?

17              THE COURT:  Yeah.

18              MS. CAI:  So plaintiffs say some zoos are private,

19    some zoos are public.  This justification, this constitutional

20    justification I've offered to the Court admittedly would not

21    apply to -- I don't remember which zoo was privately owned, but

22    whatever the privately owned zoo was, but it would apply to the

23    publicly owned zoo.  And so that's why we're making this

24    distinction.

25              When the State is acting as the owner of the zoo, it
```

```
 1    is not restricted from being able to restrict firearms and
 2    restrict a number of other activity in order to protect its
 3    status as the owner of that property.
 4             THE COURT:  So I think it's somewhat of a
 5    disingenuous argument in this regard, and you tell me, you
 6    persuade me differently.  If the State owns the property, it
 7    has every right to say "no guns allowed."  And if someone comes
 8    in, the librarian says get out, you can't have a gun in here,
 9    then the remedy is trespass, right?  The State can prosecute
10    that person for trespass.
11             But here, what the State is doing is it's
12    criminalizing the behavior as a sovereign.  It's not simply
13    putting up a no trespassing or a no guns sign, it is acting as
14    a sovereign and criminalizing the behavior.
15             So what it seems to me the State is doing is saying,
16    oh, no, Judge, we're just simply acting as a proprietor.  But
17    you have that right.  Prosecute them for trespass.  You're
18    going further and you're criminalizing and making it a crime,
19    and that's acting as a sovereign.  Tell me where I'm wrong.
20             MS. CAI:  I don't think that the analysis turns on
21    whether or not the State's prohibition is on a sign or in a
22    statute.  I may be wrong, but I'm pretty sure that --
23             THE COURT:  But I think that's the distinction
24    between whether you are acting as a proprietor or a sovereign.
25             MS. CAI:  I just -- I would have to disagree with
```

*United States District Court*
*District of New Jersey*

```
 1    that, Your Honor.  I don't think that the State's only way of
 2    acting as proprietor is posting a sign on a door.  It has --
 3              THE COURT:  Okay.  Tell me -- let me ask the question
 4    this way:  What is the source of authority when the State
 5    criminalizes this behavior, is it an owner or is it a state?
 6              MS. CAI:  So it's a combination -- it has to be a
 7    combination.  Because when states criminalize trespass for
 8    anybody, it's also the State.
 9              THE COURT:  Bingo.
10              MS. CAI:  But, but, Your Honor, it also has the
11    ability to do so as an owner.  And so there's no distinction
12    between the State's ability to do both and when it's rolled up
13    into the same regulation, that doesn't mean that it's not
14    acting as an owner.  Sorry.  That's a lot.  Let me back up for
15    a second.
16              So let's start with United States vs. Class.  This is
17    the D.C. Circuit decision.  I also wanted to clarify that
18    plaintiffs are dead wrong to say that Bruen abrogated the
19    holding in Class.  What Bruen abrogated was Class's description
20    of the legal standard, the two-part legal standard, the second
21    part of which Bruen abrogated, the means-end test.  But Class
22    specifically said we are not doing that.  We are not going to
23    that second step.  We're only doing the first step, does the
24    activity constitute Second Amendment activity at all?
25              And I am pretty sure that the regulation at issue in
```

1   *Class* on the U.S. Capitol parking lot was a statute rather than
2   a sign at the parking lot.  It might have been both.  I'm not
3   aware of, you know, if there are facts on that.  But there was
4   a statute that was violated that regulated Capitol Grounds.
5           And so in the same way that the federal government
6   was using a statute, a criminal statute to regulate its
7   property, the Capitol Grounds, the same thing is true when the
8   State here in Chapter 131 is doing the same for public
9   libraries and museums.
10          THE COURT:  Yeah.  I think the problem you have with
11  that argument, Ms. Cai, is that that's the U.S. Capitol where
12  government function is at its apex.  And that's exactly what
13  *Bruen* talked about.
14          MS. CAI:  But the holding in *Class* was not about --
15  well, first of all, it was the parking lot which I guess -- I
16  don't know if the federal government would agree, but I don't
17  think the parking lot is where the actual activity is at its
18  apex, rather it's because the government owns that parking lot.
19  It's not different from when a parking lot owner -- I don't
20  know the names of any household names for parking lot owners,
21  but if someone else is doing that.  And I think that's also a
22  slightly different argument and an even stronger one when the
23  government is not just the owner of the property, but also a
24  participant in the marketplace.  And so that's a different line
25  of cases that come from the same genesis, and in the

1   Commerce Clause context, in the preemption context.  So these

2   are constitutional provisions that courts say we don't even do

3   the preemption analysis or the very complicated "dormant"

4   Commerce Clause analysis when you don't even reach that

5   question because the government is not acting as a sovereign.

6           All of plaintiffs' arguments are saying some version

7   of, well, *Bruen* didn't talk about this in its historical test,

8   that's true.  But *Bruen* wasn't concerned with this problem,

9   right?

10          Cases like *Pike vs. Bruce Church*, which lays out a

11  very complex dormant Commerce Clause analysis, that doesn't

12  talk about government as participant.  You don't do the *Pike*

13  test if the government is a participant.  That's the whole

14  point of this part of the analysis.

15          Okay.  So on the private property role, I don't want

16  to belabor the point.  We've had a lot of conversations about

17  this, but I did want to respond to the brand new argument that

18  Mr. Jensen raised in his reply brief, which is to say that the

19  word "gun" in these historical statutes spanning from the

20  18th century through the 19th century only meant long gun and

21  not handguns.

22          A few different levels of analysis.  And I'll start

23  with the ones that don't require me to provide the Court with

24  documents.  The first is that this argument obviously doesn't

25  apply to the Texas, Louisiana, Oregon, or New York laws which

1    use the word "firearms."  And so even that alone, that would

2    establish the tradition that we're looking at here.

3           But even on the New Jersey, Massachusetts, and

4    Pennsylvania laws, I'll make this point:  Even if Mr. Jensen

5    were correct, they still regulated other kinds of guns.  *Bruen*

6    says you don't need an analog -- or you don't need a historical

7    twin, you need an analog.  Certainly people exercised their

8    Second Amendment right with long guns and they were still

9    restricted.  But the key point I want to make to Your Honor is

10   that their argument relies on a single dictionary definition

11   from 1828, the weight of the authority from the 18th century

12   period that is contemporaneous with the enactment of the 1722

13   and 1771 New Jersey statutes is otherwise.  So what we did is

14   we looked at dictionaries relied on by the Supreme Court in

15   *Heller*, and what they show was that the word "gun" was a broad

16   term for firearms, and that pistol was a type of gun and

17   handguns were a type of gun.

18          What I have for Your Honor, and plaintiffs already

19   have this because I've already sent it up to them last night,

20   is a binder.  If I may approach, Your Honor.

21          THE COURT:  Yes.  Thank you.

22          MS. CAI:  I have a nonbinder version for the clerks,

23   if they need it, I have that here.

24          (Handing documents to the Court.)

25          THE COURT:  Yeah.  Thank you.

1          MS. CAI:  So tab 1 is this Sheridan dictionary from

2     1796, which was cited in *Heller*.  You can access it on the

3     U Penn library website, but it's easier to print it out.  And

4     there, and I know it's hard to read the historical documents.

5     I'll try to point the Court geographically on the page.  On the

6     second, the right-hand column about halfway down the page,

7     under "gummy" it defines gun.  And it says it's the general

8     name for firearms, the instrument from which shot is discharged

9     by fire.

10          And on the last page of that exhibit on the upper

11     left-hand corner, it defines pistol as a small handgun.

12          Tab 2 is the Samuel Johnson dictionary from 1755,

13     which was cited by *Heller* and by another case that plaintiffs

14     cite, *Espinosa*, Justice Gorsuch's concurring opinion.

15          There, on the third page of the exhibit, the

16     right-hand column halfway down the page, it defines gun again

17     as "the general name for firearm, the instrument from which

18     shot is discharged by fire."

19          If you turn to the last page of that exhibit, on the

20     right-hand side halfway down the page, it defines pistol again

21     as a small handgun.

22          The Cunningham dictionary is Exhibit 3.  This is

23     actually from 1771, which is the same year that the relevant

24     New Jersey statute was reenacted, cited in *Heller* and actually

25     described as important.  It has a very long entry for guns

*United States District Court*
*District of New Jersey*

 1   starting on the second page, right-hand column about three

 2   quarters of the way down the page.

 3          And what it does is it describes a number of laws or

 4   cases that used the word "gun," and in the very first entry it

 5   talks about a handgun.  Second entry does the same.  And then

 6   on the following page, about halfway down the page, it talks

 7   about an execution of a sheriff's office to carry such a

 8   handgun, that it was lawful and that a dag was a handgun within

 9   the statute.  *Bruen*, on page 2140, describes "dag" as a

10   handgun.  I did not know that.  You learn something new every

11   day.

12          Outside of *Heller*, another dictionary that was cited

13   by another case that plaintiffs cite to, *Gamble*, is Exhibit 4,

14   the Dictionarium Britannicum from 1722, which is very relevant

15   because that's very close in time to when the New Jersey

16   statute was first enacted.  It describes -- or it defines gun

17   on the second page, upper left-hand side, as warlike machine

18   used before the invention of guns, or a firearm or weapon of

19   several sorts and sizes.

20          On the next page, upper left-hand side, it defines

21   pistol as a short, small gun or firearms worn on the saddle

22   bow, the girdle, or in the pocket.  And 19th century evidence

23   also confirms this.  So Exhibit 5 is Samuel Colt's 1836 patent

24   for the revolver, which, as the Rivas declaration explains, is

25   what led to the popularization of handguns in general.  It

1     literally describes his invention as a revolving gun.

2            Exhibit 6 is a dictionary or a cyclopedia of costume

3     or dress from 17 -- or sorry, 1876.  Now, I note this is a

4     British dictionary, but to the extent that we're looking at the

5     English language, it's at least somewhat relevant, although I

6     agree it's less relevant than the others.  It goes through and

7     describes in detail all kinds of guns and pistols.  And on page

8     234 it talks about the etymology of the word "gun."  It says

9     the word gun, although still retained in the language, was

10    henceforth -- thenceforth used in a general sense only.  The

11    constant improvements in hand firearms during the 16th and

12    17th centuries giving rise to various other names.

13           And so I think all of this demonstrates that the one

14    dictionary definition that plaintiffs rely on was not

15    indicative and is not evidence supporting the idea that the New

16    Jersey statute which lasted two centuries and using the word

17    "gun" meant to say, well, you can just carry a handgun on to

18    other's property without their consent in contravention of the

19    word.  And some of the statutory context evidence that

20    plaintiffs cite actually disprove their point.

21           And so, for example, Exhibit 9 to Mr. Jensen's

22    declaration is an 1812 Delaware law that prohibited the

23    discharge of "any gun, musket or pistol."

24           Mr. Jensen's argument is that guns were long guns

25    like muskets, but if it's using the word gun, musket, pistol

*United States District Court*
*District of New Jersey*

