

**State of New Jersey**

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
PO BOX 080
TRENTON, NJ 08625-0080

PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

MATTHEW J. PLATKIN
*Attorney General*

March 27, 2023

The Honorable Renée Marie Bumb, U.S.D.J.
United States District Court for the District of New Jersey
Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101

Re:   *Siegel v. Platkin*, 22-cv-7463; *Koons v. Platkin*, 22-cv-7464

Dear Chief Judge Bumb,

State Defendants submit this supplemental letter brief, pursuant to the Court's March 17 order, to briefly address eight discrete issues.

1. The State submits the following citations—all of which were decided after the State submitted its PI brief on February 13 (D.E. 91)—for the Court's consideration.[1]

---

[1] The State also notes two pending submissions in other cases that include historical evidence that support various aspects of Chapter 131. First, the United States has filed a cert petition to the Supreme Court in *United States v. Rahimi*, No. 22-915, https://tinyurl.com/yxafja2s, which highlights historical evidence supporting firearms restrictions for dangerous individuals. Second, Fairfax County and its Chief of Police have submitted a PI opposition brief in *Lafave v. Fairfax County*, No. 2021 01569 (Fairfax Cty, Va.), a challenge to ordinances that restrict firearms at county parks and events requiring a permit. Included in that submission are additional examples of historical prohibitions at parks, such as: *Annual Report of the Brooklyn Park Comm'rs 1861-73*, Ord. No. 1,



- *NRA v. Bondi*, No. 21-12314, 2023 WL 2484818 (11th Cir. Mar. 9, 2023) (finding that focus on Reconstruction era evidence of the meaning of the Second Amendment is appropriate in upholding a Florida firearms statute barring those under 21 from purchasing firearms).

- *Frey v. Nigrelli*, No. 21-cv-5334, 2023 WL 2473375 (S.D.N.Y. Mar. 13, 2023) (upholding sensitive-place restrictions on Times Square and on New York City subways, citing historical evidence similar to the State's evidence in the instant case and evidence of private railroad firearm restrictions in late 19th century).

- *In re Appeal of Denial M.U.'s App.*, No. A-2535-20, 2023 WL 2577324 (N.J. App. Div. Mar. 21, 2023) (upholding predecessor version of N.J.S.A. 2C:58-3(c)(5)'s health, safety, and welfare provision (updated in Section 2(c)(5) of Chapter 131) against Second Amendment and vagueness challenges).

- *Giambalvo v. Suffolk Cnty.*, No. 22-cv-4778 2023 WL 2050803, at *5 (E.D.N.Y. Feb. 14, 2023) (rejecting challenge to firearms permit requirements, reiterating "to establish standing to challenge the State's licensing system, plaintiffs must demonstrate that they have complied with the requisites of that system").

2. Contrary to Plaintiffs' assertion, *see* 3/17/23 Tr. of PI Arg. at 66, New Jersey's "danger to self or others" permit disqualifier is not unusual. Twelve states that the *Bruen* Court listed in its footnote 1 as permissible "shall-issue" jurisdictions have similar disqualifiers.[2] And nine states have provisions similar to New Jersey's provision that denies

---

https://bit.ly/3EG6M8g; *San Francisco Mun. Reports for the Fiscal Year 1874-75*, at 887, § 2(2), https://bit.ly/3YcWZgO; *Digest of Ord. of Town Council of Phoenixville, Pa.* at 135, § 4 (1878), http://bit.ly/3EN9iJZ; *City of Trenton, Charter & Ords.* at 390, § 8 (1890), http://bit.ly/3ZuIJB9, *Report of the Bd. of Comm'r of Rochester 1888-98*, at 98, § 4 (25), http://bit.ly/3KJy3KX.

[2] *See* Ala. Code § 13A-11-75 (considering whether permit applicant "causes justifiable concern for public safety"); Ariz. Rev. Stat. Ann. § 13-3101 (persons "unqualified" include those who poses "danger to self or to others"); Colo. Rev. Stat. § 18-12-203(2) (likelihood to "present a danger to self or others" basis for permit denial); Ill. Comp. Stat. Ann., ch. 430, 66/10(a)(4) (permit permissible only if applicant "does not pose a danger to himself, herself, or others, or a threat to public safety"); Iowa Code Ann. § 724.8(3) (no permit if "probable cause exists" that carry "would endanger the person's self or others"); Me. Rev. Stat. Ann., Tit. 25, § 2003(4)(C) (no permit if applicant has "engaged in reckless or negligent conduct"); Minn. Stat. Ann. § 624.714(6)(3) (permit denied if sheriff finds

a carry permit when "issuance would not be in the interest of the public health, safety or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm." Ch. 131, § 2(c)(5).[3]

