

Cullen and Dykman LLP
Continental Plaza
433 Hackensack Avenue
Hackensack, NJ 07601
T: 201.488.1300
F: 201.488.6541

LEON J. SOKOL
PARTNER
lsokol@cullenllp.com

March 27, 2023

Hon. Renee Marie Bumb, U.S.D.J.
United States District Court
District of New Jersey
Mitchell H. Cohen Building & U.S. Courthouse
Camden, NJ 08101

**RE:  Ronald Koons, et al v. William Reynolds, et al**
      **Civil No. 22-7464 (RMB/EAP)**

Dear Judge Bumb:

As you are aware, this office represents Defendants-Intervenors Senate President Nicholas P. Scutari and New Jersey General Assembly Speaker Craig J. Coughlin (hereafter collectively "the Presiding Officers"). Please accept this supplemental letter-brief, in lieu of a more formal submission, in further support of the Presiding Officers' opposition to Plaintiffs' motion for a preliminary injunction.  This supplemental letter-brief is being submitted pursuant to leave granted by Your Honor at the March 17 preliminary injunction hearing.

By this supplemental brief we address the following two distinct issues that were raised at oral argument: (1) the existence of substantial scholarly research that strongly supports the conclusion that the issuance of preliminary injunctive relief in this matter increases "the

Hon. Renee Marie Bumb, U.S.D.J.
March 27, 2023
Page 2

possibility of harm to other interested persons," *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir 2017); and (2) the import of counsel for the *Koons* Plaintiffs' statement at oral argument that "the defining characteristic of all … [of the sensitive] places [recognized in *Bruen*] is that there is some level of security present and a restriction on entry." T14:18 to 14:20. Each of these issues is addressed in turn.

**A. Substantial scholarly research strongly supports the conclusion that the issuance of preliminary injunctive relief in this matter would increase "the possibility of harm to other interested persons" and would be antithetical to the public interest.**

At the outset we briefly address a colloquy that occurred at the March 17 oral argument between the Court and counsel for the Presiding Officers. The Court noted that the Legislature – in Section 1 of Chapter 131 – relied upon "the Johns Hopkins study" for the proposition that "more guns on the street can translate into more acts of gun violence." L. 2022, c. 131, §1. The Court observed that "the Johns Hopkins study dealt with a "shall issue" [state] to a permitless state"… which is not what we have here." T 150:20 to 150:23. The Court was referring to the fact that Chapter 131 had the effect of altering New Jersey's legal regime from a "may issue" state to a "shall issue" state.

The Court is correct that the Johns Hopkins study focused on states that adopted permitless concealed carry weapons (CCW) laws. However, the study critically found that "[p]rior research has found a relationship between state level gun prevalence and OIS [*i.e.*, Officer Involved Shooting] victimization." Johns Hopkins Study, at 381. The study further

stated that "[o]ur findings are consistent with the theory that expanded access to firearms through lower restrictions for concealed carry increases both fatal and nonfatal OIS incidents." *Ibid*. These statements (among others) contained in the Johns Hopkins study lend support to the Legislature's express citation to the Johns Hopkins study (in Chapter 131, §1) as supporting the broad legislative finding that "[s]tatistics show that expanding handgun carrying creates safety risks, helping to fuel the epidemic of gun violence." L. 2022, c. 131, §1.

\*\*\*

In our principal brief, we pointed to two peer-reviewed studies that established a link between the relaxation of state gun laws and an increase in gun violence. Both studies were produced by researchers at Johns Hopkins University. *See* Mitchell L. Doucette, et al, *Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020*, Journal of Urban Health, volume 99, at 373–384 (2022), available at https://link.springer.com/article/10.1007/s11524-022-00627-5 (hereafter referred to as "the JUH study");[1] Mitchell L Doucette, et al, *Impact of Changes to Concealed Carry Weapons Laws on Fatal and Nonfatal Violent Crime, 1980-2019*, Am.

---

[1] The JUH study was previously referred to in this brief as the "Johns Hopkins study." Because we rely on two separate studies that were produced by researchers at Johns Hopkins University, we henceforth refer to this study as the JUH study in order to distinguish this study from the other Johns Hopkins study.

Hon. Renee Marie Bumb, U.S.D.J.
March 27, 2023
Page 4

J. Epidemiology, Sep. 14, 2022, available at https://pubmed.ncbi.nlm.nih.gov/36104849 (hereafter referred to as the "AJE study")

The two studies are complementary. The JUH study focused on states that adopted permitless CCW laws. The AJE study focused on states that adopted shall-carry CCW laws. Both studies produced comparable findings.

The JUH study found that the estimated average rate of officer-involved shootings increased by 12.9 percent in ten U.S. states that adopted permitless CCW laws. The AJE study found that "states that adopted Shall-Issue concealed-carry law were "associated with a 9.5% increase in rates of assaults with firearms during the first 10-years post-law adoption and associated with an 8.8% increase in rates of homicides by other means." Both studies lend support to the Legislature's finding (contained in L. 2022, c. 131) that "[the] evidence demonstrates that more guns on the streets can translate into more acts of gun violence." L. 2022, c. 131, §1.