```
 1    disjunctively, that disproves his point, right.  Because if a
 2    musket is a gun, then the use of the word gun doesn't exclude
 3    musket any more than it excludes the word pistol.  And that's
 4    true for several of the other statutes.  Exhibit 10, Vermont
 5    law.  In Exhibit 11, a New Hampshire law, and so forth.
 6             And I'll just note that even if sometimes we use
 7    words colloquially to mean slightly different things, that
 8    doesn't mean that the definitional use in the statute is the
 9    same.  So let me give you an example.  A car, right?  Car is
10    anything that's got four wheels and drives like an automobile.
11    It includes SUVs in probably the legal definition.  So if you
12    had a statute that says all persons are prohibited from driving
13    any car onto another's private property without expressed
14    permission, we wouldn't say aha, that exempts SUVs even though
15    sometimes in colloquial language you may say oh, there's a
16    bunch of cars parked on the street and a bunch of SUVs, too,
17    right?  You wouldn't think of that as a reason to read the
18    statute as excluding SUVs.  So that's my bit on the private
19    property rule.  Obviously there's a lot more there on the
20    principle and all that, but I did want to get that into the
21    record.
22             THE COURT:  Okay.  I want to move things along, and I
23    don't want to deprive the others of their time.  Were you going
24    to speak on the default rule?
25             MS. CAI:  Oh.  That was what this was, yes.
```

```
 1            THE COURT:  Further on it with respect -- well,
 2   obviously.
 3            MS. CAI:  Only to the extent Your Honor has any
 4   questions.
 5            THE COURT:  I wanted to focus on the First Amendment,
 6   the compelled speech.
 7            MS. CAI:  Sure, Your Honor.
 8            THE COURT:  The State focuses on the framing of the
 9   Second Amendment right, but it doesn't do a means-end analysis.
10   So assume I disagree with your framing, what level of scrutiny
11   should I apply?
12            MS. CAI:  I think it would have to be rational basis
13   or intermediate perhaps.  I mean, the problem with the entire
14   First Amendment theory of the plaintiffs is that someone is
15   speaking about their property, no matter what.
16            THE COURT:  Right.
17            MS. CAI:  So under the rule that they want, the
18   person who doesn't want guns on their property has to speak.
19   It has to put up a no trespass sign, right.  That's speech.
20   They say that's -- they say their version in our world is
21   compelled speech, but that's not compelled speech.  I think
22   that's logically impossible.  In both cases, someone is putting
23   up a sign saying what their preference is.  But I don't
24   think -- the key to the analysis is that the fact that someone
25   has to express their preference to the outside world is not
```

```
 1   compelled speech.  So that's true in contracting.  That's true
 2   in wills.  Now, the point is not what the dead person, their
 3   rights, it's what they have to say before they're dead to
 4   communicate their rights.
 5          There is a -- by definition there has to be a default
 6   rule, right, to set aside what it is the rights and
 7   responsibilities are of people vis-a-vis the thing we're
 8   talking about, be it a will, a property, whatever it is.  And
 9   so it logically cannot --
10          THE COURT:  But what's the governmental interest?
11          MS. CAI:  I'm saying, Your Honor, that there is no
12   speech infringement at all.  When the principle is you have to
13   speak to express your preference, that's not a regulation of
14   your speech.
15          THE COURT:  Okay.
16          MS. CAI:  But if there was a government interest at
17   stake under that analysis, Your Honor, it would be this:
18   First, we have evidence in the record that at best,
19   New Jerseyans are confused about what they're supposed to say
20   and not say under the prior regime before Chapter 131.  So
21   Exhibit 21 is empirical report, empirical study by Ayres and
22   Jonnalagadda, which demonstrate --
23          THE COURT:  Yeah.  And you've been --
24          MS. CAI:  Yeah.  I know it's hard to read.  So we can
25   send you an electronic copy if you'd like.
```

```
 1              THE COURT:  No.  It's been in the record.  I'm
 2   familiar with it.
 3              MS. CAI:  Your Honor, so I think the government's
 4   compelling interest is making sure that private property owners
 5   are accurately communicating what they actually believe.
 6              THE COURT:  Right.  And we've discussed this a little
 7   ad nauseam before.
 8              MS. CAI:  Yes, Your Honor.
 9              THE COURT:  And I've asked the question.  I've never
10   really quite gotten an answer to it, so run a radio campaign.
11              MS. CAI:  Your Honor, I don't even think that under
12   intermediate scrutiny the analysis is whether or not there are
13   other alternatives.  I'm not actually sure if that's more
14   restrictive of speech or less restrictive of speech.
15              I mean, it's a matter -- and it's the same that
16   people would have to post their information in a certain way
17   for the outside world to know it.  I don't even know if that's
18   a least restrictive means or just an alternative restrictive
19   means.
20              I think what's clear, though, is that there is no
21   compelled speech.  There is no content-based regulation.  It's
22   not based on what you -- you can say whatever you want about
23   your property.  The government is not telling you that you
24   can't or that you have to speak a certain message.  There's no
25   compelled speech.  And so I don't think there's a speech
```