Historical evidence also contradicts Plaintiffs' assertion, Tr. at 63, that there is no historical tradition for an overall dangerousness assessment. *See* State's PI Opp. Br. 87 (citing, *inter alia*, proposal of the Minority of the Convention of the State of Pennsylvania—cited in *District of Columbia v. Heller*, 554 U.S. 570, 604 (2008) as "highly influential" to drafting of Bill of Rights—which provided: "The people have a right to bear arms … unless for crimes committed, or real danger of public injury from individuals"); *see also* 1777 N.J. Laws 90, https://tinyurl.com/ysmyvvzj (empowering officials to "take from such Persons as they shall judge disaffected and dangerous to the present

---

"substantial likelihood that the applicant is a danger to self or the public"); Mo. Rev. Stat. § 571.101(7) (no permit if sheriff has "reasonable belief that the applicant presents a danger to himself or others"); Mont. Code Ann. § 45-8-321(2) (no permit if applicant "may be a threat to the peace and good order of the community"); 18 Pa. Cons. Stat. § 6109(d)(3) (no permit if applicant is "likely to act in a manner dangerous to public safety"); Utah Code Ann. § 53-5-704 (no permit if "reasonable cause to believe" applicant "has been or is a danger to self or others"); Va. Code. § 18.2-308.09(13) (applicants disqualified if found "likely to use a weapon unlawfully or negligently to endanger others").

[3] *See* Cal. Penal Code § 26170(a) ("good moral character"); Conn. Gen. Stat. § 29–28(b) ("suitable person"); Del. Code Ann., Tit. 11, § 1441 ("good moral character"); D.C. Code Ann. § 22-4506(a) ("suitable person"); Ga. Code Ann. § 16-11-129(d)(4) ("good moral character"); Haw. Rev. Stat. Ann. § 134-9(a) ("good moral character"); Ind. Code § 35-47-2-3(g) ("good character and reputation"); Mass. Gen. Laws Ann. ch. 140, § 131 ("unsuitable"); R.I. Gen. Laws § 11-47-11 (not "suitable"). Notably, Georgia was listed as a permissible shall-issue jurisdiction in *Bruen*'s footnote 1, and the Court found that the Connecticut, Delaware, and Rhode Island statutes operated like those in shall-issue states. 142 S. Ct. 2111, 2123, n.1 (quoting approvingly the "essential character of temperament" standard in *Dwyer v. Farrell*, 475 A.2d 257, 260 (Conn. 1984)).

Government, all the Arms, Accoutrements and Ammunition which they own or possess"); Cong. Globe, 39th Cong., 1st Sess. 908-909 (1866) (order that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms," cited by *Bruen*, 142 S. Ct. at 2151). As the Third Circuit observed in *United States v. Boyd*, 999 F.3d 171, 186 (3d Cir. 2021), under the "step one" analysis later preserved in *Bruen*, there is "longstanding historical support demonstrating that legislatures have the power to prohibit dangerous people from possessing guns, including dangerous people who have not been convicted of felonies." (internal quotation and citation omitted).

3. At oral argument, Tr. at 112, the Court inquired whether the government-as-proprietor doctrine turns on whether the government's restriction is posted on a sign or enforced via legislation or regulation. It does not. A government entity may express its "rights of an ordinary proprietor," *Camfield v. United States*, 167 US 518, 524 (1897), in myriad ways, and there is no principle of law suggesting that it may not do so in a state statute, city ordinance, or administrative regulation instead of or in addition to a posted physical sign. *See, e.g.*, N.J.A.C. § 19:76-1.1 et seq. (state regulation listing myriad rules of operations for Atlantic City Airport); N.J.A.C Code § 19:9-1.30 (same for Arts Center amphitheater); N.J.A.C. § 19:9-1.31 (same for Vietnam Veterans Memorial).