Numerous other studies further buttress this conclusion. For example, a study published in the American Journal of Public Health (hereafter the AJPH study") focused on states that adopted shall-issue CCW laws. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5678379/pdf (Michael Siegel, et al, *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 127 Am. J. Pub. Health 1923-29 (Dec. 2017)). The AJPH study "examine[d] the

relation of "shall-issue" laws in which permits must be issued if requisite criteria are met; "may-issue" laws, which give law enforcement officials wide discretion over whether to issue concealed firearm carry permits or not; and homicide rates." *Id.* at 1023. The study concluded that "shall-issue laws were significantly associated with 6.5% higher total homicide rates, 8.6% higher firearm homicide rates, and 10.6% higher handgun homicide rates." *Ibid.*

Similarly, a study published in the Journal of Empirical Legal Studies (hereafter "the JELS study") also focused on states that adopted "shall issue" CCW laws. *See* https://onlinelibrary.wiley.com/doi/abs/10.1111/jels.12219 (John J. Donohue, et al, *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198-247 (April 2017)). The study concluded:

> Our synthetic control approach also finds that RTC laws [i.e., "shall issue" CCW laws] are associated with **13–15 percent higher aggregate violent crime rates** 10 years after adoption. Using a consensus estimate of the elasticity of crime with respect to incarceration of 0.15, the average RTC state would need to roughly double its prison population to offset the increase in violent crime caused by RTC adoption. [*Id.* at 198]

All of these studies lend substantial support to the Legislature's conclusion "that more guns on the streets can translate into more acts of gun violence." L. 2022, c. 131, §1. The conclusion to be drawn is that New Jersey's transition from a may-carry state to a shall-carry

Hon. Renee Marie Bumb, U.S.D.J.
March 27, 2023
Page 6

state will result in more guns on the street which, in turn, will result in more acts of gun-related violence that will cause injury or death. [2]

In sum, substantial scholarly research strongly supports the conclusion that the issuance of preliminary injunctive relief in this matter would increase "the possibility of harm to other interested persons" and would be antithetical to the public interest. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir 2017).   When these interests are balanced against the interests of Plaintiffs in carrying their firearms in certain places designated as "sensitive" by the Legislature during the pendency of this litigation, it is respectfully submitted that the hardships and equities strongly weigh in favor of preventing additional likely gun-related violence during the pendency of this litigation. For this reason (among others), Plaintiffs' motion for a preliminary injunction should be denied.

**B. The *Koons* Plaintiffs' statement at oral argument (that "the defining characteristic of all … [of the sensitive] places [recognized in *Bruen*] is that there is some level of security present and a restriction on entry") lends further support to the Presiding**

---

[2] As applied to the issues that are before the court on Plaintiffs' motion for a preliminary injunction, the import of the above-cited studies may be succinctly stated. Whether more guns on the street results in more acts of gun violence will depend on many factors, including but not limited to whether Chapter 131 is allowed to take full effect -- and thereby limit gun carrying in sensitive places, including places: (1) that are especially prone to acts of gun violence, such as locations where alcoholic beverages are sold; and (2) that contain high population density (such as stadiums and arenas) in which there is the greatest risk of multiple injuries or deaths from acts of gun violence. Conversely, if Chapter 131's sensitive place designations were to be enjoined in part by this Court, the number of guns that may be legally carried in the above-referenced locations will likely increase.  In turn, this likely outcome will lead to more acts of gun- related violence that will cause injury or death.

**Officers' argument that the Court in *Bruen* intended a location's population density as a foundational factor as applied to a sensitive place designation**

In *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S.Ct. 2111 (2022), the Supreme Court recognized a flexible "analogic approach" to the challenge of applying the dictates of the Second Amendment to contemporary society. The Court also determined that "central considerations when engaging in an analogical inquiry" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. The Court identified two metrics to guide the analogic inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Ibid.*

Against this backdrop, counsel for the *Koons* Plaintiffs stated at oral argument that "the defining characteristic of all … [of the sensitive] places [recognized in *Bruen*] is that there is some level of security present and a restriction on entry." T14:18 to 14:20, which justifies the designation of some but not all the sensitive places in Ch. 131. Additionally, these factors arise by operation of the *Bruen* text itself (rather than strictly by operation of specific historical analogues to sensitive place laws of the 18th and 19th centuries). We are gratified that counsel for the *Koons* Plaintiffs is in full accord with the Presiding Officers with respect to this critical point.

Applying *Bruen*, the "how and why the regulations burden a law-abiding citizen's right

to armed self-defense" is that the regulation is no burden at all to the law-abiding citizen. In a densely populated stadiums, arenas or indoor entertainment venues (wherein, to use counsel's words, "there is some level of security present and a restriction on entry"), the law-abiding citizen is safer relying on a highly trained police presence for protection in a designated gun-free venue rather than relying on his or her firearm in a venue that may be awash in firearms held by other attendees. Therefore, armed self-defense in a densely populated venue is not safe – not to the civilian with the permitted firearm, not to bystanders and not to the police. Hence, there is no "burden" to a law-abiding citizen when a stadium, arena or other entertainment venue is a designated a sensitive place in which the carrying of firearms is prohibited.

In short, the *Koons* Plaintiffs' statement at oral argument lends further support to the Presiding Officers' argument that the Court in *Bruen* intended a location's population density as a foundational factor as applied to a sensitive place designation.

> Respectfully submitted,
> Cullen and Dykman LLP
>
> By:*/s/ Leon J. Sokol*
>     Leon J. Sokol
>
> Kologi ◆ Simitz,
> Counsellors at Law
>
> By:*/s/ Edward J. Kologi*
>     Edward J. Kologi

Hon. Renee Marie Bumb, U.S.D.J.
March 27, 2023
Page 9

Cc: Angela Cai, Deputy Solicitor General
Daniel L. Schmutter, Esq.
David Jensen, Esq.