```
 1   problem at all.
 2              To the extent it even touches on the First Amendment,
 3   it would be a lower tier of scrutiny.  And so the idea that
 4   there is other ways of accomplishing lesser goals, I would say
 5   that the radio announcement, probably not very effective, but
 6   I --
 7              THE COURT:  One last question, because it looks like
 8   you're sitting down, but what are you going to do about the
 9   citizens who they don't want guns on their property but they
10   don't want to broadcast it?  What's your response to that?
11              MS. CAI:  Well, they don't have to broadcast it at
12   all under Chapter 131.  And that's exactly what Chapter 131
13   allows.  So if you don't want guns on your property, you don't
14   have to say anything.
15              THE COURT:  But the --
16              MS. CAI:  The default rule under Chapter 131 is if
17   you don't say anything, guns are not allowed.
18              THE COURT:  But you have to -- okay.  Fair enough.
19   Okay.
20              MS. CAI:  I don't know if Your Honor had any
21   questions about the use of expert declarations.  I'll just note
22   that many post-*Bruen* courts have allowed them, have found them
23   useful.  The Seventh Circuit recently remanded to do that
24   precise analysis.
25              THE COURT:  Can I just go back for a second?  And
```

 1   maybe I didn't ask the question that I thought I asked.  Hang

 2   on a second.

 3            Oh, yeah.  The question I was asking is, what about

 4   those who they want -- they're fine with guns.

 5            MS. CAI:  Oh.

 6            THE COURT:  But they don't want to broadcast that,

 7   what do you say to them?  I think you misheard me.  Yeah.

 8   That's the -- well, in any event, that's my question.  What do

 9   you say to those who they want guns, they want the protection,

10   they whatever, but they don't want to broadcast it, what do you

11   say to those?

12            MS. CAI:  I don't think they have to broadcast it.

13   They can just communicate that to whoever they want to have

14   guns on their property, right?  They don't have to post a sign.

15   They can email, call, put it on their website, whatever other

16   means.

17            THE COURT:  Yeah.  And we talked about this before.

18   So if, you know, the local hardware store would prefer that

19   people come to its establishment with guns, but they certainly

20   don't want to post a sign, it's the State's position well, to

21   get in touch with your customers somehow and let them know, I

22   guess.

23            MS. CAI:  Yeah.  Or, you know, you could -- there are

24   probably other ways of doing that in advertising or other

25   things.  But the point, Your Honor, is that the hardware store

1    that does want to prohibit guns, under plaintiffs' view of the

2    world, would have to post a -- so it's the same problem to the

3    extent it is a problem.

4            Our position is that expressing your preference to

5    people that is an accurate reflection of your preference is not

6    a prohibition on speech or a restriction on speech.

7            THE COURT:  Understood.  Thank you.

8            MS. CAI:  Thank you, Your Honor.

9            THE COURT:  Okay.  Ms. Reilly.  Thank you.

10           MS. REILLY:  Your Honor, could we have a brief

11   sustenance break, like five minutes?

12           THE COURT:  Five minutes.  And then I'm really hoping

13   to go maybe a half an hour more or so.

14           MS. REILLY:  Thank you.

15           THE COURT:  Because we've covered a lot of ground,

16   and I do want to give you all your due time, but I think we've

17   covered a lot of ground.  But, yes, five minutes, okay.  Thank

18   you.

19           MS. REILLY:  Thank you, Your Honor.

20           THE COURTROOM DEPUTY:  All rise.

21           (Recess was taken at 1:07 p.m. until 1:16 p.m.)

22           THE COURTROOM DEPUTY:  All rise.

23           THE COURT:  Okay.  You can all have a seat.  Thank

24   you.

25           Okay.  Ms. Cai, can I ask you just some follow-up

1    questions?

2              MS. CAI:  Sure.

3              THE COURT:  I have some questions I want to focus on

4    before I turn to Ms. Reilly.  And this really focuses on the

5    equal protection challenge to the default rule.

6              MS. CAI:  Okay.

7              THE COURT:  I don't think you like it when I call it

8    "default rule."

9              MS. CAI:  Oh, I think it's fine.

10             THE COURT:  Okay.  Assume I think that the rule

11   implicates a fundamental right, what's your asserted

12   governmental interest?  And then how is it narrowly tailored to

13   achieve that interest?

14             MS. CAI:  So I think the interest would be the same,

15   it's the same interest analysis that we just talked about in

16   the First Amendment context.

17             THE WITNESS:  The right to know?

18             MS. CAI:  It's not the right to know.  It's the right

19   to have the accurate reflection of the private property owner's

20   belief.  So, for example, someone who lives in a house who

21   thinks that by being silent they're actually allowing the

22   plumber to come into their house with a handgun unknowingly or

23   thinks the opposite rule is in effect, so it's the same as

24   that.

25             THE COURT:  And so how is that narrowly tailored then

*United States District Court*
*District of New Jersey*

1     to achieve that interest?

2            MS. CAI:  Because there's only two defaults that the

3     government can set.  Default is either what plaintiffs want,

4     which is silence means come in with a gun or it means don't

5     come in with a gun, come in without a gun.  And so there's only

6     two options.  And so it's kind of strange to think about

7     tailoring as one or the other when that's the only way to

8     accomplish that objective.

9            A radio campaign does not -- it's not going to reach

10    everybody.  It's not -- there's no way for the government to

11    ensure that people actually understand that's what that means.

12    And so that's the interest there.

13           I will say that I don't know what fundamental right

14    would be implicated if the other flip side of that, right,

15    would be similarly restricted.  So the person who is -- so

16    you're comparing two groups of people, the person who wants to

17    restrict firearms and has to speak today and under Chapter 131

18    the person who doesn't and would have to speak.  So it's a very

19    strange equal protection theory that under either world, there

20    would be a classification on the exact same thing and a set of

21    rules and whatever analysis in terms of the interest would be

22    at play there.

23           THE COURT:  Well, I'm going to throw out two

24    possibilities.  One, there could be no default rule at all.  Or

25    two, it could apply only to private property and not property