Caselaw cited in the State's PI brief confirms the same. For example, in *Greer v. Spock*, 424 U.S. 828, 831-33, n.3 (1976), the prohibitions on political speech were expressed in three places: regulations promulgated by the U.S. Department of the Army, regulations issued by the military base itself, *and* in physical no-solicitation signs on the premises. The

Supreme Court rejected a request to enjoin the base regulations, on the basis that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 836 (citation omitted). And as the State noted at oral argument, Tr. at 115-16, the D.C. Circuit invoked the government-as-proprietor doctrine to reject a challenge to a federal statute, 40 U.S.C. § 5104(e)(1), which prohibited weapons at any capitol grounds—including the parking lot. *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019). The Court explained that "as the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property." *Id*. Neither of these cases involved prosecuting a violator for trespass, but that did not make the government's proprietary role over the premise any less valid. That the government can express its premises policies in legislation or regulation while a private owner can only do so in signage, websites, and the like does not alter the basic premise: that the underlying *right* of the government as a proprietor to exclude is the same as that of an ordinary owner.[4]

    4.  This Court inquired what qualifies as a "public transportation hub" under Chapter 131, Section 7(a)(20). As the State noted at oral argument, and other statutes confirm, public transportation hubs are facilities that connect multiple modes of public transportation. Tr. at 103-04. For example, New Jersey law states that a "hub of a regional

---

[4] Indeed, any holding that suggests a state statute *cannot* set a premise-specific policy regarding firearms for government-owned property, and that the decision must instead be left to specific signage, would mean that the Legislature could not play a role in that process—a significant intrusion by a federal court into state separation of powers.

transportation system" is one "in which the various modes of travel are integrated and coordinated." N.J. Stat. Ann. § 52:9Q-15; *see also* 49 U.S.C. 47101(b)(5) (noting transportation hubs "connect different forms of appropriate transportation" and provide "links to other forms of transportation"). Courts have similarly construed public transit hubs as those that connect different modes of transportation. *See Secaucus v. United States DOT*, 889 F. Supp. 779, 781, 783-85 (D.N.J. 1995) (characterizing Secaucus Junction as a transit hub); *State v. Gartrell*, A-1470-21, 2022 WL 6833767, at *6 (N.J. App. Div. Oct. 12, 2022) (noting Newark Penn Station is a transit hub). And as denoted in the very use of the word "hub"[5] rather than "stop" or "station," train stations and bus stops that do not connect other forms of transportation are not "public transportation hubs."

Thus, there is no question that some places in Plaintiffs' allegations—such as Newark Penn Station, Hoboken Station, and Secaucus Junction—are public transit hubs. And there is no question that other places in their other allegations are not: A stop along the PATCO line, like Ashland Station, D.E. 8-4 ¶ 13, is not a public transit hub. Neither is Farley State Marina, *see id.* ¶ 11, where no record evidence suggests the presence of any public transportation. The State also reiterates that there is no vagueness claim against Section 7(a)(20), and that even if there are questions at the margins as to whether any particular facility falls under Section 7(a)(20)—which, on this record, there is not—that does not make the provision itself unconstitutionally vague. *See* PI Br. at 77-78 (collecting cases).

---

[5] American Heritage dictionary defines "hub" as a "center of activity or interest; a focal point." https://ahdictionary.com/word/search.html?q=hub.

5. State Defendants wish to clarify the social science record, which is relevant to the Court's analysis at this juncture. because a PI motion always requires weighing the balance of the harms and the public interest, regardless of whether the merits analysis requires the same. *See Baird v. Bonta*, No. 19-cv-00617, 2022 WL 17542432, at *8 (E.D. Cal. Dec. 8, 2022) (noting *Bruen*'s test of Second Amendment merits did not abrogate PI equitable factors). That analysis applies not only to the sensitive places restrictions, but also to the challenge to Chapter 131's permitting procedures, which ensure New Jersey's post-*Bruen* shall-issue regime sets appropriate standards for who may publicly carry.

On both counts, the numerous epidemiological studies that the State submitted into the record support the public interest in denying a PI. Those studies show that when a state switches from a "may-issue" to a "shall-issue" regime—and not just when a state switches from shall-issue to permitless carry—firearm violent crime increases substantially. For example, J. Donohue *et al.* (2022) (D.E. 90-43) shows that when a state relaxes handgun carry permit requirements, firearm violent crime increases by 29%. *Id.* at 3; *see also id.* at 12 (defining methodology as comparing may-issue and no-carry jurisdictions with shall-carry and permitless carry jurisdictions). That conclusion is supported by other studies in the record. *See* J. Donohue *et al.* (2019) (D.E. 90-90-45) (ten years after adoption, shall-issue permit regime resulted in 13-15% increase in aggregate violent crime rate); M. Siegel *et al.* (2017) (D.E. 90-46) (shall-issue regimes significantly associated with 6.5% higher homicide rates than may-issue regimes, after accounting for relevant controls); D. Hemenway *et al.* (2017) (D.E. 90-42) (among gun owners, those who carry guns are over