```
 1  open to the public.  Do you agree with that?
 2              MS. CAI:  So I think there has to be a default rule,
 3  because if the rule is no restriction, that's actually a
 4  default rule in the other direction.  So that's one.  And as to
 5  a default rule that's only on I think Your Honor said
 6  commercial property, or am I getting it backwards?
 7              THE COURT:  Private property open to the public.
 8              MS. CAI:  Open to the public.  So that would just be
 9  setting a default rule for those.
10              THE COURT:  Because this is all private property.
11              MS. CAI:  Correct, correct, correct.  I just wanted
12  to make sure I was getting the analysis as Your Honor had
13  stated it.
14        So all that would mean is that there's a different
15  default rule for homes or businesses that are not open to the
16  public and places that are open to the public.  It would be two
17  different default rules for those types of locations.  So I
18  think the analysis is still the same.
19              THE COURT:  Okay.
20              MS. CAI:  Thank you, Your Honor.
21              THE COURT:  All right.  Thank you.  Ms. Reilly.
22              Take your time.
23              MS. REILLY:  Your Honor, I would like to start with
24  the, just because I think it's easiest, with the equal
25  protection challenge to the judges, the prosecutors, and the
```

 1    deputy attorney generals.

 2              THE COURT:  Okay.

 3              MS. REILLY:  First of all, the exemption for

 4    prosecutors has existed since 1937.  And that's

 5    N.J.S. 2:176.43, and that goes for assistant prosecutors as

 6    well.

 7              The exemption for a deputy attorney general has

 8    existed since at least 1983.  And that's L1983, Chapter 552.

 9    So it's unclear why there's a, you know, sudden rush for a

10    preliminary injunction now of, you know, exemptions that have

11    existed for decades.

12              THE COURT:  Yeah.  And that's the question I was

13    asking earlier.  What is the -- yeah.  Okay.  Go ahead.

14              MS. REILLY:  And as for judges, there was an

15    exemption for court attendance dating back to 1937.  And the

16    Court has -- the Legislature has now just expanded that to

17    include judges because of, you know, current events that have

18    happened.  And that's the same statute that also addressed

19    prosecutors and assistant prosecutors.

20              With regard to plaintiff said that strict scrutiny

21    applies to this equal protection challenge.  And at least four

22    circuits, and that would be the First, Second, Fifth, and

23    Ninth, have said that if a Second Amendment challenge fails,

24    the equal protection claim is subject to rational basis, not

25    strict scrutiny.  And that's because no fundamental right is

1    involved.

2         So plaintiffs are already challenging the sensitive

3    places on Second Amendment grounds.  If they prevail, then the

4    equal protection claim is moot.  If they don't prevail, then

5    that's because there's no fundamental right, so rational basis

6    applies.

7         And here, there's definitely rational basis.  The

8    exempt categories, professional categories, they're simply not

9    similarly situated.  And the State has listed all of this in

10   its brief.  They've been vetted.  They're subject to oaths and

11   codes of conduct.  But most importantly, given the nature of

12   their jobs, they're subject to a heightened risk of danger and

13   a heightened need for self-protection.  And so that's certainly

14   a rational basis.  And they're also subject to more stringent

15   requirements regarding how they qualify.  They must qualify

16   annually in the use of a handgun.

17        To turn now to what Your Honor mentioned before with

18   regard to permitting.  So Your Honor was pointing to Section 3A

19   and raised the question of when somebody who currently has a

20   permit is seeking to renew, sort of what sets of rules apply.

21   And here, the State agrees completely with the plaintiffs, that

22   that language, for many reasons -- first of which is syntax and

23   then I'll get into other reasons -- means that the person who

24   seeks to renew is subject to whatever rule is currently in

25   place for original applications.

 1          And you see that I believe as plaintiffs were also

 2     pointing to in the syntax, it doesn't say as in the case of

 3     their original application.  It says, you know, as happens to

 4     be the case of original applications at the time.  But beyond

 5     the syntax argument, there are other arguments, Your Honor.

 6          First is, as the Legislature said in Section 1A of

 7     Chapter 131, they specifically addressed *Bruen*.  And they

 8     specifically said in light of *Bruen*, we are getting rid of this

 9     justifiable need requirement.  That would be nonsensical for

10     them to have said that if this was going to -- if 3A was like

11     oh, but that doesn't apply to folks who already have permits.

12          Another reason why it just doesn't make sense is it's

13     simply the way the statute has always operated.  So the

14     disqualifiers are in section 2C:5.  And the Legislature keeps

15     adding to them.  So you see 2C:9, like oh, my goodness, we need

16     to add the terrorist watch list.  And then you see the next one

17     they add, C:10, the Extreme Risk Protective Order Act, the Red

18     Flag Law that Your Honor was saying.

19          Under no circumstance did someone say, oh, okay,

20     you're renewing your permit and now we have the terrorist watch

21     list or the Red Flag Law, but we didn't have it then so we

22     won't bother applying those to you.  The history of how this

23     law has been applied is whatever the current regulations are,

24     those are the ones that apply to your renewal.

25          And another reason is that there are, you know,

1    different requirements.  This 3A must be read in the context of

2    the entire act, which also says, you know, section 4, you need

3    liability insurance and then training requirements and fees,

4    and oh, yeah, we haven't raised the fees in 50 years, but

5    you're sort of grandfathered if you already have a permit.

6    These other sections don't make sense unless this means that

7    you're subject to whatever, at renewal, whatever the current

8    requirements are.

9              And I think that if there's an interpretation of this

10   provision that makes the statute constitutional, as we are

11   asserting there is, then the Court should take that

12   interpretation rather than one which renders it

13   unconstitutional by keeping in place the very justifiable need

14   standard that the Legislature said it was getting rid of.  So

15   that was that point.

16             With regard to the fee increases themselves, just a

17   couple of quick points.  One, it's plaintiffs' burden to prove

18   under the Third Circuit Boyd case, it's plaintiffs' burden --

19             THE COURT:  Ms. Reilly, can you push the mic away

20   from you?  I'm getting feedback.

21             MS. REILLY:  Sorry.

22             THE COURT:  Try it again, yeah.

23             (Discussion was held off the record in open court.)

24             THE COURT:  Okay.  Good.  Thank you.

25             MS. REILLY:  So plaintiffs have -- it's plaintiffs'

*United States District Court*
*District of New Jersey*

1  burden under the Third Circuit, the Boyd case, their burden to

2  prove the first step of the *Bruen* analysis, which is that the

3  regulation falls within the scope of the Second Amendment to

4  begin with, and they have not proven that at all.  They don't

5  seem to be implying, although maybe they are today, but they

6  don't seem to be -- they never raised an objection to permit

7  fees as a whole.  They just seem to be objecting to oh, well,

8  you know, $25 is not okay, but a lesser amount is okay.  And

9  it's not unusual at all for there to be sort of fees charged

10 for folks.

11        So in a prosecutorial context, right, everybody has a

12 right to go in and defend themselves in court and to get an

13 appeal and there are fees attached to that, and that's exactly

14 what we have here.  So that mere charging of a fee does not

15 fall within that first step of *Bruen*.  And we see that also in

16 Justice Kavanaugh and Justice Alito's concurrences where

17 they're like oh, yeah, permitting processes and background

18 checks and all that, you know, that's fine, we're not doing

19 anything to tinker with that.

20        Second...

21        (Pause.) (Microphone feedback.)

22        Second, you know, these are -- *Bruen* said something

23 about, well, maybe if the fees are exorbitant.  But they're not

24 exorbitant here.  They're very modest.  They haven't been

25 raised in 50 years.  The Legislature in section 1(i) lists out,

 1   well, we're doing this because of inflation and because the

 2   cost of background checks and sort of new technology upgrades

 3   that were needed.

 4         And Your Honor asked the question before, well, like

 5   what about the one plaintiff, Plaintiff Henry, I guess, who's

 6   saying like, you know, I can't really afford that.  Because

 7   there's one person saying that they can't afford it, that

 8   doesn't mean, under a facial challenge, which plainly has a

 9   legitimate sweep, you knock out the entire statute.  If

10   Plaintiff Henry wanted to bring an as-applied challenge and

11   like, listen, I feel as if I can afford the guns but I can't

12   afford the permit and she were to document that, you know, then

13   that's a different story.  The State, you know, would also be

14   willing to say, as to that one plaintiff, if she wanted somehow

15   to ask the Court to put the money in escrows to be sure she

16   gets it back or whatever, you know, we're willing to -- to

17   stipulate to that.

18         THE COURT:  What about the argument that having part

19   of the money go into the victim compensation fund is illegal?

20   Can you talk to me quickly about that?

21         MS. REILLY:  Absolutely, Your Honor.  And that,

22   frankly, is an appropriations clause issue under the state

23   constitution and actually has nothing to do with this.  So I

24   think it's important first to look at the exact language

25   instead of just sort of the sweeping generalizations plaintiffs

```
 1   make.
 2          So the victims compensation fund for all the permits
 3   to purchase and the identification cards that the
 4   superintendent issued, so state employee issued, go into the
 5   victims compensation fund, which is the state fund.
 6          Just because, no offense to the legislative
 7   intervenors, but just because this Legislature said they're
 8   going to the victims compensation fund, 100 percent of them,
 9   does not mean that, you know, the Legislature that enacts the
10   next budget in July, on July 1st, has to abide by that.  They
11   could be like no, actually, we're going to use the money for
12   this other thing.  They can sweep that money there.
13          THE COURT:  But I thought the legislation talks about
14   defraying the cost of investigations; no?
15          MS. REILLY:  Yes.  So then, right.  But, yes, it
16   adjusts for inflation.  It defrays the cost of investigations.
17   It does the whole well, we needed a technology upgrade.  So it
18   has legitimate purpose and meets those needs.  But what the
19   State then does with that money, that's irrelevant to a Second
20   Amendment analysis.
21          The Legislature three years down the road isn't bound
22   by what this Legislature said.  Oh, this Legislature expressed
23   a wish to go to the victims compensation fund.  Three years
24   down the road we could be in the middle of another pandemic and
25   the Legislature could be like no, we want to use the money for
```