three times more likely to have gun stolen); A.J. Benjamin Jr. *et al.* (2018) (D.E. 90-40) (meta-analysis of 78 independent studies showing that mere presence of weapons increases aggression and hostile appraisals); Donohue (2019) (D.E. 90-45) at 203-06 (collecting studies supporting increased "likelihood a generally law-abiding citizen will commit a crime or increase[e] the criminal behavior of others" when states adopt shall-issue laws). Thus, these studies underscore the state's interest in firearms prohibitions at sensitive places like entertainment venues, hospitals, airports, and public assemblies, where shootings or display of firearms—even if accidental—would create chaos and mass panic. *See, e.g.*, Donohue (2019) (D.E. 90-45) at 211-12 (illustrating decreased police ability to effectively respond to violent incidents at crowded venues when there are "multiple gun carriers" present). And they similarly support the State's interest in setting appropriate standards in a shall-issue permitting system. *See* Ch. 131, §§ 2, 3.

The above findings are consistent with the John Hopkins study that the Legislature cited in Chapter 131's preamble; all support the general proposition that "more guns on the street can translate into more acts of gun violence." *See* Ch. 131 § 1(c). Further, while that study focused on the difference in gun violence in shall-issue and permitless carry jurisdictions, it certainly supports the Legislature's finding regarding the importance of taking steps "to better ensure that those who exercise the right to carry are responsible, law-abiding, and appropriately trained individuals who would not pose undue safety risks if armed in public places" *Id.* Chapter 131 does exactly that through strengthening permitting requirements, mandating training, and setting safe-carry rules. *See* Ch. 131 §§ 2, 3, 5, 6.

6. Although Plaintiffs argue that the presence of security at legislative assemblies, courthouses, and polling places in the 18th century justified restricting firearms at those places, they have presented no record evidence that police protection was ubiquitous or extensive at those locations historically. Moreover, Plaintiffs' position on the security rationale *justifies* a number of the Chapter 131 locations challenged, such as stadiums, airports, transit hubs, and many permitted gatherings,[6] which either have comprehensive security, or at the very least, security assessments that are likely no less comprehensive than the level present in 18th century government buildings.

7. Whether or not an act of self-defense is covered by liability insurance does not bear on the question of whether an individual is in compliance with Chapter 131, Section 4. That section only requires that the gun owner *possess* a liability policy that covers loss from "bodily injury, death, and property damage"; the question of whether any particular gun-related injury is *covered* by the policy is an insurance law question that may be litigated between the insured and insurer after an incident occurs. As the State has argued, the requirement of obtaining liability insurance does not burden Second Amendment rights. *See* PI Br. 72. The scope of insurers' contractual obligations regarding claims arising from particular incidents is even further removed from a Second Amendment inquiry.

---

[6] For examples of municipal ordinances that assess risk and the need for security at gatherings for which a permit is required, *see* Burlington Twp. Mun. Code § 243-4; Camden Mun. Code § 716-9; City of Asbury Park Mun. Code § 4-10.4; Fair Lawn Mun. Code § 205-3; Newark Mun. Code § 5:10-4; Paterson Mun. Code § 355-4; Readington Mun. Code § 201-2.

8.  Plaintiffs fail to respond to the ample historical basis for Chapter 131's permitting fees. *See* PI Br. 84-85 (demonstrating inflation alone justifies current fee in relation to either the 1970 amount or amounts set in 19th century analogues). Their sole response at oral argument appears to be that the deposit of the $50 portion of the $200 carry permit fee into the VCCO account in the State Treasury somehow violates their constitutional rights. But the mere fact that the funds are *deposited* into a particular account of the overall State Treasury is constitutionally irrelevant. As long as the "*purpose* of charging the fee is limited to defraying expenses incurred in furtherance of a legitimate state interest," there is no constitutional problem. *Ne. Ohio Coal. for the Homeless v. City of Cleveland*, 105 F.3d 1107, 1110 (6th Cir. 1997) (emphasis added). And here, Chapter 131 confirms that all components of the fee are to "defray" the costs of issuance, Ch.131, § 3(c), including inflation and technological upgrades provided by the State. Ch. 131, §§ 1(i), 2(h), 3(d).

        Respectfully submitted,
        MATTHEW J. PLATKIN
        ATTORNEY GENERAL OF NEW JERSEY

        By:  /s/  Angela Cai
            Angela Cai
            Deputy Solicitor General

cc:    All counsel via ECF