```
1    that.  So where the money ultimately ends up in the state
2    treasury, irrelevant.  And as --
3             THE COURT:  But do the plaintiffs have a remedy to --
4    let's say I agree with the plaintiffs, is it irreparable?  Is
5    there a means for them to get the money back?
6             MS. REILLY:  Your Honor, the question of -- first of
7    all, I think there's a predicate question here, an open
8    question of whether they can even seek damages for this type of
9    harm.  And you see that plaintiffs had sort of their new cases.
10   You see that in the Freedom case, which is 408 F.3d 112, where
11   it said the cost of ordinary compliance, even if it can't
12   receive compensation later, is not irreparable harm.
13            THE COURT:  But is this a fee to exercise a Second
14   Amendment right?
15            MS. REILLY:  No.  It's entirely outside of the Second
16   Amendment context, as I said before, because it fails -- it
17   fails step one.  And there are fees, and I mentioned the right
18   of the person to come to court and their charged fees.  And I
19   recognize, it is not a perfect analogy because --
20            THE COURT:  Do you also recognize that they can't
21   have their Second Amendment right until they pay the fee?  Do
22   you concede that?
23            MS. REILLY:  But it's the fee itself, which they
24   don't seem to challenge the fact of the fee; they seem to
25   challenge the exorbitance, as they phrase it, of it.  It's not
```

1    directly regulating the right to bear arms any more than in,

2    and this is what I was saying doesn't quite fit, in the First

3    Amendment context, you know, you have to pay for a permit in

4    order to do that.  It's irrelevant to the right.

5              There's a legitimate cost associated with issuing

6    permits, and issuing permits goes to core state interest.  Like

7    we really can't have people who are a danger to themselves or

8    others, you know, possessing, carrying handguns.  And so this

9    is -- and, Your Honor, dating back to -- the State cites nine

10   historical analogs where historically fees were imposed.

11             THE COURT:  Okay.

12             MS. REILLY:  That's it there.

13             With regard to the --

14             THE COURT:  Insurance?

15             MS. REILLY:  -- insurance.

16             THE COURT:  Okay.  If you don't have anything other

17   than what's in your brief, I do -- do you?

18             MS. REILLY:  I have -- I have, I think, some.

19             THE COURT:  Okay.  I'll hear you.

20             MS. REILLY:  Okay.  So, first of all, with regard to

21   insurance, I wanted to focus on the practicalities for a moment

22   of the situation.  The record shows now that there are four

23   types of policies available.  There's the homeowner's policy.

24   You can get a personal liability policy that covers all the

25   same risk.  You can get an umbrella policy, or now you can get

 1    a stand-alone firearm policy.  Prime Insurance is offering

 2    this, and they are licensed to do business in New Jersey.

 3              With regard to the cost, the State has demonstrated

 4    that, you know, a lot of folks are already covered by virtue of

 5    their homeowner's policy, and --

 6              THE COURT:  Do you know the answer to this question?

 7    I was surprised to learn it, that...

 8              (Feedback.)

 9              THE COURT:  It's that I'm permitting remote access,

10    and I think it's through the remote access.  So it's coming

11    from those listening in.

12              I was surprised to learn this, that some homeowner's

13    policies have exclusions -- or maybe they all do, I don't

14    know -- for willful conduct.  And there is state law that says

15    that willful conduct includes the exercise of self-defense.

16    That was surprising for me to learn.  Do you know what New

17    Jersey law says?

18              MS. REILLY:  I am not familiar with that law, Your

19    Honor.  And if you --

20              THE COURT:  It would change your analysis; would it

21    not?

22              MS. REILLY:  That it says self -- so what I think is

23    at issue here is what the policies cover and what the liability

24    insurance provision is intended to cover is accidental

25    discharges, not intentional conduct, whether that conduct --

 1          THE COURT:  But the core of the -- I don't -- well...

 2          MS. REILLY:  So when you're exercising your right to

 3     self-defense, you are intentionally engaging in conduct.

 4     Whether or not that's justified, that's another issue.  But

 5     what the liability provision is designed to do is to cover

 6     accidental discharges of weapons.

 7          THE COURT:  Okay.

 8          MS. REILLY:  And we see that in the Kochenburger

 9     certification where he defines an occurrence as a defined term

10     which requires it to be an accident.

11          I think the idea is that you don't want to encourage

12     the intentional discharge of a gun at another person by giving

13     the person like oh, well, I shot him.  Like, say it's not

14     self-defense.  Yeah, well, I shot him, but all my costs are

15     going to be covered here.  I think that's what it's trying to

16     get at by focusing only on the accidental because the

17     incentive --

18          THE COURT:  Right.  But I still think you -- and I

19     really don't want to dwell on it, but I think you have a real

20     problem if in the act of self-defense a bystander is harmed.

21          MS. REILLY:  Then that's different.

22          THE COURT:  That would be accidental.  You're

23     exercising your Second Amendment right to self-defense.  And so

24     I can see a parade of horribles.

25          MS. REILLY:  And absolutely.  There's a -- and that

  1    would be a case-by-case determination of intentionality.  And

  2    you see that the New Jersey Supreme Court actually addressed

  3    this issue.  So kids were like firing a BB gun at a car and

  4    they intentionally were firing that gun, but like, oh, my

  5    goodness, the gun, it hit the car and ricocheted into the

  6    driver's eye, blinding them.  And the question was, you know,

  7    was that covered?  And the Supreme Court was like no, he

  8    never -- they never intended to injure the driver, and they

  9    deemed that it was covered under the insurance policy.  But

 10    questions like that are insurance determinations, you know,

 11    they're not Second Amendment determinations.

 12            And then, again, with regard to the plain text

 13    argument, the first prong of *Bruen* there, we would again say

 14    that the plaintiffs have not met their burden of proving that,

 15    you know, merely having insurance falls within the scope of the

 16    Second Amendment.  There -- you know, it's part of the way of

 17    making sure like background checks are of, you know, promoting

 18    safe carry.

 19            And then as the *Sebelius* case stated, the compelled

 20    purchase of the first isn't a regulation of the second.  And

 21    they were saying that in regard to the health insurance

 22    context, but the same principle applies here.

 23            And I would just like to point out with regard to the

 24    surety laws.  You know, as the Rivas declaration says, it was

 25    the common law during Colonial times to have such surety

1    statutes.  Later on, ten jurisdictions actually codified them.

2    Of those ten, two of them, Virginia and West Virginia, didn't

3    require any sort of accusation to be made against the person.

4              And as for the others, they're actually...

5              (Feedback.)

6              They're actually very close to what the State's doing

7    with liability insurance and have the same why and how metrics.

8    So the others, Massachusetts being an example, say on complaint

9    of any person having reason to fear injury or breach of the

10   peace.

11             So what's happening here is under a reasonable person

12   standard saying there's a cause to fear injury from accidental

13   discharge of firearms.  And what the insurance companies do is

14   they calibrate it to the level of risk for each person.

15             So the why, why are we doing this, are the same in

16   both instances.  Why?  We're shifting the cost of any

17   accidental damage away from the victim to the owner, and we're

18   also incentivizing safe carry.  And how are we doing it?  We're

19   doing it by putting -- by putting -- because of the fear of

20   injury of accidental injury.

21             And I won't go into what the State has already

22   addressed --

23             THE COURT:  In your submissions, yes.

24             MS. REILLY:  -- strict liability.  And I would just

25   like to address the criminal penalty if I could for a moment.

1        So I think a useful analogy here is with the -- the

2    National Firearms Act, it causes -- it requires the makers,

3    importers and transferors of firearms to have to pay a

4    registration fee.  And if you don't -- if you're found to have

5    violated that, then you have a $10,000 fine or you face

6    imprisonment for ten years.

7        And so courts addressed that, like is that a burden

8    there?  And they said under federal law on the Second Amendment

9    and said no, because the burden imposed on the National

10   Firearms Act is the tack -- or is the fee...

11        (Feedback.)

12        The burden imposed by the National Firearms Act is

13   the fee itself, not the penalty that the Legislature chooses.

14   The Legislature retains plenary discretion to decide how they

15   want to make the penalty by the degree of enforcement that they

16   want to have.

17        Does Your Honor have any specific questions?

18        THE COURT:  I don't.  Thank you.

19        MS. REILLY:  Okay.  Any questions on the permit

20   disqualifiers or the dangerous standard or the First Amendment

21   claims that plaintiffs raise?

22        THE COURT:  I don't have any further -- I have one

23   last question for you, Ms. Reilly.  Thank you.  How do you

24   define unjustifiable display?

25        MS. REILLY:  Yes, Your Honor.

*United States District Court*
*District of New Jersey*

```
 1              THE COURT:  And who decides it?
 2              MS. REILLY:  So, first of all, Your Honor, I'd like
 3    to just start with the standard.  Under the vagueness standard,
 4    if it's a facial challenge, as we have here, plaintiffs have to
 5    prove that it's vague in all of its applications.  It's okay
 6    it's imprecise, as long as it's comprehensible.  It just has
 7    to --
 8              THE COURT:  So let's just spend a minute on it.  What
 9    is an unjustified display?
10              MS. REILLY:  Okay.  So --
11              THE COURT:  And can it be -- can one officer believe
12    that it's unjustified and another believe that it is?
13              MS. REILLY:  So, Your Honor, I'll give the simplified
14    answer first and then I'll be happy to go back and go into the
15    text to see how we got there.
16              So the simple answer is unjustified display is a
17    knowing display of a firearm outside of the holster for a
18    purpose other than self-defense.
19              THE COURT:  Is it a strict liability offense?
20              MS. REILLY:  It's a knowing display.
21              THE COURT:  Okay.  So it's not a strict liability?
22              MS. REILLY:  It is not.  And the way we get there
23    is -- so under the criminal code 2C:2-2(c)(3), if the mens rea
24    is not specified, then it's knowingly.  And then under the
25    criminal code 2C:2-2(b)(2), knowingly means either the person
```

1    is aware or they have -- that, you know, such circumstances

2    exist or they're aware that there's a high probability of their

3    existence.

4            And then to look at the text of Chapter 131 itself,

5    section 3(a) defines how you have to carry.  You have to carry

6    in a holster.  And then section 3(h) gives the holster

7    specifications.  It has to be a sheath that securely retains

8    the handgun.  The main body of the firearm has to be concealed,

9    and the trigger has to be covered and inaccessible.

10           And then section 3A again exempts sort of brief

11   incidental exposure.  So it expressly says like, okay, so your

12   clothing shifted while, you know, you were moving, that doesn't

13   count.  If it's a brief incidental exposure, does not count.

14   And then what is a justifiable purpose?  We know what a

15   justifiable purpose is from *Bruen* and *Heller* saying that the

16   core of the Second Amendment is your right to self-defense.  So

17   the simple definition again is a knowing display of a firearm

18   outside of the holster for a purpose other than self-defense.

19           And if it would be helpful for me to give a few

20   examples of sort of what's in and out there.

21           THE COURT:  Well, let me just ask:  Who decides

22   whether or not it was self-defense, the police officer or the

23   holder?

24           MS. REILLY:  And, again, on any individual challenge,

25   and there's always going to be some like hypotheticals, well,

```
 1   what about this, what about that, but under the facial

 2   challenge that they've brought, they have to show it's vague in

 3   all of its applications.  And I think we would all agree if

 4   someone, despite the holster carry requirements and despite the

 5   self-defense requirement, were to go into the parent-teacher

 6   meeting and unholster their gun and put it on the desk and say

 7   I would like to discuss with you my daughter's grade in

 8   history, is that used for self-defense?  No.

 9            What if a person were to be like, oh, my goodness,

10   this is so cool, I just got my new gun and they're outside with

11   their friend in public and they're spinning it on -- it's not

12   in the holster, they're spinning it on their finger or they're

13   like here, look at this, passing it around where it could drop,

14   things like that, I think we could all agree that that would be

15   an unjustified display of the handgun because it's not in the

16   holster and it's not for purposes of self-defense.

17            THE COURT:  Right.

18            MS. REILLY:  So I think the State has --

19            THE COURT:  I think what this illustrates though is I

20   think that there is some room for disagreement.  Can we agree

21   on that?

22            MS. REILLY:  And -- and that is fine under the

23   vagueness standard.  You know, even if there's a, you know, it

24   just has to give fair notice of...

25            (Feedback.)
```

```
 1            THE COURT:  Of what the legislation prohibits, yes.
 2            MS. REILLY:  Yeah.  And it's fine if it is imprecise.
 3    It's fine if it's imprecise but comprehensible enough.  And
 4    that's the Fullmer, Third Circuit.
 5            And as the U.S. Supreme Court said in Colten, like
 6    just because we have practical difficulties in sort of drafting
 7    a statute so it's not too general, but it's also not so
 8    specific that you don't get -- you know, capture all the
 9    conduct you want, that does not raise it into a constitutional
10    challenge.
11            So I think the State has proven all it needs to with
12    regard to vagueness.
13            THE COURT:  Okay.  Thank you, Ms. Reilly.  You may
14    step down.  Thank you.
15            Okay.  Mr. Kologi, if you could limit your comments,
16    please, to those that you have not already made in your briefs.
17            MR. KOLOGI:  Your Honor, I promise that I will not be
18    duplicative in any way, shape or form, to an extent I can.
19            THE COURT:  Okay.
20            MR. KOLOGI:  Judge, at the outset, I trust that in
21    Your Honor's career, you've dealt with many situations where
22    you're dealing with a challenge to a local piece of legislation
23    either at the ordinance level, the county level, regulations,
24    the state level, a statute, and very often they're drafted in a
25    very cursory, I'll say, you know, just not a really
```

1   well-drafted document, which makes it much harder for the Court

2   to answer a lot of questions and discern things it has to

3   discern.  That's not the case here.  We're here on behalf of

4   the Assembly Speaker and the Senate President.  And what I am

5   offering to the Court is on its face, this document, the bill

6   that we're talking about, goes light years ahead of where most

7   legislation goes in terms of its drafting.

8           Section 1, this lengthy preamble, number one, it

9   recognizes *Bruen* is controlling.  Number two, it does away with

10  justifiable need.  Number three, it recognizes the need to deal

11  with historical analogs.  So on its face, this is a good, solid

12  piece of legislation.  It's followed the protocols.  The issue

13  is going to be, does the Court agree with the historical

14  analogs.  At the end of the day, that's pretty much what it's

15  going to --

16          THE COURT:  I do want to back up to the preamble

17  though, Mr. Kologi, because I do think the legislation

18  misrepresents the Johns Hopkins study.  I was disappointed to

19  see that.  I think it misrepresents what the Johns Hopkins

20  study said.  Because the analysis in the Johns Hopkins study

21  dealt with going from a "shall" issue to a permitless state,

22  and that's what the focus of that study was, which is not what

23  we have here.

24          So I was disappointed to see that the Legislature

25  would put in its legislation a study that really is not

 1    applicable to the legislation.  And the study is alarming, but

 2    it's not applicable here.

 3              I guess I say that as an observation.  But I think

 4    that if the State's going to rely upon the Johns Hopkins study,

 5    it should characterize it correctly, and I'll leave it at that.

 6              MR. KOLOGI:  Judge, I will certainly, you know,

 7    acknowledge that.  And without having the whole study in front

 8    of me, that, you know, there could be different

 9    interpretations.  I take Your Honor's point, and I will

10    certainly, you know, review that further.

11              As I said, at the end of the day, it's going to be up

12    to this Court to determine whether the historical analogs fit.

13    But the point is, the State has followed the process and has

14    basically agreed to the process that we're following, which is

15    probably a lot more than Your Honor gets in many other cases

16    involving legislation.

17              Now, Judge, I'd like to address something that really

18    is being addressed for the first time here today, and again,

19    keeping in mind, we're here today for the limited purpose of a

20    preliminary injunction.  We're not here to litigate the whole

21    case, although I've heard a lot of great stuff and there's a

22    lot of great stuff in the record.  But the limited purpose of

23    us here today is the preliminary injunction.  And under the

24    *Riley* case, obviously there's four prongs, and the plaintiffs

25    have to -- actually, the one plaintiff has to satisfy four of

```
 1   them.
 2              My understanding is that the Koons plaintiffs are not
 3   seeking anything on the insurance issue, on 4A, only the Siegel
 4   plaintiffs are.  And I believe I'm correct on that.  I think
 5   the Koons plaintiffs submitted two certifications or
 6   declarations which basically supported standing, but they are
 7   not into the merits of it.
 8              And if you look at the submissions, number one,
 9   today, I heard nothing -- the silence was deafening -- I heard
10   nothing in the proffers by plaintiffs' attorney about the
11   insurance issue.
12              Number two, if you look at the submissions, the
13   totality of the --
14              THE COURT:  Well, I want to be fair to all of you.  I
15   did cut some of you off.  Some of you I told you I wasn't
16   interested in hearing.  So just because they didn't talk about
17   it doesn't mean they don't care about it.
18              MR. KOLOGI:  Okay.  Just pointing it out for the
19   record, Your Honor.
20              If Your Honor takes a look at the brief, and I
21   believe it's page 16 of the Siegel brief, it's less than a
22   page, it's like a half a page on one, another half a page on
23   the next one, maybe 16 and 17, and it basically just gives a
24   kind of conclusory net opinion argument that, well, the
25   insurance will be more expensive.  That is basically the
```

1   totality, to my knowledge, of what has been submitted on this

2   issue of insurance.  And I submit that, you know, obviously

3   they have to prove a likelihood of success on the merits.

4          Now, looking at what we have provided the Court with,

5   number one, again, this is the first time it's being argued, so

6   there's really not a lot here.  But if you compare it to the

7   allegations in the complaint that the insurance would impose a

8   crushing financial burden, there's a substantial financial

9   burden, there are insurance requirements that have no precedent

10  in history.  And I've got all the pages and the cites, but

11  these are all in the Siegel complaint.

12         Our position is that the insurance requirement is no

13  different in terms of substance than any of the other minor or

14  significant requirements of licensure, firearms training

15  course, fingerprinting, background checks and all that other

16  type of thing.

17         And the plaintiffs who have the burden have not come

18  forward with anything to dispute that, which goes, again,

19  directly to the issue of their ability to carry this matter on

20  the merits.  The Kochenburger certification, and, Your Honor,

21  you brought --

22         (Feedback.)

23         THE COURT:  Go ahead.

24         MR. KOLOGI:  You brought up a great point which I'm

25  going to get to momentarily, but if I'm saying his name right,

1   the Kochenburger certification basically says that coverage for

2   accidental firearms injuries, deaths, et cetera, are under most

3   homeowner's insurance policies and that he is unaware of any

4   that had any exclusions.

5            Now, I understand Your Honor's comments earlier that

6   it had come to your attention.  That was the first I heard that

7   because I didn't see it in the paperwork.  But I know from

8   years of being a little bit of a PI lawyer that there's a whole

9   body of law on what is an intentional act in the context of did

10  you intend to do the act vis-a-vis intend to bring about the

11  result.  And I think the deputy attorney general, the BB gun

12  example was very illustrative of that fact.  You could shoot at

13  a car with a BB gun and it somehow ricochets and you hit the

14  guy in the eye.  So you intended to do the act but not the

15  result.  There's a whole body of case law on that.  And since I

16  just heard it for the first time, I'm not in a position to

17  argue it, but it certainly is an issue.

18           But the point is, in the papers that are before Your

19  Honor today, you know, there is nothing other than everything

20  that we've given and a net allegation by the other side that

21  it's going to be expensive.

22           And, again, we are viewing this.  Now, if Your Honor

23  somehow viewed this differently that this impacted -- we're

24  saying this does not impact on the Second Amendment.  This is

25  not something that goes -- you know, it's not an infringement

      1    on the Second Amendment.  It doesn't violate your ability to

      2    carry a gun, to transport a gun, to fire a gun, to do anything

      3    like that.  This is another paperwork type of requirement.  And

      4    that's all it is.  And to characterize it as anything else, you

      5    know, I think would be really taking it out of context.

      6         Now, if for whatever reason Your Honor found that it

      7    did impact on the Second Amendment, then Your Honor would have

      8    to get into the analogs and we have the surety analogs and we

      9    have all of that stuff, and I'm not going to beat the horse to

     10    death on that now.  You've got thousands of pages, and

     11    certainly it's all in there.  But I think when we look at the

     12    big picture here, there is nothing to defeat allowing the

     13    insurance requirement to continue.  And I would ask that you

     14    allow that to continue and not issue any injunctive relief on

     15    that.

     16         My last point, Judge, and it's in point three of our

     17    brief, two of the factors that are required under *Riley* is the

     18    possibility of harm to other parties and the public interest.

     19    I understand Your Honor is, you know -- and unfortunately, I

     20    have it here in my notes, the Johns Hopkins study, and there's

     21    another study.  But to the extent our position is that those

     22    studies indicate, no matter how you read them, that the states

     23    that have let's say lightened up on the requirements of gun

     24    carrying have had an increase in gun-related incidents.  I

     25    mean, I think it seems like a reasonable inference to be drawn.

```
 1    You're not going to have less inference -- less of a problem.
 2    The more guns out there, it shouldn't go down.  It should, you
 3    know, likely go up.  And these two studies that are cited in
 4    our brief support that proposition.
 5            If that's the case, we're talking about -- I mean,
 6    guns only have two functions -- to kill or to seriously injure.
 7    So if you have a situation where the danger to the public --
 8            THE COURT:  You forgot the right to self-defense.
 9            MR. KOLOGI:  I'm sorry, Your Honor?
10            THE COURT:  You forgot about the right to
11    self-defense.  You said guns only have two functions -- to kill
12    or to seriously injure.  But you forgot about the right to
13    self-defense.
14            MR. KOLOGI:  Well, let me qualify it.  The gun
15    itself, the metal object that has the cylinders or that's the
16    automatic, there's only two things that that could do if it
17    makes contact with somebody.  It's either going to injure them
18    or kill them, okay.
19            THE COURT:  Or defend the --
20            MR. KOLOGI:  The purpose of using it --
21            THE COURT:  Excuse me.
22            MR. KOLOGI:  I'm sorry, Your Honor.
23            THE COURT:  Or to defend the person.
24            MR. KOLOGI:  Well, I would say that goes to the
25    purpose as opposed to the mechanics, but I defer to Your
```

 1   Honor's -- I think we're saying the same thing.

 2              THE COURT:  Well, I hope we are.  But I think it's

 3   important to the conversation that we be careful with the words

 4   we use.

 5              Do guns kill?  Yes.  Do guns give someone the right

 6   to self-defense?  Yes.  So I think it's important that when we

 7   have this conversation, we have a fair one.  That's all I'm

 8   saying.

 9              MR. KOLOGI:  Judge, I certainly didn't mean to not be

10   fair.  But the point is, there's no coming back from it.  The

11   danger to the public and the danger to other people, whether

12   it's a death by a gun or a serious injury by a gun, right,

13   wrong or indifferent, at the end of the day there's no coming

14   back from that.  So that is the factor that we're saying how

15   can you possibly say that there's not a public interest in not

16   having gun-related deaths or gun-related injuries?

17              THE COURT:  I don't think anyone is saying that,

18   Mr. Kologi.  In fairness to the plaintiffs, I don't think these

19   plaintiffs are standing before this Court or any court and

20   saying that that's not a public interest.  I don't think that's

21   what they're saying.

22              MR. KOLOGI:  But to get a TRO, they would have to

23   demonstrate to Your Honor's satisfaction that there is no

24   adverse public interest to people carrying guns.

25              THE COURT:  Say it again.  Try it again.

```
 1              MR. KOLOGI:  I'm sorry.  I said TRO.  To get a
 2   preliminary injunction today to meet those other two prongs,
 3   would they not have to demonstrate that there is no significant
 4   adversity to the public interest or to the safety of others?  I
 5   think our conversation was just, I mean, it clearly is.
 6              THE COURT:  Well, I think the law requires a
 7   balancing of the interest.  It's not an either -- it's not a
 8   none or all.  It's a balancing of the interest.  And so clearly
 9   the State has, as it has argued, has a right to protect its
10   citizens.  And the plaintiffs have a right to self-defense
11   under the Second Amendment.  And so it's not an all-or-nothing.
12   You seem to be saying it's an all-or-nothing.  It isn't.  It's
13   a balancing of.  And that's what the law requires, the
14   balancing of the equities.
15              MR. KOLOGI:  Well, again, Judge, if we balance the
16   equities, I didn't really want to get into balancing, but if
17   we're going to do it, that's fine.
18              THE COURT:  But that's what the factor is, though,
19   yeah.
20              MR. KOLOGI:  Okay.  But the balancing on the side of
21   the gun owner is I'm not going to be able to carry my gun into
22   this particular place.  I can carry it.  I can carry it a lot
23   of places.  This particular place I can't carry it.  The
24   balance in terms of the injury to the other person is there's
25   either a death or a serious injury, or the significant
```

```
 1    potential for a death or a serious injury.  So when you weigh
 2    the two, I mean, I wouldn't use the word "inconvenience"
 3    because we're talking about a significant constitutional right,
 4    but just for the purposes of our argument with a small eye.
 5              THE COURT:  Okay.  So you seem to be saying -- and
 6    let me see if I can ask the question this way, because we're
 7    talking about the balancing of the equities -- you seem to be
 8    saying to me that there is no difference between a law-abiding
 9    citizen who fulfills the requirements that the legislation
10    requires to obtain a carry permit versus those who do not.
11    That's what you seem to be saying to me.  Who's more dangerous?
12              MR. KOLOGI:  Well, Judge, I mean, you've
13    characterized it in a broader sense than I think what we spoke
14    about.  I would just like to make it more limited, that when
15    we're talking about something where the possibility on one side
16    of the scale is a death or a serious injury, to me that is a
17    significant problem for the public safety and for affected
18    people.
19              When we're talking about the balancing on the other
20    side is I can't bring my gun into this particular place.  And
21    again, this isn't forever.  We're only here today on a
22    preliminary injunction.
23              THE COURT:  No, no.  But I really want to hold you to
24    it, because you don't seem to be making a distinction between
25    the types of plaintiffs here who have gone through these
```

1    rigorous requirements and have obtained a carry permit to

2    felons who haven't.  You just seem to be saying well, anyone

3    who walks into a restaurant and there's a death versus a

4    non-death, that's the analysis, but I don't think that's a fair

5    analysis.  I don't think that's the fair analysis that this

6    Court should be doing, unless you're going to tell me, maybe

7    this is the better question, do you have evidence to support

8    the position that there is an increased -- that there is

9    increased violence by issuing more permits in the manner that

10   this legislation requires?  Do you have that evidence?

11            MR. KOLOGI:  Well, Judge, there will be no evidence,

12   and I think this was brought up earlier in either the paperwork

13   or a transcript, in New Jersey because this is a relatively new

14   statute.  And government being what it is, statistics wouldn't

15   be compiled.  So we have to look to extrinsic sources.  Of

16   course, one of the sources I was going to cite was the Johns

17   Hopkins study, and then there was a second study.

18            THE COURT:  Right.  Just to be clear, the reason I'm

19   taking you a little bit to task on the Johns Hopkins study is

20   that in that study, they analyzed going to a permitless

21   scenario.  We don't have that here.  This legislation requires

22   a very rigorous, extensive background permit process.

23            So I think it's unfair to say look at these studies

24   and look at the increase in shootings and officer involvement

25   when they don't apply to the facts of this case.  That's what I

```
 1   want you to focus on.
 2           MR. KOLOGI:  Well, Judge, if you're asking me to
 3   articulate what are the dangers to the public interest and to
 4   individuals, we thought that obviously injury or death by
 5   firearms are the most significant.  I don't have anything in
 6   front of me at the moment in addition to that.  But we think
 7   that that, you know, is the gravamen of the issue.  I'm sorry
 8   if I, respectfully, am not responding, or I'm not meaning to
 9   disagree with you.  I'm just saying that that's our viewpoint
10   of it.
11           THE COURT:  No.  I think that -- I guess to sum it
12   up, your viewpoint is that when there's more guns, there's more
13   violence, that's it.  In a nutshell, that's what you're saying,
14   regardless of how those guns are obtained, whether lawfully
15   through law-abiding citizens, such as the plaintiffs here, or
16   through felons, because there's more guns, there's more
17   violence.  And that's the analysis you want me to engage in,
18   right?
19           MR. KOLOGI:  Well, that's correct, Your Honor.
20           THE COURT:  But that's not the record before me.  The
21   record before me is I have to look at the evidence, it seems to
22   me, when I look at the balancing of the equities under the law,
23   is it has to be -- it has to deal with the evidence that
24   relates to law-abiding citizens who obtain carry permits.
25           MR. KOLOGI:  Well, Judge --
```

```
 1              THE COURT:  It just seems to me.  Maybe we're saying
 2    the same thing, and maybe we're going in circles.  I don't
 3    know.
 4              MR. KOLOGI:  I think we're pretty much -- I just need
 5    to get a little clarification from the Court, if I may.
 6              THE COURT:  Yeah.
 7              MR. KOLOGI:  They have the burden of proving prongs
 8    three and four, the public interest and the injury to other
 9    people.
10              THE COURT:  Yes.
11              MR. KOLOGI:  We just gave you what we believe are the
12    most compelling examples of that, death, serious injury.
13              I don't know if the Court's saying they don't have to
14    prove that now.  I'm just trying to understand Your Honor's
15    process.  I'm sorry.
16              THE COURT:  No.  But -- because I think that in your
17    comments, when you make those kinds of comments, you are asking
18    this Court to presume that those who have valid carry permits
19    will somehow engage in violence.  And I think that is a step
20    taken too far unless you can show me evidence of such.
21              MR. KOLOGI:  Judge, I will say that that is not what
22    I'm asking.  What I'm asking is the Court to rely on the
23    studies that were submitted because we don't have any actual
24    empirical data from New Jersey or statistics.  It's too soon.
25    I'm asking the Court to rely on the studies submitted for the
```

 1   general proposition that the more guns out there, the more gun

 2   incidents, the more likely there's going to be deaths or

 3   there's going to be injuries, that's it.

 4          THE COURT:  And that --

 5          MR. KOLOGI:  I'm not saying it's going to come from

 6   law-abiding citizens.  They could be law abiding 364 days a

 7   year and on that one day go awry, you know.

 8          THE COURT:  Okay.  And that helps clarify it.

 9          MR. KOLOGI:  I appreciate it, Judge.  Thank you.

10          THE COURT:  That is how I understood your argument.

11   Because in a nutshell, it is the State's position that there

12   should be no guns?

13          MR. KOLOGI:  I'm getting less articulate as I'm

14   getting older, but thank you for reaching out for it.

15          THE COURT:  Yes.  Okay.

16          MR. KOLOGI:  Judge, that's the essence of my

17   submission.  We're going to rely on everything -- I mean, the

18   Attorney General's Office and the Deputy Solicitor General did

19   a phenomenal job, I mean, pelting this Court.  At the TRO

20   stage, you had this much to work with.  I think you've got

21   quite a bit more now, which, in my mind, would enable the Court

22   to, you know, obviously potentially reach different conclusions

23   than at the TRO.

24          And with that, I will sit down unless you have any

25   other questions.

*United States District Court*
*District of New Jersey*

```
 1              THE COURT:  Thank you, Mr. Kologi.

 2              MR. KOLOGI:  Thank you, Judge.  Nice to see you.

 3              THE COURT:  Nice to see you.  Nice to see all of you.

 4     We have gone very long.  It's now four hours.  I am very

 5     appreciative of all of the hard work that you've all done and

 6     the great advocacy that you have all done on behalf of your

 7     clients.

 8              I don't want to deprive the plaintiffs of their

 9     responsibility to respond, but it is late.  We're all getting a

10     little tired.  Here's what I'm going to do:  I'm going to give

11     you an opportunity to give me a submission, no more than eight

12     pages per side, of anything you want to respond to that was

13     said here today, all right?  And by eight pages, I mean eight

14     pages, no exhibits, no -- okay.  Eight pages.

15              There were one or two areas where I thought I would

16     want further briefing, and I can't remember what they are.

17              Yes, Mr. Schmutter.

18              MR. SCHMUTTER:  Judge, I think you wanted additional

19     briefing on the enumeration of disqualifying categories versus

20     the ad hoc, right?

21              THE COURT:  Okay.  So I'll give you a couple more

22     pages on that, and a couple more pages on that, Ms. Cai, in

23     response.  But it's eight, and so if you add that, then I'll

24     make it ten and ten, okay?

25              MR. SCHMUTTER:  So, Judge, I have a question about
```

```
 1    the enumeration versus ad hoc.  What exactly does Your Honor
 2    want to know?  Our contention about what other states do and
 3    what New Jersey does or --
 4              THE COURT:  Well, as I recall, I was asking you
 5    questions about, well, what are you really expecting the State
 6    to do?  You don't like the language that's in the legislation,
 7    and your comments to me were, well, other states do it so why
 8    can't New Jersey?  I would be interested to see what it is that
 9    you are speaking of.
10              MR. SCHMUTTER:  Okay.  Thank you, Judge.
11              MS. CAI:  Okay.  Your Honor, two questions.  Ten
12    pages, single- or double-spaced?  And what date would you like
13    the submissions?  There's a huge difference in terms of how
14    much you would have to read, Your Honor, so...
15              THE COURT:  Double-spaced, please.  Ten days, a week.
16    I don't -- most respectfully, I don't want the State telling me
17    I'm taking too long.  So how much time do you want?
18              (Laughter.)
19              THE COURT:  Ms. Cai, I'll let you set the date.
20              MS. CAI:  Sure, Your Honor.  How about -- we're happy
21    to do it sooner rather than later.  So whatever date Your Honor
22    wants.  Next Wednesday would be fine with us.
23              THE COURT:  I won't get to it by Wednesday, so make
24    it next Friday.
25              MS. CAI:  Okay.  That's fine, Your Honor.
```

```
 1              THE COURT:  Next Friday, okay?  Yes?

 2              MR. JENSEN:  All right.  Two things.  Could I maybe

 3   please ask for Monday because I was supposed to be on vacation

 4   all day next week?

 5              THE COURT:  For what?

 6              MS. CAI:  Of course.

 7              THE COURT:  Ms. Cai said yes.  Thank you.

 8              MR. JENSEN:  Second thing, we really need to do

 9   something to brief this gun definition issue a little more.

10   Could we also get --

11              THE COURT:  I really don't think you do.

12              MR. JENSEN:  You don't think so?

13              THE COURT:  No.

14              MR. JENSEN:  All right.

15              MR. SCHMUTTER:  Judge, I'm sorry.  Are we

16   simultaneously submitting on Monday?

17              THE COURT:  Yes.  Yeah.  I'm not going to have you

18   two going back and forth.  You folks can't hardly agree on

19   anything.

20              (Laughter.)

21              MR. KOLOGI:  Your Honor, will a text order follow

22   embodying what you want?

23              THE COURT:  No; wasn't planning on it.

24              MR. KOLOGI:  Or we're relying on our notes?

25              THE COURT:  Yeah, you're relying on your notes.
```

1                 MR. KOLOGI:  Thank you.

2                 THE COURT:  And you'll have the transcript.  I

3       presume you're ordering it.

4                 MR. SCHMUTTER:  And it's ten pages, not eight,

5       correct?

6                 THE COURT:  I'm giving you ten if you're addressing

7       this issue which I would like further briefing on, yeah.

8                 MR. SCHMUTTER:  Yes.  Okay.

9                 THE COURT:  Ms. Cai, you had said something in your

10      oral argument, and I think I may have intimated I wanted

11      further briefing on it, so when you review the transcript, look

12      and see.

13                MS. CAI:  Yes, Your Honor.

14                THE COURT:  Just try to include that, because it's

15      obviously something I would be interested in if I said that to

16      you, so...

17                Okay.  I thank you all.  It's great to see you all.

18      Okay.  I'll take it under advisement.  Thank you.

19                MR. JENSEN:  Thank you, Your Honor.

20                MR. SCHMUTTER:  Thank you, Judge.

21                THE COURTROOM DEPUTY:  All rise.

22                (Proceedings concluded at 2:15 p.m.)

23           - - - - - - - - - - - - - - - - - - - - - -
             **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**
24           - - - - - - - - - - - - - - - - - - - - - -

25           I certify that the foregoing is a correct transcript

                        *United States District Court*
                         *District of New Jersey*

1    from the record of proceedings in the above-entitled matter.

2

3

4    /S/John J. Kurz, RDR-RMR-CRR-CRC                March 18, 2023

5    Court Reporter/Transcriber

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*